# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| **THE CITY OF PHILADELPHIA,** | |
| *Plaintiff*, | |
| **v.** | **Case No. 2:17-cv-03894-MMB** |
| **JEFF SESSIONS, in his official capacity as Attorney General of the United States,** | |
| *Defendant.* | |

## MEMORANDUM IN OPPOSITION TO
## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

DATED:  October 12, 2017

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

LOUIS D. LAPPEN
Acting United States Attorney

JOHN R. TYLER
Assistant Director

ARJUN GARG
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave, NW
Washington, DC 20530
Phone: (202) 305-8613
Fax: (202) 616-8470
E-Mail: arjun.garg@usdoj.gov

*Counsel for Defendant*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

BACKGROUND .................................................................................................. 4

    A.  The Immigration and Nationality Act ................................................4

    B.  The Office of Justice Programs and the Byrne JAG Program....................................6

    C.  The Byrne JAG Grant-Making Process.....................................................7

    D.  Conditions on Byrne JAG Awards ................................................................8

    E.  Additional Conditions for FY 2017 Byrne JAG Awards ...........................................9

    F.  Recent Developments ................................................................10

LEGAL STANDARD ......................................................................................... 11

ARGUMENT .................................................................................................... 12

    I.  The City Is Unlikely to Succeed on the Merits of Its Claims. .......................................... 12

    A.  Federal Statutes Authorize Imposition of the Conditions. ........................................12

    B.  The City Is Unlikely to Succeed on Its Separation of Powers Claim.......................21

    C.  The City Is Unlikely to Succeed on Its Arbitrary and Capricious Claim.................23

    D.  The Conditions Are Consistent with the Spending Clause. .....................................27

    E.  The Court Should Decline the City's Request for a Declaration That It Complies with 8 U.S.C. § 1373. ...........................................................33

    II.  The City Fails to Establish That It Will Suffer Irreparable Harm Absent a Preliminary Injunction. ........................................................... 45

    III. The Public Interest and the Balance of the Equities Militate Against a Preliminary Injunction. ................................................................ 48

CONCLUSION ................................................................................................ 50

# TABLE OF AUTHORITIES

CASES

*A. O. Smith Corp. v. FTC*,
  530 F.2d 515 (3d Cir. 1976) ................................................................................ 47

*A.W. v. Jersey City Pub. Sch.*,
  341 F.3d 234 (3d Cir. 2003) ......................................................................... 28, 44

*Adams v. Freedom Forge Corp.*,
  204 F.3d 475 (3d Cir. 2000) .................................................................... 45, 46, 48

*Allen v. DeBello*,
  861 F.3d 433 (3d Cir. 2017) ................................................................................ 36

*Ameron, Inc. v. U.S. Army Corps of Eng'rs*,
  809 F.2d 979 (3d Cir. 1986) ................................................................................ 21

*Arizona v. United States*,
  567 U.S. 387 (2012) ................................................................................... *passim*

*Ashcroft v. Mattis*,
  431 U.S. 171 (1977) ...................................................................................... 35, 36

*Barbour v. Wash. Metro. Area Transit Auth.*,
  374 F.3d 1161 (D.C. Cir. 2004) .......................................................................... 29

*Bennett v. Spear*,
  520 U.S. 154 (1997) ............................................................................................ 24

*Bennett Enters., Inc. v. Domino's Pizza, Inc.*,
  45 F.3d 493 (D.C. Cir. 1995) .............................................................................. 18

*Calderon v. Ashmus*,
  523 U.S. 740 (1998) ............................................................................................ 35

*Campbell Soup Co. v. ConAgra, Inc.*,
  977 F.2d 86 (3d Cir. 1992) ................................................................................. 45

*Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*,
  566 U.S. 399 (2012) ............................................................................................ 20

*Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*,
  511 U.S. 164 (1994) ............................................................................................ 20

*Charles v. Verhagen*,
  348 F.3d 601 (7th Cir. 2003) .............................................................................. 28

*City of Chicago v. Sessions,*
   --- F. Supp. 3d ----, 2017 WL 4081821 (N.D. Ill. Sept. 15, 2017) ...................... 10, 11, 45, 46

*City of New York v. United States,*
   179 F.3d 29 (2d Cir. 1999) ............................................................................................ 43, 44

*Clinton v. City of New York,*
   524 U.S. 417 (1998) .............................................................................................................. 21

*ConverDyn v. Moniz,*
   68 F. Supp. 3d 34 (D.D.C. 2014) ....................................................................................... 47, 48

*Cornish v. Dudas,*
   540 F. Supp. 2d 61 (D.D.C. 2008) ......................................................................................... 48

*Dean v. United States,*
   556 U.S. 568 (2009) .............................................................................................................. 38

*Dep't of Treasury v. Fed. Labor Relations Auth.,*
   494 U.S. 922 (1990) .............................................................................................................. 18

*Diamond v. Chakrabarty,*
   447 U.S. 303 (1980) .............................................................................................................. 33

*DKT Mem'l Fund Ltd. v. AID,*
   887 F.2d 275 (D.C. Cir. 1989) .......................................................................................... 2, 21

*Disabled in Action of Pa. v. Se. Pa. Transp. Auth.,*
   539 F.3d 199 (3d Cir. 2008) ................................................................................................. 14

*FCC v. Fox Television Stations, Inc.,*
   556 U.S. 502 (2009) ........................................................................................................ 25, 26

*Ferring Pharm., Inc. v. Watson Pharm., Inc.,*
   765 F.3d 205 (3d Cir. 2014) ................................................................................................. 11

*Freilich v. Bd. of Directors,*
   142 F. Supp. 2d 679 (D. Md. 2001) ...................................................................................... 43

*FTC v. Standard Oil Co.,*
   449 U.S. 232 (1980) .............................................................................................................. 24

*Fullilove v. Klutznick,*
   448 U.S. 448 (1980) .............................................................................................................. 49

*Geisenger Cmty. Med. Ctr. v. Sec'y, U.S. Dep't of Health & Human Servs.*,
   794 F.3d 383 (3d Cir. 2015)..................................................................................32

*Gregory v. Ashcroft*,
   501 U.S. 452 (1991)...........................................................................................42

*Harris Cty. Texas v. MERSCORP Inc.*,
   791 F.3d 545 (5th Cir. 2015) ..........................................................................36, 37

*Hearst Radio, Inc. v. FCC*,
   167 F.2d 225 (D.C. Cir. 1948)............................................................................23

*Invention Submission Corp. v. Rogan*,
   357 F.3d 452 (4th Cir. 2004) .............................................................................23

*Jama v. ICE*,
   543 U.S. 335 (2005)...........................................................................................22

*Kingdomware Techs., Inc. v. United States*,
   136 S. Ct. 1969 (2016)........................................................................................22

*Knick v. Twp. of Scott*,
   862 F.3d 310 (3d Cir. 2017)................................................................................42

*Koslow v. Pennsylvania*,
   302 F.3d 161 (3d Cir. 2002)....................................................................3, 28, 30

*Landon v. Plasencia*,
   459 U.S. 21 (1982).............................................................................................49

*Langbord v. U.S. Dep't of Treasury*,
   832 F.3d 170 (3d Cir. 2016)................................................................................14

*Lockhart v. United States*,
   546 U.S. 142 (2005)...........................................................................................20

*Mayweathers v. Newland*,
   314 F.3d 1062 (9th Cir. 2002) .......................................................................28, 29

*N. Arapaho Tribe v. Burwell*,
   90 F. Supp. 3d 1238 (D. Wyo. 2015)..................................................................48

*Naik v. Dir. U.S. Citizenship & Immigration Servs. Vt.*,
   575 F. App'x 88 (3d Cir. 2014) ......................................................................23, 25

*Nashville, Chattanooga. & St. Louis Ry. v. Browning*,
    310 U.S. 362 (1940)..................................................................37

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012)........................................................42, 46, 47

*New York v. United States*,
    505 U.S. 144 (1992)........................................................28, 44, 45

*Nken v. Holder*,
    556 U.S. 418 (2009)..................................................................48

*Ocean Cty. Landfill Corp. v. U.S. E.P.A., Region II*,
    631 F.3d 652 (3d Cir. 2011)..................................................23, 24

*Phik Ha Lie v. Attorney Gen.*,
    349 F. App'x 706 (3d Cir. 2009) ..............................................14

*Printz v. United States*,
    521 U.S. 898 (1997)..................................................................43

*Real Alternatives, Inc. v. Sec'y Dep't of Health & Human Servs.*,
    867 F.3d 338 (3d Cir. 2017)......................................................25

*Reifer v. Westport Ins. Corp.*,
    751 F.3d 129 (3d Cir. 2014)................................................34, 35

*Reilly v. City of Harrisburg*,
    858 F.3d 173 (3d Cir. 2017)................................................11, 12

*Reno v. Condon*,
    528 U.S. 141 (2000)..................................................................42

*Rossi v. Procter & Gamble Co.*,
    597 F. App'x 69, 71 (3d Cir. 2015) ..........................................46

*South Dakota v. Dole*,
    483 U.S. 203 (1987)............................................................*passim*

*Steffel v. Thompson*,
    415 U.S. 452 (1974)..................................................................35

*Stone v. INS*,
    514 U.S. 386 (1995)..................................................................16

*Train v. City of New York*,
    420 U.S. 35 (1975)..............................................................................22

*U.S. Dep't of Health & Human Servs. v. Fed. Labor Relations Auth.*,
    844 F.2d 1087 (4th Cir. 1988) ...........................................................18

*U.S. ex rel. Kovalev v. Ashcroft*,
    223 F. Supp. 2d 688 (E.D. Pa. 2002) .................................................49

*United Savings Ass'n v. Timbers of Inwood Forest Assocs.*,
    484 U.S. 365 (1988)...........................................................................39

*United States v. Craft*,
    535 U.S. 274 (2002)...........................................................................20

*United States v. Odneal*,
    565 F.2d 598 (9th Cir. 1977) .............................................................18

*United States v. Wise*,
    370 U.S. 405 (1962)...........................................................................20

*Wilton v. Seven Falls Co.*,
    515 U.S. 277 (1995)...........................................................................34

*Winter v. Nat. Res. Def. Council*,
    555 U.S. 7 (2008).................................................................11, 46, 48

*Zuber v. Allen*,
    396 U.S. 168 (1969)...........................................................................20

## CONSTITUTION

U.S. Const. art. I, § 8, cl. 1...........................................................21, 27

U.S. Const. art. VI, cl. 2....................................................................42

## STATUTES

5 U.S.C. § 553....................................................................................26

5 U.S.C. § 702....................................................................................23

5 U.S.C. § 704..............................................................................2, 3, 23

5 U.S.C. § 706....................................................................................23

8 U.S.C. § 1101 *et seq.*.................................................................................................... 4

8 U.S.C. § 1226 .......................................................................................... 26, 30, 39, 50

8 U.S.C. § 1227 .................................................................................................. 5, 26, 29

8 U.S.C. § 1228 .............................................................................................................. 5

8 U.S.C. § 1231 ............................................................................................................ 30

8 U.S.C. § 1252c ...................................................................................................... 6, 29

8 U.S.C. § 1324 ........................................................................................................ 6, 29

8 U.S.C. § 1357 ................................................................................................... *passim*

8 U.S.C. § 1373 ................................................................................................... *passim*

18 U.S.C. § 1913 .......................................................................................................... 33

28 U.S.C. § 530C ......................................................................................................... 15

28 U.S.C. § 2201 .................................................................................................... 33, 34

31 U.S.C. § 1352 .......................................................................................................... 33

34 U.S.C. § 10101 .................................................................................................... 6, 15

34 U.S.C. § 10102 ............................................................................................... *passim*

34 U.S.C. § 10110 ........................................................................................................ 15

34 U.S.C. §§ 10151-58 .................................................................................................. 6

34 U.S.C. § 10152 ......................................................................................... 6, 7, 22, 29

34 U.S.C. § 10153 ............................................................................................... *passim*

34 U.S.C. § 10154 ..................................................................................................... 7, 24

34 U.S.C. § 10156 ........................................................................................................... 7

34 U.S.C. § 10444 .................................................................................................. 15, 16

41 U.S.C. § 4712 .......................................................................................................... 33

Omnibus Crime Control and Safe Streets Act of 1968,
   Pub. L. No. 90-351, 82 Stat. 197 ............................................................................. 6

Joint Resolution Making Continuing Appropriations for FY 1985,
   Pub. L. No. 98-473, 98 Stat. 1837 (1984) .............................................................. 15

DOJ Reauthorization Act of 2005,
   Pub. L. No. 109-162, 119 Stat. 2960 (2006) .......................................................... 15

Consolidated Appropriations Act, 2017,
   Pub. L. No. 115-31, 131 Stat. 135 ........................................................................... 7

## REGULATIONS

2 C.F.R. § 200.203 ..................................................................................................... 8, 10

2 C.F.R. § 2800.101 ......................................................................................................... 8

8 C.F.R. § 287.5 ............................................................................................................. 49

## LEGISLATIVE MATERIALS

H.R. Rep. No. 104-469, pt. 1 (1996) ...................................................................... 38, 43

H.R. Rep. No. 109-233 (2005) ...................................................................................... 13

S. Rep. No. 104-249 (1996) ..................................................................................... 43, 44

## OTHER

Randy E. Barnett, *The Sound of Silence: Default Rules and Contractual Consent*,
   78 Va. L. Rev. 821 (1992) ...................................................................................... 31

## <u>INTRODUCTION</u>

The Department of Justice distributes federal grant funds to aid law enforcement in jurisdictions throughout the country. These funds serve to aid both local and cooperative law enforcement priorities.  Consistent with federal prerogatives, the Department has long imposed conditions on these grants, including on the Edward Byrne Memorial Justice Assistance Grant Program ("Byrne JAG Program").  If the City's theories in this lawsuit are correct, however, long-standing and never-before-challenged conditions are in jeopardy.

One cooperative priority for the Department is the enforcement of a lawful system of immigration, especially the removal of aliens who have committed crimes in the United States. Accordingly, the Department notified applicants that Fiscal Year ("FY") 2017 Byrne JAG Program grants will include conditions that require modest cooperation with federal law enforcement prerogatives in the immigration setting.  Those conditions will require grant recipients (1) to comply with a federal statute, 8 U.S.C. § 1373, which prohibits state and local government and law enforcement entities or officials from restricting certain communications with the Department of Homeland Security ("DHS") ("the Section 1373 compliance condition"); (2) to ensure that certain federal officials are permitted access to state or local correctional facilities for certain immigration enforcement purposes ("the correctional facility access condition"); and (3) to ensure that certain federal officials are provided advance notice of the scheduled release date of certain individuals held in state or local correctional facilities ("the custody release condition").  *See* Decl. of Alan R. Hanson ("Hanson Decl.") ¶¶ 4-5.

The City has adopted policies that frustrate the federal government's ability to remove criminal aliens from the country.  In addition to avoiding cooperative efforts through its own, local policies, the City now seeks to do the same with respect to federal prerogatives, asking the Court to enjoin the Department from imposing immigration-related law enforcement conditions on the

receipt of *federal dollars*.  The City's position would, in essence, allow the City, not the Department, to determine the conditions associated with a federal grant that Congress has authorized the Department to award.  The City's position contravenes clear statutory language authorizing the Department to condition Byrne JAG funding, and ignores the close relationship between the federally-imposed conditions, federal law enforcement prerogatives, and the purposes of the Byrne JAG Program.  For these reasons and others, the City has not carried its burden to establish a compelling basis for preliminary injunctive relief against the Department.

The City is unlikely to succeed on the merits of the claims asserted in its motion.  Congress has expressly authorized the Assistant Attorney General ("AAG") for DOJ's Office of Justice Programs ("OJP") to impose the challenged conditions.  In the very same enactment in 2006 that created the Byrne JAG Program, Congress delegated to the AAG authority to "plac[e] special conditions on all grants," and to "determin[e] priority purposes for formula grants."  34 U.S.C. § 10102(a)(6).  With respect to 8 U.S.C. § 1373 in particular, the City is independently required to comply with federal law (including Section 1373) regardless of whether it accepts federal grant funding, and, in any event, Congress has separately authorized the Department to require grantees in the Byrne JAG Program to comply with "all . . . applicable Federal laws," of which Section 1373 is one.  *Id*. § 10153(a)(5)(D); *see also* OJP Guidance Regarding Compliance with 8 U.S.C. § 1373 (Dkt. No. 1-12).  The Department thus has ample authority to impose the challenged conditions, and their imposition does not violate the constitutional separation of powers.  *See DKT Mem'l Fund Ltd. v. AID*, 887 F.2d 275, 280-81 (D.C. Cir. 1989) (upholding statutory delegation to the Executive to impose terms and conditions on federal spending programs).

The City's claim under the Administrative Procedure Act that the conditions are arbitrary and capricious fails as a threshold matter because judicial review is not available in the absence of

final agency action.  *See* 5 U.S.C. § 704.  Even if there were final agency action to review, the conditions comfortably satisfy the "arbitrary and capricious" standard because their promotion of immigration enforcement undoubtedly intersects with the criminal justice purposes of the Byrne JAG Program.

The City also is unlikely to succeed on its Spending Clause challenge.  The Byrne JAG Program and the challenged conditions bear "a discernible relationship," and thus meet the relatedness requirement of the Spending Clause.  *Koslow v. Commonwealth of Pennsylvania*, 302 F.3d 161, 175 (3d Cir. 2002).  OJP and the grant programs it administers are designed to strengthen law enforcement and to "maintain liaison" among the various branches of government "in matters relating to criminal justice."  34 U.S.C. § 10102(a)(2).  The challenged conditions emanate from "the Department of Justice's top priority of reducing violent crime" and the "long-established cooperative principles among law enforcement agencies." *See, e.g.*, DOJ Press Release No. 17-826, *Attorney General Sessions Announces Immigration Compliance Requirements for Edward Byrne Memorial Justice Assistance Grant Programs* (July 25, 2017).[1]   And the purported ambiguities that the City claims exist in the conditions are illusory.

Additionally, the City's request for a declaration that it complies with Section 1373 is unlikely to succeed.  The Court in the first instance should exercise its discretion to decline jurisdiction over that request for declaratory relief—especially at this preliminary stage of proceedings—where the requested declaration would not in fact absolve the City of legal jeopardy, the parties are in the midst of an administrative process that may narrow or sharpen any points of concrete dispute regarding the City's compliance, and the City lacks a cause of action.  If the Court were to reach the request for declaratory relief, the City's claim is unlikely to succeed because

---

[1]      The cited press release is available at https://www.justice.gov/opa/pr/attorney-general-sessions-announces-immigration-compliance-requirements-edward-byrne-memorial.

multiple of the City's policies do or potentially do improperly restrict information-sharing in violation of Section 1373.

The City likewise fails to establish the irreparable harm needed for preliminary relief, as the harm it alleges is neither immediate nor substantial. The City faces no immediate deadline for consenting to the challenged conditions, because the Department has not issued grant award documents to the City, and at present the Department is enjoined from imposing the correctional facility access and custody release conditions. *See* Hanson Decl. ¶¶ 6-7. Should the City receive award documents, it will still have at least 45 days to review them and the specific grant conditions therein, before determining whether to accept or reject the funding. Moreover, the funding at issue amounts to less than one tenth of one percent of the City's budget, and the City's uncertainty in that regard does not establish the irreparable harm needed for preliminary relief.

The public interest and the balance of equities also militate against preliminary relief. The United States has an interest in enforcing federal law, including the effective enforcement of the immigration laws. The challenged conditions are designed to promote those interests and to effectuate the Department's mission of reducing crime and illegality and promoting law enforcement cooperation. *See generally* Decl. of Jim Brown ("Brown Decl."). Those interests far outweigh the City's speculative allegations of public harm.

For all of these reasons, and as discussed in more detail below, the Court should deny the City's motion for a preliminary injunction.

## **BACKGROUND**

### A.     **The Immigration and Nationality Act**

"The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012). Through the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, Congress granted

the Executive Branch significant authority to control the entry, movement, and other conduct of foreign nationals in the United States.  The INA authorizes the Department of Homeland Security, the Department of Justice, and other Executive Branch agencies to administer and enforce the immigration laws.  Likewise, the INA accords the Executive Branch considerable discretion to direct enforcement pursuant to federal policy objectives.  *See Arizona*, 567 U.S. at 396.

The INA includes several provisions that protect the ability of federal officials to investigate the status of non-citizens in the United States and otherwise enforce the immigration laws.  For example, the statute provides that a federal immigration officer "shall have power without warrant . . . to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States." 8 U.S.C. § 1357(a)(1).  Separately, pursuant to 8 U.S.C. § 1373, "a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual." *Id*. § 1373(a).[2]  The INA provides that certain classes of non-citizens, including certain criminal aliens, shall be removed from the United States upon the order of the Attorney General or the Secretary of Homeland Security.  *See*, *e.g.*, *id.* §§ 1227(a), 1228.

The INA also establishes immigration enforcement as a cooperative endeavor among federal, state, and local law enforcement agencies.  *See, e.g.*, *id*. § 1357(g) (providing that DHS may enter into formal cooperative agreements with states and localities under which appropriately

---

[2]    Additionally, 8 U.S.C. § 1373(b) provides that "[n]otwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual: (1) Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service. (2) Maintaining such information. (3) Exchanging such information with any other Federal, State, or local government entity."

trained and qualified state and local officers may perform specified functions of a federal immigration officer in relation to the investigation, apprehension, or detention of aliens); *id*. § 1324(c) (authorizing state and local law enforcement officers to make arrests for violations of the INA's prohibition against smuggling, transporting, or harboring aliens); *id*. § 1252c (authorizing state and local officers to arrest certain felons who have unlawfully returned to the United States); *id*. § 1231(i) (establishing State Criminal Alien Assistance Program, under which federal government compensates states and localities for their incarceration of certain criminal aliens).

### B.     The Office of Justice Programs and the Byrne JAG Program

Title I of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, established the Office of Justice Programs within the Department of Justice, and provides for OJP to be headed by an Assistant Attorney General.  *See* Pub. L. No. 90-351, 82 Stat. 197, *codified as amended at* 34 U.S.C. § 10101 *et seq*.  Congress provided the AAG certain "[s]pecific, general and delegated powers," including the power to "publish and disseminate information on the conditions and progress of the criminal justice systems" and "maintain liaison with the executive and judicial branches of the Federal and State governments in matters relating to criminal justice." *Id.* §§ 10102(a)(1), (2).  The AAG shall also "exercise such other powers and functions as may be vested in [him] pursuant to this chapter or by delegation of the Attorney General, *including placing special conditions on all grants, and determining priority purposes for formula grants*." *Id*. § 10102(a)(6) (emphasis added).

The same title of the Omnibus Crime Control Act also established the Byrne JAG Program. *See generally* 34 U.S.C. §§ 10151-58.  Under this program, OJP is authorized to –

> make grants to States and units of local government . . . to provide additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for criminal justice, including for any one or more of [certain enumerated] programs.

*Id.* § 10152(a)(1).  In the same chapter, the Omnibus Crime Control Act defines "criminal justice" broadly.  *Id.* § 10251(a)(1).

To request funds under the Byrne JAG Program, applicants must "submit an application to the Attorney General . . . in such form as the Attorney General may require." *Id.* § 10153(a). Congress provided that these applications must include, among other things, an "assurance that, for each fiscal year covered by an application, the applicant shall maintain and report such *data*, records, *and information (programmatic and financial) as the Attorney General may reasonably require*"; "[a] certification, made in a form *acceptable to the Attorney General*, . . . that . . . there has been *appropriate coordination with affected agencies*;" and "[a] certification, made in a form acceptable to the Attorney General, . . . that . . . the applicant will comply with all provisions of this part and *all other applicable Federal laws*." *Id*. § 10153(a)(4), (5) (emphases added).  Before issuing a final disapproval of an application under the Byrne JAG Program, the Attorney General must "first afford[] the applicant reasonable notice of any deficiencies in the application and opportunity for correction and reconsideration." *Id.* § 10154.

The Byrne JAG Program is a formula grant that, when awarded, must follow a statutory formula based on population, the rate of violent crime, and other factors.  *Id*. §§ 10152(a)(1), 10156.  Funding under the Byrne JAG Program is subject to annual appropriations.  For FY 2017, Congress appropriated $396,000,000 for the Byrne JAG Program, with certain carve-outs from that amount obligated to specific initiatives.  *See* Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, Div. B, Title II, 131 Stat. 135, 203.

### C.      The Byrne JAG Grant-Making Process

The federal grant-making process, including the issuance of Byrne JAG Program grants, contains several steps.  The awarding agency typically issues a solicitation that contains "sufficient information to help an applicant make an informed decision about whether to submit an

application."  *See generally* Office of Management and Budget Guidance for Grants and Agreements ("OMB Uniform Guidance"), 2 C.F.R. § 200.203(c)(2);[3] *see also* OJP Grant Process Overview, *available at* https://ojp.gov/funding/Apply/GrantProcess.htm.  Applicants respond to the solicitation by submitting an application in the form specified and with the relevant information requested.  *See generally* OJP Grant Process Overview.  The deadline for local units of government to submit FY 2017 Byrne JAG applications was September 5, 2017.[4]  *See* Byrne JAG Program, FY 2017 Local Solicitation (Dkt. No. 1-16).

For grants administered by OJP and its subcomponents, OJP engages in a multi-factored review of each application and, for those applications that are approved, OJP generates an award package that is transmitted to the applicant.  *See generally* OJP Grant Process Overview.  Applicants typically have 45 calendar days to accept the award documents, during which time the applicant has an opportunity to "[r]eview the special conditions on the award document."  *Id*.  Throughout the course of the grant period, OJP monitors compliance with the terms and conditions of the award and, ultimately, the grantee and OJP engage in certain activities to complete relevant closeout requirements for each award.  *Id.*

D.      **Conditions on Byrne JAG Awards**

OJP has historically included a variety of conditions in Byrne JAG award documents, including, for example, conditions requiring the grantee to comply with regulations pertaining to civil rights and nondiscrimination, conditions requiring that body armor purchased with grant funding meet certain minimum quality standards, and conditions designed to encourage grantees to adopt policies banning employees from text messaging while driving on duty.  These conditions

---

[3]      The Department of Justice has adopted the OMB Uniform Guidance through regulation, with limited exceptions.  *See* 2 C.F.R. § 2800.101.

[4]      Some exceptions to the deadline were made relating to jurisdictions affected by Hurricane Harvey.

have varied over time, depending upon national law enforcement necessities and Department priorities. For FY 2016, the City of Philadelphia's award included fifty-three conditions, all of which were accepted by the City without objections or legal challenges. *See* FY 2016 Byrne JAG Award to Philadelphia (Aug. 23, 2016) ("2016 Philadelphia Award") at 2-13 (Dkt. No. 1-9).

In FY 2016, OJP included for the first time an explicit recognition that Section 1373 was an applicable federal law under the Byrne JAG Program. *Id.* ¶ 53. That recognition was prompted by a memorandum issued by the Department of Justice's Inspector General on May 31, 2016, expressing concern that several state and local governments receiving federal grants may not be complying with Section 1373. *See* Mem. from Michael E. Horowitz, Inspector Gen., to Karol V. Mason, Assistant Att'y Gen., Office of Justice Programs, *Department of Justice Referral of Allegations of Potential Violations of 8 U.S.C. § 1373 by Grant Recipients* (May 31, 2016) (Dkt. No. 1-10).

Although the Inspector General observed that applications of certain local ordinances might be inconsistent with Section 1373, *id.* at 4-8, the report made clear that "no one at DHS . . . has made a formal legal determination whether certain state and local laws or policies violate Section 1373, and we are unaware of any Department of Justice decision in that regard." *Id.* at 8 n.12. From each of ten jurisdictions identified in the report, OJP sought a legal analysis of how the jurisdiction is in compliance with 8 U.S.C. § 1373. *See* DOJ Press Release No. 17-736, *Department of Justice Reviewing Letters from Ten Potential Sanctuary Jurisdictions* (July 6, 2017) (Dkt. No. 1-2). The City provided its analysis in June 2017. *See* Letter from City of Philadelphia (June 22, 2017) (Dkt. No. 1-14).

### E.   Additional Conditions for FY 2017 Byrne JAG Awards

In July 2017, OJP published a solicitation seeking applications from units of local government for participation in the FY 2017 Byrne JAG Program. *See* Byrne JAG Program, FY

2017 Local Solicitation (Dkt. No. 1-16).  That solicitation notified potential applicants that the grant award documents for FY 2017 would contain two new special conditions, in addition to the requirement to certify compliance with 8 U.S.C. § 1373.  *Id*. at 30.  Specifically, OJP notified potential applicants that the correctional facility access condition would be designed to ensure that Byrne JAG Program grantees would permit "personnel of . . . DHS to access any correctional or detention facility in order to meet with an alien . . . and inquire as to his or her right to be or remain in the United States."  *Id*.  OJP further notified potential applicants that the custody release condition would be designed to ensure that Byrne JAG Program grantees would "provide at least 48 hours' advance notice to DHS regarding the scheduled release date and time of an alien in the jurisdiction's custody when DHS requests such notice in order to take custody of the alien pursuant to the [INA]."  *Id*.  The notification contained in the FY 2017 solicitation was not itself a grant condition, akin to those contained in the grant award documents; rather, it was merely a notification designed to "help an applicant make an informed decision about whether to submit an application." 2 C.F.R. § 200.203.

The actual conditions that OJP intends to attach to FY 2017 Byrne JAG awards are viewable in award documents that OJP issued to units of local government on August 23, 2017. *See, e.g.,* Byrne JAG Program Grant Award for County of Greenville, SC ("2017 Greenville Award") (Dkt. No. 21-6).  Those award documents contain the precise text of the conditions that the City has challenged in this lawsuit.  *See id*. ¶¶ 53, 55-56.  The conditions apply only to the "program or activity" to be funded under the award, and allow awarded funds to be used for costs incurred in implementing the conditions.  *See id*.

### F.    Recent Developments

In a challenge brought by the City of Chicago, a federal district court on September 15, 2017 issued a nationwide preliminary injunction against imposition of the correctional facility

access and custody release conditions.  *See City of Chicago v. Sessions*, --- F. Supp. 3d ----, 2017 WL 4081821, at \*14 (N.D. Ill. Sept. 15, 2017).  As to the Section 1373 compliance condition, the *Chicago* court granted no relief "because the City has failed to establish a likelihood of success on the merits" as to that condition.  *Id*.  The Department has appealed that decision, and asked the district court to stay the nationwide application of the preliminary injunction pending resolution of the appeal.  *See* No. 1:17-cv-5720, Dkt. No. 81 (N.D. Ill. Sept. 26, 2017).  That stay application remains pending for the district court's decision as of this filing.

The City of Philadelphia submitted its application for an FY 2017 Byrne JAG award on September 5, 2017.  *See* Hanson Decl. ¶ 5.  OJP has not taken a decision on that application, and at this time is not issuing FY 2017 Byrne JAG award documents to any applicants while awaiting developments in the *Chicago* litigation.  *Id*. ¶¶ 6-7.  In the meantime, OJP has sent the City of Philadelphia a letter containing a "preliminary assessment" of the City's compliance with Section 1373, and requesting the City's response by October 27, 2017 before OJP makes its final determination.  *Id*. ¶ 8 & Ex. A.

## LEGAL STANDARD

Preliminary injunctive relief is an "extraordinary remedy, which should be granted only in limited circumstances."  *Ferring Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014) (citation omitted).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008).  In the Third Circuit, a party seeking a preliminary injunction must first demonstrate that "it can win on the merits" and that "it is more likely than not to suffer irreparable harm in the absence of preliminary relief."  *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017).  Under *Reilly*, "[i]f these gateway

11

factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id*.

## ARGUMENT

I.    **The City Is Unlikely to Succeed on the Merits of Its Claims.**

    A.    **Federal Statutes Authorize Imposition of the Conditions.**

        Congress has expressly authorized the Department to "plac[e] special conditions on all grants" administered by OJP, 34 U.S.C. § 10102(a)(6), to "determin[e] priority purposes for formula grants," *id*., and to ensure that grantees in the Byrne JAG Program "comply with . . . all other applicable Federal laws." *Id*. § 10153(a)(5)(D).   Despite these capacious delegations of authority, the City contends that Congress has not empowered the Department to impose the challenged conditions.   *See* Pl.'s Mem. in Supp. of Mot. for Prelim. Inj. ("Pl.'s Mem.") at 16-29 (Dkt. No. 21-1).[5]   The City is incorrect.

        **1.**    In 34 U.S.C. § 10102, Congress set forth the duties and functions of the Assistant Attorney General (AAG) for the Office of Justice Programs (OJP), which administers the Byrne JAG Program.   Within that section, Congress stated that the AAG is to "exercise such other powers and functions as may be vested in the Assistant Attorney General pursuant to this chapter or by delegation of the Attorney General, including placing special conditions on all grants, and determining priority purposes for formula grants." 34 U.S.C. § 10102(a)(6).   A plain reading of the statutory language indicates that the AAG's power must *include*, at a minimum, the power to "plac[e] special conditions on all grants" administered by OJP.   The breadth of the AAG's statutory

---

[5]    To the extent that the City couches this theory as a claim under the Administrative Procedure Act, judicial review under that statute is not available because the Department has not taken any final agency action with respect to the City in connection with an FY 2017 Byrne JAG award. *See infra* Part I.B.1.

power is reinforced by the AAG's authority to "determin[e] priority purposes for formula grants." *Id*.  Confirming what is plain on the face of the statute, a report accompanying the enactment of this language stated that the provision "allows the Assistant Attorney General to place special conditions on all grants and to determine priority purposes for formula grants."  H.R. Rep. 109-233, at 101 (2005).

The challenged conditions come comfortably within these fonts of delegated power. Pursuant to this authority, the AAG may prioritize formula grants, like the Byrne JAG Program, for jurisdictions that assist federal authorities in achieving federal law enforcement priorities, including removal of criminal aliens under immigration law.

Apart from the conditions that the City challenges here, under the Department's authority Byrne JAG awards have historically contained various discretionary conditions that are not compelled by any federal law, but promote the Department's law enforcement and public safety goals.  The Department has, for example, imposed a condition that requires complying with certain guidelines and recommendations enumerated by the Department to "promote information sharing and enable interoperability among disparate systems across the justice and public safety community."  2016 Philadelphia Award ¶ 26.   Another condition has prohibited the use of award funds to purchase various types of equipment and weapons that are listed on a Prohibited Expenditure List,[6] which list in turn traces back in significant part not to any statute or regulation but to an Executive Order.  *See id*. ¶ 49.  Multiple conditions have also imposed training mandates: certain training must be completed for law enforcement task forces, *see id*. ¶ 32; a grantee must agree to participate, upon request, in various training events, technical assistance events, or conferences, *see id*. ¶ 33; and quarterly data must be submitted regarding certain kinds of training

---

[6]     The  Prohibited  Expenditures  List  is  available  at  https://www.bja.gov/funding/JAGControlledPurchaselist.pdf.

that law enforcement officers have received, *see id.* ¶ 43.  Grantees have also been encouraged to adopt policies banning employees from text messaging while driving on duty, *see id.* ¶ 22, and to submit "JAG success stories," *id.* ¶ 44.  In a condition for FY 2017, the Department is requiring that when award funds are used for DNA testing, any resulting eligible DNA profiles must be uploaded to a DNA database operated by the FBI.  *See* 2017 Greenville Award ¶ 57.  The particular conditions that the City challenges in this lawsuit are not different in kind from these many other Byrne JAG grant conditions.

Through a series of misconceptions, the City reads out of Section 10102(a)(6) the broad power that the statute on its face confers.  According to the City, the reference in Section 10102(a)(6) to "placing special conditions on all grants, and determining priority purposes for formula grants" does not "endow the AAG with any authority" that did not already exist independently through other statutory provisions.  Pl.'s Mem. at 28-29.  But if that were so, there would be no reason to convey that authority, duplicatively, through Section 10102.  Thus, the City's "contrary interpretation would render the emphasized statutory text mere surplusage, a result [courts] try to avoid." *Langbord v. U.S. Dep't of Treasury*, 832 F.3d 170, 182 (3d Cir. 2016) (en banc) (quotation omitted).  Section 10102(a)(6) "should not be construed so as to render a portion of it superfluous, void, or meaningless." *Phik Ha Lie v. Attorney Gen.*, 349 F. App'x 706, 711 (3d Cir. 2009).  "Faced with a choice between [the City's] interpretation, which essentially renders the phrase surplusage, and [the Department's] interpretation, which gives it substantial effect," the Court should "choose the latter." *Disabled in Action of Pa. v. Se. Pa. Transp. Auth.*, 539 F.3d 199, 211 (3d Cir. 2008).

The City compounds its misinterpretation by misreading "the specific context in which that language is used, and the broader context of the statute as a whole." *Id.* at 210 (citation omitted).

14

First, the City minimizes Section 10102 as "an ancillary provision governing a sub-cabinet post." Pl.'s Mem. at 29.  The AAG for OJP is appointed by the President, subject to Senate confirmation, and answerable to the Attorney General's supervision.  *See* 34 U.S.C. § 10101.  And the Attorney General has "final authority over all functions, including any grants . . . made . . . for the Office of Justice Programs."  *Id.* § 10110; *see also* 28 U.S.C. § 530C(a)(4).  Placement of the "special conditions" and "priority purposes" powers in the organic statute for OJP, and their investiture in OJP's head (subject to the Attorney General's final authority), comports with those powers' importance and breadth.

Second, contrary to the City's "elephants in mouseholes" criticism, Pl.'s Mem. at 29, Congress added these powers not casually, but deliberately.  The City observes that the provision codified at Section 10102(a)(6) first appeared in 1984, *see* Pl.'s Mem. at 28, but does not mention that the particular language at issue here—the authority for "placing special conditions on all grants, and determining priority purposes for formula grants"—was added in 2006, *as part of the very same legislation that created the Byrne JAG Program.  See* DOJ Reauthorization Act of 2005, Pub. L. No. 109-162, 119 Stat. 2960 (2006), § 1152(b) (adding language to subsection (a)(6)); *id.* § 1111 (creating Byrne JAG Program).  Prior to that 2006 enactment, the provision stated only that the AAG for OJP "exercise[s] such other powers and functions as may be vested in the Assistant Attorney General pursuant to this title or by delegation of the Attorney General."  Joint Resolution Making Continuing Appropriations for FY 1985, Pub. L. No. 98-473, § 603, 98 Stat. 1837 (1984). The organic statute enacted in 2002 for the head of a separate Department grant-making component, by comparison, continues to contain substantially the same, more limited language as Section 10102 earlier used to contain, without the additional "special conditions" and "priority purposes" powers that Congress elected to bestow with respect to OJP.  *See* 34 U.S.C. § 10444(7)

(providing only that Director of Violence Against Women Office "[e]xercis[es] such other powers and functions as may be vested in the Director pursuant to this subchapter or by delegation of the Attorney General").  All of this context, which is missing from the City's discussion, confirms that Congress did intend the "special conditions" and "priority purposes" language to confer distinctive and meaningful power, contrary to the City's reading.  "When Congress acts to amend a statute, [courts] presume it intends its amendment to have real and substantial effect."  *Stone v. INS*, 514 U.S. 386, 397 (1995).

Third, the City's analysis is additionally incomplete in criticizing Section 10102(a)(6) as conferring "unlimited discretion" and "unbridled authority" to impose grant conditions.  Pl.'s Mem. at 29.  With this argument, the City on one hand (correctly) confirms the textual breadth of the authority provided by Section 10102(a)(6), but on the other hand overlooks important external limitations on that authority.   An obvious limitation on the Department's discretion is the Constitution.  Under the Supreme Court's jurisprudence articulating requirements for use of the Spending Clause power to condition federal grants, a grant condition must, for example, be germane and non-coercive. *See S. Dakota v. Dole*, 483 U.S. 203, 207 (1987).  A grant condition must also comport with all "other constitutional provisions" apart from the Spending Clause.  *Id*. at 208.  Moreover, the Department's conditioning power is self-limiting in practice, because extremism in imposing conditions will cause prospective recipients to reject the grant rather than accept the condition.  In addition to those limits, Congress judiciously vested these powers in Senate-confirmed officers, including the nation's chief law enforcement officer.

Fourth, the City incorrectly imputes a conflict between imposition of the conditions and a congressional purpose to retain Byrne JAG grantees' "broad control over the decision how to use the funds."  Pl.'s Mem. at 22.  The conditions go to eligibility to receive funds; they do not direct

how a grantee must spend the funds received.  These conditions of eligibility do less to mandate a "one size fits all" approach than, for example, a Byrne JAG condition that for years has prohibited the use of award funds to purchase items that are listed on a Prohibited Expenditure List that includes various types of equipment and weapons that some law enforcement agencies might otherwise have wanted to acquire.  *See* 2016 Philadelphia Award ¶ 49.  The conditions also comport with congressional purposes, expressly stated in the Byrne JAG statute, of ensuring that grantees under the Byrne JAG Program "report such data . . . and information (programmatic and financial) as the Attorney General may reasonably require" and undertake "appropriate coordination with affected agencies." 34 U.S.C. § 10153(a)(4), (5).

Finally, the City cites other statutes where Congress has used various different types of language to confer discretionary power to impose grant conditions.  *See* Pl.'s Mem. at 20.  Such statutes and their various formulations confirm no more than that Congress indeed does routinely delegate such power, and that in doing so Congress uses a variety of textual formulations rather than any magic words.  Section 10102(a)(6) is just another example.

2.      Independent of the authority conferred in Section 10102(a)(6), a separate source of authority further supports the Section 1373 compliance condition.  Under the Byrne JAG Program, the Department has statutory authority to ensure that Byrne JAG grantees "comply with . . . all other applicable Federal laws." 34 U.S.C. § 10153(a)(5)(D).  Section 1373 is, of course, a federal law.  According to the City, however, "it is not an 'applicable Federal law[].'" Pl.'s Mem. at 18. The City contends that the phrase "applicable Federal laws" refers only to "federal laws that, by their terms, are 'applicable' to federal grant-making—*i.e.*, to statutes that directly speak to recipients of federal funds." *Id*.  That straightjacketed interpretation of this statutory text is inconsistent with a plain reading of the statute.  The relevant statutory language provides:

> To request a grant under this part, the chief executive officer of a . . . local government shall submit an application to the Attorney General . . . in such form as the Attorney General may require.  Such application shall include the following:
>
> . . .
>
>> (5) A certification, made in a form acceptable to the Attorney General, . . . that—
>>
>> . . .
>>
>>> (D) the applicant will comply with all provisions of this part and all other applicable Federal laws.

34 U.S.C. § 10153.  Congress's decision to empower the Attorney General to determine the form of Byrne JAG applications renders the most natural reading of this provision as a delegation to the Attorney General to determine whether a particular federal law constitutes an "applicable Federal law[]."  *Id.*  If Congress had intended to limit the term "applicable Federal laws" as referencing only statutes of the kind that the City suggests, it could have done so expressly.  Instead, under this power, the Department may condition Byrne JAG grants if it gives notice, as it provided here for Section 1373, that it has determined that a federal law is "applicable."

Rather than the City's narrow construction, courts have broadly interpreted the term "applicable laws."  *See, e.g.*, *Dep't of Treasury v. Fed. Labor Relations Auth.*, 494 U.S. 922, 930 (1990) (interpreting the statutory term "applicable laws" as "laws outside the Act"); *see also Bennett Enters., Inc. v. Domino's Pizza, Inc.*, 45 F.3d 493, 497 (D.C. Cir. 1995) (noting that "all applicable laws" is "not reasonably or fairly susceptible to an interpretation that does not encompass compliance with state and federal tax laws"); *U.S. Dep't of Health & Human Servs. v. Fed. Labor Relations Auth.*, 844 F.2d 1087, 1094-95 (4th Cir. 1988) (finding statutory requirement that Executive Branch managers follow "applicable laws" to exclude Office of Management and Budget circulars but to reach laws made by Congress); *United States v. Odneal*, 565 F.2d 598, 600 (9th Cir. 1977) (statutory reference to "all applicable federal laws" granted "very broad statutory authority").

18

Rather than "applicable Federal laws" being cabined artificially to those laws that "directly speak to recipients of federal funds," Pl.'s Mem. at 18, or "substantive[ly] relat[e] . . . to Byrne JAG grants," Pl.'s Mem. at 19,[7] a natural and coherent reading is that "applicable Federal laws" refers simply to the corpus of federal laws that actually do apply, independently, to Byrne JAG grantees.  (8 U.S.C. § 1373 is, of course, one such law.)  Here, it is important to bear in mind the context of the Byrne JAG Program, where all grantees are state and local jurisdictions rather than private individuals or entities.  The limitation in Section 10153(a)(5)(D) to "applicable Federal laws" accordingly restricts the Department from requiring certification of compliance with, for example, federal tax laws that by their terms apply to private individuals rather than to the state and local jurisdictions that the Byrne JAG Program contemplates as grantees.  It is entirely sensible for Congress to have used the word "applicable" in Section 10153(a)(5)(D) with this meaning tailored to the class of potential grantees, and there is nothing implausible about Congress expecting a recipient of federal funds to certify its compliance with a federal law where the recipient is—independent of receiving those federal funds—already obligated to comply with that federal law.

**3.**     Unable to overcome the authority that plainly is provided under Section 10102(a)(6) and Section 10153(a)(5)(D) to impose the challenged conditions, the City embarks on the misadventure of examining "[s]ubsequent legislative history for the Byrne JAG statute as well as for Section 1373."  Pl.'s Mem. at 23.  The City focuses on various legislative proposals, which did not pass, that the City says would have withheld federal funds for jurisdictions that do not cooperate with federal immigration enforcement efforts.  *See id.* at 23-26.

---

[7]     The City also argues that the constitutional relatedness limitation of *Dole* narrows the sweep of "applicable Federal laws" so that the phrase "requires a substantive relationship . . . to Byrne JAG grants."  Pl.'s Mem. at 19.  Here, Section 1373 and the compliance condition do sufficiently relate to the purposes of the Byrne JAG Program.  *See infra* Parts I.C.2 and I.D.1.

The City's approach is improper, because "statutes are construed by the courts with reference to the circumstances existing at the time of the passage. The interpretation placed upon an existing statute by a subsequent group of Congressmen who are promoting legislation and who are unsuccessful has no persuasive significance here." *United States v. Wise*, 370 U.S. 405, 411 (1962). The Court should "decline to read any meaning into" such later legislative efforts, as "failed legislative proposals are a particularly dangerous ground on which to rest an interpretation of a prior statute." *Lockhart v. United States*, 546 U.S. 142, 146-47 (2005) (quotation omitted).

"[C]ongressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction, including the inference that the existing legislation already incorporated the offered change." *United States v. Craft*, 535 U.S. 274, 287 (2002) (quotation omitted). The City points to legislative proposals to impose a permanent congressional mandate to withhold federal funds; the different issue in this case, by contrast, is whether Congress, in paired provisions of a statute it actually enacted, gave the Department discretion to determine when to impose such conditions—and it is plausible that Congress preferred simply to stop at maintaining discretion and deferring to the judgment of the nation's chief law enforcement agency.

If the Court were to consider this subsequent legislative history at all—which it ought not to—at best "these arguments deserve little weight in the interpretive process." *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 187 (1994). "A bill can be proposed for any number of reasons, and it can be rejected for just as many others." *Caraco Pharm. Labs., Ltd. v. Novo Nordisk A/S*, 566 U.S. 399, 422 (2012) (citation omitted). "Congressional inaction frequently betokens unawareness, preoccupation, or paralysis." *Zuber v. Allen*, 396 U.S. 168, 185 n.21 (1969). Rather than speculation about subsequent legislative proposals, what controls here is a plain reading of the statutes that Congress enacted.

**B.      The City Is Unlikely to Succeed on Its Separation of Powers Claim.**

The statutes that authorize imposition of the challenged conditions render it unlikely that the City will establish a violation of the constitutional separation of powers. Article I of the Constitution confers on Congress the authority to "lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. "Incident to this power, Congress may attach conditions on the receipt of federal funds . . . ." *Dole*, 483 U.S. at 206. Importantly, Congress may delegate to the Executive Branch the authority to attach conditions on funding. *See, e.g.*, *Clinton v. City of New York*, 524 U.S. 417, 488 (1998) ("Congress has frequently delegated the President the authority to spend, or not to spend, particular sums of money."); *Ameron, Inc. v. U.S. Army Corps of Eng'rs*, 809 F.2d 979, 983 (3d Cir. 1986) ("Congress appropriates funds for a wide variety of purposes and delegates to executive branch officials the authority to make certain decisions regarding how those funds are to be spent."); *DKT Mem'l Fund*, 887 F.2d at 280-81 (upholding statutory delegation to the Executive to impose terms and conditions on federal spending programs).

Here, Congress delegated authority to the Department to impose the challenged conditions on units of local government participating in the Byrne JAG Program. As discussed above, the custody release and correctional facility access conditions are authorized under the Department's power to "plac[e] special conditions on all grants" administered by OJP, and to "determin[e] priority purposes for formula grants." 34 U.S.C. § 10102(a)(6). In addition to that authority, the Section 1373 compliance condition is further authorized by the Department's power to ensure that grantees in the Byrne JAG Program "comply with . . . all other applicable Federal laws." 34 U.S.C. § 10153(a)(5)(D). The conditions moreover comport with statutory purposes of ensuring that Byrne JAG grantees "report such data . . . and information (programmatic and financial) as the

Attorney General may reasonably require" and undertake "appropriate coordination with affected agencies." 34 U.S.C. § 10153(a)(4), (5). The challenged conditions thus do not "change the law unilaterally or ignore it altogether." Pl.'s Mem. at 30. Instead, because Congress has explicitly delegated to the Department certain powers to attach conditions on the receipt of Byrne JAG funds, the City is unlikely to establish a separation of powers violation here.

The City attempts to locate a separation-of-powers violation in what the City characterizes as the Department's choice "to spend less than the full amount of funding Congress has authorized under a statute." *Id*. That argument fails for multiple reasons.

First, the City overlooks that Congress has expressly given the Department discretionary power not to award Byrne JAG funds. *See* 34 U.S.C. § 10152(a)(1) ("From amounts made available to carry out this part, the Attorney General *may*, in accordance with the formula established under . . . this title, make grants to States and units of local government . . . ." (emphasis added)). "The word 'may' customarily connotes discretion." *Jama v. ICE*, 543 U.S. 335, 346 (2005). The City points the Court to *Train v. City of New York*, 420 U.S. 35 (1975), as "instructive" for the proposition that "the expenditure of appropriated funds is mandatory." Pl.'s Mem. at 30-31. In *Train*, however, a statute provided that "sums authorized to be appropriated . . . *shall* be allotted by the Administrator." 420 U.S. at 42 (emphasis added). "Unlike the word 'may,' which implies discretion, the word 'shall' usually connotes a requirement." *Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1977 (2016). Comparison to *Train* thus underscores that Congress has authorized the Department to decline to award funds appropriated under the Byrne JAG Program.

Second, the City's separation-of-powers argument proves too much. Under the City's broad theory, the Department would be required to spend all funds appropriated for the Byrne JAG

Program even if no valid applications for grants were submitted.  The Department would also appear to commit a separation-of-powers violation, in the City's view, whenever the Department rejects even a single Byrne JAG application, whenever a prospective grantee declines to accept a Byrne JAG award based on the wide array of grant conditions that the City does not dispute are permissible, and whenever the Department seeks to claw back awarded funds based on a post-award violation of a grant condition.  The City thus has not articulated a principle that plausibly applies here, and is unlikely to succeed on its claim that imposing the conditions violates the constitutional separation of powers.

## C.    The City Is Unlikely to Succeed on Its Arbitrary and Capricious Claim.

The City contends that, under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), the "imposition of the new conditions was also arbitrary and capricious."  Pl.'s Mem. at 32.  But the conditions have not been imposed on the City for the FY 2017 grant cycle, meaning that this APA claim fails at the threshold because the City does not challenge "final agency action." 5 U.S.C. § 704.  Even if APA review were available, the challenged conditions are supported by a reasoned explanation.

**1.**    "[T]he Administrative Procedure Act does not provide judicial review for everything done by an administrative agency."  *Invention Submission Corp. v. Rogan*, 357 F.3d 452, 459 (4th Cir. 2004) (quoting *Hearst Radio, Inc. v. FCC*, 167 F.2d 225, 227 (D.C. Cir. 1948)). One limitation is that "[t]he APA provides for judicial review of 'final agency action.'"  *Naik v. Dir. U.S. Citizenship & Immigration Servs. Vt.*, 575 F. App'x 88, 92 (3d Cir. 2014) (citing 5 U.S.C. §§ 702 & 704).  To qualify as final agency action, "the action must mark the 'consummation' of the agency's decisionmaking process" and also "must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'"  *Ocean Cty. Landfill Corp. v.*

*U.S. E.P.A., Region II*, 631 F.3d 652, 655 (3d Cir. 2011) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)).

The City does not identify a final agency action that allows judicial review of its APA claim. Although the City earlier told the Court it would wait to seek a preliminary injunction until seeing "if and when the new funding conditions are, in fact, included in the City's FY 2017 Local Byrne JAG award," Pl.'s Mem. at 12, the City instead moved for a preliminary injunction before the Department acted on the City's FY 2017 Byrne JAG application. Yet the City acknowledges that imposition of the correctional facility access and custody release conditions is presently enjoined nationwide, *id.*, and separately the City asserts that it "could be conceivably denied an [FY 2017] award at any time if the Department rejects its Section 1373 submission." *Id.* at 14.[8] In view of these contingencies, the City might never receive any FY 2017 award (irrespective of the conditions that could have been attached to it), or an award to the City might not contain at least some of the challenged conditions. And by statute there is an administrative review-and-reconsideration process that is to be followed before "finally disapprov[ing]" the City's FY 2017 Byrne JAG application, until which time there is no final agency action. 34 U.S.C. § 10154.

Accordingly, no final agency action has been taken with respect to the City, precisely because it remains to be seen "if and when the new funding conditions are, in fact, included in the City's FY 2017 Local Byrne JAG award." Pl.'s Mem. at 12. For present purposes of the City's APA claim, there has been no consummation of the Department's decisionmaking process, no

---

[8]    Since the City filed its motion for a preliminary injunction, the Department has sent a letter to the City questioning the City's compliance with 8 U.S.C. § 1373 and inviting the City's response before the Department takes a decision on the issue. *See* Hanson Decl. ¶ 8 & Ex. A. That letter, too, is not "final agency action" under the APA. Rather, "issuance of" that preliminary assessment—which is "not a definitive ruling"—had no "legal or practical effect, except to impose upon [the City] the burden of responding to the charges made against it." *FTC v. Standard Oil Co.*, 449 U.S. 232, 242-43 (1980) (finding no final agency action, and cautioning against using APA review as "a means of turning prosecutor into defendant before adjudication concludes").

determination of rights or obligations, and no legal consequence that flows.  *Cf. Naik*, 575 F. App'x at 92 (finding no final agency action where agency "has yet to respond to or act upon" submission and has "not taken any action to officially deny" petition).

    **2.**    Even if APA review of the challenged conditions were available here (which it is not), the City's claim is unlikely to succeed.  The City's "arbitrary and capricious" claim is accorded a "narrow standard of review" under which "a court is not to substitute its judgment for that of the agency, and should uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513-14 (2009) (citation omitted).  Where the action represents a shift in policy, the agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are better than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better."  *Id*. at 515.

    In the Third Circuit, "the standard for determining whether an APA violation exists under the arbitrary and capricious standard is substantially similar to rational basis review."  *Real Alternatives, Inc. v. Sec'y Dep't of Health & Human Servs.*, 867 F.3d 338, 353 (3d Cir. 2017).  Here, "the agency's reasons for" imposing the challenged conditions "were entirely rational."  *Fox Television*, 556 U.S. at 517.  The Department publicly offered—before FY 2017 applications were due and before any FY 2017 awards were made—a sound explanation for the challenged conditions.  As stated in the Department's July 25, 2017 "Backgrounder on Grant Requirements," which the City attached to its Complaint, the conditions have a "goal of increasing information sharing between federal, state, and local law enforcement" so that "federal immigration authorities have the information they need to enforce the law and keep our communities safe."  Dkt. No. 1-1.  The Backgrounder notes that some jurisdictions have "refus[ed] to cooperate with federal

immigration authorities in information sharing about illegal aliens who commit crimes," and states that the grant conditions will "prevent the counterproductive use of federal funds for policies that frustrate federal immigration enforcement." *Id*.

Federal immigration enforcement undoubtedly intersects with criminal justice, at a minimum for the simple reason that a conviction for any of a wide array of criminal offenses renders an alien removable from this country. *See* 8 U.S.C. § 1227(a)(2). Once removed, a criminal alien who has committed such an offense—*e.g.*, an aggravated felony, certain firearm offenses, domestic violence, or child abuse—is no longer present in this country with the potential to re-offend. Accordingly, a July 25, 2017 press release by the Attorney General, accompanying the Backgrounder, stated opposition to policies that "protect illegal aliens who have committed crimes," and an intent to encourage jurisdictions "to change their policies and partner with federal law enforcement to remove criminals." DOJ Press Release No. 17-826.

The City does not dispute this "common-sense" rationale, *id*., and "even in the absence of evidence, the agency's predictive judgment (which merits deference) makes entire sense" as "an exercise in logic rather than clairvoyance." *Fox Television*, 556 U.S. at 521. The City's demand for supporting "reports, studies, or analysis," Pl.'s Mem. at 33, ignores that Congress did not intend to encumber agencies with a burdensome procedural exercise for determining grant conditions; to the contrary, Congress expressly exempted "grants" from the APA's ordinary notice-and-comment rulemaking procedures. 5 U.S.C. § 553(a)(2). It suffices that the challenged conditions rationally promote interests in "maintain[ing] liaison" among the various branches of government "in matters relating to criminal justice," 34 U.S.C. § 10102(a)(2), and comport with the cooperation between federal, state, and local authorities in immigration enforcement that Congress contemplates. *See, e.g.*, 8 U.S.C. §§ 1226(d), 1357(g), 1373.

While attempting to impose heightened scrutiny because allegedly "[t]he Department departed from past practice," Pl.'s Mem. at 32, the City ignores that a requirement to certify compliance with Section 1373 was first imposed by the prior Administration in the FY 2016 grant cycle and accepted then by the City as a condition of its Byrne JAG award.  *See* 2016 Philadelphia Award ¶ 53.  As to the imposition of the challenged conditions, their use in the FY 2017 cycle is understandable as a result of a May 2016 report by the Department's Office of Inspector General (OIG) finding deteriorating local cooperation with "efforts to remove undocumented criminal aliens from the United States."  Dkt. No. 1-10 at 1-2 n.1.  The 2016 OIG report advised that "the information we have learned to date during our recent work about the present matter differs significantly from what OIG personnel found nearly 10 years ago" in a 2007 audit when federal immigration authorities had back then "commented favorably to the OIG with respect to cooperation and information flow they received from the seven selected jurisdictions" that were examined.  *Id*.  The OIG report focused on the City of Philadelphia, among other jurisdictions, in reaching its conclusions about the changed state of affairs in 2016.  *See id*. at 3, 7, 8.

For all of these reasons, even if APA review were available, the City is unlikely to succeed on the merits of its claim that the challenged conditions are arbitrary and capricious.

### D.   The Conditions Are Consistent with the Spending Clause.

The City contends that the conditions run afoul of relatedness and notice requirements under the Spending Clause.  *See* Pl.'s Mem. at 34-42.  As stated above, the Spending Clause provides that Congress may "lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States."  U.S. Const. art. I, § 8, cl. 1.  Congress may employ the spending power "to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives."  *Dole*, 483 U.S. at 206 (citation omitted).

In *Dole*, the Supreme Court described certain limitations on the spending power.  One of these limitations is that "conditions on federal grants might be illegitimate if they are unrelated to the federal interest in particular national projects or programs."  *Id.* at 207 (citation omitted). Another limitation is that when the federal government "desires to condition the States' receipt of federal funds, it must do so unambiguously, enabling the States to exercise their choice knowingly, cognizant of the consequences of their participation."  *Id.* (citation omitted).

1.      The City interprets the relatedness requirement much too stringently; the conditions are sufficiently related to the purposes of the Byrne JAG Program under the relevant constitutional analysis.

Courts have generally found that the relatedness showing does not pose a difficult hurdle. In *Dole* itself, the Supreme Court upheld conditioning receipt of federal highway funds on the only loosely-related requirement that a state adopt a minimum drinking age of twenty-one.  *See id.* at 208.  The Supreme Court has stated that only "some relationship" is necessary between spending conditions and "the purpose of federal spending."  *New York v. United States*, 505 U.S. 144, 167 (1992).  The Third Circuit has required only "a discernible relationship" between a condition and a federal interest in a program, *Koslow*, 302 F.3d at 175, rejecting the argument that a "condition must be specifically tailored to a particular federal interest" and furthermore rejecting any requirement "to make specific findings of relatedness in the text of the statute itself."  *A.W. v. Jersey City Pub. Sch.*, 341 F.3d 234, 241 (3d Cir. 2003).  Other Circuits, too, require only loose relatedness to satisfy the constitutional requirement.  *See Charles v. Verhagen*, 348 F.3d 601, 609 (7th Cir. 2003) (explaining that a challenged funding condition and the program involved must only "share[] the same goal"); *Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002) (holding that conditions on federal funding need only "bear some relationship to the purpose of

the federal spending" and disclaiming "an exacting standard for relatedness").  As the D.C. Circuit

has observed, the Supreme Court has never "overturned Spending Clause legislation on relatedness

grounds." *Barbour v. Wash. Metro. Area Transit Auth.*, 374 F.3d 1161, 1168 (D.C. Cir. 2004).

The grant conditions at issue here satisfy the relatedness requirement.  The Byrne JAG

Program's organic statute specifies that Byrne JAG funds are designed to provide resources "for

criminal justice," to support programs including law enforcement, prosecution, crime prevention

and corrections.  34 U.S.C. § 10152(a)(1).  These goals are also reflected in the responsibilities of

the AAG, which involve "maintain[ing] liaison" and disseminating information regarding

"criminal justice."  *Id*. § 10102(a)(1), (2).  Contrary to the City's view that the Byrne JAG

Program's goal is to preserve "flexibility" for grantees, *see* Pl.'s Mem. at 36, the program's overall

goals are much broader: to support and strengthen law enforcement and criminal justice.

The City is simply wrong in viewing immigration enforcement as unrelated to criminal

justice.  Numerous federal statutes expressly tie these two subjects together.  As discussed above,

*see supra* at 26, a conviction for any of a wide array of criminal offenses renders an alien removable

from this country, *see* 8 U.S.C. § 1227(a)(2), and thus no longer present here with the potential to

re-offend.   The INA also repeatedly contemplates cooperation among state and local officers and

federal officials on immigration enforcement.  *See, e.g.*, 8 U.S.C. § 1357(g) (providing that DHS

may enter into formal cooperative agreements with states and localities under which appropriately

trained and qualified state and local officers may perform specified functions of a federal

immigration officer in relation to the investigation, apprehension, or detention of aliens); 8 U.S.C.

§ 1324(c) (authorizing state and local law-enforcement officers to make arrests for violations of

the INA's prohibition against smuggling, transporting, or harboring aliens); 8 U.S.C. § 1252c

(authorizing state and local officers to arrest certain felons who have unlawfully returned to the

United States).  Under authorities such as these, "state officers may perform the functions of an immigration officer." *Arizona*, 567 U.S. at 408.  Congress also contemplates the federal detention of certain aliens upon their release from state or local custody, *see* 8 U.S.C. § 1226(c), further animating the sort of cooperation between federal, state, and local law enforcement that the conditions are designed to foster.

Given that the INA expressly contemplates local law enforcement activity with respect to immigration law enforcement, it is perfectly germane and appropriate for the Department to condition grant funding to promote this purpose.  Even the City's own arguments reflect that immigration enforcement bears some relationship to criminal justice, because the City connects its local immigration enforcement policies to the City's crime rates.  *See* Pl.'s Mem. at 10-11, 51. Accordingly, because there is a discernible relationship between the conditions and the Byrne JAG program's goals, the conditions satisfy the constitutional relatedness requirement.

The City also disputes relatedness based on its contention that the "conditions reach activities wholly unrelated to those funded through the Byrne JAG program." Pl.'s Mem. at 38. The City is mistaken.  The requirements of the conditions are expressly limited "to the 'program or activity' that is funded (in whole or in part) by this award."  2017 Greenville Award ¶¶ 53, 55, 56.[9]  This limitation mirrors the *Koslow* case that the City cites approvingly.  *See* Pl.'s Mem. at 38 (citing *Koslow*, 302 F.3d at 176 (noting that challenged condition "governs only a 'program or activity' receiving federal funds")).  The City's relatedness challenge thus fails.

    **2.**    The City further overreaches in characterizing the conditions as "highly ambiguous" in violation of the Spending Clause.  Pl.'s Mem. at 39.  As a threshold flaw of the

---

[9]    The text of the Section 1373 compliance condition is materially identical in limiting its requirements "to the 'program or activity' funded in whole or part under this award."  2017 Greenville Award ¶ 53.

City's argument, the City ignores that the Department has, in the challenged conditions that appear in the award document for a prospective grantee to consider accepting, invited submission of "[a]ny questions about the meaning or scope of this condition . . . before award acceptance."  2017 Greenville Award ¶¶ 53, 55, 56.  The City's assertion of ambiguity in this litigation comes before the City has availed of the invitation for administrative consultation.  Moreover, even as the City analogizes the conditions to the terms of a contract, *see* Pl.'s Mem. at 39, the City's nit-picking ignores that "all contracts are, by necessity, incomplete to some degree" and it is impossible for "terms specifically to cover all contingencies."  Randy E. Barnett, *The Sound of Silence: Default Rules and Contractual Consent*, 78 Va. L. Rev. 821, 821-22 (1992).

To back up its litigation posture, the City contrives ambiguities where there are none. Regarding the custody release condition, the City suggests it needs clarity regarding whether the requirement to provide "advance notice of the scheduled release date" for detained aliens would "apply to detainees who have no 'scheduled release date,' such as individuals who are awaiting preliminary hearings, trials, or sentencing."  Pl.'s Mem. at 40-41.  The condition calls for a correctional facility to honor "a formal written request" "from DHS" "that seeks advance notice of the scheduled release date and time for a particular alien in such facility," by providing "the requested notice to DHS" "as early as practicable."  2017 Greenville Award ¶ 56.  What makes the condition applicable is whether the alien is "in" the facility, not the circumstances of the alien's detention.  And, in practice, it will be evident exactly which aliens the condition applies to because the condition is triggered only upon DHS providing "a formal written request" concerning "a particular alien."  *Id*.  On its face, the condition does not admit of the ambiguity that the City describes; it applies to any alien detained for whatever reason, but only upon a request from DHS

as to a particular alien, and with the possibility of a response that no scheduled release date presently exists but that notice will be provided "as early as practicable."

With respect to the correctional facility access condition, the City wishfully identifies a supposed ambiguity about whether the condition requires allowing ICE agents access to visit an inmate even when the inmate has told the facility that the inmate does not consent to an interview. *See* Pl.'s Mem. at 41-42.  The answer is yes.  The condition does require allowing access in this scenario, even if the inmate might decline to answer questions.  The City does not attempt to point to anything in the text of the condition that indicates otherwise.

As to the Section 1373 compliance condition, the City remarkably complains of supposed unconstitutional ambiguity concerning the City's obligations under a statute with which the City has been required to comply for over twenty years (entirely independent of any Byrne JAG award condition), and for which the City provided a certification of its compliance in the FY 2016 grant cycle.  The City moreover discounts that the Department has provided public guidance regarding the requirements of Section 1373.  *See* Dkt. Nos. 1-11, 1-12.  That guidance explains, in part:

> Section 1373 does not impose on states and localities the affirmative obligation to collect information from private individuals regarding their immigration status, nor does it require that states and localities take specific actions upon obtaining such information. Rather, the statute prohibits government entities and officials from taking action to prohibit or in any way restrict the maintenance or intergovernmental exchange of such information, including through written or unwritten policies or practices.
>
> Your personnel must be informed that notwithstanding any state or local policies to the contrary, federal law does not allow any government entity or official to prohibit the sending or receiving of information about an individual's citizenship or immigration status with any federal, state or local government entity and officials.

Dkt. No. 1-12.  The City does not explain what is ambiguous about that.  "Broad general language is not necessarily ambiguous when congressional objectives require broad terms."  *Geisinger Cmty. Med. Ctr. v. Sec'y U.S. Dep't of Health & Human Servs.*, 794 F.3d 383, 393 (3d Cir. 2015)

(quoting *Diamond v. Chakrabarty*, 447 U.S. 303, 315 (1980)).  Moreover, the Department has now provided the City with further guidance in the form of a preliminary assessment of the City's compliance with Section 1373.  *See* Hanson Decl. ¶ 8 & Ex. A.

To the extent there is any uncertainty at the margins of the statute's requirements, such a penumbra is hardly a basis to find the Section 1373 compliance condition unconstitutionally ambiguous.  The City does not complain, for example, about other, long-standing Byrne JAG conditions requiring compliance with restrictions on lobbying under 18 U.S.C. § 1913 and 31 U.S.C. § 1352, 2017 Greenville Award ¶ 19, compliance with "federal appropriations statutes" generally, *id.* ¶ 20, reporting of evidence of violations of the False Claims Act, *id.* ¶ 21, and complying with prohibitions on reprisal under 41 U.S.C. § 4712, *id.* ¶ 23.  All these statutes on which various unchallenged grant conditions are predicated could have some zone of uncertainty at the margin.  The Section 1373 compliance condition presents no special problem of ambiguity that creates a constitutional infirmity.

## E.     The Court Should Decline the City's Request for a Declaration That It Complies with 8 U.S.C. § 1373.

The City seeks a preliminary injunction on the basis of its request for a declaration that it complies with 8 U.S.C. § 1373.  *See* Pl.'s Mem. at 42; Compl. ¶¶ 138-44.  On this motion for a preliminary injunction, the Court should exercise its discretion to decline the City's invitation for declaratory relief, which concerns conduct the City has already undertaken, would not absolve the City of legal jeopardy, prematurely disrupts an ongoing administrative process, and rests on no proper cause of action.  Even if the Court were to reach this claim, Philadelphia is unlikely to succeed in demonstrating that it complies with Section 1373.

**1.**     Under the Declaratory Judgment Act, courts "*may* declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could

33

be sought." 28 U.S.C. § 2201(a) (emphasis added).  "The Supreme Court has long held that this confers discretionary, rather than compulsory, jurisdiction upon federal courts." *Reifer v. Westport Ins. Corp.*, 751 F.3d 129, 134 (3d Cir. 2014).  "[D]istrict courts possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdictional prerequisites." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 282 (1995).

"[T]he propriety of declaratory relief in a particular case will depend upon a circumspect sense of its fitness informed by the teachings and experience concerning the functions and extent of federal judicial power."  *Id*. at 287 (citation omitted).  "[D]istrict courts exercising DJA discretion are governed by 'considerations of practicality and wise judicial administration.'" *Reifer*, 751 F.3d at 139 (quoting *Wilton*, 515 U.S. at 288).  The Third Circuit has articulated a "non-exhaustive list" of factors for the district court to consider, "to the extent they are relevant," in exercising its discretion over whether and when to entertain a request for a declaratory judgment:

> (1) the likelihood that a federal court declaration will resolve the uncertainty of obligation which gave rise to the controversy;
>
> (2) the convenience of the parties;
>
> (3) the public interest in settlement of the uncertainty of obligation;
>
> (4) the availability and relative convenience of other remedies;
>
> (5) a general policy of restraint when the same issues are pending in a state court;
>
> (6) avoidance of duplicative litigation;
>
> (7) prevention of the use of the declaratory action as a method of procedural fencing or as a means to provide another forum in a race for res judicata; and
>
> (8) (in the insurance context), an inherent conflict of interest between an insurer's duty to defend in a state court and its attempt to characterize that suit in federal court as falling within the scope of a policy exclusion.

34

*Reifer*, 751 F.3d at 146.  For the purpose of adjudicating the City's motion for preliminary relief, the relevant *Reifer* factors support declining to exercise declaratory jurisdiction at this time.

First, a declaratory judgment—which is available to test the legality of a course of conduct prior to its implementation to avoid legal jeopardy—is not appropriate in these circumstances, where the City seeks to test the legality of policies that have already been adopted.  The jeopardy the City seeks to avoid through a declaration of rights already exists.  A declaratory judgment, by contrast, "is an alternative to pursuit of the arguably illegal activity."  *Steffel v. Thompson*, 415 U.S. 452, 480 (1974).

Second, while the City might face legal jeopardy if its policies facially violate Section 1373, it would not be *free from* legal jeopardy—the relief sought here—unless the City's policies, *together with the City's conduct in implementing those policies*, are consistent with Section 1373. Here, at this preliminary stage of proceedings, the City asks the Court to bless the City's Section 1373 compliance before the Department has had an opportunity to take discovery of the City's actual practices and conduct.  The City's request to be declared compliant with Section 1373 accordingly is not comprehensively presented for the Court's review.  In contrast to a declaration that the City is facially *non*-compliant, a declaration that the City's policies, on their face and standing alone, comport with Section 1373—without regard to scrutiny of the City's actual practices—would be an advisory opinion and would not declare the respective rights of the parties so as to protect the City from legal jeopardy.  *See Calderon v. Ashmus*, 523 U.S. 740, 749 (1998) (no jurisdiction where "[t]he present declaratory judgment action would not completely resolve those challenges, but would simply carve out one issue in the dispute for separate adjudication"); *Ashcroft v. Mattis*, 431 U.S. 171, 172 (1977) (per curiam) (dismissing action seeking declaratory judgment that law violated Constitution, explaining that "[f]or a declaratory judgment to issue,

there must be a dispute which calls, not for an advisory opinion upon a hypothetical basis, but for an adjudication of present right upon established facts" (citation omitted)).

Third, declaratory relief on this motion for preliminary injunction would preempt the administrative process the Department is presently conducting with the City regarding Section 1373 compliance.  In that process, the City has provided its explanation regarding whether it complies, *see* Dkt. No. 1-14, the Department has responded with a "preliminary assessment,"[10] *see* Hanson Decl. ¶ 8 & Ex. A, and the Department has invited the City to respond further by October 27, 2017 for additional consideration before the Department renders its final assessment.  *Id*.  The Court would prudently wait for that process to complete itself, rather than intervening—at a preliminary stage of this federal court lawsuit, no less—where the aspects of any dispute remain to be sharpened or may not in fact exist.  As discussed below, *see infra* nn. 12-13, there is particular reason to believe this administrative process may deliver better clarity about the contours of any dispute.  The federal government, for its part, has not requested a declaration that the City violates Section 1373, and the Court should not take up that question absent an enforcement action brought by the United States, which has also not occurred.

Fourth, the City pursues declaratory relief without identifying an underlying cause of action.  "The Declaratory Judgment Act does not, however, provide an independent basis for subject-matter jurisdiction; it merely defines a remedy."  *Allen v. DeBello*, 861 F.3d 433, 444 (3d Cir. 2017).  Plaintiff does not identify a right of action, in Section 1373 or elsewhere, to seek a declaration that the City complies with Section 1373.  A plaintiff does not automatically have a right of action to seek declaratory judgment wherever Article III standing exists.  *See Harris Cty.*

---

[10]     As stated in the Department's letter, the "preliminary assessment" is based on the City's "submission, all attached documentation, and [the City's] laws, policies, and practices relating to compliance with section 1373, to the extent they were provided or are readily available."  Hanson Decl. Ex. A at 1.

*Tex. v. MERSCORP Inc.*, 791 F.3d 545, 552 (5th Cir. 2015) ("The Counties do not contend that [the governing statute] itself creates a private right of action.  Instead, the Counties believe that the Declaratory Judgment Act provides a right to relief because there is an 'actual controversy.'  This argument is flawed because the Declaratory Judgment Act alone does not create a federal cause of action.").  Declaratory relief is thus unavailable.

For all of these reasons, the Court should—especially at this stage of proceedings, for the purpose of resolving the City's motion for preliminary relief—exercise its discretion to decline to entertain the City's request for a declaration that it complies with Section 1373.

**2.**      If the Court were to ignore the flaws of the City's request and nonetheless exercise discretion to consider declaratory relief at this time, the Court should find that the City is unlikely to demonstrate that it complies with 8 U.S.C. § 1373.  The Department below identifies various facial problems with the City's policies, but emphasizes that this review does not account for any additional problems that may be revealed by further scrutiny of the City's actual practices and conduct in implementing those policies—a subject on which the Department has not taken discovery at this preliminary stage of proceedings.  Further factual development would be required before an adjudication could be made that the City's practices, beyond the face of the City's policies, comply with Section 1373.  *See Nashville, Chattanooga & St. Louis Ry. v. Browning*, 310 U.S. 362, 369 (1940) ("It would be a narrow conception of jurisprudence to confine the notion of 'laws' to what is found written on the statute books, and to disregard the gloss which life has written upon it.  Settled state practice . . . can establish what is state law.").  Importantly, Section 1373 speaks not only to local policies, but also to any restriction on information-sharing by any "entity or official."   The record in this action, accordingly, is inadequate to make any comprehensive declaratory ruling that the City complies with Section 1373.

a.      Looking only to the face of the City's policies, the City does not comply with Section 1373.  The statute provides, in part, that a "local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [federal immigration officials] information regarding the citizenship or immigration status, lawful or unlawful, of any individual."  8 U.S.C. § 1373(a).  At least two City policies do not comply with Section 1373, and at least three additional policies may also be non-compliant depending on how the City interprets and applies them.

First, the City's Executive Order No. 5-16, which the City's brief refers to as "Detainer Order II," Pl.'s Mem. at 9, states in Section 1 that notice of a person's "pending release" from City custody shall not be provided, "unless such person is being released after conviction for a first or second degree felony involving violence and the detainer is supported by a judicial warrant."  Dkt. No. 1-6.  This section restricts the sharing of "information regarding . . . immigration status" in violation of 8 U.S.C. § 1373(a).[11]  Nothing in the statute allows the City to impose a prohibition that limits information-sharing only to certain circumstances.

---

[11]      The INA states that the "immigration status of any individual" specifically "includ[es] . . . that a particular alien *is not lawfully present* in the United States."  8 U.S.C. § 1357(g)(10)(a) (emphasis added).   "Present" means "being in a certain place and not elsewhere," *Webster's New International Dictionary* (2d ed. 1958), so the fact that an alien is in custody for a specific duration (in a certain place and not elsewhere) fits within the INA's contemplation of immigration status.  Moreover, "information regarding . . . immigration status" is a broader category than "immigration status" itself.   Comparison of different subsections within Section 1373 demonstrates that Congress used the broader "information regarding" formulation deliberately.  *Compare* 8 U.S.C. § 1373(a) (concerning "information regarding . . . immigration status") *with* 8 U.S.C. § 1373(c) (discussing "immigration status" but omitting the broader "information regarding" formulation).  "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."  *Dean v. United States*, 556 U.S. 568, 573 (2009) (citation omitted).  Indeed, the House Report accompanying the legislation stated that Section 1373 was intended "to give State and local officials the authority to communicate with the INS [Immigration and Naturalization Service] regarding the *presence, whereabouts, and activities* of illegal aliens."  H.R. Rep. No. 104-469, pt. 1, at 277 (1996) (emphasis added).  Custody release (. . . *cont'd*)

Second, Police Commissioner Memorandum No. 01-06 states at Section III.C that "immigrants who are victims of crimes will not have their status as an immigrant transmitted in any manner." Dkt. No. 1-3. This Memorandum restricts the sharing of information regarding immigration status in violation of 8 U.S.C. § 1373(a). To be sure, it is not the Department of Justice's or the Department of Homeland Security's policy or practice to request information from state and local jurisdictions regarding the immigration status of victims. There are, however, instances where requesting this information could be appropriate, such as where a person is both a perpetrator and a victim. The key point is that, notwithstanding limits that the federal government may prudentially self-impose, nothing in 8 U.S.C. § 1373 allows the City to impose a prohibition that limits information-sharing under these circumstances.

Additionally, three other City policies may violate Section 1373 depending on how the City interprets and applies them. In its preliminary assessment recently transmitted to the City, the Department has invited the City to provide clarification regarding each of these policies. *See* Hanson Decl. Ex. A at 3.

The City's Executive Order No. 8-09, which the City's brief refers to as the "Confidentiality Order," Pl.'s Mem. at 8, states at Section 2(b) that police officers "shall not . . . inquire about a person's immigration status," unless certain limited exceptions apply. Dkt No. 1-

---

information falls within the sweep of "information regarding . . . immigration status" that Congress intended under Section 1373(a). Indeed, it is relevant to the federal government's statutory duties, enacted at the same time as Section 1373, to "take into custody any alien who" has committed certain offenses, 8 U.S.C. § 1226(c)(1)(A), and to "take into custody any alien who . . . is inadmissible . . . when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation," 8 U.S.C. § 1226(c)(1)(D). It is sensible to read section 1373(a) to include information that assists the federal government in carrying out its statutory responsibilities under the same Act. *See United Savings Ass'n v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371 (1988) ("A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law.").

4.  Under 8 U.S.C. § 1373(b)(1), however, the City may not "in any way restrict" the "requesting" of "information regarding . . . immigration status" from federal immigration officers.  On its face, the Executive Order appears to bar City officers from requesting information regarding immigration status from federal immigration officers.  In order to comply with 8 U.S.C. § 1373, the City would need to clarify that it interprets and applies this Executive Order to not restrict City officers and employees from requesting information regarding immigration status from federal immigration officers.   The City would also need to show that it has communicated this interpretation to its officers and employees.  Otherwise, this provision on its face violates Section 1373.

In that same Executive Order No. 8-09, Section 3 states that City officers and employees generally "shall [not] disclose" information "relating to an individual's immigration status," but that disclosure is allowed when "required by law."  Dkt No. 1-4.  In order to comply with 8 U.S.C. § 1373, the City would need to clarify that it interprets and applies this Executive Order to not restrict City officers from sharing information regarding immigration status with federal immigration officers.[12]   The City would also need to show that it has communicated this interpretation to its officers and employees.  Otherwise, this provision on its face violates Section 1373.

Finally, Police Commissioner Memorandum No. 01-06 states at Section III.A that "police personnel" shall not transmit "information regarding an immigrant . . . to federal immigration authorities" unless "[r]equired by law" or certain other exceptions apply.  Dkt. No. 1-3.  In order to comply with 8 U.S.C. § 1373, the City would need to clarify that it interprets and applies this

---

[12]     Underscoring why the Court should not exercise its discretion to consider declaratory relief at this time, the parties potentially may not have a dispute on this point because the City's brief asserts that this "required by law" language is a "saving clause" that rescues the policy from non-compliance by "ensur[ing] that Section 1373 will be followed."  Pl.'s Mem. at 49-50.

policy to not restrict City officers and employees from sharing information regarding immigration status with federal immigration officers.[13]   The City would also need to show that it has communicated this interpretation to its officers and employees.   Otherwise, this provision on its face violates Section 1373.

To find these facial violations, the Court need not disagree with the City's view that "Section 1373 imposes no affirmative requirement on States or localities to collect immigration-status information."   Pl.'s Mem. at 43.   These violations turn, instead, on impermissible "prohibitions and restrictions on information exchange" that the City acknowledges come within the sweep of what Section 1373 disallows.   *Id*.   Moreover, four of the City's facially non-compliant or suspect policies identified above are wholly independent of "the City's non-collection policies" that may result in "City officials [being] rarely in active possession of information about persons' immigration or citizenship status."   *Id*. at 44.

**b.**   Perhaps in recognition that its policies facially violate Section 1373, the City turns to seeking a limiting construction of the statute and questioning the statute's constitutionality, arguing that Section 1373 does not "displace" the City's "police powers" and cannot commandeer the City's personnel under the Tenth Amendment.   *See* Pl.'s Mem. at 46-49.   These attacks miss the mark.

In the first instance, the City's argument incorrectly frames the dispute in this case.   The dispute here turns on a grant condition that the City is free to accept or reject, not on a statutory mandate that directly regulates the City.   The relevant question, therefore, is not whether Section 1373, as an independent statutory obligation of the City, infringes the Tenth Amendment.   Instead,

---

[13]   Similar to the preceding footnote, there potentially may be no dispute on this point in view of the City's statements in its brief regarding this "required by law" savings clause, *see* Pl.'s Mem. at 49-50, which highlights why declaratory relief is inappropriate at this juncture.

the only pertinent constitutional question the City presents for the Court is whether the Section 1373 compliance condition—which could have been written to state the same textual requirements as Section 1373 even if Section 1373 did not exist—is a valid exercise of the Spending Clause power.  In that context that pertains here, it is settled that the federal government "may offer funds to the States, and may condition those offers on compliance with specified conditions.  These offers may well induce the States to adopt policies that the Federal Government itself could not impose."  *NFIB*, 567 U.S. at 537.  A "perceived Tenth Amendment limitation on congressional regulation of state affairs d[oes] not concomitantly limit the range of conditions legitimately placed on federal grants."  *Dole*, 483 U.S. at 210.

To any extent that the City could nevertheless proceed with a facial attack on Section 1373, the City bears "a higher substantive burden," because, "[a]s the Supreme Court has repeatedly intoned, facial challenges are the most difficult to mount successfully because the challenger 'must establish that no set of circumstances exist under which the statute would be valid.'"  *Knick v. Twp. of Scott*, 862 F.3d 310, 321 (3d Cir. 2017) (citations omitted).  The City does not meet that burden.

"The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens."  *Arizona*, 567 U.S. at 394.  The Supremacy Clause provides the clear rule that federal law "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.  "As long as it is acting within the powers granted it under the Constitution, Congress may impose its will on the States" and "may legislate in areas traditionally regulated by the States."  *Gregory v. Ashcroft*, 501 U.S. 452, 459-60 (1991).  And courts "begin with the time-honored presumption that [a statute] is a constitutional exercise of legislative power."  *Reno v. Condon*, 528 U.S. 141, 148 (2000) (citation omitted).

The Second Circuit has rejected a Tenth Amendment facial challenge to Section 1373 of the kind the City raises here. *See City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999). The Tenth Amendment does not give states and their subdivisions "an untrammeled right to forbid all voluntary cooperation by state or local officials with particular federal programs," particularly in the information sharing context. *Id*. at 34-35; s*ee also Printz v. United States*, 521 U.S. 898, 918 (1997) (contrasting federal statutes that "require only the provision of information to the Federal Government" with those that "force[] participation of the States' executive in the actual administration of a federal program"); *Freilich v. Bd. of Directors*, 142 F. Supp. 2d 679, 697 (D. Md. 2001) ("This Court has found no case" holding that a statutory command to report information for a federal data bank "commandeers the state."). The City's anti-commandeering theory is especially diminished here because the conditions allow a grantee to use the awarded Byrne JAG funds to cover its costs incurred in implementing the conditions. *See* 2017 Greenville Award ¶¶ 53, 55, 56.

The City's sovereignty argument flies in the face of legislative history, recounted in part by the Second Circuit in *City of New York*, *see* 197 F.3d at 32-33, demonstrating that Congress intended Section 1373 to counteract passive resistance to sharing information. The House Report accompanying the legislation stated that "[t]his section is designed to prevent any State or local law, ordinance, executive order, policy, constitutional provision, or decision of any Federal or State court that prohibits or in any way restricts any communication between State and local officials and the INS." H.R. Rep. No. 104-469, pt. 1, at 277. The Report of the Senate Judiciary Committee asserted that, "[u]nfortunately, U.S. immigration law is violated on a massive scale," S. Rep. No. 104-249, at 3 (1996), and that "[s]ome Americans appear to be ambivalent about the enforcement of the Immigration and Nationality Act." *Id*. at 7. Admonishing "[t]hose who are

reluctant to enforce the immigration laws," *id*. at 7, the Report went on to declare, with reference specifically to what became Section 1373, that "[e]ffective immigration law enforcement requires a cooperative effort between all levels of government." *Id*. at 19. "The acquisition, maintenance, and exchange of immigration-related information by State and local agencies is consistent with, and potentially of considerable assistance to, the Federal regulation of immigration and the achieving of the purposes and objectives of the Immigration and Nationality Act." *Id*. at 19-20. In this history, together with the unqualified text of Section 1373 and the plenary power of Congress to regulate immigration, is an answer to the City's demand for a "clear statement" of congressional intent "[t]o displace a State's or municipality's police powers." Pl.'s Mem. at 46.

It makes no difference on these points whether the City cabins its objection to the reach of Section 1373 to information-sharing concerning "witnesses to crimes, victims of crimes, and other law-abiding persons seeking City services." *Id*. at 45. Irrespective, the City does not enjoy "the power to forbid even voluntary cooperation by state and local officials and workers" in sharing information with federal immigration authorities. *City of New York*, 179 F.3d at 34.

The City is unlikely to succeed on its additional argument that "construing Section 1373 to compel Philadelphia to disclose information about witnesses and victims as a condition of receiving Byrne JAG funds would violate the Spending Clause" on relatedness grounds. Pl.'s Mem. at 48. The City improperly attempts to frame a Spending Clause violation by diverting focus away from the gravamen of what the Section 1373 compliance condition concerns: information-sharing regarding criminal aliens. *See supra* at 29-30; *see also A.W.*, 341 F.3d at 241 (rejecting the argument that a "condition must be specifically tailored to a particular federal interest"). The condition as a whole undoubtedly satisfies the City's demand that it "bear some relationship" to the Byrne JAG Program's criminal justice goals. Pl.'s Mem. at 48 (quoting *New York*, 505 U.S.

at 167); *see supra* at 29-30.  Finally, as the City has been advised, "[i]t is not the Department of Justice's nor the Department of Homeland Security's policy or practice to request information from state and local jurisdictions regarding the immigration status of victims," although there could be "instances where the Department finds that requesting this information could be appropriate, such as where a person is both a perpetrator and a victim."  Hanson Decl. Ex. A at 2.

Because the issue presented for the Court is a grant condition that can be declined, rather than a direct statutory mandate, and because the City is in any event unable to avoid the reach of Section 1373 through either canons of construction or constitutional limits, the City is unlikely to succeed on a claim that its policies comply with the statute, if this Court were even to entertain the City's request for declaratory relief.

## II.  The City Fails to Establish That It Will Suffer Irreparable Harm Absent a Preliminary Injunction.

"[T]he preliminary injunction device should not be exercised unless the moving party shows that it specifically and personally risks irreparable harm."  *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 487 (3d Cir. 2000).  "Furthermore, a showing of irreparable harm is insufficient if the harm will occur only in the indefinite future.  Rather, the moving party must make a clear showing of *immediate* irreparable harm."  *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992) (quotation omitted).  The Third Circuit has "insisted that the risk of irreparable harm must not be speculative."  *Adams*, 204 F.3d at 488.  "The *dramatic and drastic power* of injunctive force may be unleashed only against conditions generating a presently existing actual threat."  *Id.* at 487 (quotation omitted).  "[I]njunctions will not be issued merely to allay the fears and apprehensions or to soothe the anxieties of the parties."  *Id.* at 490 (quotation omitted).

The City cannot demonstrate irreparable harm from the correctional facility access and custody release conditions because the Department is presently enjoined nationwide from

imposing those two conditions on Byrne JAG grants.  *See Chicago*, 2017 WL 4081821, at *14. Any purported risk of irreparable harm to the City from those conditions is thus inherently speculative and relegated to the indefinite future rather than posing an immediate threat. Irreparable harm to the City does not exist under these circumstances, notwithstanding that the Department has appealed and sought to stay the nationwide injunction in *Chicago*.  "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter*, 555 U.S. at 22.  "[T]he potential harm facing" the City "is remote and hypothetical, which is fatal to [the City's] request for injunctive relief" because "an injunction may not be used to eliminate the possibility of remote future injury."  *Rossi v. Procter & Gamble Co.*, 597 F. App'x 69, 71 (3d Cir. 2015).

Separately, the City's claim of irreparable harm from imposition of the Section 1373 compliance requirement is belied by its acceptance of a requirement to certify such compliance in the FY 2016 Byrne JAG cycle and its long delay in raising any legal challenge.  Under these circumstances, the City cannot show *immediate* irreparable harm that justifies exercising "the extraordinary nature of the preliminary injunction power."  *Adams*, 204 F.3d at 487.  "[T]he use of judicial power to arrange relationships prior to a full determination on the merits is a weighty matter," *id.*, not so lightly invoked as the City would do so here in spite of its own conduct demonstrating a lack of urgency.

Even apart from the existing nationwide injunction and the City's unexplained delay in challenging the applicability of Section 1373 to the Byrne JAG Program, the City's claim that the conditions cause irreparable harm by attempting to unconstitutionally coerce the City into abandoning its right to self-government also fails.  *See* Pl.'s Mem. at 50-52.  The Supreme Court

has admonished that "courts should not conclude that [an enactment] is unconstitutional on this ground unless the coercive nature of an offer is unmistakably clear," *Nat'l Fed'n of Indep. Bus. v. Sebelius* ("*NFIB*"), 567 U.S. 519, 681 (2012) (opinion of Scalia, Kennedy, Thomas & Alito, JJ.), such as where a state is subjected to the risk of losing "over *10 percent* of a State's overall budget" if it declines to adopt certain conditions.  *Id.* at 582 (emphasis added).

The amount of funding at stake to the City through the Byrne JAG Program does not come close to meeting that constitutional threshold.  The City asserts that it expects "$1.6 million in FY 2017 Byrne JAG funding."  Pl.'s Mem. at 52.  The City's FY 2017 budget (which ran from July 1, 2016 to June 30, 2017, whereas the federal fiscal year runs from October 1 to September 30) stated estimated obligations of $4.2 billion,[14] and its budget for FY 2018 assumes over $4.4 billion in expenditures.[15]  Thus, the funds at issue for the City's FY 2017 Byrne JAG award constitute approximately 0.036% to 0.038% of the City's overall budget.  Such a relatively miniscule impact on the City's finances does not meet the threshold for establishing unconstitutional coercion.  *See NFIB*, 567 U.S. at 581 (noting that in *Dole* "the threatened loss of less than half of one percent of South Dakota's budget left that State with a 'prerogative' to reject Congress's desired policy"); *see also A. O. Smith Corp. v. FTC*, 530 F.2d 515, 527-28 (3d Cir. 1976) (no irreparable harm where movants "are not 'small' corporations" and there is no "contention that the cost of compliance would be so great vis a vis the corporate budget that significant changes in a company's operations would be necessitated"); *ConverDyn v. Moniz*, 68 F. Supp. 3d 34, 48 (D.D.C. 2014) (in determining irreparable harm, a "claim of substantial financial losses must be evaluated from the

---

[14]     *See* City of Philadelphia, *The Mayor's Operating Budget in Brief for Fiscal Year 2017*, at i, available at http://www.phila.gov/finance/pdfs/FY17FinalBudgetinBriefAdopted.pdf.

[15]     *See* City of Philadelphia, *The Mayor's Operating Budget in Brief for Fiscal Year 2018*, at 3, available at http://www.phila.gov/finance/pdfs/Operating%20Budget/FY18%20BudgetinBrief _Adopted.pdf.

perspective of the organization's total revenues in order to determine if the harm is of a magnitude that warrants injunctive relief").

Finally, the City claims irreparable harm from a "cloud of uncertainty" regarding its FY 2017 Byrne JAG grant.  Pl.'s Mem. at 53.  Such uncertainty does not amount to irreparable harm. The Third Circuit has at least thrice emphasized that "injunctions will not be issued merely to allay the fears and apprehensions or to soothe the anxieties of the parties."  *Adams*, 204 F.3d at 490 (collecting quotations).   "There are many rearrangements—not just scrimping and saving rearrangements—that individuals involved in a legal battle must endure pending the conclusion of a suit, and very few will be without some anguish."  *Id*.  The City thus does not meet its burden to demonstrate it will suffer irreparable harm absent preliminary relief.

## III.    The Public Interest and the Balance of the Equities Militate Against a Preliminary Injunction.

The City also bears the burden of establishing "that the balance of equities tips in [its] favor, and that an injunction is in the public interest."  *Winter*, 555 U.S. at 20.  These factors merge in a suit against the federal government.  *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

Here, the public interest weighs heavily against the City's attempt to enjoin congressionally-authorized Executive Branch policies designed to promote enforcement of federal immigration law in jurisdictions that receive Byrne JAG Program funds.  Courts have repeatedly held that "there is inherent harm to an agency in preventing it from enforcing regulations that Congress found it in the public interest to direct that agency to develop and enforce."  *Cornish v. Dudas*, 540 F. Supp. 2d 61, 65 (D.D.C. 2008), *aff'd sub nom. Cornish v. Doll*, 330 F. App'x 919 (Fed. Cir. 2009); *accord N. Arapaho Tribe v. Burwell*, 90 F. Supp. 3d 1238, 1255 (D. Wyo. 2015).

"Issuing a" preliminary injunction "would harm" the federal government's "enforcement of the immigration laws and is not in the public interest as 'control over matters of immigration is

a sovereign prerogative, largely within the control of the executive and the legislature' and the 'government's interest in efficient administration of immigration laws . . . is weighty.'" *U.S. ex rel. Kovalev v. Ashcroft*, 223 F. Supp. 2d 688, 698 (E.D. Pa. 2002) (Baylson, J.) (quoting *Landon v. Plasencia*, 459 U.S. 21, 34 (1982)).   The federal government additionally has an interest in seeing that federal funds are used "to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives." *Fullilove v. Klutznick*, 448 U.S. 448, 474 (1980).

The challenged conditions promote those interests by, for example, minimizing potentially hazardous public safety situations that may arise where criminal aliens are released into the community, minimizing officer safety risk by limiting potentially dangerous arrest situations, and promoting operational efficiency by conserving the resources needed by DHS to execute its mission. *See* Brown Decl. ¶¶ 6-11.   At bottom, encouraging cooperation among local governments and DHS promotes the public interest in executing federal laws that require removal of criminal aliens. *See id*.

Each of the three challenged conditions, moreover, ties closely to interests encapsulated in specific federal laws.   First, the Section 1373 compliance condition, of course, promotes adherence to 8 U.S.C. § 1373.   Second, the correctional facility access condition reinforces investigative authority provided by federal law.   An immigration officer "authorized under regulations prescribed by the Attorney General shall have power without warrant . . . to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States."  8 U.S.C. § 1357(a)(1).   An implementing regulation provides that "[a]ny immigration officer is hereby authorized and designated to exercise *anywhere in* or outside *the United States* the power conferred by" that statute.   8 C.F.R. § 287.5(a)(1) (emphasis added).   The correctional facility access

condition facilitates such investigation in state and local correctional facilities.  Third, the custody release condition helps federal authorities take custody of criminal aliens and comply with the requirement to detain criminal aliens pending removal.  *See* 8 U.S.C. §§ 1226(c), 1231(a)(2).  All three conditions, which collectively support the federal ability to remove criminal aliens from the country, help reduce federal expenditures on the State Criminal Alien Assistance Program, under which the federal government compensates states and localities for their incarceration of certain criminal aliens.  *See* 8 U.S.C. § 1231(i).  These concrete interests tip the equities at play here sharply toward denying an injunction.

## **CONCLUSION**

For the foregoing reasons, Defendant respectfully requests that the Court deny the City's motion for a preliminary injunction.[16]

DATED:  October 12, 2017                    Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

LOUIS D. LAPPEN
Acting United States Attorney

JOHN R. TYLER
Assistant Director

*/s/ Arjun Garg*
ARJUN GARG
Trial Attorney
U.S. Department of Justice

---

[16]    The Department does not understand the City to be seeking injunctive relief that extends beyond application of the challenged conditions to the City itself.  In the prayer for relief in the City's Complaint, *see* Dkt. No. 1 at 46, and in the proposed order on the City's motion for a preliminary injunction, *see* Dkt No. 21-2, the City seeks relief only as to its own prospective FY 2017 Byrne JAG award.  Relief extending beyond the City—for example, a nationwide injunction—would be improper in scope.  Not only has the City not requested such relief, but also constitutional and equitable principles require that injunctive relief be limited to redressing the City's own cognizable injuries.

Civil Division, Federal Programs Branch
20 Massachusetts Ave, NW
Washington, DC 20530
Phone: (202) 305-8613
Fax: (202) 616-8470
E-Mail: arjun.garg@usdoj.gov

*Counsel for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I, Arjun Garg, hereby certify that on October 12, 2017 I electronically filed the foregoing document using the Court's CM/ECF system, causing a notice of filing to be served upon all counsel of record.

*/s/ Arjun Garg*
ARJUN GARG