**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| THE CITY OF PHILADELPHIA, | |
| Plaintiff, | |
| v. | Case No. 2:17-cv-03894-MMB |
| JEFFERSON BEAUREGARD SESSIONS III, in his official capacity as Attorney General of the United States, | |
| Defendant. | |

**BRIEF OF AMICI CURIAE COUNTY OF SANTA CLARA,**
**24 ADDITIONAL CITIES, COUNTIES AND MUNICIPAL AGENCIES,**
**THE U.S. CONFERENCE OF MAYORS, THE NATIONAL LEAGUE OF CITIES,**
**THE INTERNATIONAL MUNICIPAL LAWYERS ASSOCIATION, AND**
**THE INTERNATIONAL CITY/COUNTY MANAGEMENT ASSOCIATION**

**IN SUPPORT OF**

**THE CITY OF PHILADELPHIA'S MOTION FOR PRELIMINARY INJUNCTION**

# **TABLE OF CONTENTS**

Page

I.  INTRODUCTION ..............................................................................................1

II.  BACKGROUND ..............................................................................................2

III.  ARGUMENT ....................................................................................................6

   A.   Local Officials Must Be Allowed to Adopt Law Enforcement Policies
        Tailored to the Needs and Unique Characteristics of Their Communities. ............6

   B.   Policies Restricting Local Immigration Enforcement Promote Public
        Safety. ....................................................................................................9

   C.   The Byrne JAG Conditions Have Created Uncertainty and Operational
        Challenges. ...........................................................................................12

IV.  CONCLUSION ...............................................................................................17

# TABLE OF AUTHORITIES

## CASES

*City of Chicago v. Sessions*
  2017 WL 4081821 (N.D. Ill. Sept. 15, 2017) ............................................................ 2, 4, 5, 13

*Cty. of Santa Clara v. Trump*
  2017 WL 1459081 (N.D. Cal. Apr. 25, 2017) ......................................................... 2, 3

*Cty. of Santa Clara v. Trump*
  2017 WL 3086064 (N.D. Cal. July 20, 2017) ......................................................... 3

*Gonzales v. Oregon*
  546 U.S. 243 (2006) .................................................................................... 6

*Medtronic, Inc. v. Lohr*
  518 U.S. 470 (1996) .................................................................................... 6

*Nat'l Fed'n of Indep. Bus. v. Sebelius*
  567 U.S. 519 (2012) .................................................................................... 6, 8

*Pennhurst State Sch. & Hosp. v. Halderman*
  451 U.S. 1 (1981) ....................................................................................... 16

*S. Dakota v. Dole*
  483 U.S. 203 (1987) .................................................................................... 8

*United States v. Lopez*
  514 U.S. 549 (1995) .................................................................................... 6

*United States v. Morrison*
  529 U.S. 598 (2000) .................................................................................... 6

## STATUTES

### Federal

8 U.S.C. section 1373 ........................................................................... 3, 4, 5, 15, 16

42 U.S.C. § 3751(a)(1) ............................................................................. 7

### State

Cal. Gov't Code § 7283.1(a) ...................................................................... 13

D.C. Code § 24-211.07(d)(1) ..................................................................... 13

Massachusetts General Laws Ch. 40B Section 24 ......................................... 1

**Local**

Cook County Code § 46-37(b) ................................................................................. 14

King County Code § 2.15.010-2.15.020 ................................................................... 9

Municipal Code of the City and County of Denver, § 28-252 ................................. 14

N.Y.C. Administrative Code 9-131(h)(1) ................................................................ 16

## OTHER AUTHORITIES

Rob Arthur, *Latinos In Three Cities Are Reporting Fewer Crimes Since Trump
Took Office* (May 18, 2017) ................................................................................. 10

*Border Insecurity: The Rise of MS-13 and Other Transnational Criminal Organizations*,
Hearing before the Committee on Homeland Security and Governmental Affairs of the
United States Senate (May 24, 2017) .................................................................... 10

Bureau of Justice Statistics, *Jail Inmates in 2015* (2016) ..................................... 12

Cato Institute, *Criminal Immigrants: Their Numbers, Demographics,
and Countries of Origin*, 1 & n.4, 2 (Mar. 15, 2017) ........................................... 9

Darcy Costello, "New LMPD policy: No working with immigration officials to
enforce federal laws," The *Courier-Journal* (Sept. 22, 2017) .............................. 11

County of Santa Clara, Bd. of Supervisors Policy No. 3.54 .............................. 9, 14

Department of Justice Programs, Grants 101, Overview of OJP Grants
and Funding, Types of Funding ............................................................................... 7

Executive Order 13768 ......................................................................................... 2, 3

H.R. Rep. No. 109-233 ............................................................................................. 8

Houston Police Dep't, Immigration Policy Questions and Answers ........................ 9

Kate Howard, "Louisville Police Don't Enforce Immigration – But Help the Feds Do It,"
*Ky. Ctr. for Investigative Reporting* (Sept. 17, 2017) .......................................... 11

Immigrant Legal Resource Center, Detainer Policies ............................................... 9

International Association of Chiefs of Police, *Enforcing Immigration Law:
The Role of State, Tribal and Local Law Enforcement* .......................................... 7

Jasmine C. Lee, Ruby Omri, and Julia Preston, "What Are Sanctuary Cities,"
*New York Times* (Feb. 6, 2017) ............................................................................. 2

Brooke A. Lewis, "HPD chief announces decrease in Hispanics reporting rape
and violent crimes compared to last year," *Houston Chronicle* (Apr. 6, 2017) ...... 10

Major Cities Chiefs Ass'n, *Immigration Policy* (2013) .......................................... 6

Katie Mettler, "'This is really unprecedented': ICE detains woman seeking domestic
abuse protection at Texas courthouse," *Wash. Post* (Feb. 16, 2017) ........................ 14

James Queally, "ICE agents make arrests at courthouses, sparking backlash from
attorneys and state supreme court," *Los Angeles Times* (Mar. 16, 2017).............................. 14

James Queally, "Latinos are reporting fewer sexual assaults amid a climate of fear
in immigrant communities, LAPD says," *Los Angeles Times* (Mar. 21, 2017) ...................... 10

Nik Theodore, Dep't of Urban Planning and Policy, University of Chicago,
*Insecure Communities: Latino Perceptions of Police Involvement in Immigration
Enforcement*, 5-6 (2013) .......................................................................................................... 10

Tucson Policy Dep't Gen. Orders, Gen. Order 2300 .................................................................... 9

Transcript of Donald Trump's Immigration Speech
*The New York Times* (Sept. 1, 2016) ....................................................................................... 2

U.S. Dep't of Justice, Office of Justice Programs, *Certifications of Compliance
with 8 U.S.C. § 1373* ............................................................................................................... 4

U.S. Dep't of Justice, Office of Public Affairs, *Attorney General Sessions
Delivers Remarks on Sanctuary Policies* (Aug. 16, 2017) ...................................................... 15

U.S. Dep't of Justice, Office of Public Affairs, *COPS Office: Immigration Cooperation
Certification Process Background* ............................................................................................ 4

U.S. Dep't of Justice, Office of Public Affairs, *Department of Justice Announces Priority
Consideration Criteria for COPS Office Grants* (Sept. 7, 2017) ............................................... 4

U.S. Dep't of Justice, Office of Public Affairs, *Justice Department Announces that
Commitment to Reducing Violent Crime Stemming from Illegal Immigration will be
Required for Participation in Public Safety Partnership Program* (Aug. 3, 2017) .................. 4

U.S. Dep't of Justice, Office of Public Affairs, *Justice Department Provides
Last Chance for Cities to Show 1373 Compliance* ................................................................. 15

Chuck Wexler, "Police chiefs across the country support sanctuary cities because
they keep crime down," *Los Angeles Times* (Mar. 6, 2017)...................................................... 9

The White House, Office of the Press Secretary, *Press Briefing by Press Secretary Sean Spicer,
2/1/2017, #6* (Feb. 1, 2017) .................................................................................................... 3

Tom K. Wong, Center for American Progress, *The Effects of Sanctuary Policies
on Crime and the Economy*, ¶ 12 (2017) ........................................................................... 9, 11

# I.

## INTRODUCTION

Amici are 24 cities, counties, and municipal agencies,[1] and four major associations of local governments and their officials: The United States Conference of Mayors, the National League of Cities, the International Municipal Lawyers Association, and the International City/County Management Association.[2]  Local governments bear responsibility for protecting the safety and welfare of our communities.  Our law enforcement officials patrol our streets, operate our jails, investigate and prosecute crimes, and secure justice for victims.  To fulfill these responsibilities, amici cities and counties must build and maintain the trust of our residents, regardless of their immigration status, and we must be able to adopt policies which foster that trust and meet our communities' unique needs.

Since January, President Trump and his Administration have targeted local jurisdictions, like the amici cities and counties, that have determined the needs of their communities are best met, and public safety is best secured, by limiting local involvement with the enforcement of federal immigration law.  In one of his first acts upon taking office, President Trump issued an Executive Order ("Order") directing his Administration to deny federal funds to so-called

---

[1] The Metropolitan Area Planning Council is the Regional Planning Agency serving the people who live and work in the 101 cities and towns of Metropolitan Boston. *See* Massachusetts General Laws Ch. 40B Section 24. The agency provides extensive technical assistance to cities and towns in the Greater Boston region, and supports the ability of cities and towns to adopt and implement best practices for maintaining a productive relationship with all residents of their communities, regardless of their immigration status.

[2] The United States Conference of Mayors is the official non-partisan organization of cities with populations of 30,000 or more.  There are 1,408 such cities in the country today.  Each city is represented in the Conference by its chief elected official, the mayor.  The National League of Cities ("NLC") is dedicated to helping city leaders build better communities.  NLC is a resource and advocate for 19,000 cities, towns and villages, representing more than 218 million Americans.  The International Municipal Lawyers Association ("IMLA") is owned by its more than 2,500 members and serves as an international clearinghouse for legal information and cooperation on municipal legal matters. IMLA's mission is to advance the responsible development of municipal law through education and advocacy by providing the collective viewpoint of local governments around the country on legal issues before courts nationwide. The International City/County Management Association ("ICMA") is a non-profit professional and educational organization with more than 11,000 members, the appointed chief executives and professionals who serve local governments throughout the world.

"sanctuary" jurisdictions.  Executive Order 13768, §§ 2(c), 9(a).  Three months later, Judge William H. Orrick of the United States District Court for the Northern District of California granted a nationwide preliminary injunction barring enforcement of Section 9(a) of the Order. *Cty. of Santa Clara v. Trump*, No. 17-CV-00574, *City & Cty. of San Francisco v. Trump*, No. 17-CV-00485, 2017 WL 1459081 (N.D. Cal. Apr. 25, 2017) (hereinafter *Santa Clara*).  Despite that injunction, the Department of Justice ("DOJ") is attempting yet again to deny federal funds to jurisdictions that choose to limit their participation in enforcing federal immigration law.

The DOJ's new conditions on the Edward Byrne Memorial Justice Assistance Grant ("Byrne JAG") program violate federal law, usurp local control over public safety policy, erode the community trust on which local law enforcement depends, and create uncertainty for local governments like amici. A district court in Chicago has already recognized this and preliminarily enjoined the enforcement of two of these conditions on a nationwide basis.  *City of Chicago v. Sessions*, No. 17-CV-5720, 2017 WL 4081821, at *14 (N.D. Ill. Sept. 15, 2017). But the federal government continues to dispute the nationwide scope of this injunction, and a preliminary injunction is required from this Court to protect Philadelphia and prevent irreparable harm to its law enforcement efforts and its local residents.

## II.

## BACKGROUND

Hundreds of local jurisdictions nationwide have concluded they can best promote the safety and well-being of their communities by limiting their involvement in immigration enforcement.  *See, e.g.*, Jasmine C. Lee, Rudy Omri, and Julia Preston, "What Are Sanctuary Cities," *New York Times* (Feb. 6, 2017), https://www.nytimes.com/interactive/2016/09/02/us/sanctuary-cities.html?mcubz=1. Although these jurisdictions are just as safe as – if not safer than, *see infra* at 9-11 – those that devote local resources to enforcing federal immigration law, President Trump has blamed them for "needless deaths" and promised to "end . . . [s]anctuary" jurisdictions by cutting off their federal funding. Transcript of Donald Trump's Immigration Speech, *The New York Times* (Sept. 1, 2016), https://www.nytimes.com/2016/09/02/us/

2

politics/transcript-trump-immigration-speech.html.

On January 25, 2017, President Trump issued Executive Order 13768, which directed the Attorney General and the Secretary of Homeland Security to ensure that "sanctuary jurisdictions" do not receive any "[f]ederal funds."  Executive Order 13768, §§ 2(c), 9(a).  The White House made clear that the Order aimed to "end[] sanctuary cities" by stripping them of *all* federal funding.  *See, e.g.*, Press Release, The White House, Office of the Press Secretary, *Press Briefing by Press Secretary Sean Spicer, 2/1/2017, #6* (Feb. 1, 2017), https://www.whitehouse.gov/the-press-office/2017/02/01/press-briefing-press-secretary-sean-spicer-212017-6.

Shortly thereafter, the County of Santa Clara and the City and County of San Francisco filed related lawsuits challenging the Order and moved for a preliminary injunction barring its enforcement.  At oral argument on the motions, DOJ attempted to walk back the Order's sweeping language by arguing the Order was merely an "exercise of the President's 'bully pulpit'" to exert political pressure on local government entities, and only applied narrowly to three specific federal grants (including Byrne JAG).  *Santa Clara*, 2017 WL 1459081, at *1.  The district court rejected this interpretation, finding it irreconcilable with the plain language of the Order, and issued a preliminary injunction in April prohibiting enforcement of Section 9(a)'s broad funding ban.[3]  *Id.* at *9.  The Executive Order remains preliminary enjoined, and Santa Clara and San Francisco have moved for a permanent injunction.

Meanwhile, the Attorney General has shifted to a grant-by-grant approach.  In April 2017, as it became increasingly likely that the Executive Order would be enjoined, DOJ took action to enforce a condition on Byrne JAG funding initially imposed in 2016.  *See* Compl. ¶¶ 69-74 (Dkt. No.1).  This condition (the "certification condition") requires recipients of Byrne JAG program funds to certify compliance with 8 U.S.C. section 1373, which prohibits

---

[3] DOJ relied on an Attorney General memorandum purporting to reinterpret the Executive Order to seek reconsideration of the preliminary injunction, but the district court rejected that attempt. *See Cty. of Santa Clara v. Trump*, No. 17-CV-00574, *City & Cty. of San Francisco v. Trump*, No. 17-CV-00485, 2017 WL 3086064 (N.D. Cal. July 20, 2017).

restrictions on the sharing of citizenship and immigration status information.  On April 21, 2017, the DOJ sent letters to nine jurisdictions, including Philadelphia, suggesting they did not comply with section 1373 and requiring them to submit an "official legal opinion" and supporting documentation to demonstrate their compliance by June 30, 2017.  Compl. ¶ 78.

Then, on July 25, 2017, the Attorney General officially announced three conditions applicable to the Byrne JAG program, including the existing certification condition and two new conditions that require recipients to (1) "permit personnel of [DHS] to access any detention facility in order to meet with an alien and inquire as to his or her right to be or remain in the United States" ("access condition"), and (2) "provide at least 48 hours advance notice to DHS regarding the scheduled release date and time of an alien in the jurisdiction's custody when DHS requests such notice in order to take custody of the alien" ("notice condition"). Compl. ¶ 5 & Exs. 1, 15.  The DOJ has indicated that these conditions may be applied to other grants, *see* U.S. Dep't of Justice, Office of Justice Programs, *Certifications of Compliance with 8 U.S.C. § 1373*, https://ojp.gov/funding/Explore/SampleCertifications-8USC1373.htm, and has made local immigration enforcement a selection criterion for other federal grant programs.[4]

Several jurisdictions filed suit to challenge the Byrne JAG conditions.[5]  After the City of

---

[4] On August 3, 2017, the DOJ announced that to be selected for the Public Safety Partnership program, local jurisdictions must "show a commitment to reducing crime stemming from illegal immigration."  U.S. Dep't of Justice, Office of Public Affairs, *Justice Department Announces that Commitment to Reducing Violent Crime Stemming from Illegal Immigration will be Required for Participation in Public Safety Partnership Program* (Aug. 3, 2017), https://www.justice.gov/opa/pr/justice-department-announces-commitment-reducing-violent-crime-stemming-illegal-immigration. Applicants are now required to report whether they have access and notice policies that mirror the access and notice conditions of the JAG grants and whether they honor ICE detainers.  *Id.*  On September 7, 2017, the DOJ announced that applicants for competitive Office of Community Oriented Policing Services (COPS Office) grants will receive priority consideration if they certify that they provide DHS access to their detention facilities and advance notice to DHS of "an illegal alien's release date and time."  U.S. Dep't of Justice, Office of Public Affairs, *COPS Office: Immigration Cooperation Certification Process Background*, https://www.justice.gov/opa/press-release/file/995376/download (last accessed Oct. 12, 2017); *see also* U.S. Dep't of Justice, Office of Public Affairs, *Department of Justice Announces Priority Consideration Criteria for COPS Office Grants* (Sept. 7, 2017), https://www.justice.gov/opa/pr/department-justice-announces-priority-consideration-criteria-cops-office-grants.

[5] *See City of Chicago v. Sessions*, No. 17-CV-05720 (N.D. Ill., filed Aug. 7, 2017); *City & Cnty. of San Francisco v. Sessions*, No. 17-CV-04642-WHO (N.D.Cal., filed Aug. 11, 2017); *State of*

Chicago moved for a preliminary injunction in its case, the DOJ again changed course and represented that the conditions announced on July 25 – and subsequently included in the Fiscal Year 2017 Byrne JAG solicitations – were not "actual" conditions, but "only advised prospective applicants regarding the *general tenor* of the conditions." Def.'s Opp. To Pl.'s Mot. to Expedite Briefing Schedule, at 3 n.2, *Chicago v. Sessions*, No. 17-CV-05720 (N.D. Ill. Aug. 14, 2017), ECF No. 28 (emphasis added). DOJ then submitted a pair of award letters, dated August 23, 2017, that set forth what are purportedly the "actual" conditions. In these letters, the DOJ modified the condition requiring 48 hours' notice to DHS before an inmate is released from local custody to require notice "as early as practicable." Declaration of Alan R. Hanson ("Hanson Decl."), Exs. A & B, ¶¶55-56, *Chicago v. Sessions*, No. 17-CV-5720 (N.D. Ill. Aug. 14, 2017), ECF No. 32. And DOJ modified the access condition to require a local policy or practice designed to ensure that federal agents "in fact" are given access to correctional facilities for the purpose of meeting with individuals believed to be aliens and inquiring into their right to remain in the country. *Id.*

On September 15, 2017, Judge Harry D. Leinenweber, of the Northern District of Illinois, issued a nationwide preliminary injunction prohibiting enforcement of the notice and access conditions, but leaving in place the certification condition.[6] *Chicago*, 2017 WL 4081821, at *14. Chicago has moved for reconsideration of the portion of the order allowing enforcement of the certification condition, and the DOJ has appealed.[7]

---

*California v. Sessions* No. 17-CV-4701-WHO (filed Aug. 14, 2017 N.D. Cal.); *City of Philadelphia v. Sessions*, No. 17-CV-03894-MMB (E.D.Pa., filed Aug. 30, 2017); *City of Los Angeles v. Sessions*, No. 17-CV-07215-R-JC (C.D.Cal., filed Sept. 29, 2017).

[6] The DOJ moved to stay the nationwide application of the preliminary injunction, but the district court denied its motion. *See* Mem. Op. & Order, *Chicago v. Sessions*, No. 17-CV-5720 (N.D. Ill. Oct. 13, 2017), ECF No. 98. The DOJ has also moved to stay the nationwide application of the preliminary injunction in the Seventh Circuit.

[7] Chicago moved for reconsideration based on a letter from DOJ, discussed *infra* at pages 15-16, that found Chicago to be in violation of 1373 and contradicted representations DOJ made to the district court. Chicago has moved to hold DOJ's appeal in abeyance pending resolution of this motion.

## III.

## ARGUMENT

**A.      Local Officials Must Be Allowed to Adopt Law Enforcement Policies Tailored to the Needs and Unique Characteristics of Their Communities.**

Our nation's constitutional structure is premised on the notion that states and localities, as the governments closest to the people, bear responsibility for protecting the health and safety of their residents.  *See Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996) ("health and safety . . . are primarily, and historically, matters of local concern") (internal quotation marks and alterations omitted).  Within the "structure and limitations of federalism," state and local governments possess "great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons."  *Gonzales v. Oregon*, 546 U.S. 243, 270 (2006) (internal quotation marks omitted).  This local control ensures that matters which "concern the lives, liberties, and properties of the people" are determined "by governments more local and more accountable than a distant federal bureaucracy."  *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 536 (2012).

The duty to protect local residents from crime lies at the heart of the police power vested in state and local jurisdictions.  *See United States v. Morrison*, 529 U.S. 598, 618 (2000) (there is "no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims").  In carrying out this duty, cities and counties possess – and must be allowed to exercise – broad discretion to develop and implement law enforcement and public safety policies tailored to the needs of their communities.  *See United States v. Lopez*, 514 U.S. 549, 561 (1995).

This is a matter not only of constitutional law, but of sound law enforcement policy.  Police chiefs and sheriffs nationwide have stated that "decisions related to how local law enforcement agencies allocate their resources, direct their workforce and define the duties of their employees to best serve and protect their communities must be left in the control of local governments."  Major Cities Chiefs Ass'n, *Immigration Policy* (2013),

https://www.majorcitieschiefs.com/pdf/news/2013_immigration_policy.pdf.  Local control is no less critical when policy decisions concern enforcement of federal immigration law.  *See id.* ("The decision to have local police officers perform the function and duties of immigration agents should be left to the local government[.]").

Amici share the judgment that local participation in federal immigration enforcement can be detrimental to community safety.  But one need not agree with Philadelphia's specific policy decisions – or those of the city and county amici – to agree these decisions should rest with the local entities tasked with keeping our communities safe.  The International Association of Chiefs of Police ("IACP") has taken no position on whether local law enforcement agencies should engage in immigration enforcement.  IACP, *Enforcing Immigration Law: The Role of State, Tribal and Local Law Enforcement*, 1, http://www.theiacp.org/portals/0/pdfs/publications/ immigrationenforcementconf.pdf (hereinafter *Enforcing Immigration Law*).  But the IACP is not neutral on *who* should decide whether local police do so.  In its view, "local law enforcement's participation in immigration enforcement is an *inherently local* decision that *must* be made by a police chief, working with their elected officials, community leaders and citizens."  *Id.* at 1 (emphasis added).  Attempts to coerce participation by withholding federal funds are "unacceptable."  *Id.* at 5.

In creating the Byrne JAG program, Congress recognized the need for local control over law enforcement policy and structured the program to maximize local discretion.  As Philadelphia has explained, the Byrne JAG program is a formula grant,[8] available for use in eight broad areas, including law enforcement; prosecution and courts; prevention and education; corrections and community corrections; drug treatment and enforcement; planning, evaluation, and technology improvement; crime victim and witness programs; and mental health.  *See* 42 U.S.C. § 3751(a)(1).  Congress designed the program in this manner to "give State and local governments

---

[8] A formula grant is a non-competitive grant in which funds are allocated based upon a statutory formula, without a competitive process.  Department of Justice Programs, Grants 101, Overview of OJP Grants and Funding, Types of Funding, https://ojp.gov/grants101/typesoffunding.htm.

more flexibility to spend money for programs that work for them rather than to impose a 'one size fits all' solution." H.R. Rep. No. 109-233, at 89 (2005). Empowering states and localities to make their own policy choices is thus a central purpose of the program. Local jurisdictions, including many of the amici, put these funds to diverse uses, reflecting both the varied law enforcement needs of different communities and Congress's intent to preserve local discretion and flexibility in Byrne JAG-funded law enforcement programs. For example:

- Iowa City, Iowa (population 74,398) uses Byrne JAG funds to promote traffic safety, to establish a search and rescue program aimed at individuals at risk for wandering, to partially fund a drug task force, and to purchase equipment.

- Portland, Oregon (population 639,863) has used Byrne JAG funds to support its New Options for Women (NOW) program, which provides services to women who have experienced sexual exploitation while working in the commercial sex industry.

- Sacramento, California (population 493,025) uses Byrne JAG funds to support the ongoing maintenance and operation of its Police Department's helicopter program.

- San Francisco, California (population 870,887) uses Byrne JAG funds to operate a Youth Adult Court aimed at reducing recidivism for youth ages 18-25 by providing case management and other services that account for young adults' unique developmental needs.

If the Byrne JAG conditions are allowed to stand, local governments will be forced to choose between losing critical funding for these diverse programs or giving up control over inherently local law enforcement policies. Such a result would not only undermine the ability of local entities to enact policies reflecting the needs and unique characteristics of their communities – thus subverting a central purpose of the funding – but also allow the executive branch to wield powers vested exclusively in Congress. Under the Spending Clause, only Congress – whose members are elected by and accountable to local communities – can place substantive conditions on federal funds. *S. Dakota v. Dole*, 483 U.S. 203, 206 (1987) ("Incident to [its Article I spending] power, *Congress* may attach conditions on the receipt of federal funds[.]") (emphasis added). And any conditions must be germane to the purpose of the funding. *Sebelius*, 567 U.S. at 632. In the case of Byrne JAG funding, Congress chose to preserve local discretion, and DOJ has no authority to upend that decision.

8

**B.      Policies Restricting Local Immigration Enforcement Promote Public Safety.**

In exercising its discretion over local law enforcement policy, Philadelphia has made the considered judgment that devoting local resources to immigration enforcement would be detrimental to community safety.  Compl., ¶¶ 2-3, 27-30.  Philadelphia is not alone in this judgment.  More than 600 counties and numerous cities – including many of the amici – have opted to limit their engagement in federal immigration enforcement efforts.  Tom K. Wong, Center for American Progress, *The Effects of Sanctuary Policies on Crime and the Economy*, ¶ 12 (2017) (hereinafter "*Effects of Sanctuary Policies*") (identifying 608 counties coded by Immigration and Customs Enforcement ("ICE") as limiting involvement with immigration enforcement), https://www.americanprogress.org/issues/immigration/reports/2017/01/26/297366/ the-effects-of-sanctuary-policies-on-crime-and-the-economy/; Immigrant Legal Resource Center, *Detainer Policies*, https://www.ilrc.org/detainer-policies (listing city and county policies to decline detainer requests).  The policies of these counties and cities are themselves diverse, reflecting the varied needs and judgments of each jurisdiction.[9]

Policies that restrict local entanglement with ICE reflect the judgment of local governments and law enforcement agencies that community trust in local law enforcement is vital to the work of public safety.  Local law enforcement agencies rely upon all community members – regardless of immigration status – to report crimes, serve as witnesses, and assist in investigations and prosecutions.  *See, e.g.,* Chuck Wexler, "Police chiefs across the country support sanctuary cities because they keep crime down," *Los Angeles Times* (Mar. 6, 2017), http://www.latimes.com/opinion/op-ed/la-oe-wexler-sanctuary-cities-immigration-crime-20170306-story.html.  Immigrants – again, regardless of immigration status – are less likely to commit crimes than native U.S. citizens.  *See, e.g.*, Cato Institute, *Criminal Immigrants: Their*

---

[9] *See, e.g.*, County of Santa Clara, Bd. of Supervisors Policy No. 3.54, https://www.sccgov.org/ sites/bos/Legislation/BOS-Policy-Manual/Documents/BOSPolicyCHAP3.pdf; Houston Police Dep't, Immigration Policy Questions and Answers, http://www.houstontx.gov/police/pdfs/ immigration_facts.pdf; King County Code § 2.15.010-2.15.020, http://aqua.kingcounty.gov/ council/clerk/code/05_Title_2.pdf ; Tucson Police Dep't Gen. Orders, Gen. Order 2300, https://www.tucsonaz.gov/files/police/general-orders/2300IMMIGRATION.pdf.

*Numbers, Demographics, and Countries of Origin*, 1 & n.4, 2 (Mar. 15, 2017), https://object. cato.org/sites/cato.org/files/pubs/pdf/immigration_brief-1.pdf.  But "[t]he moment [immigrant] victims and witnesses begin to fear that their local police will deport them, cooperation with their police then ceases."  *Border Insecurity: The Rise of MS-13 and Other Transnational Criminal Organizations*, Hearing before the Committee on Homeland Security and Governmental Affairs of the United States Senate (May 24, 2017) (statement of J. Thomas Manger, Chief of Police, Montgomery County, Maryland).  Indeed, in the experience of amici, even the *perception* that local law enforcement is assisting in immigration enforcement can erode trust, disrupt lines of communication, and make law enforcement's job much more difficult.

Recent data bear this out.  Since President Trump took office and promised to ramp up deportations, Latinos have reported fewer crimes relative to reports by non-Latinos.  Rob Arthur, *Latinos In Three Cities Are Reporting Fewer Crimes Since Trump Took Office* (May 18, 2017) (analyzing data from Dallas, Denver, and Philadelphia), https://fivethirtyeight.com/features/ latinos-report-fewer-crimes-in-three-cities-amid-fears-of-deportation/.  Disturbingly, some jurisdictions have identified declines specifically in reports of sexual assault and domestic violence.  *Id.*[10]  Local police chiefs have attributed these declines to community members' increased fear that interactions with law enforcement could lead to their deportation, or the deportation of a family member.  *Id.*; *see also supra* at 10 n.10.  Indeed, 50% of foreign-born individuals and 67% of undocumented individuals surveyed reported being less likely to offer information about crimes to law enforcement for fear that officers will inquire about their or others' immigration status.  Nik Theodore, Dep't of Urban Planning and Policy, University of Chicago, *Insecure Communities: Latino Perceptions of Police Involvement in Immigration*

---

[10] *See also* Brooke A. Lewis, "HPD chief announces decrease in Hispanics reporting rape and violent crimes compared to last year," *Houston Chronicle* (Apr. 6, 2017), http://www.chron.com/news/houston-texas/houston/article/HPD-chief-announces-decrease-in-Hispanics-11053829.php; James Queally, "Latinos are reporting fewer sexual assaults amid a climate of fear in immigrant communities, LAPD says," *Los Angeles Times* (Mar. 21, 2017), http://www.latimes.com/local/lanow/la-me-ln-immigrant-crime-reporting-drops-20170321-story.html.

*Enforcement*, 5-6 (2013), http://www.policylink.org/sites/default/files/INSECURE_
COMMUNITIES_REPORT_FINAL.PDF.

Local policies that limit entanglement with ICE help mitigate these fears, facilitate engagement with immigrant communities, and ultimately improve public safety by ensuring that those who commit crimes are brought to justice. Contrary to President Trump and Attorney General Sessions' unsupported rhetoric, research has shown that policies limiting cooperation with federal immigration authorities are associated with *lower* crime rates – on average, 35.5 fewer crimes per 10,000 people. *Effects of Sanctuary Policies*, ¶ 16. The association is even stronger in large metropolitan areas: counties with large, urban centers that limit local involvement with ICE experience 65.4 fewer crimes per 10,000 people than similar counties that do not limit such involvement. *Id.*, ¶ 15. Indeed, Philadelphia has experienced these effects first-hand. *See* Compl. ¶¶ 28, 37 (describing decrease in crime in Philadelphia following adoption of policies to limit cooperation with federal immigration enforcement efforts).

Even localities that previously engaged in extensive cooperation with ICE enforcement efforts, such as the City of Louisville, Kentucky, have since determined that having local police assist with immigration enforcement undermines community trust to the detriment of local public safety, and have discontinued the practice except in limited circumstances. *See* Kate Howard, "Louisville Police Don't Enforce Immigration – But Help the Feds Do It," *Ky. Ctr. for Investigative Reporting* (Sept. 17, 2017), http://kycir.org/2017/09/07/louisville-police-dont-enforce-immigration-but-they-help-ice-do-it/?_ga=2.181999650.449997577.1505784164-179920009.1505784164; Darcy Costello, "New LMPD policy: No working with immigration officials to enforce federal laws," The *Courier-Journal* (Sept. 22, 2017).

If the new Byrne JAG conditions are not enjoined, jurisdictions like Philadelphia and some of the amici will be compelled to make choices that undermine public safety: either abandon non-entanglement policies that increase community trust and lower crime rates, or lose funding for critical law enforcement programs. This is not a choice that cities and counties should have to make; it is not a choice that can be imposed consistent with the purpose of the

Byrne JAG program; and, as Philadelphia has demonstrated, it is not a choice that DOJ has the legal authority to require.

### C.   The Byrne JAG Conditions Have Created Uncertainty and Operational Challenges.

Since President Trump's Executive Order punishing sanctuary jurisdictions was issued, the DOJ's position on immigration-related funding conditions has become a constantly moving target. *See supra* at 3-5. The new Byrne JAG conditions are surrounded by an untenable level of uncertainty and pose operational challenges for jurisdictions that rely on this funding.

*Notice Condition.* As announced by the Attorney General and described in the FY 2017 solicitations, the new notice condition required Byrne JAG recipients to "provide *at least* 48 hours' advance notice to DHS regarding the scheduled release date and time of an alien in the jurisdiction's custody." Compl., Ex. 1 (emphasis added). This created significant uncertainty and operational concerns for local jurisdictions, including some amici, that operate detention facilities whose populations are primarily – or exclusively – *unsentenced* individuals held in custody pending resolution of criminal charges or transfer to another facility. *See* Bureau of Justice Statistics, *Jail Inmates in 2015*, at 5 tbl. 4 (2016), https://www.bjs.gov/content/pub/pdf/ji15.pdf (63% of jail inmates nationwide are unsentenced).

Unsentenced inmates typically do not have a "scheduled release date and time" that can be determined 48 hours in advance, and many are in custody for less than 48 hours before they post bail or are ordered released. For this reason, the Attorney General's announcement and the FY 2017 solicitation created confusion and concern that the notice condition may have been intended to require local jurisdictions to continue to detain unsentenced inmates after they would otherwise be released in order to provide sufficient notice to DHS.[11] DOJ now represents that this condition requires notice only "as early as practicable," and does not require any locality to hold an inmate beyond the time he or she would otherwise be released. Def.'s Opp. to Pl.'s Mot.

_____

[11] In its response to Philadelphia's motion for preliminary injunction, the DOJ represents that the access condition applies to *any* immigrant detained in local custody for whom ICE requests notification, regardless of whether the immigrant is sentenced or unsentenced or has a scheduled release date. *See* Mem. in Opp. to Pl.'s Mot. for Prelim. Inj. ("Opp.") at 31-32, ECF No. 28.

for Preliminary Injunction, 20, *Chicago*, No. 17-CV-5720 (N.D. Ill., Aug. 24, 2017), ECF No. 32; Hanson Decl., Exs. A & B, ¶¶55-56, *Chicago*, No. 17-CV-5720 (N.D. Ill., Aug. 24, 2017), ECF No. 32.  Even assuming DOJ adheres to this latest articulation of the condition, it nonetheless presents operational concerns: for agencies that detain arrestees and unsentenced individuals, there are likely to be many instances in which giving *any* advance notice is impracticable.  It also conflicts with the local laws or policies of some amici, which have limited their responses to ICE notification requests for the reasons discussed in Section II, *supra*. Moreover, given DOJ's inconsistent position, amici remain concerned about how this condition will be enforced in practice.

 *Access Condition.*  The award letters submitted by DOJ with its opposition to Chicago's preliminary injunction motion require Byrne JAG recipients to have a policy or practice in place to ensure that federal agents "in fact are given access" to a local "correctional facility for the purpose of permitting such agents to meet with individuals who are (or are believed by such agents to be) aliens and to inquire as to such individuals' right to be or remain in the United States."  Hanson Decl., Exs. A & B, ¶ 56(1)(A), *Chicago*, No. 17-CV-5720 (N.D. Ill., Aug. 24, 2017), ECF No. 32.  The award letter does not explain what "access" "in fact" means, leaving jurisdictions to guess at what they must do to comply and, in some cases, whether compliance is consistent with state law.  In California, state law requires local agencies to provide a consent form prior to any interview with ICE that explains the purpose of the interview, that the interview is voluntary, and that the inmate may decline to be interviewed or choose to be interviewed only with his or her attorney present.  Cal. Gov't Code § 7283.1(a).  Other jurisdictions require an inmate's written consent prior to allowing any interview with ICE, *see* Compl. ¶¶ 50-51 (describing Philadelphia policy), or provide that inmates must be permitted to have an attorney present during ICE interviews, *see* D.C. Code § 24-211.07(d)(1).  The DOJ has represented in this litigation that the access condition requires Byrne JAG recipients to permit ICE interviews even if the inmate does not consent to the interview or declines to answer questions.  (Opp. at 32.)  If DOJ in fact maintains that position, some jurisdictions may be forced

13

to forego Byrne JAG funds to comply with state or local laws.  For other jurisdictions, ambiguity surrounding how DOJ will ultimately enforce the condition continues to cause confusion and concern.

Whether to allow ICE to operate inside city and county detention facilities is an inherently local decision that should be left to local governments and local law enforcement officials.  *See Enforcing Immigration Law* at 1.  Local agencies are responsible for maintaining order and security within jails and other detention facilities, and they must retain the discretion to decide how that responsibility is best fulfilled.  Some jurisdictions have made the judgment that permitting ICE to operate in local detention facilities interferes with correctional operations – for example, by increasing fear among inmates and decreasing their trust of correctional staff – and is not in the best interests of staff, inmates, or the broader community.  *See, e.g.*, Cook County Code § 46-37(b); County of Santa Clara, Bd. of Supervisors Policy No. 3.54, https://www.sccgov.org/sites/bos/Legislation/BOS-Policy-Manual/Documents/ BOSPolicyCHAP3.pdf; Revised Municipal Code of the City and County of Denver, § 28-252.

Moreover, local officials have already expressed concern that ICE's practice of arresting immigrants at courthouses – including crime victims – deters immigrants both from pursuing justice for crimes committed against them, and from appearing in court to answer any charges they may be facing, thereby endangering local prosecutions.  *See, e.g.,* Katie Mettler, "'This is really unprecedented': ICE detains woman seeking domestic abuse protection at Texas courthouse," *Wash. Post* (Feb. 16, 2017), https://www.washingtonpost.com/news/morning-mix/ wp/2017/02/16/this-is-really-unprecedented-ice-detains-woman-seeking-domestic-abuse-protection-at-texas-courthouse/?utm_term=.b1c3c0902b1b; James Queally, "ICE agents make arrests at courthouses, sparking backlash from attorneys and state supreme court," *Los Angeles Times* (Mar. 16, 2017), http://www.latimes.com/local/lanow/la-me-ln-ice-courthouse-arrests-20170315-story.html.  Immigrant inmates who see ICE operating in local jails or detention facilities may assume that ICE is permitted in other government buildings, such as courthouses, and may be more likely to abscond, denying victims the opportunity for justice.

***Certification Condition.***  Finally, the Trump Administration has created significant

uncertainty and concern over how it intends to enforce requirements that federal grant recipients

comply with 8 U.S.C. § 1373. On its face, section 1373 addresses only state and local restrictions

on the sharing of information on citizenship or immigration status with ICE or other

governmental entities; the statute does not mandate that state and local governments collect this

information, nor does it impose any additional requirements.  *See* 8 U.S.C. § 1373.  Nonetheless,

the Administration has repeatedly suggested that a broad range of local policies – including

policies limiting compliance with ICE detainer requests – violate section 1373.  *See* U.S. Dep't

of Justice, Office of Public Affairs, *Attorney General Sessions Delivers Remarks on Sanctuary*

*Policies* (Aug. 16, 2017), https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-

remarks-sanctuary-policies (suggesting that Miami-Dade County is "now in full compliance"

following its decision to begin honoring detainer requests); Compl., Ex. 1 (section 1373

"generally bars restrictions on communications" between local agencies and DHS).

On October 12, 2017, the DOJ completed a preliminary review of the legal opinions and

supporting documentation it demanded from nine jurisdictions, and sent letters to five

jurisdictions – including Philadelphia and amici Chicago, Cook County, and New York City  –

stating that they "have preliminarily been found to have laws, policies, or practices that may

violate 8 U.S.C. 1373."  *See* U.S. Dep't of Justice, Office of Public Affairs, *Justice Department*

*Provides Last Chance for Cities to Show 1373 Compliance*, https://www.justice.gov/opa/pr/

justice-department-provides-last-chance-cities-show-1373-compliance.[12]  These letters only add

---

[12] *See also* Letter from Alan Hanson, Acting Assistant Attorney General, U.S. Dep't of Justice to
the Honorable Jim Kenney, Mayor of Philadelphia (Oct. 11, 2017),
https://www.justice.gov/opa/press-release/file/1003046/download ("Philadelphia Letter"); Letter
from Alan Hanson, Acting Assistant Attorney General, U.S. Dep't of Justice to Eddie T.
Johnson, Chicago Superintendent of Police (Oct. 11, 2017), https://www.justice.gov/opa/press-
release/file/1003016/download ("Chicago Letter"); Letter from Alan Hanson, Acting Assistant
Attorney General, U.S. Dep't of Justice to Toni Preckwinkle, President, Cook County Board of
Commissioners (Oct. 11, 2017), https://www.justice.gov/opa/press-
release/file/1003026/download ("Cook County Letter"); Letter from Alan Hanson, Acting
Assistant Attorney General, U.S. Dep't of Justice to the Honorable Mitchel Landieu, City of
New Orleans Criminal  Justice Coordination (Oct. 11, 2017), https://www.justice.gov/opa/press-
release/file/1003036/download ("New Orleans Letter"); Letter from Alan Hanson, Acting

to the uncertainty surrounding the certification condition and confirm that DOJ intends to enforce an insupportably broad interpretation of the statute.

For example, several of the letters indicate that policies limiting sharing of information about *custody status* or *release dates* violate section 1373.[13]  *See* Philadelphia Letter at 1; Chicago Letter at 1; Cook County Letter at 1; New York Letter at 2-3.  But DOJ provides no explanation of how such policies "prohibit, or in any way restrict" what section 1373 addresses: the sharing of information about *immigration status*.[14]  Some of the letters also state, without further explanation, that DOJ "is not relying on" policies limiting compliance with ICE detainer requests in its "preliminary assessment[s]."  Philadelphia Letter at 1 n.1; New York Letter at 2 n.1.  This cryptic language could suggest that DOJ is leaving open the possibility that such policies may violate section 1373 – leaving jurisdictions to wonder whether DOJ will "rely[] on" such policies in the future and, if so, what position it will take.

DOJ's failure to provide a clear and lawful interpretation of section 1373 has created uncertainty and forces jurisdictions to guess at how DOJ will view their policies – or what policy changes DOJ would view as sufficient – when it begins enforcing this condition.  Local jurisdictions may not lawfully be placed in this position.  *See Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) (even where Congress imposes conditions on receipt of

---

Assistant Attorney General, U.S. Dep't of Justice to Elizabeth Glazer, Director, New York City Mayor's Office of Criminal  Justice (Oct. 11, 2017), https://www.justice.gov/opa/press-release/file/1003041/download ("New York Letter").

[13] New York City law permits Department of Correction personnel to provide federal immigration authorities with information related to a person's citizenship or immigration status, but prohibits the sharing of information about incarceration status and release dates unless an enumerated exception applies.  N.Y.C. Administrative Code 9-131(h)(1).  The New York Letter states that to comply with section 1373, New York would need to certify that it interprets this ordinance to "not restrict New York officers from sharing information regarding immigration status with federal immigration officers, *including information regarding an alien's incarceration status and release date and time*."  New York Letter at 2-3 (emphasis added).

[14] In a footnote in its opposition brief, the DOJ takes the position that section 1373 covers "information that assists the federal government in carrying out its statutory responsibilities under the [Immigration and Nationality Act."  Opp. at 39 n.11.  This statement only increases confusion about the range of information DOJ believes local officials must be able to share with ICE in order to certify compliance and receive Byrne JAG funds.

federal funds, "it must do so unambiguously" and cannot leave a grant recipient "unable to ascertain what is expected of it").

## IV.

## CONCLUSION

By structuring the Byrne JAG program as a broad formula grant, Congress recognized the need for local discretion over law enforcement programs, and created a (non-competitive) source of funding on which local jurisdictions should be able to rely. The new conditions imposed by Attorney General Sessions upend congressional intent. Instead of preserving flexibility for local operations, the new conditions constrain local choices and require localities to adopt federally mandated policies that will make their communities *less* safe. Instead of preserving a reliable stream of funding, DOJ's shifting positions force localities to guess at whether DOJ will deem them eligible for funding – and whether they will be able to comply with the conditions on that funding if they accept it. An injunction is needed to halt DOJ's unlawful effort to impose these conditions and to protect the safety of local communities.

Dated:  October 19, 2017                Respectfully Submitted,

                                        COUNTY OF SANTA CLARA
                                        JAMES R. WILLIAMS,
                                        County Counsel

                                        By:  ___/s Laura S. Trice_____
                                              Laura S. Trice
                                              Lead Deputy County Counsel

                                              Laura S. Trice (*pro hac vice*)
                                              Kavita Narayan (*pro hac vice*)
                                              OFFICE OF THE COUNTY COUNSEL
                                              70 West Hedding Street, East Wing, 9th Floor
                                              San Jose, CA 95110-1770
                                              (408) 299-5900

                                        By:  ___/s John C. Grugan_____
                                              John C. Grugan
                                              Associate Counsel for the County of Santa Clara

                                              John C. Grugan (Attorney No. 83148)
                                              Jason A. Leckerman (Attorney No. 87915)
                                              Emilia McKee Vassallo (Attorney No. 318428)
                                              BALLARD SPAHR LLP
                                              1735 Market Street, 51st Floor
                                              Philadelphia, PA 19103
                                              (215) 665-8500

                                        *Attorneys for Amicus Curiae County of Santa Clara*

                                        *Full List of Amici Curiae and*
                                        *Additional Counsel for Amici Curiae Provided Below*

*List of Amici Curiae*

The County of Santa Clara, California; the City of Austin, Texas; the City of Cambridge, Massachusetts; the City of Chelsea, Massachusetts; the City of Chicago, Illinois; Cook County, Illinois; the City and County of Denver, Colorado; the District of Columbia; the International City/County Management Association; the International Municipal Lawyers Association; the City of Iowa City, Iowa; King County, Washington; the City of Los Angeles, California; the City of Madison, Wisconsin; the Metropolitan Area Planning Council; the National League of Cities; the City of New York, New York; the City of Oakland, California; the City of Pittsburgh, Pennsylvania; the City of Portland, Oregon; the City of Providence, Rhode Island; the City of Rochester, New York; the City of Sacramento, California; the City and County of San Francisco, California; the County of Santa Cruz, California; the City of Seattle, Washington; the City of Somerville, Massachusetts; The United States Conference of Mayors; and the City of West Hollywood, California.

### *Additional Counsel for Amici Curiae*

Anne L. Morgan
City Attorney, City of Austin
P.O. Box 1546
Austin, TX 78767-1546

*Attorney for the City of Austin, Texas*

Nancy E. Glowa
City Solicitor, City of Cambridge
City Hall
795 Massachusetts Avenue
Cambridge, MA 02139

*Attorney for the City of Cambridge, Massachusetts*

Cheryl Watson Fisher
City Solicitor
City of Chelsea Law Department
500 Broadway, Room 307
Chelsea, MA 02150

*Attorney for the City of Chelsea, Massachusetts*

Edward N. Siskel
Corporation Counsel of the City of Chicago
30 N. LaSalle Street, Suite 800
Chicago, IL 60602

*Attorney for the City of Chicago, Illinois*

Kimberly M. Foxx
States Attorney for Cook County
69 W. Washington, 32nd Floor
Chicago, IL  60602

*Attorney for Cook County*

Kristin M. Bronson
City Attorney, City and County of Denver
1437 Bannock Street, Room 353
Denver, CO 80202

*Attorney for the City and County of Denver, Colorado*

Karl A. Racine
Attorney General, District of Columbia
One Judiciary Square
441 4th Street NW, Suite 1100 South
Washington, DC 20001

*Attorney for the District of Columbia*

Charles W. Thompson, Jr.
Executive Director, General Counsel
International Municipal Lawyers Association
51 Monroe Street, Suite 404
Rockville, MD 20850

*Attorney for the International Municipal Lawyers Association*

19

Eleanor M. Dilkes
City Attorney, City of Iowa City
410 E. Washington St.
Iowa City, IA 52240

*Attorney for the City of Iowa City, Iowa*

Michael N. Feuer
City Attorney, City of Los Angeles
200 N. Main Street, 800 CHE
Los Angeles, CA 90012

*Attorney for the City of Los Angeles,
California*

Jennifer R. García
General Counsel
60 Temple Place, 6th Floor
Boston, MA 02111

*Attorney for the Metropolitan Area Planning
Council*

Barbara J. Parker
City Attorney, City of Oakland
One Frank H. Ogawa Plaza, Sixth Floor
Oakland, CA 94612

*Attorney for the City of Oakland, California*

Tracy Reeve
City Attorney, City of Portland
430 City Hall
1221 SW 4th Avenue
Portland, OR 97204

*Attorney for the City of Portland, Oregon*

Brian F. Curran
Corporation Counsel, City of Rochester
30 Church St., Room 400A
Rochester, NY 14614

*Attorney for the City of Rochester, New York*

Dan Satterberg
King County Prosecuting Attorney
516 Third Avenue, W400
Seattle, WA 98104

*Attorney for King County, Washington*

Michael P. May
City Attorney, City of Madison
210 Martin Luther King Jr. Blvd, Room 401
Madison, WI 53703

*Attorney for the City of Madison, Wisconsin*

Zachary W. Carter
Corporation Counsel of the City of New York
100 Church Street
New York, NY 10007

*Attorney for the City of New York, New York*

Lourdes Sánchez Ridge
City Solicitor & Chief Legal Officer,
City of Pittsburgh
313 City-County Building
414 Grant Street
Pittsburgh, PA 15219

*Attorney for the City of Pittsburgh,
Pennsylvania*

Jeffrey Dana
City Solicitor, City of Providence
444 Westminster Street, Suite 220
Providence, RI 02903

*Attorney for the City of Providence, Rhode
Island*

Matthew Ruyak
Interim City Attorney, City of Sacramento
915 I Street, Fourth Floor
Sacramento, CA 95814

*Attorney for the City of Sacramento, California*

Dennis J. Herrera
City Attorney, City and County of San Francisco
City Hall Room 234
One Dr. Carlton B. Goodlett Pl.
San Francisco, CA 94102

*Attorney for the City and County of San Francisco, California*

Dana McRae
County Counsel, County of Santa Cruz
701 Ocean Street, Room 505
Santa Cruz, CA 95060

*Attorney for the County of Santa Cruz, California*

Peter S. Holmes
City Attorney, City of Seattle
701 Fifth Avenue, Suite 2050
Seattle, WA 98104-7097

*Attorney for the City of Seattle, Washington*

Francis X. Wright, Jr.
City Solicitor, City of Somerville
93 Highland Avenue
Somerville, MA 02143

*Attorney for the City of Somerville, Massachusetts*

Michael Jenkins
City Attorney, City of West Hollywood
JENKINS & HOGIN, LLP
Manhattan Towers
1230 Rosecrans Avenue, Suite 110
Manhattan Beach, CA 90266

*Attorney for the City of West Hollywood, California*