# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

THE CITY of PHILADELPHIA,

     Plaintiff,

v.

JEFFERSON BEAUREGARD SESSIONS III,
in his official capacity as Attorney General of
the United States,

     Defendant.

Case No. 2:17-cv-03894-MMB

## REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................................ ii

INTRODUCTION ...................................................................................................................... 1

ARGUMENT ............................................................................................................................. 2

I.     The Department's New Conditions Conflict With The Byrne JAG Statute And Are Arbitrary And Capricious .............................................................. 2

II.    The Department's New Conditions Violate The Spending Clause ......................... 8

III.   The Department Has No Basis To Withhold Funding From The City On Account Of The Section 1373 Condition .................................................. 10

IV.   Philadelphia Will Suffer Irreparable Harm If Relief Is Not Granted ..................... 15

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.O. Smith Corp. v. FTC*,
530 F.2d 515 (3d Cir. 1976)...................................................................................12

*Abbott Labs. v. Gardner*,
387 U.S. 136 (1967)...........................................................................................8

*Amalgamated Transit Union v. Skinner*,
894 F.2d 1362 (D.C. Cir. 1990) ...........................................................................3

*Cal. Human Dev. Corp. v. Brock*,
762 F.2d 1044 (D.C. Cir. 1985) ...........................................................................3

*Charles v. Verhagen*,
348 F.3d 601 (7th Cir. 2003) ...............................................................................9

*City of Chicago v. Sessions*,
Case No. 17 C 5720, 2017 WL 4081821 (N.D. Ill. Aug. 15, 2017) ........................5

*City of Chicago v. Sessions*,
No. 17-2991 (7th Cir. Oct. 13, 2017)......................................................7, 8, 13, 16

*City of Los Angeles v. McLaughlin*,
865 F.2d 1084 (9th Cir. 1989) .............................................................................2

*Encino Motorcars, LLC v. Navarro*,
136 S. Ct. 2117 (2016).......................................................................................8

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (1999)..........................................................................................7

*Green v. Bock Laundry Mach. Co.*,
490 U.S. 504 (1989)..........................................................................................6

*INS v. Yueh-Shaio Yang*,
519 U.S. 26 (1996)...........................................................................................13

*Koslow v. Pennsylvania*,
302 F.3d 161 (3d Cir. 2002)...........................................................................9, 10

*Lewis v. Alexander*,
685 F.3d 325 (3d Cir. 2012)................................................................................11

*Nat'l Collegiate Athletic Ass'n v. Governor of N.J.*,
730 F.3d 208 (3d Cir. 2013)............................................................15

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
567 U.S. 519 (2012)..........................................................................9

*Ohio Forestry Ass'n, Inc. v. Sierra Club*,
523 U.S. 726 (1998)........................................................................12

*Plains All Am. Pipeline L.P. v. Cook*,
866 F.3d 534 (3d Cir. 2017)......................................................10, 11

*Printz v. United States*,
521 U.S. 898 (1997)........................................................................15

*Reilly v. City of Harrisburg*,
858 F.3d 173 (3d Cir. 2017)............................................................11

*South Dakota v. Dole*,
483 U.S. 203 (1987)......................................................................8, 9

*St. Louis Univ. v. Duncan*,
97 F. Supp. 3d 1106 (E.D. Mo. 2015)................................................3

*Step-Saver Data Sys., Inc. v. Wyse Tech.*,
912 F.2d 643 (3d Cir. 1990)............................................................11

*Travelers Ins. Co. v. Obusek*,
72 F.3d 1148 (3d Cir. 1995)......................................................11, 12

*United States v. Craft*,
535 U.S. 274 (2002)..........................................................................7

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952)..........................................................................7

**Statutes**

8 U.S.C. § 1182.................................................................................10

8 U.S.C. § 1227.................................................................................10

8 U.S.C. § 1373........................................................................*passim*

28 U.S.C. § 2201...............................................................................11

34 U.S.C. § 10102(a)(6)...............................................................4, 5, 6

34 U.S.C. §§ 10151-10158.................................................................4

iii

34 U.S.C. § 10153......................................................................................................3, 4, 5

34 U.S.C. § 10156.........................................................................................................2, 6

34 U.S.C. § 10171(b) .........................................................................................................2

34 U.S.C. § 10446(e)(3).....................................................................................................5

47 U.S.C. § 224..................................................................................................................6

Violence Against Women and Department of Justice Reauthorization Act of
    2005, Pub. L. No. 109-162, 119 Stat. 2096 ...............................................................5

**Other Authorities**

1 Richard B. Cappalli, *Federal Grants and Cooperative Agreements: Law, Policy,
    and Practice* (1987) ...................................................................................................2

H.R. Rep. No. 109-233 (2005)...........................................................................................9

# INTRODUCTION

The Department of Justice has no answer to the City of Philadelphia's core argument: The new Byrne JAG conditions being thrust upon the City are *unlawful*. The Attorney General exceeded the authority delegated to him by Congress to administer Byrne JAG's formula grant program. He added an enforcement mechanism to Section 1373 that appears nowhere in the statute, and that Congress considered enacting several times but declined to do. He imposed substantive requirements that not only are unauthorized by Byrne JAG, but *conflict* with the statute's structure and purpose. And he departed from past agency practice without reasoned explanation. This kind of agency action is the epitome of what the Administrative Procedure Act protects against. It warrants the straightforward remedy of a preliminary injunction here.

Even if Congress had intended to authorize the Department to impose these new conditions on Byrne JAG awards—which it did not—that would violate the Spending Clause. A condition must further the goals of the funding at issue. The conditions fail that test.

The Department also has no satisfactory answer to Philadelphia's argument that if the Section 1373 condition can be attached to its 2017 JAG award, the City should not lose any funding on account of that condition. The Department first tries to deter the Court from reviewing this aspect of Philadelphia's case by citing inapplicable case law and creating the impression that review is inappropriate. There is no impediment to this Court's review: The Department has determined (incorrectly) that Philadelphia's policies do not comply with Section 1373, and there is nothing that will occur during the minimal remaining administrative process (*i.e.*, Philadelphia must send a response by October 27) that will alter that conclusion. On the merits, the Department's proffered reasons for Philadelphia's non-compliance all fail. Philadelphia's policies contain numerous exceptions for information-sharing when it comes to

criminal suspects, and the City's protections for victims, witnesses, and law-abiding people are consistent with Section 1373 when interpreted in light of the Constitution.

Finally, the argument that Philadelphia will not suffer irreparable harm in the absence of injunctive relief is simply not credible. The City will have to sacrifice either close to $2 million dollars in funding, or its autonomy, hard-won trust with the immigrant community, and efforts to improve public safety for all Philadelphians. Either option irreversibly wounds the City.

## ARGUMENT

### I. The Department's New Conditions Conflict With The Byrne JAG Statute And Are Arbitrary And Capricious.

1. The Department lacks any authority—let alone "ample authority"—to impose its policy preferences on recipients of Byrne JAG funds. Opp. 2. The Byrne JAG statute creates a formula grant program, not a discretionary one, for distributing criminal justice funding to States and localities. *See* 1 Richard B. Cappalli, *Federal Grants and Cooperative Agreements: Law, Policy, and Practice* § 4.01 (1987) ("In the formula grant program the authorizing Act of Congress determines who the recipients are and how much money each shall receive."). Congress *could* have used a discretionary grant model for Byrne JAG, which would have given the administering entity more authority in selecting grantees, but it opted instead to make funds available to States and localities based on statistical indicators such as population and crime rates. *See* 34 U.S.C. § 10156 (a), (d); *see also City of Los Angeles v. McLaughlin*, 865 F.2d 1084, 1088 (9th Cir. 1989). In this way, Byrne JAG—codified at Subchapter V of Chapter 101 of Title 34—is different from the discretionary grant programs codified in the same subchapter, which are also administered by the Bureau of Justice Assistance ("BJA") and which include more authority for the agency in the "selection of applicants to receive grants." 34 U.S.C. § 10171(b); *accord id.* § 10191. Congress's decision to afford less discretion to the Department

under Byrne JAG was a deliberate one. *See Amalgamated Transit Union v. Skinner*, 894 F.2d 1362, 1368-72 (D.C. Cir. 1990) ("on the few occasions when Congress intended to give [the agency] broad rulemaking authority *vis-a-vis* its grantees, it did so expressly").

An agency's "actions in allocating . . . [grant] funds must conform to relevant statutes." *Cal. Human Dev. Corp. v. Brock*, 762 F.2d 1044, 1048 (D.C. Cir. 1985). The Department's actions here do not. Congress gave the Attorney General authority to impose three types of conditions on JAG award recipients: (1) conditions pertaining to the grantee's use of the funds, to ensure that funds are spent on one of the eight categories of criminal justice programming set forth by the statute, 34 U.S.C. § 10153(a)(5)(A); (2) conditions pertaining to financial and programmatic integrity, *id.* § 10153(a)(4); and (3) conditions pertaining to compliance with "Federal laws" that, by their terms, are "applicable" to federal grantees, *id.* § 10153(a)(5)(D); *see* PI Mem. 16-21. The Department's new immigration-related conditions fall into none of those categories. By departing from Congress's careful delegations of authority and substituting the statute's stated criteria for funds with his own, the Attorney General has acted *ultra vires* and contrary to Congress's intent. *See St. Louis Univ. v. Duncan*, 97 F. Supp. 3d 1106, 1121 (E.D. Mo. 2015) (formula grant statute "was not intended to serve as an avenue for . . . administrators to create [grant terms], according to their own policy preferences").

2. Historical practice confirms this conclusion, although the Department tries to paint a different picture. As the City exhaustively demonstrated in an exhibit attached to its preliminary injunction brief, every one of the 52 "special conditions" that the Department has historically imposed on the City falls into one of the three buckets of authority prescribed by the statute. *See* Dkt. 21-11 (Exhibit F). The Department says that several past conditions were actually "discretionary conditions" that do not derive from the authorizing statute but were imposed to

"promote the Department's law enforcement and public safety goals." Opp. 13. That is incorrect. The "information sharing" and "interoperability" condition that the Department references (at 13) fosters programmatic integrity, as per Section 10153(a)(4) of Byrne JAG. *See* Ex. F, p. 6. The "Prohibited Expenditure List" condition that the Department cites (at 13) traces to a federal law that regulates the use of funds by grantees, as per Section 10153(a)(5)(D) of Byrne JAG. *See* Ex. F, p. 10. The "training" conditions the Department mentions (at 13-14) both further Byrne JAG's goal of strengthening public safety, as per Section 10153(a)(5)(A), and implement the Attorney General's authority to "provide technical assistance to States and local governments," as per Section 10153(b). *See* Ex. F., pp. 7-8. Despite the Department's efforts to gloss over these details, *every historical condition imposed* on Philadelphia falls comfortably within the statutorily prescribed sources of authority for the Attorney General. The "conditions that the City challenges in this lawsuit" *are*, in fact, "different in kind." Opp. 14.

3. The Department's efforts to locate statutory sources of authority for its new conditions are unavailing. The Department first invokes Section 10102(a)(6) of Title 34, a provision that is not part of the Byrne JAG codification,[1] that dates to 1984, and that defines the duties of the Assistant Attorney General ("AAG") of the Office of Justice Programs. But that provision does not *itself* vest any power within the AAG: It merely authorizes him to "exercise. . . powers and functions *as may be vested* within [his office] *pursuant to this chapter or by delegation of the Attorney General*," which may "includ[e]" the power to "plac[e] special conditions" on grants or to "determin[e] priority purposes for formula grants." 34 U.S.C. § 10102(a)(6) (emphases added). In the case of JAG funds, "this chapter" (*i.e.*, Chapter 101 of Title 34) vests no "special

---

[1] Within Chapter 101 of Title 34 of the U.S. Code, the Byrne JAG program is codified at Subchapter V, entitled "Bureau of Justice Assistance Grant Programs." *See* 34 U.S.C. §§ 10151-10158. The provision concerning the powers of the Assistant Attorney General is codified in Subchapter I, entitled "Office of Justice Programs." *Id.* §§ 10101-10111.

conditions" authority in the AAG, and Congress's "delegation" to the Department is confined to imposing the narrow sets of conditions in 34 U.S.C. § 10153.[2]  (And indeed, every "special condition" historically imposed by the Attorney General on the City has fallen within that statutory delegation.  *See supra* pp. 3-4.)  The point is that Section 10102(a)(6) adds nothing beyond the JAG statute itself, and it cannot bear the weight of the Department's argument.  *See City of Chicago v. Sessions* ("*Chicago*"), No. 17 C 5720, 2017 WL 4081821, at *6-7 (N.D. Ill. Aug. 15, 2017) (rejecting the Department's Section 10102(a)(6) argument).

The Department points out that the "special conditions" and "priority purposes" language in Section 10102(a)(6) was added in 2006, in the same enactment in which Congress created the Byrne JAG program.  Opp. 15-16.  But that fact *supports* the City's argument.  As Congress was creating Byrne JAG—with its statistics-based criteria for awarding funds and its circumscribed authority for the Attorney General, *see* Pub. L. No. 109-162, 119 Stat. 2960, 3094-3103 (2005)—Congress was also clarifying that for different grant programs, the AAG's conceivable "exercise[s]" of authority could include imposing "special conditions" or setting "priorities" for grants, if such was consistent with Congress's delegations, *see id.* at 3113.  This reinforces that Congress intended Section 10102(a)(6) to run consistently with grant schemes that limit agency discretion, not to override them.  *See Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 524 (1989) ("general statutory rule[s]" should govern only if there is "no more specific rule").  Moreover, it is notable that Congress altered Section 10102(a)(6) by adding the "including"

---

[2] Byrne JAG is in this way different from certain other DOJ grant programs, including several codified in Chapter 101, which *do* imbue the Department with broader authority to impose grant conditions or develop grant priorities.  *See, e.g.*, 34 U.S.C. § 10446(e)(3) ("In disbursing grants under this subchapter [to Combat Crimes Involving Violence Against Women], the Attorney General may impose reasonable conditions on grant awards"); *id.* § 10381(c) (the Attorney General may "give preferential consideration" to applications for the "Cops on the Beat" program); *id.* §§ 10171, 10191 (similar).  For those grants, Section 10102(a)(6)'s sub-delegation to the AAG to impose "special conditions" confers broader authority.

clause, rather than by dropping the first clause. 119 Stat. at 3113. If Congress meant to endow the AAG with a new, freestanding power to impose "special conditions," it would not have retained the requirement that such power derive from other sources of authority.

Next, the Department tries to locate authority for the Section 1373 condition in the "applicable Federal laws" section of the JAG statute. Opp. 17-19. According to the Department, this provision must be construed to refer to the entire "corpus of federal laws that . . . apply" to "state and local jurisdictions," *i.e.*, *any* "federal law" that a locality is "already obligated to comply with." *Id.* at 19. The Department effectively concedes that its interpretation contains no limiting principle. Under the Department's reading, the Attorney General could pick any provision from the U.S. Code that applies to a locality—even a law concerning utility poles, *see* 47 U.S.C. § 224—and impose it as a condition of a JAG award. Such a limitless grant of authority not only would trigger Spending Clause concerns, but would undermine Congress's objective of disbursing criminal justice grants based on localities' populations and crimes rates, rather than based on the Attorney General's policy preferences. 34 U.S.C. § 10156.

4. The Department downplays the "persuasive significance" of the rejected legislation referenced in Philadelphia's brief, arguing that an "'equally tenable inference[]'" that "'may be drawn from [Congress's] inaction'" on those occasions is that "existing legislation already incorporated the offered change.'" Opp. 20 (quoting *United States v. Craft*, 535 U.S. 274, 287 (2002)). But one of the failed bills the City cited would have vested in the Attorney General authority to make localities ineligible to receive various "grants . . . awarded by the Department of Justice" if they refused to "cooperate with Federal officials" pursuant to Section 1373. PI Mem. 24 (citing S. 1812, 114th Cong. § 3 (2015)). Congress could *not* have thought that "existing legislation"—namely, Section 1373 or the "grants" administered by the Department—

"already incorporated" the authority for the Attorney General to withhold funds based on non-compliance with Section 1373; otherwise it would not have attempted to pass a statute providing exactly that power. Further, while the Department cites case law from other contexts to suggest that failed legislation has little persuasive value, *see* Opp. 19-20, federal courts, including the Supreme Court, have often relied on rejected legislation as evidence of statutory meaning when the question concerns the scope of executive authority. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 144 (1999); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 586 (1952); PI Mem. 26 (citing authorities).

5. The Department's defenses to the City's arbitrary-and-capricious challenge are just as weak. First, the Department suggests that its imposition of the conditions is not reviewable under the APA, because the Department has not taken "final agency action." Opp. 23-24. That is wrong. The Department definitively announced on July 25, 2017, that it was going to impose three new conditions on FY 2017 JAG grantees. Compl. ¶ 86. It submitted a sworn declaration in the *Chicago* case—and another one here, *see* Dkt. 28-1 (Decl. of Alan Hanson ¶ 5)—stating that every locality's FY 2017 award will contain terms identical to those printed in Greenville's award. *See* PI Mem. 13. And it told the *Chicago* district court that it intends to "issu[e], in an expeditious manner, award documents" to the 1,000 entities that applied for FY 2017 grants. *See* Mem. Supp. Stay, *Chicago*, at 1-2 (N.D. Ill. Sep. 26, 2017) (ECF No. 81). The Department's suggestion that there is some "consummation of the Department's decisionmaking process" yet to occur is nothing more than a tactic to forestall this Court's review. Opp. 24. The Department has decided to impose the new conditions on all JAG grantees; it can impose the Section 1373 condition on Philadelphia right now; and it hopes to impose the other two conditions imminently

(if the Seventh Circuit stays the nationwide injunction).[3]   The agency has acted, and this Court's review is warranted.   *See Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967).

The Department next contends that arbitrary-and-capricious review is "'substantially similar to rational basis review,'" and so this Court must rubber-stamp the Department's decision.   Opp. 25 (citation omitted).   For this proposition, though, the Department relies on a Third Circuit case that dealt with an Equal Protection Clause challenge to agency action in which there was no suspect class.   *See id.*   The standard of review is different where, as here, the basis of the plaintiff's challenge is that the agency deviated from past practice.   In this context, the agency must "show that there are good reasons for the new policy," to demonstrate that it did not act arbitrarily.   *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016).   The Department has failed to do so.   *See* PI Mem. 33-34.

## II.   The Department's New Conditions Violate The Spending Clause.

1.   The Department's efforts to resolve the Spending Clause infirmities of its new JAG conditions fare no better.   As to relatedness, that "hurdle" is higher than the Department lets on. Opp. 28.   The Constitution requires that spending conditions be "reasonably calculated to address th[e] particular . . . purpose for which the funds are expended." *South Dakota v. Dole*, 483 U.S. 203, 207 (1987).   No court has endorsed a "loose relatedness" test for the Spending Clause like the one the Department urges.   Opp. 28.   Rather, courts have insisted that the relationship between conditions and the purposes of federal spending be "reasonabl[e]," *Dole*, 483 U.S. at 207; "discernibl[e]," *Koslow v. Pennsylvania*, 302 F.3d 161, 175 (3d Cir. 2002); and that conditions and spending "share[] the same goal," *Charles v. Verhagen*, 348 F.3d 601, 609 (7th Cir. 2003).   In *Dole* itself, the Court did not find "only [a] loosely-related" connection, as

---

[3] The Department is currently seeking a stay of the *Chicago* district court's nationwide injunction in the Seventh Circuit.   It filed that motion on October 13, 2017.   *See* Appellant's Mot. Stay, *City of Chicago v. Sessions*, No. 17-2991 (7th Cir. Oct. 13, 2017) (ECF No. 8).

the Department suggests, Opp. 28—it found that the condition was "*directly related* to one of the main purposes for which [the] funds are expended." 483 U.S. at 208 (emphasis added); *accord Koslow*, 302 F.3d at 175-176 (condition "directly" furthered the federal interest).[4]

The Department's new conditions are not "reasonably calculated" to further the purposes of the JAG program, nor do they "share the same goal." The new conditions aim to enhance federal civil immigration enforcement. The JAG program aims to strengthen localities' criminal justice systems. The JAG program also seeks to "give State and local governments . . . flexibility" in bolstering public safety, H.R. Rep. 109-233, at 89; *see* PI Mem. 21-23, 36-37, while the new conditions thrust specific policy mandates on localities, including ones that cities such as Philadelphia have found *threaten* public safety. Calling this a "discernible relationship," Opp. 30, turns *Koslow* on its head: A condition must at least "further[]," not frustrate, the congressional interest. *Koslow*, 302 F.3d at 176.

Rather than confront these tensions, the Department (at 29-30) merely asserts that "immigration enforcement" is "[r]elated" to "criminal justice," based on sampled sections of the Immigration and Nationality Act ("INA"). This argument fails, too. The focus of the relatedness analysis is not achievement of the policies behind the condition (here, immigration enforcement) but achievement of the policies behind the spending program (here, criminal justice enhancement). The Department gets this backwards by pointing to INA provisions allowing for deportation of non-citizens who commit certain crimes; that shows at most that criminal justice enforcement by localities can assist *immigration* enforcement, which is not the goal of JAG funding, even if it is the goal of the Attorney General. *See* PI Mem. 21-22, 35-39. Likewise,

---

[4] The Department emphasizes that, as of 2004, "the Supreme Court ha[d] never overturned Spending Clause legislation on relatedness grounds." Opp. 29. But, until 2012, the Court had never overturned Spending Clause legislation as unduly coercive, either. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 625 (2012) (Ginsburg, J., dissenting).

INA provisions *permitting* law enforcement officers to cooperate in efforts to enforce immigration laws (which are civil, not criminal, *see* PI Mem. 36) do not show that *requiring* law enforcement officers to do so will make their jobs easier or alleviate crime in their cities. Indeed, Philadelphia (like other localities) has determined that having its police serve as immigration agents makes it *harder* for the City to fight crime. Compl. ¶¶ 27-30. The Department does not even contend this judgment is wrong. In the end, the Department utterly fails to show that forcing Philadelphia to abandon its policies under the new conditions would improve "criminal justice." The conditions do not further an interest in criminal justice; they impede it.[5]

2. As to ambiguities in the new conditions, the Department has resolved some through its representations in this litigation but has created a new one: The way it will interpret the phrase "information regarding . . . immigration status" within Section 1373. The Department appears to take a potentially limitless interpretation of the phrase, understanding it to authorize information requests about the physical location of any person. *See* Opp. 38-39 & n.11; Hanson Decl., Ex. A, p. 1. Beyond being an untenable reading of the statute and an attempt to smuggle its notification condition into the Section 1373 condition, *see infra* p. 13, this sweeping interpretation creates yet more uncertainty for Philadelphia regarding how the Department plans to enforce its conditions.

**III.  The Department Has No Basis To Withhold Funding From The City On Account Of The Section 1373 Condition.**

1. The Department begins by urging the Court not to "reach" the City's Section 1373 arguments, characterizing Philadelphia's claim for relief as a "request" for a "Declaratory

---

[5] Further, the Department's October 11 letter suggests that the conditions are infirm under the Spending Clause because they are not limited to the programs receiving funding. *See* PI Mem. 38. The letter says that the City's Confidentiality Policy violates Section 1373 unless Philadelphia communicates to *all* of "its officers and employees"—*i.e.*, nurses, records clerks, and hundreds of other persons not in JAG-funded departments—to decline following the non-disclosure provision as to the federal government. Hanson Decl., Ex. A, p. 2. That would result in the enforcement of the Section 1373 condition beyond the programs funded by the JAG award.

Judgment." Opp. 33-34. It is not. Philadelphia's preliminary injunction papers ask that this Court "enjoin the Department from withholding any JAG funding from Philadelphia on account of non-compliance with 8 U.S.C. § 1373 because Philadelphia does comply with that condition as properly construed." PI Mem. 55. To award such relief, the Court would need to find that Philadelphia is likely to succeed on the merits of its Section 1373 claim and faces a threat of irreparable harm. *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). That is not a "declaratory judgment," nor is it any form of final judgment on the merits.

But even if Philadelphia's request is evaluated under the reviewability standards of the Declaratory Judgment Act, the City meets them. The Third Circuit's test for determining the "ripeness" of a declaratory judgment action looks to three factors: (1) "the adversity of the interest of the parties," (2) "the conclusiveness of the judicial judgment," and (3) "the practical help, or utility, of that judgment." *Step-Saver Data Sys., Inc. v. Wyse Tech.*, 912 F.2d 643, 647 (3d Cir. 1990) (Becker, J.); *see also, e.g.*, *Plains All Am. Pipeline L.P. v. Cook*, 866 F.3d 534, 540 (3d Cir. 2017). All three factors are satisfied here. The adversity of the parties' interests is obvious: "Adversity" is "clearly present" where a defendant government entity claims a right to "enforce" a legal requirement against a plaintiff. *Lewis v. Alexander*, 685 F.3d 325, 341 (3d Cir. 2012). The "conclusiveness" of this Court's judgment is also plain: If this Court determines that Philadelphia complies with Section 1373 (or even is likely to succeed in making that showing), "the legal status of the parties [would] be changed or clarified by the declaration." *Travelers Ins. Co. v. Obusek*, 72 F.3d 1148, 1155 (3d Cir. 1995). And judicial disposition of Philadelphia's compliance with Section 1373 would be highly "useful" to the parties, as it would enable each to "make responsible decisions about the future." *Id.* at 1155.

The Department does not refute these points, but instead suggests that if this Court were to decide whether Philadelphia complies with Section 1373, it would somehow "preempt the administrative process." Opp. 36. That concern is illusory. The Department has concluded—by letter of October 11, 2017—that two aspects of Philadelphia's policies are "in violation of 8 U.S.C. § 1373(a)," *see* Hanson Decl., Ex. A, pp. 1-2, and that an additional three aspects of its policies will also be found to violate Section 1373 unless the City sends "communicat[ions] . . . to its officers and employees" (by October 27) to *not* follow the City's confidentiality and non-disclosure mandates as to federal officials, *id.* at 2-3. Philadelphia has no intention of sending such communications. There is accordingly no conceivable reason why the Department's "final determination" will be any different from its first "assessment"—and thus no impediment to this Court's review of the Section 1373 issue. A court need not wait for a party to suffer an actual sanction when an agency issues a rule whose effect is to "force [the party] to modify its behavior in order to avoid future adverse consequences." *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 727 (1998); *accord A.O. Smith Corp. v. FTC*, 530 F.2d 515 (3d Cir. 1976).[6]

2. On the merits, the Department's arguments about why Philadelphia's policies do not comply with Section 1373 are also unavailing. First, the Department says that the City's notification policy, which provides that notice of a person's "pending release" from City custody

---

[6] The Department's assertion that the City "asks this Court to bless the City's Section 1373 compliance" on the "face" of its policies, "without regard to scrutiny of the City's actual practices," is baseless. Opp. 35. The City has submitted numerous exhibits and declarations conveying *both* the text of its policies and information about the City's practices. *See* Dkts. 1 & 21. Indeed, the City argued that one of the reasons its policies comply with Section 1373 is that, in practice, they allow for uninhibited information-sharing about criminal suspects. PI Mem. 44-45. The City has also requested an evidentiary hearing so that these issues can be developed on the record and even subjected to cross-examination. It is the Department that has shown little interest in the City's "actual practices and conduct." *See* Opp. 35. After receiving Philadelphia's June 22 certification, it did not ask for additional information about Philadelphia's practices to guide its "preliminary assessment." Nor does the Department's October 11 letter request such information to inform its "final" assessment. *See* Hanson Decl., Ex. A, pp. 2-3.

will not be provided to ICE unless "the detainer is supported by a judicial warrant," restricts information-sharing in violation of Section 1373. Opp. 38. In a startlingly expansive reading of the INA, the Department argues that "the fact that an alien is in custody for a specific duration"—or, indeed, is "in a certain place and not elsewhere"—constitutes "information regarding . . . immigration-status" under Section 1373. Opp. 38 n.11 (citation omitted). Nonsense. Section 1373 plainly does not cover information about a person's location—it covers what its text describes: "information regarding the *citizenship or immigration status* . . . of any individual." The Department's attempt to import its advance notification condition (after the *Chicago* district court enjoined it) into Section 1373, through a reading that "[t]he text will not bear," should be rejected. *INS v. Yueh-Shaio Yang*, 519 U.S. 26, 30 (1996).

Second, the Department says that Section 3C of Memorandum 01-06, which provides that "immigrants who are the victims of crimes will not have their status as an immigrant transmitted," conflicts with Section 1373. Opp. 39. That is because there could be "instances," the Government muses, "where a person is both a perpetrator and a victim." *Id.* The Department evidently neglected to read Section 3A, which stipulates that "police personnel will transmit" immigration-status information when "[t]he immigrant is suspected of engaging in criminal activity." Compl. ¶ 25. It also ignored the rest of Section 3C, which directs that ordinary law enforcement protocols, including "cooperat[ion] with federal authorities," shall apply for all criminal suspects. Compl. ¶ 26; *see* PI Mem. 44-45.

Finally, the Department says that Philadelphia's general non-collection and non-disclosure policies violate Section 1373 because they appear to "restrict Philadelphia officers and employees from requesting" or "sharing information regarding immigration status with federal immigration officers" in some fashion. Opp. 39-40; *accord* Hanson Decl., Ex. A, pp. 2-3. The

Department's position is untenable. As an initial matter, the City's non-collection directive accords with Section 1373 because, as the Department all but admits (at 41), that statute imposes no affirmative collection obligation whatsoever. PI Mem. 42-43. Even more fundamentally, as Philadelphia explained in its brief and certification letter, the City's non-collection and non-disclosure policies contain numerous exceptions for information exchanges—both on the "requesting" end and on the "disclosing" end—especially when it comes to criminal suspects. *See* Compl. ¶¶ 25-26, 33-35 & Exs. 3-4. Officers can "inquire about a person's immigration status," for instance, if such is "relevant to identification of a person who is committing a crime." Compl. ¶ 34. They can make disclosures in similar circumstances. Compl. ¶¶ 25-26, 35. Section 1373 demands nothing more. The protections that the City's policies afford for witnesses, victims, and law-abiding persons are consistent with Section 1373—because the statute must be construed to avoid constitutional doubts under the Tenth Amendment, and in light of the Constitution's provisions on federalism. PI Mem. 45-47.

The Department has no good answer to the City's constitutional doubt arguments. Rather, it says that because compliance with Section 1373 is being imposed upon the City as a spending condition, "[t]he relevant question . . . is not whether Section 1373, as an independent statutory obligation of the City, infringes the Tenth Amendment," but only whether it is a "valid exercise of the Spending Clause." Opp. 41-42. Philadelphia agrees that the Spending Clause is a critical constraint, and that the Department's planned application of the Section 1373 condition runs afoul of the Clause's limits. *See supra* pp. 8-10; PI Mem. 48-49. But the Department also ignores its own argument. The very *reason* it claims authority to thrust Section 1373 upon the City as part of the JAG award is that it treats Section 1373 as an "applicable Federal law" that regulates the City by its own force. Opp. 17-19. It is entirely appropriate, then, for this Court to

analyze Section 1373 as a freestanding statute and discern its lawful application. And on that point, Philadelphia's argument is modest: The City contends that the statute *must* be read to permit it to exercise reasonable controls over how and when its officials respond to DHS requests, such as by limiting disclosure through criminal information-sharing databases, or else its employees would become commandeered as federal agents. *See Printz v. United States*, 521 U.S. 898, 935 (1997). As the Third Circuit recognized, "many affirmative commands can be easily recast as prohibitions," and "[t]he anti-commandeering principle may not be circumvented so easily." *Nat'l Collegiate Athletic Ass'n v. Governor of N.J.*, 730 F.3d 208, 233 (3d Cir. 2013).

## IV. Philadelphia Will Suffer Irreparable Harm If Relief Is Not Granted.

That Philadelphia will suffer irreparable harm if the Department is not enjoined from imposing its new conditions on the City is evident from the declarations of the City's senior officials. Upon receipt of its award letter, the City will have 45 days to either (1) overhaul its longstanding policies and provide training on the Department's new demands or (2) forgo its FY 2017 JAG award. If it chooses the first option, the City risks losing the enormous benefit of increased trust with the immigrant community that has improved the public's safety, health, and welfare. Crime victims will fear coming forward. Witnesses will fear testifying at trials. Parents will fear taking their children to school and to clinics for immunizations. Residents will fear seeking treatment for their own communicable conditions. But if the City chooses the second option, it will lose $1.6 million in funding for critical criminal justice programs. While the funds may constitute a small portion of the City's budget, they are essential to the City's ability to carry out numerous initiatives, spanning from disbursing naloxone to paying police officers overtime. PI Mem. 52. The *Chicago* district court and others have found that a locality's inability to apply for Byrne JAG funding threatens irreparable harm. *See id.* (collecting cases). This Court should, too.

DATED: October 19, 2017

Respectfully submitted,

*Virginia A. Gibson*

SOZI PEDRO TULANTE, I.D. NO. 202579
  City Solicitor
MARCEL S. PRATT, I.D. NO. 307483
  Chair, Litigation Group
LEWIS ROSMAN, I.D. NO. 72033
  Senior Attorney
CITY OF PHILADELPHIA LAW DEPARTMENT
1515 Arch Street, 17th Floor
Philadelphia, PA 19102

VIRGINIA A. GIBSON, I.D. NO. 32520
SARA ARONCHICK SOLOW, I.D. NO. 311081
JASMEET K. AHUJA, I.D. NO. 322093
ALEXANDER B. BOWERMAN, I.D. NO. 321990
HOGAN LOVELLS US LLP
1735 Market Street, 23rd Floor
Philadelphia, PA 19103
(267) 675-4600
virginia.gibson@hoganlovells.com

ROBERT C. HEIM, I.D. NO. 15758
JUDY L. LEONE, I.D. NO. 041165
FRIEDRICH-WILHELM W. SACHSE, I.D. NO. 84097
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
(215) 994-4000

NEAL K. KATYAL (*pro hac vice*)
DANIEL J.T. SCHUKER (*pro hac vice*)
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004

*Attorneys for the City of Philadelphia*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 19, 2017, the foregoing document was served electronically by the Court's CM/ECF system on all counsel of record in this case.

October 19, 2017

VIRGINIA A. GIBSON, I.D. No. 32520
HOGAN LOVELLS US LLP
1735 Market Street, 23rd Floor
Philadelphia, PA 19103
(267) 675-4600
virginia.gibson@hoganlovells.com