**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

THE CITY of PHILADELPHIA,

        Plaintiff,

    v.

JEFFERSON BEAUREGARD SESSIONS III,
in his official capacity as Attorney General of
the United States,

        Defendant.

No.:  2:17-cv-03894-MMB

**BRIEF OF PHILADELPHIA SOCIAL AND LEGAL SERVICES ORGANIZATIONS AS
AMICI CURIAE IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY
INJUNCTION**

# TABLE OF CONTENTS

**Page**

INTERESTS OF AMICI CURIAE .................................................................... 1

INTRODUCTION ............................................................................................ 1

ARGUMENT .................................................................................................... 2

I.     AMICI HAVE SEEN A DIRECT CONNECTION BETWEEN THE CITY'S
       WELCOMING POLICIES AND CRIME VICTIMS' WILLINGNESS TO
       REPORT CRIMES, COOPERATE WITH PROSECUTORS, AND THEREBY
       BENEFIT FROM STATE AND FEDERAL PROGRAMS DESIGNED TO
       ASSIST CRIME VICTIMS. ...................................................................... 3

II.    UNDOCUMENTED VICTIMS OF DOMESTIC VIOLENCE FACE
       HEIGHTENED FEARS THAT THE CITY'S WELCOMING POLICIES HELP
       TO ALLEVIATE. ...................................................................................... 9

III.   THE CITY'S WELCOMING POLICIES HAVE ENHANCED AMICI'S
       ABILITY TO CONNECT PHILADELPHIA'S IMMIGRANT COMMUNITIES
       WITH A BROAD RANGE OF SOCIAL SERVICES. .................................. 12

CONCLUSION .............................................................................................. 13

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Statutes**

18 P.S. § 11.103......................................................................................................................4

18 P.S. § 11.201......................................................................................................................4

18 P.S. § 11.701(a).................................................................................................................4

18 P.S. § 11.707(a)(3)............................................................................................................4

18 P.S. § 11.901......................................................................................................................4

18 P.S. § 11.902......................................................................................................................4

8 U.S.C. § 1101(a)(15)(T)-(U).............................................................................................7

**Other Authorities**

*2017 Advocate and Legal Service Survey Regarding Immigrant Survivors*
(National Network to End Domestic Violence) *available at*
http://www.tahirih.org/wp-content/uploads/2017/05/2017-Advocate-and-
Legal-Service-Survey-Key-Findings.pdf................................................................10

## INTERESTS OF AMICI CURIAE

Amici are eight non-profit civic organizations dedicated to serving the citizens of Philadelphia by providing critical social services, community organization, individual advocacy, and legal aid to the neediest segments of the Philadelphia community, including members of the community who are undocumented immigrants or part of mixed-status families made up of documented and undocumented immigrants and/or U.S. Citizens.  A full description of Amici organizations is provided in Attachment A.

## INTRODUCTION

Amici have direct experience assisting Philadelphia's immigrant communities through the diverse and robust programs they sponsor.  These programs help immigrants to vindicate their rights as crime victims; provide immigrants access to important public benefits, health care, and resources for which they may be eligible; ensure the safety of immigrant families from domestic violence and child abuse; and advocate for immigrants to achieve safe and fair housing and employment.

Amici have seen first-hand the benefits of the City's policies designed to embrace its immigrant communities, including policies that prevent City employees from unnecessarily collecting and disclosing its residents' immigration information.[1]  Those City policies have boosted Amici's efforts to serve effectively the region's immigrant communities by allowing Amici to assure their constituents and clients that contact with the City and its employees will not ineluctably result in the disclosure of immigration information to federal officials.  Without

---

[1]  The City describes its policies to welcome and protect its immigrant communities in detail in its Memorandum in Support of Motion for Preliminary Injunction, Doc. Entry No. 21-1, at 7-11 (Sept. 28, 2017).  Those policies include the Philadelphia Police Department's practice of not routinely asking a persons' immigration status in the course of investigations or routine patrols and avoiding unnecessary disclosure of individuals' immigration status.  It further includes the City's "Confidentiality Order," which directs city officers and employees, including police, to refrain from collecting immigration information and to avoid unnecessary disclosure of any such information inadvertently learned, as well as the City's policies on compliance with federal immigration detainers and federal requests for access to city prisons.

that assurance, Amici are concerned that mixed-status and undocumented families and individuals will recede into the shadows, making it difficult — if not impossible — for Amici to provide services vital to the safety, health, and welfare of the entire community.  Amici therefore are concerned that the Department of Justice's (DOJ) effort to impose new and unlawful conditions on the City's Edward Byrne Memorial Justice Assistance Grant (Byrne Grant) will imperil the City's current policies, which have been carefully designed to encourage its vibrant and substantial immigrant communities to participate more fully in civic life.

Because of the potential for irreparable harm if the City complies with the DOJ's new Byrne Grant conditions, the undersigned Amici urge this Court to grant Philadelphia's motion for a preliminary injunction.

## **ARGUMENT**

Each of the undersigned Amici serve members of the immigrant communities in the City of Philadelphia — a population that includes both documented and undocumented immigrants, as well as mixed-status families made up of documented and undocumented immigrants and/or U.S. Citizens.  Amici have witnessed how the City's welcoming policies have bolstered the trust between immigrant communities and the City and its officials.  When crime has struck members of Philadelphia's immigrant communities, Amici have played a critical role in supporting immigrant victims in seeking justice for the harm they have suffered, including educating victims and witnesses on their rights and responsibilities, affording victims an avenue to victims' compensation programs, and enabling crime victims and witnesses to participate in the T and U Visa programs that give immigration relief to certain crime victims who cooperate with law enforcement.

Amici have seen a direct link between the City's welcoming policies and their clients' willingness to report crimes and participate in any ensuing prosecution.  Those benefits are particularly crucial for those members of the immigrant communities seeking legal protection from domestic violence and abuse, where victims who are undocumented or part of mixed-status families must overcome their fear of immigration consequences in addition to their fear of their abuser before seeking legal protection or the assistance of police.  Likewise, combating human trafficking is an important law enforcement goal, and one that requires the trust and cooperation of undocumented victims.

Amici, moreover, have found that the City's welcoming policies have more broadly enabled them to identify individuals in immigrant communities in need of vital social services, and to assist members of Philadelphia's immigrant communities in asserting their legal rights not only in the immigration context, but also to obtain unpaid wages, public benefits, health care, and crime-victims' compensation to which they are entitled.

Amici believe that the City's policies designed to protect and welcome immigrants are critical to their own success in serving the community and join together in support of the City's Motion for Preliminary Injunction.

## I.     AMICI HAVE SEEN A DIRECT CONNECTION BETWEEN THE CITY'S WELCOMING POLICIES AND CRIME VICTIMS' WILLINGNESS TO REPORT CRIMES, COOPERATE WITH PROSECUTORS, AND THEREBY BENEFIT FROM STATE AND FEDERAL PROGRAMS DESIGNED TO ASSIST CRIME VICTIMS

Amici Victim Witness Services of South Philadelphia (V/WSSP) and Women Against Abuse (WAA) have witnessed a direct impact between the City's nondisclosure policies and the willingness of crime victims in Philadelphia's immigrant communities to report crimes, participate in any ensuing prosecution, and thereby render themselves eligible to receive state-mandated victim's compensation benefits, social services, and other rights to which they are

entitled by Pennsylvania state law.  Moreover, by encouraging crime victims to report crimes and assist in their prosecution, Amici have helped many undocumented Philadelphians secure U and T Visas, which allow victims of certain serious crimes and human trafficking to legally live and work in the region.

V/WSSP and other victim and witness services organizations can only effectively achieve their missions if victims of and witnesses to crime trust the police and criminal justice system. The Crime Victims Act confers substantial rights on victims of crime, including the right to be notified of services available to victims, the right to be informed of significant actions and proceedings in the victim's case (*see* 18 P.S. §§ 11.201, 11.902), and even compensation (*see* 18 P.S. § 11.701(a)); however, in order to be entitled to these rights and benefits, the Act generally requires victims to promptly report the crime and cooperate with the investigation.  *See* 18 P.S. §§ 11.707(a)(3), 11.901.  Importantly, the Crime Victims Act does not distinguish between undocumented immigrants and other victims of crime.  *See* 18 P.S. § 11.103 (defining "Victim").

V/WSSP partners with the City to identify crime victims and helps victims benefit from the Victim Compensation Assistance Program (VCAP), a program which provides compensation to crime victims including reimbursement for medical and counseling bills, lost earnings, and funeral expenses.  Not only does V/WSSP's work assist victims of crime, but it also assists the broader Philadelphia community—because V/WSSP helps ensure that crimes are reported and addressed, the City of Philadelphia as a whole is safer.  Approximately 30 percent of V/WSSP's clients are immigrants.  In the past year, V/WSSP assisted in the filing of 280 claims and recovered over $200,000 for victims of crime, in addition to providing outreach and services to over 1,400 victims, witnesses, and family members.

V/WSSP has worked hard to build trust with the many and varied immigrant communities in South Philadelphia so that it can effectively connect these communities to critical services.  V/WSSP's immigrant clients' primary concern in deciding whether to work with V/WSSP is whether they can trust the police and the criminal justice process.  V/WSSP has seen that crime victims in immigrant communities are forced to carefully weigh whether the perceived benefits of cooperating with police and prosecutors will be eclipsed by the danger that such cooperation will lead to their own investigation, apprehension, or deportation by federal immigration officials.   V/WSSP is concerned that, by forcing the City to change its nondisclosure policies, undocumented immigrants will be unwilling to face the increased risk of deportation in the event that they come forward as victims.

Amici have experienced how the threat of apprehension by federal immigration officials impedes the Philadelphia Police Department's ability to investigate crime and the ability of victim services organizations to protect the rights of victims of crime.  For example, a Latino male in his 30's was recently the victim of an aggravated assault.[2]  The Philadelphia Police Department made an arrest in the case, which proceeded to a preliminary hearing, but the victim repeatedly failed to appear.  A V/WSSP advocate was able to make contact with the victim, who told the advocate that he had not gone to court because he was fearful that federal immigration agents would be in the courtroom.  Although the case was held for trial on other evidence, it seems unlikely the prosecution will be able to successfully prosecute the case if the victim continues to feel too threatened to appear in court.

Similarly, a Latino male in his 20's was walking home from his job at a restaurant with two of his friends when he was attacked by a group of men who yelled racial slurs and beat him

---

[2]  The anecdotes in this brief do not include the names or identifying characteristics of the individuals described because of Amici's concern that such information not be used adversely by immigration officials or others.

in the head with a brick.  He is still unable to eat solid food.  An arrest was made in the case and the victim has cooperated with the prosecution.  The victim's friends, however, who witnessed the assault, told a V/WSSP advocate that they are too afraid to testify in the case because they have heard that immigration agents wait for people outside the courtroom and they are not willing to take that risk.  These friends have discouraged the victim from testifying for the same reason.

But notwithstanding heightened fear and anxiety many immigrants feel as a result of the federal government's recent crackdown on undocumented immigrants, the City's welcoming policies continue to make immigrants more comfortable reporting crimes to the local police. One member of the New Sanctuary Movement (NSM) has been mugged twice, once before the enactment of the City's current policies and once after.  When he was mugged the second time, the individual felt much more comfortable reporting the crime to the police.  The victim relayed that a police officer was dispatched, provided assistance, and never inquired about his immigration status.

Attorneys from Community Legal Services (CLS) have had similar experiences while advising low-income Philadelphians, including undocumented immigrants, whether to seek police assistance.  CLS advocates report that their undocumented clients who are victims of crime are often exploited and face wage theft, sexual harassment, and other labor abuses because they are seen as uniquely vulnerable.  Because of the City's policies, CLS has the ability to refer these clients to the police, which is critical for the safety of CLS's clients, their families, and the entire city.

Cooperation with the criminal justice system also enables Amici HIAS Pennsylvania, Nationalities Services Center (NSC), and Friends of Farmworkers (FOF) to aid undocumented

Philadelphians who cooperate and become eligible for T or U Visas that can allow them to legally remain and work here. T Visas are available to victims of human trafficking, while U Visas are available to victims of other certain serious crimes. *See* 8 U.S.C. § 1101(a)(15)(T)-(U). T and U Visas require immigrant victims of enumerated crimes to cooperate with police by reporting and then assisting with the investigation of the crimes that were perpetrated against them. During the last fiscal year, HIAS Pennsylvania opened 113 U-Visa cases, and since 2011, FOF has identified over 100 victims of labor trafficking and has successfully secured T Visas for 50 victims and 63 of their family members so far, with many cases currently pending. Because many T Visa applicants are parents of U.S. citizens, those cases stabilized the homes of 39 citizen children.

Amici can attest to the tremendous courage required by victims at risk of deportation to cooperate with police, and Amici have found that crime victims' cooperation typically can only be secured by assurances that they will not be automatically deported for reporting crimes to local police and assisting police and prosecutors in ensuring that justice can be accomplished. Under the City's current policies, HIAS Pennsylvania, NSC, and FOF have found that undocumented victims of crime, including victims of human trafficking, have been more willing to cooperate with law enforcement and, as a result, become eligible for T and U Visa status. If the City were to change its policies, however, the trust necessary to report and assist in the investigation of human trafficking or other serious crimes — a prerequisite to T or U Visa eligibility — would collapse.

Because FOF and NSC serve clients throughout the Commonwealth, they know first-hand how the variation in immigration enforcement policies across Pennsylvania impacts the willingness of immigrant crime victims to speak out. FOF reports that, in the last year, the

organization has assisted three victims of labor trafficking who were minors at the time of the trafficking.  One victim was forced to live and work in a factory in Philadelphia for years while being paid below minimum wage.  The victim had serious concerns about reporting the mistreatment to law enforcement.  Victims of labor trafficking are often hesitant to report to law enforcement because, among other things, their traffickers use the threat of reporting immigrant victims to law enforcement as a means of exerting control over them.  Ultimately, this victim reported the crime to the Philadelphia Police Department with the assistance of FOF.  Two other child trafficking victims were assisted by FOF this year and only were willing to report the trafficking crimes to the Philadelphia Police after discussing the City's nondisclosure policies with FOF.

By contrast, in jurisdictions that do not have policies like Philadelphia's to protect undocumented immigrants, FOF has worked with numerous victims who have been unwilling to report crimes to local law enforcement.  Recently, FOF staff met with a group of immigrants who live and work in another Pennsylvania county, and who reported that they and others were repeatedly raped and assaulted at work by a supervisor.  The victims are afraid of the potential immigration-related consequences of reporting the crimes to law enforcement.  Unfortunately, the crimes took place in a jurisdiction that does not have policies like Philadelphia's, and therefore it is much less likely that the victims will feel safe reporting those very serious crimes to local law enforcement.  Where policies make undocumented immigrants fearful to report criminal behavior to authorities, traffickers can continue to exploit Pennsylvanians without fear of prosecution.

A denial of the City's requested relief may force the City to change its nondisclosure policies — a change which would substantially undermine Amici's ability to encourage crime

victims to cooperate with city police, prosecutors, and employees in the prevention, investigation, and prosecution of crime. Lifting, even temporarily, the City's nondisclosure policies, would damage hard-won credibility that Amici have forged with their immigrant constituents, who trust Amici to work to improve the safety of all communities in Philadelphia. And a mandate that the City must share victims' and witnesses' immigration information with federal officials would create a strong deterrent for crime victims from cooperating with local law enforcement. The volume of crimes perpetrated against immigrants reported to Amici in only a one-year period conveys the public safety concerns at stake if those perpetrators would remain free to terrorize Philadelphia's neighborhoods without victims and witnesses cooperating in their prosecution.

## II.   UNDOCUMENTED VICTIMS OF DOMESTIC VIOLENCE FACE HEIGHTENED FEARS THAT THE CITY'S WELCOMING POLICIES HELP TO ALLEVIATE

For victims of domestic violence within Philadelphia's immigrant communities, a change in City policy would have potentially profound consequences. Undocumented immigrants who are victims of domestic and interpersonal violence face higher barriers to escaping abuse than their non-immigrant counterparts due to immigration laws, language barriers, social isolation, and lack of financial resources. The Women Against Abuse (WAA) Legal Center, which serves a diverse population of domestic violence survivors, prioritizes clients who are immigrants and those with limited English proficiency. A WAA supervising attorney with expertise in immigration serves approximately 20 immigrant victims of domestic violence each year, and has experienced how the cloud of immigration consequences inhibits domestic violence victims' ability to seek legal protection from abuse, and pursue criminal charges against their abusers. The fear and isolation suffered by all victims of domestic violence is further heightened when the victims or members of the victim's family are undocumented immigrants — factors which allow

abusers to leverage the risk of deportation to discourage their victims from reporting domestic violence to police, requesting a PFA order, or seeking refuge with organizations like WAA. Many WAA clients are only comfortable appearing in court to seek child custody or a PFA, providing information to WAA, or calling authorities when threatened or abused by a partner because of the assurance that the City and its employees will not affirmatively seek to turn over a domestic violence victim and her information to federal immigration authorities.   The City's nondisclosure policies thus allow organizations like WAA to gain the trust of domestic violence victims and assist them in crafting safety plans that take into consideration their status as both victim and immigrant.

The experience of WAA's staff, moreover, mirrors national studies on the special challenges faced by immigrants who become victims of domestic violence and abuse.   The National Network to End Domestic Violence recently released key findings from the *2017 Advocate and Legal Service Survey Regarding Immigrant Survivors*, and found "78 percent of advocates reported that immigrant survivors expressed concerns about contacting police. Similarly, three in four service providers responding to the survey reported that immigrant survivors have concerns about going to court for a matter related to the abuser/offender.  Finally, 43 percent of advocates worked with immigrant survivors who dropped civil or criminal cases because they were fearful to continue with their cases."[3]

NSC's experience show that victim's fears of detention or deportation are not unwarranted, particularly in jurisdictions that lack the policies that the City of Philadelphia has enacted.   For example, NSC represented an undocumented woman who resided in a county outside Philadelphia and who had been abused by both her spouse and her family.   When the

---

[3] *2017 Advocate and Legal Service Survey Regarding Immigrant Survivors* (National Network to End Domestic Violence)*available at* http://www.tahirih.org/wp-content/uploads/2017/05/2017-Advocate-and-Legal-Service-Survey-Key-Findings.pdf.

woman reported the abuse to the police, she was arrested because she did not speak English and the police could only get the abuser's account of the abuse.  Not only was the victim forced to submit to criminal proceedings, but because the county did not have policies like Philadelphia's, even after the criminal charges were dismissed, the victim was transferred to federal immigration custody and ended up detained and placed into removal proceedings.  Although NSC was ultimately able to help the victim obtain valid immigration status through the U Visa program, that relief came only after the ordeal of arrest, detention, and temporary separation from her child.

Conversely, NSC represented an undocumented woman under similar circumstances in Philadelphia, that resulted in a drastically different outcome.  In that case, the Philadelphia victim called the police to report abuse, and she also ended up being arrested based on her abuser's statement to the responding police officers at the scene.  Once the true facts surrounding the domestic abuse came to light, the criminal charges against the Philadelphia victim were dismissed.  This time, however, the victim was released without detention by federal immigration authorities and NSC was able to assist her application for a U Visa.  Despite the fact that both women were eligible for U Visa status under federal law, the victim that was not protected by Philadelphia's policies was forced to undergo the unnecessary and traumatic experience of federal detention as a direct consequence of reporting her abuse.

A repeal of the City's policies that otherwise protect undocumented victims of domestic violence from collateral immigration consequences could have potentially lethal effects:  victims will fear contacting authorities to report abuse and will hesitate to appear in family court to obtain PFAs or to otherwise seek protective custody and housing rights.  Conversely, if the City were forced to accept the DOJ's Byrne Grant conditions, the City's clerks, social workers, and

police officers would be empowered to collect information about domestic violence victims' immigration status and to report that information to federal immigration enforcement agents — a prospect which will surely lead to fewer immigrant victims of domestic violence seeking aid from organizations like WAA and NSC.  Such an outcome would lead to increased levels of inter-partner violence and decrease the number of abusers who are prosecuted for their actions, irreparably harming the citizens of Philadelphia.

## III.   THE CITY'S WELCOMING POLICIES HAVE ENHANCED AMICI'S ABILITY TO CONNECT PHILADELPHIA'S IMMIGRANT COMMUNITIES WITH A BROAD RANGE OF SOCIAL SERVICES

Amici have found that the City's current policies provide broad social benefits that extend well beyond the criminal justice system.  The City's policies have enabled Amici to assist immigrant residents to enable them to participate in the City's civic and economic life and obtain access to critical health care resources and public benefits for which they are eligible.

One anecdote illustrates broad-ranging benefits that the City's welcoming policies have had for Amici's constituents.  NSM relates that, as a result of the City's policies, two of its members — a husband and wife — have turned their unlicensed street-corner food sales into a licensed food-cart business that enhances the community and the City's economy.  The couple owns a small business selling Mexican food.  Before the City put its current policies in place, the couple was too frightened to register their business with the City for fear that the City would alert federal immigration agents.  As a result, the couple operated their business out of a cooler and a shopping cart on a city street corner and would hide whenever police approached.  After the City enacted its current policies, the couple gained sufficient confidence to seek a business and food license from the City's Department of Licenses and Inspections.   The couple successfully registered their business with the City, and as a result, they were able to buy a small food cart, and even hire another employee.  The City's policies thus encouraged this couple to

transform their underground food business into one that may fully and legitimately participate in the City's community and economy.

CLS advocates have further seen that the City's policies have assisted its efforts in obtaining health care for undocumented immigrants. CLS has observed that its undocumented clients are often too fearful to access desperately needed health care, and sometimes even avoid seeking emergency treatment for life-threatening illnesses out of concern that an emergency room visit could alert federal immigration authorities to their undocumented status or their whereabouts. Because of the City's policies, CLS advocates have had success referring clients to City health clinics for primary health care services, thereby preventing otherwise minor health concerns from spiraling into more serious health concerns that require specialized medical care.

CLS has also worked with the City directly to develop important community education materials. For example, CLS has heard from its clients that many undocumented parents choose not to apply for or to cancel Medicaid benefits for their eligible children for fear that federal immigration officials can access the information in a Medicaid application and use it to detain and deport the parent. However, CLS has been working to train benefits counselors at City health centers and provide those counselors with information about privacy protections in place at the County Assistance Offices. Such outreach programs improve the City's ability to reach and serve undocumented immigrants to allow them to access such critical health and educational benefits.

## **CONCLUSION**

There is no city in the country that is a "sanctuary" to an undocumented immigrant. At any time, an unauthorized immigrant can be, and often is, detained and deported. The City's welcoming policies — particularly its policies prohibiting unnecessary collection and disclosure

of immigration information — have assured the Philadelphia immigrant communities that the local police will not simply turn a crime victim or witness over to federal immigration authorities.  Likewise, the City's policies have given its immigrant communities confidence that it may access City services, license businesses, or seek out health, immigration, and social services to which they are entitled without fear of immediate immigration consequences.  In this way, the City's carefully designed policies create a safer, healthier, and more cohesive city, and enable social service and legal aid organizations like Amici to identify residents in need and to serve the City's immigrant communities in crucial, and at times life-saving, ways.

Because a change in City policy would cause irreparable harm to those services and the City, Amici urge this Court to grant Philadelphia's requested relief.

Dated: October 19, 2017                         Respectfully submitted,

/s/ Mark A. Kasten

Ilana H. Eisenstein (No. 94907)
Mark A. Kasten (No. 316387)
Kristina Neff (No. 314295)
DLA PIPER LLP (US)
One Liberty Place
1650 Market Street, Suite 4900
Philadelphia, PA  19103-7300
Telephone:        215.656.3300
Facsimile:        215.656.3301

Attorneys for *Amici Curiae*

**ATTACHMENT A:**
**Description of Amici Organizations**

**Community Legal Services** (CLS) has provided free civil legal assistance to more than one million low-income Philadelphians since it was founded by the Philadelphia Bar Association in 1966, and is nationally recognized as a model legal services organization.  In 2016, CLS has represented over 9,100 low-income Philadelphians, whose families included 12,981 children. CLS assists clients when they face the threat of losing their homes, incomes, health care, and even their families. CLS attorneys and other staff provide a full range of legal services, from individual representation, to administrative advocacy, to class action litigation.  CLS also provides community education and access to social workers.

CLS represents several hundred undocumented clients every year in a wide variety of legal cases including employment, family law, eviction, utility shutoffs and health insurance.  In several areas of law, CLS attorneys have developed specialized expertise in legal issues that particularly impact undocumented individuals and families.  For instance, CLS represents many undocumented workers whose employers improperly have withheld earned wages, have paid less than minimum wage or have not paid legally required overtime.   CLS also represents undocumented immigrants who are entitled to Medical Assistance coverage for critical health needs but have been denied and represents undocumented parents in cases involving custody of their children.

**Friends of Farmworkers** (FOF) supports low-wage workers as they pursue economic and social justice.  For nearly 40 years, FOF has principally advanced its mission by providing free legal representation on employment-related matters relevant to its client population, which is largely made up of immigrant and migrant workers.  In addition to direct representation, FOF also engages in impact litigation and provide community education throughout Pennsylvania.  A

core aspect of its current work involves assisting victims of labor trafficking with the immigration legal process and pursuing other civil legal claims on behalf of victims, both of which require FOF to facilitate reporting of trafficking crimes to police.  While FOF supports low-wage workers across Pennsylvania, during fiscal year 2017, Philadelphia residents made up 20% of its caseload.

**HIAS Pennsylvania** provides legal, resettlement, citizenship, and supportive services to immigrants, refugees, and asylum seekers from all backgrounds in order to ensure their fair treatment and full integration into American society. Driven by the Jewish value of "welcoming the stranger," HIAS Pennsylvania advocates for just and inclusive practices.  HIAS Pennsylvania provides representation and legal counseling before immigration agencies and courts; provides resettlement and other social services to newly arriving immigrants, refugees, and those recently granted asylum; and advocates for and educates the public about immigrant issues and rights.

**Nationalities Services Center** (NSC) serves more than 5,000 immigrants and refugees each year from 111 countries around the world.  Based on the types of services provided to the clients, NSC estimates that approximately half of their legal services clients are undocumented. NSC is the largest non-sectarian organization in the Greater Philadelphia area which provides comprehensive services in the areas of language access and proficiency, immigration legal services, community transition and integration, access to health and wellness, and job readiness training to immigrants and refugees.  In the past five years, NSC has resettled more than 2,500 refugees from countries around the globe.  In 2016, NSC staff attorneys served 1,164 primary clients, excluding family members, with an array of services, including family-based petitions, U-visas, naturalization, asylum, and other relief for victims of domestic violence.  As the lead agency in the Philadelphia Refugee Health Collaborative, last year, NSC's Health and Wellness

department provided health access services, including health screenings, medical appointments and health insurance enrollment, for 1,608 clients.  Furthermore, 501 survivors of torture were served through the Philadelphia Partnership for Resilience.

**New Sanctuary Movement of Philadelphia** (NSM) builds community across faith, ethnicity, and class in its work to end injustices against immigrants regardless of immigration status and to ensure that the values of dignity, justice, and hospitality are lived out in practice and upheld in policy.  Working with 26 congregations from the Latino, Indonesian and white citizen communities, NSM implements its values and vision with three programs: Education, Grassroots Organizing, and Accompaniment.  NSM organizes congregations, educates and builds leadership in Philadelphia's immigrant communities, and engages allied members to stand in solidarity with the immigrant communities and walk with families facing deportation to end unjust policies while building more organized and empowered communities.

**The Pennsylvania Immigration & Citizenship Coalition** (PICC) is a diverse coalition of over 50 member organizations and hundreds of individual members.  Its membership includes community groups, social and legal service providers, advocacy organizations, faith communities, community leaders, and concerned individuals.   Its mission is to advance immigrants' rights and promote their full integration into society by advocating with a unified voice to enhance public understanding and encourage welcoming public policies throughout Pennsylvania.

**Victim/Witness Services of South Philadelphia, Inc.** (V/WSSP) was established in 1989 by religious and community leaders, police, and local politicians who recognized that crime was having a devastating effect on neighborhoods, local business districts, and institutions.  The founders envisioned a community-based agency that would respond to problems unique to the

communities of South Philadelphia.   V/WSSP provides direct services such as support counseling; orientation to the criminal justice process; court accompaniment; social service referrals; and assistance filing claims for the Victim Compensation Assistance Program (VCAP) for medical and counseling bills, lost earnings and funeral expenses.   V/WSSP has served over 60,000 people in the three South Philadelphia Police Districts since its inception.

**Women Against Abuse** (WAA) is the leading domestic violence advocate and service provider in Philadelphia.   Women Against Abuse serves an average of 15,000 individuals each year through its legal services, two 100-bed emergency safe havens, transitional housing, community-based support, hotline counseling, trauma-informed behavioral healthcare, and community education, technical assistance, and advocacy aimed at prevention.   WAA operates the only emergency shelter facilities devoted solely to victims of domestic violence in Philadelphia.   WAA provides critical services, such as legal representation and housing, to victims of domestic violence in Philadelphia, including undocumented immigrants.   The WAA Legal Center provides free attorney representation, court advocacy and telephone counseling to thousands of individuals each year in need of assistance in protection from abuse, child custody and support matters to become safe from an abusive partner.   WAA attorneys are experts in Protection From Abuse (PFA) law and family court procedure, and the only service provider in Philadelphia to staff the PFA courtrooms daily.   WAA staff members also work closely with the Department of Human Services, Philadelphia Police Department, and the Family Violence and Sexual Assault Unit of the District Attorney's office on both individual cases and systemic issues.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was filed with the Court electronically on the 19th day of October, 2017.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  Parties may access this filing through the Court's system.



By: /s/ Mark A. Kasten_____
    Mark A. Kasten