UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE CITY of PHILADELPHIA,<br><br> Plaintiff,<br><br>v.<br><br>JEFFERSON BEAUREGARD SESSIONS III, in his official capacity as Attorney General of the United States,<br><br> Defendant. | Case No. 2:17-cv-03894-MMB |

**PLAINTIFF'S PROPOSED FINDINGS OF FACT IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to the Court's October 26, 2017 Order (Dkt. 60), Plaintiff City of Philadelphia ("the City" or "Philadelphia"), by and through its counsel, respectfully submits the following Proposed Findings of Fact regarding the Section 1373 condition.

**A.  Philadelphia's Policies Permit the Disclosure of Immigration-Status Information for Criminals and Criminal Suspects, but Not Law-Abiding Individuals.**

1.  Sixteen years ago, on May 17, 2001, Philadelphia Police Commissioner John F. Timoney signed Memorandum 01-06, entitled "Departmental Policy Regarding Immigrants" ("Memorandum 01-06").  Ex. P-1.[1]  Police memoranda are intended "to guide the actions" and "the manner in which [officers] . . . conduct [them]selves in the department."  Tr. at 23:8-9 (Ross).[2]  All sworn officers are trained on Memorandum 01-06, most commonly by receiving a physical copy of the policy from their local district and signing it.  *Id.* at 23:14-15 (Ross).

2.  Memorandum 01-06 seeks to "encourage" all immigrants to use "City services without fear of any reprisals."  Ex. P-1, ¶ II(B).  It also aims for "all of [the City's] population," including immigrants, "to understand" that the Philadelphia Police Department ("PPD") is "there to protect and serve them" and to "feel totally comfortable coming forth with whatever information they" have about crimes they have witnessed or experienced as victims.  Tr. at 24:18-22 (Ross).

3.  To achieve these objectives, Memorandum 01-06 instructs sworn officers to "preserve the confidentiality of all information regarding law abiding immigrants to the maximum extent permitted by law."  Ex. P-1, ¶ II(B); *accord id.* ¶ III(A) (directing that officers shall "safeguard the confidentiality of information regarding an immigrant").  However, Memorandum 01-06 provides several exceptions to its non-disclosure directive.  Specifically, "police personnel will

---

[1] References to "Ex. P-[]" are to the exhibits presented by Plaintiff City of Philadelphia at the October 26, 2017 evidentiary hearing.
[2] References to "Tr." are to an expedited transcript of the October 26, 2017 evidentiary hearing attached hereto.

transmit such information [regarding immigration status] to federal immigration authorities" when" doing so is (1) "[r]equired by law," (2) "[t]he immigrant requests, in writing, information be provided, to verify his or her immigration status," or (3) "[t]he immigrant is suspected of engaging in criminal activity, including attempts to obtain public assistance benefits through the use of fraudulent documents." *Id.* ¶ III(A).

4. Memorandum 01-06 further demands that "[s]worn members of the Police Department who obtain information on immigrants suspected of criminal activity will comply with normal crime reporting and investigating procedures" and that "[t]he Philadelphia Police Department will continue to cooperate with federal authorities in investigating and apprehending immigrants suspected of criminal activities." *Id.* ¶¶ III(B) & III(C).

5. Memorandum 01-06 provides for these disclosure exceptions because Philadelphia has no interest in "trying to harbor criminals" that are "committing crimes and wreaking havoc on our streets." Tr. at 25:3-4 (Ross). The Department's policy makes an important "distinction . . . between victims and witnesses, as opposed to criminal violators." *Id.* at 25: 22-24 (Ross).

6. The practices of the Philadelphia Police Department pertaining to disclosure of immigration-status information follow the text of its policy: If an individual is suspected of criminal behavior or is being investigated for criminal activity, the Department will share information pertaining to that individual's immigration status, to the extent the Department possesses it, with the federal government in the normal course of police practice. Tr. at 30:4-10 (Ross). That includes individuals who are suspected of *federal* crimes, or who are the subjects of *federal* criminal investigations. *Id.* at 33:17-18 (Ross), 118:8-10 (Abernathy). Relatedly, the routine arrest procedures and prosecution of an undocumented immigrant are no different from that of person with legal immigration status. *Id*. at 30:4-10 (Ross), 118:24-119:13 (Abernathy).

7. In the almost two decades Memorandum 01-06 has been in place, the PPD has never had an issue with the federal government about its disclosure provisions. *Id.* at 26:20-24 (Ross).

8. While Memorandum 01-06 makes clear that "immigrants who are victims of crimes will not have their status as an immigrant transmitted in any manner," Ex. P-1, ¶ III(C), if a victim is suspected of criminality, he or she would be treated as a suspect under Memorandum 01-06 ¶¶ III(B)-(C) and his or her information would be shared. Tr. at 58:4-59:18 (Ross).

9. Eight years ago, on November 10, 2009, Mayor Michael A. Nutter signed Executive Order No. 8-09, entitled Policy Concerning Access of Immigrants to City Services ("Confidentiality Order"). Ex. P-2. The Confidentiality Order contains similar non-disclosure rules as to those within Memorandum 01-06. Specifically, the Confidentiality Order instructs that City officers and employees "shall not disclose confidential information" regarding immigration status, except where the subject has authorized the disclosure, where disclosure is required by law, or where "the individual to whom such information pertains is suspected . . . of engaging in criminal activity." *Id.* § 3(A)-(B).

10. Like Memorandum 01-06, the Confidentiality Order makes an exception for the disclosure of immigration-status information in the case of criminal suspects because the City believes that when "someone is engaging in criminal activity, then that changes the game." Tr. at 29:22-23 (Ross). The City has "no interest in withholding . . . information from any federal authorities" when it comes to people who pose law enforcement threats. *Id.* at 29:21-24 (Ross).

11. The Confidentiality Order also contains directives for City officers and employees regarding inquiries about immigration status. For police officers, the Confidentiality Order instructs that officers "shall not . . . inquire about a person's immigration status, unless the status itself is a necessary predicate of a crime the officer is investigating or unless the status is relevant

3

to identification of a person who is suspected of committing a crime (other than mere status as an undocumented alien)." *Id.* § 2(B)(2). Further, police officers should not inquire about the immigration status of "crime victims, witnesses, or others who call or approach the police seeking help," period. *Id.* § 2(B)(3). For other City employees, the Confidentiality Order directs that they shall not "inquire about a person's immigration status," unless "immigration status is legally required for the determination of program, service or benefit eligibility" or unless the inquiry is "required by law." *Id.* § 2(A).

12. The Confidentiality Order's provisions on non-collection are widely followed by Philadelphia police officers. Tr. at 31:21-32:13 (Ross) ("the policy . . . about not asking [about] status" is "solid with us"), 67:8-68:19 (Ross) (similar), 110: 21-24 (Abernathy) ("[A]s recently as last month at roll call, officers were reminded not to ask for documentation status."). These provisions are also followed by City employees in other departments. Tr. at 108:1-9 (Abernathy), 165:8-20 (Gladstein). Because City officers and employees rarely ask individuals for immigration status information, the City is rarely in possession of such information to share.

13. The City's policies on not collecting and not disclosing immigration-status information—in the cases of law-abiding individuals who pose no criminal or law enforcement threat—are critical to fostering trust with the City's immigrant community. The Police Department believes that it would not be able to "effectively carry out [its] mission" if it "ha[d] a population who [was] concerned about their status being revealed" and therefore was too afraid to cooperate with the police. Tr. at 28:21-23 (Ross).

14. At the same time, the Confidentiality Order does not prohibit City employees from requesting immigration status information from the federal government. Tr. at 85:9-19 (Abernathy), 145:19-21 (Farley), 160:7-16 (Gladstein); *accord* Dkt. 61-1, at 3. However, there

4

would be little reason for City officials to collect that information, *id.* at 113: 17-19 (Abernathy), as the City does not require the disclosure of an individual's immigration status to enjoy City benefits, *id.* at 85:9-19 (Abernathy), 145:22-146:5 (Farley). It is also not the City's mission or responsibility to enforce the federal civil immigration laws. *Id.* at 19:2-9 (Ross).

15. "Confidential information" is defined in the Confidentiality Order as "any information obtained and maintained by the City agency related to an individual's immigration status." Ex. P-2, ¶ 3(A); *see also* Tr. 29:7-11 (Ross). "Confidential information" therefore does not include information related to a person's address or general whereabouts. Tr. at 122:7-15 (Abernathy).

16. On January 4, 2016, Mayor Jim Kenney signed Executive Order 5-16, titled "Policy Regarding U.S. Immigration and Customs Enforcement Agency Detainer Requests." Ex. P-4 ("Detainer Order II"). Detainer Order II provides that, for people in the "custody of the City," no "notice of his or her pending release [shall] be provided, unless such person is being released after conviction for a first or second degree felony involving violence and the detainer is supported by a judicial warrant." Ex. P-4. In a March 22, 2017 memorandum sent from First Deputy Managing Director Brian Abernathy to the Philadelphia Prisons Commissioner, Mr. Abernathy clarified that Detainer Order II did not intend to—and so does not—alter the City's past practice of complying with any criminal judicial warrant presented. Ex. P-5; Tr. at 120:6-121:12 (Abernathy). If ICE sends a notification request supported by a judicial criminal warrant of any type, the City will provide advance notification of release.

17. Detainer requests are generally sent to the Philadelphia Department of Prisons, not to police precincts, because the police generally hold suspects for a very limited amount of time before they are transferred to a Philadelphia prison. Tr. at 96:2-16 (Abernathy). ICE notification requests do not ask for immigration status information. *Id.* at 121:11-19; Ex. P-6.

**B.     Philadelphia's Practices Promote Cooperative Law Enforcement.**

18. As a part of routine police practice, the City regularly shares information about criminal suspects with the federal government through the use of three databases: (1) the National Criminal Information Center ("NCIC") database, managed by the FBI; (2) the Preliminary Arraignment System ("PARS") database, managed by the First Judicial District, the District Attorney's Office, and the PPD; and (3) the Automated Fingerprint Identification System ("AFIS"), managed by the FBI.  Tr. at 81:5-84:15 (Abernathy); Dkt. 1-14, at 8-9.

19. Philadelphia police officers use the NCIC database in their regular day-to-day criminal law enforcement activities.  PPD officers are trained to run an NCIC "look-up" for all individuals subjected to investigative detention by the police, to determine if they are subject to an outstanding warrant. If the officer is able to collect the person's date of birth and license plate information, NCIC protocols mandate that that information to be entered into NCIC.  Tr. at 84:5-15 (Abernathy); Dkt. 1-14, at 8-9.  ICE conceivably has access to NCIC and the independent ability to determine whether people of interest were detained in Philadelphia.  Dkt. 1-14, at 7-8.

20. PARS allows for the real-time sharing of information amongst Philadelphia's primary criminal justice agencies.  After a police officer enters an individual's information into PARS at the time of arrest, that information is automatically shared with the First Judicial District and the District Attorney's Office, in addition to federal agencies like ICE, which pays for access to PARS under a licensing fee Memorandum of Understanding ("MOU").  The MOU with ICE excludes the sharing of information on victims and witnesses.   Tr. at 81:5-82:24 (Abernathy).

21.  At the time of a suspect's arrest, his or her fingerprints are inputted into Philadelphia's AFIS platform.  AFIS feeds automatically into Pennsylvania's identification bureau and then to the FBI.  Tr. at 35: 6-8 (Ross).  The FBI in turn runs Philadelphia's AFIS fingerprints against the Integrated Automated Fingerprint Identification System ("IAFIS")—a national fingerprint and

6

criminal history system maintained by the FBI—and the Automated Biometric Identification System ("IDENT")—a DHS-wide system for storing and processing biometric data for national security and border management purposes.  Tr. at 82:25-84:5 (Abernathy); Dkt. 1-14, at 8-9.

22. ICE relies upon the information shared in these databases as the primary source of data to assist it in enforcing federal immigration law. Tr. at 83:16-84:4 (Abernathy).[3]

23. The City also cooperates and has "tremendous relationship[s]" with its federal law enforcement partners at the FBI, ATF, DEA, and ICE, including by serving on joint task-forces with them.  *Id.* at 30:11-17, 42:24-44:15 (Ross).

C.     **The City's Confidentiality Policies Promote Public Safety.**

24.  The PPD practices "smart policing" and "community policing" strategies that rely upon building strong community relationships.  Tr. at 14:15-13 (Ross).   PPD officers cannot be on every street corner; they must rely on residents to be the PPD's "eyes" and "ears" in detecting crimes.  *Id.* at 14:1-14, 15:5-16:25 (Ross).  "[M]ost . . . crimes are solved by an individual calling someone."  *Id.* at 41:16 (Ross). The Department has worked hard over the years to "establish these relationships" of trust with communities across the City, including immigrant communities. *Id*. at 36:18 (Ross).   But trust is a "neighborhood by neighborhood thing," and the Department often "struggles mightily" to win it.  *Id.* at 36:17 (Ross).  "Losing that trust once you . . . have it, almost makes your challenges insurmountable."  *Id.* at 45:34-24 (Ross).

25. A key component of effective police work is also crime pattern analysis.  *Id*. at 37:1-38:1 (Ross).  Crime pattern analysis, too, depends on strong police-community trust.  If victims or witnesses were to avoid reporting crimes—for example, were to withhold reports of a repeat

---

[3] *See also* U.S. Immigration & Customs Enforcement, *Declined Detainer Outcome Report FAQ's: How is an individual placed under a detainer?*, https://goo.gl/oUsD3T (last visited Oct. 31, 2017 9:10 PM EDT) ("When an individual is booked into custody by a law enforcement agency, his or her biometric data is automatically routed through federal databases to the FBI.  The FBI shares this information with ICE.").

7

burglar operating in the same neighborhood—out of fear that they would be required to reveal their immigration status, the PPD's efforts to "identify [crime] patterns" would be severely impeded. *Id*. at 37:1-38:1, 40:1-9 (Ross). Philadelphia's social and legal services organizations convey that their clients have either not reported crimes or have been discouraged by friends or family from doing so, for fear that "immigration agents [would be] wait[ing ] outside the courtroom." Dkt. 49, at 5 (Am. Br. of Philadelphia Social and Legal Services Organizations).

26. Some crimes, such as domestic violence and sexual assault, are also "very difficult to detect" unless the victim or another knowledgeable person informs the police. Tr. at 39:10-24 (Ross). Providing a promise of confidentiality to the victim is critical. *Id*. at 39:10-18 (Ross).

27. Mandating immigration status disclosure would have a "daunting" impact on the PPD's use of informants, *id*. at 38:2-39:9 (Ross), and would "severely inhibit [the PPD's] ability to gain information, intel, and things that keep the city safer." *id*. at 36: 21-23 (Ross). The City "absolutely need[s] this [willingness to work with the police] from people across the city . . . irrespective of their immigrant status." *Id.* at 36: 23 (Ross).

28. There is no "data" suggesting any link between "immigrants and crime" in Philadelphia; to the contrary, when it comes to crime statistics overall, the Department is most "concerned" with "people who were born and raised in Philadelphia." *Id.* at 41:22-42:23 (Ross).[4]

29. The PPD "is "not in the immigration business" and believes that serving as an arm of ICE would "detract[] from [its] mission." *Id*. at 19:2-9 (Ross). The Department also believes that being forced to alter its confidentiality policies would "jeopardize" the "trust" that the PPD has built in immigrant communities, and undermine its ability to maintain public safety. *Id*. at 45:11-

---

[4] Nationally in 2015, roughly 820,000 of the 11 million undocumented people in the United States (7.5%) had criminal convictions. *See* Migration Policy Inst., *Unauthorized Immigrants With Criminal Convictions: Who Might be a Priority for Removal?* (2016), goo.gl/p1ucC8.

8

46:6 (Ross); *see also* Am. Br. of Phila. Social & Legal Orgs., at 8-9 ("[A] change would substantially undermine Amici's ability to encourage crime victims to cooperate with city police, prosecutors, and employees in the prevention, investigation, and prosecution of crime.").

30. In large part because of the PPD's investment in community policing and smart policing, and the relationships the PPD has built with the immigrant community, Philadelphia has witnessed the lowest crime rate in four decades. Tr. at 40:10-18 (Ross). Since the enactment of the City's Confidentiality Order in 2009, crime has decreased by over 17 percent, including a 20 percent decrease in violent crime. Ex. P-3, at 2.

**D.     The City's Confidentiality Policies Promote the Wellbeing of all City Residents.**

31. Philadelphia's confidentiality policies also promote public health by encouraging broad-based use of vital City services. Immigrants are using the City's health and human services agencies "when they need them," "in large part because of the City's confidentiality policies." Ex. P-9, ¶ 8; *see also* Am. Br. of Phila. Social & Legal Orgs., at 13 ("Because of the City's policies, CLS advocates have had success referring clients to City health clinics for primary health care services, thereby preventing otherwise minor health concerns from spiraling into more serious health concerns that require specialized medical care.").

32. The City's health clinics serve approximately 80,000 patients, resulting in around 320,000 total visits, each year. Tr. at 147:24-148:1 (Farley). A "large number" of the City's patients are immigrants. *Id*. at 147:12-15 (Farley). Immigrants and their families receive services from City clinics including vaccinations, basic primary care, and prenatal care. *Id*. at 147:16-12 (Farley), 149:4-11 (Farley). The City believes it is important that all City residents have access to healthcare—particularly primary and preventative care—because "[d]iseases don't respect borders" and can easily spread once present. *Id*. at 144:23-145:2 (Farley).

9

33. The Philadelphia Department of Public Health believes that protecting confidential information "communicates to immigrants" that they need not "fear" adverse immigration consequences from receiving public health services. *Id*. at 146:6-12 (Farley). That promotes use of the City's health services by the immigrant population. *Id*. at 144:23-145:2 (Farley).

34. If the City were forced to disclose confidential immigration status information to federal authorities for individuals seeking City services, the Department of Public Health would be "very concerned" that the City's immigrant population would be too "afraid to receive those preventive services." *Id*. at 146:16-147:8 (Farley). Such a policy would threaten "control of infectious diseases," such as tuberculosis. *Id*. at 146:16-147:8 (Farley); *see also* ex. P-9, ¶9. Two-thirds of the 75 active tuberculosis patients in Philadelphia each year are foreign born, *id*. at 149:19-150:10 (Farley), and the treatment involves "directly observed therapy," which can require home visits. Without a "relationship of trust" with patients, *id*. at 150:11-151:8 (Farley), patients may not seek the treatment they need, threatening the further spread of the disease across the City.

35. The threat of the disclosure of confidential information would also undermine use of other critical City services. *Id.* ¶¶ 6, 8, 10. For instance, the City provides mental health and addiction services to some of its most vulnerable residents. Tr. at 161:8-16 (Gladstein). Because services like these are often "stigmatized," the City's confidentiality policy plays an important role in "removing [] barriers" to access. *Id*. at 161:17-25 (Gladstein). Requiring disclosure of immigration status would also have a "chilling effect" on the City's child-welfare services, because it would undermine the trust that City officials require to investigate reports of child abuse. *Id*. at 162:4-21 (Gladstein).

36. Forsaking the "vitality and safety" of the City by prioritizing federal immigration enforcement over City harmony would place the City "in peril." Tr. at 16:15 (Ross).

DATED: November 1, 2017                          Respectfully submitted,

                                                 /s/ Virginia A. Gibson

SOZI PEDRO TULANTE, I.D. NO. 202579              VIRGINIA A. GIBSON, I.D. NO. 32520
  City Solicitor                                 SARA ARONCHICK SOLOW, I.D. NO. 311081
MARCEL S. PRATT, I.D. NO. 307483                 JASMEET K. AHUJA, I.D. NO. 322093
  Chair, Litigation Group                        ALEXANDER B. BOWERMAN, I.D. NO. 321990
LEWIS ROSMAN, I.D. NO. 72033                     HOGAN LOVELLS US LLP
  Senior Attorney                                1735 Market Street, 23rd Floor
CITY OF PHILADELPHIA LAW DEPARTMENT              Philadelphia, PA 19103
1515 Arch Street, 17th Floor                     (267) 675-4600
Philadelphia, PA 19102                           virginia.gibson@hoganlovells.com

ROBERT C. HEIM, I.D. NO. 15758                   NEAL K. KATYAL (*pro hac vice*)
JUDY L. LEONE, I.D. NO. 041165                   DANIEL J.T. SCHUKER (*pro hac vice*)
FRIEDRICH-WILHELM W. SACHSE, I.D. NO. 84097      HOGAN LOVELLS US LLP
DECHERT LLP                                      555 Thirteenth Street, NW
Cira Centre                                      Washington, DC 20004
2929 Arch Street
Philadelphia, PA 19104
(215) 994-4000

*Attorneys for the City of Philadelphia*

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 1, 2017, the foregoing document was served electronically by the Court's CM/ECF system on all counsel of record in this case.

November 1, 2017

*Virginia A. Gibson*

VIRGINIA A. GIBSON, I.D. NO. 32520
HOGAN LOVELLS US LLP
1735 Market Street, 23rd Floor
Philadelphia, PA 19103
(267) 675-4600
virginia.gibson@hoganlovells.com