UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF PENNSYLVANIA

CITY OF PHILADELPHIA      .    Case No. 2:17-cv-03894-MMB
                          .
          Plaintiff,      .
                          .
                          .    U.S. Courthouse
     v.                   .    601 Market Street
                          .    Philadelphia, PA 19106
JEFERSON BEAUREGARD       .
SESSIONS, III, Attorney   .
General of the United     .
States,                   .
                          .
          Defendants.     .
                          .    October 26, 2017
. . . . . . . . . . . . ..      9:15 a.m.

                 TRANSCRIPT OF EVIDENTIARY HEARING
               BEFORE HONORABLE MICHAEL M. BAYLSON
                    UNITED STATES DISTRICT JUDGE


APPEARANCES:

For Plaintiff:            VIRGINIA GIBSON, ESQ.
                          JASMEET AHUJA, ESQ.
                          HOGAN LOVELLS LLP
                          1735 Market Street, 23rd Floor
                          Philadelphia, PA 19103

                          SOZI TULANTE, ESQ.
                          MARCEL S. PRATT, ESQ.
                          CITY OF PHILADELPHIA LAW DEPARTMENT
                          1515 Arch Street, 17th Floor
                          Philadelphia, PA 19102

For the Defendant:        ARJUN GARG, ESQ.
                          US DEPARTMENT OF JUSTICE
                          10 Massachusetts Avenue NW
                          Washington, DC 20530

Audio Operator:           ESR


                **AEQUUM LEGAL TRANSCRIPTION SERVICES**
                         **480-241-2841**

```
TRANSCRIBED BY:          Eileen Dhondt, CET-807
                         Aequum Legal Transcription Services
                         6934 East Almeria Road
                         Scottsdale, AZ 85257
```

Proceedings recorded by electronic sound
recording, transcript produced by transcription service.

**AEQUUM LEGAL TRANSCRIPTION SERVICES**
**480-241-2841**

INDEX

                                              PAGE:

THE COURT:

Plaintiff's Opening Statement                 5

Defendant's Opening Statement                 9

WITNESSES:

For the Plaintiff:

RICHARD ROSS
     Direct Examination by Mr. Tulante        10
     Cross-Examination by Mr. Garg            46
     Redirect Examination by Mr. Tulante      72

BRIAN ABERNATHY
     Direct Examination by Mr. Tulante        77
     Cross-Examination by Mr. Garg            103
     Redirect Examination by Mr. Tulante      118

JULIE MICHELLE WERTHEIMER
     Direct Examination by Ms. Ahuja          124
     Cross-Examination by Mr. Garg            136

THOMAS A. FARLEY
     Direct Examination by Mr. Pratt          139
     Cross-Examination by Mr. Garg            156

EVA GLADSTEIN
     Direct Examination by Mr. Pratt          157
     Cross-Examination by Mr. Garg            164


EXHIBITS:

For the Plaintiff:              MARKED        ADMITTED

Exhibits P-1 through P-9        166           166

**AEQUUM LEGAL TRANSCRIPTION SERVICES**
**480-241-2841**

PROCEEDINGS

1

2     (Call to the Order of the Court)

3     (Proceedings commence at 9:15 a.m.)

4          DEPUTY CLERK:  All rise.

5          THE COURT:  Good morning, everyone.  Please be seated.

6          ALL:  Good morning.

7          THE COURT:  All right.  We're here for an evidentiary

8  hearing in the City of Philadelphia versus Attorney General

9  Sessions, civil action 17-3894.  Present for the plaintiff is

10 Mr. Tulante, the City Solicitor.

11         MR. TULANTE:  Good morning, Your Honor.

12         THE COURT:  With him is, let me see, Marcel Pratt; is

13 that correct?

14         MR. PRATT:  Yes, Your Honor.

15         THE COURT:  Hi.  And in between you is --

16         MS. AHUJA:  Jasmeet Ahuja, Your Honor.

17         THE COURT:  All right.  Good morning.  How are you?

18 Okay.  And for the defendant is Mr. Garg from Washington, DC.

19         MR. GARG:  Good morning, Your Honor.

20         THE COURT:  Good morning.  And with you is --

21         MR. FILENGI:  August Filengi (phonetic throughout),

22 Justice Department.

23         THE COURT:  Okay.  Thank you.  Okay.  We had requested

24 and received indication of what witnesses were going to be

25 called today.  Today is exclusively for an evidentiary hearing

1   for -- in connection with the City's motion for a preliminary

2   injunction and I received a list of names.  Would counsel like

3   to make a short opening statement first?  Mr. Tulante?

4                   PLAINTIFF'S OPENING STATEMENT

5           MR. TULANTE:  Yes, Your Honor.  Good morning and thank

6   you for the opportunity.

7           Your Honor, today, as you know about this case, the

8   Department of Justice wants to impose mandates on the City of

9   Philadelphia connected to federal immigration enforcement.

10  These mandates are, in the City's view, unprecedented, unlawful

11  and unconstitutional, and the Department's efforts to impose

12  them as so-called spending conditions attached to a federal

13  formula grant that the City has received every year without any

14  issue to support its criminal justice system is also unlawful.

15          If the Department is allowed to thrust these federal

16  immigration enforcement mandates to the City, Your Honor, we'll

17  show that the impact will be irreparable.  We ask the Court to

18  prevent that outcome by issuing a preliminary injunction against

19  the Department's new JAG grant condition.

20          Today, the Court will hear from five city officials

21  who will describe the program and policies in Philadelphia that

22  are in jeopardy because of the Department's action.  The

23  evidence presented today will make five things clear.  First,

24  that the mandates the Department wants to impose will not

25  improve criminal justice or public safety in Philadelphia.

6

1   Quite to the contrary, they will actually undermine it.  We

2   can't have a cop on every corner in Philadelphia.  Community

3   policing counts upon the people in the community who are

4   officer's eyes and ears on the streets.  Their trust is critical

5   to the reporting of crimes.  Making Philadelphia police officers

6   abandon the confidentiality policies and effectively become

7   federal immigration enforcement agents will send victims and

8   witnesses into hiding and into the shadows and therefore allow

9   crime to thrive, and this is particularly the case in immigrant

10  neighborhoods.

11          Second, the Department's new conditions would hurt

12  more than help the City's law enforcement efforts.  It would

13  affect the City's ability to administer basic public services

14  like preventative healthcare as significant services to children

15  and crime victims in the city's immigrant population.  That

16  hurts every Philadelphian.  Confidentiality policies are in

17  place to protect information of patients who need city health

18  services.  Without that guarantee of confidentiality, members of

19  the immigrant community may not obtain vaccinations or treatment

20  for highly communicable diseases.

21          Third, the City complies with Section 1373.  We

22  cooperate with the federal government as to immigrants who are

23  suspected of crimes or convicted of crimes.  By city policy and

24  practice, Philadelphia shares information about every criminal

25  suspect it encounters or individual arrest with its federal law

7
Plaintiff's Opening Statement

1   enforcement partners, including ICE.  So when the Department

2   submitted a declaration from Jim Brown saying that ICE needs

3   lists of arrestees in local custody, we'll hear today that

4   Philadelphia provides exactly that kind of information through

5   these databases.  The City does provide ICE advance notification

6   of the release of persons from custody when ICE presents a

7   criminal judicial warrant, and it does provide federal

8   authorities access to its prisons when the person they wish to

9   interview consents to that request.  The City, through its

10  police officers, works with its federal law enforcement partners

11  in several criminal task forces to investigate crimes committed

12  in our area by non-immigrants and immigrants alike.  So the city

13  cooperates when it comes to immigrants who are criminals, but

14  what the Department now wants JAG recipients to do including

15  Philadelphia is to help enforce immigration laws against law

16  abiding people, even victims and witnesses of crimes.  That

17  would jeopardize our residents perhaps in unintended ways, but

18  the harm will come nonetheless.

19        Fourth, our testimony will establish the Department

20  has never done anything like it's doing here before.  It's never

21  done this before.  The Court will hear from the person

22  responsible for managing the City's JAG grants.  She'll discuss

23  the kinds of conditions that the Department is imposing to pass.

24  Not a single one require that Philadelphia assist the government

25  in enforcing federal immigration law.

1          Fifth and finally, Your Honor, the City will show that

2     the harm it will suffer without this Court's intervention.

3     Under the new JAG conditions for 2017, the City must either

4     abandon its policies that improve criminal justice, public

5     health and the general welfare in the city causing declines in

6     safety and general welfare in the city -- across the city or

7     abandon funding for significant criminal justice projects.

8     Either injury is irreversible for the City.

9          The evidence will show that the Court should issue a

10    preliminary injunction against the DOJ's unprecedented, unlawful

11    and unconstitutional grant conditions.

12         And, Your Honor, the main thing we'll show here today

13    is that we comply with federal law and it's really important for

14    the City in terms of our safety to be able to do what we do here

15    today.  And so, with that, that's my short opening statement.

16              THE COURT:  Thank you.  All right.  Mr. Garg.

17                   DEFENDANT'S OPENING STATEMENT

18              MR. GARG:  Your Honor, as you know from our briefing,

19    the Government believes that there's ample authority to impose

20    immigration related conditions on the receipt of federal dollars

21    through the Byrne JAG program that the City is challenging here.

22    We think that promotes a modest level of intergovernmental

23    cooperation related to law enforcement in the immigration

24    setting.  We'll save our argument on that for next week's

25    hearing as the Court suggested.

9

Defendant's Opening Statement

1        As a preliminary matter for today's hearing, I do

2   understand that the City intends to sequester its witnesses

3   during today's hearing and I appreciate that.  Just for the

4   record, I would ask the Court to enforce Federal Rule of

5   Evidence 615 regarding the presence of witnesses in the

6   courtroom.

7        THE COURT:  Okay.  All witnesses will be sequestered.

8   Do you mind if they -- if they want to stay in the courtroom

9   after they finish their testimony or?

10       MR. GARG:   That is acceptable, Your Honor.

11       THE COURT:  That's okay?  All right.  Thank you.

12       MR. GARG:  Yes.  Thank you.

13       THE COURT:  Okay.  Who's the first witness, Mr.

14   Tulante?

15       MR. TULANTE:  Your Honor, the first witness is Police

16   Commissioner, Richard Ross.  Before I call him, I just want to

17   for housekeeping purposes, I spoke to counsel of the Department

18   of Justice and we've agreed that -- we've submitted them a copy

19   -- a binder with exhibits.  We've provided one to the Court and

20   there will be one for the witness.  There are no disputes in

21   terms of admissibility and what we'll do as rather than going

22   through the process by admitting one by one, we'll seek to admit

23   them at the conclusion of the hearing.

24       THE COURT:  Okay.  That's agreed.

25       MR. TULANTE:  And, with that, Your Honor, the City

10

1  calls Police Commissioner Richard Ross.

2          THE COURT:  And the other witnesses will step outside?

3          MR. TULANTE:  They already are outside, Your Honor.

4          THE COURT:  Thank you.  Good morning, Commissioner.

5          MR. ROSS:  Good morning, Your Honor.

6      (RICHARD ROSS, Witness, is Sworn)

7          DEPUTY CLERK:  Please state your full name and spell

8  your last name for the record.

9          THE WITNESS:  Sure.  Richard Ross, R-O-S-S, Police

10 Commissioner, Philadelphia Police Department.

11         MR. TULANTE:  Your Honor, may I proceed?

12         THE COURT:  Please.

13                     DIRECT EXAMINATION

14 BY MR. TULANTE:

15 Q    Good morning, Commissioner Ross.

16 A    Good morning.

17 Q    Could you please tell Judge Baylson where you work?

18 A    Sure.  I work in the Philadelphia Police Department.

19 Q    And what do you do for the Philadelphia Police Department?

20 A    I am the police commissioner.

21 Q    How long have you been in that role?

22 A    Twenty-two months.

23 Q    And explain in very broad outlines what are your duties as

24 the Philadelphia police commissioner.

25 A    Well, they're vast in nature.  Ultimately, I'm responsible

1   for everything, but issues related to hiring, terminations,

2   training, policy implementation, community relations, crime

3   fighting, and the like.

4   Q      And how long have you been a member of the Philadelphia

5   Police Department?

6   A      Twenty-eight and a half years.

7   Q      And I'm going to ask you to do the impossible.  If you can

8   summarize working backwards some of the various roles you've

9   held in the police department starting with the most recent

10  position you had before you were commissioner.

11  A      Sure.  So prior to becoming the police commissioner, I was

12  the first deputy commissioner for eight years.  In that

13  capacity, I was the operations deputy commissioner in charge of

14  a variety of duties, also filling in for the police commissioner

15  in his absence; often very similar and tantamount to the duties

16  of being a C of O of a corporation.  Also was responsible for

17  overseeing crime fighting initiatives, community relation

18  issues, everything from labor relation and the like.

19           Prior to that --

20  Q      Commissioner, who was the police commissioner when you

21  were the first deputy police commissioner?

22  A      Police Commissioner Charles Ramsey.  So, prior to that

23  eight years, which was a pretty extensive experience and which

24  gave me the opportunity to see the police department in

25  preparation for this assignment, I was a deputy commissioner for

1    three years in the capacity of Internal Affairs.  In that

2    capacity, clearly, it involved investigating all police related

3    matters, both internal and external in nature, as well as some

4    issues related to criminal matters in other city departments.

5              Prior to that assignment, I was the captain of the

6    homicide unit where I was tasked with overseeing all death

7    investigations of a suspicious nature in the city interfacing

8    with the press routinely and dealing with various members of the

9    community as it relates to trying to explain issues about death

10   related investigations.

11   Q    And is it fair to say, Commissioner, that you essentially

12   worked your way up through the police department?

13   A    Yes, I did.

14   Q    And are you from Philadelphia?

15   A    Born and raised.

16   Q    And give the judge some additional background.  Do you

17   have any advanced degrees?

18   A    Yes.  Your Honor, I have a master's degree from St. Joseph

19   University in criminal justice.

20   Q    And are you a member of any organization of police

21   officials?

22   A    Yes.  Several.  In fact, several were here for a very

23   large conference this week; one being the International

24   Association of Chiefs of Police, Major City Chiefs which

25   consists of the 74 largest police agencies in the United States

Direct Examination - Ross

1    as well as in Canada as well as the Police Executive Research

2    Forum and the National Executive (sic) of Black Law Enforcement

3    Executives which is otherwise known as NOBLE.

4    Q     And how many -- approximately how many police officials

5    were here this past week?

6    A     At least 15,000 or so.

7    Q     And what do you discuss in these organizations?

8    A     Present issues in policing.  It could be about

9    immigration.  It could be about community and police relations,

10   labor related issues, crime related issues, a whole host of

11   issues, and we meet -- Major City Chiefs, for example, meets

12   quarterly to discuss these issues to see how similar or

13   dissimilar some of the issues are relating to police agencies

14   across the nation.

15   Q     Could you give Judge Baylson a little bit of overview of

16   the Philadelphia Police Department?  How many police officers

17   are you in charge of?

18   A     Sure.  We are actually budgeted for 6,525 sworn.  We

19   presently have about 6,400 so we're down a little bit, and we're

20   also budgeted for 800 civilians and that does not include the

21   part-time officers or school crossing guards as we will and

22   that's 1,037 of them are budgeted for that position.

23   Q     And nationwide, where does the Philadelphia Police

24   Department rank in terms of its size of officers?

25   A     We are the fourth largest department in the nation.

1   Q     Commissioner Ross, given your duties, really describe to

2   the judge a couple of the major things that keep you up at

3   night.

4   A     So one without question is gun violence.  It's a very

5   intractable issue in the City of Philadelphia.  It's one that we

6   grapple with getting our arms around pretty much annually not

7   much different than many other departments around the nation.

8   Given the climate that we're in right now, police community

9   relations is a major one trying to maintain relationships that

10  we have, particularly in communities of color, and also develop

11  and cultivate additional ones where we don't have them or where

12  those relationships may suffer.

13         So the issues are myriad in nature, but those are some

14  of the ones that are kind of hot button issues right now for us.

15  Q     And if you could describe also what is your theory of

16  policing; in other words, when you think about crime fighting,

17  what are some of the things you think about in terms of

18  addressing crime?

19  A     Well, one of the things that we are compelled to do is use

20  smart policing whereby we're using intelligence to respond,

21  react to and get in front of issues as quickly as we possibly

22  can, but from an overarching standpoint, community policing

23  would be the methodology or the style of policing that we

24  utilize.  It is one that is utilized across the nation.  It is

25  widespread views of many police chiefs that the way you have to

1    go and proceed in order to ensure a productive relationship and

2    a vital relationship with your respective partners, which are

3    your various members of your communities.

4    Q       And how do you put that into place?

5    A       Well, you have to be very intentional about developing

6    relationships in community.  We have 21 police districts that

7    are headed by captains and because Philadelphia is such a large

8    department, many of our captains have a scope and depth of

9    responsibility that is very similar to small and medium-sized

10   cities given their respective populations and the manpower they

11   have reporting to them, so we task those men and women with

12   developing programs.  Some of them are department wide which

13   they carry out; some of them are decentralized in nature where

14   individual captains will have different programs based on the

15   districts that they oversee.

16           But we also have programs in the City whereby we are

17   very intentional about pushing out our efforts to establish

18   relationships with our communities.  And so we have a number of

19   programs and special interest groups that are headed by very

20   high ranking people, people that work directly under me, deputy

21   police commissioners, one of which would be assigned to Deputy

22   Commissioner Christine Coulter and she has an Asian American

23   police liaison group which actually has 16 different ethnicities

24   within that Asian community that are assigned to, and the duties

25   there are vast, but the primary one is extending themselves,

1   acting as emissaries on behalf of their particular groups in

2   order to help to sustain and cultivate relationships with those

3   different communities.

4   Q     And let me just take you back in terms of really more

5   broadly.  When you talk about community policing and creating

6   partnerships, where do interactions with the immigrant community

7   fall into that theory?

8   A     Well, they fall in just as much as they would fall in with

9   everyone else, Your Honor.  They -- we have to maintain and

10  establish relationships because they are our eyes and our ears.

11  We have to make sure that people understand what we do in the

12  Philadelphia Police Department and what we're about and the fact

13  that there's an absolute need to have partnerships that are

14  strong in order for us to ensure the vitality and safety of this

15  city.  And, without them, we would be in peril quite frankly.

16  Q     Why do you say that?

17  A     Because although there are 6400 sworn officers, this is a

18  city of over a million and a half people, with far more that

19  visit and work here, and so there's no way that we could ever be

20  on every corner, in every neighborhood, simultaneously.  Despite

21  our best efforts to be present and to create that sense of

22  omnipresence, it's just not practical.  So we need to leverage

23  community partners in order to assist us in detecting crime,

24  reporting crime and just establishing relationships that will

25  improve the city.

1  Q    Does the police department have any effort in recruiting

2  bilingual officers?

3  A    Absolutely.

4  Q    Why is that?

5  A    Well, we are actually very -- I guess you could say we're

6  very intentional about our efforts to be diverse in our

7  recruiting in general, but we realize that, you know, we've got

8  a very, very diverse population.  We interface with many

9  different people.  And on occasion, our first line responders,

10 which are typically our patrol officers, come across people that

11 may or may not speak English.

12         And so, in order to make sure that we can provide the

13 best service possible, we need to have as many people who are

14 bilingual, who have the capacity to interview and get to the

15 core essence of what people need.  And you can't do that unless

16 you have people out there that have those skill sets.  And we

17 also need for people to understand that there are people serving

18 in this department who may be of the same heritage and same

19 ethnicity.  And all those things help to garner that kind of

20 support that you need.

21 Q    Explain some of the outreach you've done and your

22 familiarity with the immigrant community; not just now, but over

23 the course of your 28-year career with the police department.

24 A    So, again going back to some of the liaison groups we have,

25 but starting in -- well, basically in every rank I've occupied

Direct Examination - Ross

1    I've had an opportunity to interact with various immigrant

2    communities, even dating as far back to when I was a sergeant in

3    the early '90s in the North Philadelphia East Police Division.

4    A large Latino community.  And actually even down here in Center

5    City, working in the 9th police district across the other side

6    of Broad Street.  You've got multi-ethnic groups all throughout

7    the city.

8            Even going forward, as I was a lieutenant in the 35th

9    Police District, which is in the northwest part of the city,

10   where you get a large population of Asian communities from all

11   different groups and sectors, in the sense that we have people

12   from Vietnam, people from China, all over in those areas.  So

13   you had an opportunity to connect with those folks, to get -- to

14   understand some of their cultures, to understand, you know, what

15   their issues are.

16           Moving forward even as a captain in the 14th District,

17   and it transcends even the immigrant community because districts

18   like the 14th District are so vast in nature that it houses some

19   of the most impoverished up to some of the richest people in the

20   city.  And some of those folks are born and raised here and some

21   were not.

22   Q    Where is the 14th District?

23   A    It's in Germantown, Chestnut Hill, West Mount Airy, Mount

24   Airy.  In terms of population, it is probably second to one

25   other district, and it houses approximately 110,000 residents

Direct Examination - Ross

1    just in that district alone.

2    Q    As the Commissioner for the Philadelphia Police Department,

3    do you see as part of the role of the department to be an

4    extension of ICE?

5    A    We are not.  We are a local law enforcement agency.  We

6    cooperate with all our federal authorities, but we are not an

7    extension of ICE.  We are not in the immigration business, and

8    we believe that detracts from our mission.  So, in the sense of

9    performing those duties, the answer would be no.

10   Q    One of the things that you hear about in terms of labels is

11   the term "sanctuary city."  In your estimation, is Philadelphia

12   a sanctuary city?

13   A    Respectfully, I don't even know what that is.  We are a

14   welcoming city in my estimation.  I don't -- I'm not at all

15   clear about what a sanctuary city is.

16            THE COURT:  How did you phrase it, a welcoming city?

17            THE WITNESS:  Welcoming city, Your Honor.

18            THE COURT:  Well, let me just interrupt briefly,

19   because sometimes people take the wrong inference from a term

20   like "sanctuary city."  But is that a phrase you use or do you

21   know where it came from?

22            THE WITNESS:  I hear it touted quite frequently,

23   particularly now.  But it is not a term that I use.  So, quite

24   honestly, Your Honor, I don't use that term in meetings.  I

25   don't use that term in referencing it with my staff or anything

Direct Examination - Ross

1   like --

2             THE COURT:  Some people may infer that it means that

3   if somebody commits a crime and they happen to be an immigrant

4   or undocumented person, they won't be arrested or prosecuted.

5   Does it mean that in any sense of the word?

6             THE WITNESS:  Well, Your Honor, I think that inference

7   is correct, certainly within the law enforcement community, for

8   many of my colleagues, and that's why that connotation is never

9   used because we don't harbor criminals in the Philadelphia

10  Police Department.  We don't really care who you are or where

11  you're from.

12            THE COURT:  So, just for the record, if a police

13  officer saw somebody, a man, without further information

14  committing a crime, a serious crime, that officer would arrest

15  that man, right?

16            THE WITNESS:  Absolutely.

17            THE COURT:  Okay.  Would it make any difference in the

18  arrest procedures or the prosecution, as far as the police

19  department is concerned, whether that man was a fully-fledged

20  citizen, was here on a Visa, was an undocumented immigrant, or

21  in any other category?

22            THE WITNESS:  No difference at all, Your Honor.  A

23  criminal is a criminal.

24            THE COURT:  All right.  Go ahead.

25  BY MR. TULANTE:

Direct Examination - Ross

1  Q    And on that -- just to follow that point, Commissioner, if

2  that person, if police approached them and see evidence of a

3  crime, and say "I'm undocumented," does that change the police

4  department's approach in terms of investigating or prosecuting

5  that person?

6  A    If they committed a crime, they're going to be arrested.

7  Q    Well, this is actually a good pivot to talk about some of

8  the specific policies that the department has.  There's a book

9  in front of you, and if you go to P-1.

10         MR. TULANTE:  And, Your Honor, there's one for you, as

11  well, and for your staff.

12  BY MR. TULANTE:

13  Q    Do you have it in front of you?

14  A    I do.

15         MR. TULANTE:  Your Honor, for the record, this is

16  Philadelphia Police Department Memorandum 016.  It's cross --

17  we're cross --

18         THE COURT:  That was included in the --

19         MR. TULANTE:  Exactly.

20         THE COURT:  -- exhibits to the --

21         MR. TULANTE:  It's Exhibit 3 to our complaint for

22  declaratory judgment relief.

23         THE COURT:  Right.

24         MR. TULANTE:  But we just want to make sure that it's

25  separately marked and he has it in front of him.

Direct Examination - Ross

1            THE COURT:  Okay.

2            MR. TULANTE:  And when Your Honor has it, I can

3  proceed.

4            THE COURT:  This is 1.06?

5            MR. TULANTE:  This is P-1. Yeah, yeah, Memorandum

6  01.06.

7            THE COURT:  Okay.

8            MR. TULANTE:  May I proceed, Your Honor?

9            THE COURT:  Yes.

10  BY MR. TULANTE:

11  Q    Do you recognize Exhibit P-1?

12  A    I do.

13  Q    And what is it?

14  A    It's a departmental memorandum regarding immigrants.

15  Q    And what is the date of that memorandum?

16  A    It is dated May 17, 2001.

17            THE COURT:  Say that date again.  Sorry.

18            THE WITNESS:  May 17th, 2001.

19            THE COURT:  '01?

20            THE WITNESS:  '01, yes, Your Honor.

21            THE COURT:  Okay.  So it's like 16 years old?

22            THE WITNESS:  Correct, Your Honor.

23  BY MR. TULANTE:

24  Q    And who was the commissioner who issued this memorandum?

25  A    John Timoney.

1    Q    And were you in the department at that time?

2    A    I was.

3    Q    Before we jump into the substance of P-1, can you please

4    explain to the Court what is the function of a memorandum within

5    the police department?

6    A    A memorandum is just another form of a policy that we

7    implement.  Typically, they are generated to deal with very

8    specific issues.  But they are to guide the actions or the

9    manner in which we do things and conduct ourselves in the

10   department.

11   Q    And how does the police department transmit memoranda to

12   its line officers?

13   A    Well, it's more than one way; but one of them has to do

14   with submitting them all to our local districts, and the

15   officers have to sign indicating that they received them.

16   Q    And if you look at Section 2 of the memorandum, described

17   "policy," have you had an opportunity to review that before

18   today?

19   A    Yes, I have.

20          MR. TULANTE:  Does Your Honor have a copy of it?  I

21   just want to make sure you're --

22          THE COURT:  I know I have a copy for it.  I don't have

23   it right in front of me, but I --

24          MR. TULANTE:  We have an extra copy.

25          THE COURT:  But I'm familiar with it.

1          MR. TULANTE:  Okay.

2          THE COURT:  Go ahead.

3    BY MR. TULANTE:

4    Q    And does that Section 2 accurately reflect the policy of

5    the Philadelphia Police Department?

6    A    Yes, it does.

7    Q    And if you look in particular to 2B, the second sentence,

8    and if I may read that for the record:

9              "The Police Department will preserve the

10             confidentiality of all information regarding law-

11             abiding immigrants to the maximum extent permitted by

12             law."

13             Have I read that sentence correctly?

14   A    You have.

15   Q    And with respect to that, why is that?  Why is that the

16   police department's policy?

17   A    Because we absolutely need for all of our people in the

18   city, all of our population, to understand that we're there to

19   protect and serve them, and that we are not in any way trying to

20   do anything to put them in harm's way, and that they should feel

21   totally comfortable coming forth with whatever information they

22   deem necessary to safeguard not only themselves, their families,

23   but their fellow neighbors, as well.

24   Q    And in that provision that I read, it refers to

25   "law-abiding immigrants."  Why is that?

Direct Examination - Ross

1  A    Because what we're talking about is people who are not

2  breaking the law.  And we are not talking about people who are

3  committing crimes and wreaking havoc on our streets.  And trying

4  to make it very, very clear that we are not trying to harbor

5  criminals because that's not what we're about in the

6  Philadelphia Police Department.

7  Q    And if you then turn to Section 3, which has "procedure"

8  and then you see in A there are circumstances for where that

9  confidentiality can be waived or that information can be shared;

10 do you see that?

11 A    Yes, I do.

12 Q    And you see Section 3 on page 2, one of the exceptions is,

13 and I quote,

14          "The immigrant is suspected of engaging in criminal

15          activity, including attempts to obtain public

16          assistance benefits through the use of fraudulent

17          documents."

18          Have I read that correctly?

19 A    You have.

20 Q    And why is this exception built in there?

21 A    Well, this exception, like others in this policy, is aimed

22 to underscore the fact that there is a distinction that we're

23 making between victims and witnesses, as opposed to criminal

24 violators.  And we want to make that very clear to all the

25 members of the rank and file, that we do not support the notion

1   of harboring criminals.  However, we do not want to put our

2   other populations, particularly victims and witnesses, in a

3   position to be harmed in any way.

4   Q    And is there anything -- anything in this policy that

5   prohibits the Philadelphia Police Department from continuing to

6   work and cooperate with federal law enforcement?

7   A    Not at all.

8   Q    And if you look to Section 3C, do you see anything related

9   to that?

10  A    Yes, I do.

11  Q    And what is that?

12  A    Well, it clearly says that we will continue to cooperate

13  with federal authorities in investigating and apprehending

14  immigrants suspected of criminal activities.  However,

15  immigrants who are victims of crimes will not have their status

16  as an immigrant transmitted in any manner.

17  Q    And since Your Honor had asked you about -- this has been

18  in place for 16 years; is that correct?

19  A    Correct.

20  Q    And since before this dispute regarding JAG funding, in the

21  16 years that this policy has been in place, has the

22  Philadelphia Police Department had any issues with the federal

23  government regarding this memorandum?

24  A    I am not aware of one.

25  Q    And you've been in the force the whole 16 years?

Direct Examination - Ross

1  A    Yes, I have.

2  Q    Let me direct your attention to P-2.  And that's just tab 2

3  in your binder.

4        MR. TULANTE:  For the record, Your Honor, this was

5  filed as Exhibit 4 to our complaint for injunctive relief.

6        THE COURT:  Okay.

7  BY MR. TULANTE:

8  Q    Do you have P-2 in front of you?

9  A    I do.

10 Q    Do you recognize what P-2 is?

11 A    Yes.

12 Q    And what is it?

13 A    Mayor's Executive Order.

14 Q    And if I can direct your attention to Section 2, in

15 particular --

16       THE COURT:  This is Executive Order 8-09; is that

17 right?

18       THE WITNESS:  Correct, Your Honor.

19       THE COURT:  Okay.

20       MR. TULANTE:  Yes, Your Honor.  For the record, it's

21 Executive Order numbered 8-09, Policy Concerning Access of

22 Immigrants to City Services.

23       THE COURT:  Right.

24       MR. TULANTE:  Signed by Mayor Michael Nutter on

25 November 10th, 2009.

Direct Examination - Ross

1  BY MR. TULANTE:

2  Q    And with respect to Section 2 and Part B, do you see that

3  there are certain provisions related to the police department?

4  A    Yes, I do.

5  Q    And these are four prohibitions with respect to what law

6  enforcement can't do in terms of inquiry?

7  A    That's correct.

8  Q    I want to direct your attention to B3, and that is,

9           "Law enforcement shall not inquire about immigrant

10           status of crime victims, witnesses or others who call

11           or approach police seeking help."

12           Have I read that correctly?

13  A    You have.

14  Q    And is that the policy of the Philadelphia Police

15  Department?

16  A    It is.

17  Q    And why is it important not to inquire about status of --

18  immigration status for crime victims and witnesses?

19  A    Well, first and foremost, our obligation is to protect

20  those who call us and to provide whatever assistance our

21  constituents may need.  You cannot effectively carry that

22  mission out if you have a population who is concerned about

23  their status being revealed for whatever reason.  It is not our

24  mission.  It is not our concern at that moment.

25           What we are concerned with is providing the best

29

1    service that we possibly can and safeguarding the well-being of

2    those in the city who either live or visit here.  And that's

3    what our mission is.

4    Q     And then you see Section 3 titled "Confidentiality of

5    Information"; do you see that?

6    A     Yes, I do.

7    Q     And with respect to that, if I can direct your attention to

8    confidential information here is defined as "any information

9    obtained or maintained by city agencies relating to an

10   individual's immigration status."  Did I read that correctly?

11   A     Correct.

12   Q     If I can direct your attention to 3-B3; do you see that?

13   A     I do.

14   Q     One of the exceptions is the individual to whom such

15   information is -- pertain to -- suspected by such officer

16   employee -- or such officers or employee's agency of engaging in

17   criminal activity other than the mere status of an undocumented

18   alien.  Do you see that?

19   A     I do.

20   Q     And what does that mean?

21   A     Well, I mean, what we're talking about here is that if

22   someone is engaging in criminal activity, then that changes the

23   game.  And we have no interest in withholding that information

24   from any federal authorities.  And so it's important to

25   delineate the difference because there is a difference.  And,

1    for us, once again, we don't concern ourselves with your status

2    when you're a criminal.  If you're a criminal and you commit

3    violations, then there are no distinctions for us.

4    Q    And to follow up on Judge Baylson's hypothetical regarding

5    treatment of people with respect to status, if ICE asked you for

6    status information, immigration status information, of someone

7    who's suspected of engaging in criminal wrongdoing, is there

8    anything in this order that prohibits you from sharing their

9    information with ICE?

10   A    There is not.

11   Q    And is there anything in this order that prohibits the

12   Philadelphia Police Department from continuing to cooperate with

13   its federal law enforcement partners?

14   A    Not only is there not one, but we have the luxury of

15   enjoying a tremendous relationship with all our federal

16   authorities, FBI, ATF, DEA, ICE, Homeland Security, and everyone

17   else.

18         THE COURT:  Let me ask one other question that maybe

19   really gets to this.  And, Mr. Tulante, I'm sure you have

20   personal familiarity with this because of your service as an

21   AOSA, but there is a federal -- it is a federal crime for

22   someone who has been deported to re-enter the United States

23   without permission.

24         MR. TULANTE:  It's 8 U.S.C. 1326, illegal entry.

25         THE COURT:  I don't have in front of me the exact

1  section of the criminal code, but --

2            MR. TULANTE:  8 U.S.C. 1326(a).

3            THE COURT:  There you go.  We have a lot of those

4  cases.

5            MR. TULANTE:  Yes.

6            THE COURT:  And in that case, the defendant's status

7  as an immigrant is an element of the crime.  So I wanted to ask

8  the question -- and if the Commissioner doesn't know himself,

9  maybe you can find out and supply it through subsequent

10 testimony or otherwise -- but this crime only applies to people

11 who are illegal immigrants; that is, they've been deported once

12 and they come back in again.

13           So I just want to know if your department has any

14 particular policy about if you learn that a person -- who may

15 not have committed any state crime or other federal crime --

16 that is, they may just be wandering in the street, but if

17 they're discovered to be in the United States illegally -- that

18 is, having once been deported -- that is a federal crime.  And

19 I'm just asking if you have any specific policy about that

20 point.

21           THE WITNESS:  Your Honor, respectfully, there would be

22 limited opportunity for the members of this department to know

23 or deal with that issue because we don't ask those questions.

24 So, barring some criminal violation being involved or attached

25 to that interaction, we probably would not know the answer to

Direct Examination - Ross

 1   that anyway.

 2          THE COURT:  All right.  So if the person -- so if I

 3   changed the hypothetical a little bit, and if that person -- say

 4   an officer did see that person committing a crime and they were

 5   arrested, would the -- if the individual volunteered that he was

 6   an immigrant, would ICE be notified of that or not?

 7          THE WITNESS:  Well, to be sure -- to be certain, I

 8   can't be, because the policy is so solid with us about not

 9   asking that status that I think it is more than clear that most

10   officers would not pursue that.  However, there could be

11   extenuating circumstances all the time.  So -- in this business,

12   as you might imagine, there are no absolutes.  But we don't have

13   a policy definitively that outlines that.

14          MR. TULANTE:  Your Honor, can I ask this a different

15   way?

16          THE COURT:  Yeah, but I can ask one more question?

17          MR. TULANTE:  Yeah, of course.

18          THE COURT:  So if a person is arrested and the

19   city-wide policy, as I understand it, at least -- let's say

20   they're arrested for a felony.  They're taken to what we call

21   the roundhouse and they're photographed and fingerprints are

22   taken.  Is that a uniform policy?

23          THE WITNESS:  That is uniform policy.

24          THE COURT:  All right.  And that enables you through

25   national databases to find out if that person has any prior

1    convictions anywhere in the United States.  Would that be a fair

2    statement?

3              THE WITNESS:  That would be correct.

4              THE COURT:  All right.  And if it turned out that that

5    person had prior convictions and one of those related to this

6    crime that I'm talking about -- that is, they were previously

7    convicted of illegal entry; that is, they're recidivists in

8    terms of coming back a second time, that would -- your

9    department would learn just from the rap sheet, as you call it,

10   that this individual is definitely an immigrant, because that's

11   the only person who can be convicted of this crime -- it only

12   applies to people who are illegal immigrants.  In that

13   situation, would you notify ICE?

14             THE WITNESS:  I think there could be instances where

15   we would, Your Honor, if we knew that.

16             THE COURT:  Okay.

17             THE WITNESS:  We would never intentionally withhold

18   information.

19             THE COURT:  Okay.

20             THE WITNESS:  It's just that we don't seek to provide

21   that relative to witnesses and victims.

22             THE COURT:  In my hypo, the information does not come

23   from the suspect or the defendant.  You've gotten it

24   independently as a result of getting a criminal record.

25             THE WITNESS:  Right.

 1          THE COURT:  Would that make a difference?  I didn't

 2   see this addressed in any of the written policies.

 3          THE WITNESS:  Right.  And this is why, respectfully, I

 4   think it depends on the circumstance.  And quite frankly, it

 5   would depend on the officer.  I'm not aware of any circumstance

 6   where we definitively outline that you're supposed to do it in

 7   those circumstances that you're alluding to.

 8          THE COURT:  Okay.  Thank you.

 9          MR. TULANTE:  Well, let's take it --

10          THE COURT:  Go ahead.

11   BY MR. TULANTE:

12   Q    Does ICE routinely -- just in terms of -- to your

13   knowledge, in terms of actual practice, does ICE routinely seek

14   such information from the Philadelphia Police Department?

15   A    Do they routinely seek it?

16   Q    Yes.  Do they ask for the police department to provide a

17   listing -- irrespective of whether there's a crime or

18   whatever -- status --

19   A    Well, I believe ICE would have it themselves, so they would

20   never really have to ask us.  They would know generally.

21          THE COURT:  But ICE wouldn't know this person has been

22   arrested.

23          THE WITNESS:  Right.  So, in this case, I believe that

24   they -- we're not routinely getting that information just

25   wholesale like that from ICE.

Direct Examination - Ross

1   BY MR. TULANTE:

2   Q    Well, to the judge's point, when somebody is booked and

3   their fingerprints are shared through the database, are you

4   aware if ICE has access to that?  In other words, they have

5   knowledge that somebody's in custody?

6   A    They absolutely do.  As we -- when we book anyone, the

7   federal authorities get that information through databases, and

8   that is shared with ICE.

9         THE COURT:  So ICE could -- as far as you're

10  concerned, ICE could determine that information itself?

11        THE WITNESS:  Absolutely.  And, Your Honor,

12  respectfully, I thought part of the question was about if this

13  were an encounter where no arrest was actually made, and would

14  that officer actually be taking actions to make a notification

15  if there were no arrest associated with it.

16        THE COURT:  Okay.

17  BY MR. TULANTE:

18  Q    And I know this is about prisons, my next question, so --

19  but I wanted to ask you in terms of ICE generating detainer

20  requests.  Are you aware of whether those detainer requests are

21  generated from information received from inquiries of police

22  department or ICE getting that information separately through

23  these databases?

24  A    Well, generally, they're going to get it from databases.

25  And those databases are going to come from our arrest

1    information and ICE will have access to that and understand how

2    that works.  And so we don't withhold the information when

3    someone is fingerprinted or photographed.  And that

4    determination will be made by federal authorities and it will be

5    turned over to ICE.

6    Q    Let me -- what would happen if the Philadelphia Police

7    Department started to ask and then disclose immigration status

8    information, across the board; not just people suspected of

9    criminal activity?

10   A    Well, in my humble opinion, it would be stifling.  It would

11   create an environment where some of our partners in the

12   neighborhoods would fear us, and we can ill-afford to have that

13   happen.  It is absolutely vital that we have the opportunity to

14   maintain and cultivate these relationships as much as possible.

15         Having relationships across the board in the city is

16   something that we work very hard at.  And in some instances,

17   it's a neighborhood by neighborhood thing.  And in some

18   neighborhoods, we struggle mightily to try to establish these

19   relationships.  And I'm not just talking about immigrant

20   communities.  I'm talking about all communities.

21         And so for us, we believe that it would severely

22   inhibit our ability to gain information, intel, and things that

23   would keep the city safer.  And because we have absolutely need

24   this from the people across the city -- and that's irrespective

25   of their immigrant status or their status.

1    Q     And talk about the impact on victims and witnesses.

2    A     It is very similar. If you have a circumstance where people

3    are not comfortable coming forward, whether it be issues related

4    to domestic violence in particular, sexual assaults, it could be

5    even things like burglary.  We work based on pattern analysis in

6    many instances, in terms of trying to stave off particular

7    future crimes.

8          And if we are unable to identify crime patterns

9    because victims along that pathway are holding back information

10   out of fear of their status being revealed, well, now we're

11   operating behind the eight ball.  Because instead of knowing

12   right from the outset that there's a pattern developing, we are

13   potentially put in a position to find these things out way too

14   late.

15         And I'll give a very specific example.  You could be

16   talking about a burglary in a particular neighborhood that is

17   filled with an immigrant community.  Burglars all across this

18   city work in patterns.  And they tend to feed in a particular

19   neighborhood, either until they get caught or there's too much

20   heat put on that neighborhood by the police department.

21         And so if we cannot adequately identify patterns, then

22   that's just one example of one crime.  It really puts us in a

23   bad position as a police department, because working with

24   pattern analysis and smart policing, these are the things that

25   enable us to be better and to improve upon our service to the

1   city.

2   Q    And explain, if you could, the impact it would have on your

3   use of informants.

4   A    It would just be daunting, because there's no way in the

5   world you'd want to come forward as a source of information or

6   as a criminal informant if you believe that you're in jeopardy

7   of being deported; or not just you, your children for that

8   matter.  And so we have people who may be of the immigrant

9   community and their children are here, and we're concerned about

10  not only their well-being and their concerns about being

11  reported, but we're concerned about how they perceive the police

12  department.

13       We don't want anyone to perceive us as a menacing

14  group.  We -- anyone who's been around for the last 24 to 30

15  months has to realize the situation that modern and municipal

16  policing finds itself in.  Very, very difficult to maintain some

17  of our relationships.  Very difficult to improve upon our

18  images, particularly with the 24-hour news cycle that we contend

19  with.  And so we don't need any more obstacles in our way.

20       We deal with enough narrative and rhetoric that has

21  been harming the images of this profession, which I happen to

22  think is a very noble one, and so we really want to maintain as

23  many relationships as we can.

24       I cannot underscore that enough, Your Honor.  In a

25  city like Philadelphia, where we are proud of this city, but we

1   have our share of issues.  And that being said, a lot of those

2   issues can really be assisted with partnerships.  It is so vital

3   to develop these partnerships.

4           This is why we use widespread use of social media,

5   community meetings, town halls, play dates, police athletic

6   league, and a myriad of other things that are designed

7   specifically to show people who we are as a police agency, what

8   we're about, and why we're about protecting and serving everyone

9   in the community.

10  Q    Are there any particular types of crime you think this

11  would impact if -- again, if you started to disclose -- or share

12  immigration status information?

13  A    It could potentially affect many, but I'm most concerned

14  about sexual assaults, domestic violence, things where it can be

15  very difficult to detect absent someone else's intervention.

16  And in particular, that's why I started with domestic violence.

17  Very, very concerned about the unwillingness to come forward for

18  fear of deportation or status being repealed.

19          Again, it goes deeper -- and I think this is what's

20  important to emphasize.  It's deeper than the individual.  And

21  even just their individual crime being reported, Your Honor.

22  It's really about the holistic effect.  The effect that it has

23  on the communities that are adjacent and/or contiguous to a

24  particular crime area or geography.

25          And because, again, in many instances, criminals --

 1  they don't start and stop.  A robbery offender is not going to

 2  start and stop just because he decides that he's no longer going

 3  to be a robbery person.  Or a sexual offender is very much the

 4  same way.  And so these people have to be caught, and we need as

 5  many people as possible -- and beyond that, even in cases of

 6  domestic terrorism, it is often someone from those communities

 7  that help us identify people who wouldn't otherwise be

 8  identified.  And so we need as many eyes and ears out there as

 9  possible.

10  Q    Commissioner, let's talk -- let's pivot to crime rates.

11  You've had one full year -- one calendar year of crime rates as

12  commissioner.  Can you share what the crime rate was for

13  calendar year 2016?

14  A    Sure.  So, we finished the year with Part 1 crime, which as

15  you know is everything including murder, rape, robbery,

16  aggravated assault, stolen autos, and many other crime indices,

17  but we finished down with a 40-year low.  We're proud of that.

18  Dating back to the '70s.

19              THE COURT:  For what year, 2015?

20              THE WITNESS:  2016.

21              THE COURT:  2016.

22              THE WITNESS:  2016, Your Honor.  And while we still

23  aren't celebrating, it is an indicator of progress.  We believe

24  that progress has as much to do with our smart policing efforts

25  as it has to do with the many partnerships that we've

1   established.

2   BY MR. TULANTE:

3   Q    Do you attribute any of that reduction, historically low

4   crime rate, to the relationship you have with the immigrant

5   community?

6   A    I attribute it to everybody in our community, and they're

7   equally a part of it, because -- again, it goes to how we

8   police, how we utilize technology, how we utilize intel.  And

9   intel usually comes, first and foremost, in the form of human

10  beings; human beings who either give us a call, who send us a

11  tip, or they just flat-out were a source of information in a

12  number of ways.

13          So, absolutely.  While it is nice and glorified to

14  talk about technology and this proliferating of TV shows that

15  deal with science and technology, the various CSIs, the reality

16  of it is most of these crimes are solved by an individual

17  calling someone.  And whether it be an investigator or police

18  officer directly, or whether it be a tip line where they look at

19  a video that we push out -- and we push out many of surveillance

20  videos capturing images of criminals -- it could be a variety of

21  sources, but they're absolutely vital to us.

22  Q    In your training and over 28-year experience in various

23  roles on the police department, have you found any link between

24  immigrants and crime?

25  A    No, I have not.

Direct Examination - Ross

1  Q    And what about undocumented immigrants?

2  A    No, we have not.

3  Q    Sir, aren't you concerned that if they're undocumented --

4  in other words, somebody who came here illegally or has

5  overstayed a visa, that there would be an increase in crime in

6  Philadelphia?

7  A    Well, one, I'm not concerned about that because there's no

8  data in Philadelphia that I'm aware of that would suggest that.

9  And, two, that quite frankly is not within my purview.  We have

10 the responsibility of safeguarding this city, patrolling our

11 streets, preventing crime, and that's our primary role.  And we

12 don't wish to be involved in anything that detracts from that

13 mission.

14 Q    In your looking at crime statistics and crime overall,

15 where are you concerned -- who are you concerned in terms of

16 committing crimes?

17 A    Well, I mean, the sad reality is this.  In speaking of the

18 people that we are aware of, either via actual arrests, people

19 who we may not even arrest but we know who the suspects are,

20 because we don't have the requisite probable cause to bring them

21 to justice, in the lion's share of those cases it is people who

22 were born and raised in Philadelphia and come from our various

23 neighborhoods, without question.

24 Q    Commissioner Ross, do you see ICE as the enemy of the

25 Philadelphia Police Department?

Direct Examination - Ross

1  A    Absolutely not.  They're partners in law enforcement.

2  Q    Well, does the police department have any ongoing

3  partnerships with federal law enforcement agencies?

4  A    We have multiple.  And so all the federal agencies, Your

5  Honor, in the city, FBI, DEA, ATF, everything from Homeland

6  Security, ICE, as well as the U.S. Marshals, we have a great

7  relationship.  We have task force officers assigned to each and

8  every one of them.  And as you well know, in a city like

9  Philadelphia, most of those agencies, save for maybe the FBI,

10  could not even exist if it's not for our assistance.

11  Q    What do you mean by that?

12  A    Well, many of those agencies are too small in nature, and

13  so they need the assistance of those task force officers who

14  then become deputized as federal agents or marshals, if you

15  will, and -- depending on the agency.  And that enables them to

16  use their forces as force multipliers.  I mean, they're able to

17  take people that they didn't otherwise have and use them even to

18  assist in their federal missions.

19  Q    And what -- just if you can give the Court a few examples

20  of some of these task forces.

21  A    So, I mean, they're different in scope.  We have joint

22  terrorism task forces in the FBI.  We have drug squads in pretty

23  much FBI, DEA, even some to the degree in ATF.  We have gun

24  violence task forces out there.  There are many in nature, but

25  the point is is that we work collaboratively with all of these

1    agencies.  There's rarely a month or so that goes by that I

2    don't have discussions with the local supervisor agents in

3    charge, and so we work together to make this city and this

4    region safer.  And I think by and large we do a decent job of

5    it.

6    Q    Do you have any -- as part of any of these task forces, is

7    there a task force where there are representatives of the police

8    department and ICE on the same task force?

9    A    We do.

10   Q    And what does that relate to?

11   A    Our relationship is good.  I mean, the only difference is

12   that officer is -- my understanding is there's a memorandum of

13   agreement that they will not work in a capacity where they deal

14   with immigration issues.  But they'll deal with other Homeland

15   Security related issues.

16   Q    And I just want to get to the final area.  Let's talk very

17   quickly about JAG funding.  What is the annual budget,

18   approximately, of the Philadelphia Police Department?

19   A    Well in excess of 600 million.

20   Q    So with respect to JAG funding, we're talking about a lot

21   less money than that, why would the loss of that money be

22   significant to the police department?

23   A    Because somewhere in the neighborhood of 96 to 97 percent

24   of our operating budget deals with personnel costs and benefits.

25   And so while that may sound like a lot of money, it is a lot of

 1   money, but it is essentially allotted for those issues.  So it

 2   doesn't leave us with a lot when you have to take into account

 3   there are other things that have to happen relative to capital

 4   expenditures.

 5          So that money that we get, we totally rely on it and

 6   our ability to use it for overtime, for crime suppression,

 7   things that deal with technology.  We absolutely need it.  And

 8   so while it may seem like a small percentage of our operating

 9   budget, in the grand scheme of what we have left, it is

10   significant.

11   Q    You had talked about earlier -- you testified about your

12   concerns about losing trust with the immigrant community if your

13   policies were changed, including disclosing immigration status

14   information of victims and witnesses.  Explain to the Court how

15   easy or difficult it is to regain that trust once it is lost.

16   A    Well, Your Honor, here's the thing.  When you have -- I

17   guess programs that are aimed at cultivating relationships, you

18   work very hard at getting there.  It's not always an easy

19   endeavor, but you work and you strive hard to gain trust of your

20   various communities.  And as I testified to previously,

21   sometimes within a particular neighborhood that can be block by

22   block.

23          And so you're challenged to get there.  Losing that

24   trust once you already have it, almost makes your challenges

25   insurmountable, because you've already strived hard to gain

Direct Examination - Ross/
Cross-Examination - Ross

1  those relationships and they're not necessarily easy to get,

2  even in communities that are not immigrant.  And so you don't

3  want to do anything to jeopardize that. And once you've lost

4  that trust, it's -- you can almost forget it, because there's no

5  reason for anyone to believe that you're legitimate.  And trust

6  and legitimacy go together.

7           MR. TULANTE:  Your Honor, may I have the Court's

8  indulgence to check with my colleagues?

9           THE COURT:  Sure.

10      (Pause)

11           MR. TULANTE:  Unless Your Honor has any questions of

12  Mr. Ross --

13           THE COURT:  Well, first let me see if defendant's

14  counsel -- do you have any questions?

15           MR. GARG:  Yes, we do, Your Honor.

16           THE COURT:  Go ahead.

17                     CROSS-EXAMINATION

18  BY MR. GARG:

19  Q    Good morning, Commissioner Ross.

20  A    Good morning.

21  Q    My name is Arjun Garg.  I'm with the U.S. Department of

22  Justice.  Sir, you talked today about seeing yourself as

23  cooperating with ICE but not an extension of ICE.  Fair?

24  A    Fair.

25  Q    I just want to explore a little bit with you the dimensions

1    of that cooperation in terms of what you understand the City

2    does.  So, as you understand City policy, can a city employee

3    respond if the employer receives a request from ICE asking

4    whether a particular alien in being held in the City's law

5    enforcement custody?

6            THE COURT:  Well, let me -- there's no objection, but

7    I just want the record to be clear.  He's the police

8    commissioner, and your question is "any" city employee.  So I

9    don't know that he has knowledge about what the policy is

10   outside of the police department.  But I believe Mr. Tulante

11   that the prison system has certain regulations and one of your

12   witnesses is going to answer for the prisons.  Is that correct?

13           MR. TULANTE:  Yes.  Yes, Your Honor.  We'll make

14   available the next witness, Brian Abernathy, and he is actually

15   the policymaker on that order.  And he can --

16           THE COURT:  All right.  But does he have knowledge of

17   prison system policies?

18           MR. TULANTE:  Absolutely.  Absolutely.

19           THE COURT:  All right.  Could you limit your question

20   to the police department initially, and then you can ask him

21   broader questions.

22   BY MR. GARG:

23   Q    Sure.  So limiting all these questions to the portions of

24   the city that are under your supervision as the police

25   commissioner, as you understand city policy, can an employee

1  under your supervision respond if that employee received a

2  request from ICE asking whether a particular alien is being held

3  in the City's law enforcement custody?

4  A     Respond that they're in custody?  Yes.

5  Q     To your awareness, have employees under your supervision

6  been so advised or trained by city authorities?

7  A     I believe so.

8  Q     As you understand city policy, can an employee under your

9  supervision respond if the employer receives a request from ICE

10 asking for identifying information of a particular alien being

11 held in the City's law enforcement custody?

12 A     If they've been arrested for a criminal violation, yes.

13 Q     Okay.  And otherwise?

14 A     If they're a witness or a complainant, no.  We wouldn't be

15 revealing that information.

16 Q     As you understand city policy, can a city employee respond

17 if the employee received -- city employee under your -- let me

18 start over.

19        As you understand city policy, can a city employee

20 under your supervision respond if that employee receives a

21 request from ICE asking the location where a particular alien is

22 being held in the City's law enforcement custody among various

23 correctional facilities?

24 A     Well, if they're in a correctional facility, the assumption

25 is they were arrested, and so they can respond to that

1    indication or that request.

2    Q    To your awareness, have city employees under your

3    supervision been so advised or trained?

4    A    Yes.

5    Q    As you understand city policy, can a city employee under

6    your supervision respond if the employee receives a request from

7    ICE asking when a particular alien will be released from the

8    City's law enforcement custody?

9    A    Well, my understanding is that that information will be

10   revealed about the fact that they are in custody, but not

11   necessarily detained, so -- and to answer you, I'm not sure I

12   understand your question.

13           THE COURT:  And I don't understand what you mean by

14   "in custody but not detained."

15           THE WITNESS:  Well, I mean in terms of how long

16   they'll be detained.  I'm sorry.  To be clear.

17   BY MR. GARG:

18   Q    So as you understand what you just said, how long a person

19   will be detained, does that -- when let's say a police officer

20   communicates how long a person is going to be detained, is that

21   the same in your mind as indicating when the alien is going to

22   be released?

23   A    That's what I'm referring to, yes.

24           MR. TULANTE:  Your Honor, I'm just a little confused

25   on the line of questioning because the --

1          THE COURT:  Did you object?

2          MR. TULANTE:  I object in the sense --

3          THE COURT:  Well, I'll sustain the objection.

4          MR. TULANTE:  -- he's the police commissioner and

5   these are --

6          THE COURT:  Just rephrase it, because -- having read a

7   lot of the materials that both sides have presented, I think it

8   may be relevant for the record to draw a distinction between

9   somebody who has been arrested but not convicted, someone who's

10  been convicted but not sentenced, and someone who has been

11  convicted and sentenced but may be taking an appeal.

12          So these are technical issues -- well, they're not

13  necessarily technical, but I think they may be material to some

14  of the issues that are going on in this case.  So you're welcome

15  to ask about all of those, but I think they ought to be

16  separated, respectfully.

17          MR. GARG:  Sure.  I understand that, Your Honor.

18          THE COURT:  It's one thing for someone who is arrested

19  and not even had a preliminary hearing, and -- is under our

20  state procedure.  We're talking about people who are arrested by

21  police officers.  So sometimes Philadelphia police officers

22  arrest people who are then put into federal custody.

23          Now I assume you're not talking about that.  We're

24  talking about people who go into state custody, who go to a

25  state like detention center, would go to a state or a

1    city-operated prison facility.  Is that correct?  I mean, these

2    are -- these could be crucial differences in some of the issues

3    that are going on here.

4          MR. GARG:  Correct, Your Honor.  So let me clarify

5    what I'm asking about.  The City's own law enforcement custody

6    or -- not federal law enforcement custody.

7          THE COURT:  All right.  And this is somebody who's

8    just been arrested, right?  They're not convicted of anything.

9          MR. GARG:  Correct.  Someone -- let's break it down,

10   as the judge suggested.

11   BY MR. GARG:

12   Q    So, starting with an alien who has been arrested and is

13   detained but not convicted yet.  As you understand city policy,

14   could a city employee under your supervision respond to a

15   request from ICE asking when an alien who has been arrested but

16   not convicted will be released from the City's law enforcement

17   custody?

18   A    Yes.

19   Q    And to your awareness have city employees been so advised

20   and trained?

21   A    Yes.

22          THE COURT:  All right.  Now, let me just --

23          MR. TULANTE:  And, Your Honor, just to be clear --

24          THE COURT:  Let me just ask the Commissioner.  I don't

25   know how anybody could possibly know the answer to that question

1    when they're going to be released, because they may make bail.

2    They may be in jail for a crime for which bail is not allowed,

3    such as first degree murder.

4           So, I don't know how any -- I don't know how even a

5    judge would know the answer to that question, or a prosecutor,

6    let alone a police officer or a prison official.

7    BY MR. GARG:

8    Q    So let's move on to the next category the judge identified.

9    Somebody who -- we'll talk about an alien who has been arrested

10   and convicted and is in city law enforcement detention.  So, as

11   you understand city policy, can a city employee respond if the

12   employee received a request from ICE asking when an alien who

13   has been convicted of a crime will be released from the City's

14   law enforcement custody?

15          MR. TULANTE:  Your Honor, may I object?  Just in terms

16   of law enforcement detention, I just want to make clear that

17   counsel is talking about police.  Law enforcement may encompass

18   prisons that the line of questioning is really directed --

19          THE COURT:  Well, yeah, limited to your knowledge

20   about police officers, I'll overrule the objection.  You can

21   answer.

22          THE WITNESS:  So it is difficult to say the exact time

23   because we are not a jail.  We are a temporary facility in terms

24   of someone who is in custody.  There would be an estimation

25   perhaps when they would funnel through the system, but we

Case 2:17-cv-03894-MMB   Document 68   Filed 11/06/17   Page 53 of 172

1   wouldn't have an exact time.  But we could have some

2   approximation, perhaps.  And that's the best I can answer.

3   BY MR. GARG:

4   Q    Where such an approximation exists, if ICE asks an employee

5   under your supervision, a city employee, for that approximation,

6   would that employee be able to provide that to ICE?

7   A    They would be given an estimate, at best.

8   Q    As you understand city policy, can a city employee under

9   your supervision respond if that employee receives a request

10  from ICE asking about the whereabouts of a particular alien

11  being held in the City's law enforcement custody?

12  A    As my understanding, they would typically make that direct

13  call to that facility.  In our case, it would be a closed

14  circuit TV facility, in which case they would already know the

15  answer to that.

16  Q    Let me try it a different way.  As you understand city

17  policy, could a city employee respond if that employee under

18  your supervision receives a request from ICE asking for the

19  whereabouts of a particular alien who has been released from

20  city custody?

21              THE COURT:  Has been released?

22              MR. GARG:  Has already been released.

23              THE WITNESS:  In terms of their whereabouts?

24              MR. GARG:  Yes.

25              THE WITNESS:  No. I guess they could not.  If they've

 1  already been released, we wouldn't know.

 2  BY MR. GARG:

 3  Q    If a city employee did know the whereabouts -- let me lay

 4  out a scenario for you.  The city has arrested, detained

 5  somebody, and that person has since been released, the City

 6  knows where that person lives.  They have a known address on

 7  file.  In that scenario, as you understand city policy, could a

 8  city employee under your supervision respond if the employee

 9  receives a request from ICE asking for the whereabouts of an

10  alien who has been released from the city's law enforcement

11  custody?

12  A    Well, that broaches upon the subject of us getting involved

13  in immigration enforcement, and that's not what we do.  If

14  they've already been released -- all the information leading up

15  to that point would be made available.  But once they've been

16  released, it is no longer within our purview.

17  Q    Have you advised city employees under your supervision that

18  they may in response to a request from ICE communicate

19  information regarding immigration status to ICE with respect to

20  any alien in the city's law enforcement custody?

21  A    To the degree that we know that information and the arrest

22  processing, we don't have an issue with reporting that along for

23  arrestees.  So the answer to that is yes.

24  Q    Now, on direct examination you looked at a couple of city

25  policies.  One was Executive Order 8-09.  Do you still have that

1    in front of you?

2    A    I can get it back in front of me.  Yes.

3    Q    I'll wait a moment for the Court.  I just want to ask with

4    respect to Executive Order 8-09, have you advised city employees

5    under your supervision that they do not violate Executive Order

6    8-09 when they disclose information regarding immigration status

7    to ICE?

8    A    Well, we're supposed to follow all city Executive Orders.

9    So the answer is yes, in terms of advising.

10   Q    So I'm not sure I heard the answer to my question there.

11   A    Okay.

12   Q    Let me just ask it again to make sure.  So I understand

13   you're saying that --

14            THE COURT:  Well, you can point out a specific section

15   with this, that you think --

16            MR. GARG:  Sure.

17            THE COURT:  -- might apply.

18   BY MR. GARG:

19   Q    So Section 3, for example, talking about confidentiality of

20   information.  So have you advised city employees that they don't

21   violate Executive Order 8-09 when they disclose information

22   regarding immigration status to ICE?

23   A    I'm sorry.  You're going to have to repeat that.

24   Q    Sure.  I understand -- I think I heard you say that this is

25   an Executive Order, so obviously city employees are expected to

 1  follow it.  I appreciate that.  What I'm asking is a little

 2  different.  Have you advised city employees that they do not

 3  violate Executive Order 8-09 when they disclose information

 4  regarding immigration status to ICE?

 5  A    Well, ultimately, being in compliance with this order and

 6  any other order, anything that I push out from my office is

 7  expected to be complied with.  So we would take an Executive

 8  Order and we would make sure that everyone understands all the

 9  tenets in the order.

10  Q    Okay.  Do you understand Executive Order 8-09 not to

11  prohibit disclosing information regarding immigration status to

12  ICE?

13  A    Yes.  On -- let me qualify that, related to victims and

14  witnesses.

15             THE COURT:  Related to what?  I'm sorry.

16             THE WITNESS:  Victims and witnesses.

17  BY MR. GARG:

18  Q    Let me make sure I understand that.  So as to victims and

19  witnesses, what is or is not allowed under Executive Order 8-09

20  with respect to disclosing information regarding immigration

21  status to ICE?

22  A    The confidentiality of their identity.

23  Q    And that is or is not allowed to be disclosed?

24  A    It is not allowed to be disclosed.

25  Q    We also talked about Police Commissioner Memorandum 01-06.

1   Do you have that in front of you still?

2   A     No, but I can get it.

3   Q     Have you advised city employees under your supervision that

4   they don't violate this memorandum, 01-06, when they disclose

5   information regarding immigration status to ICE?

6   A     We have advised them that they are to follow the policy in

7   Memorandum 10-06 (sic) and all the tenets wherein.

8   Q     Have you told city employees under your supervision that

9   the tenets of this Police Commissioner Memorandum 01-06 do not

10  prohibit them from disclosing information regarding immigration

11  status to ICE?

12  A     As it relates to criminality and people arrested for

13  crimes.

14  Q     Outside of criminality, have you advised city employees

15  under your supervision that Police Commissioner Memorandum 01-06

16  does not prohibit them from disclosing information regarding

17  immigration status to ICE?

18  A     Only as it results or as it pertains to people who are

19  victims or witnesses.  As it relates to people who are arrested

20  for crimes, they are allowed to disclose that information.

21  Q     One more -- a little more general question.  Have you in

22  any training or advice given to city employees under your

23  supervision mentioned the federal statute 8 U.S.C. 1373 that

24  bars policies that prohibit the sharing of information regarding

25  immigration status?

58

Cross-Examination - Ross

1   A    Not specifically.  We deal with this policy, this

2   memorandum, as well as the Executive Order that has been put out

3   by the Mayor's office.

4   Q    So, staying on this Police Commissioner Memorandum 01-06,

5   is it your understanding that the memorandum allows transmitting

6   an alien's immigration status to federal authorities where that

7   alien is both a perpetrator of a crime and also a victim of a

8   crime?

9   A    Well, I mean, if they are a perpetrator of a crime, then

10  that information can be conveyed.  You'd have to give me a

11  specific example when they are both.

12  Q    Supposing two individuals got into a physical encounter.

13  They both hit each other.  They're both at fault.  Both

14  committed a crime.  You know, each one can say I'm both a

15  perpetrator and a victim.

16       In a scenario like that, does -- is it your

17  understanding that Police Commissioner Memorandum 01-06 allows

18  transmitting an alien's immigration status to federal

19  authorities where that alien is both a perpetrator of a crime

20  and a victim of a crime?

21  A    Well, in my estimation, the hope would be that an

22  investigation would reveal which status that individual would

23  fall in.  If they still continue to fall in both and they are

24  arrested, then in my estimation they would still be allowed to

25  transmit that information.

59

Cross-Examination - Ross

1  Q     The understanding you just described, have you advised city

2  employees that they may, in response to a request from ICE,

3  communicate information regarding immigration status to ICE with

4  respect to such an alien who is both a perpetrator of a crime

5  and also a victim of a crime?

6  A     Again, it comes to the notion of an individual being

7  charged with a crime.  And once you are charged with a crime,

8  then that would allow that to happen.

9  Q     Have you so advised city employees that regardless if the

10 person is also a victim of a crime, were they then a perpetrator

11 of a crime, that alien status can be communicated to ICE upon

12 request?

13 A     Well, it would be simply because they would be processed as

14 a criminal in that case.  Assuming that those were the

15 circumstances, yes.

16 Q     And that advice has gone to your employees?

17 A     This is what's in the memorandum related to people who are

18 arrested for crimes.

19 Q     Outside of the text of the memorandum itself, has any

20 advice or training been given regarding this point about what

21 happens when the alien is both a perpetrator and a victim of a

22 crime?

23 A     Not that I'm aware of, no.

24 Q     I want to talk about one other city policy that I don't

25 believe you were asked about earlier.  It is Executive Order

1    Number 5-16, and I'm happy to give you a copy of that, and hand

2    one to the Court.  I think it may be in the plaintiff's binder

3    at P-4, if the Judge has that.

4              MR. GARG:  May I approach?

5              THE COURT:  Yes, sure.

6              MR. TULANTE:  He has a copy in the binder, P-4.

7              MR. GARG:  It's P-4 in your binder, if you have it.

8    BY MR. GARG:

9    Q    Are you familiar with this Executive Order, sir?

10   A    Not intimately, but I've seen it before.

11   Q    Could I point you to Section 2, where it says, "The Police

12   Commissioner, among other officials, is hereby required to take

13   appropriate action to implement this order."?

14   A    Yes.

15   Q    Do you see that?

16   A    I do.

17   Q    I'd like to look at Section 1 of that order.  And you're

18   welcome to read it.  What I wanted to get at is I want to focus

19   on the portion of it, of Section 1 of Executive Order number

20   5-16, concerning notice of pending release.  I want to focus on

21   that portion of it.  And just to make sure we're all on the same

22   page, as you read it, do you understand that it's saying -- what

23   this order is saying is that under Section 1 of Executive Order

24   Number 5-16, city employees should not provide notice of the

25   pending release of an alien in city custody unless such person

Cross-Examination - Ross

1   is being released after conviction for a first or second degree

2   felony involving violence and ICE's request for notice is

3   supported by a judicial warrant.  Is that what you understand

4   that to say?

5   A     Yes.

6   Q     In Section 1?

7   A     Yes.

8   Q     So a couple of questions about that.  To your awareness,

9   are ICE requests for notice of an alien's pending release made

10  pursuant to administrative immigration warrants?

11  A     I'm sorry.  Say that again.

12  Q     This section talks about a judicial warrant.  Right?

13  A     Right.

14  Q     The notice needs to be supported by a judicial warrant.

15  Are ICE requests for notice of an alien's pending release made

16  pursuant to administrative immigration warrants, as distinct

17  from a judicial warrant, to your awareness?

18  A     No.

19  Q     In addition to first or second degree felonies, in

20  Pennsylvania are there third degree felonies?

21  A     Yes.

22  Q     Can you give us some examples of third degree felonies,

23  from your experience?

24  A     There are different crimes.  Aggravated assault could fall

25  into that.  There are different statutes related to robbery and

1   other crimes.  I don't profess to remember every one of them

2   now, but --

3   Q    Sure.  Let me see if I can offer some examples.  Sale or

4   possession of child pornography.  Is that a third degree felony?

5   A    I don't know.

6   Q    Promoting prostitution of a minor; third degree felony?  Do

7   you know?

8   A    It could be.  I'm sure it's a felony.  I don't know what

9   the degree is.

10  Q    Sexual assault of a minor in a state institution?

11  A    I'm not sure.

12  Q    Terroristic threats?

13  A    Could be.

14  Q    Possession of an explosive device with an intent to use it

15  for arson?

16        MR. TULANTE:  Your Honor, I think we get the point

17  here.

18        THE COURT:  Well, it's not a question also --

19        MR. GARG:  Sure.

20        THE COURT:  He's not expected to have memorized the

21  category of crimes; nor are you, nor can I.

22        MR. GARG:  Understood.

23        THE COURT:  And, by the way, I don't know if you've

24  ever tried to count the number of federal judicial opinions on

25  the topic of what is aggravated assault and battery under

1   various state laws, but -- this is like a footnote to our

2   proceedings, but when the Supreme Court of the United States

3   came across the concept of a career offender in the sentencing

4   guidelines, this created a very -- a sort of small academic

5   bazaar, you might say, of opinions about what different type of

6   conduct qualified as aggravated assault and battery and whether

7   it could be considered a violent crime.

8            I'd just note that, that it's a very deeply divided

9   topic among judges.  Go ahead.

10           MR. GARG:  Sure.

11  BY MR. GARG:

12  Q    And one more question, Commissioner Ross, and again not

13  trying to quiz you, but -- do you understand that a third degree

14  felony under Pennsylvania law can have a prison sentence up to

15  seven years?

16  A    I don't profess to know that, whether it does or doesn't.

17  Q    Sure.  Moving on.  Executive Order 8-09.  I'm sorry.  I've

18  jumped around on this.  I meant to ask a question before and I

19  skipped over it.  Do you have that one in front of you,

20  Executive Order 8-09?  In your binder, it's P-2.

21           THE COURT:  8-09?

22           MR. GARG:  Yes.

23           THE COURT:  All right.  I think you asked him about

24  that before.

25           MR. GARG:  I did.  And there was a question I meant to

Cross-Examination - Ross

 1  get to that I skipped over by accident.

 2          THE COURT:  Go ahead.  All right.  We're back to 8-09.

 3  Go ahead.

 4  BY MR. GARG:

 5  Q    And in Section 2 there's a discussion in that Executive

 6  Order 8-09 about when a city officer employee shall or shall not

 7  inquire about a person's immigration status.

 8  A    Okay.  What section was that again?  I'm sorry.

 9  Q    Section 2.

10  A    Section 2.  And what subsection was it?

11  Q    I'm actually not going to ask specifically about any

12  subsection.

13  A    Okay.

14  Q    I just wanted to get on the topic of it generally.  And

15  you're welcome to refer to it, if you need to.  Do you

16  understand that Executive Order 8-09 allows city employees under

17  your supervision to inquire with ICE about a person's

18  immigration status?

19  A    It appears that that says -- to inquire about the

20  immigration status of crimes victims and witnesses?  Is that the

21  statute that you're talking about or the section you're

22  referring to?  Section 3?

23  Q    That is among it.  There's also Section 4 says you shall

24  not inquire regarding immigration status.  Two says you shall

25  not inquire about a person's immigration status.  So I think it

1  would be all of them.

2  A    Correct.

3  Q    So to repeat the question, do you understand that Executive

4  Order 8-09 allows city employees to inquire with ICE -- so here

5  the inquiry is going from a city employee to ICE, not from ICE

6  to the city employee?  Do you understand that Executive Order

7  8-09 allows city employees under your supervision to inquire

8  with ICE about a person's immigration status?

9  A    Actually, it says we shall not inquire about that status.

10              MR. GARG:  Your Honor, may I --

11              THE COURT:  Well, wait a minute.  A -- so 2A applies

12  to -- does not apply to law enforcement officers.  Right?  So

13  Section B applies only to law enforcement officers.  Correct?

14              MR. GARG:  I'll let the City speak for what the

15  Executive Order means, but I think he --

16              THE COURT:  Is that right, Commissioner?

17              THE WITNESS:  That's correct, Your Honor.

18              THE COURT:  All right.  Okay.  I just wanted to

19  clarify that.  And then C says,

20              "Law enforcement officers shall continue to cooperate

21              with state and federal authorities in investigating

22              and apprehending individuals who are suspected of

23              criminal activity."

24              Is that correct?

25              THE WITNESS:  That's correct, Your Honor.

1          THE COURT:  All right.  Next question.

2          MR. GARG:  May I confer with my --

3          THE COURT:  Of course.

4          MR. GARG:  -- colleague?

5       (Pause)

6          MR. GARG:  Nothing further.  Thank you very much,

7    Commissioner.

8          THE COURT:  I have a couple questions and then either

9    of you can ask other questions.

10          When an individual is arrested, for a felony for sure

11    as we discussed, they go to the Central -- is it still a

12    roundhouse that's being used for that purpose, where the person

13    goes for a felony to be fingerprinted and photographed or does

14    it depend?

15          THE WITNESS:  Most cases, Your Honor, they're going to

16    a CCTV location, one of the visual headquarters.

17          THE COURT:  Okay.  So it can be one of the district

18    police stations?

19          THE WITNESS:  In most likelihood, it would be.

20          THE COURT:  But they would be photographed and

21    fingerprinted at the police station?

22          THE WITNESS:  Correct.

23          THE COURT:  Is that correct?  All right.  Now, would

24    that apply for someone who's arrested for a misdemeanor?

25          THE WITNESS:  Yes, in many cases.

1              THE COURT:  Okay.  And how about just given a summons

2    for a traffic offense?

3              THE WITNESS:  No.  There would have to be some

4    extenuating circumstances for a summary, the need to be printed.

5              THE COURT:  All right.

6              THE WITNESS:  Usually you would not have some

7    identification or something like that.

8              THE COURT:  All right.  They don't have

9    identification.  All right.  Now, when someone is questioned --

10   is arrested, they're requested to give their name.  Correct?

11             THE WITNESS:  Yes.

12             THE COURT:  And they're requested to give an address?

13             THE WITNESS:  Correct.

14             THE COURT:  All right.  Are they asked about their

15   citizenship status at all?

16             THE WITNESS:  They are not.

17             THE COURT:  So no question whether you're a citizen.

18   Is that correct?

19             THE WITNESS:  Your Honor, no.

20             THE COURT:  Are they asked where they --

21             THE WITNESS:  There is no block to ask that question.

22             THE COURT:  -- where they've been born?  Where they

23   were born?

24             THE WITNESS:  Typically, they -- they may ask that

25   question, right, where they were born.

Cross-Examination - Ross

1          THE COURT:  All right.  If they're born in the United

2   States, your office would know they're citizens.  Correct?

3          THE WITNESS:  Correct.

4          THE COURT:  But if they give a birthplace of some

5   foreign country, they may or may not be citizens.  Is that

6   correct?

7          THE WITNESS:  Correct.

8          THE COURT:  Now if they do give a foreign country as a

9   place of birth, are there any further questions asked about

10  whether they're citizens or not?

11         THE WITNESS:  Not systematically, no, there are not.

12         THE COURT:  Are they asked a question about their

13  immigration status?

14         THE WITNESS:  Absolutely not.

15         THE COURT:  All right.  Okay.  Now, one question about

16  -- you were asked about the Executive Order 5-16, and this

17  applies to you and the prison commissioner, as well.  So my

18  question is only related to the police department. But it

19  indicates, Section 1, as follows,

20              "No person in the custody of the City who otherwise

21              would be released from custody shall be detained

22              pursuant to an ICE civil immigration detainer request

23              pursuant to 8 CFR 287.7."

24         I'm going to stop there.  Do you know what that is,

25  what that regulation provides?  As you sit here, do you know

1   what that is?

2           THE WITNESS:  Well, Your Honor, my understanding is

3   that absent a judicial criminal warrant, we would not detain

4   that individual.

5           THE COURT:  Okay.  But do you know what is meant by an

6   "ICE civil immigration detainer"?

7           THE WITNESS:  That to me is an administrative

8   detainer, and it doesn't rise to the level of giving us the

9   ability to detain that person beyond anything additional --

10          THE COURT:  Okay.  Now, let me move to -- read the

11  rest of this.

12              "Nor shall notice of his or her pending release be

13              provided, unless such person is being released after

14              conviction for a first or second degree felony

15              involving violence and the detainer is supported by a

16              judicial warrant."

17          Is that correct?

18          THE WITNESS:  That's correct.

19          THE COURT:  So you're currently enforcing that

20  provision?

21          THE WITNESS:  Yes, Your Honor.

22          THE COURT:  All right.  Now I'm focusing on the word

23  "and" -- A-N-D -- in the prior sentence that I just read, which

24  means that -- to me, that there has to be both a conviction for

25  first or second degree felony involving violence and the

70

1   detainer supported by a judicial warrant.  Is that correct?

2           THE WITNESS:  Yes, Your Honor.

3           THE COURT:  All right.  Now, there's a subsequent

4   memorandum that the City attached to its papers that is dated

5   March 22, 2017.  Is this one of your exhibits, Mr. Tulante?

6           MR. TULANTE:  That's P-5.

7           THE COURT:  What?

8           MR. TULANTE:  That's P-5.

9           THE COURT:  All right.  Could you look at P-5 for a

10  minute, please?  All right.  Are you familiar with this,

11  Commissioner?

12          THE WITNESS:  I haven't found it yet, Your Honor.

13          THE COURT:  All right.  Take your time.

14          THE WITNESS:  Exhibit 5?

15          THE COURT:  Yes.  It's from Brian Abernathy, who I

16  understand is going to be the next witness, to Blanche Carney,

17  Prisons Commissioner, with a copy to Mr. Tulante, dated March

18  22, 2017, entitled "Cooperation with Federal Law Enforcement and

19  Criminal Warrants."

20          THE WITNESS:  I have it, Your Honor.

21          THE COURT:  Okay.  Could you read it to yourself,

22  please?

23          THE WITNESS:  Sure.

24      (Pause.)

25          THE WITNESS:  Okay, Your Honor.

1           THE COURT:  Okay.  Are you familiar with this?

2           THE WITNESS:  No, I'm not.

3           THE COURT:  Okay.  All right.  Is Mr. Abernathy going

4   to be familiar with this, Mr. Tulante?

5           MR. TULANTE:  I hope so, yes, he will.

6           THE COURT:  All right.  Well, let me just ask the

7   Commissioner --

8           MR. TULANTE:  He will, Your Honor.

9           THE COURT:  What this implies to me -- and I just want

10  to know if you agree or not with this -- is that this clarifies

11  that the City's policy is that if there is a judicial warrant,

12  then there's not -- there's no need to show a conviction of a

13  first or second degree felony; that a judicial warrant alone

14  would warrant giving ICE information about the status of a

15  person in the city prisons or in the police department.  Would

16  you agree with that?

17          THE WITNESS:  I would agree with that, Your Honor.

18          THE COURT:  All right.

19          Do you have any further questions?

20          MR. GARG:  I'd just like to ask one thing to make

21  sure.

22                  CROSS-EXAMINATION - CONTINUED

23  BY MR. GARG:

24  Q    This Exhibit P-5 that we're talking about, the March 22,

25  2017 memorandum from Brian Abernathy to Blanche Carney, this is

Cross-Examination - Ross/
Redirect Examination - Ross

1   a document you, prior to today, were not familiar with; is that

2   correct?

3   A    No, because I don't deal with the jails, so --

4   Q    Thank you.

5            MR. GARG:  Nothing further.

6            THE COURT:  All right.  Mr. Tulante, any questions?

7            MR. TULANTE:  Brief redirect.  May I proceed, Your

8   Honor?

9            THE COURT:  Yes.

10                       REDIRECT EXAMINATION

11  BY MR. TULANTE:

12  Q    Commissioner Ross, does the police department have any

13  databases with immigration status information?

14  A    Immigration status information?

15  Q    Exactly.  That somebody is here illegally or --

16  A    No, we don't maintain that.

17  Q    And does the police department collect such information?

18  A    No, we don't.

19  Q    And with respect to 1373, had there been any issue with

20  respect to Executive Order 08-09 and the police memorandum --

21  A    None that I'm aware of.

22  Q    Have the federal government prior -- previously advised

23  that the City is violating federal law in any way?

24  A    Absolutely not.

25  Q    And explain -- we talked a little about the detainer

1   policy.  Does the police -- under what circumstances, if any,

2   does the police department receive a detainer notification

3   request from ICE?

4   A    Well, if they -- upon arrest, and ICE had information about

5   any person in our custody, they would attempt to lodge a

6   detainer for that person.  But absent a judicial criminal

7   warrant, we would not comply with that.

8   Q    And how about --

9             THE COURT:  Well, wait.  Excuse me.  Isn't there a

10  nationwide database of --

11            THE WITNESS:  There are nationwide databases, Your

12  Honor, where --

13            THE COURT:  So if a person who is an individual, once

14  they're fingerprinted and photographed, if there is any detainer

15  for them, whether it's from Alaska or ICE in Philadelphia, it

16  would show up in this database; is that correct?

17            THE WITNESS:  Yeah, for -- yes, it would, Your Honor.

18            THE COURT:  All right.  Go ahead.

19  BY MR. TULANTE:

20  Q    And as far as you know, in terms of the vast majority of

21  detainer requests, to whom are they directed?  From ICE.  The

22  prisons or police?

23  A    Prisons.

24  Q    And typically how long do you hold someone once they --

25  you've taken them from the street, arrested them, before they're

Redirect Examination - Ross

1   either -- they go to court, they're released or they go to

2   prison?

3   A    It's hard to say.  I mean, it could be 12, 18 hours.  It

4   could be a little bit longer.  But it would be case by case, and

5   when they were able to see the magistrate and the judge, and

6   then would be determined by the crime they committed and whether

7   they could make bail or anything like that.

8   Q    And are you aware of anything that prohibits ICE from -- if

9   they lodged a detainer request at the precinct, the police

10  department, and that person is then transferred to prisons, from

11  sending that same request to the prisons?

12  A    No, I'm not.

13          THE COURT:  Well, the prison would have access to the

14  same database that you do; doesn't it?

15          THE WITNESS:  Yes, I believe so.

16          THE COURT:  Just so the record's clear, the police

17  department, when an officer arrests somebody, you hold them in

18  custody until they appear before a judicial officer who is

19  usually a magistrate or a district judge; is that right?

20          THE WITNESS:  That's correct.

21          THE COURT:  Okay.  And that -- so if bail is

22  authorized and there's no detainer, the individual would be

23  released, right?

24          THE WITNESS:  You're right.

25          THE COURT:  If they make bail.

 1          THE WITNESS:  Correct, Your Honor.

 2          THE COURT:  If they don't make bail, then they'll go

 3   to the detention center or Holmesburg or city prison, right?

 4          THE WITNESS:  Correct.

 5          THE COURT:  So you don't keep people after -- and if

 6   the magistrate judge sets bail, but there's a detainer, then

 7   they go to the prison anyway because of the detainer.  Is that

 8   right?

 9          THE WITNESS:  That would be correct.

10          THE COURT:  And that's correct whether it's an ICE

11   detainer or it's a detainer from Montgomery County or from

12   Alaska; is that right?

13          MR. TULANTE:  Your Honor, I think we're --

14          THE COURT:  What?

15          MR. TULANTE:  I was going to direct these questions to

16   Mr. Abernathy in terms of the prisons --

17          THE COURT:  All right.  Well, I just want to make sure

18   that the Commissioner is confident with that --

19          THE WITNESS:  I am, Your Honor.

20          THE COURT:  -- set of facts.

21          THE WITNESS:  I am.

22          THE COURT:  Okay.  All right.  Thank you very much.

23   BY MR. TULANTE:

24   Q    And I think, just to be clear, to follow up with Judge

25   Baylson's set of questions, once someone appears in court and

1    there's a court proceeding, there are no circumstances under

2    which they go back to the police custody; is that right?

3    A    No, not in that circumstance, no.

4    Q    Irrespective of whether there's bail granted and so forth.

5    A    You're correct.

6    Q    I know counsel had asked you a set of questions about

7    Executive Order 8-09 and Police Memorandum -- that's P-2, and

8    Police Memorandum 01-06.  Just to be clear, do you ask your

9    officers to follow these policies?

10   A    I do.

11   Q    As written?

12   A    Yes.

13              MR. TULANTE:  Your Honor, I have no further questions.

14              THE COURT:  All right.  Mr. Garg, any questions?

15              MR. GARG:  Nothing further, Your Honor.  Thank you.

16              THE COURT:  All right.  Thank you, Commissioner.

17              THE WITNESS:  Thank you, Commissioner.

18              THE COURT:  Okay.  We'll take a ten-minute recess

19   before the next witness.  Thank you.

20              MR. TULANTE:  Your Honor, may the Commissioner be

21   released?

22              THE COURT:  Yes.  Yes.  You're excused.  Thank you for

23   coming in.

24              THE WITNESS:  Thank you.

25        (Recess is taken from 10:48 a.m. until 11:02 a.m.

 1          THE COURT:  Okay.  Call on your next witness.

 2          Please be seated.

 3          Mr. Tulante, I think you want to --

 4          MR. TULANTE:  Your Honor, the City calls Brian

 5   Abernathy.

 6          THE COURT:  Okay.

 7      (BRIAN ABERNATHY, Witness, is Sworn)

 8          DEPUTY CLERK:  Thank you.  Please state your full name

 9   and spell your last name for the record.

10          THE WITNESS:  Brian Abernathy, A-B-E-R-N-A-T-H-Y.

11          MR. TULANTE:  Your Honor, may I proceed?

12          THE COURT:  Yes.

13                      DIRECT EXAMINATION

14   BY MR. TULANTE:

15   Q    Good morning.

16   A    Good morning.

17   Q    Sir, where do you work?

18   A    I work for the City of Philadelphia.

19   Q    And what do you do for the City of Philadelphia?

20   A    I'm the first deputy managing director.

21   Q    And I'm going to have you slow down.

22   A    Yes, sir.

23   Q    And how long have you been the first deputy managing

24   director?

25   A    I was appointed in January of 2015.

Direct Examination - Abernathy

1  Q    Can you please describe for Judge Baylson some of your

2  responsibilities as the first deputy managing director?

3  A    Yes, sir.  So as part of my role, I oversee the day-to-day

4  operations of the City.  So while the director handles primarily

5  large strategic initiatives and policy, the day-to-day concerns,

6  political issues, budgetary issues.  Operational issues will

7  come to me directly, that includes direct reports of the police

8  department, prisons, fire department, emergency management.

9        I do things like I have incident command of our

10  special events including the DNC and NFL draft.  I have broad

11  policy responsibilities, including the Office of Immigrant

12  Affairs and work on specific issues like opioids and

13  homelessness and -- and as all -- part of that is getting out

14  into the community as well, interacting and engaging with the

15  immigrant community, with residents on homelessness within --

16  within the opioid epidemic as well.

17  Q    Okay.  Who is the prisons commissioner?

18  A    Commissioner Blanche Carney operates prisons.

19  Q    And what about the police commissioner?

20  A    Commissioner Richard Ross.

21  Q    And you mentioned the Office of Immigrant Affairs.  Who is

22  the executive director?

23  A    Miriam Enriquez.

24  Q    Could you explain -- give us a brief background of any

25  other roles that you've had in City government.

1  A    Certainly.  Immediately prior to this position, I was the

2  executive director of the Philadelphia Redevelopment Authority.

3  Prior to that, I was the chief of staff to Managing Director

4  Negron in the Nutter administration, and prior to that, I was

5  the legislative assistant and policy director for Councilman

6  Frank DiCicco.

7  Q    Sir, did you prepare a declaration as part of the City's

8  motion for preliminary injunction?

9  A    Yes, I did.

10 Q    I want to --

11              THE COURT:  Yes, I've read it.  So I assume you're --

12 you won't go over all of that?

13              MR. TULANTE:  No, no.  I want him --

14              THE COURT:  That speaks for itself.

15              MR. TULANTE:  There's some corrections and updates, so

16 I want to make sure that --

17              THE COURT:  Go ahead.

18              MR. TULANTE:  -- he does that for the record.

19 BY MR. TULANTE:

20 Q    If you would turn to P-3 in the binder in front of you.

21 A    Yes, sir.

22 Q    Is this your declaration?

23 A    Yes, sir.

24 Q    Are there any corrections or updates that you wish to make

25 to your declaration?

1    A    Yes.  A correction is in paragraph 10.  I state "since

2    December 2014," that should say since December 2015.  I would

3    also like to update the current prison population, which is as

4    of this morning, 6833.  The percentages that are contained are

5    roughly the same.

6    Q    6833 meaning that's the -- as of today, the population --

7    A    The --

8              THE COURT:  And what paragraph are you in now?

9              THE WITNESS:  I'm sorry, sir.  Paragraph six towards

10   the end of the page, "across these six facilities" --

11             THE COURT:  Yeah.

12             THE WITNESS:  -- is 6833."

13             THE COURT:  So what's the number?

14             THE WITNESS:  The population this morning was 6833.

15             THE COURT:  Okay.  And how about the number of

16   detainers?

17             THE WITNESS:  So it -- there are still 83 percent of

18   the inmates within a pretrial posture.

19             THE COURT:  Okay.  Thank you.

20   BY MR. TULANTE:

21   Q    And do you have any update in paragraph 10 with respect to

22   the number of detainer requests?

23   A    Oh, yes, sir.  Thank you.  There is 140 requests as of

24   last --

25             THE COURT:  One-four-zero?

1        THE WITNESS:  One-four-zero as of last Friday.

2   BY MR. TULANTE:

3   Q    Are there any other corrections you wish to make?

4   A    No, sir.

5   Q    Can you please describe some of the ways in which the City

6   shares information with federal law enforcement?  Let me start

7   with are you familiar with something called PARS?

8   A    Yes, sir.  It's the pre -- I'm sorry, preliminary

9   arraignment reporting system.

10  Q    And how are you familiar with it?

11  A    As part of my role working with both the criminal justice

12  agencies and direct contact with both the First Judicial

13  District, the District Attorney's Office, and the police

14  department.

15  Q    And what is PARS?

16  A    It is exactly what it sounds like.  It is our preliminary

17  arraignment system that is co-owned by the three agencies, the

18  City, FJD, First Judicial District, and the District Attorney's

19  Office.  It is the information-sharing system that is used for

20  real-time updates of what's happening in a case.

21  Q    And who enters that information?

22  A    Police officers do the initial entry upon -- upon arrest.

23  Q    And does the City include immigration status in its entries

24  about individuals as part of PARS?

25  A    No.

1   Q    And other than the police, the DA, and the court system,

2   who else has access to the information about individuals in

3   PARS?

4   A    The Defender's Association also has access, as well as a

5   number of federal law enforcement officials --

6   Q    Does that --

7   A    -- or agencies.

8   Q    Does that include ICE?

9   A    Yes.

10  Q    And is it free for ICE or does ICE have to pay for it?

11  A    ICE pays a licensing fee under MOU.

12  Q    And how long -- are you aware of how long ICE has had this

13  access?

14  A    A number of years.  I don't know when it first was granted.

15  Q    And what is the benefit to law enforcement agencies,

16  including ICE, in having access to the information in PARS?

17  A    It provides, again, real-time information about what is

18  happening with specific cases and specific individuals.

19  Q    Does ICE have access to victim or witness information in

20  PARS?

21  A    No.  They signed a specific MOU that restricted that

22  access.  Clearly, the City, at the time, had concerns about

23  providing victim and witness information, and ICE made it clear

24  that they weren't interested in that information.

25  Q    And let's talk about the next set of data sharing.  Are you

1   familiar with something called AFIS?

2   A    Yes, generally so.

3   Q    So when -- and how are you familiar with it?

4   A    Again, with my work with the police department, the First

5   Judicial District of the District Attorney's Office.

6   Q    When someone is arrested by the Philadelphia Police

7   Department, are you familiar with what the police do with the

8   person's fingerprints?

9   A    Generally, yes.  Upon -- upon booking, fingerprints are

10   taken.  That information is loaded into AFIS.  AFIS information

11   is then uploaded into the state system, that state system

12   integrates with federal -- federal information.

13   Q    And why do the police use AFIS?

14   A    To identify -- identify individuals who may be wanted in

15   another state or wanted by federal government.

16   Q    And what happens to the fingerprint data once it goes up to

17   the state and so forth?

18   A    It is shared amongst all law enforcement officials across

19   the country is my understanding, and including ICE, which we

20   know ICE on their own website, and it's that they -- they

21   generate their detainers from biometric data that -- that local

22   law enforcement shares through our national -- or through our

23   national partnerships.

24   Q    What do you mean "generate the detainers"?

25   A    Generate detainer requests for local -- for local

1    jurisdictions.

2    Q    And it's your testimony is that's how ICE knows who is in

3    local custody?

4    A    That's what ICE's website says.

5    Q    Okay.  And let's move to NCIC.  Are you familiar with NCIC?

6    A    Generally speaking, as part of my role working with the

7    police department and the criminal justice system.

8    Q    And what is NCIC?

9    A    It is a database of -- of information, demographic

10   information and biographic information.  When an officer

11   interacts with an individual suspected of a crime, he enters

12   that name into NCIC to understand if that individual is wanted

13   in another jurisdiction.  Assuming that there is an ID present,

14   he also enters the biological information that he has present

15   into NCIC.

16   Q    And I want to switch gears a little bit.  What is the --

17   your relationship with ICE?

18   A    I think it's a professional, cooperative relationship.  We

19   certainly have our disagreements, but I think I personally feel

20   like I have a professional relationship with Director Ritchey,

21   and the Department itself has a relationship with Homeland

22   Security Investigation and works with them on a regular basis.

23   Q    In paragraph -- actually, let me switch gears a little bit.

24        If you go -- before you there is a document; it

25   identifies as Exhibit P-2.  And for the record, again, that's

Direct Examination - Abernathy

1    Executive Order Number 809.  Are you familiar with it?

2    A    Yes, sir.

3    Q    And do you see a section --

4         MR. TULANTE:  Your Honor, may I have a moment?

5    BY MR. TULANTE:

6    Q    It would be section two regarding inquiries regarding

7    immigration status.  Do you see that?

8    A    Yes, sir.

9    Q    Does the confidentiality order -- this is where I'm

10   referring to P-2.  Does it prohibit City employees from

11   requesting information regarding immigration status from federal

12   immigration officials, including ICE?

13   A    No, it does not.

14   Q    So another way of putting it, if a City official or

15   employee calls ICE to request immigration, citizenship, status

16   information, would that official be violating the

17   confidentiality order?

18   A    No, it would not, although I don't know of any reason why

19   they would need to request that information.

20   Q    In paragraph seven of your declaration, again, your

21   declaration is P-3, you described that through the Department of

22   Prisons put in place a new consent form in May 2017 for inmates

23   whom ICE seeks to interview.  Do you see that?

24   A    Yes, sir.

25   Q    Why was that policy put in place?

1  A    It came to our attention in the spring that ICE had been --

2  had been making requests directly to wardens to gain access

3  to -- to the prisons and to interview inmates.  When that --

4  when we became aware of that, a number of concerns were raised

5  by both the advocate community and within -- within the

6  administration itself, and the desire, quite frankly, from --

7  from some in the advocate community was to -- to not allow ICE

8  onto our campus at all.

9        We value the law enforcement relationship we have with

10  the -- with the organization and with the agency, and so, an

11  outright bar didn't seem appropriate.  Having said that, given

12  that they are investigating primarily civil offenses, and given,

13  really, the importance of maintaining the relationship with our

14  advocate community and with the immigrant community, we felt

15  it -- felt it prudent to make sure folks understood their rights

16  when dealing with ICE officials.

17  Q    And has ICE -- has ICE asked to interview any inmates since

18  the consent form was implemented in May 2017?

19  A    To my knowledge, they've made three requests.

20  Q    And what's been the result of those requests?

21  A    Two inmates declined to be interviewed, a third agreed to

22  be interviewed with an attorney present.  At that point, ICE

23  declined to move forward with the interview.

24  Q    I want to direct your attention to P-4, and for the record,

25  that is the Executive Order No. 516, titled Policy Regarding US

1   Immigration and Customs Enforcement Agency Detainer Request.  Do

2   you see that?

3   A    Yes, sir.

4   Q    Are you familiar with it?

5   A    Yes, sir.

6   Q    In paragraph eight of your declaration, you said that the

7   City, including this policy, has a policy on responding to

8   detainer requests.  And you testified that the requests are

9   honored if a federal judicial warrant accompanies that request;

10  is that correct?

11  A    Yes, sir.

12  Q    Explain that.  Explain the reason behind that.

13  A    Again, the overarching -- all of the overarching policies

14  are to maintain relationships with the immigrant community.

15  We -- when detainer requests come in, there's a practical --

16  there's a practical portion here.  You know, 80 percent,

17  roughly, of our inmates aren't serving sentences.  It is -- it

18  is nearly impossible to try and detain folks when a judge orders

19  them to be released.

20       When a judge orders bail, when a judge -- when someone

21  is found innocent or not guilty in a court of law, when there's

22  a mistrial and we have received a judge's order to release that

23  individual, we're going to honor -- we're going to honor that --

24  that judicial order.  You know, a very small portion of our

25  population would be -- would be held otherwise.

88

1  Q    Well, let's talk about notification.  If you see section

2  one of the executive order, and if I could just read it in.

3            "No person in the custody of the City who otherwise

4            would be released from custody shall be detained

5            pursuant to an ICE Civil Immigration detainer request

6            pursuant to 8 C.F.R. 287.7, nor shall notice of

7            his/her pending release be provided unless its person

8            is being released after conviction for a first or

9            second-degree felony involving violence and a detainer

10           supported by a judicial warrant."

11           I'm going to focus on the notice.  There's a portion

12  there that says notice won't be provided unless there's a

13  judicial warrant and there's been a prior conviction for a first

14  or second-degree felony involving violence.  Not talking about

15  the first or second-degree violence.  Is that the current

16  practice in the prisons?

17  A    If the prisons receives a judicial warrant, no matter what

18  the charge, they will honor that judicial warrant.

19  Q    And by judicial warrant, what type of warrant?  Here, it

20  says ICE Civil Immigration detainer request.  What if it's a --

21  what if it's an Immigration Administrative warrant?

22  A    If it is a warrant signed by a judge, we will honor that

23  warrant.

24  Q    And have you made any clarification regarding the issue of

25  first or second-degree felony?

1    A    Yes.  I issued a memo to the prison's commissioner, I

2    believe, in March of last year.

3    Q    Can you turn to P-5?

4    A    March of this year.  I apologize.  Clarifying that any

5    warrant received, no matter what the charge, should be -- should

6    be honored.

7    Q    And why was that memo promulgated?

8    A    There was some confusion based on the language in the

9    executive order.  We -- it is not appropriate for us to deny a

10   judge's order given -- given charges.

11   Q    Talk a little bit about, sort of, the practicalities of

12   providing notice to ICE.  In other words, if ICE comes in and

13   they ask for 48-hour notice or as soon as practicable, explain

14   the way the prisons operate how that would actually work if

15   you -- even if you wanted to give notice?

16   A    Again, 80 percent of our -- of our inmates are not

17   sentenced.  They're in -- in some sort --

18             THE COURT:  Are not sentenced?

19             THE WITNESS:  Are not sentenced.

20             THE COURT:  All right.  That's throughout the whole

21   city prison?

22             THE WITNESS:  Yes, that's surrounding the entire

23   system.  And so, often times an inmate may be released from

24   court and not actually be -- be delivered back to State Road.

25   We're actually -- we're trying to push -- push that, and even if

 1   a release order is made from court and the inmate travels --

 2   they're traveling to State Road, it -- figuring --

 3            THE COURT:  You're using the term State Road because

 4   that's where the prison is located?

 5            THE WITNESS:  Because that's where the prison is.

 6   Yes, sir.  I apologize.

 7            THE COURT:  That's -- no, that's okay.

 8            THE WITNESS:  That that practical reality, that

 9   operational reality of trying to be able to translate between

10   the court, the sheriff, and then the prison facility is

11   difficult to say the least, and it would require a complete

12   operational change in how we do things, not to mention

13   additional pressure from -- from the judicial system in the past

14   about making sure we have a timely release once an order is

15   received.  Generally speaking, we try to release folks within

16   four hours of receiving an order, whether that's by -- no matter

17   what that order -- what that order is.

18            And so, a notification to ICE, from my understanding,

19   even if -- even if we wanted to, I'm not certain that an agent

20   would be able to make it to the facility in time to -- to honor

21   that request, so it -- just from a very practical standpoint,

22   from a very operational standpoint, it would -- it would require

23   us to change our operations in a very -- a very real way.

24   Q    And how many -- again, just to be clear, for the record,

25   how many of your inmates would have scheduled release dates?

1    A    There are approximately 17 percent that would have

2    scheduled release dates.  Those are individuals that are

3    sentenced.

4    Q    And the other 83 percent, how do you -- let's say they are

5    to be released.  How do you -- when do they get released?  How

6    do you know when they're to be released?

7    A    We receive a court order telling us to release them.

8    Q    And do you -- does that court order allow you to hold them

9    beyond the release?

10   A    No.  No, the court's generally get very upset if we -- if

11   we hold them for more than a few hours.

12   Q    Can you -- we've -- we've heard the word "detainer" a lot.

13          THE COURT:  How -- how many -- can you estimate, is

14   there any approximation of the number of inmates for whom you

15   get a -- a release order from a judge on a daily basis or a

16   weekly basis?  Is there any way you can quantify that?

17          THE WITNESS:  I can't sit here today and quantify it,

18   but I can certainly provide it to counsel at a later time.

19          THE COURT:  Okay.

20          All right.  Go ahead.

21   BY MR. TULANTE:

22   Q    Let's talk about the -- we've heard the term "detainers."

23   Other than sort of ICE civil detainers, does the Philadelphia

24   Department of Prisons receive other forms of detainers?

25   A    Yes, sir, they do.

92

Direct Examination - Abernathy

1  Q    And what forms of detainers are those?

2  A    They receive criminal detainers from other jurisdictions.

3  Q    And what are -- what are criminal detainers?

4  A    They are detainers where the inmate may be wanted for a

5  crime in another jurisdiction.

6  Q    And what's the distinction between an ICE civil detainer

7  and a criminal detainer that you just referred to?

8  A    Again, I think ICE's civil detainer is one that we would

9  not -- we would not honor.  A criminal detainer allows us to

10  maintain and hold that person in custody, and then transfer that

11  custody to the jurisdiction upon pickup; whereas, an ICE civil

12  detainer, from my understanding of this -- of this jurisdiction,

13  we just -- to hold someone for civil charges, we feel would

14  violate their rights.

15  Q    Let me turn to Exhibit P-6, and do you have it front of you

16  in the binder before you?

17           MR. TULANTE:  And for the record, Your Honor, this is

18  a sample of an immigration detainer.

19           THE COURT:  Right.

20           MR. TULANTE:  It's a form -- DHS Form I-247A.

21  BY MR. TULANTE:

22  Q    Do you recognize it?

23  A    Yes, sir.

24  Q    And what is it?

25  A    It is a sample of an immigration detainer notice of action.

Direct Examination - Abernathy

1   Q    And of the approximately 140 of these you received, how

2   many of them have been accompanied by a criminal judicial

3   warrant?

4   A    I believe there have been five.  Four, I apologize.

5   Q    And -- and of those, have you provided -- what has happened

6   with the -- with the inmates for whom the detainer requests were

7   submitted?

8   A    Each of those inmates are still in custody.

9   Q    And have -- has any notice been provided with respect to

10  those inmates?

11  A    There's no notice required, because, again, they're still

12  in local custody.  We wouldn't --

13           THE COURT:  Do you receive this document from time to

14  time?  Does the prison receive this from time to time?

15           THE WITNESS:  Yes, they do.

16           THE COURT:  Do you give it to the -- if you have the

17  prisoner in your custody, do you give it to the prisoner?

18           THE WITNESS:  No, we do not.

19           THE COURT:  What do you do with it?

20           THE WITNESS:  It is filed.

21           THE COURT:  It's filed?

22           THE WITNESS:  It's filed and maintained.

23           THE COURT:  What does that mean?  Just put in a

24  folder?  The first -- is there a folder for each --

25           THE WITNESS:  Yes.

Direct Examination - Abernathy

1          THE COURT: -- prisoner?

2          THE WITNESS: There's a folder for each prisoner.

3          THE COURT: An electronic folder or a paper folder?

4          THE WITNESS: Paper. There's both --

5          THE COURT: There's both?

6          THE WITNESS: -- to be fair.

7          THE COURT: So this would be just put in the folder?

8          THE WITNESS: It would be put in the folder upon -- if

9  that prisoner was ordered to be released, this paperwork would

10  be pulled out, and upon -- before it's released, it's actually

11  sent to me for final approval.

12          THE COURT: Well, wait a minute. What does that mean?

13  I mean, you -- do you still --

14          THE WITNESS: I see --

15          THE COURT: Would you give it to the prisoner as

16  he/she is about to be released?

17          THE WITNESS: No, sir, we would not.

18          THE COURT: Would you keep it if -- once you --

19          THE WITNESS: It's -- it's --

20          THE COURT: -- when they're released?

21          THE WITNESS: Yes, sir. We would keep in their -- and

22  when -- in their file, in case they were to re-enter -- re-enter

23  the facility.

24          THE COURT: How long -- how long do you keep these

25  files?

1          THE WITNESS:  To -- I don't know is the honest answer.

2          THE COURT:  All right.  Go ahead.

3    BY MR. TULANTE:

4    Q    Actually, can you walk the Court through what happens from

5    the time of receipt, you know, just the procedure steps when you

6    get -- the prison is going to detain --

7          THE COURT:  Of this form?

8          MR. TULANTE:  Yes.

9          THE COURT:  Or a criminal detainer?

10          MR. TULANTE:  No, this form.

11          THE COURT:  Okay.

12    BY MR. TULANTE:

13    Q    It's a P-6.  The example of P-6.

14    A    Sure.  So this form would be delivered to the commissioner

15    directly.  So no matter what facility it would be delivered to,

16    it would be advanced to the commissioner's office, and the form

17    itself would be filed within -- within the prisoner's -- within

18    the prisoner's file, as well as they would be marked within the

19    prison's computer system so that they would recognize that a

20    detainer had been filed.  And further, it would be recognized

21    that the detainer had been filed either accompanied with a

22    judicial warrant or not accompanied by a judicial warrant.

23          Every -- that is the names of those individuals, as

24    well as any details relating to their charges, where they are

25    being housed.  And the disposition of their case is updated on a

Direct Examination - Abernathy

1   spreadsheet which is sent to me on a weekly basis.

2   Q    And are you familiar -- I know we talked about prisons, are

3   you familiar with the -- if ICE sends detainer requests to

4   police departments, police precincts?

5   A    I have heard of one case in my tenure where they have sent

6   a detainer to a police -- a police district, but it -- from a

7   practical standpoint, there's no reason for ICE to send it to

8   the police district.  The police --

9   Q    Why is that?

10  A    The police hold an individual for a very limited time

11  before that individual is transferred to the Philadelphia Prison

12  System.  And both in my conversations with the police department

13  as well as my conversation with ICE, there is not a -- there is

14  no practical reason for them to be sending a detainer to -- to a

15  police district.

16  Q    And you said since your tenure, that's since January 2016?

17  A    Yes, sir.

18  Q    Let me switch --

19        THE COURT:  And what -- are you familiar personally

20  with any -- with their -- with this document being accompanied

21  by a judicial warrant?

22        THE WITNESS:  Yes.  On a handful of times, less than

23  ten.

24  BY MR. TULANTE:

25  Q    And when it is accompanied by -- tell us what -- what the

1    prisons receives in those instances.

2    A     If it's accompanied with a warrant?

3    Q     Yeah.

4    A     So we -- we would receive this form, and to be -- and to be

5    fair, at times, we do receive an administrative warrant with

6    this form as well, and I would say especially within the last 12

7    months we've received administrative warrants with this form.

8    Judicial warrants, at times, will come, and, again, that

9    judicial warrant is filed.  Upon -- upon release, if the

10   judicial warrant was filed, we would notify -- we would notify

11   ICE and --

12            THE COURT:  Who signs an administrative warrant, if

13   you -- if you know?

14            THE WITNESS:  It would be an ICE agent.

15            THE COURT:  An ICE agent?

16            THE WITNESS:  Yes, sir.

17            THE COURT:  How about -- do you -- are you familiar

18   with the title immigration judge?

19            THE WITNESS:  Yes, sir.  There have been a handful of

20   warrants that have been signed by immigration judges as well.

21            THE COURT:  Okay.  So what do you understand their

22   role is in the immigration and deportation process?

23            THE WITNESS:  My understanding is that they -- they

24   judge civil offenses as well, and to that end, we -- we would

25   not honor -- honor that warrant.

1    THE COURT:  So if -- so if it was an administrative --

2    well, suppose an administrative judge -- well, you don't -- do

3    you -- do you consider those judicial warrants or not?

4    THE WITNESS:  No, we do not.

5    THE COURT:  Okay.

6    BY MR. TULANTE:

7    Q    Just to be clear, when you say judicial warrant, what --

8    what types of warrants are you referring to?

9    A    I'm referring to judicial criminal warrants; warrants where

10   the individual would be charged with a crime.

11   THE COURT:  Well, and what about parole violators?

12   Are you familiar -- if you're not familiar with something I ask

13   about, just say you don't know.

14   THE WITNESS:  Uh-huh.

15   THE COURT:  I mean Mr. Tulante can supplement the

16   record if it's relevant.  But you're familiar that sometimes an

17   individual is arrested is on parole --

18   THE WITNESS:  Uh-huh.

19   THE COURT:  -- it could be state parole, it could be

20   federal, what we call, supervised release; it's the same thing,

21   and are you aware -- do you have a policy about -- that means

22   the individual has been convicted of a crime, but at the moment,

23   they're being charged with parole violations.

24   THE WITNESS:  Yes, sir.

25   THE COURT:  If it's signed by a judge, you would honor

1    it, I assume?

2            THE WITNESS:  Yes, sir.

3            THE COURT:  Go ahead.

4    BY MR. TULANTE:

5    Q    Yeah.  Let me give you an example, so I'm not the -- if

6    there is an individual who had been previously convicted in

7    federal court on supervised release and they come back, and as

8    part of their coming back is violating a supervised release in

9    addition to violating illegal re-entry and Judge Baylson issued

10   a warrant, a criminal warrant to bring that person in for arrest

11   for violating supervised release, is that warrant -- would the

12   prisons honor that warrant?

13   A    Yes, sir.

14           MR. TULANTE:  I think that was the scenario Your Honor

15   was just --

16           THE COURT:  Yeah.  It's okay.

17           MR. TULANTE:  -- thinking of.

18   BY MR. TULANTE:

19   Q    Let me switch tracks a little bit to the request for JAG

20   funding.  Are you familiar with what the City intends to use its

21   FY 2017 JAG allocation for if it were to receive the JAG?

22   A    Yes, sir.  Generally, and to be fair, mostly focused on the

23   police department, but, yes, sir.

24   Q    And how are you -- how are you -- how do you have the

25   familiarity?

Direct Examination - Abernathy

1  A    With, again, overseeing the Office of Criminal Justice who

2  prepares the grant as well as my work with the police

3  department.

4  Q    And what -- what types of things the City intends to use

5  the money for?

6  A    The three big buckets that I think my biggest concerns are

7  around police overtime, around reality-based training, as well

8  as Narcan for police officers to carry.  The overtime is

9  directly related to our most difficult and most challenged

10  neighborhoods.  It's to provide additional officers and

11  additional deployment into those -- into those areas.

12  Reality-based training has been largely one of the most

13  successful training programs we've ever used.  If you look at --

14        THE COURT:  What kind of training do you call it?

15        THE WITNESS:  Reality-based training.  So this is

16  putting officers in real-time circumstances where they have to

17  make snap decisions.  Commissioner Ross, when he was -- when he

18  was first deputy, put this training into place in order to

19  address the large number of officer-involved shootings that the

20  City had, and it has been very successful in bringing those

21  officer-involved shootings down to record lows, and -- and I

22  think all officers that I've -- that I've spoken to anecdotally

23  that have gone through it think it as one of the most important

24  training sessions that they've gone -- gone through.

25        So enhancements to reality-based training is a good

Direct Examination - Abernathy

1   thing and makes us -- it makes us safer as a city.  And then --

2   then, finally, Narcan is -- is a drug used to stop an opioid --

3   an opioid reaction when someone has overdosed.  We try to equip

4   as many of our officers with Narcan as we can.

5   BY MR. TULANTE:

6   Q    What do you mean stop an overdose reaction?  What do you

7   mean in practical terms?

8   A    So if someone is -- is going through an overdose, Narcan is

9   administered, and it stops that overdose and saves that

10  individual's life.  We've had over 300 -- just over 300

11  Narcan-administered saves this year.  So literal --

12  Q    Is it -- administered saves, like what -- what are being

13  saved?

14  A    Individuals.  So individual -- so officers have

15  administered Narcan over 300 times and saved people's lives.  If

16  we could -- if we could provide additional doses to Narcan

17  across the City, I would imagine that we would save more lives.

18  And so without the funding, we will not be able to further --

19  further -- or further deploy Narcan to additional officers.

20  Q    How many -- approximately, how many overdose deaths were

21  there last year?

22  A    There were just -- just over 900 deaths last year.

23  Q    And how does that compare to the murder rate for last year?

24  A    It's more than three times the murder rate.  And this year,

25  we're expecting close to 1200 deaths, which will be four times

1    the murder rate.

2    Q    So if the City, and I want to really focus on the police

3    department, were not able to receive this funding for FY 2017,

4    what effect would that have on the City?

5    A    These programs wouldn't -- wouldn't move forward, and so,

6    we wouldn't have additional officers in our most challenged

7    neighborhoods.  We wouldn't be able to improve and enhance

8    reality-based training, and more people would die because we

9    couldn't provide Narcan and administer Narcan on a broader

10   basis.

11           MR. TULANTE:  Your Honor, may I have a second to

12   consult with the colleagues?

13       (Pause)

14   BY MR. TULANTE:

15   Q    Mr. Abernathy, I just wanted to clarify some numbers.  We

16   see in P-3, that is your declaration, on the paragraph six at

17   the top of page three, you had --

18           MR. TULANTE:  I think Your Honor had asked some

19   questions about the breakdown of who is pre-sentenced and so

20   forth.

21           THE COURT:  Okay.

22           MR. TULANTE:  I just want to clarify.

23   BY MR. TULANTE:

24   Q    You said that 83 percent of inmates are all in a pretrial

25   posture.  What does that mean?

Direct Examination - Abernathy/
Cross-Examination - Abernathy

1   A    It means that they have yet to go to trial or that there is

2   some sort of detainer, a probation or parole detainer.

3   Q    And when you say 78 percent of inmates, what does that --

4   what does that reference?

5   A    I should apologize and clarify.  Thank you for -- because I

6   did misspeak when I provided -- so, 17 percent of our inmates

7   are sentenced.  Seventy-nine percent of our inmates today, as of

8   today, are currently in a pretrial posture, not 83 percent, 79

9   percent.  Two percent of inmates are in a pre-sentencing

10  posture.  They've been found guilty but have not been sentenced,

11  and two percent are in some form of other temporary detention.

12  Q    You mean like a violation of parole and so forth?

13  A    A violation of parole, for example, would be actually in

14  the pretrial posture.

15          MR. TULANTE:  Your Honor, with that -- unless Your

16  Honor has questions --

17          THE COURT:  No, that's fine.

18          MR. TULANTE:  -- no further questions.

19                       CROSS-EXAMINATION

20  BY MR. GARG:

21  Q    Good morning, Mr. Abernathy.

22  A    Good morning.

23  Q    My name is Arjun Garg.  I'm with the Department of Justice.

24  I wanted to talk about -- I think with counsel, you reviewed

25  the -- the DHS Form I-247A, you discussed that, and it's in your

1   book.  You're welcome to look at it, but I'm not going to ask

2   about the specifics of the document.  I wanted to confirm my

3   thought.

4            I heard you say you're not sure how long those

5   documents are maintained by the City when it receives them, that

6   Form I-247A; is that accurate?

7   A    That's accurate.  I don't know our retention policy.

8   Q    In your experience, have any of those forms been discarded

9   by the City?

10  A    Not to my knowledge.

11  Q    Do you know what happens to a Form I-27 -- I-247A when a

12  detainee leaves the Philadelphia Prison System to be transferred

13  to another prison system?

14  A    No, I -- I do not know.

15  Q    All right.  Now, we also talked about the consent form that

16  the Philadelphia Department of Prisons instituted earlier this

17  year when ICE seeks to interview an inmate in a Philadelphia

18  prison.  And what I wanted to know is does the City have any

19  consent form similar to that that's required to be provided to

20  an inmate when there is a request to interview the inmate by a

21  law enforcement agency other than ICE?

22  A    No, we do not.

23  Q    ICE is the only one that that kind of consent form exists

24  for in the City?

25  A    Yes, because ICE is the only one that investigates civil --

Cross-Examination - Abernathy

1    civil matters.

2    Q    Now, we also discussed Executive Order No. 516, and, again,

3    that's -- that's in the binder.  I'm not going to walk you

4    through the document, but you're welcome to look at it; it's

5    P-4, and we discussed that there is a portion of -- sorry, I'll

6    flip to it myself.  There's a portion of section one of

7    Executive Order No. 516 that discusses notice of an alien's

8    pending release and under what circumstances the City can -- the

9    City and police can provide that notice to federal authorities.

10           Now, so just to confirm, this says that the notice on

11   the pending release will be provided only where a judicial

12   warrant supports that request; is that correct?

13   A    This -- this specifically mentions first and second-degree

14   felonies.  The memo that I issued to the Prisons Department at a

15   later date further clarified that any time a judicial warrant is

16   provided, no matter what the charge or underlying charges, we

17   should -- we should honor that warrant.

18   Q    Okay.  I understand that.  I'm trying to get something a

19   little different.  So I think you testified that, in your

20   experience, ICE will issue a detainer request asking for notice

21   of pending release that is supported only by an administrative

22   immigration warrant; is that accurate?

23   A    Often times, yes.

24   Q    In that scenario, does Executive Order No. 516 allow

25   communicating back to ICE upon that request, the notice of the

1    alien's pending release?

2    A    No, it does not.

3    Q    What are the most serious crimes that people are held for

4    in Philadelphia prisons?

5    A    Rape, murder.

6    Q    So in -- okay.  An alien who has committed rape or murder

7    would not be -- have that notice of custody release given to

8    ICE, unless it's supported by a judicial warrant, not an

9    administration immigration warrant, correct?

10              THE COURT:  Well --

11              THE WITNESS:  Correct.

12              THE COURT:  Well, wait a minute.  This is -- is the

13   person convicted or pretrial, or --

14              MR. GARG:  I'll ask -- I'll ask --

15              THE COURT:  I mean I think you need to clarify it.

16              MR. GARG:  I'll ask Mr. Abernathy.

17              THE COURT:  What?

18              MR. GARG:  I'll ask Mr. Abernathy.

19              THE COURT:  Well, then, you need to rephrase the

20   question.

21   BY MR. GARG:

22   Q    Do people in Philadelphia -- does the Philadelphia prison

23   hold rape and/or murder convicts?

24   A    No, we do not.

25   Q    Okay.  The Philadelphia prison holds rape and/or murder

Cross-Examination - Abernathy

1   accusees (sic), I guess?

2   A    Yes, those --

3   Q    Is that correct?

4   A    -- those awaiting trial.

5   Q    What are the most serious kinds of convicts held by

6   Philadelphia prisons?

7   A    So it would be any sentence that is less than two years,

8   essentially.

9            THE COURT:  Yeah, but somebody could be convicted of

10   rape and get a sentence of less than two years, right?

11           THE WITNESS:  Yes, sir.

12           THE COURT:  Or they could have voluntary manslaughter

13   and get a sentence less than two years?

14           THE WITNESS:  Yes, sir.

15           THE COURT:  Go ahead.

16           MR. GARG:  All right.

17   BY MR. GARG:

18   Q    So, in those scenarios, any prisoner, whatever the crime

19   is, if they're convicted with a sentence for less than two

20   years, they could be in the Philadelphia prison system, that

21   type of alien would not have his information about his pending

22   release transmitted to ICE by the City unless the request from

23   ICE was supported by a judicial warrant as opposed to an

24   immigration warrant; is that correct?

25   A    Yes.

1  Q    I also want to ask you about -- we talked about your

2  declaration a little.  One statement made in your declaration,

3  I'm happy to refer you to it, and its paragraph four of your

4  declaration, but I can just briefly discuss it.  As I understand

5  your testimony in that declaration, city officials will ask for

6  an alien's immigration status if required by federal law or

7  state law or if required for benefits eligibility; is that

8  accurate?

9  A    Yes.

10 Q    Can you describe any examples you're aware of where federal

11 law or state law requires asking for immigration status?

12 A    Yes.  So as an example, the prison system, there is a state

13 regulation where the prison system has to ask about immigration

14 status upon -- upon admittance.

15 Q    Are there any other examples that you know of?

16 A    Yes, there are some within our social service system.  I

17 don't feel comfortable speaking to it in detail, but I know that

18 they exist.

19 Q    All right.  Now, I'd like to talk about your understanding

20 of the dimensions of cooperation with sharing information that

21 the City provides to ICE.  As you understand city -- and before

22 we start, let me clarify.  In your position as first deputy

23 managing director, you oversee the Philadelphia police and the

24 Philadelphia prisons; is that accurate?

25 A    Yes.

1    Q    They fall under your purview?

2    A    Yes.

3    Q    As you understand city policy, can a city employee under

4    your purview respond if the employer receives a request from ICE

5    asking whether a particular alien is being held in city custody?

6    A    Yes.

7    Q    As you understand city policies, can a city employee under

8    your purview respond if the employer receives a request from ICE

9    asking for identifying information of a particular alien being

10   held in the City's custody?

11   A    The short answer is, yes, but all of that identifying

12   information is already shared between PARS, NCIC, and AFIS.  So

13   the information is already available to all of our federal law

14   enforcement partners.

15   Q    As you understand city policy, can a city employee under

16   your purview respond if the employer receives a request from ICE

17   asking the location where a particular alien is being held in

18   the City's custody among the various facilities the City has?

19   A    A particular individual?  Yes.  I wouldn't call that

20   individual an alien, but, yes.

21   Q    As you understand city policy, can a city employee under

22   your purview respond if the employer receives a request from ICE

23   asking when a particular alien will be released from the City's

24   custody?

25   A    No.

1   Q    As you understand city policy, can a city employee respond

2   if the employer receives a request from ICE asking for the

3   whereabouts of a particular alien who has been released from the

4   City's law enforcement custody?

5   A    I think it would depend on the circumstances.  So it is --

6   I don't think that's a black-and-white question.

7   Q    Can you -- can you discuss under what circumstances it

8   would versus would not be allowed?

9   A    Well, first of all, I'm not sure that a city employee would

10  know the location of an individual, one, and, two, I think it

11  depends if that is in the investigation of a crime, then

12  certainly, the police department would be sharing that

13  information.  If it was in -- to advance a civil immigration

14  action, then -- then, no, I would -- I would not expect the

15  employee to move forward.

16  Q    In your experience regarding all of these city policies and

17  the dimensions of what information is allowed to be shared with

18  federal immigration authorities such as ICE, what advice or

19  training is given to city employees beyond the actual text of

20  the policies themselves?

21  A    So as recently as last month at roll call, officers were

22  reminded not to ask for documentation status.  So training and

23  kind of regular communication happens on a fairly regular basis

24  for employees.

25  Q    To your awareness, does any of that training that happens

1  on a fairly regular basis reference the Federal Statute 8 U.S.

2  7 -- 8 U.S.C. 1373, that PARS prohibition on sharing information

3  about providing immigration status with ICE?

4  A    No, I -- no.  To my knowledge, it does not.

5  Q    Have you advised city employees or provided any training

6  that city employees may in response to a request from ICE

7  communicate information regarding immigration status to ICE with

8  respect to any alien in the City's custody?

9  A    I don't -- no, because they are not to produce information

10 to ICE regarding -- one, we don't have the information, right?

11 We don't actually ask for documentation, except for the prisons,

12 and the prisons does not communicate that information.

13 Q    So following on that answer, I would imagine that, to your

14 awareness, no other city official has advised employees or

15 provided training that city employees may in response to a

16 request from ICE communicate information regarding immigration

17 status to ICE with respect to an alien in the City's custody?

18 A    No, because that's not the city policy.

19 Q    Executive Order 8-09, which is P-2, in the binder I think

20 you have in front of you?

21 A    Yes.

22 Q    With respect to this policy, Executive Order 8-09, have you

23 advised city employees or provided any training that they do not

24 violate Executive Order 8-09 when they disclose information

25 regarding immigration status to ICE?

1  A    No, because they would be violating the executive order.

2  Q    With respect to the Police Commissioner Memorandum 01-06,

3  have you advised city employees or provided any training that

4  they do not violate the Police Commissioner Memorandum 01-06

5  when they disclose information regarding immigration status to

6  ICE?

7  A    No.

8  Q    I'd like to look at Executive Order 8-09, which is, again,

9  P-2.

10           THE COURT:  Which -- what Exhibit?

11           MR. GARG:  It's Exhibit P-2 in the binder that --

12           THE COURT:  Yes.  Okay.

13           MR. GARG:  -- you have in front of you.

14           THE COURT:  Yes.

15  BY MR. GARG:

16  Q    And we're looking at section two discussing what

17  inquiries -- various kinds of inquiries that shall not be made

18  about a person's immigration status unless certain exceptions

19  are made and you're welcome to read through that as you consider

20  the question I'm going to ask.

21           Do you understand that Executive Order 8-09 allows

22  city employees under your purview to inquire with ICE about a

23  person's immigration status?  And, to be clear, what I'm talking

24  about here is the request goes from the City to ICE.  Can you

25  tell me about a particular person's immigration status?

1    A    Yes, they can.

2    Q    Okay.  Have you advised city employees or provided any

3    training that is consistent with your answer to that yes, they

4    can inquire from ICE about a person's immigration status?

5    A    We've had a broad policy conversation, but we haven't

6    provided direct -- direct training.

7    Q    Who has been part of that policy conversation?

8    A    It has -- certainly, the mayor's office, the Office of

9    Immigrant Affairs, the police department, the prisons -- the

10   prisons department.  But, again, I don't -- I can't imagine a

11   reason why an employee would need to make that request to ICE,

12   but they certainly could if they needed -- they wanted to.

13   Q    So to your awareness, outside of policy discussions by city

14   leadership, ordinary line employees working for the City have

15   not been advised that Executive Order 8-09 allows them to

16   inquire with ICE about a person's alien immigration status?

17   A    No, but line employees also have not asked that question,

18   because, again, there's no reason for line employees to make

19   that request to ICE.

20             MR. GARG:  One moment, Your Honor?

21             THE COURT:  Sure.

22        (Pause)

23             MR. GARG:  Nothing further, Your Honor.

24             Thank you very much, Mr. Abernathy.

25             THE COURT:  All right.  I just want to ask one

1    question.  It's sort of a hypothetical.

2          So let's say John Smith is an inmate in one of your

3    prisons, all right, and it so happens that he is an immigrant.

4    And let's say he was -- he was arrested, but then he was

5    released on bail.  So he's unconvicted, all right, and he's

6    released.  And then, you get a call -- the prisoner -- the

7    warden of the prison or one of the staff gets a call from

8    Philadelphia Police Department saying we have information that

9    John Smith has just murdered somebody.  We'd like to know what

10   your records show about his address.

11         So according to what you said, the -- the prison

12   employee would then go look in his paper file or they would look

13   online?  Which would they look to or both?

14         THE WITNESS:  They would probably start in the

15   database, but they could certainly --

16         THE COURT:  All right.  They would look online.  And

17   would they give the police department the address of this -- of

18   John Smith?

19         THE WITNESS:  They would, but the police department

20   would already have access to the address.

21         THE COURT:  Okay.  So my --

22         THE WITNESS:  So the --

23         THE COURT:  -- hypothetical is unlikely?

24         THE WITNESS:  Yes, sir.

25         THE COURT:  Even though he -- he -- because he was

 1    arrested, he would -- they would have that?

 2              THE WITNESS:  Correct.  So our lock-and-track system

 3    would be --

 4              THE COURT:  All right.  Now, but just suppose --

 5              THE WITNESS:  -- would be -- near -- in PARS.

 6              THE COURT:  All right.  But just suppose they check

 7    anyway.  Now, if it so happened that this John Smith was an

 8    immigrant, and when they looked in that file, they would find

 9    the immigration detainer that we discussed before, would the

10    prison official refuse to give information about John Smith's

11    address to the police department because he was an immigrant?

12              THE WITNESS:  No, sir.

13              THE COURT:  All right.  Now, suppose ICE called and

14    made the -- makes -- someone from ICE made the same phone call,

15    okay, and let's just say they hadn't -- they didn't know, but

16    they had information that John Smith just murdered somebody.

17    Would the prison give that information about his address to ICE?

18              THE WITNESS:  In the course of an ongoing law

19    enforcement effort, I think that, yes, they would.

20              THE COURT:  Okay.  Now, suppose -- if John Smith --

21              THE WITNESS:  But -- but to be -- to --

22              THE COURT:  -- had -- all right.

23              THE WITNESS:  -- to be fair, Judge, they would

24    probably also make a call to me --

25              THE COURT:  All right.

Cross-Examination - Abernathy

1          THE WITNESS:  -- before they could --

2          THE COURT:  But you believe the city policy would

3    allow that?

4          THE WITNESS:  Yes, because, again, it's --

5          THE COURT:  All right.  Now, if John Smith had been --

6          THE WITNESS:  -- in the course of an ongoing

7    investigation.

8          THE COURT:  If John Smith had been convicted of murder

9    and then was released, there's no question about it that you

10   would provide the information about what his -- what your

11   records showed about his address?

12         THE WITNESS:  To ICE?

13         THE COURT:  What?

14         THE WITNESS:  To ICE, or --

15         THE COURT:  Yeah.  To anybody.  If he had been

16   convicted of a first or second-degree felony.

17         THE WITNESS:  If he had been convicted and released?

18         THE COURT:  Yeah.

19         THE WITNESS:  No, we probably would not.  We

20   wouldn't --

21         THE COURT:  You would not?

22         THE WITNESS:  We probably would not.

23         THE COURT:  Why not?

24         THE WITNESS:  One, that address information would

25   already be in a federal database, so that would have already

Cross-Examination - Abernathy

1   been uploaded to NCIC or to --

2            THE COURT:  Okay.  Suppose he was not an immigrant?

3            THE WITNESS:  I'm sorry?

4            THE COURT:  -- and they just call -- they want to --

5   they're being very thorough, you know?  They looked on the

6   database, but they want to see maybe you have an address that

7   was not in the database in your prison folder, or maybe -- well,

8   let me ask you this:  When a prisoner is released, do you ask

9   for any information about where they're going to live or do you

10  just let them go?

11           THE WITNESS:  Yes, sir, we do.

12           THE COURT:  You do?

13           THE WITNESS:  Yes.

14           THE COURT:  All right.  And that could be different

15  than the address they gave the police, right?

16           THE WITNESS:  Yeah.  That's fair.

17           THE COURT:  All right.  So my -- let me go back to my

18  hypothetical.  So what -- if the police department called so

19  saying, we've looked at the database, but we want to know what

20  your records show about what address the prisoner gave you to

21  where he is going to live.  You would give them that

22  information?

23           THE WITNESS:  Yes, sir.

24           THE COURT:  Over the phone from a police officer?

25           THE WITNESS:  Most likely, yes, sir.

Cross-Examination - Abernathy/
Redirect Examination - Abernathy

1        THE COURT:  Okay.  Now, suppose this John Smith was

2   also -- you had -- when you looked at the file, you would see he

3   was an immigrant because you got the immigration warrant.  Would

4   you give that information to -- would you give it to the police

5   department if they called?

6        THE WITNESS:  Yes, sir.

7        THE COURT:  Would you give it to ICE if ICE called?

8        THE WITNESS:  If ICE was pursuing a criminal matter,

9   an active criminal investigation, then, yes, we would, but if

10  they were investigating a civil matter, we would not.

11       THE COURT:  Okay.  All right.  That's all.

12       Do you have any questions?

13       MR. GARG:  Nothing further, Your Honor.  Thank you.

14       THE COURT:  All right.

15       All right.  Mr. Tulante?

16       MR. TULANTE:  Your Honor, may I briefly?

17       THE COURT:  Yeah, sure.

18       MR. TULANTE:  And if Your Honor will indulge me, I

19  want to propose some hypotheticals to follow up --

20       THE COURT:  Go ahead.

21       MR. TULANTE:  -- on Your Honor's hypotheticals.

22                    REDIRECT EXAMINATION

23  BY MR. TULANTE:

24  Q    Let me propose a hypothetical of if there's an -- let's

25  start with P-2, that's the Executive Order 08-09.  Under the

1    hypothetical if there's an inmate, and let's say he's from the

2    Congo, right, he has -- he's here.  He's undocumented.  He's

3    released and ICE contacts prisons or police or some city agency

4    and says, you know, we believe he's involved in wrongdoing right

5    now, and we need his information, including status information.

6    Under section 3 -- 3(b)(3), and that's in P-2, do you -- can the

7    City share information or cooperate with ICE?

8    A    Yes, and -- which was the basis of my -- of my response to

9    the judge.

10   Q    And why is that?

11   A    Because it's -- again, it's as part of a -- that individual

12   is suspected of a crime and it's an ongoing criminal

13   investigation.

14   Q    And if you look at the -- now, turn to P-4.  This is the

15   Executive Order 05 -- 516.  Does this executive order speak to

16   any cooperation with respect to anyone after release?

17   A    I'm sorry.  Could you --

18   Q    So if ICE is asking information about someone who has been

19   released, they think he's a suspect, I'm just trying to clarify,

20   does that fall under this executive order or the other one?

21   A    The previous executive order.

22   Q    And if you -- counsel's set of questions regarding someone

23   being an alien, you know, what information you provide whether

24   someone is an alien, the City would provide, does the City have

25   any independent way, generally, of determining whether or not

1   the person ICE is referring is, in fact, an alien?

2   A    No, we do not.

3   Q    And why is that?

4   A    Again, the city officials don't -- don't inquire about

5   someone's documented immigration status.

6   Q    And if you go to P-5, which is your memorandum clarifying

7   the prison's cooperation or compliance with criminal judicial

8   warrants, has that understanding in terms of that prisons will

9   comply with criminal warrants without respect to whether it's a

10  first-degree or second-degree felony, has that understanding

11  been communicated to ICE directly?

12  A    Yes.

13  Q    In what form?

14  A    I spoke to Director Ritchey.

15  Q    And so, it was your understanding that ICE recognizes that

16  the City will comply with a warrant -- a criminal warrant

17  without reference to the nature of the --

18  A    That's --

19  Q    -- underlying crime?

20  A    That's my understanding, and we -- not only did I speak to

21  her, we actually had a meeting where we -- where Commissioner

22  Ross and I had a conversation about this subject specifically.

23          THE COURT:  Was there any significance of -- that this

24  was not put into an executive order, but it's just like an

25  internal memorandum?  Was there any thought that it ought to be

1  in a -- since it's modifying an executive order, that it ought

2  to be an executive order itself, or --

3          THE WITNESS:  There was some conversation --

4  conversation around it, but we believed that -- that the

5  memorandum would -- would, one, show the City's intent, and,

6  two, it's a judicial order, and, you know, just like when we

7  receive a judicial order to release someone, if we receive a

8  judicial order to keep someone, we're going to do that.

9          THE COURT:  Right.  Okay.  Thank you.

10  BY MR. TULANTE:

11  Q    And if you -- now I want to direct you to Exhibit P-6, and

12  that is, for the record, the sample of DHS Form I-247A.  And do

13  you see section two, where it says, "It is therefore requested

14  that you," and it says, "notify DHS," there's all this set of

15  that information.  Do you see that?

16  A    Yes.

17  Q    Is there anything there that seeks immigration status

18  information from the prisons?

19  A    No, it does not.

20  Q    And what does this seek that -- and, again, I'm talking

21  about the notify part not the maintaining custody.

22  A    Yeah.  It asks us to notify Immigration and Customs

23  Enforcement as early as possible and practical upon the release

24  of someone.

25  Q    And the -- I'm giving you whiplash because I'm taking you

1    back to an earlier exhibit.  If you go back to P-2, and that is

2    Executive Order 8-09, section three says, "As used here, and

3    confidential information means any information obtained and

4    maintained by city agency relating to an individual's

5    immigration status."  Do you see that?

6    A    Yes.

7    Q    And so, with respect to the set of questions counsel asked

8    you about all of this information relating to an alien, is that

9    subject to this executive order?

10   A    Yes.

11   Q    So -- well, I guess my question is, is asking somebody's

12   whereabouts, does this executive order make that confidential?

13   A    No.

14   Q    What does it make confidential?

15   A    It makes the individual's immigration status confidential.

16              MR. TULANTE:  Your Honor, I have no further questions.

17              THE COURT:  All right.

18              Anything else, Mr. Garg?

19              MR. GARG:  Nothing further, Your Honor.  Thank you.

20              THE COURT:  All right.  Thank you.

21              All right.  Thank you, Mr. Abernathy.

22              THE WITNESS:  Thank you, sir.

23              THE COURT:  You're excused.  Okay.  I would like to do

24   one more witness before we take a short lunch break.  What's --

25   how does your schedule seem -- we're proceeding?

1         MR. TULANTE:  I'm paid by the City, so I'm here.

2         THE COURT:  Sorry?

3         MR. TULANTE:  I think we have one more.  We can

4    squeeze one shorter witness in.

5         THE COURT:  All right.  But you have -- then you -- we

6    have three more witnesses in total, right?

7         MR. TULANTE:  Yeah, but they're -- they're much

8    shorter.  They're getting progressively shorter.

9         THE COURT:  All right, then.

10        MR. TULANTE:  So they're much shorter.

11        THE COURT:  All right.

12        Do you -- are you -- you're not entertaining to call

13   any witnesses at all?

14        MR. GARG:  That's correct, Your Honor, and cross of

15   the additional witnesses, I also expect, would be much shorter.

16        MR. TULANTE:  Yeah.

17        THE COURT:  All right.  Well, all right.  Let's do one

18   more witness.  Let's see where we are then, okay?

19        If you all agree, and it won't be short, I'm -- I'm

20   prepared to go ahead without a lunch break.  We could take a

21   short recess without a lunch break, and then --

22        MR. TULANTE:  I think -- I think we can -- well, I'm

23   looking at my coffee here.

24        THE COURT:  Well, we -- we -- let's do the one witness

25   and we'll see where we are.

1          MR. TULANTE:  Okay.  I think let's see where we are

2    after that.

3          THE COURT:  Who is the next witness?

4          MS. AHUJA:  Your Honor, the City calls Julie

5    Wertheimer to the stand.

6          THE COURT:  Okay.

7          THE COURT:  Okay.  She also submitted a declaration?

8          MS. AHUJA:  Correct.

9       (Pause)

10      (JULIE MICHELLE WERTHEIMER, Witness, is Sworn)

11          THE DEPUTY:  Thank you.  Please state your full name

12    and spell your last name for the record.

13          THE WITNESS:  Julie Michelle Wertheimer.

14          THE COURT:  You have to keep your voice up.

15          THE WITNESS:  Julie Michelle Wertheimer.

16          THE COURT:  That's much better.  All right.  Go ahead.

17          THE WITNESS:  Wertheimer is W- --

18          THE COURT:  Yeah.  Speak right into the microphone.

19    Go ahead.

20          THE WITNESS:  W-E-R-T-H-E-I-M-E-R.

21          MS. AHUJA:  Your Honor, may I proceed?

22          THE COURT:  Go ahead.

23                          DIRECT EXAMINATION

24    BY MS. AHUJA:

25    Q    Ms. Wertheimer, what is your position with the City of

Direct Examination - Wertheimer

1   Philadelphia?

2   A    I serve as Chief of Staff in the Office of Criminal Justice

3   which is a division of the Managing Director's Office.

4   Q    Did you prepare a declaration in support of the City's

5   motion for preliminary injunction in this matter?

6   A    Yes.

7   Q    Ms. Wertheimer, can you please turn to P-7 in the binder

8   before you?  It should be titled Declaration of Julie

9   Wertheimer.

10  A    Yes.

11  Q    Do you recognize P-7?

12  A    Yes.

13  Q    Turn to page 5.  Is that your signature?

14  A    Yes.

15  Q    Is this the declaration you submitted?

16  A    Yes.

17  Q    Do you adopt this testimony as yours today?

18  A    I do.

19  Q    Ms. Wertheimer, what are your responsibilities as chief of

20  staff in the Office of Criminal Justice?

21  A    In my capacity as chief of staff, I serve as the

22  Administration's liaison to the criminal justice agencies in the

23  county that are not under the executive branch, so, for

24  instance, the district attorney's office, the First Judicial

25  District, the public defender, the sheriff.  In addition,  I

Direct Examination - Wertheimer

1  work closely with the police department and the Department of

2  Prisons on policy, strategy, and grants, and I also oversee

3  smaller units that are not part -- that are not their own

4  department such as the Office of Violence Prevention, the

5  Philadelphia Re-entry Coalition.

6  Q    Do you also oversee all of the city's criminal justice

7  grants including the Byrne JAG grant?

8  A    Yes.

9  Q    What kind of grant is a JAG grant?

10  A    It's a formula grant.

11  Q    What is a formula grant?

12  A    A formula grant is a grant that is congressionally

13  allocated, and that allocation is attached to the notice of

14  financial assistance as part of the grant application.

15  Q    How is it calculated, the formula grant?

16  A    It's congressionally appropriated.  That formula is

17  determined based on a number of factors including the

18  jurisdiction's population and crime rate.

19  Q    And who determines that formula?  Who created that formula?

20  A    Congress.

21  Q    Does the city have to compete with other jurisdictions to

22  receive its Byrne JAG grant?

23  A    No.

24  Q    You testified in your declaration, you can turn to it on

25  paragraph 11, that Philadelphia applied for approximately 1.6

Direct Examination - Wertheimer

1  million in fiscal year Byrne JAG funding.  Who decides what that

2  money will be used for?

3  A    Well, in Philadelphia, like in many counties across

4  Pennsylvania, we have what's called a Criminal Justice Advisory

5  Board or CJAB.  The Criminal Justice Advisory Board is made up

6  of the top-level principals, stakeholders, of the major criminal

7  justice departments and agencies in the county.  The Criminal

8  Justice Advisory Board also has a number of subcommittees that

9  serve different functions including the Grant Subcommittee.  And

10 that Grant Subcommittee is charged with, among other things,

11 making decisions about how the annual JAG allocation will be

12 used in Philadelphia.

13 Q    How do they decide to fund one program over another?

14 A    So the decisions are made based on priority is shared

15 across the criminal justice system, urgency of need, and really

16 any pressing crises that maybe need addressing.

17 Q    For fiscal year 2017, what projects came to the forefront?

18 A    Well, the one that comes to mind is addressing the opioid

19 crises.  The police department requested funding for overtime

20 and for Narcan specifically targeted towards addressing that

21 epidemic.  In addition, my office requested funding for a case

22 management software, which would be used for both gun violence

23 prevention programs and re-entry programs to help deliver

24 limited resources in the most efficient and effective way

25 possible.

Direct Examination - Wertheimer

1   Q    Let's discuss the opioid epidemic for a moment.  Why was

2   funding for that specifically targeted for fiscal year 2017?

3   A    Well, in addition to it being a pressing crisis, I think

4   it's important to understand how the city's budget process work.

5   The way the budget -- we're on a fiscal year that begins on July

6   1, and we start developing our budget basically the November or

7   December prior.  A proposed budget is submitted by the mayor to

8   city council usually around February and council has a series of

9   hearings and then votes on it by May or June, and it goes into

10  effect on July 1.  When needs or additional resources are needed

11  after that February to May time frame, you usually have to wait

12  until the next budget cycle to get that funding in.

13  Q    Isn't that the next year?

14  A    The next year.  And it wouldn't go into effect until the

15  following July 1.  What the JAG grant provides for is the

16  flexibility to allocate funding to, you know, priorities that

17  pop up outside that budget development cycle.

18  Q    So what popped up recently?

19  A    Well, I think one thing that's an important thing to note

20  is in dealing with the opioid crisis, the city worked to seal

21  off the Conrail tracks.  And while that was a positive

22  development in a lot of ways, it also meant that the

23  neighborhoods and communities surrounding that area needed extra

24  resources, specifically extra police overtime, extra Narcan, to

25  help address the individuals who were suffering from addiction

1    who are moving into the communities.

2    Q    And when did that sealing occur?

3    A    I believe it was in August.

4    Q    So it would have been after the budget cycle?

5    A    After the budget cycle.

6    Q    Let's turn to the JAG grant process.  You testified in your

7    declaration at paragraph 5 that the city has applied for JAG

8    funding every year since the program's inception in 2005, and

9    that it has received funding for every single application; is

10   that correct?

11   A    Yes.

12   Q    Has the city always received its congressional allocation

13   every year without controversy?

14   A    Well, there was one year where mistakenly, through a typo,

15   we accidentally requested less than the allocation and received

16   notice from our program officer at the Bureau of Justice

17   Assistance that we needed to submit a revised budget for the

18   full allocation.

19   Q    Why did your program officer, your counterpart, ask you to

20   do that?

21   A    It was a congressionally appropriated allocation, and as

22   such, we were entitled to and had to apply for the full amount.

23   Q    Before fiscal year 2016, did the Department every direct

24   the city how to interpret and implement the city's own policies?

25   A    Not that I know of.

1    Q    Before the fiscal year 2016 JAG award, had the Department

2    ever conditioned the award of criminal justice funding on

3    assisting federal immigration enforcement efforts?

4    A    I'm not aware of any such conditions.

5    Q    Before the fiscal year 2016 JAG award, had the department

6    ever asked the city to change its policies based on the JAG

7    grant conditions?

8    A    No.  But the one notable exception is over time we've been

9    asked to update policies when there have been changes to the CFR

10   making sure our own policies mirror those updates.

11   Q    So mirror the Federal Code of Federal Regulations?

12   A    Yes.

13   Q    Let's turn to 2016.  Were any new conditions added to the

14   JAG grant application process?

15   A    Yes.

16   Q    What were the new conditions or condition?

17   A    There was a condition requiring that we certify compliance

18   with Section 1373.

19   Q    What was the form of that certification?

20   A    It was a letter from the city solicitor as well as an

21   accompanying legal brief.

22   Q    Before 2016, had DOJ ever asked for a legal opinion in

23   association with a JAG application or award before?

24   A    No.

25   Q    Is a formal legal opinion from the city solicitor required

1   to apply for any other criminal justice Grant?

2   A    No.

3   Q    You testified in your declaration about the new condition

4   that DOJ asked the city to certify for its fiscal year 2017 JAG

5   application.  What were the new conditions?

6   A    Well, in addition to requiring certification with 1373,

7   again, it also asked for certification regarding our policies to

8   provide upon scheduled release 48 hours' notice for individuals

9   that the Department of Homeland Security requests and provide

10  access to our jails for the Department of Homeland Security.

11  Q    Was the fiscal year 2017 JAG application different from

12  years prior?

13  A    Yes.

14  Q    How so?

15  A    In addition to requiring those three certifications, it

16  also required physical signatures and certifications from the

17  city solicitor and the mayor.

18  Q    In your experience in managing the application process over

19  the years, the grant application process, have you ever had to

20  obtain a signature by the mayor or a signature by the city

21  solicitor for a Department of Justice grant?

22  A    No.

23  Q    Has the city heard from the Department of Justice with

24  respect to its physical year 2017 JAG application?

25  A    No.

1   Q    Has the city heard from the department with respect to its

2   fiscal year 2016 certification of compliance for the 2016 JAG

3   award?

4   A    Yes.

5   Q    What has the city heard?

6   A    On October 12th, I received an email from Tracey Trautman,

7   the acting director of the Bureau of Justice Assistance.  In

8   that email was a letter dated October 11th to Mayor Kenney from

9   the Acting Assistant Attorney General Alan Hanson.

10  Q    Now is Ms. Trautman your counterpart or program officer

11  that you've mentioned previously?

12  A    No.

13  Q    Ms. Wertheimer, please turn to tab P-8 in the binder before

14  you.  Did -- is this the letter that you just referenced?

15  A    Yes.

16  Q    Now you -- if you need to refresh your recollection, you

17  may.  But in your words, what did the letter say to you?

18  A    The letter was to inform us that upon the Department's

19  preliminary review, they believe that we had policies that

20  either violated or appeared to violate Section 1373.

21  Q    Did the letter require any response from the City?

22  A    Yes.

23  Q    What response?

24  A    It required that for the policies that may violate that we

25  certify the Department's interpretation of those policies and

1   certify that we communicate that to both police officers and

2   civilian employees alike.

3   Q    And when is your answer due to the department?

4   A    Tomorrow, October 27th.

5   Q    Do you have an understanding of what would happen if the

6   City didn't submit an answer or didn't submit these required

7   certifications?

8   A    Well, while the letter doesn't directly state that, based

9   on previous communications including, I believe, a press

10  conference by the attorney general himself, there is suggestions

11  that they would try to claw back the FY '16 award.

12  Q    Has the FY '16 award already been obligated?

13  A    Yes.

14  Q    Has the City ever not received a grant from the Department

15  of Justice for which it had applied?

16  A    Yes.

17  Q    When?

18  A    Well, we apply for competitive grants from the Department

19  all the time.  Sometimes those applications are successful and

20  sometimes they're not.  For instance, last week we were notified

21  that our application for the comprehensive opioid abuse grant

22  program was unsuccessful.

23  Q    And that was a competitive grant obligation?

24  A    Yes.

25  Q    Have you ever been denied a formula grant?

Direct Examination - Wertheimer

1   A    No.

2   Q    Does the city receive any other annual formula grant

3   funding for support criminal justice broadly?

4   A    No.

5   Q    In the past, when -- excuse me, when Philadelphia received

6   JAG funding, how was that money processed by the City?

7   A    Well, we receive, via email electronically, an award letter

8   from the Department of Justice.  That award letter is executed

9   by an authorized official, in this case, the managing director.

10  The signed copy of the award letter is returned via email to the

11  Department of Justice.  And then a copy of said letter is

12  processed via our Administrative Services Unit to the Grants

13  Accounting Unit, which is a division of our Finance Department.

14  The Administrative Services Unit would accept what's called a

15  grant profile, which includes relevant information including the

16  grant award and the duration of the project.  What Grants

17  Accounting will do with that profile is set up what's called an

18  index code, or in some cases, multiple index codes.  And those

19  are six-digit codes that serve basically as different bank

20  accounts for different programs within the city's financial

21  system.  Once there's an index code in place, funds can be

22  encumbered upon it and spending can begin.

23  Q    Is there an index code for the JAG program?

24  A    For?

25  Q    For 2017.

Direct Examination - Wertheimer

1   A    For 2017?  No.  We have not received an award yet.

2   Q    How is JAG funding, like the 2017 JAG award, accounted for

3   in Philadelphia's budget?

4   A    Well, it's not accounted for in the general fund budget.

5   However, we have what's called the unanticipated grants fund,

6   which contains general appropriation power from which

7   departments can draw once a grant award is made.

8   Q    For the unanticipated grants fund, if a grant is ultimately

9   not granted, what consequence would that be for the City?

10  A    We'd be unable to spend that money and execute those

11  projects.

12  Q    Will any new funding be identified or money diverted for

13  these programs?

14  A    No.

15          MS. AHUJA:  One moment, Your Honor.

16          Mr. Garg, your witness.

17          THE COURT:  Are you finished?

18          MS. AHUJA:  I am.

19          THE COURT:  All right.  Cross-examine.

20          Well, let me ask one question.  Are you involved in --

21  you said your answer's due tomorrow, October 27th?

22          THE WITNESS:  Yes.

23          THE COURT:  Are you involved in the preparation of

24  that?

25          THE WITNESS:  I am not.

Cross-Examination - Wertheimer

1        THE COURT:  Go ahead.

2                    CROSS-EXAMINATION

3    BY MR. GARG:

4    Q    Hello, Ms. Wertheimer.  My name is Arjun Garg.  I'm with

5    the Department of Justice.

6    A    Hello.

7    Q    Following on the judge's question, I wanted to ask you do

8    you know if the City intends to submit a response tomorrow to

9    the preliminary assessment letter, PA?

10   A    I am waiting to hear back from the Law Department about

11   what they plan to do.

12   Q    Before the fiscal year --

13       THE COURT:  So you don't know?

14       THE WITNESS:  I cannot confirm that at this time.  No.

15       THE COURT:  All right.

16   BY MR. GARG:

17   Q    Before the fiscal year 2017 grant cycle, has Philadelphia

18   ever challenged a Byrne JAG grant condition?

19   A    I'm not aware of that.

20   Q    Now you -- what Counsel adopted the written testimony you

21   gave in your declaration --

22   A    Yes.

23   Q    -- as your testimony today, and I wanted to ask you about

24   one particular statement there.  And you're welcome to look at

25   your declaration.  It's P-7.  And I'm looking in paragraph 7 of

1  Exhibit P-7, your declaration, where you mention some uses of

2  the Byrne JAG funds that the City receives.  And I want to focus

3  on one of them in particular.  You say that, "Philadelphia has

4  relied on Byrne JAG funds to bolster re-entry programs for

5  formerly incarcerated individuals seeking to re-enter the

6  community."  Is that correct?

7  A    That's what it says.  Yes.

8  Q    Are you able to confirm that Philadelphia's Byrne JAG funds

9  were not used for re-entry services for any alien regarding whom

10  the City received a request from ICE as to that alien's

11  immigration's status?

12  A    I can't speak to the immigration status of program

13  participants.

14  Q    So the answer is no.  You're not able to confirm that?

15  A    No.

16          MR. GARG:  Thank you.  Nothing further.

17          THE COURT:  All right.  Redirect.

18          MS. AHUJA:  No redirect, Your Honor.

19          THE COURT:  All right.  Thank you very much.

20          THE WITNESS:  Thank you.

21          MS. AHUJA:  Ms. Wertheimer can be dismissed.  Thank

22  you.

23          THE COURT:  Well, Mr. Tulante, what's your pleasure?

24  It's 12:20.  How long do you think the other two witnesses will

25  take?

1        MR. TULANTE:  Probably about -- depending on cross,

2  like, 45 minutes total?

3        UNIDENTIFIED SPEAKER:  Yeah.

4        THE COURT:  How long?

5        MR. TULANTE:  About approximately 45 minutes total

6  with the two additional witnesses.

7        THE COURT:  Well, I'm fine with taking a 10-minute

8  recess, then, and then finishing without breaking for lunch.  Is

9  that your -- is that okay with you all?

10        MR. TULANTE:  We're fine.  The City's fine.

11        MS. GIBSON:  We may need 15 minutes, Your Honor, to

12  get the witness back.

13        THE COURT:  15-minute break?  That's all right.

14        Is that okay with you, Mr. Garg?

15        MR. GARG:  Yes, sir.  Thank you.

16        THE COURT:  All right.  Okay.  So 15 minutes, and then

17  we'll call the other two witnesses and -- without anything

18  further.  Okay?  Thank you.

19     (Recess is taken from 12:22 p.m. until 12:54 p.m.)

20        THE COURT:  Case briefly.  So please be seated.  Call

21  your next witness, please.

22        MR. PRATT:  Your Honor, next we'd like to call Dr.

23  Thomas Farley.

24        THE COURT:  All right.  Dr. Farley.

25        DEPUTY CLERK:  I have to swear you in.  Please raise

1  your right hand.

2       (THOMAS A. FARLEY, Witness, is Sworn)

3            DEPUTY CLERK:  Thank you.  Please state your full name

4  and spell your last name for the record.

5            THE WITNESS:  Thomas A. Farley, F-A-R-L-E-Y.

6            THE COURT:  Okay.  Good morning.  Please be seated.

7                        DIRECT EXAMINATION

8  BY MR. PRATT:

9  Q    Good afternoon, Dr. Farley.  Where are you currently

10  employed?

11  A    Philadelphia Department of Public Health.

12  Q    And one of the duties of your job?

13  A    We are responsible for protecting and promoting the health

14  of everyone in the city of Philadelphia.

15  Q    And what is your title?

16  A    I'm the health commissioner.

17  Q    And how does one become the health commissioner in

18  Philadelphia?

19  A    The mayor appoints the health commissioner based upon

20  someone's experience in public health.

21  Q    And how long have you been the health commissioner in

22  Philadelphia for?

23  A    Since February of 2016.

24  Q    Could you describe your educational background to the

25  Court?

1  A    I have a bachelor's degree in mathematics from Haverford

2  College.  I have a medical degree from Tulane University.  I

3  have a master's of public health at Tulane University.  And I am

4  board certified and -- completed residency and am board

5  certified in pediatrics.

6  Q    And could you also provide an overview of your professional

7  career?

8  A    I have been working in public health since 1987, when I

9  entered a two-year training program in epidemiology operated by

10  the Centers for Disease Control and Prevention.  It's called the

11  epidemic intelligence service.  After that time, I began to work

12  in public health at the Louisiana Office of Public Health doing

13  investigations of infectious disease outbreaks and then

14  increasing the control of infectious diseases for the State of

15  Louisiana, including control of HIV, other sexually transmitted

16  diseases, tuberculosis, and vaccine preventable diseases.

17        Excuse me.

18        After that, I became a professor and chair of the

19  Department of Community Health Sciences at the Tulane University

20  School of Public Health and Tropical Medicine in New Orleans.

21  Then I spent a year as the senior advisor to the Commissioner of

22  Health in New York City, Dr. Tom Frieden.  And then he was

23  selected to be the director for the Center for Disease Control

24  and Prevention, at which point, the Mayor of New York City

25  appointed me of health commissioner for New York City, and I

141

Direct Examination - Farley

1   served in that role from 2009 two 2014.

2   Q    And you mentioned that you were health commissioner for New

3   York City.  What were your duties as health commissioner for New

4   York City?

5   A    We were responsible for protecting and promoting the health

6   of the entire city's residents.  So infectious diseases, chronic

7   diseases, whatever health threats there were, we were there to

8   protect the health of the population and to promote their

9   health.

10  Q    And how many employees were in the health department in New

11  York City?

12  A    About 6,000.

13  Q    And you oversaw 6,000?

14  A    Yes.

15  Q    And how many residents were in New York City when you were

16  the health commissioner?

17  A    8.4 million.

18  Q    And does New York City have an immigrant population?

19  A    It does.  The last I checked, there were about -- 37

20  percent of the population of New York City was foreign born.

21  Q    And while you were health commissioner in New York City,

22  did your department service New York's immigrant communities?

23  A    We did.  We provide a wide range of services and -- from

24  infectious diseases to the health promotion and we have to deal

25  with that large immigrant population.

Direct Examination - Farley

1  Q    Do you have any academic appointments?

2  A    I do.  I'm an adjunct professor at the Columbia University

3  Mailman School of Public Health and also at the Tulane

4  University School of Public Health and Tropical Medicine.

5  Q    And have you authored any publications?

6  A    I have.  I've authored more than 100 publications and

7  scientific journals.  And I have authored or co-authored two

8  books on public health, one called Prescription for a Healthy

9  Nation, which lays out a strategy for promoting health across

10 the country.  And the other is called Saving Gotham, and it's a

11 history of public health in New York City from 2002 to 2013.

12 Q    And could you explain to the Court exactly what is public

13 health?

14 A    Let me explain what public health is and by contrasting it

15 to what medicine is about.  Medical care basically treats people

16 one at a time typically when they get sick and develop symptoms

17 and they seek care from a healthcare provider, and their goal is

18 cure.  Public health, by contrast, is focused not on individuals

19 but, instead, on entire populations; so in this case, the entire

20 population of the city of Philadelphia.  And our goal is less

21 cure than it is prevention.  We try to understand what are the

22 things that make people likely to get sick and look at those

23 diseases and conditions which are particularly prevalent in the

24 population and try to put in place policies and programs that

25 prevent them from getting sick.

1    Q     And as health commissioner of Philadelphia, do you oversee

2    Philadelphia's Department of Public Health?

3    A     I do.  And we are responsible for everyone in the

4    geographic area of Philadelphia, regardless of their -- whether

5    they are visitors or whether they're residents here or just

6    passing through.

7    Q     Approximately how many people?

8    A     1.56 million people is the number who are residents of

9    Philadelphia.

10   Q     And how many employees are employed by the Department of

11   Public Health?

12   A     About 1200.

13   Q     And do you know the size of Philadelphia's immigrant

14   population?

15   A     Approximately 200,000 people in Philadelphia are born in

16   foreign countries.

17   Q     And could you provide the Court with an overview of the

18   services that the Department of Public Health provides

19   Philadelphia?

20   A     The Health Department offers and provides a very wide range

21   of services to deal with different health threats.  So for

22   prevention and control of communicable diseases, we have a

23   program for HIV prevention and treatment, the program for the

24   treatment and prevention of other sexually transmitted diseases,

25   one for tuberculosis.  We work very hard to -- excuse me -- to

Direct Examination - Farley

1   increase the number of children in the city and adults in the

2   city who are immunized to prevent the spread of

3   vaccine-preventable diseases.

4          We're responsible for the prevention of chronic

5   diseases.  So we encourage people to quit smoking and be

6   physically active.  And we try to create conditions and make it

7   easier for people to do that.  We are -- we try to make sure

8   that women are healthy during pregnancy and to protect the

9   health of newborn infants.  We inspect restaurants so people are

10  less likely to get sick when they eat out.  And we also provide

11  primary care.  We have eight primary care clinics across the

12  city that offer a wide range of early clinical health services.

13  Q    And what are the costs to patients of receiving medical

14  care from the Department of Public Health?

15  A    Well, we will bill insurance if they have insurance, if

16  they were in our primary care clinics, but the cost is no cost

17  to the patient.

18  Q    Can -- so can they receive medical care from the Department

19  of Public Health if they do not have medical insurance?

20  A    Absolutely.  We welcome everyone to our doors.  And we see

21  ourselves as a safety net, a place where everyone can go

22  regardless of their ability to pay.

23  Q    Does immigration status figure into the Department of

24  Public Health's decision to provide service to any person?

25  A    It does not, you know.  Diseases don't respect borders.

Direct Examination - Farley

1   They don't respect laws.  We are responsible for the health of

2   everyone who is here regardless of their status.

3   Q    Could you turn to tab P-2 of the binder that's in front of

4   you?

5   A    All right.  Okay.

6   Q    Do you recognize this document?

7   A    I do.

8   Q    Is this document Executive Order Number 8-09, policy

9   concerning access of immigrants to city services?

10  A    It is.

11  Q    And was it signed by Mike -- Mayor Michael A. Nutter on

12  November 10, 2009?

13  A    Yes, it was.

14  Q    And are you familiar with this policy?

15  A    Yes, I am.

16  Q    Does the Department of Public Health comply with this

17  policy?

18  A    Yes, it does.

19  Q    Does this policy contain any provision that prevents city

20  employees from asking ICE about a person's immigration status?

21  A    It does not.

22  Q    Would any of the numerous employees that work in your

23  department ever have the need to ask ICE about a person's

24  immigration status?

25  A    No, we would never have that need.  It's not relevant to

1   us.

2   Q    Are you aware of any instances where an employee of the

3   Department of Public Health, in fact, asked ICE about a person's

4   immigration status?

5   A    No.

6   Q    Does this confidentiality policy -- or I'll refer to it as

7   the confidentiality policy going forward.  Does it assist your

8   department in providing services to all Philadelphians,

9   including immigrants?

10  A    It does.  It communicates to immigrants that they don't

11  need to fear by receiving public health services.  And so, that

12  encourages them to come in.  And it's very important to public

13  health that we welcome people of all statuses, so that they will

14  get those preventive services both for their health and for the

15  health of the people around them including the entire city.

16  Q    If the City did not have this confidentiality policy, how

17  would that impact the use of public health services by

18  Philadelphia's residents including immigrants?

19  A    I would be very concerned if the City had a policy or

20  practice in which they were not -- that they were aware of

21  information about immigration status and they were providing

22  that information to others because immigrants would then be

23  afraid to receive those preventive services.  That could be

24  harmful to their health if they're not getting preventive

25  services, for example, treatment of early diabetes.  So they're

1   likely to come up later to the hospital with a severe

2   complication of diabetes, but even more so for control of

3   infectious diseases.  If people are afraid because they may be

4   deported by coming to a clinic and divulging their immigration

5   status, they don't get vaccinated or they don't get treated for

6   the tuberculosis, then there likely to be -- pose a threat not

7   only to their health but also the health of the people around

8   them.

9   Q    Do immigrants in Philadelphia currently use the Department

10  of Public Health's services?

11  A    Yes, they do, very much.

12  Q    And which services do they use?

13  A    Well, really, all of our programs impact on immigrants.

14  But, in particular, we see a large number of immigrants in our

15  eight primary care clinics.

16  Q    And what types of services are offered at those clinics?

17  A    We provide vaccinations for children and adults.  We

18  provide prenatal care, family planning services, basic primary

19  care.  So if people come in and have aches and pains or other

20  problems, they're seen.  We manage their diabetes and their

21  hypertension.  We also provide dental care.  We do mammography.

22  And I guess that's the -- pretty much the full range of primary

23  care.

24  Q    Do you know how many patients on an annual basis are

25  provided care at the city's health clinics?

Direct Examination - Farley

1   A    About 80,000 unique patients.  About 320,000 total visits.

2   Q    Do you employ any bilingual staff?

3   A    We do.  We have about 120 of our staff who are bilingual.

4   And because we have so many immigrants in our clinics, we also

5   employ translators.  We have 19 full-time and part-time

6   translators, speaking a very wide range of languages, Spanish,

7   Mandarin, Cantonese, Vietnamese, Albanian, to assist our

8   patients who are immigrants.

9   Q    Are there any health clinics located in any areas that have

10  large immigrant populations?

11  A    There are -- all of our clinics see immigrants, but we have

12  two in particular that are in neighborhoods that have very large

13  immigrant populations.  There's Health Center 10 in the north

14  side of the city that serves a population that has many Indian

15  immigrants, Bengali, many from former Soviet states, Russians in

16  particular, also Albanians up there.  Then we have Health Center

17  2 on South Broad Street and that services a lot of people from

18  Southeast Asia, Vietnam, Cambodia, also Indonesia.  As a matter

19  of fact, we had a recent visit from the Indonesian consulate

20  because so many of their immigrants from that country were here

21  and receiving services at that clinic.

22  Q    And how would you describe the demand for services at those

23  clinics?

24  A    Demand is very heavy.  We have a waiting list for people

25  who have just a non-urgent matter and want a primary care visit.

Direct Examination - Farley

1   And we are seeking to build a much larger clinic to replace

2   Health Center 10 because we just can't accommodate all the

3   patients we need to see.

4   Q    Do immigrants in Philadelphia utilize your department's

5   vaccination services?

6   A    They do.  We vaccinate them in those clinics, and we -- and

7   they vaccinate in other sites.  We also take responsibility for

8   making sure the immunization levels are high everywhere.  But we

9   provide those in our eight clinics.

10  Q    Do you provide vaccinations to children as well?

11  A    Yes.

12  Q    And does the city's confidentiality policy help with your

13  vaccination program?

14  A    It does.  We communicate very clearly that we're going to

15  provide all services that are particular vaccination services,

16  regardless of people's immigration status, to encourage people

17  to come in so they don't get infected and so they don't pose a

18  risk to the people around them.

19  Q    And earlier you mentioned tuberculosis.  Does the health

20  department have a tuberculosis control program?

21  A    It does.  We have about 75 patients a year who have active

22  tuberculosis that we manage for their health and to protect the

23  people around them.

24  Q    And why is the tuberculosis control program important

25  especially for immigrant communities in Philadelphia?

1    A    Well, tuberculosis is far more common in many foreign

2    countries than it is in the United States.  About two-thirds of

3    the patients who have tuberculosis in Philadelphia are

4    foreign-born.  And it's been shown that if you manage that

5    problem well that you can prevent spread in their community.

6    And if you don't, you'll have increasing rates of tuberculosis

7    and many additional people who will get infected in that

8    community.  So we go to great lengths to make sure that the

9    people with -- diagnosed with tuberculosis are effectively

10   treated both for their sake and the people around them.

11   Q    And how is tuberculosis treated?

12   A    The standard of care which we follow is what we call

13   directly observed therapy.  That's where a staff member from the

14   health department actually observes the person taking their

15   medicine, typically three times a week for a period of months,

16   to make absolutely sure that they are taking those medicines

17   until they are cured.  That service can be provided in the

18   clinic with the patient coming into the clinic three times a

19   week or it can take place in the patient's home.  It's wherever

20   it's convenient.  So we devote an enormous amount of staff time

21   to absolutely be sure that those people are fully treated.

22            At the same time, we investigate their contacts, their

23   family members, to see if they also are infected with the

24   organism or have the disease.  We make sure that they're treated

25   as well.

1  Q    So directly observed therapy requires you to enter people's

2  homes on occasion?

3  A    It does and requires a very close personal relationship,

4  and a relationship of trust, or they would not allow us to

5  continue to come into their homes.

6  Q    And you said it also requires you to ask questions about

7  family members or other people they've come into contact with?

8  A    Yes.

9  Q    And how does the City's confidentiality policy help the

10  health department gain that trust to ask those questions and

11  enter into homes?

12  A    Yeah.  We make it very clear that immigration status is not

13  going to determine anything that we do, that they -- we want to

14  make sure that they're healthy regardless of immigration status.

15  If they felt that by us learning that they were undocumented

16  that they might offer some consequences of that, they would hide

17  from us, and they would not get the rest of their treatment.

18  They would probably get sicker and pose a risk to those around

19  them.

20  Q    Are you aware of any situations where immigrant communities

21  raise concerns about whether they would be treated differently

22  because of their status as immigrants with the health

23  department?

24  A    I am.  There was a meeting that took place at the municipal

25  services building a month or two after the election where a

1   number of immigrant groups had requested a meeting with the city

2   administration.  I did not attend that meeting, but my chief of

3   staff did attend on my behalf and said that people were very,

4   very concerned about the risks of the new federal

5   administration's policy.  And there was at least one group that

6   specifically mentioned that people's fear of deportation under

7   the policy might mean that parents would not be taking their

8   children to the clinics to get vaccination.  Even if those

9   children themselves were legal residents, if the parents

10  themselves are undocumented, then they would be afraid to bring

11  their children to the clinic, so the children would not be

12  vaccinated.  And again, that would be risk to them as well as

13  their larger community.

14  Q    Yeah.  And is that a concern --

15        MR. GARG:  Objection, Your Honor.  I'm sorry.  I

16  didn't want to interrupt the witness' question.  I believe that

17  was all hearsay testimony, Your Honor.

18        THE COURT:  Well, it was.  But, you know, you don't --

19  don't be afraid of interrupting if you have an objection.  Well,

20  it is hearsay.

21        MR. PRATT:  Your Honor, for the record, I would just

22  say, you know, hearsay is allowed at injunction hearings because

23  of the exigent nature of the proceedings.

24        THE COURT:  Well, I'm not --

25        MR. PRATT:  There's Third Circuit case law on that

Direct Examination - Farley

1    point.

2            THE COURT:  I'm not sure that's a Third Circuit rule.

3    I'd be interested in hearsay in a Third Circuit case that's held

4    that.  But let me -- who was your deputy that was at the

5    meeting?

6            THE WITNESS:  My chief of staff, Jane Baker.

7            THE COURT:  Jane Baker?

8            THE WITNESS:  Yes.

9            THE COURT:  Okay.  Well, do you want leave to call

10   her?  Is she available to come in any time today or tomorrow?

11           MR. PRATT:  I don't --

12           THE COURT:  I mean if it's important, I would rather

13   have direct testimony to tell you the truth.

14           MR. PRATT:  We can forego it for today, Your Honor.

15           THE COURT:  All right.  Well, do you have any other

16   knowledge of this -- the impact of the federal regulations on

17   your -- on the operations of your department pertaining to

18   immigrants?

19           THE WITNESS:  I would just say, in general, it's the

20   practice of public health to welcome everyone, regardless of

21   immigration status and to convince people that they should be

22   trusting us.

23           THE COURT:  Was that your practice in New York City?

24           THE WITNESS:  Absolutely.  Yes.  As a matter of fact,

25   there's a -- the poster in New York City that warns people about

1   tuberculosis has very much right there on the poster that we

2   don't ask about immigration status because we want to

3   communicate that right up front.

4          THE COURT:  Does Philadelphia have such a practice on

5   posters?

6          THE WITNESS:  We have a practice.  We don't have a

7   poster like that.

8          THE COURT:  You don't.

9   BY MR. PRATT:

10  Q    Is there a website, Dr. Farley, that contains something to

11  that effect?

12  A    There is a website at the health department that does say

13  that we don't ask about immigration status.  I believe it's on

14  our vaccination page.

15         THE COURT:  All right.  Why do you -- and well, just

16  from your own knowledge, without relying on hearsay, why do you

17  think that's relevant and important for the discharge of your

18  duties?

19         THE WITNESS:  Well, it's important for us to be able

20  to provide services to people because they're preventive in

21  nature, both for their health and the health of the community.

22  And there's -- it's logical to assume that if people are afraid

23  that by divulging their status to us they're going to suffer the

24  consequences that are adverse, like deportation, that people are

25  going to hide from us and not participate in those services.

Direct Examination - Farley

1          THE COURT:  You know that of your own knowledge?

2          THE WITNESS:  Yes.

3          THE COURT:  All right.  Next question.  I'm going to

4  strike his answer about what he was told from Jane Baker.  Go

5  ahead.

6  BY MR. PRATT:

7  Q    Does the Department of Public Health cooperate with the

8  federal government on any initiatives?

9  A    Yes, it does.

10  Q    Could you give a few examples?

11  A    Yes.  We work very closely with the Centers for Disease

12  Control and Prevention on a wide range of communicable disease

13  control programs.  They provide funding to us in the form of

14  cooperative agreements.  We work with them based on their

15  protocols.  So that would include tuberculosis control, HIV/AIDS

16  prevention, prevention of other sexually transmitted diseases,

17  vaccine preventable disease programs.  It would include chronic

18  disease programs.

19          We also work with the Health Resources and Services

20  Administration which is a branch of the Department of Health and

21  Human Services.

22          THE COURT:  What's that called?

23          THE WITNESS:  The Health Resources and Services

24  Administration.

25          THE COURT:  Is that part of HHS?

Direct Examination - Farley/
Cross-Examination - Farley

1        THE WITNESS:  It's part of HHS.  They provide funding

2   to us for HIV treatment as well as maternal and child health.

3   And so, that's actually a large amount of funding for treatment

4   of people with HIV infection for their health and also to

5   prevent them from spreading the infection in the community.

6        MR. PRATT:  Your Honor, those are all the questions I

7   have for now unless you have additional ones.

8        THE COURT:  No, I don't have any.

9        Well, let's have Mr. Garg cross-examine.

10        MR. GARG:  Yes, Your Honor, briefly.

11                    CROSS-EXAMINATION

12   BY MR. GARG:

13   Q    Good afternoon, Dr. Farley.  My name is Arjun Garg.  I'm

14   with the Department of Justice.  Are you aware that this case is

15   about funding under the federal Byrne JAG Grant Program?

16   A    I'm aware of that, but I don't know anything beyond that.

17   Q    Sure.  I understand that.  Do you know, under the city of

18   Philadelphia's fiscal year 2017 Byrne JAG funding application,

19   would the Department of Public Health receive Byrne JAG funds?

20   A    We don't receive funds from them.  I imagine that we

21   wouldn't be in the future.

22   Q    Has any city authority reached out to the Department of

23   Public Health to ensure compliance with any Byrne JAG grant

24   conditions to your awareness?

25   A    No.

Cross-Examination - Farley/
Direct Examination - Gladstein

1          MR. GARG:  Thank you.  Nothing further.

2          THE COURT:  All right.  Redirect.

3          MR. PRATT:  Nothing further, Your Honor.

4          THE COURT:  Okay.

5          All right.  Thank you very much, Dr. Farley.

6          THE WITNESS:  Thank you.

7          THE COURT:  Next witness.

8          MR. PRATT:  Next, we'd like to call Eva Gladstein.

9          THE COURT:  Okay.  All right.  Well, once again, she

10    submitted a declaration.  So --

11         MR. PRATT:  Yes.

12         THE COURT:  Someone is going to get her I assume?

13    Yeah.

14      (Pause)

15         DEPUTY CLERK:  Please raise your right hand.

16      (EVA GLADSTEIN, Witness, is Sworn)

17         DEPUTY CLERK:  Okay.  Please state your full name and

18    spell your last for the record.

19         THE WITNESS:  Eva Gladstein, G-L-A-D-S-T-E-I-N.

20         THE COURT:  All right.  Have a seat.  Keep your --

21    speak right in the microphone.  Keep your voice up, please.

22         THE WITNESS:  Yes.

23                   DIRECT EXAMINATION

24    BY MR. PRATT:

25    Q    Good afternoon, Ms. Gladstein.  Where are you currently

**AEQUUM LEGAL TRANSCRIPTION SERVICES**
**480-241-2841**

Direct Examination - Gladstein

1  employed?

2  A    I'm employed with the City of Philadelphia in the managing

3  director's office.

4  Q    And what is your current title?

5  A    Deputy managing director for Health and Human Services.

6  Q    And could you describe your educational background?

7  A    I have a bachelor's in urban studies from Temple

8  University.

9  Q    And could you give the Court an overview of your

10  professional career?

11  A    Yes.  I spent about 25 years in the non-profit sector in

12  the City of Philadelphia, primarily doing community organizing,

13  housing policy, and housing service provision.  I entered city

14  government in September 1998.  And since that time, I've had

15  five or six different positions in the City of Philadelphia that

16  range from human service to community development positions.

17  Q    And in any of those prior positions have you had experience

18  working with immigrant communities in Philadelphia?

19  A    Yes, I have.

20  Q    And what are your duties as deputy managing director of

21  Health and Human Services?

22  A    I oversee and coordinate the services of five city

23  departments.

24  Q    And could you identify those departments and what they do?

25  A    Yes.  The Department of Human Services, which is the City's

1  child welfare agency, the Department of Public Health, the

2  Department of Behavioral Health and Intellectual Disability

3  Services, the Office of Homeless Services, and the Office of

4  Community Empowerment and Opportunity, which is the City's

5  anti-poverty agency.

6  Q    And do you communicate with those departments on a regular

7  basis?

8  A    Yes, I do.

9  Q    And how would you describe the overall purpose of having a

10  Health and Human Services enterprise in city government?

11  A    Well, we are responsible for providing immediate and direct

12  services to the city's most vulnerable population and our goal

13  is to try to make sure that people are healthy and stable and to

14  ensure their well-being.

15  Q    And do immigrant residents in Philadelphia utilize the

16  services of Health and Human Services?

17  A    Yes, they do.

18  Q    Could you turn to tab P-2 in the binder that's in front of

19  you?

20  A    Yes.

21  Q    Do you recognize this document?

22  A    Yes, I do.

23  Q    Is it Executive Order 8-09, policy concerning access of

24  immigrants to city services?

25  A    Yes, it is.

Direct Examination - Gladstein

1  Q    And was it signed by Mayor Michael Nutter on November 10,

2  2009?

3  A    I see his signature and date, so yes.

4  Q    And do the agencies and departments that you oversee comply

5  with this policy?

6  A    Yes, they do.

7  Q    Does this policy contain any provision that prevents city

8  employees from asking ICE about a person's immigration status?

9  A    No, it does not.

10 Q    Would any of the employees that fall under Health and Human

11 Services, including all five departments, ever have the need to

12 ask ICE about a person's immigration status?

13 A    To date, we have not had the need to do that.

14 Q    Are you aware of any instances where a city employee, in

15 fact, contacted ICE to ask about a person's immigration status?

16 A    No, I am not.

17 Q    Does this policy, which I'll refer to as the

18 confidentiality policy, aid Health and Human Services in

19 providing services to all Philadelphians including immigrants?

20 A    Yes, it does.  It removes barriers that would otherwise

21 impede people to access the services.

22 Q    Can Philadelphia residents utilize the services and

23 programs offered by your department without regard to their

24 immigration status?

25 A    Yes, they can.

1  Q    And do you know whether immigrant communities in

2  Philadelphia, in fact, use services such as services offered by

3  the Department of Behavioral Health?

4  A    Yes.  We're aware of immigrant populations using those

5  services.  In fact, we do specific outreach to different

6  communities and have language and cultural capacity, as

7  necessary, to serve those communities.

8  Q    And what are some of the services that they use?

9  A    In the Department of Behavioral Health and Intellectual

10 Disability Services, they provide treatment services, education

11 and outreach around mental health, around substance use

12 disorder, which is a particularly big issue right now with the

13 opioid crisis, and also early intervention services, where they

14 help assess and provide services to young children age 0 to 2

15 who are not meeting developmental milestones to help them reach

16 those milestones so they're ready to begin school.

17 Q    And how do you think the City's confidentiality policy

18 helps the Department of Behavioral Health offer those services

19 to the immigrant communities?

20 A    Again, many of these services or issues or stigmatized and

21 it's difficult for people, sometimes parents to accept that

22 their child might need those services or a family member to

23 accept that they might need those services.  And so, removing

24 any barriers is really important to engage people and have them

25 come in for treatment or support.

1    Q    Does the Department of Human Services interact with

2    immigrant communities at all?

3    A    Yes, it does.

4    Q    And could you describe how that happens?

5    A    Well, one of their primary services is that they operate a

6    hotline, a child hotline.  And they receive reports of suspected

7    abuse or neglect of children.  And then it is their

8    responsibility to investigate those cases to see whether they're

9    founded or unfounded, and if founded, to provide supports to

10   that child and that family.  In doing that investigation, it's

11   very important for them.  They have to talk to family members

12   and have a trusting relationship with the family.  Could be

13   other supports in the community, less direct kin, and it's

14   important for them to be able to have that relationship to

15   conduct an appropriate investigation.

16   Q    And if the City did not have its confidentiality policy,

17   how do you think the Department of Human Services' interactions

18   with immigrant communities would be impacted?

19   A    I would expect that we would have less participation from

20   those communities.  And then, in fact, it would have a chilling

21   effect on our ability to buy those services.

22   Q    Do immigrant communities in Philadelphia utilize services

23   offered by the Office of Homeless Services?

24   A    Yes, they do.

25   Q    And what are some of the services that are used?

Direct Examination - Gladstein

1    A    Again, we provide prevention services to help prevent

2    homelessness.  We also provide emergency shelter.  We provide --

3    we provide transitional housing.  Among those services are

4    domestic -- a domestic violence hotline and domestic violence

5    shelters and transitional housing.

6    Q    And how does the -- how would those services be impacted or

7    the utilization of those services be impacted if the city did

8    not have its confidentiality policy?

9    A    Again, it's important to remove barriers so that people

10   feel comfortable accessing those services.  They might not be

11   safe in their current housing situation either because of the

12   housing condition or because of, potentially, some familial

13   violence.  So it's important for them to be able to contact us

14   and have a trusted relationship and then access those services.

15   Q    Are there any situation think of where your departments and

16   agencies work together with the federal government?

17   A    Yes.  We've had a number of instances.  I can give a few

18   examples.  One was during recent events that required national

19   security including the DNC Convention.  Before that, the visit

20   of the Pope.  Our Office of Homeless Services had to cooperate

21   with and through other city departments with regard to outreach

22   to people who are living on the street and et cetera.

23   Certainly, our Department of Public Health has cooperated around

24   public issues, including probably most recently the Zika virus

25   and, hopefully, upcoming opioid crisis.

1  Q    And could you turn to tab P-9 in the binder in front of

2  you?

3  A    Yes.

4  Q    Do you recognize this document?

5  A    Yes, I do.

6  Q    Is it your declaration?

7  A    Yes.

8  Q    And is that your signature on page 4?

9  A    Yes, it is.

10  Q    And is this declaration still accurate to the best of your

11  knowledge?

12  A    Yes, it is.

13         MR. PRATT:  Your Honor, I have no further questions

14  unless you have something additional.

15         THE COURT:  Mr. Garg, any questions?

16         MR. GARG:  Yes, I do.

17                     CROSS-EXAMINATION

18  BY MR. GARG:

19  Q    Good afternoon, Ms. Gladstein.  My name is Arjun Garg with

20  the U.S. Department of Justice.

21  A    Good afternoon.

22  Q    I believe you testified just now -- you are looking at

23  Exhibit P2, which are welcome to flip to.  It's Executive Order

24  8-09.  And I think you are asked about section 2 of that, policy

25  in P2, Executive Order Number 8-09.

1   A    Yes.

2   Q    And I think you testified it's your understanding that this

3   executive order does not prohibit a city employee from

4   requesting immigration status from ICE?

5   A    Yes.

6   Q    Did you have that understanding prior to today?

7   A    Yes, I did.

8   Q    Now turning to your declaration, you just adopted.  It's at

9   P9.  Looking at paragraph 5.  It says -- I'm just reading the

10  text.

11             "For many years, it has been the practice and policy

12             of the City to refrain from asking for immigration

13             status information unless doing so is necessary to

14             determine benefits eligibility or otherwise required

15             by federal or state law."

16        I just wanted to ask you can you describe any examples

17  where asking for immigration status information is required by

18  federal or state law?

19  A    To my knowledge, I'm not aware of any within our agencies,

20  the agencies that I oversee.

21             MR. GARG:  Nothing further.  Thank you very much.

22             THE COURT:  Redirect.

23             MR. PRATT:  Nothing further, Your Honor.  But we would

24  like to move Exhibits P1 through P9 into evidence.

25             THE COURT:  Any objection?

1          MR. GARG:  No objection, Your Honor.

2          THE COURT:  They'll all be admitted.

3     (Plaintiff's Exhibits P-1 through P-9 admitted.)

4          THE COURT:  Okay.  All right.  Any other evidence, Mr.

5  Tulante?

6          You may step down.  Thank you.

7          THE WITNESS:  Thank you.

8          THE COURT:  But you may stay in the courtroom.

9          MR. TULANTE:  With that, the --

10          THE COURT:  I'm sorry?

11          MR. TULANTE:  With that, the City rests for purposes

12  of this hearing.

13          THE COURT:  Okay.  All right.  So your exhibit have

14  been moved.

15          Any evidence by the Defendant?

16          MR. GARG:  Your Honor, we have nothing further to

17  offer.

18          THE COURT:  All right.  Well, what -- tell me.  What

19  should I do about the Brown declaration as to which certain

20  paragraphs of been disputed?

21          MR. GARG:  Your Honor, well, we think the Brown

22  declaration is in the record.  I think, personally, I need to go

23  back through the transcript to see exactly what they've disputed

24  here today.  You know, we welcome Your Honor weighing those as

25  you see fit to the extent that you see disputes there.

1          THE COURT:  Any response?

2          MR. TULANTE:  Your Honor, that's fair.  I mean,

3    obviously, we --

4          THE COURT:  All right.

5          MR. TULANTE:  -- through the testimony by the police

6    commissioner.

7          THE COURT:  Now all right.  Well, we all know we have

8    the argument next Thursday.  Now will your acting assistant

9    attorney general be able to attend as you had requested?

10          MR. GARG:  I think that is his goal.  I don't have 100

11    percent confirmation as I stand here now.

12          THE COURT:  All right.  Well, you're always welcome.

13          MR. GARG:  I appreciate that, Your Honor.

14          THE COURT:  Yeah.  All right.  Now I would like to

15    have findings of fact -- proposed findings of fact on one issue

16    in this case and that's the 1373 issue.  It's been briefed by

17    both of you.  I'm not asking for conclusions of law because it's

18    been briefed.  But to the extent that either of you believe

19    there are any factual issues, I would like to have you submit

20    them either based on facts that are in the exhibits that were

21    attached that have not been disputed or facts that were brought

22    up in the testimony today.  I'm not suggesting that new

23    affidavits would be filed.  That's not -- I don't think that's

24    appropriate.  I'm asking for -- the proposed findings be based

25    on what is already in the record with one exception.  And that

1   is the testimony is that the City's response to the DOJ letter

2   is due tomorrow.

3            Mr. Tulante, can you tell -- is the City going to

4   file -- submit a response?

5            MR. TULANTE:  That is correct.  It's our intention to

6   file a response.

7            THE COURT:  It's what?

8            MR. TULANTE:  It is our intention to file a response.

9            THE COURT:  All right.  Well, I think that ought to be

10  submitted too as part of the record of this case if there is no

11  objection by the Government.

12           MR. GARG:  No objection, Your Honor.

13           THE COURT:  All right.  And I think -- and I don't

14  know what it's going to say.  And I don't want to know right

15  now, you know, because it's not due until tomorrow.  But I think

16  that you ought to submit it.  And it could be submitted by

17  letter if you want to --

18           MR. TULANTE:  We'll provide a courtesy copy to the

19  Court.

20           THE COURT:  But I think it should be docketed --

21           MR. TULANTE:  Yeah, okay.

22           THE COURT:  -- and obviously given to Mr. Garg.  But

23  more than that, I think the -- both parties should have the

24  opportunity to submit proposed findings on the 1373 issue.  Now

25  I say that for a couple reasons.  One is that the Chicago

1   decision, which I understand is on appeal, the judge did not

2   grant a preliminary injunction on the 1373 issue.  He did issue

3   a nationwide injunction on the other two issues, and I -- we've

4   previously discussed.  I think at least the City intends that I

5   should address those issues in this case because Philadelphia

6   has some facts that are different from Chicago and it's my

7   intention to do that.  But I don't need proposed findings of

8   fact on that issue.  But I would like them on the 1373 issue,

9   and I'd like them to be in numbered paragraphs.  I'm not going

10  to require you to get the transcript and make citations to the

11  pages.  But if you're relying on exhibits, I think you should

12  identify the exhibit number either today or attached to your

13  brief or if it's a matter of public record, that it would be

14  admissible under the Federal Rules of Evidence without

15  testimony.  That would be appropriate as well.

16          But I'd like it limited to 10 pages, because I --

17  there is a limited amount of time you have between now and next

18  Wednesday, when I would need it, but if you can submit it by

19  noon on next Wednesday, so we'll have that afternoon to review

20  it, and it may come up at the argument.  So we'll have the

21  argument on Thursday morning.  And I think I had indicated

22  10:00, but I would like to move it up to 9:30 if that's all

23  right with everybody and I'll have the morning to devote to

24  this.  And I may submit some questions to counsel before that

25  I'm -- that I'd like you to be particularly prepared to address

1   on some of the legal issues.

2            And so, we'll adjourn now.  And I want to thank you

3   for all your attention to presenting this efficiently and -- on

4   both sides and being so well-prepared as you were.

5            Okay.  Anything further from counsel?

6            MR. TULANTE:  Your Honor, one second.  Your Honor,

7   given the absence of a formal transcript, you know, we've taken

8   notes obviously.

9            THE COURT:  Right.

10           MR. TULANTE:  Can we make reference to the testimony

11  today?

12           THE COURT:  Yeah, sure.

13           MR. TULANTE:  Okay.  I just want to --

14           THE COURT:  You don't need to order the transcript for

15  next Thursday.

16           MR. TULANTE:  Okay.

17           THE COURT:  Yeah.  We've been taking notes, and a lot

18  of it is, you know, just explanatory of what's already in the

19  exhibits.

20           MR. TULANTE:  And in particular, given that

21  Commissioner Ross didn't submit a declaration, once again, it's

22  just --

23           THE COURT:  Yeah.  No, I don't need the transcript.

24  But I think you should -- your findings of fact should rely on

25  facts that are in evidence.

1          MR. TULANTE:  Absolutely.  Absolutely.

2          THE COURT:  And -- or facts that are subject to

3    judicial notice under the Rules of Evidence, okay?

4          MR. TULANTE:  All right.

5          THE COURT:  All right.  Thank you very much.

6          MR. TULANTE:  Thank you, Your Honor.

7          THE COURT:  Court is adjourned.  I'll see you next

8    Thursday, 9:30.

9          MR. GARG:  Thank you.

10       (Proceedings adjourned at 1:35 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**CERTIFICATION**

       I, EILEEN DHONDT, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.


EILEEN DHONDT, CET 807
Aequum Legal Transcription

Dated:  October 27, 2017