**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| THE CITY of PHILADELPHIA,<br><br>    Plaintiff,<br><br>v.<br><br>JEFFERSON BEAUREGARD SESSIONS III, in his official capacity as Attorney General of the United States,<br><br>    Defendant. | Case No. 2:17-cv-03894-MMB |

**PLAINTIFF'S SUPPLEMENTAL BRIEF IN SUPPORT OF**
**MOTION FOR PRELIMINARY INJUNCTION**

Pursuant to the Court's November 2, 2017 letter, Plaintiff City of Philadelphia ("the City"), by and through its counsel, respectfully submits the following supplemental brief.

**A. The Attorney General Lacks the Authority to Impose the Notification-of-Release Condition on the City as Part of its JAG Grant.**

At the November 2 oral argument on the City's motion for a preliminary injunction, the Department of Justice stated that the "main" area where the Department "think[s] the City is not in compliance" with the new JAG conditions, including the Section 1373 condition, is that "the City does not give ICE the information it would like to have" in terms of 48-hours advance notification of the release of individuals from the City's prisons. Tr.[1] (Nov. 2) at 85:8-9; *id.* at 101-103. But the Attorney General lacks the authority *as a matter of law* to impose this advance notification condition on the City as a part of its JAG award. That is so for three reasons.

First, as Philadelphia explained in its briefs, the Department cannot attach the notification condition as an independent requirement to the City's JAG award because it does not fall into any of the three buckets of authority that Congress delegated to the Attorney General in the JAG statute. PI Mem. 17-21 (Dkt. 21-1). Requiring advance notice of release is not a condition pertaining to the use of JAG funds; it has nothing to do with programmatic or financial integrity; and it does not trace to any "federal law"—rather, it is a new obligation that the Department has concocted. The condition thus finds no place in the underlying statute. Congress did not give the Department the authority to add this type of mandate to localities' formula grants. *See City of Chicago v. Sessions*, 2017 WL 4081821, at *7 (N.D. Ill. Sept. 15, 2017).

Second, the Department cannot avoid that conclusion by stretching the plain language of Section 1373 to encompass something it does not: release date information. For the first time

---

[1] References to "Tr." are to the expedited transcripts of the November 2, 2017 oral argument and the October 26, 2017 evidentiary hearing.

since Section 1373's enactment in 1996 and since the JAG program's inception in 2005 (and notably, only after a judge in Chicago enjoined the Department from adding the notification condition independently), the Department took the position on October 11, 2017[2]—in its letter to the City and its Opposition brief filed in this Court—that Section 1373(a) and (b)'s reference to "information concerning citizenship or immigration status" includes information about an individual's whereabouts, including his or her upcoming release from custody. A person's physical location is indicative of his or her "presence," the Department said, which is in turn connected to "immigration status." Opp. 38 n.11 (Dkt. 28). At oral argument, the Department repeated this tortured reading of Section 1373, stating that "[in] our view . . . information regarding immigration status . . . [is] much broader than just immigration status, [and it] includes release date information." Tr. (Nov. 2) at 101:23-25.

The language of Section 1373 cannot bear the Department's construction. The phrase "information concerning citizenship or immigration status" means what it says: information about whether a person is a citizen by birth or naturalization, or is within in the United States pursuant to green card, visa, or some other category of admission recognized by the INA. Physical location at any given point in time is neither citizenship nor immigration status. "[I]t is presumed that Congress expresses its intent through the ordinary meaning of its language," *United States v. Diallo*, 575 F.3d 252, 256 (3d Cir. 2009), and it is only where a statute's

---

[2] The Department's October 11 letter was in response to the City's certification of compliance with Section 1373 for its FY 2016 JAG award, funding which the City has already received and obligated. Tr. (Oct. 26) at 133:12-13 (Wertheimer). In the past, the Department has indicated that it may try to "claw back" grants already received, if localities fail to comply with Section 1373. *Id*. at 133:5-11. Although the present lawsuit is addressed to the City's FY 2017 JAG award, this Court's decisions about the Department's authority to impose the Section 1373 condition and the City's compliance with it could affect the City's 2016 award as well. If the Department were to try to claw-back the 2016 award, the City would promptly move to amend the Complaint and expand the scope of any injunctive relief to cover the FY 2016 JAG award.

ordinary meaning would produce "absurd results" that a court should employ additional interpretive devices, *Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004). There is nothing absurd about reading "information concerning citizenship or immigration status" to mean just that. Numerous courts have done so, *see Hisp. Int. Coal. of Ala. v. Governor of Ala.*, 691 F.3d 1236, 1248 (11th Cir. 2012); *Lozano v. City of Hazleton*, 620 F.3d 170, 194-196 (3d Cir. 2010), *judgment vacated on other grounds*, 563 U.S. 1030 (2011); *Bologna v. City and Cnty. of S.F.*, 192 Cal. App. 4th 429, 430-440 (Cal. Ct. App. 2011), and the one court to have considered the argument that the phrase refers to a person's release date rejected it, *Steinle v. City and Cnty. of S.F.*, 230 F. Supp. 3d 994, 1015 (N.D. Cal., 2017) (finding such a reading not "plausible").

It is the Department's new construction of Section 1373(a) and (b) that would produce an absurdity. If "information concerning immigration status" were to encompass information about a person's whereabouts, that would mean Section 1373 bars States and localities from having *any* law or policy that affords confidentiality to information about the physical places an individual frequents. Records of a person's visit to a pregnancy counseling center, treatment in a drug rehabilitation facility, visit to a school, or even membership at an LGBT center, would all conceivably have to be disclosed to federal authorities (if they requested it). The privacy implications of such a reading of Section 1373 are considerable. *See Whalen v. Roe*, 429 U.S. 589, 599 (1977) (recognizing a privacy interest protected by the Fourteenth Amendment's Due Process Clause in "avoiding disclosure of certain personal matters"); *Sterling v. Borough of Minersville*, 232 F.3d 190, 196 (3d Cir. 2000) (same, as to sexual orientation); *United States v. Westinghouse Elec. Corp.*, 638 F.2d 570, 577 (3d Cir. 1980) (same, as to one's medical records). There is no need for this Court to open that Pandora's box.

The third reason that the Attorney General cannot impose the advance notification on Philadelphia is that, even if such a requirement could somehow be read into Section 1373, the Attorney General *also* lacks the authority to impose the Section 1373 condition on the City in conjunction with its JAG award. Section 1373 is not an "applicable Federal law" under 34 U.S.C. § 10153(a)(5)(D), because it is not a federal statute or regulation that governs federal grantees. PI Mem. 18-19. Moreover, the inclusion of the Section 1373 condition in the City's JAG award raises considerable problems under the Spending Clause. *Id.* at 34-39.

### B. Philadelphia Provides Advance Notification of Release to ICE in a Number of Contexts, and the Additional Notice the Department is Requesting is Impractical.

A second point that bears reiterating after the November 2 argument (*see* Tr. at 81:7-83:18), is that the City does, in fact, provide advance notice of release to ICE if the notification request is supported by a criminal judicial warrant. Philadelphia Managing Director Brian Abernathy's Memorandum of March 22, 2017 clarified and overrode any contrary indication within Detainer Order II. Pl. Proposed FOF ¶ 16 (Dkt. 65). When a criminal judicial warrant is presented, the City will comply with an ICE notification request without regard to the degree of crime alleged or committed, *id.*—and, importantly, ICE understands this. Tr. (Oct. 26) at 120:6-22. Of the 140 such requests that Philadelphia has received since December 2014, approximately four were supported by a judicial warrant. Tr. (Oct. 26) at 80:1, 93:1-7 (Abernathy). ICE could certainly seek to obtain more criminal judicial warrants if it wanted to.[3]

---

[3] Note that the criminal judicial warrant which ICE would obtain, to the City's understanding, would be for a *current* criminal investigation—not a previous crime for which an individual was already convicted. *See* Tr. (Nov. 2) at 85:16-87:2 (discussing this issue). A prior conviction could conceivably make a person subject to removal under the Immigration and Nationality Act, *see* 8 U.S.C. §1127(a)(2), but it most likely would not be grounds upon which the Department of Justice or ICE could obtain a *new* criminal warrant. Nonetheless, the point is that ICE is free to seek whatever criminal judicial warrants are available, and attach them to notification requests.

4

The factual record developed also demonstrates that the additional notification ICE seeks is largely impractical to provide. Of the 6,833 people in Philadelphia's prison facilities currently, approximately 83% have not yet been sentenced to any crime. Tr. (Oct. 26) at 80:14, 89:16-19, 91:1-7 (Abernathy). Approximately 78% have not even been convicted of a crime. Abernathy Decl. ¶ 6 (Dkt. 21-5). For this sizable proportion of Philadelphia's prison population, providing advance notice of release is often not feasible because release tends to happen spontaneously. A judge may order release at a bail hearing—which the City would try to accomplish within four hours, *see* Tr. (Oct. 26) at 90:8-23 (Abernathy)—or a law enforcement official may decide not to pursue charges against the individual and to let him or her go. The irony is that these pre-sentence and pre-trial inmates are the very individuals for whom ICE is submitting its requests. Of the 140 notification requests sent to Philadelphia since December 2014, only *three* were for individuals serving sentences. Abernathy Decl. ¶ 10. In short: The very people for whom ICE wants 48 hours' advance warning of release—137 out of 140 recent requests—are the very people for whom providing that advance notice is not practical.

While Philadelphia does not believe these facts bear legal significance because the notification condition cannot be imposed on the City at all, *see supra*, it nonetheless contends that, to the extent advance notice can be made a requirement of the JAG grant, the City provides a meaningful degree of notification (*i.e.*, where a judicial warrant is provided) and the additional notification DOJ now seeks would be difficult if not often impossible to give.

**C. Philadelphia Substantially Complies With the Section 1373 Condition Because its Policies Facilitate the Cooperative Exchange of Immigration-Status Information About Individuals in the City Who Pose Criminal Threats.**

The Court asked the parties to consider whether there is a "substantial compliance" doctrine that might apply to the Section 1373 condition. *See* Oct. 27, 2017 Letter to Counsel, Q.

17. The City submits that the proper lens through which to construe its compliance with Section 1373—given that it would here be enforced through a JAG award—is the *constitutional* lens supplied by the Spending Clause and the Tenth Amendment. PI Mem. 44-49; Reply Br. 8-10, 14-15. Those doctrines, in turn, instruct that the Section 1373 condition can be imposed upon the City only in a manner that (1) is "reasonably calculated" to further the purposes of JAG's spending and is not overly ambiguous, *South Dakota v. Dole*, 483 U.S. 203, 209 (1987); and (2) does not result in commandeering, *Printz v. United States*, 521 U.S. 898, 935 (1997).[4]

    1. Perhaps most important, the Department has not come close to showing that the Spending Clause concerns can be satisfied with the application of Section 1373 that it seeks. At both the evidentiary hearing on October 26 and the oral argument on November 2, the Department utterly failed to demonstrate that compelling the disclosure of immigration status information for the limited class of individuals whom Philadelphia protects would support local criminal law enforcement under JAG. For victims, the Department appears to have abandoned its position altogether. *See* Tr. (Nov. 2) at 90:4-5 ("The victims are – we are not asking . . . for that information."). For the other individuals who fall outside of the City's disclosure exceptions—*e.g.*, witnesses, people seeking City services, or others in the City who pose no

---

[4] At oral argument, the Department repeated its contention that "this is not a Tenth Amendment case in the sense that it's a grant case." Tr. (Nov. 2) at 58:17-18; *see also id.* at 58:20-23. But the Department cannot sweep the Tenth Amendment aside so easily. The Department's very grounds for arguing that Section 1373 can be *made* a condition of the JAG award in the first place is that Section 1373 is an "applicable Federal law" that independently regulates the City. *See* Opp. 2 ("With respect to 8 U.S.C. § 1373 in particular, the City is independently required to comply with federal law (including Section 1373) regardless of whether it accepts federal grant fundings"); *accord id.* at 19, 32, 41. But no law can be "applicable" if it is in fact unconstitutional. The Department's argument warrants this Court's construction of Section 1373 in light of the Constitution and in a manner that avoids constitutional doubts. *See Clark v. Martinez*, 543 U.S. 371, 380-381 (2005) ("[W]hen deciding which of two plausible statutory constructions to adopt, a court must consider the necessary consequences of its choice. If one of them would raise a multitude of constitutional problems, the other should prevail—whether or not those constitutional problems pertain to the particular litigant before the Court.").

6

criminal concern—the Department simply offered no facts, data, or even testimony demonstrating that mandating the revelation of these individuals' immigration status to ICE (if the City has such information) would improve public safety. And there is no logical reason to assume it would: Merely being in the country without a valid immigration status is not a crime, and does not make someone a criminal threat. *Arizona v. United States*, 567 U.S. 387, 407 (2012).

The Department's only Spending Clause arguments are irrelevant, inaccurate, or both. First, it says that compelling the disclosure of immigration status information of people who pose no criminal threat would further ICE's mission of *civil* immigration enforcement. But that is not how the Spending Clause analysis works. A condition has to further the purpose of the federal spending to which it is being attached, not vice versa. *See Texas v. United States*, No. 7:15-cv-00151-O, 2016 WL 4138632, at **16-17 (N.D. Tex. Aug. 4, 2016). Second, at the November 2 hearing, the Department argued that "relatedness" under *Dole* is satisfied because the JAG program's purpose is to promote "law enforcement" generally, as well as "cooperation between federal and state officials." Tr. (Nov. 2) at 47:8-9. That is simply incorrect. As the text and history of the Byrne JAG statute make clear, Congress's purpose in creating these formula grants was to support States and localities in bolstering their criminal justice systems in eight defined program areas, not to promote any and all types of "law enforcement" (such as immigration enforcement) or "cooperation" with federal officials. *See* 34 U.S.C. § 10152; PI Mem. 21-22, 34-39. The Department cannot show the necessary relationship required by *Dole* by characterizing the purpose of the federal spending at issue at the highest possible level of generality. Countenancing such tactics in a defense to a Spending Clause challenge would "render academic

7

the Constitution's other grants and limits of federal authority." *New York v. United States*, 505 U.S. 144, 167 (1992).

2. The Fourth Circuit's holding in *Commonwealth of Virginia v. Riley*, 106 F.3d 559 (4th Cir. 1997) (en banc) is instructive and supports the City's argument. There, the court considered a Spending Clause condition being imposed upon Virginia in conjunction with a grant under the Individuals with Disabilities Education Act ("IDEA"), which supplies education funds for students with disabilities. The condition required that recipients of IDEA grants "assure[] all children with disabilities the right to a free appropriate public education" ("FAPE"), 20 U.S.C. § 1412(1), and the Department of Education was attempting to enforce the condition on Virginia, and withhold its "entire $60 million annual IDEA" award, unless the Commonwealth changed a policy that permitted students to be expelled for reasons unrelated to their disabilities. 106 F.3d at 560. The Fourth Circuit held that the Department's enforcement effort was unlawful. The condition had to be applied in light of the Spending Clause, which requires that conditions be stated "clearly and unambiguously," as well as the Tenth Amendment, which protects against "impermissible coercion," *id.* at 561. Because the IDEA statute had not put recipients on notice that expulsion policies like Virginia's were impermissible, and because denying Virginia its award would result in "[a] substantial question under the Tenth Amendment," the court determined that the Commonwealth was in sufficient compliance with the FAPE condition such that the Department could not withhold the federal funds. *Id.*

A similar analysis should apply here, and should compel the conclusion that Philadelphia complies with all that the Section 1373 condition can lawfully be enforced to demand. Again, as Philadelphia has demonstrated, the City's policies allow for the unfettered sharing of information with federal authorities about current criminal threats in the City. The *text* of the City's policies

8

permits the exchange of immigration-status information for individuals "suspected of engaging in criminal activity," Pl. Proposed FOF ¶¶ 3, 6, 9, and the *practice* of the City's officers is to use databases which provide federal authorities notice of all individuals stopped, arrested, booked, or convicted of crimes in the City, *id.* ¶¶ 18-23. ICE itself admits that it obtains the notice it needs to send detainer requests from the Automated Fingerprint Identification System (AFIS), maintained by the FBI and regularly used by the City. *Id.* ¶ 22 n.3. The City's PARS system, to which ICE also has access, shows the names, addresses, "place of birth," and upcoming court dates of individuals scheduled for arraignment. Tr. (Oct. 26) at 81:8-82:24 (Abernathy). Both in letter and in execution, the City's policies permit cooperative information-sharing in all of these regards. The Department has not even attempted to argue otherwise.

Instead, to claim a violation of the Section 1373 condition, the Department homes in on the limited class of people for whom Philadelphia does not share immigration-status information: law-abiding individuals who pose no criminal threat, but whom ICE nonetheless wants to deport. Tr. (Nov. 2) at 91:18-92:8; *see also* Oct. 11 Letter at 2 (referring to Executive Order 8-09 and its application to all of Philadelphia's "officers and employees"). But as the City's evidence has shown, requiring Philadelphia to disclose the confidential information of such individuals would chill the reporting of crimes, deter immigrants from using City services, and undermine public safety and health—threatening the very purpose of JAG funding, as well as the City's police powers and autonomy. *See* Pl. Proposed FOF ¶¶ 27-30, 33-36. Enforcement of the Section 1373 condition in such a manner would raise the same types of concerns under the Spending Clause and the Tenth Amendment that were at issue in *Riley*, and that warranted enforcement of the condition in a more limited manner. *See* PI Mem. 45-49.

3. Finally, narrowing the scope of the Department's Section 1373 condition in light of Spending Clause and Tenth Amendment limitations yields a similar conclusion as would application of the contract law doctrine of "substantial compliance" or "substantial performance." "[T]he equitable doctrine of substantial performance is intended for the protection and relief of those who have . . . honestly endeavored to perform their contracts in all material and substantial particulars, so that their right to compensation may not be forfeited by reason of mere technical, inadvertent, or unimportant omissions or defects." *Fort Washington Res., Inc. v. Tannen*, 901 F. Supp. 932, 940 (E.D. Pa. 1995). There is no impediment to applying that doctrine here: "Legislation enacted pursuant to the spending power is much in the nature of a contract," *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (quotation marks omitted), and the Court has "regularly applied the contract-law analogy" in cases "defining the scope of conduct" that can give rise to certain penalties, *Barnes v. Gorman*, 536 U.S. 181, 186-187 (2002). Philadelphia has "honestly endeavored" to comply with Section 1373 "in all material and substantial" respects. It cooperates with federal law enforcement agencies through shared databases, participation in task forces, and routine communication; it does not prohibit City officers from making inquiries of ICE where appropriate; and its policies allow for the disclosure of any immigration status information that the City may have for individuals who pose current criminal threats. The amount of communications covered by Sections 1373(a) and (b) that Philadelphia actually restricts is insubstantial, and the Department has made no showing that it is of "[i]mportan[ce]." *Fort Washington*, 901 F. Supp. at 940.

Accordingly, if Section 1373 can be applied as a JAG condition at all, both constitutional and contract principles prevent the Department from applying Section 1373 in order to withhold the City's JAG funding.

DATED: November 9, 2017　　　　　　　　　Respectfully submitted,

*Virginia A. Gibson* (signature)

| | |
|---|---|
| SOZI PEDRO TULANTE, I.D. NO. 202579<br>　City Solicitor<br>MARCEL S. PRATT, I.D. NO. 307483<br>　Chair, Litigation Group<br>LEWIS ROSMAN, I.D. NO. 72033<br>　Senior Attorney<br>CITY OF PHILADELPHIA LAW DEPARTMENT<br>1515 Arch Street, 17th Floor<br>Philadelphia, PA 19102 | VIRGINIA A. GIBSON, I.D. NO. 32520<br>SARA ARONCHICK SOLOW, I.D. NO. 311081<br>JASMEET K. AHUJA, I.D. NO. 322093<br>ALEXANDER B. BOWERMAN, I.D. NO. 321990<br>HOGAN LOVELLS US LLP<br>1735 Market Street, 23rd Floor<br>Philadelphia, PA 19103<br>(267) 675-4600<br>virginia.gibson@hoganlovells.com |
| ROBERT C. HEIM, I.D. NO. 15758<br>JUDY L. LEONE, I.D. NO. 041165<br>FRIEDRICH-WILHELM W. SACHSE, I.D. NO. 84097<br>DECHERT LLP<br>Cira Centre<br>2929 Arch Street<br>Philadelphia, PA 19104<br>(215) 994-4000 | NEAL K. KATYAL (*pro hac vice*)<br>DANIEL J.T. SCHUKER (*pro hac vice*)<br>HOGAN LOVELLS US LLP<br>555 Thirteenth Street, NW<br>Washington, DC 20004 |

*Attorneys for the City of Philadelphia*

# CERTIFICATE OF SERVICE

I hereby certify that on November 9, 2017, the foregoing document was served electronically by the Court's CM/ECF system on all counsel of record in this case.

November 9, 2017

*Virginia A. Gibson*

VIRGINIA A. GIBSON, I.D. NO. 32520
HOGAN LOVELLS US LLP
1735 Market Street, 23rd Floor
Philadelphia, PA 19103
(267) 675-4600
virginia.gibson@hoganlovells.com