## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **THE CITY OF PHILADELPHIA** | **CIVIL ACTION** |
| **v.** | **NO. 17-3894** |
| **JEFFERSON BEAUREGARD SESSIONS III, ATTORNEY GENERAL OF THE UNITED STATES** | |

### MEMORANDUM RE: MOTION FOR PRELIMINARY INJUNCTION

**Baylson, J.**                                    **November 15, 2017**

## TABLE OF CONTENTS

I.     Summary of the Counts in the Complaint...................................................... 2

II.    Summary of Findings of Fact and Conclusions of Law ................................ 5

III.   Byrne JAG Program....................................................................................... 8

IV.   The Three Challenged Conditions ................................................................ 11

V.    Philadelphia's Policies at Issue .................................................................... 14

VI.   Prior Litigation Over "Sanctuary City" Policies.......................................... 17

   A.  County of Santa Clara v. Trump ............................................................. 17

   B.  City of Chicago v. Sessions .................................................................... 20

VII.  Plaintiff's Motion for Preliminary Injunction .............................................. 22

VIII.  Review of Testimony and Sworn Declarations Filed by Plaintiff in Support of Motion . 23

   A.  Testimony of Police Commissioner Ross ............................................... 23

       1.  Philadelphia Police Priorities ........................................................ 23

       2.  Reasons for Philadelphia Police Department Policies on Immigrants......................... 24

       3.  Community Policing ....................................................................... 25

       4.  Immigrants Have No Immunity from Arrest and Prosecution for Crimes in Philadelphia 26

       5.  Reasons for Police Policies Criticized by the Attorney General .................... 26

       6.  Cooperation with Federal Law Enforcement Agencies .............................. 28

   B.  Declaration and Testimony of Julie Wertheimer ................................... 29

   C.  Declaration and Testimony of Eva Gladstein ........................................ 31

   D.  Declaration and Testimony of Brian Abernathy..................................... 33

   E.  Testimony of Thomas Farley .................................................................. 37

IX.   Review of Sworn Declarations Filed by Defendant in Opposition to Motion.................. 39

X.    Findings of Fact ............................................................................................ 40

XI.   The APA and the Challenged Conditions ...................................................... 47

   A.  Final Agency Action .............................................................................. 48

       1.  The Parties' Contentions................................................................. 48

       2.  The Agency Action at Issue is Final .............................................. 49

   B.  The City's Challenges under APA Section 706 ...................................... 50

       1.  Statutory Authority ........................................................................ 50

          a)   "Special Conditions" Authorization ...................................... 51

             (1)   The Parties' Contentions ........................................... 51

i

   (2) Section 10102(a)(6) Does Not Authorize Any Challenged Condition ............... 52

  b) "All Other Applicable Federal Laws" Authorization ........................... 54

   (1) The Parties' Contentions ................................. 54

   (2) Section 10153(a)(5)(D) May Authorize The Certification Condition ............... 57

 2. Arbitrary and Capricious.................................................. 58

  a) The Parties' Contentions.................................................. 58

  b) The "Backgrounder on Grant Requirements"........................ 61

  c) The July 25, 2017 Press Release........................................ 64

  d) The 2016 OIG Report ...................................................... 66

 3. Constitutionality of Conditions .............................................. 67

XII. The Intersection between Criminal Law and Immigration Law ....................................... 69

 A. Lawfully Present versus Unlawfully Present Noncitizens................................. 70

 B. Removal: Deportability (8 U.S.C. § 1227) versus Inadmissibility (8 U.S.C. § 1182)...... 72

  1. Overview.................................................................. 72

  2. Detention pending removal proceedings – criminal aliens................. 73

  3. Removal proceedings........................................................ 73

  4. Consequences of Deportability and Inadmissibility ........................ 74

 C. Criminal Grounds of Deportability and Inadmissibility ................................. 74

  1. § 1227(a)(2) Sets out Criminal Grounds of Deportability ....................... 75

  a) Crimes Involving Moral Turpitude ("CIMT")........................ 75

  b) Aggravated Felonies ...................................................... 77

  c) Other offenses ............................................................ 77

  2. § 1182(a)(2) Sets out Criminal Grounds of Inadmissibility ................... 78

 D. The Relevance of Padilla and Galarza ......................................... 79

  1. Padilla v. Kentucky ........................................................ 79

  2. Galarza v. Szalczyk ........................................................ 80

 E. ICE Programming and Enforcement Priorities ...................................... 82

  1. Secure Communities Program ................................................ 83

  2. Priority Enforcement Program .............................................. 83

 F. President Trump's Executive Order: New Enforcement Priorities................... 84

 G. Philadelphia's Policy and Potential Conflicts................................... 86

 H. Statutes Which Impact Both Immigration and Criminal Law ......................... 88

 I. Selective Enforcement ......................................................... 90

XIII. Spending Clause and Separation of Powers................................... 92

A.   Relatedness ........................................................................................ 93

  1.   Byrne JAG Program and the DOJ Conditions ............................ 98

  2.   Certification Condition ............................................................... 100

B.   Lack of ambiguity ............................................................................. 101

C.   Coercion and the Tenth Amendment ................................................ 106

  1.   New York v. United States .......................................................... 107

  2.   Printz v. United States ................................................................ 108

  3.   National Federation of Independent Business v. Sibelius ........... 109

  4.   City of New York v. United States .............................................. 110

  5.   The Present Case ......................................................................... 113

XIV.   Philadelphia Substantially Complies with Section 1373 ................... 115

A.   Substantial Compliance Can Be Implied .......................................... 115

B.   Substantial Compliance Can Apply to Grant Conditions ................. 117

XV.   Irreparable Harm ..................................................................................... 121

A.   The Status Quo .................................................................................. 121

B.   Philadelphia Has Demonstrated Irreparable Harm ........................... 121

XVI.   Balance of Equities and the Public Interest ........................................ 126

XVII.   CONCLUSION ..................................................................................... 127

> If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.[1]

The Complaint in this case asserts multiple counts of constitutional and statutory violations, relating to the federal government's attempt to deprive the City of Philadelphia the receipt of grants from the United States Department of Justice, referred to as "JAG Program" grants.  After a prompt Rule 16 conference, because of approaching events that threatened to deprive the City of Philadelphia of this grant money, and the non-monetary consequences of the federal government's proposed actions, the City has moved for a preliminary injunction.[2]  The Court held an evidentiary hearing on October 26, 2017.

---

[1] W. Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624, 642 (1943), (Jackson, J.).

[2] The parties agreed that responses to the Complaint, including any Rule 12 motions, would be stayed pending resolution of the preliminary injunction motion.

1

I.       **Summary of the Counts in the Complaint**

The City filed a six-count Complaint on August 30, 2017, alleging in detail the City's overarching commitments to welcoming immigrants, holding wrongdoers accountable for their criminal conduct regardless of their immigration status, and promoting the health, safety, and welfare of all residents.   The City evidently prizes the hard-won trust it has earned with immigrant communities, and believes that the City is both safer and better off when immigrants do not "fear adverse consequences to themselves or to their families from interacting with City officers." (ECF 1 ("Compl.") ¶ 2).   In the City's view, fostering trust with immigrant communities promotes cooperation with police—particularly by immigrant victims and witnesses of crimes—which in turn promotes public safety.   (Id. ¶ 3).   To that end, the City has instituted a number of policies intended to limit collection of immigration status information in the provision of City services and routine policing efforts, and limit coordination with federal immigration enforcement.   (Id. ¶¶ 21–51).   Philadelphia hastens to add, however, that it cooperates with federal authorities in various arenas of criminal justice, including by participating in federal task forces, and employs several databases that are visible to the Federal Bureau of Investigations ("FBI") and Immigration and Customs Enforcement ("ICE").   The City has applied for, and received, federal funding through the Byrne Justice Assistance Grants Program ("JAG Program") every fiscal year since the JAG Program assumed its present form in 2005.   (Id. ¶ 60).   In fiscal year 2016, it had to agree to some fifty-three special conditions in order to receive $1.68 million in JAG Program funds, as demonstrated on its 2016 grant approval sheet.   (Id.; Compl. Ex. 9).

The City objects to three conditions recently imposed by the Department of Justice through the Attorney General, and has filed suit to enjoin them.   Specifically, it alleges that the Attorney General cannot condition JAG Program funds on 1) requiring federal immigration agents access to

City detention facilities (the "Access Condition"); 2) providing the Department of Homeland Security ("DHS") at least 48 hours' advance notice of the date and time of the release of any inmate about whom DHS has requested such information (the 48 hour "Notice Condition"); and 3) certifying compliance with 8 U.S.C. § 1373 ("Certification Condition"; collectively, the "Challenged Conditions"). (Compl. ¶ 5). The City alleges six counts for injunctive and declaratory relief.

Count I asserts that the Attorney General acted *ultra vires* and in violation of the Administrative Procedure Act by imposing the Challenged Conditions, because the Challenged Conditions are not authorized by the Congressional statute creating the JAG Program, do not concern administration and spending of JAG Program funds, and are at odds with the JAG Program's formula grant structure. (Id. ¶¶ 105–12).

Count II asserts that the imposition of the Challenged Conditions is unconstitutional and therefore violates the Administrative Procedure Act ("APA"). The City argues that the Constitution bestows upon Congress the exclusive power to enact spending legislation pursuant to Article I, § 8, cl. 1 (the "Spending Clause"), whereas the President and the Executive Branch are separately tasked with "tak[ing] Care that the Law be faithfully executed." U.S. Const. art. II, § 3, cl. 5 (the "Take Care Clause"). The City also claims that Attorney General's imposition of the new conditions amounts to an unconstitutional refusal to disburse money that Congress has already appropriated. (Id. ¶¶ 113–21).

Count III alleges that the Attorney General's imposition of the Challenged Conditions is arbitrary and capricious, and therefore violates the APA, because it deviates from past agency policy without reasoned explanation or justification. (Id. ¶¶ 122–24).

Count IV asserts that even Congress could not have imposed these conditions on JAG

3

Program grants because doing so would violate the Spending Clause.   The Challenged Conditions, the City argues, are unrelated to the purpose of the JAG Program, do not impose unambiguous obligations on recipients, and transgress principles of federalism.   (Id. ¶¶ 125–31).

Count V alleges that the conditions on JAG Program funds seek to commandeer City officials into the enforcement of federal immigration law in violation of the Tenth Amendment. The City seeks injunctive and declaratory relief preventing the Attorney General from interpreting 8 U.S.C. § 1373 and the two other grant conditions in a way that would violate the Tenth Amendment.   (Id. ¶¶ 132–37).

Count VI seeks a declaration by this Court that the City is in compliance with 8 U.S.C. § 1373, as constitutionally construed.   (Id. ¶¶ 138–44).

4

II.     **Summary of Findings of Fact and Conclusions of Law**

After the City's Motion for a Preliminary Injunction was filed, the Court determined that the parties should have a chance to present relevant facts, in order to supplement the declarations which had been filed.   Testimony was received from various City officials, and the most crucial witnesses were Police Commissioner Ross, Deputy Managing Director Abernathy, and Health Commissioner Farley – who established Philadelphia's actual practices with regard to so-called "undocumented" aliens – and also, "criminal aliens."

Philadelphia is a not a "sanctuary city" – if that term means that there are any policies that would prevent or inhibit the investigation, arrest, prosecution and sentencing of aliens.   There are none.   The term "criminal aliens," although not defined by any statute, includes individuals who are not citizens, but who have been convicted of serious crimes, or have reentered the United States after being deported.   This category of criminal alien represents a fairly small percentage of the total number of non-citizens.

Approximately one half of unlawfully present non-citizens can be accurately described as "visa overstayers" – that is, they entered the United States legally, on a properly issued visa, but have stayed after the visa expired.[3]   Although Congress has enacted laws that allow civil proceedings to deport any undocumented alien, the record of the case establishes that our federal government, for decades, with both Democratic or Republican presidents, has taken no steps whatsoever to deport visa overstayers or aliens who entered unlawfully and without being arrested. All deportation efforts, from World War II to the present time, have focused on "criminal aliens."

---

[3] DHS statistics indicate that as of January, 2012 there were approximately 11.4 million unlawfully present non-citizens in the U.S.   *Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2012*, Bryan Baker and Nancy Rytina.   These statistics further indicate that roughly half of that population is made up of visa overstayers, while the other half is comprised of individuals who have entered the United States without inspection.   A very small percentage of the overall 11.4 million, including both visa overstayers and those who entered without inspection, have criminal convictions.   This topic is discussed in detail below.

5

As the record shows, Philadelphia has certain protective policies which primarily apply to aliens who are "visa overstayers."[4]  The government asserts these policies allow it to deny the Byrne JAG grants to Philadelphia.

This factual testimony forms an important part of the Court's rulings, which also depend on established statutory and constitutional principles.  Turning to the legal issues presented by the City, as the moving party for preliminary injunction, the Court finds that the Attorney General's implementation of two of the conditions for receiving the Byrne grant, which we will term the "48 hour notice" condition, and the "jail access" condition, were issued without appropriate authority under the Administrative Procedure Act, a statute enacted by Congress many years ago which regulates the matters on which federal government agencies, of which the Department of Justice is one, may issue conditions.

For the remaining issues, this opinion will explain in some detail the intersection between federal and state criminal laws, and federal immigration practices.  Regulation of immigration is exclusively a federal function, but it is not exclusively within the province of the executive branch of government.  Congress has enacted specific laws which give the federal government significant authority to deport "criminal aliens."  There is abundant statutory authority for using civil proceedings to deport visa overstayers, as well as individuals who entered without inspection, but have not been convicted of any crimes.  However, there has been virtually no enforcement action whatsoever to deport visa overstayers, or illegal entrants who were not arrested at the time they crossed into the United States, usually from Mexico.

Turning to the other allegations in the City's complaint, the Court gives careful analysis to

---

[4] Analysis of 2014 statistics suggests that 67 percent of Pennsylvania's unlawfully present noncitizen population is made up of visa overstayers.  Robert Warren and Donald Kerwin, The 2,000 Mile Wall in Search of a Purpose, 5 J. Migration and Hum. Security, 124, 129, (2017).

the Spending Clause in Article I, Section 8, Clause 1 of the United States Constitution, and also to the Tenth Amendment, which reserves to the states (and by definition, local governments) those powers not designated for the federal government.   In analyzing other actions issued by the Department of Justice, which claims that their non-observance by the City warrants rejection of the FY 2017 Byrne JAG grant to Philadelphia, the Court concludes the City is likely to succeed in its claims that the Department of Justice's conditions are improper under settled principles of the Spending Clause, the Tenth Amendment, and principles of federalism.

In doing so, the Court acknowledges that Congress has prohibited state or local governments restricting communications about aliens to the federal government.   Although the Court declines to rule whether a certification condition is applicable, the record of the case clearly shows, giving due credibility to the testimony about the City's practices, that Philadelphia is in "substantial compliance" with all of these DOJ conditions.

Applying the requisite proof for preliminary injunction of probability of success on the merits, irreparable harm, a balancing of equities, preserving the status quo, and the public interest, the Court will issue a preliminary injunction in favor of the City, that the City may certify its compliance with these conditions, and to enjoin the Department of Justice from denying the City's FY 2017 Byrne JAG grant.

### III.    Byrne JAG Program

The federal grant at issue is awarded under the Edward Byrne Memorial Justice Assistance Grant Program (the "JAG Program" or the "Byrne Program").   See 34 U.S.C. § 10151 (formerly 42 U.S.C. § 3750). Named after a fallen New York City police officer, the JAG Program supports state and local law enforcement efforts by providing additional funds for personnel, equipment, training, and other criminal justice needs.   See 34 U.S.C. § 10152 (formerly 42 U.S.C. § 3751).

A more robust understanding of federal grants, appearing below, is important to fully appreciate the contours of the JAG Program.

Federal awarding agencies have no independent power to award grants.   Thus, all grants must be authorized by Congress in the form of enabling legislation.   The degree of discretion afforded to awarding agencies depends on the statutory text and the type of grant.   However, regardless of the amount of authority delegated by Congress to the awarding agency, all grant terms must be consistent with the authorizing statute.

There are two main categories of federal grants: (1) discretionary grants, and (2) mandatory grants.   The JAG Program is a mandatory grant.

(1) Discretionary grants are those for which an awarding agency generally possesses discretion to select the awardees and the amount they receive.   Discretionary grants are typically made through a competitive grant process for a specific project, and federal awarding agencies often attach program or project-specific requirements to grant funds.

(2) Mandatory grants are those which an awarding agency must make if a grantee meets the requirements set forth in the authorizing statute.   States seeking mandatory grant awards must submit a plan to the federal agency administering the program detailing how it will use the grant funds.   Notably, mandatory grants are not "competitive," and no applicant that complies with grant requirements is excluded from receiving funds.

Mandatory grants can be further divided into three sub-categories: (A) entitlement grants, (B) block grants, and (C) formula grants.   The Byrne Program is a formula grant.

8

(A) Entitlement grants are those in which the beneficiary is entitled to receive money upon demonstrating that it qualifies for assistance.   One example is Medicaid, where the beneficiaries are individuals.

(B) Block grants are those awarded pursuant to formulas set out in their respective authorizing statutes, which often take into account factors such as population and annual Congressional appropriations.   Block grants are subject to several, but not all, provisions of the Office of Management and Budget's "Uniform Guidance," codified at 2 C.F.R. 200.

(C) Formula grants, such as the Byrne Program, are similarly awarded pursuant to formulas in their respective authorizing statutes.   However, formula grants are subject to all provisions of the Uniform Guidance.

Grants awarded under the Byrne Program are based on a formula which takes into account the applicant jurisdiction's population and violent crime rate.   See 34 U.S.C. § 10156 (formerly 42 U.S.C. § 3755).   The Attorney General has limited the eligibility of applicant jurisdictions to JAG Program funds for many years, by imposing various conditions.   In the present case, Philadelphia brings no challenge to more than fifty of these conditions, instead focusing on the three most recently imposed conditions.   (See Pl. Mot. Ex. 11).

The Attorney General claims that the three Challenged Conditions are authorized under two statutory provisions.

The first is 34 U.S.C. § 10102(a)(6), which does not appear in the same statutory subchapter as the Byrne Program.   It states in relevant part:

> The Assistant Attorney General shall . . . exercise such other powers and functions as may be vested in the Assistant Attorney General pursuant to this chapter or by delegation of the Attorney General, including placing special conditions on all grants, and determining priority purposes for formula grants.

The second source of statutory authority claimed by the Attorney General does in fact appear in the same subchapter as the Byrne Program. See 34 U.S.C. § 10153.   The Attorney General contends that this separate source of authority independently supports the Section 1373

9

Certification Condition:

> To request a grant under this part, the chief executive officer of a
> State or unit of local government shall submit an application to the
> Attorney General within 120 days after the date on which funds to
> carry out this part are appropriated for a fiscal year, in such form as
> the Attorney General may require. **Such application shall include**
> the following:
>
> [...]
>
> (5) **A certification**, made in a form acceptable to the Attorney
> General and executed by the chief executive officer of the applicant
> (or by another officer of the applicant, if qualified under regulations
> promulgated by the Attorney General), that—
>
> [...]
>
> (D) **the applicant will comply with all provisions of this part
> and all other applicable Federal laws**.

34 U.S.C. § 10153(a)(5)(D) (emphasis added).

IV.     **The Three Challenged Conditions**

The Attorney General cites a May, 2016 report from the Office of the Inspector General ("OIG") finding deteriorating local cooperation with "efforts to remove undocumented criminal aliens from the United States," (Compl. Ex. 10), as an important catalyst for the imposition of the Challenged Conditions.

Accordingly, in late July 2017, the Attorney General announced two new conditions on every grant provided by the JAG Program. (See Backgrounder on Grant Requirements, Pl. Mot. Ex. 1).   The two new conditions require, first, that local authorities provide federal agents advance notice of the scheduled release from state or local correctional facilities of certain individuals suspected of immigration violations (the "Notice Condition"), and, second, that local authorities provide immigration agents with access to City detention facilities and individuals detained therein (the "Access Condition").   Id.   Additionally, a third condition on Byrne JAG funds was added last year that requires the City to certify compliance with a federal statute, 8 U.S.C. § 1373, which prohibits local government and law enforcement officials from restricting the sharing of information with the Immigration and Naturalization Service ("INS")[5] regarding the citizenship status of any individual (the "Certification Condition").   Id.

The three conditions are as follows:

(1) The Notice Condition

> A State statute, or a State rule, regulation, policy, or practice, must be in place that is designed to ensure that, when a State (or State-contracted) correctional facility receives from DHS a formal written request authorized by the Immigration and Nationality Act that seeks advance notice of the scheduled release date and time for a particular alien in such

---

[5]  The enforcement function of INS is now performed by ICE, after a government reorganization in 2003.   Although INS is referenced in statutes throughout this Memorandum, which can be understood for present purposes to instead signify ICE.

facility, then such facility will honor such request and—as early as practicable—provide the requested notice to DHS.

(2) The Access Condition

A State statute, or a State rule, regulation, policy, or practice, must be in place that is designed to ensure that agents of the United States acting under color of federal law in fact are given access to any State (or State-contracted) correctional facility for the purpose of permitting such agents to meet with individuals who are (or are believed by such agents to be) aliens and to inquire as to such individuals' right to be or remain in the United States.

(3) The Certification Condition

The applicant local government must submit the required 'Certification of Compliance with 8 U.S.C. § 1373' (executed by the chief legal officer of the local government).

The Certification Condition requires the City to certify compliance with 8 U.S.C. § 1373 ("Section 1373"). Section 1373 is titled "Communication between government agencies and the Immigration and Naturalization Service" and provides as follows:

**(a) In General**

Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

**(b) Additional Authority of Government Entities**

Notwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual:

**(1)** Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization

12

Service.

**(2)** Maintaining such information.

**(3)** Exchanging such information with any other Federal, State, or local government entity.

### (c) Obligation to Respond to Inquiries

The Immigration and Naturalization Service shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information.

The Department of Justice ("DOJ") asserted by letter dated October 11, 2017, a "preliminary assessment" that the City did not comply with Section 1373. (ECF 28 ("Def. Opp."), Ex. A to Declaration of Alan Hanson ("Hanson Decl.")). The City responded by letter dated October 27, 2017, disputing that assessment and requesting a delay in any withholding of the FY 2017 JAG award pending resolution of this litigation. (ECF 61).

V.      **Philadelphia's Policies at Issue**

The Attorney General contends that "[a]t least two [Philadelphia] policies do not comply with Section 1373, and at least three additional policies may also be non-compliant depending on how the City interprets and applies them."   (Def. Opp., at 38).

First, Philadelphia Executive Order No. 5-16, states in Section 1:

> No person in the custody of the City who otherwise would be released from custody shall be detained pursuant to an ICE civil immigration detainer request pursuant to 8 C.F.R. § 287.7, nor shall notice of his or her pending release be provided, unless such person is being released after conviction for a first or second degree felony involving violence and the detainer is supported by a judicial warrant.

(Compl. Ex. 6).   Although Executive Order No. 5-16 appears to restrict compliance with detainers and advance notice requests, a subsequent memorandum issued to the Prisons Commissioner clarified that "the Department of Prisons is directed to cooperate with all federal agencies, including ICE, when presented with a judicial warrant," irrespective of whether "such person is being released from custody after conviction for a first or second degree felony involving violence."   (Compl. Ex. 7).

Second, Police Commissioner Memorandum No. 01-06, which has as its express goal the "preserv[ation of] confidentiality of all information regarding law abiding immigrants to the maximum extent permitted by law," states in Section III.C:

> The Philadelphia Police Department will continue to cooperate with federal authorities in investigating and apprehending immigrants suspected of criminal activities.   However, immigrants who are victims of crimes will not have their status as an immigrant transmitted in any manner.[6]

---

[6] As further discussed below, during the evidentiary hearing in this case, Philadelphia's witnesses stated that a criminal suspect who is also a victim would not be protected under Police Commissioner Memorandum No. 01-06; this narrow category of victim-suspects (e.g., two defendants both charged with felony assault on the other as the result of a fight) could have their status as an immigrant transmitted to federal authorities.

14

(Compl. Ex. 3).

<u>Third</u>, Executive Order No. 8-09, Section 2, states:

> B.  Law enforcement officers shall not:
> > …
> > (2) inquire about a person's immigration status, unless the status itself is a necessary predicate of a crime the officer is investigating or unless the status is relevant to identification of a person who is suspected of committing a crime (other than mere status as an undocumented alien);
> > (3) inquire about the immigration status of crime victims, witnesses, or others who call or approach the police seeking help; or
> > (4) inquire regarding immigration status for the purpose of enforcing immigration laws.
> C.  Law enforcement officers shall continue to cooperate with state and federal authorities in investigating and apprehending individuals who are suspected of criminal activity.

(Compl. Ex. 4).

<u>Fourth</u>, Executive Order No. 8-09, Section 3, states:

> A.  As used herein, "confidential information means any information obtained and maintained by a City agency relating to an individual's immigration status.
> B.  No City officer or employee shall disclose confidential information unless:
> > (1) such disclosure has been authorized in writing by the individual to whom such information pertains . . .;
> > (2) such disclosure is required by law; or
> > (3) the individual to whom such information pertains is suspected by such officer or employee or such officer's or employee's agency of engaging in criminal activity (other than mere status as an undocumented alien).

(<u>Id.</u>).

<u>Fifth</u>, Police Commissioner Memorandum No. 01-06, Section III.A, states:

> In order to safeguard the confidentiality of information regarding an immigrant, police personnel will transmit such information to federal immigration authorities only when:
> > (1) Required by law, or

15

(2) The immigrant requests, in writing, information be provided, to verify his or her immigration status, or

(3) The immigrant is suspected of engaging in criminal activity, including attempts to obtain public assistance benefits through the use of fraudulent documents.

(Compl. Ex. 3).

## VI.     Prior Litigation Over "Sanctuary City" Policies

The present litigation represents the latest skirmish between state or local governments and the federal government over so-called "Sanctuary City" policies.   Two recent cases in particular merit discussion prior to this Court's analysis of the current dispute between Philadelphia and the Attorney General.

### A.     County of Santa Clara v. Trump

Less than a week after assuming office, President Trump issued Executive Order 13768, entitled "Enhancing Public Safety in the Interior of the United States," which "purport[ed] to '[e]nsure that jurisdictions that fail to comply with applicable Federal law do not receive Federal funds, except as mandated by law' and to establish a procedure whereby 'sanctuary jurisdictions' shall be ineligible to receive federal grants."   Cty. of Santa Clara v. Trump, 250 F. Supp. 3d 497, 507 (N.D. Cal. 2017) (quoting 82 Fed. Reg. 8799).   Two California jurisdictions, which had policies in place prohibiting the use of resources to aid in enforcement of federal immigration law or limiting the circumstances in which they honored ICE detainers, sought to enjoin Section 9(a) of the Executive Order, which states:

> Sec. 9. Sanctuary Jurisdictions. It is the policy of the executive branch to ensure, to the fullest extent of the law, that a State, or a political subdivision of a State, shall comply with 8 U.S.C. 1373.
>
> (a) In furtherance of this policy, the Attorney General and the Secretary, in their discretion and to the extent consistent with law, shall ensure that jurisdictions that willfully refuse to comply with 8 U.S.C. 1373 (sanctuary jurisdictions) are not eligible to receive Federal grants, except as deemed necessary for law enforcement purposes by the Attorney General or the Secretary. The Secretary has the authority to designate, in his discretion and to the extent consistent with law, a jurisdiction as a sanctuary jurisdiction. The Attorney General shall take appropriate enforcement action against any entity that violates 8 U.S.C. 1373, or which has in effect a statute, policy, or practice that prevents or hinders the enforcement of Federal law.

17

Exec. Order No. 13768 (emphasis added).

The plaintiff counties alleged that this part of the Executive Order violated the principle of Separation of Powers, violated the Spending Clause of Article I of the Constitution, improperly conscripted them in enforcing federal immigration law in violation of the Tenth Amendment, was unconstitutionally vague, and violated the counties' procedural due process rights.  Id.  At oral argument, the United States argued that this section of the Executive Order applied only to three grant programs administered by the Department of Homeland Security and the Department of Justice, including the Byrne JAG Program.  Id. at 507–08, 510.

Rejecting this interpretation, the court found that the Executive Order "r[an] afoul of … basic and fundamental constitutional structures," which it explained: The Constitution gives Congress the federal spending power and place conditions on receipt of federal funds; once legislation is enacted, the President is "required to 'take Care that the Law be faithfully executed.'"  Id. at 531 (quoting U.S. Const. art. II, § 3, cl. 5).  The court stated that "[w]here Congress has failed to give the President discretion in allocating funds, the President has no constitutional authority to withhold such funds and violates his obligation to faithfully execute the laws duly enacted by Congress if he does so."  Id.  The court concluded: "Section 9 purports to give the Attorney General and the Secretary the power to place a new condition on federal funds (compliance with Section 1373) not provided for by Congress.  But the President does not have the power to place conditions on federal funds and so cannot delegate this power."  Id.  The court also noted that Congress had considered, and rejected, conditioning federal spending on compliance with Section 1373 and immigration law, which placed the President's power "at its lowest ebb."  Id. (quoting Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 637 (1952)).

18

Even if the President possessed spending powers, that court continued, the Executive Order would nonetheless have overstepped constitutional limitations on spending legislation. The court found that the Executive Order did not impose unambiguous conditions on jurisdictions. Id. at 532.   Moreover, its attempt to defund sanctuary jurisdictions lacked the requisite relationship between the condition and the purpose of the funds because there was "no nexus between Section 1373 and most categories of federal funding, including without limitation funding related to Medicare, Medicaid, transportation, child welfare services, immunization and vaccination programs, and emergency preparedness."  Id. at 532–33.   It did suggest some relationship between immigration enforcement and law enforcement, however:

> The Executive Order inverts the nexus requirement, directing the Attorney General and Secretary to cut off all federal grants to "sanctuary jurisdictions" but giving them discretion to allow "sanctuary jurisdictions" to receive grants "deemed necessary for law enforcement purposes." EO § 9(a). As the subset of grants "deemed necessary for law enforcement purposes" likely includes any federal funds related to immigration enforcement, the Executive Order expressly targets for defunding grants with no nexus to immigration enforcement at all. This is the precise opposite of what the nexus test requires.

Id. at 533 (emphasis added).[7]   The court also found that the plaintiffs were likely to succeed on the merits of their argument that the attempt to defund sanctuary jurisdictions amounted to an unconstitutionally coercive use of the spending power.   Id.   The court further found that the Executive Order attempted to conscript states and localities into enforcing federal immigration law in violation of the Tenth Amendment, contained "standardless guidance and enforcement provisions" rendering it void for vagueness, id. at 536, and violated jurisdictions' procedural due process rights by failing to establish any notice or opportunity to be heard regarding their potential

---

[7] Note that the Court did not issue any ruling regarding whether Section 1373 had a relationship to the JAG Byrne Program.

loss of federal funding.   Id.

Accordingly, the court entered a nationwide preliminary injunction barring enforcement of Section 9(a) on April 25, 2017.   Id. at 540.   It clarified that the injunction did not "impact the Government's ability to use lawful means to enforce existing conditions of federal grants or 8 U.S.C. 1373" or "restrict the Secretary from developing regulations or preparing guidance on designating a jurisdiction as a 'sanctuary jurisdiction.'"   Id.

### B.   City of Chicago v. Sessions

Prior to the initiation of the Philadelphia litigation, the city of Chicago, which had enacted a "Welcoming City Ordinance" as part of its municipal code, filed suit challenging the imposition of the Challenged Conditions attached to Byrne funding.   The arguments in the Chicago litigation in many ways parallel those at issue in the Philadelphia case, and Chicago, like Philadelphia, sought preliminary injunctive relief in federal court.   See City of Chicago, No. CV 17 C 5720, 2017 WL 4081821 (N.D. Ill. Sept. 15, 2017).

On September 15, 2017, after Philadelphia had filed its Complaint, a Judge of the United States District Court for the Northern District of Illinois ruled that the Attorney General lacked authority under the authorizing statute to impose substantive conditions on Byrne grants, 34 U.S.C. §§ 10151-58, and acted ultra vires in imposing the Notice and Access conditions.   Id. The court rejected the Attorney General's attempt to claim authority to impose such conditions on the basis of 34 U.S.C. § 10102(a)(6), a provision of a separate statutory subchapter establishing the Office of Justice Programs allowing the Assistant Attorney General to "'plac[e] special conditions on all grants' and to 'determin[e] priority purposes for formula grants.'"   Id. at *5 (alterations in original).   However, the court ruled that a provision of the Byrne JAG Program authorizing statute, 34 U.S.C. § 10153(a)(5)(D), requiring certification that an applicant for Byrne funds "will

comply with all provisions of this part and all other applicable Federal laws" gave the Attorney General the statutory authority to impose the Section 1373 Certification Condition.  Id. at *7. The court reasoned that "[t]he most natural reading of the statute authorizes the Attorney General to require a certification of compliance with all other applicable federal laws, which by the plainest definition includes Section 1373."   Id. at *9.   It specifically noted that Chicago had not challenged the Certification Condition under the Spending Clause.   In short, the court found that Chicago was likely to succeed on the merits of its challenges to the jail access and advance notification conditions, but not on the 1373 compliance provision.   The City of Chicago court did not hold an evidentiary hearing in reaching its legal conclusions.

With respect to irreparable harm, the court found that "[t]he harm to the City's relationship with the immigrant community if it should accede to the conditions is irreparable" and that "forcing the City either to decline the grant funds based on what it believes to be unconstitutional conditions or accept them and face an irreparable harm, is the type of 'Hobson's choice'" that the Supreme Court had found to support irreparable harm for purposes of granting injunctive relief. Id. at *13 (citing Morales v. Trans World Airlines, Inc., 504 U.S. 374, 381 (1992)).   Finally, the court found the balance of the equities and the public interest favored neither party because both Chicago and the Attorney General had "strong public policy arguments" grounded in "concerns of public safety," "the wisdom of which [was] not for the Court to decide."   Id. at *14.

Accordingly, the court entered a nationwide preliminary injunction barring the Notice and Access conditions.   Id.   It subsequently denied a stay of the nationwide application of the injunction.   City of Chicago v. Sessions, No. CV 17 C 5720, WL 4572208 (N.D. Ill. Oct. 13, 2017).   An appeal is pending.

21

## VII.    Plaintiff's Motion for Preliminary Injunction

Philadelphia asserts it is likely to show that the Attorney General's imposition of the Challenged Conditions violates the Administrative Procedure Act ("APA") because the Attorney General:

> (1) acted in excess of his statutory authority as well as contrary to the authorizing federal statute;
>
> (2) violated the Constitution's separation of powers; and
>
> (3) acted in an arbitrary and capricious manner.

(See Pl. Mot., at 15–16).

Philadelphia's contentions that the Attorney General acted in excess of, and contrary to, the authorizing federal statute, rely on the statute's text, legislative history, and implementation history, while rejecting the Attorney General's reliance on a statutory provision that defines the "powers and functions" of the Assistant Attorney General of the Office of Justice Programs.   See 34 U.S.C. § 10102(a)(6).

Philadelphia's motion also asserts that the Attorney General's actions are in contravention of the Constitution's Spending clause, the Tenth Amendment, and principles of Federalism.

The City also contends it is likely to show that the City's policies are consistent with Section 1373 as constitutionally and lawfully construed, and therefore that the Attorney General should be enjoined from denying the City funding on that basis.

The City alleges irreparable harm, not only from the denial of receipt of the money, but also from a loss of goodwill in the immigrant community.   Lastly, the City asserts that the public interest warrants preserving the "status quo" pending a final hearing.   The standards for a preliminary injunction are set forth below.

**VIII.    Review of Testimony and Sworn Declarations Filed by Plaintiff in Support of Motion**

   **A.    Testimony of Police Commissioner Ross**

Born and raised in Philadelphia, Richard Ross has been a member of the Philadelphia Police Department ("PPD") for over 28 years, and for the past 22 months has served as Police Commissioner.   In this role he is responsible for everything from hiring and termination decisions, to training, to policy implementation, to communication.   Prior to taking on the Police Commissioner position, Commissioner Ross rose through the ranks of the PPD, from working as a sergeant, to a lieutenant*,* working his way up to Captain of the Homicide department, before becoming the Deputy Commissioner in Internal Affairs and eventually the First Deputy Commissioner for eight years.

Commissioner Ross reported that the PPD is budgeted for 6,525 police officers, and currently employs approximately 6,400, along with an additional approximately 800 civilian employees, making it the fourth largest police department nationwide.   Commissioner Ross reported that PPD's budget is in excess of $600 million, however between 96-98% of that budget is dedicated to personnel costs and benefits.   Thus, while the $1.6 million that the City must forego if it rejects JAG funds represents a small percentage of PPD's overall budget, it is significant to crime fighting efforts and represents 10% of non-personnel costs.   Specifically, this funding would be used for overtime salaries, crime suppression, and technological updates.

   **1.    Philadelphia Police Priorities**

When asked what the most important issues are to the PPD currently, Commissioner Ross pointed to gun violence, and the development and maintenance of police-community relationships. When asked to articulate his theory of policing, he highlighted two major themes: smart policing—that is, using intelligence to react to, and proactively anticipate crime as quickly as

possible—and community policing—in the sense of viewing citizens as "partners" in crime fighting, and being intentional about developing relationships with the community in order to promote this idea of a partnership and the attendant benefits.  He emphasized the connection between these two themes, noting that it is not possible for the PPD to be omnipresent, in the sense of having a police officer on every single corner, so they must leverage community relationships to increase their capacity to detect crime.

He identified some of the ways that community members help the PPD respond to crime, for example, the PPD receives tips from the public in response to surveillance video and photos connected to requests for information; in general, he asserted, the greatest source of intelligence used for resolving criminal investigations comes from people, not through technologically advanced techniques.  He highlighted domestic violence and sexual assault as contexts in which crime can typically only be detected and addressed if victims come forward with information. Further he described PPD's efforts to utilize pattern information and analysis to anticipate and react quickly to neighborhood crime, for example robbery; information from victims and other community members regarding these patterns is incredibly valuable, and if community members are in fear of being deported as a result of approaching PPD they won't come forward.  This would put PPD far behind in their efforts to effectively respond to crime.

### 2. Reasons for Philadelphia Police Department Policies on Immigrants

Commissioner Ross discussed the likely consequences if the PPD were required to disclose the immigration status of every victim and witness with whom they came into contact.   He stated that this practice would be "stifling" because community members would fear PPD.   Although developing community relationships can be incredibly hard, but because it is so important to the PPD's ability to collect information about ongoing crime, it is something to which the PPD has

24

dedicates substantial resources.

Overall, Commisioner Ross emphasized that a broad policy of sharing the immigration status of non-criminal immigrants would detract from PPD's mission, impacting not only the individuals subject to such information sharing, but also their wider communities and those of adjacent neighborhoods.   Commissioner Ross reported that as of 2016, crime in Philadelphia was at a 40-year low, which is an indicator of the progress that has been achieved through smart policing and community partnership efforts, including in immigrant communities.   He made clear that available evidence suggests no link between an individual's status as an undocumented immigrant, and their likelihood to commit a crime; in fact, it is primarily people born and raised in Philadelphia who commit crime in the City.

### 3.   Community Policing

He indicated that the PPD engages in both department-wide and district-specific programmatic efforts to develop community relationships.   Special interest groups, including some associated with various ethnic identities, are employed to build relationships with the groups they represent.   He described the PPD's efforts, including community engagement through meetings, social media, the Police Athletic League, and town halls.   He highlighted the difficulty, particularly in the current social climate, to maintain an image of legitimacy with the community. Establishing trust, he explained, can sometimes only be achieved on a block-by-block basis. Once gained, losing the community's trust can be almost impossible because it leaves the public with no reason to believe that the PPD is legitimate.   "Trust and legitimacy go together," he stated.

Commissioner Ross described the PPD's interactions with the immigrant community as no different from the rest of the population, explaining that the PPD must have a strong partnership

with this group just as with any other.   He asserted that without them "we would be in peril."
The PPD recruits bilingual officers in order to enable communication between the police and
community members who do not speak English.   He also noted the value in showing to immigrant
communities that many PPD officer share their same heritage.

### 4.       Immigrants Have No Immunity from Arrest and Prosecution for Crimes in Philadelphia

Commissioner Ross stated emphatically that he does not consider PPD to be an extension
of ICE, noting multiple times that pursuing immigration enforcement would detract from the
PPD's mission.   With regard to the term "sanctuary city," Commissioner Ross stated that he is not
clear on exactly what the term refers to and personally does not use it.   Philadelphia is a
"welcoming city," he offered.   He noted that some people might infer that the concept of a
sanctuary city indicates that if an immigrant commits a crime, they won't be arrested or
prosecuted, before clarifying that this not the PPD's policy: "we don't harbor criminals in the
Philadelphia police department."   Commissioner Ross emphasized that a suspect's immigration
status makes no difference to arrest procedures or prosecution decisions.

### 5.       Reasons for Police Policies Criticized by the Attorney General

Commissioner Ross explained that internal PPD memoranda represent policies to be
implemented, and provide directions to guide the manner in which police officers are to conduct
themselves. The method for dissemination is via submission of memos to local police districts.
Officers are generally required to sign each memo to confirm receipt.

Referring to PPD Memorandum 01-06, dated May 17, 2001 and issued by then Police
Commissioner Timoney, Commissioner Ross clarified that the Policy outlined in Section II
accurately reflects the current policy of PPD.   With respect to Section II, Part B, which indicates
that PPD "will preserve the confidentiality of all information regarding law abiding immigrants to

the maximum extent permitted by law," Commissioner Ross explained that the motivation behind this policy is the need for the entire population to understand that the PPD is there to protect and serve them, and that they should feel comfortable coming forward with any information to help police fight crime.  He highlighted the fact that this policy protects the confidentiality only of those who are "law abiding," and says nothing about those who are breaking the law.  He emphasized the built-in exception in Section III which clarifies that police will share with federal authorities information about any immigrant who "is suspected of engaging in criminal activity" to underscore the distinction that the PPD draws between, on the one hand, victims and witnesses, and on the other, criminal violators.

Commissioner Ross explained that nothing in the policy set out in Memo 01-06 prevents PPD from cooperating with the federal government, and that in the 16 years it has been in place the federal government has never identified any issues with it.

Commissioner Ross also commented on Mayor Nutter's Executive Order 8-09, signed on November 10, 2009, which sets out the City's policy with respect to immigrants' access to City services and sets out a general prohibition on City officials inquiring into and disclosing individuals' immigrations status, subject to exceptions.   He explained that this policy is important because the PPD's mission is to safeguard the population, not to engage in immigration enforcement.   The PPD would not be able to effectively pursue its obligation to protect and serve if the City's population is concerned about officers revealing residents' immigration status. Sub-section 3 of Part B of Section 3 provides an exception by which City employees may disclose information regarding an individual's immigration status when that individual is suspected of engaging in criminal activity, "other than mere status as an undocumented alien."   Commissioner Ross again highlighted this exception as establishing PPD's position that these protections do not

27

extend to individuals who are engaged in criminal activity, noting that PPD has no interest in withholding information about criminals from ICE.

Under the City's policies, including Memorandum 01-06 and Executive Order 8-09, police officers would not be restricted from responding to an ICE request for information regarding any noncitizen who has been arrested.  However they would likely not provide address information for a former inmate who had been released and is no longer suspected of criminal activity, as this broaches on immigration enforcement and is not within PPD's purview.   When asked about the policy with regard to an individual who fits the description of both a victim and a perpetrator,[8] Commissioner Ross clarified that the PPD will make determinations about whom to arrest and charge with crimes, and ultimately will be willing to communicate to ICE information regarding the immigration status of any individual who is actually charged with a crime.   Commissioner Ross confirmed that PPD employees had been trained with respect to these policies, however Section 1373 had not been mentioned by name in training.

### 6.      Cooperation with Federal Law Enforcement Agencies

Commissioner Ross asserted that the PPD has a good relationship with all federal agencies, and that nothing in City policy prevents PPD's cooperation with federal agencies.   He identified examples of cooperation such as the joint terrorism task force between the PPD and the FBI— which feature local and federal officials working together.

When asked about the example of a noncitizen who has not committed any state crime, but who has unlawfully returned to the U.S. after being deported in violation of federal criminal law, Commissioner Ross indicated the PPD would not be likely to encounter such a person.   Generally speaking, police are not involved unless a state crime is committed.   He clarified though, that if

---

[8] For example, if two individuals have a physical altercation and both are injured.

28

such a person were to commit a state crime, they would be arrested and charged according to normal PPD procedures, which include fingerprinting the suspect and sharing his fingerprints through a database to which ICE and other federal authorities have access. In this way, the suspect's immigration status would be shared with ICE.

### B.     Declaration and Testimony of Julie Wertheimer

In her declaration, Ms. Wertheimer identifies herself as Chief of Staff, Criminal Justice, in the Managing Director's Office of Philadelphia, in which she oversees the "Office of Violence Prevention." She also discusses Philadelphia's unbroken history of receiving Byrne JAG grants since the program's inception in 2005. In FY 2016, Philadelphia received $1.67 million, and a slightly lower amount in FY 2015. Ms. Wertheimer asserts that Philadelphia relies upon federal funding provided by the Byrne JAG program to support a number of priorities and programs.

Ms. Wertheimer relates that on July 25, 2017, the Department of Justice ("DOJ") notified Philadelphia as follows:

As a condition to receiving any Byrne JAG funds in fiscal year 2017, Philadelphia must comply with three conditions. Philadelphia must:

(1)     certify that the City complies with 8 U.S.C. § 1373;

(2)     permit officials from the Department of Homeland Security ("DHS") access to any detention facility maintained by Philadelphia in order to meet with persons of interest to DHS; and

(3)     provide at least 48 hours' advance notice to DHS regarding the scheduled release date and time of an inmate for whom DHS requests such advance notice.

Ms. Wertheimer relates that the application deadline for the local FY 2017 Byrne JAG funding was September 5, 2017 and that Philadelphia submitted a timely application.

Her declaration gives further details of how Philadelphia plans to spend the JAG funds, if awarded, with further details supplied at the hearing at which she testified.

She explained at the evidentiary hearing that the Byrne Program involves congressionally allocated and congressionally appropriated formula grant funds based on population and crime rate.   Ms. Wertheimer also distinguished between, on the one hand, competitive grants and, on the other hand, formula grants, which do not require the City to compete to acquire the grant funds. In her experience, the City has never failed to receive formula grant funds for which it applied.   In fact, Ms. Wertheimer recalled that on one occasion, due to a typographical error, the city accidentally applied for less money than the formula authorized.   She received a telephone call from an officer at the DOJ informing her that Philadelphia would need to remedy the error because the City was required to receive the full amount for which it was eligible under the terms of the Byrne statute.

Ms. Wertheimer also provided an explanation of the City's budgeting process.   Because the City's fiscal year runs from July 1 to June 30, the Mayor typically submits a proposed budget around February of each year.   City Council then holds hearings and votes on the budget in May or June.   If additional resource needs arise thereafter, city officials must generally wait until the following fiscal year to seek those funds.

She further explained that Byrne Program grants are awarded early in the City's fiscal year, which typically enables the City to acquire additional funds for criminal justice programs that do not appear in that year's fiscal year budget.   In order to decide which criminal justice programs Philadelphia will seek funding for, a sub-committee of the County's Criminal Justice Advisory Board meets and decides which programs should be prioritized based on urgency and need.   In FY 2016, the opioid crisis was one such urgent need.

30

Ms. Wertheimer also testified that the City has applied and been awarded funding under the Byrne Program every year since 2005, without controversy.   In no prior year were any conditions added such as those in FY 2017, in which DOJ asked for a legal opinion from Philadelphia's City Solicitor and signatures on the grant application from the Solicitor and Mayor.

Importantly, she testified that Byrne grants are not in the City's general fund budget. Instead, the Byrne funds are located in the unanticipated funds budget, which signifies that if the grant is not awarded, the projects for which those funds were allocated will not occur.   She emphasized that no funding will be diverted from other sources to pay for what would otherwise have been several projects funded by the Byrne grant, including naloxone supply for officers to use in case of civilian opioid overdose, overtime pay for officers, and case management software used to deliver the City's limited resources efficiently.

### C.      Declaration and Testimony of Eva Gladstein

Plaintiff also submitted a declaration of Eva Gladstein, who is Deputy Managing Director of Health and Human Services in the Office of Managing Director.   After detailing her personal and professional experience, she detailed the City policies and practices regarding what she refers to the "immigrant community," specifically that the City refrains from asking for immigration status information to determine benefits eligibility.   Ms. Gladstein defends this practice and details the number of individuals and children, totaling over 114,000, who have received mental health services through City-funded programs, almost 33,000 individuals who have sought substance abuse treatment through City funded programs, and over 6,000 children who have benefitted from early intervention services by the City.

Ms. Gladstein estimates the immigrant community to include approximately 200,000 people, or 13% of the overall population.   However, because the City does not collect data or

31

statistics regarding immigration status of residents accessing City services, her estimates are not firm numbers.   Ms. Gladstein states as follows:

> If the City were required to collect immigrant status information as a requisite to providing services, that would have a significant impact on the [immigrant] community's willingness to access these services, and I would expect a significant drop in these numbers, which would put all Philadelphians at risk.

Eva Gladstein also testified at the evidentiary hearing that all five of the agencies she supervises comply with Executive Order 08-09 ("The Confidentiality Order").   She further testified that Philadelphia residents can use the City's services without regard to immigration status.   In fact, the agencies that Ms. Gladstein oversees specifically perform outreach to immigrant communities, often using the City's language and cultural capacities to do so.   Because some of these services are stigmatized—e.g., substance abuse, treatment services—the City has sought to remove as many "obstacles" as possible to ensure that immigrants, like other Philadelphia residents, are able to use the City's services.

For example, Ms. Gladstein explained that the Department of Human Services operates a hotline which receives reports of suspected abuse and neglect of children.   These reports generally lead to investigations by the Department, which seeks to determine if the complaint is founded.   These investigations typically rely on some measure of cooperation from the child's neighbors, friends, and family.   Ms. Gladstein testified that, without the Confidentiality Order in place, Philadelphia would not receive the same level of cooperation needed to ensure the safety of Philadelphia's children.

Ms. Gladstein also gave examples of other city services under her supervision that would be compromised in the immigrant community if the City's Confidentiality Order were not in effect, such as emergency shelters, transitional housing, the domestic violence hotline, and

domestic violence shelters.   Ms. Gladstein credibly testified that immigrants would be less likely to use the City's services if they feared that their immigration status would be readily revealed to ICE.

### D.      Declaration and Testimony of Brian Abernathy

Plaintiff filed the declaration of Brian Abernathy, who as First Deputy Managing Director supervises the Police and Fire and Emergency Management Departments.   In addition to providing details about his personal and professional background, Mr. Abernathy summarizes the structure and organization of the Police and Fire Departments.   He also details prior and existing mayoral orders, which do not require that immigrants disclose their immigrant status in dealing with the agencies that he oversees, specifically Philadelphia's six prison facilities, and the Police Department.

Mr. Abernathy details in May 2017 a new "consent form" provided by the City to inmates that gives an inmate the right to speak with a federal immigration official or to decline to do so. His reasons for this policy were set forth as follows:

> It is the expectation that such a policy will further encourage trust by the immigrant community and foster cooperation with law enforcement, without any fears of deportation looming above.   The consent-based policy also ensures the orderly administration of Philadelphia's prisons, by avoiding the unnecessary expenditure of time and resources that sometimes would be incurred when inmates are delivered to ICE only to then exercise their constitutional rights to remain silent or have counsel present.

Mr. Abernathy then details the City's responses to detainer notification requests by ICE and justifies them as follows:

> The City's law enforcement protocols, its notification policy, and its consent-based jail access provisions have led its immigration population to trust Philadelphia's police officers and prosecutors, to believe that reporting a crime or participating as a witness in a trial will not results in that individual or his family being turned over to

ICE, and to view Philadelphia's law enforcement personnel not as extensions of ICE or as immigration enforcement agents, but as persons whose primary job is to keep their families and communities safe from crime.   If City officials, including Philadelphia police officers, were required to affirmatively collect immigration information, this long built trust with the immigrant community would be broken, compromising public safety and pushing a significant segment of Philadelphia's community into the shadows.   Simply put, we would expect crime reporting and witness participation in criminal proceedings to drop and use of healthcare, education, and other services among segments of the immigration population to be reduced.

Abernathy oversees the day-to-day operations of the City, including public safety departments like police, fire, and emergency management, and is responsible for establishing broad policy in fields such as opioid response, immigrant affairs, and homelessness.   Through his work, he interacts with Blanche Carney, Commissioner of the Philadelphia Department of Prisons. He also testified to enjoying a "professional, cooperative relationship" with ICE—although they "h[ad their] disagreements"—and referenced a recent meeting at which he explained City policy regarding immigrants to ICE officials.

Abernathy testified that as of Friday, October 20, 2017, Philadelphia's six prisons held some 6,833 inmates, of whom 79% are being held pre-trial, and 17% have been sentenced. Another 2% have been convicted but not sentenced, and a further 2% are in some other form of temporary custody.   Abernathy several times reiterated that only 17% of inmates in Philadelphia prisons, who are all serving sentences of 23 months or less, have scheduled release dates.

City law enforcement employ several case management databases, among them the Preliminary Arraignment Reporting System (PARS), the Automated Fingerprint Information System (AFIS), and the National Crime Information Center (NCIC).   Suspects booked by Philadelphia police are fingerprinted.   The fingerprints are uploaded into a state system, which

interfaces with federal information, and shared with law enforcement across the country, including ICE.   PARS, which is co-owned by the City, the First Judicial District, and the District Attorney, is an information-sharing system for real-time case updates; although PARS does not contain immigration status information, ICE has had access for "a number of years."   A memorandum of understanding with ICE limits access to victim and witness information, however.   Abernathy testified to reading on the ICE website that most ICE detainers were generated from biometric data provided by local law enforcement.

Abernathy stated that the City often receives requests for an inmate to be detained at the behest of another jurisdiction or agency.   Sometimes these are criminal warrants signed by a judge, such as if an inmate were facing charges in another jurisdiction.   In other instances, the City receives civil, administrative detainers from ICE, which are typically signed by an ICE agent. Between December, 2015 and October 20, 2017, the City received 140 ICE detainer requests.   Of these 140 detainers, only four were accompanied by a judicial warrant; all four of these individuals are still in custody.   When an immigration detainer request is received, it is placed in the inmate's file and marked within the prison computer system, which also codes whether the detainer is accompanied by a judicial warrant.   Abernathy had heard of only one example of an immigration detainer being sent to local police, which made sense, he said, because police hold an individual only briefly.

Abernathy was familiar with City policies regarding immigration status collection and immigration detainers.   He stated that Executive Order 8-09 did not prohibit employees from asking about status information, and did not forbid employees from contacting ICE to inquire about an individual's immigration status, although he did not know why anyone would do this. He repeatedly stressed this importance of respecting court orders and warrants, and described

35

issuing a memorandum to Prisons Commissioner Blanche Carney on March 22, 2017 (ECF 1-7) clarifying Executive Order 5-16.  That memorandum ordered City prisons to honor all judicial warrants.  Pursuant to Executive Order 5-16 and the clarifying memorandum, the City does not hold individuals based on civil ICE detainers alone.  The operative question is always whether a judicial warrant was received. He clarified that the City does not honor immigration detainers signed by an immigration judge unaccompanied by a criminal warrant.

When posed with various hypotheticals regarding whether City policies prevented employees from sharing an individual's status in custody or identifying information, Abernathy frequently seemed puzzled—why was asking City employees necessary when the information was already available to ICE through shared databases?  He added that City policies allowed employees to share with ICE an individual's location, but not that individual's release date, unless the request for release date was accompanied by a judicial warrant.  Providing advance notice of a release date for an unsentenced inmate would also pose administrative burdens and practical problems, Abernathy explained, because inmates are often released directly from court or on short notice pursuant to a court order.

This spring, Abernathy began hearing reports that ICE had been contacting individual prison wardens in order to interview inmates.  In response, the City began sending consent forms to inmates that informed them of their right to decline an ICE interview.  The policy was a compromise between advocates, who wanted the City to prohibit all ICE access to prisons, and federal immigration authorities.  The City has consent forms only for ICE, Abernathy said, because only ICE is investigating civil matters.  Since the consent form was implemented, ICE has sought to interview three people, two of whom declined interviews, and the last of whom agreed to be interviewed only in the presence of a lawyer, at which point ICE cancelled the

interview.

Abernathy also oversees the Office of Criminal Justice, which prepares the City's application for Byrne JAG grants.   The City is planning to use the Byrne grant to pay overtime for officers, fund police officer training regarding use of force, and buy Narcan (also known as Naloxone), a drug that counteracts opioid overdoses, for Philadelphia police officers to administer. Abernathy emphasized the life-saving potential of these programs: the use-of-force training was implemented at the behest of Police Commissioner Ross to cut down on officer-involved shootings, which are now at record lows.   And more Narcan doses means more lives saved: Although officers carrying Narcan had made over 300 "saves" this year,   Philadelphia suffered 900 deaths from opioid overdoses in 2016, some three times the number of homicides, and is anticipating approximately 1200 deaths this year.   Without JAG funds, these programs "would not move forward."

### E.    Testimony of Thomas Farley

Philadelphia City Health Commissioner Dr. Thomas Farley, MD/MPH, testified that his role as City Health Commissioner requires him to look after the health of all of the City's 1.56 million residents, some 200,000 of whom are foreign-born.   The Department of Public Health employs approximately 1,200 employees under Dr. Farley's supervision, and oversees aspects of preventive health interventions as diverse as curbing the spread of communicable diseases like HIV, sexually transmitted diseases, and tuberculosis; promoting immunizations; encouraging Philadelphia residents to quit smoking; and inspecting restaurants.   The Department of Public Health operates numerous public clinics throughout the city, offering primary care services to some 80,000 individuals per year—without regard to immigration status.

Dr. Farley testified that cultivating trust with immigrant communities is paramount to the

work of the Department of Public Health.   Many of those seeking treatment from City clinics are immigrants, and the Department employs some 120 bilingual staff, as well as 19 full- or part-time translators.   Dr. Farley believes that it is important to the overall health of the City for immigrants to seek preventive services such as vaccinations without fear of immigration consequences. Public health is served when individuals freely seek preventive care and do not stave off care until they need emergency room treatment in the midst of a health crisis.

Dealing with tuberculosis among immigrant communities has proven particularly delicate. Two-thirds of the 75 people with active tuberculosis in Philadelphia are immigrants. Investigating tuberculosis transmission requires Department employees to enter individuals' homes; treatment protocols require Department employees to watch patients taking their medicine. Destroying this trust would have negative public health consequences for controlling the spread of this disease.

Dr. Farley stressed that he cooperates with federal public health agencies, including the Center for Disease Control.   The Department, he testified, does not receive Byrne JAG funds.

**IX.     Review of Sworn Declarations Filed by Defendant in Opposition to Motion**

The declaration of the Acting Assistant Attorney General, Alvin Hanson, sets forth the basic facts of the Byrne AG program and are not disputed.

The Jim Brown declaration (ECF 28-2), submitted by defendant, sets forth his position as Deputy Assistant Director of Enforcement of ICE, and several reasons why ICE desires to have immigrant status information provided by state and local governments.   The City objected to part of the Brown declaration and the defendant declined the opportunity to present him for live testimony and cross-examination.   Therefore, the Court gives low weight to his declaration. Specifically, Mr. Brown does not at all address the various sources of computer-based information through which ICE, like the City, has access to immigrant status information, and those who deserve the status of "criminal aliens"—as to whom Philadelphia policies do not preclude removal.   Nor does he discuss specific Philadelphia policies providing exceptions for persons convicted of felony crimes, or for whom there is a judicial warrant.

## X.      Findings of Fact

Based on the facts presented by the various declarations summarized above, and the testimony received at the hearing on October 26, 2017, the Court makes the following findings of fact:

1.      All of the witnesses called by the City to testify are credible and the Court will give significant weight to their testimony, which is based on their personal knowledge as City officials and/or employees.

2.      The Attorney General's phrase for certain cities, including Philadelphia, is "Sanctuary Cities"—which this Court rejects as a misnomer.   Philadelphia is not a sanctuary for anyone involved in criminal conduct, nor is it a sanctuary as to any law enforcement investigation, prosecution, or imprisonment after having been found guilty of a crime.   The Court does not need a label for Philadelphia's policies.

3.      The City has a comprehensive criminal justice system reflecting the broad continuum that must deal with crime in a large urban setting, ranging from minor offenses for which there is usually very little or no jail time upon conviction, but also dealing with recidivist and violent criminals who deserve and receive lengthy prison sentences.   This City policy extends through many City agencies, including the police department, responsible for law enforcement, through the District Attorney's Office, and its investigation and prosecution function, through the Defender Association and various private attorneys who defend individuals accused of crime, the court system and the prison system which is responsible for custodial maintenance of those sentenced to prison.   This continuum includes the probation department and other social service agencies which provide useful services to individuals who may be awaiting trial, or have served any sentence but are still under court supervision, and are re-entering society.

40

4.     The conditions that the Attorney General has placed on receipt of Byrne JAG grants have no relationship to successful police practice or the enforcement of criminal laws in the City. Arrest and prosecution of non-citizens who have committed crimes, is an important part of law enforcement.  However, disclosing their immigration status to ICE has nothing to do with law enforcement, and will not prevent crime.  The City has adopted policies designed to improve re-entry, to encourage non-criminal behavior by individuals who were previously convicted of a crime, whether citizens or aliens, and to preserve public health.

5.     The City's reasons for this were well explained during the testimony, particularly by Police Commissioner Ross, Deputy Managing Director Abernathy, and Dr. Farley.  Their reasons express valid principles of public health, of undue burdensomeness of administrative adherence to the ICE requests, and the reasonable and fact-based belief that giving ICE 48 hours' notice of release of an immigrant would endanger public safety, and also endanger public health. The reasons for this are set forth in the testimony and include the concept of rehabilitation once an individual leaves a prison setting, the need for individuals to have jobs so they can support themselves and their families, and to educate their children, without fear of deportation.

6.     Nonetheless, the City has a firm policy that it will honor judicial warrants and, as various witnesses pointed out, ICE as a federal law enforcement agency has access to the same national databases as any other law enforcement agency, from which ICE can secure information about where an individual subject to removal/deportation, has recorded his or her last known address and other important facts such as medications, continuing of medication for certain diseases, etc.

7.     The 48 hour Notice requirement, if strictly enforced, would impose substantial administrative burdens by City personnel, and may require hiring additional employees, at a

significant but unnecessary cost.   The testimony established only 17% of the occupants of Philadelphia City prisons are sentenced and have a "release date."

8.      In the prison setting, the recent requirement of providing 48 hours' advance notice would not only create administrative burdens, but would be basically impossible to administer, even with extra personnel.   As noted above, only 17% of the inmates in Philadelphia City prisons have actually been sentenced, and would have a release date.   As to an inmate who has not been tried, or has been convicted but not been sentenced, or has been sentenced to a term of 24 months or more (and thus will be transported to a state institution), compliance with the 48 hour notice is impossible.   The City has no way of knowing the release date of individuals who were in that prison without the specific sentence having been imposed by a judge.

9.      The City's policy of respecting judicial warrants serves a valid purpose and will enable ICE to fully perform its immigration and law enforcement functions.   As noted at the hearing, City law enforcement officials, as well as ICE, have access to national databases that indicate the name, any aliases, and addresses, past, present and future, of individuals, whether citizens or aliens.   Thus, ICE really has no need for the City to designate individuals who are subject to a specific release date.

10.     As to the request for interviews, once again ICE has access to information of criminal aliens who are subject to deportation and can check that database information against the listing of inmates in the Philadelphia prison system, which is periodically reviewed and updated.

11.     As Commissioner Ross testified, both citizens and non-citizens who happen to be in prison are anxious to get out of prison.   Most of them want to resume a normal life with a paying job and a constructive family life.   The Court finds that if the City were to succumb to the DOJ conditions at issue here, that there would be a marked decrease in the provision of City

42

services to aliens, whether criminal or otherwise, but not presently in prison, and the overall security and safety of many neighborhoods and communities would suffer.

12.     There is no evidence in the record whatsoever that non-citizens in Philadelphia commit any more crimes than the citizens.   In fact, Commissioner Ross testified that Philadelphia born and bred residents are much more responsible for crime in the City of Philadelphia than aliens.

13.     Dr. Farley, Health Commissioner, corroborated this testimony and gave specific examples of how designating and publicizing immigration status information, of non-citizen residents would be counterproductive to public health.   As one example, there are a number of communicable and infectious diseases prevalent in a large city as Philadelphia at various times, and if infected non-citizens had to disclose their immigrant status and their addresses to City agencies, with later disclosure to ICE, they would likely not accept any kind of care where they would have to disclose their non-citizenship status, and thus, there would be a significant exposure of City residents to these diseases. These individuals currently do not have to disclose their non-citizenship status, but if they were required to do so, this would cause spread of an infectious disease much to the detriment of the entire City.

14.     The evidence of record in this case, and considerable research, including newspaper accounts of the discussions in Congress over "immigration reform" lead the Court to find that the federal immigration authorities have, for decades, concentrated virtually exclusively on the removal of aliens who have committed crimes.   The extensive discussion below, of the various immigration provisions, and criminal sanctions for immigration violations, show that the emphasis on federal removal practices is limited to a group that could be fairly described as "criminal aliens" – those non-citizens who have committed serious (felony) crimes while present

in the United States.   The Court has no disagreement whatsoever with these policies, and they are really not relevant for the issues in this case, except that the fact has been established that, over decades, only criminal aliens have been subject to removal.

15.     The Court agrees with footnote 4 in the City's proposed findings of fact (ECF 65), that of the estimated 11 million non-citizen immigrants in the United States, only 8% would be classified as criminal aliens.   The policies in practice of the federal government for decades have been basically to ignore removal practices against "visa overstayers."[9]   However, the breadth, and the generalizations implied in the Attorney General's conditions, which are the subject of the City's motion for preliminary injunction, threaten to include visa overstayers and other non-citizen immigrants who cannot be classified as criminal aliens.   Examples of this would be persons arrested for minor crimes and not convicted, immigrants arrested and convicted for minor crimes but receiving very minimal sentences, and also individuals who may find themselves in prison, having been found in contempt of court for failure to pay child support or similar family court sanctions.   None of these groups can be classified as criminal aliens.   Furthermore, as Commissioner Ross explained, some ICE policies seek to use civil "immigration detainers" to require City prisons to detain aliens who have been notified of removal proceedings, irrespective of any status as a criminal alien, which may reflect a change in the existing policy of non-enforcement as to visa overstayers, but the record is not clear on this point.

16.     The Court has reviewed the City's proposed findings of fact (ECF 65), and finds that they accurately reflect the contents of the various memoranda that were discussed by the witnesses at the hearing, and the impact which the Attorney General's conditions would have on

---

[9] As discussed in more detail below, a first offense of illegal entry into the United States is a misdemeanor, but subsequent convictions are a felony.  8 U.S.C. § 1325.  This type of alien is generally not included in the term "criminal alien" and in any event does not represent any significant numbers of aliens in Philadelphia.   There may be significantly larger number of illegal entrants in the western United States.

these very valid City practices.   The Court does not see a need to incorporate in detail all of the provisions of the various memoranda, but agrees that they establish valid municipal policies, including law enforcement practices, and that the decision of the City not to make disclosure of an immigrant's status on any publicly available reports is a sound one, that is not in violation of any federal law, and serves valid public policy and public health principles.

17.     ICE is legitimately concerned about release of convicted criminal aliens from prison and into a community.   The Philadelphia policies provide an exception for any person as to whom a judicial warrant is lodged as a detainer.   The various computer databases described by Police Commissioner Ross provide ample data to ICE to identify criminal aliens who are situated in Philadelphia prisons for whatever reason.   Obtaining a judicial warrant is not a burdensome procedure.   ICE enforcement officers are well trained in preparing warrants based on "probable cause" as the Fourth Amendment of the United States Constitution provides.   Numerous United States judicial officers in this court are available on a 24/7 basis to review and approve warrants, which can then be transmitted electronically to a Philadelphia prison and lodged as a detainer against an inmate.

18.     The various arguments and reasons that the Attorney General gave for the conditions are refuted by the testimony of the City witnesses.   The Attorney General does point out, see Proposed Finding of Fact 42 (ECF 64) that there are certain instances in which Byrne JAG grant money could be used to assist a former prison inmate who is an alien, for whom ICE seeks removal, such as a person not convicted of a felony, and for whom ICE did not secure a judicial warrant.   The Court finds these instances are likely to be very few in number and that the beneficial law enforcement and public health benefits of the City's policies would outweigh any minor disregard of ICE policies.

45

19.     Based on the foregoing Findings of Facts, and the discussion below, the Court finds that the City is in substantial compliance with the Challenged Conditions for the FY 2017 Byrne JAG grant and that it can certify its compliance with Section 1373.   Any lack of strict compliance is *de minimis*, as Philadelphia policies provide no safe harbor nor sanctuary for any criminal alien.

20.     Denial of the Byrne JAG grant for FY 2017 would result in irreparable harm.   The testimony shows that this money constitutes 10% of Philadelphia Police budget for non-personnel uses, and this would make a substantial inroad on City programs which have depended on the Byrne JAG grants in prior years.   Denial will deter crime prevention efforts, and also public health efforts, such as fighting the opioid epidemic.

21.     In conclusion, the undersigned notes his experience as an Assistant District Attorney in Philadelphia, and also serving as United States Attorney in this district, which has given me substantial personal experience in the workings of the criminal justice system, the availability of judicial warrants, the cooperation between federal and local officials, the data contained on computer-based information about criminal histories, of people arrested, likely including their immigrant status or at least data showing that they are immigrants, and whether legal immigrants, or visa overstayers.

## XI.     The APA and the Challenged Conditions

The APA exempts from rulemaking requirements any "matter relating to agency management or personnel or to public property, loans, **grants**, benefits, or contracts."   5 U.S.C. § 553(a)(2) (emphasis added).   Although this exception may have "create[d] a serious gap in the procedural protections the APA was enacted to provide," it is clear that the language, "any matter relating to . . . grants," includes an agency's imposition of grant conditions.   Nat'l Wildlife Fed'n v. Snow, 561 F.2d 227, 231 (D.C. Cir. 1976).

Therefore, grant conditions—such as those at issue in this case—are not subject to the rulemaking requirements of 5 U.S.C. § 553, including requirements that the agency publish general notice of proposed rulemaking in the Federal Register, § 553(b) (i.e., notice), and provide interested persons an opportunity to participate in rulemaking through submission of written data or arguments, § 553(c) (i.e., comment).[10]

The JAG Program's enabling statute provides for limited procedural protection to be afforded to grant applicants.   It states, "[t]he Attorney General shall not finally disapprove any application . . . submitted under this part without first affording the applicant reasonable notice of any deficiencies in the application and opportunity for correction and reconsideration."   34 U.S.C. § 10154.

The JAG Program statute also clearly delegates authority to the Attorney General to "issue rules to carry out this part."   34 U.S.C. § 10155.

Philadelphia does not claim that the Attorney General lacked all authority to promulgate grant conditions, failed to provide a required notice-and-comment period, denied the City notice of

---

[10]  The Supreme Court has cautioned that while "[a]gencies are free to grant additional procedural rights in the exercise of their discretion, [] reviewing courts are generally not free to impose them if" the agencies "employed at least the statutory minima."   Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc., 435 U.S. 519, 524, 548 (1978).

perceived deficiencies, or failed to provide an opportunity for the City to seek reconsideration of the Attorney General's decision to impose the Challenged Conditions.   Instead, Philadelphia brings three claims under APA section 706, contending that the Attorney General:

> (1) acted in excess of his statutory authority (and contrary to the authorizing federal statute);
>
> (2) violated the Constitution's separation of powers; and,
>
> (3) acted in an arbitrary and capricious manner.

However, before analyzing Philadelphia's claims, this Court must first determine whether the Attorney General's action is in fact final and reviewable.

### A.      Final Agency Action

First, the Attorney General challenges Philadelphia's APA claims on the grounds that there has been no "final agency action" and thus, that the claims are not ripe for this Court's review. Therefore, the threshold question with respect to the APA claims is whether the DOJ "consummated its decision-making process" such that the action of imposing the grant conditions is "final" and therefore ripe for judicial review.

### 1.      The Parties' Contentions

The Attorney General claims that the City's APA claims are likely to fail because the City's challenge relates to non-final agency action.   The FY 2017 Byrne grant process is still unfolding, without any ultimate decision as to whether Philadelphia will be awarded Byrne funds. According, the Attorney General contends, there has been no "consummation" of DOJ's decision-making process.   The APA does not permit judicial review unless the agency has made a final determination, and as a result, the Attorney General asserts that the City's APA claims are not yet ripe.

Philadelphia claims that the agency action—in this case the imposition of the Challenged

48

Conditions—is final because the Department definitively announced that it "was going to impose three new conditions."   The City points to the Attorney General's own presentation of facts, which demonstrates that each locality's FY 2017 Byrne Program award will contain the Challenged Conditions.   (See Hanson Decl. ¶ 5).   Because the Attorney General can impose the new conditions at any time—especially if the nationwide stay is reversed in the <u>City of Chicago</u> case—the agency has acted.

**2.      The Agency Action at Issue is Final**

"As a general matter, two conditions must be satisfied for agency action to be 'final':

> First, the action must mark the 'consummation' of the agency's decisionmaking process  . . . it must not be of a merely tentative or interlocutory nature.   And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow' . . . ."

<u>Ocean Cty. Landfill Corp. v. U.S. E.P.A., Region II</u>, 631 F.3d 652, 655 (3d Cir. 2011) (quoting <u>Bennett v. Spear</u>, 520 U.S. 154, 177–78 (1997)).   The following factors are used to determine whether an agency action is final:

> 1) whether the decision represents the agency's definitive position on the question;
>
> 2) whether the decision has the status of law with the expectation of immediate compliance;
>
> 3) whether the decision has immediate impact on the day-to-day operations of the party seeking review;
>
> 4) whether the decision involves a pure question of law that does not require further factual development; and
>
> 5) whether immediate judicial review would speed enforcement of the relevant act.

<u>Univ. of Med. & Dentistry of N.J. v. Corrigan</u>, 347 F.3d 57, 69 (3d Cir. 2003) (citations omitted).

The Court agrees with Philadelphia that the Attorney General has decided to impose the Challenged Conditions on applicants for JAG Program funds, and that the decision is one from

49

which legal consequences will flow.   The Attorney General's decision to impose the conditions "represents the agency's definitive position on the question," such that it is now "final" and ripe for this Court's review.   Corrigan, 347 F.3d at 69; see Abbott Labs. v. Gardner, 387 U.S. 136, 149 (1967).

### B.   The City's Challenges under APA Section 706

In reviewing agency action, this Court must use the defined "Scope of Review" contained in 5 U.S.C. § 706.   Section 706 states in relevant part:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
>
> **(2)** hold unlawful and set aside agency action, findings, and conclusions found to be—
>
>> **(A)** arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>>
>> **(B)** contrary to constitutional right, power, privilege, or immunity; or
>>
>> **(C)** in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

For reasons that will become clearer below, this Court will analyze the City's claims pursuant to Section 706 in the following order:

(1) The Attorney General acted in excess of statutory authority;

(2) The Attorney General acted arbitrarily and capriciously; and

(3) The Attorney General acted contrary to the Constitution.

### 1.   Statutory Authority

The Attorney General cites to two different statutory provisions as purported authorization of the Challenged Conditions.

50

The first is 34 U.S.C. § 10102(a)(6), which authorizes the Assistant Attorney General ("AAG") of OJP to "plac[e] special conditions on all grants" and to "determin[e] priority purposes for formula grants."   The Attorney General claims that this section authorizes all three Challenged Conditions.

The second source of statutory authorization claimed by the Attorney General is 34 U.S.C. § 10153(a)(5)(D), which requires JAG Program applicants to include a "certification" that "the applicant will comply with all provisions of this part and all other applicable Federal laws."   The Attorney General claims that this section authorizes the Certification Condition.

Below, each of the bases for statutory authority is addressed in turn.

### a)   "Special Conditions" Authorization

The Attorney General claims authority to impose all three of the Challenged Conditions under 34 U.S.C. § 10102(a)(6), which states in relevant part:

> The Assistant Attorney General shall . . . exercise such other powers and functions as may be vested in the Assistant Attorney General pursuant to this chapter or by delegation of the Attorney General, including placing special conditions on all grants, and determining priority purposes for formula grants.

### (1)   The Parties' Contentions

The City claims that this provision does not provide any independent basis of authority to the AAG—let alone the Attorney General himself—because the statute states plainly that the AAG is empowered only with that authority conferred by "this chapter" or "by delegation."

The Attorney General contends that the City's reading would render a portion of the provision superfluous, and therefore, the reading cannot be correct.   Instead, the Attorney General reads the provision as a conferral of "broad power," limited only by the Constitution and jurisdictions' ability to reject overly demanding obligations.

51

(2)      **Section 10102(a)(6) Does Not Authorize Any Challenged Condition**

This Court concludes that reading 34 U.S.C. § 10102(a)(6) as a conferral of authority on the Attorney General to impose the Challenged Conditions would require this Court to overlook several impediments.

First, 34 U.S.C. § 10102(a)(6)'s grant of authority to the AAG is located in a different subchapter from the Byrne Program.

Second, the statute does not state that it applies 34 U.S.C. § 10102(a)(6) to the rest of the chapter, let alone to the Byrne Program.   Chapter 101—in which the JAG Program and 34 U.S.C. § 10102(a)(6) both appear—relates to grants for wide-ranging topics such a residential substance abuse treatment and criminal child support enforcement.   If 34 U.S.C. § 10102(a)(6) were found to apply to the JAG Program, such grants would also be subject to conditions under the Attorney General's purported "broad power," an interpretation which, according to the Attorney General, would be limited only by the Constitution and the prospect of state and local jurisdictions rejecting the condition—an apparent toppling of Congress's appropriations to those programs.

Third, if 34 U.S.C. § 10102(a)(6) were to apply to the Byrne Program, it would render superfluous the explicit statutory authority Congress gave to the Director of the Bureau of Justice Assistance ("BJA") on other BJA grants.   See id. § 10142(B) ("The Director shall have the following duties: . . . Establishing programs . . . [and] awarding and allocating funds . . . on terms and conditions determined by the Director to be consistent with Part B of subchapter V of this chapter").

Fourth, Congress delegated authority to impose conditions on other grants in the same chapter, and did so clearly.   See, e.g., id. § 10446(e)(3) (In the subsection relating to grants for efforts to combat violence against women, it states, "[i]n disbursing grants under this subchapter,

52

the Attorney General may impose reasonable conditions on grant awards to ensure that the States meet statutory, regulatory, and other program requirements."). "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." Russello v. U.S., 464 U.S. 16, 23 (1983). What is more, "[w]e do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest." Jama v. Immigration & Customs Enf't, 543 U.S. 335, 341 (2005).

Fifth, Congress is unlikely to ground the Attorney General's authority to impose substantive conditions in a subsection dedicated to conferring power on the AAG.

Sixth, the term "special conditions" referred to in the subsection—which states that the "powers and functions" vested in the AAG "includ[e] placing special conditions on all grants," id. § 10153(a)(6)—is a term of art for conditions intended for "high-risk grantees" with difficulty adhering to existing grant requirements. See 28 C.F.R. § 66.12(a) (in effect from Mar. 11, 1988 to Dec. 25, 2014) (listing possible problems as justifying "special conditions," including that the grantee "[i]s not financially stable"); see also, 7 C.F.R. § 550.10 (defining "special conditions" for the Department of Agriculture); 34 C.F.R. § 80.12 (same for the Department of Education); 45 C.F.R. § 74.14 (same for the Department of Health and Human Services); see also Brief of Amici Curiae ACLU, National Immigrant Justice Center, et al., at 11–13.

Thus, it is clear that § 10102(a)(6) was not intended to confer upon the Attorney General the authority to impose the Challenged Conditions.

**b)**     **"All Other Applicable Federal Laws" Authorization**

The Attorney General contends that, independent of the authority conferred to the AAG in

34 U.S.C. § 10102, a separate source of authority supports the Section 1373 Certification

Condition, namely 34 U.S.C. § 10153(a)(5)(D), which states:

> To request a grant under this part, the chief executive officer of a
> State or unit of local government shall submit an application to the
> Attorney General within 120 days after the date on which funds to
> carry out this part are appropriated for a fiscal year, in such form as
> the Attorney General may require. **Such application shall include**
> the following:
> [...]
> (5) **A certification**, made in a form acceptable to the Attorney
> General and executed by the chief executive officer of the applicant
> (or by another officer of the applicant, if qualified under regulations
> promulgated by the Attorney General), that—
> [...]
> (D) **the applicant will comply with all provisions of this part**
> **and all other applicable Federal laws**.

(Emphasis added).

**(1)**     **The Parties' Contentions**

The City asserts that while Section 1373 is a Federal law, it is not an **applicable** Federal

law.   While acknowledging that the phrase "applicable Federal laws" is not defined in the statute,

the City states that the most reasonable interpretation is that the phrase refers to Federal laws that

"directly speak to recipients on federal funds."   This interpretation is reinforced, it contends, by

the fact that it is a "residual" term within the longer phrase, "all provisions of this part and all other

applicable Federal laws," such that the residual term is limited by the qualities of the specific term.

(See 34 U.S.C. § 10153(a)(5)(D)).   Thus, the City asserts, the term "all other applicable Federal

laws" should be interpreted as "referring to other federal statutes that, similarly, impose

requirements on federal grantees."

In furtherance of its argument that the Section 1373 Certification Condition goes beyond

the Attorney General's statutory authorization, the City compares the Byrne statute to other federal statutes in which Congress conferred discretion upon the executive branch to add substantive conditions to federal grants or establish criteria for grant distribution that go beyond the stated text or purpose of the statute.   The City also highlights that Congress made delegations of the same kind to the DOJ and Attorney General for other grant programs codified in the same Chapter of Title 34 as the Byrne Program.

Philadelphia also suggests that reading 34 U.S.C. § 10153 to allow the Attorney General to create conditions, such as the Section 1373 Certification Condition, would upend the formula approach that Congress created for distributing Byrne funds based on jurisdictions' populations and rates of violent crime, because it would permit the Attorney General to substitute his preferred criteria for the express statistical criteria Congress established.   The City points to the stated purpose of the JAG Program—to fund local criminal justice agencies to implement programs that, in their view, will assist in criminal justice efforts—in order to emphasize that Congress did not intend to confer discretion in the hands of the Attorney General to impose the Certification Condition.

The City also contends that the legislative history of the Byrne statute and Section 1373 confirm that the Certification Condition exceeds the Attorney General's authority.   Citing the legislative purposes of the Byrne Program's two predecessor statutes, as well as that of the Byrne Program itself, the City asserts that Congress did not intend to authorize the Attorney General to override the flexible use of funds by state and local governments as they believe best suit their own criminal justice systems.   Moreover, the City urges the Court to make a "negative inference" that Congress did not intend for Section 1373 certification to be a requirement for receipt of Byrne funds because Congress has proposed and subsequently rejected provisions in several bills that

would have tied Section 1373 compliance to eligibility for Byrne funds and other federal grants.

Philadelphia also asserts that the Section 1373 Certification Condition departs radically from the Attorney General's historical practice because Section 1373 is not substantively "applicable" to the Byrne Program's focus on strengthening criminal justice systems. The City contends that the Attorney General's "new interpretation" of the Byrne statute would substantially expand the DOJ's authority without clear congressional authorization.

Contrary to the City, which views Section 1373 as a Federal law that is not "applicable," the Attorney General asserts that the term "applicable laws" has been interpreted broadly by federal courts and that the most natural reading of the provision is that "applicable Federal laws" refers to all federal laws that actually apply independently to JAG Program grantees. For example, the Attorney General contends that because all grantees are state and local jurisdictions, "applicable" could mean that the DOJ cannot require those jurisdictions to certify compliance with Federal laws that apply only to private individuals.

The Attorney General also disputes the City's contention that the imposition of the Section 1373 Certification Condition would run contrary to the JAG Program's purpose of enabling state and local jurisdictions to use JAG Program funds in furtherance of their own criminal justice prerogatives. According to the Attorney General, because the Certification Condition relates to eligibility to receive funds, rather than directing how a grantee must spend the funds received, it does not contravene Congress's stated purpose for the JAG Program. In fact, the Attorney General contends, the Section 1373 Certification Condition does even less to mandate a universal approach than, for example, the annual requirement attached to Byrne funds that prohibits the use of award funds to purchase various types of equipment and weapons.

Moreover, the Attorney General asserts that the Section 1373 Certification Condition is

consistent with the historical discretionary conditions that the DOJ has imposed, such as the equipment and weapons restriction mentioned above and requirements that certain training be completed for law enforcement task forces in jurisdictions that receive Byrne funds.

Lastly, the Attorney General asserts that the City's citation of various statutes in which Congress delegated to agencies the discretionary power to impose grant conditions shows nothing more than that Congress routinely delegates such power using a variety of textual formulations.

Lastly, the Attorney General cautions the Court not to credit the City's argument that a "negative inference" can be drawn by Congress's repeated consideration and rejection of bill provisions that would have tied Byrne and other federal grant eligibility to Section 1373 compliance.

### (2)     Section 10153(a)(5)(D) May Authorize The Certification Condition

The statutory language is far from unambiguous as it applies to the present case, as it is unclear whether Congress intended to permit the Attorney General to require certification from JAG Program applicants on "Federal laws" in contexts beyond the awarding of federal grants.   It is clear that the present case is not guided by the first part of subsection (D), requiring certification of compliance with "all provisions of this part," as Section 1373 is not contained within the same Part as 34 U.S.C. § 10153(a)(5)(D).   Therefore, whether the Certification Condition falls inside or outside the Attorney General's Congressionally-delegated authority turns on the phrase, "all other applicable Federal laws."

 This Court agrees with the Court in City of Chicago v. Sessions, insofar as that Court found that "[b]oth positions are plausible."   2017 WL 4081821, at *7.   However, because this Court rests its decision to grant the motion for preliminary injunction on other grounds, it need not conclude at this time whether the Attorney General acted outside his delegated authority.   It

57

suffices to say that the question is a "close call."

### 2.    Arbitrary and Capricious

The APA requires this Court to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."   5 U.S.C. § 706(2)(A).   In many cases, an agency's findings and conclusions are well-documented as part of formal rulemaking, notice-and-comment requirements, and associated hearings.   However, as mentioned above, none of those procedures are required here, because the City is challenging grant conditions.

### a)    The Parties' Contentions

The City claims that the Attorney General's imposition of the Challenged Conditions was arbitrary and capricious.   First, it contends that the DOJ deviated from its prior practice of granting Byrne funds without any requirements of this type and without any sound reason or explanation.   Second, it claims that the DOJ failed to rely on reasoned decision-making in reaching its decision to impose the Challenged Conditions.   Third, the City contends that the justifications offered by the Attorney General in public statements run counter to the testimonials provided by several jurisdictions evidencing that the policies promote rather than detract from effective policing.   Lastly, the City criticizes the DOJ for failing to release reports, studies, or analysis in support of the Challenged Conditions.

The Attorney General asserts that the City's claims that the DOJ acted in an "arbitrary and capricious" manner are likely to fail because the standard for review is unexacting and the connection between criminal justice funding and the Challenged Conditions is apparent under DOJ's "common-sense rationale."   Because, the Attorney General contends, federal immigration enforcement undoubtedly intersects with criminal justice, conditioning Byrne funding on

58

compliance with Section 1373 passes the low standard of review applied to claims of arbitrary and capricious agency action.   Moreover, the Attorney General asserts that the Inspector General report finding deteriorating local cooperation with "efforts to remove undocumented criminal aliens from the United States," (ECF 1-10, at 1-2 n. 1), justifies the Certification Condition.

An agency's departure from prior practice can serve as a basis for finding an agency's interpretation to be arbitrary and capricious, so long as the change in policy constitutes an "unexplained inconsistency."   Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 981 (2005); see also Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 42–43; Encino Motorcars, LLC v. Navarro, 136 S. Ct. 2117 (2016); FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009).   However, where Courts found that an agency's policy shift were found to constitute an "unexplained inconsistency," the agencies had an explicit rule in place, only to later issue the opposite rule with limited or no explanation.   See, e.g., Encino, 136 S. Ct. at 2123 (Department of Labor reversed its rule that service advisors at automobile dealers were exempt from overtime payments under the Fair Labor Standards Act, but "gave little explanation for its decision"); Motor Vehicles, 463 U.S. at 35 ("Briefly summarized, we hold that the agency failed to present an adequate basis and explanation for rescinding the passive restraint requirement and that the agency must either consider the matter further or adhere to or amend [the rule] along lines which its analysis supports.").   Importantly, an agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are better than the reasons for the old one . . . it suffices that the new policy is permissible under the statute . . . ." FCC, 556 U.S. at 515.

Nonetheless, "an agency must give adequate reasons for its decisions."   Encino, 136 S. Ct. at 2125.   An agency "must examine the relevant data and articulate a satisfactory explanation for

its action including rational connection between the facts found and the choice made."   <u>Motor Vehicle</u>, 463 U.S. at 43.   An agency's action is not considered the result of "reasoned decision-making" when the agency:

1. "has relied on factors which Congress has not intended it to consider,"
2. "entirely failed to consider an important aspect of the problem,"
3. "offered an explanation for its decision that runs counter to the evidence before the agency, or"
4. Provides a justification that "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

<u>Id.</u> (emphasis added).

Notably, a claim based on the "arbitrary and capricious" standard is accorded a "narrow standard of review" under which "a court is not to substitute its judgment for that of the agency." <u>FCC v. Fox Television Stations, Inc.</u>, 556 U.S. 502, 513–14 (2009).

The Attorney General points to three public explanations to demonstrate that the DOJ articulated "adequate reasons for its decisions" to impose the three conditions.

First, the DOJ issued a "Backgrounder on Grant Requirements" on July 25, 2017.   (ECF 1, Ex. 1).

Second, the Attorney General issued a press release, also on July 25, 2017.   <u>See</u> DOJ Press Release No. 17-826.

Third, the Attorney General points to a May, 2016 memorandum, discussed previously, in which the Office of the Inspector General presents findings to DOJ on local and state compliance with Section 1373.

As demonstrated below, the three items that the Attorney General cites as evincing "adequate reasons for [DOJ's] decisions," <u>Encino</u>, 136 S. Ct. at 2125, do not "articulate a satisfactory explanation for [DOJ's] action."   <u>Motor Vehicle</u>, 463 U.S. at 43.

60

**b)** **The "Backgrounder on Grant Requirements"**

The Backgrounder explained that the new conditions have a "goal of increasing information sharing between federal, state, and local law enforcement" so that "federal immigration authorities have the information they need to enforce the law and keep our communities safe."  (ECF 1, Exh. 1).   The Backgrounder continued:

> These common-sense measures will improve the flow of information between federal, state, and local law enforcement, and help keep our communities safe. Every year, the Department of Justice awards billions of dollars in grants to state and local jurisdictions across the United States. Unfortunately, some of these jurisdictions have adopted policies and regulations that frustrate the enforcement of federal immigration law, including by refusing to cooperate with federal immigration authorities in information sharing about illegal aliens who commit crimes.
>
> These measures will also prevent the counterproductive use of federal funds for policies that frustrate federal immigration enforcement. By refusing to communicate with the federal officials, these jurisdictions jeopardize the safety of their residents and undermine the Department's ability to protect the public and reduce crime and violence.

The Backgrounder demonstrates DOJ's concerns with:

1.   jurisdictions that "refus[e] to cooperate with federal immigration authorities in information sharing about illegal aliens who commit crimes,"

2.   the "use of federal funds for policies that frustrate federal immigration enforcement," and

3.   "jurisdictions [that] jeopardize the safety of their residents and undermine the Department's ability to protect the public and reduce crime and violence."

These are reasonable goals, and, to the extent authorized by statute and the Constitution, the Attorney General may impose conditions on grant money based on these goals so long as there is a "rational connection between the facts found and the choice made."   Motor Vehicle, 463 U.S. at 43.   However, certifying compliance with Section 1373 does not have a rational connection

61

with these goals.

With respect to the first concern of the Backgrounder—reducing or eliminating the flow of Byrne funds to jurisdictions that do not share information about illegal aliens who commit crimes—Section 1373 is far too broad.  By its plain language, Section 1373 is not limited to illegal aliens who commit crimes.

Section 1373(a), for example, states that a "local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [INS **information regarding the citizenship or immigration status, lawful or unlawful, of any individual**." (Emphasis added).   Thus, it explicitly encompasses United States citizens as well as immigrants with lawful status.

Section 1373(b) suffers the same inadequacy by referencing "lawful" immigrants, stating that "no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, **lawful or unlawful**, of any individual: Sending such information to, or requesting or receiving such information from, [INS] . . . ."

Section 1373(c) does not obligate state and local jurisdictions to perform any task. Instead it directs its focus at INS itself, stating that "INS shall respond to an inquiry by [agencies] seeking to verify or ascertain the citizenship or immigration status of any individual . . . ." Therefore, when a state or city like Philadelphia certifies compliance with Section 1373, they functionally only certify compliance with 1373(a) and (b), which, as mentioned above, are far too broadly drawn to find their justification in information-sharing regarding illegal immigrants who commit crimes.

The Backgrounder's second concern also appears to be a valid objective, yet not

accomplished by the Certification Condition.   If DOJ were to impose a condition prohibiting the "use of federal funds for policies that frustrate federal immigration enforcement," that would be an example of a rule geared towards that end.   However, the Attorney General's Certification condition does not restrict the use of Byrne funds based on whether the funds are used to frustrate the ends of federal immigration enforcement.   Instead, practically speaking, the Certification Condition prevents the flow of Byrne funds to jurisdictions that the DOJ deems to be non-compliant with Section 1373, which, as mentioned above, includes immigration status information about United States citizens.   And at the risk of stating the obvious, United States citizens are not subject to federal immigration enforcement.   It would strain credulity—and the "arbitrary and capricious" standard—if this Court were to find that the Certification Condition furthers DOJ's goal of prohibiting "use of federal funds for policies that frustrate federal immigration enforcement."   For example, if the Certification Condition is imposed, the City will not be able to obtain funding for naloxone to treat opioid overdoses.   This alone demonstrates that the Certification condition is geared not towards the **use** of Byrne funds, but rather the **user** of Byrne funds.

The third concern expressed in the DOJ's Backgrounder is that, through lack of cooperation with federal immigration authorities, "jurisdictions jeopardize the safety of their residents and undermine the Department's ability to protect the public and reduce crime and violence."   However, DOJ has not anywhere asserted that there is a link between localities maintaining as confidential the immigration status of non-criminal aliens or citizens and increases in crime and violence.   If anything, Philadelphia has demonstrated through testimony that the policies it has implemented encourage immigrants to seek medical services that prevent the spread of communicable diseases, report crime, and apprehend criminal suspects who may recidivate and

harm other residents.   Philadelphia has also demonstrated that those who commit crime in the

City are not given "sanctuary" by virtue of their immigration status.   In light of the evidence that

Philadelphia has presented, and the lack of any contrary evidence cited by the Attorney General,

this Court cannot find a link between, on one hand, imposing the Certification Condition, and on

the other hand, "protect[ing] the public and reduc[ing] crime and violence."

In summary, no objective discussed in the Backgrounder justifies the Certification

Condition.

### c)      The July 25, 2017 Press Release

Next, this Court considers the Attorney General's second source in seeking to demonstrate

that the DOJ articulated "adequate reasons for its decisions" to impose the three conditions.   See

DOJ Press Release No. 17-826.   The release stated that the new conditions were aimed at

"increas[ing] information sharing between federal, state, and local law enforcement," as well as

"ensuring that federal immigration authorities have the information they need to enforce

immigration laws and keep our communities safe."   It continued:

> So-called "sanctuary' policies make all of us less safe because they
> intentionally undermine our laws and protect illegal aliens who have
> committed crimes," Attorney General Jeff Sessions said. "These
> policies also encourage illegal immigration and even human
> trafficking by perpetuating the lie that in certain cities, illegal aliens
> can live outside the law. This can have tragic consequences, like the
> 10 deaths we saw in San Antonio this weekend. As part of
> accomplishing the Department of Justice's top priority of reducing
> violent crime, we must encourage these 'sanctuary' jurisdictions to
> change their policies and partner with federal law enforcement to
> remove criminals. From now on, the Department will only provide
> Byrne JAG grants to cities and states that comply with federal law,
> allow federal immigration access to detention facilities, and provide
> 48 hours notice [sic] before they release an illegal alien wanted by
> federal authorities. This is consistent with long-established
> cooperative principles among law enforcement agencies. This is
> what the American people should be able to expect from their cities
> and states, and these long overdue requirements will help us take

64

down MS-13 and other violent transnational gangs, and make our country safer.

<u>Id.</u>  The Press Release thus makes the following claims, without any support whatsoever:

1. "Sanctuary policies" make "all of us less safe,"

2. "Sanctuary policies" "protect illegal aliens who have committed crimes,"

3. "Sanctuary policies" "encourage illegal immigration" and "human trafficking,"

4. "Sanctuary policies" "perpetuat[e] the lie that in certain cities, illegal aliens can live outside the law,"

5. "Sanctuary policies" led to "the 10 deaths we saw in San Antonio," [apparently referring to the then-recent deaths of ten Mexican and Guatemalan nationals who attempted to illegally cross the border in the back of a poorly ventilated tractor-trailer]

6. "Encourag[ing] these "sanctuary jurisdictions" to change their policies" is "part of the [DOJ's] top priority of reducing violence crime,"

7. The Challenged Conditions are "consistent with long-established cooperative principles among law enforcement agencies,"

8. The Challenged Conditions "will help us take down MS-13 and other violent transnational gangs," and,

9. The Challenged Conditions "make our country safer."

Claims 1, 3, 5, 6, 8, and 9 all parrot the third "concern" in the Backgrounder, i.e., that, through lack of cooperation with federal immigration authorities, "jurisdictions jeopardize the safety of their residents and undermine the Department's ability to protect the public and reduce crime and violence."  Backgrounder at 1.  However, as explained in the prior discussion about that concern, DOJ has not anywhere demonstrated a link between localities maintaining as confidential the immigration status of non-criminal aliens or citizens and increases in crime and violence, let alone "illegal immigration" and "human trafficking."  <u>See</u> Claim #3.  Nonetheless, Section 1373 prohibits cities from protecting immigration status, including as it pertains to lawful immigrants and citizens.

Claims 2 and 4 are factually untrue in Philadelphia: the City's policies do not protect illegal

65

aliens who commit crimes.   Criminal aliens are not shielded from criminal prosecution or from federal immigration authorities.

While true in the most abstract sense, Claim 7 is untrue in this particular circumstance. "[S]ince 1996, the United States government has never sought to enforce [Section 1373] against a state or local government," and neither the DOJ nor any other agency has made compliance with Section 1373 a requirement of receiving a federal grant.   Elizabeth M. McCormick, Federal Anti-Sanctuary Law: A Failed Approach to Immigration Enforcement and a Poor Substitute for Real Reform, 20 Lewis & Clark L. Rev. 165, 170 (2016).   Even if the Certification condition were considered "consistent with" principles of cooperation between agencies, DOJ lacks the requisite "adequate reasons" vis-à-vis this particular condition.

### d)     The 2016 OIG Report

Third, the Attorney General seeks to justify the Certification Condition based on a memorandum from May, 2016, in which the OIG presents findings to DOJ on compliance with Section 1373 from local and state jurisdictions.

That report, in summary, advised that local cooperation had "deteriorated" with respect to "efforts to remove undocumented criminal aliens from the United States," and proposed—among other ideas—that the DOJ "provide clear guidance to grant recipients regarding whether Section 1373 is an 'applicable federal law' that recipients would be expected to comply with in order to satisfy relevant grant rules and regulations."   (ECF 1, Ex. 10).   Notably, the memorandum did not purport to assess the wisdom of such a proposal and its effect on immigration policy or criminal justice; instead, the memorandum's scope was limited to assessing whether jurisdictions that received grant awards were in fact complying with Section 1373.   The Attorney General cannot justify the Certification on a tautology; a report concluding that many jurisdictions are not

complying with Section 1373 does not justify imposing a condition requiring those jurisdictions to certify compliance with Section 1373.   Because the OIG memorandum did not assess the benefits or drawbacks of imposing a condition, but instead merely assessed whether jurisdictions would be compliant were such a condition imposed, the memorandum does not justify the imposition of the Certification Condition.

Therefore, DOJ has failed to "give adequate reasons for its decisions," Encino, 136 S. Ct. at 2125, by "examin[ing] the relevant data and articulat[ing] a satisfactory explanation for its action including rational connection between the facts found and the choice made," Motor Vehicle, 463 U.S. at 43.   DOJ also "entirely failed to consider an important aspect of the problem" by failing to recognize how Section 1373 interferes with local policies that promote public health and safety, and "offered an explanation for its decision that runs counter to the evidence before the agency." Id.   Its justifications cannot "be ascribed to a difference in view or the product of agency expertise."  Id.    In sum, this Court concludes that the Certification Condition is arbitrary and capricious under 5 U.S.C. § 706(2)(A).

### 3.    Constitutionality of Conditions

The APA also requires this Court to "hold unlawful and set aside agency action, findings, and conclusions found to be contrary to constitutional right, power, privilege, or immunity."   5 U.S.C. § 706(2)(B).   As further discussed below, Philadelphia asserts that the grant conditions imposed by the Attorney General violate principles of Federalism and the Separation of Powers, and more specifically, the Spending Clause and the Tenth Amendment.

One aspect of the City's Spending Clause challenge is based on the purported lack of "relatedness" between the Challenged Conditions and the JAG Program, as the Challenged Conditions pertain to Federal civil immigration enforcement and the JAG Program pertains to

67

local criminal justice enforcement.   In assessing this "relatedness" challenge, this Court is mindful of the many ways in which the areas of immigration law and criminal law intersect, addressed below.

**XII.    The Intersection between Criminal Law and Immigration Law**

Public discourse about aliens and crime takes many forms, including fact, fear, and hyperbole.   All governments (federal, state and local), have a legitimate interest in arresting and prosecuting those aliens (and all others) who commit crimes.   A crucial theme running through federal law, and this case, is the bright line drawn between aliens who commit crimes and those aliens who live here as law abiding in all respects.

Arizona v. U.S. is a major case which has led this Court to several legal conclusions. Arizona addressed the constitutional validity of pieces of an Arizona state law, S.B. 1070. Specifically, the Court reviewed two provisions that imposed criminal liability on the violation of particular federal immigration laws, and two provisions that expanded local investigative authority over immigration law compliance.   Arizona, 567 U.S. 387, 393-94 (2012).

The federal government filed suit against the state of Arizona seeking to enjoin the state law as preempted by federal law.   Ultimately, the Court held that three provisions were preempted, but one provision was not preempted.   Id. at 400-415.

Congress has exclusive power to enact immigration laws.   Federal law provides for the removal of noncitizens within U.S. borders who are determined to be "deportable" as defined by statute, and of noncitizens apprehended at the border who are determined to be "inadmissible."[11] A formal determination of whether an individual is deportable or inadmissible is made by an Immigration Judge at a removal proceeding, which is a civil, not criminal, proceeding and must adhere to legal procedures set out by statute.

Arizona clarified that "[a]s a general rule, it is not a crime for a removable alien to remain

---

[11]  A noncitizen who is apprehended within U.S. borders may also be determined to be inadmissible.   Such an individual will not be subject to removal as a consequence of this finding, but will be barred from reentering the country if she leaves voluntarily, and will be barred from adjusting her immigration status while she remains in the U.S.   This is addressed below.

present in the United States."   Id. at 407 (citing INS v. Lopez-Mendoza, 468 U.S. 1032, 1038 (1984)).

The grounds for deportability and inadmissibility are defined by statute.   They are numerous.   Involvement in criminal activity is the most common ground.   Unlawful presence in the United States is another.   Practically, though, the statutory framework is just the beginning. In practice, for decades, the federal government has pursued only limited aspects of the far-ranging grounds for removal.   The Court in Arizona stated, "Discretion in the enforcement of immigration law embraces immediate human concerns.   Unauthorized workers trying to support their families, for example, likely pose less danger than alien smugglers or aliens who commit a serious crime." Id. at 396.

The broad statutory bases for removal are reviewed below, with a particular focus on criminal grounds for removal.   This is followed by a review of changing federal immigration policy priorities over time, which has dictated the particularized enforcement regime that has emerged.

### A.      Lawfully Present versus Unlawfully Present Noncitizens

As an initial matter, noncitizens living in the United States fall into one of two categories: those who are present lawfully, and those who are present unlawfully.

Lawful presence turns on the formal permission of the federal government.   This permission comes in many forms.   Lawful permanent residents ("LPRs"), also known as Green Card holders for the documentation associated with LPR status,[12] are broadly permitted to live

---

[12] There are several bases of eligibility for obtaining a green card: through a U.S. citizen family member; through employment, a category reserved for skilled workers and other special professionals; pursuant to membership in certain categories of immigrants, including religious workers, members of the international media, and abused and neglected children; through a former grant of asylum or refugee status; through a former award of a visa due to an individual's identity as a human trafficking victim or a crime victim; through one's identity as a victim of abuse, according to certain standards; and through an additional handful of very specific bases for eligibility. USCIS, Green

and work in the U.S. indefinitely, and are permitted to freely travel across U.S. borders.[13]   USCIS, Green Card, USCIS, https://www.uscis.gov/greencard.  Visa holders are a second category of lawfully present noncitizens.   Visa holders live legally in the United States pursuant to the terms of their particular visa, which variously impose different restrictions related to travel and employment, and provide for varying lengths of legal residence.[14]   Noncitizens who have been granted refugee or asylum status, pursuant to 8 U.S.C. §§ 1157–58, are two additional classes of noncitizens present lawfully in the United States.

Noncitizens who have no grant of permission to live in the United States are present unlawfully.   More specifically, those who have entered the United States without inspection by immigration officials and without authorization are present unlawfully and can be prosecuted criminally.[15]   However, the Supreme Court has specifically held that noncitizens who remain in the United States beyond the expiration of their visa ("visa over-stayers") have not committed any crime.[16]   Arizona v. U.S., 567 U.S. 387, 407 (2012).   However, these individuals are nonetheless present in the U.S. unlawfully.   Thus, under existing laws they are technically both deportable and

---

Card Eligibility Categories, https://www.uscis.gov/greencard/eligibility-categories.

[13] If an LPR travels abroad for longer than one full year, she must obtain a reentry permit.  USCIS, After a Green Card is Granted, https://www.uscis.gov/green-card/after-green-card-granted#Reminders.

[14] 8 U.S.C. § 1153 sets out rules for the allocation of three types of visas: visas for family members of U.S. citizens and LPRs; employment-based visas; and diversity visas, which are reserved for immigrants from countries with historically low rates of immigration to the United States.   Within each of these general categories there are several subtypes of visas.   For example, there are several different type of employment-based visas available divided among five different categories of preference depending on an individual's skill and training in their field of employment. U.S. Department of State-Bureau of Consular Affairs, Employment-Based Immigration Visa, https://travel.state.gov/content/visas/en/immigrate/employment.html.

[15] Inspection upon entry to the United States is required under 8 U.S.C. § 1225.   Entry into the United States through the mandated inspection procedures with the use of fraudulent immigration documents or by making any other misrepresentations is also unlawful, and any noncitizen who enters this way will then be present in the U.S. unlawfully, and subject to criminal prosecution.   18 U.S.C. §§ 1324c, 1325, 1546.

[16] Notably, 8 U.S.C. § 1253 makes it a criminal act for any deportable noncitizen against whom a final order of removal is outstanding to remain in the United States by refusing to leave, failing to obtain the documents necessary to do so, failing to present himself for removal at the time and place ordered by the Attorney General, or to take any action to prevent his or her departure.   It is not a criminal act, however, for a technically removable noncitizen who is not subject to a final order of removal to remain in the United States.   As discussed, infra, before such an order becomes final there are several opportunities to appeal.

inadmissible and are therefore removable from the country.

A crucial issue, ignored by much discussion of immigration policy, past, present and future, is whether a non-citizen has committed specific types of crimes.  If so, consistent Executive branch practice for decades has focused on removal of people who are "criminal aliens." The very few who are not criminal aliens but subject to removal in practice turns on many additional factors that go beyond mere unlawful presence.  These factors are important in determining some of the issues in this case.

"Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect."  Arizona v. U.S., 567 U.S. at 398.

### B.    Removal: Deportability (8 U.S.C. § 1227) versus Inadmissibility (8 U.S.C. § 1182)

#### 1.    Overview

Noncitizens can only be subject to removal following a finding of deportability or inadmissibility by an Immigration Judge in a formal proceeding known as a removal proceeding. 8 U.S.C. § 1227 sets out classes of deportable noncitizens, while 8 U.S.C. § 1182 sets out classes of inadmissible noncitizens.  Removal proceedings may properly be brought against any noncitizen who is deportable or inadmissible on any basis set out in § 1227 and § 1182; this includes any noncitizen whose mere presence in, or entry into, the United States is unlawful.  §§ 1227(a)(1), 1182(a)(6).

Congress recognized the significance of criminal convictions: Section 1229(d)(1), makes clear that in the case of a noncitizen who is deportable by virtue of a conviction, "the Attorney General shall begin any removal proceeding as expeditiously as possible after the date of the conviction."

72

### 2.      Detention pending removal proceedings – criminal aliens

A noncitizen may be arrested and detained "[o]n a warrant issued by the Attorney General…pending a decision on whether the alien is to be removed from the United States."   § 1226(a).   There are statutory rules regarding detention pending removal proceedings.   The Attorney General may choose to detain a noncitizen pending proceedings, or "may release" her on a bond of at least $1,500 or on "conditional parole."   § 1226(a)(1)-(3).

There are special rules for the detention, pending removal proceedings, of noncitizens who are deportable or inadmissible on criminal grounds.   The Attorney General is <u>required</u> to detain any noncitizen who is inadmissible pursuant to § 1182(a)(2) (criminal grounds of inadmissibility, <u>see</u> infra) or § 1182(a)(3)(B) (terrorism grounds of inadmissibility), or who is deportable pursuant to § 1227(a)(2)(A)(ii)-(iii), (B), (C), (D), (4)(B), or under § 1227(a)(2)(A)(i) on the basis of an offense for which she was sentenced to imprisonment of at least one year (this includes most but not all criminal and national security grounds of deportability, <u>see infra</u>, 1226(c).   The Attorney General may only release such an individual pending a removal decision if release is necessary to protect a witness to, or someone cooperating in the investigation of, major criminal activity.   § 1226(c)(2); <u>but see</u>, <u>Diop v. ICE/Homeland Sec.</u>, 656 F.3d 221, 223 (3d Cir. 2011) (1226(c) "authorizes only detention for a reasonable period of time," after which due process "requires that the Government establish that continued detention is necessary to further the purposes of the detention statute.")

### 3.      Removal proceedings

8 U.S.C. § 1229 sets out the procedures attendant to the initiation of removal proceedings in immigration court; § 1229a sets out the rules governing these proceedings.   An Immigration Judge presides over removal proceedings and determines whether a noncitizen is removable.   §

1229a(a)(1), (c)(1)(A).   There are varying standards for these proceedings.   When a noncitizen is subject to removal proceedings to determine deportability, the burden rests with the government to establish by clear and convincing evidence that she is deportable.   § 1229a(c)(3)(A).   A finding of deportability can only be sustained on the basis of reasonable, substantial, and probative evidence.   Id.   A noncitizen being put through removal proceedings may argue that she is entitled to various forms of relief from removal, and faces the burden of proof in establishing her eligibility for such relief (and in the case of discretionary relief, that she merits a favorable finding).   § 1229a(c)(4)(A).   The decision of the Immigration Judge can be followed by an appeal to the Board of Immigration Appeals ("BIA"), and then to a Circuit Court of Appeals.   This process can delay any final decision for a lengthy period of time; several years is not unusual.

### 4.    Consequences of Deportability and Inadmissibility

Upon a finding of deportability, and assuming any appeal is rejected, a noncitizen will then be subject to an order of removal.   8 U.S.C. § 1231.   Upon a finding of inadmissibility in the case of apprehension at the border, a noncitizen will be denied entry and likewise subject to an order of removal.   Id.   When a noncitizen is ordered removed due to a finding of deportability or inadmissibility, "the Attorney General shall remove the alien from the United States within a period of 90 days," and "[d]uring the removal period, the Attorney General shall detain the alien." § 1231(1)-(2).   As elucidated in § 1182, consequences of a finding of inadmissibility for a noncitizen who is apprehended within the U.S. include the automatic denial of any application to change one's immigration status (e.g. an application for a Green Card, an application for a visa, or an application for citizenship).

### C.    Criminal Grounds of Deportability and Inadmissibility

Certain criminal convictions and involvement in other specified criminal activity are bases

for deportability and inadmissibility, as specified in § 1227(a)(2), and § 1182(a)(2), respectively.

In this context a "conviction" is defined in two ways, either of which is sufficient to establish a conviction for the purposes of this statutory scheme: (1) "a formal judgment of guilt entered by a court"; or (2) when adjudication of guilt has been withheld, but both of the following conditions are satisfied: (i) a judge or jury has found the noncitizen guilty or the noncitizen has entered a plea of guilty, a plea of nolo contendere, or has admitted sufficient facts to warrant a finding of guilt; (ii) and the judge has ordered some form of punishment, penalty, or restraint on the noncitizen's liberty to be imposed. 8 U.S.C § 1101(a)(48)(A).

## 1.   § 1227(a)(2) Sets out Criminal Grounds of Deportability

8 U.S.C. § 1227(a)(2) sets out criminal grounds of deportability, most of which hinge on criminal convictions.  When § 1227(a)(2) refers to noncitizens, it refers both to lawfully and unlawfully present noncitizens.   LPR's and visa holders who engage in criminal conduct face the same removal consequences as unlawfully present non-citizens who engage in criminal conduct. Lawful presence as an LPR or visa holder does not insulate non-citizens from being subject to removal on the basis of criminal involvement.

### a)   Crimes Involving Moral Turpitude ("CIMT")

Under § 1227(a)(2)(A)(i) a noncitizen who is convicted of a crime involving moral turpitude ("CIMT") punishable by a sentence of imprisonment of one year or longer, within five years of her admission to the United States, is deportable.[17]   Under 8 U.S.C. § 1227(a)(2)(A)(ii) any noncitizen who is convicted of two CIMTs at any time after her admission to the U.S. is deportable.  The concept of CIMT has no statutory definition; it is shaped through case law.

---

[17]  For noncitizens who receive Lawful Permanent Resident status pursuant to U.S.C. § 1255(j)—which is reserved for individuals who provide material information to law enforcement that substantially contributes to the success of criminal or terrorism investigation or prosecution—the time frame during which one CIMT conviction will lead to deportability is extended to ten years.

Courts look to the "elements of the statutory state offense, not to the specific facts," to determine whether the conviction at issue constitutes a CIMT.  Knapik v. Ashcroft, 384 F.3d 84, 88 (3d Cir. 2004) (quoting Wilson v. Ashcroft, 350 F.3d 377, 381–82 (3d. Cir. 2003).  In reviewing the statute the court should credit "the least culpable conduct necessary to sustain a conviction under the statute." Id. (citing Matter of Marchena, 12 I. & N. Dec. 355, 357, 1967 WL 14033 (BIA 1967)).  Only where a statute is "divisible," that is, it covers both conduct involving moral turpitude, and conduct that does not, does the court refer to the record, "to determine whether the alien was convicted under that part of the statute defining a crime involving moral turpitude." Partyka, 417 F.3d at 411; see, e.g. Rodriguez-Castro v. Gonzales, 427 F.3d 316, 320 (5th Cir. 2005)

CIMTs involve conduct that is "inherently base, vile, or depraved" and which is done with a criminal intent.  See Marmolejo-Campos v. Holder, 558 F.3d 903, 910 (9th Cir. 2009) ("In a series of published decisions, the BIA has set forth its general understanding that a 'crime involving moral turpitude' involves 'conduct that shocks the public conscience as being inherently base, vile, or depraved, contrary to the rules of morality and the duties owed between man and man, either one's fellow man or society in general.'") (quoting In re Perez–Contreras, 20 I. & N. Dec. 615, 618 (B.I.A.1992)); Partyka, 417 F.3d at 414 ("[T]he hallmark of moral turpitude is a reprehensible act committed with an appreciable level of consciousness or deliberation."); see also, Sotinakau v. Lynch, 846 F.3d 731, 736 (4th Cir. 2017) ("To involve moral turpitude, a crime requires two essential elements: a culpable mental state and reprehensible conduct.") (quoting In re Ortega–Lopez, 26 I. & N. Dec. 99, 100 (BIA 2013)).

Criminal statutes that provide for a conviction based on proof of criminal negligence and strict liability crimes are therefore typically found not to fall into the CIMT category due to the

absence of a criminal intent.   See In re Perez–Contreras, 20 I. & N. Dec. at 619; Sotnikau, 846

F.3d at 738; but see, Mehboob v. Attorney General of U.S., 549 F.3d 272, 277 (3d Cir. 2008) ("we

hold that the absence of *mens rea* as to a specific element of a crime does not necessarily preclude

a finding that a strict liability sex offense involves moral turpitude.").   Recklessness crimes can be

considered CIMTs, but typically only "if certain statutory aggravating factors are present," such as

a required showing of a "conscious[] disregard[] [of] a substantial risk of serious harm or death to

another."   Knapik, 384 F.3d at 90.   Essentially all specific intent crimes are considered CIMTs.

### b)      Aggravated Felonies

Under 8 U.S.C. § 1227(a)(2)(A)(iii) any noncitizen convicted of an "aggravated felony" at

any time after admission is deportable.   8 U.S.C. § 1101(a)(43) defines aggravated felony in list

format and includes the following specific crimes and categories of crimes: murder; rape; sexual

abuse of a minor; drug trafficking (one sale conviction counts as an aggravated felony under this

category); firearms trafficking; theft or burglary with an imposed sentence of one year

imprisonment or more (e.g. robbery, grand larceny, etc.); a crime of violence with an imposed

sentence of one year imprisonment or more (e.g. assault, aggravated harassment, etc.); fraud or

deceit in which more than $10,000 was involved (i.e. grand larceny, trademark counterfeiting,

etc.); bail jumping; arson; child pornography felonies; and the attempt or conspiracy to commit

any of the named offenses.

### c)      Other offenses

There are several other criminal offenses that trigger deportability.   Controlled substance

offenses constitute one major category.   One conviction for a controlled substance offense, with

the exception of an individual's first conviction for the possession of less than 30 grams of

marijuana, renders a noncitizen deportable.  8 U.S.C. § 1227(a)(2)(B)(i).[18]  Firearms offenses make up another expansive category.   One conviction of any firearms offense, broadly defined (e.g. sale, purchase, possession, etc.), triggers deportability.  8 U.S.C. § 1227(a)(2)(C).  § 1227(a)(2)(D) designates national security related criminal offenses, one conviction of any of which triggers deportability.   Under § 1227(a)(2)(A)(v) a noncitizen who is convicted of violating 18 U.S.C. § 2250, which sets out the laws regarding sex offender registration and notification, is deportable.   Under § 1227(a)(2)(A)(iv) a noncitizen who is convicted of 18 U.S.C. § 758, which criminalizes high speed flight from an immigration checkpoint, is deportable.

Some of the categories of offenses which trigger deportability include conduct that is not necessarily linked to a conviction.   § 1227(a)(2)(F) makes deportable any noncitizen who is described in 8 § U.S.C. 1182(a)(2)(H), which defines "significant traffickers in persons."   A criminal conviction is not required, however, for a person to fall within that category; rather, it leaves the determination up to federal officials.   There is also an expansive category of domestic violence conduct that triggers deportability, and a conviction is not required in the case of an order of protection violation.[19]

## 2.    § 1182(a)(2) Sets out Criminal Grounds of Inadmissibility

§ 1182(a)(2) designates "criminal and related grounds" of inadmissibility.   The criminal bases that trigger inadmissibility are quite similar to those triggering deportability, however the bar is often much lower with regard to criminal conduct.   A conviction is most often not required

---

[18] Notably, § 1227(a)(2)(B)(ii) designates that any noncitizen "who is, or at any time after admission has been, a drug abuser or addict is deportable"; this section is unique in that it does not require a criminal conviction, but rather imposes deportability based on an apparently subjective determination of an individual's conduct or status.
[19] One conviction for a crime of domestic violence, as defined in 8 U.S.C. § 16; stalking; or a crime against a child renders a noncitizen deportable.   1227(a)(2)(E)(i).   Under § 1227(a)(2)(E)(ii)a noncitizen who a "court determines" violates a protection order by engaging in credible threats of violence, repeated harassment, or bodily injury to the person protected under the order, is deportable.   This section does not require a conviction but rather turns on the vague concept of a court's "determination."

in this context.[20]   Additionally, there are some criminal bases for inadmissibility that extend

beyond the subject matter of those which trigger deportability.[21]

        **D.**      **The Relevance of <u>Padilla</u> and <u>Galarza</u>**

        **1.**      **Padilla v. Kentucky**

Under <u>Padilla v. Kentucky</u>, 559 U.S. 356 (2010), which held that defense counsel has a

duty to advise criminal defendants of potential immigration consequences to a guilty plea pursuant

to the Sixth Amendment guarantee of effective assistance of counsel, the court undertook a brief

historical review of the interaction between immigration law and criminal law in the U.S.   The

Court recounted the steadily increasing weight of immigration consequences as a result of criminal

convictions over time.   The Court observed that "changes to our immigration law have

dramatically raised the stakes of a noncitizen's criminal conviction," such that "as a matter of

federal law, deportation is an integral part—indeed, sometimes the most important part—of the

penalty that may be imposed on noncitizen defendants who plead guilty to specified crimes."   <u>Id.</u>

at 364.   As a practical matter the Court noted that "[u]nder contemporary law, if a noncitizen has

committed a removable offense…his removal is practically inevitable."   <u>Id.</u> at 363-64.

Despite the Court's apparent view that deportation as the result of a criminal conviction is

in many practical ways absorbed within the realm of criminal punishment, the opinion does

highlight the technical distinction between the civil process of removal proceedings, and the

criminal process: "[w]e have long recognized that deportation is a particularly severe penalty, but

it is not, in a strict sense, a criminal sanction.   Although removal proceedings are civil in nature,

---

[20] Under § 1182(a)(2)(A)(i)(I), for example, any noncitizen who is convicted of, <u>or admits to committing</u> the essential
elements of, a CIMT or an attempt or conspiracy to commit a CIMT, is inadmissible.   The same standard applies to
controlled substance offenses, and drug and human trafficking.   §§ 1182(a)(2)(A)(i)(II), (a)(2)(C), (a)(2)(H).
[21] For example, any noncitizen who is involved in prostitution or money laundering, or is attempting to enter the
United States to engage in any such conduct, is inadmissible.   §§ 1182(a)(2)(D), (a)(2)(I).

deportation is nevertheless intimately related to the criminal process." Id. at 365 (internal citation and quotation omitted).   This entanglement led the Court to the conclusion that classifying deportation as collateral to the criminal process and to decisions about pleading guilty would be unhelpful and impractical.   Ultimately, the Court concluded that "advice regarding deportation is not categorically removed from the ambit of the Sixth Amendment right to counsel."   Id. at 366. As such, in order to satisfy the demands of the Sixth Amendment right to effective assistance of competent counsel, defense counsel must inform noncitizen clients that deportation will result from a particular plea when the law is clear on that point, and when the law is less straightforward, advise noncitizen clients of a generalized risk of adverse immigration consequences resulting from the criminal charges.   Id. at 369.   The differing standards reflect the Court's recognition of the complexities of immigration law, a field which merits professional specialization, and the limitations of any one criminal defense lawyer.   Id. at 369.

The Court observes that while deportation as a consequence of a criminal conviction is a civil penalty subject to a civil process technically distinct from the criminal process, it is so "intimately related" to the criminal process that it is "uniquely difficult to classify as either a direct or a collateral consequence." Id., 559 U.S. at 366.

The federal government's choice to pursue deportation on the basis of local criminal justice outcomes is something that cities and localities have no control over and presumably no input in. The Philadelphia policies at issue here do not interfere with the federal government's legal ability to deport individuals convicted of serious crimes.

## 2.      Galarza v. Szalczyk

A recent Third Circuit case considered whether Department of Homeland Security regulations at 8 C.F.R. 287.7 governing immigration detainers imposed legally binding obligations

on states and localities.  See Galarza v. Szalczyk, 745 F.3d 634 (3d Cir. 2014).  Regulations

allow immigration authorities to notify other law enforcement agencies if DHS seeks custody of

the individual and set parameters on a state or municipality keeping the individual in custody after

a potential release date:

> (a) Detainers in general. Detainers are issued pursuant to sections 236 and 287 of
> the Act and this chapter 1. Any authorized immigration officer may at any time
> issue a Form I–247, Immigration Detainer–Notice of Action, to any other Federal,
> State, or local law enforcement agency. A detainer serves to advise another law
> enforcement agency that the Department seeks custody of an alien presently in the
> custody of that agency, for the purpose of arresting and removing the alien. The
> detainer is a request that such agency advise the Department, prior to release of the
> alien, in order for the Department to arrange to assume custody, in situations when
> gaining immediate physical custody is either impracticable or impossible….
>
> (d) Temporary detention at Department request. Upon a determination by the
> Department to issue a detainer for an alien not otherwise detained by a criminal
> justice agency, such agency shall maintain custody of the alien for a period not to
> exceed 48 hours, excluding Saturdays, Sundays, and holidays in order to permit
> assumption of custody by the Department.

8 C.F.R. § 287.7.

In Galarza, police in Allentown, Pennsylvania arrested a New Jersey-born man of Puerto

Rican descent on a drug charge and had him transported to Lehigh County Prison.  An Allentown

detective notified ICE, which filed a detainer.  Despite repeatedly protesting that he was born in

the United States—and posting bail—Galarza was held in the Lehigh County Prison for several

days pursuant to the detainer before being released.  The district court dismissed Galarza's claim

against Lehigh County Prison on the grounds that the prison was legally required to hold Galarza

pursuant to the detainer.  745 F.3d at 638.

The Third Circuit reversed, holding that "immigration detainers do not and cannot compel

a state or local law enforcement agency to detain suspected aliens subject to removal."  Id. at 636.

The panel construed the language in 8 C.F.R. § 287.7(a) "generally defin[ing] a detainer as a

81

'request'" and the title of 287.7(d), "Temporary detention at Department request," to mean that detainers were not mandatory.  Id. at 639-40.  In the Third Circuit's view, a contrary reading would also raise serious federalism concerns: "reading § 287.7 to mean that a federal detainer filed with a state or local [law enforcement agency] is a command to detain an individual on behalf of the federal government, would violate the anti-commandeering doctrine of the Tenth Amendment."  Id. at 644.

### E.      ICE Programming and Enforcement Priorities

Tasked with carrying out U.S. immigration law, DHS and ICE must pursue these authorizations in light of existing funding restraints which make it impossible to achieve total enforcement of all of the statutes cited above.  The federal government therefore designs initiatives to improve the efficacy of immigration enforcement.  A program known as Secure Communities was initiated in 2008 for this purpose; this program was replaced by the Priority Enforcement Program ("PEP") in 2015, for a brief period.  The Secure Communities program was reinstated in 2017.

The federal government, at times through DHS Memoranda and at times through Executive Orders, has issued guiding principles and specific commands often referred to as "enforcement priorities," related to the carrying out of these various programs.  These have reflected the change in immigration enforcement policy over time and over the course of the transitions between programs and political administrations.  However, there has been one constant:  visa-overstayers have not been affected unless they are a subject of a criminal investigation or prosecution and have been convicted.  There is an important but seldom employed exception, as individuals who are determined to be threats to national security are legitimately subjected to removal.

### 1.    Secure Communities Program

Under the Secure Communities Program, instituted in 2008, fingerprint information sent from local agencies to the FBI for criminal record and warrants checks is automatically passed on to ICE.   ICE, Secure Communities, https://www.ice.gov/secure-communities.   The purpose of this arrangement is to enable federal immigration authorities to take advantage of local information about noncitizens to identify individuals who are subject to removability. Participation is mandatory.   See Amicus Brief of ACLU at 3, ECF 52.   ICE uses the information gathered through this program in deciding against whom to initiate removal proceedings.

### 2.    Priority Enforcement Program

DHS instituted PEP in July of 2015 to replace the Secure Communities program.   PEP set out classes of noncitizens subject to escalating levels of enforcement priority.   As part of PEP, DHS sought to foster cooperation between ICE and local law enforcement agencies in order to improve the process of removing noncitizens considered "priorities" for removal.   The relevant "priority" categories were identified by DHS in a memorandum published on November 20, 2014. Memorandum from DHS Secretary Jeh Johnson, Policies for the Apprehension, Detention and Removal of Undocumented Immigrants. [22]   The memo sets out three categories, in order of priority, which represent "the Department's civil immigration enforcement priorities," and directs federal personnel to "pursue these priorities at all stages of the enforcement process."   Id. at 2-3. Generally, Priority 1 included noncitizens who represent "threats to national security, border security, and public safety"; Priority 2 included "misdemeanants and new immigration violators"; and Priority 3 included those noncitizens who had been issued a final order of removal as of January 1, 2014, but did not fall within Priority 1 or 2.   Id. at 3-4.   Priority 1 and Priority 2 are

---

[22] *Available at* https://www.dhs.gov/sites/default/files/publications/14_1120_memo_prosecutorial _discretion.pdf

reviewed in detail below:

### a.  PEP Priority 1

More specifically, Priority 1 included the following classes of removable noncitizens: (a) those engaged in or suspected of terrorism or espionage, or otherwise deemed a threat to national security; (b) those apprehended while crossing the border illegally; (c) those involved in gang activity, established either through conviction or not; (d) those convicted of any crime classified as a felony; (e) and those convicted of an "aggravated felony" as defined under immigration law.  Id. at 3.

### b.  PEP Priority 2

Priority 2 identified "misdemeanants and new immigration violators" as "the second-highest priority for apprehension and removal," and included: (a) noncitizens convicted of three or more misdemeanors arising out of separate incidents, "other than traffic offenses or state or local offenses for which an essential element was the alien's immigration status,"; (b) those convicted of a "significant misdemeanor" including a domestic violence offense, sexual abuse or exploitation, burglary, unlawful possession or use of a firearm, drug distribution or trafficking, driving under the influence, or any offense for which the actual sentence was at least 90 days; (c) those who unlawfully entered or re-entered the U.S. after January 1, 2014; (d) and those who have "significantly abused the visa or visa waiver programs" as per the judgment of an ICE Field Office Director, or a USCIS District Director or Service Center Director.  Id. at 3-4.

### F.  President Trump's Executive Order: New Enforcement Priorities

An Executive Order entitled "Enhancing Public Safety in the Interior of the United States" ("EO") issued by President Trump on January 25, 2017 ordered the termination of PEP and the reinstitution of the Secure Communities program.   Although there is, as cited above, an injunction

in effect as to Section 9(a) of the Executive Order, pertaining to non-compliance with Section 1373, other parts of the Executive Order remain in effect.   This Order established new expansive enforcement priorities.   It prioritizes the removal of noncitizens falling into categories that extend far beyond those set out under PEP, several of which are defined according to vague concepts, and the application of which allows for highly discretionary and subjective judgment calls.

The new priorities for enforcement include noncitizens described in any of the following statutory sections: § 1182(a)(2) (criminal grounds for inadmissibility), (a)(3) (national security grounds for inadmissibility), and (a)(6)(C) (procuring admission by fraud); § 1225 (expedited removal of inadmissible noncitizens attempting to cross the border); and § 1227(a)(2) (criminal grounds for deportability) and (4) (national security and related grounds); as well as removable noncitizens who qualify under any of the following:

(a)  Have been convicted of any criminal offense;
(b)  Have been charged with any criminal offense, where such charge has not been resolved;
(c)  Have committed acts that constitute a chargeable criminal offense;
(d)  Have engaged in fraud or willful misrepresentation in connection with any official matter or application before a governmental agency;
(e)  Have abused any program related to receipt of public benefits;
(f)  Are subject to a final order of removal, but who have not complied with their legal obligation to depart the United States; or
(g)  In the judgment of an immigration officer, otherwise pose a risk to public safety or national security.

Executive Order: Enhancing Public Safety, Section 5(a)-(g).

President Trump's EO alters the enforcement priorities in three major ways as compared with the priorities under PEP.

First, with respect to criminally involved removable noncitizens, the EO vastly expands the enforcement priorities.   Under PEP the priorities had been limited to those who pose a threat to national security, are involved in gang activity, are convicted of a felony, are convicted of either

85

three misdemeanors or a "significant" misdemeanor, and those who unlawfully reenter the United States.   Under Trump's EO, any removable noncitizen who has been convicted of, charged with, or has even engaged in conduct that could be subject to any criminal charge, regardless of the seriousness, is a priority for enforcement.   Notably, this newly encompasses noncitizens who are technically removable on a basis other than one laid out in § 1227(a)(2), those who have engaged in criminal activity that would not trigger § 1227(a)(2) deportability, and even reaches those who have not ever been charged with a crime.

Second is the inclusion of removable noncitizens who have "abused any program related to receipt of public benefits" on the enforcement priority list.   This adds an entirely new topic that PEP did not address in any of its three layers of enforcement priorities.   The EO fails to provide any guidance as to what might constitute the "abuse" of public benefit programs.   Finally, the EO adds a catchall for any removable noncitizen who "[i]n the judgment of an immigration officer, otherwise pose[s] a risk to public safety or national security," an apparent delegation of wildly discretionary power to ICE officers to determine their own enforcement protocol.

Although the EO expands the enforcement priorities that existed under PEP, especially with respect to non-citizens with very minor contacts with criminal law, there is no evidence in this record that ICE itself, in Philadelphia, has taken action against non-criminal aliens.

### G.    Philadelphia's Policy and Potential Conflicts

There are several ways in which the new Byrne JAG conditions could conflict with the City's preferred policies with regard to its noncitizen population.   In light of the EO there is a serious risk that the new conditions will "widen the net" of immigration enforcement unfairly—that is, that the new conditions will put noncitizens who in the past have not been the target of ICE enforcement efforts at risk of being swept up in these efforts.   Unlawfully present

noncitizens who have only been charged with, or alleged to have "committed acts that constitute" very low level criminal offenses are now at risk of being swept up in ICE enforcement efforts as a result of the 48 hour and jail access conditions.   For example, a visa over-stayer charged with a minor crime that would not trigger a 1227(a)(2) basis for deportability, held in a city facility because unable to post bail, or to serve a short sentence upon conviction, would be subject to ICE detention and potentially to removal proceedings as a result of the 48 hour condition, where she would not have been, under the stated enforcement priorities of PEP.[23]   The current administration's policy, in contrast to PEP, makes any criminal investigation or allegation, no matter how minor or untrue, a trigger for priority enforcement, thereby subjecting an enormously expanded group of noncitizens to the practical likelihood of removal proceedings.[24]

One group that is not actually named in the EO as being subject to priority enforcement, that would also be swept into enforcement as a result of the DOJ's conditions are those, such as visa over-stayers, who are unlawfully present in the United States, who are charged with a crime and detained in a city facility pre-trial for inability to post bail, but ultimately are released without conviction.   Individuals who fit this description are technically removable, but they do not fall under the current enforcement priorities.   The harm to this group is especially great, as they are at risk of being swept into immigration enforcement and subjected to removal proceedings, despite never being found guilty of any criminal activity.   They are among the group of unlawfully

---

[23] While technically even under the PEP regime, such an individual would be deportable pursuant to immigration law, the practical application of PEP was to "pursue [the stated PEP] priorities at all stages of the enforcement process—from the earliest investigative stage" and thus counseled strongly against detaining and seeking removal of an individual who did not fall into one of the three enforcement priority categories, such as the individual described in the hypothetical.   It was therefore highly unlikely that such an individual would have been subject to removal proceedings.

[24] Notably, the risk that ICE will improperly pursue detention and/or removal of lawfully present noncitizens, a risk which existed under PEP, persists under the EO.   This was exemplified in the case of Ernesto Galarza, born in New Jersey, who was erroneously detained for three days on a temporary ICE detainer.   Galarza v. Szalczyk, 745 F.3d 634 (3d Cir. 2014).

present noncitizens who escape the extraordinarily broad enforcement priorities under the EO, yet they are nevertheless at risk of being subject to removal proceedings if they are arrested but ultimately not convicted of any crime. This state of affairs goes so far as to threaten the presumption of innocence.

### H.    Statutes Which Impact Both Immigration and Criminal Law

The Department of Justice's Memorandum in Opposition to Plaintiff's Motion for a Preliminary Injunction cites a number of statutory provisions that it argues support the proposition that immigration enforcement and criminal justice are sufficiently related to survive a Constitutional challenge under the Spending Clause. (ECF 28 at 29). First, the Memorandum identifies § 1227(a)(2) as highly relevant to this consideration, see supra.

The Memorandum also points to 8 U.S.C. § 1357(g), which provides for the performance of federal immigration enforcement functions by state actors. § 1357(g)(1) provides that the Attorney General may enter into a written agreement with a state or local government by which a state or local officer deemed qualified may engage in the investigation, apprehension, or detention of noncitizens. § 1357(g)(2)-(10) set out terms for these agreements. State and local employees are required to be trained in and adhere to federal law in carrying out these functions, and these actors are also subject to the supervision of the Attorney General. The statute also clarifies that an agreement under this section is not a prerequisite to state actors' cooperation and communication with the Attorney General for the purpose of carrying out these functions.

The DOJ additionally highlights 8 U.S.C. § 1324(c), which falls within a section which prohibits the transportation of noncitizens into or within the United States in any manner not authorized by the relevant laws (as well as the harboring or employment of such individuals). This subsection details criminal and civil forfeiture penalties for such conduct. Specifically, §

1324(c) authorizes "all [ ] officers whose duty it is to enforce criminal laws" to make arrests for violations of this section.

The Memorandum also identifies 8 U.S.C. § 1252c.  This section authorizes state and local law enforcement officials to arrest and detain any noncitizen illegally present in the United States following deportation from, or voluntarily leaving, the United States after being convicted of a felony.   The statute clarifies that this authorization exists only after the state or local official confirms the noncitizen's status via ICE data, and extends only for as long as necessary for ICE to transfer the individual to federal custody.   The statute further directs the Attorney General to share information within his control that would help enable this purpose.

Finally, the DOJ's Memorandum references 8 U.S.C. § 1226(c), which falls within a statute that provides rules for the arrest and detention of noncitizens pursuant to a warrant pending a removal determination.   § 1226(c) in particular addresses the detention of "criminal aliens," which in this context is a reference to those who are deportable or inadmissible on the criminal bases set out in § 1227 and § 1182, respectively.   It dictates that the Attorney General shall take these individuals into custody "when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and without regard to whether the alien may be arrested or imprisoned again for the same offense."   The DOJ's Memorandum suggests that the fact that this statute "contemplates the federal detention of certain aliens upon their release from state or local custody…further animat[es] the sort of cooperation between federal, state, and local law enforcement that the conditions are designed to foster."   The DOJ's Memorandum does not highlight § 1226(d), however it is highly relevant.   This subsection directs the Attorney General to create an information system by which federal, state, and local authorities can determine whether individuals they have arrested for aggravated felonies are noncitizens; to maintain records

of noncitizens who have been convicted of aggravated felonies and have been removed; and to train certain officers within ICE "to serve as a liaison to Federal, state, and local law enforcement and correctional agencies and courts with respect to the arrest, conviction, and release of any alien charged with an aggravated felony."

There are many other statutes which illustrate the intersection of criminal and immigration law that the DOJ's Memorandum does not reference.   There are several criminal laws set out in the Immigration and Nationality Act that are prosecuted in federal courts.  8 U.S.C. § 1326 establishes criminal liability for the return or attempted return to the U.S. by any noncitizen who has been denied admission or removed in the past.  8 U.S.C. § 1325 criminalizes entry or attempted entry into the United States at a time or place not authorized, without inspection by immigration officers, or by making a willfully false or misleading representation.  § 1325(c) designates punishment of up to five years imprisonment and/or a fine up to $250,000 to be imposed on "any individual" who knowingly enters into a marriage to evade "any provision of the immigration laws."   There are many additional criminal laws, as well as civil penalties, that relate to immigration requirements.[25]

## I.        Selective Enforcement

The paucity of prosecutions for first offenders of illegal entry is shown by federal government statistics that, from 10/1/2013 to 9/30/2014, only 67 individuals were prosecuted for a first time commission of illegal entry.   Federal Justice Statistics, 2014-Statistical Tables, March, 2017, at 16, https://www.bjs.gov/content/pub/pdf/fjs14st.pdf.   The numbers increase for repeat

---

[25]  § 1325(d) makes it a criminal act for "any individual" to "knowingly establish a commercial enterprise for the purpose of evading any provision of the immigration laws."   8 U.S.C. § 1321 establishes civil liability for owners and operators of aircraft and other transportation methods to provide a noncitizen the means to enter the U.S. at any time or place not properly designated.   8 U.S.C. § 1324 makes it a criminal act to bring a noncitizen to the United States in any manner outside of the lawfully designated immigration procedures or to transport or harbor any person who has entered the United States in violation of the law.   This is not an exhaustive list.

offenders who are arrested in the act of attempted entry.

Further, although federal government statistics fail to show the exact number of unlawfully present noncitizens who entered the U.S. illegally, there is documentation that of all arrests for immigration offenses during the year 2014, 93% occurred in five federal districts, each positioned along the U.S.-Mexico border: the District of Arizona, the Western District of Texas, the Southern District of Texas, the Southern District of California, and the District of New Mexico.  Mark Motivans, Bureau of Justice Statistics, <u>Federal Justice Statistics 2013-2014</u>, March, 2017, 4-5, https://www.bjs.gov/content/pub/pdf/fjs1314.pdf.

Two inferences from the data show that many aliens are in the United States as a result of non-prosecution of illegal entrants, but most of these illegal entrants are located in the southwest United States.

One obvious conclusion from this discretion is that the doctrine of selective enforcement drives immigration law, particularly when criminal prosecutions are considered.  This is not a critical comment.  The lesson to be learned from the above discussion is that Philadelphia's policies do not in any meaningful way interfere with ICE's priorities of locating and removing criminal aliens.   For these purposes, there is a strong relationship.

The concept of "related" government programs, as it pertains to the Spending Clause and, particularly, Byrne JAG grants discussed below, is different.

**XIII.  Spending Clause and Separation of Powers**

Article I, Section 8, clause 1 of the U.S. Constitution grants Congress the "Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States."   U.S. Const. art. I, § 8, cl. 1.   Article I grants this power to Congress, and Congress alone.   Nothing in Article II of the Constitution provides the Executive with any independent authority to spend, or withhold, federal funds that Congress has appropriated.   Rather, the Executive is obligated to "take Care that the Laws be faithfully executed."   U.S. Const. art. II, § 3.

Congress regularly appropriates money to be paid out to states and localities, and uses that financial leverage to induce policy changes at the state and local level.   In this way, "Congress may, in the exercise of its spending power, condition its grant of funds to the States upon their taking certain actions that Congress could not require them to take."   Coll. Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 686 (1999); accord Nat'l Fed'n of Indep. Bus. v. Sebelius, 567 U.S. 519, 576 (2012).   The Supreme Court has likened Spending Clause legislation to a "contract" whereby "in return for federal funds, the States agree to comply with federally imposed conditions."   Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1, 17 (1981)).

At the same time, Congress' power to condition receipt of federal funds is subject to a number of limitations: "Spending Clause legislation must: (1) pursue the general welfare; (2) impose unambiguous conditions on states, so they can exercise choices knowingly and with awareness of the consequences; (3) impose conditions related to federal interests in the program; and (4) not induce unconstitutional action."   Koslow v. Commonwealth of Pennsylvania, 302 F.3d 161, 175 (3d Cir. 2002) (citing South Dakota v. Dole, 483 U.S. 203, 207-08, 210 (1987)).   A

92

spending condition can therefore transgress any of these four limitations, three of which we address here.

### A.     Relatedness

Despite courts' general unwillingness to invalidate grant conditions for lack of relatedness, the City launches its major Spending Clause attack by arguing that the Challenged Conditions are intended to further federal civil immigration enforcement, and are therefore unrelated to a grant program intended to provide assistance to local criminal law enforcement.  Such an argument reflects the premise, fundamental to the City's position in this litigation, that immigration enforcement and criminal justice are not sufficiently "related" to allow conditions be placed on Byrne JAG grants that would influence the City's law enforcement policies.  Amici law professors echo this view, and situate the imposition of these conditions in the context of the President's and the Attorney General's shared intent to crack down on illegal immigration—and to defund sanctuary cities in particular (see ECF 50 (Brief of Administrative Law, Constitutional Law, and Immigration Law Scholars))—especially after a federal court enjoined one section of an Executive Order that would have stripped sanctuary jurisdictions of all federal funding in April 2017.  See Cty. of Santa Clara v. Trump, supra.

The Attorney General is quick to point out that the Supreme Court still has never "overturned Spending Clause legislation on relatedness grounds," Barbour v. Washington Metro. Area Transit Auth., 374 F.3d 1161, 1168 (D.C. Cir. 2004), and emphasizes the ways in which federal law "tie[s]…together" criminal justice and immigration enforcement.  (Def. Opp. at 29). The Attorney General cites various laws and situations in which immigration law and law enforcement "intersect"—such as the fact that conviction for certain criminal offenses renders a noncitizen removable, see 8 U.S.C. 1227(a)(2), and federal law allows partnerships between state

93

or local law enforcement and immigration authorities, see 8 U.S.C. 1357(g).  The Attorney General thus asserts that the conditions on Byrne grants easily survive the "discernible relationship" threshold set by the Third Circuit in Koslow v. Commonwealth of Pennsylvania, discussed below.  302 F.3d 161 (3d Cir. 2002).  Removing criminal aliens also serves local law enforcement purposes, in the Attorney General's view, because once removed, aliens cannot commit more crimes.  The Attorney General further argues that the City implicitly concedes the existence of some sort of relationship between law enforcement and immigration enforcement by contending that its refusal to enforce immigration law aggressively has led to better public safety outcomes and lower crime rates.  The Court does not dispute these general arguments, but they do not answer all the issues.

The Supreme Court has expressly declined to "define the outer bounds of the 'germaneness' or 'relatedness' limitation on the imposition of conditions under the spending power."  South Dakota v. Dole, 483 U.S. 203, 209 n.3 (1987).  Dole concerned a challenge to a Congressional statute directing the Department of Transportation to withhold a percentage of federal highway funds to states that allowed individuals under the age of 21 to purchase alcohol. South Dakota, which allowed 19-year-olds to purchase low-alcohol beer, asserted that the power to fix the state's drinking age was its prerogative under §2 of the Twenty-First Amendment. South Dakota evidently did not press the argument that the condition was "unrelated to a national concern in the absence of the Twenty-first Amendment," and accordingly the Court's discussion of relatedness was relatively cursory: "the condition imposed by Congress is directly related to one of the main purposes for which highway funds are expended—safe interstate travel."  Id. at 208. The majority further noted that a presidential commission on drunk driving had found that the "lack of uniformity" in state drinking ages induced young people to drive to neighboring states

94

with lower drinking ages; the requirement to raise the drinking age or else forgo federal highway funds was therefore "reasonably calculated to address this particular impediment to a purpose for which the funds are expended." Id. at 209.   The majority thus saw no need to decide where to set the relevant boundary.

The Third Circuit had occasion to draw that line in Koslow, a case both parties cite with approval, which established the "discernable relationship" test.  302 F.3d 161.  In Koslow, a worker at a Pennsylvania state prison had injured himself on three occasions while carrying 80-pound bags of salt.   After being given a choice of performing the full duties of his position or receiving workers' compensation, he stayed in his job.   Some three years later, he was dismissed for not being able to perform the essential functions of his job.   Koslow filed suit, alleging, among other things, that the State had failed to provide a reasonable accommodation in violation of Section 504 of the Rehabilitation Act, which prohibited discrimination in all federally funded programs or activities on the basis of disability, and that the State had waived Eleventh Amendment immunity by accepting federal funds.   The prison in which Koslow had worked had received federal funds, and the state defendants argued that the Rehabilitation Act was unconstitutional under the Spending Clause because the limitations on the Rehabilitation Act funds (non-discrimination) were too far afield from the purposes for which they were intended.

The Third Circuit specifically rejected the defendants' argument that a plaintiff needed to identify a specific federal interest in the funds received by the prison system.   Koslow, 302 F.3d at 175.  Rather, a litigant:

> need only identify a discernible relationship imposed by a
> Rehabilitation Act condition on a "department or agency" and a
> federal interest in a program it funds. Through the Rehabilitation
> Act, Congress has expressed a clear interest in eliminating
> disability-based discrimination in state departments or agencies.

95

> That interest, which is undeniably significant and clearly reflected in the legislative history, flows with every dollar spent by a department or agency receiving federal funds. The waiver of the Commonwealth's immunity from Rehabilitation Act claims by Department of Corrections employees furthers that interest directly.

Id. at 175–76 (3d Cir. 2002) (emphasis added).   The Third Circuit took care to emphasize that "the waiver of immunity conditioned on receipt of Rehabilitation Act funds applies on an agency-by-agency, or a department-by-department, basis" which "help[ed] ensure the waiver accords with the "relatedness" requirement articulated in Dole."   Id. at 176.   After analogizing to other anti-discrimination statutes that had survived Spending Clause challenges, the court held the Rehabilitation Act constitutional.

We have described, supra, the many relationships between immigration and criminal law and neither party disputes that criminal law violations can trigger immigration law consequences. However, framing the Court's inquiry as whether a discernable relationship exists between immigration law and law enforcement, as the Attorney General seeks to do, situates the discussion at much too general a level.   The relevant question, under Koslow, is whether this Court can "identify a discernible relationship" between a grant condition on a department or agency and "a federal interest in a program" funded by the Byrne grants.   302 F.3d at 175.

Criminal justice is a very broad field with far-reaching impacts; it bears on public safety, individual freedom, the physical and mental public health systems, the economic privatization of public institutions, and beyond.   Criminal convictions impact not only immigration law enforcement, but also the disbursement of local and federal benefits, voting rights, access to housing, family law, and more.   In short, there is a seemingly endless list of areas of the law which can be said to be "related to" criminal justice and the local enforcement of criminal laws; it is not automatic, however, that these relationships operate in both directions.   For example, while

criminal law bears enormously on voting rights, voting laws don't appear to have any impact on the criminal justice system.

Criminal law is integral to immigration law, specifying classes of noncitizens for high risk of removal, dictating procedures for detaining particular individuals pending removal proceedings, and defining who falls within the federal government's priorities for immigration law enforcement. However, immigration law does not impact the criminal justice system.

Immigration law has nothing to do with the enforcement of local criminal laws.   As the record has established, this is absolutely the case in Philadelphia.   As Commissioner Ross testified, the criminal laws of Philadelphia are uniformly enforced across the city, without regard to the immigration status, whether lawful or unlawful, of individual residents, whether they come into contact with the criminal justice system as a witness, victim, or defendant.   The City even has policies in place designed to remove immigration considerations entirely from the calculus of criminal law enforcement, including instructing police officers not to inquire about the immigration status of residents.   While federal immigration law officials care deeply about local criminal law outcomes, it simply is not the case that local criminal justice actors in Philadelphia care about federal immigration laws.

This point is especially important in light of the framing of the Spending Clause relatedness inquiry, below.   The important question is whether the conditions at issue relate to the federal interest in the particular program they are attached to.   Accepting DOJ's argument about its interest, the most generous reading from its perspective is that it has an interest in pursuing "criminal justice" broadly.   As already discussed, the fact that immigration enforcement depends on and is deeply impacted by criminal law enforcement does not mean that the pursuit of criminal justice in any way relies on the enforcement of immigration law.   Realistically, it does not.

97

Further, as the City points out, the Byrne JAG statute is clearly designed for the purpose of enhancing <u>local</u> criminal justice.   When considered at this level, the argument that enforcement of federal immigration laws is related to this objective is unsustainable, particularly in light of Police Commissioner Ross's testimony.   The federal interest in enforcing immigration laws falls outside of the scope of the Byrne JAG program.

### 1.    Byrne JAG Program and the DOJ Conditions

Thus, the more precise question in this case is whether a discernable relationship exists between the federal government's interest in the Byrne JAG program and the Challenged Conditions.   The parties again disagree on how to describe the relevant federal interest.   The City points to a section of the Byrne statute requiring state plans to "detail[] how grants received under this section will be used to improve the <u>administration of the criminal justice system</u>," which must be done in consultation with various local stakeholders.   <u>See</u> 34 U.S.C. § 10153(a)(6) (emphasis added).   It also cites 2005 legislative history, which asserted that the merger of Local Law Enforcement Block Grants with the former Byrne Grant Program would "give State and local governments more flexibility to spend money for programs that work for them rather than to impose a 'one size fits all' solution.   H.R. REP. 109-233, at 89, <u>reprinted in</u> 2005 U.S.C.C.A.N. 1636, 1640.   The Attorney General situates the federal interest in the "for criminal justice" language of 34 U.S.C. § 10152(a)(1) to argue that the Byrne program possesses the "broad[]" objective of "support[ing] and strengthen[ing] law enforcement and criminal justice."   (ECF 28 at 29).

The Attorney General relies on language from a section of the Byrne statute which, however, makes clear that the City has the better reading of the statute, especially as supplemented by legislative history.   Section 10152(a)(1) establishes that the Byrne program is a formula grant

98

and provides applicant jurisdictions a broad menu of programs and purposes to which they might

apply Byrne funds:

> the Attorney General may, in accordance with the formula established under section 10156 of this title, make grants to States and units of local government, for use by the State or unit of local government to provide additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for criminal justice, including for any one or more of the following programs:
>
> > **(A)** Law enforcement programs.
> > **(B)** Prosecution and court programs.
> > **(C)** Prevention and education programs.
> > **(D)** Corrections and community corrections programs.
> > **(E)** Drug treatment and enforcement programs.
> > **(F)** Planning, evaluation, and technology improvement programs.
> > **(G)** Crime victim and witness programs (other than compensation).
> > **(H)** Mental health programs and related law enforcement and corrections programs, including behavioral programs and crisis intervention teams.

34 U.S.C.A. § 10152 (a)(1).

Thus, the best reading of the Byrne statute is that Congress intended to create a formula

grant program that simply provided fiscal assistance to states and localities for any of a wide

variety of permissible purposes that the applicant jurisdictions, having heard from various

stakeholders, were entitled to select.   Congress set up the Byrne program, and the "federal

interest" that Koslow requires this Court to evaluate for Spending Clause purposes is Congress's

very broadly stated interest as articulated in the Byrne statute, not the Attorney General's interest

in public safety or immigration enforcement, which is not mentioned in the statute.   See Koslow,

302 F.3d at 175.

Congress employed its spending power to create a grant program to provide money for

"administration of the criminal justice system," with the intent that states and municipalities use

the money as they see fit.   Any relationship connecting this formula grant program, which

99

provides wide latitude to states and municipalities, and the conditions of requiring jail access to federal immigration authorities to interview alien inmates and 48 hours' advance notice to federal immigration authorities of a noncitizen's release from custody, is therefore difficult to discern.

### 2.   Certification Condition

The Certification Condition presents a more difficult issue because Congress indicated its intent in the Byrne statute to require "applicant[s]" to "comply with…all other applicable Federal laws."   See 34 U.S.C. § 10153(a)(5)(D).[26]   The Byrne statute differentiates "applicant[s]" from "programs to be funded" in requiring

> (5) A certification, made in a form acceptable to the Attorney General and executed by the chief executive officer of the applicant (or by another officer of the applicant, if qualified under regulations promulgated by the Attorney General), that--
> (A) the programs to be funded by the grant meet all the requirements of this part;
> (B) all the information contained in the application is correct;
> (C) there has been appropriate coordination with affected agencies; and
> (D) the applicant will comply with all provisions of this part and all other applicable Federal laws.

34 U.S.C. § 10153(a)(5) (emphases added).

Philadelphia is the "applicant" for purposes of this subsection.   If the Court assumes for a moment that 8 U.S.C. § 1373 is indeed an applicable federal law, then the statute is best read as requiring compliance with Section 1373 by all city officials, regardless of function.   Moreover, the text of Section 1373(a) bars cities like Philadelphia from implementing policies that restrict sending or receiving "information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a) (emphases added).   This statutory provision—by

---

[26] Whether the Certification Condition requires compliance with Section 1373 by the entire City or simply the "programs or activities" receiving Byrne funds was the subject of considerable debate at oral argument.   Counsel for the Attorney General indicated that only "programs or activities" receiving Byrne funds were subject to the Certification Condition, as spelled out in the "special conditions" attached to the Greenville award letter.   (ECF 21-6 at ¶ 53).   The City pointed to various communications from the federal government, including a letter from the Office of Justice Programs dated October 11, 2017 (ECF 28-1) suggesting that the whole City was subject to the Certification Condition.

its plain terms—is in no way limited to aliens, criminal aliens, or even convicted criminals.   Thus, conditioning funding for local law enforcement on the compliance by, for example, Dr. Farley's health workers toward their law-abiding patients is the sort of overly "attenuated or tangential relationship" that arguably exceeds the relatedness requirement of grant conditions under the Spending Clause.   South Dakota v. Dole, 483 U.S. 203, 215 (1987) (O'Connor, J., dissenting); see also Koslow, 302 F.3d at 176 (sustaining Rehabilitation Act waiver of sovereign immunity where it applied only to the agencies or departments actually receiving federal funds under the act).

Although the Certification Condition appears to have some relationship with the JAG Program, this Court is mindful of the demanding threshold imposed by Dole and Koslow.   For purposes of the present motion for preliminary injunction, it suffices to say that the "relatedness issue" is a close question.   However, it is clear that the City has established that it uses the Byrne JAG money for purposes much broader than the prosecution of criminals, and that adherence to the Department of Justice conditions would conflict with its justifiable policies towards non-criminal aliens.

### B.      Lack of ambiguity

In their briefs, both parties address their ambiguity arguments toward the issue of whether the Challenged Conditions themselves provide unambiguous guidance to the City.   The City asserts that the 48-hour advance "Notice" and jail "Access" conditions give no guidance for situations where a suspect might be detained pending trial with no release date, or where a detained inmate refused to speak to ICE.   With respect to the Certification Condition, the problem, from the City's perspective, is more fundamental still: in light of shifting political winds, "ominous" DOJ press releases, inconsistent guidance as to the scope of the Certification Condition, and lack of case law on what types of policies actually violate Section 1373, the City was simply unsure

101

what it was agreeing to.

The Attorney General faults the City for proceeding to litigation before availing itself of the opportunity to consult with the Department of Justice about any questions it might have, an opportunity it claims is afforded to grantees (see Greenville SC Award Letter, Pl. Mot. Ex. D). Moreover, the Attorney General considers all conditions unambiguous and fully spelled out in the documents awarding Byrne grants to local jurisdictions, such as the award letter issued to Greenville County, South Carolina.   (See id.).   Dismissing the City's "nit-picking," the Attorney General argues that the Access and Notice Conditions are not facially ambiguous; after all, a locality has no notification obligations until DHS asks—at which point it must respond "as early as practicable"—and an inmate could decide not to speak to an ICE officer once the officer was allowed access.   Ignoring the Department of Justice press releases, which the City claims amount to "mixed messages" (Pl. Mot. at 40), the Attorney General cites only to prior guidance on compliance on Section 1373, which it claims is unambiguous.

Neither party would dispute that "federal grant programs originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy," Bennett v. Kentucky Dep't of Educ., 470 U.S. 656, 669 (1985), yet the emphasis on the Challenged Conditions somewhat obscures the issue, acknowledged by both counsel at oral argument, of the role of Congress itself, to which the spending power is exclusively conferred under Article I.

Spending Clause ambiguity cases generally involve statutory construction, not interpretation of conditions imposed by an agency.   In a typical case, the state assails the congressional statute itself for failing to unambiguously impose conditions on receipt of federal funds.   See, e.g., Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy, 548 U.S. 291 (2006);

Pennhurst, 451 U.S. 1.   This can occur whether or not the state is seeking to evade liability when

sued by a private party, or in turn seeks legal relief against the federal government.   Compare

Arlington Cent. 548 U.S. 291 and Pennhurst, 451 U.S. 1 with Com. of Va., Dep't of Educ. v. Riley,

106 F.3d 559 (4th Cir. 1997) (en banc).   Such cases, naturally, frame their discussion in terms of

Congress' exercise of the purse strings under Article I:

> The legitimacy of Congress' power to legislate under the spending power thus rests
> on whether the State voluntarily and knowingly accepts the terms of the "contract."
> There can, of course, be no knowing acceptance if a State is unaware of the
> conditions or is unable to ascertain what is expected of it. Accordingly, if Congress
> intends to impose a condition on the grant of federal moneys, it must do so
> unambiguously.   By insisting that Congress speak with a clear voice, we enable
> the States to exercise their choice knowingly, cognizant of the consequences of
> their participation.

Pennhurst, 451 U.S. at 17 (internal citations omitted) (holding that Section 6010 of the

Developmentally Disabled Assistance and Bill of Rights Act did not unambiguously condition

receipt of federal funds on providing residents of disabled home a right to "appropriate treatment,

services, and habilitation" in "the setting that is least restrictive of the person's personal liberty").

At least one subsequent opinion has posited that this passage analogizes the grant and receipt of

federal funds to offer and acceptance in the process of contract formation.   Barnes v. Gorman, 536

U.S. 181, 186 (2002) (citing id.).   When engaging in an inquiry regarding ambiguity, a court

"must view" a statute "from the perspective of a state official who is engaged in the process of

deciding whether the State should accept" federal funds.   Arlington Cent., 548 U.S. at 296.   "In

other words," Arlington Central continued, a court must ask whether a statute "furnishes clear

notice regarding the liability at issue."   Id.

With the introduction of a federal agency into the transaction, the analogy to offer and

acceptance in a bilateral contract is a less intuitively helpful guide:   Was it Congress or the agency

103

making the offer?   Did Congress authorize the agency to introduce terms and conditions, and under what circumstances?   Is Section 1373 a Congressionally mandated condition?   What must be unambiguous?   Specifically, if there is arguable lack of clarity both in the statute and in the agency guidance, what is a court's role?

Com. of Va., Dep't of Educ. v. Riley held that the requisite clear notice must be found in the statute itself.   106 F.3d 559 (4th Cir. 1997) (en banc) (adopting original dissenting panel opinion of Luttig, J.).   In Riley, the Department of Education interpreted the Individuals with Disabilities Education Act (IDEA) to require states to provide private educational services to disabled students who had been expelled for reasons unrelated to their disabilities.   Because Virginia did not provide private educational services to this subset of students, the Department of Education sought to withhold funds; Virginia then argued that it was in compliance with the IDEA, and that the Department's interpretation imposed conditions not required by the statute.   The Fourth Circuit, sitting *en banc*, sided with Virginia.   Pursuant to the then-operative text of the IDEA, the court then held that a state was required to "assure[] all children with disabilities the right to a free appropriate public education." 20 U.S.C. 1412(1).   The majority began with basic constitutional principles: "in order for the States to be bound by a condition upon the receipt of federal monies, the Congress must have affirmatively imposed that condition in clear and unmistakable statutory terms."   Riley, 106 F.3d at 563.   It continued to the plain language of the statute itself: "under even ordinary standards of statutory construction," the majority held, the IDEA "d[id] not impose, implicitly or otherwise, the condition for which the Federal Government argue[d]." Id.   The majority was cognizant of the federalism concerns underlying the dispute between a state and the federal government over public education, traditionally an area of local control. Id. at 566.   Riley supports the City's legal position.   The Attorney General's

Supplemental Brief (ECF 70) unsuccessfully attempts to distinguish its factual relevance to this case, and it is likely the Third Circuit would follow this decision.

This Court therefore emphasizes the language of the statute authorizing Byrne JAG grants, employing traditional tools of statutory construction but remaining mindful of the federalism concerns at stake.  Whether Congress unambiguously imposed the Challenged Conditions (or unambiguously authorized the Attorney General so to do) entails largely the same inquiry as whether it conferred authority upon the Attorney General to impose them, as discussed in preceding sections of this memorandum.  At oral argument, Defendant relied on the same language in the OJP statute allowing the AAG to "plac[e] special conditions on all grants, and determ[e] priority purposes for formula grants," as well as the requirement that applicants certify compliance with "all other applicable Federal laws" to defend the constitutionality of the Challenged Conditions under the Spending Clause.

Simply put, the Access and 48-hours Notice Conditions cannot have been unambiguously authorized by Congress if they were never statutorily authorized.   Similarly, Congress's statutory authorization for the Certification Condition—pursuant to the "all other applicable Federal laws" language of 34 U.S.C. § 10153(a)(5)(D)—is a "close call," see infra, especially under Arlington Central's recipient-centric test.   See 548 U.S. at 296.  The much-debated phrase "all other applicable Federal laws" is susceptible to a number of reasonable readings: on one hand it could signify all federal laws related to grantmaking (as the City would have it), or on the other, all federal laws related to law enforcement, or even the entire corpus of federal law codified in the United States Code.[27]   This malleable language does not provide the "clear notice that would be

---

[27] In support of its argument that the Certification Condition is unambiguous, the Attorney General cites prior DOJ guidance that notably punts on the scope of "all other applicable Federal laws":

needed to attach such a condition to a State's receipt of…funds."  See id. at 300.

Nonetheless, because the present motion is one for a preliminary injunction, this Court need not make a ruling on the merits of the City's "ambiguity" challenge.  However, the Court concludes the City is likely to prevail on its argument that the Attorney General's decision to condition receipt of JAG funds on certifying compliance with 8 U.S.C. § 1373 may be inconsistent with the requirement that all conditions on funds be unambiguously imposed by Congress.  This concern is particularly prevalent here because of federalism concerns, given that "[o]ur constitutional structure leaves local criminal activity primarily to the States."  Bond v. United States, 134 S. Ct. 2077, 2083 (2014).  See Riley, 106 F.3d at 566 ("Insistence upon a clear, unambiguous statutory expression of congressional intent to condition the States' receipt of federal funds in a particular manner is especially important where, as here, the claimed condition requires the surrender of one of . . . the powers or functions reserved to the States by the Tenth Amendment.").

###     C.     Coercion and the Tenth Amendment

The Tenth Amendment states a "truism" that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."  United States v. Darby, 312 U.S. 100, 124 (1941); U.S. Const. Am. 10.  There is "nothing in the history of its adoption to suggest that it was more than declaratory of the relationship between the national and state governments as had been established by the

---

Q. The "JAG Sanctuary Policy Guidance" cited Section 1373. Are there other components of Title 8 of the United States Code that are required for compliance?

A. All grantees are required to assure and certify compliance with all applicable federal statutes, regulations, policies, guidelines, and requirements. States may wish to consult with their legal counsel if they have any questions or concerns as to the scope of this requirement.

(ECF 1-12, Office of Justice Programs Guidance Regarding Compliance with 8 U.S.C. § 1373, at 3) (emphasis added).

Constitution before the amendment." Darby, 312 U.S. at 124. Nonetheless, the Tenth Amendment embodies the principle of Federalism that pervades the Constitution. Thus, courts frequently cite to the Tenth Amendment as a placeholder for Federalism concerns. See, e.g., Nat'l Fed'n of Indep. Bus. v. Sibelius ("NFIB")), 567 U.S. 519, 647 (2012) (Scalia, Kennedy, Thomas, Alito, JJ., dissenting) ("What is absolutely clear, affirmed by the text of the 1789 Constitution, by the Tenth Amendment ratified in 1791, and by innumerable cases of ours in the 220 years since, is that there are structural limits upon federal power."). More specifically, in the context of the Spending Clause, the Tenth Amendment represents a prohibition against "impermissible compulsion" or "commandeering," i.e., "when state participation in a federal spending program is coerced." NFIB, 567 U.S. at 677 (dissent). Among many cases, we review several to guide this Court's Tenth Amendment analysis.

### 1. New York v. United States

In New York v. United States, 505 U.S. 144 (1992), the Supreme Court addressed the constitutionality of three provisions of the Low-Level Radioactive Waste Policy Amendments Act of 1985 ("LLRWPAA"), finding only two of the three provisions consistent with "the Constitution's allocation of power to the Federal Government." Id. at 149. The LLRWPAA required each state to be "responsible for providing, either by itself or in cooperation with other States, for the disposal of . . . low-level radioactive waste generated within the State." 42 U.S.C. § 2021c(a)(1)(A). To encourage the states to comply with this statutory requirement, the LLRWPAA provided three types of incentives:

1. Monetary incentives in the form of surcharge fees paid to states who receive radioactive waste from other states;

2. Access incentives in the form of penalties for states which fail to indicate, within approximately one year of the Act's passage, an intent to develop a disposal facility or which fail to join a regional compact to develop a disposal facility; and

3. <u>A take title provision</u> mandating that states which fail to provide, within approximately ten years of the Act's passage, for disposal of waste generated within its borders must take title to such waste upon notification by the owner of the waste.

The Court's opinion distilled the central issue of the case to one sentence: "This litigation . . . concerns the circumstances under which Congress may use the States as implements of regulation; that is, whether Congress may direct or otherwise motivate the States to regulate in a particular field or a particular way." <u>Id.</u> at 161. The Court noted that the division of power between state governments and the federal government changes in the context of Congressionally-imposed conditions on the receipt of federal funds, because state governments can simply refuse the funds and thus avoid any drawbacks of compliance with the associated conditions. <u>Id.</u> at 168.

Ultimately, the Court found the first two "incentives" to be valid exercises of Congress's Commerce Clause powers. Then, the Court analyzed the third "incentive" under the Spending Clause, because it was an example of Congress placing conditions "on the receipt of federal funds." <u>Id.</u> at 172. The Court found that the third condition violated the Constitution because it represented "[a] choice between two unconstitutionally coercive regulatory techniques." <u>Id.</u> at 176 (declining to state whether the provision lay "outside Congress's enumerated powers" or "infring[ed] upon the core of state sovereignty reserved by the Tenth Amendment," but stating that either way, "the provision is inconsistent with the federal structure of our Government . . . .").

## 2. <u>Printz v. United States</u>

In <u>Printz v. United States</u>, 521 U.S. 898 (1997), the Supreme Court held that several provisions of the Brady Handgun Violence Prevention Act were unconstitutional because they "purport[ed] to direct state law enforcement officers to participate, albeit only temporarily, in the administration of a federally enacted regulatory scheme." <u>Id.</u> at 904. The majority opinion,

108

authored by Justice Scalia, explained that the "enactments of the early Congresses, as far as we are aware, contain no evidence of an assumption that the Federal Government may command the States' executive power in the absence of a particularized constitutional authorization."   Id. at 909.   The Court also noted that the Constitution itself demonstrates the Founders' view that "a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front."   Id. at 921 (quoting Gregory v. Ashcroft, 501 U.S. 452, 458 (1991).   The Court cited various prior Supreme Court opinions that "made clear that the Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs."   Id. at 925–26 (citing, among other cases, FERC v. Mississippi, 456 U.S. 742 (1982), in which the Court construed several provisions of a federal statute requiring states only to "consider" federal standards).   In particular, the Court found it improper for federal officials to "forc[e] state governments to absorb the financial burden of implementing a federal regulatory program" or to put them "in the position of taking the blame for its burdensomeness and for its defects."   Printz, 521 U.S. at 930.

### 3.   National Federation of Independent Business v. Sibelius

In NFIB, the Supreme Court considered a challenge to the constitutionality of the Patient Protection and Affordable Care Act (ACA).   567 U.S. at 519.   As originally drafted, ACA provided substantial federal funds to states to expand their Medicaid programs, but if states chose not to accept the additional funds, they would not only forgo those funds, but lose all existing federal funds as well.

The plaintiff states challenged the statute as unduly coercive.   Justice Roberts, writing for a plurality of the Court, agreed.   The plurality emphasized that decisions of the Court had "repeatedly characterized ... Spending Clause legislation as 'much in the nature of a *contract*."

Id. at 576-77 (quoting Barnes v. Gorman, 536 U.S. 181, 186 (2002)).  As such, states cannot freely accept funds where they are coerced into doing so by the lopsided terms of the grant.   Id. at 577.  After some discussion of Federalism principles, the plurality stated:

> We have upheld Congress's authority to condition the receipt of funds on the States' complying with restrictions on the use of those funds, because that is the means by which Congress ensures that the funds are spent according to its view of the "general Welfare." Conditions that do not here govern the use of the funds, however, cannot be justified on that basis.

Id. at 585.

However, it was not only the "contractual" concerns of Spending Clause that animated the Court's approach to the Medicaid expansion condition.   All of the seven justices who agreed the Medicaid expansion condition, as written, was unduly coercive detailed their concerns with federal legislation that compels states to take "unpopular actions" because "state officials [] will bear the brunt of public disapproval, while the federal officials who devised the regulatory program may remain insulated from the electoral ramifications of their decision."   Id. at 578 (Roberts, Breyer, Kagan, JJ.); id. at 678 (Scalia, Kennedy, Thomas, Alito, JJ.) (both citing New York, 505 U.S. at 169).   Equally concerning to the dissenting justices (Ginsburg and Sotomayor) was the fact that state officials might also "favor such a departure from the constitutional plan, since uncertainty concerning responsibility may also permit them to escape accountability."   Id.[28]

### 4.   City of New York v. United States

In City of New York v. United States, 179 F.3d 29 (2d Cir. 1999), New York City lodged a facial challenge against Section 434 of the Personal Responsibility and Work Opportunity

---

[28] This Court notes that the Supreme Court has also decided Tenth Amendment challenges under the Commerce Clause, which implicate similar Federalism concerns as Spending Clause cases.   See, e.g., Reno v. Condon, 528 U.S. 141 (2000); F.E.R.C. v. Mississippi, 456 U.S. 742 (1982).

Reconciliation Act of 1996 and Section 642 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, both of which, similar to Section 1373 at issue in the present litigation, "prohibit[ed] state and local governments from limiting their employees in the voluntary provision of information about the immigration status of aliens to [INS]."  Id. at 31.  New York based its Tenth Amendment challenge on the conflict between those sections and City Executive Order No. 124, which prohibited city employees from transmitting information regarding the immigration status of aliens to federal immigration authorities unless:

> (1) required by law;
> (2) consented to by the alien in writing; or
> (3) such alien was suspected of engaging in criminal activity.

Id. at 31 n.1.

The Second Circuit found that the challenged provisions did not violate the Tenth Amendment because the provisions "do not directly compel states or localities to require or prohibit anything.  Rather, they prohibit state and local governmental entities or officials only from directly restricting the voluntary exchange of immigration information with the INS."  Id. at 35 (emphasis added).  The Court's central analysis focused on the need for cooperation between state and federal governments for their "mutual benefit":

> The City's sovereignty argument asks us to turn the Tenth Amendment's shield against the federal government's using state and local governments to enact and administer federal programs into a sword allowing states and localities to engage in passive resistance that frustrates federal programs. If Congress may not forbid states from outlawing even voluntary cooperation with federal programs by state and local officials, states will at times have the power to frustrate effectuation of some programs. Absent any cooperation at all from local officials, some federal programs may fail or fall short of their goals unless federal officials resort to legal processes in every routine or trivial matter, often a practical impossibility.

111

Id. at 35.

Nonetheless, the Second Circuit stated that it might have decided the issue differently had the level of intrusion on city policies been demonstrated more adequately.   First, it noted that the Executive Order itself was the only policy proffered by New York as intrusive on its sovereignty under the Tenth Amendment.   Second, it pointed out that the court's inquiry was limited because it involved a facial challenge; thus, the challenge required New York to demonstrate that no set of circumstances existed under which the Act would be valid.   Third, the court found the Executive Order too narrowly drawn to justify New York's concern that the challenged provisions prevented the City from providing essential municipal services and receiving reports of criminal activity from residents.   Specifically, the court found the Executive Order protected immigration status as confidential only from federal immigration authorities.   Thus, the Executive Order did not operate to "prevent the sharing of information with anyone outside the INS."   Id. at 37.   Because of this, the Executive Order appeared geared more towards "singl[ing] out a particular federal policy for non-cooperation [despite] allowing City employees to share freely the information in question with the rest of the world."   Id.

However, had the City shown that "the information covered by the Executive Order might in fact be subject to other confidentiality provisions that would prevent is dissemination generally[,] . . . the Executive Order might be viewed more as an explanatory measure designed to reassure aliens that information they might impart was truly confidential."   Id.   In the end, the Second Circuit specifically disclaimed the effect of its decision on any inquiry into whether the challenged section "would survive a constitutional challenge in the context of generalized confidentiality policies that are necessary to the performance of legitimate municipal functions and that include federal immigration status," stating explicitly, "we offer no opinion on that

question."   Id.

### 5.   The Present Case

Without specifically so holding, the Court concludes, relying on Galarza, that Philadelphia is likely to succeed on the merits of its Tenth Amendment challenge to the Access, 48-hour Notice, and Certification conditions.   As it pertains to the Certification condition, this argument is somewhat distinct from that presented in City of Chicago v. Sessions and City of New York v. U.S., in which Section 1373 itself was challenged on Tenth Amendment grounds.   No. CV-17-C-5720, 2017 WL 4081821 (N.D. Ill. Sept. 15, 2017); 179 F.3d 29 (2d Cir. 1999).   This Court need not analyze the City's Tenth Amendment claim in detail, as the Court will not rely on it in considering whether to grant a preliminary injunction.

Nonetheless, it bears mention that, because the Access and Notice conditions impose affirmative obligations on Philadelphia, with associated costs of complying with such conditions, they do implicate the Tenth Amendment and its built-in anti-commandeering principles.

With respect to the Certification condition, this Court agrees with the Court in City of Chicago that Section 1373 (and in this case, compliance with it), "poses a unique and novel constitutional question."   2017 WL 4081821, at *12.   Literal compliance with Section 1373 would inherently prevent Philadelphia from, among other things, disciplining an employee for choosing to spend her free time or work time assisting in the enforcement of federal immigration laws.   See id. ("If a state or local government cannot control the scope of its officials' employment by limiting the extent of their paid time spent cooperating with the INS, then Section 1373 may practically limit the ability of state and local governments to decline to administer or enforce a federal regulatory program.").   Therefore, this Court declines to rest a preliminary injunction on Tenth Amendment grounds, but notes that the effect of Section 1373 compliance may be to

113

"thwart policymakers' ability to extricate their state or municipality from involvement in a federal

program."   <u>Id.</u>

——————————————————

## XIV.   Philadelphia Substantially Complies with Section 1373

The doctrine of substantial compliance is a judicial tool designed to promote equitable relief.   In cases where a party has meaningfully performed as expected, despite noncompliance with minor, unimportant requirements, this doctrine enables a court to excuse such imperfection and conclude that as a matter of fairness the party is entitled to the benefit she seeks.   A finding of substantial compliance is warranted where a party has "complied with the essential requirements, whether of a contract or of a statute."   In re Eagle-Picher Industries, Inc., 285 F.3d 522, 525 n. 3 (6th Cir. 2002) (quoting Black's Law Dictionary 1428 (6th ed.1991)) (internal modifications omitted).

### A.    Substantial Compliance Can Be Implied

Several statutes—including those implementing federal grant programs that condition receipt of federal aid on compliance with particular conditions—explicitly build in a standard of "substantial compliance" in the terms of the statute.   See., e.g., 42 U.S.C. § 12753, Penalties for Misuse of Funds (conditioning the grant of federal dollars to states under the Home Investment Partnerships on substantial compliance with the entire statutory scheme and all conditions announced therein).   External references to the Byrne JAG program actually impose a standard of substantial compliance with particular requirements in order for a state to maintain its full award. Under 34 U.S.C.A. § 20927, for example, "a jurisdiction that fails, as determined by the Attorney General, to substantially implement this subchapter [dealing with sex offender registration and notification] shall not receive 10 percent of the funds that would otherwise be allocated for that fiscal year to the jurisdiction under [the Byrne JAG program]."

Courts have imposed the substantial compliance doctrine in evaluating some statutes that do not explicitly invoke it.   The Third Circuit, for example, has read into the Social Security Act a

115

broad application of the substantial compliance doctrine, despite "substantial compliance" language appearing only discretely within one section of the overall statute.   Shands v. Tull, 602 F.2d 1156, 1160 (3d Cir. 1979).   The Court focused on two provisions within the Act requiring less than perfect compliance with a federal regulation mandating disbursement of Aid to Families with Dependent Children.   One of those provisions threatened to cut off federal aid for these programs upon "failure to comply Substantially," while the other permitted a four percent rate of error in determining eligibility."   Id.   The Court was persuaded that these two provisions "show an implied intent to hold the states to a standard of substantial compliance and thus to make some allowance for the difficulties of administering an extensive bureaucracy."   Id.   As such, it required only substantial compliance with a specific regulation requiring states to issue final administrative action within 90 days of a request for a hearing to review denial of a claim.   Id. at 1161.

The First Circuit and the Ninth Circuit have both held that states need only be in "substantial compliance" with the terms of the federal statute setting forth minimum requirements for state wiretap procedures, in order to be legitimate and to avoid preemption.   United States v. Smith, 726 F.2d 852 (1st Cir. 1984) (en banc); Villa v. Maricopa County, 865 F.3d 1224 (9th Cir. 2017).

The Ninth Circuit generally recognizes a limited doctrine of substantial compliance in the context of requirements imposed by federal law.   Sawyer v. Sonoma County, 719 F.2d 1001 (9th Cir. 1983).   The Ninth Circuit views it as "an equitable doctrine designed to avoid hardship in cases where the party does all that can reasonably be expected of him."   Id. at 1008.   Specifically, substantial compliance may be enough only with respect to procedural regulatory requirements, where "the essential statutory purposes have been fulfilled."   Baccei v. U.S., 632 F.3d 1140 (9th

116

Cir. 2011) (quoting <u>Shotgun Delivery, Inc. v. United States</u>, 269 F.3d 969, 973 (9th Cir. 2001)). In contrast, "when the requirement relates to the substance of the statute or where the essential purposes have not been fulfilled," strict compliance is the standard.   <u>Id</u>.

The Court notes that the Ninth Circuit has also held that "[a]s a general rule, a state that accepts federal funds with conditions attached must strictly comply with those conditions—substantial compliance will not be good enough."   <u>California Alliance of Child and Family Services v. Allenby</u>, 589 F.3d 1017 (9th Cir. 2009) (citing <u>Withrow v. Concannon</u>, 942 F.2d 1385, 1386-87 (9th Cir. 1991).   But <u>California Alliance</u> dealt with the very clear and specific condition under the Child Welfare Act that "participating states 'shall' cover the listed costs."   <u>Id</u>. at 1023.   This stands in sharp contrast to the very general nature of Section 1373.   Moreover, in <u>California Alliance</u> the Ninth Circuit considered accepting substantial rather than strict compliance given that a relevant statute indicated that "the federal government is willing to accept 'substantial compliance' at least in some circumstances," and "it makes sense that compliance cannot, as a practical matter, invariably be strict."   <u>Id</u>.   There are some requirements for which strict compliance is appropriate, such as non-discrimination conditions.   However, the factual history and latent ambiguity, as discussed above, show that as to the Attorney General's conditions, strict compliance is impractical, particularly in light of the generalized nature of the statute and DOJ's admittedly flexible expectations.

### B.    Substantial Compliance Can Apply to Grant Conditions

Substantial compliance is a broadly recognized feature of contract law, as articulated in Judge Cardozo's seminal opinion on the matter in <u>Jacob & Youngs, Inc., v. Kent</u>, 230 N.Y. 239 (Ct. App. N.Y. 1921).   For example, one subset of contract cases in which substantial compliance has almost universally been applied is in determining whether an insurance policyholder has

properly changed the beneficiary of their policy.   Pennsylvania law routinely follows this formula. Cipriani v. Sun Life Ins. Co. of America, 757 F.2d 78, 81 (3d Cir. 1985) ("Pennsylvania courts will give effect to an insured's intention to change the beneficiary on an insurance policy where, even in the absence of strict compliance with the policy provisions, the insured has made every reasonable effort under the circumstances to comply with those provisions.") (citing Provident Mutual Life Insurance Co. v. Ehrlich, 508 F.2d 129, 132–33 (3d Cir.1975); Skamoricus v. Konagiskie, 177 A. 809 (Pa. 1935); Ruggeri v. Griffiths, 173 A. 396 (Pa. 1934); see also, Teachers Ins. And Annuity Ass'n of America v. Bernardo, 683 F.Supp.2d 344 (E.D. Pa 2010). Federal courts likewise recognize this application of substantial compliance to the context of an attempt to change the beneficiary of an insurance policy, including under federal law. See, e.g., Phoenix Mut. Life Ins. Co. v. Adams, 30 F.3d 554, 563 (4th Cir. 1994) (applying the doctrine of substantial compliance to determine whether an ERISA life insurance policy holder has changed the beneficiary of her plan, even though the plan provides for a very specific procedure to make such a modification); Cooper v. United States, 340 F.2d 845, 848 (6th Cir. 1965).   The Fourth Circuit held that this application of the substantial compliance doctrine is legitimate because it "will not compromise any of the rights of or impose any additional obligations on plan administrators or sponsors," and not applying it would lead to "relatively harsh results" for policy holders.   Phoenix Mut. Life Ins. Co. v. Adams, 30 F.3d at 563.   Importantly, the Court noted that the doctrine is not in conflict with the statute, simply because the statute does not address the issue. Id.

The application of the substantial compliance doctrine to contract law is important for our purposes, as the acceptance of federal grant money conditioned on compliance with specified conditions has, as discussed above, been analogized over and over to a state entering into a

contract with the federal government.   As the Supreme Court has explained, "legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." Pennhurst, 451 U.S. at 16.  Dole further emphasized that, as in any proposed contractual relationship, states absolutely retain the choice to accept or reject grant funds made available under Spending Clause legislation; opting in "remains the prerogative of the States not merely in theory but in fact."   483 U.S. at 211-12.

The substantial compliance doctrine permits courts to avoid harsh outcomes where one party to a contract has complied with the substantive requirements imposed on it but has made mistakes or omissions with respect to the procedural aspects of the agreement.   So long as it would not unfairly disfavor the other party, substantial compliance excuses these minor errors and dictates that the contract should be enforced.   Pennsylvania law, for example, recognizes the doctrine of substantial compliance as a way of fashioning equitable relief, where appropriate, in the case of imperfect performance on a contract.   Specifically, under this doctrine minor noncompliance with the terms of a contract may be excused.   However, with regard to statutory and regulatory provisions, perfect compliance is the standard:

> [T]he equitable doctrine of substantial performance may excuse unimportant omissions with regard to the terms or requirements of a contract between two parties; the doctrine of substantial performance will not excuse, however, failures of omission, important or otherwise, with regard to the requirements of a substantive regulation having the force and effect of law. Strict compliance with the requirements of statute and of the regulations duly promulgated in accordance therewith is mandatory; substantial compliance is insufficient.

Casey Ball Supports Coordination, LLC v. Department of Human Services, 160 A.3d 278, 283 (Cmwlth Ct. Pa. 2017) (quoting State College Manor, Ltd. V. Com., Dept. of Public Welfare, 92 Pa. Cmwlth. 89, 94 (Cmwlth Ct. Pa. 1985)); see also, Sgarlat v. Griffith, 349 Pa. 42 (Sup. Ct. Pa.

1944)).   Federal courts likewise regularly recognize the doctrine of substantial compliance in the context of contracts.

Federal courts have applied concepts central to contract law, to other areas of the law which track the defining features of contract law.   Specifically, the Supreme Court has held that due to their similarity to contracts, consent decrees should be evaluated in light of governing principles in contract law: "since consent decrees and orders have many of the attributes of ordinary contracts, they should be construed basically as contracts…reliance upon certain aids to construction is proper, as with any other contract.   Such aids include the circumstances surrounding the formation of the consent order, any technical meaning words used may have had to the parties, and any other documents expressly incorporated in the decree." U.S. v. ITT Continental Baking Co., 420 U.S. 223, 237-38 (1975).   Based on this same reasoning, the Ninth Circuit and the Tenth Circuit have both applied the concept of substantial compliance in evaluating the proper enforcement of consent decrees.   Jeff D. v. Otter, 643 F.3d 278 (9th Cir. 2011); Joseph A. by Wolfe v. New Mexico Dept. of Human Services, 69 F.3d 1080, 1085-86 (10th Cir. 1995).

The supplemental briefs of the parties contend opposite views of the applicability of "substantial compliance" doctrine in this case.   Neither side has cited, nor has the Court's research found, a precedential appellate opinion that would allow or deny this concept in a similar case.   The City relies on the type of analysis above.   The government insists Congressional language, particularly Section 1373, harbors no exceptions, even for minor matters.   Exercising its discretion, and noting the hesitancy to make firm decisions on some of the legal issues in this case, but finding that it is likely the City will prevail on one and possibly more of its contentions, the Court will apply the doctrine of substantial compliance and find that the City is in substantial compliance, as noted in the Findings of Fact, supra.

120

## XV.    Irreparable Harm

### A.    The Status Quo

Although courts analyze four factors [29] in deciding whether to issue a preliminary injunction, the underlying <u>purpose</u> of a preliminary injunction is to ensure that the parties do not change the underlying facts of a case in an "irreparably harmful" way before a court has the opportunity to decide a case on the merits.

In fact, many courts have observed that that the purpose of the preliminary injunction is this preservation of the status quo.   <u>See, e.g.</u>, <u>Acierno v. New Castle Cty.</u>, 40 F.3d 645, 647 (3d Cir. 1994) ("A primary purpose of a preliminary injunction is maintenance of the status quo until a decision on the merits of a case is rendered."); <u>accord</u> <u>Hollon v. Mathis Independent School Dist.</u>, 491 F.2d 92 (5th Cir. 1974); <u>Bath Industries, Inc. v. Blot</u>, 427 F.2d 97 (7th Cir.).   Due to the importance of maintaining the status quo, an injunction may not issue if it would disturb the status quo.   <u>See</u> <u>LaChemise Lacoste v. General Mills, Inc.</u>, 487 F.2d 312, 314 (3d Cir. 1973) (refusing to issue a preliminary injunction because it "would necessarily have gone beyond the maintenance of the status quo").   This Court finds that, given the long history of Philadelphia's reliance on the annual receipt of Byrne JAG grants, and the absence of any evidence of abuse or misapplication, the preservation of the status quo is one substantial reason to grant the City's motion for preliminary injunction.

### B.    Philadelphia Has Demonstrated Irreparable Harm

The Attorney General contends that Philadelphia cannot demonstrate it will suffer irreparable harm in the absence of preliminary injunctive relief.   More specifically, the Attorney

---

[29] (1) Whether the movant has shown a reasonable probability of success on the merits; (2) Whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest.   <u>American Civil Liberties Union of New Jersey v. Black Horse Pike Regional Bd. of Educ.</u>, 84 F.3d 1471, 1477 n.2 (3d Cir. 1996).

General cites to <u>National Federal</u>, stating that the Supreme Court's Tenth Amendment "coerciveness" analysis shows the City cannot demonstrate irreparable harm by virtue of "abandoning its right to self-government."   This point somewhat conflates two areas of the law: the "irreparable harm" element of preliminary injunctions and the constitutional threshold for Tenth Amendment "coerciveness."   Nonetheless, because the city's potential Byrne grant is only $1.6 million in FY 2017, it represents less than .1% of Philadelphia's overall annual budget.   The worst that could happen, according to the Attorney General, is that the DOJ moves forward on its Byrne awards and Philadelphia is found ineligible for a tiny fraction of its budget.

Philadelphia, on the other hand, notes that the $1.6 million represents far more than portrayed by the Attorney General, who asserts that the $1.6 million is a very minor part of the overall City budget, or even the PPD's $600 million budget.   However, the city shows approximately 97% of the PPD's budget is tied to wages and personnel costs, which means the $1.6 million represents approximately 10% of the remaining PPD budget.

With the additional funds, the City intends to bolster several criminal justice initiatives, including a dramatic expansion in the availability of naloxone for its officers to revive civilians experiencing opioid overdose.   Because the City administered naloxone approximately 300 times last year, but opioid overdoses still accounted for 900 deaths in the City, Philadelphia seeks to use a portion of the Byrne funds to bolster its officers' ability to administer naloxone in the field. Given the seriousness of the opioid crisis and its effects on the City, Philadelphia contends that, "[w]ithout hyperbole:   These projects save lives."   (Pl's Mot. at 5).

Determining "what may constitute irreparable harm in a particular case is, of course, dependent upon the particular circumstances of the case."   <u>Oburn v. Shapp</u>, 521 F.2d 142, 151 (3d Cir. 1975).   The party moving for a preliminary injunction "must demonstrate both a likelihood of

success on the merits and the probability of irreparable harm if relief is not granted." Morton v. Beyer, 822 F.2d 364, 367 (3d Cir. 1987). However, "[e]stablishing a risk of irreparable harm is not enough. A plaintiff has the burden of proving a 'clear showing of immediate irreparable injury.'" ECRI v. McGraw-Hill, Inc., 809 F.2d 223, 226 (3d Cir. 1987) (quoting Continental Group, Inc. v. Amoco Chemical Corp., 614 F.2d 351, 359 (3d Cir. 1980).

To demonstrate irreparable harm, the moving party may point to potential harm which cannot be redressed by a legal or equitable remedy following trial. See Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797 (1989) (citing Weinberger v. Romero-Barcelo, 456 U.S. 305 (1982) ("The Court has repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies.").

The City has proven, by a preponderance of the evidence, that it is faced with a "stark choice" among the following:

(1) changing its policies to comply with the Jail Access, Advance Notification, and Certification conditions;
(2) accepting the grant award knowing that the City may be later deemed out of compliance with the three conditions, thereby subjecting itself to debarment, administrating sanctions, and funding denials; or
(3) forfeiting $1.6 million in funding.

The first option would cause irreparable harm in light of this Court's finding that the conditions are likely unconstitutional, because changing the City's policies to conform to the Attorney General's conditions would constitute a form of Constitutional harm. See Council of Alternative Political Parties v. Hooks, 121 F.3d 876, 883 (3d Cir. 1997) ("Having concluded that requiring plaintiffs to file their petitions by April 10 likely violates their constitutional rights, it clearly follows that denying them preliminary injunctive relief will cause them to be irreparably injured."); accord County of Santa Clara v. Trump, No. 17-v-00485, 2017 WL 1459081, at *27

(N.D. Cal. Apr. 25, 2017) (plaintiff established a "constitutional injury" and irreparable harm "by being forced to comply with an unconstitutional law or else face financial injury"); See also City of El Cenizo v. State, 17-cv-404, 2017 WL 3763098 (W.D. Tex. Aug. 30, 2017).

The City has also demonstrated that the first option would lead to irreparable reputational harm.

The second option would cause irreparable harm for the same reason.   For example, this Court may eventually find at the merits stage that the Certification Condition is unconstitutional under the Spending Clause, and that the other two conditions were imposed outside the Attorney General's statutory authority.   In this example, during the period between this opinion and the final decision of this case on the merits, the City would likely have been denied the funds or later found out of compliance with the conditions at issue.   This risk of injury for non-compliance is not speculative: the DOJ's letter to Philadelphia on October 15, 2017 clearly stated that the DOJ considers the City to be out of compliance with Section 1373.   A finding of non-compliance from DOJ could cause debarment and sanctions, clear forms of irreparable injury.

The third option, i.e., foregoing receipt of the funds to which Philadelphia may be entitled, would cause irreparable harm.   Philadelphia is faced with a "Hobson's Choice" between, on the one hand, complying with a law it credibly believes is unconstitutional, and on the other hand, foregoing funds it plans to use for life-saving projects.   In City of Chicago v. Sessions, the Court found that a similar "Hobson's Choice" constituted irreparable harm, because it forced Chicago to decide between foregoing the "relatively modest Byrne" funds or submitting to a potentially unconstitutional law.   2017 WL 4081821, at *13 (citing Morales v. Trans World Airlines, Inc., 504 U.S. 374 (1992) (finding injunctive relief available where "respondents were faced with a Hobson's Choice" between acquiescing to a law they credibly believed to be unconstitutional and

124

violating the law under pain of liability).   The Attorney General cannot argue against the imposition of a preliminary injunction by virtue of the fact that the City has the third option.   The choice itself demonstrates irreparable harm.

Moreover, the City has also demonstrated that irreparable harm would result if it is forced to decline the Byrne funds.   In United Steelworkers of America, AFL-CIO v. Fort Pitt Steel Casting, the Third Circuit found the plaintiff demonstrated irreparable harm 598 F.2d 1273 (1979)

The City's criminal justice agencies have a fixed quantity of resources, most of which must be dedicated to personnel costs.   With the Byrne funds, the City aspired to expand its police officers' capacity to deliver naloxone to civilians who overdose as a result of opioid abuse which President Trump and many members of Congress, have described as a major public health crisis. Even if this Court were to later require the Attorney General to repay the improperly withheld $1.6 million, the City has demonstrated a high risk of irreparable harm during the intervening months, in the form of loss of human life.

**XVI.   Balance of Equities and the Public Interest**

The last two factors in the preliminary injunction analysis are whether "the balance of the equities tips in [the City's] favor, and [whether] an injunction is in the public interest."   Winter v. Nat. Res. Def. Council, 555 U.S. at 20.   Where the Government is a party, the last two factors in the preliminary injunction analysis merge.   Nken v. Holder, 556 U.S. 418, 435 (2009).

The City's submissions—and those of the *amici curiae*—present anecdotes and statistics to emphasize the importance of the City's confidentiality policies with respect to immigration status information.   Moreover, the City presented several detailed declarations as well as witnesses at an evidentiary hearing expounding upon the importance of the funds that the City could utilize if the conditions were not applied to the JAG Program funds.   The DOJ, in contrast, declined to present any witnesses at the evidentiary hearing and presented only two declarations, neither of which contains any detailed discussion of the potential effect on Federal immigration enforcement should the Challenged Conditions be preliminarily enjoined.

This Court finds that the public interest is better served if the City is not forced to choose between foregoing the JAG Grant funds and losing hard-fought goodwill amongst the immigrant community.   Moreover, enjoining the imposition of the Challenged Conditions with respect to Philadelphia would only cause the DOJ—at most—a minor hardship: paying funds that Congress had appropriated for disbursement consistent with the purposes of the Byrne JAG Program.   The third and fourth factors of the preliminary injunction standard are unquestionably in favor of Philadelphia.

126

## XVII.  CONCLUSION

The judicial function in resolving disputes should maximize harmonization, and minimize conflict, as much as the facts allow.  Settlement of disputes is, of course, an important judicial function, reflected in the fact that 99% of civil cases in the United States are resolved before trial – some by motion practice, but most by amicable agreements.  When, as in this case, a settlement is not feasible, and in particular, government entities are at odds, seeking a resolution which serves the public interest is paramount – and looking to preserve common interest is important.

Both the federal government and the City of Philadelphia have important interests at stake here and the Court does not minimize either of their concerns.  The extended discussion of the "intersection" between criminal law and immigration law shows that the approaches of DOJ and the City have significant congruence, but also, departures – and each serves different functions. Immigration law is, of course, exclusively a federal concern; but criminal laws are federal, state, and local.  Each sovereign has significant interests in enforcement, but cities, such as Philadelphia, have concerns and issues that operate outside of both immigration law and criminal law.

There is nothing inherently wrong or unusual with imposing conditions on the receipt of benefits.  The operatic hero Orfeo was allowed to escape Hades with his deceased and beloved Eurydice, conditioned on his not looking at her, but when he does, she dies; Mephistopheles grants Faust eternal knowledge and pleasure on the condition that Faust surrender his soul; and Salome, the title character demands the head of St. John the Baptist as a condition to dance for King Herod. However, in real life, the Courts, in interpreting the Constitution, and Congress in enacting laws, as detailed at some length in this Memorandum, have interposed restrictions on the Executive's ability to impose conditions on the transfer of benefits to local governments.

127

Federalism is not an island floating in some distant ocean; there are many bridges, connecting federal, state and local governments.   Some of these "bridges" are paved with money, some with conditions, and some with both.   The Byrne JAG grants are one of the latter. Principles of federalism allow a city to deal with local issues as it sees best.   The supremacy clause of the Constitution gives the federal government the final say – if, as, and when there is a conflict.   In this case, given Philadelphia's unique approach to meshing the legitimate needs of the federal government to remove criminal aliens with the City's promotion of health and safety, there is no conflict of any significance.   For all these reasons, the Court finds Philadelphia can properly certify, as required by Section 1373, its substantial compliance with Byrne JAG conditions, and the Attorney General will be enjoined from denying the City's Byrne JAG grant for FY 2017.

An appropriate Order follows.[30]

O:\CIVIL 17\17-3894 City v Sessions\17cv3894 Memorandum re Motion for Prelim Inj.docx

---

[30] The Order is entered with recognition that the City of Chicago injunction is presently in effect as to two of the Challenged Conditions.   If this legal status changes, Plaintiff may apply for further relief.