THE CITY OF PHILADELPHIA

    *Plaintiff*,

    v.

JEFFERSON BEAUREGARD SESSIONS III,
Attorney General of the United States, in
his official capacity,

    *Defendant*.

Civ. Action No. 17-3894
Hon. Michael M. Baylson

**BRIEF *AMICI CURIAE* OF ADMINISTRATIVE LAW, CONSTITUTIONAL LAW, AND IMMIGRATION LAW SCHOLARS IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

HARRY SANDICK (*pro hac vice* pending)
JAMISON DAVIES (*pro hac vice* pending)
MICHAEL D. SCHWARTZ (*pro hac vice* pending)
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036

IRA N. RICHARDS (PA Bar No. 501879)
Schnader Harrison Segal & Lewis LLP
1600 Market St., Suite 3600
Philadelphia, PA 19103

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................................... ii

PRELIMINARY STATEMENT ............................................................................... 1

SUMMARY OF ARGUMENT ................................................................................ 1

ARGUMENT ........................................................................................................... 3

I.  The Attorney General Has Disregarded Constitutional Limits on the Exercise of
    Federal Spending Power That Protect States and Localities ................................. 3

    A.  The Spending Clause and the Separation of Powers Limit Congress's
        Authority to Impose Conditions on Federal Grants and Deny Federal
        Agencies the Ability to Independently Force States and Localities to
        Accept Conditions ..................................................................................... 4

    B.  The Dysfunctional Administrative Process in this Case Underscores the
        Need for Judicial Enforcement of Constitutional Limits on Federal
        Spending Power ......................................................................................... 6

II. Congress Did Not and Could Not Authorize the Conditions that the Attorney
    General Seeks to Unilaterally Impose on Byrne JAG Funding ......................... 11

    A.  The Byrne JAG Statutory Scheme Does Not Authorize the Attorney
        General's Conditions ............................................................................... 11

    B.  Congress Cannot Authorize the Attorney General to Violate Constitutional
        Limits on the Federal Government's Spending Power ........................... 16

CONCLUSION ....................................................................................................... 19

APPENDIX A ..................................................................................................... A-1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aiken County*,
    725 F.3d 255 (D.C. Cir. 2013) .................................................................5

*Arizona v. United States*,
    567 U.S. 387 (2012) .................................................................................10

*City of Arlington v. FCC*,
    569 U.S. 290 (2013) ...................................................................................5

*City of Chicago v. Sessions*,
    2017 U.S. Dist. LEXIS 149847 (N.D. Ill. Sept. 15, 2017) ...........................8, 13, 16

*City of New York v. United States*,
    179 F.3d 29 (2d Cir. 1999) .......................................................................19

*Clinton v. City of New York*,
    524 U.S. 417 (1998) ...................................................................................5

*County of Santa Clara v. Trump*,
    2017 U.S. Dist. LEXIS 62871 (N.D. Cal. Apr. 25, 2017) ...................................5, 7

*County of Santa Clara v. Trump*,
    No. 17-16886 (9th Cir.) ...............................................................................7

*DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*,
    485 U.S. 568 (1988) .................................................................................17

*Galarza v. Szalczyk*,
    745 F.3d 634 (3d Cir. 2014) .......................................................................9

*Garcia v. San Antonio Metro. Transit Auth.*,
    469 U.S. 528 (1985) ...................................................................................6

*Kelley v. Johnson*,
    425 U.S. 238 (1976) ...................................................................................1

*Lunn v. Commonwealth*,
    78 N.E.3d 1143 (Mass. 2017) ...................................................................10

*Moreno v. Napolitano*,
    213 F. Supp. 3d 999 (N.D. Ill. 2016) .........................................................10

ii

*N. Ill. Chapter of Assoc. Builders & Contractors, Inc. v. Lavin*,
    431 F.3d 1004 (7th Cir. 2005) ........................................................................17

*New York v. United States*,
    505 U.S. 144 (1992) ........................................................................................18

*NFIB v. Sebelius*,
    567 U.S. 519 (2012) .........................................................................2, 4, 14, 19

*Pennhurst State Sch. & Hosp. v. Halderman*,
    451 U.S. 1 (1981) .......................................................................4, 12, 14, 15

*Printz v. United States*,
    521 U.S. 898 (1997) ........................................................................................19

*South Dakota v. Dole*,
    483 U.S. 203 (1987) ...........................................................................4, 14, 17

*States of New York, Massachusetts, et al. v. Donald Trump et al.*,
    No. 1:17-cv-05228 (E.D.N.Y. Sep. 6, 2017) ...............................................18

*Steinle v. City and County of San Francisco*,
    230 F. Supp. 3d 994 (N.D. Cal. 2017) ........................................................15

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001) ........................................................................................14

**Constitution, Statutes & Executive Orders**

U.S. Const. art. I, § 8, cl. 1.............................................................................2, 3

U.S. Const., art. I, § 9, cl. 7 ................................................................................3

U.S. Const., art. II, § 3 ........................................................................................5

U.S. Const. Amend. IV .....................................................................................10

U.S. Const. Amend. X .................................................................10, 15, 18, 19

8 U.S.C. § 1357(a)(2) ........................................................................................10

8 U.S.C. § 1357(d) .............................................................................................10

8 U.S.C. § 1373.............................................................................................. *passim*

23 U.S.C. § 108..................................................................................................16

iii

23 U.S.C. § 158(a)(1)(A) .................................................................................14

25 U.S.C. § 4112 ...........................................................................................16

34 U.S.C. § 10102(a)(6) .............................................................................12, 13

34 U.S.C. § 10152 .........................................................................................12

34 U.S.C. § 10152(a)(1) .............................................................................11, 12

34 U.S.C. § 10152(d) .....................................................................................12

34 U.S.C. § 10153 .........................................................................................12

34 U.S.C. § 10153(a)(5)(D) .................................................................13, 14, 15, 16

34 U.S.C. § 10155 ...........................................................................................8

34 U.S.C. § 10702(3)(D) ..................................................................................16

42 U.S.C. § 1396c ...........................................................................................14

42 U.S.C. § 2000cc-1 .......................................................................................13

42 U.S.C. § 2000d ...........................................................................................13

42 U.S.C. § 3712(a)(6) .....................................................................................12

Exec. Order 13,563, *Improving Regulation and Regulatory Review*,
    76 Fed. Reg. 3821 (Jan. 18, 2011) ..............................................................8

Exec. Order 13,768, *Enhancing Public Safety in the Interior of the United States*,
    82 Fed. Reg. 8799 (Jan. 25, 2017) ..........................................................7, 10

Pub. L. No. 113-121, 128 Stat. 1193 (2014).........................................................16

Violence Against Women and Department of Justice Reauthorization Act of 2005,
    H.R. 3402, Pub. L. No. 109-162, 119 Stat. 2960 (2006) .................................13

**Legislative History**

Enforce the Law for Sanctuary Cities Act, H.R. 3009, 114th Cong. (2015) .................12

H.R. Rep. No. 109-233 (2005)............................................................................12

Stop Sanctuary Cities Act, S. 1814, 114th Cong. (2015) ..........................................12

**Other Authorities**

The Federalist No. 48 (James Madison) (1788).............................................................3, 5

Bradford R. Clark, *Separation of Powers as a Safeguard of Federalism*, 79 Tex.
    L. Rev. 1321 (2001) ..............................................................................................6

Anil Kalhan, *Immigration Policing and Federalism Through the Lens of
    Technology, Surveillance, and Privacy*,
    74 Ohio St. L.J. 1105 (2013)..................................................................................9

Christopher N. Lasch, *Sanctuary Cities and Dog-Whistle Politics,*
    42 New Eng. J. on Crim. & Civ. Confinement 159 (2016)..................................18

Robert A. Mikos, *Can the States Keep Secrets from the Federal Government?*,
    161 U. Pa. L. Rev. 103 (2012) ..............................................................................19

Hiroshi Motomura, *The Discretion That Matters: Federal Immigration
    Enforcement, State and Local Arrests, and the Civil-Criminal Line,*
    58 UCLA L. Rev. 1819 (2011) ...............................................................................9

Eloise Pasachoff, *Agency Enforcement of Spending Clause Statutes: A Defense of
    the Funding Cut-Off*, 124 Yale L.J. 248 (2014).....................................................8

S. Karthick Ramakrishnan & Pratheepan Gulasekaram*, The Importance of the
    Political in Immigration Federalism,* 44 Ariz. St. L.J. 1431 (2012).....................18

Rubén Rumbaut & Walter Ewing, *The Myth of Immigrant Criminality and the
    Paradox of Assimilation, Immigration Policy Center* (2007).................................18

Juliet P. Stumpf, *D(e)volving Discretion: Lessons from the Life and Times of
    Secure Communities,* 64 Am. U.L. Rev. 1259 (2015) .............................................9

Donald J. Trump, Donald Trump's Contract with the American Voter (Oct. 2016).......................7

Tom Wong, *The Effects of Sanctuary Policies on Crime and the Economy,
    National Immigration Law Center* (Jan. 26, 2017), *available at*
    https://perma.cc/B57Q-XGTE ...............................................................................17

U.S. Dept. of Justice, Attorney General Jeff Sessions Delivers Remarks (Mar. 27,
    2017), *available at* https://www.justice.gov/opa/speech/attorney-general-jeff-
    sessions-delivers-remarks-sanctuary-jurisdictions ...............................................18

U.S. Dept. of Justice, Attorney General Sessions Announces Immigration
    Compliance Requirements for Edward Byrne Memorial Justice Assistance
    Grant Programs (July 25, 2017), *available at*
    https://www.justice.gov/opa/pr/attorney-general-sessions-announces-
    immigration-compliance-requirements-edward-byrne-memorial.............................7

U.S. Dept. of Justice, *Justice Department Provides Last Chance for Cities to Show Section 1373 Compliance* (Oct. 12, 2017) *available at* https://www.justice.gov/opa/pr/justice-department-provides-last-chance-cities-show-1373-compliance ............................................................................................8

U.S. Dep't of Justice, Office of Justice Programs, Bureau of Justice Assistance, Comprehensive Opioid Abuse Site-based Program FY 2017 Competitive Grant Announcement, OMB No. 1121-0329, at 43 (Jan. 24, 2017) OMB No. 1121-0329 (Jan. 24, 2017), *available at* https://www.bja.gov/funding/CARA17.pdf ........................................................16

Full Text: Donald Trump Immigration Speech in Arizona (Aug. 31, 2016), *available at* http://www.politico.com/story/2016/08/donald-trump-immigration-address-transcript-227614 ...........................................................2, 7, 18

Letter to Bob Goodlatte, Chairman, Committee on the Judiciary, U.S. House of Representatives et al. (Sept. 26, 2016) ......................................................................19

Letter from Alan R. Hanson, Acting Ass't Att'y Gen'l, Office of Justice Programs to Jim Kenney, Mayor, City of Phila. (Oct. 11, 2017) ...........................................15

Memorandum from Jeh Charles Johnson, Sec'y, U.S. Department of Homeland Security, *Secure Communities* (Nov 20, 2014) .........................................................10

Christopher Ingraham, *Trump says sanctuary cities are hotbeds of crime. Data say the opposite*, The Washington Post (Jan. 27, 2017) .................................18

*Here's Donald Trump's Presidential Announcement Speech*, Time (June 16, 2015) ....................................................................................................................17

"Police Chiefs to Trump: Don't Punish Sanctuary Cities," NBC News (Mar. 29, 2017), *available at* https://perma.cc/L4BD-7G9H ..................................................17

## PRELIMINARY STATEMENT

This case concerns the limits on the federal executive branch's authority to co-opt states and localities into administering the executive's regulatory agenda rather than addressing their own public safety priorities. Since the Founding, "[t]he promotion of safety of persons and property [has been] unquestionably at the core of [the states'] police power." *Kelley v. Johnson*, 425 U.S. 238, 247 (1976). The Constitution reserves this police power to the states as well as localities. *See id.* (treating state and local governments equivalently). But in today's era of expansive federal spending, the federal government has vast power to influence state and local policy by attaching conditions to federal grants. The Constitution protects federalism by limiting the types of conditions Congress may impose on federal grants and the manner in which they may be imposed and by denying the Executive Branch unilateral authority to impose new conditions. The Attorney General's vision of federal executive authority, if accepted, would permit federal agencies to ignore these basic constitutional principles and impose spending conditions of their own confection.

*Amici*, who are listed in Appendix A, are scholars of administrative, constitutional, and immigration law. They have an interest in the proper construction and enforcement of constitutional and statutory limits on federal executive power. While the parties focus on the Attorney General's threat to deny the City of Philadelphia law enforcement funding under the Edward Byrne Justice Assistance Grant ("Byrne JAG") program, *amici* provide a unique perspective on the larger ramifications of the Court's decision for federal executive authority.

## SUMMARY OF ARGUMENT

The rules that deny federal agencies unilateral authority to impose conditions on federal spending are well settled and of considerable importance. Congress offers federal funding to

states and localities in areas ranging from policing to healthcare, and states and localities increasingly depend upon federal funding to provide government services. The ubiquity of federal funding makes judicial enforcement of constitutional and statutory limits on federal spending conditions crucial to protecting state and local sovereignty.

Article I of the Constitution grants the power of the purse to Congress, not to the President or to the Attorney General. U.S. Const. art. I, § 8, cl. 1. The Department of Justice does not have freewheeling authority independent from Congress to impose spending conditions under the Constitution. And for good reason. Over the course of the last ten months, the Administration—in an effort to fulfill the President's campaign promise to "end" sanctuary cities[1]—has already tried to bypass the limits on the federal spending power multiple times. The Attorney General's announcement of sweeping and intrusive demands on states and localities that receive Byrne JAG grants is only one of the latest examples.

No provision of the Byrne JAG statute gives the Attorney General sweeping discretion to condition funding on acquiescence to the president's immigration plans. Congress did not authorize the Department to impose the new conditions on Byrne JAG grants. Further, the Constitution limits even Congress's authority to leverage federal funding to require states and local governments to implement federal policies. *See NFIB v. Sebelius*, 567 U.S. 519, 576 (2012) (explaining that the Court has "recognized limits on Congress's power under the Spending Clause to secure state compliance with federal objectives"). The Attorney General can no more circumvent those constitutional limits than can Congress.

---

[1] Full Text: Donald Trump Immigration Speech in Arizona (Aug. 31, 2016) (hereinafter "August Speech"), *available at* http://www.politico.com/story/2016/08/donald-trump-immigration-address-transcript-227614.

The Attorney General would have this Court hold that a federal agency may impose its own conditions on a funding program without clear and specific congressional authorization, even when those conditions are inconsistent with Congress's purposes. Should the Court accept this invitation, it would set a dangerous precedent that goes far beyond the current bid to force Byrne JAG recipients to implement the President and Attorney General's immigration policies. Administration officials will feel free to disregard the balance between state and federal authority and require states and localities to administer whatever unrelated priorities the executive wants to pursue in any particular fiscal year. This case confirms the need for federal courts to protect federalism by enforcing the constitutional limits on federal executive power.

## ARGUMENT

### I. The Attorney General Has Disregarded Constitutional Limits on the Exercise of Federal Spending Power That Protect States and Localities

Article I of the Constitution grants Congress the power to tax and to spend: "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defense and general Welfare of the United States." U.S. Const., art. I, § 8, cl. 1. Congress "alone has access to the pockets of the people"—the executive branch has no authority to spend under Article I, for "[n]o money shall be drawn from the Treasury, but in Consequence of Appropriations made by law." The Federalist, No. 48, at 148 (James Madison); U.S. Const., art. I, § 9, cl. 7. It is for Congress to enact spending measures and authorize conditions on federal grants, leaving to the federal executive the task of implementing those programs. Since the executive has no independent spending power, it thus also has no independent authority to create new conditions on federal funds once appropriated by Congress.

The Framers adopted a carefully calibrated separation of powers that protects both individual liberty and federalism by limiting the authority of each branch of the federal

government.  These constitutional limits protect states and localities against the very sort of executive branch dysfunction that has been on display in this case, culminating in the Attorney General announcing, unilaterally and without authority, new conditions on Byrne JAG grants.

A.  **The Spending Clause and the Separation of Powers Limit Congress's Authority to Impose Conditions on Federal Grants and Deny Federal Agencies the Ability to Independently Force States and Localities to Accept Conditions**

To ensure that states and localities are protected from arbitrary and unpredictable changes in federal grantmaking, the executive branch may not withhold funds based on a grant condition unless Congress has clearly authorized it: "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).  Moreover, a reviewing court "must carefully inquire" into the legislative scheme before concluding that the executive can order states and localities to comply with particular conditions to receive federal grants.  *Id.* at 18.  This clear-statement rule ensures that a state has "voluntarily and knowingly" agreed to the spending condition.  *Id.* at 17.  If there is no specific statutory language authorizing the executive to implement a spending condition, then Congress should be presumed not to have authorized it.

When authorizing spending conditions, Congress must also comply with other constitutional limits on its spending power.  Spending conditions must not only be clearly authorized, but also be designed to promote the general welfare, be related to Congress's public purpose in spending the funds, and not be subject to an independent constitutional bar.  *See South Dakota v. Dole*, 483 U.S. 203, 207-08, 211 (1987).  Such conditions may not, moreover, be unduly coercive.  *See id.* at 211; *NFIB*, 567 U.S. at 577-78.  Like the other limits on Congress's spending power, these constitutional constraints help ensure "the political accountability key to our federal system."  *NFIB*, 567 U.S. at 578.

4

To ensure political accountability and protect federalism, the Framers not only limited Congress's Article I power to authorize spending conditions. They also denied to the executive branch any independent Article II authority to impose conditions of its own making, or to unilaterally refuse to spend appropriated funds for its own policy ends. The executive's duty is to "take Care that the Laws be faithfully executed." U.S. Const., art. II, § 3. In carrying out that duty, the executive departments, like administrative agencies, are creatures of statute whose "power to act . . . [is] authoritatively prescribed by Congress." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013). Neither the President nor any executive agency has the "constitutional authority to withhold" funds that Congress has designated for a particular purpose—indeed, withholding such funds "violates [the] obligation to faithfully execute the laws duly enacted by Congress." *County of Santa Clara v. Trump*, 2017 U.S. Dist. LEXIS 62871, at *74 (N.D. Cal. Apr. 25, 2017) (citing *Clinton v. City of New York*, 524 U.S. 417, 439 (1998) (striking down Line Item Veto Act, which purported to give President authority to cancel specific types of spending provisions)); *see also In re Aiken County*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (holding that President "does not have unilateral authority to refuse to spend the funds" that Congress has appropriated).

By limiting congressional and executive authority over spending, the Constitution protects states and localities. With the power to spend comes the power to make policy by imposing substantive conditions on the acceptance of federal funds. The finely wrought procedures of federal lawmaking preclude a single person—whether the President or an agency department head—from arrogating to himself power over "the pockets of the people." The Federalist, No. 48, at 148 (James Madison). Instead, the Spending Clause and separation-of-powers rules together ensure that the concurrence of Congress is necessary before the federal

government can impose a spending condition.  *See* Bradford R. Clark, *Separation of Powers as a Safeguard of Federalism*, 79 Tex. L. Rev. 1321, 1391 (2001) (explaining that "federal lawmaking procedures," including those limiting federal spending, "safeguard federalism"). These political safeguards, and their enforcement by the judiciary, are essential to the federal system.

**B.    The Dysfunctional Administrative Process in this Case Underscores the Need for Judicial Enforcement of Constitutional Limits on Federal Spending Power**

When the federal government announces conditions on federal grants, states and localities can normally take any concerns they have to Congress, or, in the alternative, lodge them with the executive.  *See Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 550-52 (1985) (explaining that "the shape of the constitutional scheme" of federal lawmaking protects states' "'residuary sovereignty'" (quoting The Federalist No. 62, at 408 (B. Wright ed. 1961))). But when spending conditions are announced unilaterally and without any formal process, it leaves states and localities without any recourse but to the federal courts.

From the inception of the Byrne JAG program until 2016, the federal government dispersed hundreds of millions of dollars of grant funds without any immigration-related conditions.  The Attorney General's imposition of the challenged conditions was a substantial departure from past practice, with high stakes for states and localities.  Nevertheless, the Attorney General did not use any formal procedures, such as notice-and-comment rulemaking, that would have facilitated transparency and consultation.

That the Administration took such a drastic step without consulting state and local jurisdictions is unsurprising.  "End[ing]" so-called "sanctuary cities" has been a preoccupation of

President Trump since before he took office. *See* August Speech, *supra* note 1.[2] To that end, the Administration has tried several times to bypass limits on executive authority to threaten such jurisdictions with funding cut-offs, without regard for congressional intent or for state and local sovereignty. Within one week of taking office, the President issued Executive Order 13,768, directing Administration officials to "ensure that jurisdictions that . . . refuse to comply with 8 U.S.C. § 1373 . . . are not eligible to receive Federal grants."[3] Local governments promptly challenged the move in federal court. In April 2017, a district court in California found that plaintiffs were likely to succeed on the merits of their constitutional challenge and entered a nationwide preliminary injunction. *Santa Clara*, 2017 U.S. Dist. LEXIS 62871, at *97. The court made clear that Congress had "repeatedly, and frequently, declined to broadly condition federal funds or grants on compliance with 8 U.S.C. § 1373 or other federal immigration laws" and found the Executive Order "an improper attempt to wield Congress's exclusive spending power and . . . a violation of the Constitution's separation of powers principles." *Id.* at *75-76.[4]

Undeterred, the Administration then switched course. In July 2017, the Attorney General announced the Byrne JAG funding conditions challenged in this case.[5] The Attorney General

---

[2] *See also* Donald J. Trump, Donald Trump's Contract with the American Voter (Oct. 2016), https://assets.donaldjtrump.com/_landings/contract/O-TRU-102316-Contractv02.pdf (promising to "cancel all funding to sanctuary cities" in the first 100 days of his presidency).

[3] Exec. Order 13,768, *Enhancing Public Safety in the Interior of the United States* § 9(a), 82 Fed. Reg. 8799, 8801 (Jan. 25, 2017) (hereinafter "Interior Enforcement Executive Order"), *available at* https://www.whitehouse.gov/the-press-office/2017/01/25/presidential-executive-order-enhancing-public-safety-interior-united.

[4] The district court's order has been appealed to the Court of Appeals for the Ninth Circuit and the appeal is currently pending. *County of Santa Clara v. Trump*, No. 17-16886 (9th Cir.), filed Sept. 18, 2017.

[5] U.S. Dept. of Justice, Attorney General Sessions Announces Immigration Compliance Requirements for Edward Byrne Memorial Justice Assistance Grant Programs (July 25, 2017), *available at* https://www.justice.gov/opa/pr/attorney-general-sessions-announces-immigration-compliance-requirements-edward-byrne-memorial.

did not engage notice-and-comment rulemaking, which would have allowed states and localities to raise their federalism concerns directly with the Department of Justice. Many agencies have voluntarily conducted notice-and-comment rulemaking when making substantive changes to grant conditions.[6] Indeed, in the Byrne JAG statute, Congress instructed the Attorney General to "issue rules to carry out" the Byrne JAG program. 34 U.S.C. § 10155. Nonetheless, when the Attorney General adopted the new and intrusive conditions on the Byrne JAG program at issue here, he informed state and local jurisdictions for the first time by press release.

After the Attorney General announced the three new Byrne JAG conditions, several jurisdictions filed suit. In September 2017, a federal court in Chicago granted a nationwide preliminary injunction against the notice and access conditions based on a finding that the executive lacked authority to impose them. *See City of Chicago v. Sessions*, 2017 U.S. Dist. LEXIS 149847, at *44 (N.D. Ill. Sept. 15, 2017). Even then, the Attorney General did not give up. Last week, the Department of Justice issued letters to five jurisdictions, including Philadelphia, finding those jurisdictions to be "preliminarily" in violation of 8 U.S.C. § 1373, the federal statute that serves as the basis for the remaining Byrne JAG condition.[7] In doing so, the Attorney General adopted an expansive interpretation of § 1373 that would effectively implement *de facto* the conditions he is enjoined from imposing directly. *See infra* at 15.

---

[6] *See* Eloise Pasachoff, *Agency Enforcement of Spending Clause Statutes: A Defense of the Funding Cut-Off*, 124 Yale L.J. 248, 325 n.394 (2014) (noting agency practice of waiving Administrative Procedure Act exemption from rulemaking for grants). The executive branch has also previously directed federal agencies to have an "open exchange of information and perspectives" with state and local officials when creating new policies. Exec. Order 13,563, *Improving Regulation and Regulatory Review*, 76 Fed. Reg. 3821, 3821-22 (Jan. 18, 2011).

[7] The letters are available on the Department of Justice's website. *See* U.S. Dept. of Justice, Justice Department Provides Last Chance for Cities to Show Section 1373 Compliance (Oct. 12, 2017) *available at* https://www.justice.gov/opa/pr/justice-department-provides-last-chance-cities-show-1373-compliance.

The Administration's attack on so-called sanctuary jurisdictions appears to be part of a broader policy platform of mass deportations, itself marked by a tendency towards executive overreach. To achieve its policy end, the Administration recognizes that it must obtain the acquiescence of state and local jurisdictions, including Philadelphia, and persuade them to open up their jails to immigration officials and redirect policing resources towards immigration enforcement.

The Attorney General's new conditions on Byrne JAG funding are of a piece with its other attempts to conscript state and local participation in immigration enforcement, including through the revival of the controversial Secure Communities program. Launched in 2008, the program precipitated a federalism crisis when officials were forced to admit they had left no way for states and localities to "opt out" of immigration checks for every arrestee, dramatically raising the stakes of police contact for noncitizens.[8] States and localities, unable to stop their routine booking process from being co-opted for immigration checks, turned to limiting the circumstances under which local officials would comply with the "detainers" issued by federal immigration authorities under the program.

Initially, there was confusion about whether local officials had discretion to decline to comply with detainers. Federal courts later clarified that the executive lacked statutory authority to compel local officials to hold individuals on detainers. *See Galarza v. Szalczyk*, 745 F.3d 634, 641-45 (3d Cir. 2014) (finding that mandatory detainer compliance was not authorized by 8

_____

[8] *See* Juliet P. Stumpf, *D(e)volving Discretion: Lessons from the Life and Times of Secure Communities,* 64 Am. U.L. Rev. 1259, 1272-73, 1279-81 (2015); Hiroshi Motomura, *The Discretion That Matters: Federal Immigration Enforcement, State and Local Arrests, and the Civil-Criminal Line,* 58 UCLA L. Rev. 1819 (2011). At least one scholar has argued that the Secure Communities program may itself exceed statutory authority and thus be unlawful. Anil Kalhan, *Immigration Policing and Federalism Through the Lens of Technology, Surveillance, and Privacy*, 74 Ohio St. L.J. 1105, 1130-31, 1162-63 (2013).

U.S.C. § 1357(d) and would violate the Tenth Amendment's anti-commandeering doctrine).[9]  In

*Moreno v. Napolitano*, a federal court further held that the federal government's practice of

regularly issuing immigration detainers to local officials without first trying to obtain warrants

violated limits on the federal government's statutory civil arrest authority under 8 U.S.C. §

1357(a)(2).  213 F. Supp. 3d 999, 1003-04 (N.D. Ill. 2016).

In November 2014, due to growing body of federal court decisions calling into question

the legality of detainer-based detention by state and local officials, the federal government

discontinued the Secure Communities program.[10]  But the Trump Administration has brought it

back.[11]  Ignoring "the removal system Congress created," *Arizona v. United States,* 567 U.S.

387, 407 (2012), it has attempted, unsuccessfully, to revive the discredited theory that state and

local officials have "inherent authority" to hold individuals for civil immigration purposes.  *See*

*Lunn*, 78 N.E.3d at 1156-58.  The Administration has also devised a system for shaming

jurisdictions that decline immigration detainers,[12] despite the legitimate reasons state and local

jurisdictions have for not complying with them.

In its quest to maximize deportations, the Administration has thus gone to extraordinary

lengths to press state and local criminal justice actors into the service of the federal immigration

enforcement machinery.  This war on so-called sanctuary jurisdictions is also a war on the

---

[9] Indeed, a number of courts have indicated that it would be a Fourth Amendment violation for state and local authorities to hold individuals beyond the time they would otherwise be entitled to release based solely on an immigration detainer.  *See, e.g.*, *Lunn v. Commonwealth*, 78 N.E.3d 1143, 1153 (Mass. 2017).

[10] *See* Memorandum from Jeh Charles Johnson, Sec'y, U.S. Department of Homeland Security, *Secure Communities* (Nov 20, 2014), *available at* https://perma.cc/AHK5-GMEU.

[11] Interior Enforcement Executive Order § 10.

[12] *Id.* § 9(b).

constitutional prerogatives of states and localities and it will not stop unless the judiciary

enforces constitutional limits on the executive's authority.

## II. Congress Did Not and Could Not Authorize the Conditions that the Attorney General Seeks to Unilaterally Impose on Byrne JAG Funding

The Attorney General's newly minted conditions on Byrne JAG funding violate statutory

limits on his authority and constitutional constraints on the federal government's spending

power. No act of Congress contains the type of clear statement required to permit the Attorney

General to condition Byrne JAG funds on compliance with the agency's notice, access, or

information-sharing requirements. Further, interpreting the Byrne JAG statute to authorize the

new immigration-related conditions would violate the constitutional limits on the federal

spending power. Accepting the Attorney General's interpretation of its authority would

therefore set a dangerous precedent not only for the Byrne JAG program, but also for the myriad

other federal grant programs on which states and localities have come to rely.

### A. The Byrne JAG Statutory Scheme Does Not Authorize the Attorney General's Conditions

There is no indication in the Byrne JAG statute that Congress intended for the Attorney

General to have any authority to impose immigration-related requirements on grantees of the

type contemplated here. Indeed, the statutory text does not even authorize the Department of

Justice to impose *criminal justice* mandates on local law enforcement actors, much less to

leverage Byrne JAG funding to require participation in the enforcement of *civil* immigration

laws. To the contrary, the statute's structure, purpose, and history all confirm that Congress

intended the Department to defer to state and local policy choices.

The Byrne JAG program is largely a formula grant created for criminal law enforcement,

and the statutory structure reflects that purpose. *See* 34 U.S.C. § 10152(a)(1) (authorizing the

Attorney General to "make grants to States and units of local government" to support "criminal justice," but "in accordance with the formula established under section 3755 of this title"). By statute, the Attorney General may design a "form" for Byrne JAG applications, "reasonably require" applicants to "maintain and report . . . data, records, and information (programmatic and financial)," and develop a "program assessment component." *See id.*; 34 U.S.C. §§ 10152-53. Congress specified a few prohibited uses of Byrne JAG funding, but generally allows states and localities to adapt the program's funding to their specific needs. *See* 34 U.S.C. § 10152(d) (listing prohibited uses); H.R. Rep. No. 109-233, at 89 (explaining that Congress's purpose was to "give State and local governments more flexibility"). Options, not mandates, are the bedrock of the Byrne JAG program.

The Byrne JAG program's purpose and history also confirm that Congress did not authorize the Attorney General to impose civil immigration enforcement mandates on grantees. Since 2005, when Congress created the program, its focus has been on improving the criminal justice system, including policing, adjudication, and incarceration, not on immigration policy. *See* 34 U.S.C. § 10152. It would run counter to the program's purpose to permit the Attorney General to use it as a tool to carry out the Administration's immigration agenda. In fact, Congress has declined to adopt any conditions on Byrne JAG funding related to immigration enforcement, despite numerous attempts to do so by individual legislators. *See, e.g.*, Enforce the Law for Sanctuary Cities Act, H.R. 3009, 114th Cong. § 3(b) (2015); Stop Sanctuary Cities Act, S. 1814, 114th Cong. § 2(b)(2) (2015).

In light of the Byrne JAG statute's text, structure, purpose, and legislative history, something more than stray, generic statutory phrases would be required to authorize the Department's new conditions. *See Pennhurst*, 451 U.S. at 17. The Attorney General relies on

12

34 U.S.C. § 10102(a)(6) (formerly 42 U.S.C. § 3712(a)(6)), which provides the power to "plac[e] special conditions on . . . grants" and "determin[e] priority purposes for formula grants," but this provision does nothing more than assign to the Assistant Attorney General for the Office of Justice Programs whatever "powers and functions [are] vested in [the AAG] pursuant to this title or by delegation of the Attorney General, including placing special conditions on all grants." This provision would only be relevant if Congress had vested statutory authority in either the Attorney General or the Assistant Attorney General to implement any of the Department's immigration-related Byrne JAG requirements. But Congress did not do so. *See Chicago*, 2017 U.S. Dist. LEXIS 149847, at *16-22 (rejecting the Department of Justice's claim that § 10102(a)(6) conferred freewheeling authority on the agency to create new conditions on Byrne JAG funding).[13]

Next, the Attorney General contends that it may require Byrne JAG grantees to certify their compliance with 8 U.S.C. § 1373 pursuant to 34 U.S.C. § 10153(a)(5)(D), which states, in the course of describing various requirements associated with an application for Byrne JAG funding, that applicants must certify compliance with the Byrne JAG statute and "all other applicable Federal laws." The Attorney General apparently reads this provision to confer on the Department of Justice unlimited discretion to convert into grant conditions any of the thousands of laws that apply to states and localities. This interpretation is wrong for several reasons.

---

[13] In the same Act that added the language in § 10102(a)(6), Congress set forth a number of new conditions on grant funds, none of which are related to immigration enforcement. *See generally* Violence Against Women and Department of Justice Reauthorization Act of 2005, H.R. 3402, Pub. L. No. 109-162, 119 Stat. 2960 (2006). Congress also identified *other* factors—unrelated to immigration enforcement— that are given priority in the allocation of formula grants. *See, e.g.*, *id.* § 505(f). Some cross-cutting spending conditions that Congress *has* approved include those related to compliance with various civil rights and nondiscrimination laws. *See, e.g.*, 42 U.S.C. § 2000d (prohibiting discrimination on the basis of race, color, or national origin in "any program or activity receiving Federal financial assistance"); 42 U.S.C. § 2000cc-1 (protecting free exercise rights of institutionalized persons in any "program or activity that receives Federal financial assistance").

First, § 10153(a)(5)(D) does not itself clearly impose compliance with every potentially applicable federal law as a condition on Byrne JAG funding.[14]  There is a critical difference between expecting grant applicants to certify that they follow federal law, on the one hand, and authorizing the Department of Justice to convert such a certification requirement into an indefinite number of spending conditions, on the other.  If Congress intended to authorize new, substantive spending conditions through § 10153(a)(5)(D), then it would have had to speak far more clearly.  *Pennhurst*, 451 U.S. at 17 ("[I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously."); *see also Whitman v. Am. Trucking Ass'ns,* 531 U.S. 457, 468 (2001) ("Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes.").

Second, "all other *applicable* Federal laws" plainly does not mean all federal laws.  More likely, it refers only to laws that, like other "provisions of" the Byrne JAG program, 34 U.S.C. § 10153(a)(5)(D), apply to federal grantees *as grantees* or are otherwise intrinsic to administration of the program.  Moreover, to comply with the Constitution, spending conditions must be "related" to the federal purposes that the grant program was established to pursue.  *Dole*, 483 U.S. at 207-08.  The Attorney General's interpretation of "all other applicable Federal laws" to extend to provisions of the U.S. code, such as 8 U.S.C. § 1373, that are not germane to the purposes Byrne JAG program cannot be squared with that constitutional limit.  34 U.S.C.

---

[14] In contrast, Congress used explicit language to impose certain requirements as funding conditions in *Dole* and *NFIB*.  The statute at issue in *Dole* directed the Secretary of Transportation to withhold allocated highway funding from "any State . . . in which the purchase or public possession . . . of any alcoholic beverage by a person who is less than twenty-one years of age is lawful."  23 U.S.C. § 158(a)(1)(A).  In *NFIB*, the law allowed the Secretary of Health and Human Services to declare that "further payments will not be made to the State," 42 U.S.C. § 1396c, if a given State's Medicaid plan did not comply with Affordable Care Act requirements.

§ 10153(a)(5)(D) should be construed narrowly to avoid the constitutional problem. *See also*

*infra* at 17-18 (discussing germaneness requirement).

The danger of allowing the Department of Justice to determine unilaterally what a law

like 8 U.S.C. § 1373 means for states and localities and withhold funding on that basis became

clear last week when the Department issued its Byrne JAG § 1373 letters. Even though § 1373's

plain text is limited only to information about "citizenship or immigration status," *see Steinle v.*

*San Francisco*, 230 F. Supp. 3d 994, 1015 (N.D. Cal. 2017) (holding that "no plausible reading

of [Section 1373] encompasses the release date of an undocumented inmate"), the Department

found Philadelphia in violation of the statute due to the City's policy limiting the circumstances

in which local officials can provide federal immigration authorities with advance notice of a

person's release from custody.[15]

In fact, there is nothing in 34 U.S.C. § 10153(a)(5)(D)'s text or legislative history to

suggest Congress intended to authorize an indefinite number of new spending conditions through

the "all other applicable Federal laws" language. If the Attorney General has authority to select

from among the myriad potentially applicable laws in any given fiscal year, then states and

localities would lack meaningful notice and opportunity to plan their budgets. *See Pennhurst*,

451 U.S. at 17-18. And the Department's interpretation of § 10153(a)(5)(D) offers *no* principle

that would limit the discretion it claims under the statute.

---

[15] Letter from Alan R. Hanson, Acting Ass't Att'y Gen'l, Office of Justice Programs to Jim
Kenney, Mayor, City of Phila. 1 (Oct. 11, 2017) ("Philadelphia § 1373 Letter"), *available at*
https://www.justice.gov/opa/press-release/file/1003046/download. In stretching § 1373 to encompass
policies limiting the circumstances under which local officials will provide notification of an individual's
release date, the Department has rendered the textual limits of the statute meaningless. The Department's
approach flies in the face of well-established principles of statutory interpretation and seems to confirm
fears that the statute will be used to undermine state and local sovereignty under the Tenth Amendment.
*See infra* at 18-19.

In *Chicago v. Sessions*, the court found that § 10153(a)(5)(D) could be read to permit the condition that grantees comply with 8 U.S.C. § 1373. 2017 U.S. Dist. LEXIS at *23-26. But the court did not apply *Pennhurst*'s clear-statement rule. Nor did it appear to consider that Congress has expressly and repeatedly declined to pass legislation conditioning Byrne JAG funding on compliance with 8 U.S.C. § 1373, or that Congress has elsewhere used the same statutory text— "all other applicable Federal laws"—to apply narrowly to obligations imposed upon grantees and the "applicable" objectives of a particular funding stream.[16] This Court should decline to follow this aspect of the *Chicago* decision because it cannot be squared with neither Congress's intent in enacting the Byrne JAG program nor the constitutional requirement that spending conditions be germane to the purposes of the spending program.

## B. Congress Cannot Authorize the Attorney General to Violate Constitutional Limits on the Federal Government's Spending Power

There are additional reasons why the Court should reject the Attorney General's unilateral imposition of immigration-related conditions on Byrne JAG funding. Even if Congress *had* authorized the conditions at issue here, such conditions would raise at least two serious constitutional problems. Thus, to avoid an interpretation of the Byrne JAG statute that would violate constitutional limits on Congress's spending power, the Court should construe the

---

[16] The Comprehensive Opioid Abuse Grant Program, for example, requires a certification that the applicant "will comply with all provisions of this part and all other applicable Federal laws." 34 U.S.C. § 10702(3)(D). In implementing this statutory requirement, the Department certainly has not required an applicant to certify compliance with any and all federal laws that might apply to them. *See* U.S. Dep't of Justice, Office of Justice Programs, Bureau of Justice Assistance, Comprehensive Opioid Abuse Site-based Program FY 2017 Competitive Grant Announcement, OMB No. 1121-0329, at 43 (Jan. 24, 2017), *available at* https://www.bja.gov/funding/CARA17.pdf. Congress has also required federal compliance certifications with substantially identical language in a variety of other arenas. *See, e.g.*, 23 U.S.C. § 108 (grants for real estate acquisitions to facilitate transportation projects); 25 U.S.C. § 4112 (grants for Indian tribal housing); Pub. L. No. 113-121, 128 Stat. 1193, 1244-45 (2014) (grants for feasibility studies for various water-related projects).

statute narrowly. *See DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988).

First, when Congress authorizes a spending condition, it must be "germane[]" to the grant's public purposes. *Dole*, 483 U.S. at 207-08 & 208 n.3. If not, the condition is an unconstitutional regulation of states and localities. *See N. Ill. Chapter of Assoc. Builders & Contractors, Inc. v. Lavin*, 431 F.3d 1004, 1006 (7th Cir. 2005) ("Conditions on spending may become regulation if they affect conduct other than the financed project."). Here, the immigration-related conditions are not germane to the purpose of Byrne JAG grants. The Byrne JAG grant is a criminal justice program intended to provide states and localities with flexibility in criminal justice policy. The immigration-related conditions are unrelated to, and indeed inconsistent with, that purpose.

Immigration enforcement is not co-extensive with crime control, and should not be treated as such. Indeed, as the International Association of Police Chiefs recently explained, entangling local police with immigration enforcement may *impede* efforts to combat violent crime. "Police Chiefs to Trump: Don't Punish Sanctuary Cities," NBC News (Mar. 29, 2017), *available at* https://perma.cc/L4BD-7G9H.[17] The Administration's effort to paint immigrants with a broad brush of criminality has been part and parcel of its strategy to maximize immigration enforcement. At times it has taken on an explicitly racialized tone. Trump began his campaign by branding Mexican immigrants as rapists and drug dealers.[18] He then perpetuated this identification of immigrants with criminality in his attack on sanctuary cities and

---

[17] *See also* Tom Wong, *The Effects of Sanctuary Policies on Crime and the Economy, National Immigration Law Center*, at 6 (Jan. 26, 2017), *available at* https://perma.cc/B57Q-XGTE (finding that "[c]rime is . . . significantly lower in sanctuary counties compared to nonsanctuary counties").

[18] Here's Donald Trump's Presidential Announcement Speech, Time (June 16, 2015), *available at* http://time.com/3923128/donald-trump-announcement-speech/.

the "needless deaths" they have supposedly caused,[19] comments that Attorney General Sessions

echoes when he blames sanctuary cities for the deaths of "[c]ountless Americans."[20]  While the

myth of immigrant criminality—which at times has taken on an explicitly racialized tone[21]—may

be a particularly persistent one,[22] it is unsupported by empirical evidence and "undermin[es] the

development of reasoned public responses to both immigration and crime."  Rubén Rumbaut &

Walter Ewing, *The Myth of Immigrant Criminality and the Paradox of Assimilation, Immigration*

*Policy Center* (2007).  It does not provide a sound basis upon which to conclude that the

Attorney General's spending conditions are germane to the purposes of the Byrne JAG program.

Second, the Attorney General's information-sharing condition raises Tenth Amendment

problems.  Compliance with this condition could easily lead to the diversion of the resources of

several full-time employees in a large urban police force or corrections agency.  Denying states

and localities authority to supervise their officials may cripple their ability to "regulate in

accordance with the views of the local electorate."  *New York v. United States*, 505 U.S. 144, 169

(1992).  Moreover, § 1373 appears to deny states and localities the prerogative to decline "to

provide information that belongs to the State and is available to [officers] only in their official

---

[19] August Speech, *supra* note 1; *see also* Christopher Ingraham, *Trump says sanctuary cities are hotbeds of crime. Data say the opposite*, The Washington Post (Jan. 27, 2017), *available at* https://www.washingtonpost.com/news/wonk/wp/2017/01/27/trump-says-sanctuary-cities-are-hotbeds-of-crime-data-say-the-opposite/.

[20] U.S. Dept. of Justice, Attorney General Jeff Sessions Delivers Remarks (Mar. 27, 2017), *available at* https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-delivers-remarks-sanctuary-jurisdictions.

[21] *See* Christopher N. Lasch, *Sanctuary Cities and Dog-Whistle Politics,* 42 New Eng. J. on Crim. & Civ. Confinement 159, 173-75 (2016) (describing use of death of Kate Steinle during the Trump campaign); Complaint, *States of New York, Massachusetts, et al. v. Donald Trump et al.,* No. 1:17-cv-05228, ECF No. 1, at 45-48 (E.D.N.Y. Sep. 6, 2017) (recounting Trump's "history of disparaging Mexicans").

[22] *See* S. Karthick Ramakrishnan & Pratheepan Gulasekaram, *The Importance of the Political in Immigration Federalism,* 44 Ariz. St. L.J. 1431, 1452-53, 1474-75 (2012) (explaining why myths about immigrant criminality and sanctuary cities persist).

capacity." *Printz v. United States*, 521 U.S. 898, 932 n.17 (1997) (striking down statute with information-sharing provision). This raises additional Tenth Amendment concerns.[23] Any reading of what § 1373 requires must be construed against the backdrop of these constitutional limits.[24] The Attorney General's broad interpretation of § 1373, as exhibited in last week's letter to Philadelphia, does not respect the constitutional principles of state sovereignty and limited executive authority.

## CONCLUSION

Federal agencies play an important role in implementing spending programs, but not by creating new spending conditions whenever it suits the Administration's policy preferences. Permitting an agency such unbridled authority "would threaten the political accountability key to our federal system." *NFIB*, 567 U.S. at 578. *Amici* urge the Court to reject the Attorney General's latest bid for unilateral executive power and grant Philadelphia's motion for a preliminary injunction.

---

[23] *See* Robert A. Mikos, *Can the States Keep Secrets from the Federal Government?*, 161 U. Pa. L. Rev. 103, 159-64 (2012) (arguing that information-sharing statutes such as Section 1373 violate anti-commandeering principle of *Printz*); *cf. City of New York v. United States,* 179 F.3d 29, 36-37 (2d Cir. 1999) (declining to strike down 8 U.S.C. § 1373 but explaining how a challenge under the Tenth Amendment could succeed if it a municipality could show the disclosure of information unduly interfered with its ability to carry out local government functions).

[24] *See, e.g.*, Letter to Bob Goodlatte, Chairman, Committee on the Judiciary, U.S. House of Representatives et al. (Sept. 26, 2016), *available at* http://docs.house.gov/meetings/JU/JU01/20160927/105392/HHRG-114-JU01-20160927-SD003.pdf (cataloguing constitutional concerns).

Dated: October 19, 2017

Respectfully submitted,

*/s/ Harry Sandick*

HARRY SANDICK (*pro hac vice* pending)
JAMISON DAVIES (*pro hac vice* pending)
MICHAEL D. SCHWARTZ (*pro hac vice* pending)
Patterson Belknap Webb & Tyler LLP
1133 Avenue of the Americas
New York, NY 10036
hsandick@pbwt.com
jmdavies@pbwt.com
mschwartz@pbwt.com

*/s/ Ira N. Richards*

IRA N. RICHARDS (PA Bar No. 501879)
Schnader Harrison Segal & Lewis LLP
1600 Market St., Suite 3600
Philadelphia, PA 19103
irichards@schnader.com

# APPENDIX A[*]

Muneer I. Ahmad
Clinical Professor of Law and Deputy Dean for Experiential Education
Yale Law School

Amna Akbar
Assistant Professor of Law
The Ohio State University Moritz College of Law

Deborah Anker
Clinical Professor of Law
Harvard Law School

Sabi Ardalan
Assistant Clinical Professor
Harvard Law School

Caitlin Barry
Assistant Professor of Law
Villanova University Charles Widger School of Law

Lenni Benson
Professor of Law
New York Law School

Jason Cade
Associate Professor of Law
University of Georgia Law School

Kristina M. Campbell
Jack and Lovell Olender Professor of Law
Co-Director, Immigration and Human Rights Clinic
University of the District of Columbia David A. Clarke School of Law

Benjamin Casper Sanchez
Director, James H. Binger Center for New Americans
University of Minnesota Law School

R. Linus Chan
Associate Clinical Professor of Law
University of Minnesota Law School

---

[*] *Amici curiae* appear in their individual capacities; institutional affiliations are provided here for identification purposes only.

Erwin Chemerinsky
Dean and Jesse H. Choper Distinguished Professor of Law
University of California, Berkeley School of Law

Holly S. Cooper
Co-Director, Immigration Law Clinic
University of California, Davis School of Law

Ericka Curran
Immigration Clinic Faculty
Florida coastal School of law

Seth Davis
Assistant Professor of Law
University of California, Irvine School of Law

Ingrid V. Eagly
Professor of Law
UCLA School of Law

Richard Frankel
Associate Professor of Law
Drexel University Thomas R. Kline School of Law

César Cuauhtémoc García Hernández
Associate Professor of Law
University of Denver Sturm College of Law

Denise Gilman
Clinical Professor
Director, Immigration Clinic
University of Texas School of Law

Joanne Gottesman
Clinical Professor of Law and Director, Immigrant Justice Clinic
Rutgers Law School

Dina Francesca Haynes
Professor of Law
New England Law

Laila L. Hlass
Professor of Practice
Tulane University School of Law

Geoffrey A. Hoffman
Director
University of Houston Law Ctr. Immigration Clinic

Kari Hong
Assistant Professor and Founder, Ninth Circuit Appellate Program
Boston College Law School

Aziz Huq
Frank and Bernice J. Greenberg Professor of Law
University of Chicago Law School

Anil Kalhan
Associate Professor of Law
Drexel University Thomas R. Kline School of Law

Ramzi Kassem
Professor of Law
CUNY School of Law

Elizabeth Keyes
Associate Professor
University of Baltimore School of Law

Jennifer Lee Koh
Professor of Law
Western State College of Law

Hiroko Kusuda
Clinic Professor
Loyola New Orleans College of Law

Annie Lai
Assistant Clinical Professor of Law
University of California, Irvine School of Law

Christopher N. Lasch
Associate Professor of Law
University of Denver Sturm College of Law

Jennifer J. Lee
Assistant Clinical Professor of Law
Temple University Beasley School of Law

Peter L. Markowitz
Professor of Law
Kathryn O. Greenberg Immigration Justice Clinic, Director
Benjamin N. Cardozo School of Law

Toni M. Massaro
Regent's Professor and Milton O. Riepe Chair in Constitutional Law
University of Arizona James E Rogers College of Law

Elizabeth McCormick
Associate Clinical Professor of Law
University of Tulsa College of Law

Vanessa Merton
Professor of Law
Elisabeth Haub School of Law at Pace University

Nancy Morawetz
Professor of Clinical Law
Co-Director, Immigrant Rights Clinic
NYU School of Law

Hiroshi Motomura
Susan Westerberg Prager Professor of Law
School of Law
University of California, Los Angeles

Karen Musalo
Professor
University of California, Hastings College of the Law

Nina Rabin
Clinical Professor of Law
Director, Bacon Immigration Law and Policy Program
James E. Rogers College of Law, University of Arizona

Jaya Ramji-Nogales
Professor
Temple Law School

Andrea Ramos
Clinical Professor of Law
Director of Immigration Law Clinic
Southwestern Law School

Victor C. Romero
Associate Dean for Academic Affairs, Maureen B. Cavanaugh Distinguished Faculty Scholar &
Professor of Law
Penn State Law (University Park)

Carrie Rosenbaum
Adjunct Professor
Golden Gate University School of Law

Rachel E. Rosenbloom
Professor of Law
Co-Director, Immigrant Justice Clinic
Northeastern University School of Law

Ragini N. Shah
Clinical Professor of Law
Suffolk University Law School

Rebecca Sharpless
Clinical Professor
Roger Schindler Fellow
Director, Immigration Clinic
University of Miami School of Law

Sarah Sherman-Stokes
Associate Director, Immigrants' Rights and Human Trafficking Program
Boston University School of Law

Dan R. Smulian
Associate Professor of Clinical Law
Brooklyn Law School

Ilya Somin
Professor of Law
George Mason University, Antonin Scalia Law School

Juliet P. Stumpf
Robert E. Jones Professor of Advocacy and Ethics
Lewis & Clark Law School

David B. Thronson
Professor of Law
Michigan State University College of Law

Philip L. Torrey
Managing Attorney
Harvard Immigration and Refugee Clinical Program
Harvard Law School

Laurence H. Tribe
Carl M. Loeb University Professor and Professor of Constitutional Law
Harvard Law School

Enid Trucios-Haynes
Professor of Law
Brandeis School of Law

Yolanda Vázquez
Associate Professor of Law
University of Cincinnati College of Law

Shoba Sivaprasad Wadhia
Samuel Weiss Faculty Scholar
Director, Center for Immigrants' Rights Clinic
Penn State Law- University Park

Jonathan Weinberg
Professor of Law
Wayne State University

Virgil Wiebe
Professor of Law
Robins Kaplan Director of Clinical Education
Co-Director, Interprofessional Center
University of St. Thomas (MN)

Michael J. Wishnie
William O. Douglas Clinical Professor of Law
Yale Law School

Stephen Wizner
William O. Douglas Clinical Professor Emeritus
Yale Law School

Stephen W. Yale-Loehr
Professor of Immigration Law Practice
Cornell Law School

**CERTIFICATE OF SERVICE**

I hereby certify that on October 19, 2017, I electronically filed the foregoing Brief *Amici Curiae* of Administrative Law, Constitutional Law, and Immigration Law Scholars in Support of Plaintiff's Motion for a Preliminary Injunction using the CM/ECF system, which will send notification of such filing to all parties of record.

*/s/ Ira N. Richards*
Attorney for *Amici Curiae*