# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| THE CITY OF PHILADELPHIA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| vs. | ) | Case No. 2:17-cv-3894-MMB |
| | ) | |
| JEFFERSON BEAUREGARD SESSIONS | ) | |
| III, in his official capacity as Attorney | ) | |
| General of the United States, | ) | |
| | ) | |
| *Defendant.* | ) | |
| | ) | |

---

### BRIEF OF *AMICI CURIAE* THE AMERICAN CIVIL LIBERTIES UNION, AMERICAN CIVIL LIBERTIES UNION OF PENNSYLVANIA, NATIONAL IMMIGRANT JUSTICE CENTER, ET AL. IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

---

Mark Fleming
Katherine E. Melloy Goettel
NATIONAL IMMIGRANT JUSTICE CENTER
208 S. LaSalle Street, Suite 1300
Chicago, Illinois 60604
(312) 660-1628

Molly Tack-Hooper
ACLU OF PENNSYLVANIA
P.O. Box 60173
Philadelphia, PA 19103
(212) 592-1513 x 113

Spencer E. W. Amdur
Cody H. Wofsy
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION—IMMIGRANTS'
RIGHTS PROJECT
39 Drumm St., 4th Floor
San Francisco, CA 94111
(415) 343-1198

*Counsel for Amici Curiae*

**TABLE OF CONTENTS**

INTEREST OF *AMICI CURIAE* .................................................................................................... ii

INTRODUCTION ............................................................................................................................... 1

ARGUMENT........................................................................................................................................ 2

    I. The Attorney General's New JAG Conditions Are Part of a Larger Escalation in Federal
      Efforts to Coerce Local Immigration Assistance.................................................................. 2

        A. Federal Efforts to Use Local Resources Have Increased over the Last Decade. ...... 2

        B. Federal Enlistment of Local Police Has Eroded Community Policing Strategies
          and Prompted Policies Like Philadelphia's.......................................................... 5

        C. Federal Attempts to Conscript Local Police Have Escalated Dramatically in Recent
          Months............................................................................................................. 7

    II. The Attorney General Lacks Statutory Authority to Impose the New JAG Conditions.... 10

CONCLUSION................................................................................................................................... 15

APPENDIX A: LIST OF *AMICI CURIAE* ............................................................................... A-1

## INTEREST OF *AMICI CURIAE*

*Amici curiae*, listed in an appendix in Ex. A to this brief, respectfully submit this brief in support of the City of Philadelphia. *Amici* include immigration-focused civil rights and legal organizations that litigate and advocate on behalf of the individuals and communities who are the ultimate targets of the policies being challenged in this case. *Amici* have a substantial, shared interest in the Court's resolution of Philadelphia's claims. This Court will decide issues that have a direct impact on local laws and policies that *amici* have campaigned for in states and municipalities across the country. These policies promote public safety, foster trust between law enforcement and immigrant communities, and ensure that limited law enforcement resources are allocated to local public-safety priorities. *Amici* are well-positioned to explain the broader legal and policy context surrounding the Department of Justice's new and unprecedented Byrne Justice Assistance Grant (JAG) funding condition

## INTRODUCTION

The Attorney General seeks to exercise an extraordinary new authority to use funds appropriated by Congress as leverage to force police chiefs and sheriffs to adopt his own preferred immigration policies. No Attorney General has ever claimed such a sweeping power under the JAG program. *Amici* submit this brief for two related reasons: (1) to provide the historical context surrounding this latest attempt to coerce local enforcement assistance, and (2) to explain that basic federalism and statutory construction principles preclude the Attorney General's claimed statutory authority to dictate local policing decisions using JAG funds.

The statutory claims in this case arise against the backdrop of several important constitutional rules. "[T]he Constitution has never been understood to confer upon [the federal government] the ability to require the States to govern according to [its] instructions." *New York v. United States*, 505 U.S. 144, 162 (1992). This is true whether federal compulsion comes directly or through the coercive use of federal funds. *See Nat'l Fed. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 580-81 (2012). To ensure that those boundaries are not lightly crossed, courts will only find that Congress intended to override the normal scope of local self-government when that intention is "unmistakably clear in the language of the statute." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991) (quotation marks omitted). In particular, the clearest statement of intent is required before a statute can authorize federal intrusion into areas of "traditional state authority," such as policing. *Bond v. United States*, 134 S. Ct. 2077, 2089 (2014).

No such clear statement supports the Attorney General's unprecedented new JAG conditions. He primarily grounds his claimed power on one statute, 34 U.S.C. § 10102(a)(6), which contemplates authority to impose "special conditions." But that phrase is a narrow term of art referring to conditions that ensure grantees comply with *existing* requirements. It does not

encompass the far-more-intrusive authority to impose conditions that require cities and states to adopt new substantive policies of the agency's choosing. This was the accepted meaning at the time Congress enacted § 10102(a)(6), and it is reflected across multiple statutes, regulations, rulemakings, and treatises.

Before addressing the meaning of "special conditions," *amici* detail the recent context in which the new JAG conditions arose. That history provides crucial background for understanding policies like Philadelphia's, and for reviewing the Attorney General's latest—and most severe— attempt to override them.

## ARGUMENT

I. **THE ATTORNEY GENERAL'S NEW JAG CONDITIONS ARE PART OF A LARGER ESCALATION IN FEDERAL EFFORTS TO COERCE LOCAL IMMIGRATION ASSISTANCE.**

Local governments have a constitutionally-protected right not to lend their resources and authority to help enforce a federal regulatory program. *Printz v. United States*, 521 U.S. 898, 931- 32 & n.15 (1997). Nevertheless, the federal government has applied increasingly severe means in an attempt to force local police to shoulder the burdens of immigration enforcement, especially in recent months. At the very least, this history raises troubling concerns for "the etiquette of federalism" that the Supreme Court has espoused. *United States v. Lopez*, 514 U.S. 549, 583 (1995) (Kennedy, J., concurring) (explaining that the federal government should not direct a state "to enact a certain policy" or "to organize its governmental functions in a certain way").

### A. Federal Efforts to Use Local Resources Have Increased over the Last Decade.

For decades, federal immigration agents performed the bulk of tasks necessary to enforce the federal immigration laws, and seldom called on local police to devote their own time, money, or community resources. This started to change in the mid-2000s, when Immigration and Customs Enforcement (ICE) began to systematically target individuals encountered by local police. For

years, this was primarily accomplished through the Criminal Alien Program, in which ICE monitors state and local prisons and jails to identify individuals who may be deportable.[1]

Federal agencies' efforts to divert local resources to immigration enforcement began to increase dramatically in 2008, when ICE rolled out a program called Secure Communities. Through Secure Communities, every time a local agency sends an individual's fingerprints to the FBI to check for criminal warrants, those fingerprints and booking information (including country of birth and citizenship, if collected) is shared automatically with ICE to check for possible removability.[2] ICE championed the program as a "force-multiplier" by which it could "leverage" local police forces nationwide.[3] ICE originally presented the program as voluntary,[4] but after states started backing out—citing serious concerns that the program was disproportionately targeting people with little to no criminal history—ICE reversed course and decided to make participation compulsory.[5]

Because states and localities cannot effectively opt out of Secure Communities, every time local police make an arrest, the person's fingerprints are run through federal immigration databases. The program has transformed local officers across the country into involuntary

---

[1] Congressional Research Service, "Interior Immigration Enforcement: Criminal Alien Programs," at 10 (Sept. 8, 2016), *available at* https://fas.org/sgp/crs/homesec/R44627.pdf.

[2] ICE, "Secure Communities: Standard Operating Procedures" (2009), *available at* https://www.ice.gov/doclib/foia/secure_communities/securecommunitiesops93009.pdf.

[3] ICE, Press Release, *Secretary Napolitano and ICE Assistant Secretary Morton Announce That the Secure Communities Initiative Identified More Than 111,000 Criminal Aliens in Its First Year* (Nov. 12, 2009), *available at* https://www.dhs.gov/news/2009/11/12/secure-communities-initiative-identified-more-111000-criminal-aliens-its-first-year; *Supra* note 2.

[4] *See supra* note 2; ICE, FOIA Library, "Secure Communities-Memorandums of Agreement/Understanding," *available at* https://www.ice.gov/foia/library.

[5] *See* Kirk Semple & Julia Preston, *Deal To Share Fingerprints Is Dropped, Not Program*, N.Y. Times (Aug. 6, 2011), http://www.nytimes.com/2011/08/06/us/ 06immig.html. The program is effectively compulsory because it operates by drawing fingerprints from the FBI's background check system, which every law enforcement agency in the country utilizes and none can forego as a practical matter.

frontline immigration agents. By February 2015, ICE had screened over 47 million local fingerprint checks.[6]

Once it was able to access information about arrestees from local law enforcement agencies, ICE began trying to use localities' arrest and detention capabilities as well. Over the last decade, the agency has increasingly relied on "immigration detainers," which are requests to hold a person for ICE after the person would normally be released from local custody.[7] Over the last decade, the number of detainers sent to local jails has skyrocketed. In FY 2005, ICE issued 7,090 detainers; by FY 2012, that number had shot up by a factor of 40, to 276,181.[8] As a result, law enforcement could no longer credibly claim that contact with them would not lead to immigration consequences. This caused immigrant communities across the country to live in fear of their own police.

That fear was bolstered by the fact that ICE placed the vast majority of detainers on people with little to no criminal record. According to ICE's own data, nearly half of all detainers in 2012 targeted people with no criminal record at all, and almost two-thirds targeted people with either no convictions or only very minor ones, such as traffic offenses.[9]

---

[6] ICE, "Secure Communities Nationwide Interoperability Statistics-Year to Date FY2015" (Feb. 28, 2015), *available at* http://altgov2.org/wp-content/uploads/ICE_secure-communities_stats_2009-2015.pdf?7ba951&7ba951. The Obama Administration formally ended the Secure Communities program in November 2014, but kept its main fingerprint-sharing feature. The Trump Administration has formally reinstated the program. *See* White House, Executive Order 13768, Enhancing Public Safety in the Interior of the United States, § 10 (Jan. 25, 2017).

[7] *See* DHS Form I-247A, https://www.ice.gov/sites/default/files/documents/Document/2017/I-247A.pdf. Until June 2015, the immigration detainer form requested detention for up to 48 hours, excluding weekends and holidays, thus up to 5 days. It now asks for two days of detention.

[8] Transactional Record Access Clearinghouse (TRAC), *Detainer Use Stabilizes Under Priority Enforcement Program*, Tbl. 1 (Jan. 21, 2016), *available at* http://trac.syr.edu/immigration/reports/413/. From 2014-2016, detainer use dropped because of new federal priorities guidelines. The Trump administration has eliminated those guidelines, leading ICE's detainer use to climb again. TRAC, "Use of ICE Detainers Obama v. Trump" (Aug. 30, 2017), *available at* http://trac.syr.edu/immigration/reports/479/.

[9] TRAC, "Few ICE detainers Target Serious Criminals," Tbl. 3 (Sept. 17. 2013), *available at* http://trac.syr.edu/immigration/reports/330/.

4

These federal efforts have also proved costly to local governments themselves. By prolonging detention for people in local custody who would otherwise be released, immigration detainers are expensive for local jails, which must allocate bed spaces and cover additional medical, staff, and food costs. ICE has explicitly refused to reimburse these costs.[10] Local governments have also faced significant financial liability in cases where ICE has made mistakes, such as asking police and sheriffs to detain U.S. citizens for immigration purposes.[11] *See, e.g.*, *Morales v. Chadbourne*, 235 F. Supp. 3d 388, 398 (D.R.I. 2017); *Davila v. United States*, 247 F. Supp. 3d 650, 666-67 (W.D. Pa. 2017). For instance, in 2010, *amici* the ACLU and ACLU of Pennsylvania sued on behalf of Ernesto Galarza, a Hispanic U.S. citizen who was held illegally for three days in the Lehigh County Prison pursuant to an ICE detainer. *See Galarza v. Szalczyk*, 745 F.3d 634, 636-38 (3d Cir. 2014) (holding that ICE could not force locality to honor a detainer). All of the defendants ultimately settled the case.

## B. Federal Enlistment of Local Police Has Eroded Community Policing Strategies and Prompted Policies Like Philadelphia's.

The threat of immigration enforcement injected into every police encounter has had severely negative effects on community policing. For example, a 2012 University of Illinois-Chicago survey found that 44% of Latinos (including U.S. citizens and documented immigrants) reported "they are less likely to contact police officers if they have been the victim of a crime

---

[10] Letter to Santa Clara County, from David Venturella, Assistant Dir., Secure Communities, Department of Homeland Security ("ICE does not reimburse localities for detaining any individual until ICE has assumed actual custody of the individual."), *available at* https://immigrantjustice.org/sites/immigrantjustice.org/files/Detainers%20-%20ICE%20response%20to%20Santa%20Clara.pdf.

[11] ICE acknowledges that it has mistakenly placed *hundreds* of detainers on U.S. citizens in recent years. *See, e.g.*, TRAC, *ICE Detainers Placed on U.S. Citizens and Legal Permanent Residents*, Feb. 20, 2013 (documenting 834 detainers on U.S. citizens), http://trac.syr.edu/immigration/reports/311/; Eyder Peralta, *You Say You're an American, but What if You Had to Prove It or Be Deported?*, NPR (Dec. 22, 2016) (documenting "693 U.S. citizens [who] were held in local jails on federal detainers"), http://www.npr.org/sections/thetwo-way/2016/12/22/504031635/you-say-you-re-an-american-but-what-if-you-had-to-prove-it-or-be-deported.

because they fear that police officers will use this interaction as an opportunity to inquire into their immigration status or that of people they know"; that number rose to 70% for undocumented immigrants surveyed.[12] Other reports from the last year have demonstrated even more alarming decreases in some communities' access to police services.[13] Philadelphia, for instance, experienced "a marked decline in crime reports from Latinos relative to those from non-Latinos in the first three months of 2017."[14]

Even ICE's own "Task Force on Secure Communities" warned that Secure Communities' use of local police was "disrupting police-community relationships that are important to public safety and national security."[15] The President's Task Force on 21st Century Policing went further in recommending that in the interest of community policing, "[t]he U.S. Department of Homeland Security should terminate the use of the state and local criminal justice system, including through detention, notification, and transfer requests, to enforce civil immigration laws against civil and nonserious criminal offenders."[16] Yet ICE continues to push local police to help deport thousands of people every month, close to 70% of whom have minor or no criminal records.[17]

---

[12] Nik Theodore, Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement, at i, 5 (May 2013), *available at* http://www.policylink.org/sites/default/files/INSECURE_COMMUNITIES_REPORT_FINAL.PDF.

[13] *See, e.g.*, James Queally, *Fearing Deportation, Many Domestic Violence Victims Are Steering Clear of Police and Courts*, L.A. Times, Oct. 9, 2017, http://www.latimes.com/local/lanow/la-me-ln-undocumented-crime-reporting-20171009-story.html.

[14] Rob Arthur, FiveThirtyEight, *Latinos in Three Cities Are Reporting Fewer Crimes Since Trump Took Office*, May 18, 2017, https://fivethirtyeight.com/features/latinos-report-fewer-crimes-in-three-cities-amid-fears-of-deportation/.

[15] Homeland Security Advisory Council, "Task Force on Secure Communities: Findings and Recommendations," Ch. IV (Sept. 2011), *available at* https://www.dhs.gov/xlibrary/assets/hsac-task-force-on-secure-communities.pdf.

[16] Dep't of Justice, The President's Task Force on 21st Century Policing, Final Report, 1.9 Recommendation (May 2015), *available at* https://cops.usdoj.gov/pdf/taskforce/taskforce_finalreport.pdf.

[17] TRAC, "Reforms of ICE Detainer Program Largely Ignored by Field Officers" (Aug. 9, 2016), *available at* http://trac.syr.edu/immigration/reports/432/; TRAC, "Use of ICE Detainers Obama v. Trump" (Aug. 30, 2017), *available at* http://trac.syr.edu/immigration/reports/479/.

It is against this backdrop that cities like Philadelphia have adopted policies to restore the line between their own local public-safety mission and federal immigration enforcement. In 2014, Philadelphia Mayor Nutter signed an executive order directing Philadelphia detention facilities not to imprison people for the federal immigration authorities without a judicial warrant.[18] Other localities in Pennsylvania have followed suit.[19] Philadelphia policies also restrict when City officials, including law enforcement agents, may ask about, collect, or release immigration status information from crime victims, witnesses, and people seeking access to City services.[20]

### C. Federal Attempts to Conscript Local Police Have Escalated Dramatically in Recent Months.

In recent months, the Executive Branch has stepped up its attempts to make local jurisdictions bear the costs of its deportation efforts. During his first week in office, President Trump signed an executive order directing that the Attorney General and DHS Secretary:

> shall ensure that [sanctuary jurisdictions] are not eligible to receive Federal grants, except as deemed necessary for law enforcement purposes by the Attorney General or the Secretary. . . . The Attorney General shall take appropriate enforcement action against any entity . . . which has in effect a statute, policy, or practice that prevents or hinders the enforcement of Federal law.[21]

This was a frightening threat, because states and localities receive billions of dollars in federal funding each year. But the truth was the President had no such authority, because the spending

---

[18] Phila. Exec. Order No. 1-14, Policy Regarding U.S. Immigration and Customs Enforcement Agency Detainer Requests, *available at* http://www.phila.gov/ExecutiveOrders/Executive%20Orders/EO%201-14.pdf.

[19] Sheller Center for Social Justice, Temple University Beasley School of Law, "A Changing Landscape: Pennsylvania Counties Reevaluate Policies on Immigration Detainers" (March 2015), https://www2.law.temple.edu/csj/publication/a-changing-landscape-report/.

[20] *See* Phila. Exec. Order No. 8-09, Policy Concerning Access of Immigrants to City Services, *available at* http://www.phila.gov/ExecutiveOrders/Executive%20Orders/2009_EO08-09.pdf; Phila. Police Dep't Mem. 01-06, Departmental Policy Concerning Immigrants, *available at* https://www.pabar.org/public/committees/civileql/resolutions/Phila_Police_Memo.pdf.

[21] Executive Order 13768: Enhancing Public Safety in the Interior of the United States, § 9 (Jan. 25, 2017).

power is Congress's, not the President's, *see* U.S. Const. art. I, § 8, cl. 1, and because the federal government cannot use financial leverage to force states and localities to enforce federal priorities. *See NFIB*, 567 U.S. at 575-85. When cities and counties sued, DOJ took the position that the Order had no operative effect, *Santa Clara v. Trump*, 2017 WL 1459081, at *7 (N.D. Cal. Apr. 25, 2017), but the court concluded that the government's interpretation was "not legally plausible" and preliminarily enjoined the Order. *Santa Clara v. Trump*, 2017 WL 3086064, at *1-2 (N.D. Cal. July 20, 2017).

The administration has tried to coerce assistance in other ways as well. In May, DOJ demanded legal memoranda from a number of states and localities—including Philadelphia—to explain how they were in compliance with 8 U.S.C. § 1373, which prohibits policies that "restrict" the sharing of "information regarding . . . citizenship or immigration status."[22] DOJ made this demand without issuing any guidance of its own to explain what, in fact, it understood § 1373 to require. Meanwhile, the Attorney General held press conferences in which he strongly implied that § 1373 prohibits anti-*detainer* policies,[23] despite the statute's omission of any reference to detention. DOJ has, in fact, conceded in litigation that the statute does not require detainer compliance.[24]

To this day, DOJ has not offered a full explanation of what it thinks § 1373 requires. Despite a constant barrage of threats tied to compliance with the statute since January, DOJ

---

[22] *See* Dep't of Justice, *Department of Justice Sends Letter to Nine Jurisdictions Requiring Proof of Compliance with 8 U.S.C. § 1373* (Apr. 21, 2017), *available at* https://www.justice.gov/opa/pr/department-justice-sends-letter-nine-jurisdictions-requiring-proof-compliance-8-usc-1373.

[23] *See, e.g.,* Dep't of Justice, Justice News, *Attorney General Jeff Sessions Delivers Remarks on Sanctuary Jurisdictions*, Washington D.C. (Mar. 27, 2017), *available at* https://www.justice.gov/opa/speech/attorney-general-jeff-sessions-delivers-remarks-sanctuary-jurisdictions.

[24] *See* Defendants' Opp. to Motion for Prelim. Inj., Dkt. 32, at 1, 5, *City of Chicago v. Sessions*, No. 5720 (N.D. Ill. *filed* Aug. 24, 2017).

withheld any guidance whatsoever until October 11, when, without explanation, it informed most

(but not all) recipients of its May letter that it now believes the statute covers not just citizenship

and status information, but also information about detainees' custody status and release dates.[25]

*But see Steinle v. San Francisco*, 230 F. Supp. 3d 994, 1015 (N.D. Cal. 2017) ("[N]o plausible

reading of 'information regarding citizenship or immigration status' encompasses the release date

of an undocumented inmate.") (alteration omitted). The only public explanation DOJ has provided

anywhere for this atextual and implausible interpretation is a single footnote of its recently-filed

brief in this case. Gov't Br. 38 n.11, ECF No. 28.

ICE, similarly, has publicly badgered local officials to lend their support to federal

deportation efforts with pronouncements that are—like the January executive order—frightening

but legally and factually unsupportable. The ICE Director has threatened criminal prosecution

against officials who do not volunteer their officers to help him round up their residents.[26] And in

March, ICE began publishing a weekly report of cherry-picked data about jurisdictions that had

declined detainers in the previous week. The reports aimed to increase public pressure on local

leaders, but did not acknowledge the widespread legal flaws courts have identified in the use of

detainers or the many costs that have led officials to turn some of them down.[27] ICE was forced

to discontinue these reports after widespread outrage from law enforcement, and after it become

---

[25] Dep't of Justice, Press Release, *Justice Department Provdes Last Chance for Cities to Show 1373 Compliance*, Oct. 12, 2017, https://www.justice.gov/opa/pr/justice-department-provides-last-chance-cities-show-1373-compliance.

[26] Stephen Dinan, *ICE Chief Wants to Slap Smuggling Charges on Leaders of Sanctuary Cities*, Wash. Times (July 26, 2017), *available at http://www.washingtontimes.com/news/2017/jul/26/thomas-homan-ice-chief-says-immigrant-sanctuaries-/*.

[27] *See* Dep't of Homeland Sec., Press Release, *DHS Releases U.S. Immigration and Customs Enforcement Declined Detainer Outcome Report* (Mar. 20, 2017), *available at* https://www.dhs.gov/news/2017/03/20/dhs-releases-us-immigration-and-customs-enforcement-declined-detainer-outcome-report.

clear that its data was remarkably inaccurate.[28] Most recently, ICE has begun trumpeting

immigration raids in "sanctuary cities" as a way to pressure localities to cooperate.[29]

The administration appears to be undaunted by its failed efforts to hector, pressure, and

threaten localities into becoming extensions of the federal deportation system. Mere weeks before

the FY 2017 JAG application deadline, DOJ issued application materials with the three new

immigration conditions that Philadelphia has challenged—48 hours' notice of release, access to

local jails and detention centers, and certified compliance with 8 U.S.C. § 1373.[30]

## II. The Attorney General Lacks Statutory Authority to Impose the New JAG Conditions.

This pattern of intrusive federal attempts to conscript local governments and officers raises

serious constitutional questions. But the Court need not resolve them in this case, because the

Attorney General's new notice and access conditions find no basis in statute.[31] He invokes one

statute, which, at most,[32] contemplates authority to "plac[e] special conditions" on grants

administered by the Assistant Attorney General for the Office of Justice Programs. 34 U.S.C. §

10102(a)(6). But the new conditions are not "special conditions" for purposes of the statute,

---

[28] Ron Nixon, *Trump Administration Halts Reports on Immigration Cooperation*, N.Y. Times (Apr. 10, 2017), https://www.nytimes.com/2017/04/10/us/politics/trump-administration-immigration.html?_r=0.

[29] Miriam Jordan, *Immigration Agents Arrest Hundreds in Sweep of Sanctuary Cities*, N.Y. Times, Sept. 28, 2017 (107 arrests in Philadelphia), https://www.nytimes.com/2017/09/28/us/ice-arrests-sanctuary-cities.html?_r=0.

[30] Dep't of Justice, Office of Justice Programs, "Edward Byrne Memorial Justice Assistance Grant Program: FY 2017 Local Solicitation," at 29-30 (released Aug. 3, 2017, with application deadline of September 5), *available at* https://www.bja.gov/Funding/JAGLocal17.pdf.

[31] *Amici* do not address the Attorney General's new position that 8 U.S.C. § 1373 is an "applicable Federal law[]" for purposes of 34 U.S.C. § 10153(a)(5)(D). *Amici* agree with Philadelphia's arguments on that issue.

[32] As Philadelphia explains, the statute does not actually grant the Assistant Attorney General who administers JAG any new authority to impose "special conditions"; rather, it provides that he "*may* be vested" with that authority. 34 U.S.C. § 10102(a)(6) (emphasis added). The government points to no statute or regulation that in fact vests the Assistant Attorney General with that authority.

because that term encompasses only a much narrower set of policies meant to ensure compliance with pre-existing grant conditions.

It is well-settled that "if a statute uses a legal term of art, [courts] must presume Congress intended to adopt the term's ordinary legal meaning." *Eaves v. Cty. of Cape May*, 239 F.3d 527, 532 (3d Cir. 2001) (quotation marks omitted); *see Sullivan v. Stroop*, 496 U.S. 478, 482-83 (1990); *Buckhannon Bd. & Care Home, Inc. v. West Va. Dep't of Health & Human Res.*, 532 U.S. 598, 615-16 (2001) (Scalia, J., concurring) (explaining the term-of-art rule).

"Special conditions" is a term of art. When Congress enacted the current version of § 10102(a)(6) in 2006, the Department of Justice's own regulations governing "[s]pecial grant or subgrant conditions" described them as intended for "'high-risk' grantees" who might have problems adhering to existing grant requirements. 28 C.F.R. § 66.12(a) (in effect from Mar. 11, 1988 until Dec. 25, 2014) (listing possible problems, including that the grantee "[i]s not financially stable" or "[h]as not conformed to terms and conditions of previous awards"). The regulation provided a list of the "[s]pecial conditions or restrictions" that could be imposed, and provided that "corrective actions" by the grantee could lead to the special conditions being removed. *Id.* § 66.12(b), (c)(3) (2006). DOJ's regulation was based on the Office of Management and Budget's Circular A.102—a government-wide guidance document for grant-making agencies—which defined "special conditions" in the exact same way. *See* OMB, Circular A-102, § 1(g) (Aug. 29, 1997).[33] Other agencies' regulations did the same. *See, e.g.*, 7 C.F.R. § 550.10 (Department of Agriculture); 34 C.F.R § 80.12 (Department of Education); 45 C.F.R. § 74.14 (Department of Health and Human Services); *see also* 20 U.S.C. § 1416(e)(1)(C) (directing agency to "impose special conditions" on "a high-risk grantee").

---

[33] *Available at* https://www.whitehouse.gov/omb/circulars_a102.

"Special conditions" have long been understood as a term of art. Both of the leading treatises on federal grant law define them as conditions intended to ensure that a grantee complies with existing requirements. One of them defines "special conditions" as those imposed on a "'high risk' recipient" to ensure that the recipient "will successfully execute [the] grant." Allen, Federal Grant Practice (2017 ed.), § 25:4; *see also id.* §§ 25:1 (defining "'specific' or 'special' conditions"), 25:2, 25:5, 25:10, 47:6. The other treatise contrasts "special conditions"—which address "special risks" of non-compliance—with "general conditions" and "cross-cutting conditions," both of which involve substantive requirements applicable to all grantees. *Compare* Dembling & Mason, Essentials of Grant Law Practice (1991), at 125-36 (special conditions), *with id.* at 121-24 (general conditions); *id.* at 107-19 (cross-cutting conditions). And as early as 1988, OMB itself warned that "[s]pecial [c]onditions"—intended for "[h]igh [r]isk" recipients only—should not be used as "loopholes" to "circumvent" normal grant-making rules and "impose additional or unwarranted requirements." OMB, *Grants and Cooperative Agreements with State and Local Governments*, 53 Fed. Reg. 8028-01, 8028 (Mar. 11, 1988).

Thus, when Congress referred to "special conditions" in enacting § 10102(a)(6), it incorporated this term-of-art meaning. *See Sekhar v. United States*, 133 S. Ct. 2720, 2724 (2013) (Congress "brings the old soil with it" when it enacts terms with accepted meanings) (quotation marks omitted); *Shell Petrol., Inc. v. United States*, 182 F.3d 212, 217 (3d Cir. 1999) ("We ordinarily look to the meaning of a statutory term at the time the statute was adopted."). If Congress had meant to refer to *any* conditions, the word "special" would have been unnecessary. *See Advocate Health Care Network v. Stapleton*, 137 S. Ct. 1652, 1659 (2017) (applying the "presumption that each word Congress uses is there for a reason"). The government has not

explained how "special conditions" could mean something other than the accepted meaning at the time. *See* Gov't Br. 12-17 (entire explanation of § 10102(a)(6)).

Federal grant law continues to define special conditions narrowly. Government-wide OMB regulations allow agencies to impose "special conditions that can appropriately mitigate the effects of the non-Federal entity's risk." 2 C.F.R. § 200.205. The same regulations restrict the imposition of "specific conditions" to particular "circumstances" where there is a risk of non-compliance with existing requirements. 2 C.F.R. § 200.207.[34] DOJ has adopted these regulations to govern the grants it administers. *See* 2 C.F.R. § 2800.101.

This limited understanding of the Attorney General's authority makes sense in light of the background "assumption that Congress does not casually authorize administrative agencies to interpret a statute" in a way that "alters the federal-state framework by permitting federal encroachment upon a traditional state power." *Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172-73 (2001).[35] If Congress wanted to empower the Attorney General to wield JAG funds as a tool to extract unrelated policy changes from local police departments, it would have needed to do so with unmistakable clarity. *Bond*, 134 S. Ct. at 2089;

---

[34] The terms "special conditions" and "specific conditions" are used interchangeably. *See, e.g.*, OMB, *Federal Awarding Agency Regulatory Implementation of OMB's Uniform Administration Requirements*, 79 Fed. Reg. 75871-01, 75874 (Dec. 19, 2014) (explaining that prior "standards for imposing special conditions on grantees" are "virtually identical" to current standards for imposing "specific conditions" pursuant to 2 C.F.R. §§ 200.205 and 200.207); Allen, *Federal Grant Practice* (2017 ed.), § 25:1 (stating that "'specific' or 'special' conditions" are the same), § 25:3 (discussing "the imposition of special/specific conditions"); OMB, *Uniform Guidance Crosswalk from Existing Guidance to Final Guidance*, at 3, 4 (2013) (noting OMB's transition between the two phrases).

[35] The Attorney General's interpretation of "special conditions" in this case is entitled to no particular deference, because he has not adopted it through formal procedures. *See Hagans v. Comm'r of Social Sec.*, 694 F.3d 287, 303 (2012) (no *Chevron* deference for an interpretation adopted "through [an] informal mechanism"); *Sikora v. UPMC*, 153 F. Supp. 3d 820, 827 n.12 (W.D. Pa. 2015). To the contrary, its new understanding of the term directly *clashes* with the regulations DOJ *has* formally adopted through notice-and-comment rulemaking. *See* 81 Fed. Reg. 61981-01, 61982 (Sept. 8, 2016), *codified at* 2 C.F.R. § 2800.101 (adopting OMB grant rules after formal rulemaking); 2 C.F.R. § 200.207 (OMB grant rules providing that an agency "may impose additional specific award conditions . . . under the following circumstances," all of which adhere to the term-of-art definition). DOJ's failure to follow its own regulation raises independent concerns under the Administrative Procedure Act. *See* 5 U.S.C. § 706(2)(A) (court must "set aside agency action" that is "not in accordance with law"); *Frisby v. HUD*, 755 F.2d 1052, 1055-56 (3d Cir. 1985) ("Failure on the part of the agency to act in compliance with its own regulations is fatal to such action.").

*Gregory*, 501 U.S. at 458-59. Here, Congress has done exactly the opposite. It has used a term with an established meaning that does not support the extraordinary authority the Attorney General has claimed.

Finally, the government has pointed out that, in Philadelphia's FY 2016 JAG documents, DOJ described a variety of conditions as "special conditions." Gov't Br. 13-14. But that is not probative of what Congress understood the term to mean when it enacted § 10102(a)(6). Far more relevant is the interpretation reflected in DOJ's own published regulations, OMB's longstanding government-wide guidance, the enacted regulations of multiple other agencies, and the unanimous understanding of multiple authoritative treatises. In any event, the vast majority (if not all) of the conditions listed in Philadelphia's grant documents *do* speak to compliance with existing requirements. *See* ECF No. 21-1, Ex. F (chart of conditions). Any that go further are unproblematic insofar as they are supported by other sources of law, as Philadelphia has explained. *See id*; Mot. for Prelim. Inj., ECF No. 21-1, at 26-28. The government has simply not identified any clear statement of authority to use JAG to impose new substantive policies on states and localities.

## CONCLUSION

DOJ's unprecedented addition of immigration conditions to Byrne JAG is just the latest chapter in the Executive Branch's aggressive attempts to coerce and conscript local law enforcement. *Amici* ask the Court to enjoin these conditions.

Dated: October 19, 2017                    Respectfully submitted,

By:    /s/ Molly Tack-Hooper          

Molly Tack-Hooper
AMERICAN CIVIL LIBERTIES UNION
OF PENNSYLVANIA
P.O. Box 60173
Philadlephia, PA 19103
(215) 592-1513 x 113
Mtack-hooper@aclupa.org

Spencer E. W. Amdur*
Cody H. Wofsy*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION—IMMIGRANTS' RIGHTS
PROJECT
39 Drumm Street, 4th Floor
San Francisco, CA 94111
Tel: (415) 343-1198
samdur@aclu.org
cwofsy@aclu.org

Mark Fleming*
Kate Melloy Goettel*
NATIONAL IMMIGRANT JUSTICE CENTER
208 South LaSalle Street, Suite 1300
Chicago, Illinois 60604
Telephone: (312) 660-1370
Facsimile: (312) 660-1505
mfleming@heartlandalliance.org
kgoettel@heartlandalliance.org

*Pro hac vice* motion forthcoming        *Counsel for Amici Curiae*

APPENDIX A: LIST OF *AMICI CURIAE*

The **American Civil Liberties Union (ACLU)** is a nationwide, nonprofit, nonpartisan organization dedicated to the principles of liberty and equality embodied in the Constitution and this nation's civil rights laws, and the **American Civil Liberties Union of Pennsylvania (ACLU-PA)** is the state affiliate of the ACLU. The ACLU, through its Immigrants' Rights Project and state affiliates, engages in a nationwide program of litigation, advocacy, and public education to enforce and protect the constitutional and civil rights of noncitizens. In particular, the ACLU has a longstanding interest in enforcing the constitutional and statutory constraints on the federal government's use of state and local police to enforce civil immigration laws. The ACLU and ACLU-PA have been counsel and amicus in a variety of cases involving immigration detainers and anti-sanctuary laws, including *Morales v. Chadbourne*, 793 F.3d 208 (1st Cir. 2015); *Galarza v. Szalczyk*, 745 F.3d 634 (3d Cir. 2014); *Davila v. United States*, 247 F. Supp. 3d 650 (W.D. Pa. 2017); *Gonzalez v. ICE*, No. 13-cv-4416 (C.D. Cal. filed June 19, 2013); and *City of El Cenizo v. State of Texas*, No. 17-cv-404 (W.D. Tex. filed May 8, 2017).

The **Asian Americans Advancing Justice – Asian Law Caucus (AAAJ-ALC)** is a non-profit organization founded in 1972 and is the nation' s first legal and civil rights organization serving the low-income Asian and Pacific Islander communities. AAAJ-ALC has seven program areas focused on housing rights, voting rights, immigrant rights, immigrant youth, labor and employment issues, civil rights and national security, and criminal justice reform. AAAJ-ALC's immigrant rights' program primarily defends immigrants in deportation proceedings. The mission of AAAJ-ALC is to promote, advance, and represent the legal and civil rights of Asian and Pacific Islander communities. Recognizing that social, economic, political, and racial inequalities continue to exist in the United States, AAAJ-ALC is committed to the pursuit of equality and justice for all sectors of our society, with a specific focus directed toward addressing the needs of low-income, immigrant, and underserved Asians, Pacific Islanders, and other vulnerable communities. AAAJ-ALC was an organizational sponsor of the Trust Act, 2013 Cal. Stat. 4650 (codified at Cal. Gov't Code §§ 7283-7282.5), a California state law that went into effect in California on January 1, 2014, that limits detentions in response to ICE detainer requests. AAAJ-ALC also assisted in drafting and supporting passage of the California Values Act (SB 54) in the 2017 California state legislative cycle to limit local law enforcement entanglement with ICE.

The **National Immigrant Justice Center (NIJC)** is a program of Heartland Alliance, which provides resettlement services to refugees and mental health services for immigrants and refugees. NIJC, through its staff of attorneys, paralegals and a network of over 1,500 *pro bono* attorneys, provides free or low-cost legal services to immigrants, including detained non-citizens. NIJC's direct representation, as well as its immigration advisals to criminal defense attorneys, has informed its strategic policy and litigation work around the myriad legal and policy problems of entangling local law enforcement in civil immigration enforcement. NIJC is counsel on a host of immigration detainer-related cases including *Jimenez Moreno v. Napolitano*, 11-5452 (N.D. Ill.) and *Makowski v. United States*, 12-5265 (N.D. Ill.). NIJC also advocated for the amendments to the Welcoming City Ordinance (Ch 2-173) in 2012, the Cook County detainer ordinance (11-O-73) in 2011, and the recently enacted Illinois TRUST Act (S.B. 31).

The **Northwest Immigrant Rights Project (NWIRP)** is a non-profit legal organization dedicated to the defense and advancement of the rights of noncitizens in the United States. NWIRP provides direct representation to low-income immigrants who are applying for immigration and naturalization benefits and to persons who are placed in removal proceedings. In addition, NWIRP engages in community education to immigrant communities who interact both with federal immigration enforcement and local law enforcement agencies. Thus, NWIRP has a direct interest in the issues presented in this case.

## CERTIFICATE OF SERVICE

I, Molly Tack-Hooper, hereby certify that on October 19, 2017, I caused a true and correct copy of the foregoing Brief of *Amici Curiae* American Civil Liberties Union, American Civil Liberties Union of Pennsylvania, National Immigrant Justice Center, et al. in Support of Plaintiff's Motion for Preliminary Injunction to be filed and served on all participants in this case via the court's CM/ECF system.

Dated: October 19, 2017          Respectfully submitted,

By:   /s/  Molly Tack-Hooper

        Molly Tack-Hooper
        AMERICAN CIVIL LIBERTIES UNION
        OF PENNSYLVANIA
        P.O. Box 60173
        Philadelphia, PA 19103
        (215) 592-1513 x 113
        Mtack-hooper@aclupa.org