## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

THE CITY OF PHILADELPHIA,

        Plaintiff,

v.

JEFFERSON BEAUREGARD SESSIONS III, in his
official capacity as Attorney General of the United States,

        Defendant.

Case No. 2:17-cv-03894-MMB

## AMENDED COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MANDAMUS RELIEF

Plaintiff, the City of Philadelphia, hereby alleges as follows:

### INTRODUCTION

1.    The City of Philadelphia ("Philadelphia" or "the City") brings this action to enjoin the Attorney General of the United States from imposing new and unprecedented requirements on the Edward Byrne Memorial Justice Assistance Grant ("Byrne JAG"). Philadelphia seeks a declaratory judgment that the new conditions are contrary to law, unconstitutional, and arbitrary and capricious. Philadelphia also seeks a declaratory judgment confirming that its policies comply with 8 U.S.C. § 1373 ("Section 1373"), to the extent that statute is lawfully deemed applicable to the Byrne JAG program. Additionally, given the Court's granting of the City's motion for preliminary injunction and the continued failure to disburse the City's fiscal year 2017 Byrne JAG funds for months after the end of that fiscal year, the City seeks mandamus relief pursuant to 28 U.S.C. § 1361, compelling the immediate release of its award.

1

2.      Philadelphia has a vibrant immigrant community.  Immigrants are an integral part of Philadelphia's workforce, small business sector, school and college population, and civic associations; their success is vital to the City's success.  To ensure that Philadelphia's immigrant community continues to thrive, the City has adopted policies that seek to foster trust between the immigrant population and City officials and employees, and to encourage people of all backgrounds to take full advantage of the City's resources and opportunities.  Several of those policies protect the confidentiality of individuals' immigration and citizenship status information, and prevent the unnecessary disclosure of that information to third parties.  The rationale behind these policies is that if immigrants, including undocumented immigrants, do not fear adverse consequences to themselves or to their families from interacting with City officers, they are more likely to report crimes, apply for public benefits to which they are entitled, enroll their children in Philadelphia's public schools, request health services like vaccines, and—all in all—contribute more fully to the City's health and prosperity.

3.      Philadelphia also practices community policing.  And, like most major cities, it has determined that public safety is best promoted *without* the City's active involvement in the enforcement of federal immigration law.  To the contrary, Philadelphia has long recognized that a resident's immigration status has no bearing on his or her contributions to the community or on his or her likelihood to commit crimes, and that when people with foreign backgrounds are afraid to cooperate with the police, public safety in Philadelphia is compromised.  For this reason, the Philadelphia Police Department ("PPD") has for many years prohibited its officers from asking individuals with whom they interact about their immigration status.  Police officers also do not stop or question people on account of their immigration status, do not in any way act as immigration enforcement agents, and are particularly protective of the confidential information

2

of victims and witnesses to crimes.  In Philadelphia's experience—with property crimes currently at their lowest since 1971, robberies at their lowest since 1969, and violent crime the lowest since 1979— these policies have promoted the City's safety by facilitating greater cooperation with the immigrant community writ large.

4.      For over a decade, Philadelphia has pursued the above policies while also relying upon the funding supplied by the Byrne JAG program to support critical criminal justice programming in the City.  Indeed, the Byrne JAG award has become a staple in Philadelphia's budget and is today an important source of funding for the PPD, District Attorney's Office, and local court system.  Since the grant was created in 2005, Philadelphia has applied for—and successfully been awarded—its local allocation every year.  Philadelphia has never had any conflicts with the federal government in obtaining Byrne JAG funds.

5.      That is all changing.  On July 25, 2017, the Department of Justice ("DOJ" or "the Department") notified Philadelphia that, as a condition to receiving any Byrne JAG funds in fiscal year 2017, Philadelphia must comply with three conditions.  Philadelphia must: (1) certify, as part of its FY 2017 grant application, that the City complies with Section 1373, a statute which bars states and localities from adopting policies that restrict immigration-related communications between state and local officials and the federal government; (2) permit officials from the U.S. Department of Homeland Security ("DHS") (which includes U.S. Immigration and Customs Enforcement ("ICE")) to access "any detention facility" maintained by Philadelphia in order to meet with persons of interest to DHS; and (3) provide at least 48 hours' advance notice

to DHS regarding the "scheduled release date and time" of an inmate for whom DHS requests such advance notice.[1]

6.     The Department has since revised the latter two conditions to instead require Byrne JAG recipients to have in place (1) a "local ordinance, -rule, -regulation, -policy, or -practice . . . that is designed to ensure that [any, not just DHS] agents of the United States . . . are given access [to] a local-government . . . correctional facility" to meet with individuals believed to be aliens and question them, and (2)  a "local ordinance, -rule, -regulation, -policy, or -practice . . . that is designed to ensure that, when a local-government . . . correctional facility receives from DHS a formal written request . . . [for] advance notice of the scheduled release date and time for a particular alien in such facility, then such facility will honor such request and—as early as practicable . . . provide the requested notice to DHS."[2]

7.     The imposition of these conditions marks a radical departure from the Department of Justice's past grant-making practices.  No statute permits the Attorney General to impose these conditions on the Byrne JAG program.  Although Congress delegated certain authorities to the Attorney General to administer Byrne JAG awards, the Attorney General has far exceeded that delegation here.   Moreover, even if Congress *had* intended to authorize the Attorney General to attach conditions of this nature to JAG grants (which it did not), that would have been unlawful:  Demanding that localities certify compliance with Section 1373, allow ICE agents unrestrained access to their prisons, or provide ICE advance notification of inmates' scheduled release dates as conditions of receiving Byrne JAG funds, would flout the limits of Congress' Spending Clause powers under the United States Constitution.

---

[1] U.S. Dep't of Justice, *Backgrounder On Grant Requirements* (July 25, 2017), *available at* https://goo.gl/h5uxMX; *see also* Dkt. 1-1.
[2] *See, e.g.*, Dkt. 21-6 (County of Greenville Award Letter).

8.      Simply put, the Attorney General's imposition of these three conditions on the FY 2017 Byrne JAG grant is contrary to law, unconstitutional, and arbitrary and capricious.  That action should be enjoined and the City's award should be made and disbursed.

9.      The Department of Justice's decision to impose its sweeping conditions upon Byrne JAG grantees represents the latest affront in the Administration's ever-escalating attempts to force localities to forsake their local discretion and act as agents of the federal government. Within the President's first week in office, he signed an Executive Order commanding federal agencies to withhold funds from so-called "sanctuary cities"—*i.e.*, cities that have exercised their basic rights to self-government and have chosen to focus their resources on local priorities rather than on federal immigration enforcement.[3]  After a federal court enjoined much of that Order,[4] the Department of Justice singled out Philadelphia along with eight other jurisdictions by demanding that these jurisdictions certify their compliance with Section 1373 by June 30, 2017. The Department warned the localities that their failure to certify compliance "could result in the withholding of [Byrne JAG] funds, suspension or termination of the [Byrne JAG] grant, ineligibility for future OJP grants or subgrants, or other action."[5]  By this time in the grant funding schedule, Philadelphia had already appropriated and in most cases obligated the funds it received under the FY 2016 JAG award to a number of important programs to strengthen its criminal justice system.  None of the planned FY 2017 JAG funds have been able to be obligated or spent.

---

[3] Exec. Order No. 13768, "Enhancing Public Safety in the Interior of the United States," 82 Fed. Reg. 8799 (Jan. 25, 2017).
[4] *County of Santa Clara v. Trump*, --- F. Supp. 3d ----, 2017 WL 1459081 (N.D. Cal. Apr. 25, 2017).
[5] Letter from Alan R. Hanson, Acting Assistant Attorney General, Office of Justice Programs, to Major Jim Kenney, City of Philadelphia (Apr. 21, 2017).

10.     Without any facts or support, the Attorney General has claimed that "the lawless practices" of cities he characterizes as "so-called 'sanctuary' jurisdictions . . . make our country less safe."[6] Philadelphia's experience is quite the opposite:  Philadelphia has witnessed a reduction in crime of over 17 percent since the City formally adopted policies protecting the confidentiality of its constituents.

11.     Philadelphia certified its compliance with Section 1373 on June 22, 2017. Fundamentally, Philadelphia explained that it complies with Section 1373 because its agents do not collect immigration status information in the first place, and, as a result, the City is in no position to share or restrict the sharing of information it simply does not have.  At the same time, the City explained, if immigration status information does inadvertently come into the City's possession, Philadelphia's policies allow local law enforcement to cooperate with federal authorities and to share identifying information about criminal suspects in the City.  For these reasons and others, Philadelphia certified that it complies with all of the obligations that Section 1373 can constitutionally be read to impose on localities.

12.     In response to the certifications filed in June 2017 by Philadelphia and other jurisdictions, the Attorney General issued a press release condemning those submissions.  He did not offer his definition of compliance or any details on the aspects of any locality's policies he considered illegal; he said only that "[i]t is not enough to assert compliance" and that "jurisdictions must actually be in compliance."[7]

---

[6] Press Release, U.S. Dep't of Justice, *Attorney General Jeff Sessions Delivers Remarks on Violent Crime to Federal, State and Local Law Enforcement* (Apr. 28, 2017), *available at* https://goo.gl/sk37qN.

[7] Press Release, U.S. Dep't of Justice, *Department of Justice Reviewing Letters from Ten Potential Sanctuary Jurisdictions* (July 6, 2017), *available at* https://goo.gl/of8UhG; *see also* Dkt. 1-2.

13.     Against this backdrop, the Department of Justice announced in a July 25, 2017 press release that it would now be imposing two additional conditions on jurisdictions applying for FY 2017 Byrne JAG funding, along with another mandatory certification of compliance with Section 1373.  The fiscal year 2017 application was due on September 5, 2017.  Philadelphia submitted a timely application.

14.     The Attorney General's action was an unlawful, *ultra vires* attempt to force Philadelphia to abandon its policies and accede to the Administration's political agenda.  It is one thing for the Department of Justice to disagree with Philadelphia as a matter of policy; it is quite another thing for the Department to violate both a congressionally-defined program and the Constitution in seeking to compel Philadelphia to forfeit its autonomy.

15.     In response, Philadelphia now seeks a declaration from this Court that the Department of Justice's imposition of the new conditions to Byrne JAG funding was unlawful. That agency action is contrary to federal statute, contrary to the Constitution's separation of powers, and arbitrary and capricious.  Further, even if Congress had intended to permit the Attorney General's action, it would violate the Spending Clause.  The City also seeks a declaration from this Court that, to the extent Section 1373 can be made an applicable condition to the receipt of Byrne JAG funds, Philadelphia is in full compliance with that provision.

16.     The City also seeks injunctive relief.  It requests that this Court permanently enjoin the Department of Justice from imposing these three conditions in conjunction with the FY 2017 Byrne JAG application, and any future grants under the Byrne JAG program.  Further, the City seeks any other injunctive relief the Court deems necessary and appropriate to allow Philadelphia to receive its FY 2017 JAG allocation as Philadelphia has since the inception of the JAG program, and as Congress intended.

7

17.     Finally, given the Court's granting the City's motion for a preliminary injunction and the Department's continued refusal to disburse Philadelphia's FY 2017 JAG award, the City now seeks a writ of mandamus, pursuant to 28 U.S.C. § 1361, compelling the Attorney General and the Department of Justice to disburse the City's FY 2017 Byrne JAG allocation, in accordance with the Byrne JAG authorizing statute and its formula established by Congress. Importantly, Congress allocated the JAG funds specifically for fiscal year 2017, the fiscal year is now over, and the money is still not disbursed.

## PARTIES

18.     Plaintiff Philadelphia is a municipal corporation, constituted in 1701 under the Proprietor's Charter.  William Penn, its founder, was a Quaker and early advocate for religious freedom and freedom of thought, having experienced persecution firsthand in his native England. He fashioned Philadelphia as a place of tolerance and named it such.  "Philadelphia," the City of Brotherly Love, derives from the Greek words "philos," meaning love or friendship, and "adelphos," meaning brother.

19.     Philadelphia is now the sixth-largest city in the United States and is home to almost 1.6 million residents.  About 200,000 Philadelphia residents, or 13 percent of the City's overall population, are foreign-born, which includes approximately 50,000 undocumented immigrants.  The number of undocumented Philadelphia residents therefore account for roughly one of every four foreign-born Philadelphians.

20.     Defendant Jefferson Beauregard Sessions III is the Attorney General of the United States.  The Attorney General is sued in his official capacity.  The Attorney General is the federal official in charge of the United States Department of Justice, which took and threatens imminently to take the governmental actions at issue in this lawsuit.

## JURISDICTION AND VENUE

21.     The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1346.  The

Court is authorized to issue the relief sought here under the Administrative Procedure Act, 5

U.S.C. §§ 702, 705, 706, the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, and the

Mandamus Statute, 28 U.S.C. § 1361.

22.     Venue is proper in the Eastern District of Pennsylvania under 28 U.S.C. §

1391(e)(1) because substantial events giving rise to this action occurred therein and because

Philadelphia resides therein.

## FACTUAL ALLEGATIONS

## I.     PHILADELPHIA'S POLICIES

23.     As the City of Brotherly Love, Philadelphia is recognized as a vital hub for

immigrants from across the globe who seek good jobs and better futures for themselves and their

families.  A study by the Brookings Institute found "Philadelphia's current flow of immigrants

[to be] sizable, varied, and . . . grow[ing] at a moderately fast clip."[8]

24.     Philadelphia's policies developed over time to address the needs and concerns of

its growing immigrant community.  Today, Philadelphia has four sets of policies relevant to the

present suit, as each concern the City's efforts to engender trust with the City's immigrant

community and bring individuals from that community into the fold of City life.  These policies

work.  They are discussed in turn below.

---

[8] Audrey Singer et al., *Recent Immigration to Philadelphia: Regional Change in a Re-Emerging Gateway*, Metropolitan Policy Program at Brookings (Nov. 2008), https://goo.gl/pZOnJx.

A.      **Philadelphia's Police Department Memorandum 01-06**

25.     Decades ago, the Philadelphia Police Department recognized that a resident's immigration status was irrelevant to effective policing and, if anything, that asking about an individual's immigration status hampers police investigations.  For that reason, PPD officers were trained to refrain from asking persons about their immigration status when investigating crimes or conducting routine patrols.

26.     That practice was formalized into policy on May 17, 2001, when Philadelphia's then-Police Commissioner John F. Timoney issued Memorandum 01-06, entitled "Departmental Policy Regarding Immigrants" ("Memorandum 01-06").[9]  The Memorandum states that one of its overarching goals is for "the Police Department [to] preserve the confidentiality of all information regarding law abiding immigrants to the maximum extent permitted by law." Memorandum 01-06 ¶ 2B.

27.      Memorandum 01-06 generally prohibits police officers in Philadelphia from unnecessarily disclosing individuals' immigration status information to other entities.   The Memorandum sets out this non-disclosure instruction, and three exceptions, as follows:  "In order to safeguard the confidentiality of information regarding an immigrant, police personnel will transmit such information to federal immigration authorities only when: (1) required by law, or (2) the immigrant requests, in writing, that the information be provided, to verify his or her immigration status, or (3) the immigrant is suspected of engaging in criminal activity, including attempts to obtain public assistance benefits through the use of fraudulent documents." Memorandum 01-06 ¶¶ 3A-3B.

---

[9] *See* Dkt. 1-3 (Memorandum 01-06).

28.     Notwithstanding the instruction to "safeguard the confidentiality of information regarding an immigrant," Memorandum 01-06 also directs police officers to continue adhering to typical law enforcement protocols for the reporting and investigating of crimes.  Section 3B of the Memorandum provides that "[s]worn members of the Police Department who obtain information on immigrants suspected of criminal activity will comply with normal crime reporting and investigating procedures."  *Id.* ¶ 3B.  This mandate applies irrespective of the criminal suspect's identity or immigration status.  Section 3C further instructs that "[t]he Philadelphia Police Department will continue to cooperate with federal authorities in investigating and apprehending immigrants suspected of criminal activities."  *Id.* ¶ 3C.   But as to "immigrants who are victims of crimes," the Memorandum provides a blanket assurance of confidentiality.  Such persons "will not have their status as an immigrant transmitted in any manner."  *Id.*

29.     The Philadelphia Police Department's policy was motivated by the desire to encourage members of Philadelphia's immigrant community to make use of City services and to cooperate with the police without fear of negative repercussions.  *See id.* ¶¶ 2B, 3C.  Indeed, an essential tenet of modern policing is that police departments should engender trust from the communities they serve so that members of those communities will come forward with reports of criminal wrongdoing, regardless of their immigration status or that of their loved ones.  Numerous police chiefs and criminal law enforcement experts have echoed that finding.[10]

---

[10] *See* Hearing before the Comm. on Homeland Security & Gov't Affairs of the United States Senate, May 24, 2014 (statement of J. Thomas Manger, Chief of Police of Montgomery County, Maryland) (conveying that the "moment" immigrant "victims and witnesses begin to fear that their local police will deport them, cooperation with their police then ceases"); Chuck Wexler, *Police Chiefs Across the Country Support Sanctuary Cities Because They Keep Crime Down*, L.A. Times (Mar. 6, 2017), https://goo.gl/oQs9AT (similar).

30.     Philadelphia has witnessed firsthand the positive effects that increased trust between communities, including immigrant communities, and the police, has on law and order. In part due to the tireless efforts of the PPD to forge that trust with the immigrant community, the City has seen a drop in its overall crime rate.

31.     The success of Philadelphia's policies should come as no surprise. A systematic review of municipalities' "sanctuary city" policies, defined as "at least one law or formal resolution limiting local enforcement of immigration laws as of 2001," found that policies of this nature were *inversely correlated* with rates of robbery and homicide—meaning that "sanctuary policies" made cities safer.[11]  Indeed, cities with these policies saw lower rates of crime even among immigrant populations.[12]  Social science research confirms that when there is a concern of deportation, immigrant communities are less likely to approach the police to report crime.[13]

32.     Recent events also confirm the positive relationship between policies that forge community trust with immigrant populations and the overall reporting of crimes.  Since President Trump was elected and announced plans to increase deportations and crack down on so-called

---

[11]  *See* Christopher Lyons, Maria B. Ve'lez, & Wayne A. Santoro, *Neighborhood Immigration, Violence, and City-Level Immigrant Political Opportunities*, 78 American Sociological Review, no. 4, pp. 9, 14-19 (June 17, 2013).

[12]  *Id.* at 14, 18.

[13]  Cecilia Menjiyar & Cynthia L. Bejarano, *Latino Immigrants' Perceptions of Crime and Police Authorities in the United States: A Case Study from the Phoenix Metropolitan Area*, 27 Ethnic and Racial Studies, no. 1, pp. 120-148 (Jan. 2004) ("As these cases illustrate, when there is a threat of immigration officials' intervention, immigrants (particularly those who fear any contacts with these officials due to their uncertain legal status, as is the case of the Mexicans and Central Americans in this study) are more reluctant to call the police because they are aware of the links between the two.").

sanctuary cities, overall crime reporting by Latinos in three major cities—including in Philadelphia—"markedly decline[d]" as compared to reporting by non-Latinos.[14]

### B.   Philadelphia's Confidentiality Order

33.    Philadelphia's policies that engender confidence between its immigrant population and City officials extend beyond its police-related protocols.  Indeed, the City's hallmark policy in building trust with all city service offerings is its "Confidentiality Order," signed by then-Mayor Michael A. Nutter on November 10, 2009.  *See* Executive Order No. 8-09, "Policy Concerning Access of Immigrants to City Services" ("Confidentiality Order").[15]   That policy recognizes that the City as a whole fares better if all residents, including undocumented immigrants, pursue health care services, enroll their children in public education, and report crimes.

34.    The Confidentiality Order instructs City officials to protect the confidentiality of individuals' immigration status information in order to "promote the utilization of [City] services by all City residents and visitors who are entitled to and in need of them, including immigrants." *See* Confidentiality Order preamble.  It intends that all immigrants, regardless of immigration status, equally come forward to access City services to which they are entitled, without having to fear "negative consequences to their personal lives."  *Id.*  The Order defines "confidential information" as "any information obtained and maintained by a City agency related to an individual's immigration status."  *Id.* § 3A.

---

[14] Rob Arthur, *Latinos in Three Cities Are Reporting Fewer Crimes Since Trump Took Office*, FiveThirtyEight (May 18, 2017), https://goo.gl/ft1fwW (surveying trends in Philadelphia, Dallas, and Denver).
[15] *See* Dkt. 1-4 (Confidentiality Order).

35.     The Confidentiality Order directs City officers and employees to refrain from affirmatively collecting information about immigration status, unless that information is necessary to the officer or employee's specific task or the collection is otherwise required by law.  The Order states:  "No City officer or employee, other than law enforcement officers, shall inquire about a person's immigration status unless: (1) documentation of such person's immigration status is legally required for the determination of program, service or benefit eligibility . . . or (2) such officer or employee is required by law to inquire about such person's immigration status."  *Id.* § 2A.

36.     The Confidentiality Order has additional mandates for law enforcement officers. It directs that officers "shall not" stop, question, detain, or arrest an individual solely because of his perceived immigration status; shall not "inquire about a person's immigration status, unless the status itself is a necessary predicate of a crime the officer is investigating or unless the status is relevant to identification of a person who is suspected of committing a crime"; and shall not "inquire regarding immigration status for the purpose of enforcing immigration laws."  *Id*. §§ 2B(1), (2), (4).  Witnesses and victims are afforded special protection:  Law enforcement officers "shall not . . . inquire about the immigration status of crime victims, witnesses, or others who call or approach the police seeking help."  *Id*. § 2B(3).

37.     The Confidentiality Order also requires City officers and employees to avoid making unnecessary disclosures of immigration status information that may inadvertently come into their possession.  *Id.* § 3B ("No City officer or employee shall disclose confidential information[.]").  But the Order permits disclosure both by City "officer[s] or employee[s]," when "such disclosure is required by law," or when the subject individual "is suspected . . . of engaging in criminal activity."  *Id.* § 3B(2)-(3).

14

38.     Philadelphia's Confidentiality Order, like the PPD's Memorandum 01-06, is motivated by concerns among officials across local government—from the City's health and social services departments to its law enforcement departments—that members of Philadelphia's immigrant community, especially those who are undocumented, would otherwise not access the municipal services to which they and their families are entitled and would avoid reporting crimes to the police, for fear of exposing themselves or their family members to adverse immigration consequences.  The City's Confidentiality Order and Memorandum 01-06 play a vital role in mitigating undesired outcomes like neighborhoods where crimes go unreported, where families suffer from preventable diseases, and where children do not go to school.

39.     Indeed, notwithstanding the Attorney General's claim that "[t]he residents of Philadelphia have been victimized" because the City has "giv[en] sanctuary to criminals,"[16] Philadelphia's crime statistics tell a very different story.  Since 2009, when the Confidentiality Order was enacted, Philadelphia has witnessed a decrease in crime of over 17 percent, including a 20 percent decrease in violent crime. Tellingly, the Administration offers not a single statistic or fact to support their allegations otherwise—either publicly or as a part of the JAG solicitation announcing the requirement of the three new conditions.  This is because the Administration has no support for its claims that sanctuary cities promote crime or lawlessness.

C.     **Philadelphia's Policies on Responding to ICE Detainer and Notification Requests**

40.      On April 16, 2014, shortly after the United States Court of Appeals for the Third Circuit issued a decision concluding that "detainer" requests sent by ICE are voluntary upon localities, *see Galarza v. Szalczyk*, 745 F.3d 634, 640 (3d Cir. 2014), then-Mayor Nutter signed

---

[16] Rebecca R. Ruiz, *Sessions Presses Immigration Agenda in Philadelphia, a Sanctuary City*, N.Y. Times (July 21, 2017), https://goo.gl/4EDuuo.

Executive Order No. 1-14, entitled "Policy Regarding U.S. Immigration and Customs

Enforcement Agency Detainer Requests" ("Detainer Order I").[17]

41.     Detainer Order I stated that under the "Secure Communities" program, the U.S.

Immigration and Customs and Enforcement Agency had been "shift[ing] the burden of federal

civil immigration enforcement onto local law enforcement, including shifting costs of detention

of individuals in local custody who would otherwise be released."  Detainer Order I preamble.

42.     Accordingly, Detainer Order I announced a policy that "[n]o person in the

custody of the City who otherwise would be released from custody shall be detained pursuant to

an ICE civil immigration detainer request . . . nor shall notice of his or her pending release be

provided, unless such person is being released after conviction for a first or second degree felony

involving violence and the detainer is supported by a judicial warrant."  *Id.* § 1.  The Order

instructed the "Police Commissioner, the Superintendent of Prisons and all other relevant

officials of the City" to "take appropriate action to implement this order."  *Id.* § 2.

43.     Detainer Order I was partly rescinded at the end of then-Mayor Nutter's term.

After his election and upon taking office, on January 4, 2016, Mayor James F. Kenney signed a

new order dealing with ICE detainer and notification requests.  Its title was the same as Mayor

Nutter's prior order and it was numbered Executive Order No. 5-16 ("Detainer Order II").[18]

44.     Detainer Order II states that, although ICE had "recently discontinued its 'Secure

Communities' program" and "the Department of Homeland Security and ICE have initiated the

new Priority Enforcement Program (PEP) to replace Secure Communities[,] . . . it is incumbent

upon the Federal government and its agencies to both listen to individuals concerned with this

---

[17] *See* Dkt. 1-5 (Detainer Order I).
[18] *See* Dkt. 1-6 (Detainer Order II).

new program, and ensure that community members are both informed and invested in the

program's success."  Detainer Order II preamble.  Until that occurs, Detainer Order II directs that

Philadelphia officers "should not comply with detainer requests unless they are supported by a

judicial warrant and they pertain to an individual being released after conviction for a first or

second-degree felony involving violence."  *Id.*

  45. Detainer Order II therefore provides:  "No person in the custody of the City who

otherwise would be released from custody shall be detained pursuant to an ICE civil immigration

detainer request . . . nor shall notice of his or her pending release be provided, unless such person

is being released after conviction for a first or second degree felony involving violence and the

detainer is supported by a judicial warrant."  *Id.* § 1.  The Order instructs "the Police

Commissioner, the Prisons Commissioner and all other relevant officials of the City" to "take

appropriate action to implement this order."  *Id.* § 2.

  46. As a result of Detainer Orders I and II, Philadelphia prison authorities stopped

notifying ICE of the forthcoming release of inmates, unless ICE provided the authorities a

notification request that was accompanied by a judicial warrant.  This has been the practice in the

prisons since the signing of Detainer Order I in April 2014 through the date of this filing.

Because the vast majority of individuals in Philadelphia's prison facilities are pre-trial or pre-

sentence detainees, however, the vast majority of detainer or notification requests that the City

receives from ICE concern persons without scheduled release dates.   Since January 2016, only

three individuals for whom ICE sent Philadelphia detainer or notification requests and who were

in City custody had been serving a sentence after being convicted of a crime.   Every other

individual for whom ICE sent a detainer or notification request during that time period was an

individual in a pre-trial, pre-sentencing, or temporary detention posture, whose release could often be ordered with no advance notification to local authorities.

47.     On March 22, 2017, the City's First Deputy Managing Director, Brian Abernathy, clarified by memorandum that, although Executive Order 5-16 (Detainer Order II) suggested that in order for the City to cooperate with an ICE notification request, there needed to be both a "judicial warrant" and a prior conviction by the inmate for a first or second degree felony, that text did not and does not reflect the practice of the City's prisons.[19]  Mr. Abernathy explained that the historical practice of the Department of Prisons has been to "cooperat[e] with all federal criminal warrants, including criminal warrants obtained by Immigration and Customs Enforcement," and "[b]y signing Executive Order 5-16, Mayor Kenney did not intend to alter this cooperation."  Accordingly, Mr. Abernathy's memorandum stated that "the Department is directed to continue to cooperate with all federal agencies, including ICE, when presented with a warrant to the same extent it cooperated before Executive Order 5-16."  Philadelphia therefore continues to comply with ICE advance notification requests, regardless of the crime for which the individual was convicted, when ICE also presents a "judicial warrant."

48.     Philadelphia's policies on detainer requests—that is, of complying with ICE requests to detain an individual for a brief period of time or to provide advance notification of a person's release *only* if ICE presents a judicial warrant—serve an important function in the City. Like Police Memorandum 01-06 and the Confidentiality Order, these policies forge trust with the immigrant community because they convey the message that Philadelphia's local law enforcement authorities are not federal immigration enforcement agents.  They tell residents that if they find themselves in the City's custody and are ordered released, they *will* be released—not

---

[19] *See* Dkt. 1-7 (Abernathy's March 22, 2017 internal memorandum).

turned over to ICE unless a judge has determined such action is warranted.  For instance, if a member of the immigrant community is arrested for a petty infraction and is temporarily detained in a Philadelphia Prison facility, or if he or she is arrested and then released the next morning, the City will not voluntarily detain that individual at the request of ICE or alert ICE to their release—unless, in the rare circumstance, ICE presents a judicial warrant.  This message of assurance is important to community trust:  Philadelphia's residents do not have to fear that each and every encounter with the local police is going to land them in an ICE detention center.  After all, lawful immigrants and even citizens can be wrongfully caught up in alleged immigration enforcement actions.

49.      Philadelphia's detainer policies also ensure fair treatment for all of Philadelphia's residents, immigrants and non-immigrants alike.  Just as Philadelphia would not detain an individual at the request of the FBI for 48 hours without a judicial warrant, Philadelphia will not do so at the request of ICE.  The City believes that all persons should be treated with equal dignity and respect, whatever their national origin or immigration status.

**D.      Philadelphia's Policies on ICE Access to Prisons**

50.      The Philadelphia Prison System ("PPS") is managed by the Philadelphia Department of Prisons ("PDP").  PDP operates six facilities:  (1) the Curran-Fromhold Correctional Facility, which is PPS' largest facility and contains 256 cells; (2) the Detention Center; (3) the House of Correction; (4) the Philadelphia Industrial Correctional Center ("PICC"); (5) the Riverside Correctional Facility; and (6) the Alternative & Special Detention facilities.

51.       Across these six facilities, the inmate population is roughly 6,700. Approximately 17 percent of those inmates are serving time for criminal sentences imposed, and

the remaining 83 percent inmates are all in a pre-trial posture (roughly 78 percent of inmates), a pre-sentencing posture (roughly 2 percent of inmates), or some other form of temporary detention (roughly 3 percent of inmates). Of the 17 percent serving sentences, none are serving sentences longer than 23 months, and approximately 30 percent are serving sentences of one year or less.

52.     In May 2017, the Philadelphia Department of Prisons implemented a new protocol providing that ICE may only interview an inmate if the inmate consents in writing to that interview. To implement this protocol, the Department of Prisons created a new "consent form," to be provided to any inmate in a PPS facility whom ICE seeks to interview. The consent form informs the individual that "Immigration and Customs Enforcement ("ICE") wants to interview you" and that "[y]ou have the right to agree or to refuse this interview."[20]

53.      The new consent-based policy for ICE access to PPS facilities was put in place to help protect prisoners' constitutional rights to decline speaking with law enforcement authorities against their will or to speak only with such authorities in the presence of counsel if they so choose. The consent-based policy also ensures the orderly administration of Philadelphia's prisons, by avoiding the unnecessary expenditure of time and resources that would otherwise occur were inmates to be delivered to interviews with ICE only then to exercise their constitutional rights to remain silent or have counsel present.

###     E.     Other Relevant Policies and Practices

54.     In addition to the above policies, each of which are important for strengthening Philadelphia's relationship with its immigrant communities and fostering the health and welfare of the City, Philadelphia also believes that combatting crime is a leading—and entirely

---

[20] *See* Dkt. 1-8 (Philadelphia Department of Prisons "Inmate Consent Form – ICE Interview").

consistent—policy priority.  To that effect, the Philadelphia Police Department routinely

cooperates with federal law enforcement authorities in detecting, combatting, and holding people

accountable for crimes committed in the City or by residents of the City, irrespective of the

identity of the perpetrator or their immigration status.  For instance, Philadelphia actively

participates in a number of federal task forces, including the Violent Crimes Task Force; the

Alcohol, Tobacco, Firearms and Explosive (ATF) Task Force; the FBI Terrorism Task Force;

Joint Terrorism Task Force; the Human Trafficking Task Force; and the U.S. Marshals Service's

Task Force.

55.     Philadelphia also uses a number of databases as part of its regular police work

and law enforcement activities.   Philadelphia's use of these databases provides the federal

government notice about—and identifying information for—persons stopped, detained, arrested,

or convicted of a crime in the City.  In turn, federal authorities can use information derived from

those databases to obtain knowledge about undocumented persons of interest in the City.  The

databases Philadelphia uses include:

       a.    The FBI's National Crime Information Center ("NCIC") database:  The

Philadelphia Police Department's protocol is for its officers to voluntarily

and regularly use the NCIC database as they engage in criminal law

enforcement.  For instance, Philadelphia police officers are trained to run

an NCIC "look-up" for all individuals who are subjected to "investigative

detention" by the police, for the purpose of determining if an outstanding

warrant has been issued for the individual whether in Philadelphia or

another jurisdiction.  If the officer is able to collect the person's date of

birth or license plate information, NCIC protocols mandate that that information will also be entered into NCIC.

b.  The Automated Fingerprint Identification System ("AFIS")[21]: As part of a routine and longstanding protocol, at the time a person in Philadelphia is arrested, his or her fingerprints are inputted into Philadelphia's AFIS platform, which feeds automatically into Pennsylvania's identification bureau and then to the FBI.  The FBI in turn has the capacity to run fingerprints against the Integrated Automated Fingerprint Identification System ("IAFIS"), a national fingerprint and criminal history system maintained by the FBI, and the Automated Biometric Identification System ("IDENT"), a DHS-wide system for storing and processing biometric data for national security and border management purposes.

c.  The Preliminary Arraignment System ("PARS"):  PARS is a database maintained by the First Judicial District of Pennsylvania, the Philadelphia Police Department, and the Philadelphia District Attorney.  The purpose of the database is to give information that the police collect upon an arrest directly to the District Attorney's Office.  Based upon an end-user license agreement signed with ICE in 2008 and amended in 2010, ICE has access to criminal information in the PARS database, *i.e.*, to information about people suspected of criminal activity and entered into the system.

---

[21] Philadelphia recently transitioned to the Multimodal Biometric Identification System ("MBIS"), which is the next generation to AFIS.  But because the FBI refers to the Integrated Automated Fingerprint Identification System ("IAFIS"), we use AFIS here.

56.     Philadelphia does not have visibility into how various federal agencies use or share information derived from the above databases with one another.  But ICE itself admits that it obtains the notice it needs to send detainer requests from the Automated Fingerprint Identification System (AFIS), maintained by the FBI and regularly used by the City.[22]

## II.    THE BYRNE JAG PROGRAM AND 2017 GRANT CONDITIONS

### A.     Overview of the Byrne JAG Program

57.     Congress created the modern-day Byrne JAG program in 2005 as part of the Violence Against Women and Department of Justice Reauthorization Act.  *See* Pub. L. No. 109-162 (codified at 42 U.S.C. § 3751 *et seq.*).  In fashioning the present-day Byrne JAG grant, Congress merged two prior grant programs that had also provided criminal justice assistance funding to states and localities.  These two predecessor grant programs were the Edward Byrne Memorial Formula Grant Program, created in 1988, and the Local Law Enforcement Block Grant Program.[23]

58.     Today, grants under the Byrne JAG program are the primary source of federal criminal justice funding for states and localities.  As stated in a 2005 House Report accompanying the bill, the program's goal is to provide State and local governments the "flexibility to spend money for programs that work for them rather than to impose a 'one size fits all' solution" for local policing.  *See* H.R. Rep. No. 109-233, at 89 (2005).

---

[22] *See* U.S. Immigration & Customs Enforcement, *Declined Detainer Outcome Report FAQ's: How is an individual placed under a detainer?*, https://goo.gl/oUsD3T (last visited Jan. 5, 2018 12:38 PM ET) ("When an individual is booked into custody by a law enforcement agency, his or her biometric data is automatically routed through federal databases to the FBI. The FBI shares this information with ICE.").

[23] *See* Nathan James, *Edward Byrne Memorial Justice Assistance Grant ("JAG") Program*, Congressional Research Service (Jan. 3, 2013), https://goo.gl/q8Tr6z.

59.      The authorizing statute for the Byrne JAG program provides that localities can apply for funds to support a range of local programming to strengthen their criminal justice systems.  For instance, localities can apply for funds to support "law enforcement programs, prosecution and court programs, prevention and education programs, corrections and community corrections programs, drug treatment and enforcement programs,"  and "crime victim and witness programs."  42 U.S.C. § 3751(a)(1).

60.      Byrne JAG funding is structured as a formula grant, awarding funds to all eligible grantees according to a prescribed formula.   *See* 42 U.S.C. § 3755(d)(2)(A).  The formula for states is a function of population and violent crime, *see id.* § 3755(a), while the formula for local governments is a function of the state's allocation and of the ratio of violent crime in that locality to violent crime in the state as a whole, *see id.* § 3755(d).

61.      Unlike discretionary grants, which agencies award on a competitive basis, "formula grants . . . are not awarded at the discretion of a state or federal agency, but are awarded pursuant to a statutory formula."  *City of Los Angeles v. McLaughlin*, 865 F.2d 1084, 1088 (9th Cir. 1989).  States and local governments are entitled to their share of the Byrne JAG formula allocation as long as their proposed programs fall within at least one of eight broadly-defined goals, *see* 42 U.S.C. § 3751(a)(1)(A)-(H), and their applications contain a series of statutorily prescribed certifications and attestations,  *see id.* § 3752(a).

62.      Philadelphia has filed direct applications for Byrne JAG funding every year since the program's inception in 2005.  All of its applications have been granted; the City has never been denied Byrne JAG funds for which it applied.  For instance, in FY 2016, Philadelphia received $1.67 million in its direct Byrne JAG award.  That award was dated August 23, 2016. In FY 2015, the City received $1.6 million in its direct Byrne JAG award.  Over the past eleven

years, excluding funds received as part of the 2009 Recovery Act, Philadelphia's annual Byrne

JAG award has averaged $2.17 million and has ranged between $925,591 (in 2008) to $3.13

million (in 2005).

63.     Over the last five years, the Department has routinely disbursed Philadelphia's

JAG award in September and August of the particular grant year, and the money is immediately

obligated by the City's criminal justice agencies to fund pressing needs.  The Department has

represented in this litigation that it has no plans to make any JAG awards to Philadelphia, or to

any jurisdiction, in the immediate future.

64.     The City is also eligible for, and has previously been awarded, competitive

subgrants from the annual Byrne JAG award to the State of Pennsylvania.

65.     Philadelphia uses the federal funding provided by the Byrne JAG program to

support a number of priorities within and improvements to its criminal justice system.  In recent

years, a significant portion of Philadelphia's Byrne JAG funding has gone towards Philadelphia

Police Department technology and equipment enhancements, training, and over-time payments

to police officers.  Philadelphia has also drawn upon Byrne JAG funds to finance upgrades to

courtroom technology in the City; to enable the District Attorney's Office to purchase new

technology and invest in training programs for Assistant District Attorneys; to support juvenile

delinquency programs for the City's youth; to bolster reentry programs for formerly incarcerated

individuals seeking to reenter the community; to operate alternative rehabilitation programs for

low-level offenders with substance use disorders; to make physical improvements to blighted

communities with Clean and Seal teams; and to improve indigent criminal defense services.  It is

clear, then, that the funds that the City receives from the Byrne JAG program play a vital role in

many facets of the City's criminal justice programming.

25

66.    For FY 2017, Philadelphia intends to use its JAG award for, among other things, to support Philadelphia's Police Commissioner's "Crime Fighting Strategy," including overtime funding for "Quality of Life" police initiatives; the enhancement of a Reality Based Training Unit to emphasize best practices on the use of force; and to procure supplies for a citywide collaboration to support inner-city youth.  Philadelphia also intends to use its FY 2017 funding to purchase life-saving naloxone for Philadelphia police officers responding to opioid overdoses. The City faces a devastating opioid epidemic, with an estimated 1,200 overdose deaths in 2017, a 30 percent increase from 900 deaths in 2016.  Philadelphia's FY 2017 JAG funds will, without hyperbole, save human lives.

**B.    Conditions for Byrne JAG Funding**

67.    The statute creating the Byrne JAG program authorizes the Attorney General to impose a limited set of conditions on applicants.  First, the statute authorizes the Attorney General to require that applicants supply information about their intended use of the grant funding, and to demonstrate that they will spend the money on purposes envisioned by the statute.  *See* 42 U.S.C. § 3752(a)(2) & (5) (the Attorney General can insist upon assurances by applicants that "the programs to be funded by the grant meet all the requirements of this part" and "that Federal funds . . . will not be used to supplant State or local funds").  Second, the statute allows the Attorney General to require that applicants provide information about their budget protocols; for instance, he can insist that a recipient of a Byrne JAG "maintain and report such data, records, and information (programmatic and financial) as [he] may reasonably require."  *Id*. § 3752(a)(4).  Third, the Attorney General can demand that localities "certif[y]," in conjunction with their applications for funding, that they "will comply with all provisions of this

part and all other applicable Federal laws." *Id*. § 3752(a)(5)(D).  Finally, the statute authorizes the Attorney General to "issue Rules to carry out this part."  *Id*. § 3754.

68.     That is all.  The above delegations of authority do not include a general grant of authority to the Attorney General to impose new obligations the Attorney General himself creates and that are neither traceable to existing "applicable Federal law[]" nor reflected in "provisions of this part" (*i.e.*, the JAG statute itself).  *See id*. § 3752(a)(5)(D).  Congress' decision *not* to delegate to the Attorney General such a broad scope of authority was intentional and clear.

69.     Time and time again, Congress has demonstrated that it knows how to confer agency discretion to add substantive conditions to federal grants when it wants to.  *See, e.g.*, 42 U.S.C. § 3796gg-1(e)(3) (authorizing the Attorney General to "impose reasonable conditions on grant awards" in a different program created by the Omnibus Control and Safe Streets Act); 42 U.S.C. § 14135(c)(1) (providing that the Attorney General shall "distribute grant amounts, and establish grant conditions . . ."); *see also Andrus v. Glover Const. Co*., 446 U.S. 608, 616-617 (1980) ("Where Congress explicitly enumerates certain exceptions," its "omission" of a different exception means "only one inference can be drawn:  Congress meant to" exclude that provision).

70.     Furthermore, the Attorney General has never imposed conditions on Byrne JAG applicants beyond the bounds of his statutory authority, *i.e.*, conditions that neither reflect "applicable Federal laws" nor that relate to the disbursement of the grants themselves.  For instance, the FY 2016 JAG funds awarded to Philadelphia on August 23, 2016 included many "special conditions."  Philadelphia had to certify, among other things, that it:

       a.     complies with the Department of Justice's "Part 200" Uniform

              Administrative Requirements, Cost Principles, and Audit Requirements;

      b.       adheres to the "DOJ Grants Financial Guide";

      c.       will "collect and maintain data that measure the performance and effectiveness of activities under this award";

      d.       recognizes that federal funds "may not be used by the recipient, or any subrecipient" on "lobbying" activities;

      e.       "agrees to assist BJA in complying with the National Environmental Policy Act (NEPA) . . . in the use of these grant funds";

      f.       will ensure any recipients, subrecipients, or employees of recipients do not engage in any "conduct related to trafficking in persons";

      g.       will ensure that any recipient or subrecipient will "comply with all applicable requirements of 28 C.F.R. Part 42" (pertaining to civil rights and non-discrimination).[24]

71.     These conditions almost all relate to the administration and expenditure of the grant itself.  The few conditions that apply to the general conduct of the recipient or subrecipient are expressly made applicable to federal grantees by statute.  The Department of Justice's new conditions do not apply to the expenditure of the grant funding, and neither the jail access nor advance notification conditions discussed below invoke any existing federal law or statute.  Meanwhile, the Section 1373 condition refers to a federal law that is wholly inapplicable to the JAG grant.  The Department offered no statistics, studies, or legal authority to support its imposition of these 2017 conditions as promoting public safety and the law enforcement purposes of the JAG program.

---

[24] *See* Dkt. 1-9 (Philadelphia's FY 2016 JAG award).

72.    Had Congress authorized the Attorney General to create new substantive conditions for Byrne JAG funds at his choosing, that would have upended Congress' formula approach for distributing funds under the program based on population and violent crime.  That in turn would have resulted in the allocating of grants according to criteria invented by the Department of Justice.  That is not the program Congress created.  *See Amalgamated Transit Union v. Skinner*, 894 F.2d 1362, 1364 (D.C. Cir. 1990) ("Where Congress prescribes the form in which an agency may exercise its authority, . . . we cannot elevate the goals of an agency's action, however reasonable, over that prescribed form.").

73.    Congress's decision to use a formula grant mechanism, namely, "in accordance with the formula established under section 10156 of this title," impacts its use of the phrase "may … make grants to States and units of local government."  34 U.S.C. § 10152(a)(1).  Read together, this language demonstrates that Congress imposed a non-discretionary duty to issue JAG awards.  It is, as in other statutory schemes, a mandate to issue JAG awards, not a delegation of discretion to the Attorney General.  *See, e.g.*, *United Hosp. Ctr., Inc. v. Richardson*, 757 F.2d 1445, 1453 (4th Cir. 1985) ("While the term 'may' in a statute or agency regulation dealing with agency power is generally construed as permissive rather than mandatory, the construction of such term—whether discretionary or mandatory—is reached in every case 'on the context of the statute [or regulation], and on whether it is fairly to be presumed that it was the intention of the legislature [or agency] to confer a discretionary power or to impose an imperative duty.'" (brackets in original)); *id*. ("There can be no question that the board intended the challenged provision in this regulation, even though stated in terms of 'may,' to be mandatory."); *Wilson v. United States*, 135 F.2d 1005, 1009 (3d Cir. 1943) ("[T]he word 'may', ordinarily permissive in quality, is frequently given a mandatory meaning where a public body or

29

officer is clothed by statute with power to do an act which concerns the public interest, or the rights of third persons. In such cases, what they are empowered to do for the sake of justice, or the public welfare, the law requires shall be done. The language, although permissive in form, is, in fact peremptory." (ellipsis omitted) (citing *Bd. of Supervisors of Rock Island Cty. v. U.S. ex rel. State Bank*, 71 U.S. 435 (1866)).

### C.     Section 1373 Condition

74.     On February 26, 2016, Congressman John Culberson, Chairman of the House Appropriations Subcommittee on Commerce, Justice, Science and Related Agencies, sent a letter to then-Attorney General Loretta Lynch, inquiring whether recipients of Department of Justice grants were complying with Section 1373.[25]

75.     The Culberson letter spurred the Office of Justice Programs ("OJP") at the Department of Justice to ask that the Department's Office of Inspector General ("OIG") investigate local jurisdictions' compliance with Section 1373.  In an email sent from OJP to Inspector General Michael Horowitz on April 8, 2016, OJP indicated that it had "received information" indicating that several jurisdictions who receive OJP funding may be in violation of Section 1373 and attached a spreadsheet of over 140 state and local jurisdictions that it wanted OIG to investigate.[26]

---

[25] *See* Letter from Cong. Culberson to Attorney General Lynch (Feb. 26, 2016), *available at* https://goo.gl/Cytb3B.  Congressman Culberson's letter was accompanied by analysis from the Center for Immigration Studies, a non-profit institute that describes itself as "animated by a 'low-immigration, pro-immigrant' vision of America that admits fewer immigrants but affords a warmer welcome for those who are admitted." *About the Center for Immigration Studies*, Center for Immigration Studies (last visited August 29, 2017 2:42 PM EDT), https://goo.gl/GrsfoQ.
[26] *See* Dkt. 1-10 (Memorandum from Department of Justice Inspector General Michael Horowitz to Assistant Attorney General Karol Mason (May 31, 2016) (describing OJP's earlier email to OIG)).

76.     On May 31, 2016, Inspector General Horowitz transmitted a report to Department of Justice Assistant Attorney General Karol Mason, reviewing the policies of ten state and local jurisdictions, including Philadelphia, and whether they comply with Section 1373.[27]  The other jurisdictions analyzed were:  Connecticut, California, City of Chicago (Illinois), Clark County (Nevada), Cook County (Illinois), Miami-Dade (Florida), Milwaukee County (Wisconsin), Orleans Parish (Louisiana), and New York City.  The report expressed "concerns" with several of the localities' laws and policies.   The report did not analyze the effects of any of the ten local jurisdictions' policies on crime rates or public safety.

77.     On July 7, 2016, Assistant Attorney General Mason, who then oversaw the Office of Justice Programs, sent a Memorandum to Inspector General Horowitz conveying that, in response to OIG's report, "the Office of Justice Programs has determined that Section 1373 is an applicable federal law for the purposes of the Edward Byrne Memorial Justice Assistant Grant (JAG) program and the State Criminal Alien Assistance Program (SCAAP)."[28] There was no analysis supporting this conclusion whatsoever, nor any explanation for why OJP had not reached that conclusion during the prior ten years that it administered the JAG program.

78.     Also on July 7, 2016, the Office of Justice Programs released a Question and Answer "Guidance" document, entitled "Office of Justice Programs Guidance Regarding Compliance with 8 U.S.C. § 1373."[29]  The Q&A Guidance document stated that under the Department's new policy, "[a] JAG grantee is required to assure and certify compliance with all applicable federal statutes, including Section 1373."  The document explained that Section 1373

---

[27] *Id.*

[28] *See* Dkt. 1-11 (Memorandum from Assistant Attorney General Karol Mason to Inspector General Michael Horowitz (July 7, 2016)).

[29] *See* Dkt. 1-12.

"prevents federal, state, and local government entities and officials from 'prohibit[ing] or in any way restrict[ing]' government officials or entities from sending to, or receiving from, federal immigration officers information concerning an individual's citizenship or immigration status." But it further stated that "Section 1373 does not impose on states and localities the affirmative obligation to collect information from private individuals regarding their immigration status, nor does it require that statutes and localities take specific actions upon obtaining such information."

79.     On October 6, 2016, OJP released a document entitled "Additional Guidance Regarding Compliance with 8 U.S.C. § 1373."[30]  That document addressed the question, "Does OJP's guidance on 8 U.S.C. § 1373 impact FY 2016 funding?"  And it answered:  "No FY 2016 or prior year Byrne/JAG or SCAAP funding will be impacted.  However, OJP expects that JAG and SCAAP recipients will use this time to examine their policies and procedures to ensure they will be able to submit the required assurances when applying for JAG and SCAAP funding in FY 2017."

80.     As DOJ has conceded, Section 1373 imposes no affirmative obligation on state or local entities to collect immigration status information or take any specific actions upon receiving immigration status information.  Nor does the statutory provision address ICE detainer requests or release-date notification requests.

81.     Within a week of taking office, on January 25, 2017, President Trump issued Executive Order 13768, a sweeping order aimed at punishing "sanctuary" jurisdictions.  Entitled "Enhancing Public Safety in the Interior of the United States," the order announced that it is the policy of the Executive Branch to withhold "Federal funds" from "jurisdictions that fail to comply with applicable Federal law" by acting as "sanctuary jurisdictions."   Exec. Order 13768

---

[30] *See* Dkt. 1-13.

§§ 1, 2(c).  The Order directed the Attorney General and the Secretary of Homeland Security to "ensure that jurisdictions that willfully refuse to comply with 8 U.S.C. § 1373 (sanctuary jurisdictions) are not eligible to receive Federal grants," and authorized the Secretary of DHS to "designate, in his discretion and to the extent consistent with law, a jurisdiction as a sanctuary jurisdiction."  *Id.* § 8(a).  The Order was ultimately enjoined in large part by the United States District Court for the Northern District of California because the court found that it violated multiple constitutional provisions.  *County of Santa Clara v. Trump*, --- F. Supp. 3d ----, 2017 WL 1459081 (N.D. Cal. Apr. 25, 2017).

82.     As the *Santa Clara* case unfolded, the Trump Administration sharpened its focus—both within the context of that lawsuit and more broadly—on denying local jurisdictions grants disbursed by the Departments of Justice and Homeland Security *in particular*, as the mechanism for carrying out the Administration's efforts to crack down on so-called sanctuary cities.  At the preliminary injunction hearing in March in the *Santa Clara* case, the lawyer for the government represented that the Executive Order only applied to three federal grants administered by the Departments of Justice and Homeland Security.  *Id.* at *1.

83.     On April 21, 2017, the Department of Justice sent letters to Philadelphia and eight other jurisdictions "alert[ing]" the recipients that "under the terms of your FY 2016 Byrne JAG grant, award 2016 DJ-BX-0949 from the Office of Justice Programs ('OJP'), your jurisdiction is required to submit documentation to OJP that validates your jurisdiction is in compliance with 8 U.S.C. § 1373."[31]  The letter went on that "this documentation must be accompanied by an official legal opinion from counsel . . . [and] must be submitted to OJP no later than June 30,

---

[31] Letter from Alan R. Hanson to Mayor Jim Kenney, *supra* note 5.  Connecticut does not appear to have received such a letter, but the other nine jurisdictions in the OIG report did.  *See* https://goo.gl/r16Gmb (collecting letters from Alan R. Hanson dated April 21, 2017).

2017."  It provided that "[f]ailure to comply with this condition could result in the withholding

of grant funds, suspension, or termination of the grant, ineligibility for future OJP grants or

subgrants, or other action, as appropriate."

84.     On June 22, 2017, Philadelphia City Solicitor Sozi Pedro Tulante signed a formal

"certification" memorandum declaring that the City determined it is in compliance with Section

1373 and explaining why.[32]  The letter was addressed to Tracey Trautman, Acting Director of the

Bureau of Justice Assistance at the Department of Justice and submitted to DOJ that day.

85.     Philadelphia certified that, as a general matter, it does not collect immigration

status information from its residents.  Both Memorandum 01-06 and the Confidentiality Order

bar City officials and employees from asking residents or other persons within the City for such

information, subject to discrete exceptions.  Philadelphia certified that it neither restricts nor

prohibits its officials and employees from sharing immigration-status information with the

federal government in contravention of Section 1373, because as a result of the City's

aforementioned policies, the City is rarely in possession of that type of information.

86.     Philadelphia also certified that it complies with Section 1373 because its policies

allow for the sharing of immigration-status and other identifying information with federal

authorities in the case of criminals or persons suspected of crime.  Both the Confidentiality Order

and Memorandum 06-01 mandate the continued cooperation between local officers and federal

authorities in combating crime.  Further, those policies allow for the disclosure and

"transmi[ssion] . . . to federal authorities" of confidential information (*i.e.*, immigration status

information) by Philadelphia police officers when the individual is suspected of engaging in

---

[32] *See* Dkt. 1-14 (City's certification memorandum).

criminal activity.[33]  The Confidentiality Order and Memorandum 01-06 also contain "savings clauses," which permit inquiry into or disclosure of immigration status information if "required by law."

87.    Philadelphia also explained how its everyday law enforcement practices comply with Section 1373.  Specifically, Philadelphia's use of the FBI's National Crime Information Center ("NCIC") database, its sharing access with ICE to certain information in the City's Preliminary Arraignment System ("PARS") database, and its use of the Automated Fingerprint Identification System ("AFIS"), all enable federal immigration authorities to access identifying information about any persons stopped, detained, arrested, or convicted of a crime in the City.

88.    Philadelphia acknowledged that for witnesses of crimes, victims of crimes, and law-abiding persons seeking City services, its policies do mean that immigration status information, to the extent it inadvertently comes into the City's possession, is ordinarily not disclosed to the federal government.  But Philadelphia contended that Section 1373 cannot be construed to require the City to disclose confidential information about those persons because reading the statute in such a manner would raise constitutional problems.  Specifically, construing Section 1373 to impose that type of mandate on the City would undermine its core police powers under the U.S. Constitution and its critical interests in protecting the safety and welfare of its residents.

89.    Philadelphia reserved the right to challenge the Section 1373 certification requirement on several grounds in its June 22, 2017 submission.  Notably, it reserved the argument that the DOJ's insistence that localities certify compliance with Section 1373 as a

---

[33] *See* Dkt. 1-14, at 7 (citing Sections 2B and 2C of the Confidentiality Order and Parts 3B and 3C of Memorandum 06-01).

condition of receiving Byrne JAG grants is itself unlawful and beyond the authority that Congress delegated to the Attorney General.  It also argued that making JAG grants contingent on compliance with Section 1373 violates the Spending Clause.

90.     Days after receiving certifications from Philadelphia and other jurisdictions, the Department of Justice expressed non-specific concerns with those submissions.  It issued a press release saying that "some of these jurisdictions have boldly asserted that they will not comply with requests from federal immigration authorities," and that "[i]t is not enough to assert compliance, the jurisdictions must actually be in compliance."[34]

91.     On October 11, 2017, the Department of Justice notified Philadelphia that two aspects of Philadelphia's policies are "in violation of 8 U.S.C. § 1373(a)," and that an additional three aspects of its policies will also be found to violate Section 1373 unless the City sends "communicat[ions]  . . . to its officers and employees" (by October 27) to not follow the City's confidentiality and non-disclosure mandates as to federal officials.[35]  The Department maintains that this letter constitutes only a "preliminary" determination, leaving the City with no information as to what actions the Department considers a "final" determination.  Yet the Department asks the City to change its policies and purports to dictate the substance of what the City communicates to its employees.

**D.     July 2017 Announcement Regarding Advance Notification and Jail Access Conditions**

92.     On July 25, 2017, the Department of Justice announced two *more* significant changes that it would be unilaterally making—without authority—to the Byrne JAG application process.   In a two-paragraph press release and accompanying press "backgrounder," the

---

[34]  *See* Dkt. 1-2.
[35]  Dkt. 28-1 (Hanson Decl., Ex. A, pp. 1-2).

Department announced that in addition to requiring applicants for the FY 2017 Byrne JAG award to again certify their compliance with Section 1373, applicants would be required to adhere to two additional conditions.[36]   These conditions are (1) the "advance notification" condition and (2) the "jail access" condition.

93.     On August 24, 2017, the Department revised—and indeed expanded—what the "advance notification" condition and the "jail access" condition would entail.[37]

94.     Under the revised advance notification condition, the Department of Justice will now require Byrne JAG grantees to have in place a "local ordinance, -rule, -regulation, -policy, or -practice . . . that is designed to ensure that, when a local-government . . . correctional facility receives from DHS a formal written request . . . [for] advance notice of the scheduled release date and time for a particular alien in such facility, then such facility will honor such request and—as early as practicable . . . provide the requested notice to DHS."[38]

95.     The Department did not define the term "scheduled release date" as a part of the advance notification condition.  The Federal Bureau of Prisons defines "date of release" as the "date of the expiration of the prisoner's term of imprisonment, less any time credited toward the service of the prisoner's sentence . . . ."  18 U.S.C. § 3624.  Similarly, within the Philadelphia Department of Prisons, only inmates serving sentences would have "scheduled release dates." Accordingly, the advance notification condition appears to apply only to those inmates in Philadelphia's prisons who have been convicted of crimes and are serving sentences—not to the

---

[36] Press Release, U.S. Dep't of Justice, *Attorney General Sessions Announces Immigration Compliance Requirements for Edward Byrne Memorial Justice Assistance Grant Programs* (July 25, 2017), *available at* https://goo.gl/KBwVNP.
[37] *See City of Chicago v. Sessions* ("*Chicago*"), No. 1:17-cv-05720 (N.D. Ill. Aug. 24, 2017), ECF No. 32, Def.'s Opp. to Mot. for Prelim. Inj. at Ex. 1.
[38] *See, e.g.*, Dkt. 21-6 (County of Greenville Award Letter).

roughly 83% of inmates in PPS facilities who are in a pre-trial, pre-sentence, or other temporary

detention posture, many of whom may be ordered released with less than 48 hours' notice (i.e.,

because they post bond or the charges against them are dropped).  But this is far from clear.

96.     Under the revised jail access condition, the Department of Justice will now

require Byrne JAG grantees to have in place a "local ordinance, -rule, -regulation, -policy, or -

practice . . . that is designed to ensure that [any, not just DHS] agents of the United States . . . are

given access [to] a local-government . . . correctional facility" to meet with individuals believed

to be aliens and question them.[39]  Like the advance notification condition, the jail access

condition is vague and ambiguous; it gives no indication of what "access" means, and whether

jurisdictions will be deemed compliant as long as they permit ICE personnel to access their

facilities in order to meet with inmates who have in turn consented to such meetings.  By its

broadest construction, this requirement appears to mandate that federal immigration agents be

given unprecedented and unfettered access to local correctional or detention facilities, including

to meet with and to question inmates on a non-consensual basis and/or without notice of their

right to have counsel present.

97.     The application deadline for local FY 2017 Byrne JAG funding—the grant for

which cities, such as Philadelphia, apply—was September 5, 2017.[40]  The City timely filed its

application.

98.     The Department of Justice's July 25, 2017 announcement was accompanied by

virtually no explanation for the change in policy and no opportunity for public notice and

---

[39] *Id.*

[40] U.S. Dep't of Justice, Office of Justice Programs, *Edward Byrne Memorial Justice Assistance Grant Program: FY 2017 Local Solicitation* (Aug. 3, 2017), https://goo.gl/SfiKMM; *see also* Dkt. 1-16.

comment.  The Department of Justice's pronouncement on August 24, 2017 that it had revised its conditions was likewise unaccompanied by an explanation for the change and had no comment opportunity.  It noted only that it had already awarded two other jurisdictions and applied the same conditions.  The Department thus did not explain how it arrived at these conditions or what alternatives it considered.  The initial press release is also noticeably silent as to the purpose of the Byrne JAG program and the ways in which the newly-imposed conditions—or even complying with Section 1373—relate to, let alone serve to advance, the interests of the Byrne JAG program.  The Department also failed to provide law enforcement with any guidance as to how the conditions will operate in practice.

99.      As a result of the Department of Justice's actions, in order for Philadelphia to have applied for the FY 2017 Byrne JAG grant on September 5, 2017, the City must have (1) certified again its compliance with Section 1373, and confirmed that it was (2) prepared to adhere to the advance notification condition, and (3) prepared to comply with the jail access condition, despite the ambiguity about what each condition will entail.

100.      At the time of the City's application, the Department had not yet informed Philadelphia whether it had concluded Philadelphia was in violation of 8 U.S.C. § 1373.  No court has countenanced the Department's startlingly expansive reading of the Immigration and Nationality Act that it advanced in its October 11, 2017 letter.  Philadelphia submits that it complies with Section 1373, as constitutionally construed.

101.      Likewise, Philadelphia believes that its jail access policy may comply with the new jail access condition, because Philadelphia allows ICE agents to enter PPS facilities to meet with individuals who have consented to such meetings; and Philadelphia believes its detainer and notification policies do not meaningfully interfere with the Department of Justice's prerogatives,

because while Philadelphia does not provide advance notification of release without a judicial

warrant, it rarely if ever gets notification requests from ICE for inmates who have scheduled

release dates.  However, Philadelphia is left only to wonder whether the Department of Justice

will accept these contentions because the jail access and advance notification conditions are

inscrutably vague.

## III.   IMPACT OF THE NEW JAG CONDITIONS ON PHILADELPHIA

102.    None of the three new conditions imposed by the Department of Justice upon

applicants for FY 2017 Byrne JAG funding can withstand legal scrutiny.

103.    The authorizing statute creating the Byrne JAG grant program does not delegate

authority to the Attorney General to impose these conditions.  Rather, the authorizing statute

allows the Attorney General to insist that applicants "comply with all … applicable Federal

laws."  42 U.S.C. § 3752(a)(5)(D).  None of the three conditions constitutes "applicable" federal

requirements.  Each deals with civil immigration enforcement—something wholly *inapplicable*

to criminal justice grants.   And the last two conditions are not reflected in any existing federal

law whatsoever:  There is no federal law requiring local jurisdictions to provide ICE "at least 48

hours' advance notice" before they release alleged aliens in their custody, and there is no federal

law requiring jurisdictions to grant access to DHS officials to their detention facilities.

104.     In fact, Congress has considered—and failed to enact—legislation that would

have stripped federal funding from states and localities that do not provide ICE advance

notification of the release of persons for whom detainer requests have been sent.  *See, e.g*., Stop

Dangerous Sanctuary Cities Act §3(a)(2), S. 1300, 114th Cong. (rejected by Senate July 6, 2016)

(entities that do not "comply with a detainer for, or notify about the release of, an individual" in

response to requests made by ICE shall be ineligible for public works and economic

development grants and community development block grants).  The fact that Congress failed to pass bills of this type demonstrates that Congress considered and then chose not to link federal spending to advance notification.

105.    The Department of Justice's new conditions also represent a sharp break with past agency practice.   The agency has never before attached any conditions of this nature to Byrne JAG funds.

106.    The Department of Justice's imposition of the conditions violates several bedrock constitutional principles.  The Department's actions violate the Separation of Powers between Congress and the Executive.  They also exceed limits on the federal government's ability to place conditions on federal funds under the Spending Clause.  In particular, although conditions on federal funds must be germane to the purpose of the federal program, the Department's new conditions bear no relation to the purpose of the Byrne JAG program.  Moreover, the conditions are woefully ambiguous, leaving cities like Philadelphia guessing as to how to comply.  At its worst, this ambiguity threatens to induce unconstitutional action, as the conditions could potentially be construed to require localities to detain individuals of interest to ICE even after they have been ordered released.

107.    If the City is forced to comply with the Department's new conditions in order to receive its FY 2017 JAG award, and if those conditions are not construed in accordance with constitutional and reasonable limits, the result would be that Philadelphia would be forced to significantly change several of its policies.  In turn, such changes would compromise the City's criminal enforcement, public safety, and health and welfare.

108.    Philadelphia believes that it does already comply with Section 1373 when read in light of the U.S. Constitution.   But if Section 1373 is interpreted to extend to victims, witnesses,

and law-abiding persons in the City—and to require that Philadelphia allow for the unfettered disclosure to federal authorities of those persons' immigration status information—that would require Philadelphia to overhaul several of its policies, including Memorandum 01-06 and the Confidentiality Order.  The trust that Philadelphia has worked so hard to build with its immigrant population would be broken, and the City's efforts to prosecute crimes to completion, provide redress to victims, and ensure full access to City services, would be hindered.

109.    Philadelphia also believes that it may already comply with the jail access condition.   The Department of Justice did not define the term "access" or explicitly state that jurisdictions must permit entry to ICE even when an inmate refuses to speak with ICE; Philadelphia, meanwhile, allows for meetings to which inmates consent.  However, the condition as written is exceedingly vague, and in its most unreasonable light could be read to insist that jurisdictions provide federal agents unrestrained entry to their detention facilities.  Requiring Philadelphia to apply for the FY 2017 grant amidst this uncertainty is harmful in itself, and if the Department takes an extreme reading, it could result in forcing Philadelphia to sacrifice an important local prerogative.  Philadelphia should not be compelled to abandon its efforts to protect the constitutional rights of its inmates, nor to take actions that will sow the very fear and mistrust among the immigrant population that the City has worked so hard to overcome.

110.    Philadelphia further believes that its notification and detainer policies do not meaningfully conflict with the Department of Justice's policy concerns that underlie the advance notification condition.   Although Philadelphia only provides advance notification of an inmate's release when ICE presents a judicial warrant, ICE rarely sends advance notification requests for inmates who have scheduled release dates.  Given the ambiguity and lack of explanation for the

condition, however, Philadelphia cannot be sure that the Department will accept the City's position.

111.    If the City's application for the FY 2017 Byrne JAG award is rejected or withheld, or if its award is clawed back, either because the Department of Justice rejects the City's Section 1373 certification, or because the Department insists on certain activities pursuant to the advance notification and jail access conditions and the City refuses to comply, the vitality of Philadelphia's criminal justice programs would be placed in jeopardy.

112.    As a result of the injuries Philadelphia will suffer in all of the above circumstances, Philadelphia faces a significant danger of harm due to the Department of Justice's imposition of the new conditions for the FY 2017 grant.

## CAUSES OF ACTION

### COUNT I
### (Violation of the Administrative Procedure Act through *Ultra Vires* Conduct Not Authorized by Congress in the Underlying Statute)

113.    Plaintiff incorporates by reference the allegations in the preceding paragraphs.

114.    The Department of Justice may only exercise authority conferred by statute.  *See City of Arlington v. FCC*, 133 S. Ct. 1863, 1869 (2013).

115.    The Byrne JAG statute provides no authority to the Attorney General to impose conditions on the receipt of Byrne JAG funds that are neither reflected in "applicable Federal laws" nor concern the administration of the JAG program itself.

116.    The three conditions added to the FY 2017 grant by the Department of Justice are neither "applicable Federal laws" nor conditions that deal with the administration and spending of the Byrne JAG funds.

117.     The Attorney General's imposition of the new conditions is unauthorized by statute.

118.     The Attorney General's imposition of the new conditions also contradicts the formula-grant structure of the Byrne JAG program.  *See* 42 U.S.C. § 3755(d)(2)(A).

119.     The APA requires courts to hold unlawful and set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; or "in excess of statutory jurisdictions, authority, or limitations[.]"  5 U.S.C. § 706(2)(A)-(C).  The Act further demands courts to "compel agency action [that is] unlawfully withheld or unreasonably delayed."  *Id*. § 706(1).

120.     Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that the Attorney General is without the statutory authority to impose the Section 1373, advance notification, and jail access conditions on FY 2017 Byrne JAG funds, and in doing so, has acted contrary to law under the APA.  Plaintiff is also entitled to a permanent injunction preventing the Attorney General from putting those conditions into effect.

121.     Pursuant to 28 U.S.C. § 1361 and 5 U.S.C. § 706(1), Plaintiff is further entitled to a writ of mandamus to compel the Attorney General to disburse Philadelphia's FY 2017 Byrne JAG award as the Attorney General is unreasonably delaying its issuance and doing so for reasons that are contrary to law

**COUNT II**
**(Violation of the Administrative Procedure Act through Violation of the Constitution's Separation-of-Powers)**

122.     Plaintiff incorporates by reference the allegations of the preceding paragraphs.

123.    The Constitution vests Congress, not the President or officials in the Executive

Branch, with the power to appropriate funding to "provide for the . . . general Welfare of the

United States."  U.S. Const. art I, § 8, cl. 1.

124.     The President's constitutional duty—and that of his appointees in the Executive

Branch—is to "take Care that the Law be faithfully executed."  U.S. Const. art. II, § 3, cl. 5.

125.    The President "does not have unilateral authority to refuse to spend . . . funds"

that have already been appropriate by Congress "for a particular project or program."  *In re*

*Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013); *see also Train v. City of New York*, 420

U.S. 35, 44 (1975).

126.    The President also cannot amend or cancel appropriations that Congress has duly

enacted because doing such violates the Presentment Clause of the Constitution and results in the

President purporting to wield a constitutional power not vested within his office.  *See Clinton v.*

*City of New York*, 524 U.S. 417, 438 (1998).

127.    Imposing a new condition on a federal grant program amounts to refusing to

spend money appropriated by Congress unless that condition is satisfied.

128.    The Section 1373 condition was not imposed by Congress, but rather by the

Department of Justice in issuing its Office of Justice Program Guidance for FY 2016 Byrne JAG

awards and its FY 2017 Byrne JAG application. Therefore, the Section 1373 condition amounts

to an improper usurpation of Congress's spending power by the Executive Branch.

129.    The advance notification and jail access conditions were not imposed by

Congress, but rather by the Department in issuing the FY 2017 Byrne JAG application.

Therefore, the imposition of the advance notification and jail access conditions amounts to an

improper usurpation of Congress's spending power by the Executive Branch.

130.     Pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that the Attorney General's imposition of the Section 1373, advance notification, and jail access conditions violates the constitutional principle of separation of powers and impermissibly arrogates to the Executive Branch power that which is reserved for the Legislative Branch. Plaintiff is also entitled to a permanent injunction preventing the Attorney General from putting those conditions into effect.

131.     Pursuant to 28 U.S.C. § 1361 and 5 U.S.C. § 706(1), Plaintiff is further entitled to a writ of mandamus to compel the Attorney General to disburse Philadelphia's FY 2017 Byrne JAG award as the Attorney General is unreasonably delaying its issuance and doing so for reasons that are contrary to law.

## COUNT III
### (Violation of the Administrative Procedure Act through Arbitrary and Capricious Agency Action)

132.     Plaintiff incorporates by reference the allegations of the preceding paragraphs.

133.     The Department of Justice's decision to impose the Section 1373, advance notification, and jail access conditions on the receipt of FY 2017 Byrne JAG funds deviates from past agency practice without reasoned explanation or justification.

134.     Pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that the Attorney General's imposition of the Section 1373, advance notification, and jail access conditions is arbitrary and capricious.   Plaintiff is also entitled to a permanent injunction preventing the Attorney General from putting those conditions into effect.

135.     Pursuant to 28 U.S.C. § 1361 and 5 U.S.C. § 706(1), Plaintiff is further entitled to a writ of mandamus to compel the Attorney General to disburse Philadelphia's FY 2017 Byrne

JAG award as the Attorney General is unreasonably delaying its issuance and doing so for reasons that are contrary to law.

### COUNT IV
### (Spending Clause)

136.   Plaintiff incorporates by reference the allegations of the preceding paragraphs.

137.   Congress could not have authorized the immigration-related conditions attached the Byrne JAG award here because they do not satisfy the requirements of the Spending Clause of the Constitution.

138.   None of the three conditions is "reasonably related" or "germane[]" to the federal interest that underlies the Byrne JAG grant program.  *See South Dakota v. Dole*, 483 U.S. 203, 207-08 & n.3 (1987) (conditions must be "reasonably related," or "germane[]," to the particular program); *see also New York v. United States*, 505 U.S. 144, 167 (1992) (the attached "conditions must . . . bear some relationship to the purpose of the federal spending").  The three conditions all deal with federal civil immigration enforcement, not localities' enforcement of state or local criminal law.

139.   The three conditions threaten the federal interest that underlies the Byrne JAG program.  They undermine Congress's goals of dispersing funds across the country, targeting funds to combat violent crime, and respecting local judgment in setting law enforcement strategy.

140.   The Department's imposition of the conditions also violates the requirement that Spending Clause legislation "impose unambiguous conditions on states, so they can exercise choices knowingly and with awareness of the consequences."  *Koslow v. Commonwealth of Pennsylvania*, 302 F.3d 161, 175 (3d Cir. 2002).

141.    Moreover, because the conditions are ambiguous, they arguably require cities to infringe on individuals' Fourth and Fifth Amendment rights, violating the prohibition on Spending Clause conditions that "induce unconstitutional action."  *Koslow*, 302 F.3d at 175.

142.    Pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that the imposition of the three immigration-related conditions for the FY 2017 Byrne JAG violates the Constitution's Spending Clause as well as an injunction preventing those conditions from going into effect.

143.    Pursuant to 28 U.S.C. § 1361 and 5 U.S.C. § 706(1), Plaintiff is further entitled to a writ of mandamus to compel the Attorney General to disburse Philadelphia's FY 2017 Byrne JAG award as the Attorney General is unreasonably delaying its issuance and doing so for reasons that are contrary to law.

## COUNT V
### (Tenth Amendment: Commandeering)

144.    Plaintiff incorporates by reference the allegations of the preceding paragraphs.

145.    The Tenth Amendment prohibits the federal government from "requir[ing]" states and localities "to govern according to Congress's instructions," *New York*, 505 U.S. at 162, and from "command[ing] the States' officers . . . to administer or enforce a federal regulatory program," *Printz v. United States*, 521 U.S. 898, 935 (1997).

146.    Where the "whole object" of a provision of a federal statute is to "direct the functioning" of state and local governments, that provision is unconstitutional, *Printz*, 521 U.S. at 932, and must be enjoined, *id*. at 935; *New York*, 505 U.S. at 186-187. That description precisely fits each of the three immigration-related conditions.

147.    If Section 1373 is interpreted to extend to information sharing about witnesses, victims, and law-abiding persons in the City,  and to require that Philadelphia provide federal

48

authorities unfettered access to immigration status information about such persons, that would hamper Philadelphia's ability to ensure law and order.  As a result, Philadelphia's personnel would be "commandeered" to perform federal functions rather than to pursue local priorities, in violation of the Tenth Amendment.

148.    The advance notification and jail access conditions, in their most extreme and unreasonable lights, could be construed to require that Philadelphia change its policies concerning the administration of its detention facilities and the providing of advance notification of release to ICE only pursuant to a judicial warrant.  That federalization of bedrock local police power functions would violate the Tenth Amendment's anti-commandeering principle.

149.    Pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that if Section 1373 or the other two grant conditions are construed by the Department to conflict with Philadelphia's local policies, that would result in a violation of the Tenth Amendment.  Plaintiff is entitled to a permanent injunction preventing the Department from taking such an interpretation.

150.    Pursuant to 28 U.S.C. § 1361 and 5 U.S.C. § 706(1), Plaintiff is further entitled to a writ of mandamus to compel the Attorney General to disburse Philadelphia's FY 2017 Byrne JAG award as the Attorney General is unreasonably delaying its issuance and doing so for reasons that are contrary to law.

## COUNT VI
### (Declaratory Judgment Act: Philadelphia Complies with 8 U.S.C. § 1373)

151.    Plaintiff incorporates by reference the allegations of the preceding paragraphs.

152.    Philadelphia certified its compliance with Section 1373 to the Department of Justice in a June 22, 2017 legal opinion signed by the City's Solicitor and describing the basis for the City's certification.

153.     Philadelphia complies with Section 1373 to the extent it can be constitutionally enforced vis-a-vis the City.

154.     Philadelphia's policies, namely Memorandum 01-06 and the Confidentiality Order, direct City officials and employees not to collect immigration status information unless such collection is required by state or federal law.  Because Philadelphia cannot restrict the sharing of information it does not collect, the City's policy of non-collection renders it necessarily compliant with Section 1373 for all cases covered by the non-collection policy.

155.     Where City officials or agents do incidentally come to possess immigration status information, the City has no policy prohibiting or restricting the sharing of such information contrary to Section 1373.  Both Memorandum 06-01 and the Confidentiality Order contains "saving clauses" that limits the disclosure of an individual's citizenship or immigration status information "unless such disclosure is required by law."   Both policies also direct City police officers to cooperate with federal authorities in the enforcement of the criminal law, and to provide identifying information to federal authorities, when requested, about criminals or criminal suspects within the City.

156.     Any non-disclosure about immigration status information that the City's policies directs in the case of witnesses of crimes, victims of crimes, and law-abiding individuals seeking City services, is consistent with Section 1373 when read in light of the Constitution.

157.     Pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that it complies with Section 1373 as properly construed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays this Court:

a.    Declare that all three immigration-related conditions for the FY 2017 Byrne JAG
are unlawful;

b.    Declare that Philadelphia complies with 8 U.S.C. § 1373 as properly construed;

c.    Permanently enjoin the Department of Justice from enforcing the advance
notification, jail access, or Section 1373 conditions for the FY 2017 Byrne JAG
and retain jurisdiction to monitor the Department's compliance with this Court's
judgment;

d.    Issue a writ of mandamus compelling the Attorney General to immediately
disburse Philadelphia's FY 2017 JAG award, without further delay;

e.    Grant such other relief as this Court may deem proper; and

f.    Award Philadelphia reasonable costs and attorneys' fees.


DATED: January 5, 2018                          Respectfully submitted,

                                                 /s/ Virginia A. Gibson
                                                _____
SOZI PEDRO TULANTE, I.D. NO. 202579             VIRGINIA A. GIBSON, I.D. NO. 32520
  City Solicitor                                SARA ARONCHICK SOLOW, I.D. NO. 311081
MARCEL S. PRATT, I.D. NO. 307483                JASMEET K. AHUJA, I.D. NO. 322093
  Chair, Litigation Group                       ALEXANDER B. BOWERMAN, I.D. NO. 321990
LEWIS ROSMAN, I.D. NO. 72033                    HOGAN LOVELLS US LLP
  Senior Attorney                               1735 Market Street, 23rd Floor
CITY OF PHILADELPHIA LAW DEPARTMENT             Philadelphia, PA 19103
1515 Arch Street, 17th Floor                    (267) 675-4600
Philadelphia, PA 19102                          virginia.gibson@hoganlovells.com

ROBERT C. HEIM, I.D. NO. 15758                  NEAL K. KATYAL (*pro hac vice*)
JUDY L. LEONE, I.D. NO. 041165                  DANIEL J.T. SCHUKER (*pro hac vice*)
FRIEDRICH-WILHELM W. SACHSE, I.D. NO. 84097     HOGAN LOVELLS US LLP
DECHERT LLP                                     555 Thirteenth Street, NW
Cira Centre                                     Washington, DC 20004

2929 Arch Street
Philadelphia, PA 19104
(215) 994-4000

*Attorneys for the City of Philadelphia*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 5, 2018, the foregoing document was served on all counsel by electronic mail.

January 5, 2018

/s/ Virginia A. Gibson
VIRGINIA A. GIBSON, I.D. NO. 32520
HOGAN LOVELLS US LLP
1735 Market Street, 23rd Floor
Philadelphia, PA 19103
(267) 675-4600
virginia.gibson@hoganlovells.com