## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**THE CITY OF PHILADELPHIA,**

*Plaintiff*,

v.

**JEFF SESSIONS, in his official capacity as Attorney General of the United States,**

*Defendant*.

**Case No. 2:17-cv-03894-MMB**

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

DATED:  February 2, 2018

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

LOUIS D. LAPPEN
Acting United States Attorney

JOHN R. TYLER
Assistant Director

ARJUN GARG
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave, NW
Washington, DC 20530
Phone: (202) 305-8613
Fax: (202) 616-8470
E-Mail: arjun.garg@usdoj.gov

*Counsel for Defendant*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................ 1

BACKGROUND ....................................................................................................... 2

    A.  The Immigration and Nationality Act ....................................................2

    B.  The Office of Justice Programs and the Byrne JAG Program...................4

    C.  Conditions on Byrne JAG Awards ........................................................5

    D.  Additional Conditions for FY 2017 Byrne JAG Awards .........................7

    E.  The City's Amended Complaint...............................................................8

LEGAL STANDARD................................................................................................ 8

ARGUMENT ............................................................................................................ 9

    I.  The City Does Not Challenge Final Agency Action That Is Judicially
        Reviewable................................................................................................ 9

    II.  The City's Ultra Vires and Separation of Powers Claims Fail Because the
         Challenged Conditions Are Authorized by Statute......................................... 10

    III. The Challenged Conditions Are Not Arbitrary or Capricious. ..................... 15

    IV. The Challenged Conditions Are Consistent with the Spending Clause......................... 18

    V.  The Challenged Conditions Do Not Commandeer the City. ........................................ 24

    VI. The Court Should Decline the City's Request for a Declaration That the
         City Complies with 8 U.S.C. § 1373. ..................................................... 26

CONCLUSION........................................................................................................ 31

## TABLE OF AUTHORITIES

**CASES**                                                  **PAGE(S)**

*A.W. v. Jersey City Pub. Sch.,*
341 F.3d 234 (3d Cir. 2003) .................................................................. 18

*Abbott Labs. v. Gardner,*
387 U.S. 136 (1967) ............................................................................... 26

*Allen v. DeBello,*
861 F.3d 433 (3d Cir. 2017) .................................................................. 28

*Ameron, Inc. v. U.S. Army Corps of Eng'rs,*
809 F.2d 979 (3d Cir. 1986) .................................................................. 11

*Arizona v. United States,*
567 U.S. 387 (2012) ....................................................................... *passim*

*Ballentine v. United States,*
486 F.3d 806 (3d Cir. 2007) .................................................................... 8

*Barbour v. Wash. Metro. Area Transit Auth.,*
374 F.3d 1161 (D.C. Cir. 2004) ............................................................. 18

*Bennett Enters., Inc. v. Domino's Pizza, Inc.,*
45 F.3d 493 (D.C. Cir. 1995) ................................................................. 14

*Bennett v. Spear,*
520 U.S. 154 (1997) ................................................................................. 9

*Benning v. Georgia,*
391 F.3d 1299 (11th Cir. 2004) ............................................................. 23

*Charles v. Verhagen,*
348 F.3d 601 (7th Cir. 2003) ................................................................. 23

*City of New York v. United States,*
179 F.3d 29 (2d Cir. 1999) .................................................................... 25

*Clinton v. City of New York,*
524 U.S. 417 (1998) ............................................................................... 11

*Dean v. United States,*
556 U.S. 568 (2009) ............................................................................... 29

*Del. Riverkeeper v. Simpson*,
    2008 WL 755947 (E.D. Pa. Mar. 17, 2008) ........................................................... 10

*Dep't of Treasury v. Fed. Labor Relations Auth.*,
    494 U.S. 922 (1990) ........................................................................................... 14

*Diamond v. Chakrabarty*,
    447 U.S. 303 (1980) ........................................................................................... 22

*DKT Mem'l Fund Ltd. v. AID*,
    887 F.2d 275 (D.C. Cir. 1989) ............................................................................ 11

*Duvall v. Att'y Gen. of U.S.*,
    436 F.3d 382 (3d Cir. 2006) ............................................................................... 19

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ............................................................................... 15, 16, 17

*Freilich v. Bd. of Directors of Upper Chesapeake Health, Inc.*,
    142 F. Supp. 2d 679 (D. Md. 2001) ................................................................... 25

*Freilich v. Upper Chesapeake Health, Inc.*,
    313 F.3d 205 (4th Cir. 2002) ............................................................................. 26

*FTC v. Standard Oil Co. of Cal.*,
    449 U.S. 232 (1980) ......................................................................................... 9, 10

*Geisinger Cmty. Med. Ctr. v. Sec'y U.S. Dep't of Health & Human Servs.*,
    794 F.3d 383 (3d Cir. 2015) ............................................................................... 22

*Gregory v. Ashcroft*,
    501 U.S. 452 (1991) ........................................................................................... 25

*Harris Cty. Tex. v. MERSCORP Inc.*,
    791 F.3d 545 (5th Cir. 2015) ............................................................................. 28

*Jones v. Hobbs*,
    745 F. Supp. 2d 886 (E.D. Ark. 2010) ............................................................. 28

*Knick v. Twp. of Scott*,
    862 F.3d 310 (3d Cir. 2017) ............................................................................... 25

*Koslow v. Pennsylvania*,
    302 F.3d 161 (3d Cir. 2002) ............................................................................... 18

*LeBoon v. Zurich Am. Ins. Co.*,
 673 F. App'x 173 (3d Cir. 2016) ........................................................ 8, 9

*Levy-Tatum v. Navient Sols., Inc.*,
 183 F. Supp. 3d 701 (E.D. Pa. 2016) ...................................................... 28

*Mayweathers v. Newland*,
 314 F.3d 1062 (9th Cir. 2002) ............................................................. 18

*Naik v. Dir. U.S. Citizenship & Immigration Servs. Vt.*,
 575 F. App'x 88 (3d Cir. 2014) ........................................................ 9, 10

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
 567 U.S. 519 (2012) .......................................................................... 24

*New York v. United States*,
 505 U.S. 144 (1992) .......................................................................... 18

*Norton v. S. Utah Wilderness, All.*,
 542 U.S. 55 (2004) ............................................................................ 10

*Ocean Cty. Landfill Corp. v. U.S. E.P.A., Region II*,
 631 F.3d 652 (3d Cir. 2011) ................................................................. 9

*Padilla v. Kentucky*,
 559 U.S. 356 (2010) .......................................................................... 19

*Printz v. United States*,
 521 U.S. 898 (1997) .......................................................................... 25

*Rattlesnake Coal. v. EPA*,
 509 F.3d 1095 (9th Cir. 2007) ............................................................. 10

*Real Alternatives, Inc. v. Sec'y Dep't of Health & Human Servs.*,
 867 F.3d 338 (3d Cir. 2017) ................................................................ 15

*Reno v. Condon*,
 528 U.S. 141 (2000) .......................................................................... 25

*South Dakota v. Dole*,
 483 U.S. 203 (1987) ...................................................... 18, 21, 23, 24

*Stone v. INS*,
 514 U.S. 386 (1995) .......................................................................... 13

*Texas v. United States*,
   523 U.S. 296 (1998) ................................................................................... 27

*U.S. Dep't of Health & Human Servs. v. Fed. Labor Relations Auth.*,
   844 F.2d 1087 (4th Cir. 1988) .................................................................... 14

*United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd.*,
   484 U.S. 365 (1988) ................................................................................... 30

*United States v. Odneal*,
   565 F.2d 598 (9th Cir. 1977)....................................................................... 14

*Wyatt, Virgin Islands, Inc. v. Gov't of the Virgin Islands*,
   385 F.3d 801 (3d Cir. 2004) ....................................................................... 26

## STATUTES

5 U.S.C. § 702 ..................................................................................................... 9

5 U.S.C. § 704 ..................................................................................................... 9

8 U.S.C. § 1101 .................................................................................................... 2

8 U.S.C. § 1226 ................................................................................... 17, 20, 30

8 U.S.C. § 1227 ..................................................................................... 3, 17, 19

8 U.S.C. § 1228 .................................................................................................... 3

8 U.S.C. § 1231 ............................................................................................. 4, 20

8 U.S.C. § 1252c ........................................................................................... 3, 20

8 U.S.C. § 1324 ........................................................................................... 3, 20

8 U.S.C. § 1357 .............................................................................. 3, 17, 19, 29

8 U.S.C. § 1373 .......................................................................................... *passim*

18 U.S.C. § 1913 ............................................................................................... 23

28 U.S.C. § 530C .............................................................................................. 11

31 U.S.C. § 1352 ............................................................................................... 23

34 U.S.C. § 10101 ....................................................................................... 4, 11

34 U.S.C. § 10102 ........................................................................................... *passim*

34 U.S.C. § 10110 ................................................................................................... 11

34 U.S.C. §§ 10151-58 ............................................................................................. 4

34 U.S.C. § 10152 ........................................................................................... 4, 5, 19

34 U.S.C. § 10153 ........................................................................................... *passim*

34 U.S.C. § 10154 ......................................................................................... 5, 9, 27

34 U.S.C. § 10156 ..................................................................................................... 5

34 U.S.C. § 10202 ..................................................................................................... 6

34 U.S.C. § 10251 ............................................................................................... 4, 19

34 U.S.C. § 10444 ................................................................................................... 12

41 U.S.C. § 4712 ..................................................................................................... 23

Consolidated Appropriations Act, 2017,
    Pub. L. No. 115-31, 131 Stat. 135 ............................................................... 5

Joint Resolution Making Continuing Appropriations for FY 1985,
    Pub. L. No. 98-473, 98 Stat. 1837 (1984) ................................................ 12

Omnibus Crime Control and Safe Streets Act of 1968,
    Pub. L. No. 90-351, 82 Stat. 197 ................................................................ 4

Violence Against Women and DOJ Reauthorization Act of 2005,
    Pub. L. No. 109-162, 119 Stat. 2960 (2006) ............................................ 12

**RULES**

Fed. R. Civ. P. 12 ..................................................................................................... 8

**LEGISLATIVE MATERIALS**

H.R. Rep. No. 104-469 (1996) ............................................................................... 30

H.R. Rep. No. 109-233 (2005) ............................................................................... 12

**OTHER AUTHORITIES**

4 Summ. Pa. Jur. 2d Criminal Law (2d ed.) .................................................................. 31

5 Summ. Pa. Jur. 2d Criminal Law (2d ed.) .................................................................. 31

5A Summ. Pa. Jur. 2d Criminal Law (2d ed.) ............................................................... 31

5B Summ. Pa. Jur. 2d Criminal Law (2d ed.) ............................................................... 31

28 C.F.R. pt. 18 .............................................................................................................. 27

37 Pa. Code § 95.222 ..................................................................................................... 29

Federal Support for Local Law Enforcement Equipment Acquisition,
    Exec. Order No. 13,688, 80 Fed. Reg. 3451 (Jan. 16, 2015) ..................................... 6

## INTRODUCTION

The City of Philadelphia has adopted local policies of non-cooperation that frustrate information-sharing between the City and the federal government regarding the City's inmate population. In this suit, the City now seeks moreover to block the U.S. Department of Justice even from promoting information-sharing as a condition of participation in a federally-funded law enforcement grant program administered by the Department.

The Department notified applicants that Fiscal Year ("FY") 2017 awards under the Edward Byrne Memorial Justice Assistance Grant Program ("Byrne JAG Program") will include three conditions requiring modest cooperation with federal law enforcement prerogatives in the immigration setting. Those conditions will require grantees to (1) have a policy of providing the U.S. Department of Homeland Security ("DHS") with advance notice of the scheduled release date of certain individuals held in state or local correctional facilities (the "notice condition"); (2) have a policy permitting federal agents to access state or local correctional facilities for certain immigration enforcement purposes (the "access condition"); and (3) comply with a federal statute, 8 U.S.C. § 1373, that prohibits state and local government and law enforcement entities or officials from restricting certain communications with DHS (the "compliance condition"). *See, e.g.*, Byrne JAG Program Grant Award for County of Greenville, SC ("2017 Greenville Award") (Dkt. No. 21-6) ¶¶ 53, 55, 56 (cited in Am. Compl. ¶ 6 n.2).

The call for intergovernmental law enforcement cooperation embodied in these three conditions follows from recognition that "[c]onsultation between federal and state officials is an important feature of the immigration system." *Arizona v. United States*, 567 U.S. 387, 411 (2012). And the conditions are consonant with the Byrne JAG Program's purposes of ensuring that grantees "report such data . . . and information (programmatic and financial) as the Attorney General may reasonably require" and undertake "appropriate coordination with affected agencies."

34 U.S.C. § 10153(a)(4), (5).  The City's suit nevertheless attacks the prospective imposition of these conditions, and seeks a declaration that the City complies with Section 1373.

The Amended Complaint warrants dismissal in its entirety. The City's claims fail on the threshold ground that they prematurely seek to preempt the Department's administrative processes. On their merits, the City's claims fail because they contravene clear statutory language authorizing the Department to condition Byrne JAG funding; ignore the close relationship between the grant conditions, federal law enforcement prerogatives, and the purposes of the Byrne JAG Program; and otherwise suffer from various legal defects.   At bottom, the City cannot sustain its counterintuitive theory that Byrne JAG applicants can insist on their entitlement to a federal law enforcement grant even as they refuse to provide basic cooperation in immigration enforcement, which the Department has identified as a federal priority and which plainly intersects with criminal justice under the framework of the Immigration and Nationality Act.  For all of these reasons, and as further explained below, dismissal is appropriate.

## **BACKGROUND**

### A.     **The Immigration and Nationality Act**

Enforcement of the immigration laws, including and especially the investigation and apprehension of criminal aliens, is quintessentially a law enforcement function.   Through the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, Congress granted the Executive Branch significant authority to control the entry, movement, and other conduct of foreign nationals in the United States.   These responsibilities are assigned to law enforcement agencies, as the INA authorizes the Department of Homeland Security, the Department of Justice, and other Executive Branch agencies to administer and enforce the immigration laws.   The INA permits the Executive Branch to exercise considerable discretion to direct enforcement pursuant to federal policy objectives.  *See Arizona*, 567 U.S. at 396.

The INA includes several provisions that protect the ability of federal officials to investigate the status of non-citizens in the United States and otherwise enforce the immigration laws.  For example, the statute provides that a federal immigration officer "shall have power without warrant . . . to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States."  8 U.S.C. § 1357(a)(1).  Separately, pursuant to 8 U.S.C. § 1373, "a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual."  *Id.* § 1373(a).[1]  The INA provides that certain classes of non-citizens, including certain criminal aliens, shall be removed from the United States upon the order of the Attorney General or the Secretary of Homeland Security.  *See, e.g.*, *id.* §§ 1227(a), 1228.

The INA also establishes immigration enforcement as a cooperative endeavor among federal, state, and local law enforcement agencies.  *See, e.g.*, *id.* § 1357(g) (providing that DHS may enter into formal cooperative agreements with states and localities under which appropriately trained and qualified state and local officers may perform specified functions of a federal immigration officer in relation to the investigation, apprehension, or detention of aliens); *id.* § 1324(c) (authorizing state and local law enforcement officers to make arrests for violations of the INA's prohibition against smuggling, transporting, or harboring aliens); *id.* § 1252c (authorizing state and local officers to arrest certain felons who have unlawfully returned to the United States);

---

[1]     Additionally, 8 U.S.C. § 1373(b) provides that "[n]otwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual: (1) Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service. (2) Maintaining such information. (3) Exchanging such information with any other Federal, State, or local government entity."

*id*. § 1231(i) (establishing State Criminal Alien Assistance Program, under which the federal government compensates states and localities for their incarceration of certain criminal aliens).

### B.      The Office of Justice Programs and the Byrne JAG Program

Title I of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, established the Office of Justice Programs ("OJP") within the Department of Justice, and provides for OJP to be headed by an Assistant Attorney General ("AAG").  *See* Pub. L. No. 90-351, 82 Stat. 197 (codified as amended at 34 U.S.C. § 10101 *et seq.*).  Congress provided the AAG certain "[s]pecific, general and delegated powers," including the power to "publish and disseminate information on the conditions and progress of the criminal justice systems" and "maintain liaison with the executive and judicial branches of the Federal and State governments in matters relating to criminal justice." *Id.* § 10102(a)(1), (2).  Notably, the AAG shall also "exercise such other powers and functions as may be vested in [him] pursuant to this chapter or by delegation of the Attorney General, *including placing special conditions on all grants, and determining priority purposes for formula grants.*"  *Id.* § 10102(a)(6) (emphasis added).

The same title of the Omnibus Crime Control Act also established the Byrne JAG Program. *See generally* 34 U.S.C. §§ 10151-58.  Under this program, OJP is authorized to "make grants to States and units of local government . . . to provide additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for criminal justice, including for any one or more of [certain enumerated] programs.  *Id.* § 10152(a)(1).  In the same chapter, the Omnibus Crime Control Act defines "criminal justice" broadly to include various activities of police, courts, correctional authorities, and "related agencies." *Id.* § 10251(a)(1).

To request funds under the Byrne JAG Program, applicants must "submit an application to the Attorney General . . . in such form as the Attorney General may require." *Id.* § 10153(a). Congress provided that these applications must include, among other things, an "assurance that,

for each fiscal year covered by an application, the applicant shall maintain and report such *data, records, and information (programmatic and financial) as the Attorney General may reasonably require*”; “[a] certification, made in a form *acceptable to the Attorney General*, . . . that . . . there has been *appropriate coordination with affected agencies*;” and “[a] certification, made in a form acceptable to the Attorney General, . . . that . . . the applicant will comply with all provisions of this part and *all other applicable Federal laws*.” *Id*. § 10153(a)(4), (5) (emphasis added).  Before issuing a final disapproval of an application under the Byrne JAG Program, the Attorney General must “first afford[] the applicant reasonable notice of any deficiencies in the application and opportunity for correction and reconsideration.” *Id.* § 10154.

The Byrne JAG Program is a formula grant that, when awarded, must follow a statutory formula based on population, the rate of violent crime, and other factors.  *Id*. §§ 10152(a)(1), 10156.  Funding under the Byrne JAG Program is subject to annual appropriations.  For FY 2017, Congress appropriated $396,000,000 for the Byrne JAG Program, with certain carve-outs from that amount obligated to specific initiatives.  *See* Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, Div. B, Title II, 131 Stat. 135, 203.

### C.    Conditions on Byrne JAG Awards

OJP has historically included a variety of conditions in Byrne JAG award documents.  For example, OJP has imposed a condition that requires complying with certain guidelines and recommendations enumerated by the Department to “promote information sharing and enable interoperability among disparate systems across the justice and public safety community.”  Byrne JAG Program Grant Award for City of Philadelphia, PA (“2016 Philadelphia Award”) (Dkt. No. 1-9) ¶ 26.  Multiple conditions have also imposed training mandates: certain training must be completed for law enforcement task forces, *see id*. ¶ 32; a grantee must agree to participate, upon request, in various training events, technical assistance events, or conferences, *see id*. ¶ 33; and

quarterly data must be submitted regarding certain kinds of training that law enforcement officers have received, *see id.* ¶ 43.   Other special conditions historically imposed on Byrne JAG awards have been inspired by Executive Branch prerogatives, and in some instances resulted in *subsequent* congressional codification.   One such condition, which prohibits use of Byrne JAG funds to purchase military-style equipment, relates in part to an Executive Order issued by President Obama in 2015.  *See id.* ¶ 49; Exec. Order No. 13,688, 80 Fed. Reg. 3451 (Jan. 16, 2015).   Since 2012, other conditions have required that recipients (a) comply with specific national standards when purchasing body armor, and (b) institute a "mandatory wear" policy for any purchased armor.  *See* 2016 Philadelphia Award ¶¶ 38-39.   While those conditions have now been codified by Congress, *see* 34 U.S.C. §§ 10202(c)(1)(B), (C), they originated as exercises of the authority to impose special conditions.   And the Assistant Attorney General has imposed an "American-made" requirement for body armor purchases, something Congress did not choose to codify last year.  *See* 2016 Philadelphia Award ¶ 38.   The conditions attached to Byrne JAG awards have varied over time, depending on national law enforcement necessities and Department of Justice priorities.

In FY 2016, OJP included for the first time an explicit recognition that Section 1373 was an applicable federal law under the Byrne JAG Program.  *Id.* ¶ 53.   That recognition followed a memorandum issued by the Department's Inspector General on May 31, 2016, expressing concern that several state and local governments receiving federal grants may not be complying with Section 1373.  *See* Mem. from Michael E. Horowitz, Inspector Gen., to Karol V. Mason, Assistant Att'y Gen., Office of Justice Programs, *Department of Justice Referral of Allegations of Potential Violations of 8 U.S.C. § 1373 by Grant Recipients* ("OIG Report") (Dkt. No. 1-10).

OJP is in the midst of a review as to a number of jurisdictions for compliance with Section 1373.   Most recently, OJP issued document requests to various Byrne JAG grantees.  *See* DOJ

Press Release No. 18-81.[2]  (OJP did not send such a request to the City of Philadelphia because of this Court's injunction.)  OJP has not at this time made a final determination that any jurisdiction does not comply with Section 1373.

### D.    Additional Conditions for FY 2017 Byrne JAG Awards

For the current Byrne JAG grant cycle, FY 2017, OJP notified applicants that awards under the Program will include three conditions requiring modest cooperation with federal law enforcement prerogatives in the immigration setting.  Those conditions will require grantees to (1) have a policy of providing DHS with advance notice of the scheduled release date of certain individuals held in state or local correctional facilities (the "notice condition"); (2) have a policy permitting federal agents to access state or local correctional facilities for certain immigration enforcement purposes (the "access condition"); and (3) comply with 8 U.S.C. § 1373, which, as noted above, prohibits state and local government and law enforcement entities or officials from restricting certain communications with DHS (the "compliance condition").  *See* 2017 Greenville Award ¶¶ 53, 55, 56.

Under the "Rules of Construction" within those grant conditions, it is made clear that nothing in the notice or access conditions requires a grantee to detain "any individual in custody beyond the date and time the individual would have been released in the absence of this condition." *See id*. ¶¶ 55, 56.  It is also made clear that these conditions impose no requirements in relation to any requests by federal immigration authorities to detain aliens, and that the notice condition requires "only as much advance notice as practicable" before the release of an alien.  *Id*.  Finally, the conditions apply only to the "program or activity" to be funded under the award, and they allow awarded funds to be used for costs incurred in implementing the conditions.  *See id*.

---

[2]      Available at https://www.justice.gov/opa/pr/justice-department-demands-documents-and-threatens-subpoena-23-jurisdictions-part-8-usc-1373.

E.    **The City's Amended Complaint**

The City brings six causes of action and seeks relief running only to the City itself rather than to Byrne JAG applicants generally.  Counts I through V challenge the legality of imposing the notice, access, and compliance conditions.  Count I alleges that imposition of the conditions is ultra vires conduct not authorized by statute.  *See* Am. Compl. ¶¶ 113-21.  Count II asserts that the conditions violate the Constitution's separation of powers.  *See id.* ¶¶ 122-31.  Count III avers that the conditions are arbitrary and capricious.  *See id.* ¶¶ 132-35.  Count IV claims that the conditions violate the Spending Clause.  *See id.* ¶¶ 136-43.  Count V contends that the conditions commandeer the City in violation of the Tenth Amendment.  *See id.* ¶¶ 144-50.  On each of Counts I through V, the City seeks declaratory and injunctive relief from the three challenged conditions and a writ of mandamus compelling issuance of an FY 2017 Byrne JAG award to the City.[3]  In Count VI, the City seeks a declaration that the City complies with 8 U.S.C. § 1373.  *See id.* ¶¶ 151-57.

## LEGAL STANDARD

"Federal Rule of Civil Procedure 12(b)(1) provides that a party may bring a motion to dismiss for lack of subject matter jurisdiction."  *Ballentine v. United States*, 486 F.3d 806, 810 (3d Cir. 2007) (citation omitted).  "A Rule 12(b)(6) motion tests the sufficiency of the factual allegations contained in the complaint."  *LeBoon v. Zurich Am. Ins. Co.*, 673 F. App'x 173, 176 (3d Cir. 2016) (citation omitted).

"When ruling on a defendant's motion to dismiss, the Court may consider a document explicitly relied upon in the complaint without converting the motion to dismiss to a summary judgment motion."  *Id.*  (citation omitted).  "A Court may also consider an undisputedly authentic

---

[3]    Because the City has pled its mandamus theory only as a possible aspect of relief if its claims succeed, rather than as an independent cause of action, this motion to dismiss does not directly address the flaws of that theory.  To be clear, Defendant disputes that such mandamus relief would be proper, but will reserve argument on that issue for an appropriate time when the issue may come before the Court.

document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Id.* (citation omitted).

## ARGUMENT

## I.      The City Does Not Challenge Final Agency Action That Is Judicially Reviewable.

Inasmuch as the City's claims arise under the Administrative Procedure Act ("APA"), they are subject to the limit that "[t]he APA provides for judicial review of 'final agency action.'" *Naik v. Dir. U.S. Citizenship & Immigration Servs. Vt.*, 575 F. App'x 88, 92 (3d Cir. 2014) (citing 5 U.S.C. §§ 702, 704). To qualify as final agency action, "the action must mark the 'consummation' of the agency's decisionmaking process" and also "must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Ocean Cty. Landfill Corp. v. U.S. E.P.A., Region II*, 631 F.3d 652, 655 (3d Cir. 2011) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)).

The Amended Complaint does not identify a final agency action that allows APA review. At this time the Department has not yet acted on the City's FY 2017 Byrne JAG application and imposed any condition on an FY 2017 award to the City. And by statute there is an administrative review-and-reconsideration process to be followed before "finally disapprov[ing]" the City's FY 2017 Byrne JAG application, until which time there is no final agency action on the City's application. 34 U.S.C. § 10154. That process was initiated when the Department in October 2017 sent a "preliminary assessment" letter to the City questioning the City's compliance with 8 U.S.C. § 1373 and inviting the City's response before the Department takes a decision on the issue. *See* Dkt. No. 28-1, Ex. A (cited in Am. Compl. ¶ 91 n.35). But the "issuance of" that preliminary assessment—which is "not a definitive ruling"—had no "legal or practical effect, except to impose upon [the City] burden of responding to the charges made against it." *FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 242-43 (1980) (finding no final agency action).

Accordingly, no final agency action has been taken against the City.  *See Rattlesnake Coal. v. EPA*, 509 F.3d 1095, 1104 (9th Cir. 2007) (no "final agency action until [agency] completes its review of the grant application and decides [whether] to disburse the appropriated funds").  As concerns the City's challenge to the conditions, there has been no consummation of the Department's decisionmaking process, no determination of rights or obligations, and no legal consequence that flows.  *Cf. Naik*, 575 F. App'x at 92 (finding no final agency action where agency "has yet to respond to or act upon" submission and has "not taken any action to officially deny" petition).

It is for good reason that "[w]ithout a final agency action," the City's "claims are not ripe for adjudication."  *Del. Riverkeeper v. Simpson*, 2008 WL 755947, at *5 (E.D. Pa. Mar. 17, 2008).  "The principal purpose of the APA['s] limitations . . . is to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve."  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66 (2004).  "[T]he effect of the judicial review sought by [the City] is likely to be interference with the proper functioning of the agency and a burden for the courts."  *Standard Oil*, 449 U.S. at 242 (finding no final agency action, and cautioning that APA review is not "a means of turning prosecutor into defendant before adjudication concludes").  APA claims challenging imposition of the three conditions falter on this threshold ground, apart from the failure of those claims on their merits.

## II.    The City's Ultra Vires and Separation of Powers Claims Fail Because the Challenged Conditions Are Authorized by Statute.

Counts I and II of the Amended Complaint respectively allege that the challenged conditions are ultra vires, *see* Am. Compl. ¶¶ 113-21, and violate the Constitution's separation of powers, *see id*. ¶¶ 122-31.  Both theories rest fundamentally on the City's incorrect view that

Congress has not authorized the Department to impose these three conditions.  *See id.* ¶¶ 115-17, 128-29.

Congress of course may delegate to the Executive Branch the authority to attach conditions on funding.  *See, e.g.*, *Clinton v. City of New York*, 524 U.S. 417, 488 (1998) ("Congress has frequently delegated the President the authority to spend, or not to spend, particular sums of money."); *Ameron, Inc. v. U.S. Army Corps of Eng'rs*, 809 F.2d 979, 983 (3d Cir. 1986) ("Congress appropriates funds for a wide variety of purposes and delegates to executive branch officials the authority to make certain decisions regarding how those funds are to be spent."); *DKT Mem'l Fund Ltd. v. AID*, 887 F.2d 275, 280-81 (D.C. Cir. 1989) (upholding statutory delegation to the Executive to impose terms and conditions on federal spending programs).

Relevant to the administration of the Byrne JAG Program, Congress authorized the Department to "plac[e] special conditions on all grants," 34 U.S.C. § 10102(a)(6), to "determin[e] priority purposes for formula grants," *id.*, and to ensure that grantees "comply with . . . all other applicable Federal laws."  *Id.* § 10153(a)(5)(D).  These capacious delegations of authority empower the Department to impose the challenged conditions to promote intergovernmental law enforcement cooperation, so that grantee policies do not impair federal policies.

A.    The Attorney General has "final authority over all functions, including any grants" made by the Department's Office of Justice Programs, which administers the Byrne JAG Program. *Id.* § 10110.  Under the Attorney General's authority, an Assistant Attorney General heads OJP. *See id.* § 10101; 28 U.S.C. § 530C(a)(4).  In setting forth the duties and functions of the AAG, Congress stated that the AAG is to "exercise such other powers and functions as may be vested in the Assistant Attorney General pursuant to this chapter or by delegation of the Attorney General, including placing special conditions on all grants, and determining priority purposes for formula

grants."  34 U.S.C. § 10102(a)(6).  A plain reading of the statutory text indicates that the AAG's power must *include*, at a minimum, the power to "plac[e] special conditions on all grants" administered by OJP.  *Id*.  The breadth of the AAG's statutory power is reinforced by the AAG's authority to "determin[e] priority purposes for formula grants."  *Id*.  Confirming the statute's plain text, a report accompanying the enactment of this language stated that the provision "allows the Assistant Attorney General to place special conditions on all grants and to determi\ne priority purposes for formula grants."  H.R. Rep. No. 109-233, at 101 (2005).

Indeed, the particular statutory language at issue here—the authority for "placing special conditions on all grants, and determining priority purposes for formula grants"—was added *as part of the very same legislation that created the Byrne JAG Program*.  *See* Violence Against Women and DOJ Reauthorization Act of 2005, Pub. L. No. 109-162, § 1152(b), 119 Stat. 2960, 3113 (2006) (adding language to subsection (a)(6)); *id*. § 1111 (creating Byrne JAG Program).  Prior to that 2006 enactment, the provision stated only that the AAG for OJP "exercise[s] such other powers and functions as may be vested in the Assistant Attorney General pursuant to this title or by delegation of the Attorney General."  Joint Resolution Making Continuing Appropriations for FY 1985, Pub. L. No. 98-473, § 603, 98 Stat. 1837, 2078 (1984).  The organic statute enacted in 2002 for the head of a separate Department grant-making component, by comparison, continues to contain substantially the same, more limited language as Section 10102 earlier used to contain, without the additional "special conditions" and "priority purposes" powers that Congress elected to bestow with respect to OJP.  *See* 34 U.S.C. § 10444(7) (providing only that Director of Violence Against Women Office "[e]xercis[es] such other powers and functions as may be vested in the Director pursuant to this subchapter or by delegation of the Attorney General").  This context confirms that Congress did intend the "special conditions" and "priority purposes" language to confer distinctive and meaningful power.  "When Congress acts to amend a statute, [courts]

presume it intends its amendment to have real and substantial effect." *Stone v. INS*, 514 U.S. 386, 397 (1995).

The challenged conditions come comfortably within the fonts of delegated power in Section 10102(a)(6). Pursuant to this authority, the AAG may prioritize formula grants, like the Byrne JAG Program, for jurisdictions that cooperate with federal authorities in achieving federal law enforcement priorities, including removal of criminal aliens under immigration law.

**B.** Independent of the authority conferred in Section 10102(a)(6), a separate source of authority further supports the compliance condition. Underscoring the Byrne JAG Program's emphasis on intergovernmental cooperation so that grantee policies do not impair federal policies, the Department has statutory authority to ensure that Byrne JAG grantees "comply with . . . all other applicable Federal laws." 34 U.S.C. § 10153(a)(5)(D). Section 1373 is, of course, a federal law. According to the City, however, Section 1373 is not an "applicable" federal law. *See* Am. Compl. ¶ 103. The Amended Complaint does not clearly articulate what are "applicable Federal laws," but the City appears to suggest that the phrase "applicable Federal laws" refers only to laws that "relate to the administration and expenditure of the grant itself" or are "expressly made applicable to federal grantees." *Id.* ¶ 71.[4]

The City's straightjacketed interpretation of this statutory text is inconsistent with a plain reading of the statute. The relevant statutory language provides that a Byrne JAG applicant "shall

---

[4]    In adjudicating the City's motion for a preliminary injunction earlier in this case, the Court did not decide whether 34 U.S.C. § 10153(a)(5)(D) authorizes the Section 1373 compliance condition, but opined only that "the question is a 'close call.'" Dkt. No. 74 at 58. Defendant respectfully submits that it is important that the Court decide this issue in resolving this motion to dismiss. Defendant seeks a ruling recognizing that the condition is authorized by statute. On the other hand, if the condition is not authorized by statute, there is no need for this litigation to reach the City's claim that the City complies with Section 1373, and there should be no further proceedings on that claim until such time as the Department prevails on its view that the condition is authorized by statute.

submit an application . . . in such form as the Attorney General may require," to "include . . . [a] certification, made in a form acceptable to the Attorney General . . . that . . . the applicant will comply with all provisions of this part and all other applicable Federal laws."  34 U.S.C. § 10153(a).  Congress's decision to empower the Attorney General to determine the form of Byrne JAG applications renders the most natural reading of this provision as a delegation to the Attorney General to determine whether a particular federal law constitutes an "applicable Federal law[]." *Id*.  If Congress had intended to limit the term "applicable Federal laws" as referencing only statutes of the kind that the City suggests, it could have done so expressly.  Instead, under this power, the Department may condition Byrne JAG grants if it gives notice, as it provided here for Section 1373, that it has determined that a federal law is "applicable."

Rather than the City's narrow construction, courts have broadly interpreted the term "applicable laws."  *See, e.g.*, *Dep't of Treasury v. Fed. Labor Relations Auth.*, 494 U.S. 922, 930 (1990) (interpreting statutory term "applicable laws" as "laws outside the Act" (emphasis omitted)); *see also Bennett Enters., Inc. v. Domino's Pizza, Inc.*, 45 F.3d 493, 497 (D.C. Cir. 1995) (noting that "all applicable laws" is "not reasonably or fairly susceptible to an interpretation that does not encompass compliance with state and federal tax laws"); *U.S. Dep't of Health & Human Servs. v. Fed. Labor Relations Auth.*, 844 F.2d 1087, 1094-95 (4th Cir. 1988) (finding statutory requirement that Executive Branch managers follow "applicable laws" to exclude federal agency circulars but to reach laws made by Congress); *United States v. Odneal*, 565 F.2d 598, 600 (9th Cir. 1977) (statutory reference to "all applicable federal laws" granted "very broad statutory authority").

Instead of "applicable Federal laws" being cabined artificially to those laws that "relate to the administration and expenditure of the grant itself" or are "expressly made applicable to federal grantees," Am. Compl. ¶ 71, a natural and coherent reading is that "applicable Federal laws" refers

simply to the corpus of federal laws that actually do apply, independently, to Byrne JAG grantees. (8 U.S.C. § 1373 is, of course, one such law.)  Here, it is important to bear in mind the context of the Byrne JAG Program, where all grantees are state and local jurisdictions rather than private individuals or entities.  The limitation in Section 10153(a)(5)(D) to "applicable Federal laws" accordingly restricts the Department from requiring certification of compliance with, for example, federal tax laws that by their terms apply to private individuals rather than to the state and local jurisdictions that the Byrne JAG Program contemplates as grantees.  It is entirely sensible for Congress to have used the word "applicable" in Section 10153(a)(5)(D) with this meaning tailored to the class of potential grantees, and there is nothing implausible about Congress expecting a recipient of federal funds to certify its compliance with a federal law where the recipient is— independent of receiving those federal funds—already obligated to comply with that federal law.

## III.   The Challenged Conditions Are Not Arbitrary or Capricious.

Count III of the Amended Complaint claims that the challenged conditions are arbitrary or capricious in violation of the APA.  *See* Am. Compl. ¶¶ 132-35.  If the conditions are statutorily authorized and comport with the Spending Clause, however, it is unclear how "arbitrary or capricious" scrutiny could otherwise limit the Department's broad discretion.  In any event, "the standard for determining whether an APA violation exists under the arbitrary and capricious standard is substantially similar to rational basis review."  *Real Alternatives, Inc. v. Sec'y Dep't of Health & Human Servs.*, 867 F.3d 338, 353 (3d Cir. 2017).  The Supreme Court directs a "narrow standard of review" under which "a court is not to substitute its judgment for that of the agency, and should uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513-14 (2009) (citation omitted).  Where the action represents a shift in policy, the agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices

that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better." *Id*. at 515.

Here, the City's claim fails because "the agency's reasons for" imposing the challenged conditions "were entirely rational." *Fox Television*, 556 U.S. at 517. The imposition of the challenged conditions is understandable as a result of a May 2016 report by the Department's Office of Inspector General ("OIG") finding deteriorating local cooperation with "efforts to remove undocumented criminal aliens from the United States." OIG Report at 1-2 n.1. The 2016 OIG Report advised that "the information we have learned to date during our recent work about the present matter differs significantly from what OIG personnel found nearly 10 years ago" in a 2007 audit when federal immigration authorities had back then "commented favorably to the OIG with respect to cooperation and information flow they received from the seven selected jurisdictions" that were examined. *Id*. The OIG Report focused on the City of Philadelphia, among other jurisdictions, in reaching its conclusions about the changed state of affairs in 2016. *See id*. at 3, 7, 8.

In the FY 2016 grant cycle, the Department under the prior Administration introduced a requirement to certify compliance with Section 1373. *See* 2016 Philadelphia Award ¶ 53 (special condition in Philadelphia's FY 2016 Byrne JAG award); Dkt. No. 1-11 (July 7, 2016 Memorandum stating determination that Section 1373 is an applicable federal law for Byrne JAG Program).

For the FY 2017 cycle, the Department maintained the compliance condition and added the notice and access conditions, and publicly offered a sound explanation for all three conditions. The Department's July 25, 2017 "Backgrounder on Grant Requirements" states that the conditions have a "goal of increasing information sharing between federal, state, and local law enforcement" so that "federal immigration authorities have the information they need to enforce the law and keep

16

our communities safe." Dkt. No. 1-1. The Backgrounder notes that some jurisdictions have "refus[ed] to cooperate with federal immigration authorities in information sharing about illegal aliens who commit crimes," and states that the conditions will "prevent the counterproductive use of federal funds for policies that frustrate federal immigration enforcement." *Id*. The three conditions are "common-sense measures," *id*., and "even in the absence of evidence, the agency's predictive judgment (which merits deference) makes entire sense" as "an exercise in logic rather than clairvoyance." *Fox Television*, 556 U.S. at 521.

Immigration enforcement undoubtedly relates to criminal justice. As further discussed below, *see infra* at 19-20, numerous federal statutes expressly tie these two subjects together—most centrally inasmuch as a conviction for any of a wide array of criminal offenses renders an alien removable from this country, *see* 8 U.S.C. § 1227(a)(2), and thus no longer present here with the potential to re-offend. Accordingly, a July 25, 2017 press release by the Attorney General, accompanying the Backgrounder, stated opposition to policies that "protect illegal aliens who have committed crimes," and an intent to encourage jurisdictions "to change their policies and partner with federal law enforcement to remove criminals." DOJ Press Release No. 17-826 (cited in Am. Compl. ¶ 92 n.36).[5]

The conditions thus rationally promote interests in "maintain[ing] liaison" among tiers of government "in matters relating to criminal justice," 34 U.S.C. § 10102(a)(2), and comport with the intergovernmental cooperation that Congress contemplates in immigration enforcement. *See, e.g.*, 8 U.S.C. §§ 1226(d), 1357(g), 1373; *Arizona*, 567 U.S. at 411-12 ("Consultation between federal and state officials is an important feature of the immigration system" and Congress "has encouraged the sharing of information about possible immigration violations." (citation omitted)).

---

[5]     Available     at     https://www.justice.gov/opa/pr/attorney-general-sessions-announces-immigration-compliance-requirements-edward-byrne-memorial.

IV.     **The Challenged Conditions Are Consistent with the Spending Clause.**

Count IV of the Amended Complaint contends that the challenged conditions violate the Spending Clause because allegedly they are not germane to the Byrne JAG Program, *see* Am. Compl. ¶¶ 138-39, are ambiguous, *see id.* ¶ 140, and "arguably require cities to infringe on individuals' Fourth and Fifth Amendment rights," *see id.* ¶ 141.  These contentions are wrong.

**A.**     In *South Dakota v. Dole*, the Supreme Court stated that "conditions on federal grants might be illegitimate if they are unrelated to the federal interest in particular national projects or programs."  483 U.S. 203, 207 (1987) (citation omitted).  Courts have generally found that the relatedness showing does not pose a difficult hurdle.  The Supreme Court in *Dole* upheld conditioning receipt of federal highway funds on the only loosely-related requirement that a state adopt a minimum drinking age of twenty-one.  *See id.* at 208.  Only "some relationship" is necessary between spending conditions and "the purpose of the federal spending."  *New York v. United States*, 505 U.S. 144, 167 (1992).  The Ninth Circuit thus rejects "an exacting standard for relatedness," *Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002), and the D.C. Circuit observes that the Supreme Court has never "overturned Spending Clause legislation on relatedness grounds."  *Barbour v. Wash. Metro. Area Transit Auth.*, 374 F.3d 1161, 1168 (D.C. Cir. 2004).

The Third Circuit has required only "a discernible relationship" between a condition and a federal interest in a program, *Koslow v. Pennsylvania*, 302 F.3d 161, 175 (3d Cir. 2002), rejecting the argument that a "condition must be specifically tailored to a particular federal interest" and further rejecting any requirement "to make specific findings of relatedness in the text of the statute itself."  *A.W. v. Jersey City Pub. Sch.*, 341 F.3d 234, 241 (3d Cir. 2003) (citation omitted).

The grant conditions at issue here satisfy the relatedness requirement.  The Byrne JAG Program's organic statute specifies that Byrne JAG funds are designed to provide resources "for criminal justice," to support programs including law enforcement, prosecution, crime prevention,

and corrections.  34 U.S.C. § 10152(a)(1).  These goals are also reflected in the responsibilities of the AAG, which involve "maintain[ing] liaison" and disseminating information regarding "criminal justice."  *Id*. § 10102(a)(1), (2).  As relates to these statutes, the term "criminal justice" is defined broadly to include various activities of the police, the courts, and "related agencies."  *Id*. § 10251(a)(1).  Contrary to the City's view that the Byrne JAG Program's goal is to promote State and local flexibility, see Am. Compl. ¶ 58, the program's overall goals are much broader: to support and strengthen law enforcement and criminal justice.  And as the Department has stated, the challenged conditions emanate from the "top priority of reducing violent crime" and "long-established cooperative principles among law enforcement agencies."  DOJ Press Release No. 17-826 (cited in Am. Compl. ¶ 92 n.36).

Immigration enforcement, which the conditions promote, undoubtedly intersects with the Byrne JAG Program's criminal justice purposes, at a minimum for the simple reason that a conviction for any of a wide array of criminal offenses renders an alien removable from this country.  *See* 8 U.S.C. § 1227(a)(2).  Indeed, "[a] primary goal of several recent overhauls of the INA has been to ensure and expedite the removal of aliens convicted of serious crimes."  *Duvall v. Att'y Gen. of U.S.*, 436 F.3d 382, 391 (3d Cir. 2006) (citations omitted); *see also Padilla v. Kentucky*, 559 U.S. 356, 360 (2010) (observing that "deportation or removal is now virtually inevitable for a vast number of noncitizens convicted of crimes" (citation omitted)).  Once removed, a criminal alien who has committed a removable offense—*e.g.*, an aggravated felony, domestic violence, child abuse, or certain firearm offenses—is no longer present in this country with the potential to re-offend.

The INA also repeatedly contemplates cooperation among state and local officers and federal officials on immigration enforcement.  *See, e.g.*, 8 U.S.C. § 1357(g) (authorizing formal cooperative agreements under which trained and qualified state and local officers may perform

specified functions of a federal immigration officer in relation to the investigation, apprehension, or detention of aliens); *Id*. § 1324(c) (authorizing state and local officers to make arrests for violations of the INA's prohibition against smuggling, transporting, or harboring aliens); *Id*. § 1252c (authorizing state and local officers to arrest certain felons who have unlawfully returned to the United States). Under authorities such as these, "state officers may perform the functions of an immigration officer." *Arizona*, 567 U.S. at 408.

Furthermore, insofar as the INA contemplates the federal detention of certain aliens upon their release from state or local custody, *see* 8 U.S.C. § 1226(c), the conditions can be understood as seeking to ensure that a state or local grantee's law enforcement activities will not impair the law enforcement activities of the federal government. Congress has mandated that certain aliens who have committed criminal offenses be taken into federal custody pending removal proceedings, but only "when the alien is released" from state custody. *Id*. § 1226(c)(1). With respect to incarcerated aliens subject to a final removal order, the INA establishes a "removal period" of 90 days that begins with the date of the alien's release. *Id.* § 1231(a)(1)(B). It is crucial to this cooperative law enforcement framework that states and localities respond to requests for release date information, allow federal agents to have access to detainees in their custody, and avoid restricting communication with DHS of information regarding immigration status.

Given that the INA expressly contemplates local law enforcement activity with respect to immigration law enforcement, it is perfectly germane and appropriate for the Department to condition grant funding to promote this purpose. Even the City's own Amended Complaint reflects that immigration enforcement bears some relationship to criminal justice, because the City connects its local immigration enforcement policies to the City's crime rates. *See* Am. Compl. ¶¶ 3, 30. Accordingly, because there is some relationship between the conditions and the Byrne JAG Program's goals, the conditions satisfy the constitutional relatedness requirement.

20

**B.**        Another limitation on the spending power is that when the federal government "desires to condition the States' receipt of federal funds, it must do so unambiguously, enabling the States to exercise their choice knowingly, cognizant of the consequences of their participation." *Dole*, 483 U.S. at 207 (citation omitted).  The City claims that all three conditions "are woefully ambiguous, leaving cities like Philadelphia guessing as to how to comply."  Am. Compl. ¶ 106.

Underscoring that the City has brought this dispute to the Court prematurely, the City's assertion of ambiguity in this litigation comes before the City has availed itself of administrative consultation that the Byrne JAG Program invites.  The FY 2017 Byrne JAG solicitation invited any prospective grantee with a question about "any . . . requirement of this solicitation" to contact OJP's Response Center (customer service center) by telephone, email, fax, or online chat.  *See* Byrne JAG Program FY 2017 Local Solicitation (Dkt. No. 1-16) at 2.  A prospective grantee could also contact the appropriate "State Policy Advisor"—that is, a specific, named OJP employee assigned to work with jurisdictions within a specified geographical area.  *Id.*  Beyond this invitation in the FY 2017 solicitation, in each of the challenged conditions that appears in the award document for a prospective grantee to consider accepting, the Department has invited submission of "[a]ny questions about the meaning or scope of this condition . . . before award acceptance." 2017 Greenville Award ¶¶ 53, 55, 56.

Regarding the notice condition, the City complains that the phrase "scheduled release date" as used in the condition is not defined, and accordingly the City thinks it is unclear whether the condition will "apply only to those inmates in Philadelphia's prisons who have been convicted of crimes and are serving sentences" rather than inmates "who are in a pre-trial, pre-sentence, or other temporary detention posture, many of whom may be ordered released with less than 48 hours' notice."  Am. Compl. ¶ 95.  Yet the condition is clear that a correctional facility must honor "a

formal written request" "from DHS" "that seeks advance notice of the scheduled release date and time for a particular alien in such facility," by providing "the requested notice to DHS" "as early as practicable." 2017 Greenville Award ¶ 56. The City is therefore obligated to provide notice of the scheduled release of any alien inmate identified by DHS, regardless of the duration or nature of the alien's detention. And the condition specifically contemplates situations in which aliens may be released with less than 48 hours' notice: if the City schedules a release with less than 48 hours' notice, for example, "it shall not be a violation . . . to provide only as much advance notice as practicable." *Id.* ¶ 55.

With respect to the access condition, the City complains that it is unclear "whether jurisdictions will be deemed compliant as long as they permit ICE personnel to access their facilities in order to meet with inmates who have in turn consented to such meetings." Am. Compl. ¶ 96. But nothing in the text of the condition suggests such an exception turning on inmate consent; the condition requires access even if the inmate might decline to answer questions.

As to the compliance condition, the City remarkably complains of supposed unconstitutional ambiguity concerning the City's obligations under a statute with which the City has been required to comply for over twenty years (entirely independent of any Byrne JAG award condition), and for which the City provided a certification of its compliance in the FY 2016 grant cycle. *See* City of Philadelphia Letter (Dkt No. 1-14). "Broad general language is not necessarily ambiguous when congressional objectives require broad terms." *Geisinger Cmty. Med. Ctr. v. Sec'y U.S. Dep't of Health & Human Servs.*, 794 F.3d 383, 393 (3d Cir. 2015) (quoting *Diamond v. Chakrabarty*, 447 U.S. 303, 315 (1980)). Moreover, the Department has now given the City guidance via a preliminary assessment of the City's compliance with Section 1373. *See* Dkt. No. 28-1, Ex. A (cited in Am. Compl. ¶ 91 n.35).

To the extent there is any uncertainty at the margins of what any of the three conditions requires, such a penumbra does not make a condition unconstitutionally ambiguous. Indeed, "the exact nature of the conditions may be largely indeterminate, provided that the existence of the conditions is clear, such that States have notice that compliance with the conditions is required." *Charles v. Verhagen*, 348 F.3d 601, 607 (7th Cir. 2003) (citation omitted); *see also Benning v. Georgia*, 391 F.3d 1299, 1306 (11th Cir. 2004) ("Once Congress clearly signals its intent to attach federal conditions to Spending Clause legislation, it need not specifically identify and proscribe in advance every conceivable state action that would be improper." (citation omitted)). By comparison, the City does not complain about other Byrne JAG conditions requiring compliance with restrictions on lobbying under 18 U.S.C. § 1913 and 31 U.S.C. § 1352, 2017 Greenville Award ¶ 19; compliance with "federal appropriations statutes" generally, *id.* ¶ 20; reporting of evidence of violations of the False Claims Act, *id.* ¶ 21; and compliance with prohibitions on reprisal under 41 U.S.C. § 4712, *id.* ¶ 23. All those statutes on which unchallenged conditions are predicated could have some zone of uncertainty at the margin. The conditions challenged here present no special problem of ambiguity that creates a constitutional infirmity. The City's ambiguity theory thus fails.

**C.** The Spending Clause does not authorize conditions that "induce the States to engage in activities that would themselves be unconstitutional." *Dole*, 483 U.S. at 210. The City suggests that the conditions "arguably require cities to infringe on individuals' Fourth and Fifth Amendment rights." Am. Compl. ¶ 141. How the City thinks the conditions call for any such infringement is unclear.

The plain text of the notice and access conditions makes clear that "[n]othing in th[ese] condition[s] shall be understood to authorize or require any recipient . . . to maintain (or detain)

any individual in custody beyond the date and time the individual would have been released in the absence of this condition." 2017 Greenville Award ¶¶ 55-56.  The conditions also clarify that "[i]n the event that . . . the scheduled release date and time for an alien are such as not to permit the advance notice [of scheduled release] that DHS has requested, it shall not be a violation of this condition to provide only as much advance notice as practicable." *Id*.  These conditions explicitly contravene Fourth Amendment concerns, and the Constitution neither forbids DHS employees from accessing detention facilities nor forbids local government employees from providing DHS with certain detainee release information.  The City's theory thus lacks merit.

## V.   The Challenged Conditions Do Not Commandeer the City.

The City alleges in Count V of the Amended Complaint that each of the challenged conditions would commandeer the City in violation of the Tenth Amendment.  *See* Am. Compl. ¶¶ 144-50.  But this case involves a grant that the City is free to accept or reject, not any federal mandate that directly regulates the City.  The relevant question here is not whether the grant conditions, if they were federally-compelled obligations of the City, would infringe the Tenth Amendment.  A "perceived Tenth Amendment limitation on congressional regulation of state affairs d[oes] not concomitantly limit the range of conditions legitimately placed on federal grants." *Dole*, 483 U.S. at 210.  Instead, the only pertinent constitutional question presented is whether the grant conditions are a valid exercise of the Spending Clause power.  In that context, the federal government "may offer funds to the States, and may condition those offers on compliance with specified conditions.  These offers may well induce the States to adopt policies that the Federal Government itself could not impose." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 537 (2012).  Because the City may simply decline to participate in the Byrne JAG Program, the City's commandeering claim has no purchase here.

To any extent that the City could nevertheless proceed with a facial attack on Section 1373 as an independent statutory mandate, *see* Am. Compl. ¶ 147, the City bears "a higher substantive burden," because, "[a]s the Supreme Court has repeatedly intoned, facial challenges are the most difficult to mount successfully because the challenger 'must establish that no set of circumstances exist under which the statute would be valid.'" *Knick v. Twp. of Scott*, 862 F.3d 310, 321 (3d Cir. 2017) (citations omitted).

"The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona*, 567 U.S. at 394 (citation omitted). "As long as it is acting within the powers granted it under the Constitution, Congress may impose its will on the States" and "may legislate in areas traditionally regulated by the States." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). And courts "begin with the time-honored presumption that [a statute] is a constitutional exercise of legislative power." *Reno v. Condon*, 528 U.S. 141, 148 (2000) (citation omitted).

The Second Circuit rejected a Tenth Amendment facial challenge to Section 1373 of the kind the City raises here. *See City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999). The Tenth Amendment does not give states and localities "an untrammeled right to forbid all voluntary cooperation by state or local officials with particular federal programs," particularly in the information sharing context. *Id*. at 34-35; *see also Printz v. United States*, 521 U.S. 898, 918 (1997) (contrasting federal statutes that "require only the provision of information to the Federal Government" with those that "force[] participation of the States' executive in the actual administration of a federal program"); *Freilich v. Bd. of Directors of Upper Chesapeake Health, Inc.*, 142 F. Supp. 2d 679, 697 (D. Md. 2001) ("This Court has found no case" holding that a statutory command to report information for a federal data bank "commandeers the state."), *aff'd*

*sub nom. Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205 (4th Cir. 2002).  The City's commandeering theory is especially diminished here because the conditions allow a grantee to use awarded funds to cover the grantee's costs incurred in implementing the conditions.  *See* 2017 Greenville Award ¶¶ 53, 55, 56.

Because the City challenges conditions attached to a grant that can be declined, and because the City moreover cannot show that 8 U.S.C. § 1373 as an independent statutory obligation is facially unconstitutional, the City's commandeering claim warrants dismissal.

## VI.  The Court Should Decline the City's Request for a Declaration That the City Complies with 8 U.S.C. § 1373.

Count VI of the Amended Complaint seeks a declaration that the City complies with 8 U.S.C. § 1373.  *See* Am. Compl. ¶¶ 151-57.  This claim is non-justiciable for lack of ripeness, and also does not rest on a proper cause of action.  If the Court nevertheless were to reach this claim, the City is not entitled to the requested declaration because the City's allegations suggest a violation of Section 1373.

**A.**     Constitutional justiciability requires that a claim under the Declaratory Judgment Act must be ripe for judicial consideration.  *See Wyatt, Virgin Islands, Inc. v. Gov't of the Virgin Islands*, 385 F.3d 801, 805-06 (3d Cir. 2004).  Where the declaratory claim concerns governmental action, "[t]he purpose of the ripeness doctrine is to 'prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'"  *Id*. at 806 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967)).  The Declaratory Judgment Act is no exception to the rule that "[a] claim is not ripe for adjudication if it rests upon contingent

future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (citation omitted).

Here, the City's premature claim for declaratory relief preempts the administrative process that the Department has been conducting with the City regarding Section 1373 compliance. In that process, the City has provided its explanation regarding whether it complies, *see* Dkt. No. 1-14, the Department has responded with a "preliminary assessment" that expressly disclaims "final agency action," *see* Dkt. No. 28-1, Ex. A (cited in Am. Compl. ¶ 91 n.35), the City has responded further, *see* Dkt. No. 61-1, and the Department has yet to render its final assessment.[6] Even after the Department would make any determination whether the City violates Section 1373, the City would have an opportunity to appeal that determination administratively. *See* 34 U.S.C. § 10154; *see generally* 28 C.F.R. pt. 18. The Department could decide, either upon consideration of the City's existing submissions, or upon consideration of any administrative appeal, that the City does not violate Section 1373 and thus that Byrne JAG funds will not be withheld on that basis.

Under these circumstances, the City's request for a declaration that the City complies with Section 1373 is unripe, in that it "rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas*, 523 U.S. at 300 (citation omitted). The federal government has not requested a declaration that the City violates Section 1373, and the Court should not take up that question absent an enforcement action by the United States, which has also not occurred.

---

[6] In fact, OJP has not yet made a final determination with respect to the Section 1373 compliance of *any* jurisdiction. OJP's review of a number of jurisdictions continues, most recently with OJP's issuance of document requests to various Byrne JAG grantees. *See* DOJ Press Release No. 18-81, *available at* https://www.justice.gov/opa/pr/justice-department-demands-documents-and-threatens-subpoena-23-jurisdictions-part-8-usc-1373. OJP did not send such a request to Philadelphia because of this Court's injunction, but these document requests illustrate the numerous administrative steps that remain before there is a reviewable agency decision.

**B.**      Even if the City's claim were constitutionally ripe, it is defective because the City pursues declaratory relief without identifying an underlying cause of action.  "The Declaratory Judgment Act does not, however, provide an independent basis for subject-matter jurisdiction; it merely defines a remedy."  *Allen v. DeBello*, 861 F.3d 433, 444 (3d Cir. 2017); *see also Levy-Tatum v. Navient Sols., Inc.*, 183 F. Supp. 3d 701, 709 (E.D. Pa. 2016) ("We agree that the Declaratory Judgment Act 'does not authorize actions to decide whether federal statutes have been or will be violated when no private right of action to enforce the statutes has been created by Congress.'" (quoting *Jones v. Hobbs*, 745 F. Supp. 2d 886, 893 (E.D. Ark. 2010))).

The City does not identify a right of action, in Section 1373 or elsewhere, to seek a declaration that the City complies with Section 1373.  A plaintiff does not automatically have a right of action to seek declaratory judgment wherever Article III standing exists.  *See Harris Cty. Tex. v. MERSCORP Inc.*, 791 F.3d 545, 552 (5th Cir. 2015) ("The Counties do not contend that [the governing statute] itself creates a private right of action.  Instead, the Counties believe that the Declaratory Judgment Act provides a right to relief because there is an 'actual controversy.'  This argument is flawed because the Declaratory Judgment Act alone does not create a federal cause of action.").  Declaratory relief is thus unavailable.

**C.**      If the Court nonetheless were to consider declaratory relief, the Court should find that the City's claim fails.  The statute provides, in part, that a "local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [federal immigration officials] information regarding the citizenship or immigration status, lawful or unlawful, of any individual."  8 U.S.C. § 1373(a).  At least two City policies on their face suggest violations of Section 1373, setting aside additional City policies that may also be non-compliant depending on how the City interprets and applies them.

First, the City's Executive Order No. 8-09 states in Section 3 that City officers and employees "shall [not] disclose" information "relating to an individual's immigration status," unless certain exceptions apply.  Dkt. No. 1-4.  Pursuant to 37 Pa. Code § 95.222, the City when admitting a new inmate is required to collect data on an inmate's country of citizenship, and moreover is required to advise a detainee who is not a U.S. citizen of the right to have notice given to the detainee's consular officials.  Although the City is thus required to possess citizenship information as to every inmate it holds, the City restricts its officials and employees from sharing with DHS this "information regarding the citizenship or immigration status, lawful or unlawful, of any individual," in violation of 8 U.S.C. § 1373.

Second, the City's Executive Order No. 5-16 states in Section 1 that notice of a person's "pending release" from City custody shall not be provided, "unless such person is being released after conviction for a first or second degree felony involving violence and the detainer is supported by a judicial warrant."  Dkt. No. 1-6.  This section restricts the sharing of "information regarding . . . immigration status" in violation of 8 U.S.C. § 1373(a).[7]  Nothing in the statute allows the City to impose a prohibition that limits information-sharing only to certain circumstances.

---

[7]    The INA states that the "immigration status of any individual" specifically "includ[es] . . . that a particular alien *is not lawfully present* in the United States."  8 U.S.C. § 1357(g)(10)(a) (emphasis added).  "Present" means "being in a certain place and not elsewhere," *Webster's New International Dictionary* (2d ed. 1958), so the fact that an alien is in custody for a specific duration (in a certain place and not elsewhere) fits within the INA's contemplation of immigration status.  Moreover, "information regarding . . . immigration status" is a broader category than "immigration status" itself.  Comparison of different subsections within Section 1373 demonstrates that Congress used the broader "information regarding" formulation deliberately.  *Compare* 8 U.S.C. § 1373(a) (concerning "information regarding . . . immigration status") *with* 8 U.S.C. § 1373(c) (discussing "immigration status" but omitting the broader "information regarding" formulation).  "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."  *Dean v. United States*, 556 U.S. 568, 573 (2009) (citation omitted).  Indeed, the House Report accompanying the legislation stated that Section 1373 was intended "to give State and local officials the authority to communicate with the INS *(. . . cont'd)*

The City's first prerequisite in Executive Order No. 5-16 of a judicial warrant is imposed even though an immigration detainer,[8] which is premised on the existence of probable cause and includes a request for notification before an alien is released from custody, is often issued pursuant to an administrative warrant rather than a judicial warrant.[9]   Removability is a civil matter for which no judicial warrant is provided for by the INA, which instead contemplates arrest pursuant to an administrative warrant.   There is no Fourth Amendment or Tenth Amendment rationale that necessitates forcing DHS to go through the exercise of obtaining a judicial warrant (if a judicial warrant is even obtainable) before a City employee is permitted to provide information, upon the request of DHS, about the City's pending release of a particular alien.

The second prerequisite in Executive Order No. 5-16, which limits the provision of information to persons convicted of first or second degree felonies involving violence, omits serious criminals who may be subject to removal under the INA.   Under Pennsylvania law, third degree felonies include, for example, sale or possession of child pornography, terroristic threats, promoting prostitution, possession of an explosive device with an intent to use it to commit arson,

---

(cont'd . . . )   [Immigration and Naturalization Service] regarding the *presence, whereabouts, and activities* of illegal aliens."   H.R. Rep. No. 104-469, pt. 1, at 277 (1996) (emphasis added).   Custody release (. . . *cont'd*) information falls within the sweep of "information regarding . . . immigration status" that Congress intended under Section 1373(a).   Indeed, it is relevant to the federal government's statutory duties, enacted at the same time as Section 1373, to "take into custody any alien who" has committed certain offenses, 8 U.S.C. § 1226(c)(1)(A), and to "take into custody any alien who . . . is inadmissible . . . when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation," 8 U.S.C. § 1226(c)(1)(D).   It is sensible to read section 1373(a) to include information that assists the federal government in carrying out its statutory responsibilities under the same Act.   *See United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988) ("A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law.").

[8]      *See* DHS Form I-247A, available at https://www.ice.gov/sites/default/files/documents/ Document/2017/I-247A.pdf.

[9]      *See* U.S. Immigrations and Customs Enforcement Policy No. 10074.2 ¶¶ 2.4, 5.2, available at https://www.ice.gov/sites/default/files/documents/Document/2017/10074-2.pdf.

sexual assault of a minor in a state institution, carrying a concealed firearm without a license, bribery, and vehicle theft.  *See* 4 Summ. Pa. Jur. 2d Criminal Law §§ 9:70, 11:61; 5 Summ. Pa. Jur. 2d Criminal Law §§ 14:11, 15:65, 16:3, 23:13; 5A Summ. Pa. Jur. 2d Criminal Law § 27:6; 5B Summ. Pa. Jur. 2d Criminal Law § 30:34 (2d ed.).  The City's restriction moreover excludes individuals who have committed first and second degree felonies that do not "involve violence" and first and second degree misdemeanors, even though some such offenses may involve serious misconduct that threatens public safety.

And the City's two prerequisites must *both* be met under the City's policy; thus, if an illegal alien who is a qualifying first or second degree felon—such as a violent rapist—was soon to be released, Philadelphia would not give notice to DHS so that the criminal could be subject to removal proceedings or removed, unless DHS supplied a judicial warrant, which as explained is not provided for by the immigration laws.  Furthermore, it is of no consequence that for some portion of its detainees who are in temporary lock-up the City may not know a release date; what matters is that a sizable portion of detainees do have a known release date, that for other detainees the City could still provide an estimated or emergent release date/time, and that for all detainees the City has restricted the sharing of custody release information by imposing these prerequisites.

Thus, if the Court were to reach the City's request for a declaration of compliance with Section 1373, the claim fails because the Amended Complaint in at least two ways suggests that the City violates the statute.[10]

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court dismiss the City's Amended Complaint in its entirety.

---

[10]   The Department emphasizes that it has not made its final determination about the City's compliance with 8 U.S.C. § 1373—a subject on which the Department is subject to this Court's preliminary injunction and is at this time taking discovery.

DATED:  February 2, 2018                    Respectfully submitted,

                                            CHAD A. READLER
                                            Acting Assistant Attorney General

                                            LOUIS D. LAPPEN
                                            Acting United States Attorney

                                            JOHN R. TYLER
                                            Assistant Director

                                            */s/ Arjun Garg*
                                            ARJUN GARG
                                            Trial Attorney
                                            U.S. Department of Justice
                                            Civil Division, Federal Programs Branch
                                            20 Massachusetts Ave, NW
                                            Washington, DC 20530
                                            Phone: (202) 305-8613
                                            Fax: (202) 616-8470
                                            E-Mail: arjun.garg@usdoj.gov

                                            *Counsel for Defendant*