| | |
|---|---|
| THE CITY of PHILADELPHIA, | |
| Plaintiff, | |
| v. | Case No. 2:17-cv-03894-MMB |
| JEFFERSON BEAUREGARD SESSIONS III, in his official capacity as Attorney General of the United States, | |
| Defendant. | |

**MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................iv

INTRODUCTION ...................................................................................................1

BACKGROUND ....................................................................................................3

    A.    Factual Background ......................................................................3

        1.    Philadelphia's Policies..........................................................3

        2.    The Challenged Conditions....................................................6

    B.    Procedural History ......................................................................7

ARGUMENT.........................................................................................................9

    I.    LEGAL STANDARDS.....................................................................9

    II.    PHILADELPHIA HAS PROPERLY ALLEGED FINAL AGENCY ACTION. .....................................................................10

    III.    PHILADELPHIA HAS PROPERLY ALLEGED THAT THE DEPARTMENT'S IMPOSITION OF THE CHALLENGED CONDITIONS IS CONTRARY TO FEDERAL STATUTE. .............12

        A.    Section 10102(a)(6) Does Not Authorize the Challenged Conditions. ............................................................13

        B.    Section 10153(a)(5)(D) Does Not Authorize the Section 1373 Certification Condition. ................................18

    IV.    PHILADELPHIA HAS PROPERLY ALLEGED THAT THE DEPARTMENT'S IMPOSITION OF THE CHALLENGED CONDITIONS VIOLATES THE SEPARATION OF POWERS. ......24

    V.    PHILADELPHIA HAS PROPERLY ALLEGED THAT THE DEPARTMENT'S DECISION TO IMPOSE THE CONDITIONS WAS ARBITRARY AND CAPRICIOUS.........................................25

    VI.    PHILADELPHIA HAS PLAUSIBLY DEMONSTRATED THAT THE CONDITIONS VIOLATE THE SPENDING CLAUSE............................28

VII.    PHILADELPHIA STATES A COMMANDEERING CLAIM. .........................36

VIII.    PHILADELPHIA HAS PROPERLY STATED A CLAIM FOR A DECLARATORY JUDGMENT THAT IT COMPLIES WITH SECTION 1373 ..............................................................................43

    A.    Philadelphia's Claim Regarding 1373 Compliance Is Justiciable.........................................................................43

        1.    The Declaratory Judgment Claim Rests on Two Independent Causes of Action. ......................................43

        2.    The Claim Is Ripe. ......................................................45

    B.    Philadelphia's Claim Is Plausible On The Merits. ...................48

        1.    The Department Misconstrues Section 1373.................48

        2.    The Department Misinterprets The Policies It Contends Conflict With Section 1373. ........................52

        3.    The Complaint Demonstrates At A Minimum That The City Substantially Complies With Section 1373................................................................53

CONCLUSION..............................................................................58

# TABLE OF AUTHORITIES

**Page(s)**

C<span style="font-variant:small-caps;">ASES</span>

*Abbott Labs. v. Gardner*,
    387 U.S. 136 (1967) ................................................................. 12, 46

*In re Aiken Cty.*,
    725 F.3d 255 (D.C. Cir. 2013) ............................................................24

*Allen v. DeBello*,
    861 F.3d 433 (3d Cir. 2017) ...............................................................45

*Arizona v. United States*,
    567 U.S. 387 (2012) .....................................................................23, 45

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
    548 U.S. 291 (2006) .....................................................................35, 36

*Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*,
    846 F.2d 731 (Fed. Cir. 1988)............................................................48

*Badger v. Stryden, Inc.*,
    No. 2:09-CV-3619-CDJ, 2016 WL 3014867 (E.D. Pa. May 26, 2016)..................................9

*Baker v. Cuomo*,
    58 F.3d 814 (2d Cir. 1995) ................................................................43

*Barnes v. Gorman*,
    536 U.S. 181 (2002) ..........................................................................55

*U.S. ex rel. Bauchwitz v. Holloman*,
    671 F. Supp. 2d 674 (E.D. Pa. 2009) ................................................13

*Bennett v. Spear*,
    520 U.S. 154 (1997) ..........................................................................11

*Bond v. United States*,
    134 S. Ct. 2077 (2014) ......................................................................52

*In re Buckhead Am. Corp.*,
    178 B.R. 956 (D. Del. 1994)..............................................................42

*CBS Corp. v. FCC*,
    663 F.3d 122 (3d Cir. 2011) ..............................................................28

**Page(s)**

*CEC Energy Co. v. Public Serv. Comm'n,*
891 F. 2d 1107 (3d Cir. 1989)............................................................................11

*Charles v. Verhagen,*
348 F.3d 601 (7th Cir. 2003) ...........................................................................29

*Circuit City Stores, Inc. v. Adams,*
532 U.S. 105 (2001) .........................................................................................19

*City & Cty. of San Francisco v. Sessions,*
No. 17-cv-04642 (N.D. Cal. Feb. 2, 2018).........................................................9

*City of Chicago v. Sessions,*
264 F. Supp. 3d 933 (N.D. Ill. 2017) ............................................................7, 16

*City of Chicago v. Sessions,*
No. 17-2991 (7th Cir., filed Sept. 26, 2017)..................................................7, 17

*City of Los Angeles v. McLaughlin,*
865 F.2d 1084 (9th Cir. 1989) .........................................................................13

*City of New York v. United States,*
179 F.3d 29 (1999).......................................................................................41, 42

*Clinton v. City of New York,*
524 U.S. 417 (1998) .........................................................................................24

*Collin Cty. Texas v. Homeowners Ass'n for Values Essential to Neighborhoods
(HAVEN),*
915 F.2d 167 (5th Cir. 1990) ........................................................................44, 45

*Comite' De Apoyo A Los Trabajadores Agricolas v. Perez,*
774 F.3d 173 (3d Cir. 2014) .............................................................................27

*Comm'r of Internal Revenue v. Sun Pipe Line Co.,*
126 F.2d 888 (3d Cir. 1942) .............................................................................15

*Congregation Kollel, Inc. v. Twp. of Howell, N.J.,*
No. 16-cv-2457-FLW, 2017 WL 637689 (D.N.J. Feb. 16, 2017) .........................10

*Dabney v. Reagan,*
542 F. Supp. 756 (S.D.N.Y. 1982).....................................................................24

*Dep't of Air Force v. Rose,*
425 U.S. 352 (1976) .........................................................................................51

*Edelman v. Lynchburg Coll.,*
535 U.S. 106 (2002) .........................................................................................19

Page(s)

*Encino Motorcars, LLC v. Navarro,*
    136 S. Ct. 2117 (2016) ..............................................................................27

*Evanston Ins. Co. v. Layne Thomas Builders, Inc.,*
    635 F. Supp. 2d 348 (D. Del. 2009) ...........................................................10

*Fed. Land Bank of St. Paul v. Bismarck Lumber Co.,*
    314 U.S. 95 (1941) ......................................................................................14

*Fortin v. Comm'r of Mass. Dep't of Pub. Welfare,*
    692 F.2d 790 (1st Cir. 1982)...............................................................56, 57

*Gonzales v. Carhart,*
    550 U.S. 124 (2007) ...................................................................................38

*Gonzales v. Oregon,*
    546 U.S. 243 (2006) ...................................................................................41

*Gould Elecs., Inc. v. United States,*
    220 F.3d 169 (3d Cir. 2000) .........................................................................9

*Grant v. City of Roanoke,*
    265 F. Supp. 3d 654 (W.D. Va. 2017)........................................................54

*Gregory v. Ashcroft,*
    501 U.S. 452 (1991) .............................................................................37, 52

*Harris Cty. Texas v. MERSCORP Inc.,*
    791 F.3d 545 (5th Cir. 2015) ......................................................................45

*Jacob & Youngs, Inc. v. Kent,*
    230 N.Y. 237 (1921)....................................................................................55

*Karen L. ex rel. Jane L. v. Health Net of Ne.,*
    267 F. Supp. 2d 184 (D. Conn. 2003) ........................................................55

*Kasten v. Saint-Gobain Performance Plastics Corp.,*
    563 U.S. 1 (2011)........................................................................................20

*Khodara Envtl., Inc. v. Blakey,*
    376 F.3d 187 (3d Cir. 2004) .......................................................................46

*Knick v. Twp. of Scott,*
    862 F.3d 310 (3d Cir. 2017) .......................................................................38

*Koog v. United States,*
    79 F.3d 452 (5th Cir. 1996) ........................................................................42

**Page(s)**

*Koslow v. Pennsylvania*,
  302 F.3d 161 (3d Cir. 2002) ........................................................................................ 29, 35

*Kundratic v. Thomas*,
  407 F. App'x 625 (3d Cir. 2011) ....................................................................................9

*Levy-Tatum v. Navient Sol'ns, Inc.*,
  183 F. Supp. 3d 701 (E.D. Pa. 2016) ............................................................................45

*Marathon Petroleum Corp. v. Sec'y of Fin. for Del.*,
  876 F.3d 481 (3d Cir. 2017) ..........................................................................................46

*Md. Cas. Co. v. Pacific Coal & Oil Co.*,
  312 U.S. 270 (1941) ......................................................................................................46

*Massachusetts v. United States*,
  435 U.S. 444 (1978) ......................................................................................................29

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) ...................................................................................................2, 10

*McGary v. City of Portland*,
  386 F.3d 1259 (9th Cir.2004) ........................................................................................43

*MedImmune, Inc. v. Genentech, Inc.*,
  549 U.S. 118 (2007) ................................................................................................44, 47

*Moore v. Perales*,
  692 F. Supp. 137 (E.D.N.Y. 1988)................................................................................54

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ..........................................................................................25, 26, 27

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
  545 U.S. 967 (2005) ......................................................................................................27

*Nat'l Collegiate Athletic Ass'n v. Governor of N.J.*,
  730 F.3d 208 (3d Cir. 2013) ..........................................................................................37

*Nevada v. Hicks*,
  533 U.S. 353 (2001) ......................................................................................................42

*New York v. United States*,
  505 U.S. 144 (1992) ..........................................................................................29, 37, 42

*NFIB v. Sebelius*,
  567 U.S. 519 (2012) ................................................................................................35, 37

**Page(s)**

*Ocean Cty. Landfill Corp. v. U.S. E.P.A., Region II,*
631 F.3d 652 (3d Cir. 2011) ............................................. 11

*P.C. Pfeiffer Co. v. Ford,*
444 U.S. 69 (1979) ............................................................ 15

*Padilla v. Kentucky,*
559 U.S. 356 (2010) .......................................................... 32

*Pennhurst St. Sch. & Hosp. v. Halderman,*
451 U.S. 1 (1981) ....................................................... 34, 55

*Phillips v. Cty. of Allegheny,*
515 F.3d 224 (3d Cir. 2008) ............................................. 10

*Phoenix Mut. Life Ins. Co. v. Adams,*
828 F. Supp. 379 (D.S.C. 1993) ........................................ 56

*Plains All Am. Pipeline L.P. v. Cook,*
866 F.3d 534 (3d Cir. 2017) ....................................*passim*

*Printz v. United States,*
521 U.S. 898 (1997) ....................................... 37, 39, 40, 41

*Renfro v. Unisys Corp.,*
671 F.3d 314 (3d Cir. 2011) ......................................... 1, 10

*Robert Wood Johnson Univ. Hosp. v. Thompson,*
297 F.3d 273 (3d Cir. 2002) ............................................. 25

*Sec. & Exch. Comm'n v. Chenery Corp.,*
318 U.S. 80 (1943) ............................................................ 27

*Shands v. Tull,*
602 F.2d 1156 (3d Cir. 1979) ..................................... 53, 54

*South Dakota v. Dole,*
483 U.S. 203 (1987) ................................................*passim*

*Stanton v. City of Phila.,*
No. 10-cv-2726, 2011 WL 710481 (E.D. Pa. Mar. 1, 2011) ............................................. 10

*Steinle v. City & Cty. of San Francisco,*
230 F. Supp. 3d 994 (N.D. Cal. 2017) .......................... 36, 49

*Step-Saver Data Sys., Inc. v. Wyse Tech.,*
912 F.2d 643 (3d Cir. 1990) ..................................... 46, 47

**Page(s)**

*Susan B. Anthony List v. Driehaus,*
   134 S. Ct. 2334 (2014) .................................................................47

*Texas v. United States,*
   201 F. Supp. 3d 810 (N.D. Tex 2016) ..........................................12

*Texas v. United States,*
   523 U.S. 296 (1998) .....................................................................48

*Train v. City of New York,*
   420 U.S. 35 (1975) ...............................................................21, 24,

*United States v. Alabama,*
   691 F.3d 1269 (11th Cir. 2012) ....................................................45

*United States v. Bd. of Comm'rs of Sheffield, Ala,*
   435 U.S. 110 (1978) .....................................................................15

*United States v. Morrison,*
   529 U.S. 598 (2000) .....................................................................41

*United States v. Wilson,*
   503 U.S. 329 (1992) .....................................................................20

*Univ. of Med. & Dentistry of N.J. v. Corrigan,*
   347 F.3d 57 (3d Cir. 2003) .......................................................8, 11

*Wabash Valley Power Ass'n, Inc. v. Rural Electrification Admin.,*
   903 F.2d 445 (7th Cir. 1990) ........................................................44

*Woodruff v. Hamilton Twp. Pub. Sch.,*
   No. CIV.06-3815NLH, 2007 WL 1876491 (D.N.J. June 26, 2007) ......................42

*Wright v. North Carolina,*
   787 F.3d 256 (4th Cir. 2015) ........................................................43

**CONSTITUTIONAL PROVISIONS**

U.S. Const. amend. X. ..................................................................*passim*

U.S. Const. art. I, § 8, cl. 1 ...............................................................24

U.S. Const. art. II, § 3, cl. 5 ..............................................................24

**STATUTES AND REGULATIONS**

5 U.S.C. § 702 ..................................................................................43

5 U.S.C. § 706 ..............................................................................8, 25

**Page(s)**

8 U.S.C. § 1101 ............................................................................ 49

8 U.S.C. § 1182 ............................................................................ 52

8 U.S.C. § 1357 ............................................................................ 49

8 U.S.C. § 1373 ..................................................................... *passim*

12 U.S.C. § 4569 .......................................................................... 54

28 U.S.C. § 509 ............................................................................ 14

34 U.S.C. § 10102 ................................................................. *passim*

34 U.S.C. § 10142 ........................................................................ 16

34 U.S.C. § 10152 ............................................................ 13, 21, 32

34 U.S.C. § 10153 ................................................................. *passim*

34 U.S.C. § 10156 ................................................................. 12, 17

34 U.S.C. § 10174 ........................................................................ 14

34 U.S.C. § 10191 ........................................................................ 14

34 U.S.C. § 10202 ........................................................................ 15

34 U.S.C. § 10222 ................................................................. 54, 55

34 U.S.C. § 10228 ........................................................................ 31

34 U.S.C. § 10251 ........................................................................ 31

34 U.S.C. § 10263 ........................................................................ 17

34 U.S.C. § 10304 ........................................................................ 17

34 U.S.C. § 10361 ........................................................................ 14

34 U.S.C. § 10442 ........................................................................ 17

34 U.S.C. § 11185 ........................................................................ 16

34 U.S.C. § 40914 ........................................................................ 20

42 U.S.C. § 12753 ........................................................................ 54

42 U.S.C. § 15027 ........................................................................ 54

**Page(s)**

47 U.S.C. § 224 .................................................................................................18

52 U.S.C. § 21081 .............................................................................................19

Enforce the Law for Sanctuary Cities Act, H.R. 3009, 114th Cong. (2015) ...............................23

Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. No. 104-208, 110 Stat. 3009–707 ...........................................................................................51

Michael Davis, Jr. and Danny Oliver in Honor of State and Local Law Enforcement Act, S. 1640, 114th Cong. (2015) ...............................................................................23

Pub. L. No. 100-690, 102 Stat. 4181 (1988) ..............................................................29

Stop Sanctuary Cities Act, S. 1814, 114th Cong. (2015) ...............................................23

28 C.F.R. § 0.90 (2017) ......................................................................................15

37 Pa. Code § 95.222 .........................................................................................52

**OTHER AUTHORITIES**

161 Cong. Rec. H2184-2186 (2016) ...........................................................................15

161 Cong. Rec. S2670-2672 (2016) ...........................................................................15

H. Rep. No. 114-544 (2015) ..................................................................................15

Circular A-102, Uniform Administrative Requirements for Grants in Aid to State and Local Governments, Attachment M, 42 Fed. Reg. 45,828 (Sept. 12, 1977). .......................22

Elizabeth M. McCormick, *Federal Anti-Sanctuary Law: A Failed Approach to Immigration Enforcement and a Poor Substitute for Real Reform*, 20 Lewis & Clark L. Rev. 165 (2016) ...........................................................................................35

Gov. Accountability Office, Report No. 12-353, "Law Enforcement Body Armor: DOJ Could Enhance Grant Management Controls and Better Ensure Consistency in Grant Program Requirements" (Feb. 2012), *available at* https://goo.gl/YGiu2F ...........................15

# **INTRODUCTION**

The Department of Justice has decided to use the Fiscal Year 2017 Byrne JAG program to mandate that State and local officials assist federal immigration authorities. Although "[r]egulation of immigration is exclusively a federal function, . . . it is not exclusively within the province of the executive branch of government." Mem. Op. on Mot. for Prelim. Inj. 6, 67 (Dkt. 74) ("Op."). Congress did not authorize the Department's actions, and the Constitution does not permit them.

Because acquiescing to the Department's demands would jeopardize Philadelphia's longstanding efforts to strengthen ties with vulnerable members of its community—efforts that are vital to improving public health and safety—the City filed this challenge to the Department's unlawful and unconstitutional actions and sought a preliminary injunction. After extensive proceedings, this Court concluded that the Department's advance notification and jail access Byrne JAG grant conditions "were issued without appropriate [statutory] authority"; that the decision to impose the Department's Section 1373 condition on the receipt of formula grant funds was arbitrary and capricious; and that the City "is likely to succeed" on its claims that the "conditions are improper under settled principles of the Spending Clause, the Tenth Amendment, and principles of federalism." Op. 6-7, 67. The Court also concluded the City is likely to show it can certify compliance with the Section 1373 condition because it substantially complies with Section 1373. Op. 128. The Court accordingly issued a preliminary injunction preventing the Department from denying the City's grant funding.

The Department's motion to dismiss Philadelphia's lawsuit largely repeats arguments this Court has already rejected, and falls far short of establishing that Philadelphia's complaint is not even "plausible on its face." *Renfro v. Unisys Corp.*, 671 F.3d 314, 320-321 (3d Cir. 2011)

(quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 n.12 (2011)). The Department's bare assertion (at 9-10) that Philadelphia has not alleged final agency action offers nothing to dispute the Court's finding that "the Attorney General has decided to impose the Challenged Conditions on applicants for JAG program funds, and that decision is one from which legal consequences will flow." Op. 49-50. Likewise, the Department cannot dispute that it has already directed the City to make changes to its policies to come into compliance with Section 1373, making the City's request for a declaratory judgment ripe. *See infra* pp. 45-48.

On the City's statutory challenge, the Department effectively concedes the Byrne JAG statutes grant no authority for the advance notification and jail access conditions, as it relies exclusively on 34 U.S.C. § 10102(a)(6), which is located elsewhere in Chapter 101 of Title 34, to justify those conditions. As the Court has already recognized, though, that provision does not independently justify *any* grant condition; it simply directs the Assistant Attorney General to exercise powers that may be "vested" in him elsewhere. Op. 52-53. The Department pins its remaining hope for its Section 1373 condition on the requirement that Byrne JAG applicants certify that they "will comply with all provisions of [Title 34, Chapter 101, Subchapter V, Part A] and all other applicable Federal laws." 34 U.S.C. § 10153(a)(5)(D). But the Department's reading of the statute cannot withstand scrutiny. Just like the statutory text and structure, the Department's consistent past practice in imposing JAG conditions belies its contention that it can make any federal statute, regulation, or Executive Order a condition for receiving criminal justice funds under the JAG program. In fact, the Department's practice extends back even further, to before the JAG program was enacted, as reflected in past guidance documents for federal grantees. The serious Spending Clause concerns with the Department's view only further compel its rejection.

The Department likewise fails to show that, "treat[ing] the allegations in the complaint as true and draw[ing] all reasonable inferences in favor of the [City]," it is entitled to dismissal of any of the City's other claims. *Plains All Am. Pipeline L.P. v. Cook*, 866 F.3d 534, 538 (3d Cir. 2017). The First Amended Complaint properly alleges that the Department's conditions were imposed without adequate explanation by the agency, that they fail to further the JAG program's goal of improving local criminal justice, and that they force States and cities like Philadelphia to expend resources complying with immigration enforcement mandates. It further sets forth a plausible claim that the City complies with a proper interpretation of Section 1373. Further discovery—which is already nearly complete—will confirm that the City is entitled to relief on each of its claims. There is certainly no basis for terminating proceedings now. In short, the Department cannot meet its burden of showing grounds for dismissal. The motion should be denied.

## BACKGROUND

### A. Factual Background

#### 1. Philadelphia's Policies

The Court is by now intimately familiar with the facts giving rise to this litigation. Philadelphia is home to a sizeable, and growing, immigrant population. *See* First Amended Complaint ¶ 23, Dkt. 84 ("FAC"). The City has developed policies over the past several decades to build trust between City officials and the immigrant community and to encourage all City residents to participate actively in City life. *Id.* ¶ 24. Four of those policies are relevant here.

First, in 2001, Philadelphia Police Commissioner John F. Timoney issued Memorandum 01-06, entitled "Departmental Policy Regarding Immigrants," which aims to "preserve the confidentiality of all information regarding law abiding immigrants to the maximum extent permitted by law." Memorandum 01-06 ¶ 2B, Dkt. 1-3. Memorandum 01-06 directs officers of

the Philadelphia Police Department not to disclose a person's immigration status unless "(1) required by law, or (2) the immigrant requests, in writing, that the information be provided, to verify his or her immigration status, or (3) the immigrant is suspected of engaging in criminal activity, including attempts to obtain public assistance benefits through the use of fraudulent documents." *Id.* ¶¶ 3A-3B. The memorandum makes clear, however, that "[t]he Philadelphia Police Department will continue to cooperate with federal authorities in investigating and apprehending immigrants suspected of criminal activities." *Id.* ¶ 3C; *see* FAC ¶¶ 25-32.

Second, in 2009, Mayor Michael A. Nutter issued Executive Order 8-09, "Policy Concerning Access of Immigrants to City Services." The order is intended to "promote the utilization of [City] services by all City residents and visitors who are entitled to and in need of them, including immigrants." Executive Order 8-09 pmbl., Dkt. 1-4. To achieve this, the order generally instructs City employees not to collect information about a person's immigration status, providing that: "No City officer or employee, other than law enforcement officers, shall inquire about a person's immigration status unless: (1) documentation of such person's immigration status is legally required for the determination of program, service or benefit eligibility . . . or (2) such officer or employee is required by law to inquire about such person's immigration status." *Id.* § 2A. The order also provides that law enforcement officers "shall not" stop, question, detain, or arrest an individual solely because of his perceived immigration status; shall not "inquire about a person's immigration status, unless the status itself is a necessary predicate of a crime the officer is investigating or unless the status is relevant to identification of a person who is suspected of committing a crime"; and shall not "inquire regarding immigration status for the purpose of enforcing immigration laws." *Id.* §§ 2B(1), (2), (4); *see* FAC ¶¶ 33-36. Executive Order 8-09 protects any information regarding immigration status that comes into

a City employee's possession, preventing disclosure of such information unless "such disclosure is required by law" or when the subject individual "is suspected . . . of engaging in criminal activity." *Id.* § 3B.

Third, the City has developed a policy for responding to detainer requests issued by U.S. Customs and Immigration Enforcement ("ICE"). *See* FAC ¶¶ 40-47. Under Executive Order 5-16 (Dkt. 1-6), as clarified by a March 2017 internal memorandum issued by First Deputy Managing Director Brian Abernathy (Dkt. 1-7): "No person in the custody of the City who otherwise would be released from custody shall be detained pursuant to an ICE civil immigration detainer request . . . nor shall notice of his or her pending release be provided, unless . . . the detainer is supported by a judicial warrant." FAC ¶ 45, 47. Like Memorandum 01-06 and Executive Order 8-09, the City's detainer policy forges trust with Philadelphia's immigrant community. *Id.* ¶ 48.

Fourth, in May 2017, the Philadelphia Department of Prisons implemented a new protocol for requests by ICE to interview inmates in Philadelphia's six jail facilities. The protocol provides that ICE may only interview an inmate if the inmate consents in writing. To implement this protocol, the Department of Prisons created a new "consent form," to be provided to any inmate in a Philadelphia facility whom ICE seeks to interview. The consent form informs the individual that "Immigration and Customs Enforcement ('ICE') wants to interview you" and that "[y]ou have the right to agree or to refuse this interview." FAC ¶ 52; Philadelphia Dep't of Prisons "Inmate Consent Form – ICE Interview", Dkt. 1-8.

These policies have so far achieved their desired effect. Philadelphia's immigrant population has grown, and it has contributed immensely to the City's economy, educational institutions, arts, and culture. *See* FAC ¶ 2. Philadelphia has also witnessed a significant

decrease in crime. Since 2009, when Executive Order 8-09 was enacted, Philadelphia has witnessed a decrease in crime of over 17 percent, including a 20 percent decrease in violent crime. FAC ¶¶ 30, 39. Property crimes, robberies, and violent crime are at their lowest levels since the 1960s and 1970s. *Id.* ¶ 3. Philadelphia's experience is of course not unique; it has been the experience of law enforcement across the country that reporting on the immigration status of residents, or even asking about status, deters persons of foreign backgrounds from reporting crimes or cooperating with law enforcement while declining to do so strengthens community policing. *Id.* ¶¶ 31-32.

### 2. The Challenged Conditions

The Department's recent actions threaten to reverse the City's progress in building trust with the immigrant community and improving police-community communications to fight crime. The Department seeks to deprive one of the nation's largest and most impoverished cities of important congressional funding under the Edward Byrne Memorial Justice Assistance Grant Program (the "Byrne JAG" or "JAG" program) and prevent Philadelphia from deciding for itself how to cooperate with federal immigration enforcement efforts.

In July 2016, the Department's Office of Justice Programs ("OJP") announced for the first time ever that JAG recipients would be required to certify compliance with 8 U.S.C. § 1373 (the "Section 1373 condition"). FAC ¶ 78. The Department announced two more conditions in July 2017: JAG recipients must also allow federal agents to access any detention facility they maintain to meet with persons of interest (the "jail access" condition); and must provide at least 48 hours' advance notice to the Department of Homeland Security ("DHS") regarding the scheduled release date and time of an inmate for whom DHS requests such notifications (the "advance notification" condition). *See* FAC ¶¶ 92-96. Each of these three conditions appeared in the JAG award documents issued to the County of Greenville, South Carolina and the City of

Binghamton, New York in August 2017, and the Acting Assistant Attorney General for OJP indicated the conditions were "being included in each award document being generated within OJP for awards under the FY 2017 Byrne JAG – Local Solicitation." Decl. of Alan Hanson ¶ 6, *City of Chicago v. Sessions*, No. 1:17-cv-05720, (N.D. Ill. Aug. 24, 2017), ECF No. 32-1 ("Hanson *Chicago* Decl."); *see also* FAC ¶ 93 nn.37, 38; Greenville Award ¶¶ 52-56, Dkt. 21-6.

Since imposing the Section 1373 condition in 2016, the Department has taken steps to enforce it. In April 2017, the Department sent letters to Philadelphia and eight other jurisdictions "alert[ing]" the recipients that they must submit a certification of compliance with Section 1373, along with an "official legal opinion from counsel." FAC ¶ 83. Philadelphia submitted its certification on June 22, 2017. *Id.* ¶ 84. The Department responded on October 11, 2017, informing Philadelphia that two aspects of its policies are "in violation" of Section 1373, and that another three will also be found to violate Section 1373 unless the City sends "communicat[ions] . . . to its officers and employees" (by October 27, 2017) to disregard the City's confidentiality and non-disclosure mandates for communications with federal officials. *Id.* ¶ 91.

### B. Procedural History

Philadelphia filed a complaint challenging these three conditions (referred to herein as the "Challenged Conditions") on August 30, 2017. Dkt. 1. The City submitted its application for FY 2017 Byrne JAG funding on September 5, 2017. FAC ¶ 97. Ten days later, the U.S. District Court for the Northern District of Illinois issued a nationwide injunction prohibiting the Department from imposing the jail access and advance notification conditions. *See City of Chicago v. Sessions*, 264 F. Supp. 3d 933, 950 (N.D. Ill. 2017). The Department's appeal of that ruling is pending before the Seventh Circuit. *City of Chicago v. Sessions*, No. 17-2991 (7th Cir., filed Sept. 26, 2017).

Less than two weeks after the *Chicago* injunction issued, Philadelphia moved for a preliminary injunction in this Court "because of approaching events that threatened to deprive the City of Philadelphia" of its FY 2017 JAG allocation, as well as "the non-monetary consequences of the federal government's proposed actions." Op. 1. Following an evidentiary hearing, submissions of proposed findings of fact, oral argument, and supplemental briefing, the Court granted the City's motion, and issued a thorough memorandum opinion. *Id.*

The Court found "the Attorney General has decided to impose the Challenged Conditions on applicants for JAG Program funds, and that the decision is one from which legal consequences will flow," and thus, that decision "'represents the agency's definitive position on the question,' such that it is now 'final' and ripe for th[e] Court's review." Op. 50 (quoting *Univ. of Med. & Dentistry of N.J. v. Corrigan*, 347 F.3d 57, 69 (3d Cir. 2003)). The Court found that the advance notification and jail access conditions "were issued without appropriate authority under the Administrative Procedure Act." Op. 6. The Court also "conclude[d] the City is likely to succeed in its claims that the Department of Justice's conditions are improper under settled principles of the Spending Clause, the Tenth Amendment, and principles of federalism." Op. 7. The Court explained that it declined to rule whether the Section 1373 is authorized by statute, describing the question as a "close call." Op. 57-58. But the Court did conclude that the Department's decision to impose the condition was "arbitrary and capricious under 5 U.S.C. § 706(2)(A)." Op. 67. And while the Court did not "specifically so hold[]," the Court "conclude[d] . . . that Philadelphia is likely to succeed on the merits of its Tenth Amendment challenge" to all three conditions. Op. 113. The Court further found that "the record of the case clearly shows, giving due credibility to the testimony about the City's practices, that Philadelphia is in 'substantial compliance' with all of these DOJ conditions." Op. 7. The Court accordingly

issued a preliminary injunction barring the Department "from rejecting Philadelphia's FY 2017 application for Byrne JAG funding or withholding any FY 2017 Byrne JAG funding from Philadelphia based on Philadelphia's certification of compliance with 8 U.S.C. § 1373." Dkt. 75.

Notwithstanding the Court's November 15, 2017 ruling and the expiration of FY 2017, the Department has not issued a decision on Philadelphia's FY 2017 Byrne JAG application. FAC ¶ 17. The City accordingly filed a First Amended Complaint on January 8, 2018, to assert claims for mandamus relief based on the Department's unlawful and unjustifiable delay in processing the City's application. *See* FAC ¶ 17. The parties have since engaged in discovery, and the Department has appealed the Court's preliminary injunction to the Third Circuit. *See* Dkt. 86. The Court set February 2, 2018, as the Department's deadline to respond to the First Amended Complaint, and the Department opted to file this motion.[1] *See* Dkt. 95.

## ARGUMENT

## I.    LEGAL STANDARDS

In moving to dismiss, the Department "bears the burden of proving"—as to each count— that "the [City] has failed to articulate a claim upon which relief could be granted." *Kundratic v. Thomas*, 407 F. App'x 625, 627 (3d Cir. 2011) (citing *Gould Elecs., Inc. v. United States,* 220 F.3d 169, 178 (3d Cir. 2000)). As with all motions to dismiss pursuant to Rule 12(b)(6), this court "must 'accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'" *Badger v. Stryden, Inc.*, No. 2:09-CV-3619-

---

[1] The Department also filed motions to dismiss in three other challenges to its new JAG conditions, including the *Chicago* case. *See* Mem. in Supp. of Def.'s Mot. to Dismiss, *City of Chicago v. Sessions*, No. 17-cv-05720 (N.D. Ill. Jan. 3, 2018), ECF No. 139; Def.'s Mot. to Dismiss, *California v. Sessions*, No. 17-cv-04701 (N.D. Cal. Jan. 16, 2018), ECF No. 77; Def.'s Mot. to Dismiss, *City & Cty. of San Francisco v. Sessions*, No. 17-cv-04642 (N.D. Cal. Jan. 19, 2018), ECF No. 66.

CDJ, 2016 WL 3014867, at *2 (E.D. Pa. May 26, 2016) (quoting *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)). "The question is 'not whether [the City] will ultimately prevail . . . but whether [its] complaint [is] sufficient to cross the federal court's threshold." *Renfro*, 671 F.3d at 320-321 (quoting *Skinner v. Switzer*, 562 U.S. 521, 529-530 (2011)). The Complaint "need only allege 'enough facts to state a claim to relief that is plausible on its face." *Id.* at 321 (quoting *Matrixx Initiatives*, at 1322 n.12).[2] The Department has not—and cannot—come close to meeting its burden.

## II. PHILADELPHIA HAS PROPERLY ALLEGED FINAL AGENCY ACTION.

The Department argues first that the City does not allege a final agency action, contending that the Department "has not yet . . . imposed any condition on an FY 2017 award to the City." Def.'s Mem. in Support of Mot. to Dismiss at 9, Dkt. 102-1 ("MTD"). But the City has plausibly alleged (and the Department's own statements have confirmed) that the Department took final agency action in the imposition of the three conditions. *See* FAC ¶¶ 13, 92. As this Court has already and correctly ruled, "the agency has acted" and that action is "'final' and ripe for this Court's review." Op. 49-50.

For a court to find final agency action, two conditions must be met: (1) "the action must mark the 'consummation' of the agency's decisionmaking process[, and] . . . not be of a merely tentative or interlocutory nature"; and (2) "the action must be one by which 'rights or obligations

---

[2] The Department styles its motion as one under Rules 12(b)(1) and 12(b)(6). This does not change the legal standard. *See Congregation Kollel, Inc. v. Twp. of Howell, N.J.*, No. 16-cv-2457-FLW, 2017 WL 637689, at *4 (D.N.J. Feb. 16, 2017) (citing *Evanston Ins. Co. v. Layne Thomas Builders, Inc.*, 635 F. Supp. 2d 348, 352 (D. Del. 2009)); *see also Plains All Am. Pipeline*, 866 F.3d at 538 (stating that when considering a Rule 12(b)(1) motion, a court "treat[s] the allegations in the complaint as true and draw[s] all reasonable inferences in favor of the plaintiff"); *Stanton v. City of Philadelphia*, No. 10-cv-2726, 2011 WL 710481, at *2 (E.D. Pa. Mar. 1, 2011) (collecting cases and explaining that the Third Circuit has reviewed ripeness issues under both Rule 12(b)(1) and Rule 12(b)(6)).

have been determined,' or from which 'legal consequences will flow.'"  *Ocean Cty. Landfill Corp. v. U.S. E.P.A., Region II*, 631 F.3d 652, 655 (3d Cir. 2011) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)).  Both are met here.

First, the Department's July 2017 announcement of the Challenged Conditions reflects the "consummation" of the agency's decision to impose them.  *Ocean Cty. Landfill Corp.*, 631 F.3d at 655.  After announcing that all grant "recipients" would be "required" to comply with the three conditions, *see* FAC ¶ 92, the Department issued two JAG awards, one to the County of Greenville, South Carolina, and one to the City of Binghamton, New York, both containing the Challenged Conditions.  Decl. of Alan R. Hanson ¶ 5, Dkt. 28-1.  The Department then doubled down in a sworn declaration in the *Chicago* litigation stating that every locality's FY 2017 award will contain terms *identical* to those printed in Greenville's award.  Hanson *Chicago* Decl. ¶ 6. These actions clearly "represent[] the agency's definitive position" that the conditions apply. *Corrigan*, 347 F.3d at 69 (quoting *CEC Energy Co. v. Public Serv. Comm'n,* 891 F. 2d 1107, 1110 (3d Cir. 1989)).  On top of that, at oral argument on the City's motion for preliminary injunction, the Department explained that until the appeal is *Chicago* "is resolved," Philadelphia will not be granted an award, regardless of whether the City would comply with the Challenged Conditions; the agency is so committed to imposing the conditions on every Byrne JAG award that it refuses to issue *any* awards until the injunction is lifted or resolved.  Nov. 2, 2017 Tr. at 62:4-63:17, Dkt. 72; *see also* FAC ¶ 17.  The Department cannot, on the one hand, claim an action is tentative or interlocutory while simultaneously, on the other hand, holding steadfast to that decision until a federal court orders otherwise.

Second, the imposition of the Challenged Conditions triggers significant "legal consequences" for the City.  *Ocean Cty. Landfill Corp.*, 631 F.3d at 655.  Philadelphia must

certify compliance or forgo a formula grant that Congress has already appropriated and designated for it. *Cf. Texas v. United States*, 201 F. Supp. 3d 810, 824 (N.D. Tex 2016) ("[T]he challenged agency action has the effect of committing the agency itself to a view of the law that, in turn, forces the plaintiff to either alter its conduct, or expose itself to liability." (quotation marks omitted)). By requiring the chief legal officer to certify compliance with Section 1373, and the grantee to certify compliance under penalty of perjury for all three Challenged Conditions, the Department's decision requires Philadelphia to act. *See Abbott Labs. v. Gardner*, 387 U.S. 136, 153 (1967) (finding final agency action "where a regulation requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance"). A further indicator is the Department's October 11 direction that the City must come into compliance with its view of Section 1373. *See infra* p. 46-47. Thus, the Department's imposition of the Challenged Conditions is final.

## III. PHILADELPHIA HAS PROPERLY ALLEGED THAT THE DEPARTMENT'S IMPOSITION OF THE CHALLENGED CONDITIONS IS CONTRARY TO FEDERAL STATUTE.

Turning to the merits of Philadelphia's claims, the City's amended complaint demonstrates a host of reasons the Challenged Conditions are unlawful. To begin, as Count I alleges, they are not authorized by statute.

The Byrne JAG program proceeds from a basic premise: "that crime is essentially a local problem that must be dealt with by State and local governments if it is to be controlled effectively." S. Rep. No. 90-1097, at 1 (1968). Congress structured the program as a formula grant, one that allocates money among applicants according to pre-set formulas that depend on population counts and crime levels. *See* 34 U.S.C. § 10156(a) ("the Attorney General shall . . . allocate"), *id.* § 10156(d) ("grants . . . shall be made"). Congress chose not to use a discretionary

grant model, under which an administering agency may have some authority to select among applicants. *See City of Los Angeles v. McLaughlin*, 865 F.2d 1084, 1088 (9th Cir. 1989) ("[F]ormula grants," unlike discretionary ones, "are not awarded at the discretion of a state or federal agency, but are awarded pursuant to a statutory formula."); *U.S. ex rel. Bauchwitz v. Holloman*, 671 F. Supp. 2d 674, n.16 (E.D. Pa. 2009) (similar). Because of this choice, States and local governments are entitled to their share of the Byrne JAG allocation each year, so long as their grant proposals fall within the statute's eight broadly defined programmatic areas, each of which pertain to aspects of the applicant's criminal justice system. *See* 34 U.S.C. §§ 10152(a)(1)(A)-(H).

In imposing the Challenged Conditions, the Attorney General is attempting to turn a statute expressly designed to limit his discretion into one that grants him unlimited authority. He cannot. No statute authorizes the Attorney General to impose these conditions on Byrne JAG funding. The Department offers up two provisions but misreads both. The first, 34 U.S.C. § 10102(a)(6), does not contain a grant of authority. The second, 34 U.S.C. § 10153(a)(5)(D), cannot bear the limitless interpretation the Department gives it.

### A. Section 10102(a)(6) Does Not Authorize the Challenged Conditions.

The Department first attempts to locate the authority to impose the new conditions in 34 U.S.C. § 10102(a)(6), arguing that it contains an independent grant of authority to impose conditions on Department grant programs overseen by the Assistant Attorney General ("AAG") of the Office of Justice Programs ("OJP"). MTD 11-12. The plain text of Section 10102(a)(6) and the surrounding statutory structure foreclose the Department's reading.

Section 10102(a)(6) appears in a provision delineating the duties and functions of the AAG. The AAG must provide information relating to the criminal justice system to the public and other government entities and liaise with the public and other government entities on matters

13

relating to criminal justice. *Id.* § 10102(a)(1)-(4). The AAG is also responsible for coordinating the work of five offices and bureaus within OJP that oversee grant-making programs. *See id.* § 10102(a)(5). And as most relevant here, the AAG must "exercise such other powers and functions as may be vested in the [AAG] pursuant to this chapter [101 of Title 34] or by delegation of the Attorney General, including placing special conditions on all grants, and determining priority purposes for formula grants." *Id.* § 10102(a)(6).[3]

The text of Section 10102(a)(6) is clear and does not contain an independent grant of authority. Instead, it directs the AAG to "exercise" two sets of "powers and functions" that may be "vested" in him: (1) powers given to the AAG directly in other provisions of Chapter 101, and (2) powers delegated to the AAG by the Attorney General, who in turn must be acting pursuant to some source of delegated authority. In other words, Section 10102(a)(6) directs the AAG to "exercise," or to make use of, power vested in him or in his supervisor by other federal statutory provisions.[4] *See Exercise*, Black's Law Dictionary (10th ed. 2014) (defining "exercise" as "[t]o make use of; to put into action"). The "including" clause of Section 10102(a) simply makes clear that the powers and functions the AAG can exercise, either because Chapter 101 vests them in him or because the Attorney General delegates them to him, "includ[e] placing special conditions on all grants, and determining priority purposes for formula grants." 34 U.S.C. § 10102(a)(6); *see Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941) ("[T]he term 'including' is not one of all-embracing definition, but connotes simply an

---

[3] Chapter 101 of Title 34 is entitled "Justice System Improvements" and contains numerous programs to improve the criminal justice system, including grant programs. Some of the grant programs are discretionary grants. *See, e.g.*, 34 U.S.C. §§ 10174, 10191, 10361. Others, like the Byrne JAG program, are formula grants. *See, e.g.*, *id.* §§ 10401, 20102.

[4] Provisions setting out the functions of an office commonly reference existing authorities and do not independently grant new authority. *See, e.g.* 28 U.S.C. § 509 ("All functions of other officers of the Department of Justice and all functions of agencies and employees of the Department of Justice are vested in the Attorney General except [certain specified functions].").

illustrative application of the general principle."). It cannot be read as an independent grant of authority without replacing "including" with "and also." *See P.C. Pfeiffer Co. v. Ford*, 444 U.S. 69, 77 n.7 (1979) (rejecting an interpretation that "suppose[d] that the word 'including' means 'and' or 'as well as'").

The Department's regulations confirm this reading. The provision governing the AAG's authorities does not mention any role in setting grant conditions; indeed, the provision does not reference the functions in Section 10102(a)(6) at all. *See* 28 C.F.R. § 0.90 (2017). If Section 10102(a)(6) did confer independent or additional authority, rather than merely confirm the AAG's obligation to carry out existing or delegated authorities, one would expect the Department's own regulations to say so.[5]

---

[5] The Department claims that Congress has "codified" some conditions imposed on JAG awards, citing a single example: In FY 2012, the Department began to obligate grantees to have a policy requiring officers to wear bulletproof vests before Byrne funds could be used to purchase them, and in 2016, Congress enacted a statutory mandatory wear requirement for all BJA-funded vest purchases. MTD 6 (citing 34 U.S.C. § 10202(c)(1)(B), (C)). The Department does not explain why this matters. *See id.* If the Department is suggesting that it relied on Section 10102(a)(6) to impose that condition in 2012 and that Congress acknowledged such authority in 2016, it is wrong. First, it provides nothing to support its premise about the Department's basis for imposing the conditions. The run-up to the 2012 condition suggests that, if anything, the Department was relying on its authority in 34 U.S.C. § 10153(a)(4) to require grantees to "maintain and report . . . data, records, and information" about how grant money is used, and its authority in Section 10153(a)(5)(A) to require a certification that "programs to be funded by the grant meet all the requirements of [Part A of Chapter 101, Subchapter V]." *See* Gov. Accountability Office, Report No. 12-353, "Law Enforcement Body Armor: DOJ Could Enhance Grant Management Controls and Better Ensure Consistency in Grant Program Requirements," at 24, 37-38 (Feb. 2012), *available at* https://goo.gl/YGiu2F. And second, the legislative history contains no hint that Congress knew about, much less approved of, the Department's interpretation of its own authority. *See* H. Rep. No. 114-544 (2015); 161 Cong. Rec. S2670-2672 (daily ed. May 6, 2016); 161 Cong. Rec. H2184-2186 (daily ed. May 10, 2016). That silence defeats the notion that Congress somehow ratified the Department's view. *See United States v. Bd. of Comm'rs of Sheffield, Ala*, 435 U.S. 110, 135 (1978); *accord Comm'r of Internal Revenue v. Sun Pipe Line Co.*, 126 F.2d 888, 891-892 (3d Cir. 1942) (rejecting argument that Congress endorsed an agency interpretation when "legislative knowledge of the regulations appear[ed] too doubtful").

The Department's view that Section 10102(a)(6) contains an independent grant of authority not only disregards the plain text of Section 10102(a)(6) but also renders superfluous other provisions in Chapter 101 relating to grant conditions. For example, the Director of the Bureau of Justice Assistance, located within OJP, has the authority to "award[] and allocate[] funds and technical assistance in accordance with the criteria of [the Bureau of Justice Assistance discretionary grant provisions], and *on terms and conditions determined by the Director to be consistent with* [*those provisions*]." 34 U.S.C. § 10142(2) (emphasis added). And the Administrator of the Office of Juvenile Justice and Delinquency Prevention, also located within OJP, is authorized to make payments "pursuant to a grant or contract . . . in advance or by way of reimbursement, in such installments and *on such conditions as the Administrator may determine*." 34 U.S.C. § 11185(a) (emphasis added). There would be no need for Congress to specify these limited grants of authority to the Director and Administrator to impose conditions on grants if Section 10102(a)(6) already granted their superior—the AAG—unfettered discretion to impose the same types of conditions. *See City of Chicago*, 264 F. Supp. 3d at 942. That is because the AAG could have accomplished the same result as these statutory grants of authority through administrative delegation of his Section 10102(a)(6) authority.

The Department's insistence that the "including" clause be construed to confer independent authority on the AAG, lest it have no effect, rests on a superfluity problem that does not exist. The Department points out that a provision delineating the duties and functions of the Director of the Violence Against Women Office lacks a similar "including" clause and argues that the inclusion of the clause in Section 10102(a)(6) must therefore be significant. MTD 12-13. The City does not disagree that the "including" clause has meaning: Its meaning is to *illustrate* the types of "powers and functions" that can be delegated to the AAG under the first

clause. That illustrative function alone renders the clause non-superfluous. What is more, as the Department itself has explained, the Violence Against Women Office is separate from OJP, and the use of "different language . . . in connection with that distinct program has no evident bearing on the issue presented here." App. Br. at 20, *City of Chicago v. Sessions*, No. 17-2991 (7th Cir. Nov. 28, 2017), ECF No. 39. And, in any event, differences between these Department of Justice offices easily explain the difference in statutory language. The Violence Against Women Office has no subordinate offices and its Director reports directly to the Attorney General. *See* 34 U.S.C. § 10442. The OJP, in contrast, "coordinate[s] the activities of" five other offices, *id.* § 10102(5), each of which is headed by an official who reports to the Attorney General through the Assistant Attorney General, *id.* §§ 10132(a)-(b), 10141(a)-(b), 11111(a)-(b), 20111(a)-(b), and each of whom has statutory authority to run that office's grant programs*, id.* §§ 10132(b) ("final authority"), 10141(b) (same), 11111(b) (similar), 20111(b) ("final authority"). The more complicated chain of command within OJP helps explain Congress's choice to illustrate one kind of grant-related authority—vested in, or delegated to, the AAG—in Section 10102(6), without doing the same for the Director of the Violence Against Women Office.

The Department also hints that the reference in the Section 10102(a)(6) "including" clause to "determining priority purposes for formula grants" authorizes the new conditions. MTD 11, 13. That suggestion is doubly wrong. Again, the clause does not contain an independent grant of authority at all. But in any event, the Challenged Conditions cannot be justified as an exercise of authority to "determin[e] priority *purposes* for formula grants." 34 U.S.C. § 10102(a)(6) (emphasis added). As is evident in other provisions in Chapter 101, prioritization of formula grant money refers to allocating available funds among eligible applicants. *See id.* §§ 10156(f), 10263(3), 10304(b). The Department has not done that here. To

start, the Department does not even attempt to explain why such prioritization would be necessary due to, for example, some scarcity of funds or need to reprogram funds. Most importantly, thee Challenged Conditions do not prioritize among eligible grantees, but rather render every applicant who refuses to accede to the conditions wholly ineligible for funding. That is not a "prioritization" in the doling out of formula grant funds; it is a wholesale revision of Congress's formula grant criteria.

**B.** **Section 10153(a)(5)(D) Does Not Authorize the Section 1373 Certification Condition.**

The Department next attempts to locate the authority to impose the Section 1373 condition in 34 U.S.C. § 10153(a)(5)(D), which requires Byrne JAG program applicants to certify that "the applicant will comply with all provisions of this part and all other applicable Federal laws."[6] While the Section 1373 condition does obviously relate to a federal law, that law is not an "applicable Federal law" within the meaning of Section 10153(a)(5)(D).

The Department argues that "applicable Federal laws" are those federal provisions that apply to the applicant. MTD 19. The first problem with that interpretation is that it would render Section 10153(a)(5)(D) unconstitutional. Congress cannot exercise its spending powers to impose conditions on federal grantees that are not "reasonably calculated to address th[e] particular . . . purpose for which the funds are expended." *South Dakota v. Dole*, 483 U.S. 203, 209 (1987); *see infra* pp. 28-36. Many federal laws impose obligations on state and local governments but bear no relation to the administration or goals of the Byrne JAG program. *See, e.g.*, 47 U.S.C. § 224(c) (requirements on States which regulate utility pole attachments); 52

---

[6] As this Court recognized, the jail access and advance notification conditions are not grounded in any federal law, and so Section 10153(a)(5)(D) cannot authorize them. Op. 105. The Department concedes this point. It discusses only the Section 1373 condition under Section 10153(a)(5)(D). MTD 13-15.

U.S.C. § 21081 (voting system standards).[7]  The Department's suggestion that "applicable Federal laws" include literally every provision in the U.S. Code or Code of Federal Regulations that "applies" to a locality must be rejected out of the gate.

Rather, "all other applicable Federal laws" should be construed to refer to those federal laws—statutes, regulations, and executive orders—that by their text govern federal grantees. Along with avoiding any constitutional concerns, this reading best aligns with the statutory text, the statutory structure, the Department's longstanding practice, and Congress's consistent rejection of attempts to tie grant funding to Section 1373 or other immigration enforcement requirements.

1. Start with the rest of Section 10153(a)(5)(D), which refers to "all provisions of this part and all other applicable Federal laws."  The reference to *other* applicable federal laws follows a specific reference to the provisions "of this part" governing Byrne JAG grantees.  It should be read in light of that specific reference, to refer to "other" federal laws governing federal grantees.  *See, e.g., Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114-115 (2001) (finding that the phrase "any other class of workers" should be "controlled and defined by reference to" the preceding terms, "seamen" and "railroad employees" (quotation marks omitted)).

---

[7]  In an aside, the Department points to the portion of Section 10153(a) that requires applicants to submit applications "in such form as the Attorney General may require" and argues that it delegates to the Attorney General the authority to decide which Federal laws are "other applicable Federal laws."  MTD 14.  Not so.  This language permits the Attorney General to prescribe only the manner in which the applicant communicates the statutorily-required information.  *See Form*, Black's Law Dictionary (10th ed. 2014) (defining "form" as "[t]he . . . configuration of something, as distinguished from its substance or matter"); *see also Edelman v. Lynchburg Coll.*, 535 U.S. 106, 113 (2002) (discussing whether the EEOC Commissioner had overstepped his authority to set the "form" of charges of discrimination by "address[ing] a substantive issue over which the EEOC has no rulemaking power").

Consider next the immediately surrounding provisions. These require an applicant to make three other certifications related to its application: that the application seeks funds for programs that "meet" the Byrne JAG program's requirements; that the information in the application "is" correct; and that the applicant "has" coordinated with affected agencies as appropriate. *See* 34 U.S.C. § 10153(a)(5)(A)-(C). Part of this list, Section 10153(a)(5)(D), requires applicants to certify that, going forward, the applicant "will" comply with "all provisions of this part and all other applicable Federal laws." The first three items ensure that the applicant has complied with the requirements related to preparing and submitting the Byrne JAG application. And so the fourth item, aimed at the applicant's future actions, should be read to ensure that the applicant will comply with obligations—within the Byrne JAG statute and within federal laws that govern the administration of granted funds—that will apply once it becomes a federal grantee. *See Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 20-21 (2011) ("That several items in a list share an attribute counsel in favor of interpreting the other items as possessing that attribute as well." (quotation marks omitted)); *see also United States v. Wilson*, 503 U.S. 329, 333 (1992) ("Congress' use of a verb tense is significant in construing statutes.").

2. Moreover, in several places in the U.S. Code, Congress has already identified those statutes (not already generally-applicable to federal grantees by their terms) for which Byrne JAG funding can be used as a stick to encourage compliance. It gave the Attorney General carefully circumscribed authority to withhold small portions of Byrne JAG funding based on non-compliance with certain laws. *See, e.g.*, 34 U.S.C. § 40914(b)-(c) (National Instant Criminal Background Check System, 5% of grant if a State transmits fewer than 90% of the required records); *id.* § 20927(c)-(d) (sex offender registration and notification, 10% of grant the year

after a grantee fails to substantially implement requirements); *id.* § 30307(e)(2) (prison rape elimination, 5% of grant to be used to bring jurisdiction into compliance or to be held in abeyance until jurisdiction complies); *id.* § 60105(c)-(d) (death in custody reporting, maximum 10% reduction in the next fiscal year's grant).  Reading Section 10153(a)(5)(D) to allow the Attorney General to cut off *all* funding for the failure to comply with *any* federal law renders these specific choices meaningless.

Beyond the text of Section 10153(a)(D) and the text of the few other federal laws that expressly make JAG funds contingent on compliance therewith, the structure of the Byrne JAG statute as a whole reinforces that the Department's interpretation of "applicable Federal laws" is incorrect.  The Byrne JAG statute authorizes the Attorney General to make grants, "in accordance with the [prescribed statutory] formula," for eight types of programs: law enforcement; prosecution and courts; prevention and education; corrections and community corrections; drug treatment and enforcement; planning, evaluation, and technology improvement; crime victim and witness (other than compensation); and mental health programs and related law enforcement and corrections programs.  34 U.S.C. § 10152(a)(1).  And it prohibits the use of funding for a few purposes.  *See id.* § 10152(d).  Beyond these parameters, the Byrne JAG program gives state and local law enforcement the "flexibility to spend [federal] money for programs that work for them."  H.R. Rep. No. 109-233, at 89 (2005).  Interpreting Section 10153(a)(5)(D) to allow the Attorney General to withhold funds based on a jurisdiction's non-compliance with any provision in the U.S. Code turns a predictable formula grant funding stream into one that changes with the tide of the Attorney General's preferences.  *See Train v. City of New York*, 420 U.S. 35, 45-46 (1975) ("We cannot believe that Congress at the last minute

scuttled the entire effort by providing the Executive with the seemingly limitless power to withhold funds from the allotment and obligation.").

3. The Department's longstanding practice further supports this reading. From the time the Byrne JAG program was created in 2005 until today, the Attorney General has never insisted that applicants comply with laws beyond those governing federal grantees. Rather, all of the conditions it has historically imposed on grantees have either (1) related to the disbursement of the grants themselves, to ensure they meet the Byrne JAG program's requirements, *see* 34 U.S.C. § 10153(a)(5)(D) ("all provisions of this part"); (2) pertained to the accounting of that spending, *see id.* § 10153(a)(4) ("maintain and report such data, records, and information (programmatic and financial) as the Attorney General may reasonably require"); or (3) related to statutes that apply to federal grantees by their express terms, *see id.* § 10153(a)(5)(D) ("*other applicable Federal laws*" (emphasis added)). Philadelphia catalogued all of the 53 special conditions printed in its FY 2016 award and demonstrated that each fell into one of those three buckets. *See* Analysis of FY 2016 Byrne JAG Award Special Conditions, Dkt. 21-11. The new Section 1373 condition falls outside all three; there is simply no precedent for it.

Indeed, the Department's practice of requiring assurances of compliance only for cross-cutting laws that apply to federal grantees dates back to before the Byrne JAG program's predecessors were enacted. The standard form for grant applications contained in the Office of Management and Budget's guidance listed a set of required assurances of compliance with various Federal laws "as they relate to the application, acceptance, and use of Federal funds." Circular A-102, Uniform Administrative Requirements for Grants in Aid to State and Local Governments, Attachment M, 42 Fed. Reg. 45,828, 45,845, 45,864-45,865 (Sept. 12, 1977). It prohibited agencies from adding "[a]dditional assurances . . . to the standard assurances . . .

unless specifically required by law." *Id.*, at 45,845. The 1978 Department guidance manual for grant programs aligns with this guidance. *See* Amicus Brief of State of New York, et al., Add. at 17-40, *City of Chicago v. Sessions*, No. 1:17-cv-5720 (Jan. 31 2018), ECF. No. 149-1. And the Department has maintained that practice. *See* U.S. Dep't of Justice, 2015 DOJ Grants Financial Guide, at 5, *available at* https://goo.gl/ATgjaL (explaining that various "assurances and certifications are made by signing an assurances form that addresses various cross-cutting federal requirements, including those prohibiting unlawful discrimination").

4. Finally, Congress has consistently rejected legislation that would have tied Byrne JAG program funding to a jurisdiction's cooperation with federal immigration enforcement. *See, e.g.*, Enforce the Law for Sanctuary Cities Act, H.R. 3009, § 3(b), 114th Cong. (2015) (proposing that the Attorney General shall withhold Byrne JAG grant awards from any jurisdiction that "ha[d] in effect" a policy "in contravention of" Section 1373); Stop Sanctuary Cities Act, S. 1814, 114th Cong. (2015) (proposing that jurisdictions not in compliance with Section 1373 be "[in]eligible to receive a grant under the Byrne Memorial Justice Assistance Grant Program" following a 180 period to remedy non-compliance). It rejected similar bills relating to broader categories of funding. *See, e.g.*, Michael Davis, Jr. and Danny Oliver in Honor of State and Local Law Enforcement Act, S. 1640, § 114, 114th Cong. (2015) (proposing that jurisdictions not in compliance with Section 1373 be "[in]eligible to receive" "any . . . law enforcement or Department of Homeland Security Grant").[8] Not only has Congress declined to condition funding on compliance with Section 1373, it chose not to impose *any* consequences on non-compliance in Section 1373 itself. *See* 8 U.S.C. § 1373. The provision's only effect is to preempt contrary state or local legislation, as the Department itself has asserted. *See* Br. for

---

[8] These bills, and additional examples, can be found in Exhibits E-1 through E-4 to Philadelphia's motion for a preliminary injunction (Dkt. 21-7 through Dkt. 21-10).

United States at 51-52, *Arizona v. United States*, 567 U.S. 387 (2012) (No. 11-182), 2012 WL 939048 ("Congress enacted Section 1373 to preempt various state and local laws and policies that, at the time, precluded officials from sharing information with federal immigration authorities.").

## IV. PHILADELPHIA HAS PROPERLY ALLEGED THAT THE DEPARTMENT'S IMPOSITION OF THE CHALLENGED CONDITIONS VIOLATES THE SEPARATION OF POWERS.

Count II of the City's Amended Complaint sufficiently alleges that the Attorney General's decision to impose conditions not authorized by statute on Byrne JAG funds violated the Constitution's separation of powers principles. In imposing conditions on federal spending that Congress itself has not, the Attorney General has usurped Congress' appropriations power. The Constitution vests Congress, not the President or his appointees, with the power to appropriate funding to "provide for the . . . general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. When Congress makes an appropriation, the Executive Branch officials, from the President on down to the Assistant Attorney General—have a duty to carry out that appropriation. *See* U.S. Const. art. II, § 3, cl. 5. They may not, as here, amend or cancel a duly enacted appropriation. *See Clinton v. City of New York*, 524 U.S. 417, 438 (1998). And they cannot, through the imposition of conditions not specified in a statute, choose to spend less than the full amount of funding Congress has appropriated. *See Train*, 420 U.S. at 44; *see also In re Aiken Cty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (the President cannot "refuse to spend . . . funds" that Congress appropriated "for a particular project or program"); *Dabney v. Reagan*, 542 F. Supp. 756, 764-768 (S.D.N.Y. 1982) (officials at HUD could not decide unilaterally not to "mak[e] available" statutorily "appropriated funds").

## V.    PHILADELPHIA HAS PROPERLY ALLEGED THAT THE DEPARTMENT'S DECISION TO IMPOSE THE CONDITIONS WAS ARBITRARY AND CAPRICIOUS.

Even if the Department had a statutory basis to impose the Challenged Conditions on Byrne JAG program applicants, the City has stated a plausible claim in Count III of its amended complaint that the Department's decision to impose the conditions was arbitrary and capricious. The Administrative Procedure Act authorizes a court to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). To avoid this result, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation marks omitted); *see also Robert Wood Johnson Univ. Hosp. v. Thompson*, 297 F.3d 273, 280 (3d Cir. 2002) (agency action is arbitrary and capricious when, among other things, "[t]he agency relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem," or "offered an explanation . . . that runs counter to the evidence before the agency" (quotation marks omitted)). As Philadelphia's First Amended Complaint demonstrates and as further discovery will reinforce, the advance notification, jail access, and Section 1373 conditions bear all the hallmarks of an arbitrary and capricious agency action.

First and foremost, there is a glaring disconnect between the Department's stated reasons for imposing the new conditions and the actual effects of those conditions. *See State Farm*, 463 U.S. at 43 (holding that agency action is arbitrary where there is no "rational connection between the facts found and the choice made" (quotation marks omitted)). The Department claims the goal behind the new conditions is to facilitate immigration enforcement as well as cooperation

between the federal government and localities. MTD 17, 19-20. As this Court has explained, though, the Section 1373 condition imposes far broader requirements than are necessary for the Department's immigration-enforcement goals. The Department claims it needs information about unlawful aliens who commit crimes, but Section 1373 addresses information related to *any* individual's citizenship and immigration status. *See* 8 U.S.C. § 1373(a). The Department claims it does not want federal funds to be used to frustrate federal goals, but the Section 1373 condition does not restrict the *use* of funds; instead, it impacts the applicant's eligibility for any funds at all. And while the Department claims that violations of Section 1373 increase crime, it provides no evidence to establish that link. Op. 61-67. As to the advance notification and jail access conditions, while the Department claims that their objective is to promote "cooperation" between state and local governments and the federal government on immigration enforcement, MTD 17, the conditions do nothing of the sort. They impose a mandate on how localities must treat arrested individuals and operate their jails, backed by the stick of withdrawing significant federal funding. That is not cooperation, nor has the Department even attempted to explain how it could foster future cooperation.

The second hallmark of arbitrariness is that the Attorney General has failed to explain why he imposed the new conditions even though doing so ran "counter to the evidence before the agency." *State Farm*, 463 U.S. at 43. In the summer of 2017, several jurisdictions submitted evidence and testimonials alongside their Section 1373 certification letters explaining that policies which build trust with the immigrant community promote, rather than detract from, effective policing. Philadelphia's certification letter provides an example. *See* FAC ¶¶ 84-88; Dkt. 1-14. And there is no shortage of studies and reports that have concluded that localities with welcoming policies, like Philadelphia, have seen reductions in crime rates. *See* FAC ¶¶ 29-

32.   The Department has not acknowledged or responded to any of this evidence despite its importance to the purposes of the Byrne JAG grant program—making communities safer.

Finally, given the Department's consistent practice of imposing only limited programmatic and grant-related conditions on Byrne JAG program funds, and not immigration enforcement mandates, the Department's failure to explain its change in position renders the new conditions arbitrary.  *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) (An "unexplained inconsistency" in an agency's policy is "a reason for holding an interpretation to be an arbitrary and capricious change.").  When an agency changes position, as the Department has done here, it must "at least display awareness that it is changing position" and "show that there are good reasons for the new policy."  *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (citations and quotations omitted); *accord State Farm*, 463 U.S. at 42-43.  But the Department did not.  When it announced the new conditions on July 25, 2017, it did not release any reports, studies, or analysis.  Nor did it do so in August 2017, when it posted the FY 2017 Local Solicitation.  *See* FAC ¶ 98.  The Department's shift in position was not minor.  It affected state and local governments' eligibility for over $375 million in funding.  *See* Office of Justice Programs, *FY 2018 Program Summaries*, at 26 (June 2017), *available at* https://goo.gl/RSwXZp (stating funding for FY 2017).  In light of the stakes, the Department's "failure to offer an explanation . . . for the change in its policy" is particularly inexcusable. *Comite' De Apoyo A Los Trabajadores Agricolas v. Perez*, 774 F.3d 173, 188 (3d Cir. 2014).

To this, the Department suggests that the shift in policy was prompted by the May 2016 memorandum issued by the Department's Office of the Inspector General ("OIG").  MTD 16. Its argument runs into two problems.  First, the two other documents on which the Department relies as providing a basis for its decision—the Attorney General's press release and the

backgrounder document—do not mention the OIG memorandum.[9]  And so it is not clear whether that memorandum formed the basis for the new conditions.  *See Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 95 (1943) (An agency action "cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained.").  Second, the OIG memorandum offered four recommendations to ensure grant applicants' compliance with Section 1373: guidance from the Department to grantees; certification of compliance by grantees; consultation prior to grant awards; and guidance from grantees to their personnel.  *See* Memorandum from U.S. Dep't of Justice Inspector General Michael E. Horowitz to Assistant Attorney General Karol Mason at 9-10 (May 31, 2016), Dkt. 1-10.  At most, the memorandum supports consideration of the Section 1373 condition as one of four options.  It does not provide a rationale for picking that option from the four, and it does not even mention the advance notification and jail access conditions.  And so the memorandum does not "supply a reasoned explanation for [the] departure from prior policy."  *CBS Corp. v. FCC*, 663 F.3d 122, 151-152 (3d Cir. 2011).

## VI.  PHILADELPHIA HAS PLAUSIBLY DEMONSTRATED THAT THE CONDITIONS VIOLATE THE SPENDING CLAUSE.

The Challenged Conditions suffer from yet another incurable defect:  They violate the Constitution.  The Department contends (at 18-24) that the conditions are consistent with the Spending Clause, repeating the same arguments it made in opposition to the City's motion for a preliminary injunction.  *See* Def.'s Mem. in Opp. to Prelim. Inj. at 27-33, Dkt. 28 ("PI Opp.").

---

[9] *See* Press Release No. 17-826, U.S. Dep't of Justice, *Attorney General Sessions Announces Immigration Compliance Requirements for Edward Byrne Memorial Justice Assistance Grant Programs* (July 25, 2017), https://goo.gl/KBwVNP ("Press Release No. 17-826"); U.S. Dep't of Justice, *Backgrounder On Grant Requirements* (July 25, 2017), Dkt. 1-1, *available at* https://goo.gl/h5uxMX.

The Department's arguments have not improved with age, and they fall far short of showing that the Department is entitled to dismissal of Count IV of the First Amended Complaint.

1. To avoid the risk that "the spending power could render academic the Constitution's other grants and limits of federal authority," that power is cabined by a meaningful "relatedness" requirement. *New York v. United States*, 505 U.S. 144, 167 (1992). "[C]onditions on federal grants" must be "reasonably calculated to address th[e] particular . . . purpose for which the funds are expended." *Dole*, 483 U.S. at 207; *accord Massachusetts v. United States*, 435 U.S. 444, 461 (1978). The condition and the spending program must "share[] the same goal," *Charles v. Verhagen*, 348 F.3d 601, 609 (7th Cir. 2003), and the connection between them must be "discernible." *Koslow v. Pennsylvania*, 302 F.3d 161, 175 (3d Cir. 2002). The City's complaint amply demonstrates that the new conditions do not further the purposes of the Byrne JAG program, and so fail this test.

a. In creating the two predecessors to the current Byrne JAG program, Congress sought to help "local governments throughout the country confront crime." H.R. Rep. 104-24, at 8 (1995); *see also* Pub. L. No. 100-690, § 6091, 102 Stat. 4181 (1988) (aiming to "assist States and units of local government in carrying out specific programs which offer a high probability of improving the functioning of the criminal justice system"). Congress chose to do so "without getting in their way," by "provid[ing] resources for the counties, cities and towns of America to develop local solutions to their unique crime problems." H.R. Rep. 104-24, at 9. And when Congress combined the two programs in 2005, it gave grant recipients "*more* flexibility to spend money for programs that work for them rather than to impose a 'one size fits all' solution" for local policing. *See* H.R. Rep. No. 109-233, at 89 (2005) (emphasis added). The Challenged Conditions do just the opposite by dictating how cities like Philadelphia run their prisons,

manage their employees' communications with federal officers, and share information regarding not just criminal suspects, but also victims, witnesses, and other law-abiding people. The conditions therefore flunk "the demanding threshold imposed by *Dole* and *Koslow*" for relatedness under the Spending Clause. Op. 101.

The Department contends that the relatedness requirement "does not pose a difficult hurdle" and that *Dole* upheld an "only loosely-related requirement" on highway funds. MTD 18; *see* PI Opp. 28 (advancing same argument). In doing so, the Department continues to ignore *Dole*'s finding that the condition at issue was "*directly related* to one of the main purposes for which [the] funds [were] expended." 483 U.S. at 208 (emphasis added); *see* Op. 94-95. Whatever the precise height of the hurdle set by the Spending Clause's relatedness requirement, the Department cannot clear it. The conditions do not further the purposes of the JAG program *at all*. To the contrary, they undermine efforts of local law enforcement agencies to adopt policies and practices that best address crime in their communities.

The Department does not dispute this, but instead asks the Court (again) to ignore Congress's desire to allow localities to "develop local solutions to their unique crime problems," H.R. Rep. 104-24, at 9, and to instead ascribe to Congress a "much broader" goal: "to support and strengthen law enforcement and criminal justice." MTD 19; *see* PI Opp. 29. The Court rightly rejected this misreading of Congress's intent when it granted Philadelphia's motion for a preliminary injunction, explaining: "[T]he Byrne JAG statute is clearly designed for the purpose of enhancing <u>local</u> criminal justice. When considered at this level, the argument that enforcement of federal immigration laws is related to this objective is unsustainable . . . ." Op. 97-98. As a result, this Court concluded, "[t]he federal interest in enforcing immigration laws falls outside of the scope of the Byrne JAG program." Op. 98. Exactly.

The Department's contrary argument (at 19) relies on Section 10102(a), which delineates the AAG's authority and mentions the phrase "criminal justice." *See generally supra* pp. 13-18. The broad categories of responsibilities delegated to an official overseeing a portfolio of programs are dubious evidence of "the federal interest in [a] *particular* national project[] or program[]." *Dole*, 483 U.S. at 207 (emphasis added). In any event, as just shown, the Byrne JAG program—which was enacted *after* Congress's inclusion of the "criminal justice" language in Section 10102(a)—evinces a clear intent to bolster State and local solutions to criminal justice problems with federal funds. That Congress had previously authorized the AAG for OJP to generally "maintain liaison" with State and local officials, *see* 34 U.S.C. § 10102(a)(4), in no way suggests that Congress's purpose in enacting the JAG program was to improve the enforcement of federal laws by mandating support from local officials. In fact, Congress stated just the opposite in a different portion of Chapter 101 (which contains the JAG program), warning that "[n]othing in this chapter or any other Act shall be construed to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over any police force or any other criminal justice agency of any State or any political subdivision thereof." 34 U.S.C. § 10228(a).

b. But even if Congress's goal in creating the Byrne JAG program were simply to improve criminal justice writ large, the Department's conditions would still fail the relatedness test. The Department freely admits that its conditions "promote" "[i]mmigration enforcement." MTD 19. Immigration enforcement is not criminal justice. Indeed, in citing 34 U.S.C. § 10251(a)(1), *see* MTD 19, the Department skips over the key part of the definition of "criminal justice" within the Byrne JAG statute: "activities pertaining to crime prevention, control, or reduction, or the enforcement *of the criminal law*." *Id.* (emphasis added). Immigration

enforcement falls outside of this definition: Being in the country without valid immigration status is *not* a "crime," and deportation and removal proceedings are "civil in nature." *Padilla v. Kentucky*, 559 U.S. 356, 365 (2010). The JAG statute reinforces this when it sets forth the eight program areas constituting "criminal justice" programs in which localities can use their funds. *See* 34 U.S.C. § 10152(a)(1)(A)-(H). None of those program areas involves immigration enforcement.

The Department's insistence (at 19) that immigration law "intersects" with criminal justice is beside the point.[10] Having a tangential connection to something is not "relatedness" or "germaneness" under *Dole.* As the Court surmised, "there is a seemingly endless list of areas of the law which can be said to be 'related to' criminal justice and the local enforcement of criminal laws"; that does not mean a grant condition imposing any such law can satisfy *Dole*'s relatedness inquiry. Op. 96; *see also id.* ("[F]raming the Court's inquiry as whether a discernible relationship exists between immigration law and law enforcement, as the Attorney General seeks to do, situates the discussion at much too general a level."). The question is whether a spending condition is "reasonably calculated" to advance Congress's purpose. *Dole*, 483 U.S. at 209. The Department's conditions are not.

c. The allegations included in the City's amended complaint make clear: Not only do the Department's conditions fail to promote the goals of the JAG program in an abstract or

_____

[10] Similarly, the Court should once again reject the Department's perverse suggestion (at 20) that because the City contends its policies to welcome and protect immigrant communities reduce crime, the Department's conditions requiring the City to *abandon* those policies are sufficiently related to a congressional goal of reducing crime. *See* Op. 94 (recounting the Department's argument "that the City implicitly concedes the existence of some sort of relationship between law enforcement by contending that its refusal to enforce immigration law aggressively has led to better public safety outcomes and lower crime rates"). This is the exact opposite of the relationship required under *Dole*, and "it is not automatic . . . that these relationships operate in both directions." Op. 96. The Department certainly does not explain how it could reduce crime by forcing Philadelphia to eliminate a crime-reducing policy.

theoretical sense, they subvert the goals of the JAG program in an *actual* sense.  As the City averred, it has been the experience of Philadelphia—as well as of cities across the nation—that implementing policies similar to those that the Department is insisting upon, in which localities fail to protect the confidentiality of individuals' immigration status information, decreases the reporting of crimes and makes cities *less* safe.  *See* FAC ¶¶ 30-32, 39.

This Court reached a similar conclusion after reviewing the City's evidence presented during the preliminary injunction proceedings.  It found:

> The conditions that the Attorney General has placed on receipt of Byrne JAG grants have no relationship to successful police practice or the enforcement of criminal laws in the City.  Arrest and prosecution of non-citizens who have committed crimes, is an important part of law enforcement.  However, disclosing their immigration status to ICE has nothing to do with law enforcement, and will not prevent crime.

Op. 41; *see also* Op. 96-97 ("[T]he fact that immigration enforcement depends on and is deeply impacted by criminal law enforcement does not mean that the pursuit of criminal justice in any way relies on the enforcement of immigration law.  Realistically, it does not.").  The Court also observed that, at least in Philadelphia, non-citizens are not responsible for the majority of crimes, nor do they have a greater tendency than other residents to engage in criminal behavior.  Op. 43. The Department's statement (at 19) that removing "a criminal alien who has committed a removable offense" means he or she "is no longer present in this country with the potential to re-offend" does nothing to show that *these conditions* will improve criminal justice; if anything, deterring residents from reporting crimes would make it more difficult to prevent criminals (citizen or not) from re-offending.  *See* FAC ¶¶ 31-32.  The Court already considered this point in ruling on Philadelphia's motion for a preliminary injunction, concluding it did not "resolve all the issues."  Op. 94.  It hardly warrants dismissal now.

d. Fundamentally, the Department is focused on the wrong statute. The Department says that because "*the INA* expressly contemplates local law enforcement activity with respect to immigration enforcement, it is perfectly germane and appropriate for the Department to condition grant funding to promote this purpose." MTD 20 (emphasis added). That might be true for grant funding *created by the INA*. It is not true for Byrne JAG funds. Tellingly, in attempting to frame its conditions as "seeking to ensure that a state or local grantee's law enforcement activities will not impair the law enforcement activities of the federal government," the Department discusses only the requirements the INA places on federal immigration officials for taking non-citizens into custody "pending removal proceedings," as well as the "removal period" for non-citizens. MTD 20. The Department does not explain (at least not with any specificity) how the conditions will promote enforcement of the criminal law, let alone on *local* criminal justice. Even if the Attorney General stated in a press release that he views the conditions to be part of the Department's efforts in "reducing violent crime," MTD 19, the Department cannot hope to establish (particularly on a motion to dismiss) that the conditions in fact facilitate anything but immigration enforcement, especially considering that the same press release indicates that the "new conditions . . . will . . . ensur[e] that *federal immigration authorities* have the information *they* need *to enforce immigration laws* and keep our communities safe." Press Release No. 17-826 (emphasis added).

2. Philadelphia has also adequately alleged that the conditions are unconstitutionally ambiguous. "[L]egislation enacted pursuant to the spending power is much in the nature of a contract; in return for federal funds, the States agree to comply with federally imposed conditions." *Pennhurst St. Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). "The legitimacy of Congress's exercise of the spending power . . . rests on whether the State voluntarily and

knowingly accepts the terms of the 'contract.'" *NFIB v. Sebelius*, 567 U.S. 519, 577 (2012) (quotation marks omitted). Grantees "cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'" *Arlington Central Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). As a result, conditions must be "unambiguous." *Koslow*, 302 F.3d at 175. The Department's conditions are not.

a. The Department's motion does not resolve the infirmities of the advance notification and jail access conditions. *See* MTD 21-22. The text of the advance notification condition does not make clear how a grantee would be expected to respond to a request from ICE for notification of a person's "scheduled release date" when, at the time of the request, that person *has* no scheduled release date. *See* FAC ¶¶ 94-95. And the text of the jail access condition does not state the extent to which grantees must accommodate federal agents in their jails in the event an inmate declines to speak with the agents. *Id.* ¶ 96. The Department's representations in its motion to dismiss do not on their own resolve these ambiguities.

b. As for the Section 1373 condition, the condition is ambiguous by its terms, and the Department's litigation positions have rendered the condition even more opaque. Before the Department's current attempts to use Section 1373 against States and cities applying for federal funds, "the United States government ha[d] never sought to enforce [Section 1373] against a state or local government, or to invalidate a sub-federal sanctuary law or practice based on these provisions." Elizabeth M. McCormick, *Federal Anti-Sanctuary Law: A Failed Approach to Immigration Enforcement and a Poor Substitute for Real Reform*, 20 Lewis & Clark L. Rev. 165, 170 (2016). Case law still has yet to illuminate what kinds of policies or practices conflict with the statute. And even before the start of this litigation, the Department has stated that State and local employees "must be informed" about the implications of Section 1373; a requirement not

found in the text of the statute.[11]  Simply put, the Section 1373 condition was already ambiguous when it issued.

The Department has since made it indecipherable.  After the *Chicago* court enjoined the Department's attempt to require JAG grantees to provide notice of a person's release from custody, the Department advanced an unheard-of interpretation of the words "information regarding . . . immigration status" in Section 1373 to encompass the same information as the advance notification condition.  The Department now reads those words as encompassing information about the physical location of any individual, and, for incarcerated individuals, the date of their release from custody, reasoning that Section 1373 should be read to "include information that assists the federal government in carrying out its statutory responsibilities" under the INA.  *See* MTD 29-30 n.7; *see also* PI Opp. 38-39 & n.11; Letter from Alan R. Hanson to Mayor Jim Kenney (Oct. 11, 2017), Hanson Decl., Ex. A, Dkt. 28-1 ("Oct. 11 Letter").  This reading is limitless.  It is also wrong, and contrary to the only decision to consider the scope of Section 1373 that the City has found.  *See Steinle v. City & Cty. of San Francisco*, 230 F. Supp. 3d 994, 1015 (N.D. Cal. 2017) ("Nothing in 8 U.S.C. § 1373(a) addresses information concerning an inmate's release date.");  *see also infra* pp. 48-52.  To say the least, the Department's "flexible expectations," Op. 117, provide anything but "clear notice" about what the Department intends to require of Byrne JAG applicants, *Arlington Central*, 548 U.S. at 296.

## VII.    PHILADELPHIA STATES A COMMANDEERING CLAIM.

Wholly apart from the statutory and Spending Clause issues with the conditions, Count V of the First Amended Complaint sufficiently alleges a claim that both the Department's new conditions, and Section 1373 itself, if given its most expansive reading, would commandeer the

---

[11] U.S. Dep't of Justice, *Office of Justice Programs Guidance Regarding Compliance with 8 U.S.C. § 1373*, at 1 (2016), https://goo.gl/ht5eQP.

City's officers and employees in violation of the Tenth Amendment. *See* FAC ¶¶ 144-150. The Department fails to carry its burden of showing it is entitled to dismissal at this stage.

A. The Constitution does not "require the States to govern according to Congress' instructions.'" *NFIB*, 567 U.S. at 577, 579 (quoting *New York*, 505 U.S. at 162). In particular, the Tenth Amendment bars the federal government from "compel[ling] the States to enact or administer a federal regulatory program." *New York*, 505 U.S. at 188. The federal government may not "circumvent that prohibition by . . . command[ing] the States' *officers*, or those of their political subdivisions, to administer or enforce" a federal program. *Printz v. United States*, 521 U.S. 898, 935 (1997) (emphasis added).

The Department's conditions do exactly that. This Court already recognized that the advance notification and access conditions "impose affirmative obligations on Philadelphia, with associated costs of complying with such conditions," thus "implicat[ing] the Tenth Amendment and its built-in anti-commandeering principles." Op. 113. And despite being cast as a prohibition on information-sharing restrictions, the Section 1373 condition runs afoul of the same principles. As the Third Circuit has explained, "many affirmative commands can be easily recast as prohibitions"; "[t]he anti-commandeering principle may not be circumvented so easily." *Nat'l Collegiate Athletic Ass'n v. Governor of N.J.*, 730 F.3d 208, 233 (3d Cir. 2013). This Court accordingly "conclude[d] . . . that Philadelphia is likely to succeed on the merits of its Tenth Amendment challenge" to each of the Department's new conditions. Op. 113.[12]

---

[12] The Department takes out of context the statement in *Gregory v. Ashcroft*, 501 U.S. 452 (1991), that "[a]s long as it is acting within the powers granted it under the Constitution, Congress may impose its will on the States" and "legislate in areas traditionally regulated by the States." That statement merely describes how pre-emption works under the Supremacy Clause. *Id.* at 460. The Court cautioned that this is an "extraordinary power" that the Court "must assume Congress does not exercise lightly." *Id.* And the Court made clear that Congress cannot "impose its will" in all areas. Specifically, the Court explained that Congress cannot infringe on "the authority of the people of the States to determine the qualifications of their most important

B. Separate and apart from the City's challenge to the Department's grant conditions, Philadelphia is entitled to a declaration that the Department's interpretation of Section 1373 itself conflicts with the Tenth Amendment and principles of federalism. As the Department has argued repeatedly, *see* PI Opp. 17-19; MTD 15, 22, Section 1373 imposes statutory requirements on the City independent of its application for JAG funding. The City complies with lawful applications of the statute. *See* FAC ¶¶ 151-157; *see also infra* pp. 53-57. But the Department's interpretation of Section 1373 would both invade the City's exercise of its police power, and strip the City of any ability to enact reasonable guidelines for its officers' and employees' communications with the federal government. That interpretation cannot stand.

1. As an initial matter, the Department misconstrues the City's challenge to the Section 1373 condition as a facial one. It is not. The City challenges the Department's construction of Section 1373 such that it "conflict[s] with Philadelphia's local policies." FAC ¶ 149. Philadelphia's challenge is a "'pre-enforcement, as-applied challenge[].'" *Knick v. Twp. of Scott*, 862 F.3d 310, 321 (3d Cir. 2017) (quoting *Gonzales v. Carhart*, 550 U.S. 124, 167 (2007)); *see also infra* pp. 43-57 (discussing Philadelphia's declaratory judgment cause of action). The "no set of circumstances" test therefore does not apply, *Knick*, 862 F.3d at 321; rather, the question before the Court is whether the Department's application of Section 1373 is lawful in *these* circumstances. After all, Philadelphia has not attempted to litigate on a "bare-bones record," *Knick*, 862 F.3d at 321. Just the opposite. The existing factual record and the additional evidence the parties are exchanging in discovery will inform this Court's consideration of the Tenth Amendment and federalism issues raised by the Department's application of Section 1373.

government officials," which "is a power reserved to the States under the Tenth Amendment and guaranteed them by that provision of the Constitution under which the United States guarantees to every State in this Union a Republican Form of Government." *Id.* at 463 (brackets and quotation marks omitted).

2. Those issues are particularly serious in Philadelphia's case. Philadelphia does not restrict the communication of immigration-status information to or from federal officials for individuals suspected of criminal activity. Philadelphia does, however, protect the confidential information of victims, witnesses, and other law-abiding people through its information-sharing policies in an effort to encourage residents to report crimes, access city services, and generally improve public health and safety. *See supra* pp. 3-6. Any attempt by the Department, or any other federal agency, to override these efforts is unlawful.

a. *Printz* made clear that the Tenth Amendment is violated where, as here, the "whole object" of a federal law is "to direct the functioning of the state executive." 521 U.S. at 931-932. That is precisely how the Department is seeking to use Section 1373 against Philadelphia. The statute says that States and localities cannot "in any way restrict" sending immigration-status information to federal immigration officials, or receiving it from them. 8 U.S.C. § 1373(a). In its most capacious construction—which the Department is advancing here—that means that localities cannot even impose reasonable controls on the time, manner, and instances in which their employees exchange immigration status information with federal officials. Indeed, under the Department's proposed application of the statute, local officials can be summoned by ICE at any moment to drop what they are doing, look up information regarding a person's citizenship or immigration status, and communicate that information to ICE to aid in the enforcement of federal immigration law. The Department's attempt to shoehorn location and release date information into Section 1373 exacerbates the problem. Just as in *Printz*, the Department seeks to "require[]" jurisdictions like Philadelphia to "enact or administer a federal regulatory program." 521 U.S. at 926. And just as in *Printz*, the statute regulates a State or locality's use of "information that belongs to the State and is available to them only in their official capacity."

521 U.S. at 932 n.17. This attempt by the federal government to "impress into its service . . . the police officers of the 50 States" must be rejected under the Tenth Amendment. *Id.* at 922. Section 1373's application in this manner should not be permitted.

The Department's suggestion (at 26) that the City could "use awarded funds to cover the grantee's costs incurred in implementing the conditions" is no remedy. The City would still suffer financially: Using JAG funds to pay for the cost of having employees respond to ICE inquiries, or otherwise comply with federal demands under Section 1373, would require the City to divert JAG funds from crucial law enforcement needs, like funding police overtime and efforts to combat opioid overdoses. *See* FAC ¶¶ 107-108; Op. 125. But even if the City were not injured financially at all, the Tenth Amendment violation would not disappear: As the Supreme Court explained in *Printz*, the Tenth Amendment's anti-commandeering commands are violated "even when the States are not forced to absorb the costs of implementing a federal program," as "they are still put in the position of taking the blame for its burdensomeness and for its defects." 521 U.S. at 930. That would undoubtedly be the case here. If Philadelphia were forced to abandon its confidentiality policies, the hard-earned trust it has developed with vulnerable communities would be destroyed. *See* FAC ¶ 108; Op. 126.[13]

The issue is amplified by the federalism implications of the Department's use of Section 1373 against Philadelphia. "[T]he structure and limitations of federalism . . . allow the States great latitude under their police powers to legislate as to the protection of the lives, limbs, health,

---

[13] In addition, the Department overstates (at 25) the "contrast[]" drawn in *Printz* between "information sharing" statutes and other mandates to administer federal programs. The Court in *Printz* did not hold that statutes that "require only the provision of information to the federal government" are lawful; it did not address them. In fact, the Court expressed skepticism towards such measures, explaining that "they are of such recent vintage that they are no more probative . . . of a constitutional tradition" than the statute the Court struck down. 521 U.S. at 918. The Court explained: "Their persuasive force is far outweighed by almost two centuries of apparent congressional avoidance of the practice." *Id.*

comfort, and quiet of all persons." *Gonzales v. Oregon*, 546 U.S. 243, 270 (2006) (quotation marks omitted). There is "no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims." *United States v. Morrison*, 529 U.S. 598, 618 (2000). Philadelphia's confidentiality policies are plainly a proper exercise of its police power, a "proper sphere of [its] authority" in which it is entitled to "remain independent and autonomous." *Printz*, 521 U.S. at 928. Using Section 1373 to displace Philadelphia's policies would "reduce [it] to [a] puppet[] of a ventriloquist Congress." *Id.* (quotation marks omitted). It would also irreversibly hamper Philadelphia's efforts to protect its residents.

b. For these reasons, the Department's invocation of the Second Circuit's *City of New York* decision is unavailing—even assuming the decision was correct. The court based its holding on the fact that the policy at issue restricted communications with the INS "while allowing City employees to share freely the information in question with the rest of the world." *City of New York v. United States,* 179 F.3d 29, 37 (1999). But the court expressly recognized how the operation of Section 1373 could give rise to a Tenth Amendment claim in other circumstances:

> The City's concerns are not insubstantial. The obtaining of pertinent information, which is essential to the performance of a wide variety of state and local governmental functions, may in some cases be difficult or impossible if some expectation of confidentiality is not preserved. Preserving confidentiality may in turn require that state and local governments regulate the use of such information by their employees. Finally, it is undeniable that [Section 1373] do[es] interfere with the City's control over confidential information obtained in the course of municipal business and over its employees' use of such information.

*Id.* at 36. Accordingly, it left open whether Section 1373 "would survive a constitutional challenge in the context of generalized confidentiality policies that are necessary to the performance of legitimate municipal functions and that include federal immigration status." *Id.*

41

Philadelphia's policies fit that description, as they prohibit disclosure of confidential information not only to federal immigration officials, but to anyone—unless a person is suspected of criminal activity, or disclosure is required by law.  FAC ¶ 37.

Indeed, this Court has already considered *City of New York*, and concluded it does not resolve Philadelphia's challenge.  *See* Op. 110-114.  The Court recognized the impact of the Department's interpretation of Section 1373 on the City, explaining:  "Literal compliance with Section 1373 would inherently prevent Philadelphia from, among other things, disciplining an employee for choosing to spend her free time or work time assisting in the enforcement of federal immigration laws."  Op. 113.  This is not a mere inconvenience:  Because a State "can act only through its officers and agents," *Nevada v. Hicks*, 533 U.S. 353, 365 (2001), interfering with "the right to set the duties of office for state-created officials and to regulate the internal affairs of governmental bodies" infringes on state sovereignty.  *Koog v. United States*, 79 F.3d 452, 457-460 (5th Cir. 1996).  The Court further recognized that "the effect of Section 1373 compliance may be to thwart policymakers' ability to extricate their state or municipality from involvement in a federal program."  Op. 113-114 (quotation marks omitted).  This is, at bottom, precisely what the Tenth Amendment prohibits:  The federal government cannot prevent a State or locality from "declin[ing] to administer [a] federal program."  *New York*, 505 U.S. at 177.

c. At the very least, the City has stated a plausible basis for relief on this "unique and novel constitutional question."  Op. 113.  The Court should therefore deny the Department's motion, as such questions are "best tested . . . in light of actual, rather than alleged facts."  *Woodruff v. Hamilton Twp. Pub. Sch.*, No. CIV.06-3815NLH, 2007 WL 1876491, at *5 (D.N.J. June 26, 2007) (quoting *In re Buckhead America Corp.,* 178 B.R. 956, 961 (D. Del. 1994));

*accord Wright v. North Carolina*, 787 F.3d 256, 263 (4th Cir. 2015) (quotation marks omitted) (citing *McGary v. City of Portland*, 386 F.3d 1259, 1270 (9th Cir. 2004); *Baker v. Cuomo,* 58 F.3d 814, 818-19 (2d Cir. 1995)) ("Rule 12(b)(6) dismissals are especially disfavored in cases where the complaint sets forth a novel legal theory that can best be assessed after factual development.").

## VIII. PHILADELPHIA HAS PROPERLY STATED A CLAIM FOR A DECLARATORY JUDGMENT THAT IT COMPLIES WITH SECTION 1373.

Turning to Philadelphia's final claim, the City has properly stated a claim for a declaratory judgment that its policies comply with Section 1373 as lawfully construed; indeed, this Court has already held that the City is likely to succeed on this Count. Op. 120. The Department's justiciability challenges are red herrings, and its arguments on the merits are legally and factually mistaken.

### A. Philadelphia's Claim Regarding 1373 Compliance Is Justiciable.

#### 1. The Declaratory Judgment Claim Rests on Two Independent Causes of Action.

The Department attempts to evade review on Count VI by arguing that the City has not identified "an underlying cause of action." MTD 26. This argument is wrong; the City's declaratory judgment count rests on at least two different causes of action.

First, this count rests on the APA. As this Court is well aware by now, that statute creates a cause of action for "relief other than money damages" for any "person suffering a legal wrong because of agency action." 5 U.S.C. § 702. This includes a claim that agency action is "arbitrary and capricious" or "not in accordance with law." *Id.* That is exactly what the City is claiming through this declaratory judgment action: that the Department's decision to deny the City a Byrne JAG Grant based on a purported failure to comply with Section 1373 is both "arbitrary and capricious" and "not in accordance with" that law as it is correctly interpreted.

*See infra* pp. 48-57; FAC ¶ 153. "The Administrative Procedure Act authorizes declaratory judgment actions in such circumstances[.]" *Wabash Valley Power Ass'n, Inc. v. Rural Electrification Admin.*, 903 F.2d 445, 452 (7th Cir. 1990).

Second, this count seeks to adjudicate the Department's threatened civil enforcement action against the City. Although the Declaratory Judgment Act is not an independent cause of action, it also does not require the declaratory-judgment plaintiff to have its own cause of action; rather, "it is the underlying cause of action of the defendant against the plaintiff that is actually litigated in a declaratory judgment action." *Collin Cty. Texas v. Homeowners Ass'n for Values Essential to Neighborhoods, (HAVEN)*, 915 F.2d 167, 171 (5th Cir. 1990). This rule allows the Declaratory Judgment Act to serve its "very purpose": "to ameliorate" the problem of "putting the challenger to the choice between abandoning his rights or risking prosecution." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129 (2007). As the Supreme Court has explained, therefore, where the government has "threatened action," the Declaratory Judgment Act "do[es] not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat[.]" *Id.* at 129.

Here, the Department's underlying cause of action is a civil enforcement action asserting that the relevant City policies are incompatible with federal law (in the form of Section 1373) and therefore preempted under the Supremacy Clause. Both here and in parallel litigation around the country, the Department indicated that it can and will file such a suit. *See* MTD 27 (describing just such an "enforcement action"); Mem. in Supp. of Def.'s Mot. to Dismiss at 18, *City of Chicago v. Sessions*, No. 17-cv-05720 (N.D. Ill. Jan. 3, 2018), ECF No. 139 (same); Def.'s Opp. to Pl.'s Mot. for Prelim. Inj. at 8, *City of Richmond v. Donald J. Trump*, No. 3:17-cv-01535-WHO (N.D. Cal. Apr. 18, 2017), ECF No. 16 ("[T]he Attorney General has

determined that . . . action [to enforce Section 1373] would take the form of civil litigation asserting that a jurisdiction's law or policy is preempted by federal law."). Indeed, this has been the Government's consistent practice when it considers state laws to be in conflict with federal immigration law. *See, e.g.*, *Arizona v. United States*, 567 U.S. 387, 392 (2012); *United States v. Alabama*, 691 F.3d 1269, 1279-1280 (11th Cir. 2012). Based on this threatened cause of action, the City is entitled to seek a declaration that its policies are not, in fact, in conflict with federal law.

The cases cited by the Department are easily distinguished. The plaintiffs in *Levy-Tatum* and *Harris County* made no attempt to argue that the declaratory-judgment defendants were threatening to bring an action against them; rather, they sought to use declaratory judgment actions offensively, to enforce statutes under which neither party had a private right of action. *Levy-Tatum v. Navient Sol'ns, Inc.*, 183 F. Supp. 3d 701, 709 (E.D. Pa. 2016) (plaintiff attempting to challenge lending practices); *Harris Cty. Texas v. MERSCORP Inc.*, 791 F.3d 545, 552 (5th Cir. 2015) (plaintiffs attempting to enforce procedural requirements of Texas property law).[14] That is not what the City is doing in this case. By contrast, the Department has already taken the position that it *can* bring a preemption action against the City. *See* MTD 27. That is the "underlying cause of action" to be litigated here. *HAVEN*, 915 F.2d at 171.

### 2.    The Claim Is Ripe.

The Department next argues that a declaratory judgment is not ripe, asserting that the Court should wait to address this issue until the Department chooses to initiate "an enforcement action" against the City. MTD 27. But the Department has already ordered the City to make

---

[14] *Allen v. DeBello* is even less relevant. That case dealt with whether the Declaratory Judgment Act could create subject-matter jurisdiction—specifically, by eliminating judicial immunity—not whether a declaratory judgment plaintiff had a proper cause of action. 861 F.3d 433, 444 (3d Cir. 2017).

changes to its policies to come into compliance with Section 1373, an action that immediately threatens the City's rights. *See* Oct. 11 Letter at 4-6. Under the Supreme Court and this Circuit's precedent, that makes the City's request for a declaratory judgment ripe.

A declaratory judgment action is ripe when "the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941). In assessing the ripeness of a declaratory judgment, the Third Circuit has repeatedly applied the test "that was first articulated in . . . *Step-Saver Data Sys., Inc. v. Wyse Tech.*, 912 F.2d 643 (3d Cir. 1990)." *Plains All Am. Pipeline*, 866 F.3d at 539-540. The *Step-Saver* test considers "(1) the adversity of the parties' interests, (2) the conclusiveness of the [proposed declaratory] judgment, and (3) the utility of the judgment." *Id.* at 540 (quoting *Khodara Envtl., Inc. v. Blakey*, 376 F.3d 187, 196 (3d Cir. 2004)). This analysis is informed by whether refusing a declaratory judgment would impose hardship on the plaintiff and whether the legal issues are fit for judicial review. *Id.* (citing *Abbott Labs.*, 387 U.S. at 149). Applying this test, "a challenge to government action is typically ripe when a party is faced with th[e] dilemma" of "being forced to choose between complying with a burdensome law and risking serious penalties." *Id.* at 451. That is particularly true when the declaratory judgment sought would "be conclusive," "effectively" putting the litigation "at an end." *Marathon Petroleum Corp. v. Sec'y of Fin. for Delaware*, 876 F.3d 481, 499 (3d Cir. 2017).

Under these principles, this declaratory judgment is ripe; it does not rest on a contingency, as the Department claims. MTD 27. The Department has *already* informed the City that it considers at least two of Philadelphia's policies to be "in violation of [Section 1373],"

and that three more will also be found in violation unless the City has "communicated" the Department's preferred interpretation "to its officers and employees."  Oct. 11 Letter at 4-6; *accord* FAC ¶ 91.  This letter gave the City about two weeks to file a response explaining any "additional evidence" that the Department should consider, but did not suggest that it would reconsider its legal interpretation of Section 1373 or what evidence, if any, could influence any additional determination.  *Id.*  The City has received no communication from the Department since submitting its response on October 27, 2017.  Meanwhile, the Department has vigorously defended its position that the City currently violates Section 1373 throughout this litigation.  And the Department has explained, both here and elsewhere, that it may also enforce Section 1373 through a civil enforcement action to have the City's practices declared in conflict with, and preempted by, federal law.  *See supra* pp. 43-45.

Applying the *Step-Saver* factors, the City and the Department clearly have adverse legal interests:  They hold fundamentally different views about the obligations that Section 1373 imposes on the City.  *See Step-Saver*, 912 F.2d at 647.  And the declaratory judgment sought by the City would be useful and entirely conclusive on the Section 1373 issue—no further litigation would be necessary on this subject.  *See id.* at 648.  Without the judgment, the City will suffer a substantial hardship, because it will be required to make substantial changes to its policies that will damage its ability to engage in effective policework and service provision.  *See Plains All Am. Pipeline*, 866 F.3d at 540.  The issues here are also fit for judicial review—the dispute is primarily legal, and the facts are largely not in contention.  *See id.*  And, as the Supreme Court has held, a party facing a "credible threat of enforcement" from the government need not wait until such proceedings begin to seek a declaratory judgment.  *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2342 (2014); *accord MedImmune*, 549 U.S. at 128.

*Texas v. United States*, 523 U.S. 296 (1998), which the Department relies on, was very different. In that case, Texas sought declaratory judgment regarding certain policies that *it* had not yet decided to implement. *See id.* at 300. And the Department had not definitively stated whether it considered the proposed policies to be in violation of the relevant federal law. *Id* at 299. In stark contrast, the City's policies here are longstanding. *See* FAC ¶¶ 26, 33. And the Department has clearly stated that it considers several of those policies to violate Section 1373. *See id.* ¶ 91. The Department's characterization of that determination as "preliminary" is precisely the sort of "Damoclean threat with a sheathed sword" that the Declaratory Judgment Act was designed to defeat. *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 735 (Fed. Cir. 1988), *overruled on other grounds by MedImmune*, 549 U.S. at 127. This action is therefore ripe for review now.

### B.     Philadelphia's Claim Is Plausible On The Merits.

Finally, the City has plausibly alleged compliance with Section 1373. The Department's arguments to the contrary are wrong on both the law and the facts.

#### 1.     The Department Misconstrues Section 1373.

The Department contends (at 29-30) that the City's policies about when to provide notification of an inmate's release run afoul of Section 1373. But Section 1373 does not encompass information about a person's release from custody. The City's notification policies are therefore irrelevant to evaluating whether the City complies with Section 1373.

Section 1373 reaches restrictions on the communication of "information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a). Such information could include whether a person is a U.S. citizen, and if so, whether that person is a citizen by birth or a naturalized citizen; whether a person holds other citizenships; the history of a person's changes in citizenship; whether a person has been admitted as a lawful permanent

resident; whether the person has been issued, or has applied for, any of the immigrant or non-immigrant visas established in the INA (or whether someone has applied on that person's behalf); whether a person has been awarded or has applied for one of the special immigrant classifications under the INA (for example, as a Special Immigrant Juvenile under 8 U.S.C. § 1101(a)(27)(J)); or a person's history of applications for admission, immigrant or non-immigrant visas, adjustment of status, or other benefits under the INA.

The Department argues that "the fact that an alien is in custody for a specific duration (in a certain place and not elsewhere) fits within the INA's contemplation of immigration status." MTD 29 n.7. This nonsensical interpretation of Section 1373 arose only after the Department's advanced notification condition was enjoined. It has no basis in the statutory text or common sense. By its terms, Section 1373 does not touch information regarding the physical location of any individual, or information regarding a person's detention by local law enforcement. The Department's argument to the contrary has not been accepted by any court. The only opinion the City has found considering the argument rejected it, reasoning: "If the Congress that enacted the Omnibus Consolidated Appropriations Act of 1997 (which included Section 1373(a)) had intended to bar *all* restriction of communication between local law enforcement and federal immigration authorities, or specifically to bar restrictions of sharing inmates' release dates, it could have included such language in the statute. It did not, and no plausible reading of 'information regarding . . . citizenship or immigration status' encompasses the release date of an undocumented inmate." *Steinle*, 230 F. Supp. 3d at 1015 (ellipsis in original).

The Department starts its case for its interpretation not with Section 1373 itself, but with 8 U.S.C. § 1357(g), which governs agreements between the federal government and State or local agencies that wish for their officers to "perform a function of an immigration officer." 8

U.S.C. § 1357(g)(1). The sub-section the Department quotes simply makes clear that such agreements are not necessary for ordinary inter-agency communications: "Nothing in this subsection shall be construed to require an agreement under this subsection in order for any officer or employee of a State or political subdivision of a State to communicate with the Attorney General regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States." *Id.* § 1357(g)(10). The mention of "knowledge that a particular alien is not lawfully present in the United States" does not mean that *any* information about where a person is present constitutes "information regarding . . . immigration status" under Section 1373 or any other statute.

The Department then moves to Section 1373(c)'s mention of "immigration status," but that provision does not support the Department's reading either. That subsection provides in full.

> The Immigration and Naturalization Service shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information.

8 U.S.C. § 1373(c). The Department creates a false distinction between the phrase "information regarding the citizenship or immigration status, lawful or unlawful, of any individual" in Section 1373(a), and the words "immigration status" in Section 1373(c), by carving off the rest of the sentence containing those words. The words "immigration status" are used only as part of a description of an "inquiry" to the INS from another agency. The pertinent analogue in Section 1373(c) to the phrase "information regarding . . . immigration status" in Section 1373(a) is therefore "the requested verification or status information," and neither phrase suggests as broad a category of information as the Department hopes.

Without an argument based in the text, the Department offers a carefully-chosen piece of legislative history: language from a House report discussing an early version of Section 1373. MTD 29-30 n.7. Section 1373 was enacted in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996. *See* Pub. L. No. 104-208, div. C, title VI, § 642, 110 Stat. 3009–707. The House and Senate produced different versions of Section 1373. *Compare* H.R. 2202, 104th Cong., § 833 (engrossed in House Mar. 21, 1996), *with* H.R. 2202, 104th Cong., § 177 (engrossed Senate amendment May 2, 1996). The conference committee that reconciled the two bills modified both provisions to produce the language in Section 1373. *See* H. Rep. No. 104-828, at 108 (Sept. 24, 1996). In describing the revisions, the conference committee's report simply restates the requirement in now-Section 1373(a). *See id.* at 249. The conference report is the more reliable source of legislative history than the House report on which the Department relies. *See Dep't of Air Force v. Rose*, 425 U.S. 352, 366–67 (1976) (explaining that a report that was before both Houses of Congress is more reliable than a report before only one). And it says nothing to support the Department's expansive interpretation of the scope of Section 1373.

Even if the text were not clear, the federalism implications of the Department's reading would compel its rejection. The Department's interpretation would extend Section 1373 to reach not only information about whether a criminal alien is in custody, but *any* information that a person—criminal or not and alien or not (as Section 1373 applies to "any individual," 8 U.S.C. § 1373(a))—is "in a certain place and not elsewhere." MTD 29 n.7. Further, the Department ultimately appears to interpret the statute to encompass any "information that assists the federal government in carrying out its statutory responsibilities" under the INA. MTD 30 n.7. Considering the endless range of information that could fit that description,[15] this reading of

---

[15] To take just one section of the INA, there is a staggering range of information that could be relevant to the numerous grounds of inadmissibility that may be charged in any removal

Section 1373 would open up State and city officers and employees to seemingly endless inquiries by federal officials, while enfeebling the ability of States and their subdivisions to regulate their internal affairs. The Supreme Court has warned federal courts "to be certain of Congress' intent before finding that [a] federal law" like Section 1373 "overrides the 'usual constitutional balance of federal and state powers.'" *Bond v. United States*, 134 S. Ct. 2077, 2089 (2014) (quoting *Gregory*, 501 U.S. at 460). The Department's reading of Section 1373 would do just that. *See supra* pp. 36-43. But because the statute contains no "clear statement" that this was Congress's intent, the Department's reading cannot stand. *Bond*, 134 S. Ct. at 2089.

> **2.      The Department Misinterprets The Policies It Contends Conflict With Section 1373.**

The Department also fundamentally misreads the operation of Philadelphia's policies as explained in the First Amended Complaint. The Department contends (at 29) that the Philadelphia Department of Prisons collects citizenship information at the time of admission pursuant to 37 Pa. Code § 95.222, and that the City then restricts the sharing of this information. But Executive Order No. 8-09 expressly permits the exchange of this type of information. The Department appears to acknowledge this, noting that "certain exceptions apply" to Executive Order No. 8-09, but then overlooks these very exceptions. MTD 29. The order instructs at Section 3(B)(3) that "[n]o City officer or employee shall disclose confidential information *unless* the individual to whom such information pertains is *suspected by such officer or employee or such officer's or employee's agency of engaging in criminal activity*." Dkt. 1-4

---

proceeding, like whether a person suffers from a "communicable disease"; whether a person "is likely to become a public charge"; whether a person seeks to "perform[] skilled or unskilled labor"; or whether a person "practice[s] polygamy." *See* 8 U.S.C. § 1182(a)(1)(A), (4)(A), (5)(A), (10)(A).

(emphasis added).  Individuals in custody at the City's prisons would obviously fall within this exception.

Similarly, the Department's complaint (at 30-31) about third-degree felons completely ignores the March 2017 interagency memorandum clarifying that Philadelphia will cooperate with all requests for notification accompanied by any judicial criminal warrant.  FAC ¶ 47 & n.19 (citing Dkt. 1-7).  In fact, the Department raised this same line of argument during the October 26, 2017 evidentiary hearing, and the Court itself interjected to confirm that Mr. Abernathy's March 2017 memorandum clarifies that the City would comply with any judicial criminal warrant, irrespective of the underlying conviction.  Oct. 26, 2017 Tr. at 66:8-71:17 (Ross), Dkt. 65-1.

### 3. The Complaint Demonstrates At A Minimum That The City Substantially Complies With Section 1373.

At this stage of the litigation, the City has properly alleged its compliance with Section 1373.  Even if the Court could conclude from the pleadings that the City does not technically comply with Section 1373 in its entirety, the Court has already determined that it "will apply the doctrine of substantial compliance and find that the City is in substantial compliance" with Section 1373.  Op. 120.  That doctrine supports Philadelphia's claim for relief.

a. As this Court has recognized, substantial compliance is a doctrine designed to determine when a party that "has meaningfully performed as expected" such that it is "entitled to the benefit" in question.  Op. 115.  In the context of federal grant conditions, the ultimate question is whether Congress intended to impose a standard of substantial or strict compliance.  Op. 115-116; *accord Shands v. Tull*, 602 F.2d 1156, 1160 (3d Cir. 1979).  That congressional intent can be either express or implied.  Op. 115-116; *Shands*, 602 F.2d at 1160.

In the case of the Byrne JAG program, the Court does not need to look beyond the express statutory text. In the provision governing procedures for "denial or termination" of Byrne JAG program funds, Congress has provided that the Department may withhold payments from a "recipient of assistance under" the relevant chapter[16] if it "has failed to comply *substantially* with," among other things, "any other applicable Federal Act." 34 U.S.C. § 10222 (emphasis added). Thus, even if the Court ultimately agrees with the Department that Section 1373 is "applicable" to the Byrne JAG program, Congress has only required that the City be "substantially" in compliance to continue receiving grants. *Id.* There is no meaningful difference between the language in Section 10222 and that which Congress routinely uses to hold grant recipients to a standard of substantial compliance. *See, e.g.*, 42 U.S.C. § 12753 (Home Investment Partnerships); 42 U.S.C. § 15027 (federal assistance to state councils on developmental disabilities); 12 U.S.C. § 4569 (Capital Magnet Fund). Courts have interpreted such language according to its plain meaning. *See, e.g.*, *Grant v. City of Roanoke*, 265 F. Supp. 3d 654, 668 (W.D. Va. 2017) (recognizing that 42 U.S.C. § 12753 does not "require[e] perfect compliance"). That is exactly what this Court should do with Section 10222.

Even if the Court does not read the statute to contain an express substantial compliance standard, it should reaffirm its conclusion that the statutory scheme supports reading in an implied substantial compliance standard. *See* Op. 120. As the Third Circuit, in line with other courts, has made clear, there can be "an implied intent to hold states to a standard of substantial compliance," thereby making "some allowance for the difficulties of administering an extensive bureaucracy." Op. 116 (quoting *Shands*, 602 F.2d at 1160); *accord Moore v. Perales*, 692 F.

---

[16] Section 10222 applies to "a recipient of assistance under *this chapter*." 34 U.S.C. § 10222 (emphasis added). Like the Byrne JAG program, Section 10222 is located in Chapter 101 ("Justice System Improvement") of Title 34 ("Crime Control and Law Enforcement"). It therefore applies to the Byrne JAG program.

Supp. 137, 145 (E.D.N.Y. 1988) (finding implied standard of substantial compliance when the Act "contemplates imperfections in its administration"); *Karen L. ex rel. Jane L. v. Health Net of Ne.*, 267 F. Supp. 2d 184, 192 (D. Conn. 2003) (collecting cases).  The notion that grant conditions in particular may be satisfied by substantial compliance makes sense because "legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions."  Op. 119 (quoting *Pennhurst*, 451 U.S. at 16).  It is beyond dispute that the equitable doctrine of substantial compliance is deeply ingrained in principles of contract law.  Op. 117 (citing *Jacob & Youngs, Inc. v. Kent*, 230 N.Y. 237 (1921) (Cardozo, J.)).  And the Supreme Court has "regularly applied the contract-law analogy" in cases addressing the scope of a federal grant recipient's rights and obligations.  *Barnes v. Gorman*, 536 U.S. 181, 186 (2002).

Here, a substantial compliance standard for Section 1373 is—at a bare minimum— implied in the statutory scheme.  Section 10222 is just one of a constellation of statutory provisions that make it clear that Byrne JAG recipients were not to be held to a standard of strict compliance.  Op. 115.  As the Court recognized, Congress has also specifically provided that Byrne JAG money should not be withheld for failure to strictly adhere to the requirements of ancillary federal laws.  *See supra* pp. 20-21 (listing substantial compliance provisions applicable to the Byrne JAG program). And the "very general," open textured nature of Section 1373 further weighs against demanding strict compliance, which would be "impractical, particularly in light of . . . DOJ's admittedly flexible expectations."  Op. 117.

Whether express or implied, then, the Court was clearly correct to hold that substantial compliance is the appropriate standard in assessing the City's compliance with Section 1373. Whether a grant applicant has achieved substantial compliance "must depend on the

circumstances of each case, including the nature of the interest at stake and the degree to which noncompliance affects that interest." *Fortin v. Comm'r of Mass. Dep't of Pub. Welfare*, 692 F.2d 790, 795 (1st Cir. 1982); *accord Phoenix Mut. Life Ins. Co. v. Adams*, 828 F. Supp. 379, 388 (D.S.C. 1993) ("Whether substantial compliance exists, therefore, is necessarily dependent on the specific facts of a given case.").

b. This Court has already rightly found the City's policies *do* substantially comply with Section 1373 as it is appropriately construed. Op. 46, 120. First of all, as the City has repeatedly explained, none of its policies prevents the City from disclosing the immigration status of any person suspected of a crime. FAC ¶ 27 (Memorandum 01-06); *id.* ¶ 37 (Executive Order 8-09). In fact, much of that information is automatically available to federal authorities through the multiple law enforcement databases that the City participates in. *See* FAC ¶ 55. As for anyone else, the City does not collect data regarding immigration status for the vast majority of persons who interact with the City but are not themselves suspected of criminal activity. FAC ¶ 25 (under policy codified in Memorandum 01-06, Philadelphia police officers are "trained to refrain from asking persons about their immigration status when investigating crimes or conducting routine patrols"); *id.* ¶ 35 (Executive Order 8-09 "directs City officers and employees to refrain from affirmatively collecting information about immigration status, unless that information is necessary to the officer or employee's specific task or the collection is otherwise required by law"). Any information that the City does inadvertently come to possess can be shared when "such disclosure is required by law" or when the person is suspected of criminal activity. *Id.* ¶ 37.

As a practical matter, any "restrictions" on "sending" or "receiving information regarding . . . immigration status" are therefore insubstantial. 8 U.S.C. § 1373(a). Indeed, as the

Court has recognized, reading Section 1373 to require substantially more on the part of the City would raise serious constitutional concerns. Op. 100-114. As a condition of a Byrne JAG grant, it would conflict with the Spending Clause because any additional disclosures would not have any discernible connection to the criminal law enforcement purposes of the grant. *See supra* pp. 28-36. And as an independent obligation, requiring additional disclosures would raise serious concerns that the Department was commandeering the City to perform federal civil immigration enforcement in violation of the Tenth Amendment. *See supra* pp. 36-43. To the extent there is any doubt that the City's policies substantially comply, the Court should deny the motion to dismiss to ensure that this determination can be made on a full factual record, in light of the fact-intensive nature of assessing "substantiality." *Fortin*, 692 F.2d at 795.

**CONCLUSION**

Philadelphia has stated plausible claims for relief, and the Department identifies no basis to terminate the proceedings already months underway in this Court. The Department's motion to dismiss should be denied.

DATED: February 16, 2018

Respectfully submitted,

_[signature: Virginia A. Gibson]_

SOZI PEDRO TULANTE, I.D. NO. 202579
  City Solicitor
MARCEL S. PRATT, I.D. NO. 307483
  Chair, Litigation Group
LEWIS ROSMAN, I.D. NO. 72033
  Senior Attorney
CITY OF PHILADELPHIA LAW DEPARTMENT
1515 Arch Street, 17th Floor
Philadelphia, PA 19102

ROBERT C. HEIM, I.D. NO. 15758
JUDY L. LEONE, I.D. NO. 041165
FRIEDRICH-WILHELM W. SACHSE, I.D. NO. 84097
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
(215) 994-4000

VIRGINIA A. GIBSON, I.D. NO. 32520
SARA ARONCHICK SOLOW, I.D. NO. 311081
JASMEET K. AHUJA, I.D. NO. 322093
ALEXANDER B. BOWERMAN, I.D. NO. 321990
HOGAN LOVELLS US LLP
1735 Market Street, 23rd Floor
Philadelphia, PA 19103
(267) 675-4600
virginia.gibson@hoganlovells.com

NEAL K. KATYAL (*pro hac vice*)
KIRTI DATLA (*pro hac vice*)\*
REEDY C. SWANSON (*pro hac vice*)
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004

*\*Admitted only in Texas; supervised by firm members*

*Attorneys for the City of Philadelphia*

## CERTIFICATE OF SERVICE

I hereby certify that on February 16, 2018, the foregoing document was filed with the Clerk of the Court using the CM/ECF system, which will send notification of the filing to all counsel of record.

February 16, 2018

_____

VIRGINIA A. GIBSON, I.D. No. 32520
HOGAN LOVELLS US LLP
1735 Market Street, 23rd Floor
Philadelphia, PA 19103
(267) 675-4600
virginia.gibson@hoganlovells.com