## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

THE CITY OF PHILADELPHIA,

          *Plaintiff*,

    v.

JEFFERSON BEAUREGARD SESSIONS III,
Attorney General of the United States, in
his official capacity,

          *Defendant*.

No. 17-cv-3894

Hon. Michael M. Baylson

## BRIEF FOR THE STATES OF NEW YORK, CALIFORNIA, CONNECTICUT, DELAWARE, HAWAII, ILLINOIS, IOWA, MAINE, MARYLAND, MASSACHUSETTS, NEW JERSEY, NEW MEXICO, OREGON, VERMONT, AND WASHINGTON, AND THE DISTRICT OF COLUMBIA, IN SUPPORT OF PLAINTIFF

ERIC T. SCHNEIDERMAN
  *Attorney General*
  *State of New York*
BARBARA D. UNDERWOOD
  *Solicitor General*
ANISHA S. DASGUPTA
  *Deputy Solicitor General*
CAROLINE A. OLSEN*
  *Assistant Solicitor General*
ERIC R. HAREN
  *Special Counsel & Senior Advisor*
*Admitted pro hac vice
120 Broadway, 25th Floor
New York, NY  10271
Telephone: (212) 416-8921

GILDA L. KRAMER, Esquire
JAMES T. WALTHER, Esquire
PA ID # 35992 and 319581
GILDA L. KRAMER & ASSOCIATES, LLC
1528 Walnut Street, Suite 501
Philadelphia, PA 19102
Telephone: (215) 732-4055
Fax: (215) 732-2736
gkramer@gildakramer.com
Attorneys for Amici Curiae

Dated: February 16, 2018

(*Counsel list continues on signature pages.*)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................... ii

INTERESTS OF AMICI ........................................................................................... 1

STATEMENT OF THE CASE ................................................................................... 2

ARGUMENT ............................................................................................................ 5

POINT I

The New Conditions Are Unlawful ......................................................................... 5

      A.    DOJ Has No Authority to Impose New Generally-Applicable Substantive Conditions. ....................................................................................... 5

           1.    The text, structure, and history of Byrne-JAG confirm that Congress did not authorize DOJ to add new generally-applicable substantive conditions. ....................................................... 6

           2.    The certification condition is not authorized by 34 U.S.C. § 10153(a)(5)(D). ....................................................................... 9

      B.    The New Conditions Are Inconsistent with 34 U.S.C. § 10228(a) ........................ 13

POINT II

DOJ's Decision to Impose the New Conditions Is Harming State and Local Jurisdictions, Including the Amici States and Their Subdivisions .................................................. 16

CONCLUSION ........................................................................................................ 18

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Ali v. Federal Bureau of Prisons,*
   552 U.S. 214 (2008)..............................................................................................13

*City of Chicago v. Sessions,*
   264 F. Supp. 3d 933 (N.D. Ill. 2017) ..................................................................8

*City of Los Angeles v. McLaughlin,*
   865 F.2d 1084 (9th Cir. 1989) .............................................................................6

*City of Philadelphia v. Sessions,*
   No. 17-cv-3894, 2017 WL 5489476 (E.D. Pa. Nov. 15, 2017) ...................... passim

*County of Santa Clara v. Trump,*
   250 F. Supp. 3d 497 (N.D. Cal. 2017) ...............................................................17

*Department of Homeland Sec. v. MacLean,*
   135 S. Ct. 913 (2015).............................................................................................6

*Ely v. Velde,*
   451 F.2d 1130 (4th Cir. 1971) ........................................................................2, 14

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.,*
   529 U.S. 120 (2000).........................................................................................8, 12

*Kennedy v. Allera,*
   612 F.3d 261 (4th Cir. 2010) ..............................................................................15

*Louisiana Pub. Serv. Comm'n v. FCC,*
   476 U.S. 355 (1986)...............................................................................................6

*McDermott Int'l., Inc., v. Wilander,*
   498 U.S. 337, 342 (1991)......................................................................................11

*New York v. United States,*
   505 U.S. 144 (1992)..............................................................................................14

*Printz v. United States,*
   521 U.S. 898 (1997).......................................................................................14, 15

*United States v. Morrison,*
   529 U.S. 598 (2000)...............................................................................................1

*Whitman v. American. Trucking Ass'ns, Inc.,*
   531 U.S. 457 (2001)..............................................................................................10

# TABLE OF AUTHORITIES (cont'd)

**Laws**                                                                                               **Page(s)**

Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, 102 Stat. 4181 ............................................2

Justice Assistance Act of 1984, Pub. L. No. 98-473, 98 Stat. 1837 ................................................2

Justice System Improvement Act of 1979, Pub. L. No. 96-157, 93 Stat. 1167 ......................2, 10

Omnibus Consolidated Appropriations Act, Pub. L. No. 104-208, 110 Stat. 3009 (1996) ...........12

Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, 82
    Stat. 197 ...........................................................................................................................3, 13

Violence Against Women and Department of Justice Reauthorization Act of
    2005, Pub. L. No. 109-162, 119 Stat. 2960 (2006) ...............................................2, 7

26 U.S.C. § 432 ...............................................................................................................................10

29 U.S.C. § 1085 .............................................................................................................................10

34 U.S.C.
    § 10102 .................................................................................................................................8
    §§ 10151-10158 ...............................................................................................................3, 6
    § 10152 .................................................................................................................................3
    § 10153 .................................................................................................................................5
    § 10156 .................................................................................................................................6
    §§ 10171-10191 ...................................................................................................................7
    § 10228 .............................................................................................................................3, 13
    § 20927 .................................................................................................................................8
    § 30307 .................................................................................................................................8

42 U.S.C.
    § 2000d .................................................................................................................................9
    § 3753 (2000) .......................................................................................................................7
    § 3756 (2000) .......................................................................................................................8

42 Fed. Reg. 45,828 (Sept. 12, 1977) ............................................................................................10

**Legislative History**

*Reports & Hearings*

H.R. 3355, 103d Cong. (version dated Nov. 19, 1993) ...................................................................7

H.R. Rep. No. 103-694 (1994) (Conf. Report) ...............................................................................7

# TABLE OF AUTHORITIES (cont'd)

**Legislative History**                                                         **Page(s)**

H.R. Rep. No. 109-233 (2005) ................................................................3, 7

S. Rep. No. 90-1097 (1968) ..................................................................2, 13

*Amendments to Title I (LEAA) of the Omnibus Crime Control and Safe Streets Act: Hearing Before the Subcomm. on Criminal Laws and Procedures of the S. Judiciary Comm.*, 94th Cong. (1976) ..................................................10

*Controlling Crime Through More Effective Law Enforcement: Hearings Before the Subcomm. on Criminal Laws and Procedure of the S. Comm. on the Judiciary*, 90th Cong. (1967) ..................................................14

*Federal Assistance to State and Local Criminal Justice Agencies: Hearing Before the Subcomm. on Criminal Laws and Procedures of the S. Comm. on the Judiciary*, 95th Cong. (1978) ....................................... 11-12

*Restructuring the Law Enforcement Assistance Administration: Hearings Before the Subcomm. on Crime of the H. Comm. on the Judiciary*, 95th Cong. (1977). ..............11, 12

*Bills*

Criminal Alien Control Act of 1995, S. 179, 104th Cong. ...........................................12

Enforce the Law for Sanctuary Cities Act, H.R. 3009, 114th Cong. (2015) ..................................8

Illegal Immigration Control Act of 1995, H.R. 1018, 104th Cong. ................................13

Illegal Immigration Control Act of 1995, S. 999, 104th Cong. ....................................12

Mobilizing Against Sanctuary Cities Act, H.R. 3002, 114th Cong. (2015) ..................................8

Stop Dangerous Sanctuary Cities Act, H.R. 5654, 114th Cong. (2016) ........................................8

Stop Dangerous Sanctuary Cities Act, S. 3100, 114th Cong. (2016) .............................................8

Stop Sanctuary Cities Act, S. 1814, 114th Cong. (2015) .................................................8

Stop Sanctuary Policies and Protect Americans Act, S. 2146, 114th Cong. (2015) ......................8

**Miscellaneous Authorities**                                                    **Page(s)**

Commonwealth of Mass. Exec. Office of Pub. Safety & Sec., Office of Grants
    and Research, *Edward J. Byrne Memorial Justice Assistance Grant Federal
    Fiscal Year 2017* (2017), *at* http://www.mass.gov/eopss/docs/ogr/justiceprev/
    massachusetts-ffy17-byrne-jag-application.pdf ................................................................4

*Departments of Commerce, Justice, and State, the Judiciary, and Related
    Agencies Appropriations for 2004: Hearings Before a Subcomm. of the H.
    Comm. on Appropriations*, 108th Cong. 1338-39 (2003) ...........................................7

DOJ, *Restructuring the Justice Department's Program of Assistance to State and
    Local Governments for Crime Control and Criminal Justice System
    Improvement* (June 23, 1977), *at* https://www.ncjrs.gov/pdffiles1/Digitization/
    64996NCJRS.pdf .....................................................................................................11

*Fiscal Year (FY) 2017 State Edward Byrne Memorial Justice Assistance Grant
    (JAG) Allocations*, *at* https://www.bja.gov/Funding/17JAGStateAllocations.pdf ..............17

John K. Hudzik et al., *Federal Aid to Criminal Justice: Rhetoric, Results, Lessons*
    (1984) ...............................................................................................................10, 14

*Justice Assistance Grant (JAG) Program: FY 2017 Allocations*, *at*
    https://bja.gov/Programs/jag/17jagallocations.html ..............................................17

Law Enforcement Assistance Administration, General Briefing (1977) ......................................10

*New York State's Application for Byrne-JAG Program Funds—FFY 2016* (June
    30, 2016), *at* http://www.criminaljustice.ny.gov/ofpa/pdfdocs/nys_2016_
    byrne_jag_program_byrne_page.pdf ......................................................................4

Office of Representative Peter W. Rodino, Press Release, *Committee Approves
    LEAA Reorganization* (May 10, 1979) ..................................................................12

Paul G. Dembling & Malcolm S. Mason, *Essentials of Grant Law Practice* (1991) ................6, 9

*Request for Public Comment, FY 2017 Justice Assistance Grant Program* (2017) ........................4

# INTERESTS OF AMICI

In our federal system, States and localities have primary responsibility for the design of law-enforcement policies to keep their residents safe. *See, e.g.*, *United States v. Morrison*, 529 U.S. 598, 618 (2000). The Edward Byrne Memorial Justice Assistance Grant (Byrne-JAG) is a mandatory formula grant that Congress created to provide States and localities with a reliable source of funding to use in accordance with state and local law-enforcement and criminal-justice policies. The amici States of New York, California, Connecticut, Delaware, Hawaii, Illinois, Iowa, Maine, Maryland, Massachusetts, New Jersey, New Mexico, Oregon, Vermont, and Washington, and the District of Columbia have received funding under the Byrne-JAG program and its predecessor grants for nearly fifty years. They use Byrne-JAG funds to support a diverse array of critical law-enforcement and criminal-justice programs, ranging from efforts to decrease gun violence to projects combating opioid addiction.

The United States Attorney General now claims authority to withhold Byrne-JAG funding from States and localities that have made law-enforcement policy judgments that federal law permits, but with which he disagrees. Specifically, he contends that he may deny grants to States and localities that limit their voluntary involvement with enforcing federal immigration policy because those jurisdictions have concluded that fostering a relationship of trust between their law-enforcement officials and their immigrant communities will promote public safety. The Byrne-JAG statute does not authorize the U.S. Attorney General's position, which is also contrary to the federalism principles that Congress enshrined in the Byrne-JAG program.

The amici States have adopted different approaches to cooperating with the federal government in immigration matters based on their own determinations about what measures will best promote public safety. Whether or not they believe that Philadelphia's approach would be

optimal for them, the amici States join this brief because they believe that the Byrne-JAG statute permits the City of Philadelphia to adopt a law-enforcement policy suited to local needs without financial penalty.

## STATEMENT OF THE CASE

The Byrne-JAG program has its origins in the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, Title I, 82 Stat. 197, which created the first block grants for States and localities to use for law-enforcement and criminal-justice programs.[1] Recognizing that "crime is essentially a local problem that must be dealt with by State and local governments," 82 Stat. at 197, Congress designed the grant to provide a reliable funding stream that States and localities could use in accordance with state and local law-enforcement policies.[2]

To ensure federal deference to local priorities, Congress prohibited federal agencies and executive-branch officials from using law-enforcement grants such as Byrne-JAG to "exercise any direction, supervision, or control over any police force or any other law enforcement agency of

---

[1] *See* Justice System Improvement Act of 1979, Pub. L. No. 96-157, 93 Stat. 1167, 1179 (amending Title I of the 1968 Act and reauthorizing law-enforcement block grants to States and local governments); Justice Assistance Act of 1984, Pub. L. No. 98-473, 98 Stat. 1837, 2077-85 (same); Anti-Drug Abuse Act of 1988, Pub. L. No. 100-690, pt. E, 102 Stat. 4181, 4329 (amending Title I of the 1968 Act and creating a formula law-enforcement grant); Violence Against Women and Department of Justice Reauthorization Act of 2005, Pub. L. No. 109-162, § 1111, 119 Stat. 2960, 3094 (2006) (amending Title I of the 1968 Act and creating the modern Byrne-JAG program).

[2] *See, e.g.*, S. Rep. No. 90-1097, at 2 (1968) (stating that Congress sought to encourage States and localities to adopt programs "based upon their evaluation of State and local problems of law enforcement") (excerpt available in Addendum (Add.) to this brief at 2); *see also Ely v. Velde*, 451 F.2d 1130, 1136 (4th Cir. 1971) (reviewing the legislative history of the 1968 Act and concluding that "[t]he dominant concern of Congress apparently was to guard against any tendency towards federalization of local police and law enforcement agencies").

any State or any political subdivision thereof." *Id*. § 518(a), 82 Stat. at 208. Although Congress has repeatedly modified the structure and terms of the law-enforcement grants authorized under Title I of the 1968 Act, the prohibition originally set forth in § 518 of the 1968 Act remains in effect with virtually no modification, and is now codified in the same chapter of the United States Code as Byrne-JAG. *See* 34 U.S.C. § 10228(a).[3]

The modern Byrne-JAG program was codified in 2006. See *supra* n.1; *see* 34 U.S.C. §§ 10151-10158. Like its predecessors, Byrne-JAG aims to "give state and local governments more flexibility to spend money for programs that work for them rather than to impose a 'one size fits all' solution." H.R. Rep. No. 109-233, at 89 (2005). To that end, the Byrne-JAG statute creates a mandatory formula grant and gives recipients substantial discretion to use funds for eight "broad purposes," *id*., including law enforcement, crime prevention and education, technology improvements, and drug treatment, 34 U.S.C. § 10152(a)(1).

The amici States have received Byrne-JAG funding from the U.S. Department of Justice (DOJ) since 2006, as well as funding from Byrne-JAG's predecessor grant programs. Amici have used the funds to support a diverse array of programs tailored to local law-enforcement and criminal-justice needs. For example, New York has used Byrne-JAG funding to support a multicounty program to combat gun violence, improve criminal records systems, enhance forensic

---

[3] The full text of § 10228(a) provides as follows:

Nothing in this chapter or any other Act shall be construed to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over any police force or any other criminal justice agency of any State or any political subdivision thereof.

laboratories, and support prosecution and defense services.[4] California has used Byrne-JAG funds for education, employment, and substance abuse services; prevention and intervention initiatives for high-risk students; and diversion and re-entry programs.[5] New Jersey has historically used Byrne-JAG funding to support multi-jurisdictional gang, gun, and narcotics task forces and law-enforcement information-sharing projects. The District of Columbia has used Byrne-JAG funds to improve re-entry services for formerly incarcerated women, and to support anti-truancy and juvenile delinquency programs. Hawaii intends to use its fiscal year 2017 Byrne-JAG funds to improve prosecution services and court programs, and to support drug treatment and enforcement programs. Massachusetts plans to use its 2017 Byrne-JAG funds to reduce gun violence, combat the opioid crisis, and promote community-based policing programs.[6] And Connecticut plans to use fiscal year 2017 Byrne-JAG funds to reduce recidivism, prevent gun violence, provide training to mentally ill offenders, and provide treatment for offenders addicted to opioids and heroin.[7] Without Byrne-JAG funds, the amici States may be forced to cut these critical programs.

DOJ has announced that the new immigration-related conditions imposed on state Byrne-JAG recipients will be substantively identical to the conditions it will impose on localities like

---

[4] *See New York State's Application for Byrne-JAG Program Funds—FFY 2016*, at 4-9 (June 30, 2016) (internet). For sources available on the internet, complete URLs are available in the table of authorities. All websites last visited on February 15, 2018.

[5] *See* Br. for States of California and Illinois as Amici Curiae at 11-12, *City of Chicago v. Sessions*, No. 17-2991 (7th Cir. Oct. 18, 2017), ECF No. 25.

[6] *See* Commonwealth of Mass. Exec. Office of Pub. Safety & Sec., Office of Grants and Research, *Edward J. Byrne Memorial Justice Assistance Grant Federal Fiscal Year 2017*, at 4-43 (2017) (internet).

[7] *Request for Public Comment, FY 2017 Justice Assistance Grant Program*, at 5-6 (2017) (internet).

Philadelphia.[8] Like Philadelphia, the amici States have not received Byrne-JAG awards for fiscal year 2017, and DOJ has made clear that it will not issue awards until, at the earliest, the resolution of litigation in *City of Chicago v. Sessions*, No. 17-cv-5720 (N.D. Ill.).

## ARGUMENT

## POINT I

## THE NEW CONDITIONS ARE UNLAWFUL

### A.   DOJ Has No Authority to Impose New Generally-Applicable Substantive Conditions.

The text of the Byrne-JAG statute creates a mandatory formula grant, leaving no room for DOJ to deviate from the legislative formula by imposing new generally-applicable substantive conditions. The structure and legislative history of the statute and its predecessor law-enforcement grants confirm DOJ's lack of authority to prescribe new generally-applicable conditions like the "notice," "access," and "certification" conditions at issue here. *See City of Philadelphia v. Sessions*, No. 17-cv-3894, 2017 WL 5489476, at *2 (E.D. Pa. Nov. 15, 2017). The structure and legislative history of 34 U.S.C. § 10153(a)(5)(D) likewise make clear that DOJ cannot impose the certification condition, which requires States and localities to comply with 8 U.S.C. § 1373, a collateral statute. Such statutes are not "applicable Federal laws," *see* 34 U.S.C. § 10153(a)(5)(D), within the meaning of Byrne-JAG.

---

[8] *See* Decl. of Alan R. Hanson, Opp'n to Pl.'s Amended Mot. for Prelim. Inj. ¶ 8, *California ex rel. Becerra v. Sessions*, No. 17-cv-4701 (N.D. Cal. Nov. 22, 2017), ECF No. 42-1 (statement of Acting Assistant Attorney General for the Office of Justice Programs that, absent an injunction, state awards will contain "substantively identical language" to the conditions in the local award documents).

**1. The text, structure, and history of Byrne-JAG confirm that Congress did not authorize DOJ to add new generally-applicable substantive conditions.**

Under basic separation-of-powers principles, an executive "agency literally has no power to act . . . unless and until Congress confers power upon it." *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). The Byrne-JAG statute contains no express provision authorizing DOJ to impose new generally-applicable substantive conditions like the ones at issue in this case. The statute instead provides that "the Attorney General shall . . . allocate" grant money based on the statutory formula. 34 U.S.C. § 10156(a)(1). Formula grants leave no discretion to the administering agency: if a grantee satisfies the statutory requirements, the grantee is entitled to what the formula dictates. *See, e.g.*, *City of Los Angeles v. McLaughlin*, 865 F.2d 1084, 1088 (9th Cir. 1989).[9]

Other provisions of Byrne-JAG confirm Congress's intent to prevent DOJ from deviating from Congress's statutory formula. For example, § 10157(b) permits DOJ to reserve up to five percent of appropriated funds and reallocate them to a State or locality if DOJ determines that reallocation is necessary to combat "extraordinary increases in crime" or to "mitigate significant programmatic harm resulting from" the formula. By expressly restricting DOJ's authority to redirect Byrne-JAG funds, Congress clearly signaled that DOJ must otherwise abide by the statutory formula. *See, e.g.*, *Department of Homeland Sec. v. MacLean*, 135 S. Ct. 913, 919 (2015) (provision of express authority in one section of statute implies intent to exclude such authority elsewhere).[10]

---

[9] *See also* Paul G. Dembling & Malcolm S. Mason, *Essentials of Grant Law Practice* § 5.03, at 33-35 (1991). (Add. 7-8.)

[10] The structure of title 34, chapter 101 of the United States Code also confirms DOJ's limited authority. Byrne-JAG is located in part A of subchapter V of Chapter 101, which is entitled "Edward Byrne Memorial Justice Assistance Grant Program." *See* 34 U.S.C. §§ 10151-10158. Part

The Byrne-JAG statute's legislative history leads to the same conclusion. From the time it first created a law-enforcement block grant program in 1968, Congress has sought to ensure that such grants do not become a means for federal agencies to control, direct, or supervise state and local law enforcement. See *supra* at 2-3; *infra* 13-14. In enacting Byrne-JAG—the latest version of the 1968 program (*supra* at 2)—Congress reaffirmed this priority, stating that the grant was designed to "give State and local governments more flexibility to spend money for programs that work for them rather than to impose a 'one size fits all' solution." H.R. Rep. No. 109-233, at 89 (2005).[11]

What is more, since the 1990s, Congress has repeatedly considered and rejected legislation that would withhold grant funding as a penalty for noncooperation with federal immigration law.[12] When Congress enacted the modern Byrne-JAG program in 2006, it repealed the only immigration-related condition imposed on grants under Byrne-JAG's predecessor program. *See* 42 U.S.C. § 3753(a)(11) (2000) (requiring grantees to inform federal immigration authorities of an alien's criminal conviction); Pub. L. No. 109-162, § 1111(a)(1), 119 Stat. at 3094 (repeal). And more recently, Congress has considered and rejected legislative proposals to impose funding

---

B, entitled "Discretionary Grants," authorizes DOJ to issue grants to support projects similar to those supported by Byrne-JAG but at DOJ's discretion. *See id.* §§ 10171-10191.

[11] The George W. Bush Administration proposed the modern Byrne-JAG program in its 2003 budget, stating that the "paramount goal" was to "provide fund recipients maximum flexibility and control over funding." *Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations for 2004: Hearings Before a Subcomm. of the H. Comm. on Appropriations*, 108th Cong. 1338-39 (2003).

[12] The Senate version of the 1994 Crime Bill, for example, included a provision conditioning grant funding on immigration cooperation, but it was eliminated in conference. *See* H.R. 3355, 103d Cong. § 5119 (version dated Nov. 19, 1993); H.R. Rep. No. 103-694, at 424 (1994) (Conf. Report).

conditions on so-called "sanctuary cities," including under Byrne-JAG.[13] DOJ's attempt to adopt the same policy through administrative processes is thus suspect. *See Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 159-60 (2000).

When Congress has wanted to authorize deviations from the statutory formula, it has done so explicitly and authorized only modest withholdings. For example, Congress has provided that a State that fails to "substantially implement" relevant provisions of the Sex Offender Registration and Notification Act (SORNA) "shall not receive 10 percent of the funds" the State would otherwise receive under Byrne-JAG. *See* 34 U.S.C. § 20927(a).[14] The amici States are unaware of Congress ever imposing a condition on Byrne-JAG that would withhold all funding, as DOJ now seeks to do.

As this Court has already recognized, the U.S. Attorney General is wrong to contend (see Mem. in Supp. of Mot. to Dismiss (U.S. Br.) at 14 (ECF No. 102-1)) that the new conditions fall within DOJ's authority to "plac[e] special conditions on all grants, and determin[e] priority purposes for formula grants," 34 U.S.C. § 10102(a)(6). *See City of Philadelphia*, 2017 WL 5489476, at *26-27; *see also City of Chicago v. Sessions*, 264 F. Supp. 3d 933, 941-43 (N.D. Ill. 2017) (holding that § 10102(a)(6) does not authorize DOJ to impose the notice or access conditions). First, § 10102(a)(6) is located in a different subchapter of the United States Code from the Byrne-

---

[13] *See, e.g.*, Stop Dangerous Sanctuary Cities Act, H.R. 5654, 114th Cong. § 4 (2016); Stop Dangerous Sanctuary Cities Act, S. 3100, 114th Cong. § 4 (2016); Enforce the Law for Sanctuary Cities Act, H.R. 3009, 114th Cong. § 3 (2015); Mobilizing Against Sanctuary Cities Act, H.R. 3002, 114th Cong. § 2 (2015); Stop Sanctuary Policies and Protect Americans Act, S. 2146, 114th Cong. § 3(a) (2015); Stop Sanctuary Cities Act, S. 1814, 114th Cong. § 2 (2015). The full text of the bills and their legislative histories are available at https://www.congress.gov.

[14] *See also* 34 U.S.C. § 30307(e)(2) (providing a five percent penalty for non-compliance with the Prison Rape Elimination Act); 42 U.S.C. § 3756(f) (2000) (providing a ten percent penalty for not testing sex offenders for HIV at victim's request).

JAG program, and there is nothing in the statute suggesting Congress intended that provision to apply to Byrne-JAG. *See City of Philadelphia*, 2017 WL 5489476, at \*26. Second, the term "special conditions" in § 10102(a)(6) is a term of art that refers only to those grant conditions that are "tailored to problems perceived in a particular grant project," Dembling & Mason, *supra*, § 11.01, at 107. (Add. at 9.) The term is not "generally applicable to all grants under a particular grant program," *id.*; *see also City of Philadelphia*, 2017 WL 5489476, at \*27.

## 2. The certification condition is not authorized by 34 U.S.C. § 10153(a)(5)(D).

Section 10153(a)(5)(D) of Title 34 requires grant applicants to provide "[a] certification, made in a form acceptable to the Attorney General," that assures "the applicant will comply with all provisions of this part and all other applicable Federal laws." The U.S. Attorney General is incorrect in contending (U.S. Br. at 14) that § 10153(a)(5)(D) grants DOJ authority to determine what constitutes an "applicable federal law," and that 8 U.S.C. § 1373 is one such law. As the location of § 10153 and its legislative history establish, § 10153(a)(5)(D) refers only to statutes that govern federal grant-making by their express terms, i.e., those that "directly speak to recipients of federal funds."[15] *See, e.g.,* 42 U.S.C. § 2000d ("No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in . . . any program or activity receiving Federal financial assistance.").

**a.** Section 10153 appears in a section of Title 34 entitled "Applications," which lays out technical and ministerial application requirements for grant applicants, such as the certifications

---

[15] Mem. in Supp. of Mot. for Prelim. Inj. at 18, *City of Philadelphia*, 2017 WL 5489476 (E.D. Pa. Sept. 28, 2017), ECF No. 21-1.

and assurances that applicants must provide. Had Congress intended § 10153(a)(5)(D) to be a broad grant of authority to DOJ, it would have said so explicitly, as it has done in other statutes.[16] *See Whitman v. American. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001).

**b.** The relevant language was first enacted in the Justice System Improvement Act of 1979, which reauthorized a predecessor to Byrne-JAG. *See* Pub. L. No. 96-157, § 2, secs. 401-05, 93 Stat. 1167, 1179-92 (1979) (amending the 1968 Omnibus Crime Control and Safe Streets Act).[17] When the 1979 Act was drafted, DOJ understood the term "applicable Federal laws" to mean those statutes that govern the provision of federal financial assistance. For example, DOJ's Law Enforcement Assistance Administration (LEAA)—the agency responsible for administering law-enforcement grants—issued manuals providing "guidance to grantees on their responsibilities of [sic] *applicable federal laws and regulation*s" (emphasis added).[18] A 1978 manual lists the laws DOJ understood to be applicable to federal law-enforcement grants, and the list contains only statutes governing federal grant-making. (Add. 35-39.) Other contemporaneous DOJ documents take the same approach,[19] as did a contemporaneous Office of Management and Budget circular,

---

[16] *See, e.g.*, 26 U.S.C. § 432 (e)(9)(E)(iv)(II) (special rule for benefit increases does not apply if taxpayer is "required . . . to comply with other applicable law, *as determined by the Secretary of Treasury*" (emphasis added)); 29 U.S.C. § 1085(e)(9)(E)(iv)(II) (same).

[17] The relevant language in the 1979 Act was codified in 42 U.S.C. § 3743, which, like 34 U.S.C. § 10153, codified grant application requirements, including that an applicant certify it "will comply with all provisions of this title and *all other applicable Federal laws*." Pub. L. No. 96-157, § 2, sec. 403(a)(8), 93 Stat. 1188 (emphasis added). (Add. 12.)

[18] *Amendments to Title I (LEAA) of the Omnibus Crime Control and Safe Streets Act: Hearing Before the Subcomm. on Criminal Laws and Procedures of the S. Judiciary Comm.*, 94th Cong. 404 (1976) (statement of Richard Velde, LEAA Administrator). (Add. 15.)

[19] *See, e.g.*, LEAA, General Briefing 6 (1977) (identifying twenty-three laws "applicable" to DOJ grants, and providing the National Environmental Policy Act and civil rights statutes as examples) (Add. 47); *see also* John K. Hudzik et al., *Federal Aid to Criminal Justice: Rhetoric, Results, Lessons* 45, 66-68 (1984) (listing the "19 different 'cross-cutting' laws which governed the expenditure of federal grants"). (Add. 93-95.)

which advised federal grant-in-aid programs of the laws applicable to federal grant funding. *See* 42 Fed. Reg. 45,828, 45,864 (Sept. 12, 1977). (Add. 97.)

The phrase "applicable Federal law" must be construed to have this meaning. Absent some contrary indication, when Congress incorporates a term of art into a statute, courts "assume" that "Congress intended" the language "to have its established meaning." *McDermott Int'l., Inc., v. Wilander*, 498 U.S. 337, 342 (1991). The inference is particularly strong here because Congress was aware of DOJ's understanding of what constituted an "applicable Federal law" when it adopted the relevant language. In 1977, DOJ prepared a report identifying the laws that DOJ deemed applicable to LEAA grants: approximately twenty federal laws that, by their terms, governed federal grant-making.[20] And that report was distributed to every Member of Congress and every Governor—among others—and was subject to public comment and hearings.[21]

The U.S. Attorney General's construction of § 10153(a)(5)(D) thus unjustifiably expands DOJ's authority under Byrne-JAG. Where Congress has made clear that a jurisdiction is entitled to funding on certain terms—as Congress does when creating a non-discretionary formula grant program—DOJ cannot substitute its own terms.

DOJ's interpretation of § 10153(a)(5)(D) is also contrary to one of the main goals of the 1979 Act that enacted the relevant language: to reduce administrative burdens associated with DOJ grants.[22] One of the main concerns highlighted in DOJ's 1977 report was that the then-body of

---

[20] *See* DOJ, *Restructuring the Justice Department's Program of Assistance to State and Local Governments for Crime Control and Criminal Justice System Improvement* 8-9 (June 23, 1977) (internet).

[21] *See Restructuring the Law Enforcement Assistance Administration: Hearings Before the Subcomm. on Crime of the H. Comm. on the Judiciary*, 95th Cong. 3, 9  (1977). (Add. 100, 102.)

[22] *See, e.g.*, *Federal Assistance to State and Local Criminal Justice Agencies: Hearing Before the Subcomm. on Criminal Laws and Procedures of the S. Comm. on the Judiciary*, 95th

federal laws applicable to LEAA grants—the twenty cross-cutting statutes that applied to federal grant-making—imposed excessive burdens on grantees.[23] It is unlikely that the relevant language would have been supported by DOJ and enacted by Congress if either entity believed it could be used to drastically increase the compliance burdens on States and localities.

Finally, even if § 10153(a)(5)(D) were to give DOJ some authority to determine whether a law is "applicable" for purposes of Title 34's certification requirement, the legislative history of 8 U.S.C. § 1373 makes clear that it is not such a law. The same legislation that enacted § 1373 in September 1996 also funded a predecessor to Byrne-JAG.[24] And while that legislation imposed a number of conditions on the use of Byrne grants, it imposed no immigration-related conditions. Moreover, Congress has repeatedly considered and rejected imposing information-sharing requirements on grantees as a condition of federal funding, which makes DOJ's authority to impose the conditions inherently suspect.[25] *See Brown & Williamson*, 529 U.S. at 159-60.

---

Cong. 383 (1978) (transmittal letter from U.S. Attorney General Griffin Bell) (stating that the bill was "designed" to "simplify[] the grant process") (Add. 106); *id.* at 7 (statement of Senator Edward Kennedy) (explaining that one purpose of the bill was to eliminate "red tape") (Add. 105); Office of Representative Peter W. Rodino, Press Release, *Committee Approves LEAA Reorganization* (May 10, 1979) (noting the 1979 Act was "designed to drastically reduce the red tape which has plagued the process of getting federal assistance to states and local governments" (quotation marks omitted)) (Add. 109).

[23] *See Restructuring*, *supra* n.20, at 9 ("Although each of these acts addresses an important national priority, the cumulative effect of their reporting and administrative requirements is staggering by the time they are passed on to a state agency administering the LEAA block grant.").

[24] *See* Omnibus Consolidated Appropriations Act, Pub. L. No. 104-208, Title I, 110 Stat. 3009, 3009-13 to -15 (1996) (appropriations for the Edward Byrne Memorial State and Local Law Enforcement Assistance Programs); *id.* Title VI (amendments to the Immigration and Nationality Act).

[25] *See, e.g.*, Criminal Alien Control Act of 1995, S. 179, 104th Cong. § 201 (proposing no crime-bill grant funding if participant refuses to cooperate with the Immigration and Naturalization Service (INS) in the "identification, location, arrest, prosecution, detention, or deportation of aliens"); Illegal Immigration Control Act of 1995, S. 999, 104th Cong. § 405 (proposing twenty

### B.    The New Conditions Are Inconsistent with 34 U.S.C. § 10228(a).

All three of the conditions are also invalid under a separate statutory provision, which was adopted in 1968 at the same time as the first law-enforcement block grant program, and which has consistently prohibited executive-branch officials from using law-enforcement grants to exert "any direction, supervision, or control" over any state or local police force or criminal justice agency. Pub. L. No. 90-351, § 518(a), 82 Stat. at 208. The current version of that prohibition, which is codified in the same chapter of the United States Code as the Byrne-JAG statute, provides that *"[n]othing in this chapter* or *any* other Act shall be construed to authorize *any* department, agency, officer, or employee of the United States to exercise *any* direction, supervision, or control over *any* police force or *any* other criminal justice agency of *any* State or *any* political subdivision thereof." 34 U.S.C. § 10228(a) (emphasis added). The repeated use of "any" signals Congress's intent to speak broadly, *see Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 218-19 (2008)—and in the present context, to prohibit all agency action that could interfere with state and local authority over law enforcement. The new conditions violate this statutory prohibition by seeking to control, direct, and supervise state and local law enforcement.

The legislative history of § 10228(a) confirms this meaning. Opponents of the Omnibus Crime Control and Safe Streets Act of 1968 expressed concerns that the U.S. Attorney General would use law-enforcement grants to coerce States and localities into adopting federal law-enforcement priorities.[26] Supporters responded that § 10228, which was pending before Congress

_____

percent funding cut for refusing to cooperate with INS officers or employees with respect to arrest and removal of aliens); Illegal Immigration Control Act of 1995, H.R. 1018, 104th Cong. § 405 (same).

[26] *See, e.g.*, S. Rep. No. 90-1097, at 230 (1968) (views of Senators Dirksen, Hruska, Scott, and Thurmond) (expressing concern that the Act would enable the U.S. Attorney General to

as part of the 1968 Act, would prohibit such control. U.S. Attorney General Ramsey Clark testified it would violate both "the mandate and spirit" of § 10228(a) to withhold funds because police departments were not run "the way the Attorney General says they must," and that § 10228(a) prevented DOJ from imposing extra-statutory conditions on law-enforcement grants.[27] Reviewing this history, the only appellate decision to construe § 10228 has observed that § 10228(a)'s purpose was "to shield the routine operations of local police forces from ongoing control by [DOJ]—a control which conceivably could turn the local police into an arm of the federal government." *Ely v. Velde*, 451 F.2d 1130, 1136 (4th Cir. 1971).

Although arising in a different context, the Supreme Court's anti-commandeering jurisprudence sheds further light on what it means to prohibit federal "direction" and "control" of state and local law-enforcement entities. The Court's cases make clear that anti-commandeering prohibitions prevent the federal government from compelling States to enact federal programs, *see New York v. United States*, 505 U.S. 144, 188 (1992), or compelling state officers to enforce such programs, *see Printz v. United States*, 521 U.S. 898, 930, 935 (1997). *Printz* suggests at least two actions constitute impermissible "direction" or "control": requiring state law-enforcement officers to assist in "the administration of a federally enacted regulatory scheme," and requiring those officers to receive information as part of their administrative responsibilities. *Id*. at 904.[28]

---

"become the director of state and local law enforcement"). (Add. 4.) *See generally* Hudzik et al., *supra*, at 15, 23-26 (1984) (discussing opposition to the grant). (Add. 89-92.)

[27] *Controlling Crime Through More Effective Law Enforcement: Hearings Before the Subcomm. on Criminal Laws and Procedure of the S. Comm. on the Judiciary*, 90th Cong. 100, 384, 497 (1967) (discussing § 408 of the bill, which became § 10228(a)). (Add. 112, 114, 116.)

[28] The legislation at issue in *Printz*, the Brady Act, violated these prohibitions by requiring local officers to run background checks on handgun purchasers, and requiring state officers "to accept" forms from gun dealers. 521 U.S. at 904, 905, 934.

As this Court has already recognized, the challenged conditions implicate "anti-commandeering principles" in a variety of ways. *City of Philadelphia*, 2017 WL 5489476, at *56. The certification condition requires States and localities to monitor their subgrantees for compliance with 8 U.S.C. § 1373 and to report any violations to DOJ—effectively turning States and localities into an enforcement arm of the Department of Homeland Security (DHS). The notice condition requires state officials to administer federal immigration policy by mandating that they respond to DHS requests for information, while the access condition violates anti-commandeering principles by requiring state officials to devote staff, resources, and real property to facilitate federal agents' access to aliens in correctional facilities. See Mot. for Preliminary Injunction Ex. D., at 16-20, *City of Philadelphia*, 2017 WL 5489476 (E.D. Pa. Sept. 28, 2017), ECF No. 21-6. If requiring state officials to "accept" a form is impermissible direction, *see Printz*, 521 U.S. at 904, then surely requiring them to accept and assist federal officials at state facilities is too. *See also Kennedy v. Allera*, 612 F.3d 261, 269 (4th Cir. 2010) (SORNA does not violate Tenth Amendment because it does not require States to accept sex offender registrations).

## POINT II

## DOJ'S DECISION TO IMPOSE THE NEW CONDITIONS IS HARMING STATE AND LOCAL JURISDICTIONS, INCLUDING THE AMICI STATES AND THEIR SUBDIVISIONS

DOJ contends that Philadelphia's challenge to the new conditions is premature, mistakenly asserting that Philadelphia and other jurisdictions have yet to suffer any adverse consequences as a result of DOJ's decision to impose the challenged conditions. See U.S. Br. at 9-10. This Court has already rejected that argument, *see City of Philadelphia*, 2017 WL 5489476, at *25, and the current effects of DOJ's actions on the amici States underscore the correctness of the Court's determination.

Like Philadelphia, the amici States are being put to an impermissible choice by DOJ: accept invalid conditions that diminish their ability to set their own law-enforcement priorities, or lose Byrne-JAG funding and the vital programs those grants support. Moreover, this choice is already having a current and "immediate impact on the day-to-day operations" of the amici States. *See, e.g., id.* (recognizing that such impact is among the factors that make an agency action final and reviewable under the Administrative Procedure Act).

For example, New York is in the middle of its own budget process and must decide now whether to cut funding to programs that are ordinarily supported by Byrne-JAG funds or substitute its own resources, which may come at the expense of other important programs. In New Jersey, many of the task force projects implemented at the local level and supported by Byrne-JAG may experience a disruption in funding, putting a strain on county budgets and raising the question of whether the projects can continue in the current environment of economic uncertainty. In Hawaii, the delay in funding will adversely affect the State's ability to continue proven programs and test innovative new programs that prevent crime and reduce recidivism.

These harms are further compounded by DOJ's decision to withhold all Byrne-JAG awards for the fiscal year 2017 during the pendency of litigation challenging the lawfulness of the notice, access, and certification conditions.[29] In total, DOJ is withholding approximately $170 million in Byrne-JAG funding from the States and the District of Columbia, and tens of millions of dollars in direct grants to localities.[30] New York—which is awaiting approximately $8.9 million—has been informed by the state agency responsible for administering Byrne-JAG awards that DOJ's refusal to issue grants has jeopardized funding to a number of law-enforcement and criminal-justice programs. Thus, contrary to DOJ's contention, Philadelphia's challenge to the new conditions is ripe for adjudication. *See id.*; *see also County of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 530 (N.D. Cal. 2017) (claims were ripe when new DOJ funding conditions created budget uncertainty).

---

[29] *See* Decl. of Alan R. Hanson, Acting Assistant Attorney General for the Office of Justice Programs at DOJ, Opp'n to Pl.'s Amended Mot. for Prelim. Inj. ¶¶ 9-10, California ex rel. Becerra v. Sessions, No. 17-cv-4701 (N.D. Cal. Nov. 22, 2017), ECF No. 42-1.

[30] *See Fiscal Year (FY) 2017 State Edward Byrne Memorial Justice Assistance Grant (JAG) Allocations* (internet); *Justice Assistance Grant (JAG) Program: FY 2017 Allocations* (internet).

## CONCLUSION

This Court should deny the U.S. Attorney General's motion to dismiss.


Dated:     New York, NY
           February 16, 2018

                                        Respectfully submitted,



                              By:     /GLK/_____
                                      Gilda L. Kramer


ERIC T. SCHNEIDERMAN                   GILDA L. KRAMER, Esquire
 *Attorney General*                    JAMES T. WALTHER, Esquire
 *State of New York*                   PA ID # 35992 and 319581
BARBARA D. UNDERWOOD                   GILDA L. KRAMER & ASSOCIATES, LLC
 *Solicitor General*                   1528 Walnut Street, Suite 501
ANISHA S. DASGUPTA                     Philadelphia, PA 19102
 *Deputy Solicitor General*            Telephone: (215) 732-4055
CAROLINE A. OLSEN*                     Fax: (215) 732-2736
 *Assistant Solicitor General*         gkramer@gildakramer.com
ERIC R. HAREN                          Attorneys for Amici Curiae
 *Special Counsel & Senior Advisor*
*Admitted pro hac vice
120 Broadway, 25th Floor
New York, NY  10271
Telephone: (212) 416-8921


*(Counsel list continues on next page.)*

XAVIER BECERRA
  *Attorney General*
  *State of California*
1300 I Street
Sacramento, CA 95814


GEORGE JEPSEN
  *Attorney General*
  *State of Connecticut*
55 Elm Street
Hartford, CT  06106

MATTHEW P. DENN
  *Attorney General*
  *State of Delaware*
Carvel State Bldg., 6th Fl.
820 N. French Street
Wilmington, DE 19801


RUSSELL A. SUZUKI
  *Acting Attorney General*
  *State of Hawaii*
425 Queen St.
Honolulu, HI 96813


LISA MADIGAN
  *Attorney General*
  *State of Illinois*
100 W. Randolph Street
  12th Fl.
Chicago, IL 60601

THOMAS J. MILLER
  *Attorney General*
  *State of Iowa*
1305 E. Walnut Street
Des Moines, IA 50319


JANET T. MILLS
  *Attorney General*
  *State of Maine*
6 State House Station
Augusta, ME 04333

BRIAN E. FROSH
  *Attorney General*
  *State of Maryland*
200 Saint Paul Place
Baltimore, MD 21202


MAURA HEALEY
  *Attorney General*
  *Commonwealth of*
  *Massachusetts*
One Ashburton Place
Boston, MA 02108


GURBIR S. GREWAL
  *Attorney General*
  *State of New Jersey*
R. J. Hughes Justice Complex
25 Market St.
Trenton, NJ 08625

HECTOR BALDERAS
  *Attorney General*
  *State of New Mexico*
408 Galisteo Street
Santa Fe, NM 87501


ELLEN F. ROSENBLUM
  *Attorney General*
  *State of Oregon*
1162 Court Street, N.E.
Salem, OR 97301

THOMAS J. DONOVAN, JR.
  *Attorney General*
  *State of Vermont*
109 State Street
Montpelier, VT 05609


BOB  FERGUSON
  *Attorney General*
  *State of Washington*
800 Fifth Avenue,
  Ste. 2000
Seattle, WA 98104


KARL A. RACINE
  *Attorney General*
  *District of Columbia*
One Judiciary Square
441 4th Street, N.W.
Washington, DC 20001