# ADDENDUM TABLE OF CONTENTS

**PAGE**

Senate Report No. 90-1097 (1968) ............................................................................1

Paul G. Dembling & Malcolm S. Mason, *Essentials of Grant Law Practice* (1991).....................6

Justice System Improvement Act, Pub. L. No. 96-157, 93 Stat. 1167 (1979)..............................10

*Amendments to Title I (LEAA) of the Omnibus Crime Control and Safe Streets Act: Hearing Before the Subcomm. on Criminal Laws and Procedures of the S. Judiciary Comm.*, 94th Cong. (1976)..................................................................................................13

Department of Justice, *Guide for Discretionary Grant Programs* (1978)....................................17

Department of Justice, General Briefing (1977)........................................................................42

John K. Hudzik et al., *Federal Aid to Criminal Justice: Rhetoric, Results, Lessons* (1984).........88

Uniform Administrative Requirements for Grants-in-Aid to State and Local Governments, 42 Fed. Reg. 45,828 (Sept. 12, 1977)....................................................................96

*Restructuring the Law Enforcement Assistance Administration: Hearings Before the Subcomm. on Crime of the H. Comm. on the Judiciary*, 95th Cong. (1977) ..............................99

*Federal Assistance to State and Local Criminal Justice Agencies: Hearing Before the Subcomm. on Criminal Laws and Procedures of the S. Comm. on the Judiciary*, 95th Cong. (1978) ....................................................................................................103

Office of Representative Peter W. Rodino, Press Release, *Committee Approves LEAA Reorganization* (May 10, 1979)..................................................................................109

*Controlling Crime Through More Effective Law Enforcement: Hearings Before the Subcommittee on Criminal Laws and Procedure of the Senate Committee on the Judiciary*, 90th Cong. (1967) ..........................................................................................111

i

# Calendar No. 1080

| 90TH CONGRESS<br>*2d Session* | SENATE | REPORT<br>No. 1097 |
|---|---|---|

## OMNIBUS CRIME CONTROL AND SAFE STREETS ACT OF 1967

———————

APRIL 29, 1968.—Ordered to be printed

———————

Mr. McCLELLAN, from the Committee on the Judiciary,

# REPORT

Submitted the following

together with

## MINORITY, INDIVIDUAL, AND ADDITIONAL VIEWS

[To accompany S. 917]

The Committee on the Judiciary, to which was referred the bill (S. 917) to assist State and local governments in reducing the incidence of crime, to increase the effectiveness, fairness, and coordination of law enforcement and criminal justice systems at all levels of government, and for other purposes, having considered the same, reports favorably thereon, with an amendment in the nature of a substitute, and recommends that the bill, as amended, do pass.

## AMENDMENT

Strike out all after the enacting clause and insert in lieu thereof the following:

That this Act may be cited as the "Omnibus Crime Control and Safe Streets Act of 1967".

### TITLE I—LAW ENFORCEMENT ASSISTANCE

#### DECLARATIONS AND PURPOSE

Congress finds that the high incidence of crime in the United States threatens the peace, security, and general welfare of the Nation and its citizens. To prevent crime and to insure the greater safety of the people, law enforcement efforts must be better coordinated, intensified, and made more effective at all levels of government.

Congress finds further that crime is essentially a local problem that must be dealt with by State and local governments if it is to be controlled effectively.

2

It is therefore the declared policy of the Congress to assist State and local governments in strengthening and improving law enforcement at every level by national assistance. It is the purpose of this title to (1) encourage States and units of general local government to prepare and adopt comprehensive plans based upon their evaluation of State and local problems of law enforcement; (2) authorize grants to States and units of local government in order to improve and strengthen law enforcement; and (3) encourage research and development directed toward the improvement of law enforcement and the development of new methods for the prevention and reduction of crime and the detection and apprehension of criminals.

PART A—LAW ENFORCEMENT ASSISTANCE ADMINISTRATION

SEC. 101. (a) There is hereby established within the Department of Justice, under the general authority of the Attorney General, a Law Enforcement Assistance Administration (hereafter referred to in this title as "Administration").

(b) The Administration shall be composed of an Administrator of Law Enforcement Assistance and two Associate Administrators of Law Enforcement Assistance, who shall be appointed by the President, by and with the advice and consent of the Senate. No more than two members of the Administration shall be of the same political party, and members shall be appointed with due regard to their fitness, knowledge, and experience to perform the functions, powers, and duties vested in the Administration by this title.

(c) It shall be the duty of the Administration to exercise all of the functions, powers, and duties created and established by this title, except as otherwise provided.

PART B—PLANNING GRANTS

SEC. 201. It is the purpose of this part to encourage States and units of general local government to prepare and adopt comprehensive law enforcement plans based on their evaluation of State and local problems of law enforcement.

SEC. 202. The Administration is authorized to make grants to States, units of general local government, or combinations of such States or units of local government for preparing, developing, or revising law enforcement plans to carry out the purpose set forth in section 302: *Provided, however,* That no unit of general local government or combination of such units shall be eligible for a grant under this part unless such unit or combination has a population of not less than fifty thousand persons.

SEC. 203. A grant authorized under section 202 shall not exceed 80 per centum of the total cost of the preparation, development, or revision of a plan.

SEC. 204. The Administration may advance such grants authorized under section 202 upon application for the purposes described. Such application shall:

(1) Set forth programs and activities designed to carry out the purposes of section 302.

(2) Contain such information as the Administration may prescribe in accordance with section 501.

PART C—GRANTS FOR LAW ENFORCEMENT PURPOSES

SEC. 301. It is the purpose of this part to encourage States and units of general local government to carry out programs and projects to improve and strengthen law enforcement.

SEC. 302. (a) The Administration is authorized to make grants to States, units of general local government, and combinations of such States or units of general local government to improve and strengthen law enforcement: *Provided however,* That no unit of general local government or combination of such units shall be eligible for a grant under this part unless such unit or combination has a population of not less than fifty thousand persons.

(b) Under this part grants may be made pursuant to an application which is approved under section 303 for—

(1) Public protection, including the development, demonstration, evaluation, implementation, and purchase of methods, devices, facilities, and equipment designed to improve and strengthen law enforcement and reduce crime in public and private places.

(2) The recruiting of law enforcement personnel and the training of personnel in law enforcement.

(3) Public education relating to crime prevention and encouraging respect for law and order, including education programs in schools and programs to

## INDIVIDUAL VIEWS MESSRS. DIRKSEN, HRUSKA, SCOTT, AND THURMOND ON TITLES I, II, AND III

Since 1960, serious crime in the United States has increased an alarming 88 percent. This fact is cause for the gravest national concern. This is not a partisan issue. It is an American tragedy.

In consideration of the omnibus crime bill, we have sought to strengthen and improve the proposal sent to Congress. To a limited extent, these efforts have been successful. The committee bill, however, still needs further upgrading and refinement.

### MINORITY CONTRIBUTIONS

The Omnibus Crime Control Act reported by the Senate Judiciary Committee bears an unmistakable imprint of constructive Republican contributions. These contributions range from new substantive provisions to perfecting technical changes.

### ORGANIZED CRIME

The most significant Republican contributions to the bill are those which increase significantly the tools and financial resources to combat the scourge of organized crime. In this regard, two major provisions were added at our insistence.

First, the substance of Amendment 223, introduced on June 29, 1967, by Senators Dirksen, Hruska, Scott, Thurmond and several others, has been approved. The amendment creates a category of special financial assistance to state and local governments. Such assistance has two purposes:

(1) To assist in the establishment or expansion of special prosecuting groups on a local level to ferret out and prosecute the multifarious illegal activities of organized crime.

(2) To provide special federal assistance in establishing a coordinated intelligence network among states including computerized data banks of syndicate operations and activities. These efforts would be under the direction and control of State Organized Crime Councils. A special authorization up to $15 million for fiscal year 1969 would be available for this purpose.

### ELECTRONIC SURVEILLANCE

Another major contribution to efforts to combat organized crime is found in Title III of the committee bill. To a great degree, this title reflects the provisions of S. 2050, the proposed Electronic Surveillance Act of 1967, which was introduced by Senators Dirksen, Hruska, Scott, Thurmond, Percy, Hansen and others in June of 1967. Included in the committee bill is the formula for strict impartial court authorization and supervision of surveillance and a broad prohibition on private snooping. S. 2050 was introduced in the wake of the Supreme Court's decision of *Berger v. New York*. It was tailored to meet the constitutional requirements imposed by that decision.

(224)

3

### INDEPENDENT LAW ENFORCEMENT ASSISTANCE ADMINISTRATION

In pursuit of one of the same objectives of the block grant provisions, namely the prevention of federal domination and control of state and local law enforcement, the Criminal Laws Subcommittee, upon the initiative of Chairman McClellan, added a provision to its bill for the establishment of an independent Law Enforcement Assistance Administration to administer the federal aid program. The administering agency was to be headed by a three-man board appointed by the President with the advice and consent of the Senate. Minority party representation was assured by the requirement that one of the three men would be a representative of the party out of power.

The subcommittee bill provided:

> In the exercise of its functions, powers, and duties, the Administration shall be independent of the Attorney General and other offices and officers of the Department of Justice.

This was deemed essential to insure that, as much as possible, the law enforcement assistance program would be administered impartially and free from political pressures. Also, it was considered to be important to refrain from placing in the hands of one man the potential power of granting or denying federal financial assistance in very large amounts to state and city law enforcement agencies.

It is regrettable that the provision for the independent status of the Administration was dropped from the bill. We attempted unsuccessfully to reinstate the provision in the full committee, and will urge its adoption on the floor of the Senate.

In short, we don't want the Attorney General, the so-called "Mr. Big" of federal law enforcement to become the director of state and local law enforcement as well. It is true that the Attorney General is chief law enforcement officer of the federal government. But he is not chief law enforcement officer of states or cities. We believe America does not want him to serve in this latter capacity.

Organization and management experts may object to a dilution of executive authority, but we want no part of a national police force. Such dilution, if a price at all, is a small price to pay to preserve a fundamental balance of police power.

We don't want this bill to become the vehicle for the imposition of federal guidelines, controls, and domination.

### POLICE SALARY SUPPORT

The Administration's original proposal to Congress in early 1967 contained a feature allowing up to one-third of each federal grant to be utilized for compensation of law enforcement personnel. In the hearing record of both the House and Senate Judiciary Committees, this provision proved to be quite controversial. When the House Committee reported the bill, the provision for salary support was deleted. Commenting on this action, the committee report on page 6 stated:

> The committee deleted all authority to use grant funds authorized by the bill for the purpose of direct compensation to police and other law enforcement personnel other than for training programs or for the performance of innovative

231

functions. Deletion of authority to use Federal funds for local law enforcement personnel compensation underscores the committee's concern that responsibility for law enforcement not be shifted from State and local government level. It is anticipated that local governments, as the cost for research, innovative services, training, and new equipment developments are shared by the Federal Government in the programs authorized in the bill will be able to devote more of their local resources to the solution of personnel compensation problems. The committee recognizes that adequate compensation for law enforcement personnel is one of the most vexing problems in the fight against crime.

We wholeheartedly subscribe to the House committee's view. There is indeed a grave concern that responsibility for law enforcement not be shifted from the state and local levels.

The Senate Criminal Laws Subcommittee also deleted a similar provision by an overwhelming vote, but subsequently a somewhat modified salary provision was reinstated. In modified form, up to one-third of each grant could be made available to pay one-half the cost of salary *increases* for law enforcement personnel. Even with this modification, we must strongly oppose the provision. This is not because we are indifferent to the low pay of the nation's law enforcement officers. It is because we fear that "he who pays the piper calls the tune" and that dependence upon the federal government for salaries could be an easy street to federal domination and control.

In addition, this provision would not have equal application or provide equal benefits to all law enforcement officials. In fact, most of the nation's 400,000 police officers would not be eligible because under the committee bill only local jurisdictions or groups of local jurisdictions with populations of more than 50,000 would be eligible to apply for grant aid. Thus, those smaller jurisdictions, some 80 percent of the nation's total with 58 percent of the population, would not be eligible for grant assistance. Who is to say that the officers of City A which meets the population standard could receive federal salary supplements whereas the officers of City B, perhaps an adjoining community whose population requirements do not meet the test, could not qualify.

The unfairness of the Administration proposal becomes crystal clear when it is considered that not all large cities and policemen will be beneficiaries of federal law enforcement grants. This is so because there is simply not enough federal money to go around. Thus, City C which perhaps got its application in early or whose political leadership was in favor with the Department of Justice received a grant and salary support, while City D with the same needs, the same crime problems and same low pay scales was left out because its application was tardy or not in compliance with contemporary federal notions on what a good application should contain. What could be more manifestly unfair?

Finally, it should be noted that once salary support is granted, it would be difficult if not impossible for the federal government to abandon its assistance, thus leaving a permanent dependence on the federal treasury.

## TITLE II

The spectre of American society—the greatest in the history of the world—plunging into chaos as the national fabric unravels into law-

5

# ESSENTIALS OF GRANT LAW PRACTICE

**PAUL G. DEMBLING**
of the District of Columbia Bar

**MALCOLM S. MASON**
of the New York Bar



AMERICAN LAW INSTITUTE-AMERICAN BAR ASSOCIATION
COMMITTEE ON CONTINUING PROFESSIONAL EDUCATION
4025 CHESTNUT STREET • PHILADELPHIA • PENNSYLVANIA 19104

There are overlapping characteristics among these classifications and categories of grant programs. For example, in a particular mandatory grant, although the grant is not considered "discretionary," there is some degree of discretionary judgment for the grantor agency in fact.

There are also subcategories of grants within these general classifications, and certain terminology important to understanding the grant field.

For example, since certain grants are made as a matter of right to recipients who qualify. These are called "entitlement" grants.

When, as is typical, grants to states (typically mandatory) require submission of a state plan for approval, they are called "state plan" grants.

"Formula" grants are so called because the amount of these grants are determined by a mathematical formula. The formula for a grant program is often based on the amount appropriately spent by the state, without a maximum limit. There may or may not be a minimum limit, but the state can claim larger amounts if it spends more in a manner conforming to the statute or rules. Such grants are called "open-ended."

These various categories are referred to throughout this and the following chapters.

## § 5.02 DISCRETIONARY GRANTS

Discretionary grant programs authorize grants for stated purposes. When authorized, and moneys are appropriated, the program must be carried out by the Government agency. The question is, to whom will the grants go? In that sense, the statutory program is discretionary as among the applicants.

An application is necessary. The grantor agency may make a grant or refuse it to a particular applicant. It may ordinarily make a grant in a large amount or small amount; occasionally the amount of the grant is fixed by statute, but that is not usual. The grantor agency may make no grant at all if no applications appear sufficiently meritorious; but it may not make a general refusal on fiscal grounds to

See § 2.04(b), supra and Chapter 9, "Direct, Discretionary, Project Grants."

---

consider applications on their merits without a disclosure to the Congress and the opportunity for congressional action.

When grants are discussed without indication of the type of grant, it is often discretionary grants that are intended, although mandatory grants are far larger in total dollar amount and probably more important in social impact.

## § 5.03 MANDATORY GRANTS

A mandatory grant program is one in which entitlement to the grant is established by statute. If the particular applicant meets the requirements or criteria established, the agency must award that applicant a grant. An eligible grantee has a right to receive a grant, and the amount of the grant is also legally determined. Although these statutes are not compelled by constitutional provisions to follow any particular pattern, certain recognizable patterns have formed over the years that generally apply to these mandatory grants.

### § 5.03(a) State Plan Grants

In the mandatory grant program, the grantee is usually a state. The grantee is usually required to submit a "state plan" that meets statutory tests of eligibility. These grants are therefore commonly called "state plan" grants. There is of course some discretionary judgment for the grantor agency to determine whether the state plan meets the statutory requirements, but these requirements are generally stated in fairly sharp terms. The area of discretion is thus narrow, and it is narrowed further by traditional practice. In practice, if the grantor and grantee disagree, there is likely to be a negotiated resolution. If the dispute is not resolved by negotiation, there is generally a provision for administrative or judicial determination. The discretion that exists is seldom used to refuse a grant, but it is sometimes used to negotiate details.

When the state plan is approved, it controls the grant, and any change in the plan ordinarily should be made by an amendment that goes through substantially the same process as the original state plan.

See § 2.04(a), supra, Chapter 6, "A Sample Mandatory Grant Program — Medicaid," and Chapter 7, "Mandatory Grants — The Town Court Case."

The amount of a mandatory grant is generally fixed by a "formula." For that reason these grants are often called "mandatory" state plan formula" grants.

§ 5.03(b) Requirements for the State Plan

The requirements for the state plan are generally quite lengthy and complex. They typically require the benefits of the grant to be passed on to the state's residents in an evenhanded way. Various standards of this evenhandedness are spelled out in detail including often some degree of procedural protection for the intended indirect beneficiaries. The formulas for the grant payments take into account relevant factors, such as economic, social, and demographic data. They may have such variables as the population of the state, or the juvenile population, or the population residing in certain kinds of institutions. Grants for weatherization may have as parameters the number of "degree days" in an average year and the number of single family homes and their average square footage or cubic footage. The formula for Medicaid grants to the states under Title XIX of the Social Security Act fills more than a dozen pages of the United States Code.

Often, the state has been required to administer the grant through a single state agency, but this requirement may be waivable.

§ 5.03(c) Formula Provisions

The amount of funds available is also typically set by a rather complex formula. A definition of formula grants given by the General Accounting Office reads: "Formula grants are grants in which a structured mathematical statement and data elements, such as statistical data, are used to (1) allocate funds to eligible recipients, or (2) determine a potential grant recipient's eligibility to receive funds, or both."[1] For example, the amount may run to approxi-

42 U.S.C. §§ 1396b, 1396d(b)

31 U.S.C. § 6504

[1]GAO, GRANT FORMULAS: A CATALOG OF FEDERAL AID TO STATES AND LOCALITIES at 10, GAO/HRD-87-28 (March 1987). The GAO report collects a large number of grant formulas. We discuss in Chapter 6 the Medicaid formula as a sample.

mately one-half to two-thirds of the total amount spent by the state for the grant purposes, but may include 100 percent reimbursement of certain expenditures, 90 percent of other expenditures, and 50 percent of others. The definition of expenditures that may be counted towards determining the federal share is also typically quite complex

§ 5.03(d) Common Assurances for Mandatory Grants

An assurance that the federal government will not interfere in certain areas is frequently present. The areas typically protected are education, medicine, and police.[2] Similar assurances are sometimes found in discretionary grant statutes as well.

§ 5.03(e) Flow-Through of Benefits

Although the state may be the grantee, the underlying purpose of the grant is typically to assist local governments through sub-awards by the state, or to assist the state's residents. Because of this, and perhaps, in part, because of some confusion of ideas, the ultimate intended beneficiary may be recognized as having rights, which the courts often approach in terms of constitutional doctrine.

§ 5.04 CATEGORICAL GRANTS AND BLOCK GRANTS

There are grants that are classified as "categorical" grants, which can be contrasted with those classified as "block" grants.

Grant programs that typically deal with assistance for fairly limited and specific purposes are often called "categorical" grants. Discretionary grants that may be for fairly limited purposes are also considered to be categorical.

In contrast, "block" grants are grants that are made to provide assistance within broad limits rather than for narrowly defined purposes. They authorize a broader range of activities. They are not categorical, since they deliberately leave the state a range of

[2]Cf. Current Development, PUB. CONT. NEWSL. No. 2, at 16 (Jan. 1979). See § 4.09, supra.

See, e.g., § 1.01(G), supra, and Chapter 7, "Mandatory Grants — The Tiam Court Case."

§ 2.04(c), supra, and Chapter 8, "Block Grants."

8

# 11

# Cross-Cutting Conditions

## § 11.01 DIFFERENCES AMONG GRANT CONDITIONS

A grant is normally accompanied by conditions. A major distinction among grant conditions is in the degree of generality. There are *government-wide* conditions, which apply nearly universally to all grant programs of all agencies. These are sometimes called "cross-cutting" conditions.[1] There are *agency-wide* conditions, sometimes called "general" conditions, which apply broadly to all grants of a certain type issued by a particular agency. There are *program* conditions, which are generally applicable to all grants under a particular grant program — these are most conveniently discussed along with agency-wide conditions. And there are *special* conditions, which are more or less tailored to problems perceived in a particular grant project. These different types of conditions will be discussed in turn.

## § 11.02 GOVERNMENT-WIDE CONDITIONS

Government-wide, or cross-cutting conditions, are largely imposed directly by statute. Some are imposed by Executive Order. A few are imposed by OMB circulars pursuant to statute. Others are imposed pursuant to OMB recommendation or other Executive Department policy advice, without statutory requirement.

The cross-cutting requirements are of two principal types: a) socio-economic policy requirements — such as prohibition of

---

[1] For a brief discussion of the history of the imposition and enforcement of conditions in grant programs, see P. Dembling & R. Dembling, *Significant Legislative Developments*, FEDERAL GRANT LAW 281, 294 *et seq.*, particularly § VI, "Cross-Cutting Conditions," and n. 25 (ABA, M. Mason ed. 1982).

PUBLIC LAW 96-157—DEC. 27, 1979          93 STAT. 1167

Public Law 96-157
96th Congress

## An Act

To restructure the Federal Law Enforcement Assistance Administration, to assist
State and local governments in improving the quality of their justice systems, and
for other purposes.

Dec. 27, 1979
[S. 241]

*Be it enacted by the Senate and House of Representatives of the
United States of America in Congress assembled,* That this Act may be
cited as the "Justice System Improvement Act of 1979".

Sec. 2. Title I of the Omnibus Crime Control and Safe Streets Act of
1968 is amended to read as follows:

Justice System
Improvement
Act of 1979.
42 USC 3701
note.

## "TITLE I—JUSTICE SYSTEM IMPROVEMENT

### "TABLE OF CONTENTS

"Declaration and purpose.

#### "Part A—Law Enforcement Assistance Administration

"Sec. 101. Establishment of Law Enforcement Assistance Administration.
"Sec. 102. Duties and functions of Administrator.
"Sec. 103. Office of Community Anti-Crime Programs.

#### "Part B—National Institute of Justice

"Sec. 201. National Institute of Justice.
"Sec. 202. Establishment, duties, and functions.
"Sec. 203. Authority for 100 per centum grants.
"Sec. 204. National Institute of Justice Advisory Board.

#### "Part C—Bureau of Justice Statistics

"Sec. 301. Bureau of Justice Statistics.
"Sec. 302. Establishment, duties, and functions.
"Sec. 303. Authority for 100 per centum grants.
"Sec. 304. Bureau of Justice Statistics Advisory Board.
"Sec. 305. Use of data.

#### "Part D—Formula Grants

"Sec. 401. Description of program.
"Sec. 402. Eligibility.
"Sec. 403. Applications.
"Sec. 404. Review of applications.
"Sec. 405. Allocation and distribution of funds.

#### "Part E—National Priority Grants

"Sec. 501. Purpose.
"Sec. 502. Percentage of appropriation for national priority grant program.
"Sec. 503. Procedure for designating national priority programs.
"Sec. 504. Application requirements.
"Sec. 505. Criteria for award.

#### "Part F—Discretionary Grants

"Sec. 601. Purpose.
"Sec. 602. Percentage of appropriation for discretionary grant program.

PUBLIC LAW 96-157—DEC. 27, 1979          93 STAT. 1187

"(f) To be eligible for funds under this part all eligible jurisdictions shall assure the participation of citizens, and neighborhood and community organizations, in the application process. No grant may be made pursuant to this part unless the eligible jurisdiction has provided satisfactory assurances to the Administration that the applicant has— *Funds, eligibility.*

"(1) provided citizens and neighborhood and community organizations with adequate information concerning the amounts of funds available for proposed programs or projects under this title, the range of activities that may be undertaken, and other important program requirements;

"(2) provided citizens and neighborhood and community organizations an opportunity to consider and comment on priorities set forth in the application or amendments;

"(3) provided for full and adequate participation of units of local government in the performance of the analysis and the establishment of priorities required by subsection (b)(1)(A); and

"(4) provided an opportunity for all affected criminal justice agencies to consider and comment on the proposed programs to be set forth in the application or amendments.

The Administrator, in cooperation with the Office of Community Anti-Crime Programs, may establish such rules, regulations, and procedures as are necessary to assure that citizens and neighborhood and community organizations will be assured an opportunity to participate in the application process. *Application process, rules.*

"APPLICATIONS

"SEC. 403. (a) No grant may be made by the Administration to a State, or by a State to an eligible recipient pursuant to part D, unless the application sets forth criminal justice programs covering a three-year period which meet the objectives of section 401 of this title. This application must be amended annually if new programs are to be added to the application or if the programs contained in the original application are not implemented. The application must include— *42 USC 3743.*

*Contents.*

"(1) an analysis of the crime problems and criminal justice needs within the relevant jurisdiction and a description of the services to be provided and performance goals and priorities, including a specific statement of how the programs are expected to advance the objectives of section 401 of this title and meet the identified crime problems and criminal justice needs of the jurisdiction;

"(2) an indication of how the programs relate to other similar State or local programs directed at the same or similar problems;

"(3) an assurance that following the first fiscal year covered by an application and each fiscal year thereafter, the applicant shall submit to the Administration, where the applicant is a State, and to the council where the applicant is a State agency, the judicial coordinating committees, a nongovernmental grantee, or a unit or combination of units of local government—

"(A) a performance report concerning the activities carried out pursuant to this title; and

"(B) an assessment by the applicant of the impact of those activities on the objectives of this title and the needs and objectives identified in the applicant's statement;

"(4) a certification that Federal funds made available under this title will not be used to supplant State or local funds, but will be used to increase the amounts of such funds that would, in the

93 STAT. 1188          PUBLIC LAW 96–157—DEC. 27, 1979

absence of Federal funds, be made available for criminal justice activities;

"(5) an assurance where the applicant is a State or unit or combination of units of local government that there is an adequate share of funds for courts and for corrections, police, prosecution, and defense programs;

"(6) a provision for fund accounting, auditing, monitoring, and such evaluation procedures as may be necessary to keep such records as the Administration shall prescribe to assure fiscal control, proper management, and efficient disbursement of funds received under this title;

"(7) a provision for the maintenance of such data and information and for the submission of such reports in such form, at such times, and containing such data and information as the Administration may reasonably require to administer other provisions of this title;

"(8) a certification that its programs meet all the requirements of this section, that all the information contained in the application is correct, that there has been appropriate coordination with affected agencies, and that the applicant will comply with all provisions of this title and all other applicable Federal laws. Such certification shall be made in a form acceptable to the Administration and shall be executed by the chief executive officer or other officer of the applicant qualified under regulations promulgated by the Administration; and

"(9) satisfactory assurances that equipment, whose purchase was previously made in connection with a program or project in such State assisted under this title and whose cost in the aggregate was $100,000 or more, has been put into use not later than one year after the date set at the time of purchase for the commencement of such use and has continued in use during its useful life.

"(b) Applications from judicial coordinating committees, State agencies, and other nongovernmental grantees do not have to include the crime analysis required by subsection (a)(1) but may rely on the crime analysis prepared by the council.

"REVIEW OF APPLICATIONS

Financial assistance.
42 USC 3744.

"SEC. 404. (a) The Administration shall provide financial assistance to each State applicant under this part to carry out the programs or projects submitted by such applicant upon determining that—

"(1) the application or amendment thereof is consistent with the requirements of this title;

"(2) the application or amendment thereof was made public prior to submission to the Administration and an opportunity to comment thereon was provided to citizens and neighborhood and community groups; and

"(3) prior to the approval of the application or amendment thereof the Administration has made an affirmative finding in writing that the program or project is likely to contribute effectively to the achievement of the objectives of section 401 of this title.

Each application or amendment made and submitted for approval to the Administration pursuant to section 403 of this title shall be deemed approved, in whole or in part, by the Administration within ninety days after first received unless the Administration informs the applicant of specific reasons for disapproval.

# AMENDMENTS TO TITLE I (LEAA) OF THE OMNIBUS CRIME CONTROL AND SAFE STREETS ACT

# HEARING

BEFORE THE

## SUBCOMMITTEE ON
## CRIMINAL LAWS AND PROCEDURES

OF THE

## COMMITTEE ON THE JUDICIARY
## UNITED STATES SENATE

NINETY-FOURTH CONGRESS

SECOND SESSION

ON

## S. 460, S. 1297, S. 1598, S. 1601, S. 1875, S. 2212, S. 2245 and S. 3043

OCTOBER 2, 8, 9, 22, 23, NOVEMBER 4, DECEMBER 4, 1975 AND
MARCH 17, 1976

Printed for the use of the Committee on the Judiciary



U.S. GOVERNMENT PRINTING OFFICE

69-103 O    WASHINGTON : 1976

13

398

But Congress also hears another voice from the public, and most of them say cut our taxes, cut our expenditures, let us get sensible about this thing so that we will have a little to live on and save a little for our children to go to school and retirement and so on. So Congress is listening, but they are listening to different parts, perhaps, of the people's cry.

Mr. REED. We are well familiar with this, Mr. Chairman.

I think you will agree with me that the criminal justice system and especially the prisons and jails, constitute a stronghold for our society. Now, there are those who would breach that stronghold. There are those who for their own reasons would eliminate prisons, would denigrate the activities that go on in jails and prisons. I propose to you, Mr. Chairman, that if this stronghold is breached, we will no longer have a society. And whatever the cost is, within reason, we must some way or other provide the reasonable resources for sustaining that stronghold in conformity with our constitutional and our good American expectations.

Senator HRUSKA. Well, it is associations like your which could do much to stir public thought and also, hopefully, some action along these lines that you have described so well.

Mr. REED. We are trying, sir.

Senator HRUSKA. So give the greetings of the subcommittee to your associates in that association. Tell them to be of good cheer. We are going to do the best we can.

Mr. REED. Thank you, sir.

Senator HRUSKA. And thanks for your help.

Our final witness for the day is Richard W. Velde who is Administrator of the Law Enforcement Assistance Administration.

Mr. Velde, some time ago you appeared here and gave us the opening scenario of these hearings. Since then we have had many witnesses and many points of view expressed in this forum. I know you have followed those hearings and the testimony very carefully and methodically, and the size and the scope of your 26-page statement indicates as much.

I know it would be helpful—the statement is long, and yet, in having read it last night and early this morning I suggest it would be a good reference work to those who have any specific ideas or criticisms to voice; because for every action there is a reaction, and we know that. We had some in the last 2 minutes.

We have had a subject that is dear to your heart—namely, the idea that there are so many guidelines that they are oppressive and frustrating and burdensome, and they never cease to come. I know you will in due time address yourself to that.

We welcome you here once again, and we will print in the record this statement that you have submitted in its entirety.

You may now proceed in your own fashion, to highlight it or skip-read it, as you choose.

[The material referred to follows:]

ADDITIONAL STATEMENT OF RICHARD W. VELDE, ADMINISTRATOR, LAW ENFORCEMENT ASSISTANCE ADMINISTRATION, CONCERNING LEGISLATION WHICH WOULD AMEND THE OMNIBUS CRIME CONTROL AND SAFE STREETS ACT OF 1968

Mr. Chairman, I appreciate your invitation to again appear before the Subcommittee on Criminal Laws and Procedures in my capacity as Adminis-

404

Section 301(d) provides that not more than one-third of any Part C grant awarded to a state may be expended for compensation of police and other regular law enforcement and criminal justice personnel. The one-third salary provision was included in the Safe Streets Act because the Congress was concerned that responsibility for law enforcement not be shifted from state and local governments to the Federal Government. In addition, federal funds might supplant state and local efforts, instead of supplementing them.

In a few instances, remarks have been directed to the Subcommittee to the effect that there is excessive "red tape" involved in the administration of the LEAA grant program. While in some cases, regrettable and unforeseen difficulties have arisen and caused delay to certain applicants, I believe the Subcommittee will find that overall the program has been administered effectively and efficiently.

Prior testimony before the Subcommittee made reference to 1,200 pages of guidelines issued by LEAA to implement a 23 page Act. Such statements can be very misleading. LEAA has implemented the statute in a manner consistent with the intent of Congress in establishing the block grant program. Much of the material contained in guideline manuals is informational. Included are such items as reprints of the statute, OMB circulars, standard application forms, reporting forms, fund allocation tables, and address lists. All this material is provided for the convenience of the user, not to impose additional burdens on applicants, as one might be led to believe.

An example of the manuals issued by LEAA is the most recent edition of the "Guide for Discretionary Grant Programs." This manual, which is LEAA's largest program guideline document, has 224 pages of requirements and specifications. However, the specifications are for numerous different categories of programs. Any particular applicant would need only refer to the two or three pages under which funds were being sought, and a few pages of general requirements. In addition to the guideline requirements, the manual contains 15 informational appendices.

It should be noted that some of the information provided in LEAA guideline manuals relate not to requirements arising out of LEAA's legislation, but to other federal statutes which have been passed to deal with crucial issues of national concern. Examples of such statutes which may be considered by some critics to be LEAA "red tape," but over which we have no control, are the National Environmental Policy Act, the Clean Air Act, the Federal Water Pollution Control Act, the National Historic Preservation Act, the Uniform Relocation Assistance and Real Property Acquisition Act, and the Safe Drinking Water Act. Thus, it is unfair to single out LEAA as the cause for many requirements being imposed on those seeking assistance.

As you know, Mr. Chairman, provisions have been added to LEAA's enabling legislation which help assure swift action. By law, LEAA must approve or disapprove state comprehensive plans within ninety days of submission. State planning agencies must act on subgrant applications within ninety days of their receipt. LEAA has adopted a similar ninety day rule for consideration of any discretionary grant applications. I might add, Mr. Chairman, that there have been well over 100,000 grants made during the course of the LEAA program, with the number of applicants far exceeding that figure.

With regard to the application forms themselves, LEAA uses the standard forms for federal grant programs, prescribed by the Office of Management and Budget, in its discretionary grant program. This assures uniformity for all such applicants.

To clarify provisions of LEAA's enabling legislation and provide guidance on application, award, and grant administration procedures, a number of guideline manuals have been issued. Program manuals give information on programs and projects for which funds are available and guidance to prospective grantees about the steps to be taken in making application for funds. The manuals also give guidance to grantees on their responsibilities of applicable federal laws and regulations. Additionally specified are monitoring and evaluation policies and procedures.

Guideline manuals have also been issued to provide direction regarding specific issues concerning which grantees often require assistance. Examples are our audit guide, financial guide, and equal opportunity guidelines. Without the detailed information provided in these manuals by LEAA, many problems could arise for grantees which could only otherwise be resolved on a case-by-case basis, a very time consuming proposition.

**15**

405

Finally in this regard, Mr. Chairman, it should be pointed out that the LEAA program is essentially one administered by the states and by local governments. These jurisdictions all may have requirements which affect the management of the program, perhaps causing delay to applicants for funds. If inefficient management techniques are the cause of problems, LEAA may be able to provide the technical assistance necessary to upgrade capabilities and initiate effective techniques. In fact, we have taken such action in several instances. However, it would be inappropriate for LEAA to otherwise dictate to these jurisdictions the nature of their administrative procedures.

Representatives of state court systems appearing before the Subcommittee have taken issue with LEAA's estimate of the percentage of funds which goes for court programs. You will recall, Mr. Chairman, that we have indicated that courts projects receive in the neighborhood of 16 percent of LEAA program funds. Others, however, have voiced the opinion that the actual courts funding level is 6 or 7 percent, and have been critical of the fact that LEAA includes in the total such items as defense and prosecution projects.

It is extremely difficult to credit LEAA funds to exclusive program categories such as police, courts, or corrections. This is particularly true since as much as 40 percent of LEAA grants benefit multiple components of the criminal justice system. Criminal justice training academies receiving LEAA support are one example of this multi-component thrust. One week, courses may be given to prosecutors, one week to police officers, one week to probationary officers, and another week to judicial representatives.

Another example is the funding provided to support criminal history information systems. Such systems are used by nearly all elements of the criminal justice system, including police, the courts, and correctional agencies. There is no accurate way to assign a specific amount of these dollars to particular program categories.

Another difficulty in this regard is one of definition. There is a bona fide difference of opinion as to what actually is a court program. Certain projects to assist prosecution, defense, and probation functions have been characterized by LEAA as courts projects. Advocates of increased funding for the courts feel, however, that only those projects which directly benefit court operations be included in the definition, with other efforts being listed separately, perhaps as a new category.

LEAA is now attempting to resolve these differences and provide a discrete apportionment of all funding for courts projects under definitions acceptable to all interested parties. A special task force of judicial leaders and technicians has been commissioned to develop acceptable working definitions for categorizing projects, apply these definitions to LEAA project expenditure data, and determine the percentage of LEAA funds devoted to courts projects.

The last issues I would like to address are criticisms of the LEAA program which trouble me deeply. I am troubled not only because the criticisms are felt to be inappropriate and unwarranted, but because of the manner in which they were presented to the Subcommittee. Certain of the comments supporting the criticisms were misleading and incomplete, while other statements would clearly be shown not supported by the facts if careful investigation were undertaken. It is my hope that the Subcommittee, for the reasons I will discuss, will not be misled in its deliberations with respect to the LEAA program as a result of this testimony.

One issue which was raised in the testimony concerned certain aspects of LEAA's civil rights compliance effort. Because the organization which the witness represents is, and was at the time of the prior testimony, engaged in litigation with LEAA on these very matters, it would be highly inappropriate for me to discuss the substance of those particular remarks in this forum. LEAA is now preparing its response to the allegations involved in the litigation and will be most happy to provide the Subcommittee with a copy when formally submitted to the court. Needless to say, LEAA believes it is very effectively enforcing its civil rights responsibility, and it is felt that the results of litigation will clearly establish this fact.

LEAA's role in the development of information systems and the impact of such systems upon individual privacy was also called into question by this same witness. For the full information of the Subcommittee, I would like to briefly describe LEAA's involvement in the area of criminal justice information systems.

# Guideline Manual

M 4500.1G

# GUIDE FOR DISCRETIONARY GRANT PROGRAMS



## September 30, 1978

UNITED STATES DEPARTMENT OF JUSTICE
LAW ENFORCEMENT ASSISTANCE ADMINISTRATION

Distribution:                                          Initiated By:

M 4500.1G
September 30, 1978

## INTRODUCTION

1. PURPOSE.  The purpose of this manual is to provide information about
   major categorical programs of the Law Enforcement Assistance
   Administration, authorized by the Crime Control and Safe Streets Act
   of 1968, as amended, and the Juvenile Justice and Delinquency
   Prevention Act of 1974, as amended.  The manual includes information
   about discretionary grant programs, selected program field tests,
   technical assistance, and training.  Information about how to apply
   for assistance and who to contact for additional information is also
   provided.

   This manual is complemented by additional guidelines and program
   announcements and plans, such as the Program Plan of the National
   Institute of Law Enforcement and Criminal Justice, the Program Plan
   for Statistics of the National Criminal Justice Information and
   Statistics Service, program guidelines of the Office of Criminal
   Justice Education and Training, and program announcements and other
   documents regarding Incentive Programs.  In addition, supplements
   to this manual will be published as new programs, such as those of
   the Office of Juvenile Justice and Delinquency Prevention, are developed.

2. SCOPE.  This manual is of interest to State and local criminal justice
   agencies, institutions and organizations who work with criminal justice
   agencies, State Planning Agencies, regional and local planning units,
   and LEAA personnel.

3. CANCELLATION.  LEAA Guideline Manual M 4500.1F, December 21, 1977,
   same subject, is herewith cancelled.

4. INTRODUCTION.  Many of the programs in this manual reflect the
   implementation of the Action Program Development Process in LEAA during
   the past year.  The Action Program Development Process is an effort
   to improve the value and effectiveness of LEAA action programs by
   systematically building on knowledge about concepts, approaches,
   and techniques which are successful in controlling crime and improving
   criminal justice, carefully testing program concepts, demonstrating
   programs which are successful, and marketing concepts through training
   and technical assistance.

   Programs which are currently in the stages of program design and testing
   as well as demonstration, are included in this manual.  Major technical
   assistance and training programs which serve to market program concepts
   and techniques are also included.

   LEAA programs will increasingly be developed through the Action Program
   Development Process.

i

M 4500.1G
September 30, 1978

5. **RELATED GUIDELINES AND DOCUMENTS.**

   a. **The Programs described in this manual** are supported and supplemented by a number of other LEAA programs. The major documents describing other programs and the general procedures governing them include:

      (1) Guide for State Planning Agency Grants (effective edition of M 4100.1) which describes the procedures and requirements for planning grants to State Criminal Justice Planning Agencies (SPA's) supported under Part B of the Crime Control and Safe Streets Act of 1968, as amended, and for the development of State comprehensive criminal justice plans required under Part C and E of the Crime Control Act, and the Juvenile Justice and Delinquency Prevention Act of 1974, as amended.

      (2) Program Plan for the National Institute of Law Enforcement and Criminal Justice (NILECJ) which describes the research, development and technology transfer activities planned for NILECJ.

      (3) Program Plan for Statistics FY 1977-81 which describes LEAA's planned statistical activities.

      (4) Law Enforcement Education Program Guideline Manual (effective edition of M 5200.1) which describes the education assistance program of the Office of Criminal Justice Education and Training (OCJET).

      (5) Graduate Research Fellowship Program Guideline (effective edition of G 5400.2) which describes the procedures and requirements for participation in the LEAA Graduate Research Fellows Program.

      (6) Guideline Manual for the Comprehensive Data Systems Program (effective edition of M6640.1) which describes the Comprehensive Data Systems Program (CDS), sets forth guidelines for CDS action plans, and indicates the purpose, available funding, and criteria for evaluation of CDS applications.

      (7) Guideline Manual for Financial Management for Planning and Action Grants (effective edition of M 7100.1), which describes the requirements and procedures for financial management of LEAA grants, including those set forth in this manual.

      (8) Program Announcement for Incentive Fund Programs, which describes the concept, background, and procedures governing LEAA's newly developed Incentive Fund grant programs. The program announcement will be available early in FY 1979.

September 30, 1978

   b.  These documents are available from LEAA, 633 Indiana Avenue, N.W.
       Washington, D.C.  20531.

   c.  In addition, the National Criminal Justice Reference Service
       (NCJRS) can provide a wide range of information about specific
       areas of interest to the criminal justice community.  Information
       about these services is available from LEAA or directly from
       NCJRS, Box 6000, Rockville, Maryland  20850.

   d.  For further information or assistance in the use of this manual,
       contact LEAA offices referred to herein or the appropriate
       State Planning Agency.

JAMES M. H. GREGG
Assistant Administrator
Office of Planning and Management

M 4500.1G
September 30, 1978

## TABLE OF CONTENTS

### CHAPTER 1   PREVENTION PROGRAMS

|  |  | Page No. |
|---|---|---|
| 1. | Scope of Chapter | 1 |
| 2. | Community Anti-Crime Program | 1 |
| 3. | Comprehensive Crime Prevention Program | 12 |
| 4. | Family Violence Program | 19 |
| 5. | Commercial Security Program Test | 27 |
| 6. | Reserved | 27 |
| 7. | Technical Assistance in Crime Prevention | 28 |
| 8. | Training in Crime Prevention | 30 |
| 9. | Reserved | 30 |

### CHAPTER 2   ENFORCEMENT PROGRAMS

| 10. | Scope of Chapter | 31 |
|---|---|---|
| 11. | Anti-Fencing Program | 31 |
| 12. | Organized Crime Program | 33 |
| 13. | Comprehensive Career Criminal:  ICAP Component | 34 |
| 14. | Arson Control Test | 35 |
| 15-16. | Reserved | 35 |
| 17. | Technical Assistance in Enforcement | 36 |
| 18. | Training in Enforcement | 39 |
| 19. | Reserved | 41 |

### CHAPTER 3   ADJUDICATION PROGRAMS

| 20. | Scope of Chapter | 43 |
|---|---|---|
| 21. | Court Delay Reduction Program | 43 |
| 22. | Comprehensive Career Criminal Program | 51 |
| 23. | Fundamental Court Improvement Program | 60 |
| 24. | Integrated Police and Prosecution Witness Assistance Program | 69 |
| 25. | State Judicial Information System Program (SJIS) | 74 |
| 26. | Jail Overcrowding and Pretrial Detainee Program (Adjudication) | 77 |
| 27. | Technical Assistance in Adjudication | 78 |
| 28. | Training in Adjudication | 81 |
| 29. | Reserved | 83 |

iv

M 4500.1G
September 30, 1978

## CHAPTER 4    CORRECTIONS PROGRAMS

|  |  | Page No. |
|---|---|---|
| 30. | Scope of Chapter | |
| 31. | Corrections Facility Standards Implementation Program | 85 |
| 32. | Corrections Program Standards Implementation Program | 85 |
| 33. | Correctional Standards Accreditation Program | 91 |
| 34. | Restitution Program | 97 |
| 35. | Treatment Alternatives to Street Crime (TASC) Program | 98 |
| 36. | Treatment and Rehabilitation for Addicted Prisoners Program (TRAP) | 104 |
| 37. | Jail Accounting Microcomputer System (JAMS) Program | 107 |
| 38. | Offender Based State Corrections Information System (OBSCIS) Program | 112 |
| 39. | Inmate Legal Services Program | 115 |
| 40. | Jail Overcrowding and Pretrial Detainee Program | 119 |
| 41-46. | Reserved | 120 |
| 47. | Technical Assistance in Corrections | 127 |
| 48. | Training in Corrections | 128 |
| 49. | Reserved | 136 |
|  |  | 136 |

## CHAPTER 5    SYSTEM SUPPORT PROGRAMS

| 50. | Scope of Chapter | 137 |
|---|---|---|
| 51. | Comprehensive Data Systems (CDS) Program | 137 |
| 52. | Small State Supplement Program | 141 |
| 53. | Indian Criminal Justice Program | 141 |
| 54. | Manpower Planning and Development | 142 |
| 55-56. | Reserved | 144 |
| 57. | Technical Assistance in System Support | 145 |
| 58. | Training in System Support | 146 |
| 59. | Reserved | 148 |

## CHAPTER 6    JUVENILE JUSTICE AND DELINQUENCY PREVENTION PROGRAMS

| 60. | Juvenile Justice and Delinquency Prevention | 149 |
|---|---|---|
| 61. | Youth Advocacy – Reserved | 149 |
| 62. | Alternative Education – Reserved | 149 |
| 63. | Children in Custody – Alternative Programs Part II Reserved | 149 |
| 64. | Project New Pride – Replication Program – Reserved | 149 |
| 65. | Juvenile Justice System Reform – Reserved | 149 |

v

M 4500.1G
September 30, 1978

CHAPTER 6   (Cont.)

66.  Announcement of OJJDP Unsolicited Proposal Cycle  –
        Reserved                                                    149
67-70.  Reserved
71.  Technical Assistance in Juvenile Justice and
        Delinquency Prevention                                      150
72.  Training in Juvenile Justice and Delinquency
        Prevention – Reserved                                       151


APPENDIX 1.  GENERAL SPECIFICATIONS AND REQUIREMENTS
             FOR DISCRETIONARY GRANTS

        1.  Scope                                                    1

SECTION 1.  ELIGIBLE PROJECTS AND APPLICANTS

        2.  Eligible Projects                                        1
        3.  Eligible Applicants                                      1

SECTION 2.  GENERAL REQUIREMENTS

        4.  Grantee Matching Contribution                            3
        5.  Assumption of Costs                                      3
        6.  Period of Support                                        4
        7.  Grant Assurances                                         4

SECTION 3.  SPECIAL REQUIREMENTS

        8.  Special Requirements for Part E
             (Corrections) Grants                                    6
        9.  Special Requirements for Construction
             Projects                                                7
       10.  Special Requirements for Grants Involving
             Automated Data Processing (ADP)                         8
       11.  Special Requirements for Multi-State or
             Multi-Units Projects                                    9
       12.  Special Requirements of Other Federal
             Legislation and Regulations                            10

SECTION 4.  PROHIBITIONS AND RESTRICTIONS

       13.  Lethal Weapons, Ammunition and Related Items            15
       14.  Medical Research and Psychotherapy                      15
       15.  Expenditures for Personnel                              15

vi

23

M 4500.1G
September 30, 1978

|  |  |  | Page No. |
|---|---|---|---|
| APPENDIX 2. | | PREPARATION AND SUBMISSION OF APPLICATIONS | |
| | 1. | Scope | 1 |
| SECTION 1. | | PREPARATION OF APPLICATIONS | |
| | 2. | Standard Application Forms | 1 |
| | 3. | Preapplications | 1 |
| SECTION 2. | | SUBMISSION OF APPLICATIONS | |
| | 4. | Consultation and Participation with State Planning Agencies | 2 |
| | 5. | Submission and Processing Procedures | 3 |
| | 6. | Panel Review Process | 4 |
| | 7. | Notification | 4 |
| APPENDIX 3. | | AWARD AND ADMINISTRATION OF GRANTS | |
| | 1. | Scope | 1 |
| | 2. | Applicability of Financial Management Guide | 1 |
| | 3. | Award and Payment of Funds | 1 |
| | 4. | Allowability of Costs | 2 |
| | 5. | State Planning Agency Supervision and Monitoring Responsibility | 3 |
| | 6. | Audit Responsibilities | 4 |
| | 7. | Suspension and Termination of Grants | 5 |
| | 8. | Reports Required of Grant Recipients | 6 |
| APPENDIX 4. | | MEASUREMENT OF PERFORMANCE:  EVALUATION AND MONITORING OF DISCRETIONARY GRANTS | |
| | 1. | Background | 1 |
| | 2. | The Four Types of Performance Measurement | 1 |
| | 3. | Self-Assessment | 2 |
| | 4. | LEAA Project Monitoring | 2 |
| | 5. | Evaluation Requirements | 3 |
| | 6. | Program Evaluation | 3 |
| | 7. | Intensive Project Evaluation | 6 |

M 4500.1G
September 30, 1978

Page No.

APPENDIX 5.  SPECIAL INSTRUCTIONS FOR NON-CONSTRUCTION GRANT
            APPLICATIONS

       1.  Scope                                          1
       2.  Part I (Standard Form 424)                     1
       3.  Part III, Budget Information and Budget
           Narrative                                      2
       4.  Part IV, Program Narrative Instructions        4

M 4500.1G
September 30, 1978

APPENDIX 1.  GENERAL SPECIFICATIONS AND REQUIREMENTS FOR
DISCRETIONARY GRANTS

1.  SCOPE.  This appendix contains general requirements for and limits
on use of discretionary funds grants, including eligibility rules,
general requirements, prohibitions and restrictions, and other
technical requirements.

SECTION 1.  ELIGIBLE PROJECTS AND APPLICANTS

2.  ELIGIBLE PROJECTS.

a.  Applications will normally be considered only if they fall
within the scope and coverage of programs described in Chapters 1
through 6 of this Manual.

b.  Applicants seeking categorical funds for projects which do not
fall within the scope and coverage of programs described in this
Manual should submit a brief pre-application or concept paper
describing the objectives, strategies, and resources required
for the proposed project, before submitting a formal application.

c.  Applicants are advised that categorical funds for projects not
covered by this Manual or by the Program Plan of the National
Institute of Law Enforcement and Criminal Justice are extremely
limited.

3.  ELIGIBLE APPLICANTS.

a.  Discretionary grants authorized under Part C (Grants for Law
Enforcement Purposes) and Part E (Grants for Correctional
Purposes) of the Crime Control and Safe Streets Act can be made
only to:

(1)  State Planning Agencies;

(2)  Local units of government;

(3)  Combinations of local units of government; or

(4)  Non-profit organizations.

b.  Grants may be made to State agencies as co-applicants with or
subgrantees of State Planning Agencies.

App 1    Par 1
Page 1

**26**

M 4500.1G
September 30, 1978

c. Special emphasis grants authorized under Section 224 of the
Juvenile Justice and Delinquency Act (Grants for Juvenile
Delinquency Prevention and Treatment Programs) can be made to
public and private agencies, organizations and institutions.
Private non-profit agencies, organizations or institutions must
have had experience in dealing with youth.

(1) A private non-profit agency, organization or institution
is defined as any corporation, foundation, trust,
association, cooperative, accredited institution of higher
education, and any other agency, organization or institution
which is operated primarily for scientific, educational,
service, charitable, or similar public purposes, but which
is not under public supervision or control, and no part
of the net earnings of which inures or may lawfully inure
to the benefit of any private shareholder or individual,
and which has been held by IRS to be tax-exempt under the
provisions of Section 501(c) (3) of the 1954 Internal
Revenue Code.

(2) (a) Experience in dealing with youth means that the
non-profit agency, organization or institution has been
in existence for at least two years and has established
program services for youth related to the program or
project for which funding is sought;

(b) Under special circumstances the two year requirement may
be waived by the Administrator of the Office of Juvenile
Justice and Delinquency Prevention.

d. Programs contemplating action by a particular type of law
enforcement agency, or efforts conducted for State and local
government by a university or other private agency, must have
the application submitted by either:

(1) The department of state government under whose jurisdiction
the project will be conducted; or

(2) A unit of general local government, or combination of such
units, whose law enforcement agencies, systems, or activities
will execute or be benefited by the grant.

M 4500.1G
September 30, 1978

SECTION 2.  GENERAL REQUIREMENTS

4.  GRANTEE MATCHING CONTRIBUTION.  Applicants for grants authorized
    under Parts C and E of the Crime Control Act (except Indian Tribes,
    the Trust Territories, Guam, American Samoa and the Marianas) must
    provide at least 10 percent of the total project costs.  For some
    programs a larger matching contribution is required for second and
    subsequent years of award.

    a.  Matching contributions must be in cash rather than in-kind goods
        and services.

    b.  Matching contributions may be funds from State, local or private
        sources but may not include other Federal funds except where the
        Federal statute governing the other funds authorizes those
        funds to be used to match other Federal  grants, e.g.:

        (1)  Funds provided by the Housing and Community Development
             Act of 1974;

        (2)  Funds provided by the Appalachian Regional Development Act
             of 1965; and

        (3)  Funds provided by the State and Local Fiscal Assistance Act
             of 1972, as amended (General Revenue Sharing Funds).

    c.  Projects funded under the Juvenile Justice and Delinquency Preventi
        Act  of 1974, as amended, do not require matching funds, unless
        otherwise designated in the program description

    d.  Community Anti-Crime Program projects (Chapter 1, Paragraph 2) do
        require matching funds.

    e.  For more detailed information regarding grantee matching contribut
        see the effective edition of LEAA M 7100.1.

5.  ASSUMPTION OF COSTS.  It is LEAA policy that funds are awarded for
    initial development and demonstration and not for long term support.

    a.  Projects will not be funded for a total of more than three years
        specific justification and approval at the initial award by the
        Administrator of LEAA.

    b.  Applicants must indicate as part of the initial application how
        project activities will be paid for when Federal funding ceases
        what plans will be made during the period of Federal funding to
        arrange for that funding.  This information will be used as one
        criterion for evaluating applications for funding.

App 1     Par 4
Page 3

M 4500.1C
September 30, 1978

c. It is LEAA policy to encourage increasing grantee matching contribution for second and third years of award.

d. Juvenile Justice and Delinquency Prevention Act funded programs may be continued for longer periods consistent with LEAA Financial Guideline M 7100.1A, Change 3, Chapter 7, Paragraph 12.

e. See individual program descriptions (Chapters 1 through 6) for any special requirements or exemptions with respect to assumption of costs.

6. PERIOD OF SUPPORT.

a. Projects will normally be awarded funds for a twelve month period.

b. Awards for longer periods, not to exceed eighteen months, may be made subject to grantee and LEAA needs.

c. Projects exceeding eighteen months require separate applications for specific periods of eighteen months or less.

d. Juvenile Justice and Delinquency Prevention Act funded programs may be supported for longer periods of time, consistent with LEAA Financial Guideline M 7100.1A, Change 3, Chapter 7, Paragraph 12.

e. Exceptions to funding period limitations, where applicable, are noted in program descriptions (Chapters 1 through 6).

7. GRANT ASSURANCES. The grant assurances contained in Part V of SF 424, Application for Federal Assistance (Appendix 6) are incorporated in and made a part of all discretionary grant awards.

a. All grant assurances should be reviewed carefully because they define the obligations of grantees and their subgrantees and express commitments that have binding contractual effect when the award is accepted by the grantee.

b. Special Conditions. Frequently, LEAA will approve or require, as a condition of grant award and receipt of funds, "special conditions" applicable only to the particular project or type of program receiving grant support. These special conditions are to be negotiated and included in the terms of an award. Notice and opportunity for discussion will be provided to grant applicants. Special conditions may:

M 4500.1G
September 30, 1978

   (1)  Set forth specific grant administration policies;

   (2)  Set forth LEAA regulations (e.g., written approval of changes);

   (3)  Seek additional project information or detail;

   (4)  Establish special reporting requirements; and/or

   (5)  Provide for LEAA approval of critical project elements such as key staff, evaluation designs, dissemination of manuscripts, contracts, etc.

c.  **All grants are subject to applicable** other LEAA guidelines and regulations. Copies of these and other grant condition references may be obtained from LEAA. Major other guidelines and regulations are:

   (1)  M 7100.1, Financial Management for Planning and Action Grants, which is the basic fiscal administration manual for LEAA grants;

   (2)  LEAA regulations implementing the provisions of Title VI of the Civil Rights Act of 1964 with respect to LEAA grants (28 CFR 42.101, et. seg., Subpart C);

   (3)  LEAA Nondiscrimination in Federally Assisted Crime Control and Juvenile Delinquency Program (28 C.F.R. 42. 201, et. seq., subpart D) and equal employment opportunity program guidelines (28 C.F.R. 42.301 et. seq., subpart E) with respect to LEAA grants;

   (4)  Department of Justice–LEAA regulations on privacy and security of criminal history information systems (28 C.F.R. Part 20);

   (5)  Department of Justice–LEAA regulations on the Confidentiality of Identifiable Research and Statistical Information (28 C.F.R. Part 22).

d.  The following condition applies to all grants awarded by LEAA:

   "THIS GRANT, OR PORTION THEREOF, IS CONDITIONAL UPON SUBSEQUENT CONGRESSIONAL OR EXECUTIVE ACTION WHICH MAY RESULT FROM FEDERAL BUDGET DEFERRAL OR RECISION ACTIONS PURSUANT TO THE AUTHORITY CONTAINED IN SECTIONS 1012(A) AND 1013(A) OF THE CONGRESSIONAL BUDGET AND IMPOUNDMENT CONTROL ACT OF 1974, 31 U.S.C. 1301, PUBLIC LAW 93-344, 88 STAT. 297 (JULY 12, 1974)."

App 1    Par 7
Page 5

M 4500.1G
September 30, 1978

SECTION 3.   SPECIAL REQUIREMENTS

8. SPECIAL REQUIREMENTS FOR PART E (CORRECTIONS) GRANTS.  As a condition for receipt of Part E funds for the planning, construction, acquisition, or renovation of adult or juvenile correctional institutions or facilities, ALL applicants for such must demonstrate and provide the following to the extent applicable:

a. Evidence of reasonable use of alternatives to incarceration, including but not limited to referral and bail practices, diversionary procedures, court sentencing practices, comprehensive probation resources and the minimization of incarceration by State and local parole practices, work-study release or other programs assuring timely release of prisoners under adequate supervision.  (Applications should indicate the areas to be served, comparative rates of disposition for fines, suspended sentences, probation, institutional sentences and other alternatives, and rates of parole.);

b. Evidence of special provision for the treatment of alcohol and drug abusers in institutions and community-based programs;

c. Architectural provision for the complete separation of juvenile, adult female, and adult male offenders;

d. Architectural design for new facilities providing for appropriate correctional treatment programs, particularly those involving other community resources and agencies;

e. Willingness to accept in the facilities persons charged with or convicted of offenses against the United States, subject to negotiated contractual agreements with the Bureau of Prisons;

f. Certification that, where feasible and desirable, provisions will be made for the sharing of correctional institutions and facilities on a regional basis;

g. Certification that Part E funds will utilize advanced techniques in the design of institutions and facilities;

h. Satisfactory assurances that the personnel standards and programs of the institutions and facilities will reflect advanced practices including designation of the kinds of personnel standards and programs which will be sought in institutions and facilities receiving Part E support; and

M 4500.1G
September 30, 1978

i.  **Certification that special administrative requirements** dealing
with objectives, architectural and cost data, contractual
arrangements, etc., will be made applicable to contractors.

j.  **All Applications for Part E funds** for purposes of construction
or renovation of juvenile and adult correctional institutions
or facilities MUST BE submitted in accordance with Guideline
G 4063.2 (effective edition) to the national contractor to be
selected by LEAA for clearance of the architectural plans, designs
and construction drawings.  Applications should be forwarded
to the contractor at the same time they are submitted to the
State Planning Agency and to LEAA.  In turn, the contractor
will respond to the applicant, the State Planning Agency and LEAA.

9.  **SPECIAL REQUIREMENTS FOR CONSTRUCTION PROJECTS.**

a.  **Construction grants under Part C** are intended to be supportive
of and supplemental to programs aimed at crime reduction and
criminal justice system improvement.  Construction grants under
Part E are intended to meet the need for improved correctional
facilities, with prime emphasis on community-based correctional
facilities, and must be an integral part of a comprehensive plan
for correctional programs and facilities.

b.  **New construction projects will be** considered for funding only
when they represent the only method available to meet program
goals of LEAA national programs or of State comprehensive plans.

c.  **Construction projects will be funded** only when they meet critical
needs, are innovative, and when they involve approaches which are
replicable to other jurisdictions:

(1)  An innovative approach to construction involves special
attention to the needs of citizens who come in contact with
the criminal justice system, special attention to possible
multi-jurisdictional, regional, or multi-purpose use of
the facility, among other elements.

(2)  To be replicable, projects must show how requirements for th-
facility were developed, how the facility supported the
goals, objectives, and priorities of LEAA national programs
or State comprehensive plans, and how considerations of
program objectives were built into the design of the facili_

September 30, ....

d. Applicants must comply with LEAA Guidelines, G 7400.1B, Equal Employment Opportunity Procedure for Submitting Information on Construction and Renovation Contracts and with Executive Orders 11246 and 11375.

e. In accordance with the provisions of the Rehabilitation Act of 1973, Pub. L. 93-112, 29 U.S.C. #792, et seq., any building construction funded under the Act for which there is an intended use that will require that such building or facility be accessible to the public or may result in the employment or residence therein of physically handicapped persons must be so constructed as to assure that physically handicapped persons will have ready access to, and use of, such buildings.

f. Construction programs and projects funded under the Juvenile Justice and Delinquency Prevention Act are limited to construction of innovative community based facilities for less than 20 people. Facilities include both buildings, and parts or sections of a building to be used for a particular program or project.

   (1) Erection of new buildings is not permitted with Juvenile Justice and Delinquency Prevention funds.

   (2) Federal funds may not be used for more than 50 percent of the cost of construction of a facility developed pursuant to Section 227 of the Juvenile Justice and Delinquency Prevention Act.

g. Application for construction projects must be made on Standard Form 424 with LEAA Form 4000/4 (Application for Federal Assistance Construction Program) attached.

h. Preapplications must be submitted for construction grants exceeding $100,000 in Federal funds.

i. For more information on definitions and requirements with respect to construction programs, see the effective edition of M 7100.1.

10. SPECIAL REQUIREMENTS FOR GRANTS INVOLVING AUTOMATED DATA PROCESSING (ADP) In addition to the conditions set forth in this manual which apply to all grants, grantees receiving funds for automated data processing (ADP) must agree:

a. To use, to the maximum extent practicable, computer software already produced and available without obligation.

M 4500.1G
September 30, 1978

b.  That all application programs will be written in Federal Standard
    COBOL or ANS FORTRAN (where the nature of the task requires a
    scientific programming language) whenever possible.  Programs may
    be written in ANS BASIC for microcomputers and minicomputers
    subject to the following conditions:  grantees will require
    hardware vendor assurance that the BASIC language facility
    (including any extensions or additions to the instruction set of
    ANS BASIC) will be validated by the National Bureau of Standards
    validation routine; extensions to the ANS BASIC instruction will
    be limited to those instructions agreed upon by mutual agreement
    after consultation with at least three hardward manufacturers;
    program applications, whether new or transferred, will run on
    the hardware of at least three manufacturers.

c.  That grant funds will not be used for lease, maintenance, or
    engineering costs of proprietary applications software packages
    without specific, prior approval of LEAA.

d.  That all computer software written under the grant will be made
    available to LEAA for transfer to authorized users in the
    criminal justice community without cost other than that directly
    associated with the transfer and that the system will be documented in
    sufficient detail to enable a competent data processing staff
    to adapt the system, or portions thereof, to usage on a computer
    of similar size and configuration, of any manufacturer.

e.  To provide a complete copy of documentation, upon request, to the
    Systems Development Division, National Criminal Justice
    Information and Statistics Service, LEAA.  Documentation will
    include, but not be limited to, Systems description, Operating
    Instructions, User Instructions, Program Maintenance Instructions,
    input forms, file descriptions, report formats, program listings,
    and flow charts for the system and programs.  Grantee agrees to
    produce system documentation for this grant in accordance
    with Federal Information Processing Standards (FIPS PUB 38).

f.  To incorporate the provisions of all applicable conditions of the
    grant into all requests for proposal (RFP), requests for
    quotation (RFQ), information for bid (IFB), and contracts utilizing
    funds from the grant in order that contractors concerned will be
    guided by the LEAA requirements.

g.  That conversion cost  in itself will not be used to justify sole
    source procurement of ADP equipment.

11. SPECIAL REQUIREMENTS FOR MULTI-STATE OR MULTI-UNITS PROJECTS.  Several
    discretionary programs encourage multi-State, regional, or cooperative
    projects involving multiple units of State or local government.

    a.  Unless otherwise indicated in the specifications for a particular
        program, applications may be made by:

App 1  Para 10
Page  9

34

M 4500.1G
September 30, 1978

(1) One government unit in the group on behalf of the others;

(2) All units in the group jointly; or

(3) A special combination, association or joint venture created by a group of governmental units for general or grant application purposes.

b.  In all cases, clear evidence will be required of approval by all participating units of government with respect to:

(1) Their participation in the project; and

(2) The terms and commitments of the grant proposal or application.

12. SPECIAL REQUIREMENTS OF OTHER FEDERAL LEGISLATION AND REGULATIONS. LEAA is required to insure that all discretionary grants meet certain administrative and legal requirements imposed by other laws and administrative issuances. Therefore, the applicant must insure that the following requirements are met:

a.  Clean Air Act Violations. In accordance with the provisions of the Clean Air Act (42 U.S.C. 1857) as amended by Public Law 91-604, the Federal Water Pollution Act (33 U.S.C. 1251 et seq.) as amended by Public Law 92-500 and Executive Order 11738, grants, subgrants or contracts cannot be entered into, reviewed or extended with parties convicted of offenses under these laws.

b.  Relocation Provisions. In accordance with the provisions of the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, P.L. 91-646, 84 Stat. 1894, and the regulations of the Department of Justice (effective edition of LEAA Guideline G 4061.1, Relocation Assistance and Payments):

(1) The applicant and State Planning Agency shall assure that any program under which LEAA financial assistance is to be used to pay all or part of the cost of any program or project which results in displacement of any individual family, business and/or farm shall provide that:

(a) Within a reasonable period of time prior to displacement comparable decent, safe, and sanitary replacement dwellings will be available to displaced persons in accordance with such regulations as issued by the Attorney General;

M 4500.1G
September 30, 1978

    (b)  Fair and reasonable relocation payments and assistance shall be provided to or for displaced persons as are required in such regulations as are issued by the Attorney General;

    (c)  Relocation or assistance programs shall be provided for such persons in accordance with such regulations issued by the Attorney General;

    (d)  The affected persons will be adequately informed of the available benefits and policies and procedures relating to the payment of monetary benefits; and

  (2)  Such assurances shall be accompanied by an analysis of the relocation problems involved and a specific plan to resolve such problems.

c.  **Environmental Impact.**

  (1)  The National Environmental Policy Act of 1969 established environmental review procedures to determine if a proposed LEAA funded program or project is a "major Federal action significantly affecting the human environment." Each proposed action listed below must include an environmental evaluation.

    (a)  New construction.

    (b)  The renovation or modification of a facility which leads to an increased occupancy of more than 25 persons.

    (c)  The implementation of programs involving the use of pesticides and other harmful chemicals.

    (d)  The implementation of programs involving harmful radiation (x-rays, etc.).

    (e)  Research and technology whose anticipated or intended future application could be expected to have a potential effect on the environment.

    (f)  Other actions determined by LEAA to possibly have a significant effect on the quality of the environment.

M 4500.1G
September 30, 1978

(2) A determination shall thereafter be made by the responsible Federal official as to whether the action will have a significant effect on the environment requiring the preparation of an environmental analysis (a draft environmental impact statement) or whether a negative declaration can be filed.

(3) An environmental evaluation is a report of the environmental effects of the proposal and should consist of questions and narrative answers as well as supporting documentation that substantiates conclusions.

(4) An environmental analysis must be submitted with the original application in cases where the proposed action would significantly affect the environment.  It will be utilized in the preparation of a draft environmental impact statement.

(5) A negative declaration will be filed by LEAA if the environmental evaluation does not indicate a significant environmental impact.

(6) Environmental Analysis Impact and Negative Declaration forms are available from Grants and Contracts Management Division, Law Enforcement Assistance Administration, 633 Indiana Avenue, Washington, D.C.  20531.

d. <u>Historic Sites</u>.  Before approving grants involving construction, renovation, purchasing or leasing of facilities LEAA shall consult with the State Liaison Officer for Historic Preservation to determine if the undertaking may have an effect on properities listed in the National Register of Historic Places.  If the undertakings may have an effect on the listed properties, LEAA shall notify the Advisory Council on Historic Preservation.

e. <u>A-95 Notification Procedures</u>.  Applicants must notify appropriate areawide and State Clearinghouses of their intent to apply for Discretionary Grants, in accordance with LEAA's A-95 requirements (28CFR Part 30).

f. <u>Flood Disaster Protection Act of 1973</u>, Pub. L. 93-234, 42 U.S.C. §4001, et seq.  LEAA will not approve any financial assistance for construction purposes in any area that has been identified by the Secretary of HUD as an area having special flood hazards un the community in the hazardous area is then participating in the National Flood Insurance Program.

g. <u>Rehabilitation</u>.  In accordance with the Rehabilitation Act of 1973 (P.L. 93-112), no otherwise qualified handicapped individual in the United States, as defined in Section 7(6) of that Act, shall, solely by reason of his handicap, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

September 30, 1978

h. **Safe Drinking Water Act**, Pub. L. 93-523, 42 U.S.C. §300f, et seq. If the Administrator of the Environmental Protection Agency determines that an area has an aquifer (a water-bearing stratum of permeable rock, sand or gravel) which is the sole or principal source of drinking water for an area, and which if contaminated would create a significant hazard to public health, he shall publish notice of that determination in the Federal Register. After publication of such notice, no commitment of Federal financial assistance (through a grant, contract, loan or otherwise) may be entered into for any project which the EPA Administrator determines may contaminate such an aquifer. Any prospective subgrantee of Parts C and E funds shall assure that the project will have no  effect on an aquifer so designated by the EPA Administrator.

i. **Endangered Species Act of 1973**, Pub. L. 93-205, 16 U.S.C. §1531, et seq. The Secretary of Interior shall publish in the Federal Register, and from time to time he may by regulations revise a list of species determined by him or the Secretary of Commerce to be endangered species and a list of all species determined by him or the Secretary of Commerce to be threatened species. Each list shall refer to the species contained therein by scientific and common name and shall specify with respect to each such specie over what portion of its range it is endangered or threatened. Any prospective recipient of LEAA funds shall certify in writing prior to a grant award that the proposed action will not jeopardize the continued existence of an endangered specie or a threatened specie or result in the destruction or modification of the habitat of such a specie.

j. **Wild and Scenic Rivers Act**, Pub. L. 90-542, 16 U.S.C. §1271, et seq. LEAA must notify the Secretary of the Interior and, where National Forest lands are involved, the Secretary of Agriculture of any activities in progress, commenced or resumed which affect any of the rivers specified in the Wild and Scenic Rivers Act. Any prospective grantee or subgrantee of LEAA grant funds will certify in writing that LEAA will be notified if any of the designated rivers are or will be affected by any program or project.

k. **Fish and Wildlife Coordination Act**, Pub. L. 85-624, 16 U.S.C. §661, et. seq.  LEAA must notify the Fish and Wildlife Service of the Department of Interior and the head of the State administrative agency exercising administration over the wildlife resources of the State wherever the waters of any stream or other body of water are proposed to be diverted or controlled by LEAA, a grantee, or subgrantee. Any prospective recipient of LEAA grant funds will certify that LEAA will be notified if any of the action specified in 16 U.S.C. §662(a) are anticipated.

App 1    Par 12
Page 13

M 4500.1G
September 30, 1978

l.  Historical and Archeological Preservation Act, Pub. L. 93-291,
    16 U.S.C. §469, et seq.  Any prospective recipient of LEAA funds shall
    notify LEAA if the funded activity may cause irreparable loss
    or destruction to significant historical or archeological data.
    LEAA will then notify the Secretary of the Interior who shall
    conduct a survey and investigation of the area which may
    be affected and recover and preserve such data.

m.  Coastal Zone Management Act of 1972, Pub. L. 92-583, 16 U.S.C.
    §1451, et seq.  Each LEAA-supported activity which directly affects
    the Coastal Zone shall be conducted in a manner, which to the
    maximum extent feasible, is consistent with the approved State
    management program for the protection of the Coastal Zone.  Every
    applicant submitting an application for grant funds supporting
    programs affecting land or water uses in the Coastal Zone shall
    attach the views of the appropriate State or local agencies
    on the relationship of the proposed activity to the approved
    management program.  This applies to subgrant applications
    submitted to the State planning agency as well as to discretionary
    grant applications.  Such applications shall be submitted in
    accordance with the provisions of Title IV of the Intergovernmental
    Cooperation Act of 1968, Pub. L. 90-577.

n.  Animal Welfare Act of 1970, Pub. L. 91-579, 7 U.S.C. §2131, et seq.
    This act establishes recordkeeping and animal treatment standards
    for schools, institutions, organizations and persons that use or
    intend to use live animals in research, tests or experiments,
    and that receive Federal funds for the purpose of carrying
    out research, tests or experiments.  No grant or contract for
    this
    assures compliance with the provisions of the Animal Welfare Act
    of 1970.

o.  Criminal Penalities.

    (1)  Whoever embezzles, willfully misapplies, steals, or obtains
         by fraud or endeavors to embezzle, willfully misapply steal
         or obtain by fraud any funds, assets, or property which are
         the subject of a grant or contract or other form of assistance
         pursuant to this title, whether received directly or indirectly
         from the Administration, or whoever receives, conceals, or
         retains such funds, assets, or property with intent to convert
         such funds, assets, or property to his use or gain, knowing
         such funds, assets, or property have been embezzled, willfully
         misapplied, stolen, or obtained by fraud, shall be fined
         not more than $10,000 or imprisoned not more than five years,
         or both.

M 4500.1G
September 30, 1978

(2) Whoever knowingly and willfully falsifies, conceals, or covers up by trick, scheme, or device, any material fact in any application for assistance submitted pursuant to the Act or in any records required to be maintained pursuant to the Act shall be subject to prosecution under the provisions of Section 1001 of Title 18, United States Code.

(3) Any law enforcement and criminal justice program or project underwritten, in whole or in part, by any grant or contract or other form of assistance pursuant to the Act, whether received directly or indirectly from the Administration, shall be subject to the provisions of Section 371 of Title 18, United States Code.

SECTION 4.  PROHIBITIONS AND RESTRICTIONS

13. LETHAL WEAPONS, AMMUNITION AND RELATED ITEMS.  LEAA Discretionary Funds may not be used to purchase lethal weapons, ammunition, armored vehicles, explosive devices, and related items.

14. MEDICAL RESEARCH AND PSYCHOTHERAPY.  LEAA discretionary funds may not be used for medical research or for the use of medical procedures which seek to modify behavior by means of any aspect of psychosurgery, aversion therapy, chemotherapy (except as part of routine clinical care), and physical therapy of mental disorders.  Such proposals should be submitted to the Secretary of the Department of Health, Education and Welfare for funding consideration.  This policy does not apply to programs involving procedures generally recognized and accepted as not subjecting the patient to physical or psychological risk (e.g., methadone maintenance and certain alcoholism treatment programs), specifically approved in advance by the Office of the Administration, LEAA, or to programs of behavior modification which involve environmental changes or social interaction where no medical procedures are utilized.

15. EXPENDITURES FOR PERSONNEL.

a. Not more than one-third of any discretionary grant may be expended for compensation of police or other regular law enforcement and criminal justice personnel, exclusive of time engaged in training programs or in research, development, demonstration, or other short term programs.

b. Indian manpower projects not exceeding 24 months duration are excepted from this restriction.

App 1    Par 12
Page 15

U.S. DEPARTMENT OF JUSTICE
LAW ENFORCEMENT ASSISTANCE ADMINISTRATION
WASHINGTON, D.C. 20531

**OFFICIAL BUSINESS**
PENALTY FOR PRIVATE USE,·$300

POSTAGE AND FEES PAID
U.S. DEPARTMENT OF JUSTICE
JUS-436



**SPECIAL FOURTH-CLASS RATE
BOOK**

LEAA

# GENERAL BRIEFING

## FEBRUARY 1977



# LAW ENFORCEMENT ASSISTANCE ADMINISTRATION
## U.S. DEPARTMENT OF JUSTICE

# BASIS OF LEGISLATION

- CRIME A LOCAL PROBLEM/BEST CONTROLLED AT STATE AND LOCAL LEVEL

- LAW ENFORCEMENT AUTHORITY TRADITIONALLY RESERVED TO STATES (CONCEPTS OF FEDERALISM)

- LEAA NOT ESTABLISHED AS AN OPERATIONAL LAW ENFORCEMENT AGENCY

- NO LEAA DIRECTION, SUPERVISION OR CONTROL OVER STATE OR LOCAL LAW ENFORCEMENT AGENCIES - [SECTION 518 (a)]

# LEAA PROGRAM PURPOSES

- ENCOURAGE STATE COMPREHENSIVE PLANNING FOR CRIMINAL JUSTICE IMPROVEMENTS

- TECHNICAL AND FINANCIAL ASSISTANCE TO IMPROVE & STRENGTHEN LAW ENFORCEMENT & CRIMINAL JUSTICE

- CONDUCT RESEARCH & DEVELOPMENT TO IMPROVE CRIMINAL JUSTICE

- DEVELOP & TRANSFER NEW TECHNIQUES AND METHODS TO:

  - *REDUCE CRIME*

  - *DETECT, APPREHEND, AND REHABILITATE CRIMINALS*

44

# PROGRAMS

## BLOCK GRANTS FOR:

- CRIMINAL JUSTICE PLANNING, EVALUATION, ADMINISTRATION & TECHNICAL ASSISTANCE

- CRIMINAL JUSTICE SYSTEM IMPROVEMENTS (POLICE, COURTS, CORRECTIONS)

- CORRECTIONAL PROGRAM IMPROVEMENTS

- JUVENILE JUSTICE AND DELINQUENCY PREVENTION

45

# PROGRAMS

## DIRECT GRANTS AND CONTRACTS FOR:

- CRIMINAL JUSTICE SYSTEM IMPROVEMENTS (POLICE, COURTS, CORRECTIONS)
- EDUCATIONAL ASSISTANCE
- TECHNICAL ASSISTANCE
- INFORMATION SYSTEMS AND STATISTICS
- JUVENILE JUSTICE & DELINQUENCY PREVENTION
- RESEARCH & EVALUATION
- COMMUNITY ANTI-CRIME PROGRAMS

PUBLIC SAFETY OFFICERS' BENEFIT ACT (PSOB)

46

# COLLATERAL RESPONSIBILITIES

- CIVIL RIGHTS COMPLIANCE
- PRISON/JAIL CONSTRUCTION GUIDELINES
- PRIVACY AND SECURITY OF CRIMINAL JUSTICE INFORMATION AND STATISTICS SYSTEMS
- NATIONAL ENVIRONMENTAL POLICY COMPLIANCE
- JOINT FUNDING SIMPLIFICATION ACT
- INTERGOVERNMENTAL COOPERATION ACT (A-95)
- SURPLUS PROPERTY MANAGEMENT
- FREEDOM OF INFORMATION COMPLIANCE

PLUS 23 OTHER APPLICABLE ACTS

47



# COMPARISON OF: LEAA 1968 ACT AND 1968 ACT AS AMENDED





LEAA ORGANIZATION CHART

# PRIORITIES

- INCARCERATE SERIOUS HABITUAL OFFENDERS
- IMPROVE COURT MANAGEMENT AND REDUCE COURT DELAY
- PREVENT JUVENILE DELINQUENCY
- OBTAIN BETTER CRIMINAL JUSTICE STATISTICS
- UPGRADE JAILS AND PRISONS
- DISRUPT CRIMINAL OPERATIONS (e.g. STING)
- INTERVENE IN CRIMINAL CAREERS
- EVALUATE IMPACT OF FUNDED PROJECTS
- TRAIN & EDUCATE CRIMINAL JUSTICE PERSONNEL
- REPLICATE SUCCESSFUL PROJECTS
- EVALUATE TRADITIONAL CRIMINAL JUSTICE PRACTICES
- IMPROVE STATE/LOCAL ANALYSIS & EVALUATION CAPABILITY
- PROVIDE TECHNICAL ASSISTANCE
- ENCOURAGE DEVELOPMENT OF STANDARDS & GOALS FOR CRIMINAL JUSTICE

51

## ORGANIZED CRIME PROGRAM

ANNUAL BUDGET
$7.9 M

**PURPOSE:** IMPROVE INVESTIGATIVE AND PROSECUTORIAL EFFORTS THROUGH OPERATIONS, TECHNICAL ASSISTANCE AND TRAINING.

**TARGET GROUP:** ORGANIZED CRIMINALS AND MAJOR CRIMINAL CONSPIRACIES

**KEY FEATURES:**
- IDENTIFICATION OF ORGANIZED CRIMINAL ACTIVITY TO INCLUDE FENCING, WHITE COLLAR CRIME, CORRUPTION AND CARGO THEFT
- INVESTIGATION, PROSECUTION AND REMOVAL OF ORGANIZED CRIMINALS
- INTERGOVERNMENTAL COOPERATION AMONG LOCAL, STATE AND FEDERAL AGENCIES

**RESULTS:**
- $24 M RECOVERED IN STOLEN PROPERTY - ($.5 M BUY MONEY)
- 70% ARRESTED ARE CAREER CRIMINALS
- 359 CONVICTIONS FROM 10 ANTI-FENCING PROJECTS — 75% GUILTY PLEAS

52

# ORGANIZED CRIME

## PROGRAM RESULTS ★

### ANTI-FENCING — (SINCE FY 74)

| | |
|---|---|
| NO. OF PROJECTS | 28 |
| NO. OF ARRESTS/ CHARGES | 748 |
| STOLEN PROPERTY RECOVERED | $ 24 MILLION |
| CRIMINAL PROFILE | 70% CAREER CRIMINAL |
| CONVICTIONS | 359 |
| TYPE OF CON- VICTIONS | 75% GUILTY PLEAS |
| SAVINGS | SIGNIFICANT PROSECUTORIAL AND JUDICIAL RESOURCES |

### GENERAL — (SINCE FY 69)

| | |
|---|---|
| NO. OF PROJECTS | 205 |
| NO. OF INVESTIGATORS AND PROSECUTORS TRAINED | |
| NO. OF STATE ORGANIZED CRIME PREVENTION COUNCILS | 12 |
| NO. OF MANUALS PRODUCED | 15 |
| NO. OF INVESTIGATIONS | 20,000 |
| NO. OF ARRESTS | 8,000 |
| NO. OF CONVICTIONS | 800 |

★ RESULTS OF PHASE ONE OF 10 PROJECTS

# ORGANIZED CRIME

## PROGRAM RESULTS ★

### ANTI-FENCING — (SINCE FY 74)

| | |
|---|---|
| NO. OF PROJECTS | 28 |
| NO. OF ARRESTS/ CHARGES | 748 |
| STOLEN PROPERTY RECOVERED | $ 24 MILLION |
| CRIMINAL PROFILE | 70% CAREER CRIMINAL |
| CONVICTIONS | 359 |
| TYPE OF CON- VICTIONS | 76% GUILTY PLEAS |
| SAVINGS | SIGNIFICANT PROSECUTORIAL AND JUDICIAL RESOURCES |

### GENERAL — (SINCE FY 69)

| | |
|---|---|
| NO. OF PROJECTS | 205 |
| NO. OF INVESTIGATORS AND PROSECUTORS TRAINED | |
| NO. OF STATE ORGANIZED CRIME PREVENTION COUNCILS | 12 |
| NO. OF MANUALS PRODUCED | 15 |
| NO. OF INVESTIGATIONS | 20,000 |
| NO. OF ARRESTS | 8,000 |
| NO. OF CONVICTIONS | 800 |

★ RESULTS OF PHASE ONE OF 10 PROJECTS

# ORGANIZED CRIME

## PROGRAM RESULTS ★

### ANTI-FENCING — (SINCE FY 74)

| | |
|---|---|
| NO. OF PROJECTS | 28 |
| NO. OF ARRESTS/ CHARGES | 748 |
| STOLEN PROPERTY RECOVERED | $ 24 MILLION |
| CRIMINAL PROFILE | 70% CAREER CRIMINAL |
| CONVICTIONS | 359 |
| TYPE OF CON-VICTIONS | 75% GUILTY PLEAS |
| SAVINGS | SIGNIFICANT PROSECUTORIAL AND JUDICIAL RESOURCES |

### GENERAL — (SINCE FY 69)

| | |
|---|---|
| NO. OF PROJECTS | 205 |
| NO. OF INVESTIGATORS AND PROSECUTORS TRAINED | |
| NO. OF STATE ORGANIZED CRIME PREVENTION COUNCILS | 12 |
| NO. OF MANUALS PRODUCED | 15 |
| NO. OF INVESTIGATIONS | 20,000 |
| NO. OF ARRESTS | 8,000 |
| NO. OF CONVICTIONS | 800 |

★ RESULTS OF PHASE ONE OF 10 PROJECTS

ANNUAL BUDGET
$6.8 M

# CAREER CRIMINAL PROGRAM

**PURPOSE:**  TO PROSECUTE REPEAT OFFENDERS

**TARGET GROUP:**  THE VIOLENT AND REPEAT OFFENDER

**KEY FEATURES:**
- IDENTIFICATION:
  PROMPT SELECTION OF DEFENDANTS DESERVING OF FULL AND BEST APPLICATION OF PROSECUTORIAL RESOURCES.

- PRIORITY:
  PROSECUTION BY EXPERIENCED PROSECUTORS WITH APPEARANCES AT EVERY STAGE OF ADJUDICATORIAL PROCESS, THROUGH SENTENCING

- RESULTS:
  93.8% CONVICTION RATE, 19.41 YEARS AVERAGE SENTENCE

# CAREER CRIMINAL PROGRAM

## PROGRAM RESULTS — AS OF DEC. 13, 1976

- **19 DISCRETIONARY FUNDED PROJECTS**
- **3,445 DEFENDANT DISPOSITIONS**
- **3,231 DEFENDANT CONVICTIONS**
- **93.8% CONVICTION OF DISPOSTION**
- **93.2% INCARCERATION RATE OF DEFENDANTS CONVICTED**
- **19.41 YEARS AVERAGE SENTENCE**
- **85 DAYS MEDIAN TIME FROM ARREST TO SENTENCE**
- **CONVICTED DEFENDANTS PRIOR CRIMINAL RECORD**
  - 32,605 PRIOR ARRESTS
  - AVERAGE 10 PER DEFENDANT
  - 17,170 PRIOR CONVICTIONS
  - AVERAGE 5.5 PER DEFENDANT
- **44.3% CONVICTED DEFENDANT'S STATUS AT TIME OF ARREST (REARREST) i.e., ON PROBATION, PAROLE, PRETRIAL RELEASE OR AN ESCAPEE.**

# STANDARDS AND GOALS

**PURPOSE:**

TO RECOMMEND STANDARDS FOR USE BY STATES AND LOCALITIES IN CONTROLLING CRIME AND IMPROVING THEIR CRIMINAL JUSTICE SYSTEMS.

● **REPORTS ISSUED:**

**PHASE I**

● NATIONAL STRATEGY TO REDUCE CRIME

— *POLICE*
— *COURTS*
— *CORRECTIONS*
— *COMMUNITY CRIME PREVENTION*
— *CRIMINAL JUSTICE SYSTEM*

**PHASE II**

— *ORGANIZED CRIME*
— *DISORDERS AND TERRORISM*
— *JUVENILE JUSTICE*
— *PRIVACY & SECURITY*
— *RESEARCH AND DEVELOPMENT*

● STATES ENCOURAGED TO REVIEW AND ADOPT OWN STANDARDS

# STANDARDS AND GOALS
## (PHASE I)

**PURPOSE:**

TO RECOMMEND STANDARDS FOR USE BY STATES AND LOCALITIES IN CONTROLLING CRIME AND IMPROVING THEIR CRIMINAL JUSTICE SYSTEMS.

**PHASE I**

- NATIONAL ADVISORY COMMISSION ESTABLISHED IN 1971

- NATIONAL ADVISORY COMMISSION ADOPTS OVER 500 SPECIFIC RECOMMENDATIONS SETTING PERFORMANCE LEVELS FOR OPERATION OF THE ENTIRE CRIMINAL JUSTICE SYSTEM.

- SIX-VOLUME REPORT ISSUED IN 1973

  - *POLICE*  — *COMMUNITY CRIME PREVENTION*
  - *COURTS*  — *CRIMINAL JUSTICE SYSTEM*
  - *CORRECTIONS*  — *NATIONAL STRATEGY TO REDUCE CRIME*

- 30,000 COPIES DISTRIBUTED OR SOLD (EACH)

- STATES ENCOURAGED TO REVIEW AND ADOPT OWN STANDARDS

- BY 1976 ALL STATES HAD STANDARDS AND GOALS REVIEW EFFORTS AND 35 IMPLEMENTING STANDARDS

- EVALUATION NOW UNDERWAY

# STANDARDS AND GOALS (PHASE II)

- NATIONAL ADVISORY COMMITTEE — FORMED IN 1975

- CHAIRED BY GOVERNOR BRENDAN T. BYRNE

- STANDARDS ADOPTED IN:
  - *ORGANIZED CRIME*
  - *JUVENILE JUSTICE*
  - *DISORDERS AND TERRORISM*
  - *PRIVACY SECURITY*
  - *RESEARCH AND DEVELOPMENT*

- ORGANIZED CRIME AND RESEARCH AND DEVELOPMENT VOLUMES NOW AVAILABLE

- REMAINING THREE AVAILABLE BY END OF FEBRUARY 1977

**ANNUAL BUDGET**
**$4.6 M**

# TREATMENT ALTERNATIVE TO STREET CRIME

## (TASC)

**PURPOSE:** TO REDUCE DRUG-RELATED CRIME BY REFERRING OFFENDERS INTO TREATMENT

**TARGET GROUP:** DRUG ABUSING CRIMINAL OFFENDERS

**KEY FEATURES:**
- REDUCES PROCESSING BURDENS
- IMPROVES COOPERATION BETWEEN CRIMINAL JUSTICE AND TREATMENT SYSTEMS
- REDUCES SPREAD OF DRUG ABUSE

**RESULTS:**
- 72% OF 28,500 CLIENTS SUCCESSFULLY COMPLETED PROGRAM
- ONLY 11% REARRESTED — 2% CONVICTED

61

# TREATMENT ALTERNATIVES TO STREET CRIME (TASC)

## PROGRAM RESULTS AS OF JANUARY 1, 1977

### CLIENTS ENTERING TASC:

- 39 PROJECTS

- 28,500 CLIENTS FORMALLY REFERRED TO AND/OR OFFICIALLY ADMITTED TO PROJECTS

- 5,100 CLIENTS ACTIVE TODAY

- 28% OF CLIENTS DROPPED OUT OR FAILED TASC REQUIREMENTS

- 11% OF CLIENTS REARRESTED WHILE IN PROGRAM, 2% CONVICTED

- 4,900 CLIENTS SUCCESSFULLY COMPLETED TASC PROGRAM REQUIREMENTS

FY 77  BUDGET
$12 M

# COURT IMPROVEMENT INITIATIVES

**PURPOSE:** TO IMPROVE COURT MANAGEMENT

**TARGET GROUPS:** STATE COURTS, TRIAL COURTS

**KEY FEATURES:**
- TECHNICAL ASSISTANCE TO JUDGES, PROSECUTORS, COURT ADMINISTRATORS
- INTRODUCTION OF ADVANCED PLANNING TECHNIQUES
- REDUCE PRE-TRIAL DELAY
- ACQUIRE DATA ON CASELOAD, PROCESSING TIMES

**RESULTS:**
- 44 STATES DOING LONG-RANGE PLANNING
- UNIFIED COURT SYSTEMS DOUBLED
- SUPPORT FOR:
  - *NATIONAL CENTER FOR STATE COURTS*
  - *NATIONAL CENTER FOR DEFENSE MANAGEMENT*
  - *NATIONAL ASSOCIATION OF ATTORNEYS GENERAL*
  - *INSTITUTE FOR COURT MANAGEMENT*

63

# ADJUDICATION TECHNICAL ASSISTANCE PROGRAM RESULTS

SUMMARY DATA

1. TRAINING

   - PROSECUTORS — 1,500
   - DEFENSE COUNSEL — 1,000
   - APPELLATE JUDGES — 240
   - OTHER JUDGES — 6,000

   - TRIAL ADVOCATES — 300
   - PRETRIAL AGENCY PERSONNEL — 350
   - COURT ADMINISTRATORS — 220

2. TECHNICAL ASSISTANCE STUDIES COMPLETED

   - DEFENSE — 30
   - PROSECUTION — 60
   - COURTS — 90

3. OTHER RESULTS

   - PRE-APPEAL SETTLEMENT CONFERENCES IN STATE COURT
   - IMPROVED COURT MANAGEMENT
   - SCREENING STAFF FOR STATE APPELLATE COURTS
   - 50 JURISDICTIONS USING THE PROSECUTORS MANAGEMENT INFORMATION SYSTEM (PROMIS)

# PRETRIAL DELAY REDUCTION
## (NEW PROGRAM)

**PURPOSE:** REDUCE PRETRIAL DELAY

**TARGET GROUP:** TRIAL COURTS

**KEY FEATURES:**

1. ACCURATELY ASSESS STATE OF DELAY THROUGHOUT COUNTRY

2. ACCUMULATE INFORMATION ON ALL PROGRAMS AND TECHNIQUES USED AROUND THE COUNTRY TO REDUCE PRETRIAL DELAY

3. BEGIN INTENSIVE APPLICATION OF BEST KNOW METHODS IN SIX TEST JURISDICTIONS.

4. BEGIN JURISTICTION — WIDE TESTS OF 6-10 NEW APPROACHES TO DELAY — REDUCTION

5. CONTINUOUS PROGRAM OVERSIGHT BY LEAA COURTS WORKING GROUPS (RESEARCH, STATISTICS, ACTION, MANAGEMENT DIVISION REPRESENTATIVES)

6. NATION-WIDE JUDICIAL STATISTICS PROGRAM INITIATED

7. STATE SPEEDY TRIAL ANALYSIS AND RECOMMENDATIONS

**OBJECTIVE:** TO REDUCE TIME FROM ARREST TO TRIAL TO 60 DAYS IN 18 TRIAL COURTS.

**65**

ANNUAL BUDGET
$.5 M

## PROSECUTOR'S MANAGEMENT INFORMATION SYSTEM (PROMIS)

**PURPOSE:** TO APPLY ADVANCED BUSINESS MANAGEMENT TO PROSECUTOR COURT SCHEDULING AND CASE HANDLING.

**TARGET GROUP:** PROSECUTORS AND COURTS

**KEY FEATURES:**

- CONTROL OF SCHEDULING AND ALLOTMENT OF PROSECUTION RESOURCES

- TIMELY ACCESS TO CASE STATUS INFORMATION

- ANALYSIS OF PROBLEMS ASSOCIATED WITH PROSECUTION/COURT ACTIVITIES AND PROCEDURES

- COLLECTION OF DATA CONCERNING ACCUSED PERSONS, CRIME, ARRESTS, WITNESSES

- 25% INCREASE IN CONVICTION RATES, TIME CUT 50%

- OPERATIONAL OR PLANNED IN JURISDICTIONS COVERING 21% OF NATION

# PROMIS

## PROGRAM RESULTS:

- PROMIS OPERATIONAL OR PLANNED IN JURISDICTIONS COMPRISING 21% OF THE U.S. POPULATION

- 25% INCREASE IN CONVICTION RATE IN SERIOUS CASES

- TIME LAG BEFORE INDICTMENT CUT 50%

- PROMPT IDENTIFICATION OF OFFENDERS WITH OTHER CASES PENDING

- DEFICIENCIES IN CASE DOCUMENTATION AND PROSECUTION SKILLS IDENTIFIED THROUGH PROMIS

- UNIFORMITY OF STATISTICS ESTABLISHED AMONG PROMIS USERS FOR CROSS JURISDICTIONAL ANALYSIS

- PROMIS USER GROUP:   FORUM FOR INFORMATION EXCHANGE.