# CORRECTIONS

FY 77 BUDGET
$10.5 M

**PURPOSE:** TO PROVIDE FOR MORE EFFECTIVE CORRECTIONAL SYSTEMS

**TARGET GROUP:** STATE AND LOCAL CORRECTIONAL AGENCIES INCLUDING JAILS, INSTITUTIONS, PROBATION AND PAROLE

**KEY FEATURES:** *PROVIDES SUPPORT FOR:*

1. STATE-WIDE CORRECTIONS MASTERPLANNING
2. CORRECTIONAL OFFICER TRAINING
3. MEDICAL CARE/HEALTH SERVICES DELIVERY SYSTEMS
4. EXPERIMENTS IN RESTITUTION
5. IMPROVEMENTS IN PROBATION AND PAROLE SERVICES
6. JAIL PROGRAMS (ALTERNATIVES, DIVERSION, AND MEDICAL SERVICES)
7. CORRECTIONAL STANDARDS
8. TECHNICAL ASSISTANCE NATIONWIDE

68

# CORRECTIONS
## PROGRAM RESULTS FY 1977

29 PROJECTS OPERATIONAL

16 PROJECTS PLANNED

45 TOTAL PROJECTS FOR FY 1977

- TECHNICAL ASSISTANCE:

  - 200 RESPONSES IN FY 77 TO REQUESTS FOR T.A.

  - AREAS IN WHICH T.A. WAS PROVIDED:

    1. *EVALUATION AND RESEARCH*
    2. *PROGRAM DEVELOPMENT*
    3. *TRAINING*
    4. *CLIENT SERVICES*
    5. *PART E COMPLIANCE REVIEWS BY THE NATIONAL CLEARINGHOUSE FOR CRIMINAL JUSTICE PLANNING AND ARCHITECTURE*

- MEDICAL SERVICES

  - PROMULGATION OF NATIONAL TRAINING DESIGN

  - SITE TESTING OF MEDICAL SERVICES DESIGN IN 5 STATES

- PRISON INDUSTRIES

  - NATIONAL TECHNICAL ASSISTANCE PROVIDED IN 3 STATES

  - SITE TESTING OF MODEL IN 3 STATES

69

# LAW ENFORCEMENT EDUCATION PROGRAM
## (LEEP)

ANNUAL BUDGET
$40 M

**PURPOSE:** UPGRADE EDUCATIONAL ACHIEVEMENTS OF CRIMINAL JUSTICE SYSTEM PERSONNEL

**TARGET GROUP:** PERSONNEL EMPLOYED BY OR SEEKING CAREERS IN CRIMINAL JUSTICE AGENCIES

**KEY FEATURES:**
- PROVIDE GRANTS AND LOANS TO INDIVIDUALS
- EXPAND CRIMINAL JUSTICE EDUCATION OPPORTUNITIES
- UPGRADE QUALITY OF CURRICULUM

70

# LEEP

## CURRENT YEAR

| | | |
|---|---|---|
| PARTICIPATING INSTITUTIONS | 1,014 | |
| PARTICIPATING INDIVIDUALS | 98,000 | (TOTAL) |
| POLICE | 70,000 | (71.4%) |
| ADJUDICATION | 5,000 | (5.1%) |
| CORRECTIONS | 11,800 | (12%) |
| OTHER | 4,200 | (4.2%) |
| PRE-SERVICE | 7,000 | (7.1%) |

## CUMULATIVE ACTIVITY

| | |
|---|---|
| FUNDING 1969-1977 | $221 MILLION |
| PARTICIPANTS | 273,000 |

### DEGREE OBJECTIVES

| | |
|---|---|
| 2-YEAR (AA OR CERTIFICATE) | 140,000 |
| 4-YEAR (BACHELOR OF ARTS) | 97,000 |
| GRADUATE LEVEL   (MA, PhD) | 36,000 |

71

# SYSTEMS AND STATISTICS

## SYSTEMS

- STATE JUDICIAL INFORMATION SYSTEM (SJIS)
- PROSECUTOR'S MANAGEMENT INFORMATION SYSTEM (PROMIS)
- OFFENDER BASED STATE CORRECTIONAL INFORMATION SYSTEM (OBSCIS)
- NATIONAL LAW ENFORCEMENT TELECOMMUNICATIONS (NALECOM)
- APCO PROJECT 13 AND 13A — COMMUNICATIONS PLANNING AND TECHNICAL ASSISTANCE

## STATISTICS

- NATIONAL CRIME PANEL VICTIMIZATION SURVEY
- COMPREHENSIVE DATA SYSTEMS
- EMPLOYMENT AND EXPENDITURE SURVEY
- SOURCEBOOK OF CRIMINAL JUSTICE STATISTICS
  - PAROLE        — FACILITIES
  - PRISONERS    — COURT
- NATIONAL CRIMINAL JUSTICE DATA ARCHIVE NETWORK

## COMPREHENSIVE DATA SYSTEMS
### (CDS)

FY 77 BUDGET
$13 M

**PURPOSE:** TO ESTABLISH OR ENHANCE STATE LEVEL CRIMINAL JUSTICE INFORMATION AND STATISTICS CAPABILITIES.

**TARGET GROUP:** 50 STATES, THE DISTRICT OF COLUMBIA AND PUERTO RICO

**KEY FEATURES:**
- REQUIRE A STATE DATA SYSTEM ACTION PLAN
- ESTABLISH STATE STATISTICAL ANALYSIS CENTERS (SACs)
- STATE LEVEL RESPONSIBILITY FOR UNIFORM CRIME REPORTS (UCRs)
- COMPUTERIZED CRIMINAL HISTORIES (CCH)
- OFFENDER BASED TRANSACTION STATISTICS (OBTS)
- BEING IMPLEMENTED IN 49 STATES

# COMPREHENSIVE DATA SYSTEMS (CDS)

## PROGRAM RESULTS:

- 49 STATES ARE IMPLEMENTING OR PREPARING TO IMPLEMENT A CDS PROGRAM

- 38 STATES HAVE ESTABLISHED STATISTICAL ANALYSIS CENTERS

- IMPROVED ANALYTICAL INPUT TO STATE COMPREHENSIVE PLANS THROUGH SAC's

- 35 STATES REPORTING TO FBI's UNIFORM CRIME REPORTS

- 30 OFFENDER BASED TRANSACTION STATISTICS/ COMPUTERIZED CRIMINAL HISTORY SYSTEMS UNDER DEVELOPMENT.

FY 77 BUDGET
$6.7 M

# VICTIMIZATION SURVEYS

**PURPOSE:**

TO OBTAIN INFORMATION CONCERNING BOTH REPORTED AND
UNREPORTED CRIMINAL VICTIMIZATION.

**KEY FEATURES:**

- SHOWS CHANGES IN RATES OF VICTIMIZATION OVER TIME

- CONTINUOUS SURVEYS IN 26 AMERICAN CITIES INVOLVING
  INTERVIEWS WITH 65,000 HOUSEHOLDS, 135,000 PERSONS
  AND 15,000 BUSINESSES EVERY SIX MONTHS.

- CRIMES MEASURED: RAPE, ROBBERY, ASSAULT, BURGLARY, PERSONAL
  AND HOUSEHOLD LARCENY, MOTOR VEHICLE THEFT, COMMERCIAL
  BURGLARY AND ROBBERY.

- SURVEY OF ATTITUTES: FEAR OF CRIME; CHANGES IN LIFESTYLE AS A
  RESULT OF VICTIMIZATION; OPINIONS ABOUT POLICE EFFECTIVENESS.

75

# VICTIMIZATION

## PROGRAM RESULTS

- ANNUAL SURVEYS CONDUCTED SINCE JULY 1972

- NINE PUBLICATIONS ON FINDINGS WITH THIRTY REPORTS SCHEDULED FOR PUBLICATION IN FY 77

- SELECTED FINDINGS INCLUDE:

  - NO SIGNIFICANT CHANGE OCCURRED IN RATES FOR CRIMES MEASURED BETWEEN 1974 AND 1975

  - AS MANY AS ONE-HALF TO TWO-THIRDS OF VICTIMIZATIONS ARE NOT REPORTED TO POLICE

  - COMMERCIAL CRIMES ARE USUALLY REPORTED

  - FEAR OF CRIME IS GREATEST AMONG PEOPLE WHO HAVE THE LEAST CHANCE OF BEING VICTIMIZED.

# RESEARCH

## NATIONAL INSTITUTE OF LAW ENFORCEMENT AND CRIMINAL JUSTICE

**FUNCTIONS:**

- DESIGN AND SPONSOR RESEARCH
- EVALUATE CRIMINAL JUSTICE PROGRAMS
- PROMOTE ADOPTION OF PROVEN TECHNOLOGY AND SUCCESSFUL PRACTICES
- DISSEMINATE INFORMATION TO CRIMINAL JUSTICE COMMUNITY

**MAJOR RESEARCH AREAS:**

- JURY OPERATIONS
- SENTENCING GUIDELINES
- POLICE PERFORMANCE MEASURES
- LIGHTWEIGHT BODY ARMOR
- CRIME PREVENTION THROUGH ENVIRONMENTAL DESIGN
- CRIMINAL INVESTIGATIONS
- POLICE RESPONSE TIME

# KEY RESEARCH RESULTS

## JURY OPERATIONS:

- JURY POOLS CAN BE CUT 20 to 25% WHILE STILL MAINTAINING ADEQUATE TRIAL COVERAGE

- NATIONWIDE, SAVINGS COULD TOTAL $50 MILLION ANNUALLY

- SOME COURTS ALREADY USING THE NEW METHODS, WITH NEW YORK COUNTY REPORTING $1.2 MILLION ANNUAL SAVINGS

- JURY REFORM PROGRAMS BEGINNING IN 18 COURT SYSTEMS WITH INSTITUTE FUNDING.

## POLICE RESPONSE TIME:

- CITIZENS FAIL TO REPORT MOST CRIMES IMMEDIATELY

- REPORTING DELAYS DIMINISH IMPACT OF RAPID POLICE RESPONSE TIME

- FINDINGS HAVE IMPLICATIONS FOR MANPOWER ALLOCATION, COMMUNICATIONS TECHNOLOGY, AND CRIME REPORTING PATTERNS.

## CRIMINAL INVESTIGATIONS:

- VICTIM/WITNESS KEY TO SOLVING MOST CRIMES

- INFORMATION FROM CRIME SCENE MORE IMPORTANT THAT "LEADS" DEVELOPED LATER ON

- SCREENING PROCEDURES DEVELOPED TO HELP POLICE DECIDE WHETHER CASE CAN BE PRODUCTIVELY PURSUED

- IMPROVED INVESTIGATIVE PROCEDURES TO BE TESTED IN FIVE JURISDICTIONS.

78

# KEY RESEARCH RESULTS

## LIGHTWEIGHT BODY ARMOR:

- INCONSPICUOUS, CAN BE WORN ROUTINELY
- FIELD TESTED IN 15 MAJOR CITIES
- CREDITED WITH SAVING THE LIVES OF 3 OFFICERS AND AND PREVENTING SERIOUS INJURY TO ANOTHER 10

## SENTENCING GUIDELINES:

- DESIGNED TO REDUCE DISPARITY WITHIN A JURISDICTION
- GUIDELINE SENTENCES COVER 85 PERCENT OF CASES
- DENVER NOW USING GUIDELINE SYSTEM
- GUIDELINES BEING DEVELOPED IN CHICAGO, NEWARK AND PHOENIX

## POLICE PERFORMANCE MEASURES:

- ARREST DATA AND REPORTED CRIME FIGURES INADEQUATE MEASURES
- NEW SYSTEM USES A VARIETY OF "INDICATORS" TO ASSESS A DEPARTMENT'S PRODUCTIVITY
- SOUND PERFORMANCE EVALUATION METHODS INCREASINGLY CRUCIAL IN LIGHT OF BUDGETARY PRESSURES
- TESTING TO BEGIN SOON IN FOUR CITIES.

# EVALUATION RESULTS

- EVALUATE IMPACT OF NEW LAWS AND PRACTICES SUCH AS STATE SPEEDY TRIAL LEGISLATION, MASSACHUSETTS GUN LAW, NEW YORK DRUG LAW AND CLOSING OF SECURE FACILITIES FOR JUVENILE OFFENDERS

- EVALUATE WIDELY-USED CRIMINAL JUSTICE PRACTICES:

  *27 PROGRAMS EVALUATED TO DATE, RANGING FROM JUVENILE DIVERSION TO PREVENTATIVE PATROL TO STREET LIGHTING*

  *SOME FINDINGS INCLUDE:*

  PROPERTY-MARKING PROJECTS REDUCE BURGLARY RATES FOR PARTICIPANTS, BUT COMMUNITY-WIDE RATES MAY BE UNAFFECTED

  ALARM SYSTEMS LINKED DIRECTLY TO POLICE EFFECTIVE IN REDUCING COMMERCIAL ROBBERIES

  DRUG ABUSERS IN TASC PROGRAMS SHOW LOW REARREST RATES WHILE IN PROGRAM, BUT FOLLOW-UP STUDIES NEED TO MEASURE LONG TERM PROGRESS

- IN TOTAL, OVER 100 POLICY RELEVANT EVALUATIONS AND ASSESSMENTS HAVE BEEN CONDUCTED TO DATE.

# OFFICE OF JUVENILE JUSTICE AND DELINQUENCY PREVENTION

ANNUAL BUDGET
$75 M

JUVENILE JUSTICE AND DELINQUENCY PREVENTION ACT 1974 (PUB. 1. 93 - 415)

## PROGRAM OPERATIONS

*SPECIAL EMPHASIS:*
DISCRETIONARY GRANTS FOR IMPLEMENTING AND TESTING DEMONSTRATION PROGRAMS

*FORMULA GRANTS AND TECHNICAL ASSISTANCE:*
PROVIDE FINANCIAL AND TECHNICAL ASSISTANCE TO STATE AND LOCAL AGENCIES

*CONCENTRATION OF FEDERAL EFFORT:*
DEVELOP OBJECTIVES AND PRIORITIES TO COORDINATE ALL FEDERAL POLICIES AND PROGRAMS RELATED TO JUVENILE DELINQUENCY

## NATIONAL INSTITUTE
(J.D. RESEARCH)

*STATISTICS AND DATA BASE:*
ESTABLISH INFORMATION CLEARINGHOUSE

*TRAINING:*
PROVIDE TRAINING PROGRAMS FOR JUVENILE JUSTICE PROFESSIONALS AND OTHER PRACTITIONERS

*STANDARDS:*
DEVELOPMENT OF COMPREHENSIVE STANDARDS FOR ADMINISTRATION OF JUVENILE JUSTICE

*RESEARCH AND EVALUATION:*
ESTABLISH CENTRALIZED RESEARCH EFFORT EVALUATION OF FEDERAL AND STATE J.J. PROGRAMS

# OFFICE OF JUVENILE JUSTICE AND AND DELINQUENCY PREVENTION

## PROGRAM OPERATIONS

### SPECIAL EMPHASIS:

AWARDED:

- DEINSTITUTIONALIZATION OF STATUS OFFENDERS - 11 ACTION PROGRAMS
- DIVERSION - 11 ACTION PROGRAMS
- INTERAGENCY GRANT ON SCHOOL VIOLENCE TO OFFICE OF EDUCATION

### FORMULA GRANTS AND TECHNICAL ASSISTANCE:

46 STATES HAVE COMPREHENSIVE PROGRAMS

- TWO MAJOR CONTRACTS FOR FORMULA GRANTS AND SPECIAL EMPHASIS T.A. PROGRAMS

### CONCENTRATION OF FEDERAL EFFORT:

PUBLISHED FIRST ANALYSIS AND EVALUATION OF ALL FEDERAL JUVENILE DELINQUENCY RELATED PROGRAMS

## NATIONAL INSTITUTE (J.D. RESEARCH)

### TRAINING:

- PREPARED OFFICE TRAINING PLAN
- PROVIDED TRAINING FOR JUVENILE COURT JUDGES
- IMPLEMENTED ACA PROJECT READ IN TRAINING SCHOOLS

### STANDARDS:

- 65 JUVENILE JUSTICE STANDARDS SUBMITTED TO CONGRESS
- 140 STANDARDS READY FOR SUBMISSION
- 37 PREVENTION STRATEGIES COMPLETED

### RESEARCH AND EVALUATION:

- GRANTS AWARDED TO EVALUATE SPECIAL EMPHASIS PROGRAMS
- IMPLEMENTED NATIONAL ASSESSMENT PROGRAM
- GRANTS AWARDED TO IMPLEMENT A RESEARCH AND DEMONSTRATION PROGRAM ON LEARNING DISABILITIES AND JUVENILE DELINQUENCY

82

# MAJOR MANAGEMENT IMPROVEMENTS

**PURPOSE:** TO PROVIDE EFFECTIVE MANAGEMENT DIRECTION AND MANAGEMENT CONTROL.

**KEY FACTORS:**

- MANAGEMENT-BY-OBJECTIVES
- ZERO-BASED BUDGETS TIED TO MBO
- PROGRAM DEVELOPMENT SYSTEM
- LONG RANGE PLANS FOR SYSTEMS AND STATISTICS
- LONG RANGE EVALUATION PLAN AND EVALUATION UTILIZATION SYSTEM
- INFORMATION SYSTEM (PROFILE) TO MEET MANAGEMENT INFORMATION NEEDS
- MONTHLY MANAGEMENT REVIEWS
- GRANT/CONTRACT REVIEW BOARD
- GRANT-MONITORING SYSTEM
- ACCOUNTING SYSTEM APPROVED BY GAO



**LEAA Budget History**
**(In $ Millions)**

| FY 69 | FY 70 | FY 71 | FY 72 | FY 73 | FY 74 | FY 75 | FY 76 | FY 77 | FY 78 |
|-------|-------|-------|-------|-------|-------|-------|-------|-------|-------|
| 63 | 268 | 529 | 699 | 855 | 871 | 886 | 810 | 753 | 704 ★ |

★ REQUESTED



# THE LEAA DOLLAR
## Fiscal Year 1977 - $754 Million

TECHNICAL ASSISTANCE
$13,000,000

COMMUNITY ANTI-CRIME
$15,000,000

DATA SYSTEMS AND
STATISTICAL ASSISTANCE
$21,522,000

MANAGEMENT & OPERATIONS
$28,536,000

NATIONAL INSTITUTE
OF LAW ENFORCEMENT
AND CRIMINAL JUSTICE
$27,029,000

HI-CRIME AREA PROGRAM
$40,000,000*

MANPOWER DEVELOPMENT
$44,300,000

DISCRETIONARY (PART C)
$54,007,000

PLANNING (PART B)
$60,000,000

CORRECTIONS (PART E)
$72,009,000

JUVENILE JUSTICE
$75,000,000

BLOCK (PART C)
$306,039,000

41%

10%

9%

8%

7%

6%

5%

4%

3%

3%

2%

2%

\* Proposed reprogramming as follows:   PSOB- $30 M, Part C & E - $10 M.

# BUDGET BY FUNCTION — POLICE/ADJUDICATION/CORRECTIONS

## FY 1975

### AS % OF TOTAL CRIMINAL JUSTICE EXPENDITURE

**POLICE**
- 55% STATE/LOCAL
- 45% BLOCK GRANTS
- 33% CATEGORICAL

**ADJUDICATION**
- 13% STATE/LOCAL
- 19% BLOCK GRANTS
- 20% CATEGORICAL

**CORRECTIONS**
- 24% STATE/LOCAL
- 36% BLOCK GRANTS
- 47% CATEGORICAL

**OTHER**
- 8% STATE/LOCAL (ONLY)

**LEAA** — FY 1969 - FY 1976 (CUMULATIVE)
- 44% POLICE
- 16% ADJUDICATION
- 40% CORRECTIONS

86

## LEAA BUDGET FUNCTION BY YEAR
### (IN THOUSANDS OF DOLLARS) AS OF 12/31/76

| 1969 - 1974 | POLICE | | COURTS | | CORRECTIONS | | TOTAL | BUDGET AUTHORITY |
|---|---|---|---|---|---|---|---|---|
| BLOCK | 964,480 | 49% | 305,210 | 15% | 715,136 | 36% | 1,984,826 | |
| NONBLOCK | 245,024 | 39% | 87,953 | 14% | 301,196 | 47% | 634,173 | |
| TOTAL | 1,209,504 | 46% | 393,163 | 15% | 1,016,332 | 39% | 2,618,999 | 3,285,310  80% |
| **1975** | | | | | | | | |
| BLOCK | 205,242 | 46% | 84,911 | 19% | 163,403 | 36% | 463,556 | |
| NONBLOCK | 61,879 | 33% | 37,800 | 20% | 86,736 | 47% | 186,415 | |
| TOTAL | 267,121 | 42% | 122,711 | 19% | 250,139 | 39% | 639,971 | 895,000* 72% |
| **1976** | | | | | | | | |
| BLOCK | 107,927 | 39% | 63,475 | 23% | 103,987 | 38% | 275,389 | |
| NONBLOCK | 66,572 | 29% | 38,780 | 17% | 122,346 | 54% | 227,698 | |
| TOTAL | 174,499 | 35% | 102,255 | 20% | 226,333 | 45% | 503,087 | 809,638  62% |
| **TOTAL** | | | | | | | | |
| BLOCK | 1,277,649 | 47% | 453,596 | 17% | 982,526 | 36% | 2,713,771 | |
| NONBLOCK | 373,475 | 35% | 164,533 | 16% | 510,278 | 49% | 1,048,286 | |
| TOTAL | 1,651,124 | 44% | 618,129 | 16% | 1,492,804 | 40% | 3,762,057 | 4,989,948  75% |

* INCLUDES FUNDS FOR JUVENILE JUSTICE AND DELINQUENCY PREVENTION ACT.

DOJ-1977-02

95596

# Federal Aid to Criminal Justice
## Rhetoric, Results, Lessons

John K. Hudzik
Principal Author

with contributions by

Thomas J. Madden
and
Ernest E. Allen
Cornelius J. Behan
Geoff Gallas
Robert M. Morgenthau
Robert L. Smith

1984

The National Criminal Justice Association
Washington, D.C.

the findings and recommendations were based on the most comprehensive review ever undertaken of the nature and causes of crime, of the performance and capability of the criminal justice system, and of the problems confronted by that system. Criticism was levelled not so much against the Commission's findings and conclusions as against its failure to offer concrete suggestions for meaningfully affecting crime in the *near* term.[34] This too would be addressed if not resolved in the debates surrounding passage of the Safe Streets Act in 1968.

## Safe Streets: The Panoply of Conflicting Views

By 1967 reports of crime continued to paint an increasingly gloomy picture. Civil disorders of massive proportions engulfed several American cities during the summers of 1965, 1966, and 1967. Public ire and concern required a federal response greater than that made under provisions of the 1965 Law Enforcement Assistance Act. In response, President Johnson sent Congress a legislative message on crime (his third) that included a proposed bill entitled, "The Safe Streets and Crime Control Act of 1967." The President's message was delivered on February 6, 1967, and thirteen days later the President's Commission issued its long awaited report. The timing of the two events was not accidental, and the title of the President's bill was calculated to elicit maximum positive political response.

The Safe Streets Bill recognized the primacy of state and local police powers; all of its provisions were aimed at *assisting* the states in performing their functions rather than at taking over those functions or unduly interfering in the performance of them. Specific provisions included proposals of assistance to modernize equipment, to reorganize law enforcement agencies, to recruit and train law enforcement officers, to modernize the court system, to develop more effective rehabilitation techniques, and to set up effective crime-prevention programs. Even though several portions of the bill offered assistance to corrections and the courts, there was an apparently widespread assumption held in Congress as well as by the public that the assistance was primarily, if not exclusively, aimed toward law enforcement. Both the President's proposed legislation and the subsequent report of his Commission gave forthright recognition to the concept of a criminal justice system—an interrelated and interdependent group of "crime-fighting" agencies.

Yet, during debate and passage of the legislation there was little to indicate that this concept received marked recognition or treatment.

The President's Safe Streets proposals were closely fashioned after the approach undertaken in the 1965 Law Enforcement Assistance Act. The grants would fund innovation and improvement in a variety of categories. Grant administration would be federally controlled under the Attorney General. There was much more money involved in the 1967 proposals, but the intent of grants-in-aid, as in the 1965 legislation, would be to make direct "categorical" grants. Cities with a population of fifty thousand or more (following the course laid out by other great-society funding ventures) would be eligible for action funds, but funding levels proposed were far smaller than those proposed for other great-society program efforts such as OEO.[35] This may have been a conscious effort to shield the crime proposals from the type of criticism then being levelled by Congress against OEO—namely, that OEO had gone in too fast with too much and had produced massive waste because the infrastructure was not available to manage the funds effectively.[36]

Although the President's funding and program proposals were limited to innovation and improvement that were likely to have a significant effect on the crime problem only in the long run, the public and Congress were far too anxious for quicker fixes. Part of this disparity can be traced to President Johnson himself: in 1965 he charged his Crime Commission to find the ways not only to reduce crime but to "banish" it.[37] Later attempts by the President to retreat from this excessive goal were too late—the public was fixed on the notion of quickly minimizing if not eliminating crime. The President's Commission in its final report did not help in setting expectations straight: at one point it asserted, "America can control crime."[38] The Commission noted that it would not be achieved quickly or easily, but few heard that. Among other factors involved, the nation was moving through a period of unbridled faith in the power of money and especially in the power of federal expenditures to solve problems.

Chapter 2 will treat the legislative debates and final features of the Safe Streets Act in greater detail. However, there are aspects to that debate and to the changes subsequently made to the President's proposal that reflect the several competing social and political forces discussed above. Clearly, the state's prerogatives in exercising the police power were hotly at issue. So, too, the get-tough preferences of conservatives, largely ignored in President Johnson's legislative proposals,

The Origins of LEAA    21

26. Richard Harris, *The Fear of Crime*, (New York, Frederick A. Praeger, 1968), p. 10. Also see Walker, op. cit., p. 231.

27. Lyndon Johnson, *The Choices We Face* (New York: Bantam Books, 1969), p. 125.

28. See Caplan, op. cit., p. 586.

29. Walter B. Miller, "Ideology and Criminal Justice Policy: Some Current Issues," *Journal of Criminal Law and Criminology* 64, no. 2 (June, 1973), p. 141.

30. Caplan, op. cit., p. 590.

31. Hearings on S. 1792 and S. 1825 before a Subcommittee of the Senate Committee on the Judiciary, 89th Congress, 1st session (1965), p. 7.

32. Caplan, op. cit., pp. 593-594.

33. The President's Commission on Law Enforcement and Administration of Justice Report, op. cit., p. 15.

34. See, for example, James Q. Wilson, "A Reader's Guide to the Crime Commission Reports," *The Public Interest*, Fall, 1967, p. 65. Also see, Henry Ruth, "To Dust Shall Ye Return?", *Notre Dame Lawyer* 43 (1968), p. 811.

35. *The Budget in Brief*, Executive Office of the President, Bureau of the Budget, U.S. Government Printing Office. See them for the years 1965-1969.

36. Thomas E. Cronin, Tania Z. Cronin, and Michael E. Milakovich, *U.S. v. Crime in the Streets* (Bloomington: Indiana University Press, 1981), p. 32.

37. Public Papers of the Presidents of the United States, Lyndon B. Johnson, 1965 (1966) pp. 982-83.

38. The President's Commission on Law Enforcement and Administration of Justice, *The Challenge of Crime in a Free Society* (New York, Avon Books, 1968), p. 621.

39. Cronin, Cronin, and Milakovich, op. cit., pp. 50-53.

40. Law Enforcement Assistance Administration, Office of General Counsel, "Index to the Legislative History of the Omnibus Crime Control and Safe Streets Act of 1968," January 23, 1973, p. 117.

41. Cronin et al, op. cit., p. 51.

42. LEAA, Office of General Counsel, op. cit., p. 240.

43. Ibid., p. 238.

44. Walker, op. cit., p. 237.

# Chapter 2

# LAWS AND REGULATIONS GOVERNING THE LEAA PROGRAM

Thomas J. Madden

In the 1960s, Congress began to use the constitutional spending power to exert substantial policy controls over state and local functions and to create a host of new grant programs. In 1962, there were only 160 federal grant programs authorized by the Congress.[1] By January of 1967, when Congress prepared to take up the debate on the Safe Streets Act, the number of intergovernmental grant programs had grown to 379 with some 109 new grant programs being enacted in 1965 alone.[2] Federal assistance in dollar terms more than doubled between 1963 and 1967, rising from 7.7 percent to 11 percent of all federal budget outlays and from 1.5 percent to 2.2 percent of the gross national product.[3]

By 1967, it was also clear that the new programs and laws controlling the expenditure of the new grants' had substantially altered the relationships between state, local, and federal government relationships without establishing an essential rationale for assigning intergovernmental functions other than that of pragmatic politics.[5]

The Safe Streets Act followed the pattern leading to the creation of many of these new programs. The rise in crime in 1963 and 1964 was the subject of debate in the 1964 elections and it was addressed by President Johnson in a crime message in 1965 calling for a national response to the crime problem.[6] This message was followed by Congressional enactment of a small criminal justice assistance program and the appointment of the President's Commission on Law Enforcement and the Administration of Justice.[7] The Commission documented the need for a major federal response to state and local crime problems, and Congress responded with the Omnibus Crime Control and Safe Streets Act.

When Congress took up the debate on President Johnson's proposal in 1967 to create a major new criminal justice assistance program, it quickly became clear that there were two issues of overriding concern to the conservative members who were in a position to control the

**Preceding page blank**

23

24                                    "Federal Aid to Criminal Justice"

debate. The first was a concern that by vesting the Attorney General with the authority to provide grants to states, the Congress would also be giving the Attorney General the power to control state and local law enforcement agencies and would thereby be nationalizing state and local law enforcement functions. The second and related concern was that the Johnson proposal bypassed state government and allowed the Attorney General to deal directly with cities in making grants. In the view of then House Minority Leader Gerald R. Ford, a "direct" federalism approach would enable the Attorney General to "arbitrarily" decide which local law enforcement agencies would receive funds and what these agencies could do with the funds.[8]

The Senate Judiciary Committee was the initial focus of much of the concern over the creation of the national police force. The minority report of the committee, for example, in commenting on the discretionary authority given to the Attorney General to make grants stated:

[W]e don't want the Attorney General, the so-called "Mr. Big" of Federal law enforcement to become the director of State and local law enforcement as well. It is true that the Attorney General is the chief law enforcement officer of the Federal government. But he is not chief law enforcement officer of States and cities. We believe America does not want him to serve in that capacity.... We don't want this bill to become the vehicle for the imposition of Federal guidelines, controls, and domination.[9]

The House of Representatives, which acted first on the Johnson proposal, had accepted the view that the states should have control over expenditures by local government.[10] This view was rejected by the Senate Judiciary Committee[11] and the Senate floor became the forum for the key debate on this issue. The contest was between the supporters of direct federalism—large city mayors and their Congressional supporters—and the supporters of state control through so-called block grants—governors from the Midwest and the Western states and Republican senators and southern Democratic senators.

Amendments to convert the Senate Committee bill from a direct local aid program to a state block grant program were introduced by Senate Minority Leader Everett M. Dirksen. Senator Dirksen contended that gubernatorial supervision over state planning was necessary to avoid duplication or conflict between local and state crime reduction plans and programs. In the debate he stated that:

Laws and Regulations Governing the LEAA Program                              25

We are never going to do a job in this field until we have a captain at the top, in the form of the Governor, and those he appoints, to coordinate the matter for a State because crime may be committed in a spot, but before it gets through its ramifications, it may spread over a very considerable area.[12]

The view stated by Senator Dirksen had roots not only in the Senator's traditional concern for state interests but also in the 1967 report of the President's Commission on Law Enforcement and the Administration of Justice, which recommended that:

In every State and every city, an agency, or one or more officials, should be specifically responsible for planning improvements in crime prevention and control and encouraging their implementation.[13]

The recommendation of the President's Crime Commission reflected a concern for system-wide planning. This meant at the very least *ad hoc* coordination among police, courts, and corrections agencies so that policies implemented in one part of the system would not have an adverse effect on other components.

The Dirksen amendments required each state to create a state criminal justice planning agency (SPA) and to develop an annual comprehensive plan. These amendments were intended, in part, to address the concerns of the President's Crime Commission. The amendments were also intended to assure that there was a coordinated intergovernmental approach to crime control in each state.

The block grant was also seen by its supporters as a way of minimizing substantive federal control over state and local law enforcement. In the Senate Judiciary Committee report on the Safe Streets Act, the supporters of block grants stated that the purpose of the block grant was "to insure that federal assistance to state and local law enforcement does not bring with it federal domination and control nor provide the machinery or potential for the establishment of a federal police force."[14]

The United States Court of Appeals for the Fourth Circuit in 1971 had an opportunity to comment on this latter concern of the block grant proponents. In a law suit challenging the lack of controls exerted over block grant expenditures, the court stated:

"The dominant concern of Congress apparently was to guard against any tendency towards federalization of local police and

## "Federal Aid to Criminal Justice"

law enforcement agencies. Such a result, it was felt, would be less efficient than allowing local law enforcement officials to coordinate their state's overall efforts to meet unique local problems and conditions. Even more important than Congress's search for efficiency and expertise was its fear that over-broad federal control of state law enforcement would result in the creation of an Orwellian "federal police force.'"[15]

The Senate passed the bill containing the Dirksen amendments by a 72 to 4 roll-call vote and final action on the legislation came on June 6, when the House accepted without change the Senate version.[16] On June 19, 1968, President Johnson signed into law the Omnibus Crime Control and Safe Streets Act of 1968.[17]

A key assumption underlying the Safe Streets program was that, like many of the hundreds of new grant programs created by the Johnson Administration, "money makes a difference,"—that is, the more funds that are available, the greater the possibility of reducing crime.[18]

While the federal government had been extending nonfinancial criminal justice assistance to state and local governments at the operational level for several years prior to the enactment of the Safe Streets Act, the Act was the first major effort to provide financial assistance for state and local criminal justice efforts.[19] The Safe Streets Act had three basic purposes:

- ○ the stimulation of efforts to improve the effectiveness of state and local criminal justice agencies;
- ○ the coordination of the activities of state and local criminal justice systems;
- ○ the upgrading of the capabilities of state and local criminal justice agencies to deal with crime.[20]

The Safe Streets Act also gave the federal government new powers to enforce control over the sale and possession of handguns;[21] It made possession of firearms by convicted felons a federal crime.[22] It also made unauthorized wiretapping a federal crime.[23]

Title I of the Safe Streets Act which established the LEAA program, had the following major provisions:

*Administration.* A Law Enforcement Assistance Administration (LEAA) was established within the Department of Justice. In doing so, Congress severely limited the authority of the Attorney

General over LEAA by establishing LEAA within the Department of Justice under the "general authority of the Attorney General." In essence, this meant that LEAA was to be free of the day-to-day supervision of the Attorney General to operate as an independent agency. LEAA was subject to the Attorney General's control only when the Attorney General established policies of general applicability to the entire Justice Department. The Attorney General did have final authority to recommend to the President and the Office of Management and Budget the amount of funds that should be appropriated each year for the LEAA programs.

The LEAA was put under the direction of a "troika"—an administrator and two associate administrators, appointed by the President, and confirmed by the Senate. The "troika" had authority jointly to carry out, the functions, powers and duties of the LEAA.

*Block Grants.* Block grants were authorized under Part B of the Act to cover up to 90 percent of the total cost of the operation of state planning agencies (SPAs), which were to be created or designated by the governor of each state and were to develop annual comprehensive criminal justice plans. The SPA was to have a representative character including representatives of law enforcement and units of local government. Each state was to be allocated each year a flat amount of $100,000, with the remainder of planning funds to be distributed on a population basis. Forty percent of the planning grant funds were to be made available to local jurisdictions.

Under Part C of the Act, eighty-five percent of the so-called "action grant" funds were to be allocated to the states on a population basis as block grants, with seventy-five percent of the funds to be passed through to local governments. In order to receive a block action grant, the state had to submit a comprehensive plan that met certain requirements, including special emphasis on organized crime and civil disorder programs. The federal government was authorized to pay up to seventy-five percent of the total cost for organized-crime and riot-control projects, fifty percent for construction projects, and sixty percent for other action purposes. One significant limitation, added by those concerned about federal control of state and local law enforcement

## "Federal Aid to Criminal Justice"

LEAA concluded that its block grants were not governed by these laws. In 1971 the courts held otherwise and by 1973 the adverse effects of the application of the block-grant concept to Federal strings, were being felt by states.

*Ely v. Velde* arose out of a block grant that LEAA made to the State of Virginia. In making the block grant, LEAA approved the comprehensive plan prepared by the State of Virginia in accordance with the Omnibus Crime Control and Safe Streets Act. The plan indicated that Virginia intended to spend approximately $500,000 for a correctional facility. The expenditure of these funds was consistent with the Safe Streets Act. The plan did not specify where Virginia planned to build the facility.

At the time the Virginia plan was approved by LEAA, Virginia had not yet selected a final site. After the plan was approved, Virginia announced in a local newspaper that it intended to build a new penal facility in Green Springs, Virginia. Virginia did not notify LEAA of the selection of this site because it was not required by LEAA guidelines to do so.

Shortly after the announcement, a lawsuit was filed against the Administrator of LEAA and the Head of the Department of Corrections in Virginia. The lawsuit alleged that Virginia had failed to comply with the National Historic Preservation Act (NHPA) and the recently-enacted National Environmental Policy Act (NEPA) in selecting a site for the prison facility and that the Administrator of LEAA had failed to enforce NHPA and NEPA.

In their defense, LEAA and the State of Virginia contended that the LEAA program was a block-grant program and, under the LEAA law, the location for the penal facility was a state concern and not a Federal concern. LEAA contended that the State in expending LEAA funds did not have to comply with NEPA since the decision on where to build a penal facility was the state's decision and not subject to the review or disapproval of the Federal government. The district court agreed with this rationale and ruled against the plaintiffs.

The court of appeals disagreed and overruled the district court, making the following observation:

The LEAA insists that it is not obliged to comply—indeed it may not comply—with NHPA and NEPA because it has been disabled, when approving block grants, from imposing any con-

ditions not found in the Safe Streets Act itself. Support for this proposition is claimed in the language and the policy inherent in the Safe Streets Act.

\*          \*          \*

Reliance in the present case is misplaced, for it is plain that the LEAA has overdrawn the 'hands off' policy of the Safe Streets Act. Properly read, neither the Act's language nor its policy prohibits or excuses compliance with NHPA and NEPA.[49]

In 1975 there were 19 different "cross-cutting" laws which governed the expenditure of federal grants which, under the rationale of the ruling in *Ely v. Velde*, neither prohibited nor excused compliance with these statutes. (Appendix II.)

In 1973, LEAA had undergone another reorganization which divided the state and local grant program among several offices within LEAA. (See Figure 6.)

## The Juvenile Justice and Delinquency Prevention Act of 1974

By 1974, Congressional dissatisfaction with the low emphasis placed by LEAA on juvenile justice peaked. Congressional critics charged that LEAA's approach had been to see the juvenile offender in terms of crime and punishment. In their view, LEAA had not provided adequate funds for juvenile delinquency problems, particularly prevention, and had not succeeded in bringing about effective coordination of Federal juvenile delinquency programs.

Ultimately Congress passed the Juvenile Justice and Delinquency Prevention Act of 1974 and established an Office of Juvenile Justice and Delinquency Prevention in LEAA to administer it. The Senate Judiciary Committee stated that the purpose of the Act was as follows:

The Committee bill, as amended, provides for Federal leadership and coordination of the resources necessary to develop and implement at the State and local community level effective programs for the prevention and treatment of juvenile delinquency. Towards this end, it establishes a new Juvenile Justice and Delinquency Prevention program within the Department of Justice, Law Enforcement Assistance Administration, to provide comprehensive national leadership for attacking the problems of juvenile delinquency and to insure coordination of all delinquency activities of the Federal government.[50]

66

**Department of Treasury Circulars**

Treasury Circular 1075 — Withdrawal of Cash from the Treasury for Advances Under Federal Grant and Other Programs

Treasury Circular 1082 — Notification to States of Grant-in-Aid Information

**Executive Orders**

E.O. 11246 — Nondiscrimination in Employment in Federally Assisted Construction Projects

E.O. 11764 — Nondiscrimination in Federally Assisted Programs

E.O. 11914 — Nondiscrimination with Respect to Handicapped in Federally Assisted Programs

APPENDIX II
STATUTES CONTROLLING EXPENDITURES OF GRANT FUNDS

ENVIRONMENTAL LAWS

1. National Environmental Policy Act of 1969, 42 U.S.C. § 4321, *et seq.* (1970) [NEPA]. NEPA requires Federal grantor agencies to consider the environmental impact of major Federal actions funded by Federal grants and to prepare environmental impact statements on these actions.

2. National Historic Preservation Act of 1966, 16 U.S.C. § 470, *et seq.* (1970) [NHPA]. NHPA requires Federal grantor agencies and grantees to consider the effect of Federally assisted projects on historical properties listed in the National Register of Historic Places.

3. Flood Disaster Protection Act of 1973, 42 U.S.C. § 4001, *et seq.* (Supp. II, 1973) [FDPA]. FDPA prohibits the use of Federal grant funds to support construction in any area identified by the Secretary of Housing and Urban Development as having special flood hazards unless the building and any related personal property is covered by flood insurance. *This is the only statute in this listing which exempts block grants from its coverage.*

4. Clean Air Act of 1970, 42 U.S.C. § 7401, *et seq.* (Supp. II, 1972). The Clean Air Act and Executive Order 11738 prohibit funding through grants of activities with an organization that proposes to use a facility which violates the pollution standards of the Clean Air Act.

5. Federal Water Pollution Control Act of 1948, as amended, 33 U.S.C. § 1251, *et seq.* (Supp. II, 1972) [FWPCA]. The FWPCA and Executive Order 11738 prohibit funding through grants of activities with an organization that proposes to use a facility which violates the water pollution standards of the FWPCA.

6. Safe Drinking Water Act of 1974, 42 U.S.C. § 300f, *et seq.* (Supp. IV, 1974) [SDWA]. SDWA provides that no grant may be used to fund a project which may contaminate an aquifer which is the principal drinking water source for a community.

7. Endangered Species Act of 1973, 16 U.S.C. § 1531, *et seq.* (Supp. III, 1973) [ESA]. ESA requires Federal grantor agencies to assure that grant

"Federal Aid to Criminal Justice"

94

---

Laws and Regulations Governing the LEAA Program

67

fund are not used in a manner that jeopardizes the continued existence of a threatened or endangered species.

8. Wild and Scenic Rivers Act of 1968, as amended, 16 U.S.C. § 1271, *et seq.* (1976) [WSRA]. WSRA requires Federal grantor agencies to assure that grant funds are not used in a manner that jeopardizes the clear and free-flowing condition of certain wild and scenic rivers.

9. Historical and Archeological Data Preservation Act of 1960, as amended, 16 U.S.C. § 469 *et seq.* (Supp. IV, 1974) [HADPA]. HADPA places limitations on the use of Federal funds to support an activity that may cause irreparable loss to significant historical or archeological data.

10. Coastal Zone Management Act of 1972, 16 U.S.C. § 1451, *et seq.* (Supp. II, 1972) [CZMA]. CZMA specifies that grant-supported activities must be consistent with State land-management programs for the protection of coastal zones, including Great Lake waters.

CIVIL RIGHTS LAWS

11. Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d (1970). Title VI provides that no person on the ground of race, color, or national origin can be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity funded with Federal grants.

12. Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.* (Supp. III, 1973). The Rehabilitation Act extends the Title VI type protections to the handicapped.

13. Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 (Supp. II, 1972). Title IX provides that no person can on the basis of sex be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or project funded with Federal grants.

OTHER

14. Indian Self-Determination Act, 25 U.S.C. § 450f (Supp. V, 1975). The Self-Determination Act requires Federal grantor agencies to give preferences to training and employment of Indians and use of Indian enterprises for administrative functions under grant programs which benefit Indians.

15. Intergovernmental Cooperation Act of 1968, 42 U.S.C. § 4201, *et seq.* (1970). The Intergovernmental Cooperation Act authorizes the creation of clearinghouses at the State and local levels to coordinate and review grant programs and projects. Use of the clearinghouse by Federal grantor agencies and State and local grantees is mandated by OMB Circular A-95.

16. Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. § 4601, *et seq.* (1970). The Relocation Act requires grantees to pay the costs of relocating individuals displaced by construction and leasing undertaken with Federal grant funds. It also requires grantees to assure that displaced persons find adequate housing.

# Chapter 3
# LEAA IN THE STATES: 1968-1980

This chapter focuses on what happened to the LEAA program at the state level and particularly on the role played by the state planning agencies (SPAs). The lessons to be gained from the experience are rich but nonetheless complicated in what they offer to guide future criminal justice development. The chapter begins with a few remarks concerning our approach to assessment, and then examines the LEAA program in the states by following its evolution from 1968 to 1980. Employing the perspective provided by models of interorganizational and intergovernmental relations, the chapter ends with a preliminary assessment and analysis of the initial design and subsequent evolution of the program.

## LEAA Program Objectives and an Approach to Assessment

The central objective of the Safe Streets Act was to build the capacity of state and local criminal justice agencies to combat crime. While the program enacted to achieve this effort was multifaceted, the lynchpin was a group of programmatic and funding priorities directed toward three capacity-building initiatives at the state-level: (1) comprehensive system planning and coordination, (2) program innovation, and (3) development of new crime-fighting technology. State planning agencies were created to supply essential direction to these efforts.

A common assumption among proponents of the LEAA program had been that state and local units of government lacked both sufficient financial resources and policy commitment to support change in the criminal justice system.[1] The block grants were intended not only to offer the necessary financial support for innovation but were also intended to alter criminal justice agency task environments (that is, whom and what criminal justice agencies responded to, or more formally, the source and kind of inputs and the demand for outputs made by the criminal justice agency's relevant environment).[2] To alter agency task environments, new agencies, supported largely through LEAA funds, were to advance comprehensive planning, innovation, and co-

69

---

68

"Federal Aid to Criminal Justice"

17. Hatch Political Activity Act of 1940, as amended, 5 U.S.C. § 1501, et seq. (Supp. IV, 1974). The Hatch Act prohibits State and local government officials whose salaries are paid in part with Federal grant funds from running for political office other than the office they currently hold. It also prohibits coercion of political contributions from government employees whose salaries are paid with grant funds.

18. Animal Welfare Act of 1970, 7 U.S.C. § 2131, et seq. (1970). This Act requires research facilities to comply with humane standards for the care and handling of animals which are used in Federally-assisted projects or experiments.

19. Demonstration Cities and Metropolitan Development Act of 1966, 42 U.S.C. § 3301, et seq. (1970). This Act requires grantees to submit proposed metropolitan construction projects to an areawide planning agency for comments and recommendations prior to submitting a grant application to the Federal government.

Title 18 of the United States Code contains a number of criminal sanctions applicable to grants. These include prohibitions against false statements, 18 U.S.C. § 1001 (1970); prohibitions against using grants for political purposes, 18 U.S.C. §§ 600-607 (1970); and prohibitions against the expenditure of grant funds for purposes other than for which the funds were appropriated.

The listing does not include legislative riders attached to appropriation bills. It does not include acts such as the Davis Bacon Act, 40 U.S.C. § 2769 (1970), which are incorporated by specific statutory reference into the enabling statute of selected grant programs.

# OFFICE OF MANAGEMENT AND BUDGET

[Circular No. A-102 Revised]

## UNIFORM ADMINISTRATIVE REQUIREMENTS FOR GRANTS-IN-AID TO STATE AND LOCAL GOVERNMENTS

AUGUST 24, 1977.

1. *Purpose.* This Circular promulgates standards for establishing consistency and uniformity among Federal agencies in the administration of grants to State, local, and federally recognized Indian tribal governments. Also included in the Circular are standards to insure the consistent implementation of sections 202, 203, and 204 of the Integrovemental Cooperation Act of 1968 (82 Stat. 1101).

2. *Supersession.* The President by Executive Order 11717 transferred the functions covered by OMB Circular No. A-102 dated October 19, 1971, from the Office of Management and Budget to the General Services Administration. OMB Circular No. A-102 was revised and issued as Federal Management Circular 74-7 dated September 13, 1974. On December 31, 1975, the President superseded this order by Executive Order 11893 and transferred the functions covered by this Circular back to the Office of Management and Budget. FMC 74-7 is revised and reissued under its original designation of OMB Circular No. A-102.

3. *Summary of significant changes.* The revised Circular contains changes that bring it into general agreement with the more recent Circular A-110 which covers grants to universities, hospitals, and nonprofit organizations.

The more significant changes include:

(a) An amendment to the basic Circular to make it clear that the provisions of the attachments shall be applied to subgrantees except where they are specifically excluded.

(b) A provision that Federal agencies may accept the bonding policies and requirements of the grantee for construction contracts over $100,000 provided that the Government's interest is adequately protected.

(c) A revision to the criterion for the valuation of donated real and personal property to provide that the value of such property shall be based on fair market value. The original Circular provided that property should be based on the cost of the property less depreciation or fair market value, whichever was less.

(d) A provision that grantee audits should be made in accordance with generally accepted auditing standards, including Standards for Audit of Governmental Organizations, Programs, Activities and Functions, published by the General Accounting Office.

(e) A provision to require Federal agencies to pay within 30 days after the receipt of billing when the reimbursement method is used.

(f) A revision to the criterion for issuance of a letter of credit from $250,000 to $120,000.

(g) Deletion of the requirements for grantees to obtain prior approvals for budget revisions to grants under $100,-000.

(h) Provision that title to real property funded partly or wholly by the Federal Government shall vest in the recipient.

(i) A revision to the criteria governing when a grantee may keep nonexpendable property without reimbursement to the Federal Government when it is no longer needed for any Federal program.

4 *Background* The standards included in the attachments to this Circular replace the multitude of varying and oftentimes conflicting requirements in the same subject matter which have been burdensome to the State and local governments. Inherent in this standardization process is the concept of placing greater reliance on State and local governments. In addition, the Intergovernmental Cooperation Act of 1968 was passed, in part, for the purposes of: (a) Achieving the fullest cooperation and coordination of activities among levels of government; (b) improving the administration of grants-in-aid to the States; and (c) establishing coordinated intergovernmental policy and administration of Federal assistance program. This Act provided certain basic policies pertaining to administrative requirements to be imposed upon the States as a condition to receiving Federal grants. The implementing instructions of these policies were initially issued in Circular A-96. These instructions are modified herein in the interest of achieving further consistency in implementing that Act.

5 *Applicable provisions of the Intergovernmental Cooperation Act of 1968.* Federal agencies shall continue to follow the provisions of the Act, quoted below:

### DEPOSIT OF GRANTS-IN-AID

Sec 202 No grant-in-aid to a State shall be required by Federal law or administrative regulation to be deposited in a separate bank account apart from other funds administered by the State All Federal grant-in-aid funds made available to the States shall be properly accounted for as Federal funds in the accounts of the State In each case the State agency concerned shall render regular authenticated reports to the appropriate Federal agency covering the status and the application of the funds, the liabilities and obligations on hand, and such other facts as may be required by said Federal agency. The head of the Federal agency and the Comptroller General of the United States or any of their duly authorized representatives shall have access for the purpose of audit and examination to any books, documents, papers, and records that are pertinent to the grant-in-aid received by the States.

### SCHEDULING OF FEDERAL TRANSFERS TO THE STATES

Sec 203 Heads of Federal departments and agencies responsible for administering grant-in-aid programs shall schedule the transfer of grant-in-aid funds consistent with program purposes and applicable Treasury regulations, so as to minimize the time elapsing between the transfer of such funds from the United States Treasury and the disbursement thereof by a State, whether such disbursement occurs prior to or subsequent to such transfer of funds, and subsequent to such

transfer of funds (Sic) States shall not be held accountable for interest earned on grant-in-aid funds pending their disbursement for program purposes

### ELIGIBLE STATE AGENCY

Sec 204 Notwithstanding any other Federal law which provides that a single State agency or multimember board or commission must be established or designated to administer or supervise the administration of any grant-in-aid program, the head of any Federal department or agency administering such program may upon request of the Governor or other appropriate executive or legislative authority of the State responsible for determining or revising the organizational structure of State government, waive the single State agency or multimember board or commission provision upon adequate showing that such provision prevents the establishment of the most effective and efficient organizational arrangements within the State government and approve other State administrative structure or arrangements *Provided,* That the head of the Federal department or agency determines that the objectives of the Federal statute authorizing the grant-in-aid program will not be endangered by the use of such other State structure or arrangements

Some of the above provisions require implementing instructions and they are provided in several of the attachments to this Circular which deal with the specific subject matter

6 *Applicability and scope.* The standards promulgated by this Circular apply to all Federal agencies responsible for administering programs that involve grants to State and local governments and federally recognized Indian tribal governments However, agencies are encouraged to apply the standards to loan and loan guarantee programs to the extent practicable If the enabling legislation for a specific grant program prescribes policies or requirements that differ from the standards provided herein, the provisions of the enabling legislation shall govern. Except where they are specifically excluded, the provisions of the attachments of this Circular shall be applied to subgrantees performing substantive work under grants that are passed through or awarded by the primary grantee if such subgrantees are States, local governments or federally recognized Indian tribal governments as defined in paragraph 7

7 *Definitions* For the purposes of this Circular:

(a) The term "grant" or "grant-in-aid" means money, or property in lieu of money, paid or furnished by the Federal Government to a State, local, or federally recognized Indian tribal government under programs that provide financial assistance through grant or contractual arrangements. The term does not include technical assistance programs which provide services instead of money or other assistance in the form of general revenue sharing, loans, loan guarantees, insurance, or contracts which are entered into and administered under procurement laws and regulations.

(b) The term "State" means any of the several States of the United States, the District of Columbia, the Commonwealth of Puerto Rico, any territory or

Attachment M

## PART V

### ASSURANCES

The Applicant hereby assures and certifies that he will comply with the regulations, policies, guidelines and requirements, including OMB Circulars No. A–95, A–102 and FMC 74–4, as they relate to the application, acceptance and use of Federal funds for this federally–assisted project. Also the Applicant assures and certifies to the grant that:

1. It possesses legal authority to apply for the grant; that a resolution, motion or similar action has been duly adopted or passed as an official act of the applicant's governing body, authorizing the filing of the application, including all understandings and assurances contained therein, and directing and authorizing the person identified as the official representative of the applicant to act in connection with the application and to provide such additional information as may be required.

2. It will comply with Title VI of the Civil Rights Act of 1964 (P.L. 88-352) and in accordance with Title VI of that Act, no person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be otherwise subjected to discrimination under any program or activity for which the applicant receives Federal financial assistance and will immediately take any measures necessary to effectuate this agreement.

3. It will comply with Title VI of the Civil Rights Act of 1964 (42 USC 2000d) prohibiting employment discrimination where (1) the primary purpose of a grant is to provide employment or (2) discriminatory employment practices will result in unequal treatment of persons who are or should be benefiting from the grant-aided activity.

4. It will comply with requirements of the provisions of the Uniform Relocation Assistance and Real Property Acquisitions Act of 1970 (P.L. 91-646) which provides for fair and equitable treatment of persons displaced as a result of Federal and federally assisted programs.

5. It will comply with the provisions of the Hatch Act which limit the political activity of employees.

6. It will comply with the minimum wage and maximum hours provisions of the Federal Fair Labor Standards Act, as they apply to hospital and educational institution employees of State and local governments.

7. It will establish safeguards to prohibit employees from using their positions for a purpose that is or gives the appearance of being motivated by a desire for private gain for themselves or others, particularly those with whom they have family, business, or other ties.

8. It will give the sponsoring agency or the Comptroller General through any authorized representative the access to and the right to examine all records, books, papers, or documents related to the grant.

9. It will comply with all requirements imposed by the Federal sponsoring agency concerning special requirements of law, program requirements, and other administrative requirements.

10. It will insure that the facilities under its ownership, lease or supervision which shall be utilized in the accomplishment of the project are not listed on the Environmental Protection Agency's (EPA) list of Violating Facilities and that it will notify the Federal grantor agency of the receipt of any communication from the Director of the EPA Office of Federal Activities indicating that a facility to be used in the project is under consideration for listing by the EPA.

11. It will comply with the flood insurance purchase requirements of Section 102(a) of the Flood Disaster Protection Act of 1973, Public Law 93-234, 87 Stat. 975, approved December 31, 1976. Section 102(a) requires, on and after March 2, 1975, the purchase of flood insurance in communities where such insurance is available as a condition for the receipt of any Federal financial assistance for construction or acquisition purposes for use in any area that has been identified by the Secretary of the Department of Housing and Urban Development as an area having special flood hazards.

Exhibit M-3.  Application for Federal Assistance (Nonconstruction Programs)

(Page 12 of 13)

22

Attachment M

PART V (Continued)

The phrase "Federal financial assistance" includes any form of loan, grant, guaranty, insurance payment, rebate, subsidy, disaster assistance loan or grant, or any other form of direct or indirect Federal assistance.

12.   It will assist the Federal grantor agency in its compliance with Section 106 of the National Historic Preservation Act of 1966 as amended (16 U.S.C. 470), Executive Order 11593, and the Archeological and Historic Preservation Act of 1966 (16 U.S.C. 469a-1 et seq.) by (a) consulting with the State Historic Preservation Officer on the conduct of investigations, as necessary, to identify properties listed in or eligible for inclusion in the National Register of Historic Places that are subject to adverse effects (see 36 CFR Part 800.8) by the activity, and notifying the Federal grantor agency of the existence of any such properties, and by (b) complying with all requirements established by the Federal grantor agency to avoid or mitigate adverse effects upon such properties.

(Page 13 of 13)

Exhibit M-3.  Application for Federal Assistance (Nonconstruction Programs)

23

# RESTRUCTURING THE LAW ENFORCEMENT ASSISTANCE ADMINISTRATION

## HEARINGS

BEFORE THE

### SUBCOMMITTEE ON CRIME

OF THE

## COMMITTEE ON THE JUDICIARY

## HOUSE OF REPRESENTATIVES

NINETY-FIFTH CONGRESS

FIRST AND SECOND SESSIONS

### PART 1

AUGUST 1; OCTOBER 3, 4, 20, 1977; AND MARCH 1, 1978

### Serial No. 95–38



Printed for the use of the Committee on the Judiciary

U.S. GOVERNMENT PRINTING OFFICE

20-613                  WASHINGTON : 1978

H521-29

3

Mr. CONYERS. Having said that, we now recognize and welcome Associate Deputy Attorney General Walter M. Fiederowicz; Assistant Attorney General, Ms. Patricia M. Wald; General Counsel for LEAA, Thomas Madden; the Acting Director of the National Institute of Law Enforcement, Blair Ewing; Mr. James Gregg, Acting Administrator of LEAA, and Paul Nejelski, also a member of the task force study group.

We welcome you all, ladies and gentlemen. We know that the Deputy Attorney General has sent a prepared statement, and we would welcome you to proceed with it in your own way.

## TESTIMONY OF WALTER M. FIEDEROWICZ, ASSOCIATE DEPUTY ATTORNEY GENERAL, ACCOMPANIED BY PATRICIA M. WALD, ASSISTANT ATTORNEY GENERAL FOR THE OFFICE OF LEGISLATIVE AFFAIRS; BLAIR G. EWING, ACTING DIRECTOR OF THE NATIONAL INSTITUTE OF LAW ENFORCEMENT; PAUL A. NEJELSKI, OFFICE OF IMPROVEMENTS IN THE ADMINISTRATION OF JUSTICE; THOMAS J. MADDEN, GENERAL COUNSEL, LAW ENFORCEMENT ASSISTANCE ADMINISTRATION; AND JAMES M. H. GREGG, ACTING DIRECTOR OF THE LAW ENFORCEMENT ASSISTANCE ADMINISTRATION

Mr. FIEDEROWICZ. Although the Deputy Attorney General cannot be here today, I would like his statement introduced in the record.

I also have a prepared statement, fairly lengthy, of which I would like to read excerpts and have the full statement introduced in the record, with your permission.

Mr. CONYERS. All of the prepared statements will be incorporated into the record.

[The prepared statements of Messrs. Fiederowicz and Flaherty follow:]

STATEMENT OF PETER F. FLAHERTY, DEPUTY ATTORNEY GENERAL, DEPARTMENT OF JUSTICE

The hearings which your Committee has scheduled to discuss the Department of Justice Study Group "Report to the Attorney General" come at a most opportune time because the Department is currently evaluating the recommendations contained in the Report for restructuring the Law Enforcement Assistance Administration.

Attorney General Bell and I have assigned a high priority to the improvement of the effectiveness and responsiveness of the Department of Justice's program of assistance to state and local governments for crime control and criminal justice system improvement. Among our initiatives in this area was the creation of the Study Group and our charge to the Group that it present for our consideration recommendations for change in the program.

On June 23, 1977, the Study Group submitted its Report to Attorney General Bell and me. On June 30, 1977, the Attorney General publicly released the Report and asked for specific comments on the Report for a period of sixty days beginning on July 1, 1977.

In response to the Attorney General's request for public comment, the Attorney General and I have received a number of letters and reports which cogently discuss the LEAA program and its future. I find this response heartening. As the Attorney General noted in releasing the report: "Crime is a problem which

4

touches every one of us. A Federal role in this area must be shaped with the greatest possible participation of the American people and their elected leaders."

At this time and until the end of the sixty-day comment period, the Attorney General and I will be studying the "Report to the Attorney General," as well as the various documents that we receive in response to the Attorney General's request for commentary upon the Report.

I know that the hearings which your Committee has scheduled will enhance the quality of the discussion of the issues raised in the Study Group's "Report to the Attorney General" and will assist Attorney General Bell and me to evaluate the Report and the issues which it addresses.

The Attorney General and I look forward to working closely with you to resolve those issues.

─────────

STATEMENT OF WALTER M. FIEDEROWICZ, OFFICE OF THE ATTORNEY GENERAL, DEPARTMENT OF JUSTICE

Mr. Chairman, I want to take this opportunity on behalf of the Department of Justice and the members of the Study Group to thank you for this opportunity to appear before your Committee to discuss its "Report to the Attorney General" regarding the restructuring of the Law Enforcement Assistance Administration.

The Attorney General has made the improvement of the Law Enforcement Assistance Administration and its programs one of his top priorities. In April of this year, he organized the Study Group and asked it to conduct a comprehensive review of the present LEAA program and to undertake a basic rethinking of the Department of Justice's program of assistance to state and local governments in crime control and criminal justice system improvement. On June 23, 1977, the Study Group submitted its Report to the Attorney General and the Deputy Attorney General. On June 30th, because of his belief that a "Federal role in this area must be shaped with the greatest possible participation of the American people and their elected leaders," Attorney General Bell publicly distributed the Report and solicited comments concerning the Report.

During the comment period, which extends through the end of August, the Attorney General and the Deputy Attorney General will be considering the Study Group's recommendations and the comments they receive from public officials and the general public. Only after such a process has been completed will the Attorney General and the Deputy Attorney General adopt a position concerning the recommendations contained in the "Report to the Attorney General". Accordingly, I would like to emphasize that the conclusions and recommendations of the Study Group in its "Report to the Attorney General" do not necessarily reflect the official views of the Department of Justice on the issues addressed in the Report. Similarly, I would like to emphasize that at these hearings my colleagues and I can speak only on behalf of the Study Group and not on behalf of the Department of Justice.

Today, I would like to briefly outline the process followed by the Study Group in examining the LEAA program and to highlight the key findings contained in the Report. In the session scheduled for Thursday it is my understanding that we will be asked to discuss the specific recommendations contained in the Report.

Serving with me on the Study Group were six individuals who have had a wide range of experience in and out of government. Patricia M. Wald, Assistant Attorney General for the Office of Legislative Affairs, has among numerous other activities, served as a member of the President's Commission on Crime in the District of Columbia, as a consultant to the President's Commission on Law Enforcement and Administration of Criminal Justice and on the Executive Committee of the Juvenile Justice Standards Project IJA–ABA.

Ronald L. Gainer currently serves as Deputy Assistant Attorney General for the Office for Improvements in the Administration of Justice. Prior thereto, Mr. Gainer served as an attorney in the Criminal Division of the Department of Justice and as Director of the Department's Office of Policy and Planning. In these positions, Mr. Gainer has had an opportunity to work on a number of criminal justice matters on a policy-making level and to review the operations of the LEAA program for the Department of Justice.

Paul A. Nejelski, Deputy Assistant Attorney General for the Office for Improvements in the Administration of Justice, was employed by LEAA in its National Institute of Law Enforcement and Criminal Justice in 1969 and 1970. He

9

"In summary, then, the lessons of the past nine years of the LEAA program have been mixed. The comprehensive review undertaken by the Study Group led to the conclusion that there is the need for a major restructuring of the Justice Department's program of assistance to state and local governments for crime control and criminal justice improvements. This major restructuring must take place in the context of both the positive as well as the negative lessons of the past. LEAA was always viewed as an experiment. It is time now to capitalize on the lessons of nine years of experience and design a better Federal response to the nation's crime problem."

Based upon its review of the LEAA program and its findings, the Study Group identified certain major issues pertinent to the future of LEAA, and made recommendations to the Attorney General concerning those issues. Mr. Nejelski concurred only with recommendations Nos. 1 and 2 of the Report.

As I mentioned at the outset, the Attorney General and the Deputy Attorney General are reviewing the Report. Over 3,000 copies of the Report have been distributed for public comment. A listing of the individuals and groups who have received copies of the Report is attached to my testimony. The Study Group will be reviewing and analyzing responses to the Report, as will the staff of the Attorney General and the Deputy Attorney General. Your hearings come at a most opportune time to assist the Department of Justice in its evaluation of LEAA and its future.

My coleagues and I would be pleased to attempt to respond to any questions the Committee may have.

DISTRIBUTION OF THE REPORT TO THE ATTORNEY GENERAL

As of this date, over 3,000 copies of the report have been distributed among the following groups:

(a) All members of the U.S. Congress.
(b) All Governors.
(c) All State Attorneys General.
(d) All State Chiefs Justice.
(e) The Mayors of the 120 Largest Cities.
(f) All State Planning Agencies under the LEAA Program.
(g) All major national interest groups including:
  (1) National Governors Conference;
  (2) National Association of Criminal Justice Planning Directors;
  (3) National Association of Regional Councils;
  (4) National Association of Counties;
  (5) National Conference of State Criminal Justice Planning Administrators;
  (6) National Conference of State Legislators;
  (7) National League of Cities/U.S. Conference of Mayors;
  (8) Advisory Commission on Intergovernmental Relations;
  (9) International City Management Association;
  (10) National Center for State Courts;
  (11) American Correctional Association;
  (12) Council of State Governments;
  (13) American Bar Association;
  (14) National Sheriffs Association;
  (15) International Association of Chiefs of Police;
  (16) National Legal Aid and Defender Association;
  (17) National Association of Attorneys General;
  (18) National District Attorneys Association;
  (19) National Urban League;
  (20) National Association of Neighborhoods;
  (21) National Peoples Action;
  (22) National Center for Community Action;
  (23) National Council of La Raza; and
  (24) National Congress for Community Economic Development.
(h) All Major Newspapers.
(i) The General Public upon request.

Mr. FIEDEROWICZ. Thank you.

# FEDERAL ASSISTANCE TO STATE AND LOCAL CRIMINAL JUSTICE AGENCIES



## HEARING

BEFORE THE

## SUBCOMMITTEE ON
## CRIMINAL LAWS AND PROCEDURES

OF THE

## COMMITTEE ON THE JUDICIARY
## UNITED STATES SENATE

NINETY-FIFTH CONGRESS

SECOND SESSION

ON

## S. 1245, S. 1882, S. 3270, and S. 3280

PART I

### RESTRUCTURING THE LAW ENFORCEMENT ASSISTANCE ADMINISTRATION

AUGUST 16 AND 23, 1978

Printed for the use of the Committee on the Judiciary





U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 1978

35-689

S521-17

**103**

6

the State role should be strengthened. We will hear from the cities about how the city role should be strengthened. We have tried to develop an imaginative concept of arbitration. We have provided new flexibility so that if the cities do not get sufficient resources, they can get more under other formulas.

This legislation has flexibility. I think it makes clear that if we had a $6 billion authorization for this year, we might do a lot more. But we do not have that.

One of the principles of this administration has been trying to target limited resources through leveraging. We are not going to be able to do everything, but we can make this a responsible program. We can make the Federal Government's limited participation with local communities, States, and counties an important instrument to help meet one of the great concerns of the citizens of this Nation.

So I look forward to working with the chairman of this subcommittee and the other members. I regret I will not be able to hear the testimony, but I have reviewed the testimony, Attorney General Bell and Governor Hunt. I was prepared to develop some of these points with you. I think the testimony will be excellent and I will try to get back. .

I give you the assurance that I have read your testimony in detail prior to the hearing. I will look forward to working with you.

Thank you, Mr. Chairman.

Senator BIDEN. Without objection, Senator Kennedy, your statement shall become a part of this hearing record at this point.

[Material follows:]




STATEMENT OF SENATOR EDWARD M. KENNEDY AT OPEN HEARINGS ON THE REAUTHORIZATION OF THE LAW ENFORCEMENT ASSISTANCE ADMINISTRATION

Today, the Subcommittee on Criminal Laws and Procedures begins a comprehensive series of hearings on the future of the Federal Law Enforcement Assistance Administration. These hearings are aimed at analyzing the structure, method, goals and future of the current LEAA program, which is subject to reauthorization next year. In a broader sense, these hearings provide us with an opportunity to examine the federal government's role in aiding local crime-fighting efforts.

The development of just, workable proposals for combating crime is an urgent concern of all of us. It is an intolerable situation in this Nation when our own citizens cannot walk down the streets without facing the dangers of robbery, mugging and other street crimes. Although there are no hidden panaceas for eliminating crime from our society, it is clear that certain measures can and must be taken to make our streets safe and our citizens secure. I am convinced that the federal government does have a limited, but very important role to play in this area. LEAA is both the symbol and the reality of the federal government's modest commitment to assist localities in this continuing struggle. We need LEAA.

The major legislative vehicle for reorganizing and restructuring the LEAA program is S. 3270, the "Justice System Improvement Act of 1978," which I introduced, with strong administration and bipartisan support last month. This bill is designed to make the LEAA program more efficient and effective. It has been personally endorsed by both President Carter and Attorney General Bell and should go a long way in eliminating the defects and faults which have plagued the LEAA program during the past decade.

These current defects are many: poor priorities; excessive redtape; lack of clearly delineated federal, state, and local crime-fighting roles; excessive state control of the program at the expense of the cities and counties; poor internal LEAA structural organization; absence of effective research and evaluation components; lack of clearly understandable purposes and goals; poor targeting of block grant funds and the failure of comprehensive planning.

7

But beyond these specific defects, there remain troublesome general questions concerning LEAA—why does LEAA remain the stepchild of the federal grant programs? Did LEAA get off on the wrong foot in 1968 with its extensive hardware and antiriot purchases? Is the program still perceived in ideological terms, as "law and order" oriented?

During the past year I have been engaged in lengthy discussions with the Department of Justice in an effort to make the program more effective. These discussions have been most cooperative and constructive. But the basic roots of S. 3270 go all the way back to the early 1970's, when I first proposed steps to improve the functioning of the program. For too long the Congress has been unable or unwilling to confront the structural and administrative defects which hinder LEAA. In 1970, 1973, and, especially in 1976, various amendments were made to the program in an effort to improve it; but these amendments, although important and constructive, were largely band-aid reforms, aimed at particular LEAA weaknesses. Major surgery was left for another day.

I continue to question, not the concept of federal assistance to aid localities in the war on crime, but, rather, the nature and administration of that assistance. Since 1968 LEAA has authorized expenditures totaling over $6 billion, and yet many, including myself, question how this money has been spent. I am, of course, aware that crime is primarily a local problem and that LEAA's role is, by necessity, limited. But the issue is not whether LEAA can cure the nation's crime problem—it cannot—but whether LEAA can be altered and restructured in order to make a more meaningful contribution. I believe it can.

S. 3270 attempts to provide the type of comprehensive reform which has not taken place during the last decade. I believe this bill and these hearings will go a long way in making LEAA the type of federal agency contemplated by Congress when it enacted the LEAA program in 1968.

The Justice System Improvement Act is not a palliative; it constitutes a major break with the existing program. All of the major concepts found in the current statute—block grant assistance, discretionary funding, the National Institute of Justice, criminal justice planning—are substantially restructured and reorganized to meet the constructive criticisms raised during recent years. Thus, the bill: (1) creates a separate National Institute of Justice and Bureau of Justice Statistics within the Justice Department—and outside of LEAA—and places both of them, in addition to LEAA under a new umbrella office—the Office of Justice Assistance, Research and Statistics; (2) eliminates the annual comprehensive plan requirement and its attendant red tape; (3) replaces state planning agencies; (4) prohibits the expenditure of LEAA funds for equipment and hardware unless such expenditures are a necessary part of a larger innovative program; (5) gives special emphasis to judicial needs and programs; (6) provides direct financial assistance to larger cities and counties; (7) provides greater community and neighborhood involvement in choosing local priorities and (8) creates new criminal justice formulas to target funds to local areas of greatest need.

I look forward to the upcoming testimony on S. 3270 and other LEAA bills, as we attempt to fashion a final legislative product which will give LEAA an opportunity—long overdue—to make a more meaningful contribution to the local war on crime. The provisions of these bills are not etched in stone; I believe we can do an even better job. The hearings, beginning today and continuing into next year, will give us an extended opportunity to examine the strengths and weaknesses of the pending legislation. What is needed during the months ahead is the valuable input of those manning the front lines in the battle against crime—the police, judges, corrections officers, district attorneys and the defense bar. These hearings will also afford an opportunity for us to hear from the governors, mayors, county officials, criminal justice planners and all those who have a very real, dedicated interest in seeing the LEAA program work. The hearings are designed to assure that the American taxpayer will receive a better return on his or her investment in the war on crime than on the $6 billion spent so far. We owe it to the public to put this agency in order and to restore the confidence of the people that we are making progress in dealing with the problem of crime in America.

Senator BIDEN. Senator Thurmond?

Senator THURMOND. Mr. Chairman, today the Criminal Laws Subcommittee begins its oversight and reauthorization process for the

383

OFFICE OF THE ATTORNEY GENERAL,
*Washington, D.C., July 10, 1978.*

Hon. WALTER F. MONDALE,
*Vice President of the United States,*
*The White House,*
*Washington, D.C.*

DEAR MR. VICE PRESIDENT: Enclosed for your consideration is a legislative proposal entitled the "Justice System Improvement Act of 1978" which amends in its entirety Title I of the Omnibus Crime Control and Safe Streets Act of 1968. This proposal restructures the Federal Law Enforcement Assistance Administration and is intended to assist state and local governments in improving the quality of their justice systems.

The Justice System Improvement Act provides a four-year authorization for justice assistance, research and statistics programs. The Act is significantly different than the current LEAA statute and makes major structural and substantive changes in the financial assistance, research and statistical programs now being administered by LEAA.

The Act is designed to correct the major criticisms directed at the LEAA program by simplifying the grant process and eliminating needless red tape, by the targeting of funds, by strengthening the role of local governments in the program, by eliminating wasteful use of LEAA funds, by increasing community participation in the LEAA program, and by improving justice research, demonstration, and statistics programs.

More specifically, the bill can be described as follows:

#### (1) STATE AND LOCAL FINANCIAL ASSISTANCE

The bill replaces the current LEAA block and discretionary grant programs with a formula grant program, a priority grant program, and a discretionary grant program. Seventy percent of such funds must be set aside for formula grants, twenty percent for priority grants and ten percent for discretionary grants. These grants are to be administered by LEAA and LEAA is to be under the direct authority of the Attorney General. Under the bill, the Administrator of LEAA has final sign-off authority on all grants and contracts and reports to the head of an Office of Justice Assistance, Research and Statistics established by the bill.

##### FORMULA GRANTS

The bill contemplates the submission to LEAA of a very simple three-year application which would not contain much of the verbiage that has led to larger paper submission requirements under current law. The application must be based on an analysis of the crime problems in the state and must include priorities for addressing these crime problems.

Under the new bill, the state is authorized to prepare those parts of the application which relate to state agencies and to cities under 100,000 population and counties under 250,000 population. The state courts through Judicial Coordinating Committees are authorized to prepare a single application for state court activities. Each major city and county is authorized to prepare a single application for their own activities. The State would then integrate these applications into a single application to be submitted to LEAA.

The state review of the application from major cities and counties under the bill is limited. Applications can only be reviewed for compliance with Federal requirements and state law, for duplication of other projects, and for inconsistencies with priorities. Any disagreements between state and large units of local government must be resolved through arbitration.

Formula grant funds are to be distributed on the basis of a national formula with a hold harmless provision which assures that no state receives less than a population share of the funds as under current law. The bill also contains provisions under which some states with particularly severe crime problems receive additional funds based on a formula that takes into account crime, population, tax effort, and criminal justice expenditures.

Major cities and counties receive a fixed allotment of funds from the state share. The amount of funds received is determined by a formula based on criminal justice expenditures.

384

An annual performance report must be submitted to LEAA each year by each state. LEAA must review this performance report and, if based on this performance report or on LEAA's independent evaluation it is determined that the funds were not being used effectively, LEAA must either suspend all funds going to a jurisdiction or suspend only those funds which would be otherwise used for an ineffective program or project.

The annual state comprehensive plans now being submitted to LEAA average about 1,000 pages. The single three-year application should not exceed 300–400 pages. Over a three-year period total paper submission, including amendments and annual performance reports, could be cut by 75 percent.

### NATIONAL PRIORITY GRANTS

Under the priority grants provisions of the bill, the Office of Justice Assistance, Research and Statistics is directed, after consultation with the National Institute of Justice, the Bureau of Justice Statistics, state and local governments, and others to establish programs for priority grant funding which have been shown through research, demonstration or evaluation, to be particularly effective in improving the criminal justice system and reducing crime.

In order to receive a priority grant, a state or local government must provide for 50 percent of the cost of the program or project. In providing such a matching share, a recipient can use the formula grant, general revenue sharing funds, state and local appropriations, or any other source of funds available for that jurisdiction.

### DISCRETIONARY GRANTS

The bill also authorizes LEAA to award discretionary grants. Under the bill, these grants are to be used to fund programs for improving the criminal justice system which might not be otherwise undertaken under the formula or priority grant programs.

### (2) NATIONAL INSTITUTE OF JUSTICE

The bill creates a National Institute of Justice within the Justice Department that replaces two existing units (the National Institute for Law Enforcement and Criminal Justice and the National Institute of Corrections) and part of a third unit (Institute of Juvenile Justice Development and Research). The bill authorizes the National Institute of Justice to undertake basic and applied research in the areas of civil and criminal justice and to conduct evaluations and sponsor demonstrations in these areas. To insure the independence and integrity of the research operation, the bill gives the Director of the National Institute of Justice sign-off authority for all grants and contracts to be awarded by the National Institute of Justice. To insure administrative responsibility, the Director of the National Institute of Justice reports to the Director of the Office of Justice Assistance, Research and Statistics. The bill establishes a National Institute of Justice advisory board to be appointed by the Attorney General and to consist of a broadly based group of the academic and research community, justice practitioners, state and local officials, officials of neighborhood and community organizations, and citizens. The board would have authority to develop, in conjunction with the Director, policies and priorities for the National Institute of Justice.

### (3) BUREAU OF JUSTICE STATISTICS

The bill also creates a Bureau of Justice Statistics within the Department of Justice under the direct authority of the Attorney General. Under the bill, the Director of the Bureau of Justice Statistics reports to the Director of the Office of Justice Assistance, Research and Statistics. Research and Statistics and has final sign-off authority for all grants and contracts to be awarded by the Bureau of Justice Statistics. The Bureau of Justice Statistics is authorized to collect, analyze and disseminate statistics on criminal and civil justice matters.

The bill establishes a Bureau of Justice Statistics advisory board to be appointed by the Attorney General and to consist of a broadly based group of researchers, statisticians, justice practitioners, state and local officials and citizens. The board would have authority to recommend to the Director policies and priorities for the Bureau of Justice Statistics.

Prompt and favorable consideration of the proposed "Justice System Improvement Act of 1978" is recommended. In addition to the bill, there is enclosed a

385

section-by-section analysis. The Office of Management and Budget has advised that there is no objection to the submission of this legislative proposal to the Congress and that its enactment would be in accord with the program of the President.

Yours sincerely,

GRIFFIN B. BELL, *Attorney General.*

Enclosure.

### SECTION-BY-SECTION ANALYSIS

Section 2—Title I of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, is amended in its entirety as follows:

The Declaration and Purpose Clause sets out justice system improvement as the overall purpose of the new title. The clause provides that the policy of Congress is (1) to provide financial and technical assistance with maximum certainty and minimum delay; (2) to support community anti-crime efforts; (3) to encourage development of basic and applied research in the civil, criminal, and juvenile justice systems; and (4) encourage the collection and analysis of statistical information concerning crime and the operation of justice systems.

### PART A—LAW ENFORCEMENT ASSISTANCE ADMINISTRATION

Section 101—Section 101 of Part A retains within the Department of Justice, under the direct authority of the Attorney General, a Law Enforcement Assistance Administration. The office is under the direction of an Administrator who reports to the Director of the Office of Justice Assistance, Research and Statistics established in Part H.

Section 102—Section 102 sets out the duties and functions of the Administrator.

Section 103—Section 103 retains within the Law Enforcement Assistance Administration the Office of Community Anti-Crime Programs. This office is authorized to encourage community and citizen participation in crime prevention, to coordinate its activities with ACTION and other Federal programs designed to increase citizen participation, and to provide grants and technical assistance for such purposes.

### PART B—NATIONAL INSTITUTE OF JUSTICE

Sections 201 and 203—These sections establish within the Department of Justice, under the direct authority of the Attorney General, a National Institute of Justice. The Institute is to be headed by a Director who will report to the Director of the Office of Justice Assistance, Research and Statistics.

Section 202(c)—Section 202(c) sets out the authority of the Institute. This authority includes: (1) making grants and entering into cooperative agreements and contracts to conduct research, demonstrations, or special projects; (2) conducting or authorizing multi-year and short term research in civil, criminal, and juvenile justice systems; (3) conducting evaluations; (4) providing research fellowships and internships; (5) serving as a national and international clearinghouse; (6) serving in a consulting capacity to Federal, State, and local justice systems.

Section 202(d)—Section 202(d) sets out the functions and authority of the Director of the Institute.

Section 203—Section 203 provides that grants under Part B may be up to 100 per centum of the total cost of each project.

Section 204—Section 204 establishes a 21 member National Institute of Justice Advisory Board consisting of researchers, criminal justice practitioners, State and local elected officials, and members of the general public. The Board develops research policy for the National Institute of Justice.

### PART C—BUREAU OF JUSTICE STATISTICS

Sections 301 and 302—Sections 301 and 302 establish within the Department of Justice, under the direct authority of the Attorney General, a Bureau of Justice Statistics. The Bureau is to be headed by a Director who will report to the Director of the Office of Justice Assistance, Research and Statistics.

Section 302(c)—Section 302(c) sets out the authority of the Bureau. This authority includes: (1) making grants and entering into cooperative agreements and contracts for the purpose of gathering justice statistics; (2) collecting and

**108**

# NEWS RELEASE - - -

**PETER W. RODINO**

10th District   •   New Jersey
Chairman
Committee on the Judiciary
U.S. House of Representatives

FOR IMMEDIATE RELEASE
THURSDAY, MAY 10, 1979, AND AFTER
CONTACT:   JOHN RUSSONELLO   202-225-3436

## COMMITTEE APPROVES LEAA REORGANIZATION

WASHINGTON, D. C. -- The House Judiciary Committee, by a 24 to 6 vote, approved today a bill reorganizing the Law Enforcement Assistance Administration which places increased emphasis on anti-crime programs in local communities.

Rep. Peter W. Rodino, chairman of the committee and the bill's primary sponsor, said it "provides a significant improvement in LEAA's structure and organization, which will make it more effective in helping local governments fight crime."

He said the bill "offers an important balance in the areas of involvement for LEAA, while putting special emphasis on those areas which have proven most successful -- especially the Community Anti-Crime program."

"If we are ever to make real progress in reducing crime, we must encourage efforts by local citizens who are most familiar with the dangers and the causes of crime," he added.

The bill would require 10% of all LEAA funds to go for the Community Anti-Crime program which promotes crime prevention activities by non-governmental community groups.

The bill also provides a minimum of 20% of LEAA funds for juvenile delinquency programs with primary emphasis on serious juvenile offenders.

Rodino said "the bill is designed to drastically reduce the red tape which has plagued the process of getting federal assistance to states and local governments."

By requiring state and local governments to submit one application every three years instead of annually, the bill is expected to reduce paperwork by 60%.

The bill also would set up new "priority grants" which would provide extra money to programs that have proven especially effective in combatting crime.

A Bureau of Justice Statistics also would be established to collect and analyze information concerning crime, juvenile delinquency and the operation of the criminal justice system at various levels of government.

Rodino said he would "push very strongly for this bill's approval by the House because crime is a problem which concerns all of us -- and LEAA is the only instrument that the federal government has to assist states and localities to fight crime."

- 30 -

**109**

FOR RELEASE SUNDAY
MAY 6, 1979, AND AFTER
CONTACT:  JOHN RUSSONELLO  202-225-3436

## RODINO LEADS FIGHT TO SAVE LEAA

WASHINGTON, D. C. -- Peter W. Rodino, Chairman of the House Judiciary Committee, is leading a fight to save the Law Enforcement Assistance Administration from drastic budget cuts in 1980.

Rodino has sent a letter to all House members asking them to vote against all amendments to the Fiscal 1980 Budget Resolution which would eliminate or reduce the amount Congress can authorize for LEAA in 1980.

"I am convinced that now is not the time to abandon LEAA, which is our last remaining federal commitment to the fight against street crime," Rodino said.

"I think that the recent climate to cut expenditures across-the-board can be irresponsible when you are considering vital programs," he added.

He pointed out that the $546 million proposed by the 1980 budget resolution is a modest amount to spend for criminal justice assistance -- substantially below that appropriated for fiscal 1979."

He also added, "Crime continues to rank very high among the concerns of Americans, particularly those in our cities; yet less than one percent of the federal assistance that will be awarded to state and local governments next year will be allocated to LEAA under the 1980 budget resolution."

He promised to "make an all-out effort to save this program because I know how important it is to our states and localities.  There must be a national commitment to fight crime, and if we abaondon LEAA we will be turning our backs on the problem."

The House will be considering the 1980 budget resolution on Monday and Tuesday next week.

Rodino also announced that the House Judiciary Committee would begin on Tuesday marking up legislation to reorganize and restructure the LEAA.

"The committee's goal will be to allow the successful projects under LEAA to continue, while eliminating the less productive aspects of the program," Rodino said.

He noted that "the costs of more than 65% of the projects initially funded by LEAA are now financed by the participating communities or states."

Rodino is the principal sponsor of an LEAA reauthorization proposal in his committee, which he introduced for President Carter this year.

He said that the Judiciary Committee "must complete consideration of LEAA by May 15th according to the time limits established by the House budget process.

"If the House cuts the Budget authority for LEAA, it will tie the hands of the committee to decide the most constructive proposal to reorganize the agency.

"Crime is a national problem and LEAA is the only instrument that the federal government has to assist states and localities to fight crime."

- 30 -

# CONTROLLING CRIME THROUGH MORE EFFECTIVE LAW ENFORCEMENT

*1833-1*

# HEARINGS

### BEFORE THE

## SUBCOMMITTEE ON
## CRIMINAL LAWS AND PROCEDURES

#### OF THE

## COMMITTEE ON THE JUDICIARY
## UNITED STATES SENATE

### NINETIETH CONGRESS
### FIRST SESSION

#### ON

## S. 300, S. 552, S. 580, S. 674, S. 675, S. 678,
## S. 798, S. 824, S. 916, S. 917, S. 992, S. 1007,
## S. 1094, S. 1194, S. 1333, and S. 2050

**BILLS RELATING TO CRIME SYNDICATES, WIRETAPPING, ADMISSIBILITY IN EVIDENCE OF CONFESSIONS, ASSISTING STATE AND LOCAL GOVERNMENTS IN COMBATING CRIME AND RELATED AREAS OF CRIMINAL LAWS AND PROCEDURES**

MARCH 7, 8, AND 9; APRIL 18, 19, AND 20; MAY 9; JULY 10, 11, AND 12, 1967

Printed for the use of the Committee on the Judiciary



**U.S. GOVERNMENT PRINTING OFFICE**
**WASHINGTON : 1967**

78-433

For sale by the Superintendent of Documents, U.S. Government Printing Office
Washington, D.C. 20402 - Price $3.50

eral department or agency engaged in administering programs related to law enforcement and criminal justice shall, to, the maximum extent practicable, consult with and seek advice from the Attorney General to insure fully coordinated efforts.

SEC. 404. The Attorney General may arrange with and reimburse the heads of other Federal departments and agencies for the performance of any of his functions under this Act, and, as necessary or appropriate, delegate any of his powers under this Act with respect to any part thereof, and authorize the redelegation of such powers.

SEC. 405. The Attorney General is authorized—

(a) to conduct research and evaluation studies with respect to matters related to this Act; and

(b) to collect, evaluate, publish, and disseminate statistics and other information on the condition and progress of law enforcement and criminal justice in the several States.

SEC. 406. Payments under this Act may be made in installments, and in advance or by way of reimbursement, as may be determined by the Attorney General.

SEC. 407. Whenever the Attorney General, after reasonable notice and opportunity for hearing to a grantee under this Act, finds that, with respect to any payments made under this Act, there is a substantial failure to comply with—

(a) the provisions of this Act;

(b) regulations promulgated by the Attorney General under this Act; or

(c) the law enforcement and criminal justice plan submitted in accordance with the provisions of this Act; the Attorney General shall notify such grantee that further payments shall not be made (or in his discretion that further payments shall not be made for activities in which there is such failure), until there is no longer such failure.

SEC. 408. Nothing contained in this Act shall be construed to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over any police force or other agency of any State or local law enforcement and criminal justice system.

SEC. 409. Unless otherwise specified in this Act, the Attorney General shall carry out the programs provided for in this Act during the fiscal year ending June 30, 1968, and the four succeeding fiscal years.

SEC. 410. Not more than 15 per centum of the sums appropriated or allocated for any fiscal year to carry out the purpose of this Act shall be used within any one State.

SEC. 411. The Attorney General, after appropriate consultation with representatives of State and local governments, is authorized to prescribe such regulations as may be necessary to implement the purpose of this Act, including regulations which—

(a) provide that a grantee will from time to time, but not less often than annually, submit a report evaluating accomplishments and cost-effectiveness of activities funded under this Act;

(b) provide for fiscal control, sound accounting procedures and periodic reports to the Attorney General regarding the application of funds paid under this Act; and

(c) establish criteria to achieve an equitable distribution among the States of assistance under this Act.

SEC. 412. On or before August 31, 1968, and each year thereafter, the Attorney General shall report to the President and to the Congress on activities pursuant to the provisions of this Act during the preceding fiscal year.

SEC. 413. For the purpose of carrying out this Act, there is hereby authorized to be appropriated the sum of $50,000,000 for the fiscal year ending June 30, 1968; and for each succeeding fiscal year such sums as the Congress may hereafter appropriate. Funds appropriated for the purpose of carrying out this Act shall remain available until expended.

## TITLE V—DEFINITIONS

SEC. 501. As used in this Act—

(a) "Law enforcement and criminal justice" means all activities pertaining to crime prevention or the enforcement and administration of the criminal law, including but not limited to activities involving police, prosecution or defense of criminal cases, courts, probation, corrections and parole.

course, the Governors often play a vital role in these functions. The attorneys general of the States have general supervision of all major criminal prosecutions and the trials. There is a very close supporting relationship between States and cities. For example, how can it be said that New York City is free and clear of State government and does not have any close ties or relationship in law enforcement. I cannot follow that reasoning.

Would you have a comment on this? It is not limited to New York, but, generally, I cannot see any difference between this field and any other fields.

Attorney General CLARK. I guess that police activities were the first function of cities if not of government itself. It has been a function we have left to the cities in this country. New York City provides an illustration. There are 28,000 policemen there. The annual budget of the New York City Police Department exceeds the budget of the U.S. Department of Justice by $400 million. As far as I know the State does not provide any funds for police protection in New York City. They supply no advice. Only last year they established an office in the State government involving one man and one staff assistant. What can they contribute to the mighty police department of New York City, which has protected the people for generations.

As far as the powers of the State attorneys generals are concerned, the average attorney general of a State exercises no significant criminal powers. Many have no legal authority in this area. Those that do have common law powers find it difficult to use them. A rare exception is the State of California where there is a department of justice but its functions, too, are limited. It tends to be on the prosecution side, rather than to involve police protection. And it exercises no control over the local district attorneys in their handling of prosecutions.

Senator HRUSKA. Your bill emphasizes that we are prosecutors of cases.

Attorney General CLARK. Yes.

Senator HRUSKA. Those claiming to be in the law enforcement part of justice make up a very small percentage.

Attorney General CLARK. Yes, very small.

Senator HRUSKA. In many of the Middle Western States the Attorney General prosecutes all appeals from trial courts and in many instances participates in the prosecution of cases and trials in State district courts.

Attorney General CLARK. There would be no need for a Governor veto there because he would be directly involved, presumably.

Senator HRUSKA. Of course, when we experience breakdown in a city police force due to either civil commotion or massive civil disobedience, the Governor steps in, does he not?

Attorney General CLARK. He has to sometimes, unfortunately.

Senator HRUSKA. In thinking of the Governor, I wonder if the fear of bypassing the State in a program of this kind would not grip the heart as much as other programs which they have discussed so vigorously.

Attorney General CLARK. My judgment is that it would not because police departments are old-line agencies with which the Governors have had a very minimal experience, connection, and relationship.

Senator HRUSKA. I do not know if you have convinced me. I just wanted to ascertain from you whether that had received any thought.

Such questioning is going to be raised on the Senate floor because there are many Governors who say you cannot be partners with the Federal Government.

The Federal Government is dealing out this money and after it becomes a substantial amount the municipality is hooked. If municipalities do not substantially comply with the plan, that money can be withdrawn and they have no alternative. They must run that department the way the Attorney General says they must, pursuant to that plan. Control then slips away from the municipality and goes into the Attorney General's Office.

Is that not about the size of it?

Attorney General CLARK. No. Not at all. That would be both a violation of the mandate and spirit of section 408. I think as a practical matter the Attorney General will not run the police department because they will not let him and because he does not want to. He would not even if he could do so.

And the amount of money contributed by the Federal Government will be a small fraction of the total investment and it could hardly be the controlling part.

Senator HRUSKA. You can go as high as 60 percent of these budgets for administrative improvement. The expenditure of 60 percent is a big percentage.

Attorney General CLARK. Sixty percent of the increase above 105 percent the first year, 110 percent the next year, 115 percent——

Senator HRUSKA. It is only to an improvement component which this 60 percent applies?

Attorney General CLARK. That is all.

Senator HRUSKA. Will it not in due time be a sizable amount?

Attorney General CLARK. It will become a large sum in some cases in due time.

Senator HRUSKA. Now you refer to section 408 which states that nothing contained in this act shall be construed to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over any police force or agency of any State or local law enforcement and criminal justice system.

That is a most noble statement made in good faith. Yet the preceding section says:

Whenever the Attorney General, after reasonable notice and opportunity for hearing to a grantee under this Act, finds that, with respect to any payments made under this Act, there is a substantial failure to comply with—

    (a) the provisions of this Act—

And (b) and (c).

Considering the vast discretionary power invested in the Attorney General in this act and its overwhelming discretion in connection with this program, any aspect of the plan that has been submitted and approved must be OK'd by the Attorney General. Thus, if he feels it is being maladministered and not substantially complied with, he will say, "Sorry, boys, the show is over. No more money."

Would that constitute control and supervision in your judgment? It is well intended and filled with the spirit of wanting improved law enforcement service and all of its processes, but is it not a pretty compulsive situation?

Attorney General CLARK. No. I think it is necessary to the integrity of the act that its provisions be complied with and its regulations be

Attorney General CLARK. It can apply to any need of a police department or a corrections agency or a court.

Senator THURMOND. You have got a bill here then in which any police department of any city in this Nation can ask Washington, our Government, to help to supply uniforms and clothing to their policemen; is that right?

Attorney General CLARK. Well, that is a peculiar way of thinking about it. But they could come out that way. We require, however, that they have spent 105 percent before they are entitled to anything from the Federal Government. We would look at the whole budget together. Why in the world they would take out of all their budget uniforms and put it in the Federal part? Whether they could get the funds when they actually sought them for such a limited purpose or not is another question. But these funds would be available for any need of a police department that met the qualifications.

Senator THURMOND. Would that include shoes, too?

Attorney General CLARK. It could include shoes; yes.

Senator THURMOND. Well now, suppose the Federal Government said to the police departments over the country, suppose your director says, "Now, I think the policemen will look handsomer, better, and appear more disciplined if they all used blue uniforms and black shoes, and we are going to withhold funds unless you buy blue uniforms and black shoes."

Would your director have that authority to do that?

Attorney General CLARK. Well, I think we would start looking for a new director about that time.

Senator THURMOND. I know, but that is not the question. I am visualizing some Attorney General other than Mr. Clark now; someone who might succeed you some day and be arbitrary. Would your director have the right to withhold funds if the police departments did not use the color uniform he wanted or the color shoes or the quality of uniform or shoes that he wanted them to use?

Attorney General CLARK. He has to have broad discretion, and in theory he would probably have that discretion under the bill.

As a practical matter, the opportunity to exercise it would be very limited. The police are an independent type of person, and I just do not think that is a real possibility.

Senator THURMOND. But you think he would have that authority?

Attorney General CLARK. Yes, sir.

Senator THURMOND. Well, then, would your director also have the authority to say that, "We don't think a Colt is a very good pistol. It doesn't get results, and, therefore, we are not going to give any funds unless you buy Smith & Wesson pistols."

Would your director have the authority to withhold funds unless they used Smith & Wesson pistols?

Attorney General CLARK. I think if some police department sought Federal funds for a type of weapon that we thought was dangerous or unreliable or otherwise defective, that we would have a duty to withhold funds.

Senator THURMOND. So the Director would have the authority to withhold funds as to the kind of weapon or the quality of weapon that the city police department or the State law enforcement agency would purchase?

Attorney General CLARK. The probability of an exercise of discretion like that is very, very slight. It depends, unless——

Senator THURMOND. I am not saying how he would use this discretion, Mr. Attorney General. I am just asking, I am trying to get at the authority the bill gives, whether he would have the authority.

Attorney General CLARK. The bill gives broad discretion.

Senator THURMOND. It gives broad discretion.

Attorney General CLARK. Yes.

Senator THURMOND. So your director would have the right to withhold funds if he saw fit unless a policeman used the kind of weapons that he said they must use or use the kind of uniforms that he says they must use or use the kind of shoes that he said they must use.

Attorney General CLARK. No. I think that really is very remote. It is necessary under the bill to give broad discretion. But if it came to the specificity you are talking about, such an exercise of discretion would probably violate section 408 itself. It is so unreal.

Senator THURMOND. It is not contemplated, but is it possible?

Attorney General CLARK. I would say when it reaches the level that you have now reached with shoes and uniforms and guns and all these oher things there would begin to be control of the police department, and there would be a violation of section 408 of the act, and, therefore, it would be in violation of the act.

Senator THURMOND. Well, I took up each one separately, and you said he would have the authority, and then I summarized it and lumped it together, and now you say you do not. What is your position?

Attorney General CLARK. My position is as stated that the case you pose would be clearly arbitrary, when you add them up the way you do—in fact, any one by itself would seem highly arbitrary to me and so unrealistic as to not be a possibility.

Senator THURMOND. Who is going to control whether he is arbitrary or not? He makes the final decision, does he not?

Attorney General CLARK. Well, there are lots of checks and balances that we have in the system, and one is we would hope he would always try to accomplish the purposes of the act, and if he proceeded the way you indicated, I think the act would break down.

Senator THURMOND. That is not the question. I asked you who would call his hand if he became arbitrary.

Attorney General CLARK. Well, perhaps, with you Senators up here, you would help and there would be an Attorney General and other people.

Senator THURMOND. That is not it. I mean in the executive branch. Suppose you had a director under you or some other Attorney General who was arbitrary, and he was trying to bring about conformity in every way, shape and form, just completely arbitrary. Now, who is above him to correct him?

Attorney General CLARK. We worked for these 19 months under the Law Enforcement Assistance Act. There is complete discretion in the director there. He can grant or not grant. There are no criteria or standards set whatever, and we have not had any complaints of any type that you raise.

Senator THURMOND. In other words, he does have the discretion but you do not think he would be arbitrary, is that it?