UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

CITY OF PHILADELPHIA        .    Case No. 2:17-cv-03894-MMB
                            .
          Plaintiff,        .
                            .
                            .    U.S. Courthouse
      v.                    .    601 Market Street
                            .    Philadelphia, PA 19106
JEFFERSON BEAUREGARD        .
SESSIONS, III, Attorney     .
General of the United       .
States,                     .
                            .
          Defendants.       .
                            .    March 15, 2018
. . . . . . . . . . . . . ..    4:09 p.m.

                TRANSCRIPT OF TELEPHONE CONFERENCE
            BEFORE HONORABLE DAVID R. STRAWBRIDGE
                 UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:              JASMEET AHUJA, ESQ.
                            VIRGINIA GIBSON, ESQ.
                            HOGAN LOVELLS LLP
                            1735 Market Street, 23rd Floor
                            Philadelphia, PA 19103

                            LEWIS ROSMAN, ESQ.
                            CITY OF PHILADELPHIA LAW DEPARTMENT
                            1515 Arch Street, 17th Floor
                            Philadelphia, PA 19102



For the Defendant:         ARJUN GARG, ESQ.
                            AUGUST FLENTJE, ESQ.
                            US DEPARTMENT OF JUSTICE
                            10 Massachusetts Avenue NW
                            Washington, DC 20530


Audio Operator:            B. Johnson



**AEQUUM LEGAL TRANSCRIPTION SERVICES**
**480-241-2841**

TRANSCRIBED BY:          Eileen Dhondt, CET-807
                         Aequum Legal Transcription Services
                         6934 East Almeria Road
                         Scottsdale, AZ 85257

<pre>
 1                        PROCEEDINGS

 2        (Call to the Order of the Court)

 3        (Proceedings commence at 4:09 p.m.)

 4             THE COURT:  Okay, folks.  Good afternoon.  It's Judge

 5   Strawbridge.

 6             MS. AHUJA:  Good afternoon, Judge.

 7             THE COURT:  Ms. Gibson?

 8             MS. GIBSON:  Yes.  Good afternoon, Your Honor.

 9             THE COURT:  Okay.  And who was that first voice I

10   heard?

11             MS. AHUJA:  This is Jasmeet Ahuja also with the City

12   of Philadelphia, Your Honor.

13             THE COURT:  All right, Ms. Ahuja.  Okay.  And Mr.

14   Garg?

15             MR. GARG:  Good afternoon, Your Honor.  And also on

16   the line from the Department of Justice is August Flentje.

17             THE COURT:  Okay.  All right.  Good to have you all.

18   Okay.  So, I thank you very much for the letters that you have

19   provided to me.  I have been through them and I'm trying to look

20   at them from the perspective of what ought to be our next steps.

21   If I could break this down into categories.  I'm going to want

22   to hear from you all, but if you don't mind, I want to go

23   through this kind of in a particular order that I've laid out,

24   because it may well be that as a result of this conference, I'll

25   have to fashion an order, so I want to do that, so let's try to
</pre>

1  stay with -- and I trust I'll cover most of whatever else you

2  wanted to address with me, but if not, I'll give you ample

3  opportunity to do that at the end.

4          So, okay.  So the first thing which I think is

5  addressed principally by Mr. Garg would be the question with

6  respect to the categories of information that the City considers

7  to be relevant based upon its understanding and review of what

8  the requirements are and you've identified some of those.  Has

9  the -- does the Department of Justice agree with those

10  categories of information?  And I'm looking at the PARS and the

11  NCIC and the AFIS, you know, those things that are identified in

12  the letter.  Ms. Gibson, why don't you --

13          MR. GARG:  Your Honor, this is Arjun Garg.  So as far

14  as what the City has identified in there, I think we agree that

15  what the City has identified is relevant information for the

16  case.

17          THE COURT:  Right.

18          MR. GARG:  And Your Honor is going to get to this next

19  part.  Obviously, in our letter we suggested there might be --

20  first of all, within those issues, there's some areas of

21  unclarity (sic) for us.  There are other pieces where we think

22  that we have -- the last paragraph of our letter talking about

23  additional types of information.

24          THE COURT:  Yeah.

25          MR. GARG:  There were some other things the City --

1          THE COURT:  I am going to get to that, but you've

2    spotted -- you've spotted right on.  The issues that you raise

3    with respect to parts of it that you thought lacked clarity.

4    Let's talk a little bit about that and then I'll hear from Ms.

5    Gibson or Ms. Ahuja to respond.  I'm apologizing for butchering

6    your name again, Ms. -- can you say it one more time?

7          MS. AHUJA:  Sure.  It's actually just how it looks.

8    It's Ahuja.

9          THE COURT:  Ahuja.  Okay.

10          MS. AHUJA:  Yeah.  It's easier than it appears.

11          THE COURT:  All right.  Well, I apologize for that.

12    Go ahead, Mr. Garg.

13          MR. GARG:  Yes.  So just to pick through some of the

14    points and I hope this would all be clear from our letter so

15    nobody would be surprised by these.

16          Your know, under -- the City's letter I think

17    mentioned that there's a Pennsylvania state law that requires

18    collecting citizenship information.

19          THE COURT:  Uh-huh.

20          MR. GARG:  We have some sort of questions on the

21    City's process and policy on that.  One is in terms of process,

22    it's not clear to us whether Philadelphia police are or are not

23    collecting that information obviously from prisons.  So that's

24    one question we had.  Secondly, I'm not quite sure --

25          THE COURT:  Mr. Garg, let's do these one at a time.

1  Okay.  I think what you're talking about, so Ms. Ahuja, you're

2  familiar with what he's talking about I trust.

3          MS. AHUJA:  Yes, Your Honor.

4          THE COURT:  Okay.  So what's the answer to the first

5  question?  His first question.

6          MS. AHUJA:  Mr. Lewis, do you want to respond or would

7  you like us to respond?

8          THE COURT:  No.  I wanted you to respond.

9          MS. AHUJA:  Okay.  Great.  So in response to the first

10  question, it is clear both in what has been produced in

11  discovery that the starting point is the prisons, not the

12  police, that process information.  This is information that is

13  required to be collected at the time of admission by a county

14  prison facility.  So -- and Mr. Garg knows this was a part of

15  our discovery response, so the first step, police have no part

16  in this.  It is simply prisons.

17          And as far as we know and Mr. Garg, if I'm mistaken,

18  please correct me, at no point has ICE ever asked for this

19  information before or not ever, but currently is not asking.

20          THE COURT:  Okay.  So is this information -- is what

21  you're talking about a matter of protocol and if so, is it a

22  matter of protocol that is actually engaged in in regular

23  practice?

24          MS. AHUJA:  Your Honor, you're asking about us

25  collecting the information --

1          THE COURT:  Well --

2          MS. AHUJA:  -- yes, it is --

3          THE COURT:  Go ahead.  I'm sorry.

4          MS. AHUJA:  Sorry.

5          THE COURT:  You go ahead.  I'm sorry.

6          MS. AHUJA:  If I'm understanding your question

7    correctly, you are asking whether we collected information as a

8    part of general process and the answer is yes.  We are required

9    by state law that at the time that an inmate is admitted into

10   our prison facilities, we ask a variety of information, a

11   variety of fields they must answer and citizenship is one field,

12   so we -- it is self-reported so often times, you know, because

13   it's self-reported, we have no way to verify that information is

14   correct --

15         THE COURT:  Yeah.

16         MS. AHUJA:  -- and we do not verify once that

17   information is correct.

18         THE COURT:  Okay.  I did understand about that, but

19   Mr. Garg, does the statute that you're referring to, in your

20   judgment, obligate police to maintain or to gather this

21   information -- this kind of information?

22         MR. GARG:  No, Your Honor.  That was -- no, Your

23   Honor.  That was not our theory.  As far as I read the statute

24   and understand it, it's correct and only it does apply to

25   prisons.  I was focusing more on just a line I saw in the City's

1   letter that says the City does not collect citizenship or

2   immigration status information upon arrest, which I take it --

3   you know, I can accept that at face value.  I just didn't know

4   whether that was meant to signal probably speaking police just

5   don't collect this at all or whether there was any, you know,

6   anything there to clarify, and then what I'm hearing is that the

7   police don't collect this at all.

8           MS. AHUJA:  That is correct.

9           THE COURT:  Okay.  All right.  So we're going to rely

10  upon that and I remember the business before about how it is

11  part of the intake into the prison system.  Is this something --

12          MS. AHUJA:  Yes, sir.

13          THE COURT:  -- is this something that ends up in this

14  lock and track system?

15          MS. AHUJA:  Yes, Your Honor.  It does.

16          THE COURT:  Okay.  All right.  Good.  Okay.  So I

17  guess the next sort of question along these lines that I had,

18  and I'm happy for either of you to jump in as long as it's --

19  try to keep it related to where we are at least on my outline.

20  Is there other information, Mr. Garg, that the Department of

21  Justice believes that the City may be collecting that's not been

22  identified?  And I'm asking that just based upon the wide

23  variety of federal agencies that are involved in law enforcement

24  activity could impact upon ultimately being part of a prison

25  population, marshal service, US Attorney's Office, Pretrial

1  Services, probation department.  You know, all these sort of

2  things.  Is there anything within any of those entities that you

3  believe would contain relevant information that the City is or

4  may be -- collecting relevant information -- I guess relevant

5  information, you know, obviously to the subject matter of this

6  litigation.

7  　　　　　MR. GARG:  So, Your Honor, I would point to --

8  obviously, we have no idea what all might or might not be

9  collected and it's sort of -- obviously, it's possible to run

10  through an exhaustive list of every kind of information a city

11  would have.  What we were trying to do is in our -- it's on page

12  4 of our letter, is just come up with some specific types of

13  information that I honestly don't know whether the City has it,

14  but try to narrow down to here's specific things that we are

15  interested to have if you have this kind of information, and try

16  to come at it that way, rather than, you know, forcing the City

17  to cough up everything under the sun that it potentially might

18  have.

19  　　　　　THE COURT:  Well, I was --

20  　　　　　MR. GARG:  So I would point to the -- go ahead.

21  　　　　　THE COURT:  The reason why I addressed it the way that

22  I did was the thought that through the extensive contact that

23  you and your folks would have with all the various federal law

24  enforcement agencies, is there anything you gathered from that

25  that causes you now or, you know, Mr. Sessions, and through his

1  designees now, to be believe that the City may be collecting

2  that's not yet been identified?  And I'm hearing you to say --

3  I'm hearing you to say that's not an issue and there's not such

4  information.  Is that a correct -- would that be --

5          MR. GARG:  I think that's fair, Your Honor.  We're not

6  specifically contending that we know there's something the City

7  is doing that they're not -- that they're collecting and they're

8  not sharing.  We're not specifically contending that.

9          THE COURT:  Okay.  That was the point.  All right.

10 Now, I'm sorry.  I did interrupt you.  I think you were about to

11 say something else relevant to this.

12         MR. GARG:  Well, I was going to -- and, again, I think

13 your agenda is probably marching towards this, and I was going

14 to again get to the additional types of information we

15 identified in our letter for exploration.

16         THE COURT:  Yeah.  That's fine.  I think that fits

17 close enough to what it is that I want to do and you're

18 referring to your full bullet point items on page 4 of your

19 letter?

20         MR. GARG:  That's correct.  And this was just an

21 effort, you know, potentially have ICE -- look -- what --

22 specific kinds of information you can suggest that we should ask

23 the City about, not knowing what the City might or might not

24 possess, but what can we ask about to try to narrow this down,

25 and this is the list we came up with.

1           THE COURT:  Okay.  All right.

2           MR. GARG:  So it's really just a question to the City.

3    We don't know.

4           THE COURT:  Yeah.  All right.  I think it's a fair

5    question.  Ms. Ahuja, are you familiar with what he's talking

6    about on page 4 of his letter?

7           MS. AHUJA:  Yes, Your Honor.

8           THE COURT:  Okay.  Can you respond to those specific

9    items?

10          MS. AHUJA:  Yes.  I'll attempt to.  We are obviously

11   now post-discovery and this is not an area that we had focused

12   on.  We were focusing on citizenship information and the

13   collecting of that.  Having said that, the first two --

14          THE COURT:  I understand -- I completely understand

15   that, but I guess we're looking for information where these

16   things might be the type of information that could possibly be

17   within what's collected.

18          MS. AHUJA:  Right.

19          THE COURT:  So go ahead.

20          MS. AHUJA:  Right.  The first two that really as I see

21   more in terms of the police link, or clearly in terms of the

22   police link, there is no -- you know, there is no place in which

23   an individual when they're -- you know, when they're being

24   interviewed by the police for the police to input this type of

25   information in their standard form.  Right.  There's no field in

1  that form for foreign identification documents.  There's no

2  field for writing down, you know, an individual citizenship.

3           THE COURT:  Uh-huh.

4           MS. AHUJA:  Citizenship or immigration status.  We've

5  made that clear from the beginning of this litigation.  So as

6  far as we know, you know, that type of information is not

7  collected because there's no field for it to be collected,

8  processed and maintained.

9           Regarding whether an individual has --

10          THE COURT:  Before you leave that, would you say that

11  perhaps absent some exceptional circumstance, it's not the kind

12  of information you would have thought that the police --

13  Philadelphia Police Department would have gathered during any of

14  the investigative work it would do?

15          MS. AHUJA:  Right, Your Honor.  A police officer on

16  the street is always filling out forms in order to keep track of

17  who they're meeting, what they're encounting (sic), for their

18  own purposes, but also for later on, you know --

19          THE COURT:  Yeah.

20          MS. AHUJA:  -- for investigation purposes.

21          THE COURT:  Yeah.

22          MS. AHUJA:  And on those forms, there is no field for

23  them to write this type of information down.  It is the practice

24  of the City of Philadelphia not to collect immigration status.

25          THE COURT:  Yeah.  Okay.

1    MS. AHUJA:  So there then would not be access for nor

2    are there fields for foreign identification documents.

3    THE COURT:  Okay.

4    MS. AHUJA:  There is no field for, you know, any --

5    any field regarding citizenship --

6    THE COURT:  Right.

7    MS. AHUJA:  -- or immigration status, so they're not

8    collecting it.  Now, as you said under a circumstance if it

9    might arise, perhaps, but they're not actively -- there's no

10   place to store that in for the standard course of police

11   process.

12   THE COURT:  Uh-huh.

13   MS. GIBSON:  And there's no place for that

14   information -- if it is blurted in the course of the interview,

15   there's no place for it to be retrieved by someone else working

16   on another case.

17   THE COURT:  I understand.  I understand.  Okay.  You

18   were going to go under the third and fourth bullet, but I

19   interrupted you.

20   MS. AHUJA:  Right.  So that -- you know, whether an

21   individual has requested to speak with the consular official,

22   whether the individual has requested to speak with the US

23   Immigration official, this is not the type of information that

24   the police nor -- it's my understanding again.  We're

25   post-discovery, but as far as I know, the prison staff, either.

1    So at this point because the City defines confidential

2    information so broadly to include, you know, immigration status

3    or information related to one's immigration's status, I would

4    suspect that none of this information is collected and there

5    would be no field in any form used either by the police or by

6    the prisons to collect this.

7            So, you know, I can't say definitively, absolutely,

8    that it's never been tracked ever by the prisons, but as far as

9    I know, there's no form for them to do so and we've spent a long

10   time over the course of the litigation with our partners in the

11   prison, in the police, and this has never come up.

12           THE COURT:  Okay.  Anything else on that, Mr. Garg?

13           MR. GARG:  I appreciate all the statements from

14   counsel.  I do wonder, and I appreciate that there's no -- no

15   field for it on an intake form.  I'm looking -- I wonder if

16   that's a bit of a narrow way of looking at it and I'm really

17   just sort of thinking out loud here.

18           For example, the foreign identification documents that

19   might be -- the police arrest somebody on the street for

20   whatever kind of offense it is, I would imagine police are going

21   to look at whatever that person is carrying on him at that time,

22   whether it's -- whatever the contents of their wallet are, for

23   example.

24           So I don't know whether the assertion here is that,

25   you know, supposing somebody was walking out on the street, got

1   arrested, they were carrying a foreign ID document.  If the

2   assertion here is that the Philadelphia Police would not --

3   would basically just ignore that, wouldn't make a copy of it, I

4   mean, is that the suggestion to be made?  I don't know.  It

5   strikes me that might be that's it.

6           MS. GIBSON:  Arjun, I think the point (indiscernible)

7   is -- your question goes to is there a place where either the

8   police department or the Philadelphia prison collect and record

9   in a reasonable form information on immigration status.  And

10  you're correct that a wallet is put in a lock-up when a prisoner

11  -- when a person is arrested and the most in inventory I have

12  would be local and it would say wallet.  You know, so that's the

13  challenge.  There's no centralized database where the contents

14  of a wallet are enumerated, every kind of identification paper

15  or credit card or whatever be written down when the wallet was

16  taken from the prisoner during a search incident to arrest.

17          THE COURT:  All right.  Anything else on that, Mr.

18  Garg?

19          MR. GARG:  I don't think so at this time, Your Honor.

20          THE COURT:  And, by the way, I don't know if I said

21  this before, but we are on the record, so there's a

22  transcript -- a transcript is available to be prepared if any

23  party wants it and it will be available to you folks from an

24  audio perspective within a couple of days.

25          Okay.  So a propos of that, and I don't know if this

1  relates directly in order, but a propos of that, I'm not clear

2  as to whether or not within the -- you know, within the scope of

3  what -- I'm trying to interpret what it is that I'm supposed to

4  do and we're supposed to do together is the extent of whether or

5  not there is something which the Department of Justice thinks

6  the City should be doing relevant to this, and I do appreciate

7  that the question of providing notice and the question of access

8  are the two big questions in this area, but to put that aside

9  for just a moment.

10       But other than those two big things, is there

11  something that the Department of Justice says that the City

12  should be doing that the City is not doing?  And I'm looking at

13  this particularly in the context of gathering of information at

14  this point.

15       MR. GARG:  Your Honor, in terms of gathering

16  information, I mean, obviously we have big policy and legal

17  disagreements.  I don't think that there's an allegation in this

18  case that there's a legal requirement for Philadelphia to be

19  doing some collecting of information that it's not.  I don't

20  think that's the position we're asserting here.

21       THE COURT:  Okay.

22       MR. GARG:  So I don't know if I'd frame anything that

23  way.  Obviously, you're aware that we have disputes about, for

24  instance, the inmate consent form that's required for ICE, but

25  that's something we talked about before.  I don't know if we're

1  still going through those kinds of issues.

2       THE COURT:  Okay.  Well, no.  This is -- we'll get

3  those on the record here, but I was looking specifically with

4  respect to any other type of information.

5       So -- but moving ahead with this, and I don't know how

6  far you all have developed this, but the question with respect

7  to notice.  Right.  So you want the City to be able to provide

8  notice, as I understand it, within a 24 hour basis as to when

9  individuals would be released from custody as I understand it,

10  and I want to see where we are with respect to that in terms of

11  what there are that are facts in dispute with respect to this,

12  if I'm supposed to weigh in on some of that in some way, or to

13  the extent to which there's agreement.  If there is agreement,

14  obviously, I know and it's central to the case as to whether the

15  City should have an obligation to do that.

16       But has it -- has it come down to whether or not

17  anything more specifically than that or any way or any effort

18  that we might engage in to see whether or not the -- ICE would

19  be able to get the kind of information which would -- would

20  broadly fit within what you're looking for, but not as far as,

21  you know -- would not invade the protections that the City has.

22  And as I understand that, that would be related to something for

23  which there is a judicial -- judicial warrant that would be

24  pending, would be a reason of rationale, and also some issues

25  with respect to whether or not the nature of the offense that

1  the person had been released upon.

2         So talk to me a little bit about -- I mean I

3  understand what a judicial warrant is and I understand that

4  there are administrative warrants that the City draws a strict

5  distinction between those two things.  What I'm not clear about

6  100 percent is the extent to which the -- excuse me.

7         So I've got another phone ringing back here I'm trying

8  to get some control over.  So the other question then becomes --

9      (Judge confers with clerk)

10        THE COURT:  -- is how far we go with that and in

11 particular I wasn't clear as to the extent to which there's

12 action to be taken if there is a warrant which I think would

13 come from the immigration court judge calling for the removal of

14 someone which would have been the result of a judicial process.

15 Does that fit within the City's definition of a judicial warrant

16 as opposed to an administrative warrant?

17        MS. AHUJA:  No, Your Honor.  It does not.

18        THE COURT:  It does not.  So that is an administrative

19 warrant then.

20        MS. AHUJA:  Yes, Your Honor.

21        THE COURT:  Okay.  So if there had been a judicial

22 process and that judicial process was one which resulted in an

23 order for removal, that's -- and if that was information which

24 the City had -- the position of the City is that that should not

25 be turned over -- not be provided to ICE.

1          MS. AHUJA:  Your Honor, I think as a starting point,

2    the City doesn't get those types -- those types of orders.  We

3    would not get a warrant for removal as I understand what you're

4    saying -- an order for removal.  That wouldn't come to us.

5          THE COURT:  Well, okay.

6          MS. AHUJA:  We would get detainer issued by ICE --

7          THE COURT:  Okay.

8          MS. AHUJA:  -- asking perhaps with an accompanying

9    immigration warrant, but it's different than a removal order, so

10   to speak.

11         THE COURT:  Yeah.  All right.  Well, that's what is

12   going to help me get some clarity.  I don't -- maybe this is not

13   even an issue for you all.  But I'm certainly familiar from my

14   work with respect to ICE detainers.  So what I'm interested in

15   is to the extent that there is -- that's going to be a different

16   question.  The extent to which there is a warrant for some

17   prisoner's arrest who may or may not be an alien, probable cause

18   warrant issued by a judicial officer, that information is all

19   made available, and that's correct; is that right?

20         MS. AHUJA:  Yes, Your Honor.

21         MS. GIBSON:  The person is made available.

22         MS. AHUJA:  Yeah.  The person is made available, Your

23   Honor.  We would notify or in some way correspond with ICE if

24   there is an accompanying federal judicial warrant.

25         THE COURT:  Okay.  And have you had any discussions or

1  any discovery on the question of the business with respect to

2  the nature of the offense with which the individual is being

3  released and how that relates to information that's disclosed?

4          MS. AHUJA:  Yes, Your Honor.  We actually addressed

5  this with you in court, we've addressed this in our papers, and

6  I believe Judge Baylson also directly addressed it with the

7  Department.  The City clarified by a March 22nd, 2017 memorandum

8  from Brian Abernathy, excuse me, to the prison commissioner,

9  Commissioner Kearney that the City would comply with any federal

10 judicial warrant.  There was some confusion surrounding the

11 Mayor's initial executive order and Mr. Abernathy clarified that

12 and everyone has understood that to be the case, and we thought

13 that we clarified that with you with the Department together.

14 In fact, that was the first thing I raised when we were all

15 together in the room.

16         And Mr. Garg, I believe, at the time agreed and said

17 he understood.  We have since had some motion practice and he

18 had raised it again and we again clarified in our response that

19 this seems to be an issue that even Judge Baylson has addressed

20 and has said that there's no issue because the City would comply

21 with any federal judicial warrant.

22         So I'm not clear at this point what DOJ's concern is.

23         THE COURT:  Okay.  So I'm not necessarily saying this

24 comes from DOJ, so the first thing just to be clear.  When

25 you're talking about the session with me, you're talking about

1  when we had -- when we had the conference?

2       MS. GIBSON:  Yes, Your Honor.  The in-person

3  conference with the representative from ICE --

4       THE COURT:  Yeah.

5       MS. GIBSON:  -- the US Attorney's Office and Mr. Brian

6  Abernathy from the City.

7       THE COURT:  I got all of that.  What we didn't have

8  there was a record being made.  We had -- I have my notes and we

9  have this and that, so I'm trying to make sure that we get some

10 of these things on the record.

11      So, okay.  So -- and I'm remembering this now that you

12 had -- what you had said and what you had articulated before.

13      Mr. Garg, is there anything that you have with respect

14 to that question?  It sounds to me like particularly if Judge

15 Baylson has commented upon it, it's off the table at this point;

16 is that right?

17      MR. GARG:  Yeah.  And then I think that's right and

18 our own letter that we just submitted on March 13th acknowledged

19 that the City has made this clarification that is the subject of

20 our letter, so I don't think there's anything more to discuss on

21 that.

22      THE COURT:  Okay.  Good.  Yeah, I see that.  All

23 right.  Good.  Thank you for that.

24      Okay.  Is there anything more on the issue with

25 respect to the immigration -- of the detainers being -- being

1  saved, records being kept?  I understand there was some, I

2  thought, an open issue still with respect to that; the ICE

3  detainers.

4       MR. GARG:  So, Your Honor -- this is Arjun, Your

5  Honor.  I can just discuss that.  We've laid that out at page 3

6  of our letter.

7       THE COURT:  Yeah.

8       MR. GARG:  That's something where we received

9  information in discovery that raised a question for us.  It was

10  a prison official stating a directive that, and this is a

11  Philadelphia prison official obviously, stating a directive that

12  under no circumstances are we to lodge ICE detainers in lock and

13  track or put ICE detainers in the jackets.  That's obviously

14  using some, you know, City lingo that we don't fully understand

15  what that means, but our concern is, and it links up to

16  requirements of Section 1373 --

17       THE COURT:  Yeah.

18       MR. GARG:  -- the statute at issue.

19       THE COURT:  Yeah.

20       MR. GARG:  Our concern is ideally what ICE wants is

21  when they issue a detainer on an individual, the nature of the

22  prison system is individuals often get transferred around from

23  prison to prison.  Maybe they're in one state custody for some

24  crime and then after that, they get transferred to another state

25  in relation to another sentence they're serving.

1          In that kind of scenario, ICE wants the detainer to

2    follow that prisoner around so that whenever the prisoner

3    ultimately would be -- otherwise be released into, you know, the

4    general public after completion of all sentences, there would be

5    an opportunity to honor that detainer knowing that ICE is

6    interested in this person for purposes of removal.

7          And so we're concerned that the City's directive might

8    be blocking that kind of exchange of these detainers.  So it's a

9    question where we don't quite know what that statement means,

10   but it raised a concern in our mind, so we were looking for more

11   information about that.

12         THE COURT:  All right.  Can we get some clarity on

13   that, Ms. Ahuja or Ms. Gibson?

14         MS. AHUJA:  Your Honor, I'm a bit just perplexed by

15   Mr. Garg's request in that it seems to me that a detainer itself

16   does not represent citizenship or immigration status such

17   that -- I'm not certain how this relates to Section 1373.  I

18   understand what he has written down, but what he has written

19   down doesn't make it relatable.  So I'm not really certain what

20   to say outside of this does not relate to Section 1373 and that

21   is what we are on the call with you for, so I can't speak to

22   whether we maintain or not maintain.

23         MS. GIBSON:  In our view, whether the prison stores a

24   piece of paper about a prisoner and then transfers it to another

25   state or county with that prisoner is wholly irrelevant to

1    immigration status information being kept from ICE.

2         MS. AHUJA:  Particularly since it's ICE's information,

3    so we're just -- we're just questioning the whole paragraph

4    because it's perplexing to us.

5         THE COURT:  Yeah.  I get it.  Obviously, your comment

6    about it's ICE's information has not gone unnoticed with me.  I

7    take your point with respect to that.

8         Okay.  But I guess I can also understand to the extent

9    that there is a detainer which is meant to have some kind of

10   effect, are you saying that there is no reason to believe that

11   there's anything in the detainers that's going to provide any

12   information with respect to citizenship or immigration status or

13   -- maybe it's better for Mr. Garg if there are federal

14   detainers.

15        MR. GARG:  Your Honor, the form explicitly includes an

16   averment and I'm quoting from it that DHS has determined that

17   probable cause exists that the subject is a removable alien.  So

18   the purpose of the form is to advise you that this person is

19   here, DHS believes according to probable cause is here

20   unlawfully.  You know, when you have a statute covering

21   information regarding immigration status, to me, that seems

22   quite relevant that, you know, DHS has concluded that this

23   person -- there's probably cause, at least, to believe that this

24   person is here unlawfully.

25        That, to our mind, is clearly within the scope of

1  information regarding immigration status that is covered by the

2  statute.  And then you get into the statute's requirements

3  concerning maintenance and exchange of covered information.

4           THE COURT:  Okay.  Any response to that, Ms. Gibson?

5           MS. GIBSON:  Your Honor, first this was not something

6  asked in discovery, but with respect to whether an ICE detainer

7  sent from ICE to the City falls within the confidential

8  information that the City protects is something we just haven't

9  --

10          THE COURT:  You can't get your head around your

11  obligation to protect information you got from them?

12          MS. GIBSON:  Yeah.  Excuse me for being inarticulate.

13  Thank you for answering for me.

14          THE COURT:  And maybe -- I mean the scope of all this,

15  you know, from my perspective and both of you have said it

16  various times about discovery having been closed, and I'm

17  sensitive as to whether or not this process is somehow having an

18  impact upon what you all think is not particularly relevant at

19  this point in time.

20          But it does -- I mean it seems to me on one level, and

21  maybe this is not sort of outside the scope of the lawsuit, but

22  it seems to be generally relevant to the topic was the question

23  of, you know, when an ICE detainer is presented to -- when you

24  come into possession of an ICE detainer, that's something that

25  comes from the federal government, it's calling for you to take

1  some particular action with respect to if somebody is going to

2  be released from your institution; would that be right?

3          MS. GIBSON:  Yes.

4          THE COURT:  They have to respond to whatever it is

5  that's the subject matter of the detainer?

6          MS. GIBSON:  Well, that's the -- that's the legal

7  question if we were not to respond to the detainer, the City

8  does not interpret it as binding upon the City.

9          THE COURT:  Say that again.

10          MS. GIBSON:  The City does not interpret an ICE

11  detainer as binding upon the City.

12          THE COURT:  Okay.  All right.  And so that goes in

13  part to the distinction we talked about between a judicial

14  warrant and an administrative warrant?

15          MS. GIBSON:  Correct.

16          THE COURT:  Okay.

17          MS. GIBSON:  And I think Mr. Garg raises his question

18  of transferring a prisoner, not releasing a prisoner, but

19  transferring a prisoner to another facility outside the City of

20  Philadelphia, and that's not -- we're not keeping information

21  from ICE.  It's information ICE has.  This is about -- again,

22  what Mr. Garg is getting at, is the City informing ICE about the

23  location of the prisoner and for the same reason that the City

24  does not honor detainers when it releases the prisoner, they

25  could ultimately notify ICE on a transferred prisoner to another

1  facility.

2          THE COURT:  Yeah.

3          MR. GARG:  Your Honor, may I be heard?

4          THE COURT:  Yeah.

5          MR. GARG:  This is Mr. Garg for the record.  So I

6  think the -- I feel the discussion is veering off a little bit

7  at least on what I was getting at under the requirements of

8  Section 1373.  1373 not only deals with maintaining or

9  exchanging information with ICE, it also deals with exchanging

10 information with any other federal, state or local government

11 entity.

12          The idea here is that -- and I realize we have a

13 dispute over whether the immigration detainer form itself is or

14 is not covered information under the statute.  Assuming it is

15 covered information under the statute, the idea here is the

16 restriction or the concern the City has put on is that the way

17 they're directing that these immigration detainers be stored

18 ensures that they're never going to make it out of the City's

19 own possession when that prisoner gets transferred.  It's not

20 allowed to be transferred to another prison system because the

21 City is saying we can't put it on lock and track and we can't --

22 I'm trying to find the letter, and not put them in the jackets.

23 I don't know exactly what that language means.  That's why we're

24 asking for some clarity, but the idea we have here is the issue

25 of being stored away, never to see the light of day again, and

1  there's basically a prohibition on that form being exchanged

2  with other local government entities when that prisoner gets

3  transferred.

4          MS. AHUJA:  Your Honor, if I may speak to that

5  quickly.

6          THE COURT:  Yeah.

7          MS. AHUJA:  This is Ms. Ahuja.

8          THE COURT:  Go ahead.

9          MS. AHUJA:  The City of Philadelphia does not have a

10  policy in place prohibiting or restricting the maintenance, if

11  we were to use Mr. Garg's word, of detainer requests that

12  contain ICE provided citizenship information or immigration

13  status information.  We simply don't have a written policy in

14  place and as Ms. Gibson already discussed and as you know, the

15  Department did not pursue this in discovery.

16          THE COURT:  Okay.  All right.  I'm not sure I can take

17  that any further unless either of you have any more to say about

18  it.

19          MR. GARG:  Your Honor, I'll just raise two additional

20  points.  I don't want to beat a dead horse.  It's not just about

21  maintaining such information.  The words of the statute is

22  1373(b)(3), exchanging such information with any other federal,

23  state or local government entity.

24          THE COURT:  I get that.

25          MS. AHUJA:  And we still -- I was going to say, we

1    don't restrict it and we don't prohibit it.  Our policy --

2            MR. GARG:  I -- I -- well, I guess I don't know

3    (indiscernible).  The statement in the email we saw suggests to

4    us there is a restriction.  And, Your Honor, in terms of we

5    didn't take discovery on this, I guess it came to us in a

6    document that was produced to us so I guess we could take

7    follow-up discovery, but I envision that the point of this kind

8    of (indiscernible) would be to clarify some of these questions.

9            THE COURT:  Yeah, I agree.

10           MR. GARG:  I feel like that there's no more to say on

11   that and I'll leave it to Your Honor's --

12           THE COURT:  I do agree with that with respect to the

13   need for clarification, and I guess it's also the City's

14   position, Ms. Gibson, that this is not the kind of information

15   that is required under 1373 in any event?

16           MS. GIBSON:  Well, I think what 1373 says is there

17   shall not be a restriction.

18           THE COURT:  Yeah.

19           MS. GIBSON:  On the sharing of information and our

20   policy doesn't restrict sharing that information.

21           THE COURT:  Okay.  So that's as far as the discovery

22   went and there was never any questions asked with respect to

23   whether or not -- what the practicalities of this was in terms

24   of what usually happens.

25           MS. GIBSON:  Correct.  There were some limited

1  questions at the hearing of preliminary injunction on this issue

2  where Mr. Garg asked (indiscernible) Mr. Abernathy

3  (indiscernible) and that's what Mr. Garg is quoting in this

4  letter.

5          THE COURT:  And what was it Mr. Abernathy -- how did

6  he respond to that?

7          MR. GARG:  He just didn't know one way or another, so

8  --

9          THE COURT:  Okay.

10         MS. GIBSON:  It was a compound question asked and he

11  wasn't sure.

12         THE COURT:  Okay.  All right.  All right.  Let me see.

13  There was a reference made, and I had not looked at this

14  document before.  I think it was from you Mr. Garg in the City

15  Memorandum 08-09 in your -- Executive Order 8-09 on your second

16  page of your letter with respect to citizenship.

17         So give me the point there -- is there information

18  there that you're feeling is not -- is relevant to the --

19  relevant to the dispute here that is at the core of the dispute

20  or why the issue is in dispute?

21         MR. GARG:  Yes, Your Honor.  And this goes to -- so

22  the basic issue here is as (indiscernible) police, I think it's

23  acknowledged -- it's agreed that the prisons are collecting

24  information on the citizenship of individual inmates.  The

25  question then becomes will the City policy restrict or prohibit

1    sharing that information with ICE.  The policy that would seem

2    to do that if any is Executive Order Number 8-09 and we had

3    pointed that out and we have sort of been parallel to your

4    proceedings, Your Honor, in briefing a motion to dismiss, and we

5    pointed that out in our motion to dismiss that look, it seems

6    that the executive order doesn't allow the City to share this

7    information.

8         The response we got from the City suggests to us at

9    least that -- I don't think it's 100 percent clear, but it's

10   suggested, I think, that actually the executive order has

11   exceptions that do allow the prisons to share this information.

12   I think it would be helpful in terms of narrowing the issues to

13   just have a clear statement that yes or no, the City -- the City

14   interprets its own executive order to allow this or not.

15        And then I also said -- I'd be interested to know how

16   that applies to police, but if the assertion is that police

17   aren't collecting this kind of information, then that's

18   irrelevant.

19        THE COURT:  Yeah.  I think --

20        MR. GARG:  So it's really just getting clarity on what

21   the City thinks Executive Order 8-09 allows as to sharing -- the

22   prison sharing the citizenship information they collect.

23        THE COURT:  All right.  Now, you made reference -- was

24   this a subject of -- all right.  So there was a motion to

25   dismiss before Judge Baylson that he's recently ruled upon.  Is

1   that where this came up or some other --

2          MR. GARG:  Yes, Your Honor.  It came up in the

3   briefing there.  And there was a question -- again, that isn't

4   asked.  It wasn't directly on this very narrow question, but

5   there was testimony that we thought in the preliminary

6   injunction proceedings we thought tended to get the opposite

7   answer that the City would not share this information and the --

8   if the City is saying they do think the executive order allows

9   sharing this information, great.  We just want to be clear what

10  the City's position is one way or the other.

11         THE COURT:  All right.  I think I know the answer to

12  this, but let me ask -- let's ask Ms. Ahuja or Ms. Gibson.

13         MS. AHUJA:  This is Ms. Ahuja.  The City stands by its

14  papers.  We stand by what was written in our opposition to the

15  motion to dismiss on pages 52 and 53.  And we believe that there

16  is no prohibition on sharing this type of information.

17         THE COURT:  Is this -- is this the same thing that

18  goes into that lock and track system?

19         MS. AHUJA:  Yes, Your Honor.

20         THE COURT:  This is citizen -- citizenship information

21  provided by the individual themselves -- self-report.

22         MS. AHUJA:  Yes, Your Honor.

23         THE COURT:  Okay.  And is the lock and track system --

24  my recollection was this lock and track system is available to

25  federal agencies?

1          MS. GIBSON:  No, Your Honor.  It is not currently

2     available to federal agencies.  As we -- let me rephrase that.

3     It's currently not available to ICE.  ICE has not asked for it.

4          THE COURT:  Okay.  All right.

5          MS. GIBSON:  Whereas, for instance, with PARS, as you

6     know, Your Honor, the City has a memorandum of understanding as

7     well as a license user fee agreement with ICE with respect to

8     information the City collects and inputs into PARS.

9          THE COURT:  Yeah.  All right.  I suspect your belief

10    is that ICE hasn't asked for it because they know or believe, as

11    I understand you folks to believe, that the information that's

12    provided that self-report is notoriously unreliable?

13         MS. GIBSON:  Your Honor, I have no way to know why ICE

14    has not asked for it, but we would agree that, you know, if it

15    is self-reported, we do not verify it whatsoever.

16         THE COURT:  Yeah.  All right.  Okay.  All right.  The

17    question which -- is there anything further that you think can

18    benefit from this process on the question with respect to the

19    advice, if that's the right word, or the notice, rather, that's

20    given to inmates by the Department of Corrections with respect

21    to ICE interviews?  That seems to be issues squarely joined.  Is

22    it?  Is there anything on the edges there that is worth having

23    discussion about?  Does anybody think?

24         MS. AHUJA:  Not for the City, Your Honor.

25         MR. GARG:  Your Honor, I think it's the same for the

1   federal government.  I think we just have a disagreement there

2   (indiscernible) on that.

3           THE COURT:  Right.  Okay.  And, similarly, the

4   question with respect to the release -- providing release

5   information.  Any progress made with respect to that?

6           MS. AHUJA:  No, Your Honor.  I believe that's outside

7   the confines of Section 1373.

8           THE COURT:  Yeah.  And that's all been fully briefed

9   as I recall correctly; is that right?

10          MS. GIBSON:  Yes, Your Honor.

11          THE COURT:  All right.  All right.  Mr. Garg, anything

12  else you have?

13          MR. GARG:  Your Honor, I think you've covered the

14  waterfront.  I appreciate all fair attention given.

15          THE COURT:  Now I need your advice on what I do with

16  it.  All right.  Ms. Ahuja, anything further?

17          MS. AHUJA:  No, Your Honor.  I agree with my opposing

18  counsel on this.

19          THE COURT:  All right.  Ms. Gibson?

20          MS. GIBSON:  We're all in agreement finally, Your

21  Honor.

22          MR. GARG:  It had to happen eventually.

23          THE COURT:  Okay.  Thank you very much.  We're done.

24          MS. GIBSON:  Thank you, Your Honor.

25          MR. GARG:  Thank you very much, Your Honor.

1          (Proceedings concluded at 4:56 p.m.)

## CERTIFICATION

I, EILEEN DHONDT, court-approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.


_____

EILEEN DHONDT, CET 807
Aequum Legal Transcription

Dated:  March 22, 2018