## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| **THE CITY OF PHILADELPHIA,** | |
| *Plaintiff*, | |
| **v.** | **Case No. 2:17-cv-03894-MMB** |
| **JEFF SESSIONS, in his official capacity as Attorney General of the United States,** | |
| *Defendant.* | |

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

DATED:  April 13, 2018

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

WILLIAM M. MCSWAIN
United States Attorney

JOHN R. TYLER
Assistant Director

BRAD P. ROSENBERG
RACHAEL L. WESTMORELAND
ARJUN GARG
Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave, NW
Washington, DC 20530
Phone: (202) 514-3374
Fax: (202) 616-8460
E-Mail: brad.rosenberg@usdoj.gov
        rachael.westmoreland@usdoj.gov
        arjun.garg@usdoj.gov

*Counsel for Defendant*

## **TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................... 1

BACKGROUND ...................................................................................................................... 2

    A.  The Immigration and Nationality Act ................................................................. 2

    B.  The Office of Justice Programs and the Byrne JAG Program ................................. 4

    C.  Conditions on Byrne JAG Awards ....................................................................... 5

    D.  Additional Conditions for FY 2017 Byrne JAG Awards ........................................ 7

    E.  The City's Amended Complaint ........................................................................... 8

LEGAL STANDARD ............................................................................................................... 9

ARGUMENT ........................................................................................................................... 9

    I.   The City Does Not Challenge Final Agency Action That Is Judicially Reviewable ....... 9

    II.  The City's Ultra Vires and Separation of Powers Claims Fail Because the Challenged Conditions Are Authorized by Statute .................................................................. 12

    III. The Challenged Conditions Are Not Arbitrary or Capricious ...................................... 17

    IV. The Challenged Conditions Are Consistent with the Spending Clause ........................ 22

    V.  The Challenged Conditions Do Not Commandeer the City ......................................... 29

    VI. The Court Should Reject the City's Request for a Declaration That the City Complies with 8 U.S.C. § 1373 ............................................................................................. 31

    VII. Mandamus Relief Is Not Warranted .......................................................................... 40

CONCLUSION ...................................................................................................................... 43

## TABLE OF AUTHORITIES

**CASES**                                                                      **PAGE(S)**

*A.W. v. Jersey City Pub. Sch.*,
    341 F.3d 234 (3d Cir. 2003) ................................................................ 22

*Abbott Labs. v. Gardner*,
    387 U.S. 136 (1967) ........................................................................... 32

*Ali v. Fed. Bureau of Prisons*,
    552 U.S. 214 (2008) ........................................................................... 16

*Ameron, Inc. v. U.S. Army Corps of Eng'rs*,
    809 F.2d 979 (3d Cir. 1986) ................................................................ 12

*Arizona v. United States*,
    567 U.S. 387 (2012) ................................................................... passim

*Baccei v. United States*,
    632 F.3d 1140 (9th Cir. 2011) ............................................................ 39

*Bennett Enters., Inc. v. Domino's Pizza, Inc.*,
    45 F.3d 493 (D.C. Cir. 1995) .............................................................. 15

*Bennett v. Spear*,
    520 U.S. 154 (1997) ........................................................................... 10

*Benning v. Georgia*,
    391 F.3d 1299 (11th Cir. 2004) ........................................................... 27

*Bologna v. City & Cty. of San Francisco*,
    121 Cal. Rptr. 3d 406 (Cal. Ct. App. 3d Div. 2011) .............................. 33

*Charles v. Verhagen*,
    348 F.3d 601 (7th Cir. 2003) .............................................................. 27

*City of Chicago v. Sessions*,
    264 F. Supp. 3d 933 (N.D. Ill. 2017) ................................................... 16

*City of New York v. United States*,
    179 F.3d 29 (2d Cir. 1999) ........................................................... 30, 33

*Clinton v. City of New York*,
    524 U.S. 417 (1998)............................................................................................. 12

*Cost Control Mktg. & Mgmt., Inc. v. Pierce*,
    848 F.2d 47 (3d Cir. 1988)................................................................................... 10

*Del. Riverkeeper v. Simpson*,
    2008 WL 755947 (E.D. Pa. Mar. 17, 2008)......................................................... 11

*Dep't of Treasury v. Fed. Labor Relations Auth.*,
    494 U.S. 922 (1990)............................................................................................. 15

*Diamond v. Chakrabarty*,
    447 U.S. 303 (1980)............................................................................................. 27

*DKT Mem'l Fund Ltd. v. AID*,
    887 F.2d 275 (D.C. Cir. 1989).............................................................................. 12

*Dorley v. Cardinale*,
    119 F. Supp. 3d 345 (E.D. Pa. 2015) .................................................................... 9

*Duvall v. Att'y Gen. of U.S.*,
    436 F.3d 382 (3d Cir. 2006)................................................................................. 23

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009).................................................................................... 18, 21

*Food Service Dynamics, Inc. v. Bergland*,
    465 F. Supp. 1178 (E.D.N.Y. 1979) .................................................................... 42

*Freilich v. Bd. of Directors of Upper Chesapeake Health, Inc.*,
    142 F. Supp. 2d 679 (D. Md. 2001) ..................................................................... 30

*Freilich v. Upper Chesapeake Health, Inc.*,
    313 F.3d 205 (4th Cir. 2002) ............................................................................... 30

*FTC v. Standard Oil Co. of Cal.*,
    449 U.S. 232 (1980)............................................................................................. 11

*Geisinger Cmty. Med. Ctr. v. Sec'y U.S. Dep't of Health & Human Servs.*,
    794 F.3d 383 (3d Cir. 2015)................................................................................. 27

*Gregory v. Ashcroft*,
    501 U.S. 452 (1991)............................................................................................. 30

iii

*Heckler v. Ringer*,
    466 U.S. 602 (1984) ................................................................................ 41

*Impro Prods., Inc. v. Block*,
    722 F.2d 845 (D.C. Cir. 1983) .................................................................. 9

*Jennings v. Rodriguez*,
    138 S. Ct. 830 (2018) .............................................................................. 35

*Koslow v. Pennsylvania*,
    302 F.3d 161 (3d Cir. 2002) .............................................................. 22, 26

*Lockhart v. United States*,
    546 U.S. 142 (2005) ................................................................................ 16

*Massie v. HUD*,
    620 F.3d 340 (3d Cir. 2010) .................................................................... 41

*Mayweathers v. Newland*,
    314 F.3d 1062 (9th Cir. 2002) ................................................................ 28

*Naik v. Dir. U.S. Citizenship & Immigration Servs. Vt.*,
    575 F. App'x 88 (3d Cir. 2014) ............................................................ 9, 11

*New York v. United States*,
    505 U.S. 144 (1992) ................................................................................ 22

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) ...................................................................... 11, 41, 42

*Ocean Cty. Landfill Corp. v. EPA, Region II*,
    631 F.3d 652 (3d Cir. 2011) .................................................................... 11

*Oil, Chemical & Atomic Workers Union v. OSHA*,
    145 F.3d 120 (3d. Cir. 1998) .................................................................. 42

*Padilla v. Kentucky*,
    559 U.S. 356 (2010) ................................................................................ 23

*Pennsylvania Dep't of Human Servs. v. U.S. Dep't of Health & Human Servs.*,
    241 F. Supp. 3d 506 (M.D. Pa. 2017) ...................................................... 9

*Printz v. United States*,
    521 U.S. 898 (1997) .......................................................................... 30, 31

*Prometheus Radio Project v. FCC*,
  824 F.3d 33 (3d. Cir. 2016) ............................................................................... 42

*Rattlesnake Coal. v. EPA*,
  509 F.3d 1095 (9th Cir. 2007) ......................................................................... 10

*Raymond Proffitt Found. v. EPA*,
  930 F. Supp. 1088 (E.D. Pa. 1996) ..................................................................... 9

*Real Alternatives, Inc. v. Sec'y Dep't of Health & Human Servs.*,
  867 F.3d 338 (3d Cir. 2017) ............................................................................. 17

*Reno v. Condon*,
  528 U.S. 141 (2000) ......................................................................................... 30

*Safford Unified Sch. Dist. No. 1 v. Redding*,
  557 U.S. 364 (2009) ......................................................................................... 35

*Sawyer v. Sonoma Cty.*,
  719 F.2d 1001 (9th Cir. 1983) ......................................................................... 39

*South Dakota v. Dole*,
  483 U.S. 203 (1987) ........................................................................ 22, 26, 28, 29

*State Coll. Manor, Ltd. v. Commonwealth Dep't of Pub. Welfare*,
  498 A.2d 996 (Pa. Commw. Ct. 1985) ............................................................. 39

*Stone v. INS*,
  514 U.S. 386 (1995) ......................................................................................... 14

*Sydnor v. Office of Pers. Mgmt.*,
  2008 WL 1990808 n.8 (E.D. Pa. May 7, 2008) .................................................. 9

*Texas v. United States*,
  523 U.S. 296 (1998) ......................................................................................... 32

*U.S. Dep't of Health & Human Servs. v. Fed. Labor Relations Auth.*,
  844 F.2d 1087 (4th Cir. 1988) ......................................................................... 15

*United States v. Elkins*,
  683 F.3d 1039 (9th Cir. 2012) ......................................................................... 25

*United States v. Kebodeaux*,
  570 U.S. 387 (2013) ......................................................................................... 25

*United States v. Odneal*,
  565 F.2d 598 (9th Cir. 1977) ................................................................ 15

*United States v. State of California*,
  No. 2:18-cv-00490 (E.D. Cal.) ................................................................7

*United States v. Wise*,
  370 U.S. 405 (1962) ................................................................ 16

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
  567 U.S. 519 (2012) ................................................................ 29, 30

*Van Wyhe v. Reisch*,
  581 F.3d 639 (8th Cir. 2009) ................................................................ 28

*Wyatt, Virgin Islands, Inc. v. Gov't of the Virgin Islands*,
  385 F.3d 801 (3d Cir. 2004) ................................................................ 31, 32

**Statutes**

5 U.S.C. § 551 ................................................................ 9, 10

5 U.S.C. § 702 ................................................................ 9

5 U.S.C. § 704 ................................................................ 9, 11

5 U.S.C. § 706 ................................................................ 9, 40, 42

Immigration and Nationality Act,
  8 U.S.C. § 1101 *et seq.* ................................................................ 2

8 U.S.C. § 1226 ................................................................ 21, 24, 35

8 U.S.C. § 1227(a) ................................................................ passim

8 U.S.C. § 1228 ................................................................ 3, 30

8 U.S.C. § 1229b ................................................................ 36

8 U.S.C. § 1231 ................................................................ 4, 24, 33

8 U.S.C. § 1252c ................................................................ 4, 24

8 U.S.C. § 1305 ................................................................ 36

8 U.S.C. § 1324(c) ........................................................................................... 4, 24

8 U.S.C. § 1357 ............................................................................................... passim

8 U.S.C. § 1373 ............................................................................................... passim

18 U.S.C. § 1913 ................................................................................................... 28

20 U.S.C. § 4013 ................................................................................................... 31

28 U.S.C. § 510 ..................................................................................................... 14

28 U.S.C. § 530C(a) .............................................................................................. 13

28 U.S.C. § 1361 .......................................................................................... 40, 41, 42

31 U.S.C. § 1352 ................................................................................................... 28

34 U.S.C. §§ 10101 *et seq.* ............................................................................... passim

34 U.S.C. §§ 10151-58 ....................................................................................passim

34 U.S.C. § 10202(c) .............................................................................................. 6

34 U.S.C. § 10251(a) ..................................................................................... 5, 18, 22

34 U.S.C. §  10444(7) ........................................................................................... 14

Sex Offender Registration and Notification Act,
   34 U.S.C. § 20901 *et seq.* ............................................................................. 25

34 U.S.C. § 20927(a) ............................................................................................ 25

34 U.S.C. §§ 41307-08 .......................................................................................... 31

37 Pa. Code § 95.222 ............................................................................................ 37

41 U.S.C. § 4712 ................................................................................................... 28

**Rules**

Fed. R. Civ. P. 56(a) .............................................................................................. 9

**Regulations**

8 C.F.R. § 287.7 .............................................................................................. 34, 35

## **Other Authorities**

Exec. Order No. 13,688
   80 Fed. Reg. 3451 (Jan. 16, 2015) ........................................................................ 6

H.R. Rep. No. 109-233 (2005)..........................................................................13, 23

Joint Resolution Making Continuing Appropriations for FY 1985,
   Pub. L. No. 98-473, 98 Stat. 1837 (1984)................................................... 13

Omnibus Crime Control and Safe Streets Act of 1968
   Pub. L. No. 90-351, 82 Stat. 197 ................................................................ 4

S. Rep. No. 104–249 (2d Sess. 1996)..............................................................33

Violence Against Women and DOJ Reauthorization Act of 2005,
   Pub. L. No. 109-162, 119 Stat. 2960 (2006)............................................. 13

Department of Justice Appropriations Act, 2017,
   Pub. L. No. 115-31, 131 Stat. 135.........................................................5, 41

## INTRODUCTION

The City of Philadelphia has adopted local policies of non-cooperation that frustrate information-sharing between the City and the federal government regarding aliens in the City's law enforcement custody.  The City now also seeks to use this premature litigation to block the U.S. Department of Justice from promoting information-sharing and cooperation as a condition of participation in a federally-funded law enforcement grant program administered by the Department.  Such information-sharing and cooperation between local governments and federal agencies promotes effective law enforcement and, hence, furthering such efforts is entirely consistent with the federal grant program that is the subject of this litigation.

The Department notified applicants that Fiscal Year ("FY") 2017 awards under the Edward Byrne Memorial Justice Assistance Grant Program ("Byrne JAG Program") will include three conditions requiring modest cooperation with federal law enforcement prerogatives in the immigration setting.  Those conditions will require grantees to (1) have a policy of providing the U.S. Department of Homeland Security ("DHS") with advance notice of the scheduled release date of certain individuals held in state or local correctional facilities (the "notice condition"); (2) have a policy permitting federal agents to access state or local correctional facilities for certain immigration enforcement purposes (the "access condition"); and (3) comply with a federal statute, 8 U.S.C. § 1373, that prohibits state and local government and law enforcement entities or officials from restricting certain communications with DHS (the "compliance condition").  *See, e.g.*, Byrne JAG Program Grant Award for County of Greenville, SC ("2017 Greenville Award") (Dkt. No. 21-6) ¶¶ 53, 55, 56.

The call for intergovernmental law enforcement cooperation embodied in these three conditions follows from recognition that "[c]onsultation between federal and state officials is an important feature of the immigration system." *Arizona v. United States*, 567 U.S. 387, 411 (2012).

And the conditions are consonant with the Byrne JAG Program's purposes of ensuring that grantees "report such data . . . and information (programmatic and financial) as the Attorney General may reasonably require" and undertake "appropriate coordination with affected agencies." 34 U.S.C. § 10153(a)(4), (5)(C).  The City's suit nevertheless attacks the prospective imposition of these conditions, and seeks a declaration that the City complies with Section 1373.

Because the City's claims fail, the Court should grant summary judgment to Defendant. As a threshold matter, these claims prematurely seek to preempt the Department's administrative processes.  On their merits, the City's claims fail because they contravene clear statutory language authorizing the Department to condition Byrne JAG funding; ignore the close relationship between the grant conditions, federal law enforcement prerogatives, and the purposes of the Byrne JAG Program; and otherwise suffer from various legal defects.  At bottom, the City cannot sustain its counterintuitive theory that Byrne JAG applicants can insist on their entitlement to a federal law enforcement grant even as they refuse to provide basic cooperation in immigration enforcement, which the Department has identified as a federal priority and which plainly intersects with criminal justice under the framework of the Immigration and Nationality Act.  For all of these reasons, and as further explained below, summary judgment in Defendant's favor is appropriate.

## BACKGROUND

### A.     The Immigration and Nationality Act

Enforcement of the immigration laws, including and especially the investigation and apprehension of criminal aliens, is quintessentially a law enforcement function.  Through the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, Congress granted the Executive Branch significant authority to control the entry, movement, and other conduct of foreign nationals in the United States.  These responsibilities are assigned to law enforcement agencies, as the INA authorizes the Department of Homeland Security, the Department of Justice, and other Executive

Branch agencies to administer and enforce the immigration laws.  The INA permits the Executive Branch to exercise considerable discretion to direct enforcement pursuant to federal policy objectives.  *See Arizona*, 567 U.S. at 396.  A component of DHS, U.S. Immigration and Customs Enforcement ("ICE"), is "responsible for the identification, apprehension, and removal of illegal aliens from the United States."  *Id.* at 397 (citation omitted).

The INA includes several provisions that protect the ability of federal officials to investigate the status of non-citizens in the United States and otherwise enforce the immigration laws.  For example, the statute provides that a federal immigration officer "shall have power without warrant . . . to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States."  8 U.S.C. § 1357(a)(1).  Separately, pursuant to 8 U.S.C. § 1373, "a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual."  *Id.* § 1373(a).[1]  The INA provides that certain classes of non-citizens, including certain criminal aliens, shall be removed from the United States upon the order of the Attorney General or the Secretary of Homeland Security.  *See, e.g.*, *id.* §§ 1227(a), 1228.

The INA also establishes immigration enforcement as a cooperative endeavor among federal, state, and local law enforcement agencies.  *See, e.g.*, *id.* § 1357(g) (providing that DHS may enter into cooperative agreements with states and localities under which appropriately trained

---

[1]     Additionally, 8 U.S.C. § 1373(b) provides that "[n]otwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual: (1) Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service. (2) Maintaining such information. (3) Exchanging such information with any other Federal, State, or local government entity."

and qualified state and local officers may perform specified functions of a federal immigration officer in relation to the investigation, apprehension, or detention of aliens); *id*. § 1324(c) (authorizing state and local law enforcement officers to make arrests for violations of the INA's prohibition against smuggling, transporting, or harboring aliens); *id*. § 1252c (authorizing state and local officers to arrest certain felons who have unlawfully returned to the United States); *id*. § 1231(i) (establishing State Criminal Alien Assistance Program, under which the federal government compensates states and localities for their incarceration of certain criminal aliens).

### B.      The Office of Justice Programs and the Byrne JAG Program

Title I of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, established the Office of Justice Programs ("OJP") within the Department of Justice, and provides for OJP to be headed by an Assistant Attorney General ("AAG").  *See* Pub. L. No. 90-351, 82 Stat. 197 (codified as amended at 34 U.S.C. § 10101 *et seq.*).   Congress provided the AAG certain "[s]pecific, general and delegated powers," including the power to "publish and disseminate information on the conditions and progress of the criminal justice systems" and "maintain liaison with the executive and judicial branches of the Federal and State governments in matters relating to criminal justice." *Id.* § 10102(a)(1), (2).  Notably, the AAG shall also "exercise such other powers and functions as may be vested in [him] pursuant to this chapter or by delegation of the Attorney General, *including placing special conditions on all grants, and determining priority purposes for formula grants*." *Id*. § 10102(a)(6) (emphasis added).

The same title of the Omnibus Crime Control Act also established the Byrne JAG Program. *See generally* 34 U.S.C. §§ 10151-58.  Under this program, OJP is authorized to "make grants to States and units of local government . . . to provide additional personnel, equipment, supplies, contractual support, training, technical assistance, and information systems for criminal justice, including for any one or more of [certain enumerated] programs." *Id*. § 10152(a)(1).  In the same

4

chapter, the Omnibus Crime Control Act defines "criminal justice" broadly to include various activities of police, courts, correctional authorities, and "related agencies." *Id*. § 10251(a)(1).

To request funds under the Byrne JAG Program, applicants must "submit an application to the Attorney General . . . in such form as the Attorney General may require." *Id.* § 10153(a). Congress provided that these applications must include, among other things, an "assurance that, for each fiscal year covered by an application, the applicant shall maintain and report such *data, records, and information (programmatic and financial) as the Attorney General may reasonably require*"; "[a] certification, made in a form *acceptable to the Attorney General*, . . . that . . . there has been *appropriate coordination with affected agencies*;" and "[a] certification, made in a form acceptable to the Attorney General, . . . that . . . the applicant will comply with all provisions of this part and *all other applicable Federal laws*." *Id*. § 10153(a)(4), (5) (emphasis added).  Before issuing a final disapproval of an application under the Byrne JAG Program, the Attorney General must "first afford[] the applicant reasonable notice of any deficiencies in the application and opportunity for correction and reconsideration." *Id.* § 10154.

The Byrne JAG Program is a formula grant that, when awarded, must follow a statutory formula based on population, the rate of violent crime, and other factors.  *Id*. §§ 10152(a)(1), 10156.  Funding under the Byrne JAG Program is subject to annual appropriations that remain legally available for obligation until the funds are expended, without regard to fiscal year limitation.  For FY 2017, Congress appropriated $396,000,000 for the Byrne JAG Program, with certain carve-outs from that amount obligated to specific initiatives.  *See* Department of Justice Appropriations Act, 2017, Pub. L. No. 115-31, Div. B, Title II, 131 Stat. 135, 203.

### C.    Conditions on Byrne JAG Awards

OJP has historically included a variety of conditions in Byrne JAG award documents.  For example, OJP has imposed a condition that requires complying with certain guidelines and

recommendations enumerated by the Department to "promote information sharing and enable interoperability among disparate systems across the justice and public safety community."  Byrne JAG Program Grant Award for City of Philadelphia, PA ("2016 Philadelphia Award") (Dkt. No. 1-9) ¶ 26.  Multiple conditions have also imposed training mandates: certain training must be completed for law enforcement task forces, *see id.* ¶ 32; a grantee must agree to participate, upon request, in various training events, technical assistance events, or conferences, *see id.* ¶ 33; and quarterly data must be submitted regarding certain kinds of training that law enforcement officers have received, *see id.* ¶ 43.  Other special conditions historically imposed on Byrne JAG awards have been inspired by Executive Branch prerogatives, and in some instances resulted in *subsequent* congressional codification.  One such condition, which prohibits use of Byrne JAG funds to purchase military-style equipment, relates in part to an Executive Order issued by President Obama in 2015.  *See id.* ¶ 49; Exec. Order No. 13,688, 80 Fed. Reg. 3451 (Jan. 16, 2015).  Since 2012, other conditions have required that recipients (a) comply with specific national standards when purchasing body armor, and (b) institute a "mandatory wear" policy for any purchased armor.  *See* 2016 Philadelphia Award ¶¶ 38-39.  While those conditions have now been codified by Congress, *see* 34 U.S.C. §§ 10202(c)(1)(B), (C), they originated as exercises of the authority to impose special conditions.  And the Assistant Attorney General has imposed an "American-made" requirement for body armor purchases, something Congress did not choose to codify last year.  *See* 2016 Philadelphia Award ¶ 38.  The conditions attached to Byrne JAG awards have varied over time, depending on national law enforcement necessities and Department of Justice priorities.

In FY 2016, OJP included for the first time an explicit recognition that Section 1373 was an applicable federal law under the Byrne JAG Program.  *Id.* ¶ 53.  That recognition followed a report issued by the Department's Inspector General on May 31, 2016, expressing concern that several state and local governments receiving federal grants may not be complying with Section

1373.  *See* Mem. from Inspector Gen. to OJP, *Department of Justice Referral of Allegations of Potential Violations of 8 U.S.C. § 1373 by Grant Recipients* ("2016 OIG Report") (Exhibit A).[2]

OJP is in the midst of a review as to a number of jurisdictions for compliance with Section 1373.  In January 2018, OJP issued document requests to various Byrne JAG grantees.  *See* DOJ Press Release No. 18-81 (Exhibit B).  (OJP did not send such a request to the City of Philadelphia because of this Court's injunction.)  OJP continues to use the administrative process to gather facts about a number of jurisdictions' practices, and has not yet made a final determination that any jurisdiction does not comply with Section 1373.[3]  OJP has, however, advised a number of jurisdictions that it has found no evidence that they are out of compliance with Section 1373.[4]

### D.    Additional Conditions for FY 2017 Byrne JAG Awards

For the current Byrne JAG grant cycle, FY 2017, OJP notified applicants that awards under the Program will include three conditions requiring modest cooperation with federal law enforcement prerogatives in the immigration setting.  Those conditions will require grantees to (1) have a policy of providing DHS with advance notice of the scheduled release date of certain individuals held in state or local correctional facilities (the "notice condition"); (2) have a policy permitting federal agents to access state or local correctional facilities for certain immigration enforcement purposes (the "access condition"); and (3) comply with 8 U.S.C. § 1373, which, as noted above, prohibits state and local government and law enforcement entities or officials from

---

[2]    References to Exhibits in this brief refer to the exhibits attached to the Declaration of Brad P. Rosenberg that is being filed in support of Defendant's Motion for Summary Judgment.

[3]    Separate from OJP's administrative process, the Department has filed a lawsuit against the State of California alleging that certain California laws violate Section 1373.  *See United States v. State of California*, No. 2:18-cv-00490 (E.D. Cal.).

[4]    *See, e.g.*, DOJ Press Release No. 17-1140 (Exhibit C) (referencing Milwaukee County, WI; Clark County, NV; Miami-Dade County, FL; and the State of Connecticut).

restricting certain communications with DHS (the "compliance condition").  *See* 2017 Greenville Award ¶¶ 53, 55, 56.

The "Rules of Construction" within those grant conditions make clear that nothing in the notice or access conditions requires a grantee to detain "any individual in custody beyond the date and time the individual would have been released in the absence of this condition."  *See id.* ¶¶ 55, 56.  It is also clear that these conditions impose no requirements in relation to any requests by federal immigration authorities to detain aliens, and that the notice condition requires "only as much advance notice as practicable" before the release of an alien.  *Id.*  Finally, the conditions apply only to the "program or activity" to be funded under the award, and they allow awarded funds to be used for costs incurred in implementing the conditions.  *See id.*

E.     **The City's Amended Complaint**

The City brings six causes of action and seeks relief running only to the City itself rather than to Byrne JAG applicants generally.  Counts I through V challenge the legality of imposing the notice, access, and compliance conditions.  Count I alleges that imposition of the conditions is ultra vires conduct not authorized by statute.  *See* Am. Compl. (Dkt. No. 84) ¶¶ 113-21.  Count II asserts that the conditions violate the Constitution's separation of powers.  *See id.* ¶¶ 122-31.  Count III avers that the conditions are arbitrary and capricious.  *See id.* ¶¶ 132-35.  Count IV claims that the conditions violate the Spending Clause.  *See id.* ¶¶ 136-43.  Count V contends that the conditions commandeer the City in violation of the Tenth Amendment.  *See id.* ¶¶ 144-50.  On each of Counts I through V, the City seeks declaratory and injunctive relief from the three challenged conditions and a writ of mandamus compelling issuance of an FY 2017 Byrne JAG award to the City.  In Count VI, the City seeks a declaration that the City complies with 8 U.S.C. § 1373.  *See id.* ¶¶ 151-57.

## LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Where claims call for "judicial review under the Administrative Procedure Act ('APA')," as here, "summary judgment is the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review."  *Pennsylvania Dep't of Human Servs. v. U.S. Dep't of Health & Human Servs.*, 241 F. Supp. 3d 506, 511 (M.D. Pa. 2017) (citation omitted).

"[B]ecause the district judge sits as an appellate tribunal" regarding APA claims, the usual summary judgment standard does not apply" to such claims.  *Dorley v. Cardinale*, 119 F. Supp. 3d 345, 351 (E.D. Pa. 2015).  In adjudicating APA claims, a "court's review of agency action is limited to the full administrative record that was before the agency at the time it made its decision."  *Raymond Proffitt Found. v. EPA*, 930 F. Supp. 1088, 1102 (E.D. Pa. 1996) (declining to consider depositions and declarations in adjudicating APA claims brought under 5 U.S.C. § 706(2)(A)-(B)); *see also Sydnor v. Office of Pers. Mgmt.*, 2008 WL 1990808, at *3 n.8 (E.D. Pa. May 7, 2008) (holding over plaintiff's objection that "the Court must consider only the administrative record filed by" the defendant federal agency).

## ARGUMENT

### I.     The City Does Not Challenge Final Agency Action That Is Judicially Reviewable.

Inasmuch as the City's claims arise under the Administrative Procedure Act ("APA"), they are subject to the limit that "[t]he APA provides for judicial review of 'final agency action.'"  *Naik v. Dir. U.S. Citizenship & Immigration Servs. Vt.*, 575 F. App'x 88, 92 (3d Cir. 2014) (citing 5 U.S.C. §§ 702, 704).  As a preliminary matter, "[f]or there to be 'final' agency action, there must, of course, be 'agency action,'" as defined by 5 U.S.C. § 551(13).  *Impro Prods., Inc. v. Block*, 722

F.2d 845, 848-49 (D.C. Cir. 1983).  Once an appropriate "agency action" is identified, finality is reached only when the action in question (1) "marks the consummation of the agency's decisionmaking process," and (2) is "one by which rights or obligations have been determined, or from which legal consequences will flow."  *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted).

The City fails to identify an "agency action" within the meaning of the APA, much less one that is "final."  As relevant here, the APA defines "agency action" as "the whole or a part" of, *inter alia*, agency "relief . . . or [the] denial thereof," 5 U.S.C. § 551(13), and "relief," in turn, as including an agency "grant of money [or] assistance," *id*. § 551(11)(A).  Comporting with these definitions, in the context of agency grant-making in particular, "the congressional appropriation to [an agency] of funds for a particular project *does not constitute a final agency action* by the [agency] until the [agency] has *reviewed a grant application and decided to disburse the funds*." *Rattlesnake Coal. v. EPA*, 509 F.3d 1095, 1103-04 (9th Cir. 2007) (emphasis added).

At this time the Department has not yet acted on the City's FY 2017 Byrne JAG application and imposed any condition on an FY 2017 award to the City.  And by statute there is an administrative review-and-reconsideration process to be followed before "finally disapprov[ing]" the City's FY 2017 Byrne JAG application, until which time there is no final agency action on the City's application.  34 U.S.C. § 10154; *see also Cost Control Mktg. & Mgmt., Inc. v. Pierce*, 848 F.2d 47, 49 (3d Cir. 1988) ("Where Congress has provided a specific statutory administrative procedure, we are reluctant to provide an alternative judicial avenue to a party seeking review of an administrative finding or to one hoping to block an agency from exercising its power to investigate matters within its authority.").  As the Department has not determined whether to make an FY 2017 Byrne JAG award to the City, or deny its pending application, it follows that there is, as of yet, no final agency action for judicial review.

As concerns the City's challenge to the conditions, there has been no consummation of the Department's decisionmaking process, no determination of rights or obligations, and no legal consequence that flows. *Cf. Naik*, 575 F. App'x at 92 (finding no final agency action where agency "has yet to respond to or act upon" submission and has "not taken any action to officially deny" petition). An announcement of intent to impose the challenged conditions is a preliminary, interlocutory step in the grant-making process. Only an FY 2017 award to the City that contains the challenged conditions, "not intermediate decisions, will mark the 'consummation' of the agency's decisionmaking process." *Ocean Cty. Landfill Corp. v. EPA, Region II*, 631 F.3d 652, 656 (3d Cir. 2011); *see also* 5 U.S.C. § 704 ("A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action."). No such award has been made to the City. And precisely because the challenged conditions have not been imposed on the City in an FY 2017 Byrne JAG award, the City cannot have suffered legal consequences from the imposition of the conditions. An announcement of intent to impose the conditions does not require any action by the City before any such conditions have actually been included in an FY 2017 award to the City.

It is for good reason that "[w]ithout a final agency action," the City's "claims are not ripe for adjudication." *Del. Riverkeeper v. Simpson*, 2008 WL 755947, at *5 (E.D. Pa. Mar. 17, 2008). "The principal purpose of the APA['s] limitations . . . is to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve." *Norton v. S. Utah Wilderness All.* ("*SUWA*"), 542 U.S. 55, 66 (2004). "[T]he effect of the judicial review sought by [the City] is likely to be interference with the proper functioning of the agency and a burden for the courts." *FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 242 (1980) (finding no final agency action, and cautioning that APA review is not "a means of turning prosecutor into defendant before

11

adjudication concludes").  APA claims challenging the imposition of the three conditions thus fail because they do not challenge final agency action.

## II.     The City's Ultra Vires and Separation of Powers Claims Fail Because the Challenged Conditions Are Authorized by Statute.

Counts I and II of the Amended Complaint respectively allege that the challenged conditions are ultra vires, *see* Am. Compl. ¶¶ 113-21, and violate the Constitution's separation of powers, *see id*. ¶¶ 122-31.  Both theories rest on the City's incorrect view that Congress has not authorized the Department to impose these three conditions.

Congress of course may delegate to the Executive Branch the authority to attach conditions on funding.  *See, e.g.*, *Clinton v. City of New York*, 524 U.S. 417, 488 (1998) ("Congress has frequently delegated the President the authority to spend, or not to spend, particular sums of money."); *Ameron, Inc. v. U.S. Army Corps of Eng'rs*, 809 F.2d 979, 983 (3d Cir. 1986) ("Congress appropriates funds for a wide variety of purposes and delegates to executive branch officials the authority to make certain decisions regarding how those funds are to be spent."); *DKT Mem'l Fund Ltd. v. AID*, 887 F.2d 275, 280-81 (D.C. Cir. 1989) (upholding statutory delegation to the Executive to impose terms and conditions on federal spending programs).

Relevant to the administration of the Byrne JAG Program, Congress authorized the Department to "plac[e] special conditions on all grants," 34 U.S.C. § 10102(a)(6), to "determin[e] priority purposes for formula grants," *id*., and to ensure that grantees "comply with . . . all other applicable Federal laws."  *Id*. § 10153(a)(5)(D).  These capacious delegations of authority empower the Department to impose the challenged conditions to promote intergovernmental law enforcement cooperation, so that grantee policies do not impair federal policies.

A.     The Attorney General has "final authority over all functions, including any grants" made by the Department's Office of Justice Programs, which administers the Byrne JAG Program.

*Id*. § 10110.  Under the Attorney General's authority, an Assistant Attorney General heads OJP.  *See id*. § 10101; 28 U.S.C. § 530C(a)(4).  In setting forth the duties and functions of the AAG, Congress stated that the AAG is to "exercise such other powers and functions as may be vested in the Assistant Attorney General pursuant to this chapter or by delegation of the Attorney General, including placing special conditions on all grants, and determining priority purposes for formula grants."  34 U.S.C. § 10102(a)(6).  A plain reading of the statutory text indicates that the AAG's power must *include*, at a minimum, the power to "plac[e] special conditions on all grants" administered by OJP.  *Id*.  The breadth of the AAG's statutory power is reinforced by the AAG's authority to "determin[e] priority purposes for formula grants."  *Id*.  Confirming the statute's plain text, a report accompanying the enactment of this language stated that the provision "allows the Assistant Attorney General to place special conditions on all grants and to determine priority purposes for formula grants."  H.R. Rep. No. 109-233, at 101 (2005).

Indeed, the particular statutory language at issue here—the authority for "placing special conditions on all grants, and determining priority purposes for formula grants"—was added *as part of the very same legislation that created the Byrne JAG Program*.  *See* Violence Against Women and DOJ Reauthorization Act of 2005, Pub. L. No. 109-162, § 1152(b), 119 Stat. 2960, 3113 (2006) (adding language to subsection (a)(6)); *id*. § 1111 (creating Byrne JAG Program).  Prior to that 2006 enactment, the provision stated only that the AAG for OJP "exercise[s] such other powers and functions as may be vested in the Assistant Attorney General pursuant to this title or by delegation of the Attorney General."  Joint Resolution Making Continuing Appropriations for FY 1985, Pub. L. No. 98-473, § 603, 98 Stat. 1837, 2078 (1984).  The organic statute enacted in 2002 for the head of a separate Department grant-making component, by comparison, continues to contain substantially the same, more limited language as Section 10102 used to contain, without the additional "special conditions" and "priority purposes" powers that Congress elected to bestow

13

with respect to OJP.  *See* 34 U.S.C. § 10444(7) (providing only that Director of Violence Against Women Office "[e]xercis[es] such other powers and functions as may be vested in the Director pursuant to this subchapter or by delegation of the Attorney General").

This context confirms that Congress intended the "special conditions" and "priority purposes" language to confer distinctive and meaningful power.  The City has not explained why Congress would have added that language, if not to confer the authority described.  Another law *already* authorized the Attorney General to delegate the performance of his functions.  *See* 28 U.S.C. § 510.  The City's interpretation of the amendment thus gives no practical effect to either the "special condition" or "priority purpose" powers.  But "[w]hen Congress acts to amend a statute, [courts] presume it intends its amendment to have real and substantial effect."  *Stone v. INS*, 514 U.S. 386, 397 (1995).

**B.**    Independent of the authority conferred in Section 10102(a)(6), the Department has statutory authority to ensure that Byrne JAG grantees "comply with . . . all other applicable Federal laws."  34 U.S.C. § 10153(a)(5)(D).  This authority permits the Department to impose the compliance condition upon providing notice that Section 1373 is an "applicable" federal law.

The relevant statutory language provides that a Byrne JAG applicant "shall submit an application . . . in such form as the Attorney General may require," to "include . . . [a] certification, made in a form acceptable to the Attorney General . . . that . . . the applicant will comply with all provisions of this part and all other applicable Federal laws."  34 U.S.C. § 10153(a).  Congress's decision to empower the Attorney General to determine the form of Byrne JAG applications renders the most natural reading of this provision as a delegation to the Attorney General to determine whether a particular federal law constitutes an "applicable Federal law[]."  *Id.*  Under this power, the Department may condition Byrne JAG grants if it gives notice, as it provided here for Section 1373, that it has determined that a federal law is "applicable."

14

Courts have broadly interpreted the term "applicable laws." *See, e.g.*, *Dep't of Treasury v. Fed. Labor Relations Auth.*, 494 U.S. 922, 930 (1990) (interpreting statutory term "applicable laws" as "laws outside the Act" (emphasis omitted)); *see also Bennett Enters., Inc. v. Domino's Pizza, Inc.*, 45 F.3d 493, 497 (D.C. Cir. 1995) (noting that "all applicable laws" is "not reasonably or fairly susceptible to an interpretation that does not encompass compliance with state and federal tax laws"); *U.S. Dep't of Health & Human Servs. v. Fed. Labor Relations Auth.*, 844 F.2d 1087, 1094-95 (4th Cir. 1988) (finding statutory requirement that Executive Branch managers follow "applicable laws" to exclude federal agency circulars but to reach laws made by Congress); *United States v. Odneal*, 565 F.2d 598, 600 (9th Cir. 1977) (statutory reference to "all applicable federal laws" granted "very broad statutory authority").

The City artificially cabins "applicable Federal laws" only to those federal laws that, by their text, govern federal grantees. A more natural and coherent reading is that "applicable Federal laws" refers simply to the corpus of federal laws that actually do independently apply to Byrne JAG grantees. (8 U.S.C. § 1373 is, of course, one such law.) This natural reading is supported by the context of the Byrne JAG Program, where all grantees are state and local jurisdictions rather than private individuals or entities. The limitation in Section 10153(a)(5)(D) to "applicable Federal laws" accordingly restricts the Department from requiring certification of compliance with, for example, federal tax laws that by their terms apply to private individuals rather than to the state and local jurisdictions that the Byrne JAG Program contemplates as grantees. It is entirely sensible for Congress to have used the word "applicable" in Section 10153(a)(5)(D) with this meaning tailored to the class of potential grantees, and there is nothing implausible about Congress expecting a recipient of federal funds to certify its compliance with a federal law where the recipient is—independent of receiving those federal funds—already obligated to comply with that federal law. And this authorization does not confer unlimited discretion on the Department

15

because the Spending Clause is, of course, an independent bar—one that is met here—on what sorts of applicable federal laws may be the basis of a Byrne JAG grant condition.

If Congress had, as the City has asserted, intended to limit the term "applicable Federal laws" as referencing only statutes that by their text govern federal grantees, it could have done so expressly. The *ejusdem generis* canon does not support the City's interpretation because the structure of the phrase "all provisions of this part and all other applicable Federal laws" in Section 10153(a)(5)(D) "is disjunctive, with one specific and one general category, not . . . a list of specific items separated by commas and followed by a general or collective term." *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 225 (2008). Instead, as Judge Leinenweber found, "the prefatory term in § 10153(a)(5)(D), 'all other,' implies a broader meaning than that tolerated by the City's interpretation." *City of Chicago v. Sessions*, 264 F. Supp. 3d 933, 944 (N.D. Ill. 2017).

Judge Leinenweber also rejected the argument that the Department lacks the power it claims because the Department has allegedly not previously asked Byrne JAG grantees to comply with federal laws beyond those governing grantees. *Id*. at 945 ("[T]hat the Attorney General has not exercised authority does not necessarily speak to whether he possesses it, especially where the statutory terms embrace such an authorization.").

The City has also argued that Section 10153(a)(5)(D) should be interpreted in light of failed legislation that sought to tie federal funds to compliance with Section 1373. This Court, however, should "decline to read any meaning into" such later legislative efforts, as "failed legislative proposals are a particularly dangerous ground on which to rest an interpretation of a prior statute." *Lockhart v. United States*, 546 U.S. 142, 146-47 (2005) (quotation omitted); *see also United States v. Wise*, 370 U.S. 405, 411 (1962) ("[S]tatutes are construed by the courts with reference to the circumstances existing at the time of the passage. The interpretation placed upon

an existing statute by a subsequent group of Congressmen who are promoting legislation and who are unsuccessful has no persuasive significance here.").

The City further has suggested that the compliance condition is not authorized by statute because the Byrne JAG Program provides for formula grants rather than discretionary grants, but this argument confuses conditions on grant *eligibility*—such as the compliance condition—with the *formula* for allocating funds to eligible recipients.  Although deviation from the statutory formula for allocating funds among eligible jurisdictions is not permitted except in limited circumstances, *see* 34 U.S.C. §§ 10156-10157, the amount of a jurisdiction's award under that formula is unrelated to whether the jurisdiction has, in the first instance, demonstrated its eligibility to receive the funds by complying with a condition authorized by statute.  For similar reasons, the authority to impose the compliance condition does not make superfluous provisions of other statutory regimes that contemplate the Department withholding designated percentages of Byrne JAG funds as a penalty for noncompliance; such penalties operate on the allocation otherwise made by the statutory formula, irrespective of whether the Department has exercised its authority to set conditions of eligibility for grants.

## III.    The Challenged Conditions Are Not Arbitrary or Capricious.

Count III of the Amended Complaint claims that the challenged conditions are arbitrary or capricious in violation of the APA.  *See* Am. Compl. ¶¶ 132-35.  If the conditions are statutorily authorized and comport with the Spending Clause, however, it is unclear how "arbitrary or capricious" scrutiny could otherwise limit the Department's broad discretion.  In any event, "the standard for determining whether an APA violation exists under the arbitrary and capricious standard is substantially similar to rational basis review."  *Real Alternatives, Inc. v. Sec'y Dep't of Health & Human Servs.*, 867 F.3d 338, 353 (3d Cir. 2017).  The Supreme Court directs a "narrow standard of review" under which "a court is not to substitute its judgment for that of the agency,

and should uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513-14 (2009) (citation omitted). Where the action represents a shift in policy, the agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better." *Id.* at 515.

The challenged conditions easily meet this standard. The Byrne JAG Program's authorizing statute specifies that Byrne JAG funds are designed to provide resources "for criminal justice," 34 U.S.C. § 10152(a)(1), defined broadly as "activities pertaining to *crime prevention, control, or reduction,* or the enforcement of the criminal law, including, but not limited to, police efforts to prevent, control, or reduce crime or to *apprehend criminals*, . . . activities of courts having criminal jurisdiction, and *related agencies*," *id.* § 10251(a)(1) (emphases added). Such purposes are rationally advanced by facilitating federal access to aliens who have violated, or are suspected of violating, state or local criminal laws—if for no other reason than that once removed, an alien who has committed a removable criminal offense is undeniably no longer present in this country with the potential to re-offend. *See* 8 U.S.C. § 1227(a)(2) (providing that a criminal conviction for any of a wide array of criminal offenses renders an alien removable).

Further, the challenged conditions rationally promote interests in "maintain[ing] liaison" among tiers of government "in matters relating to criminal justice," 34 U.S.C. § 10102(a)(2), and comport with the intergovernmental cooperation that Congress contemplates in immigration enforcement. Indeed, the imposition of the challenged conditions is understandable as a result of a pair of investigations conducted the Department's Office of Inspector General ("OIG").

In 2007, the OIG conducted a congressionally-mandated audit concerning the cooperation of State Criminal Alien Assistance Program ("SCAAP") recipient jurisdictions in the removal of

criminal aliens from the United States.  *See* Cooperation of SCAAP Recipients in the Removal of Criminal Aliens from the United States ("2007 OIG Audit") (Exhibit D).  In conducting this audit, the OIG "interviewed ICE officials to obtain their views, distributed a questionnaire to 164 SCAAP recipients, and conducted independent testing in 7 jurisdictions that received SCAAP funding." *Id*. at PHLJAG-00005.  Relevant to compliance with 8 U.S.C. § 1373, "[t]he 99 jurisdictions that responded to the questionnaire stated almost unanimously that there was no legislation or policy impeding the ability of local officers and agencies to communicate with ICE on immigration-enforcement matters."  *Id*. at PHLJAG-00011.  Regarding seven jurisdictions that were studied further, "ICE officials objected to San Francisco's policies but they did not raise any concerns about the flow of information to and from any of the other six sites where we performed field work."  *Id*. at PHLJAG-00013.  The 2007 OIG Audit observed that "many state, county, and local law enforcement agencies are unwilling to initiate immigration enforcement but have policies that suggest they are willing to cooperate with ICE when they arrest individuals on state or local charges and learn that those individuals may be criminal aliens."  *Id*. at PHLJAG-00040-41.

Nine years later, the OIG issued a report in response to a request by the Department's Office of Justice Programs to examine allegations of potential violations of 8 U.S.C. § 1373 by grant recipients.  *See* 2016 OIG Report at PHLJAG-00366.  This 2016 review found deteriorating local cooperation with "efforts to remove undocumented criminal aliens from the United States." *Id*. at PHLJAG-00366-67 n.1.  The 2016 OIG Report advised that "the information we have learned to date during our recent work about the present matter differs significantly from what OIG personnel found nearly 10 years ago" when, in the 2007 OIG Audit, ICE officials had "commented favorably to the OIG with respect to cooperation and information flow they received from the seven selected jurisdictions, except for the City and County of San Francisco."  *Id*.  The 2016 OIG Report found that "each of the 10 jurisdictions" surveyed "had laws or policies directly related to

how those jurisdictions could respond to ICE detainers, and each limited in some way the authority of the jurisdiction to take action with regard to ICE detainers." *Id*. at PHLJAG-00369.  The City of Philadelphia was among the jurisdictions on which the 2016 OIG Report focused in explaining the deteriorated state of affairs.  *See id*. at PHLJAG-00368, 72, 73.  After examining various jurisdictions' policies, including one of the City of Philadelphia's policies, the OIG stated that, "based on our discussions with ICE officials about the impact these laws and policies were having on their ability to interact with local officials, as well as the information we have reviewed to date, we believe these policies and others like them may be causing local officials to believe and apply the policies in a manner that prohibits or restricts cooperation with ICE in all respects," which "would be inconsistent with and prohibited by Section 1373." *Id*. at PHLJAG-00373.  The 2016 OIG Report expressly recommended that the Department "[r]equire grant applicants to provide certifications specifying the applicants' compliance with Section 1373, along with documentation sufficient to support the certification." *Id*. at PHLJAG-00374.

In the FY 2016 grant cycle, the Department under the prior Administration introduced a requirement to certify compliance with Section 1373.  *See* 2016 Philadelphia Award ¶ 53 (special condition in Philadelphia's FY 2016 Byrne JAG award); 7/7/16 OJP Memorandum (Exhibit E) (stating determination that Section 1373 is an applicable federal law for Byrne JAG Program).

For the FY 2017 cycle, the Department maintained the compliance condition and added the notice and access conditions, and publicly offered a sound explanation for all three conditions. The Department's July 25, 2017 "Backgrounder on Grant Requirements" states that the conditions have a "goal of increasing information sharing between federal, state, and local law enforcement" so that "federal immigration authorities have the information they need to enforce the law and keep our communities safe."  Exhibit F.  The Backgrounder notes that some jurisdictions have "refus[ed] to cooperate with federal immigration authorities in information sharing about illegal

20

aliens who commit crimes," and states that the conditions will "prevent the counterproductive use of federal funds for policies that frustrate federal immigration enforcement." *Id.* The three conditions are "common-sense measures," *id.*, and "even in the absence of evidence, the agency's predictive judgment (which merits deference) makes entire sense" as "an exercise in logic rather than clairvoyance." *Fox Television*, 556 U.S. at 521.

Immigration enforcement undoubtedly relates to criminal justice. As further discussed below, *see infra* at 23-24, numerous federal statutes expressly tie these two subjects together—most centrally inasmuch as a conviction for any of a wide array of criminal offenses renders an alien removable from this country, *see* 8 U.S.C. § 1227(a)(2), and thus no longer present here with the potential to re-offend. *See* 2007 OIG Audit at PHLJAG-00014 (observing, in analyzing the recidivism of criminal aliens released from state or local custody, that if the examined "data is indicative," then "the rate at which released criminal aliens are rearrested is extremely high"). Accordingly, a July 25, 2017 press release by the Attorney General, accompanying the Backgrounder, stated opposition to policies that "protect illegal aliens who have committed crimes," and an intent to encourage jurisdictions "to change their policies and partner with federal law enforcement to remove criminals." DOJ Press Release No. 17-826 (Exhibit G).

For these reasons, the conditions rationally promote interests in "maintain[ing] liaison" among tiers of government "in matters relating to criminal justice," 34 U.S.C. § 10102(a)(2), and comport with the intergovernmental cooperation that Congress contemplates in immigration enforcement. *See, e.g.*, 8 U.S.C. §§ 1226(d), 1357(g), 1373; *Arizona*, 567 U.S. at 411-12 ("Consultation between federal and state officials is an important feature of the immigration system" and Congress "has encouraged the sharing of information about possible immigration violations." (citation omitted)). Because "the agency's reasons for" imposing the challenged conditions "were entirely rational," the City's claim fails. *Fox Television*, 556 U.S. at 517.

21

IV.     **The Challenged Conditions Are Consistent with the Spending Clause.**

Count IV of the Amended Complaint contends that the challenged conditions violate the Spending Clause because allegedly they are not germane to the Byrne JAG Program, *see* Am. Compl. ¶¶ 138-39, and are ambiguous, *see id*. ¶ 140.  These contentions are wrong.

A.     In *South Dakota v. Dole*, the Supreme Court stated that "conditions on federal grants might be illegitimate if they are unrelated to the federal interest in particular national projects or programs."  483 U.S. 203, 207 (1987) (citation omitted).  Courts have generally found that the relatedness showing does not pose a difficult hurdle.  The Supreme Court in *Dole* upheld conditioning receipt of federal highway funds on the only loosely-related requirement that a state adopt a minimum drinking age of twenty-one.  *See id*. at 208.  Only "some relationship" is necessary between spending conditions and "the purpose of the federal spending."  *New York v. United States*, 505 U.S. 144, 167 (1992).  To that end, the Third Circuit has required only "a discernible relationship" between a condition and a federal interest in a program, *Koslow v. Pennsylvania*, 302 F.3d 161, 175 (3d Cir. 2002), rejecting the argument that a "condition must be specifically tailored to a particular federal interest" and further rejecting any requirement "to make specific findings of relatedness in the text of the statute itself."  *A.W. v. Jersey City Pub. Sch.*, 341 F.3d 234, 241 (3d Cir. 2003) (citation omitted).

The grant conditions at issue here satisfy the relatedness requirement.  The Byrne JAG Program's organic statute specifies that Byrne JAG funds are designed to provide resources "for criminal justice," to support programs including law enforcement, prosecution, crime prevention, and corrections.  34 U.S.C. § 10152(a)(1).  These goals are also reflected in the responsibilities of the AAG, which involve "maintain[ing] liaison" and disseminating information regarding "criminal justice."  *Id*. § 10102(a)(1), (2).  As relates to these statutes, the term "criminal justice" is defined broadly to include various activities of the police, the courts, and "related agencies."  *Id*.

§ 10251(a)(1).  The conditions also comport with the Byrne JAG purposes of ensuring that grantees undertake "appropriate coordination with affected agencies," *id.* § 10153(a)(4), and "report such data . . . and information (programmatic and financial) as the Attorney General may reasonably require," *id.* § 10153(a)(5)(C).

Contrary to the City's view that the Byrne JAG Program's goal is to promote State and local flexibility, the program's overall goals are much broader: to support and strengthen law enforcement and criminal justice.  Unalloyed deference to purely local prerogatives and issues is self-evidently misplaced, as the Byrne JAG statute directs no such thing and under the City's theory it is unclear how any conditions on these federal funds would be constitutionally viable.  Even the legislative history that the City has cited talks only of "more flexibility" for State and local governments, not all-embracing local flexibility that leaves no room for federal prerogatives.  *See* H.R. Rep. No. 109-233, at 89 (2005).  And these conditions of eligibility do less to mandate a "one size fits all" approach than, for example, a Byrne JAG condition that for years has prohibited using award funds to purchase items on a Prohibited Expenditure List that includes various types of equipment and weapons that some law enforcement agencies might otherwise have wanted to acquire.  *See* 2016 Philadelphia Award ¶ 49.

Immigration enforcement, which the conditions promote, undoubtedly intersects with the Byrne JAG Program's criminal justice purposes, at a minimum for the simple reason that a conviction for any of a wide array of criminal offenses renders an alien removable from this country.  *See* 8 U.S.C. § 1227(a)(2).  Indeed, "[a] primary goal of several recent overhauls of the INA has been to ensure and expedite the removal of aliens convicted of serious crimes."  *Duvall v. Att'y Gen. of U.S.*, 436 F.3d 382, 391 (3d Cir. 2006) (citations omitted); *see also Padilla v. Kentucky*, 559 U.S. 356, 360 (2010) (observing that "deportation or removal is now virtually inevitable for a vast number of noncitizens convicted of crimes" (citation omitted)).  Once

removed, a criminal alien who has committed a removable offense—*e.g.*, an aggravated felony, domestic violence, child abuse, or certain firearm offenses—is no longer present in this country with the potential to re-offend.

The INA also contemplates cooperation among state and local officers and federal officials on immigration enforcement.  *See, e.g.*, 8 U.S.C.  § 1357(g) (authorizing formal cooperative agreements under which trained and qualified state and local officers may perform specified functions of a federal immigration officer in relation to the investigation, apprehension, or detention of aliens); *id.* § 1324(c) (authorizing state and local officers to make arrests for violations of the INA's prohibition against smuggling, transporting, or harboring aliens); *id.* § 1252c (authorizing state and local officers to arrest certain felons who have unlawfully returned to the United States).  Under authorities such as these, "state officers may perform the functions of an immigration officer."  *Arizona*, 567 U.S. at 408.

Furthermore, insofar as the INA contemplates the federal detention of certain aliens upon their release from state or local custody, *see* 8 U.S.C. § 1226(c), the conditions can be understood as seeking to ensure that a state or local grantee's law enforcement activities will not impair the law enforcement activities of the federal government.  Congress has mandated that certain aliens who have committed criminal offenses be taken into federal custody pending removal proceedings, but only "when the alien is released" from state custody.  *Id.* § 1226(c)(1).  With respect to incarcerated aliens subject to a final removal order, the INA establishes a "removal period" of 90 days that begins with the date of the alien's release.  *Id.* § 1231(a)(1)(B).  It is crucial to this cooperative law enforcement framework that states and localities respond to requests for release date information, allow federal agents to have access to detainees in their custody, and avoid restricting communication with DHS of information regarding immigration status.

Given that the INA expressly contemplates local law enforcement activity with respect to immigration law enforcement, it is perfectly germane and appropriate for the Department to condition grant funding to promote this purpose. Revealingly, a City official who oversees the City's Byrne JAG grants was unable to confirm that the City's use of Byrne JAG funding for re-entry services for formerly incarcerated individuals has not gone to support any alien regarding whom the City received a request from ICE as to that alien's immigration status. *See* 10/26/17 Hr'g Tr. (Dkt. No. 68) at 126:6-8, 137:8-15. And even the City's own arguments reflect that immigration enforcement bears some relationship to criminal justice, because the City connects its local immigration enforcement policies to the City's crime rates. *See* Am. Compl. ¶¶ 3, 30. While the City may disagree with the *substance* of the federal policy choices embodied by the challenged conditions, the undeniable *relationship* between these subjects is evident from the City's own positions linking them together.

It is no barrier that immigration enforcement is civil in nature, because the Spending Clause allows for the linkage of civil and criminal subject areas. Indeed, the federal Sex Offender Registration and Notification Act ("SORNA"), 34 U.S.C. § 20901 *et seq.*, is "a civil regulatory scheme rather than a criminal one," *United States v. Elkins*, 683 F.3d 1039, 1044-45 (9th Cir. 2012), but notwithstanding SORNA's civil nature, compliance with SORNA is directly tied to Byrne JAG funding. *See* 34 U.S.C. § 20927(a); *United States v. Kebodeaux*, 570 U.S. 387, 398 (2013) (observing with approval that SORNA "used Spending Clause grants to encourage States to adopt its uniform definitions and requirements").

Moreover, the requirements of the conditions are expressly limited "to the 'program or activity' that is funded (in whole or in part) by this award." 2017 Greenville Award ¶¶ 53, 55, 56.[5]

---

[5]     The text of the Section 1373 compliance condition is materially identical in limiting its requirements "to the 'program or activity' funded in whole or part under this award." 2017 Greenville Award ¶ 53.

25

Such a limitation has been noted approvingly by the Third Circuit.  *See Koslow*, 302 F.3d at 176 (noting that challenged condition "governs only a 'program or activity' receiving federal funds" and finding that this limitation helps satisfy "the 'relatedness' requirement articulated in *Dole*"). As relevant here, for example, the City's health commissioner confirmed that the City's Department of Public Health does not receive Byrne JAG funding, does not expect to receive Byrne JAG funding in the future, and has not in the past been asked by any City authority to ensure compliance with any Byrne JAG grant condition.  *See* 10/26/17 Hr'g Tr. at 156:17-25.

      **B.**     Another limitation on the spending power is that when the federal government "desires to condition the States' receipt of federal funds, it must do so unambiguously, enabling the States to exercise their choice knowingly, cognizant of the consequences of their participation." *Dole*, 483 U.S. at 207 (citation omitted).  The challenged conditions satisfy this requirement.

      Underscoring that the City has brought this dispute to the Court prematurely, the City's assertion of ambiguity in this litigation comes before the City has availed itself of administrative consultation that the Byrne JAG Program invites.  The FY 2017 Byrne JAG solicitation invited any prospective grantee with a question about "any . . . requirement of this solicitation" to contact OJP's Response Center (customer service center).  *See* Byrne JAG Program FY 2017 Local Solicitation (Dkt. No. 1-16) at 2.  A prospective grantee could also contact a "State Policy Advisor"—that is, a specific, named OJP employee assigned to work with jurisdictions within a specified geographical area.  *Id.*  Beyond this invitation in the FY 2017 solicitation, in each of the challenged conditions that appears in the award document for a prospective grantee to consider accepting, the Department has invited submission of "[a]ny questions about the meaning or scope of this condition . . . before award acceptance."  2017 Greenville Award ¶¶ 53, 55, 56.

      Regarding the notice condition's use of the phrase "scheduled release date," the condition is clear that a correctional facility must honor "a formal written request" "from DHS" "that seeks

advance notice of the scheduled release date and time for a particular alien in such facility," by providing "the requested notice to DHS" "as early as practicable."  2017 Greenville Award ¶ 56. The condition thus obligates the City to provide notice of the scheduled release of any alien inmate identified by DHS, regardless of the duration or nature of the alien's detention.  And the condition specifically contemplates situations in which aliens may be released with less than 48 hours' notice: if the City schedules a release with less than 48 hours' notice, for example, "it shall not be a violation . . . to provide only as much advance notice as practicable."  *Id.* ¶ 55.

With respect to the access condition, nothing in the text of the condition suggests such an exception turning on inmate consent; the condition requires access even if the inmate might decline to answer questions.

As to the compliance condition, there is no unconstitutional ambiguity concerning the City's obligations under a statute with which the City has been required to comply for over twenty years (entirely independent of any Byrne JAG award condition), and for which the City provided a certification of its compliance in the FY 2016 grant cycle.  *See* 6/22/17 City of Philadelphia Ltr. (Exhibit H).  "Broad general language is not necessarily ambiguous when congressional objectives require broad terms."  *Geisinger Cmty. Med. Ctr. v. Sec'y U.S. Dep't of Health & Human Servs.*, 794 F.3d 383, 393 (3d Cir. 2015) (quoting *Diamond v. Chakrabarty*, 447 U.S. 303, 315 (1980)). Moreover, the Department has given the City guidance via a preliminary assessment of the City's compliance with Section 1373.  *See* Dkt. No. 28-1, Ex. A.

To the extent there is any uncertainty at the margins of what any of the three conditions requires, such a penumbra does not make a condition unconstitutionally ambiguous.  Indeed, "the exact nature of the conditions may be largely indeterminate, provided that the existence of the conditions is clear, such that States have notice that compliance with the conditions is required." *Charles v. Verhagen*, 348 F.3d 601, 607 (7th Cir. 2003) (citation omitted); *see also Benning v.*

27

*Georgia*, 391 F.3d 1299, 1306 (11th Cir. 2004) ("Once Congress clearly signals its intent to attach federal conditions to Spending Clause legislation, it need not specifically identify and proscribe in advance every conceivable state action that would be improper." (citation omitted)); *Van Wyhe v. Reisch*, 581 F.3d 639, 650 (8th Cir. 2009) (finding notice requirement satisfied even where condition "provides a pliable standard"); *Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002) (finding notice requirement satisfied even where condition required compliance with a "standard [that] is perhaps unpredictable because it has resulted in different determinations in different courts").

By comparison, the City does not complain about other Byrne JAG conditions requiring compliance with restrictions on lobbying under 18 U.S.C. § 1913 and 31 U.S.C. § 1352, 2017 Greenville Award ¶ 19; compliance with "federal appropriations statutes" generally, *id.* ¶ 20; reporting of evidence of violations of the False Claims Act, *id.* ¶ 21; and compliance with prohibitions on reprisal under 41 U.S.C. § 4712, *id.* ¶ 23.  All those statutes on which unchallenged conditions are predicated could have some zone of uncertainty at the margin.  The conditions challenged here present no special problem of ambiguity that creates a constitutional infirmity.

**C.**     The Spending Clause does not authorize conditions that "induce the States to engage in activities that would themselves be unconstitutional." *Dole*, 483 U.S. at 210.  The City suggests that the conditions "arguably require cities to infringe on individuals' Fourth and Fifth Amendment rights."  Am. Compl. ¶ 141.  How the City thinks the conditions call for any such infringement is unclear.

The plain text of the notice and access conditions makes clear that "[n]othing in th[ese] condition[s] shall be understood to authorize or require any recipient . . . to maintain (or detain) any individual in custody beyond the date and time the individual would have been released in the absence of this condition."  2017 Greenville Award ¶¶ 55-56.  The conditions also clarify that "[i]n

28

the event that . . . the scheduled release date and time for an alien are such as not to permit the advance notice [of scheduled release] that DHS has requested, it shall not be a violation of this condition to provide only as much advance notice as practicable." *Id*.  These conditions explicitly contravene Fourth Amendment concerns, and the Constitution neither forbids DHS employees from accessing detention facilities nor forbids local government employees from providing DHS with certain detainee release information.  The City's theory thus lacks merit.

**V.      The Challenged Conditions Do Not Commandeer the City.**

The City alleges in Count V of the Amended Complaint that each of the challenged conditions would commandeer the City in violation of the Tenth Amendment.  *See* Am. Compl. ¶¶ 144-50.  But this case involves a grant that the City is free to accept or reject, not any federal mandate that directly regulates the City.   The relevant question here is not whether the grant conditions, if they were federally-compelled obligations of the City, would infringe the Tenth Amendment.   A "perceived Tenth Amendment limitation on congressional regulation of state affairs d[oes] not concomitantly limit the range of conditions legitimately placed on federal grants."  *Dole*, 483 U.S. at 210.  Instead, the only pertinent constitutional question presented is whether the grant conditions are a valid exercise of the Spending Clause power.  In that context, the federal government "may offer funds to the States, and may condition those offers on compliance with specified conditions.  These offers may well induce the States to adopt policies that the Federal Government itself could not impose."  *Nat'l Fed'n of Indep. Bus. v. Sebelius* ("*NFIB*"), 567 U.S. 519, 537 (2012).  Because the City may simply decline to participate in the Byrne JAG Program, the City's commandeering claim has no purchase here.

To any extent that the City could nevertheless proceed with an attack on Section 1373 as an independent statutory mandate, *see* Am. Compl. ¶ 147, that attack fails on its own merits.  As an initial point, "[t]he Government of the United States has broad, undoubted power over the

subject of immigration and the status of aliens." *Arizona*, 567 U.S. at 394 (citation omitted). "As long as it is acting within the powers granted it under the Constitution, Congress may impose its will on the States" and "may legislate in areas traditionally regulated by the States." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). And courts "begin with the time-honored presumption that [a statute] is a constitutional exercise of legislative power." *Reno v. Condon*, 528 U.S. 141, 148 (2000) (citation omitted).

Merely protecting the transmission of information to federal authorities does not "compel the State[] to enact or administer a federal regulatory program" or to "act on the Federal Government's behalf." *NFIB*, 567 U.S. at 575, 620. But Section 1373 *does* ensure that the Federal Government can carry out its statutory responsibilities to "interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States" and to remove the alien "upon the order of the Attorney General" after completion of criminal sentences. 8 U.S.C. §§ 1227(a), 1228, 1357(a)(1).

The Second Circuit has rejected a Tenth Amendment facial challenge to Section 1373. *See City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999). The Tenth Amendment does not give states and localities "an untrammeled right to forbid all voluntary cooperation by state or local officials with particular federal programs," particularly in the information sharing context. *Id*. at 34-35; *see also Printz v. United States*, 521 U.S. 898, 918 (1997) (contrasting federal statutes that "require only the provision of information to the Federal Government" with those that "force[] participation of the States' executive in the actual administration of a federal program"); *Freilich v. Bd. of Directors of Upper Chesapeake Health, Inc.*, 142 F. Supp. 2d 679, 697 (D. Md. 2001) ("This Court has found no case" holding that a statutory command to report information for a federal data bank "commandeers the state."), *aff'd sub nom. Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205 (4th Cir. 2002). The City's commandeering theory is especially diminished

here because the conditions allow a grantee to use awarded funds to cover the grantee's costs incurred in implementing the conditions.  *See* 2017 Greenville Award ¶¶ 53, 55, 56.

The City has relied on *Printz* in arguing that Section 1373 violates the Tenth Amendment. But Section 1373 is very different from the Brady Act that was challenged in *Printz*.  The Brady Act provisions at issue in *Printz* required local law enforcement officers to "make a reasonable effort to ascertain within 5 business days whether receipt or possession [of a handgun] would be in violation of the law" by conducting research in available databases, and to provide a written statement of the reasons for any contrary determination.  521 U.S. at 903.  Section 1373's protection of the exchange of information regarding aliens is in no way comparable to the detailed instructions and mandates of the Brady Act, and thus not fairly deemed to force the City "to enact or administer a federal regulatory program."  *Id*. at 926.  In fact, it was expressly recognized in *Printz* that federal statutes merely requiring "the provision of information to the Federal Government" were not before the Court.  *Id*. at 917-18.  Such federal statutes exist in other contexts.  *See, e.g.*, 20 U.S.C. § 4013 (requiring states to provide information on asbestos in schools); 34 U.S.C. §§ 41307-08 (requiring states to provide information on missing children).

## VI.  The Court Should Reject the City's Request for a Declaration That the City Complies with 8 U.S.C. § 1373.

Count VI of the Amended Complaint seeks a declaration that the City complies with 8 U.S.C. § 1373.  *See* Am. Compl. ¶¶ 151-57.  This claim is non-justiciable for lack of ripeness, and fails moreover because the City appears to violate Section 1373.

A.      Constitutional justiciability requires that a claim under the Declaratory Judgment Act must be ripe for judicial consideration.  *See Wyatt, Virgin Islands, Inc. v. Gov't of the Virgin Islands*, 385 F.3d 801, 805-06 (3d Cir. 2004).  Where the declaratory claim concerns governmental action, "[t]he purpose of the ripeness doctrine is to 'prevent the courts, through avoidance of

premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Id*. at 806 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967)).  The Declaratory Judgment Act is no exception to the rule that "[a] claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (citation omitted).

Here, the City's premature claim for declaratory relief preempts the administrative process that the Department has been conducting with the City regarding Section 1373 compliance.  In that process, the City has provided its explanation regarding whether it complies, *see* Exhibit H, the Department has responded with a "preliminary assessment" that expressly disclaims "final agency action," *see* Dkt. No. 28-1, Ex. A, the City has responded further, *see* Dkt. No. 61-1, and the Department has yet to render its final assessment.  In the remainder of that process, the Department could decide that the City does not violate Section 1373 and thus that Byrne JAG funds will not be withheld on that basis.  Under these circumstances, the City's request for a declaration that the City complies with Section 1373 is unripe, in that it "rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas*, 523 U.S. at 300 (citation omitted).

**B.**     The City's claim for declaratory relief further fails because City policies appear to violate Section 1373, as described below.[6]  This result holds even if any standard of "substantial compliance" with Section 1373 applies.

*First*, the City's Executive Order No. 5-16 (Dkt. No. 1-6) states in Section 1 that notice of a person's "pending release" from City custody shall not be provided, "unless such person is being

---

[6]     The Department emphasizes that it has not made its final determination about the City's compliance with 8 U.S.C. § 1373—a subject on which the Department is subject to this Court's preliminary injunction and has not completed administrative proceedings.

released after conviction for a first or second degree felony involving violence and the detainer is supported by a judicial warrant."  Dkt. No. 1-6.  This section restricts the sharing of "information regarding . . . immigration status" in violation of 8 U.S.C. § 1373(a).[7]

The City has represented that, despite the plain text of Executive Order No. 5-16, the City's cooperation does not depend on whether an individual was convicted of a first or second degree crime of violence, but rather that the City will cooperate when ICE presents a judicial criminal warrant.  *See* Pl.'s Proposed Findings of Fact in Supp. of Mot. for Prelim. Inj. (Dkt. No. 65) ¶ 16.  But it is doubtful that City employees understand that City policy allegedly is to cooperate with ICE when ICE presents a federal criminal warrant, regardless of whether a subject individual was convicted of a first or second degree felony involving violence.  As recently as February 2018, the City was continuing, in an official memorandum from the Commanding Officer of the City's

---

[7]      In enacting section 1373, Congress sought "to prevent any State or local law . . . that prohibits or in any way restricts any communication between State and local officials and the INS.'" *Bologna v. City & Cty. of San Francisco*, 121 Cal. Rptr. 3d 406, 414 (Cal. Ct. App. 3d Div. 2011) (quoting House report) (explaining further that congressional reports on section 1373 "demonstrate legislative intent to facilitate the enforcement of federal immigration law"); *see also City of New York*, 179 F.3d at 31-33 (discussing legislative history and purpose of § 1373).  Relevant legislative history of the 1996 amendments to the INA, which added section 1373, explains that "[t]he acquisition, maintenance, and exchange of immigration-related information by State and local agencies is consistent with, and potentially of considerable assistance to, the Federal regulation of immigration and the achieving of the purposes and objectives of the Immigration and Nationality Act."  S. Rep. No. 104–249, at 19-20 (2d Sess. 1996).  Information such as an alien's pending release from custody is "information regarding" immigration status within the contemplation of Section 1373, particularly where the release date implicates the federal authority to take custody pursuant to the removal statute in 8 U.S.C. § 1231.  That term does not merely denote an alien's technical immigration status, a reading that disregards the interrelationship between state custody and federal obligations.  Indeed, Congress's use of "information regarding" in section 1373(a) was intended to broaden the scope of the information covered, as demonstrated by comparing Section 1373(a) to Section 1373(c), which uses the different phrase "[immigration] status information."  8 U.S.C. § 1373.  Moreover, another provision of the INA, 8 U.S.C. § 1357(g)(10)(A), in fact defines the phrase "immigration status" to include whether "a particular alien is not lawfully present in the United States."  Whether an alien has been *released* from state or local charges is highly relevant to his "lawful presence" given that Congress has explicitly excepted DHS from its duty to remove *unlawfully* present aliens subject to final orders of removal *only* where those aliens are serving a criminal sentence in State or local custody.  *See* 8 U.S.C. § 1231(a)(4).

Police Detention Unit discussing City policy regarding ICE enforcement, to quote the plain text of Executive Order No. 5-16—including the requirement regarding conviction for a first or second degree felony involving violence.  *See* 2/7/18 Memorandum (Exhibit I).  Moreover, that memorandum states flatly that "ICE Agents are prohibited from entering the Police Detention Unit for the purpose of interviewing prisoners"—with no exception for when ICE presents a federal criminal warrant.  *See id*.  This memorandum does not square with an assertion that the City will cooperate with ICE in all circumstances where a federal criminal warrant is presented.  *Cf*. Police Memorandum 01-06 (Dkt. No. 1-3) ¶ III(C) (stating that the "Philadelphia Police Department will continue to cooperate with federal authorities in investigating and apprehending immigrants suspected of criminal activities."); Pl.'s Proposed Findings of Fact in Supp. of Mot. for Prelim. Inj. ¶ 10 (asserting that "the City believes that when 'someone is engaging in criminal activity, than that changes the game,'" and that "[t]he City has 'no interest in withholding . . . information from any federal authorities' when it comes to people who pose law enforcement threats").

Even setting aside the element regarding the nature of the conviction that the City asserts is not actually a consideration, the City's prerequisite of a judicial warrant in order to provide notice to ICE of a person's pending release from custody is problematic by itself.  The mechanism that ICE uses to request notification before a person is released from custody is an immigration detainer, which includes a request to "[n]otify DHS as early as practicable (at least 48 hours, if possible) before the alien is released from your custody."  DHS Form I-247A (Exhibit J); *see also* 8 C.F.R. § 287.7.  Under ICE policy, and as is clear from the face of DHS Form I-247A, ICE's detainers are premised on the existence of probable cause to believe that the individual is a removable alien.  *See* ICE Policy No. 10074.2 ¶¶ 5.1 (Exhibit K).  The standard of probable cause that ICE applies for issuing detainers corresponds to the Supreme Court's articulation of the probable cause standard.  *Compare* ICE Policy No. 10074.2 ¶¶ 3.3 (defining "probable cause" for

issuing an ICE detainer) *with Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 370 (2009) (articulating probable cause standard generally).

Even though ICE's requests for notification are predicated on a probable cause determination, the City nonetheless imposes the requirement of a judicial warrant. This is a significant restriction because, as the City knows, *see* 10/26/17 Hr'g Tr. at 97:12-98:4, 105:18-23, an immigration detainer is issued pursuant to an administrative warrant rather than a judicial warrant. *See* ICE Policy No. 10074.2 ¶¶ 2.4, 5.2; *see also* 8 C.F.R. § 287.7. A judicial warrant would only be available if criminal proceedings were being pursued. Removability is a civil matter for which no judicial warrant is provided for by the Immigration and Nationality Act ("INA"), which instead contemplates arrest pursuant to an administrative warrant. *See Jennings v. Rodriguez*, 138 S. Ct. 830, 837 (2018) (The INA "sets out the default rule: The Attorney General may issue a warrant for the arrest and detention of an alien 'pending a decision on whether the alien is to be removed from the United States.'" (quoting 8 U.S.C. § 1226(a))).

There is no Fourth Amendment or Tenth Amendment rationale that necessitates forcing ICE to go through the exercise of obtaining a judicial warrant (if a judicial warrant is even obtainable) before a City employee is permitted to provide information about the City's pending release of a particular alien. Indeed, as recently as 2015, a since-rescinded Executive Order of the City contemplated that, under various circumstances where a judicial warrant was absent, "[u]pon request of ICE with respect to a particular person in the custody of the City, the City shall provide notice to ICE of that person's impending release from custody." Executive Order No. 7-15 (Exhibit L). Now, for any convict, whatever that convict's crime is (including even rape or murder), if the convict is convicted with a sentence of less than two years, that convict could be held in the City's prison system, and such a convict who is an alien would not have information about his pending release transmitted to ICE by the City unless the request from ICE was supported

by a judicial warrant as opposed to an immigration warrant. *See* 10/26/17 Hr'g Tr. at 105:18-106:2, 106:6-11, 107:18-25. The City would not honor an immigration warrant even if it was issued by an immigration judge. *See id.* at 97:17-98:4.

To be clear, the City does not contend that its asserted sharing of information about criminal suspects with the federal government through the use of three databases provides the federal government with notice of the City's upcoming release from custody of any detained individual. *See* Pl.'s Resp. to Def.'s Interrog. No. 3 (Exhibit M). Furthermore, it is of no consequence that for some portion of its detainees who are in temporary lock-up the City may not know a release date; what matters is that a sizable portion of detainees do have a known release date, that for other detainees the City could still provide an estimated or emergent release date/time, and that for all detainees the City has restricted the sharing of custody release information by imposing the prerequisite of supplying a judicial warrant.

*Second*, a City official testified during preliminary injunction proceedings that, when the City releases a prisoner, the City does ask the prisoner for an address where the prisoner is going to live, but the City will not share that information with ICE unless ICE's request for that information arises in the context of ICE pursuing an active criminal investigation (as distinct from civil immigration enforcement). *See* 10/26/17 Hr'g Tr. at 117:4-118:10. This information is an aspect of "information regarding . . . immigration status" under 8 U.S.C. § 1373.[8] ICE's need for such information (in order to, among other things, track and apprehend a subject individual after release from custody) is driven by the City's non-cooperation in providing advance notice of release from City custody (which would allow ICE to take custody of a subject individual directly

---

[8]    See *supra* at 33 n.7. An alien's address is "information regarding" immigration status within the contemplation of Section 1373, because it is relevant to immigration status issues such as whether the alien has kept DHS informed of any change of address as required under 8 U.S.C. § 1305, and whether an alien has accrued the necessary continuous presence to be eligible for relief from removal, *id.* § 1229b(a)(1), (a)(2), (b)(1)(A).

from City custody in an orderly fashion, rather than requiring a potentially dangerous at-large apprehension).  The City has not suggested that the address information that the City collects from prisoners upon release is made available to ICE through law enforcement databases.  And the City's witness acknowledged that an address collected upon a prisoner's release may differ from such an address as might earlier have been collected by City police and reported in the PARS database.  *See id*. at 117:14-16.

**Third**, the City's Executive Order No. 8-09 states in Section 3 that City officers and employees "shall [not] disclose" information "relating to an individual's immigration status," unless certain exceptions apply.  Dkt. No. 1-4.  Pursuant to 37 Pa. Code § 95.222, the Philadelphia Department of Prisons is required to and does collect data on the country of citizenship of each new inmate upon admission.  *See* Pl.'s Resp. to Def.'s Interrog. No. 1 (Exhibit M).  Such information falls within the scope of "information regarding the citizenship or immigration status, lawful or unlawful, of any individual" under 8 U.S.C. § 1373, and the City thus cannot restrict its officials and employees from sharing that information with ICE.  The City has suggested in briefing that the enumerated exceptions in Executive Order No. 8-09 would allow for this citizenship information to be shared with ICE, but the actual record evidence that is available—in the form of a responsible City official's testimony—indicates that the prisons do *not* share such information.  10/26/17 Hr'g Tr. at 111:5-12.

**Fourth and fifth**, the apparent confusion in the City's position underscores other problems.  As discussed, Section 3 of Executive Order 8-09 (Dkt. No. 1-4) states that the City's officers and employees "shall [not] disclose" information "relating to an individual's immigration status" unless certain exceptions apply, including when "required by law."  Separately, Section III.A of Police Memorandum No. 01-06 (Dkt. No. 1-3) states that officers shall not transmit "information regarding an immigrant" unless "required by law" or certain other exceptions apply.  In order to

37

comply with 8 U.S.C. § 1373, the City would need to certify that it interprets and applies each of these policies to not restrict its officers and employees from sharing information regarding immigration status with federal immigration officers, and furthermore the City would need to certify that it has communicated this interpretation to its officers and employees.  But the City interprets and applies Executive Order No. 8-09 to restrict its officers and employees from sharing information regarding immigration status with federal immigration officers. *See* 10/27/17 City of Philadelphia Ltr. (Dkt. No. 61-1) at 3-4; 10/26/17 Hr'g Tr. at 111:22-112:1.  The City likewise interprets and applies Police Memorandum No. 01-06 to restrict its officers and employees from sharing information regarding immigration status with federal immigration officers. *See* 10/27/17 City of Philadelphia Ltr. at 3-4.  The City has not advised or trained its employees that they may in response to a request from ICE communicate information regarding immigration status to ICE with respect to any alien in the City's custody. *See id.* at 111:5-18.  And the City does not specifically reference 8 U.S.C. § 1373 in its training or advice given to city employees regarding the dimensions of what information is allowed to be shared with federal immigration authorities. *See id.* at 57:21-58:3, 110:16-111:4.  Moreover, although the City has touted its sharing of information about criminal suspects with the federal government through the use of three databases, the City concedes that its asserted sharing of information in that manner does not provide the federal government with such information as the City possesses on the immigration status of such individuals. *See* Pl.'s Resp. to Def.'s Interrog. No. 2 (Exhibit M).

*Sixth*, Executive Order No. 8-09 states at Section 2(b) that police officers "shall not . . . inquire about a person's immigration status," unless certain limited exceptions apply.  The City has asserted that this provision does not bar City officers from requesting information regarding immigration status from federal immigration officers—a restriction that would violate 8 U.S.C. § 1373. *See* 10/27/17 City of Philadelphia Ltr. at 3.  But the City as of October 26, 2017 had not

advised or trained its employees that they may inquire with ICE regarding a person's immigration status. *See* 10/26/17 Hr'g Tr. at 113:2-19. In order to comply with 8 U.S.C. § 1373, the City would need further to show that it has communicated this interpretation to its officers and employees, which the City's letter expressed a willingness to do. *See* 10/27/17 City of Philadelphia Ltr. at 3 n.2.

The City would not be rescued from the above-discussed violations by a standard of "substantial compliance" with Section 1373, if that doctrine applies at all here. In the first instance, substantial compliance is inapplicable to a party's failure to fulfill substantive statutory requirements. *See Baccei v. United States*, 632 F.3d 1140, 1145 (9th Cir. 2011) ("Full compliance is necessary when the requirement relates to the substance of the statute." (quoting *Sawyer v. Sonoma Cty.*, 719 F.2d 1001, 1008 (9th Cir. 1983))); *State Coll. Manor, Ltd. v. Commonwealth Dep't of Pub. Welfare*, 498 A.2d 996, 999 (Pa. Commw. Ct. 1985) ("[T]he doctrine of substantial performance will not excuse . . . failures of omission, important or otherwise, with regard to the requirements of a substantive regulation having the force and effect of law."). In any event, the substantial compliance doctrine would not excuse the City's deliberate decisions not to comply with a statutory requirement (as distinct from the failure of good-faith efforts to achieve perfect compliance), nor does it allow the City to immunize its deliberate non-compliance on the basis of various other cooperation that the City provides apart from the requirements of Section 1373.

Rather than constituting any minor misstep, the City's mandates of non-cooperation can mean that aliens convicted of crimes are released back into the community where they may re-offend, rather than into ICE custody to face removal proceedings. The City has declined to honor immigration detainer or notification requests concerning, and instead released into the community, three individuals who had been serving sentences in City custody after being convicted of crimes including: contact with minor, corrupting morals of minor, indecent assault, false imprisonment,

terroristic threats, simple assault, robbery, possession instrument of crime, criminal attempt, theft unlawful taking movable property, manufacture, delivery or possession with intent to manufacture or deliver, and conspiracy to manufacture.  *See* Pl.'s Supp. Resp. to Def.'s Interrog. No. 5 (Exhibit N).  The City also has declined to honor immigration detainer or notification requests concerning individuals in City custody who, apart from their contemporaneous basis for being held in City custody, had prior felony convictions.  *See* City's Detainer Spreadsheet (Exhibit O).

When the City fails to honor an immigration detainer or notification request and the subject individual is released back into the community, that individual may subsequently commit a crime. For example, the City acknowledges that an individual for whom ICE had lodged a detainer was released from the custody of the Philadelphia Department of Prisons in 2015, and subsequently rearrested and charged in 2016 for an unrelated offense, where he pled guilty to rape of a child and unlawful contact with a minor – sexual offenses.  *See* Pl.'s Supp. Resp. to Def.'s Interrog. No. 4 (Exhibit P).  He was transferred to a state correctional institution in March 2017, where he is serving an eight to twenty year sentence.  *See id*.  This example is not surprising, as it is well-established that criminals have high recidivism rates—with two-thirds of prisoners released from state prisons arrested for a new crime within three years, and three-quarters within five years.  *See* Bureau of Justice Statistics, *3 in 4 Former Prisoners in 30 States Arrested Within 5 Years of Release* (Exhibit Q).  A non-cooperation policy in the context of criminal aliens poses a risk to public safety.

## VII.    Mandamus Relief Is Not Warranted.

The City is not entitled to a writ of mandamus, under either 5 U.S.C. § 706(1) or alternatively 28 U.S.C. § 1361, compelling the Department to immediately disburse an FY 2017 JAG award to the City.

40

To compel agency action under the APA or by a writ of mandamus, the City must show that the Department failed to take a "legally *required*" action, as where the agency is subject to "a specific, unequivocal command" concerning "action that it is *required to take*." *SUWA*, 542 U.S. at 63-64 (emphasis in original); *see also Massie v. HUD*, 620 F.3d 340, 347 (3d Cir. 2010) (The APA "does not give us license to 'compel agency action' whenever the agency is withholding or delaying an action we think it should take. Instead, our ability to 'compel agency action' is carefully circumscribed to situations where an agency has ignored a specific legislative command.") (citation omitted); *Heckler v. Ringer*, 466 U.S. 602, 616 (1984) ("The common-law writ of mandamus, as codified in 28 U.S.C. § 1361, is intended to provide a remedy for a plaintiff only if he has exhausted all other avenues of relief and only if the defendant owes him a clear nondiscretionary duty."). The Byrne JAG statute, however, provides that the Attorney General "may" make grants from appropriated funds to carry out the purposes of the program, 34 U.S.C. § 10152(a)(1), and does not set any deadline for the Department to issue decisions on Byrne JAG applications. The lack of any deadline is especially evident when considering that Byrne JAG annual appropriations do not expire at the end of the fiscal year but instead remain legally available for obligation until the funds are expended, without regard to fiscal year limitation. *See, e.g.*, Department of Justice Appropriations Act, 2017, "State and Local Law Enforcement Assistance," 131 Stat. 135, 202-03 (stating that FY 2017 funds "remain available until expended"). Accordingly, the pendency of a decision on the City's FY 2017 Byrne JAG application does not reflect any omission by the Department to perform a clear, mandatory duty. Mandamus relief therefore is not available.

The continued pendency of the City's FY 2017 application is an appropriate exercise of the Department's discretion in administering the Byrne JAG Program, particularly in light of the extraordinary circumstance of ongoing litigation (in this case and others) that leaves unsettled the

Department's authority to attach conditions to Byrne JAG awards. To be clear, the City of Philadelphia has not been singled out in this respect; since entry of the preliminary injunction in the *Chicago* litigation that first interfered with the Department's ability to impose conditions on FY 2017 Byrne JAG awards, no awards have been made to any jurisdiction. In similar circumstances, when the propriety of disbursing federal funds to a State program was in question due to uncertainty over how the funds were being used, a court determined that mandamus was not appropriate. *See Food Service Dynamics, Inc. v. Bergland*, 465 F. Supp. 1178, 1181-82 (E.D.N.Y. 1979). Practically speaking, the City's requested writ of mandamus might have the effect of depriving the Department of its ability to seek appellate relief from an adverse ruling in this case with respect to the conditions that may be included in any FY 2017 Byrne JAG award to the City.

The City's request further errs in seeking a judicial direction that the Department issue an FY 2017 Byrne JAG award to the City, as distinct from a more limited direction that the Department make a decision on the City's FY 2017 Byrne JAG application. Agencies are afforded "considerable deference" in fulfilling their statutory obligations, and mandamus relief is "severely limit[ed]." *Oil, Chemical & Atomic Workers Union v. OSHA*, 145 F.3d 120, 123-24 (3d. Cir. 1998) (citation omitted). Indeed, "the principal purpose" of limitations on judicial authority to issue writs of mandamus under 5 U.S.C. § 706(1) and 28 U.S.C. § 1361 is to "protect agencies from undue judicial interferences with their lawful discretion." *SUWA*, 542 U.S. at 66. Accordingly, even "when an agency is compelled by law to act within a certain time period, but the manner of its action is left to the agency's discretion, a court can compel the agency to act, but has no power to specify what the action must be." *Id.* at 65; *see also Prometheus Radio Project v. FCC*, 824 F.3d 33, 49 (3d. Cir. 2016) ("We do not intend to prejudge the outcome of this analysis; we only order that it must be completed."). Regardless of this Court's decision as it relates to the propriety of

the challenged conditions, the Court would not appropriately insert itself into the Department's review process, effectively superseding the Department's statutory authority to determine whether the application criteria have been met.  *See* 34 U.S.C. § 10154 ("The Attorney General shall not finally disapprove any application . . . without first affording the applicant reasonable notice of any deficiencies in the application and opportunity for correction and reconsideration."); *see also id.* § 10153(a) ("To *request* a grant under this part," a jurisdiction "shall submit an application to the Attorney General . . . *in such form as the Attorney General may require*" (emphasis added)); *id.* § 10153(a)(5) (requiring that grant applications include a "certification, made *in a form acceptable to the Attorney General*" (emphasis added)).

## CONCLUSION

For the foregoing reasons, Defendant respectfully requests that the Court grant summary judgment to Defendant on all claims.

DATED:  April 13, 2018                    Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

WILLIAM M. MCSWAIN
United States Attorney

JOHN R. TYLER
Assistant Director

*/s/ Brad P. Rosenberg*
BRAD P. ROSENBERG
RACHAEL L. WESTMORELAND
ARJUN GARG
Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave, NW
Washington, DC 20530
Phone: (202) 514-3374
Fax: (202) 616-8460

E-Mail: brad.rosenberg@usdoj.gov
           rachael.westmoreland@usdoj.gov
           arjun.garg@usdoj.gov

*Counsel for Defendant*