## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE CITY of PHILADELPHIA, | |
|      Plaintiff, | |
| v. | Case No. 2:17-cv-03894-MMB |
| JEFFERSON BEAUREGARD SESSIONS III, in his official capacity as Attorney General of the United States, | |
|      Defendant. | |

## MEMORANDUM IN SUPPORT OF THE CITY OF PHILADELPHIA's MOTION FOR PARTIAL SUMMARY JUDGEMENT

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ......................................................................................... iii

INTRODUCTION ......................................................................................................... 1

STATEMENT OF UNDISPUTED FACTS ................................................................... 2

ARGUMENT ................................................................................................................. 9

     I.      LEGAL STANDARD ........................................................................... 9

     II.     THE DEPARTMENT HAS TAKEN FINAL AGENCY ACTION ..................... 11

     III.    THE IMPOSITION OF THE CHALLENGED CONDITIONS WAS ULTRA VIRES ............................................................................. 14

            A.     Section 10102(a)(6) Does Not Authorize the Challenged Conditions ........................................................................... 15

            B.     Section 10153(a)(5)(D) Does Not Authorize the Section 1373 Certification Condition ................................................ 20

     IV.    THE IMPOSITION OF THE CHALLENGED CONDITIONS VIOLATES THE SEPARATION OF POWERS .................................... 27

     V.     THE DEPARTMENT'S DECISION TO IMPOSE THE CONDITIONS WAS ARBITRARY AND CAPRICIOUS ................................. 29

     VI.    THIS COURT SHOULD ENTER A PERMANENT INJUNCTION .............................................................................. 36

CONCLUSION ........................................................................................................... 39

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abbott Labs. v. Gardner,*
    387 U.S. 136 (1967) ...............................................................................................14

*In re Aiken Cty.,*
    725 F.3d 255 (D.C. Cir. 2013) ......................................................................27, 28

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986)...............................................................................................10

*Arizona v. United States,*
    567 U.S. 387 (2012), 2012 WL 939048 ...............................................................27

*U.S. ex rel. Bauchwitz v. Holloman,*
    671 F. Supp. 2d 674 (E.D. Pa. 2009) ...................................................................15

*Bennett v. Spear,*
    520 U.S. 154 (1997)...............................................................................................12

*CBS Corp. v. FCC,*
    663 F.3d 122 (3d Cir. 2011)..................................................................................31

*CEC Energy Co. v. Public Serv. Comm'n,*
    891 F. 2d 1107 (3d Cir. 1989)...............................................................................13

*Christ the King Manor, Inc. v. Secretary U.S. Dept. of Health &Human Servs.,*
    730 F.3d 291 (3d Cir. 2013)..................................................................................11

*Circuit City Stores, Inc. v. Adams,*
    532 U.S. 105 (2001)...............................................................................................22

*City of Chicago v. Sessions,*
    No. 1:17-cv-05720 (N.D. Ill. Aug. 24, 2017) ................................................13, 17

*City of Chicago v. Sessions,*
    No. 1:17-cv-5720 (Jan. 31 2018) ..........................................................................25

*City of Chicago v. Sessions,*
    No. 17-2991 (7th Cir. Nov. 28, 2017)...................................................................18

*City of Los Angeles v. McLaughlin,*
    865 F.2d 1084 (9th Cir. 1989) ..............................................................................15

iii

**TABLE OF AUTHORITIES—***Continued*

**Page(s)**

*Clinton v. City of New York,*
  524 U.S. 417 (1998)..................................................................27

*Comite' De Apoyo A Los Trabajadores Agricolas v. Perez,*
  774 F.3d 173 (3d Cir. 2014).......................................................34

*Comm'r of Internal Revenue v. Sun Pipe Line Co.,*
  126 F.2d 888 (3d Cir. 1942).......................................................19

*Crowell v. Benson,*
  285 U.S. 22 (1932)....................................................................21

*Dabney v. Reagan,*
  542 F. Supp. 756 (S.D.N.Y. 1982) .............................................27

*Dubose v. Hills,*
  405 F. Supp. 1277 (D. Conn. 1975)............................................29

*eBay Inc. v. MercExchange, L.L.C.,*
  547 U.S. 388 (2006)..................................................................37

*Edelman v. Lynchburg Coll.,*
  535 U.S. 106 (2002)..................................................................21

*Encino Motorcars, LLC v. Navarro,*
  136 S. Ct. 2117 (2016)..............................................................30

*Fed. Land Bank of St. Paul v. Bismarck Lumber Co.,*
  314 U.S. 95 (1941)....................................................................16

*Guadamuz v. Ash,*
  368 F. Supp. 1233 (D.D.C. 1973)...............................................29

*Kansas v. United States,*
  249 F.3d 1213 (10th Cir. 2001) .................................................37

*Kasten v. Saint-Gobain Performance Plastics Corp.,*
  563 U.S. 1 (2011)......................................................................22

*Kendall v. U.S. ex rel. Stokes,*
  37 U.S. (12 Pet.) 524 (1838)......................................................28

*Marshall Cty. Health Care Auth. v. Shalala,*
  988 F.2d 1221 (D.C. Cir. 1993)..................................................10

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983).............................................................11, 30, 31, 35

## TABLE OF AUTHORITIES—*Continued*

**Page(s)**

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
545 U.S. 967 (2005) ................................................................................30

*Nat'l Council of Cmty. Mental Health Ctrs., Inc. v. Weinberger*,
361 F. Supp. 897 (D.D.C. 1973) ...........................................................29

*Ocean Cty. Landfill Corp. v. U.S. E.P.A., Region II*,
631 F.3d 652 (3d Cir. 2011) .............................................................12, 13

*P.C. Pfeiffer Co. v. Ford*,
444 U.S. 69 (1979) .................................................................................17

*Prometheus Radio Project v. FCC*,
373 F.3d 372 (3d Cir. 2004) ..................................................................11

*Rempfer v. Sharfstein*,
583 F.3d 860 (D.C. Cir. 2009) ...............................................................10

*Robert Wood Johnson Univ. Hosp. v. Thompson*,
297 F.3d 273 (3d Cir. 2002) ..................................................................35

*Scott v. Harris*,
550 U.S. 372 (2007) ...............................................................................10

*Sec. & Exch. Comm'n v. Chenery Corp.*,
318 U.S. 80 (1943) .................................................................................34

*South Dakota v. Dole*,
483 U.S. 203 (1987) ...............................................................................21

*Texas v. United States*,
201 F. Supp. 3d 810, 824 (N.D. Tex 2016) ......................................13, 37

*Train v. City of New York*,
420 U.S. 35 (1975) .......................................................................24, 27, 28

*United States v. Bd. of Comm'rs of Sheffield*,
Ala, 435 U.S. 110 (1978) .......................................................................19

*United States v. Diebold, Inc.*,
369 U.S. 654 (1962) ...............................................................................10

*United States v. Wilson*,
503 U.S. 329 (1992) ...............................................................................23

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) ...............................................................................29

**TABLE OF AUTHORITIES—***Continued*

**Page(s)**

**STATUTES AND REGULATIONS**

5 U.S.C. § 706(2)(A)...............................................................30

5 U.S.C. § 706(2)(A)-(B)...........................................................10

5 U.S.C. § 706(2)(C)...............................................................14

8 U.S.C. § 1373...............................................................*passim*

8 U.S.C. § 1373(a)................................................................36

28 U.S.C. § 509..................................................................16

34 U.S.C. 10152(a)(1)..............................................................3

34 U.S.C. § 10102(a)(6).....................................................*passim*

34 U.S.C. § 10142(2)..............................................................17

34 U.S.C. § 10152..................................................................3

34 U.S.C. § 10152(a)(1)...........................................................24

34 U.S.C. §§ 10152(a)(1)(A)-(H)...................................................15

34 U.S.C. § 10153(a)(4).......................................................19, 25

34 U.S.C. § 10153(a)(5)(A)-(C)...................................................22

34 U.S.C. § 10153(a)(5)(D)..................................................*passim*

34 U.S.C. § 10156(a)..............................................................14

34 U.S.C. § 10156(a)(1)...........................................................24

34 U.S.C. § 10156(a)-(d)...........................................................2

34 U.S.C. §§ 10174, 10191, 10361.................................................16

34 U.S.C. § 10202(c)(1)(B), (C)..................................................19

34 U.S.C. § 10228(a)..............................................................26

34 U.S.C. 10442...................................................................18

34 U.S.C. § 11185(a)..............................................................17

34 U.S.C. § 40914(b)-(c)..........................................................23

## TABLE OF AUTHORITIES—*Continued*

**Page(s)**

47 U.S.C. § 224(c) ................................................................................................21

52 U.S.C. § 21081 ...............................................................................................21

**Other Authorities**

28 C.F.R. § 0.90 (2017) .......................................................................................17

161 Cong. Rec. H2184-2186 (daily ed. May 10, 2016) ......................................19

161 Cong. Rec. S2670-2672 (daily ed. May 6, 2016) ........................................19

42 Fed. Reg. 45,828, 45,845, 45,864-45,865 (Sept. 12, 1977) ..........................25

Enforce the Law for Sanctuary Cities Act, H.R. 3009, § 3(b), 114th ..................26

Stop Sanctuary Cities Act .....................................................................................26

Black's Law Dictionary (10th ed. 2014) ..........................................................16, 21

H.R. Rep. No. 109-233 (2005) .............................................................................24

H.R. Rep. No. 114-544 (2015) .............................................................................19

S. Rep. No. 90-1097 (1968) .................................................................................14

U.S. Const. art. I, § 8, cl. 1 ...................................................................................27

U.S. Const. art. II, § 3, cl. 5 .............................................................................27, 28

## INTRODUCTION

The Department of Justice ("the Department" or "DOJ") has decided to use the Fiscal Year 2017 Byrne JAG program to mandate that State and local officials assist federal immigration authorities with immigration enforcement.  Although "[r]egulation of immigration is exclusively a federal function, . . . it is not exclusively within the province of the executive branch of government."  Dkt. 64, at 6, 67 (Mem. Op. on Mot. for Prelim. Inj.) ("Op.").  Congress did not authorize the Department's actions, the Constitution does not permit them, and they fail to meet the basic standard for reasoned agency action.

The Department's decision to impose the three conditions at issue in this litigation (the "Challenged Conditions") on the City's FY 2017 Byrne JAG award ran afoul of the Administrative Procedure Act in three distinct ways, each of warrants summary judgment for the City here.  *First*, that decision was made without appropriate statutory authority—as alleged in Count I of the City's amended complaint.  *Second*, that decision was tantamount to a usurpation of Congress' authority under the Spending Clause and thereby ran afoul of the Constitution's separation of powers—as alleged in Count II of the City's amended complaint.  *Third*, that decision was arbitrary and capricious –as alleged in Count III of the City's amended complaint. This Court should grant summary judgment to the City on all three Counts.

Deciding these three claims and thereby issuing the City summary judgment on each does not require this Court to resolve any material dispute of fact.  The first and second claims turn on pure questions of law; this Court can decide those questions without reference to the factual record at all.  The third claim does turn on questions of fact, but there is no *dispute* of fact between the parties that is material to its resolution. In short:  The Department has lodged an Administrative Record that it contends represents the complete basis for its decision to add the Challenged Conditions to Philadelphia's Byrne JAG award, and the City contends that the

Administrative Record evidences arbitrary and capricious agency action.  There is no material dispute of fact on this point, although the parties (likely) dispute what legal conclusion naturally follows from them.

Because Philadelphia is entitled to summary judgment on Counts I, II, and III of its amended complaint, this Court should enter a permanent injunction, enjoining the Department from attaching the conditions to the City's FY 2017 JAG award.  Philadelphia will suffer irreparable and permanent harm in the absence of such relief, and both the balance of hardships and public interest supports the issuance of a permanent injunction.

## STATEMENT OF UNDISPUTED FACTS

The undisputed facts recounted below include only those facts that are relevant to the City's partial summary judgment motion—that is, the undisputed facts relevant to the resolution of Counts I, II and III of the City's First Amended Complaint ("FAC").

1.      Congress created the Edward Byrne Memorial Justice Assistant Grant ("Byrne JAG" or "JAG") program in 2005 as a formula grant, merging two prior criminal justice assistance grant programs. *See* Pub. L. No. 109-162 (2005) (codified at 34 U.S.C. § 10151 et seq.). The formula allocates funds to States and localities according to their populations and rates of violent crime, 34 U.S.C. § 10156(a)-(d).

2.      The U.S. Department of Justice ("the Department" or "DOJ") has explained that because Byrne JAG is a "formula-based [grant], with the eligibility criteria (and related penalties, if any) set firmly by statute," the Department "does not have the discretion to suspend funding [of the JAG program] at all." Dkt. 110 (hereinafter "Administrative Record" or "AR"), at PHLJAG-00113.

2

3.      The Department has further stated that any law "applicable" to the grant "has to [have] a connection between the issue and the grant." AR at PHLJAG-00202. "[A] grant for human trafficking would be different from a grant for community policing." *Id.*

4.      The purpose of the Byrne JAG program is to give financial assistance to States and localities so that they can strengthen their criminal justice systems according to local priorities and needs. 34 U.S.C. § 10152.

5.      The Byrne JAG program is today the "primary provider of federal criminal justice funding to state and local jurisdictions."[1]

6.      "Withholding the funding" for any reason, the Department explained in a September 2015 letter to Congress, "would have a significant, and unintended, impact on the underserved local populations who benefit from these programs, most of whom have no connection to immigration policy." AR at PHLJAG-00113.

7.      Applicants must submit a plan to the Department of Justice detailing how they will use their awards in one or more of eight enumerated programmatic areas, 34 U.S.C. 10152(a)(1), and also submit a series of statutorily prescribed assurances and certifications, *see id.* § 10153(a).

8.      The Byrne JAG authorizing statute permits the Attorney General to exercise discretion over some tasks in implementing the grant program, including specifying the "form" of the application or designating financial information grantees must report, *see id.* § 10153(a)(4)-(5).

9.      Philadelphia has applied for, and successfully been awarded, its local allocation every year since the JAG program's inception, from FY 2005 to and including FY 2016. Over

---

[1]      U.S. Dep't of Justice, Bureau of Justice Assistance, *Edward Byrne Memorial Justice Assistance Grant (JAG) Program Fiscal Year (FY) 2016 Local Solicitation* (May 16, 2016), https://goo.gl/cQuuRR.

the past eleven years, Philadelphia's cumulative Byrne JAG allocation totals over $26 million, and its annual award has averaged $2.17 million. Dkt. 21-3, ¶ 5 (Decl. of Julie Wertheimer). Philadelphia has never had any conflicts with the federal government in obtaining Byrne JAG funds. Dkt. 65-1 (hereinafter "Tr."), at 129:6-22 (Wertheimer).

10.     Over the last five years, the Department has routinely disbursed Philadelphia's JAG award in August or September of the particular grant year. The money is immediately obligated by the City's criminal justice agencies to fund pressing needs. Tr. at 127:13-25 (Wertheimer).

11.     The Department will not make any JAG awards to Philadelphia, or to any jurisdiction, until the Department's appeals in *Chicago v. Sessions*, No. 17-2991 (7th Cir.) and this case are resolved. Dkt. 72, at 62:4-63:17 (Nov. 2, 2017 Oral Arg. Tr.).

12.     On February 26, 2016, Congressman John Culberson, Chairman of the House Appropriations Subcommittee on Commerce, Justice, Science and Related Agencies, sent a letter to then-Attorney General Loretta Lynch, inquiring whether recipients of Department of Justice grants were complying with 8 U.S.C. § 1373 ("Section 1373"). AR at PHLJAG-00250-00256.

13.     In response to the Culberson letter, the Office of Justice Programs ("OJP") at the Department of Justice tasked the Department's Office of Inspector General ("OIG") to investigate local jurisdictions' compliance with Section 1373. In an email sent from OJP to Inspector General Michael Horowitz on April 8, 2016, OJP stated that it had "received information" that several jurisdictions who receive OJP funding may be in violation of Section 1373 and attached a spreadsheet of over 140 state and local jurisdictions that it wanted OIG to investigate. AR at PHLJAG-00366- 00381.

14.     On May 31, 2016, Inspector General Horowitz transmitted a report to Department of Justice Assistant Attorney General Karol Mason, reviewing the policies of ten state and local jurisdictions, including Philadelphia, and whether they comply with Section 1373. *Id.* The report expressed "concerns" with several of the localities' laws and policies. The report did not analyze the effects of any of the ten local jurisdictions' policies on crime rates or public safety. *Id.* The report also did not include any determination as to whether Section 1373 was an "applicable" law to the JAG program. *Id.*

15.     On July 7, 2016, Assistant Attorney General Mason, who then oversaw the Office of Justice Programs, sent a Memorandum to Inspector General Horowitz stating that, in response to OIG's report, "the Office of Justice Programs has determined that Section 1373 is an applicable federal law for the purposes of the Edward Byrne Memorial Justice Assistant Grant (JAG) program and the State Criminal Alien Assistance Program (SCAAP)." Dkt. 1-11 (July 7, 2016 Memo. from Karol Mason to Michael Horowitz). The memorandum includes no legal analysis or other basis supporting this conclusion and no explanation for why OJP had not reached this conclusion during the prior ten years that it administered the JAG program.

16.     Also on July 7, 2016, the OJP released a Question and Answer "Guidance" document, entitled "Office of Justice Programs Guidance Regarding Compliance with 8 U.S.C. § 1373." AR at PHLJAG-00392-00394. The Q&A Guidance document stated that under the Department's new policy, "[a] JAG grantee is required to assure and certify compliance with all applicable federal statutes, including Section 1373." *Id.* The document explained that Section 1373 "prevents federal, state, and local government entities and officials from 'prohibit[ing] or in any way restrict[ing]' government officials or entities from sending to, or receiving from, federal immigration officers information concerning an individual's citizenship or immigration status."

*Id*.  It further stated that "Section 1373 does not impose on states and localities the affirmative obligation to collect information from private individuals regarding their immigration status, nor does it require that statutes and localities take specific actions upon obtaining such information." *Id.*

17.     The July 7, 2016 "Guidance" document did not define the terms "information regarding citizenship or immigration status" or "information regarding the immigration status, lawful or unlawful, of any individual." AR at PHLJAG-00392; PHLJAG-00395. The Guidance did not provide examples of the types of information the Department believed that fall within that term.  AR at PHLJAG-00393–00394; PHLJAG-00396–00397. The Guidance did not state that an inmate's potential release date or address after release constitutes "information regarding citizenship or immigration status" or "information regarding the immigration status, lawful or unlawful, of any individual." AR at PHLJAG-00393–00394; PHLJAG-00396–00397.

18.     On October 6, 2016, OJP released a document entitled "Additional Guidance Regarding Compliance with 8 U.S.C. § 1373." AR at PHLJAG-00431-00434. That document addressed the question, "Does OJP's guidance on 8 U.S.C. § 1373 impact FY 2016 funding?" *Id*. And it answered: "No FY 2016 or prior year Byrne/JAG or SCAAP funding will be impacted. However, OJP expects that JAG and SCAAP recipients will use this time to examine their policies and procedures to ensure they will be able to submit the required assurances when applying for JAG and SCAAP funding in FY 2017." *Id.*

19.     The October 6, 2016 "Additional Guidance" document did not define the terms "information regarding citizenship or immigration status" or "information regarding the immigration status, lawful or unlawful, of any individual." AR at PHLJAG-00431. The Additional Guidance document did not provide examples of the types of information the

Department believed that fall within that term.  AR at PHLJAG-00432–00434. The Additional Guidance document did not state that an inmate's potential release date or address after release constitutes "information regarding citizenship or immigration status" or "information regarding the immigration status, lawful or unlawful, of any individual." AR at PHLJAG-00432–00434.

20.    The Department has not issued any additional guidance or other document defining the terms "information regarding citizenship or immigration status" or "information regarding the immigration status, lawful or unlawful, of any individual" in 8 U.S.C. § 1373.

21.    In April 2017, the Department sent letters to Philadelphia and eight other jurisdictions "alert[ing]" each recipient that it is "required to submit documentation to [the Office of Justice Programs] that validates your jurisdiction is in compliance with 8 U.S.C. § 1373." AR at PHLJAG-00477-00485. The Department informed these jurisdictions that "[f]ailure to comply with this condition could result in the withholding of grant funds, suspension, or termination of the grant, ineligibility for future OJP grants or subgrants, or other action, as appropriate." *Id*.

22.    Philadelphia certified its compliance with Section 1373 on June 22, 2017. AR at PHLJAG-00640–00660. The City asserted how its policies—by their text and in operation— comply with the lawful application of Section 1373, and it raised statutory and constitutional concerns with the Department's plans to condition JAG funding on compliance with Section 1373. *Id*.

23.    On July 6, 2017, the Department responded via press release to the certifications submitted by what-were-now ten local jurisdictions. The press release stated that, although several jurisdictions had made "bol[d] assert[ions]" in their letters regarding compliance, "[i]t is not enough to assert compliance, the jurisdictions must actually be in compliance."  AR at PHLJAG-00991.

24.     The Department did not explain what "be[ing] in compliance" with Section 1373 requires. AR at PHLJAG-00991.

25.     On July 25, 2017, the Department announced two more conditions on the FY 2017 JAG program.   AR at PHLJAG-00993. The Department stated that, beyond certifying compliance with 8 U.S.C. § 1373, JAG recipients must also allow personnel from the Department of Homeland Security ("DHS") access to any detention facility they maintain to meet with persons of interest to DHS (the "jail access" condition); and must provide at least 48 hours' advance notice to DHS regarding the scheduled release date and time of an inmate for whom DHS requests such notifications (the "advance notification" condition).

26.     On August 24, 2017, the Department revised what the "advance notification" condition and the "jail access" condition would entail.

27.     Under the revised advance notification condition, the Department will now require Byrne JAG grantees to have in place a "local ordinance, -rule, -regulation, -policy, or -practice . . . that is designed to ensure that, when a local-government . . . correctional facility receives from DHS a formal written request . . . [for] advance notice of the scheduled release date and time for a particular alien in such facility, then such facility will honor such request and—as early as practicable . . . provide the requested notice to DHS." *See, e.g.*, Dkt. 21-6 (County of Greenville Award Letter).

28.     Under the revised jail access condition, the Department of Justice will now require Byrne JAG grantees to have in place a "local ordinance, -rule, -regulation, -policy, or -practice . . . that is designed to ensure that [any, not just DHS] agents of the United States . . . are given access [to] a local-government . . . correctional facility" to meet with individuals believed to be aliens and question them. *See, e.g.,* Dkt. 21-6 (County of Greenville Award Letter).

29.     The local solicitation for the FY 2017 JAG program was posted by the Department on August 3, 2017.  It required both the Chief Legal Officer and the Chief Executive of the Applicant to certify compliance with Section 1373, or forgo Byrne JAG funds.

30.     The City timely filed an application for its federal allocation of almost $1.6 million in JAG funding on September 5, 2017.[2]

31.     Philadelphia described in its application that it intends to use its FY 2017 JAG award for, among other things, to support Philadelphia's Police Commissioner's "Crime Fighting Strategy," including overtime funding for "Quality of Life" police initiatives; the enhancement of a Reality Based Training Unit to emphasize best practices on the use of force; and to procure supplies for a citywide collaboration to support inner-city youth. Philadelphia also intends to use its FY 2017 funding to purchase life-saving naloxone for Philadelphia police officers responding to opioid overdoses. The City faces a devastating opioid epidemic, with an estimated 1,200 overdose deaths in 2017, a 30 percent increase from 900 deaths in 2016

32.     The DOJ has certified an administrative record in this case which represents the basis for the Department's decision to impose the three new conditions on the FY 2017 JAG program.

## ARGUMENT

## I.     LEGAL STANDARD.

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).   At the summary judgment stage, "courts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the . . . motion.' " *Scott v. Harris*,

---

[2]     U.S. Dep't of Justice, Office of Justice Programs, *Edward Byrne Memorial Justice Assistance Grant Program: FY 2017 Local Solicitation* (Aug. 3, 2017), https://goo.gl/SfiKMM; *see also* Dkt. 1-16.

550 U.S. 372, 378 (2007) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 176 (1962)). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–248 (1986). Further, "when opposing parties tell two different stories, one of which is blatantly contradicted by the record . . . a court *should not* adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Harris*, 550 U.S. at 380 (emphasis added).

In the context of claims brought under the Administrative Procedure Act ("APA"), a reviewing court may "hold unlawful and set aside agency action" that is "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "(B) contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A)-(B). Challenges to agency action "not in accordance with law" present only a question of law concerning "the legal conclusion to be drawn about the agency action." *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009). Thus, when reviewing whether an agency's action was beyond the bounds of its delegated authority or contrary to a federal statute, there often is "no real distinction . . . between the question presented on a 12(b)(6) motion and a motion for summary judgment." *Marshall Cty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993). A motion for summary judgment arguing that agency action was *ultra vires* requires no factfinding, but simply asks whether the agency action was permissible under existing law.

Allegations that agency action was arbitrary and capricious require the court to consult the administrative record, and determine whether the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983); *accord Prometheus Radio Project v.*

*FCC*, 373 F.3d 372, 389-90 (3d Cir. 2004)  (reviewing court "must ensure that, in reaching its decision, the agency examined the relevant data and articulated a satisfactory explanation for its action, including a 'rational connection between the facts found and the choice made.'" (citation omitted)).   At summary judgment, this means a court should hold an agency action to be arbitrary and capricious if it finds that the "agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Christ the King Manor, Inc. v. Secretary U.S. Dept. of Health & Human Servs.*, 730 F.3d 291, 305 (3d Cir. 2013) (internal quotation marks and citation omitted).

## II.    THE DEPARTMENT HAS TAKEN FINAL AGENCY ACTION.

The Department has continually argued, throughout these proceedings, that the City's claims are not ripe and that this Court's review is not warranted because the City is not challenging final agency action.  *See* Dkt. 102-1 (Def. Mem. in Support of Mot. to Dismiss) ("MTD").  For instance, the Department argued in its motion to dismiss the City's complaint that the Department "has not yet . . . imposed any condition on an FY 2017 award to the City." *Id.* at 9.

That characterization of the facts—and of the position that the Department's actions have put the City in—is simply incorrect. The Department took final agency action when it announced on July 25, 2017 that it was imposing the Challenged Conditions on all Byrne JAG grantees in fiscal year 2017, and when it posted a local solicitation for the FY 2017 Byrne JAG award on August 3, 2017 that incorporated those conditions.  *See* Department of Justice, Edward Byrne Memorial Justice Assistance Grant Program FY 2017 Local Solicitation, at 29, 38-39 https://www.bja.gov/Funding/JAGLocal17.pdf    (citing the Section 1373 condition explicitly,

and incorporating the jail access and advance notification conditions implicitly by releasing the local solicitation on the same website where the July 25, 2017 announcement and backgrounder had been posted a week earlier).   Indeed, as this Court has already and correctly ruled, "the agency has acted" in attaching the Challenged Conditions, and that action is "'final' and ripe for this Court's review."  Op. at 49-50.   That should be the end of the matter.

To reiterate, for a court to find final agency action, two conditions must be met:  (1) "the action must mark the 'consummation' of the agency's decisionmaking process[, and] . . . not be of a merely tentative or interlocutory nature"; and (2) "the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'"  *Ocean Cty. Landfill Corp. v. U.S. E.P.A., Region II*, 631 F.3d 652, 655 (3d Cir. 2011) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)).  Both are met here.

First, the Department's July 25, 2017 announcement of the three conditions and its incorporation of those conditions into the Local Solicitation for Byrne JAG awards on August 3, 2017 reflected the "consummation" of the agency's decision to impose the Challenged Conditions.  *Ocean Cty. Landfill Corp.*, 631 F.3d at 655.  Localities had to apply for their awards by the deadline of September 5, 2017, with the understanding that compliance with all three conditions would now be a requirement of their receipt of a JAG award.

Furthermore, after announcing that all grant "recipients" would be "required" to comply with the three conditions in its July 25 announcement, *see* AR at PHLJAG-00993, the Department issued two JAG awards, one to the County of Greenville, South Carolina, and one to the City of Binghamton, New York, that each contained the three conditions.  Dkt. 28-1 (Decl. of Alan Hanson), ¶ 5.  The Department then doubled down in a sworn declaration in the *Chicago* litigation stating that every locality's FY 2017 award will contain terms *identical* to those printed

in Greenville's award. *City of Chicago v. Sessions*, No. 1:17-cv-05720, (N.D. Ill. Aug. 24, 2017), ECF No. 32-1, ¶ 6 ("Hanson *Chicago* Decl.").

These actions clearly "represent[] the agency's definitive position" that the conditions apply. *Univ. of Med. & Dentistry of N.J. v. Corrigan*, 347 F.3d 57, 69 (3d Cir. 2003) (quoting *CEC Energy Co. v. Public Serv. Comm'n,* 891 F. 2d 1107, 1110 (3d Cir. 1989)). On top of that, at oral argument on the City's motion for preliminary injunction, the Department explained that, until the appeal in *Chicago* "is resolved," Philadelphia will not be granted an award, regardless of whether the City would comply with the Challenged Conditions; the agency is so committed to imposing the conditions on every Byrne JAG award that it refuses to issue *any* awards until the injunction is lifted or resolved. Dkt. 72, at 62:4-63:17 (Nov. 2, 2017 Oral Arg. Tr.). The Department cannot, on the one hand, claim an action is tentative or interlocutory while simultaneously, on the other hand, holding steadfast to that decision until a federal court orders otherwise. The agency clearly acted.

Second, the imposition of the Challenged Conditions triggers significant "legal consequences" for the City. *Ocean Cty. Landfill Corp.*, 631 F.3d at 655. Philadelphia had to decide either to accept the new conditions when it made its September 5 application, or to forgo a formula grant that Congress has already appropriated for it. *Cf. Texas v. United States*, 201 F. Supp. 3d 810, 824 (N.D. Tex 2016) ("[T]he challenged agency action has the effect of committing the agency itself to a view of the law that, in turn, forces the plaintiff to either alter its conduct, or expose itself to liability." (quotation marks omitted)). Philadelphia chose the former (with the knowledge that it was simultaneously filing this suit). But by requiring the chief legal officer and chief executive of Philadelphia to certify compliance with Section 1373, and the City to apply for its local award with the understanding that it would have to comply

with all three Challenged Conditions once it received the award, the Department's decision has *already* required Philadelphia to act.  *See Abbott Labs. v. Gardner*, 387 U.S. 136, 153 (1967) (finding final agency action "where a regulation requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance").

## III.   THE IMPOSITION OF THE CHALLENGED CONDITIONS WAS ULTRA VIRES.

The Department lacks statutory authority to impose the Challenged Conditions on the Byrne JAG program.  During this litigation, the Department has claimed that two provisions—34 U.S.C. § 10102(a)(6) and 34 U.S.C. § 10153(a)(5)(D)—authorize the Challenged Conditions. Neither does.  The Challenged Conditions are therefore *ultra vires*, and this Court must set them aside.  *See* 5 U.S.C. § 706(2)(C) (A "reviewing court shall . . . hold unlawful and set aside agency action . . . found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.").

The Byrne JAG program proceeds from a basic premise: "that crime is essentially a local problem that must be dealt with by State and local governments if it is to be controlled effectively."  S. Rep. No. 90-1097, at 1 (1968).  Congress structured the program as a formula grant, one that allocates money among applicants according to pre-set formulas that depend on population counts and crime levels.  *See* 34 U.S.C. § 10156(a) ("the Attorney General shall . . . allocate"), *id.* § 10156(d) ("grants . . . shall be made").  Congress chose not to use a discretionary grant model, under which an administering agency may have some authority to select among applicants.  *See City of Los Angeles v. McLaughlin*, 865 F.2d 1084, 1088 (9th Cir. 1989) ("[F]ormula grants," unlike discretionary ones, "are not awarded at the discretion of a state or federal agency, but are awarded pursuant to a statutory formula."); *U.S. ex rel. Bauchwitz v. Holloman*, 671 F. Supp. 2d 674, n.16 (E.D. Pa. 2009) (similar).  As a direct result of this choice,

States and local governments are entitled to their share of the Byrne JAG allocation each year, so long as their grant proposals fall within eight statutorily-defined programmatic areas, each pertaining to the applicant's criminal justice system. *See* 34 U.S.C. §§ 10152(a)(1)(A)-(H).

The Byrne JAG program does not authorize the Attorney General to add his own substantive requirements to this scheme, that is, to cut off this non-discretionary funding stream at his discretion. And yet, the Challenged Conditions attempt to do just that. The Department argues that two provisions—one outside of the Byrne JAG program statute, and one inside it— authorize the Challenged Conditions. Neither does: Section 10102(a)(6) does not contain a grant of authority and Section 10153(a)(5)(D) does not incorporate the entire body of Federal law into the Byrne JAG program.

### A.  Section 10102(a)(6) Does Not Authorize the Challenged Conditions.

The Department relies first on 34 U.S.C. § 10102(a)(6), arguing that it contains an independent grant of authority to impose conditions—such as the Challenged Conditions—on all Department grant programs overseen by the Assistant Attorney General ("AAG") of the Office of Justice Programs ("OJP"). As the plain text of Section 10102(a)(6) and the surrounding statutory structure make clear, however, the provision does not contain an independent grant of authority but merely states that the AAG is to exercise existing authorities—his own and those delegated to him by the Attorney General.

Section 10102(a)(6) appears in a provision delineating the duties and functions of the AAG. The AAG must provide information relating to the criminal justice system to the public and other government entities and liaise with the public and other government entities on matters relating to criminal justice. *Id.* § 10102(a)(1)-(4). The AAG is also responsible for coordinating the work of five offices and bureaus within OJP that oversee grant-making programs. *See id.* § 10102(a)(5). And as most relevant here, the AAG must "exercise such other powers and

15

functions as may be vested in the [AAG] pursuant to this chapter [101 of Title 34] or by delegation of the Attorney General, including placing special conditions on all grants, and determining priority purposes for formula grants." *Id.* § 10102(a)(6).[3]

The text of Section 10102(a)(6) is clear and does not contain an independent grant of authority. Instead, it directs the AAG to "exercise" two sets of "powers and functions" that may be "vested" in him: (1) powers given to the AAG directly in other provisions of Chapter 101, and (2) powers delegated to the AAG by the Attorney General, who in turn must be acting pursuant to some source of delegated authority. In other words, Section 10102(a)(6) directs the AAG to "exercise," or to make use of, power vested in him or in his supervisor by other federal statutory provisions.[4] *See Exercise*, Black's Law Dictionary (10th ed. 2014) (defining "exercise" as "[t]o make use of; to put into action"). The "including" clause of Section 10102(a) simply makes clear that the powers and functions the AAG can exercise, either because Chapter 101 vests them in him or because the Attorney General delegates them to him, "includ[e] placing special conditions on all grants, and determining priority purposes for formula grants." 34 U.S.C. § 10102(a)(6); *see Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941) ("[T]he term 'including' is not one of all-embracing definition, but connotes simply an illustrative application of the general principle."). It cannot be read as an independent grant of authority without replacing "including" with "and also." *See P.C. Pfeiffer Co. v. Ford*, 444 U.S.

---

[3]    Chapter 101 of Title 34 is entitled "Justice System Improvements" and contains numerous programs to improve the criminal justice system, including grant programs. Some of the grant programs are discretionary grants. *See, e.g.*, 34 U.S.C. §§ 10174, 10191, 10361. Others, like the Byrne JAG program, are formula grants. *See, e.g., id.* §§ 10401, 20102.

[4]    Provisions setting out the functions of an office commonly reference existing authorities and do not independently grant new authority. *See, e.g.* 28 U.S.C. § 509 ("All functions of other officers of the Department of Justice and all functions of agencies and employees of the Department of Justice are vested in the Attorney General except [certain specified functions].").

16

69, 77 n.7 (1979) (rejecting an interpretation that "suppose[d] that the word 'including' means 'and' or 'as well as'").[5]

Section 10102(a)(6) cannot be read to contain an independent grant of authority for another reason:  Doing so renders superfluous other provisions in Chapter 101 relating to grant conditions.  For example, the Director of the Bureau of Justice Assistance, located within OJP, has the authority to "award[] and allocate[] funds and technical assistance in accordance with the criteria of [the Bureau of Justice Assistance discretionary grant provisions], and *on terms and conditions determined by the Director to be consistent with* [*those provisions*]."  34 U.S.C. § 10142(2) (emphasis added).  And the Administrator of the Office of Juvenile Justice and Delinquency Prevention, also located within OJP, is authorized to make payments "pursuant to a grant or contract . . . in advance or by way of reimbursement, in such installments and *on such conditions as the Administrator may determine*."  34 U.S.C. § 11185(a) (emphasis added). There would be no need for Congress to specify these limited grants of authority to the Director and Administrator to impose conditions on grants if Section 10102(a)(6) already granted their superior—the AAG—unfettered discretion to impose the same types of conditions.  *See City of Chicago*, 264 F. Supp. 3d at 942.  That is because the AAG could have accomplished the same result as these statutory grants of authority through administrative delegation of his Section 10102(a)(6) authority.

Reading Section 10102(a)(6) in line with its plain text does not deprive it of meaning. The Department has pointed out that a provision delineating the duties and functions of the

---

[5]      The Department's regulations confirm this reading.  The provision governing the AAG's authorities does not mention any role in setting grant conditions; indeed, the provision does not reference the functions in Section 10102(a)(6) at all.  *See* 28 C.F.R. § 0.90 (2017).  If Section 10102(a)(6) did confer independent or additional authority, rather than merely confirm the AAG's obligation to carry out existing or delegated authorities, one would expect the Department's own regulations to say so.

Director of the Violence Against Women Office lacks a similar "including" clause, claiming that the inclusion of the clause in Section 10102(a)(6) must therefore be significant. The City does not disagree. The "including" clause *illustrates* the types of "powers and functions" that can be delegated to the AAG under the first clause. That illustrative function renders the including clause non-superfluous. What is more, the Violence Against Women Office is separate from OJP, and the use of "different language . . . in connection with that distinct program has no evident bearing on the issue presented here." App. Br. at 20, *City of Chicago v. Sessions*, No. 17-2991 (7th Cir. Nov. 28, 2017), ECF No. 39. And, in any event, differences between these Department of Justice offices easily explain the difference in statutory language. The Violence Against Women Office has no subordinate offices and its Director reports directly to the Attorney General. *See* 34 U.S.C. § 10442. The OJP, in contrast, "coordinate[s] the activities of" five other offices, *id.* § 10102(5), each of which is headed by an official who reports to the Attorney General through the Assistant Attorney General, *id.* §§ 10122(a)-(b); 10132(a)-(b), 10141(a)-(b), 11111(a)-(b), 20111(a)-(b), and each of whom has statutory authority to run that office's grant programs, *id.* § 10122(b) ("final authority"), 10132(b) ("final authority"), 10141(b) (same), 11111(b) (similar), 20111(b) ("final authority"). The more complicated chain of command within OJP explains the choice to illustrate one kind of grant-related authority—vested in, or delegated to, the AAG—in Section 10102(a)(6), without doing the same for the Director of the Violence Against Women Office.

Nor can the Department justify its interpretation on the basis of congressional ratification. The Department has noted that in FY 2012, it began to obligate grantees to have a policy requiring officers to wear bulletproof vests before Byrne funds could be used to purchase them, and in 2016, Congress enacted a statutory mandatory wear requirement for all BJA-funded vest

purchases, now codified in 34 U.S.C. § 10202(c)(1)(B), (C). But it has never explained why that matters. To start, nothing indicates that it relied on Section 10102(a)(6) to impose that condition in 2012, or that Congress acknowledged such authority in 2016. It has offered no evidence—no memoranda, no testimony, no nothing—about its basis for imposing the 2012 condition. The run-up to the condition suggests that, if anything, it was relying on its authority in 34 U.S.C. § 10153(a)(4) to require grantees to "maintain and report . . . data, records, and information" about how grant money is used, and its authority in Section 10153(a)(5)(A) to require a certification that "programs to be funded by the grant meet all the requirements of [Part A of Chapter 101, Subchapter V]." *See* Gov. Accountability Office, Report No. 12-353, "Law Enforcement Body Armor: DOJ Could Enhance Grant Management Controls and Better Ensure Consistency in Grant Program Requirements," at 24, 37-38 (Feb. 2012), *available at* https://goo.gl/YGiu2F. That aside, no legislative history even hints that Congress knew about, much less approved of, the Department's view of its authority to impose the 2012 condition. *See* H. Rep. No. 114-544 (2015); 161 Cong. Rec. S2670-2672 (daily ed. May 6, 2016); 161 Cong. Rec. H2184-2186 (daily ed. May 10, 2016). That silence defeats any notion that Congress somehow ratified the Department's view. *See United States v. Bd. of Comm'rs of Sheffield*, Ala, 435 U.S. 110, 135 (1978); *accord Comm'r of Internal Revenue v. Sun Pipe Line Co.*, 126 F.2d 888, 891-892 (3d Cir. 1942) (rejecting argument that Congress endorsed an agency interpretation when "legislative knowledge of the regulations appear[ed] too doubtful"). Still less does it support the notion that Congress has somehow ratified the Challenged Conditions, which do not appear in the text of any statute.

Finally, the Department has begun suggesting that the reference in Section 10102(a)(6)'s "including" clause to "determining priority purposes for formula grants" authorizes the new

conditions.  That is doubly wrong.  Again, the clause does not contain an independent grant of authority at all.  But in any event, the Challenged Conditions cannot be justified as an exercise of authority to "determin[e] priority *purposes* for formula grants."  34 U.S.C. § 10102(a)(6) (emphasis added).  As is evident in other provisions in Chapter 101, prioritization of formula grant money refers to allocating available funds among eligible applicants.  *See id.* §§ 10156(f), 10263(3), 10304(b).  That is not what happened here.  To start, the Department has never even attempted to explain why such prioritization would be necessary due to, for example, some scarcity of funds or need to reprogram funds.  Most importantly, the Challenged Conditions do not prioritize among eligible grantees, but rather render every applicant who refuses to accede to the conditions wholly ineligible for funding.  *See* Dkt. 130 (Def. Reply in Support of Mot. to Dismiss), at 4 (conceding that the Challenged Conditions determine "grant *eligibility*").  That is not a "prioritization" in the doling out of formula grant funds; it is a wholesale revision of Congress's formula grant criteria.

> **B.** **Section 10153(a)(5)(D) Does Not Authorize the Section 1373 Certification Condition.**

The Department's fall back is 34 U.S.C. § 10153(a)(5)(D), which requires a Byrne JAG program applicant to certify that "the applicant will comply with all provisions of this part and all other applicable Federal laws."  As this Court recognized, the jail access and advance notification conditions are not grounded in any federal law, and so Section 10153(a)(5)(D) cannot authorize them.  Op. at 105.  That leaves only the Section 1373 condition.  While 8 U.S.C. § 1373 is a Federal law, it is not an "applicable Federal law" within the meaning of Section 10153(a)(5)(D).

The phrase "all applicable Federal laws" cannot mean all laws that apply to a Byrne JAG program applicant.  Section 10153(a)(5)(D) would be unconstitutional under that interpretation.

Congress cannot exercise its spending powers to impose conditions on federal grantees that are not "reasonably calculated to address th[e] particular . . . purpose for which the funds are expended."  *South Dakota v. Dole*, 483 U.S. 203, 209 (1987).  Many federal laws impose obligations on state and local governments but bear no relation to the administration or goals of the Byrne JAG program.  *See, e.g.*, 47 U.S.C. § 224(c) (requirements on States which regulate utility pole attachments); 52 U.S.C. § 21081 (voting system standards).[6]  An interpretation under which "all applicable Federal laws" means every provision—whether in a statute, regulation, and or executive order—that "applies" to a locality must be rejected out of the gate in favor of an interpretation that avoids that result.  *See Crowell v. Benson*, 285 U.S. 22, 62 (1932) ("When the validity of an act of the Congress is drawn in question . . . it is a cardinal principle that [a] Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.").

Such an interpretation is readily available:  "[A]ll other applicable Federal laws" refers to those federal laws that by their text govern federal grantees in their capacity as grantees.  Along with avoiding any constitutional concerns, this reading best aligns with the statutory text, the statutory structure, the Department's longstanding practice, and Congress's consistent rejection of attempts to tie grant funding to immigration enforcement requirements like Section 1373.

---

[6]      Section 10153(a) requires applications to be submitted "in such form as the Attorney General may require."  This does not delegate to the Attorney General the authority to interpret "other applicable Federal laws."  It merely allows him to prescribe the manner in which an applicant communicates the statutorily-required information.  *See Form*, Black's Law Dictionary (10th ed. 2014) ("[t]he . . . configuration of something, as distinguished from its substance or matter"); *see also Edelman v. Lynchburg Coll.*, 535 U.S. 106, 113 (2002) (discussing whether the EEOC Commissioner had overstepped his authority to set the "form" of charges of discrimination by "address[ing] a substantive issue over which the EEOC has no rulemaking power").

1. Start with the rest of Section 10153(a)(5)(D), which refers to "all provisions of this part and all other applicable Federal laws."  The reference to *other* applicable federal laws follows a specific reference to the provisions "of this part" governing Byrne JAG grantees.  The *noscitur a sociis* and *ejusdem generis* canons teach that it should be read in light of that specific reference, to refer to "other" federal laws governing federal grantees.  *See Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114-115 (2001) (finding that the phrase "any other class of workers" should be "controlled and defined by reference to" the preceding terms, "seamen" and "railroad employees" (quotation marks omitted)).

Next consider the immediately surrounding provisions.  These require an applicant to make three other certifications related to its application: that the application seeks funds for programs that "meet" the Byrne JAG program's requirements; that the information in the application "is" correct; and that the applicant "has" coordinated with affected agencies as appropriate.  *See* 34 U.S.C. § 10153(a)(5)(A)-(C).  Part of this list, Section 10153(a)(5)(D), requires applicants to certify that, going forward, the applicant "will" comply with "all provisions of this part and all other applicable Federal laws."  The first three items ensure that the applicant has complied with the requirements related to preparing and submitting the Byrne JAG application.  And so the fourth item, aimed at the applicant's future actions, should be read to ensure that the applicant will comply with obligations—within the Byrne JAG statute and within federal laws that govern the administration of granted funds—that will apply once it becomes a federal grantee.  *See Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 20-21 (2011) ("That several items in a list share an attribute counsel in favor of interpreting the other items as possessing that attribute as well." (quotation marks omitted)); *see also United*

*States v. Wilson*, 503 U.S. 329, 333 (1992) ("Congress' use of a verb tense is significant in construing statutes.").

2. Moreover, in several places in the U.S. Code, Congress has already identified those statutes (not already generally-applicable to federal grantees by their terms) for which Byrne JAG funding can be used as a stick to encourage compliance.  It gave the Attorney General carefully circumscribed authority to withhold small portions of Byrne JAG funding based on non-compliance with certain laws.  *See, e.g.*, 34 U.S.C. § 40914(b)-(c) (National Instant Criminal Background Check System, 5% of grant if a State transmits fewer than 90% of the required records); *id.* § 20927(c)-(d) (sex offender registration and notification, 10% of grant the year after a grantee fails to substantially implement requirements); *id.* § 30307(e)(2) (prison rape elimination, 5% of grant to be used to bring jurisdiction into compliance or to be held in abeyance until jurisdiction complies); *id.* § 60105(c)-(d) (death in custody reporting, maximum 10% reduction in the next fiscal year's grant).  Reading Section 10153(a)(5)(D) to allow the Attorney General to cut off *all* funding for the failure to comply with *any* federal law renders these specific choices meaningless.

Beyond the text of Section 10153(a)(D) and the text of the few other federal laws that expressly make JAG funds contingent on compliance therewith, the structure of the Byrne JAG statute as a whole reinforces the case for a narrower interpretation of "all applicable Federal laws."  The Byrne JAG statute authorizes the Attorney General to make grants, "in accordance with the [prescribed statutory] formula," for eight types of programs: law enforcement; prosecution and courts; prevention and education; corrections and community corrections; drug treatment and enforcement; planning, evaluation, and technology improvement; crime victim and witness (other than compensation); and mental health programs and related law enforcement and

23

corrections programs.  34 U.S.C. § 10152(a)(1).  And it prohibits the use of funding for a few purposes.  *See id.* § 10152(d).  Beyond these parameters, the Byrne JAG program gives state and local law enforcement the "flexibility to spend [federal] money for programs that work for them."  H.R. Rep. No. 109-233, at 89 (2005).  Interpreting Section 10153(a)(5)(D) to allow the Attorney General to withhold funds based on a jurisdiction's non-compliance with any provision in the U.S. Code turns a predictable formula grant funding stream into one that changes with the tide of the Attorney General's preferences.  *See Train v. City of New York*, 420 U.S. 35, 45-46 (1975) ("We cannot believe that Congress at the last minute scuttled the entire effort by providing the Executive with the seemingly limitless power to withhold funds from the allotment and obligation.").

To this, the Department's only response has been to say that the Challenged Conditions speak to an applicant's eligibility but leave the grant formula intact.  That underscores why its interpretation cannot be reconciled with the statutory structure.  The choice of a formula grant shows not just that Congress intended to strip the Attorney General of discretion to set the *amount* of funding grantees would receive, but also that it intended that the full amount of appropriated funding would be distributed.  *See* 34 U.S.C. § 10156(a)(1) (The Attorney General "shall allocate" Byrne JAG program funds according to the formula.).  The formula accounts for every dollar appropriated, dividing up the amount across jurisdictions.  *See id.* § 10156.  The Department's interpretation, under which the Attorney General can cut off funding *entirely* based on any Federal law he chooses at whim, would frustrate the purpose of the formula grant scheme.

3.  The Department's longstanding practice further supports this reading.  From the time the Byrne JAG program was created in 2005 until today, the Attorney General has never insisted that applicants comply with laws beyond those governing federal grantees.  Rather, all of the

conditions it has historically imposed on grantees have either (1) related to the disbursement of the grants themselves, to ensure they meet the Byrne JAG program's requirements, *see* 34 U.S.C. § 10153(a)(5)(D) ("all provisions of this part"); (2) pertained to the accounting of that spending, *see id.* § 10153(a)(4) ("maintain and report such data, records, and information (programmatic and financial) as the Attorney General may reasonably require"); or (3) related to statutes that apply to federal grantees by their express terms, *see id.* § 10153(a)(5)(D) ("*other applicable Federal laws*" (emphasis added)).  Philadelphia catalogued all of the 53 special conditions printed in its FY 2016 award and demonstrated that each fell into one of those three buckets.  *See* Dkt. 21-11 (Analysis of FY 2016 Byrne JAG Award Special Conditions).  The new Section 1373 condition falls outside all three; there is simply no precedent for it.

Indeed, the Department's practice of requiring assurances of compliance only for cross-cutting laws that apply to federal grantees dates back to before the Byrne JAG program's predecessors were enacted.  The standard form for grant applications contained in the Office of Management and Budget's guidance listed a set of required assurances of compliance with various Federal laws "as they relate to the application, acceptance, and use of Federal funds." Circular A-102, Uniform Administrative Requirements for Grants in Aid to State and Local Governments, Attachment M, 42 Fed. Reg. 45,828, 45,845, 45,864-45,865 (Sept. 12, 1977).  It prohibited agencies from adding "[a]dditional assurances . . . to the standard assurances . . . unless specifically required by law." *Id.*, at 45,845.  The 1978 Department guidance manual for grant programs aligns with this guidance.  *See* Amicus Brief of State of New York, et al., Add. at 17-40, *City of Chicago v. Sessions*, No. 1:17-cv-5720 (Jan. 31 2018), ECF. No. 149-1.  And the Department has maintained that practice.  *See* U.S. Dep't of Justice, 2015 DOJ Grants Financial Guide, at 5, *available at* https://goo.gl/ATgjaL (explaining that various "assurances and

certifications are made by signing an assurances form that addresses various cross-cutting federal requirements, including those prohibiting unlawful discrimination").

4. If there is any doubt about the meaning of "all other applicable Federal laws," the Byrne JAG program statute itself requires it to be resolved in favor of an interpretation that does not authorize the Challenged Conditions.  The statute contains an anti-commandeering rule of construction:

> Nothing in this chapter or any other Act shall be construed to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over any police force or any other criminal justice agency of any State or any political subdivision thereof.

34 U.S.C. § 10228(a).  This provision makes clear that Section 10153(a)(5)(D) cannot be read to allow the Department to impose conditions that give it the authority to direct the activities of a grantee's criminal justice agencies.  The Challenged Conditions do just that.

5. Finally, Congress has consistently rejected legislation that would have tied Byrne JAG program funding to a grantee's cooperation with federal immigration enforcement.  *See, e.g.*, Enforce the Law for Sanctuary Cities Act, H.R. 3009, § 3(b), 114th Cong. (2015) (proposing that the Attorney General to withhold Byrne JAG grant awards from any jurisdiction that "ha[d] in effect" a policy "in contravention of" Section 1373); Stop Sanctuary Cities Act, S. 1814, 114th Cong. (2015) (proposing that jurisdictions not in compliance with Section 1373 be "[in]eligible to receive a grant under the Byrne Memorial Justice Assistance Grant Program" following a 180 period to remedy non-compliance).  It rejected similar bills relating to other funding programs. *See, e.g.*, Michael Davis, Jr. and Danny Oliver in Honor of State and Local Law Enforcement Act, S. 1640, § 114, 114th Cong. (2015) (proposing that jurisdictions not in compliance with Section 1373 be "[in]eligible to receive" "any . . . law enforcement or Department of Homeland

Security Grant").[7]  Not only has Congress declined to condition funding on compliance with Section 1373, it chose not to impose *any* consequences on non-compliance in Section 1373 itself. *See* 8 U.S.C. § 1373.  The provision's only effect is to preempt contrary state or local legislation, as the Department itself has asserted.  *See* Br. for United States at 51-52, *Arizona v. United States*, 567 U.S. 387 (2012) (No. 11-182), 2012 WL 939048 ("Congress enacted Section 1373 to preempt various state and local laws and policies that, at the time, precluded officials from sharing information with federal immigration authorities.").

## IV.    THE IMPOSITION OF THE CHALLENGED CONDITIONS VIOLATES THE SEPARATION OF POWERS.

Summary judgment is also warranted on Count II of the City's Amended Complaint, alleging that the Attorney General's imposition of the Challenged Conditions violated the Constitution's separation of powers.

The Constitution vests Congress, not the President or his appointees, with the power to appropriate funding to "provide for the . . . general Welfare of the United States."  U.S. Const. art. I, § 8, cl. 1.  When Congress makes an appropriation, the Executive Branch officials, from the President on down to the Assistant Attorney General—have a duty to carry out that appropriation.  *See* U.S. Const. art. II, § 3, cl. 5.  They may not amend or cancel a duly enacted appropriation.  *See Clinton v. City of New York*, 524 U.S. 417, 438 (1998).  They also may not choose to spend less than the full amount of funding Congress has appropriated.  *See Train*, 420 U.S. at 44; *see also In re Aiken Cty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (the President cannot "refuse to spend . . . funds" that Congress appropriated "for a particular project or program"); *Dabney v. Reagan*, 542 F. Supp. 756, 764-768 (S.D.N.Y. 1982) (officials at HUD

---

[7]     These bills, and additional examples, can be found in Exhibits E-1 through E-4 to Philadelphia's motion for a preliminary injunction at Dkt. 21-7 through Dkt. 21-10.

could not decide unilaterally not to "mak[e] available" statutorily "appropriated funds").  The President's constitutional duty, and that of his appointees, is to "take Care that the Law be faithfully executed."  U.S. Const. art. II, § 3, cl. 5.  It is not to change the law unilaterally or ignore it altogether.  *See Kendall v. U.S. ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 613 (1838) (to allow the President to ignore a federal statute "would be clothing the President with a power to control the legislation of congress").

The Department of Justice's imposition of the Challenged Conditions without congressional authorization was tantamount to a usurpation of Congress' Spending Clause powers, and thereby a violation of the Constitution's separation of powers between the Executive and Legislative Branches.  By adding those conditions—and using them as a basis to deny localities' their congressionally appropriated Byrne JAG awards—the Department is effectively "refus[ing] to spend . . . funds" that Congress has appropriated.  *In re Aiken Cty.*, 725 F.3d 255, 261 n.1.  That is a violation of the Constitution's separation of powers.  The Supreme Court's decision in *Train* is instructive.  There, the EPA Administrator had attempted to issue a regulation providing that the EPA would allot only $2 billion in annual spending on a water pollution abatement program, created by Congress to extend federal financial assistance to localities, even though the statute had appropriated a sum "'not to exceed $5 billion.'"  *Train*, 420 U.S. at 38, 40.  The Court held that the Administrator lacked the authority to withhold the fully authorized amount.  *Id.* at 40.  The statute had not "confer[red] . . . discretion on the Executive to withhold funds from the program," and the Court identified no other source of authority that would permit an Executive Branch official to negate "a firm commitment" of funds by Congress "to achieve" its objective.  *Id.* at 46.  Numerous courts have similarly held that the expenditure of appropriated funds is mandatory, and that executive officials have no inherent or

residual constitutional authority to "refuse to spend" such funds.  *Nat'l Council of Cmty. Mental Health Ctrs., Inc. v. Weinberger*, 361 F. Supp. 897, 903 (D.D.C. 1973); *see also Dubose v. Hills*, 405 F. Supp. 1277, 1287-88 (D. Conn. 1975) (Secretary lacked "the authority not to spend the reserve fund" created by Congress); *Guadamuz v. Ash*, 368 F. Supp. 1233, 1243-44 (D.D.C. 1973) ("the Executive has no residual constitutional power to refuse to spend th[e] appropriations").

That Congress has expressly rejected funding conditions like those the Department seeks to impose, as well as legislation that would have given the Department the kind of authority it claims, *see supra* at 26-27, underscores the separation-of-powers violation.  In *Youngstown*, the Supreme Court concluded that President Truman lacked the seizure power he claimed because "[w]hen the Taft-Hartley Act was under consideration in 1947, Congress rejected an amendment which would have authorized such governmental seizures in cases of emergency."  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 586 (1952); *accord id.* at 663 (Clark, J., concurring); *id.* at 599 (Frankfurter, J., concurring).  The same reasoning applies here.  The attachment of the Challenged Conditions was contrary to the Byrne JAG statute, and contrary to the Constitution's vesting of power to create and fund formula grant programs (like Byrne JAG) in Congress.  This Court should grant the City summary judgment on Count II of its amended complaint.

## V.    THE DEPARTMENT'S DECISION TO IMPOSE THE CONDITIONS WAS ARBITRARY AND CAPRICIOUS

Even if the Department had a statutory basis to impose the Challenged Conditions on Byrne JAG program applicants, the City is entitled to summary judgment on Count III of its amended complaint because the Department's decision to impose the conditions was arbitrary and capricious.

The Administrative Procedure Act authorizes a court to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  To avoid this result, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."  *State Farm*, 463 U.S. at 43 (quotation marks omitted).  The Administrative Record that the Department filed in this Court—and that the Department claims represents the complete basis for its decision to impose the Challenged Conditions on Byrne JAG awards—fails this basic test.   For three reasons, that record establishes that the Department's attachment of the Challenged Conditions was the hallmark of arbitrary and capricious action.

First, the record underscores that the Department deviated from its prior practice of imposing only limited programmatic and grant-related conditions on Byrne JAG funds, and not immigration enforcement mandates, without a sound reason or explanation.   *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (an "agency must at least 'display awareness that it is changing position' and 'show that there are good reasons for the new policy'" (citations omitted)); *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005) (an "unexplained inconsistency" in an agency's policy is "a reason for holding an interpretation to be an arbitrary and capricious change"); *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983) (same).  Since the enactment of Section 1373 in 1996, neither the Department of Justice nor any other agency has made compliance with the statute a requirement of receiving a federal grant.[8]   Likewise, no grant-making arm of the government, including the Department of Justice, has ever sought to impose a requirement like

_____

[8]      Elizabeth M. McCormick, *Federal Anti-Sanctuary Law: A Failed Approach to Immigration Enforcement and a Poor Substitute for Real Reform*, 20 Lewis & Clark L. Rev. 165, 170 (2016).

the jail access or advance notification conditions on federal grantees.  And most important here, the Department has never made Section 1373, jail access, or advance notification a condition for receiving Byrne JAG awards, or even *hinted* that it viewed those types of conditions as related to the purpose of JAG funding.

The Administrative Record provides no "satisfactory explanation"—let alone any supportive reasoning—for the Department's departure from this prior practice.  *State Farm*, 463 U.S. at 43; *accord CBS Corp. v. FCC*, 663 F.3d 122, 151-52 (3d Cir. 2011).  Indeed, the Administrative Record reveals that the Department long believed that it *lacked* the authority to attach immigration-oriented conditions to JAG funds, and even viewed such an action as potentially contrary to the goal of the JAG statute.  In September 2015, Assistant Attorney General Peter Kadzik wrote Senator Richard Shelby a letter, responding to the Senator's request that the Department "use its administrative authorities to limit the availability of JAG and COPS grants to only those state and local agencies" that comply with ICE detainer requests.  AR at PHLJAG-00112.  Assistant Attorney General Kadzik wrote:

> In general, the purpose of the Department's grant programs is to provide criminal justice funding to state, local and tribal governments to reduce crime, address significant gaps in local funding, and respond to emerging criminal justice issues. The law enforcement assistance funding is used to build capacity across state and local criminal justice systems, including re-entry services, justice system reform, information systems, and drug courts.  *Withholding the funding would have a significant, and unintended, impact on the underserved local populations who benefit from these programs, most of whom have no connection to immigration policy*. Additionally, many Department grant funds are formula-based, with the eligibility criteria (and related penalties, if any) set firmly by statute.  *In many cases, therefore, the Department does not have the discretion to suspend funding at all*.

AR at PHLJAG-00112-00113 (emphases added).  Those sentiments—that conditioning JAG awards on immigration enforcement could hurt the "underserved populations" that the program aims to protect, and was likely beyond the Department's "discretion" entirely—were reinforced

31

by Attorney General Loretta Lynch on several occasions.  In February 2016, while testifying before a subcommittee of the House of Representatives, Attorney General Lynch was asked whether the Department would commit to "cease any grants going to a particular so-called sanctuary city."  AR at PHLJAG00202.   Rather than embrace the idea, she explained that a "grant [must be] tied to the applicable law," and so there "has to be a connection between the issue and the grant."  AR at PHLJAG00202.  Later that month, while testifying before a Senate subcommittee, Attorney General Lynch was again asked whether "cities that refuse to cooperation with the federal immigration laws should be allowed to receive federal law enforcement grant funding."  AR at PHLJAG-00226.  She responded that the Department "felt that as a policy matter, having a policy that allowed us to deal first with the removal matter *would be more effective*"—and that is why the Department was putting in place a new Bureau of Prisons protocol to enhance its coordination with ICE.  AR at PHLJAG-00225-00226 (emphasis added).   In yet another hearing, this time before the Senate Oversight Committee in March 2017, Attorney General Lynch was asked whether she agreed "with [local] policies that prohibit reporting illegal status" of certain individuals.  AR at PHLJAG-00273.  She answered: "[W]ith the current state of the law . . . that is a local matter."  *Id.*   At no point did she suggest that the Department could insist that localities change their immigration policies in order to receive JAG awards.  Nor did she suggest that doing such would be sensible, or consistent with JAG's purpose.

When the Department announced its new conditions on July 25, 2017, it released no reports or studies explaining why it had changed its stance on the above points.  Nor did it release anything in August 2017, when the Department posted the FY 2017 Local Solicitation.  *See* FAC ¶ 98.   One will search the Administrative Record in vain to find additional clues:  The

Administrative Record is simply devoid of any findings, internal publications, or analyses that help explain why the Department decided to jettison its prior practice and now add immigration terms to JAG awards.  For instance, there is no internal study where the Department found that there *is* indeed a "connection between [immigration enforcement] and the [JAG] grant"—like a finding that if localities were to reveal undocumented persons' confidential information to ICE, that would improve local public safety.  AR at PHLJAG-00202.  There is no document where the agency revisited the idea that "withholding [DOJ] funding" from localities "would have a significant, and unintended, impact on the underserved local populations who benefit from these programs, most of whom have no connection to immigration policy."   AR at PHLJAG-00113.  The absence of such evidence is notable, because the Department's shift was not minor.   The July 25 announcement represented the first time that the Department was making localities' immigration policies a condition of receiving current JAG funding,[9] and that decision affected state and local governments' eligibility for over $375 million in funding.  *See* Office of Justice Programs, *FY 2018 Program Summaries*, at 26 (June 2017), *available at* https://goo.gl/RSwXZp (stating funding for FY 2017).   In light of the stakes, the Department's "failure to offer an explanation . . . for the change in its policy" is inexcusable.   *Comite' De Apoyo A Los Trabajadores Agricolas v. Perez*, 774 F.3d 173, 188 (3d Cir. 2014).

The Department's likely response will be that its policy shift was prompted by the May 31, 2016 memorandum issued by the Department's Office of the Inspector General ("OIG").  *See* AR at PHLJAG-00366-00381.  There are several problems with that argument.  First, the OIG

---

[9]     While the Department of Justice did decide in July 2016 to require that JAG grantees provide a "[s]ubmission of compliance validation" regarding Section 1373 by June 30, 2017, *see* AR at PHLJAG-00455, that certification requirement did not affect grantees' eligibility for FY 2016 JAG funding.   *See* AR at PHLJAG-00432 (clarifying that the July 2016 certification requirement did not "impac[t]" any "FY 2016 or prior year Byrne/JAG or SCAAP funding").  And even that step was a departure from a decade of practice.

memorandum did not even address the Department's new jail access and advance notification conditions—those conditions appear for the first time, in the *entire* Administrative Record, when they were imposed in July 2017.  Second, the Attorney General's July 25, 2017 press release and backgrounder do not reference the OIG memorandum; it is not in fact clear that the memorandum played a role in the agency's ultimate decision.  AR at PHLJAG-009992-00993; *see Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 95 (1943) (an agency action "cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained").  But perhaps most important, while the OIG purported to study whether various jurisdictions have policies that may conflict with Section 1373, it did not engage in any analysis about whether DOJ funding intended to bolster cities' criminal justice systems should be made contingent on a locality's immigration protocols.  For instance, the memorandum did not find—or even discuss the notion—that local policies which protect the confidentiality of individuals' immigration-status information result in a greater incidence of crime.  In short, the OIG memorandum cannot possibly stand as evidence of the Department's discovering of some "connection" between localities' immigration policies and the Byrne JAG program (or any other federal grant administered by the Department of Justice), AR at PHLJAG00202, because the OIG memorandum did not even consider the issue.  *See* AR at PHLJAG-00366-00381.

The second reason that the record demonstrates that the Department's attachment of the Challenged Conditions was arbitrary is it ran "counter to evidence before the agency."  *State Farm*, 463 U.S. at 43; *see also Robert Wood Johnson Univ. Hosp. v. Thompson*, 297 F.3d 273, 280 (3d Cir. 2002) (agency action is arbitrary and capricious when, among other things, the agency "entirely failed to consider an important aspect of the problem," or "offered an

explanation . . . that runs counter to the evidence before the agency" (quotation marks omitted)). In the summer of 2017, several jurisdictions submitted evidence and testimonials alongside their Section 1373 certification letters explaining that policies which build trust with the immigrant community promote, rather than detract from, effective policing. Philadelphia's certification letter provides an example. *See* AR at PHLJAG-00640; FAC ¶¶ 84-88; Dkt. 1-14. The Administrative Record contains additional such certification letters that the Department unquestionably reviewed. AR at PHLJAG-00664-00668 (New York); AR at PHLJAG-00722-00724 (Milkwaukee); AR at PHLJAG-00959 (Cook County). And there is no shortage of studies and reports that have concluded that localities with welcoming policies, like Philadelphia, have seen reductions in crime rates. *See* FAC ¶¶ 29-32 (collecting citations). The Department has not acknowledged or responded to any of this evidence despite its importance to the purposes of the Byrne JAG grant program—making communities safer.

Third, there is a glaring disconnect between the Department's stated reasons for imposing the Challenged Conditions and the actual effects of those conditions—which the Administrative Record does nothing to resolve. *See State Farm*, 463 U.S. at 43 (holding that agency action is arbitrary where there is no "rational connection between the facts found and the choice made" (quotation marks omitted)). Throughout this litigation, the Department has claimed that the goal behind the new conditions is to facilitate cooperation between the federal government and localities in immigration enforcement. *See* MTD 17, 19-20. As this Court has explained, though, the Section 1373 condition imposes far broader requirements than are necessary for the Department's immigration-enforcement goals. The Department claims it needs information about unlawful aliens who commit crimes, but Section 1373 addresses information related to *any* individual's citizenship and immigration status. *See* 8 U.S.C. § 1373(a). The Department claims

35

it does not want federal funds to be used to frustrate federal goals, but the Section 1373 condition does not restrict the use of funds; instead, it impacts the applicant's eligibility for any funds at all.  As to the advance notification and jail access conditions, while the Department has similarly represented that their objective is to promote "cooperation" pertaining to immigration enforcement, *see*  MTD 17, the conditions do nothing of the sort.  They impose a mandate on how localities must treat arrested individuals and operate their jails, backed by the stick of withdrawing significant federal funding.  That is not cooperation, nor has the Department even attempted to explain how it could foster future cooperation.  The Administrative Record lacks any indication that the Department even considered the mismatch between its stated objectives and its chosen means of achieving them.

## VI.    THIS COURT SHOULD ENTER A PERMANENT INJUNCTION

Because the Challenged Conditions violate the Administrative Procedure Act—as ultra vires, in violation of the separation of powers, and as arbitrary and capricious—the Court should permanently enjoin the Department from enforcing the Challenged Conditions upon the City in conjunction with its FY 2017 Byrne JAG award.  In granting relief, this Court should retain jurisdiction to monitor the Department's compliance with the injunction and, as needed, to allow the City to ask the Court to step in if the Department again attempts to impose the Challenged Conditions on the City.

A permanent injunction is appropriate where a plaintiff shows: it "suffered an irreparable injury," "remedies available at law  .  .  .  are inadequate to compensate for that injury," "the balance of hardships between the plaintiff and defendant" supports an equitable remedy, and "that the public interest would not be disserved."  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

36

A permanent injunction is warranted here. The Department has conveyed in its letter of October 11, 2017, in its preliminary injunction papers, and its motion to dismiss, that it does not deem Philadelphia's policies to comply with Section 1373. Dkt. 28-1, Ex. A (Department's Oct. 11, 2017 Ltr to the City); Dkt. 28 (Opp. to the City's Motion for Preliminary Injunction); Dkt. 70 (Suppl. Br. in support of Opp.); Dkt. 102 (MTD). It has also represented in this litigation that it does not deem Philadelphia's policies to comply with the advance notification and jail access condition. *See* Dkt. 72, at 88:18-23 (Nov. 2, 2017 Oral Arg. Tr.). But forcing Philadelphia to change its policies in order to receive the FY 2017 JAG award would inflict two distinct and irreparable harms. One is the interference with Philadelphia's autonomy and exercise of its police powers, which courts have widely recognized as an irreparable injury. *See Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001); *Texas v. United States*, 201 F. Supp. 3d 810, 834-835 (N.D. Tex. 2016). The other is the impact on Philadelphia's public safety and well-being. Philadelphia officials have engaged in a concerted effort to build trust with the City's immigrant community and ensure that its residents feel safe to engage fully in public life. Forcing Philadelphia to abandon its policies would destroy that trust. *See* FAC ¶¶ 100-102; Tr. at 36:21-23 (Ross); 38:2-39:9 (Ross); 146: 16-147:8 (Farley). Residents could be discouraged from accessing City services or speaking to the police, and the crime rates that Philadelphia has seen fall could tick back up. FAC ¶ 37.

At the same time, should the City decline to accept the new conditions as the Department is attempting to enforce them, and thus forfeit its entitlement to $1.6 million in FY 2017, it will also suffer irreparable damage. For FY 2017, the City intends to use its grant funding, among other things, to support the Police Commissioner's "Crime Fighting Strategy," including overtime funding for "Quality of Life" police initiatives; to enhance a Reality Based Training

Unit to emphasize best practices on the use of force; for supplies for a citywide collaboration to support inner-city youth; and to purchase life-saving naloxone for officers responding to opioid overdoses.  *See supra* at 9, ¶ 31.   Meanwhile, the Byrne JAG program provides the City no remedy at law, such as damages; if it forgoes its FY 2017 award, it will never recoup that money.

As to the balance of hardships and public interest, both factors also support granting the City permanent injunctive relief.   The balance of hardships favors the City because the Department has never identified any harm that it would suffer from granting the City's application—and there is none.   The public interest also favors a permanent injunction: Allowing the City to improve its criminal justice system with Byrne JAG program funds while also preserving its hard-earned trust with the immigrant community—which helps keep the City healthy, safe, and integrated—would benefit all City residents.   And, plainly, the public interest is always served by the prevention of unlawful and unconstitutional government actions like the Department's effort to impose the Challenged Conditions.  *See Swartwelder v. McNeilly*, 297 F.3d 228, 242 (3d Cir. 2002).

## CONCLUSION

The City is entitled to judgment as a matter of law on Counts I, II, and III of the City's

Amended Complaint.  The Court should grant the City's motion for partial summary judgment.


DATED: April 13, 2018                          Respectfully submitted,

                                               /s/ Virginia A. Gibson
MARCEL S. PRATT, I.D. NO. 307483               VIRGINIA A. GIBSON, I.D. NO. 32520
  Acting City Solicitor                        SARA ARONCHICK SOLOW, I.D. NO. 311081
LEWIS ROSMAN, I.D. NO. 72033                   JASMEET K. AHUJA, I.D. NO. 322093
  Senior Attorney                              ALEXANDER B. BOWERMAN, I.D. NO. 321990
CITY OF PHILADELPHIA LAW DEPARTMENT            HOGAN LOVELLS US LLP
1515 Arch Street, 17th Floor                   1735 Market Street, 23rd Floor
Philadelphia, PA 19102                         Philadelphia, PA 19103
                                               (267) 675-4600
ROBERT C. HEIM, I.D. NO. 15758                 virginia.gibson@hoganlovells.com
JUDY L. LEONE, I.D. NO. 041165
FRIEDRICH-WILHELM W. SACHSE, I.D. NO. 84097    NEAL K. KATYAL (*pro hac vice*)
DECHERT LLP                                    KIRTI DATLA (*pro hac vice*)*
Cira Centre                                    REEDY C. SWANSON (*pro hac vice*)
2929 Arch Street                               HOGAN LOVELLS US LLP
Philadelphia, PA 19104                         555 Thirteenth Street, NW
(215) 994-4000                                 Washington, DC 20004

                                               *Admitted only in Texas; supervised by firm
                                               members*

                    Attorneys for the City of Philadelphia

39

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 13, 2018, the foregoing document was filed with the Clerk of the Court using the CM/ECF system, which will send notification of the filing to all counsel of record.

April 13, 2018

      /s/ Virginia A. Gibson

VIRGINIA A. GIBSON, I.D. NO. 32520
HOGAN LOVELLS US LLP
1735 Market Street, 23rd Floor
Philadelphia, PA 19103
(267) 675-4600
virginia.gibson@hoganlovells.com