## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

THE CITY OF PHILADELPHIA,

*Plaintiff,*

v.

JEFF SESSIONS, in his official capacity as
Attorney General of the United States,

*Defendant.*

Case No. 2:17-cv-03894-MMB

## DEFENDANT'S PROPOSED FINDINGS OF FACT

Defendant, by and through undersigned counsel, hereby submits its Proposed Findings of Fact pursuant to this Court's Scheduling Order (Dkt. No. 191).

## ICE's Responsibilities

1.      U.S. Immigration and Customs Enforcement ("ICE"), through its Criminal Alien Program, is responsible for removing criminal aliens and the threats that they pose from the community.  *See* Transcript of May 1 Bench Trial ("May 1 Trial Tr.") 129:12-19.

2.      A priority of ICE's Philadelphia Field Office is to focus on threats to public safety and national security.  *See* Transcript of May 2 Bench Trial ("May 2 Trial Tr.") 102:15-23.

3.      ICE does not seek out victims of crimes or witnesses to crimes for enforcement actions.  May 2 Trial Tr. 84:20-21, 85:16-18.

## How ICE Learns of Arrests

*IDENT:*

4.      DHS's Automated Biometric Identification System ("IDENT") is the "central DHS-wide system for the storage and processing of biometric and associated biographic information for national security, law enforcement, immigration and border management, intelligence, and background investigation purposes."  Special Master's Report and Recommendation ("MJ R. & R.") (Dkt. No. 154) at 9 (citation omitted).

5.      IDENT has relevant information for only a subset of potentially removable aliens. May 2 Trial Tr. 94:11-13.  If someone crosses a United States border illegally, and has not previously had an encounter with the government, there would not be any biometric information for that individual to match against in IDENT.  May 1 Trial Tr. 132:01-17, 159:21-24.  *See also* May 1 Trial Tr. 154:21-155:02.

6.      When Philadelphia police officers submit fingerprint information for aliens they arrest and those fingerprints are run through law enforcement databases, there would not be a match in

IDENT for individuals who crossed a border illegally and who had not previously had an encounter with the government. May 1 Trial Tr. 132:18-24, 159:25-160:09; May 2 Trial Tr. 82:14-83:05. Accordingly, ICE would not be made aware via IDENT that the person had been arrested by the City. May 1 Trial Tr. 159:25-160:09.

***PARS:***

7.      ICE sometimes becomes aware of individuals claiming to be foreign born and who are in Philadelphia police custody through the Preliminary Arraignment System ("PARS"). May 1 Trial Tr. 132:25-133:07.

8.      PARS contains self-reported information as to an individual's country of birth. May 1 Trial Tr. 133:22-25, 134:14-15, 141:01-14. PARS does not show citizenship status. May 1 Trial Tr. 141:25-142:01. Individuals do not always accurately report their country of birth. May 1 Trial Tr. 141:11-14.

9.      PARS does not automatically alert ICE that the City has arrested someone born in a foreign country; instead, ICE has to manually check PARS. May 1 Trial Tr. 133:17-21, 134:02-09, 142:04-14. Nor does PARS send ICE alerts as an individual is moving through the criminal process. *See* Transcript of Apr. 30 Bench Trial ("Apr. 30 Trial Tr.") 234:05-14, May 1 Trial Tr. 142:15-19, 145:10-17. Accordingly, ICE has to manually check the PARS database on a daily basis. May 1 Trial Tr. 146:10-13. It is resource-intensive for ICE to monitor PARS in this manner. May 2 Trial Tr. 96:04-06.

10.      PARS does not contain any information about the release of individuals from City prisons. May 1 Trial Tr. 207:02-04.

11.      PARS does not provide advance notice identifying when an individual will be released from police custody. *See* May 1 Trial Tr. 142:20-24, 207:08-13; May 2 Trial Tr. 11:09-12:03.

12.     It is not feasible for ICE to rely upon the "waiting for release" column in the PARS database for individuals being released from police custody because people can be listed as awaiting release for several hours.  Moreover, it is not feasible for ICE officers to surround police departments in the City waiting for people who are identified in the "waiting for release" column to actually be released from city custody.  May 2 Trial Tr. 95:16-96:01.

***First Judicial District Website:***

13.     The First Judicial District website, which is available to the public, only provides after-the-fact information.  May 1 Trial Tr. 151:08-25.  Specifically, the First Judicial website does not provide advance notice that an individual is being released from City custody.  May 1 Trial Tr. 207:14-17.  Accordingly, the First Judicial District website does not provide timely information that ICE can use.  May 1 Trial Tr. 151:13-15.

## Training of City Employees

14.     City employees, including police officers, are trained on numerous policies affecting their duties, and are trained on those policies in a variety of different ways.  Apr. 30 Trial Tr. 9:01-10:16; *see* Transcript of May 10 Bench Trial ("May 10 Trial Tr.") 6:08-07:13, 38:03-40:07; *see also* Transcript of Evidentiary Hearing on Oct. 26, 2017 ("PI Tr.") 23:03-15, 110:16-24 (Dkt. No. 65-1).

15.     City employees, including police officers, are not trained on the requirements of 8 U.S.C. § 1373.  Apr. 30 Trial Tr. 9:21-10:19, 11:10-14, 64:10-65:03; May 10 Trial Tr. 8:22-9:15; *see also* PI Tr. 57:21-58:03, 110:25-111:18.

16.     There is no practical impediment to training City employees on § 1373, given that those employees are trained on City policies governing information-sharing, and are also trained on other provisions of federal law affecting their job duties.  ¶ 14, *supra*; Apr. 30 Trial Tr. 64:07-65:03; May 10 Trial Tr. 8:12-21, 9:16-10:18.

17.     Affirmative training is sometimes required to ensure that City employees understand the full scope of City policies.  Apr. 30 Trial Tr. 130:01-06.

## The City's Current Policies Regarding Advance Notice

18.     In January 2016, Mayor Kenney issued Executive Order 5-16, which prohibits City employees from providing advance notice of an inmate's release pursuant to an ICE detainer "unless such person is being released after conviction for a first or second degree felony involving violence and the detainer is supported by a judicial warrant."  Ex. P-16 at § 1.

19.     Executive Order 5-16 was issued by the Mayor without consulting the City's Police Commissioner.  May 10 Trial Tr. 24:14-16.

20.     There was confusion within the City regarding the scope of this Executive Order's provisions, particularly with respect to whether a federal judicial warrant was by itself sufficient to allow advance notice to ICE, or whether the person in custody must also be "released after conviction for a first or second degree felony involving violence[.]"  Ex. P-16 at § 1; Apr. 30 Trial Tr. 82:14-19; May 1 Trial Tr. 180:19-24; PI Tr. 89:07-10.

21.     In March 2017, Brian Abernathy issued a "clarifying" memorandum to the Department of Prisons stating that cooperation should continue for "all federal criminal warrants" in the same manner as prior to Executive Order 5-16 ("Abernathy Memo").  Ex. P-17; PI Tr. 88:17-89:10, 105:02-105:17.

22.     Despite issuance of the clarifying memorandum in March 2017, members of the Police Department continued to rely on the provisions of Executive Order 5-16 as written at least as recently as February 2018.  *See* Ex. D-24; Apr. 30 Trial Tr. 124:18-127:10.  The Police Department's training for police officers regarding Executive Order 5-16 does not include training on the March 2017 clarifying memorandum.  May 10 Trial Tr. 13:8-18.

23.     The Commanding Officer of the Police Detention Unit ("PDU") had never seen the Abernathy Memo prior to being shown the document at trial.  Apr. 30 Trial Tr. 219:04-09.

24.     The term "judicial warrant" as used in Executive Order 5-16 refers only to judicial criminal warrants issued in connection with criminal matters.  Apr. 30 Trial Tr. 32:11-17, 33:21-36:13, 82:20-25; May 10 Trial Tr. 11:07-11, 58:23-59:08; MJ R. & R. at 18 n.14; PI Tr. 98:07-10.

### Release of Inmates from City Custody

25.     Approximately 20% of individuals in City custody are serving sentences after being convicted of a crime.  Apr. 30 Trial Tr. 108:22-109:07; *see also* PI Tr. 90:24-91:03.  The City agrees that it could feasibly provide ICE with advance notice of these individuals' release from custody.  Apr. 30 Trial Tr. 109:08-12.

26.     For the other approximately 80% of individuals, even when someone is ordered released, there is a period of time before the person is actually physically released from the facility.  In the Department of Prisons, the City tries to release individuals within four hours.  Apr. 30 Trial  Tr. 73:20-25, 110:05-15; PI Tr. 90:15-17.   In the Police jail facilities, release of individuals also requires some time for processing.  Apr. 30. Trial Tr. 73:16-74:09; 215:19-216:04.

27.     The City tracks individuals for whom ICE lodges a detainer through a spreadsheet that is transferred to Mr. Abernathy on a weekly basis.  Ex. D-20; Apr. 30 Trial Tr. 88:05-16.

28.     When an individual for whom ICE has lodged a detainer has been ordered released—regardless of whether that person is pre-trial or a convicted prisoner serving a sentence—the City has developed a protocol for providing advance notice to Mr. Abernathy, and other City officials, about that inmate's upcoming release.  Apr. 30. Trial Tr. 32:03-10, 95:04-96:09, 100:24-101:17, 102:01-12. Mr. Abernathy typically receives that advance notice within an hour of the release order, and then has approximately four hours to review and respond regarding the inmate's upcoming release.  Apr. 30 Trial Tr. 97:16-98:17, 100:24-101:08, 101:18-25.

29.     There is no practical impediment to the City providing advance notice to ICE of an inmate's upcoming release, even for pre-trial inmates, given that the City has successfully implemented and complied with a protocol for providing such advance notice to Mr. Abernathy and other City officials. *See* ¶ 28, *supra.* Such advance notice, even if only a few hours, would still be valuable to ICE, as demonstrated by ICE successfully taking custody of the five individuals for whom Mr. Abernathy provided only 3 to 4 hours' notice prior to their release. *See* ¶ 40, *infra.*

### ICE's Ability to Obtain Criminal Warrants

30.     ICE attempts to obtain a criminal warrant along with a detainer where, in addition to pursuing administrative removal charges against an individual, ICE also seeks to have that individual be charged with a criminal offense. May 1 Trial Tr. 168:24-169:04. Not all aliens present unlawfully in the country have committed a criminal offense by virtue of their unlawful status—for example, overstaying a visa is not a crime. May 1 Trial Tr. 170:03-171:14.

31.     ICE does not have the ability to issue criminal warrants independently, but instead must first contact the U.S. Attorney's Office and ask them to proceed with requesting a criminal warrant from the district court. The U.S. Attorney's Office must then obtain the warrant from a Magistrate Judge. May 1 Trial Tr. 169:05-23, 175:15-20.

32.     It can take a substantial amount of time—up to several days—for ICE to obtain a criminal warrant. In the meantime, an individual may be released from custody by the City. May 2 Trial Tr. 100:20-101:15.

33.     After Executive Order 5-16 was signed, there was at least one incident where the City did not honor an ICE detainer that was accompanied by a judicial criminal warrant. In that circumstance, the City released the individual from custody without notifying ICE before the individual was released. Apr. 30 Trial Tr. 82:14-19; May 1 Trial Tr. 180:25-181:19.

**Harms Caused by the City's Policy Restricting Advance Notice**

34.     Unless an ICE detainer is accompanied by a federal criminal warrant, the City's policies forbid advance notice to ICE of a person's release from custody – even if the person has been charged with or convicted of a serious offense.  Apr. 30 Trial Tr. 83:04-84:03; May 10 Trial Tr. 61:23-62:12; PI Tr. 106:03-107:25.

35.     On numerous occasions, the City has failed to comply with ICE detainers because they were unaccompanied by federal criminal warrants, even though the detainers were lodged against individuals charged with or convicted of committing serious crimes, such as rape and sexual assault. Ex. D-9 at 2-3 (Suppl. Resp. No. 5); *see* Ex. D-20; Apr. 30 Trial Tr. 87:07-90:23.

36.     In 2015, the City chose not to comply with an ICE detainer for Juan Vasquez, a/k/a Ramone Aguirre-Ochoa, who was instead released from custody by the Philadelphia Department of Prisons.  Mr. Vasquez was subsequently rearrested and charged in 2016 for an unrelated offense, where he pled guilty to rape of a child and unlawful contact with a minor.  He is currently serving a sentence of 8-to-20 years for those offenses.  Ex. D-8; Apr. 30 Trial Tr. 85:06-86:09.

37.     Notwithstanding policies to the contrary, Philadelphia police officers have occasionally called the ICE Philadelphia Field Office to inform ICE that an individual on whom ICE had lodged a detainer was ready to be transferred to ICE custody, even though no federal criminal warrant accompanied the detainer.  In those circumstances, custody of the individual was transferred inside police facilities.  May 1 Trial Tr. 187:15-20, 191:21-192:01.

38.     Notwithstanding policies to the contrary, members of the Philadelphia Department of Prisons have occasionally provided advance notice to ICE of the release of an individual on whom ICE has issued a detainer, even though no federal criminal warrant accompanied the detainer.  When ICE was provided with such advance notice, it typically responded within a couple of hours.  May 1 Trial Tr. 201:03-17.

39.     On five separate occasions, a senior City official—Brian Abernathy, First Deputy Managing Director—consciously violated Executive Order 5-16 and provided advance notice to ICE of an inmate's release from custody even in the absence of a criminal warrant, based in part on his concerns that the individual's release would pose a risk to public safety.  Apr. 30 Trial Tr. 37:16-24, 102:15-105:05; May 1 Trial Tr. 201:18-23, 202:16-21.

40.     On each of the five occasions in which Mr. Abernathy provided advance notice of an individual's release, he provided approximately 3 to 4 hours advance notice to ICE.  Apr. 30 Trial Tr. 105:12-105:15.  On all five occasions, ICE successfully took custody of the individuals.  Apr. 30 Trial Tr. 105:06-11.

41.     The tips that Mr. Abernathy provided were unofficial and off the record.  May 1 Trial Tr. 203:01-02.  Pursuant to these tips, ICE was not provided access to the City's jails in order to allow ICE to take custody of the individuals being released by the City.  May 1 Trial Tr. 203:03-08.

42.     ICE prefers to take custody of individuals at jails because it is the safest and most efficient place to do so.  May 1 Trial Tr. 186:01-05; *see also* Apr. 30 Trial Tr. 237:05-10.

43.     Transfers of custody of individuals inside the controlled environment of city facilities rather than in public environments, such as on the street in front of those facilities, promotes officer safety and the safety of the public at large.  Apr. 30 Trial Tr. 106:19-107:12, 237:11-17.

44.     ICE typically sends two officers when the City transfers custody of an individual inside a jail or other similar facility.  May 1 Trial Tr. 186:06-08.

45.     In order to respond to the tips provided by Mr. Abernathy, ICE had to send teams of four or five officers to surveil the City's prisons to wait for the individuals to be released from custody.  May 1 Trial Tr. 203:12-204:01.  Most of these arrests occurred after midnight.  May 1 Trial Tr. 204:02-06.

46.     ICE arrests that take place immediately outside of the City's prisons do not take place in a controlled environment because the individual that ICE is attempting to arrest has already left City custody; instead, the arrest takes place on a public street.  May 1 Trial Tr. 205:02-10.

47.     Many things can go wrong when ICE arrests individuals immediately outside of the City's prisons because the arrests take place in a public area, occur late at night (when it is dark), because ICE may merely have a picture of the person they are looking for, because there are many people coming and going from the prison, because the person ICE is seeking to detain may have somebody outside the prison to pick them up, because the person ICE is seeking to detain may flee, and because there could be a struggle, resulting in injury.  May 1 Trial Tr. 205:11-19.

48.     ICE takes many precautions prior to arresting individuals in public environments, including preparing a fugitive operation worksheet, obtaining supervisory approval, and conducting surveillance.  May 1 Trial Tr. 207:23-208:17.

49.     ICE very often does not have accurate address or whereabouts information for individuals previously released from City custody.  May 1 Trial Tr. 208:18-209:06.  City databases, including the PARS database, can contain inaccurate address information.  May 1 Trial Tr. 209:07-22.

50.     ICE typically does not arrest individuals inside their homes because it is very dangerous to complete an arrest inside someone's house and because ICE's administrative arrest warrants do not allow ICE agents to go into a house without being invited into that house.  May 1 Trial Tr. 210:11-19. Instead, many ICE arrests take place on the City's streets.  May 1 Trial Tr. 211:03-04.

51.     When ICE officers attempt to make arrests in a public environment, ICE's officers are armed and carry bulletproof vests, tactical gear, and ICE markings.  May 1 Trial Tr. 211:07-09.

52.     ICE typically sends at least five officers to conduct an arrest in a public environment. May 1 Trial Tr. 211:10-22.

53.     In one incident, ICE learned of an alien in the City's custody at about 7:30 in the morning, and promptly lodged a detainer with the City.  The individual had an extensive criminal history and had already been deported.  ICE also attempted to obtain a criminal warrant, and had notified the City that it was attempting to obtain a criminal warrant.  ICE obtained the warrant at approximately 1:00 in the afternoon and faxed the warrant to the City's police department.  By that point in time, however, the individual had already been released from City custody.  An ICE agent later located and arrested the individual across state lines, in New Jersey.  Shortly after arrest, the individual managed to steal an ICE police car and drove off.  The police car was found abandoned later that day, and ICE ultimately arrested the individual again four or five days later.  May 1 Trial Tr. 212:05-213:22.

54.     During ICE arrests in public environments, there have been a number of instances where individuals have resisted arrest, attempted to flee, or engaged in physical struggles.  May 1 Trial Tr. 213:23-214:04.

55.     By prohibiting advance notice to ICE of an inmate's release from custody, the City's policy results in ICE trying to apprehend the individual on the street or in the community, which is less safe than transferring custody of the individual in a controlled environment.  Apr. 30 Trial Tr. 105:25-107:12.  Arresting someone on the street after they have been released into the community is even risker than arresting someone outside of a prison immediately after they have been released from custody.  May 1 Trial Tr. 214:18-20.

56.     If the City shared more information with ICE, including providing advance notice of when individuals are released from City custody, ICE would be in a better position to pursue its priority of focusing on threats to public safety and national security.  *See* May 1 Trial Tr. 216:09-12; May 2 Trial Tr. 102:24-103:06.

57.     If the City were to provide advance notice of release, there would be less of a need for ICE to conduct targeted enforcement operations on the City's streets.  May 2 Trial Tr. 105:10-106:01.  As a result, there would be fewer circumstances in which ICE would come into contact with removable aliens who are collateral to the target itself.  May 2 Trial Tr. 106:18-23.

58.     The City's policies make it harder for ICE to arrest criminal aliens.  May 2 Trial Tr. 103:04-11.  That is because the best way to apprehend criminal aliens is to identify and apprehend individuals while they are in custody.  May 1 Trial Tr. 129:05-19.

59.     Advance notification of when an alien is being released from custody is the single most useful piece of information to ICE regarding citizenship and immigration status, because without advance notification of release, ICE is not able to make effective use of the other immigration-related information provided by the City.  May 1 Trial Tr. 216:13-24.

60.     Delaware, Montgomery, Chester, and Bucks Counties provide advance notice to ICE before they release individuals from custody on whom ICE has lodged a detainer.  May 1 Trial Tr. 215:09-216:08.

61.     As reflected by Philadelphia's high recidivism rate, individuals who commit crimes in the past also commit crimes in the future at a substantial rate.  Apr. 30 Trial Tr. 115:01-116:03.  Accordingly, given ICE's focus on public-safety risks, it is sensible for ICE to focus on individuals already arrested for crimes, consistent with the Philadelphia Police Department's own strategies.  May 10 Trial Tr. 20:17-21:08.

### The City's Philosophy of "Smart Policing" and Its Cooperation with ICE

62.     The guiding principle for the City's policies is that the City will share immigration-related information about individuals suspected of or convicted of committing crimes, but it will not share information as to otherwise law-abiding immigrants, because once somebody commits a crime that is "a game changer."  Apr. 30 Trial Tr. 12:19-13:05, 77:15-78:03, 166:01-05; *see also* May 10 Trial

Tr. 16:13-22, 25:22-26:01, 62:25-63:04. The sharing of information regarding individuals suspected of or convicted of committing crimes is consistent with the City's philosophy of "smart policing." Apr. 30 Trial Tr. 79:08-22; May 10 Trial Tr. 26:02-18, 27:01-11, 32:23-33:09. *See also* PI Tr. 24:24-26:03, 29:21-30:03, 33:04-33:21, 36:06-14.

63. Many of the City's policies reflect this guiding principle, allowing the sharing of immigration-related information when an individual is suspected of committing a crime. Ex. P-14 at § III; Ex. P-15 at §§ 2(C), 3(B)(3); Apr. 30 Trial Tr. 12:07-18, 58:21-59:07, 78:04-22; May 10 Trial Tr. 26:19-27:06. *See also* PI Tr. 26:04-16, 29:12-30:17, 48:08-49:1, 56:10-57:20, 58:04-59:08, 115:13-19, 118:24-119:13.

64. Executive Order 5-16 is inconsistent with this guiding principle, however, because it forbids sharing information with ICE even as to individuals who are suspected of or convicted of committing crimes. Ex. P-16 at § 1; *see* Apr. 30 Trial Tr. 80:24-81:18.

65. In general, the City's policies do not prohibit police officers from sharing information with ICE regarding an alien's potential whereabouts. Apr. 30 Trial Tr. 15:3-17:3, 60:05-61:1, 167:07-168:21; May 10 Trial Tr. 15:13-16:07. It is consistent with the City's philosophy of smart policing to allow police officers to share information with ICE regarding an alien's whereabouts. Apr. 30 Trial Tr. 144:14-145:05. The only circumstances in which police officers *are* prohibited from sharing information regarding an alien's whereabouts—*i.e.*, where the alien will be at a particular time—is pursuant to Executive Order 5-16, when the alien is being released from City custody. *See* Ex. P-16 § 1.

66. The City currently shares immigration-related information with ICE, including on an automatic basis, which does not imperil the City's philosophy of "smart policing." Apr. 30 Trial Tr. 144:07-13, 149:13-25; May 10 Trial Tr. 57:17-58:07.

67.     Particularly in light of the existing information-sharing between the City and ICE, there is no evidence that providing advance notice to ICE in circumstances beyond detainers accompanied by federal criminal warrants would deter individuals from reporting crimes.  *See* May 10 Trial Tr. 27:12-18; Apr. 30 Trial Tr. 145:24-146:12.

68.     The City's Police Commissioner does not disagree that modifying Executive Order 5-16 to allow for exceptions could better promote public safety.  *See* May 10 Trial Tr. 22:24-23:20, 25:04-21.

69.     The City's Police Commissioner has no knowledge of the Police Department's information-sharing with ICE about aliens suspected of committing crimes causing the law-abiding immigrant community to lose trust in the Police Department.  May 10 Trial Tr. 27:23-28:12.

### Lock & Track Database

70.     In 2016, the City stopped providing ICE with access to the "Lock & Track" database, which is the Philadelphia Department of Prisons database that captures individuals' names, some biographical information including self-reported citizenship, the person's charges, and where they are located within the prison system itself.  Apr. 30 Trial Tr. 20:20-23:04; May 1 Trial Tr. 146:21-23.  The City removed ICE's access to both an online portal, as well as a daily report sent to ICE.  Apr. 30 Trial Tr. 25:07-26:18, 133:12-134:09.  The daily email contained both country of citizenship and country of birth information.  May 1 Trial Tr. 148:07-10.  ICE used this information on a daily basis.  May 1 Trial Tr. 148:11-23.

71.     It would advance ICE's mission to know whether an individual sought by ICE is in the custody of the Philadelphia Department of Prisons, regardless of what that person's previous record in PARS might be.  *See* May 1 Trial Tr. 149:14-18.

72.     At the time of the City's application for FY2017 Byrne JAG funding on September 5, 2017, ICE did not have access to the Lock & Track database, and still today does not have access to

the Lock & Track database.  Apr. 30 Trial Tr. 132:02-17; May 1 Trial Tr. 147:02-08.  *See also* Ex. D-26 (Dkt. No. 199-1).

73.     ICE is interested in receiving information from the Lock & Track database because it would help ICE do its job.  May 1 Trial Tr. 147:09-13.

74.     The City has stated that it would be willing to give ICE access to the self-reported citizenship information contained in Lock & Track, but has not stated what other information in the database the City would be willing to provide.  Apr. 30 Trial Tr. 27:10-13, 132:13-133:03.

### Philadelphia Department of Prisons' Failure to Forward Detainers

75.     Prior to March 2018—including on September 5, 2017, when the City submitted its application for FY2017 Byrne JAG funding—the City's Department of Prisons directed its employees not to record in the Department's files any ICE detainers received for inmates.  Ex. D-12; Ex. D-13.

76.     If an inmate was subsequently transferred to a new facility, the City's practice resulted in the ICE detainer not being transferred along with the inmate.  Apr. 30 Trial Tr. 135:05-20, 140:03-13.

77.     On March 29, 2018, Brian Abernathy sent a memorandum to Prisons Commissioner Carney purporting to clarify the Department of Prisons' policy, such that when the Department of Prisons receives an ICE detainer, "that detainer request should be placed in the inmate's file, including adding to Lock &Track, and any facility or jurisdiction to which the inmate is transferred should receive a copy of the detainer."  Ex. P-28; Apr. 30 Trial Tr. 31:09-20, 162:10-23.

78.     Even after the March 2018 clarifying memorandum, the City has not taken actions with respect to the ICE detainers that were received by the Department of Prisons before March 2018 and that were not properly recorded.  Apr. 30 Trial Tr. 141:03-19.

## ICE's Ability to Interview Persons in Philadelphia Custody

***Purpose of Interviews Generally:***

79.    If ICE identifies an individual who was arrested but born in a foreign country, and if ICE did not have any information on that person already, ICE would run records checks and would want to interview that person.  May 1 Trial Tr. 152:05-15.

80.    ICE seeks to interview anyone in whom ICE has an interest in placing a detainer.  May 1 Trial Tr. 217:22-218:01.  ICE conducts interviews in order to establish alienage and removability.  May 1 Trial Tr. 218:02-09.

81.    ICE also uses interviews to learn additional information about the individual, to include an individual's health status and family ties in the United States.  May 1 Trial Tr. 218:02-09, 227:16-228:04.  Understanding these types of issues helps ICE to decide whether someone should be placed into ICE custody and, if so, helps ICE to prepare the place where ICE will put the person into custody.  May 1 Trial Tr. 219:11-21, 220:16-21, 227:16-228:04.  ICE will also attempt to ascertain whether an alien has any avenue of relief from deportation available to them.  May 1 Trial Tr. 218:17-219:03.

82.    If, during the course of an interview, an ICE officer comes to believe that there is the potential to pursue criminal charges, ICE policy requires the officer to stop the interview and Mirandize the individual.  May 1 Trial Tr. 219:04-10.

83.    ICE is not aware of any problems that arose as a result of ICE conducting interviews in City facilities.  May 1 Trial Tr. 222:23-223:02.

***Interviews at City Prisons:***

84.    In May 2017, the City initiated a new policy requiring that, prior to ICE interviewing an inmate at the Philadelphia Department of Prisons, the City will provide that inmate with a "consent form" regarding the interview.  Ex. P-8; PI Tr. at 85:20-86:16; Apr. 30 Trial Tr. 43:05-43:14.

85.     Prior to implementation of the "consent form," ICE successfully interviewed inmates at the Philadelphia Department of Prisons.  Apr. 30 Trial Tr. 45:14-20, 116:17-25.  At that time, it was uncommon for inmates to refuse to speak with ICE agents.  May 1 Trial Tr. 222:03-06.

86.     Since the City initiated this "consent form" policy, ICE's ability to conduct interviews of inmates at the Philadelphia Department of Prisons has become limited.  PI Tr. at 86:17-23; Apr. 30 Trial Tr. 45:02-16; May 1 Trial Tr. 223:07-18; May 2 Trial Tr. 37:8-13.

87.     ICE attempted to conduct interviews of individuals incarcerated at City prisons following the introduction of the "consent form."  Some prisoners, however, refused to sign the form and, as a result, ICE was not granted access to those prisoners.  Other prisoners requested the presence of counsel at the interview but did not identify their counsel or otherwise make counsel available.  Accordingly, ICE did not know who their attorneys were or how to arrange to have counsel be present.  May 1 Trial Tr. 223:19-224:10.  *See also* Apr. 30 Trial Tr. 45:02-16.

88.     The City's inmate consent form misleadingly informs aliens that they have the right to remain silent, and that anything they say may be used against them, but fails to inform aliens that their silence can also be used against them in civil immigration proceedings.  Apr. 30 Trial Tr. 120:11-121:22.

89.     Montgomery, Bucks, Chester, and Delaware Counties do not use consent forms for ICE interviews in their facilities.  May 1 Trial Tr. 227:03-08.

***Interviews at the Police Detention Unit:***

90.     When police arrest someone, the individual is typically taken either to the Police Detention Unit ("PDU") located in police headquarters, or to one of six divisional headquarters.  Apr. 30 Trial Tr. 65:11-67:20.

91.     Sometimes individuals are arrested based on an arrest warrant after they have already been charged with a crime; otherwise individuals are arrested and then charged with a crime prior to

arraignment.  Apr. 30 Trial. Tr. 67:21-69:17.  The PDU houses both kinds of offenders.  Apr. 30 Trial Tr. 65:17-66:01, 69:13-69:17.  The offenders housed at the PDU are prisoners.  Apr. 30 Trial Tr. 223:17-23; Ex. D-24.

92.      Individuals may be detained at the PDU for up to 48 hours, May 1 Trial Tr. 166:4-7, including for several hours after arraignment, Apr. 30 Trial Tr. 69:18-73:18, 215:16-216:04.

93.      ICE seeks to conduct interviews at the PDU because ICE wants to identify persons of interest as soon as possible and, if appropriate, lodge a detainer before those persons are released from City custody.  May 1 Trial Tr. 165:01-11.

94.      Prior to May 2017, ICE conducted interviews at the PDU at least a couple of times a week.  May 1 Trial Tr. 222:07-11.

95.      If someone is released from the PDU either on their own recognizance or on bond, ICE loses the opportunity to interview that person while he or she is in City custody if the interview does not take place while the person is incarcerated at the PDU.  May 1 Trial Tr. 165:18-21.

96.      Approximately 8,000 people of the 19,000 people processed at the PDU last year either posted bail or were released on their own recognizance, without going to another City detention facility until potentially after conviction.  Apr. 30 Trial Tr. 217:14-218:05; *see also* Apr. 30 Trial Tr. 74:14-75:09.

97.      Although the City determined that an outright ban on ICE interviews of inmates at the Philadelphia Department of Prisons would not be appropriate, the City nonetheless decided to ban interviews at the PDU.  Ex. D-24; Ex. P-30; Apr. 30 Trial Tr. 117:13-117:19, 122:02-123:04.  On February 7, 2018, the Commanding Officer of the PDU issued a memo prohibiting ICE agents from entering the PDU for the purpose of interviewing prisoners ("Gillespie Memo").  Apr. 30 Trial Tr. 198:14-25, 199:23-25; May 1 Trial Tr. 225:18-23; Ex. D-24.

98.     The PDU has various rooms in which interviews can be conducted, so there is no practical impediment to conducting interviews there.  *See* Apr. 30 Trial Tr. 123:13-15, 202:12-16, 228:14-24.

## Crime Rates

99.     Philadelphia's crime rates are not tied to issues of immigration policy.  May 10 Trial Tr. 59:09-16.  There is no evidence tying a decrease to Philadelphia's crime rates to the Mayor's Executive Order 5-16.  May 10 Trial Tr. 60:19-61:22.

## Public Health Effects

100.    No department included in the City's Health and Human Services Division applied for Byrne JAG Grant funds in FY 2017.  *See* Apr. 30 Trial Tr. 143:22-144:06; May 1 Trial Tr. 50:12-21; May 10 Trial Tr. 66:01-04.

101.    The City's Managing Director's Office's Public Safety Division does not include any department also included within the Health and Human Services Division.  May 1 Trial Tr. 50:22-25; May 10 Trial Tr. 64:23-25.

102.    If the City's Police or Public Health departments determined that certain priorities warranted additional funding, that funding could have been requested during the annual budget process.  May 10 Trial Tr. 53:21-22, 54:17-55:02.  For FY2019, the City Police Department for FY2019 requested an increase of more than $18 million.  May 10 Trial Tr. 53:17-20.

103.    The City already has funding for the overdose drug "Narcan" built into its budget, and has additional funding sources available for Narcan as well.  May 10 Trial Tr. 55:03-07.

104.    Particularly in light of the existing information-sharing between the City and ICE, there is no evidence that providing advance notice to ICE in circumstances beyond detainers accompanied by federal criminal warrants would deter individuals from taking advantage of City health or social services.  Apr. 30 Trial Tr. 146:13-19, 148:15-149:25, 163:04-14.

105.     There is no reason to believe that immigrants are deterred from seeking health and human services by the City's policy of providing advance notice of release to ICE for those individuals for whom ICE has lodged a detainer accompanied by a criminal warrant.  May 10 Trial Tr. 68:23-69:14.

106.     City residents do not distinguish between ICE detainers accompanied by a criminal warrant and those that are not.  *See* May 10 Trial Tr. 76:06-10.

107.     ICE does not monitor health centers to see if people who visit those centers are undocumented aliens.  May 2 Trial Tr. 90:9-16.

### There is No Irreparable Harm

108.     The annual budget for the Philadelphia Police Department is close to $700 million.  May 10 Trial Tr. 29:11-13; *see also* PI Tr. 44:16-19.

109.     The City received its Byrne JAG award for FY 2016 in August or September of 2016.  May 1 Trial Tr. 36:01-04.

110.     As of May 2018, the City had not obligated or spent any of its FY 2016 award.  May 1 Trial Tr. 37:24-25; 36:01-04, 56:10-12, 70:12-19, 71:22-72:04, 93:13-19.

111.     The City submitted a quarterly financial report to DOJ confirming that none of the FY 2016 funds were obligated, even though the City claimed in the litigation that some of the funds had been obligated.  May 1 Trial Tr. 36:19-25, 37:24-25; Ex. D-25, ln. 8; Joint Stip. of Facts (Dkt. No. 179) ¶ 45 (City Submission, citing PI Tr. 127:13-25) (Wertheimer)).

112.     Before the FY 2017 solicitation, the City was provided with guidance that no FY 2016 prior year Byrne JAG funds would be impacted by the DOJ Office of Justice Program's ("OJP") guidance on 8 U.S.C. § 1373 compliance.  May 1 Trial Tr. 69:01-17.

113.    In FY 2017, the City applied for $1.598 million of Byrne JAG funds, which would comprise less than one third of one percent of the Philadelphia Police Department's budget for FY 2017.  May 1 Trial Tr. 39:13-15, 51:16-52:2.

## Other Byrne JAG Conditions

114.    There are many conditions attached to Byrne JAG awards other than the three challenged conditions in this case.  May 1 Trial Tr. 45:05-08, 46:07-09.

115.    In the past, the City has complied with other conditions that DOJ has attached to Byrne JAG Grants.  May 1 Trial Tr. 46:07-12.

116.    The City of Philadelphia certified compliance with all applicable federal laws as a condition of its FY 2016 award after being on notice that the Department of Justice was concerned with the City's compliance with 8 U.S.C. § 1373.  May 1 Trial Tr. 89:23-90:06, 93:01-04.

117.    The City of Philadelphia specifically certified compliance with 8 U.S.C. § 1373 for purposes of the FY 2016 award in June 2017.  May 1 Trial Tr. 66:09-17, 68:05-07; 68:22-25.

118.    On October 11, 2017 the City received a letter from OJP indicating that, on a preliminary assessment, DOJ determined that the City was not in compliance with 8 U.S.C. § 1373 for the purposes of FY 2016.  May 1 Trial Tr. 7:05-11, 42:07-20; Ex. P-10.

119.    The City submitted a response to OJP's preliminary assessment of noncompliance with 8 U.S.C. § 1373 with respect to the FY 2016 award on October 27, 2017.  May 1 Trial Tr. 7:12-14; Ex. P-27.

120.    The City was aware of the three grant conditions at issue in this case before it submitted an application for FY 2017 on September 5, 2017.  May 1 Trial Tr. 48:15-18, 60:21-23.

DATED: May 17, 2018

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

WILLIAM M. MCSWAIN
United States Attorney

JOHN R. TYLER
Assistant Director

*/s/ Brad P. Rosenberg*
BRAD P. ROSENBERG
(D.C. Bar No. 467513)
DANIEL SCHWEI
Senior Trial Counsel
RACHAEL L. WESTMORELAND
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave, NW
Washington, DC 20530
Phone: (202) 514-3374
Fax: (202) 616-8460
E-Mail:   brad.rosenberg@usdoj.gov
         daniel.s.schwei@usdoj.gov
         rachael.westmoreland@usdoj.gov

*Counsel for Defendant*

**CERTIFICATE OF SERVICE**

I, Brad P. Rosenberg, hereby certify that on May 17, 2018, I electronically filed the foregoing

Defendant's Proposed Findings of Fact using the Court's CM/ECF system, causing a notice of filing

to be served upon all counsel of record.


*/s/ Brad P. Rosenberg*
BRAD P. ROSENBERG