THE CITY of PHILADELPHIA,

     Plaintiff,

v.

JEFFERSON BEAUREGARD SESSIONS III, in his
official capacity as Attorney General of the United
States,

     Defendant.

Case No. 2:17-cv-03894-MMB

## CITY OF PHILADELPHIA'S PROPOSED FINDINGS OF FACTS

Plaintiff City of Philadelphia (the "City" or "Philadelphia") respectfully submits its proposed findings of fact in support of its claims for injunctive, declaratory, and mandamus relief. The City incorporates by reference the parties' Joint Stipulation of Facts (Dkt. No. 179).

## I. Philadelphia's Policies Governing Information Regarding Citizenship and Immigration Status

1. As set forth below, the City's policies direct that City officers and employees should collect information regarding citizenship and immigration status only in rare, specified instances. *See infra* ¶¶ 2-4. When such information is in the City's possession, the City's policies limit its disclosure as to law-abiding individuals, but specifically *permit* its disclosure in the case of criminal suspects or convicts. *See infra* ¶ 5. None of Philadelphia's policies restrict the exchange of information regarding an individual's address, whereabouts, criminal record, or whether that person is in the City's custody, nor do they limit Philadelphia officers from making inquiries about immigration status from ICE. *See infra* ¶¶ 6-8. Consistent with these principles, the City has established mechanisms to exchange information regarding criminal suspects with federal and state agencies, including AFIS, PARS, Lock and Track, and the use of the NCIC Immigration Violator File by Philadelphia police. *See infra* ¶¶ 9-18. This is on top of the public access ICE has to the Common Pleas Case Management System, which tracks an individual's case status, confinement information, and bail information. 5/1 Tr. 33:11-35:21 (Wertheimer).

### A. Policies Regarding Collection of Information Regarding Immigration Status

2. Under Executive Order 8-09, the City of Philadelphia does not collect citizenship or immigration status information from its residents, unless collection is required for a certain benefit application, is otherwise required by law, or such information is pertinent to a criminal investigation. Ex. P-15; 4/30 Tr. 20:3-6 (Abernathy); 4/30 Tr. 194:10-16 (Gillespie).

3. Executive Order 8-09's provisions on non-collection are followed by Philadelphia police officers. PI Tr. (Dkt. No. 68) 31:21-32:13, 67:8-68:19 (Ross), 110:21-24 (Abernathy) ("[A]s recently as last month at roll call, officers were reminded not to ask for documentation status."); 4/30 Tr. 193:18-194:16 (Gillespie). These provisions are also followed by City employees in other departments. PI Tr. 108:1-9 (Abernathy), 165:8-20 (Gladstein).

4. To the extent the City does collect citizenship or immigration status information, it is self-reported and not verified by the City. 4/30 Tr. 20:24-21:4 (Abernathy). Neither the City nor ICE believe that the information the City collects is reliable or accurate. 4/30 Tr. 21:12-22:2 (Abernathy); 5/2 Tr. 13:10-14 (O'Neill).

**B.      Policies Regarding Exchange of Information with Federal Agencies**

5. <u>Criminal Suspects (Exception)</u>: Both Police Memorandum 01-06 and Executive Order 8-09 allow City personnel to disclose citizenship or immigration status information regarding criminal suspects. If an individual is suspected of criminal behavior or is being investigated for criminal activity, Executive Order 8-09 allows for the sharing of immigration information with ICE. 4/30 Tr. 20:12-19 (Abernathy); 4/30 Tr. 195:12-25 (Gillespie). Philadelphia has no interest in "trying to harbor criminals" that are "committing crimes and wreaking havoc on our streets." PI Tr. 25:3-4 (Ross). The Philadelphia Police Department's ("PPD's") policy also makes an important "distinction . . . between victims and witnesses, as opposed to criminal violators." *Id.* at 25:22-24 (Ross).

6. <u>Addresses and whereabouts (No Restriction)</u>: "Confidential information," as defined in Executive Order 8-09, explicitly does not include information related to a person's address or general whereabouts. PI Tr. 122:7-15 (Abernathy). Accordingly, neither Executive Order 8-09 nor Police Memorandum 01-6 prohibits City employees from sharing information

regarding the address or whereabouts of an individual. 4/30 Tr. 14:8-15:8 (Abernathy). If an ICE agent were to call a Philadelphia police precinct, district division, or detention center and ask for such information, it would be at the discretion of the answering police officer to respond to ICE's question; the City's policies do not in any way restrict the police officer from answering any questions posed by ICE with respect to an individual's address or whereabouts. 4/30 Tr. 15:3-18:13 (Abernathy); 5/10 Tr. 15:10-16:4 (Ross).

7. <u>Fact of Custody (No Restriction):</u> No City policy restricts PPD or Philadelphia Prisons System ("PPS") personnel from confirming to ICE that a particular inmate is in custody. *See* 5/10 Tr. 35:25-36:17 (Ross). Police officers in the Police Detention Unit ("PDU"), the "largest temporary holding facility" in the City, will confirm for ICE "that a person is . . . at the detention unit." 4/30 Tr. 173:8-15, 210:12-14 (Gillespie).

8. <u>Inquiries Made of ICE (No Restriction):</u> No City policy prevents Philadelphia police officers or City employees from asking ICE or other federal agencies about an individual's immigration status. PI Tr. 85:9-19 (Abernathy), 145:19-21 (Farley), 160:7-16 (Gladstein); *accord* Dkt. 61-1, at 3.

### C. Fingerprints and PARS

9. The City shares the fingerprints of all individuals whom it arrests and books with the federal government. 4/30 Tr. 179:3-19 (Gillespie).

10. ICE relies on this fingerprint information to carry out its functions. In an immigration officer's affidavit accompanying a detainer request, he stated that ICE relied upon fingerprints collected by the PPD. PPD shared this information in its regular use of AFIS, the Automated Fingerprint Identification System. 4/30 Tr. 27:22-29:16 (Abernathy); Ex. P-29; *see also* 5/2 Tr. 14:12-15:17 (O'Neill).

11.     The ICE Philadelphia Field Office has access to PARS, and officers there monitor PARS on a real-time, daily basis.  5/2 Tr. 6:3-13 (O'Neill).  PARS tracks the developments in an individual's case "from arrest to the bringing of charges to arraignment [and] to bail being paid."  5/2 Tr. 9:15-18 (O'Neill).  PARS includes fields for an individual's time of arrest and time of arraignment.  *Id*. at 9:22-10:2 (O'Neill).  PARS also includes a "defendant location" field, indicating where a person is held.  4/30 Tr. 206:5-11 (Gillespie).  PARS includes a "description" field for the status of an individual's case, including whether they are "awaiting bail payment" or "awaiting release."  *Id.* at 10:9-11:8 (O'Neill); 4/30 Tr. 184:24-188:11 (Gillespie); Ex. P-3.

12.     ICE relies on its access to PARS to decide if it is going to serve a detainer request at a police facility.  5/2 Tr. 18:8-15 (O'Neill).

13.     With the information accessible via PARS, ICE's Philadelphia Field Office can access and track any individual's progress through the custody of the PPD, and learn when an individual posts bail and is awaiting release.  ICE stated it would prefer to receive an alert from the City because its "manual[]" PARS review is laborious.  5/1 Tr. 142:25-144:25 (O'Neill).

**D.     Lock and Track**

14.     The City collects self-reported citizenship information from inmates upon admission to a PPS facility, as required by Pennsylvania state law.  4/30 Tr. 20:20-21:4 (Abernathy).  This information is stored in a PPS database called Lock and Track.  *Id.* at 22:3-13.

15.     From 2004 through 2016, the City provided ICE with the self-reported citizenship information stored in Lock and Track in a daily email report.  *Id.* at 22:18-25:10.  ICE first reached out to the City by letter in 2004, asking for this type of information in a data dump.  *Id.* at 22:20-24.  The City stopped sending the report in 2016 because the City believed ICE had stopped using the information the City provided.  *See id.* at 26:13-18.  After the City stopped

sending the email report, the City heard no complaints or requests from ICE. No one from ICE contacted Brian Abernathy, First Deputy Managing Director of the City's Managing Director's Office, to restart its access until this litigation ensued, *id.* at 27:6-9, nor did ICE otherwise request the emails to resume, 5/2 Tr. 23:11-23 (O'Neill). Rather, two years after the City stopped sending emails, ICE has now stated that it "was waiting for this hearing to be concluded before we proceeded with anything." 5/2 Tr. 25:5-6 (O'Neill).

16. Without a request from ICE, the City informed the Department of Justice ("DOJ") on May 9, 2018 that it is prepared to provide the ICE Philadelphia Field Office with information in Lock and Track, including self-reported citizenship information. Ex. P-42 (Dkt. No. 197-1).

17. When the City receives detainers from ICE, the PPS logs them into Lock and Track, and the detainer is placed in the inmate's "jacket" or file. 4/30 Tr. 30:21-31:3 (Abernathy); *see also* PI Tr. 95:14-22 (Abernathy) ("[T]he form itself would be filed within … the prisoner's file, as well as they would be marked within the prison's computer system so that they would recognize that a detainer had been filed."). If an inmate is transferred to another facility, including a state facility, it is the policy of the City of Philadelphia that the detainer follows the inmate. 4/30 Tr. 31:21-32:2 (Abernathy). ICE's Philadelphia Field Office has separate ways of tracking the individuals who are booked into Pennsylvania's prisons— including individuals transferred from the PPS to state custody—and typically serves subsequent detainers on transferees. 5/2 Tr. 30:16-32:14 (O'Neill).

### E.    NCIC Immigration Violator File

18. The NCIC protocol for the Immigration Violator File, developed by the FBI, states that if an encountering agency gets a "hit" for a suspected wanted individual, but the agency has "no other reason for detaining the subject," "appropriate procedures will depend on

whether state or local laws permit detainment and/or arrest." Ex. P-31, at 5.6. The NCIC protocol further provides for notice to ICE if the whereabouts of the person are known and the "person inquired upon appears to be identical with the subject of an ICE record." *Id.* The City follows this protocol, and police officers appropriately notify ICE upon obtaining a hit for an immigration violator file. 4/30 Tr. 197:3-198:9 (Gillespie).

## II. Philadelphia's Policies Governing Advance Notification of Release

19. The City of Philadelphia will "honor any" criminal warrant, "signed by a judge," "no matter the charge." 4/30 Tr. 34:24-35:2 (Abernathy); *see also* 5/10 Tr. 14:8-15:9 (Ross). If the City is presented with a detainer request from ICE with an accompanying criminal warrant signed by a judge, the City complies and notifies ICE of the inmate's expected release date. 4/30 Tr. 39:10-13 (Abernathy). The charges specified in the criminal warrant do not make any difference. 4/30 Tr. 192:8-22 (Gillespie).

20. In a March 22, 2017 memorandum titled "Cooperation with Federal Law Enforcement and Criminal Warrants," First Deputy Managing Director Brian Abernathy clarified that the policy of the City of Philadelphia is to cooperate "with all federal criminal warrants, including criminal warrants obtained by Immigration and Customs Enforcement (ICE)." Ex. P-17; *see also* 4/30 Tr. 35:15-36:13 (Abernathy).

21. ICE is aware that the City will comply with all ICE detainers that are accompanied by a criminal warrant. 4/30 Tr. 36:21-37:3 (Abernathy).

22. There have been no instances since Mr. Abernathy's March 22, 2017 memorandum in which the City has not complied with an ICE detainer accompanied by a criminal warrant. 4/30 Tr. 36:14-17 (Abernathy). The DOJ has purportedly identified only one such instance before March 22, 2017. 5/2 Tr. 27:2-6 (O'Neill).

23.     Between April and November 2017, there were a handful of occasions where the City, on a case-by-case basis, provided information to ICE about the expected release date of a particular inmate without an accompanying judicial warrant.  4/30 Tr. 37:16-24, 91:22-92:1 (Abernathy).  The City has since determined that continuing these ad hoc notifications would undermine public safety given the increased frequency and aggressiveness of ICE's enforcement actions in Philadelphia, particularly against non-criminals. 4/30 Tr. 38:10-15 (Abernathy).  City residents are "scared," "hesitant to report crimes" and "hesitant to approach the City for any reason because they're afraid that it may cause them to engage ICE."  *Id.* at 38:16-19 (Abernathy); *see also infra* ¶¶ 47-53, 60-62.

24.     The vast majority of the detainers the City receives from ICE relate to inmates with no prior felony convictions. Out of the 164 detainers received from ICE between April 2016 and January 2018, only 27 related to individuals with prior felony convictions.  Several of those convictions are for non-violent offenses such as criminal trespass and retail theft.  Ex. D-20.

25.     Approximately 82% of inmates in Philadelphia's prison system are in a pre-trial posture. 4/30 Tr. 108:25-109:3 (Abernathy).  Almost all of the inmates against whom ICE lodges detainers are in a pre-trial posture.  Ex. D-20.  Many of these individuals are then released by "court order" because the charges against them are dropped or they are found not guilty.  4/30 Tr. 91:3-5 (Abernathy).  From January 2016 through August 2017, only three detainers that ICE lodged with the City related to inmates actually serving a sentence at the time ICE had lodged the detainer.  Ex. D-9 (Plaintiff's Supplemental Response to Defendant's Interrog. No. 5).

26.     For the handful of individuals actually serving a sentence when ICE had lodged a warrantless detainer, the City believes that once a person has "done their time," they "have paid their debt to society."  4/30 Tr. 84:20-25 (Abernathy).

27. The City honors determinations of judges and bail commissioners in releasing people from police and prison custody. 4/30 Tr. 84:20-25 (Abernathy); 5/10 Tr. 20:10-15 (Ross). The City believes that judges are "best left" to "make th[e] determination" of whether an individual should be detained pursuant to a warrant and therefore whether advance notification would be proper. 5/10 Tr. 23:2-5 (Ross). If a bail commissioner or a judge determines that an individual should be released from custody or confinement, it is not the responsibility of the City to second guess that reasoned determination. *Id.* at 23:15-20 (Ross). The "criminal justice system is just that, a system." *Id.* at 23:23-24:2 (Ross).

28. The U.S Attorney's Office for the Eastern District of Pennsylvania can seek judicial warrants for the arrest of at least some of the individuals whom ICE has targeted for removal, including individuals who have illegally entered the United States, and individuals who have illegally re-entered the United States after being removed. *See* 8 U.S.C. §§ 1325(a), 1326(a)-(b); *see also id.* § 1329 (prosecutions may be instituted "at any place in the United States . . . at which [a] person charged with a violation under section 1325 or 1326 . . . may be apprehended"). But the office has declined to prosecute at least some violations of Section 1326, and generally does not prosecute violations of Section 1325. 5/2 Tr. 43:24-44:25 (O'Neill). The DOJ declined to offer requested testimony on its prosecution guidelines or warrant practices.

## III. Philadelphia's Policies And Practices Governing ICE Access to City Jails

29. ICE is the only law enforcement agency that seeks to conduct interviews at City police and prison facilities for non-criminal purposes. 4/30 Tr. 160:4-7 (Abernathy).

30. When other law enforcement agencies request to interview subjects of criminal investigations, they give the City advance notice of their intent and arrange a time that will not hinder the arraignment process. *Id.* at 202:2-9 (Gillespie). ICE generally does not give advance

notice before arriving to interview at the PDU, nor does it indicate that it is conducting a criminal (rather than civil) interview.  *Id.* at 202:17-24 (Gillespie).

31.     ICE is given access to PPS facilities to conduct interviews of City prisoners.  4/30 Tr. 43:5-10 (Abernathy).  Since May 2017, the City has provided PPS inmates with a form asking if they consent to an interview with ICE.  *Id.* at 43:5-10, 45:10-11; Ex. P-8.  The consent form states that prisoners have a right to refuse to speak with ICE, and that they may request to have an attorney present for the interview.  Ex. P-8; 4/30 Tr. 118:23-121:22 (Abernathy).

32.     The consent form does not prohibit or deter ICE from requesting interviews with City prisoners.  ICE made approximately six interview requests in both the year before the form was implemented and the year after.  4/30 Tr. 45:2-46:1 (Abernathy).[1]

33.     Of the approximately six interview requests that ICE has made since the consent form was implemented, approximately three inmates refused to consent to the interview.  4/30 Tr. 45:2-14.  The others agreed to be interviewed with a lawyer present.  *Id.* at 45:15-16.  ICE did not further pursue an interview with any of those inmates.  *Id.*; 5/1 Tr. 224:1-10.

34.     At the PDU, no state or federal agency is permitted to conduct an interview regarding an administrative or non-criminal matter.  4/30 Tr. 122:23-25 (Gillespie); Ex. P-30.

35.     Lieutenant Matthew Gillespie, the commanding officer of the PDU, circulated a memorandum regarding ICE access to the PDU in early 2018.[2]  4/30 Tr. 198:19,199:16-22

---

[1] To the extent that David O'Neill gave conflicting testimony about the number of interviews ICE conducts at City facilities, his testimony is not credible.  The City's record of six requests since May 2017 is supported by contemporaneously maintained data.  *See* Dkt. No. 154, at 21-22; Dkt. 154-1.  O'Neill did not have a precise recollection about the number of interviews that ICE conducts, gave conflicting testimony on this subject, and has never personally attended an ICE interview at a City facility.  5/1 Tr. 222:11-14, 225:1-11; 5/2 Tr. 33:4-34:22.

[2] Lt. Gillespie's original February 2018 memorandum, Ex. P-38, was rescinded and replaced with a revised memorandum in April 2018, Ex. P-30. The April memorandum clarified that the

(Gillespie). He did so after ICE agents began showing up at the PDU in January 2018 without prior warning, and attempting to gain access to prisoners. *Id.* at 199:3-15. The ICE officers used "subterfuge" on occasion, and were not "clear as to why they were there." *Id.* at 199:11. This differed from past ICE practice. *Id.* at 225:5-7. No ICE interviews occurred at the PDU in the year prior to Lt. Gillespie's memorandum. *Id.* at 224:9-16. To the extent that David O'Neill gave conflicting testimony, his testimony was not credible. *See supra* ¶ 32 n.1.

36.     If ICE were to notify the City that it sought to interview a prisoner at either a PPS facility or the PDU as part of a criminal investigation, the City would work with ICE to ensure that the interview would take place. 4/30 Tr. 117:20-118:6, 160:1-3 (Abernathy), 230:1-14 (Gillespie). The City wrote the Director of ICE's Philadelphia Field Office in April 2017 requesting notification if an interview is sought for criminal purposes. Dkt. No. 154-12. ICE has not responded to that request and has yet to inform the City when it is investigating a criminal matter. 4/30 Tr. 159:1-6 (Abernathy). There is no evidence that ICE has ever been refused access to a City facility to conduct a criminal investigation. *See id.* at 239:4-7 (Gillespie).

## IV.     Training On City Policies

37.     PPD officers are trained on City policies regarding communication with ICE, including Executive Order 8-09 and Police Memorandum 01-06, in multiple ways. Officers are first trained on these issues at police academy. 4/30 Tr. 9:1-4, 10:5-16 (Abernathy), 193:16-19 (Gillespie). When new policies are announced or policies are updated, they are sent to all districts and read at roll call for every shift for three days in a row and then posted for all to see. *Id.* at 9:4-9 (Abernathy); 5/10 Tr. 38:9-39:7 (Ross). All police officers must sign to acknowledge

---

PDU would continue to cooperate with ICE regarding criminal matters, although ICE refuses to inform the City when it is investigating a criminal matter. Ex. P. 30; 4/30 159:1-6 (Abernathy).

their receipt of policy memoranda.  PI Tr. 23:14-15 (Ross).  Updates are also sent via police teletype and covered in annual in-service training.  5/10 Tr. 6:10-15, 39:13-18 (Ross).

38.     Each of the City's police districts has been trained on Police Memorandum 01-06 and Executive Order 8-09 as recently as summer 2017.  4/30 Tr. 128:19-129:5 (Abernathy).

39.     The City's policies are well-understood by City employees.  4/30 Tr. 55:6-56:10 (Abernathy); 5/10 Tr. 12:13-22 (Ross).  On a single occasion, there was confusion whether the City would honor a detainer request accompanied by a judicial warrant.  4/30 Tr. 32:15-33:3 (Abernathy); 5/2 Tr. 27:2-6 (O'Neill).  The City then clarified its policy.  *Id.*; Ex. P-17.  There have been no other incidents suggesting any confusion regarding the City's policies about communicating with ICE.  4/30 Tr. 32:20-22; 127:14-17 (Abernathy); 5/10 Tr. 13:1-7 (Ross).

40.     In general, the City does not refer to U.S. Code provisions when training police officers because it is impractical to do so.  4/30 Tr. 9:21-10:4 (Abernathy).  Consistent with that approach, the City's training does not explicitly mention 8 U.S.C. § 1373 ("Section 1373").  *Id.* at 9:21-10:21.  Nevertheless, the City trains police officers on what information they can share with ICE, and officers generally understand what they are permitted to communicate to ICE.  *See supra* ¶¶ 3, 37-38; 4/30 Tr. 55:6-56:10, 64:21-25 (Abernathy); 5/10 Tr. 10:15-16 (Ross).

V.      **Philadelphia's FY 2017 Byrne JAG Application**

41.     Despite applying in September 2017, the City has not yet received a decision on its FY 2017 Byrne JAG application.  5/1 Tr. 39:8-9 (Wertheimer).

42.     This delay is unprecedented.  FY 2017 is the first year since at least FY 2010 that the DOJ has not disbursed JAG awards by August or September.  *See* 5/1 Tr. 36:1-9 (Wertheimer).  If the DOJ had issued FY 2017 awards in a manner consistent with past practice, the City would have expected to have obligated its FY 2017 allotment by now, as the City

normally obligates and expends funds from its Byrne JAG award for a given fiscal year by May of the following year. *See* 5/1 Tr. 37:16-39:7 (Wertheimer).[3]

43.     As the DOJ continues to delay, the City is losing out on its time to use its congressionally appropriated Byrne JAG allotment. Byrne JAG funds awarded in a given fiscal year may be spent any time during a four-year period that begins on October 1 of the *prior* fiscal year. This time period gives grantees sufficient time to comply with competitive bidding and other requirements. *See* 5/1 Tr. 56:25-58:12, 81:9-25 (Wertheimer); *see also* 34 U.S.C. § 10152(f) (establishing four-year grant period).

44.     The City needs its FY 2017 allotment of $1.598 million in Byrne JAG funding to finance important police projects, including specialized overtime, reality-based training, and purchasing naloxone or Narcan kits, as there is no other funding available for these projects. 5/1 Tr. 39:13-25 (Wertheimer). Although the City has received Narcan from other sources, Narcan is not reusable, and the City needs as many supplies as it can get in an attempt to reduce the number of opioid deaths in the City; there were 1,200 in 2017. *Id.* at 40:1-18. A loss of Byrne JAG funding "would have a profound impact" on the PPD. 5/10 Tr. 55:19-21 (Ross).[4]

45.     The DOJ admits that it has "not acted on any" Byrne JAG applications since a nationwide injunction was issued in *Chicago v. Sessions*. Ex. P-4 (Defendant's Response to Plaintiff's Interrog. No. 24). The DOJ's only explanation for its failure to act is that it is

---

[3] The City delayed obligating portions of its FY 2016 funds because of threats from the Attorney General that the DOJ would "claw back" FY 2016 funds from certain jurisdictions and the City does not have funds in its budget to repay the DOJ. Nevertheless, because the City believes it's in compliance with Section 1373, to the extent applicable and lawfully construed, the City has since obligated its FY 2016 funds in order to fund critical projects. *See* 5/1 Tr. 37:16-39:7 (Wertheimer); *see also* Ex. P-1, at PHLJAG-00475-PHLJAG-00476.

[4] Any year-to-year increases in the police department's budget are necessary to cover personnel costs, which are largely determined by collective bargaining and binding arbitration. 5/10 Tr. 53:20-54:14 (Ross).

awaiting "clarification of the governing law in connection with the [DOJ]'s appeals in *Chicago v. Sessions*, No. 17-92991 (7th Cir.), and *Philadelphia v. Sessions*, No. 18-1103 (3d Cir.)." *Id.*

46.     Before the nationwide injunction was imposed in September 2017, the DOJ had never stated—neither in the Administrative Record nor in any communications through its program officers to the City—that the terms "information regarding citizenship or immigration status" refer to an inmate's release date, address, or whereabouts.  5/1 Tr. 17:12-27:17 (Wertheimer).  Unlike every other instance when the City has asked for explanation or guidance from DOJ's program officers on complying with grant conditions, DOJ could not provide the City with any explanation or guidance regarding compliance with Section 1373.  *Id.* 7:15-30:9.

## VI.     The DOJ's Conditions Would Undermine Public Safety and Well-Being In Philadelphia While Imposing Substantial Burdens on the City

### A.     ICE Mission in Philadelphia is Civil Immigration Enforcement, Not Public Safety

47.     ICE's enforcement priorities and activities are not limited to the removal of aliens who have been convicted of crimes.  ICE"s "statutory mandate" is to pursue cases against "[a]nybody who's in the country in violation of law."  5/1 Tr. 178:13-17 (O'Neill).  The goal of ICE's Philadelphia Field Office is to "enforce the immigration laws in our area."  *Id.* at 128:20-21.  ICE's Philadelphia Field Office has priorities besides removing criminal aliens, including seeking deportation of certain classes of non-criminal aliens.  5/2 Tr. 45:7-12 (O'Neill).

48.     Even the ICE Philadelphia Field Office's "Criminal Alien Program" is not limited to removing people who have been convicted of crimes.  The office prioritizes removing people who have been *charged* with a crime when "those criminal charges have not yet been resolved" as part of its "Criminal Alien Program."  5/1 Tr. 176:16-23 (O'Neill); 5/2 Tr. 108:6-20 (O'Neill).

49.    ICE's activities that *are* focused on aliens convicted of crimes are not limited to the removal of aliens subject to mandatory detention under 8 U.S.C. § 1226(c).  The Philadelphia Field Office has enforcement programs designed specifically for aliens who are *not* subject to mandatory detention: a "Non-Detained Docket Management Program" and an "Alternative to Detention Docket," which involve individuals who are "usually in a non-detained setting."  5/1 Tr. 129:1-131:12 (O'Neill).  In fact, *most* people in removal proceedings in the Philadelphia are not subject to mandatory detention:  There are "many more cases non-detained than . . . detained" in the Philadelphia area, notwithstanding the fact that "people who have a criminal background would be more likely to be detained than somebody who didn't have a criminal background."  *Id.* at 220:22-221:5 (O'Neill); *see also id.* at 219:25-220:13.

50.    In recent years, ICE has increased enforcement efforts against non-criminal aliens.   In February 2017, then-Secretary of Homeland Security John Kelly issued a memorandum instructing that:  "Effectively immediately . . . Department personnel shall faithfully execute the immigration laws of the United States against *all removable aliens*," and that "the Department will no longer exempt classes or categories of removable aliens from potential enforcement."   5/2 Tr. 48:15-49:11 (O'Neill) (emphasis added); *see* Ex. P-39.  The memorandum does not discourage ICE officers from bringing enforcement actions against crime victims, witnesses, or non-criminal immigrants.  *See* Ex. P-39; *see also* 5/2 Tr. 87:2-5 (O'Neill).

51.    In the approximately three-month period after this memorandum was issued, non-criminal arrests by ICE increased nationwide from approximately 4,200 during the same period in 2016 to more than 10,800 in 2017.  5/2 Tr. 52:3-10 (O'Neill); Ex. P-40.  And in Philadelphia, specifically, ICE has arrested more non-criminals over the past two years.  5/2 Tr. 53:6-8; *see also* 4/30 Tr. 38:10-15 (Abernathy).  If ICE had more resources, it would deport even more non-

criminals, possibly every removable individual. 5/2 Tr. 53:12-54:4 (O'Neill). The DOJ has represented in this litigation that, "in the majority of cases that ICE pursues, [it pursues] in fact civil matters." Dkt. No. 159 (Tr. of 4/11 Hr'g before MJ Strawbridge), 50:18-20.

52. Neither ICE nor the DOJ has studied whether the deportation of people from Philadelphia reduces the crime rate in the City or otherwise improves public safety. *See* 5/2 Tr. 57:8-11 (O'Neill); *cf., e.g.*, Ex. P-1, at PHLJAG-00366-PHLJAG-00381 (OIG memorandum containing no discussion of whether confidentiality policies affect crime). Nowhere in the Administrative Record has the DOJ explained any connection between its interpretation of Section 1373 and how the purposes of the JAG program will be served by that interpretation.

53. ICE does not verify whether its enforcement operations compromise informants, sources, or relationships that Philadelphia police officers have developed, nor does it take steps to determine whether its enforcement operations would compromise planned or ongoing law enforcement initiatives. *See* 5/2 Tr. 61:1-62:20 (O'Neill).

## B. Philadelphia's Immigration-Related Policies Improve Public Safety By Fostering Community Trust

54. ICE's increased enforcement over the last year has made people afraid to report crimes, and the Philadelphia police cannot "cultivate relationships with people who live in this City" if the police are viewed as "an extension of ICE." 5/10 Tr. 14:17-15:9 (Ross); *see also id.* at 25:7-14 (Ross); 4/30 Tr. 38:16-22 (Abernathy). Improving police-community relations is a major concern for the Philadelphia Police Department. 5/10 Tr. 31:3-19 (Ross).

55. The City practices "community" or "smart" policing. The City does not "have the resources to put an officer on every block," so it "need[s] the community to be [its] eyes and ears," which requires that people "trust [the] police department." 4/30 Tr. 11:3-9 (Abernathy). The City therefore aims to "protect witnesses and victims in order to encourage them to come

forward and report crime." *Id.* at 77:22-24. Crime reporting is particularly crucial for detecting crime patterns so the police department knows where to deploy officers. *See* 5/10 Tr. 41:6-21 (Ross); *accord* 4/30 Tr. 10:22-11:2 (Abernathy).

56. Philadelphia works hard to make sure that Philadelphia residents do not view City officials, particularly law enforcement officers, as an "extension" of ICE, as that would "damage[] [the City's] ability to communicate and partner with some of the immigrant communities." 4/30 Tr. 53:21-25 (Abernathy).

57. Philadelphia's Police Memorandum 01-06, Executive Order 8-09, and Executive Order 5-16 (as clarified by Brian Abernathy's March 22, 2017 Memorandum) are intended to reassure law-abiding members of Philadelphia's immigrant community that they may report crimes and contact City officials without fear of immigration consequences. *See, e.g.*, PI Tr. 24:15-23 (Ross); 4/30 Tr. 38:16-22 (Abernathy). In particular, the City's policies are motivated by the concerns of the serious consequences of immigration detention and deportation, as well as the possibility that ICE enforcement actions target the wrong person, as ICE has reportedly arrested over 1,400 U.S. citizens, and in some cases, wrongfully deported U.S. citizens. 4/30 Tr. 39:14-40:11 (Abernathy). The City's policies also seek to avoid the potential liability of wrongfully detaining a U.S. citizen, as in *Galarza v. Szalcyk*. 745 F.3d 634 (3d Cir. 2014). *See* 4/30 Tr. 42:1-5, 42:23-43:1 (Abernathy).

58. Crime has gone down in the City of Philadelphia since Executive Order 8-09 was adopted in 2009. Crime reached a historic low in April 2016, and has continued to decrease. 4/30 Tr. 160:13-17 (Abernathy). The PPD attributes much of this success to "smart policing" and "community policing," namely, building relationships to make residents comfortable reporting crimes. *See* 5/10 Tr. 41:6-21 (Ross).

59. There is no "data" suggesting any link between "immigrants and crime" in Philadelphia; to the contrary, the PPD is most "concerned" with "people who were born and raised in Philadelphia." PI. Tr. 41:22-42:23 (Ross). Arrest data from the PPD indicates that "gang violence" in the City is "largely centered around neighborhood factions" of individuals "born and raised" in Philadelphia. 5/10 Tr. 43:12-47:1 (Ross).

## C. The Challenged Conditions Would Harm Public Safety in Philadelphia

60. The City believes that changing its policies to provide advance notification of release to ICE beyond when a judicial warrant is presented would "have a chilling effect on the reporting of crime." 4/30 Tr. 42:3-7 (Abernathy). Some residents could be concerned about the consequences for the offender. In particular, victims of domestic violence could be deterred from reporting abusers out of concern that the abuser would be deported, possibly to a country in which they could be harmed. *See id.* at 42:6-15. Relatives of addicts committing drug offenses or petty offenses may not contact authorities if they are worried their loved one will be deported. *Id.* at 42:16-21; *see also id.* at 80:16-23, 84:22-85:1, 154:19-155:8.[5]

61. In the City's judgment, there is a distinction recognized by the immigrant community between (a) the City sharing certain information with ICE officials during the investigation of a crime or the pursuit of a criminal suspect, and (b) the City notifying ICE of a

---

[5] As discussed above, while First Deputy Managing Director Brian Abernathy notified ICE of the release of five particular individuals on a one-off basis between April and November, 2017, Mr. Abernathy and the City later determined that "continued notification of ICE, upon the release, no matter what the underlying charges, w[ould] jeopardize our public safety going forward in the City," including because of ICE's increase in enforcement against non-criminals in the Philadelphia area. 4/30 Tr. 91:22-92:1, 102:20-22, 103:11-104:24 (Abernathy). The City believes that public safety is best served by relying on the decisions of judges about whether an individual arrested by the Philadelphia police should remain in custody, and staying out of the business of immigration enforcement. *See* 5/10 Tr. 22:5-23:5, 37:21-25 (Ross).

person's release from custody. In the latter case, the City is acting "as an extension of immigration and customs enforcement." 4/30 Tr. 147:5-23 (Abernathy).

62. Information regarding ICE enforcement actions, as well as information regarding any perception that the City is assisting in immigration enforcement, can spread quickly throughout Philadelphia, as many of Philadelphia's immigrant groups are close-knit, and Philadelphia's immigrant community is served by numerous advocacy groups that are "very well-organized and very tied into the people that they serve." 4/30 Tr. 51:25-52:24 (Abernathy).

### D. The Challenged Conditions Could Threaten Access to City Services

63. In addition to policing, "[a]lmost all of City government relies upon community engagement." 4/30 Tr. 46:19-25 (Abernathy). Philadelphia's policies promote public health as they encourage immigrants to use City services. *See* Dkt. 21-4, ¶ 8; Dkt. No 49, at 13.

64. Philadelphia residents do not generally distinguish between City departments when interacting with City officials. *See* 4/30 Tr. 52:25-53:18 (Abernathy). The public tends to assume that "what you tell someone in the health department gets to the fire department or the police department or the L&I." *Id.* at 54:7-13. In the City's judgment, if a law abiding immigrant resident of Philadelphia believed that any part of the City reported immigration status information to ICE, they would be "very hesitant" to interact with any City official. *Id.* at 54:2-17; *see also* 5/10 Tr. 72:4-12 (Gladstein).

65. Because City departments often work closely together, residents may attribute actions of one City department to another. City Health and Human Services ("HHS") workers work closely with police officers, including as part of homelessness outreach and opioid abuse efforts. 5/10 Tr. 72:14-73:19 (Gladstein). HHS workers also work closely with PPS officials, by providing addiction treatment to individuals in custody or after release. *Id.* at 74:15-24.

66. It is the City's judgment that if residents were to learn that the City notified ICE every time an individual were released from custody, "trust overall" would be "reduce[d]" in the City government, decreasing people's willingness to access City services. *Id.* at 68:17-23. If Philadelphia police were seen as an extension of ICE, it could "color perception of . . . City services" broadly. *Id.* at 74:1-10.

67. The DOJ intends to impose the Challenged Conditions on non-law-enforcement branches of the City. For instance, it intends to apply them to the City departments that fall within the Public Safety division of the Philadelphia Managing Director's Office. Ex. P-4 (Defendant's Response to Plaintiff's Interrog. No 23). The Public Safety division includes the Department of Licenses & Inspections ("L&I"), which inspects business and construction code compliance, and the Philadelphia Fire Department ("PFD"). Neither L&I nor the PFD enforces criminal law, and neither has ever applied for JAG funding. *See* 4/30 Tr. 48:7-25 (Abernathy).

68. Executive Order 8-09 applies to L&I and the PFD. Changing that could deter residents from using these critical services and undermine well-being in the City. In the City's judgment, "[i]f people felt like the fire department was going to ask about your immigration status, they'd stop calling the fire department," or reporting unlicensed or unsafe construction to L&I. 4/30 Tr. 49:12-50:13 (Abernathy). Likewise, knowledge that L&I or PFD officials were sharing immigration-status information could have a "chilling effect" on reporting fires or unsafe conditions to L&I or PFD. *Id.* at 50:14-51:23.

### E. The Challenged Conditions Would Impose Operational Burdens on the City

69. The DOJ's conditions threaten the City's public-safety objectives by overwhelming its operations. The City does not direct City employees to call federal agencies in the normal course of business. 4/30 Tr. 11:10-19 (Abernathy). If the City were required to have

City employees call ICE or another federal agency on a regular basis, it would create "chaos in trying to manage [the City's] departments." *Id.* at 11:22-12:3. Likewise, the PPD does not "frequently receive requests from ICE regarding an individual's home address or general whereabouts." *Id.* at 19:17-20. "If ICE were to start making such requests more frequently," it "would be a burden," as the PPD is "understaffed." *Id.* at 19:23-20:2. *See* 5/10 Tr. 40:24-41:3 (Ross). And requiring Philadelphia to notify ICE of the release of any person of interest could cause significant disruption in light of the number of people moving between the City's six police divisions, the PDU, and the PPS. 5/10 Tr. 56:10-25 (Ross).

70. The jail access condition would similarly disrupt the administration of Philadelphia's jails. It would "hinder the arraignment process" in the PDU to have ICE requesting interviews with individuals in custody. 4/30 Tr. 203:2:10 (Gillespie). ICE would likely seek to conduct interviews in the PPS or the PDU on a daily basis, or even ask to station ICE officers in City facilities. *See* 5/2 Tr. 36:15-23 (O'Neill). In addition, interactions with ICE officers could cause people detained in the PPS or PDU, who are afraid of deportation (particularly those suffering from drug addiction or mental illness) to act violently or disruptively, which could endanger City employees. 4/30 Tr. 203:11-204:2 (Gillespie).

71. Although the Challenged Conditions allow grantees to use Byrne JAG funds to cover the costs of complying with the Challenged Conditions, doing so would require grantees to divert Byrne JAG funds from their intended purpose. *See* 4/30 Tr. 111:16-24 (Abernathy).

72. Requiring the City to expend its own resources to comply with the Challenged Conditions enables ICE to avoid having to spend its own resources to enforce federal law. *See* 5/2 Tr. 13:6-9, 96:2-10, 98:15-19, 111:7-13 (O'Neill); 5/1 Tr. 144:21-25 (O'Neill).

DATED: May 17, 2018.                                        Respectfully submitted,

MARCEL S. PRATT, I.D. NO. 307483
  City Solicitor
LEWIS ROSMAN, I.D. NO. 72033
  Senior Attorney
CITY OF PHILADELPHIA LAW DEPARTMENT
1515 Arch Street, 17th Floor
Philadelphia, PA 19102

  /s/ Virginia A. Gibson
VIRGINIA A. GIBSON, I.D. NO. 32520
SARA ARONCHICK SOLOW, I.D. NO. 311081
JASMEET K. AHUJA, I.D. NO. 322093
ALEXANDER B. BOWERMAN, I.D. NO. 321990
HOGAN LOVELLS US LLP
1735 Market Street, 23rd Floor
Philadelphia, PA 19103
(267) 675-4600
virginia.gibson@hoganlovells.com

NEAL K. KATYAL (*pro hac vice*)
KIRTI DATLA (*pro hac vice*)*
REEDY C. SWANSON (*pro hac vice*)
HOGAN LOVELLS US LLP
555 Thirteenth Street, NW
Washington, DC 20004

*Admitted only in Texas; supervised by firm members*

*Attorneys for the City of Philadelphia*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on May 17, 2018 the foregoing document was filed electronically with the Clerk of Court using the CM/ECF system, which will send notification of the filing to all counsel of record.

May 17, 2018

  /s/ Virginia A. Gibson
Virginia A. Gibson, I.D. No. 32520
Hogan Lovells US LLP
1735 Market Street, 23rd Floor
Philadelphia, PA 19103
(267) 675-4600
virginia.gibson@hoganlovells.com