

**U.S. Department of Justice**
**Civil Division, Federal Programs Branch**
20 Massachusetts Ave., NW
Washington, DC  20530

Daniel Schwei  Telephone: (202) 305-8693
Senior Trial Counsel  E-Mail: daniel.s.schwei@usdoj.gov

May 18, 2018

*Filed via ECF*

The Hon. Michael M. Baylson
United States District Court
Eastern District of Pennsylvania
601 Market Street
Philadelphia, PA 19106

Re:   *City of Philadelphia v. Sessions*, No. 2:17-cv-3894 (E.D. Pa.)

Dear Judge Baylson:

The Department of Justice respectfully submits this letter in response to the Court's letters of May 11, 2018 (Dkt. No. 198), and May 14, 2018 (sent to counsel via e-mail).  The parties have conferred, and both have agreed to file their responses on the public docket.

Defendant appreciates the Court's interest in encouraging the City of Philadelphia to provide greater cooperation with U.S. Immigration and Customs Enforcement (ICE), at least with respect to "criminal aliens" in the City's custody.[1]  Although Defendant does not believe that the particular proposals set forth in the Court's letters are workable, *see* Part II, *infra*, the City itself is certainly able to take steps to address the Court's concerns.  *See* Part III, *infra*.  Defendant respectfully submits that, because the Court's concerns ultimately stem from the scope of the City's policy, the best way to address the Court's concerns is for the City simply to change its policy—*i.e.*, to voluntarily provide greater cooperation with respect to criminal aliens.

Defendant's understanding, however, is that the City is not currently willing to change its existing policies.  Moreover, even if the City were willing to change its policies along the lines the Court has suggested, Defendant does not believe those changes would be sufficient to allow the parties to reach a comprehensive settlement of this litigation.  Accordingly, Defendant has significant doubts about whether further attempts at negotiations with the City would be productive.

---

[1] Defendant understands the Court to have defined the term "criminal alien" as those aliens who would be subject to mandatory detention under 8 U.S.C. § 1226(c).  Defendant does not agree with that definition of "criminal alien," and also notes that other statutes beyond § 1226(c) also provide for mandatory detention once DHS takes custody of the alien.  *See, e.g.*, 8 U.S.C. §§ 1225(b), 1231(a), 1357(d); *see also Jennings v. Rodriguez*, 138 S. Ct. 830, 842-47 (2018) (discussing these various detention authorities).  Nonetheless, for purposes of simplicity and clarity, Defendant will use the phrase "criminal alien" in this letter consistent with the Court's definition.

Nonetheless, to the extent the City is willing to consider voluntarily changing its policies, Defendant would be amenable to further discussions regarding whether, and if so how, those policy changes could be implemented in a manner suitable to both parties. Any changes in City policy, however, would need to account for Defendant's own practical constraints and limitations, as discussed further below.

## I.     Clarifications of the Department's Positions and Understandings

Before discussing the Court's particular proposals set forth in its letters, the Department wishes to clarify several points, particularly in light of the testimony received at trial.

First, the Court's May 11 Letter stated that "ICE can determine from available databases any applicable 'release date,' and notify the City of its intention to be present at the City facility on the release date." Dkt No. 198 at ¶ 2. Respectfully, Defendant's position is that ICE *cannot* determine an individual's "release date" based on any of the databases currently available to ICE. That is true both for individuals arrested, as well as individuals convicted and serving defined sentences. *See, e.g.*, Apr. 30 Trial Tr. 109:08-110:02 (Abernathy); Apr. 30 Trial Tr. 233:24-234:14 (Gillespie); May 1 Trial Tr. 151:08-25, 207:14-17 (O'Neill); *see generally* Def.'s Proposed Findings of Fact (Dkt. No. 200) ¶¶ 4-13, 70-74 (discussing the various databases). Thus, for any change to the City's policies to be meaningful, the City must agree to provide advance notice to ICE of an individual's release from custody; otherwise ICE is unable to determine when to take custody of the individual.

Second, the Court's May 14 Letter assumes that the City would honor a "judicial detainer" or "judicial warrant" even if it was obtained in connection with a civil immigration matter, rather than a criminal matter. *See* May 14 Letter at ¶ 2. As reflected in the testimony at trial, however, City officials understand Executive Order 5-16 to allow cooperation only with respect to arrest warrants obtained in connection with criminal matters. *See* Def.'s Proposed Findings of Fact ¶ 24. Accordingly, even if ICE and the U.S. Attorney's Office were to obtain "judicial detainers," the City would still need to amend its policies to make clear that Executive Order 5-16 permits cooperation even when those "judicial detainers" are obtained for civil immigration purposes and not in connection with a criminal matter.

## II.    Practical Concerns About the Court's Specific Proposals

As noted above, Defendant appreciates this Court's attempt to find a way to obtain greater cooperation between the City and ICE with respect to criminal aliens. However, the specific proposals presented by the Court are not practically feasible in Defendant's view. In particular, the Court's proposals appear to rely on two key assumptions: <u>first</u>, that it is relatively easy for ICE, at the time ICE lodges a detainer for an individual, to determine whether that person qualifies as a "criminal alien" subject to mandatory detention under § 1226(c); and <u>second</u>, that there are no meaningful impediments to ICE and the U.S. Attorney's Office pursuing "judicial detainers" or "judicial warrants" based solely on an individual's status as a "criminal alien" under § 1226(c), *i.e.,* not in connection with any independent criminal matter. Defendant respectfully submits that, as explained below, these assumptions are incorrect.

### A. Feasibility of ICE Identifying "Criminal Aliens" at the Time a Detainer is Lodged

The Court's May 11 Letter appears to assume that ICE, at the time of lodging a detainer for an alien, could easily provide the City with some form of documentation proving that the individual is a criminal alien. *See* May 11 Letter ¶ 2 (suggesting that ICE "attach documented proof of that [criminal alien] status to an immigration detainer presented to the City").

As both parties discussed with the Court on May 10, however, mandatory-detention determinations under § 1226(c) are typically quite complicated. *See* May 10 Trial Tr. 104:09-106:13, 121:18-122:01. Even when ICE has determined that probable cause exists to issue a detainer, it is a separate—and more complicated—question whether that person would be subject to mandatory detention under § 1226(c). Mandatory-detention determinations under § 1226(c) frequently turn on complex legal judgments about what constitutes a crime of moral turpitude, an aggravated felony, or a host of other potential categories of crimes. *See generally* 8 U.S.C. § 1226(c)(1); Dkt. No. 192 at 4-5 (Court's letter of May 3, 2018, summarizing criminal grounds of deportability under 8 U.S.C. § 1227(a)(2)); *see also Sessions v. Dimaya*, 138 S. Ct. 1204, 1210-11 (2018) (describing the "distinctive form of what we have called the categorical approach" that is used to determine whether a particular conviction qualifies as an aggravated felony); *Padilla v. Kentucky*, 559 U.S. 356, 378 (2010) (Alito, J., concurring) ("As has been widely acknowledged, determining whether a particular crime is an 'aggravated felony' or a 'crime involving moral turpitude' is not an easy task." (modifications omitted)).

In order to perform the necessary legal review to determine whether an alien is subject to mandatory detention, ICE generally also needs to obtain the underlying documents confirming the alien's criminal history—not simply the criminal activity that has led to the alien's current detention, but also the alien's prior criminal history. Thus, ICE frequently must contact state and local court systems to request copies of the alien's past judgments of convictions, and then ICE must await receipt of those documents before conducting its legal review.

This process of obtaining the requisite documents and conducting the legal review necessarily takes time. Accordingly, it is not feasible for ICE to make a determination about an individual's mandatory-detention status at the time ICE lodges a detainer for that individual. If ICE officers needed to wait to lodge a detainer until the underlying criminal records could be obtained and this legal review could occur, it would significantly inhibit ICE officers' abilities to quickly and efficiently lodge detainers for individuals—especially for individuals who, after ICE learns about their arrest, may only be in custody for several more hours.

Additionally, the current practice is for ICE to conduct its mandatory-detention review only after an individual has been taken into ICE custody. This sequencing is the most efficient allocation of ICE's limited resources—*i.e.*, it ensures that ICE does not spend time making complex mandatory-detention determinations until those determinations are actually necessary. A change in ICE's procedures to make mandatory-detention determinations at the outset, before ICE takes custody of an individual, would require the allocation of substantially greater resources that, in the Government's view, are not practically possible or sustainable.

Accordingly, Defendant has serious logistical concerns about any proposal that would require ICE officers to identify, at the time they lodge a detainer, whether an alien is subject to mandatory detention under § 1226(c).

### B. The Burdens Associated with Obtaining Judicial Warrants or Judicial Detainers

The Court's May 14 Letter appears to assume that the Department of Justice and Department of Homeland Security could, with relative ease, obtain "judicial warrants" or "judicial detainers" for aliens based solely on their status as an alien subject to the initiation of removal proceedings and/or subject to mandatory detention under § 1226(c). *See, e.g.*, May 14 Letter at 2 ("'[T]he federal government can easily adopt a joint policy, between the local ICE office and the local U.S. Attorney's office, that . . . the U.S. Attorney will agree to approve and process an ICE request for a detainer as to a criminal alien, for presentation to a magistrate judge or district court judge.").[2]

As noted above, Defendant's understanding is that even this type of judicial detainer would not allow City officials to cooperate with ICE pursuant to the City's Executive Order 5-16. *See* Part I, *supra*. But in any event, Defendant also respectfully submits that such a joint policy could not so easily be adopted, particularly in light of the burdens that such a policy would impose on ICE, the U.S. Attorney's Office, and the courts.

While judicial warrants are validly pursued for some civil matters, *see United States v. Phillips*, 834 F.3d 1176, 1181 (11th Cir. 2016) (collecting examples), in this context the Immigration and Nationality Act (INA) has created a comprehensive scheme governing the detention and removal of aliens. As part of that comprehensive scheme, Congress directed that aliens "may be arrested and detained" based "[o]n a warrant issued by the Attorney General[.]" 8 U.S.C. § 1226(a). This grant of authority—allowing arrest based on administrative rather than judicial warrants—is consistent with the "overwhelming historical legislative recognition of the propriety of administrative arrest for deportable aliens[.]" *Abel v. United States*, 362 U.S. 217, 233 (1960) (noting "impressive historical evidence" of validity of "administrative deportation arrest from almost the beginning of the Nation"). And it is well-established that neither the INA nor the Constitution *requires* a judicial warrant prior to an immigration arrest. *Id.* Here, it is unclear how an alternate procedure involving judicial warrants would proceed, as a legal or practical matter, or how feasible it would be to obtain such warrants. For example, Federal Rule of Criminal Procedure 4 provides extensive rules governing the issuance and execution of criminal warrants, but there are no analogous rules for an immigration-related judicial warrant given that courts are traditionally not involved in this process.[3]

---

[2] The Court's proposal refers to a policy for obtaining judicial arrest warrants as to criminal aliens. In Defendant's view, the basis for arrest would not be the alien's status as a "criminal alien"; arrest would be permissible for any alien as to whom ICE has probable cause of removability. *See, e.g., City of El Cenizo v. Texas*, --- F.3d ----, 2018 WL 2121427, at *13-15 (5th Cir. May 8, 2018).

[3] In *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211 (D.C. Cir. 1981), the D.C. Circuit upheld a judicial *search* warrant obtained by the Immigration and Naturalization Service (INS) for purposes of entering and searching a private restaurant. The D.C. Circuit held that obtaining a judicial search warrant was consistent with the INA. *See, e.g., id.* at 1222 ("Although the statute does not provide by its terms for INS entry into dwellings or commercial premises, it is logical to suppose . . . that INS agents are not always restricted to questioning only those whom they see on the street or in public places."). Here, the INA has specifically addressed the manner of arresting an alien—on a warrant issued by an

In addition to detention and removal authority, the INA also defines the scope of permissible judicial review, generally channeling any judicial review through administrative processes first. *See generally* 8 U.S.C. § 1252. If ICE and/or the U.S. Attorney's Office were to present requests for judicial arrest warrants to magistrate or district court judges, that would necessarily provide those judges with the authority to deny those requests—effectively inviting a new form of judicial review into the comprehensive statutory scheme. Congress's express decision to authorize administrative warrants in this context shows it did not contemplate this form of judicial review over detention-related decisions. *See also* 8 U.S.C. §§ 1226(e), 1252(b)(9).

Thus, Defendant does not currently believe that seeking judicial arrest warrants, as suggested by the Court, is a practicable option. At a minimum, Defendant is concerned that even if this Court is willing to indulge such applications, other judges within this District to whom such applications are presented may decline to issue such warrants—which would place ICE in the untenable position of being obligated to obtain judicial warrants in order to obtain the City's cooperation, but unable to do so depending on the identity of the Court before which ICE and the U.S. Attorney's Office are proceeding.

Defendant also has concerns regarding the substantial burdens that would be associated with obtaining judicial warrants. The preparation of judicial warrant applications necessarily requires time and coordination between ICE and the U.S. Attorney's Office—significantly more time than is required under current practices for ICE to lodge an administrative detainer. That time would detract from both offices' other pressing missions, and such warrant applications might not be able to be completed prior to an alien's release from City custody. *Cf.* Def.'s Proposed Findings of Fact ¶ 32 (discussing the time required to obtain a criminal warrant)

Moreover, such judicial warrant applications would also require substantial time and attention by the magistrate judges and district court judges in this District. Given that a substantial number of aliens in the City's custody are released with only several hours' notice, these warrant applications could frequently be presented to magistrate judges or district court judges on a time-sensitive basis. The limited time for preparation and review of these warrant applications would only further add to the overall burdens on each of the entities involved—ICE, the U.S. Attorney's Office, and the courts within this District.

Finally, this process would appear to serve little practical purpose. ICE has the authority to issue an arrest warrant to any "alien . . . pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). Thus, a court reviewing an application for a "judicial warrant" would not evaluate any issues relating to removability or whether the alien's criminal history subjected the alien to mandatory detention; those determinations are instead made by the immigration courts in removal proceedings. *See* 8 U.S.C. § 1229a(a)(1) (immigration proceedings are generally "the sole and exclusive procedure for determining whether an alien may be . . . removed from the United States"); *Jennings*, 138 S. Ct. at 838 n.1 (describing so-called *Joseph* hearings in which aliens may contest their mandatory-detention status before an immigration judge). Thus, unlike a typical warrant application in which courts are responsible for making legal determinations regarding probable cause, it is not entirely clear what role courts would play for the type of "judicial warrants"

---

immigration officer. *See* 8 U.S.C. § 1226(a) (authorizing administrative warrants). Indeed, the D.C. Circuit appeared wholly unconcerned with the arrest of individuals even in the absence of judicial arrest warrants. *See Blackie's House of Beef*, 659 F.2d at 1214 (noting that 15 employees were seized during the search of the restaurant).

contemplated by this Court's proposals. And to the extent a reviewing court were to require a greater showing than what is necessary for ICE to issue an administrative warrant, that would clearly render the practice of seeking judicial warrants, and the accompanying judicial review, contrary to the overall scheme set forth in the INA.

Based on the foregoing, Defendant does not believe it is a feasible option for ICE to begin pursuing, in conjunction with the U.S. Attorney's Office, judicial warrants or judicial detainers from courts in this District based solely on an individual's status as a criminal alien.[4]

### III. A Potential Way for the City to Address the Above Concerns

Notwithstanding the above, there may be ways in which the City itself could change its policies that would account for Defendant's logistical concerns while still satisfying the Court's desire for greater cooperation with respect to criminal aliens.

One potential option would be for the City to modify its policies along the lines the Court suggested in Questions 18-20 of its Letter of May 3, 2018. *See* Dkt. No. 192 at 3-5. Specifically, there are likely to be a fair number of circumstances where the City itself is able to determine that an individual likely qualifies as a "criminal alien." For example, when an individual has been convicted and is being sentenced, presumably the City already knows the individual's prior criminal history. *Cf.* 204 Pa. Code §§ 303.1, 303.4 (requiring that the Pennsylvania Sentencing Guidelines be calculated for each convicted offender, which involves calculating a "prior record score" based on the individual's past convictions). At that time, the City itself could decide whether the individual likely qualifies as a criminal alien, and the City's policies could be modified to allow advance notice to ICE for those individuals (and any other appropriate categories of individuals, such as public-safety threats identified by the City on a case-by-case basis).

Indeed, the City has already developed a protocol for sending a weekly spreadsheet to a senior City official (Mr. Abernathy) regarding inmates for whom ICE has lodged a detainer, and that spreadsheet already contains information regarding each inmate's prior criminal history. *See* Exh. D-20 (column titled "Prior Felony Conviction"); Def.'s Proposed Findings of Fact ¶¶ 27-28. And Mr. Abernathy has previously provided advance notice to ICE for individuals listed on that spreadsheet. *See* Apr. 30 Trial Tr. 89:11-23. Thus, the City itself could unilaterally take steps to modify its policies and protocols in order to address the Court's concerns regarding criminal aliens.

Ultimately, the Court's concerns stem from the City's broad policy of non-cooperation. The best way to resolve the Court's concerns, therefore, is to go to the source—*i.e.*, for the City to change the scope of its policy prohibiting advance notice to ICE. ICE receives this kind of cooperation from the vast majority of jurisdictions in the country. The burden should not be placed

---

[4] Even if the Department of Justice and/or Department of Homeland Security were able to decide, as a matter of their own discretion, to seek judicial warrants as to criminal aliens, that does not mean that the City can enact a policy effectively requiring the Federal Government to pursue such judicial warrants instead of administrative warrants. *See, e.g.*, *Arizona v. United States*, 567 U.S. 387, 408-10 (2012) (holding that a state statute was pre-empted because it conflicted with "[t]he federal statutory structure instruct[ing] when it is appropriate to arrest an alien during the removal process"). This Court need not opine on pre-emption principles because they are irrelevant to the core issue in this lawsuit: whether the Department of Justice has authority to condition Byrne JAG funding on the City's compliance with three particular conditions. Nonetheless, to the extent the Court is considering opining on a broader set of issues—*i.e.*, whether ICE should be seeking "judicial detainers" to obtain the City's cooperation with respect to criminal aliens— such a proposal is independently foreclosed by the Supremacy Clause.

on ICE to jump through hoops to obtain the City's cooperation, particularly when it is the City's own policy that has erected those hoops. Thus, Defendant respectfully submits that voluntary action by the City along the lines suggested here would be far more appropriate than ICE being expected to undertake additional steps not contemplated by the INA. *Cf.* note 4, *supra*.

*   *   *   *

As stated above, Defendant appreciates the Court's interest in encouraging the City to provide greater cooperation at least with respect to individuals who are criminal aliens. While Defendant has substantial concerns with the particular proposals detailed in the Court's letters, there may be ways in which the City could voluntarily change its policies that would address certain of Defendant's concerns as well as the Court's concerns.

Even if the City were willing to change its policies in this manner, Defendant does not believe those changes would be sufficient to satisfy the City's obligations under the "advance notice" condition, the "jail access" condition, or 8 U.S.C. § 1373. Defendant's overall position continues to be that, in order to receive FY2017 Byrne JAG funding, the City should comply with those conditions with respect to all aliens in the City's custody, not simply those that qualify as "criminal aliens" under § 1226(c). Thus, Defendant does not presently believe that a comprehensive settlement of this lawsuit is possible.

Nonetheless, if the City is willing to consider voluntary changes to its policies, Defendant would be amenable to discussing further the ways in which the City's policies could be changed in a manner suitable to both parties. Defendant's present understanding, however, is that the City is not willing to independently make any changes to its policies. Thus, Defendant has doubts about whether further negotiation and discussion regarding these issues would be productive.

                                                                     Respectfully,

                                                                     */s/ Daniel Schwei*
                                                                     Senior Trial Counsel
                                                                       U.S. Department of Justice
                                                                      Civil Division, Federal Programs Branch