## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE CITY of PHILADELPHIA,<br><br>      Plaintiff,<br><br>v.<br><br>JEFFERSON BEAUREGARD SESSIONS III,<br>in his official capacity as Attorney General of<br>the United States,<br><br>      Defendant. | Case No. 2:17-cv-03894-MMB |

## CITY OF PHILADELPHIA'S POST-TRIAL BRIEF

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ...................................................................................................................1

ARGUMENT ..........................................................................................................................2

    I.      SECTION 1373 DOES NOT EXTEND TO RELEASE DATE INFORMATION..................................................................................................2

    II.     THE CHALLENGED CONDITIONS VIOLATE THE SPENDING CLAUSE (COUNT IV).........................................................................6

    III.    THE DEPARTMENT'S APPLICATION OF SECTION 1373 VIOLATES THE TENTH AMENDMENT (COUNT V)...................................10

    IV.    PHILADELPHIA COMPLIES WITH SECTION 1373 (COUNT VI).......................................................................................................15

    V.     NEITHER *JENNINGS*, SECTION 1226(c), NOR ANY OTHER ALTERNATIVE ISSUES AFFECT THE RESULT OF THIS LITIGATION............................................................................................20

    VI.    PHILADELPHIA IS ENTITLED TO DECLARATORY, INJUNCTIVE, AND MANDAMUS RELIEF .......................................23

CONCLUSION......................................................................................................................25

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES:

*Bologna v. City & Cnty. of S.F.*,
    192 Cal. App. 4th 429 (Cal. Ct. App. 2011) .............................................................3

*Bond v. United States*,
    134 S. Ct. 2077 (2014) ......................................................................................5

*Charles v. Verhagen*,
    348 F.3d 601 (7th Cir. 2003) ............................................................................7

*City of Chicago v. Sessions*,
    264 F. Supp. 3d 933 (N.D. Ill. 2017) ...............................................................4

*Commonwealth of Va. Dep't of Educ. v. Riley*,
    106 F.3d 559 (4th Cir. 1997) (en banc) .........................................................17

*Demore v. Kim*,
    538 U.S. 510 (2003) ........................................................................................22

*Doe v. City of New York*,
    860 N.Y.S.2d 841 (N.Y. Sup. Ct. 2008) .....................................................3, 17

*Exxon Mobile Corp. v. Allapattah Servs., Inc.*,
    545 U.S. 546 (2005) ..........................................................................................3

*Galarza v. Szalczyk*,
    745 F.3d 634 (3d Cir. 2014) ..........................................................13, 15, 22, 23

*Gregory v. Ashcroft*,
    501 U.S. 452 (1991) .....................................................................................5, 14

*Hisp. Int. Coal. of Ala. v. Governor of Ala.*,
    691 F.3d 1236 (11th Cir. 2012) .......................................................................3

*Jama v. ICE*,
    543 U.S. 335 (2005) ........................................................................................20

*Jennings v. Rodriguez*,
    138 S. Ct. 830 (2018) ................................................................................21, 22

*Koog v. United States*,
    79 F.3d 452 (5th Cir. 1996) .......................................................................13, 15

### TABLE OF AUTHORITIES—*Continued*

**Page(s)**

*Koslow v. Pennsylvania,*
  302 F.3d 161 (3d Cir. 2002) .................................................................10

*Lozano v. City of Hazleton,*
  620 F.3d 170 (3d Cir. 2010) ...................................................................3

*Matter of Joseph,*
  22 I. & N. Dec. 799 (BIA 1999) ...........................................................21

*Moore v. Perales,*
  692 F. Supp. 137 (E.D.N.Y. 1998) .......................................................18

*Murphy v. Nat'l Collegiate Athletic Ass'n,*
  --- S. Ct. ----, 2018 WL 2186168 (May 14, 2018) ....................... *passim*

*N. Ill. Chapter of Assoc. Builders & Contractors, Inc. v. Lavin,*
  431 F.3d 1004 (7th Cir. 2005) ..............................................................10

*New York v. United States,*
  505 U.S. 144 (1992) ..............................................................................11

*Printz v. United States,*
  521 U.S. 898 (1997) ....................................................................... *passim*

*Prometheus Radio Project v. FCC,*
  824 F.3d 33 (3d Cir. 2016) ...................................................................23

*Ratzlaf v. United States,*
  510 U.S. 135 (1994) ................................................................................3

*Rice v. Santa Fe Elevator Corp.,*
  331 U.S. 218 (1947) ..............................................................................22

*South Dakota v. Dole,*
  483 U.S. 203 (1987) ................................................................................6

*Steinle v. City and Cnty. of S.F.,*
  230 F. Supp. 3d 994 (N.D. Cal. 2017) ...................................................3

*Sterling v. Borough of Minersville,*
  232 F.3d 190 (3d Cir. 2000) ...................................................................5

*Udall v. State of Wisconsin,*
  306 F.2d 790 (D.C. Cir. 1962) .............................................................24

*United States v. Westinghouse Elec. Corp.,*
  638 F.2d 570 (3d Cir. 1980) ...................................................................5

**TABLE OF AUTHORITIES—*Continued***

**Page(s)**

*U.S. ex rel. Bauchwitz v. Holloman*,
    671 F. Supp. 2d 674 (E.D. Pa. 2009) .......................................................................25

*Whalen v. Roe*,
    429 U.S. 589 (1977)............................................................................................5

*Wilson v. United States*,
    135 F.2d 1005 (3d Cir. 1943)...............................................................................25

**STATUTES:**

5 U.S.C. § 706(1) .....................................................................................................23

8 U.S.C. § 1182 ....................................................................................................2, 20

8 U.S.C. § 1226(c) ..........................................................................................20, 21, 22

8 U.S.C. § 1227 ....................................................................................................2, 20

8 U.S.C. § 1252c ......................................................................................................21

8 U.S.C. § 1373 ............................................................................................... *passim*

8 U.S.C. § 1357(g) ....................................................................................................21

28 U.S.C. § 1361 ......................................................................................................24

34 U.S.C. § 10152(a)(1)......................................................................................6, 24, 25

34 U.S.C. § 10156(a)(1)......................................................................................24, 25

34 U.S.C. § 10228(a) ................................................................................................6

53 P.S. § 13131 ........................................................................................................13

Consolidated Appropriations Act, 2017
    Pub. L. No. 115-3, 131 Stat. 135 ...........................................................................25

Pub. L. No. 104-208, 110 Stat. 3009-585 (1998) .......................................................20

Pub. L. No. 104-208, 110 Stat. 3009-707 (1998) .......................................................20

**CONSTITUTIONAL PROVISIONS:**

U.S. Const. amend. X................................................................................. *passim*

TABLE OF AUTHORITIES—*Continued*

Page(s)

OTHER AUTHORITIES:

Julie Dona, *Making Sense of "Substantially Unlikely": An Empirical Analysis of the Joseph Standard in Mandatory Detention Custody Hearings*, 26 Geo. Immigr. L.J. 65 (2011) .............................................................................21

Int'l Ass'n of Chiefs of Police, *Enforcing Immigration Law: The Role of State, Tribal and Local Law Enforcement*, https://goo.gl/xxC6Wq ....................................9

Major Cities Chiefs Ass'n, *Major Cities Chiefs Association Immigration Position* (Oct. 2011), https://goo.gl/qnsp4X ....................................................................9

L. Meckler, *Trump Administration Proposes Tougher Line on 'Sanctuary Cities' Over Detainer Requests*, Fox Business (May 23, 2017), https://goo.gl/GkADE5 ...................4

U.S. Dep't of Justice, *Summary of General Provisions contained in the FY 2018 President's Budget*, https://goo.gl/2AhFAK...........................................................3

## INTRODUCTION

The City of Philadelphia determined long ago that its officials cannot act as an extension of U.S. Customs and Immigration Enforcement ("ICE"), as doing so would jeopardize its efforts to build community trust, chill the reporting of crimes, and discourage the use of City services. Congress respected and supported judgments like these when it enacted the Edward Byrne Memorial Justice Assistance Grant ("Byrne JAG") program. "Congress employed its spending power to create a grant program to provide money for 'administration of the criminal justice system,' with the intent that states and municipalities use the money as they see fit." PI Op. 98 (Dkt. 74). But as the City has shown, the Department of Justice (the "Department") has sought to add conditions ("the Challenged Conditions") to the City's Byrne JAG award that co-opt the City's police powers, at odds with Congress' scheme. Although the Founders made a "fundamental structural decision" to withhold "the power to issue orders directly to the states," the Department is using 8 U.S.C. § 1373 to do exactly that. *Murphy v. Nat'l Collegiate Athletic Ass'n*, --- S. Ct. ----, 2018 WL 2186168, at *10 (May 14, 2018).

For the reasons set forth below, as well as those in the City's First Amended Complaint and preliminary injunction, motion to dismiss, and summary judgment briefing (Dkts. 21-1, 46, 71, 84, 119, 157-1), the Court should enter judgment for the City on all counts. The Court has already found that the Advance Notification and Jail Access Conditions are unauthorized by statute, and that the Department's decision to impose them was arbitrary and capricious. Dkt. 185. The Court should find the same for the Section 1373 Condition. Further, the Court should find that all three Challenged Conditions violate the Spending Clause and the Tenth Amendment. And while the parties have hotly contested whether the City's policies and practices comply with Section 1373, the dispute has largely been driven by the Department's position that Section 1373

1

extends to release date information.  The Department is wrong, and has failed to identify any way the City violates a correct interpretation of the statute.  The Court should grant the City's request for declaratory, injunctive, and mandamus relief.

## ARGUMENT

I.    **SECTION 1373 DOES NOT EXTEND TO RELEASE DATE INFORMATION.**

Underlying the Department's arguments is a fundamentally flawed premise: the notion that release dates "fit[] within the INA's contemplation of immigration status" under Section 1373.  MTD 29 n.7 (Dkt. 102-1); *see also* PI Opp. 38 n.11 (Dkt. 28); 11/2 Tr. 101:23-25 (Dkt. 72).  That reading of Section 1373 is wrong several times over.  It is contradicted by the plain text of the statute, poses constitutional problems, and was invented only during the course of this litigation.  Simply put, Section 1373 can only require what it says, not what the Department might want it to say.

1. *Text.*  Section 1373 prohibits restrictions on the sharing of "information regarding the citizenship or immigration status, lawful or unlawful, of any individual" and on "information regarding the immigration status, lawful or unlawful, of any individual."  8 U.S.C. § 1373(a), (b).  "[I]nformation regarding citizenship or immigration status" encompasses what it plainly describes: information about whether a person is a citizen by birth or naturalization, or is in the United States pursuant to a green card, visa, or some other category of admission recognized by the INA.  Although the Department has claimed Section 1373 encompasses a person's release date, location, or whether they are in custody, the text makes no mention of those things.  Moreover, whether a person is in custody has no bearing on his "citizenship or immigration status"; no part of the INA even suggests that a person who is lawfully present in the United States becomes unlawfully present by virtue of being detained.  *Cf.* 8 U.S.C. §§ 1182, 1227.

2

This Court took "notice" that Section 1373 does not "by its face" apply to information regarding a person's "whereabouts." 5/1 Tr. 23:13-24:2 (Dkt. 207). That should end the inquiry. *See, e.g.*, *Exxon Mobile Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005) ("[T]he authoritative statement is the statutory text[.]"). Every court to examine Section 1373's text has given it its natural reading. *See, e.g.*, *Hisp. Int. Coal. of Ala. v. Governor of Ala.*, 691 F.3d 1236, 1248 (11th Cir. 2012); *Lozano v. City of Hazleton*, 620 F.3d 170, 194-196 (3d Cir. 2010), *judgment vacated on other grounds*, 563 U.S. 1030 (2011); *Bologna v. City & Cnty. of S.F.*, 192 Cal. App. 4th 429, 433, 439-440 (Cal. Ct. App. 2011) (Section 1373 governs "immigration information"); *Doe v. City of New York*, 860 N.Y.S.2d 841, 844 (N.Y. Sup. Ct. 2008) (Section 1373 governs "restrictions on the reporting of immigration status"). And the only court to consider whether Section 1373 extends to a person's release date soundly rejected it as "[im]plausible." *Steinle v. City and Cnty. of S.F.*, 230 F. Supp. 3d 994, 1015 (N.D. Cal. 2017).[1]

2. *Administrative Interpretation.* The Department has also made repeated public statements that Section 1373 *does not* encompass the sharing of release date information. In its May 22, 2017 proposed budget to Congress, the Department requested an "*amendment* to 8 U.S.C. 1373 to . . . *expand the scope* to prevent State and local government officials from prohibiting or restricting any government entity or official from complying with a lawful civil immigration detainer request." U.S. Dep't of Justice, *Summary of General Provisions contained in the FY 2018 President's Budget*, n.7, https://goo.gl/2AhFAK (emphasis added). Complying with detainer requests means providing notification of release. *See* Ex. D-21. Specifically, the Department's amendment would replace the phrase "information regarding citizenship and

---

[1] The Court need not consult legislative history, as the "statutory text . . . is clear." *Ratzlaf v. United States,* 510 U.S. 135, 147-148 (1994). But as the City has already explained, the legislative history of Section 1373 does not support the Department's interpretation either. *See* MTD Opp. 51 (Dkt. 119).

immigration status" in Section 1373 with "information related to the nationality, citizenship, immigration status, removability, *scheduled release date and time*, home address, work address, or contact information." *Id.* (emphasis added).[2]  If that is not proof enough that the statutory phrase does not presently include release dates, it is hard to imagine what would be.

The Department's Office of the Inspector General's ("OIG") Memorandum from May 31, 2016 reiterates this same limited scope of Section 1373.  Ex. P-1, at PHLJAG-00366.  The Memorandum states that "Section 1373 does not specifically address restrictions by state or local entities on cooperation with ICE regarding detainers," noting that "detainers"—which seek advance notification—are "voluntary requests." *Id.* at PHLJAG-00369.  The Memorandum also observes that Philadelphia's Executive Order 5-16 is focused on "civil immigration detainer requests," and is thus outside the ambit of Section 1373. *Id.* at PHLJAG-00373.  The fact that the Department added a *separate* Advance Notification condition to JAG grants in July 2017, rather than resting on the Section 1373 condition alone, drives home the point.  The Department's current interpretation of Section 1373 as including demands for advance notification of release dates to roughly two weeks after its Advance Notification condition was enjoined by the *Chicago* district court. *See City of Chicago v. Sessions*, 264 F. Supp. 3d 933, 943 (N.D. Ill. 2017).

3.  *Constitutional Problems.*  Settling any doubt, the constitutional implications of the Department's reading further reinforce its flaws.  First, the Department would have Section 1373 reach not just information about when a criminal alien will be released from custody, but *any*

---

[2]  After the budget announcement, a spokesperson from the Department confirmed that an internal memorandum sent by Attorney General Sessions discussing compliance with Section 1373 "reflects the current law, which as now written doesn't relate to detainer requests."  L. Meckler, *Trump Administration Proposes Tougher Line on 'Sanctuary Cities' Over Detainer Requests*, Fox Business (May 23, 2017), https://goo.gl/GkADE5; *see also* Ex. P-1, at PHLJAG-00507-508 (Attorney General memorandum regarding compliance with Section 1373).

information that a person—criminal or not, and alien or not (as Section 1373 applies to "any individual," 8 U.S.C. § 1373(a))—is "in a certain place and not elsewhere."  MTD 29 n.7. Beyond release dates, records of a person's visit to a medical facility, drug rehabilitation facility, LGBT center, or school, would all conceivably have to be disclosed to inquiring federal authorities.  The privacy implications of such a reading compel its rejection.  *See Whalen v. Roe*, 429 U.S. 589, 599 (1977) (recognizing a constitutional privacy interest in "avoiding disclosure of personal matters"); *Sterling v. Borough of Minersville*, 232 F.3d 190, 196 (3d Cir. 2000) (same as to sexual orientation); *United States v. Westinghouse Elec. Corp.*, 638 F.2d 570, 577 (3d Cir. 1980) (same as to medical records).

Additionally, the Department's reading would work a substantial shift in authority from states to the federal government with no clear indication that Congress intended such. According to the Department, Section 1373 encompasses any "information that assists the federal government in carrying out its statutory responsibilities" under the INA.  MTD 30 n.7. Considering the wide range of information which could fit that description, state and local officers could become subsumed by endless federal inquiries.  "If Congress intends to alter the usual constitutional balance between the States and the Federal Government," it "must make its intention to do so unmistakably clear in the language of the statute."  *Gregory v. Ashcroft*, 501 U.S. 452, 460-461 (1991).  Section 1373 contains no such "clear statement."  *Bond v. United States*, 134 S. Ct. 2077, 2089 (2014).  Moreover, if Section 1373 *did* purport to reach any and all location-related information to the extent it helped ICE, it would violate the Tenth Amendment. The federal government cannot "conscript" state officers "or those of their political subdivisions" "as its agents," *Murphy*, 2018 WL 2186168, at *11 (quotation marks omitted); insisting that local officers stand at the beck and call of ICE would do exactly that.

## II.    THE CHALLENGED CONDITIONS VIOLATE THE SPENDING CLAUSE (COUNT IV).

The City is entitled to judgment on Count IV of its First Amended Complaint. All three Challenged Conditions violate the Spending Clause because they are not "reasonably calculated" to address the purposes of the Byrne JAG program. *South Dakota v. Dole*, 483 U.S. 203, 207 (1987). The trial record makes this abundantly clear.[3]

1. Throughout this litigation, the Department has based its Spending Clause arguments on a distortion of Congress' purpose in enacting the Byrne JAG program. The Department has argued Congress' goal was "to support and strengthen law enforcement and criminal justice" broadly construed. Def. MSJ 23 (Dkt. 155-1). This tactic ignores both (a) the Supreme Court's command to focus on the "*particular* . . . purpose for which the funds are expended," *Dole*, 483 U.S. at 207 (emphasis added), and (b) this Court's recognition that "the Byrne JAG statute is clearly designed for the purpose of enhancing <u>local</u> criminal justice." PI Op. 97-98. To that end, Congress' purpose in enacting the Byrne JAG program was not to force states and localities to assist with federal immigration enforcement. Indeed, Congress expressly stated in a different portion of Chapter 101 (which contains the JAG program) that "[n]othing in this chapter or any other Act shall be construed to authorize any department [or] agency . . . of the United States to exercise any direction, supervision, or control over any police force or any other criminal justice agency of any State or any political subdivision thereof." 34 U.S.C. § 10228(a). And immigration enforcement is not one of the eight enumerated programmatic areas for which grantees are authorized to use JAG funds. *Id.* § 10152(a)(1).

---

[3] While the City maintains that all of the Challenged Conditions violate the Spending Clause, the remainder of this discussion focuses primarily on the Section 1373 Condition in light of the Court's ruling that the Advance Notification and Jail Access Conditions are not authorized by statute. *See* Dkt. 185.

The Challenged Conditions are not aimed at improving "local criminal justice" in Philadelphia or anywhere else. Rather, they are designed to make it easier for ICE to enforce the immigration laws. The Attorney General admitted as much, stating that the "new conditions . . . will . . . ensur[e] that *federal immigration authorities* have the information *they* need *to enforce immigration laws*." Ex. P-1, at PHLJAG-00992 (emphasis added). The Department has not shown otherwise during this litigation; its entire case was focused on how Philadelphia's policies hinder the ICE Philadelphia Field Office from accomplishing its mission. But ICE's marching orders—in Philadelphia, and nationally—are to pursue the removal of "[*a*]*nybody* who's in the country in violation of law," not just those with criminal convictions. Pl. FOF ¶¶ 47-51 (Dkt. 201) (referring to the directive from Secretary John Kelly). ICE has even touted in a press release its arrests of over 10,000 non-criminals over a three-month time period. *See* Ex. P-40. And ICE does not evaluate whether its enforcement operations locally will compromise the law enforcement operations of the Philadelphia police. Pl. FOF ¶ 53. In short, the JAG program aims to support the improvement of local criminal justice, while the Challenged Conditions aim to further federal immigration enforcement. The conditions do not "share[] the same goal" that Congress had in establishing the JAG program. *Charles v. Verhagen*, 348 F.3d 601, 609 (7th Cir. 2003).

2. To attempt to salvage the Challenged Conditions' compliance with the Spending Clause, the Department has repeatedly argued that "[o]nce removed, a criminal alien who has committed a removable offense . . . is no longer present in this country with the potential to reoffend." Def. MSJ 23-24. As the Court recognized, this "general argument . . . do[es] not answer all the issues." PI Op. 94. "Local criminal justice" involves far more than undocumented persons with criminal records; it involves operating a law enforcement system for

all of the City's residents.  Pl. FOF ¶ 27.  As the City demonstrated at trial, forcing the City to change its policies in order to heed the Department's demands would harm public safety in Philadelphia, and come at the expense of public trust and community policing.  *Id.* ¶¶ 55-56, 58.

    a.  Philadelphia is home to about 200,000 immigrants.  PI Op. 31, 37.  The City has worked hard to encourage victims and witnesses within the immigrant community to come forward to report crimes.  Pl. FOF ¶¶ 55-57.  That has become more difficult as ICE has increased its enforcement actions against non-criminals.  *Id.* ¶¶ 47-54.  The need to reassure law-abiding residents that contact with City officials will not lead to contact with ICE applies both to people who lack lawful immigration status themselves, and to people who *do* have lawful status, but fear ICE action against their loved ones, or who fear they will be erroneously detained or even deported.  Pl. FOF ¶¶ 57, 60; *see* PI Op. 87 n.24.  To avoid the perception that residents cannot safely approach City officials, the City has made clear that Philadelphia officers do not act as an "extension of ICE."  Pl. FOF ¶¶ 56-57.  While the City shares information with partner agencies in the pursuit of criminal suspects, and honors the findings of state and federal judges that a person is subject to arrest for a criminal offense, it will not deliver a person into ICE custody based on ICE's say-so alone.  *See id.* ¶¶ 5, 9-28.[4]

    Philadelphia's policies reflect the reasoned judgments of City officials in the course of their duties, as well as years of regular meetings between City policymakers and community stakeholders.  *See, e.g.*, 4/30 Tr. 38:16-22, 43:20-45:1, 52:5-24 (Abernathy) (Dkt. 206); 5/10 Tr. 66:11-67:4 (Gladstein) (Dkt. 209).[5]  In contrast, neither the Department nor ICE has considered

---

[4] As the City explained in its May 18 letter to the Court, the City would also honor findings by a state or federal judge that a person is lawfully subject to arrest for an immigration violation by notifying ICE of such a person's release, and facilitating the transfer of that person into ICE's custody.  Dkt. 203.  But ICE appears unwilling to take this step.

[5] The City is far from alone; both the International Association of Chiefs of Police and the Major Cities Chiefs Association have advised that the actions required by the Challenged Conditions

whether the Challenged Conditions would impact the City's law enforcement capabilities.  Pl. FOF ¶ 52. The Administrative Record contains not one study or internal assessment of whether the conditions would further local criminal justice efforts.  *Id.*  But the City's policies and practices have paid off, helping to reduce crime to its lowest levels in decades.  Pl. FOF ¶ 58.

b.  The Challenged Conditions would force the City to abandon these policies, and would shatter the trust between City officials and members of the immigrant community.  Again, this is because the Challenged Conditions extend far beyond "criminal alien[s] who ha[ve] committed a removable offense."  Def. MSJ 24.  The Department has made clear it will require grantees to comply with the Challenged Conditions "with respect to *all* aliens in the City's custody."  Dkt. 204, at 7 (emphasis added).  ICE has also demonstrated that it is committed to pursuing the removal of non-criminals, and there certainly is no policy preventing or even discouraging that. Pl. FOF ¶ 50.  Plain and simple:  The federal government wants to compel the City to share information about *any and all* undocumented individuals.  This would significantly undermine the City's message that it is not in the business of immigration enforcement (*see, e.g.*, 5/10 Tr. 37:21-25 (Ross)), and would deter residents' willingness to report crimes.  Pl. FOF ¶¶ 60-68.

Moreover, the Department has indicated that it intends to apply the Section 1373 Condition to non-law enforcement functions of the City, like the Philadelphia Fire Department and the Department of Licenses & Inspections.  Pl. FOF ¶¶ 67-68.  It is near impossible to imagine—and the Department has offered no evidence to explain—how local criminal justice is served by eliminating restrictions on the exchange of immigration-status information between ICE and firefighters or building inspectors.  This dooms the Department's Spending Clause case.

---

could chill the reporting of crimes, especially domestic violence offenses.  Int'l Ass'n of Chiefs of Police, *Enforcing Immigration Law: The Role of State, Tribal and Local Law Enforcement*, at 5, https://goo.gl/xxC6Wq; Major Cities Chiefs Ass'n, *Major Cities Chiefs Association Immigration Position* (Oct. 2011), https://goo.gl/qnsp4X.

*See Koslow*, 302 F.3d at 176 (applying condition only to entities receiving federal funding "helps ensure the [condition] accords with the 'relatedness' requirement"); *see also N. Ill. Chapter of Assoc. Builders & Contractors, Inc. v. Lavin*, 431 F.3d 1004, 1006 (7th Cir. 2005) ("Conditions on spending may become regulation if they affect conduct other than the financed project.").

Nor can the Department justify the Advance Notification or the Section 1373 Condition under the Spending Clause by arguing that the City is less safe if ICE lacks advance notice of a person's release.[6]  Not every undocumented individual the City releases from custody (on bail, on a declination to prosecute, or after a sentence is complete) is inherently dangerous.  Just the opposite—the overwhelming majority of people in the City's custody have not been convicted of any offense, nearly all of the detainers the City receives from ICE are for people with *no* prior felonies, and individuals who have completed their sentences are presumed rehabilitated by the criminal justice system.  Pl. FOF ¶¶ 24-27.  Meanwhile, providing advance notification to ICE without a judicial warrant would send the same signal to the immigrant community that the City is an extension of ICE.  *Id.* ¶¶ 60-62.  The overall effect on crime reporting, public safety, and criminal justice would be negative.  *See* Dkt. 203, at 3.

In sum, the Challenged Conditions seek to further ICE's immigration objectives at the expense of the City's criminal justice objectives.  Given that the vehicle for attaching these conditions is a criminal justice *improvement* grant, that cannot be done.

## III.    THE DEPARTMENT'S APPLICATION OF SECTION 1373 VIOLATES THE TENTH AMENDMENT (COUNT V).

The Court should also enter judgment for the City on Count V of the First Amended Complaint.  As the Department has argued repeatedly (*see* PI Opp. 17-19; MTD 15, 22), Section

---

[6] This argument faces a threshold problem with respect to the Section 1373 Condition because the statute does not extend to release date information.  *See supra* pp. 2-5.

1373 imposes statutory requirements on the City independent of its application for JAG funding. Accordingly, the Department's interpretation of Section 1373 itself is properly before the Court, and the City is entitled to a declaration that the Department's interpretation violates the anti-commandeering component of the Tenth Amendment.[7] *See Murphy*, 2018 WL 2186168, at *13.

1.  The Tenth Amendment prohibits Congress from "commandeer[ing] the . . . States." *New York v. United States*, 505 U.S. 144, 162, 166 (1992) (citation omitted).  This is because "[t]he Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions"; rather, "the Framers explicitly chose a Constitution that confers upon Congress the power to regulate *individuals*, not States." *Id.* at 162, 166 (emphasis added).  As a result, "State governments are neither regional offices nor administrative agencies of the Federal Government." *Id.* at 188.  Under these principles, a federal law cannot stand "where . . . it is the whole *object* of the law to direct the functioning of the state executive." *Printz v. United States*, 521 U.S. 898, 932 (1997).

Earlier this month, the Supreme Court explained that these principles apply equally to federal laws *prohibiting* states from adopting certain policies. *Murphy*, 2018 WL 2186168, at *13.  The statute at issue in *Murphy* made it "unlawful for a State or any of its subdivisions to," among other things, "authorize by law" gambling on sports. *Id.* at *4.  The Government argued that it did not run afoul of the anticommandeering principle for the federal government to "prohibit[] a State from enacting new laws." *Id.* at *13.  The Court emphatically disagreed, holding that such a provision puts states "under the direct control of Congress . . . as if federal

---

[7] In response to Question 1 of the Court's May 18 Letter, Section 1373 very well may be facially unconstitutional, particularly after *Murphy*, and at least two litigants have asserted facial challenges against the statute.  But this Court need not reach that issue, as the City has pled an as-applied challenge, and seeks a declaration that the Department's expansive interpretation violates the Tenth Amendment as applied to the City. *See* MTD Opp. 38.

officers were installed in state legislative chambers and were armed with the authority to stop legislators from voting on any offending proposals." *Id.*

The anti-commandeering doctrine is a "categorical[]" rule. *Printz*, 521 U.S. at 932. It makes no difference if the federal law "serves very important purposes," or if it "places a minimal and only temporary burden upon state officers." *Id.* at 931-932 (quotation marks omitted). Even though this rule can appear "formalistic in a given case," "[i]t is the very *principle* of separate state sovereignty that such a law offends, and no comparative assessment of the various interests can overcome that fundamental defect." *Id.* at 932. And it applies with equal force to "political subdivisions" of states and executive officers. *Id.* at 935.

The Supreme Court has consistently "explained why adherence to the anti-commandeering principle is important" by reference to several fundamental values. It "prevents Congress from shifting the costs of regulation to the States"; if "Congress enacts a law and requires enforcement by the Executive Branch, it must appropriate the funds needed to administer the program." *Murphy*, 2018 WL 2186168, at *12. The doctrine also "promotes political accountability," as it ensures that Congress cannot evade responsibility for unpopular policies by cloaking them in the authority of state and local governments. *Id.*

2. The Department's proposed interpretation of Section 1373 has been a moving target in this litigation. But all of its interpretations violate the anti-commandeering principle.

a. First, the Department has argued that Section 1373 blocks the City from enacting a policy that controls the time, manner, and instances in which their employees exchange immigration status information with federal officials. *See* DOJ Oct. 11 Letter (Dkt. 28-1). For instance, the Department now argues that Executive Order 5-16 is invalid because it seeks to limit when City police and prisons officials comply with ICE detainer requests to instances

where ICE has obtained a judicial warrant.  This is precisely the sort of prohibition on state and local policymaking that *Murphy* forbids.  2018 WL 2186168, at *13.  The City, exercising power delegated by the Commonwealth of Pennsylvania, *see* 53 P.S. § 13131, has adopted policies governing the occasions on which its employees can assist federal officials.  But Section 1373, as construed by the Department, would "operate directly on the" City and "dictat[e]" that the City "may not do" exactly that.  *Murphy*, 2018 WL 2186168, at *13, *15.  Such a prohibition is a "direct affront" on "state sovereignty."  *Id.* at 13.  *Cf. Galarza v. Szalczyk*, 745 F.3d 634, 645 (3d Cir. 2014) (noting that "a number of local governments" have exercised "their right" to refuse to comply with ICE detainers unless the target is suspected of "a serious crime").

The Department's interpretation has other commandeering problems as well.  Under its view, local officials can be summoned by ICE at any moment to drop what they are doing and respond to inquiries, and the City is disallowed from having any policy or protocol that regulates those employees' activities.  In other words, ICE can commandeer individual City officers to dedicate their official time to federal immigration enforcement rather than City tasks.  *Printz* prohibits the federal government from siphoning off City resources to "administer a federal regulatory program" in such a manner.  521 U.S. at 926; *see also Koog v. United States*, 79 F.3d 452, 460 (5th Cir. 1996) ("Whatever the outer limits of state sovereignty may be, it surely encompasses the right to set the duties of office for state-created officials").

The evidence at trial confirms that reading Section 1373 to require the City turn its employees over to ICE would result in the problematic consequences that the Tenth Amendment seeks to avoid.  It would "require . . . local governments to spend public funds in in order to" further federal immigration enforcement efforts.  *Galarza*, 745 F.3d at 644.  As Mr. O'Neill readily admitted, ICE does not have "infinite resources," and co-opting the City's personnel

13

would save ICE time and money.  5/2 Tr. 96:2-10 (O'Neill) (Dkt. 208); *see also* Pl. FOF ¶ 72.[8]
It would also "blu[r]" the federal government's "responsibility" for deportations, because if
undocumented individuals whom the City arrested were turned over to ICE in the ordinary
course, blame would be placed on the City officials who arrested them in the first place.
*Murphy*, 2018 WL 2186168, at *12; Pl. FOF ¶ 57.  Further, as the City's witnesses explained,
citizens already have difficulty distinguishing between different components of government.  Pl.
FOF ¶ 64.

The Department might say that the immigration context allows the federal government to
sidestep these Tenth Amendment limitations.  But *Printz* forecloses that argument, as it holds
that the anti-commandeering principle applies no matter how important the federal interest.  *Id.*
at 931-933; *see also id.* at 905-907 (rejecting argument that Founding-era states were required to
participate in federal naturalization procedures).[9]  Or the Department may contend that Section
1373 requires only the "provision of information" to the federal government, and is therefore a
question reserved in *Printz*.  521 U.S. at 918.  That characterization is misleading:  What the
Department seeks is *not* the "purely ministerial reporting" of information that is already a matter
of public record, *id.* at 936 (O'Connor, J., concurring), but the turning over of "information that
belongs to the [City] and is available to [officers] only in their official capacity."  *Id.* at 932 n.17
(majority opinion).  Such a command runs afoul of *Printz*.  *See id.*  And, in point of fact, the

---

[8] It makes no difference that the City could use some Byrne JAG money to defray these costs.
That is money that Congress appropriated to fund local law enforcement priorities; using it to
indirectly fund ICE priorities exacerbates the commandeering problem.  *See* Pl. FOF ¶ 71; MTD
Opp. 40.  And, in any event, the Tenth Amendment can be violated "even when the States are not
forced to absorb the costs of implementing a federal program."  *Printz*, 521 U.S. at 930.

[9] The Government's reliance on *Gregory v. Ashcroft* for the proposition that Congress can
"impose its will on the States" is misplaced.  *See* Def. MSJ 30.  That case predated the Supreme
Court's anti-commandeering cases and had nothing to do with the Tenth Amendment or
immigration—it was about state judge retirement ages.  501 U.S. at 455.

Court did not bless even purely informational reporting requirements in *Printz*; it merely declined to pass on their constitutionality. *See* MTD Opp. 40 n.13.

b. In another interpretation, the Department has suggested that Section 1373 requires the City not only to comply with the advance notification portion of ICE detainers but also to facilitate transfer within its prisons. *See* Def. FOF ¶¶ 42-55 (Dkt. 200). Even leaving aside the obvious textual flaw in that argument, *Galarza* forecloses it as a constitutional matter. *Galarza*, 745 F.3d at 643 ("Essentially, the federal government cannot command the government agencies of the states to imprison persons of interest to federal officials.").

c. Finally, the Department has also suggested that Section 1373 might go even further: that it might require the City to include Section 1373 by name in its training materials. That interpretation is simply irreconcilable with the text of the statute, which does not say a word about training, and, as the Court recognized, does not "impose[] any affirmative obligation on the City," 5/1 Tr. 24:1-2. And it is once again foreclosed by *Printz*'s prohibition on "conscripting . . . officers . . . to administer" a federal regulatory program. 521 U.S. at 898. It is a direct intrusion on sovereignty to dictate the precise contents of a training program that the City runs for its employees. *Koog*, 79 F.3d at 460.

## IV.    PHILADELPHIA COMPLIES WITH SECTION 1373 (COUNT VI).

Turning to the remaining claim in the First Amended Complaint, the City is entitled to judgment on Count VI. To the extent the Department *can* apply the Section 1373 Condition to the City's Byrne JAG award—notwithstanding that it is not an "other applicable Federal law," its imposition was arbitrary and capricious, and the condition violates the Spending Clause and Tenth Amendment—the City complies with Section 1373 as lawfully construed.

Section 1373 reaches restrictions on the communication of "information regarding the citizenship or immigration status, lawful or unlawful, of any individual."  8 U.S.C. § 1373(a). The City's policies allow for the exchange of such information as to criminal suspects and convicts.  The only relevant exchanges that the City's policies actively limit pertain to victims, witnesses, and law-abiding people—areas for which Department has not sought to prove that the City's policies do not comply with Section 1373, and where Section 1373 cannot reach in light of the Spending Clause, Tenth Amendment, and federalism principles.  Meanwhile, the three ways that the Department *has* sought to prove that the City does not comply with Section 1373— the City's suspension of Lock and Track emails to ICE, the confusion among City officials over placing ICE detainers in jackets, and its advance notification policy—are all red herrings or do not fall within Section 1373.  Other arguments that the Department has advanced, such as issues pertaining to training, are simply unfounded.  The City complies with Section 1373.

1.  *The Exceptions in the City's Policies for Criminals and Criminal Suspects Compel a Finding of Compliance with Section 1373.*  As the City has repeatedly stressed from the filing of its certification letter with the Department in June 2017, the City's policies contain exceptions for information exchanges—both on the "collecting" end and on the "disclosing" end—when it comes to criminal suspects.  *See* Pl. FOF ¶¶ 1-2, 4-5.  Officers can inquire about a person's immigration status if it is "pertinent to a criminal investigation," *id.* ¶ 2, and can disclose it in similar circumstances, *id.* ¶ 5.   And the City *does*, in practice, routinely share information about individuals it arrests and books with the federal government through the use of AFIS and PARS. *Id.* ¶¶ 9-13.  Section 1373 demands nothing more.  The protections that the City's policies afford witnesses, victims, and law-abiding persons are consistent with Section 1373 because the statute must be construed to avoid constitutional doubts under the Tenth Amendment and in light of the

Constitution's federalism principles (*see* PI Br. 45-47 (Dkt. 21-1); MTD Opp. 37-41), and because it would conflict with the Spending Clause for the Department to require disclosures that lack a discernible connection to criminal law enforcement, *see supra* pp. 6-10; *accord Commonwealth of Va. Dep't of Educ. v. Riley*, 106 F.3d 559, 561 (4th Cir. 1997) (en banc) (interpreting IDEA grants condition in light of the Tenth Amendment and Spending Clause).

2. *Lock and Track.* There is no conceivable basis for the Department's Lock and Track argument. *See* Def. FOF ¶¶ 70-74. First and foremost, the City has repeatedly offered to provide the ICE Philadelphia Field Office with information in Lock and Track, most recently on May 9, 2018. Pl. FOF ¶ 15. Second, the City only stopped sending ICE the daily report from Lock and Track because it believed that ICE was not using the information. *Id.* That was reasonable, because after the City discontinued the report, it heard nothing from ICE for *two years*. *Id.* Indeed, the Department itself confirmed ICE's previous silence on Lock and Track in a filing with Magistrate Judge Strawbridge, writing: "Prior to this litigation, ICE . . . did not know that 'citizenship' information was collected from each new inmate upon admission by Philadelphia prisons. *Accordingly, ICE has not previously asked for citizenship information collected by Philadelphia prisons*." Dkt. 154-13, at 5 (emphasis added). Surely, ICE's lack of demonstrated interest in Lock and Track should not be used as a basis to deny the City funding *going forward*. In sum, the City is taking steps to share information in Lock and Track with ICE and its past decision to stop sending a daily email report was based on a reasonable belief that ICE had no use for it. The Department's attempt to manufacture a situation of supposed non-compliance by the City on this basis, solely to further its litigation position, should be rejected.[10]

---

[10] This is especially so given that the Department's guidance to JAG grantees made clear that Section 1373 does not "require that states and localities take specific actions upon obtaining [immigration status] information." Ex. P-1, at PHLJAG-00393; *see also, e.g.*, *Doe*, 860 N.Y.S.2d at 844 ("[W]hile [Section 1373] provision prohibits state and local governments from

3. *Placing ICE Detainers in Prisoners' "Jackets."*  A second ground that the Department has advanced for why the City is not in compliance with Section 1373 is the "Department of Prisons' Failure to Forward Detainers."  Def.  FOF ¶¶ 75-78.  This, too, is a solution in search of a problem.  As Philadelphia's First Deputy Managing Director testified, when the City receives detainers from ICE, the detainers are to be placed in the inmate's "jacket" and logged into Lock and Track.  Pl. FOF ¶ 17.  If an inmate is transferred to another facility, including a state facility, the detainer follows the inmate.  *Id.*  Evidence unearthed during discovery revealed—for the first time to the awareness of the City's leadership—that there had been some confusion in 2016 and 2017 among lower-level employees within the prisons system as to how detainers should be stored.  Exs. D-12; D-13.  As soon as this misunderstanding came to light, Mr. Abernathy circulated a clarifying memorandum, reiterating that ICE detainers should be placed in an inmate's file and added to Lock and Track.  Def. FOF ¶ 77; Ex. P-28.  The City's policy has always been for ICE detainers to be recorded and transferred along with an inmate, *see* 10/26 Tr. at 93:13-94:23 (Abernathy) (Dkt. 68), and the City's practices are now unquestionably in line.

The Department responds that the "City has not taken actions with respect to ICE detainers that were received by the Department of Prisons" between September 2017 (when the City applied for the FY 2017 JAG grant) and March 2018 (when the Abernathy memorandum was sent).  Def. FOF ¶ 78.  Any non-transmittal of ICE detainers during that seven-month period was harmless error.  *See Moore v. Perales*, 692 F. Supp. 137, 145 (E.D.N.Y. 1998); MTD Opp. 53-56.  The Philadelphia Prisons System transferred a total of five inmates to state custody for whom ICE had lodged a detainer during that time.  *See* Ex. D-20.  Even assuming that none of the detainers followed, the ICE Philadelphia Field Office can independently track individuals

---

placing restrictions on the reporting of immigration status, it does not impose an affirmative duty to make such reports.").

booked into Pennsylvania's prisons, and it typically serves subsequent detainers on transferees. Def. FOF ¶ 17. This inadvertent oversight is no reason to deny Philadelphia its FY 2017 grant.

4. *Advance Notice of Release.* The gravamen of the Department's argument for why the City does not comply with Section 1373 relates to the City's advance notification policy. Def. FOF ¶¶ 18-69. The Department wants the City to comply with *all* ICE advance notification requests, not just those supported by a judicial warrant. But Section 1373 does not compass release date information. *See supra* pp. 2-5. The Department is trying to enforce a statutory mandate that does not exist.

5. *Other Issues: Addresses, Inquiries from ICE, Training*. Finally, the other reasons that the Department has advanced for the City's purported non-compliance with Section 1373 lack merit. The Department has pointed to the City's non-provision of address information to ICE, *see* Def. MSJ 36-37, and to the supposed incapacity of City officials to make inquiries *from* ICE, *see id.* at 38-39. These claims are ungrounded: The City's policies do not restrict providing address information to ICE or making inquiries of ICE. Pl. FOF ¶¶ 6-8. Meanwhile, the Department has pointed to what it deems inadequate training of City employees about Section 1373. *See* Def. FOF ¶¶ 14-17. This argument is flawed factually *and* legally. Mr. Abernathy, Commissioner Ross, and Lt. Gillespie each explained that City employees are amply aware of the City's immigration-related policies, and receive the training necessary for them to perform their tasks. *Id.* ¶¶ 37-40. Meanwhile, the Department's efforts to force the City to train its employees about a specific federal law and educate them on their role in ICE's civil immigration enforcement efforts only underscores the Tenth Amendment problems with the Department's reading of Section 1373. *See supra* p. 15.

## V.    NEITHER *JENNINGS*, SECTION 1226(c), NOR ANY OTHER ALTERNATIVE ISSUES AFFECT THE RESULT OF THIS LITIGATION.

Section 1226(c)(1) of Title 8 of the U.S. Code directs the Attorney General to "take into custody any alien who" is inadmissible or deportable under certain provisions of Title 8 "when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation[.]"    The Attorney General shall then detain such individuals—referred to as "criminal aliens"[11]—during the pendency of their removal proceedings, and may release them in only limited circumstances.    *See* 8 U.S.C. § 1226(c)(2).    This provision, which speaks solely to the Attorney General, has no bearing on the issues in this case.

1.    Section 1226(c) says nothing about states and localities, and certainly imposes no obligations upon them.    To the contrary, the provision contemplates that states and localities will "*releas*[*e*]" individuals when their criminal sentences expire in the ordinary course, including "on parole, supervised release, or probation," and that, afterwards, the Attorney General shall seek their mandatory detention during the removal process.    *Id.* § 1226(c)(1).    Other provisions in the INA confirm that Section 1226(c)'s silence as to states and localities is *meaningful*.    Take Section 1373, enacted in the same bill as Section 1226(c).    *See* Pub. L. No. 104-208, Div. C, Title III, § 303, 110 Stat. 3009-585 (1998) (Section 1226); *id.* at Title VI, § 642, 110 Stat. 3009-707 (Section 1373).    That provision *does* expressly refer to states and localities, in an attempt to prohibit them from enacting certain laws.    When, as here, Congress makes clear that it knows how to enact preemptive language in one part of a statute and chooses not to in another, that choice should be respected.    *See, e.g.*, *Jama v. ICE*, 543 U.S. 335, 341 (2005).    And consider

---

[11] While the term "criminal alien" implies a narrow, intuitive category of aliens who have committed crimes, Section 1226(c) extends to an alien who enters the country "to engage in . . . unlawful commercialized vice," such as gambling, 8 U.S.C. § 1182(a)(2)(D)(iii), "who is," or who has been after being admitted to the country, "a drug abuser or addict," *id.* § 1227(a)(2)(B)(ii), or who fails to register for the Selective Service, *id.* § 1227(a)(2)(D)(iii).

Sections 1252c and 1357(g), which permit—but do not require—state and local officers to detain aliens in certain circumstances, and only "to the extent" "permitted by" or "consistent with" "State and local law." 8 U.S.C. §§ 1252c(a), 1357(g)(1). These provisions show that Congress knew how to authorize state and local officers to detain aliens, and it chose *not* to do so in Section 1226(c), let alone to *mandate* that they detain aliens.

2. As a practical matter, it also would not make sense for Section 1226(c) to implicitly wrap States and localities into the process of identifying and detaining individuals subject to mandatory detention. The process of classifying someone as a "criminal alien" under Section 1226(c) is a complicated task—it turns on complex legal tests (such as whether a prior conviction is a "crime of moral turpitude"), and requires documentation of an individual's prior criminal history that may be located in other jurisdictions. *See* Dkt. 204, at 3. Moreover, even after federal authorities make their *own* determinations that an alien falls within Section 1226(c), the individual is entitled to a hearing before an immigration judge where he can challenge the designation with a right to appeal. *See Matter of Joseph*, 22 I. & N. Dec. 799 (BIA 1999).[12]

Given the complexity and time that it takes to determine whether a person falls within Section 1226(c)—not to mention the separate administrative review process—it is not realistic to expect the federal government to make Section 1226(c) evaluations at the time ICE serves

---

[12]    This administrative review process identifies some, but not all, erroneous designations. Because the alien carries a heavy burden at the *Joseph* hearing, many false positives are not caught. *See* Julie Dona, *Making Sense of "Substantially Unlikely": An Empirical Analysis of the Joseph Standard in Mandatory Detention Custody Hearings*, 26 Geo. Immigr. L.J. 65, 84 (2011). A good number of aliens who lose at the *Joseph* phase later prevail on the merits during their removal proceedings. *See* Br. of Am. for Immigrant Justice, et al. as Amici Curiae at 18-21, *Jennings*, No. 15-1204 (U.S. Oct. 2016) (providing examples of a legal permanent resident and a U.S. citizen who lost at the *Joseph* stage and won at the merits stage). And many aliens end up receiving relief from removal. In the *Jennings* litigation, "[n]early 40% of those who [] served criminal sentences" and were detained under Section 1226(c) "receive[d] relief from removal" at the end of their immigration proceedings and were permitted to remain in the United States. *Jennings v. Rodriguez*, 138 S. Ct. 830, 860 (2018) (Breyer, J., dissenting).

detainers on local prisons.  And the Department itself has explained that the federal government generally has *no idea* whether an alien is subject to Section 1226(c).  Dkt. 204, at 3.  Instead, the federal government will review whether an alien is subject to mandatory detention *"only after* an individual has been taken into [ICE] custody."  *Id.* (emphasis added).   But if ICE's initial detention request is not made under the auspices of Section 1226(c), the City's decision not to comply with it cannot be said to interfere with Section 1226(c).

3.  *Jennings* changes none of this.  There, the Supreme Court confronted whether Section 1226(c) can be read to require that a criminal alien subject to mandatory detention for six months be given a bond hearing.  *See* 138 S. Ct. 830, 839 (2018).  The Court held that the plain text of Section 1226(c) foreclosed that reading, *id.* at 846, although it remanded the Due Process Clause question to the lower court, *id.* at 851.  *Jennings* was not the first case to uphold the general legality of mandatory immigration detention under Section 1226(c)—*Demore* did so, fifteen years earlier.  *Demore v. Kim*, 538 U.S. 510, 517-518 (2003).  And more importantly, the roles of states and localities—and the way in which their policies intersect with Section 1226—were simply not at issue in *Jennings*.  Neither the merits briefs nor any amicus brief even addressed the issue.  This Court should not read into *Jennings* a holding that was not a part of the case.

4.  If Section 1226(c) *were* interpreted—by preemption[13] or any other means of statutory construction—to require that states and localities assist in the placement of "criminal aliens" into mandatory detention, such a reading would run afoul of the Tenth Amendment.  The implication would be that Section 1226(c) *obligates* states and localities to honor ICE's advance notification and detention requests, at least for those people ICE identifies as (presumed) "criminal aliens."  As with the Department's interpretations of Section 1373, *Galarza* forecloses that reading:

---

[13]  Preemption is an especially poor vehicle for such an interpretation because there is a presumption against preemption when it comes to the exercise of "historic police powers of the States."  *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947).

"Under the Tenth Amendment, immigration officials may not order state and local officials to imprison suspected aliens subject to removal at the request of the federal government." *Galarza*, 745 F.3d at 643; *see also Murphy*, 2018 WL 2186168, at *13.

## VI.    PHILADELPHIA IS ENTITLED TO DECLARATORY, INJUNCTIVE, AND MANDAMUS RELIEF.

For the reasons set forth above and in the City's prior filings, the Court should issue a declaratory judgment finding the Challenged Conditions unlawful and unconstitutional, as well as an injunction barring the Department from imposing them. *See* Pl. MSJ 36-39 (Dkt. 157-1).[14] Further, the Court should issue a declaratory judgment finding that the City complies with Section 1373. *See* MTD Opp. 43-48. The Court should issue a writ of mandamus compelling the Attorney General to immediately disburse Philadelphia's FY 2017 JAG award.

1. The Administrative Procedure Act authorizes this Court to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). The relevant factors are: (1) "the length of time that has elapsed since the agency came under a duty to act," (2) "the reasonableness of the delay . . . in the context of the statute authorizing the agency's action," (3) the consequences of the agency's delay," and (4) "any plea of administrative error, administrative inconvenience, practical difficulty in carrying out a legislative mandate, or need to prioritize in the face of limited resources." *Prometheus Radio Project v. FCC*, 824 F.3d 33, 39-40 (3d Cir. 2016). Those factors support mandamus relief here. The City filed its JAG application on September 5, 2017 and has not received its award, despite usually receiving one in September or August of the relevant grant year. Stip. ¶¶ 45, 62-63 (Dkt. 179); Pl. FOF ¶¶ 41-42. The Department's failure to award the City its allotment stems from the *Department's* legal error

_____

[14] The Department's arguments (Def. FOF ¶¶ 108-113) that the City will not suffer irreparable harm repeat the arguments it made at the preliminary injunction stage, and again fall short. *See* PI Op. 46, 121-125; *see also* Pl. FOF ¶¶ 43-44 & nn.3-4.

in imposing the Challenged Conditions, not any burdens imposed by the JAG statute or any resource constraints. *See* Stip. ¶ 46; Pl. FOF ¶ 45. By now, the FY 2017 grant cycle is halfway over, and the City has already lost the use of significant federal funds for over half of FY 2017. Stip. ¶¶ 43-44; Pl. FOF ¶¶ 42-43 & n.3. As a result, several important police priorities have gone unfunded. Stip. ¶ 65; Pl. FOF ¶ 44.

Mandamus relief is also proper under 28 U.S.C. § 1361, which grants this Court jurisdiction "to compel an officer or employee of the United States or any agency thereof to perform a duty owed to" Philadelphia. Mandamus relief is appropriate if the defendant owes a plaintiff a non-discretionary duty and the plaintiff lacks another avenue for relief. Both conditions are met here: The Department's duty to disburse formula grant funds is non-discretionary, when, as here, the applicant meets the requirements of the grant. *See Udall v. State of Wisconsin*, 306 F.2d 790, 793 (D.C. Cir. 1962).

2. The Department contends its duty to disburse JAG funds *is* discretionary. The Department has never purported to decline to issue JAG awards in the history of the program. The Department's argument is based entirely on the fact that, in one provision, the JAG statute uses "may" rather than "shall." *See* Def. MSJ 41. The statute provides that, "[f]rom amounts made available to carry out this part, the Attorney General may, in accordance with the formula established [], make grants to States and units of local government." 34 U.S.C. § 10152(a)(1). Section 10156 in turn requires that "[o]f the total amount appropriated for this part [*i.e.*, the JAG Program], the Attorney General *shall* . . . allocate" money according to the statutory formula. *Id.* § 10156(a)(1) (emphasis added). Read together, these provisions are unambiguous, and the duty they impose is mandatory. Section 10156(a)(1) directs the Attorney General to disburse appropriated sums by stating that he "*shall* . . . allocate" the funds according to the

24

congressionally-prescribed formula.  *Id.* § 10156(a)(1).  Section 10152(a)(1)'s use of the word "may" simply reflects that some eligible grantees may choose *not* to apply for funding.

The Department's contrary interpretation significantly overreads the word "may."  *See Wilson v. United States*, 135 F.2d 1005, 1009 (3d Cir. 1943) ("[T]he word 'may,' ordinarily permissive in quality, is frequently given a mandatory meaning[.]" (quotation marks omitted)).  Not only can the Department's reading not be reconciled with Section 10156(a)(1), it is also incompatible with Congress' choice to adopt a formula grant, long understood to be mandatory.  *See U.S. ex rel. Bauchwitz v. Holloman*, 671 F. Supp. 2d 674, 680 n.16 (E.D. Pa. 2009).

Nor could the Department show that the Byrne JAG program does not set a deadline for it to disburse funds.  *Cf.* Def. MSJ 41-42.  Section 10152(a)(1) directs the Attorney General to make grants "[f]rom amounts made available" to carry out the Byrne JAG program.  Congress has appropriated funds for the Byrne JAG Program "*for the fiscal year ending September 30, 2017*" that "remain available until expended."  Consolidated Appropriations Act, 2017, § 5 & tit. II, Pub. L. No. 115-3. 1 § 5, 131 Stat. 135, 137, 203 (emphasis added).  The Department was thus obligated to disburse the FY 2017 funds.  And its delay in doing so is encroaching on the period during which grantees may use FY 2017 funds.  *See* Pl. FOF ¶ 43.

Finally, the Department suggests that if mandamus issues, it should be limited to an order to take action on the City's application, but not necessarily to grant the City's award.  *See* Def. MSJ 42-43.  But the Department has never suggested that the City fails any requirement other than the Challenged Conditions; if so, the Department surely would have used that to attack its standing.  The Court's ruling on the merits will establish that the City *is* eligible for its grant.

## CONCLUSION

The Court should enter judgment for Philadelphia on all counts.

DATED: May 25, 2018                    Respectfully submitted,

                                       _____

MARCEL S. PRATT, I.D. NO. 307483       VIRGINIA A. GIBSON, I.D. NO. 32520
  City Solicitor                       SARA ARONCHICK SOLOW, I.D. NO. 311081
LEWIS ROSMAN, I.D. NO. 72033           JASMEET K. AHUJA, I.D. NO. 322093
  Senior Attorney                      ALEXANDER B. BOWERMAN, I.D. NO. 321990
CITY OF PHILADELPHIA LAW DEPARTMENT     HOGAN LOVELLS US LLP
1515 Arch Street, 17th Floor           1735 Market Street, 23rd Floor
Philadelphia, PA 19102                 Philadelphia, PA 19103
                                       (267) 675-4600
                                       virginia.gibson@hoganlovells.com


                                       NEAL K. KATYAL (*pro hac vice*)
                                       KIRTI DATLA (*pro hac vice*)*
                                       REEDY C. SWANSON (*pro hac vice*)
                                       HOGAN LOVELLS US LLP
                                       555 Thirteenth Street, NW
                                       Washington, DC 20004


                                       *Admitted only in Texas; supervised by firm
                                       members*


            *Attorneys for the City of Philadelphia*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 25, 2018, the foregoing document was filed with the Clerk of the Court using the CM/ECF system, which will send notification of the filing to all counsel of record.

May 25, 2018

_____
VIRGINIA A. GIBSON, I.D. No. 32520
HOGAN LOVELLS US LLP
1735 Market Street, 23rd Floor
Philadelphia, PA 19103
(267) 675-4600
virginia.gibson@hoganlovells.com