## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **THE CITY OF PHILADELPHIA,** | |
| *Plaintiff,* | **Case No. 2:17-cv-03894-MMB** |
| v. | |
| **JEFF SESSIONS, in his official capacity as Attorney General of the United States,** | |
| *Defendant.* | |

## DEFENDANT'S POST-TRIAL BRIEF

## Table of Contents

Introduction...................................................................................................................................1

Background....................................................................................................................................2

Argument.......................................................................................................................................3

   I.   Defendant Is Entitled to Judgment on Counts I-V of the Amended Complaint.......................3

      A.  Plaintiff's Section 1373 Claims in Counts I-III Fail as a Matter of Law.............................3

      B.  The Court Should Enter Judgment for Defendant on Plaintiff's Spending Clause Claim
          in Count IV.....................................................................................................................4

      C.  Plaintiff's Commandeering Claim in Count V Also Fails as a Matter of Law...................5

  II.  Plaintiff Has Failed to Meet Its Burden of Proof on Its Count VI Claim That the City is in
      Compliance with Section 1373........................................................................................8

      A.  The City's Failure to Provide Advance Notice of Release Violates Section 1373.............8

      B.  The City's Failure to Provide Access to Lock & Track Violates Section 1373 ...............10

      C.  The City's Failure to Forward Detainers Violates Section 1373.......................................11

      D.  The Substantial Compliance Doctrine Does Not Affect the Above Analysis..................12

 III. Plaintiff Has Not Proven Entitlement to Declaratory, Injunctive, or Mandamus Relief..........13

      A.  The Court Should Not Grant a Declaratory Judgment that the City Is in Compliance
          with Section 1373..........................................................................................................13

      B.  The Court Should Not Grant an Injunction.......................................................................13

          1.  The Advance Notice Condition Should Not Be Enjoined.......................................14

              a.  There Are No Impediments to Providing Advance Notice.........................14

              b.  Providing Advance Notice Would Not Have Adverse Effects within the
                  Immigrant Community................................................................................15

              c.  Enjoining the Advance Notice Condition Would Result in Significant
                  Harm to Public Safety................................................................................18

          2.  Plaintiff Has Not Offered a Basis to Enjoin the Section 1373 Condition............21

          3.  The Jail Access Condition Should Not Be Enjoined..............................................21

4. The City Cannot Establish Irreparable Harm Based on How the Byrne JAG Funding Might Be Spent.................................................................................24

C. The City is Not Entitled to Mandamus Relief.........................................................25

D. At Most, the Court Should Remand the Matter to the Agency........................................25

Conclusion.........................................................................................................................25

## Table of Authorities

**Cases**                                                                    **Page(s)**

*Adams v. Freedom Forge Corp.*,
    204 F.3d 475 (3d Cir. 2000).................................................................... 14, 24

*Arizona v. United States,*
    567 U.S. 387 (2012)............................................................................... 6

*Bologna v. City & Cty. of San Francisco*,
    121 Cal. Rptr. 3d 406 (Cal. Ct. App. 3d Div. 2011) ................................ 8

*Cheney v. U.S. Dist. Court for D.C.*,
    542 U.S. 367 (2004)............................................................................... 13

*Comiteé De Apoyo A Los Trabajadores Agricolas v. Solis*,
    2010 WL 3431761 (E.D. Pa. Aug. 30, 2010) ........................................ 25

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006)............................................................................... 14

*Galarza v. Szalczyk*,
    745 F.3d 634 (3d Cir. 2014)................................................................... 8

*In re Pharmacy Benefit Managers Antitrust Litig.*,
    582 F.3d 432 (3d Cir. 2009)................................................................... 4

*INS v. Orlando Ventura*,
    537 U.S. 12 (2002)................................................................................. 25

*Jennings v. Rodriguez*,
    138 S. Ct. 830 (2018)............................................................................. 8

*Koslow v. Pennsylvania*,
    302 F.3d 161 (3d Cir. 2002)................................................................... 5

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010)............................................................................... 13

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
    2018 WL 2186168 (U.S. May 14, 2018) .......................................... 5, 6, 7

*Nken v. Holder*,
    556 U.S. 418 (2009) ................................................................................ 14

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) .................................................................................. 25

*Philadelphia v. Sessions*,
    280 F. Supp. 3d 579 (E.D. Pa. 2017) ...................................................... 12

*Printz v. United States*,
    521 U.S. 898 (1997) .................................................................................. 6

*Quad/Tech, Inc. v. Q.I. Press Controls B.V.*,
    701 F. Supp. 2d 644 (E.D. Pa. 2010) ...................................................... 14

*Rattlesnake Coal. v. EPA*,
    509 F.3d 1095 (9th Cir. 2007) ................................................................. 3

*Reno v. Condon*,
    528 U.S. 141 (2000) .................................................................................. 6

*Shields v. Zuccarini*,
    254 F.3d 476 (3d Cir. 2001) .................................................................... 13

*State Auto Ins. Cos. v. Summy*,
    234 F.3d 131 (3d Cir. 2000) .................................................................... 13

*U.S. Bank Nat. Ass'n v. JGKM Assocs. LLC*,
    2015 WL 1474448 (E.D. Pa. Mar. 31, 2015) .......................................... 8

*Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
    435 U.S. 519 (1978) ................................................................................ 10

*Wilton v. Seven Falls Co.*,
    515 U.S. 277 (1995) ................................................................................ 13

## **Statutes**

5 U.S.C. § 702 ............................................................................................... 3

5 U.S.C. § 704 ............................................................................................... 3

8 U.S.C. § 1226(c) .................................................................................... 9, 20

8 U.S.C. § 1229a(b)(4)........................................................................................23

8 U.S.C. § 1231(a)(1)........................................................................................ 9

8 U.S.C. § 1231(a)(4)........................................................................................ 9

8 U.S.C. § 1357(a)(1)........................................................................................ 22

8 U.S.C. § 1362 .............................................................................................. 23

8 U.S.C. § 1373 ........................................................................................ *passim*

8 U.S.C. § 1373(b)(3) ...................................................................................... 12

28 U.S.C. § 2201(a) ........................................................................................ 13

34 U.S.C. § 10102(a)(2) .................................................................................... 4

34 U.S.C. § 10102(a)(6).................................................................................... 3

34 U.S.C. § 10152(a)(1) .................................................................................. 25

34 U.S.C. § 10154 ...................................................................................... 3, 25

42 U.S.C. § 5779(a) .......................................................................................... 7

## **Rules**

Fed. R. Civ. P. 54(b) ........................................................................................ 4

## **Regulations**

8 C.F.R. § 287.3(c)........................................................................................ 23

8 C.F.R. § 287.5(a)(1) .................................................................................... 22

## **Other Authorities**

H.R. Rep. No. 104-469 (2d Sess. 1996)............................................................8

Organized Crime Control Act of 1970,
    Pub. L. No. 91-452, 84 Stat. 922 ............................................................... 7

**Introduction**

The landscape in this case has shifted significantly since this Court entered its preliminary injunction. At that time, the Court found the City to be in "substantial compliance" with 8 U.S.C. § 1373, in large part based on the notion that the City did not restrict information-sharing with ICE with respect to criminal aliens. The four day bench trial that has just concluded, however, demonstrated exactly the opposite: By restricting the sharing of advance notice of release from custody of individuals on whom U.S. Immigration and Customs Enforcement ("ICE") has issued a detainer (but not obtained a federal criminal warrant), the City intentionally violates Section 1373's requirements in the one way that most effectively thwarts ICE's ability to implement its priority of arresting criminal aliens. As a result, the safety of ICE agents, and the public at large, is placed into jeopardy when criminal aliens are released onto the City's streets.

The City attempts to justify its non-compliance based on concerns that members of the immigrant community will neither report crimes nor use unrelated City services if they knew that the City was providing advance notice of release to ICE. Even if this were a plausible theory (it is not), the City is free to reject its Byrne JAG funding. Instead, the City seeks to interfere with the federal government's removal of criminals from the country—instead returning these criminals to the community—all the while demanding that it receive federal funds for which its policies have made it ineligible. In any event, the City's theory of harm is not plausible: It requires immigrants to draw distinctions between ICE detainers accompanied by federal criminal warrants (with which the City complies) versus those that are not. That theory is wholly unsupported by any credible evidence at trial, especially in light of the other information that the City openly admits that it shares with ICE.

The manner in which the City refuses to provide advance notice (including the consequences that flow therefrom) is not the only new evidence educed at trial. For two years, the City refused to forward ICE detainers to the Pennsylvania Department of Corrections when it transferred custody of

its prisoners to the state. That refusal left the state in the dark about whether ICE had lodged detainers on transferred prisoners unless ICE was able to separately lodge a new detainer with the state. Although the City recently "clarified" this policy, it still has not taken any steps to come into compliance with Section 1373 for those prisoners affected by the City's prior unlawful policy. Separately, the City also cut-off ICE's access to the Philadelphia Department of Prisons' Lock & Track database, including the citizenship information contained in that database. Again, although the City has recently indicated that it will restore access, it has not yet done so. Both of these actions constitute substantial violations of Section 1373's requirements.

For these reasons, the Court cannot find that the City is in compliance (substantial or otherwise) with Section 1373's requirements, which is a condition that the Department of Justice ("DOJ") had the legal authority to, and properly did, impose on 2017 Byrne JAG grant recipients. Accordingly, the Court should enter judgment for Defendant that the Section 1373 condition was properly imposed and that the City was not in compliance with the requirements of that provision. To the extent that the Court finds, however, that the City is in compliance with Section 1373's requirements, it should nonetheless decline to enter the equitable relief that Plaintiff requests. Among other things, the City has failed to demonstrate that it is entitled to injunctive relief, let alone a writ of mandamus. In fact, the City has not yet spent a single dollar of its FY 2016 funds, undercutting any irreparable harm argument regarding the FY 2017 Byrne JAG grants. Instead, and as is typical in Administrative Procedure Act cases, the Court should remand for further agency review of the City's application, allowing DOJ to take into account any concerns identified by the Court.

## **Background**

Defendant incorporates, by reference, its Proposed Findings of Fact ("Def.'s FOF"). *See* Dkt. No. 200.

## Argument

I.     **Defendant Is Entitled to Judgment on Counts I-V of the Amended Complaint.**

   A.     **Plaintiff's Section 1373 Claims in Counts I-III Fail as a Matter of Law.**

Though the Court on Summary Judgment decided as a matter of law that the prison access and advance notice conditions are invalid, the Court has not yet determined whether DOJ's decision to impose the Section 1373 condition was lawful.  *See* Pretrial Order ¶¶ 1-3, Dkt. No. 185.[1]  As an initial matter, Defendant hereby incorporates by reference the arguments set forth more fully in its prior motion for summary judgment.  *See* Mem. in Supp. of Mot. for Summ. J. ("Defendant's Motion" or "Def.'s Mot."), Dkt. No. 155-1.  To summarize, judicial review of Plaintiff's claims, including its claims regarding the lawfulness of the Section 1373 condition, is premature because Plaintiff has failed to identify any "final agency action."  *See* 5 U.S.C. §§ 702, 704; Def.'s Mot. at 9-12.  Rather than waiting for the Department to act on the City's FY 2017 application, or for the administrative review and reconsideration process to unfold, *see* 34 U.S.C. § 10154, the City speculated on future actions of the Department, filing this lawsuit before its application was even due.  *See* Compl., Dkt. No. 1 (filed Aug. 30, 2017); May 1 Trial Tr. 32:4-7, 39:8-9, Dkt. No. 207 (testimony that FY 2017 applications were due on September 5, 2017).  Plaintiff's claims are thus not ripe for judicial review.  *See Rattlesnake Coal. v. EPA*, 509 F.3d 1095, 1103-04 (9th Cir. 2007).

Even if Plaintiff's claims were ripe, the imposition of the Section 1373 condition was not ultra vires, in violation of separation of powers, or arbitrary and capricious.  Congress authorized the Department to "plac[e] special conditions on all grants," 34 U.S.C. § 10102(a)(6), to "determin[e] priority purposes for formula grants," *id.*, and to ensure that grantees "comply with . . . all other applicable Federal laws," *id.* § 10153(a)(5)(D), and the Section 1373 condition falls well within those

---

[1] The Court, however, left open the question of irreparable harm and relief as to those conditions. April 27 Pretrial Hearing Tr. 48:11-23.

authorities.  *See* Def.'s Mot. at 12-17.  Moreover, the Department's decision to impose all three conditions, including the Section 1373 condition, was neither arbitrary nor capricious, as it was rationally intended to "maintain liaison" among tiers of government "in matters relating to criminal justice," 34 U.S.C. § 10102(a)(2), and comport with the intergovernmental cooperation that Congress contemplates in immigration enforcement.  *See* Def.'s Mot. at 17-21.  Accordingly, this Court should enter judgment for Defendant on Counts I-III regarding the Section 1373 condition.[2]

> **B.    The Court Should Enter Judgment for Defendant on Plaintiff's Spending Clause Claim in Count IV.**

Defendant's Motion for Summary Judgment on Plaintiff's Spending Clause claim has been held in abeyance, and Plaintiff did not move for summary judgment on this claim.  *See* Dkt. No. 185 ¶ 4.  The Court can and should resolve this claim in Defendant's favor for the reasons set forth in Defendant's Motion:  The challenged conditions are germane to the Byrne JAG program, and Plaintiff had sufficient notice of such conditions.  *See* Def.'s Mot. at 22-29.

The factual testimony developed at trial only supports this conclusion.  First Deputy Managing Director Brian Abernathy and Lieutenant Matthew Gillespie both provided testimony linking the challenged conditions to goals of the Byrne JAG program.  Mr. Abernathy testified that a substantial number of individuals who have committed crimes in the past commit crimes in the future.  *See* Def.'s FOF ¶ 61; Apr. 30 Trial Tr. 115:15-116:03, Dkt. No. 206.  The Department's conditions would reduce the presence of repeat offenders who are not in the country lawfully.  Mr. Abernathy and Lieutenant Gillespie also both provided testimony linking the provision of advance notice to the safety of individuals, law enforcement officers, and the community writ large.  *See* Def.'s FOF ¶¶ 42-43, 55;

---

[2] Should the Court agree with Defendant on these arguments, nothing precludes the Court from reconsidering its prior holding with respect to the notice and access provisions.  That is because "a trial judge has the discretion to reconsider an issue and should exercise that discretion whenever it appears that a previous ruling, even if unambiguous, might lead to an unjust result."  *In re Pharmacy Benefit Managers Antitrust Litig.*, 582 F.3d 432, 439 (3d Cir. 2009); *see also* Fed. R. Civ. P. 54(b).

Apr. 30 Trial Tr. 105:25-107:14, 237:05-17.   These additional facts constitute more than enough evidence to satisfy the deferential requirement that the challenged conditions bear "a discernible relationship" to the Department's federal interest in the Byrne JAG program.  *See Koslow v. Pennsylvania*, 302 F.3d 161, 175 (3d Cir. 2002).  And to the extent that Plaintiff argues that the challenged conditions are ambiguous, Chief of Staff for Criminal Justice Julie Wertheimer admitted that the City had notice of the conditions at the time it submitted its application.  *See* Def.'s FOF ¶ 120; May 1 Trial Tr. 48:15-18.   As long as the existence of the conditions is clear, the Spending Clause's requirement for unambiguous notice has been met.  *See* Def.'s Mot. at 26-28.

### C.  Plaintiff's Commandeering Claim in Count V Also Fails as a Matter of Law.

Like Plaintiff's Spending Clause claim, Plaintiff did not move for summary judgment on its commandeering claim, and Defendant's Motion on this claim has been held in abeyance.  *See* Dkt. No. 185 ¶ 4.  As set forth more fully in that motion, the challenged conditions do not violate the Tenth Amendment because this lawsuit involves a grant that the City is free to accept or reject, not any federal mandate that directly regulates the City.  *See* Def.'s Mot. at 29-31.  Spending Clause analysis, rather than commandeering analysis, thus applies.

This Court has inquired about the effect of *Murphy v. NCAA* on the proceedings in this case. *See* Letter from Chambers, Dkt. No. 202.  As a threshold matter, the constitutional validity of Section 1373 as a standalone legal requirement is not at issue in this case.  As set forth in Section I.B, *supra*, the Spending Clause provides the appropriate rubric for analyzing Plaintiff's claims in this grant case, and whether the Department of Justice can impose a grant requirement that prohibits restrictions on the sharing of immigration information should be reviewed pursuant to that body of case law.

Even if the Court were to determine that the constitutional validity of Section 1373 were relevant to the grant condition, Plaintiff's Amended Complaint does not present a facial challenge to the constitutionality of Section 1373.  *See* Transcript of April 27 Pre-Trial Hearing ("Apr. 27 Hrg. Tr.")

5

36:17-37:5, Dkt. No. 194.  For that reason as well, *Murphy* has no bearing on this case.

In any event, the Supreme Court's recent decision in *Murphy* supports the legality of Section 1373.  The statute addressed in *Murphy*—the Professional Amateur Sports Protection Act of 1992 ("PASPA")—was a clear effort to avoid accountability and require states to themselves regulate sports betting in the manner Congress wished.  *See Murphy v. Nat'l Collegiate Athletic Ass'n*, No. 16-476, 2018 WL 2186168, at *4 (U.S. May 14, 2018).  Section 1373, on the other hand, is an information-sharing component of the overall removal scheme, in which the federal government takes full responsibility for regulation of and enforcement against individuals.  *See Arizona v. United States*, 567 U.S. 387, 409 (2012) (holding that state law is pre-empted when it violates "the principle that the removal process is entrusted to the discretion of the Federal Government").  As such, Section 1373 ensures that the federal government has the information it needs to "regulate individuals, not States." *Murphy*, 2018 WL 2186168, at *15 (quotation omitted).

The Constitution does not prohibit federal enactments that "do[ ] not regulate the States in their sovereign capacity to regulate their own citizens," but instead "regulate[ ] the States as the owners of data bases." *Reno v. Condon*, 528 U.S. 141, 151 (2000).  Thus, the Supreme Court upheld a federal provision that "restricts the States' ability to disclose a driver's personal information without the driver's consent." *Id.* at 144.  It made no difference that compliance with the regulation would "require time and effort on the part of state employees," *id.* at 150, or that the State had acquired the relevant information in its capacity as a regulator of drivers.  And the Court has recognized that statutes "which require only the provision of information to the Federal Government[ ] do not involve . . . the forced participation of the States' executive in the actual administration of a federal program." *Printz v. United States*, 521 U.S. 898, 918 (1997).  As Justice O'Connor explained, the Supreme Court's Tenth Amendment cases are not properly read to invalidate reporting requirements, such as the requirement for "state and local law enforcement agencies to report cases of missing children to the Department

of Justice." *Id.* at 936 (O'Connor, J., concurring) (citing 42 U.S.C. § 5779(a)).  Indeed, the analysis in *Murphy* likely would have been very different had the law at issue not sought to prevent States from regulating or authorizing sports betting, but instead had merely required States to share information regarding sports betting operations to facilitate federal regulation.  *See, e.g.*, Organized Crime Control Act of 1970, Pub. L. No. 91-452, § 806, 84 Stat. 922, 939-40 (creating commission to evaluate national policy towards gambling, which was "authorized to call upon . . . States to furnish, on a reimbursable basis or otherwise, such statistical data, reports, and other information as the Commission deems necessary").

Consistent with these principles, the Supreme Court's decision in *Murphy* supports the legality of Section 1373.  The Court's analysis underscores that it makes no difference whether Section 1373 is phrased as a limitation on States and localities.  Explaining that "it is a mistake to be confused by the way in which a preemption provision is phrased," the Court recognized that it had previously upheld a provision explicitly prohibiting a "State or political subdivision" from "enact[ing] or enforc[ing]" laws relating to air carrier rates.  *Murphy*, 2018 WL 2186168, at *15 (quoting 49 U.S.C. App. § 1305(a)(1) (1988 ed.)).  There, as here, the federal law's substance was merely to prevent States from interfering with the operation of federal law, not to commandeer them into applying that law.

For the reasons set forth above, the Government does not believe that the *Murphy* decision impacts the Court's analysis of the claims in this case.  To the extent the Court disagrees with the above, however, and concludes that *Murphy* is relevant in the grant context, that the validity of Section 1373 is properly raised by the City, and that *Murphy* requires a holding that Section 1373 itself does not allow the Government to reject Philadelphia's Byrne JAG application due to constitutional concerns, *see* Dkt. No. 202, the Court should nonetheless consider whether the statute's language— namely, that the City may not restrict the sharing of information regarding immigration status—can

operate as an independent grant condition regardless of the underlying validity of Section 1373.[3]

## II.   Plaintiff Has Failed to Meet Its Burden of Proof on Its Count VI Claim That the City is in Compliance with Section 1373.

As Plaintiff, the City bears the burden of proof of demonstrating compliance with Section 1373.[4]  "In a civil case the burden of proof is the same whether by bench trial or jury:  Every element must be proved by a preponderance of the evidence, or, in other words, the matter asserted must be shown to be more likely true than not true."  *U.S. Bank Nat. Ass'n v. JGKM Assocs. LLC*, No. CIV.A. 12-4550, 2015 WL 1474448, at *3 (E.D. Pa. Mar. 31, 2015).  The City has not met its burden of proving compliance with Section 1373 because it does not provide advance notice of release for individuals in City custody on whom ICE has issued a detainer; because it restricts the sharing of citizenship information from the Lock & Track database with ICE; and because it did not forward ICE detainers to the Pennsylvania Department of Corrections along with the transfer of prisoners to state custody.

### A.   The City's Failure to Provide Advance Notice of Release Violates Section 1373.

As a threshold matter, this Court has not yet resolved the question of whether information regarding an alien's pending release from custody is "information regarding the immigration status" of that alien for purposes of Section 1373.  As a matter of law, the answer to that question is yes.  And that legal answer is supported by practical considerations revealed through trial testimony.

In enacting Section 1373, Congress sought "'to prevent any State or local law . . . that prohibits or in any way restricts any communication between State and local officials and the INS.'"  *Bologna v. City & Cty. of San Francisco*, 121 Cal. Rptr. 3d 406, 414 (Cal. Ct. App. 3d Div. 2011) (quoting H.R. Rep.

---

[3] The *Murphy* decision does not impact other issues in this case, such as the questions that the Court previously posed to counsel regarding *Jennings v. Rodriguez*, 138 S. Ct. 830, 842-47 (2018).  Nor is an analysis of *Galarza v. Szalczyk*, 745 F.3d 634 (3d Cir. 2014), relevant here:  That case involved the *detention* of an individual pursuant to an ICE detainer unaccompanied by a warrant; this case, by contrast, merely concerns providing advance notice of release.

[4] This argument is without prejudice to Defendant's primary contention that the City's claim for declaratory relief improperly preempts the administrative process, *see* Def.'s Mot. at 32, and that review of any such administrative decision should be subject to the APA's arbitrary and capricious standard.

No. 104-469, at 1 (2d Sess. 1996)) (explaining that congressional reports on section 1373 "demonstrate legislative intent to facilitate the enforcement of federal immigration law").  Information such as an alien's pending release from custody is "information regarding" immigration status within the contemplation of Section 1373, particularly where the release date implicates when the federal authority to take custody pursuant to the mandatory detention provision in 8 U.S.C. § 1226(c) and the removal statute in 8 U.S.C. § 1231(a)(1)(B) and (a)(4) is triggered.  *See also* Def.'s Mot. at 33 n.7.  The phrase "information regarding" is not limited to an alien's immigration status, a reading that would disregard the interrelationship between state custody and federal obligations.  Indeed, Congress's use of "information regarding" in Section 1373(a) was intended to broaden the scope of the information covered, as demonstrated by comparing Section 1373(a) to Section 1373(c), which uses the different phrase "[immigration] status information."  8 U.S.C. § 1373.  And whether an alien has been released from state or local charges is highly relevant to his "lawful presence" given that Congress has explicitly excepted DHS from its duty to remove aliens subject to final orders of removal while those aliens are serving a criminal sentence in State or local custody.  *See* 8 U.S.C. § 1231(a)(4).

The legal conclusion that advance notice of release falls within the scope of Section 1373 is supported by the trial testimony.  The City, for example, touts that its policies do not prohibit the sharing of "whereabouts" information.  *See* Pl.'s Proposed Findings of Fact ("Pl.'s FOF") ¶ 6, Dkt. No. 201.  Advance notice of release, however, is simply providing advance notice of an individual's whereabouts as he is being released from custody.  Moreover, advance notice of release is the key to using other "information regarding" immigration status, and is necessary to allow ICE to carry out its mission of apprehending criminal aliens in an efficient, and safe, manner.  It is, according to Assistant Field Office Director David O'Neill, the most important immigration-related information that ICE could receive:  "Without information on when we can arrest somebody, the other information really doesn't have any validity to it.  It doesn't do us any good."  May 1 Trial Tr. 216:13-24.

The City's policy thwarts the sharing of this information and thus affirmatively frustrates the enforcement of immigration law. And in light of the City's express restriction on sharing this information, the City is not in compliance with the Section 1373 condition.

**B.      The City's Failure to Provide Access to Lock & Track Violates Section 1373.**

Lock & Track is the Philadelphia Department of Prisons' database that captures individuals' names and other biographical information, including self-reported citizenship and country of birth information. *See* Def.'s FOF ¶ 70. Such information is "information regarding immigration status" that falls within the scope of Section 1373. ICE used the information provided through a daily email until the City cut-off access to Lock & Track in 2016. *See id.* ¶¶ 70-71, 73.

There is no dispute that, at the time the City submitted its FY2017 Byrne JAG application, ICE did not have access to Lock & Track. Def.'s FOF ¶ 72. Nor did ICE have access to Lock & Track as of the close of Plaintiff's affirmative case at trial. Because the City affirmatively restricted the sharing of immigration information by cutting off ICE's access to Lock & Track, the City is not in compliance with the Section 1373 condition.

To be sure, on May 9, 2018, the City, through litigation counsel, sent defense counsel a letter indicating that it was "prepared to provide the Philadelphia ICE office with information maintained in its Lock and Track database." Ex. P-42, Dkt. No. 197-1; *see also* Pl.'s FOF ¶ 16. There are three separate reasons why the City's letter does not bring the City into compliance with Section 1373 for purposes of this litigation. First, the appropriate time to judge whether the City was in compliance with Section 1373 was at the time of the administrative proceedings being reviewed here. *See Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 554-55 (1978) ("If upon the coming down of the order litigants might demand rehearings as a matter of law because some new circumstances has arisen, some new trend has been observed, or some new fact discovered, there would be little hope that the administrative process could ever be consummated in an order that would

not be subject to reopening.") (quotation omitted).  Second, even if this Court were to disregard DOJ's administrative role in determining the City's compliance with the Section 1373 condition at the time the City submitted its application, the City nonetheless did not send its letter *until one week after the close of plaintiff's affirmative case at trial*.  And third, the letter merely represents that the City is prepared to provide access to Lock & Track information in the future, without addressing the scope of access.  *See* Ex. D-26, Dkt. No. 199-1; Def.'s FOF ¶ 74.  Thus, while ICE may, at some unspecified future time, have access to Lock & Track, the evidence does not demonstrate that such access currently exists.

### C.    The City's Failure to Forward Detainers Violates Section 1373.

There is another reason why the City is not in compliance with Section 1373:  For years, the City's Department of Prisons' policy was to not forward ICE detainers when it transferred prisoners to state custody, and the City has done nothing since it "clarified" its policy to correct its errors.

Prior to March 2018—including on September 5, 2017, when the City submitted its application for FY2017 Byrne JAG funding—the City's Department of Prisons directed its employees not to record in the Department's files any ICE detainers received for inmates.  *See* Def.'s FOF ¶ 75; Ex. D-12; Ex. D-13.  As a result of this policy, when an inmate was transferred to state custody, the Pennsylvania Department of Corrections would not know that an ICE detainer had been placed on that prisoner unless ICE independently ascertained that the prisoner was transferred and lodged a separate detainer with the state.  *See* Def.'s FOF ¶ 76.  Only as a result of this litigation did the City "clarify" the Department of Prisons' policy so that, beginning two months ago, detainers are now placed into the inmate's file.  *See* Def.'s FOF ¶ 77.  Notwithstanding a practice that went back at least until 2016, *see* Ex. D-13, the City has not taken any steps to fix this problem for detainers that were disregarded prior to March 2018.  *See* Def.'s FOF ¶ 78.

For the same reasons that apply to the City's failure to provide information in Lock & Track, the appropriate time to ascertain whether the City was in compliance with Section 1373 regarding the

forwarding of detainers was at the time that the City applied for FY2017 Byrne JAG funding.  At that time, the City had a policy of not forwarding detainers and therefore was violating Section 1373's provision prohibiting restrictions on the exchange of immigration-status information "with any other Federal, State, or local government entity."  8 U.S.C. § 1373(b)(3).

### D.      The Substantial Compliance Doctrine Does Not Affect the Above Analysis.

The City's non-compliance with Section 1373's requirements cannot be justified even under the "substantial compliance" doctrine.  As Defendant previously noted, that doctrine is inapplicable in the statutory context.  *See* Def's Mot. at 39-40.  Even if applicable, however, additional facts revealed since this Court entered its preliminary injunction preclude a finding of substantial compliance here.

When this Court issued its preliminary injunction, it described the substantial compliance standard as excusing "imperfection[s]" and "noncompliance with minor, unimportant requirements." *Philadelphia v. Sessions*, 280 F. Supp. 3d 579 (E.D. Pa. 2017).  Trial revealed that the City's areas of non-compliance with the Section 1373 condition are far from "minor" or "unimportant."  For example, the City deliberately does not comply with Section 1373's advance notice requirement in a manner that thwarts ICE's ability to carry out its mission, including ICE's objective of arresting criminal aliens in the safest manner possible.  This affirmative decision to withhold the single piece of information that is the most useful to ICE—advance notice of release—takes the City's practices far outside of the substantial compliance doctrine and has significant public safety consequences.  *See* May 1 Trial Tr. 216:13-24.  As for the City's failure both to forward detainers to the Pennsylvania Department of Corrections and to allow the sharing of citizenship information in Lock & Track with ICE, neither of those issues was even presented to the Court at the preliminary injunction stage, thus further justifying a finding that the City was not, and is not, in substantial compliance with Section 1373.

**III.    Plaintiff Has Not Proven Entitlement to Declaratory, Injunctive, or Mandamus Relief.**

Even if the Court were to conclude that Plaintiff should prevail on its substantive claims, it is a separate question what relief the Court should provide.  Among other things, Plaintiff's amended complaint seeks a declaratory judgment that the City is in compliance with Section 1373, a permanent injunction, and a writ of mandamus.  *See* Am. Compl., Dkt. No. 84, Prayer for Relief ¶¶ (b)-(d).  None of the relief that Plaintiff seeks is awarded as of right.  *See, e.g.*, *Wilton v. Seven Falls Co.*, 515 U.S. 277, 288 (1995) (declaratory judgments); *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010) (injunctions); *Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 380-81 (2004) (writs of mandamus).  The City has failed to carry its additional burden of demonstrating that it is entitled to any such relief.

**A.    The Court Should Not Grant a Declaratory Judgment that the City Is in Compliance with Section 1373.**

For the reasons set forth above, the City has failed to carry its burden of proof on its claim that it is in compliance with Section 1373.  Even if the City had satisfied its burden, however, the Court should nonetheless exercise its discretion not to enter a declaratory judgment.  *See* 28 U.S.C. § 2201(a) (a court "*may* declare the rights . . . of any interested party") (emphasis added); *see State Auto Ins. Cos. v. Summy*, 234 F.3d 131, 133 (3d Cir. 2000), *as amended* (Jan. 30, 2001) (Declaratory Judgment Act "contemplates that district courts will exercise discretion in determining whether to entertain such actions").  Here, given the premature nature of the City's claims (Part I.A, *supra*), the significant equitable harms that would result from declaring the conditions invalid (Part III.B, *infra*), and the possibility of simply remanding this case to the agency for further administrative action (Part III.D, *infra*), the Court should exercise its discretion to decline to enter a declaratory judgment here.

**B.    The Court Should Not Grant an Injunction.**

To obtain a permanent injunction, the moving party must have "shown actual success on the merits," *Shields v. Zuccarini*, 254 F.3d 476, 482 (3d Cir. 2001), as well as several additional requirements:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).  Because this lawsuit is against the Federal Government, the "harm to the opposing party" and "public interest" factors merge together.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

To establish irreparable harm, the plaintiff cannot merely rely on statements that "are conclusory, speculative and unsupported by any other evidence." *Quad/Tech, Inc. v. Q.I. Press Controls B.V.*, 701 F. Supp. 2d 644, 656-57 (E.D. Pa. 2010), *aff'd*, 413 F. App'x 278 (Fed. Cir. 2011).  Indeed the Third Circuit has "insisted that the risk of irreparable harm must not be speculative." *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 488 (3d Cir. 2000).  Injunctions "will not be issued merely to allay the fears and apprehensions or to soothe the anxieties of the parties." *Id.* at 490.  Here, the City has failed to prove that a permanent injunction against any of the three challenged conditions is warranted.

### 1.    The Advance Notice Condition Should Not Be Enjoined.

The City claims that it would be impractical to provide advance notice to ICE regarding the release of inmates for whom ICE had lodged detainers, and that such advance notice would deter law-abiding immigrants' willingness to report crimes or take advantage of other City services.  These theories are implausible and contradicted by the testimony at trial.  Moreover, as the Court has already acknowledged, the City's categorical refusal to provide advance notice to ICE (in the absence of a federal criminal warrant) results in significant harm to public safety.  Thus, the equitable balance does not support entry of a permanent injunction against this condition.

### a.    There Are No Impediments to Providing Advance Notice.

The City has previously claimed that it would be impractical to provide advance notice of inmates' release to ICE because approximately 80% of the City's inmates are not sentenced with

defined terms of confinement.  *See* Transcript of Evidentiary Hearing on Oct. 26, 2017 ("PI Tr.") 89:11-91:11, Dkt. No. 65-1.  This concern is not credible.  For one thing, even the City does not dispute that it could feasibly provide advance notice of inmates' release at least with respect to the approximately 20% of inmates who *are* serving defined terms of imprisonment.  *See* Def.'s FOF ¶ 25.

Moreover, even with respect to the other 80% of inmates, the City could clearly provide at least several hours of advance notice to ICE, given that the City has *already* implemented a protocol for providing such advance notice to Mr. Abernathy.  *See* Def.'s FOF ¶¶ 26, 28-29.  It would not be difficult for Mr. Abernathy to then provide advance notice of the inmate's release to ICE (or develop a protocol for doing so).  *Id.*  Indeed, Mr. Abernathy himself previously provided advance notice to ICE on at least five separate occasions.  *Id.* ¶¶ 39-40.  Thus, the City cannot plausibly claim irreparable harm based on the purported burdens of providing advance notice.

### b.   Providing Advance Notice Would Not Have Adverse Effects within the Immigrant Community.

The City also claims that if the City were to provide advance notice to ICE for all inmates for whom ICE had lodged a detainer (instead of only those inmates for whom the ICE detainer is accompanied by a federal criminal warrant), that would cause a series of harms stemming from the immigrant community's loss of trust in the City government.  This theory simply is not credible.

**i.**  The City cannot point to any credible, admissible testimony—*i.e.*, that is non-hearsay and non-speculative—demonstrating that if the City were to change its policy to allow advance notice to ICE even in the absence of a federal criminal warrant, that change in policy would deter individuals from reporting crimes or taking advantage of other City services.  *See* Def.'s FOF ¶¶ 67-69, 104-106.

Commissioner Ross was asked specifically about whether the City "sharing information with ICE about individuals suspected of criminal conduct [would] deter law-abiding citizens from reporting crimes," and his response was "I don't think so[.]"  May 10 Trial Tr. 27:12-15; Def.'s FOF ¶ 67.  And when the Commissioner was asked about whether information-sharing with ICE causes the immigrant

community to lose trust in the Philadelphia Police Department, he said "I don't know."  May 10 Trial Tr. 28:01-12; Def.'s FOF ¶ 69.

Plaintiff's proposed findings of fact ignore this testimony from the Police Commissioner, and instead rely on testimony from Mr. Abernathy, who has never held a job specifically devoted to criminal-justice issues nor obtained any degrees in criminal justice.  *See* Apr. 30 Trial Tr. 62:17-18, 63:07-09.  Although Mr. Abernathy offered some examples in which individuals may be deterred from reporting crimes, *see* Pl.'s FOF ¶ 60, he later confirmed that those examples were only speculative hypotheticals, *see* Apr. 30 Trial Tr. 145:17-19, and that he could not point to any specific evidence suggesting that this change in City policy would deter law-abiding immigrants from reporting crimes or seeking City services.  *See id.* 145:24-146:12, 148:15-149:07.  Indeed, even the City's proposed findings of fact reflect only that "*[t]he City believes* that changing its policies . . . would have a chilling effect on the reporting of crime," Pl.'s FOF ¶ 60 (emphasis added), not that a change in policy would, in fact, have such an effect.[5]

Plaintiff also relies on the testimony of Ms. Gladstein.  *See* Pl.'s FOF ¶ 64.  Although Ms. Gladstein initially speculated about individuals who might be deterred from seeking City services, she later admitted "I don't know who has been deterred" and "I can't give you a specific person or individual who was deterred by a specific action."  May 10 Trial Tr. 69:06-14; *see also* Def.'s FOF ¶¶ 100-04.  And Plaintiff's bold assertion that "if a law abiding immigrant resident of Philadelphia believed that any part of the City reported immigration status information to ICE, they would be very hesitant to interact with any City official," Pl.'s FOF ¶ 64 (citation omitted), is of course not credible

---

[5] This limited assertion is consistent with, and required by, the narrow foundation for Mr. Abernathy's testimony, which appears to have been based solely on hearsay from other individuals. *See, e.g.*, Apr. 30 Trial Tr. 38:16-19 ("I know from speaking to advocates that people are scared. People are hesitant to report crimes, hesitant to approach the City for any reason because they're afraid that it may cause them to engage with ICE."). Defendant hereby renews and incorporates by reference its objections and motions to strike to the extent that Mr. Abernathy's testimony is being relied upon for the truth of any matter asserted in his answers, as opposed to merely what the City believes.

in light of the numerous ways in which the City *already* shares immigration status information with ICE, as the City itself acknowledges.  *See* Pl.'s FOF ¶¶ 5-18; *see also* part ii, *infra*.

**ii.** Plaintiff's theory of harm is also contradicted by other facts in the trial record.  Plaintiff's theory—that providing advance notice to ICE would cause the immigrant community to lose trust in the City—wholly ignores that the City *already* provides substantial information to ICE.

Both sides agree that the City already shares (or does not prohibit sharing) immigration-related information with ICE in a variety of different ways, and that these existing information-sharing practices do not imperil the City's philosophy of "smart policing."  *See* Def.'s FOF ¶¶ 6-13, 63, 66, and 74; *see also* Pl.'s FOF ¶¶ 5-18.  If this existing information-sharing with ICE does not already cause the immigrant community to lose trust in the City, it is implausible that information-sharing in one additional context—*i.e.*, providing advance notice to ICE for individuals whose detainers are not accompanied by a criminal warrant—would lead to the dramatic effects asserted by the City.

Indeed, the rationale underpinning the City's existing information-sharing policies highlights why providing advance notice to ICE would *not* lead to the City's claimed harms.  The City views its existing information-sharing policies as permissible because they distinguish between law-abiding individuals (for whom City employees are generally *not* permitted to share information with ICE), and individuals who commit crimes (for whom City employees *are* permitted to share information with ICE).  *See* Def.'s FOF ¶¶ 62-63; Pl.'s FOF ¶ 5.  As Commissioner Ross explained, "if someone is engaging in criminal activity, then that changes the game" and "*we have no interest in withholding that information from any federal authorities*."  PI Hr'g Tr. 29:21-23 (emphasis added).  Under the City's own logic, therefore, there should be no obstacle to sharing information with ICE about inmates' release from custody, because that information is *necessarily* about individuals who have engaged in criminal activity.  *See* Def.'s FOF ¶ 64; Apr. 30 Trial Tr. 81:04-05 (Abernathy agreeing that "if someone is in

our custody, clearly they were suspected of or committed a crime").[6]

Finally, the City's theory of harm assumes that immigrants have perfect knowledge of the City's policies, and that this particular issue—when the City complies with detainers—is singularly important to law-abiding immigrants. The City presented no testimony at trial supporting this assumption, and in fact the City has elsewhere argued that residents generally are not effective at distinguishing between various City departments and policies. *See, e.g.*, Pl.'s FOF ¶¶ 64-65. Thus, there is simply no reason to believe that a modest change in policy on this issue would lead to any meaningful decrease in immigrants' willingness to report crimes, trust City government, or take advantage of public-health services. *See* Def.'s FOF ¶¶ 67, 104-06.

### c.   Enjoining the Advance Notice Condition Would Result in Significant Harm to Public Safety.

On the other side of the equitable balance, granting relief against the advance notice condition would cause considerable harm to Defendant, as well as the public interest. The Court and the parties have already discussed at length the harms caused by the City's refusal to provide advance notice to ICE, even for the most dangerous criminals such as those who would be subject to mandatory detention during removal proceedings. Even if the City had established some minimal irreparable harm, therefore, the overall equitable balance would weigh squarely against issuing relief.

**i.**   Although ICE has statutory authority to remove any alien not lawfully present in the country, ICE generally seeks to exercise its enforcement discretion by focusing on threats to public safety and national security. *See* Def.'s FOF ¶¶ 1-3. To accomplish that mission, ICE focuses on

---

[6] The City's theory is further undermined because, if anything, Executive Order 5-16 provides *greater* protections to criminals than to law-abiding citizens. The City's current policies do not "prohibit[] City employees from sharing information regarding the address or whereabouts of an individual," even for a law-abiding individual. Pl.'s FOF ¶ 6 (citing Apr. 30 Trial Tr. 14:8-15:8 (Abernathy)). Thus, the only circumstance in which City employees *are* prohibited from sharing information regarding a person's whereabouts—*i.e.*, where that person will be at a particular time—is for individuals suspected of or convicted of committing crimes, pursuant to Executive Order 5-16. *See* Def.'s FOF ¶ 65.

individuals currently in custody—*i.e.*, those suspected of or convicted of crimes—which is an effective way to combat risks to public safety, particularly due to Philadelphia's high rate of recidivism. *Id.* ¶ 61.

Executive Order 5-16, which prohibits providing advance notice to ICE in the absence of a federal criminal warrant, impedes ICE's mission and forces ICE to expend more resources. *Id.* ¶¶ 56, 58. When ICE takes custody of an individual in a controlled environment, such as a City jail or prison, ICE generally sends only two officers. *Id.* ¶ 44. In contrast, when ICE is forced to try to take custody of an individual in a public environment, ICE generally sends at least five officers, all of whom are armed and wear bulletproof vests, tactical gear, and ICE markings. *Id.* ¶¶ 51-52. If the City provided advance notice of inmates' release from custody, ICE would not need to try to apprehend those individuals on the street or in the community. *Id.* ¶¶ 55, 57. Moreover, operations in public environments increase the likelihood that ICE will encounter removable aliens who are not the target of the enforcement operation or may not otherwise be a priority. *Id.* ¶ 57.

By forcing ICE to apprehend individuals in public environments, the City's policy places ICE agents and the community in substantial danger. *See id.* ¶¶ 42-43. Operations in public environments entail a number of risks that are not present in controlled environments: it is harder for ICE to identify the relevant individual; the person ICE is seeking may flee; the person may engage in a physical struggle; or the person may do something else that places ICE law-enforcement officers and members of the community in harm's way. *See id.* ¶¶ 47-55.

**ii.** In addition to the above harms to ICE's mission and officer safety, the City's policy also endangers public safety by allowing offenders to return to the community, instead of providing ICE an opportunity to take those offenders into custody and initiate removal proceedings. *See* Def.'s FOF ¶¶ 34-35. The City has released numerous offenders for whom ICE had lodged detainers, including offenders charged with serious crimes such as rape and sexual assault, and in at least one instance such an individual was subsequently re-arrested for an unrelated offense and the individual ultimately pled

guilty to rape of a child and unlawful contact with a minor. *Id.* ¶¶ 35-36.

City employees have effectively confirmed that Executive Order 5-16 is overly categorical, and contrary to public safety, by violating the Executive Order on numerous occasions. *See id.* ¶¶ 37-39. Indeed, Mr. Abernathy consciously violated Executive Order 5-16 on five separate occasions, based in part on his concerns that those five individuals' release from custody would pose a risk to public safety. *Id.* ¶ 39.[7]  And the Police Commissioner himself did not disagree that Executive Order 5-16 might better promote public safety if it were less categorical. *See* Def.'s FOF ¶ 68.  Notably, the Police Commissioner was not consulted regarding Executive Order 5-16 prior to its issuance. *Id.* ¶ 19.

As this Court has previously expressed, the categorical nature of the City's policy can present legitimate public-safety risks, particularly with respect to offenders whom Congress has determined should be subject to mandatory detention during their removal proceedings. *See, e.g.*, Dkt. Nos. 192, 198; *see generally* 8 U.S.C. § 1226(c).  The City's non-cooperation even as to these offenders highlights why an injunction against the advance notice condition is unwarranted—it would allow the City's categorical policy to remain in effect despite the significant public-safety risks implicated by that policy.

**iii.**  It is no answer to the above harms for the City to rely on Executive Order 5-16's allowance for advance notice when ICE obtains a federal criminal warrant for the inmate. *See, e.g.*, Pl.'s FOF ¶¶ 19-28.  As set forth in the Government's correspondence to the Court, the Immigration and Nationality Act has created a comprehensive scheme governing the detention and removal of aliens, including through the use of administrative warrants. *See* Letter at 4, Dkt. No. 204.  Moreover, not all individuals who are present unlawfully may be charged with a federal crime, and therefore a federal criminal warrant may be unavailable for many individuals for whom ICE wishes to issue a detainer. *See* Def.'s FOF ¶ 30.  There is a process for obtaining a criminal warrant, and that process necessarily

---

[7] In these circumstances, the City still did not allow ICE to take custody of the individuals inside the controlled environment of the prison.  Instead, ICE officers had to surveil the City's prisons late at night in order to identify, and arrest, individuals on the streets outside. *See* Def.'s FOF ¶¶ 41-47.

takes time—sometimes several days.  *See id.* ¶¶ 31-32.  Accordingly, ICE may not be able to obtain a criminal warrant for an individual before the City releases that individual from custody, as has happened in the past.  *See id.* ¶¶ 32, 53.  Thus, Executive Order 5-16 is a genuine and sometimes insurmountable obstacle to ICE's ability to obtain advance notice from the City.

**2.      Plaintiff Has Not Offered a Basis to Enjoin the Section 1373 Condition.**

As discussed above, the advance notice condition is also embedded within the Section 1373 compliance condition.  *See* Part II.A, *supra*.  The reasons why an injunction is inappropriate against the advance notice condition are therefore equally applicable to the Section 1373 compliance condition.

Apart from the advance notice component of Section 1373, the City has offered no basis whatsoever for enjoining the Section 1373 certification condition.  *See generally* Pl.'s FOF ¶¶ 47-72 (not mentioning the Section 1373 compliance condition in connection with the discussion of harms).  Nor could the City provide any such reason.  Defendant first informed the City that it would need to certify compliance with Section 1373 as part of its *FY2016* Byrne JAG application, *see* May 1 Trial Tr. 72:18-73:15, and the City in fact submitted such a certification, and then also certified compliance with Section 1373 again in June 2017.  *See* Def.'s FOF ¶¶ 116-17.  The City's willingness to certify compliance with Section 1373 in connection with the FY2016 Byrne JAG funding undermines any potential claim of irreparable harm from having to do the same with respect to the FY2017 funding. Thus, there is no basis for entering an injunction against this independent condition.

**3.      The Jail Access Condition Should Not Be Enjoined.**

There is also no basis for enjoining the jail access condition.  The City violates the jail access condition in two ways:  by prohibiting all interviews in the Police Detention Unit (PDU), and by providing inmates in Philadelphia Prisons a misleading "consent form" prior to allowing ICE to interview those inmates.  The City has not identified any irreparable harm from being forced to change those policies, whereas those policies effectively preclude ICE from interviewing any inmates in City

21

custody—even though federal law expressly grants ICE agents the authority to "interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States," 8 U.S.C. § 1357(a)(1), and to do so "anywhere in or outside the United States," 8 C.F.R. § 287.5(a)(1).

**i.** With respect to barring interviews in the PDU, the City's sole claim of harm is that allowing ICE interviews would be impractical. *See* Pl.'s FOF ¶ 70. But this concern is not credible. The PDU has sufficient space for such interviews, *see* Def.'s FOF ¶ 98; the PDU allows visitors in other circumstances, *see* Apr. 30 Trial Tr. 123:13-17; and the PDU also allows interviews by other law-enforcement agencies. *See id.* 227:25-226:13. The City has not identified any practical concern that permits other law-enforcement agencies to conduct interviews, but prohibits ICE from doing the same. And to the extent any such practical concerns do exist, ICE officers, as fellow law-enforcement agents, would of course work with staff at the PDU to accommodate and mitigate those concerns. *See* May 2 Trial Tr. 36:05-14. Lieutenant Gillespie speculated about *possible* harms from allowing ICE to conduct interviews, *see* Pl.'s FOF ¶ 70, but that testimony did not account for ICE's stated willingness to work with PDU staff to accommodate their concerns.

On the other side of the balance, conducting interviews at the PDU is particularly important for ICE's ability to fulfill its mission. ICE seeks to interview inmates as soon as possible, particularly given the possibility that an inmate may not return to custody after arraignment. *See* Def.'s FOF ¶ 93. At the PDU, approximately 42% (8,000 of 19,000) of individuals are released directly without ever going to another City detention facility until potentially after conviction. *See id.* ¶ 96. Once those individuals are released from the PDU, therefore, ICE loses the ability to interview those persons in a controlled environment. *See id.* ¶ 95.

ICE interviews are important for establishing probable cause of removability, as well as other purposes. *See* Def.'s FOF ¶¶ 79-81. For example, ICE also seeks to learn about an individual's health status and family ties in the United States, which are important for ICE to understand in order to

make an appropriate custody determination and/or arrangements for taking that person into custody. *See id.* ¶ 81. Additionally, those topics may allow ICE to determine if an individual has any avenue of relief from deportation available to them. *Id.* Thus, by completely barring ICE from conducting interviews at the PDU, the City inflicts substantial harm on ICE's ability to fulfill its overall mission.

**ii.** The City also violates the jail access condition by providing a "consent form" to inmates in the Philadelphia Department of Prisons before allowing ICE to interview those inmates. Notably, the City does not identify any irreparable harm if it were no longer able to use the consent form. *See generally* Pl.'s FOF ¶¶ 47-72 (discussion of harms, not mentioning the consent form at all). Nor can the City claim harm rooted in an attempt to substitute its judgment about what rights and warnings aliens should be given during the immigration process. *See* Apr. 30 Trial Tr. 118:23-120:10; *see also* 8 U.S.C. § 1362 (providing aliens a statutory right to counsel, at no expense to the Government, in removal proceedings), § 1229a(b)(4) (describing aliens' other rights); 8 C.F.R. § 287.3(c) (requiring certain notifications be provided to aliens once removal proceedings commence).

Again, on the other side of the balance, the City's consent form effectively precludes ICE from conducting interviews. Since the consent form was implemented, ICE has not successfully completed any interviews. *See* Def.'s FOF ¶ 87. Although some of the inmates stated that they would be willing to be interviewed with their attorney present, the alien did not identify their counsel, and ICE was unsure how to proceed. *See id.*; *see also* May 2 Trial Tr. 38:10-39:39:15 (observing that inmates frequently do not provide accurate information regarding the identity of their attorneys). The consent form thus clearly impedes ICE's mission.

Moreover, the consent form is misleading to aliens. Although it informs aliens that anything they say can be used against them in immigration proceedings, it fails to inform them that their silence can *also* be used against them. *See* Def.'s FOF ¶ 88. Enjoining the jail access condition would therefore not be in the public interest, because the City could continue using a consent form that not only blocks

23

ICE from interviewing inmates, but does so by providing misleading information to aliens.

### 4. The City Cannot Establish Irreparable Harm Based on How the Byrne JAG Funding Might Be Spent.

Finally, the City cannot rely on how it would like to spend the Byrne JAG funding as the basis for its irreparable harm. For one thing, even under the City's theory of its claims, the City is not challenging any substantive decision by Defendant about whether Philadelphia should receive its FY2017 Byrne JAG funding; instead, the City is challenging the purported "final agency action" of the decision to impose certain conditions on the FY2017 Byrne JAG funding. *See, e.g.*, Pl.'s Opp. to Mot. to Dismiss at 10, Dkt. No. 119 ("[T]he City has plausibly alleged . . . that the Department took final agency action *in the imposition of the three conditions*." (emphasis added)). Accordingly, the City cannot rely on purported harms from not having the Byrne JAG funding when its claims do not even challenge any denial of funding. *See Adams*, 204 F.3d at 489-90 (denying injunctive relief when the purported harm is "insufficiently related" to the claims in the complaint).

In any event, the City has likewise failed to establish any irreparable harm from not yet receiving this funding. Despite Plaintiff's claim that it needs FY 2017 Byrne JAG funds immediately, testimony at trial revealed that Plaintiff's need is overstated. The City's police department budget is close to $700 million. Def.'s FOF ¶ 108. Yet, in FY 2017, the City applied for only $1.598 million of Byrne JAG funds, which would comprise less than one third of one percent of the Philadelphia Police Department's budget for FY 2017. *Id.* ¶ 113. Moreover, as of May 1, 2018, the City has not obligated the entirety of its FY 2016 award, and has not even spent a single dollar of its FY 2016 funds. *Id.* ¶¶ 110-11. Though the City has insisted that it needs Byrne JAG funding to purchase a lifesaving overdose drug immediately, the City admitted at trial that it already has funding for this drug built into its budget in addition to having more funding sources available to buy the drug. *Id.* ¶ 103. Plaintiff has thus failed to show irreparable harm tied to the actual FY2017 Byrne JAG funding.

### C.     The City is Not Entitled to Mandamus Relief.

Plaintiff has not shown that the Department failed to take a legally *required* action, and thus is not entitled to a writ of mandamus compelling the Department to act on its application.  *See Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63-64 (2004).  The Byrne JAG statute provides that the Attorney General "may" make grants from appropriated funds to carry out the purposes of the program, 34 U.S.C. § 10152(a)(1), and does not set any deadline for the Department to issue decisions on Byrne JAG applications.  Thus, mandamus relief is unwarranted.

### D.     At Most, the Court Should Remand the Matter to the Agency.

To the extent the Court concludes that Plaintiff has proven its claims and is entitled to some form of relief, the most relief the Court should provide is a remand back to the agency—the typical relief awarded in a case involving judicial review of administrative action.  *See INS v. Orlando Ventura*, 537 U.S. 12, 16-17 (2002).   The agency should be permitted in the first instance to decide, under 34 U.S.C. § 10154, whether, and if so how, it might be able to correct any practical or legal concerns addressed in the Court's opinion.  In the meantime, particularly given the strong equities in favor of Defendant, the challenged conditions should not be enjoined or vacated pending the completion of those potential administrative proceedings.  *See Comiteé De Apoyo A Los Trabajadores Agrícolas v. Solis*, No. CIV.A 09-240, 2010 WL 3431761, at *24 (E.D. Pa. Aug. 30, 2010) (Pollak, J.) (noting that "in certain circumstances, remand without vacatur is the proper course").

### <u>Conclusion</u>

The Court should enter judgment for Defendant on all claims.

DATED:  May 25, 2018                    Respectfully submitted,

                                        CHAD A. READLER
                                        Acting Assistant Attorney General

                                        WILLIAM M. MCSWAIN
                                        United States Attorney

                                        JOHN R. TYLER
                                        Assistant Director

                                        */s/ Brad P. Rosenberg*
                                        BRAD P. ROSENBERG
                                        (D.C. Bar No. 467513)
                                        DANIEL SCHWEI
                                        Senior Trial Counsel
                                        RACHAEL L. WESTMORELAND
                                        Trial Attorney
                                        U.S. Department of Justice
                                        Civil Division, Federal Programs Branch
                                        20 Massachusetts Ave, NW
                                        Washington, DC 20530
                                        Phone: (202) 514-3374
                                        Fax: (202) 616-8460
                                        E-Mail:   brad.rosenberg@usdoj.gov
                                                  daniel.s.schwei@usdoj.gov
                                                  rachael.westmoreland@usdoj.gov

                                        *Counsel for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I, Brad P. Rosenberg, hereby certify that on May 25, 2018, I electronically filed the foregoing

Defendant's Post-Trial Brief using the Court's CM/ECF system, causing a notice of filing to be served

upon all counsel of record.


*/s/ Brad P. Rosenberg*
BRAD P. ROSENBERG