# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

THE CITY OF PHILADELPHIA,

    Plaintiff,

v.

JEFFERSON BEAUREGARD SESSIONS III, in his
official capacity as Attorney General of the United States,

    Defendant.

Case No. 2:17-cv-03894-MMB

## BRIEF OF AMICI CURIAE CITY OF NEW YORK, 20 ADDITIONAL CITIES AND COUNTIES, AND THE UNITED STATES CONFERENCE OF MAYORS

### IN SUPPORT OF THE CITY OF PHILADELPHIA

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................................................... ii

STATEMENT OF INTEREST AND SUMMARY OF ARGUMENT......................................... 1

ARGUMENT ........................................................................................................................... 5

   POLICIES THAT PROTECT SENSITIVE INFORMATION ABOUT IMMIGRANT
   POPULATIONS ARE ESSENTIAL TO LOCAL GOVERNMENTS' ABILITY TO
   EFFECTIVELY DELIVER SERVICES .................................................................................. 5

     A.The fear of immigration enforcement can discourage residents from engaging with
      essential local government services, including police, schools, and medical care. ............ 5

     B.Local policies to limit information sharing with federal immigration authorities promote
      trust in local governments, which is necessary to protect public safety and health........... 9

   CONCLUSION..................................................................................................................... 14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arizona v. United States*,
  567 U.S. 387 (2012).................................................................................................8

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
  548 U.S. 291 (2006).................................................................................................4

*City of Chicago v. Sessions*,
  264 F. Supp. 3d 933, No. 1:17-cv-5720 (N.D. Ill. 2017)......................................11

*City of Chicago v. Sessions*,
  No. 17-2991, 2018 U.S. App. LEXIS 9862 (7th Cir. Apr. 19, 2018).................6, 11

*County of Santa Clara v. Trump*,
  275 F. Supp. 3d 1196 (N.D. Cal. 2017) ...............................................................6

*Hispanic Interest Coalition v. Governor of Ala.*,
  691 F.3d 1236 (11th Cir. 2012) ............................................................................9

*LULAC v. Wilson*,
  908 F.Supp. 755 (C.D. Cal. 1995) ........................................................................8

*Pennhurst State Sch. & Hosp. v. Halderman*,
  451 U.S. 1 (1981)...................................................................................................4

*Riegel v. Medtronic, Inc.*,
  529 U.S. 598 (2008)...............................................................................................2

*South Dakota v. Dole*,
  483 U.S. 203 (1987)...............................................................................................4

**Statutes, Regulations, and Executive Orders**

8 U.S.C. § 1373.............................................................................................................4

13 U.S.C. § 9(a) ...........................................................................................................13

26 U.S.C. § 6103 ..........................................................................................................13

34 U.S.C. §§ 10152(a) ...................................................................................................4

Chicago Mun. Code § 2-173 ..........................................................................................3

Cook Cty. Bd. of Comm'rs Res. 07- R-240....................................................................3

Cook Cty. Ill., Mun. Code § 46-37(b)..............................................................................3

Davis Res. 14-153 (2014) ................................................................................................3

Davis Res. 5407 (1986)....................................................................................................3

Denver Exec. Order 142 (2017)........................................................................................3

Denver Rev. Mun. Code §§ 28-250 to 28-253..................................................................3

Madison Res. 17-00125 ....................................................................................................3

Minneapolis Code of Ordinances Ch. 19 .........................................................................3

N.Y.C. Admin. Code § 9-131(h)(1) ..................................................................................3

N.Y.C. Charter § 8(g) .......................................................................................................3

N.Y.C. Mayoral Exec. Order 41 (2003)...........................................................................3

Oakland Res. No. 63950 (1986) .......................................................................................3

Oakland Res. No. 86498 (2016) .......................................................................................3

2017 Or. Laws Ch. 724 .....................................................................................................3

Or. Rev. Stat. § 181A.820.................................................................................................3

Rochester Res. No. 2017-5 ...............................................................................................3

**Other Authorities**

Brooke A. Lewis, *HPD Chief Announces Decrease in Hispanics Reporting Rape
    and Violent Crimes Compared to Last Year,* Houston Chron. (Apr. 6, 2017),
    https://bit.ly/2wvUQVV........................................................................................7

Cara Buckley, *New York City Police Seek Trust Among Immigrants*, N.Y. Times
    (May 31, 2007)....................................................................................................11

Cassi Feldman, *Despite Trump immigration crackdown, city tells students and
    families: 'We stand with you'*, Chalkbeat (Jan. 30, 2017), https://bit.ly/2rxttWz....................11

CBS New York, *NYPD Memo Emphasizes Commitment to Immigrants* (Feb. 22,
    2017), https://cbsloc.al/2L0eD2Y .....................................................................11

Christopher Smart, *Fearful of deportation, unauthorized immigrants in Salt Lake
    City are not reporting crime, police chief says*, The Salt Lake Trib., Jan. 9,
    2018, https://bit.ly/2wDRlx1 ...............................................................................7

iii

Dara Lind, *Fear Itself: Donald Trump's Real Immigration Policy*, Vox (Sep. 17, 2017), https://bit.ly/2h3IcGo ....................................................................................7

Donald G. McNeil, Jr., *Trump, Tell Us About Your Flu Shot*, N.Y. Times, Feb. 9, 2018, https://nyti.ms/2KRM8EI ....................................................................................8

Emily Baumgaertner, *Spooked by Trump Proposals, Immigrants Abandon Public Nutrition Services*, N.Y. Times (Mar. 6, 2018), https://nyti.ms/2HeoMqg ...............................9

Emily Bazar, *Some Immigrants, Fearful of Political Climate, Shy Away from Medi-Cal*, California Healthline, Feb. 16, 2017, https://bit.ly/2KPyQbK ...............................7

*Estimates of unauthorized immigrant population, by metro area, 2014*, Pew Research Center (Feb. 3, 2017), available at https://goo.gl/ZwBgda .......................................3

*Feds: Alabama immigration law caused spike in Hispanic student absences*, CNN (May 4, 2012), https://cnn.it/2IbV0U3 .....................................................................9

Int'l Ass'n of Chiefs of Police, *Enforcing Immigration Law: The Role of State, Tribal and Local Law Enforcement*, available at http://bit.ly/2ksLZxb ...................................12

Jennifer Medina, *Too Scared to Report Sexual Abuse. The Fear: Deportation.*, N.Y. Times (Apr. 30, 2017), https://nyti.ms/2pOOe0Q ...........................................................7

Kari White, et al., *Impact of Alabama's Immigration Law on Access to Health Care Among Latina Immigrants and Children: Implications for National Reform*, 104 Am. J. Pub. Health 397 (2014), *available at* https://bit.ly/2G2U3eS ...................................................................9

Kathleen Roche, et al., *Impacts of Immigration Actions and News and the Psychological Distress of U.S. Latino Parents Raising Adolescents*, J. Adolescent Health (forthcoming 2018), *available at* https://bit.ly/2FAbbrT ...........................5

Kelli Kennedy, *Immigration Concerns Drive Legal Immigrants Away from Public Health Care*, Christian Sci. Monitor (Jan. 22, 2018), https://bit.ly/2IxTi2z ...........................8

Major Cities Chiefs Ass'n, *Major Cities Chiefs Association Immigration Position* (Oct. 2011), accessed May 4, 2018, https://bit.ly/2IoRh91 .....................................12

Mayor's Office of Immigrant Affairs, *State of Our Immigrant City*, March 2018, available at https://on.nyc.gov/2Iu3Lw6 .......................................................................2

Monica Disare, *Could fear of Trump's immigration policies keep New York City students out of school?*, Chalkbeat (Mar. 1, 2017), https://bit.ly/2rxW5iu ...........................10

N.Y.C. Dep't of City Planning, *The Newest New Yorkers*, 2013, available at http://on.nyc.gov/2drcFH6 ....................................................................................2

N.Y.C. Health + Hospitals, *Seek Care Without Fear*, https://bit.ly/2G4otx1 (last
 visited May 7, 2018) ...........................................................................................................11

Nicole Rodriguez, *Trump's Immigration Crackdown Creating a Public Health
 Crisis Among Children, Analysts Say*, Newsweek, Jan. 4, 2018,
 https://bit.ly/2E6M93w .......................................................................................................7

Nik Theodore, *Insecure Communities: Latino Perceptions of Police Involvement
 in Immigration Enforcement*, May 2013, *available at* https://bit.ly/1Adp6RD.......................6

The President's Task Force on 21st Century Policing, *Final Report* (May 2015),
 available at https://bit.ly/2KPn5lP ....................................................................................12

Russell B. Toomey, et al., *Impact of Arizona's SB 1070 Immigration Law on
 Utilization of Health Care and Public Assistance Among Mexican-Origin
 Adolescent Mothers and Their Mother Figures*, 104 Am. J. Pub. Health S28
 (2014), *available at* https://bit.ly/2IbAx1w ...................................................................8

Tom Dart, *Fearing deportation, undocumented immigrants wary of reporting
 crimes*, The Guardian, Mar. 23, 2017, https://bit.ly/2nMHVd7 .................................................7

Tom K. Wong, Center for American Progress, *The Effects of Sanctuary Policies
 on Crime and the Economy* (Jan. 26, 2017), available at
 http://ampr.gs/2kxOcHX...........................................................................................................13

## STATEMENT OF INTEREST AND SUMMARY OF ARGUMENT

The undersigned cities and counties—representing more than 24 million residents from across the country—and the United States Conference of Mayors submit this amici curiae brief to support the City of Philadelphia's proposed findings of fact regarding the benefits of policies limiting the information it shares with the federal government and to show that Philadelphia's understanding of such policies is corroborated by the experience of local governments nationwide. *See* Phila. Prop. Findings of Fact, Dkt. 201 at ¶¶ 54–68. Amici fully support the City of Philadelphia's position that the Department of Justice cannot unilaterally condition receipt of Byrne JAG awards on a city's willingness to be enlisted into serving as instruments of federal immigration enforcement efforts. This brief, however, focuses particularly on the effects and importance of information-sharing policies like Philadelphia's because, as local governments, we have decades of experience with similar policies safeguarding sensitive information. Our experience refutes the Department of Justice's suggestion that such policies do not impact a city's ability to provide essential government services. *See* Def.'s Prop. Findings of Fact, Dkt. 200 at ¶¶ 99–107; Def.'s Post-Trial Br., Dkt. 213 at 1. Quite the contrary: amici have found that creating appropriate firewalls between local public service providers and federal immigration enforcement is critical to building the trust with our residents that is required to protect the safety and health of all.

Local governments neither set immigration policy, nor determine who enters this country. Our core jobs are to effectively police our neighborhoods—whoever lives in them—to teach our children—whoever their parents might be—and to provide all the other essential public services that keep our cities and counties running. And we know that residents' willingness to report crime and assist the police, complain about unsafe conditions, send their children to school, seek

medical treatment, or take advantage of other public services depends on our ability to protect the confidentiality of their personal information.

Contrary to the federal government's claims, policies that clearly separate local public services from the federal immigration enforcement system—like those adopted by the City of Philadelphia—are essential to fulfilling local governments' fundamental role in serving their residents. Our experiences confirm that absent the trust engendered by policies protecting personal information, people simply will not seek assistance or cooperate with local governments in the provision of essential services. The basic purpose—and demonstrated effect—of such policies is thus to improve public health, safety and welfare, all police powers in "fields of traditional state regulation" that are not to be impeded lightly. *Riegel v. Medtronic, Inc.*, 529 U.S. 598, 618 (2008).

Ensuring that all of our residents, including immigrants, can and do access government services is not a minor concern, but rather indispensable to the vitality, prosperity, and safety of our communities, because immigrants play central roles in cities large and small. For example, nearly six out of every ten New York City residents are immigrants or the children of immigrants, and immigrants contributed $195 billion to the City's gross domestic product in 2017.[1] In Chicago, immigrants pay $1.6 billion in state and local taxes (and more in federal taxes); additionally, while immigrants make up 20.7 percent of Chicago's population, they account for 36.4 percent of its entrepreneurs, a remarkable measure of economic dynamism.[2] In Chelsea, Massachusetts, 44 percent of the city's residents were born outside the country.

---

[1] N.Y.C. Dep't of City Planning, *The Newest New Yorkers*, 2013, available at http://on.nyc.gov/2drcFH6; Mayor's Office of Immigrant Affairs, *State of Our Immigrant City*, March 2018, at 6, available at https://on.nyc.gov/2Iu3Lw6.

[2] Memorandum from City of Chicago to City of New York (May 16, 2018).

2

Our concern is not—and cannot be—limited to those who have legal status in this country. In New York City alone, roughly 560,000 residents are undocumented and approximately one million residents live in a household where at least one member is undocumented.[3] The greater Oakland metropolitan area, likewise, is home to approximately 240,000 undocumented immigrants.[4] The well-being of all our residents is connected. No one benefits when large portions of the population are reluctant to obtain vaccinations against preventable disease or are afraid to speak to the police because they worry that sharing their personal information might lead to deportation for themselves or their family members.

Thus, local governments have adopted policies—some going back decades—motivated by the same concerns and experiences that underlie Philadelphia's information-sharing provisions.[5] These policies are diverse in approach and scope, as befitting the diverse needs of our jurisdictions, but all are based on the need to maintain trust with communities. Many of these policies, such as New York City's, protect not only the confidentiality of residents' immigration status, but also other sensitive information such as sexual orientation, status as a victim of domestic violence or sexual assault, or receipt of public assistance.[6] Others are specifically focused on information sharing by law enforcement. The valid and legitimate concerns

---

[3] Mayor's Office of Immigrant Affairs, *supra* note 1 at 6.

[4] *Estimates of unauthorized immigrant population, by metro area, 2014*, Pew Research Center (Feb. 3, 2017), available at https://goo.gl/ZwBgda.

[5] *See, e.g.*, N.Y.C. Mayoral Exec. Order 41 (2003); N.Y.C. Admin. Code § 9-131(h)(1); Cook Cty. Bd. of Comm'rs Res. 07- R-240; Cook Cty. Ill., Mun. Code § 46-37(b); Chicago Mun. Code § 2-173; Davis Res. 14-153 (2014); Davis Res. 5407 (1986); Denver Rev. Mun. Code §§ 28-250 to 28-253; Denver Exec. Order 142 (2017); Madison Res. 17-00125; Oakland Res. No. 86498 (2016); Oakland Res. No. 63950 (1986); Or. Rev. Stat. § 181A.820; 2017 Or. Laws Ch. 724 (HB 3464); Minneapolis Code of Ordinances Ch. 19; Rochester Res. No. 2017-5.

[6] *See e.g.* N.Y.C. Charter § 8(g); N.Y.C. Mayoral Exec. Order 41 (2003).

animating these policies are as simple as they are powerful. Our experience as local governments makes plain that we must build trust with residents if we are to govern effectively.

The Congressional scheme does not purport to allow the DOJ to interfere with that critical local governance, and the constitution does not allow it. Even if the language of 8 U.S.C. § 1373 applied to the information Philadelphia's policy keeps confidential (it does not) and the DOJ's attempts to apply that statute did not run afoul of the Tenth Amendment (they do), the statute *still* could not form a basis for imposing conditions on the receipt of Byrne JAG funding. To pass constitutional muster, the conditions the federal government imposes on funding must be clearly and unambiguously attached to germane funding. *See Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006); *South Dakota v. Dole*, 483 U.S. 203, 206–07 (1987); *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Here, there can be no question that Congress intended the JAG program to assist local law enforcement efforts. *See* 34 U.S.C. §§ 10152(a). But imposing the requirements of § 1373 is not designed to benefit local law enforcement—it is intended to promote *federal* immigration enforcement efforts. *See* Def.'s Post-Trial Br., Dkt. 213 at 8–10. Indeed, as the City of Philadelphia proved at trial, and as this brief further demonstrates, requiring cities like Philadelphia to abandon its restrictions on information sharing will impede local governments' abilities to provide law enforcement and other essential services to their residents.

The Court has direct testimony before it that Philadelphia's policies improve public safety and promote access to city services. Phila. Prop. Findings of Fact, Dkt. 201 at ¶¶ 54–68. As this brief explains, that testimony is supported by academic research and the experience of other local governments, which demonstrate that the policies clearly separating local services

4

from federal immigration enforcement efforts serve an important and lawful purpose. Indeed, they are critical to successful local governance.

## ARGUMENT

### POLICIES THAT PROTECT SENSITIVE INFORMATION ABOUT IMMIGRANT POPULATIONS ARE ESSENTIAL TO LOCAL GOVERNMENTS' ABILITY TO EFFECTIVELY DELIVER SERVICES

**A. The fear of immigration enforcement can discourage residents from engaging with essential local government services, including police, schools, and medical care.**

In immigrant communities, fear of government officials can pose a considerable obstacle to basic government functions. According to one recent study, 40 percent of Latino parents surveyed told their children to avoid medical care, police, and other public services, and almost half told their children to stay away from authorities generally.[7] These fears are not limited to those without legal status, because undocumented immigrants are the parents, siblings, and friends of citizens and legal residents. Even parents who were citizens or had permanent resident status were found to have issued similar warnings to their children, at only slightly lower rates.[8] Notably, these instructions stemmed directly from immigration-related fears.[9] Local governments cannot effectively prevent crime, or halt the spread of communicable diseases, when parents instruct their children to avoid police and doctors.

Immigration concerns can cripple a city's ability to investigate or prosecute crime. Because they fear that police will ask about their immigration status or the status of people they

---

[7] Kathleen Roche, et al., *Impacts of Immigration Actions and News and the Psychological Distress of U.S. Latino Parents Raising Adolescents*, J. Adolescent Health (forthcoming 2018), *available at* https://bit.ly/2FAbbrT.

[8] *Id.*

[9] *Id.*

know, 45 percent of Latinos say in surveys that they are less likely to report a crime or offer information about crimes, whether as a witness or a victim.[10] This behavior extends throughout entire communities, far beyond undocumented immigrants or even immigrants with legal status: 28 percent of Latinos born in the United States—U.S. citizens—say they are less likely to contact police, as the direct *victims* of a crime, because they fear immigration consequences for those close to them.[11] The result is plain. "[T]he failure to obtain that victim and witness cooperation could both hinder law enforcement efforts and allow criminals to freely target communities with a large undocumented population, knowing that their crimes will be less likely to be reported." *City of Chicago v. Sessions*, No. 17-2991, 2018 U.S. App. LEXIS 9862, at *15 (7th Cir. Apr. 19, 2018).

Recent federal actions and rhetoric have worsened this problem. In January 2017, for example, President Trump issued a sweeping executive order instructing law enforcement agencies to target more immigrants for deportation, encourage state and local government participation in federal immigration enforcement, and unilaterally withdraw all federal funding from whatever jurisdictions the Attorney General deemed "sanctuary jurisdictions." Exec. Order No. 13,768, 82 Fed. Reg. 8799 (Jan. 25, 2017). This unprecedented attempt to coerce local governments into serving as federal immigration agents has already been found unconstitutional. *County of Santa Clara v. Trump*, 275 F. Supp. 3d 1196 (N.D. Cal. 2017). Even so, it sent an unmistakable message to immigrants, raising the specter that any interaction with local authorities could risk immigration consequences. Indeed, in remarks before Congress, acting

---

[10] Nik Theodore, *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement*, May 2013, *available at* https://bit.ly/1Adp6RD.

[11] *Id.*

Immigration and Customs Enforcement Director Tom Homan told undocumented immigrants, "[Y]ou should be uncomfortable … You should look over your shoulder."[12]

This message was heard loud and clear, sending many residents into the shadows, to the detriment of their own safety and the public's. In Houston, for example, the number of Latinos reporting rapes dropped by 40 percent compared to the year before, even as non-Latino victims reported an increased number of rapes.[13] Latinos in Salt Lake City reported 36 percent fewer larcenies and thefts, even as crime reporting among other demographics stayed roughly the same.[14] Fears of deportation caused victims to drop their domestic violence cases in cities like Austin, San Antonio, and Denver.[15]

Public health, too, has suffered. Doctors have reported parents cancelling their children's pediatric appointments and vaccinations over immigration fears,[16] or cancelling health insurance coverage altogether.[17] Many immigrant patients have applied for public medical coverage but withheld sensitive identifying information from their forms—precisely the kind of information that policies like Philadelphia's try to keep confidential—and then are predictably denied for

---

[12] Dara Lind, *Fear Itself: Donald Trump's Real Immigration Policy*, Vox (Sep. 17, 2017), https://bit.ly/2h3IcGo.

[13] Jennifer Medina, *Too Scared to Report Sexual Abuse. The Fear: Deportation.*, N.Y. Times (Apr. 30, 2017), https://nyti.ms/2pOOe0Q; Brooke A. Lewis, *HPD Chief Announces Decrease in Hispanics Reporting Rape and Violent Crimes Compared to Last Year,* Houston Chron. (Apr. 6, 2017), https://bit.ly/2wvUQVV.

[14] Christopher Smart, *Fearful of deportation, unauthorized immigrants in Salt Lake City are not reporting crime, police chief says*, The Salt Lake Trib., Jan. 9, 2018, https://bit.ly/2wDRlx1.

[15] Tom Dart, *Fearing deportation, undocumented immigrants wary of reporting crimes*, The Guardian, Mar. 23, 2017, https://bit.ly/2nMHVd7.

[16] Nicole Rodriguez, *Trump's Immigration Crackdown Creating a Public Health Crisis Among Children, Analysts Say*, Newsweek, Jan. 4, 2018, https://bit.ly/2E6M93w.

[17] Emily Bazar, *Some Immigrants, Fearful of Political Climate, Shy Away from Medi-Cal*, California Healthline, Feb. 16, 2017, https://bit.ly/2KPyQbK.

having submitted incomplete applications.[18] Nationwide, in one of the worst flu seasons in memory, eight percent fewer Hispanic adults received flu shots this year than in 2016, compared to a two percent decline among all Americans.[19] As one legal resident explained to the Associated Press, "We're afraid of maybe getting sick or getting into an accident, but the fear of my husband being deported is bigger."[20]

These trends are consistent with what local governments have long known: when states and local governments engage in immigration enforcement, immigrant communities disengage from public services. After Arizona enacted SB 1070—which among other things allowed and sometimes required state and local police officers to enforce federal immigration law[21]— Mexican-origin citizens and non-citizens alike avoided basic preventive health care, including for their children.[22] Notably, even the *message* that states will engage in immigration enforcement is enough to trigger this effect. California's Proposition 187, for example, would have required all government officials to report any person using public services who was suspected of being an undocumented immigrant to federal immigration enforcement.[23] Even though Prop. 187 was immediately enjoined by a federal court, it nonetheless resulted in reduced medical care in immigrant communities—including for highly communicable diseases like

---

[18] Kelli Kennedy, *Immigration Concerns Drive Legal Immigrants Away from Public Health Care*, Christian Sci. Monitor (Jan. 22, 2018), https://bit.ly/2IxTi2z.

[19] Donald G. McNeil, Jr., *Trump, Tell Us About Your Flu Shot*, N.Y. Times, Feb. 9, 2018, https://nyti.ms/2KRM8EI.

[20] Kennedy, *supra* note 18.

[21] *Arizona v. United States*, 567 U.S. 387, 394 (2012).

[22] Russell B. Toomey, et al., *Impact of Arizona's SB 1070 Immigration Law on Utilization of Health Care and Public Assistance Among Mexican-Origin Adolescent Mothers and Their Mother Figures*, 104 Am. J. Pub. Health S28 (2014), *available at* https://bit.ly/2IbAx1w.

[23] *See LULAC v. Wilson*, 908 F.Supp. 755 (C.D. Cal. 1995).

tuberculosis.[24] Likewise, Alabama's HB 56 required, among other things, that public schools check the immigration status of all students.[25] Again, although this provision was blocked from taking effect, the U.S. Department of Justice observed that 13.4 percent of Hispanic children dropped out of school as a result, while other groups of students were unaffected.[26] And in the public health arena, when Indiana began asking women and children receiving nutritional assistance about their immigration status, enrollment immediately plunged.[27]

**B. Local policies to limit information sharing with federal immigration authorities promote trust in local governments, which is necessary to protect public safety and health.**

As the data discussed above illustrates, the mere threat of local participation in federal immigration enforcement efforts drives a wedge between local governments and their residents. But, as Philadelphia urges this court to find, local governments can mitigate the fear that drives people away from engaging in essential government services by sending a clear, unequivocal message that we will protect the information that immigrants and their loved ones provide to the police, the public health system, and schools.

Our experiences support the City of Philadelphia's proposed findings of fact that policies limiting information sharing improve public safety by fostering community trust. *See* Phila. Prop. Findings of Fact, Dkt. 201 at ¶¶ 54–62. For example, unlike many other cities, in early 2017 New York City saw no decline in crime reporting associated with ZIP codes with the

---

[24] Kari White, et al., *Impact of Alabama's Immigration Law on Access to Health Care Among Latina Immigrants and Children: Implications for National Reform*, 104 Am. J. Pub. Health 397 (2014), *available at* https://bit.ly/2G2U3eS.

[25] *See Hispanic Interest Coalition v. Governor of Ala.*, 691 F.3d 1236 (11th Cir. 2012).

[26] *Feds: Alabama immigration law caused spike in Hispanic student absences*, CNN (May 4, 2012), https://cnn.it/2IbV0U3.

[27] Emily Baumgaertner, *Spooked by Trump Proposals, Immigrants Abandon Public Nutrition Services*, N.Y. Times (Mar. 6, 2018), https://nyti.ms/2HeoMqg.

highest foreign-born or non-citizen populations.[28] This trend extended to crimes like harassment and rape, where a greater chilling effect would be expected if residents were afraid to contact the police because of immigration concerns.[29] Crimes continue to be reported—and therefore, dangerous criminals continue to be arrested and prosecuted.

Likewise, these policies ensure that residents are not afraid to access local services. *See* Phila. Prop. Findings of Fact, Dkt. 201 at ¶¶ 63–68. New York City clinics and hospitals reported no decrease in outpatient visits across population groups, including by immigrant communities.[30] Residents continue to get the medical care they need, and communicable diseases are not allowed to spread through the population unchecked. And despite the intense distress of public school students with immigrant family members,[31] there was no decrease in New York City school attendance.[32] Notably, New York City data showed immense anxiety in immigrant communities during this time period—such as huge spikes in requests for birth certificates and other vital records by families planning for the safety of their children should they be deported— but that anxiety did not cause immigrants to disengage from local service providers.

New York City officials attribute these successes to the City's policies protecting confidential information and its visibly demonstrated independence from immigration enforcement efforts. Local agencies have systematically communicated these policies to residents as part of sustained efforts to maintain trust with immigrant communities and other

---

[28] Memorandum from Sabrina Fong, N.Y.C. Mayor's Office of Immigrant Affairs to file (May 8, 2018).

[29] *Id.*

[30] *Id.*

[31] Monica Disare, *Could fear of Trump's immigration policies keep New York City students out of school?*, Chalkbeat (Mar. 1, 2017), https://bit.ly/2rxW5iu.

[32] Memorandum from Sabrina Fong, *supra* note 28.

vulnerable populations.[33] As another example, in Cook County, both the county's prosecutors and its public defenders have provided sworn declarations that forcing the county to provide federal immigration officials with information like notifications of inmate release dates would reduce cooperation with the legal system and increase violent crime.[34]

Policies regulating information-sharing help local governments credibly assure its immigrant communities that they can confidently and safely interact with government. It has taken decades to build the trust needed to prevent the disruptions to public safety and public health on display elsewhere. The DOJ would have local governments betray that trust overnight. As the Seventh Circuit recently recognized, "[s]uch trust, once destroyed by the mandated cooperation and communication with the federal immigration authorities, would not easily be restored." *City of Chicago*, 2018 U.S. App. LEXIS 9862, at *45.

Drawing a bright line separating local governments' efforts to provide services from federal activities around immigration enforcement is a well-established best practice, particularly among law enforcement organizations. The International Association of Chiefs of Police has recognized the concern that state and local police cooperation with federal immigration enforcement activities "could have a chilling effect in immigrant communities and could limit cooperation with police by members of those communities," especially in the realm of domestic

---

[33] *See, e.g.*, Cassi Feldman, *Despite Trump immigration crackdown, city tells students and families: 'We stand with you'*, Chalkbeat (Jan. 30, 2017), https://bit.ly/2rxttWz; N.Y.C. Health + Hospitals, *Seek Care Without Fear*, https://bit.ly/2G4otx1 (last visited May 7, 2018); CBS New York, *NYPD Memo Emphasizes Commitment to Immigrants* (Feb. 22, 2017), https://cbsloc.al/2L0eD2Y. *See also* Cara Buckley, *New York City Police Seek Trust Among Immigrants*, N.Y. Times (May 31, 2007) (showing length of efforts to build trust between police and immigrant communities).

[34] Brief of Amicus Curiae Cook County and other Amici in Support of Pl. Motion for Prelim. Injunction, *City of Chicago v. Sessions*, 264 F. Supp. 3d 933, No. 1:17-cv-5720 (N.D. Ill. 2017).

violence reporting.[35] Similarly, the Major Cities Chiefs Association—whose members include the 69 largest law enforcement agencies in the United States—concluded that local police efforts in support of enforcing federal immigration law "undermines the trust and cooperation with immigrant communities which are essential elements of community oriented policing."[36]

The President's Task Force on 21st Century Policing adopted a similar position. The Task Force—formed under the previous administration—engaged with a wide variety of stakeholders from across the country to formulate recommendations designed to "strengthen community policing and trust among law enforcement officers and the communities they serve."[37] The Task Force recognized that the ability of local law enforcement to build strong relationships with immigrant communities is necessary for public safety and community well-being. Thus, the President's Task Force counseled, "whenever possible, state and local law enforcement should not be involved in immigration enforcement."[38] The Task Force recommended, as a matter of good law enforcement practice, that agencies should "decouple" local policing from federal immigration enforcement, including by ending the use of notification requests by the Department of Homeland Security.[39] When Philadelphia and other local governments decline requests to notify federal immigration authorities of certain detainees' release dates, they are implementing policies supported by the best law enforcement thinking nationwide.

---

[35] Int'l Ass'n of Chiefs of Police, *Enforcing Immigration Law: The Role of State, Tribal and Local Law Enforcement*, at 5, available at http://bit.ly/2ksLZxb.

[36] Major Cities Chiefs Ass'n, *Major Cities Chiefs Association Immigration Position* (Oct. 2011), accessed May 4, 2018, https://bit.ly/2IoRh91.

[37] The President's Task Force on 21st Century Policing, *Final Report* (May 2015), at iii, 1, available at https://bit.ly/2KPn5lP.

[38] *Id.* at 18.

[39] *Id.*

Congress too has recognized that keeping personal information confidential can serve important functions. For instance, the federal government has used confidentiality guarantees to encourage people to participate in the census and pay federal taxes. *See* 13 U.S.C. § 9(a); 26 U.S.C. § 6103. Congress recognized that these goals could be better achieved by removing the threat that the information people share with the government will be used against them in a context wholly divorced from the reason they shared their information in the first place.

This, in the end, is what so-called sanctuary policies try to do. They create a zone free of immigration anxiety in which other essential government interests can be realized. In dismissing the efficacy of Philadelphia's challenged policies, the DOJ overlooks not only the proven benefits of those policies, but also the experience of similar local governments across the nation. Charged with the responsibility for protecting, teaching, and serving all of our residents, we have enacted policies to make clear to our residents that they can engage with local governments, secure in the knowledge that we will protect their confidential information and keep our services separate from federal immigration enforcement efforts to the utmost of our ability. As the front-line providers of government services, we have established that these policies are essential to our ability to engage in good and effective governance. They create safer and more prosperous communities.[40] Congress has not authorized the DOJ to use the Byrne JAG program to interfere with this local determination and cripple the ability of local governments to perform their core jobs serving all residents. And in multiple ways, from structural principles of separation of powers to the basic guaranty of dual sovereignty in the Tenth Amendment to federalism protections under the Spending Clause, the Constitution guards against that result.

---

[40] Tom K. Wong, Center for American Progress, *The Effects of Sanctuary Policies on Crime and the Economy* (Jan. 26, 2017), available at http://ampr.gs/2kxOcHX.

## CONCLUSION

The Court should enter judgment for the City of Philadelphia on all counts.


Dated:  May 31, 2018                    Respectfully submitted,

                                        */s/ Jason A. Leckerman*_____

                                        John C. Grugan (Attorney No. 83148)
                                        Jason A. Leckerman (Attorney No. 87915)
                                        Emilia McKee Vassallo (Attorney No. 318428)
                                        BALLARD SPAHR LLP
                                        1735 Market Street, 51st Floor
                                        Philadelphia, PA 19103
                                        (215) 665-8500

                                        ZACHARY W. CARTER
                                        *Corporation Counsel*
                                        *  of the City of New York*
                                        Richard Dearing
                                        Aaron Bloom
                                        Noah Kazis
                                        John Moore
                                        New York City Law Department
                                        100 Church Street
                                        New York, NY 10007
                                        Telephone: (212) 356-0840

                                        *Counsel for Proposed Amici Curiae*
                                        *City of New York, 20 additional cities and counties,*
                                        *and the United States Conference of Mayors*

14

THOMAS A. CARR
*City Attorney*
   *Boulder, Colorado*
1777 Broadway
P.O. Box 791
Boulder, Colorado 80306
(303) 441-3020
*Counsel for City of Boulder*

EILEEN M. BLACKWOOD
*City Attorney and Corporate Counsel*
   *City of Burlington*
149 Church Street, Room 11
Burlington, VT 05451
(802) 865-7121
*Counsel for City of Burlington*

CHERYL WATSON FISHER
*City Solicitor*
   *City of Chelsea*
500 Broadway, Room 307
Chelsea, MA 02150
(617) 466-4150
*Counsel for City of Chelsea*

EDWARD N. SISKEL
*Corporation Counsel*
   *of the City of Chicago*
30 N. LaSalle Street, Suite 800
Chicago, IL 60602
(312) 744-7764
*Counsel for City of Chicago*

KIMBERLY M. FOXX
*States Attorney for Cook County*
69 W. Washington, 32nd Floor
Chicago, IL 60602
(312) 603-5440
*Counsel for Cook County, Illinois*

HARRIET STEINER
*City Attorney*
   *City of Davis*
Best Best & Krieger LLP
500 Capitol Mall, Suite 1700
Sacramento, CA 95814
(916) 551-2821
*Counsel for City of Davis*

BARBARA J. DOSECK
*City Attorney*
101 West Third Street
P.O. Box 22
Dayton, Ohio 45402
(937) 333-4100
*Counsel for City of Dayton*

KRISTIN M. BRONSON
*Denver City Attorney*
1437 Bannock St., Room 353
Denver, CO 80202
(720) 865-8600
*Counsel for City and County of Denver*

AARON O. LAVINE
*City Attorney*
108 E. Green St.
Ithaca, NY 14850
(607) 274-6504
*Counsel for City of Ithaca*

MICHAEL N. FEUER
*City Attorney*
   *City of Los Angeles*
200 N. Main Street, 800 CHE
Los Angeles, CA 90012
(213) 978-8100
*Counsel for City of Los Angeles*

MICHAEL P. MAY
*City Attorney for the City of Madison*
210 Martin Luther King Jr. Blvd, Room 401
Madison, Wisconsin  53703
(608) 266-4511
*Counsel for City of Madison*

SUSAN L. SEGAL
*Minneapolis City Attorney*
350 S. 5th Street, Rm. 210
Minneapolis, MN 55415
(612) 673-3272
*Counsel for City of Minneapolis*

15

JON COOPER
*Director of Law*
One Public Square, Suite 108
Nashville, TN 37201
(615) 862-6341
*Counsel for Metropolitan Government*
  *of Nashville and Davidson County*

KATHLEEN E. GILL
*Chief of Staff for Policy and Government*
  *Affairs/Corporation Counsel*
  *City of New Rochelle*
515 North Avenue
New Rochelle, NY 10801
(914) 654-2125
*Counsel for City of New Rochelle*

BARBARA J. PARKER
*Oakland City Attorney*
One Frank Ogawa Plaza
Sixth Floor
Oakland, California 94612
(510) 238-3601
*Counsel for City of Oakland*

TRACY REEVE
*Portland City Attorney*
  *Portland City Attorney's Office*
1221 SW Fourth Avenue, Suite 430
Portland, OR 97240
(503) 823-4047
*Counsel for City of Portland, Oregon*

TIMOTHY R. CURTIN
*Corporation Counsel*
  *of the City of Rochester*
30 Church St., Room 400A
Rochester, NY 14614
(585) 428-6986
*Counsel for City of Rochester, New York*

JAMES R. WILLIAMS
*County Counsel*
  *Santa Clara County*
70 West Hedding St.
9th Floor
San Jose, CA 95110
(408) 299-5900
*Counsel for Santa Clara County*

PETER S. HOLMES
*Seattle City Attorney*
701 Fifth Avenue, Suite 2050
Seattle, WA 98104-7097
(206) 684-8200
*Counsel for City of Seattle*

FRANCIS X. WRIGHT, Jr.
*City Solicitor*
  *City of Somerville*
93 Highland Avenue
Somerville, MA 02143
(617) 625-6600, ext. 4400
*Counsel for City of Somerville*

JOHN DANIEL REAVES
*General Counsel*
  *The United States Conference of Mayors*
1200 New Hampshire Ave. NW, 3rd Floor
Washington, DC 20036
*Counsel for the United States Conference of*
*Mayors*

16