# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **THE CITY OF PHILADELPHIA** | **CIVIL ACTION** |
| **v.** | **NO. 17-3894** |
| **JEFFERSON BEAUREGARD SESSIONS III, ATTORNEY GENERAL OF THE UNITED STATES** | |

## <u>MEMORANDUM</u>

**Baylson, J.**                                                                                      **June 6, 2018**

"no place indeed should murder sanctuarize."

Hamlet, Act 4, sc 7, II, 98

"nor sleep nor sanctuary."

Coriolanus, Act 1, sc II, 19-27

"The privilege of sanctuary was as ancient as England itself and
developed from a mixture of Hebrew, Greek, Roman, Anglo-Saxon,
and Christian traditions."

Liberty to Misread:   Sanctuary and Possibility in *The Comedy of Errors*

Woodring, Vol. 28, Yale Journal of Law & the Humanities, 319, 320 (2017)

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION AND LITIGATION HISTORY SUMMARY ........................................ 1

II.    SUMMARY OF FINDINGS ........................................................ 2

III.   FACTS ........................................................................ 3

   A.  Summary of Testimony at Trial ...................................... 3

      1.  Brian Abernathy .............................................. 3

         a)  City Prisoner Information ............................ 4

         b)  ICE Detainers ........................................ 6

         c)  Advance Notice of Release ............................ 7

         d)  Prison Access ........................................ 7

      2.  Eva Gladstein ................................................ 8

      3.  Julie Wertheimer ............................................. 9

         a)  Section 1373 Issues .................................. 9

         b)  City Criminal Justice Details ........................ 11

         c)  JAG Details .......................................... 12

      4.  Matthew Gillespie ........................................... 13

         a)  Memos – February 7, 2018 and April 23, 2018 ......... 15

      5.  Commissioner Ross ........................................... 16

         a)  Training ............................................. 16

         b)  Smart Policing ....................................... 17

         c)  Budget .............................................. 17

         d)  Decrease in Crime .................................... 18

      6.  David O'Neill ............................................... 18

         a)  ICE Access to City Data .............................. 20

         b)  Prisoner Interviews .................................. 21

         c)  Custody Transfer ..................................... 22

   B.  Findings of Fact .................................................. 23

      1.  City Policies ................................................ 23

      2.  City Law Enforcement Practices .............................. 26

      3.  Prison Access ............................................... 27

      4.  Information Sharing ......................................... 27

      5.  City Supports Cooperation with all Law Enforcement Agencies ... 33

      6.  City Practices Re: ICE Request for Advance Notice of Release ... 36

7. Conclusory Findings of Fact ............................................................... 37

IV. CITY'S MOTION FOR ADOPTION OF JUDGE STRAWBRIDGE'S REPORT AND RECOMMENDATION .................................................................................. 41

V. CROSS-MOTIONS FOR SUMMARY JUDGMENT AS TO COUNTS I-III ................... 44

A. Parties' Contentions .......................................................................... 45

B. Relevant Standards ............................................................................ 46

1. Rule 56 Standard ........................................................................... 46

2. Administrative Procedure Act ........................................................ 47

C. Violation of the APA through *Ultra Vires* Conduct Not Authorized by Congress in the Underlying Statute (Count I) ...................................................... 47

1. City of Chicago v. Sessions – 7th Circuit Decision ........................ 47

2. Prior opinion of this Court: the Challenged Conditions are *Ultra Vires* ...... 49

D. Violation of Constitutional Separation of Powers (Count II) ............................ 49

E. Violation of the APA through Arbitrary and Capricious Agency Action (Count III) ...... 50

1. The Administrative Record ............................................................. 52

2. The Decision to Impose All Three Challenged Conditions Was Arbitrary and Capricious 53

VI. SPENDING CLAUSE (COUNT IV) ........................................................... 55

VII. MURPHY V. NCAA AND THE TENTH AMENDMENT – COMMANDEERING ..... 56

A. Review of Preliminary Injunction Opinion ............................................... 56

B. Murphy v. NCAA ............................................................................. 58

C. Effect of Murphy v. NCAA on Constitutionality of Section 1373 .................... 61

D. The First Alternative Conclusion re §1373 – The Text Supports the City's Contentions 65

1. The Text of Section 1373 Does Not Require Compliance with the JAG Conditions... 65

2. Cases Interpreting Section 1373:   Bologna and Steinle .............................. 66

a) Bologna ................................................................................... 66

b) Steinle ..................................................................................... 67

3. Statutory Interpretation ................................................................... 67

E. Second Alternative Conclusion re §1373 – The City Complies with the JAG Conditions 68

1. Demore v. Kim, 538 U.S. 510, 513 (2003) .......................................... 69

2. Jennings and Dimaya .................................................................... 70

3. City Complies with § 1373 .............................................................. 73

VIII. STANDARD FOR PERMANENT INJUNCTION AND STANDARD OF REVIEW... 78

A. Permanent Injunction Standard ........................................................... 78

B.    Arguments of the Parties.................................................................................... 79

C.    Injunctions Against Unconstitutional Grant Conditions.................................... 79

D.    Irreparable Harm ............................................................................................... 80

IX.    DECLARATORY JUDGMENT ................................................................................ 84

X.    MANDAMUS........................................................................................................... 85

XI.    CONCLUSIONS OF LAW ...................................................................................... 88

XII.    CONCLUSION......................................................................................................... 89

I.      INTRODUCTION AND LITIGATION HISTORY SUMMARY

As sailors in Homer's "The Odyssey" seeking to avoid the mythical sea monsters Scylla and Charybdis as they travel to the island of Thrinacia, Philadelphia seeks to avoid having to confront the choice between two alternatives which it finds undesirable.   To Philadelphia, Scylla represents compliance with a federal statute requiring that the City issue no guidance restricting its police and other officials from sharing information about the immigration status of City residents, while Charybdis represents $1.6 million that Philadelphia would use to provide vital resources to bolster its local criminal justice prerogatives.   In Greek, this is referred to as *δίλημμα*—a "dilemma," or a "double proposition"—which offers two unacceptable alternatives.   Below, this Court lays out a full explanation of why Philadelphia need not make this "Hobson's Choice," and in any event, can steer safely to Thrinacia, accepting the $1.6 million without compromising its local objectives.

The City of Philadelphia filed this lawsuit seeking to enjoin Defendant, United States Attorney General Jefferson Beauregard Sessions, III, from imposing three separate immigration-related conditions on the receipt of grant funds under the Edward Byrne Memorial Justice Assistance Grant (JAG) Program, a federal program providing financial assistance to states and cities for criminal justice.   Under the Byrne program, grants are determined by a formula, and funds have already been appropriated by Congress.   In fiscal year 2017, Philadelphia would have been entitled to $1.598 million, which it planned to allocate, among other things, to equipping police officers with Narcan to counteract opioid overdoses.

The three conditions on Byrne grants the City challenges are as follows:

   a.  The City must provide to the U.S. Immigration and Customs Enforcement (ICE) access to City prisons to interview individuals of interest to ICE.

      b.    The City must provide advance notice to ICE of release from City prisons of aliens whose "scheduled release date and time" ICE requests.

      c.    The City must certify compliance with 8 U.S.C. § 1373, a statute which purports to prohibit the City from restrictions on disclosure of information as to the citizenship or immigration status of any "person."

The City also sought a declaration that it complied with 8 U.S.C. § 1373, as lawfully construed, and a writ of mandamus requiring the Attorney General to fund the City its full grant award.   The City moved for a preliminary injunction ("PI"), and after an evidentiary hearing, the Court granted the injunction.   <u>City of Philadelphia v. Sessions</u>, 280 F. Supp. 3d 579 (E.D. Pa. 2017).[1]   The 7th Circuit Court of Appeals has affirmed a similar PI entered by the Chicago district court, citing and relying on this Court's PI opinion.

The Court then required the parties to engage in fact discovery, which took place, in part, under Judge David Strawbridge, appointed as a Master, who filed a Report and Recommendation, discussed below.

Following a four-day trial and submission of post-trial briefs, this opinion makes findings of fact and conclusions of law on all issues and the Court will grant equitable relief, in favor of the City.

## II.    SUMMARY OF FINDINGS

1.    The public statements of President Trump and Attorney General Sessions, asserting that immigrants commit more crimes than native-born citizens, are inaccurate as applied to Philadelphia, and do not justify the imposition of these three conditions.

2.    The Attorney General did not follow established law in promulgating the first two conditions.

---

[1] Defendant filed an appeal from this decision, but the Court has been advised that briefing on the appeal has been delayed, apparently because the Third Circuit, having been advised of the imminence of this Court's final judgment and decree, has delayed the briefing on the appeal from the preliminary injunction.

3.     As to the third condition, certification of compliance with Section 1373, the Court finds:

        a.     The Attorney General did not follow established law in promulgating this condition;

        b.     The Supreme Court's recent opinion in <u>Murphy v. NCAA</u> renders it unconstitutional;

4.     The Court alternatively finds:

        a.     As to the first two conditions:

               i.     The City provides ICE access to City prisoners if the prisoner consents after being advised of their right to counsel;

              ii.     The City has agreed to give advance notice of release of criminal aliens if ICE secures a judicial order, which ICE can easily obtain by coordination with the United States Attorney's Office for this district.

        b.     The plain language of Section 1373 does not independently require the City to comply with the first two conditions;

        c.     Nevertheless, the City complies or substantially complies with all three conditions.

5.     The City has proven it will suffer irreparable harm if the conditions are not enjoined.

6.     The City is entitled to prompt payment of the JAG funds.[2]

## III.    FACTS

### A.    Summary of Testimony at Trial

#### 1.    Brian Abernathy

Brian Abernathy, First Deputy Managing Director of the City of Philadelphia, testified that

---

[2] This memorandum will incorporate by reference three topics discussed in detail in the PI Opinion: First, description of the "Byrne JAG Program," 280 F. Supp. 3d at 593, second, a lengthy discussion entitled "The Intersection Between Criminal Law and Immigration Law," <u>Id</u>. at 625-638, and third, "substantial compliance." <u>Id</u>. at 651-654.

he is responsible for overseeing "everything you would think of as City government," including public safety, community services, and health and human services.   (4/30/18, "Day 1 Tr." 6:5-12). He oversees the Philadelphia Department of Prisons and the Police Department, which take up 50% or more of his time.   (Id. 151:5-11).   Throughout his testimony, he frequently described the need to establish trust with Philadelphia residents so that individuals feel free to report crimes and utilize City services, while at the same time maintaining the City's law enforcement relationship with ICE, with which it partners on a number of matters, including drugs and human trafficking. (Id. 11:9; 144:18-23).   He is personally notified if an immigration detainer is lodged against an individual in city custody, and testified to reviewing some 165 immigration detainers since January 2017.   (Id. 155:10-18).

Mr. Abernathy testified to meeting regularly with representatives of the immigrant and advocate communities, and stated that in his experience, immigrants perceive City government as highly integrated; he speculated that "if individuals felt like we were sharing immigration information through the police department…they would be hesitant to engage in the Health Department or even the library."   (Id. 44:12; 54:14-17).   He speculated about the potential health and safety implications if immigrants were not to avail themselves of the City Fire Department, public health services, or if they were to circumvent licensing and inspection processes in areas like construction.   (Id. 46:15-52:13).

### a)      City Prisoner Information

Mr. Abernathy testified that 81.5% of the City's prison population has not been sentenced and therefore lacks a release date.   (4/30/18, "Day 1 Tr." 65:9-10).   These individuals may be released from City custody despite having no set release date, such as if they post bail; Mr. Abernathy testified that the Department of Prisons attempts to release individuals in such cases

within four hours.   (Id. 74:3-9).   He also testified that a "substantial portion" of individuals who enter police custody are released directly from the Police Detention Unit.   (Id. 75:9).

Mr. Abernathy testified that he is familiar with various City policies regarding the treatment of immigration status information.   He testified to being aware that police officers are trained in the requirements of Police Commissioner Memorandum 01-06 and Executive Order 8-09 during a Philadelphia-specific training module at the police academy.   (Id. 9:4; 10:14). When new City guidance is introduced, it is read out at roll call for every police shift for three consecutive days and then posted at police precincts "for all to see."   (Id. 9:7-9:11).   City police officers are not trained on 8 U.S.C. § 1373 specifically because, Mr. Abernathy testified, it was "not practical" and Section 1373 "shouldn't affect how an officer does their job."   (Id. 64:12-18). He testified that Police Commissioner Memorandum 01-06 did not prevent an officer from disclosing to ICE the immigration status of an undocumented immigrant suspected of a crime, and Executive Order 8-09 did not prohibit the disclosure to ICE of the whereabouts or home address of an undocumented person.   (Id. 12:13; 15:8).   Mr. Abernathy clarified that while it was not the police department's practice to collect individuals' citizenship or immigration status information, officers were not prohibited from sharing that information if they somehow learned it.   (Id. 163:1-3; 20:19).   He was not aware of any disciplinary action against any of the City's approximately 6,500 police officers for violating a confidentiality policy.   (Id. 61:5-9).

Mr. Abernathy, who had testified at length at the preliminary injunction hearing regarding the City's participation in various databases, testified that the City employs a database called "Lock and Track" to keep track of individuals in the City prison system.   (Id. 22:10-13).   Lock and Track contains information such as an individual's name, biographical information, location, charges, and the like.   When arrested individuals enter the custody of the Department of Prisons, a

5

City official collects their self-reported citizenship information, which Mr. Abernathy acknowledged was often inaccurate, and enters it into Lock and Track.   (Id. 21:12-22:6).

From 2004-16, ICE had access to the citizenship information available in the City's Lock and Track system, and Mr. Abernathy stressed that if ICE were to request that access be restored, the City would allow ICE access again.   (Id. 22:15-19; 27:10-13).   ICE could access citizenship information either through a daily e-mail sent by the City or through a portal.   (Id. 26:13-18). The City shut down the portal and ceased providing the daily e-mail in 2016 when it realized that the portal had not been accessed in a long time.   (Id.)

### b)   ICE Detainers

Immigration detainers received from ICE are entered into an individual's Lock and Track "jacket," and a paper copy of the immigration detainer is kept in that individual's physical file. (Id. 30:24-31:7).   Mr. Abernathy testified that ICE detainers are "generally" sent to City prisons, but sent "at times" to police districts; he testified that it would not surprise him to hear that 16 out of 67 detainers since January 2017 had been sent to police precincts.   (Id. 27:14-18; 130:23).   At present, detainers "follow" an individual such that if he is transferred to state custody, the state will be aware that he has a pending immigration detainer.   (Id. 31:21-32:2).   Mr. Abernathy testified to some "confusion" regarding whether a detainer would "follow" an individual—such that a subsequent holding facility, such as a state prison, might not be aware of the pending detainer—but stated that he clarified the policy in a memo to the Director of the Bureau of Prisons dated March 29, 2018.   (Id. 140:8-141:2).   He admitted that the City had not done anything to ensure that other facilities that had received inmates from Philadelphia before March 29, 2018 were notified of pending detainer requests.   (Id. 141:3-19).

### c)   Advance Notice of Release

Mr. Abernathy also repeatedly testified that the City only provides advance notification of an individual's release to ICE, in response to an immigration detainer lodged by ICE, when the City receives a criminal judicial warrant in addition to the detainer.   (Id. 82:20-25).   He testified to the contents of Executive Order 5-16, about which he had testified at the preliminary injunction hearing, and reiterated that pursuant to his memorandum to the Director of the Bureau of Prisons, the City's policy was to honor all criminal warrants, although he admitted that the City had failed to honor a federal criminal judicial warrant on one occasion.   (Id. 33:25-34:2; 35:22-36:13; 32:19-20).   The City also honors all detainers from other states made pursuant to criminal warrants, and holds individuals at City prison facilities for pickup by law enforcement from other jurisdictions, which Mr. Abernathy testified is a "safer transfer."   (Id. 98:18-99:6; 106:11-21).

Mr. Abernathy stated that on five occasions between the issuance of Executive Order 5-16 and his March 22, 2017 clarifying memo, he had personally informed ICE of the pending release of an inmate charged with "serious felony 1 charges" including rape, attempted murder, and criminal conspiracy—despite the absence of a federal criminal judicial warrant.   (Id. 102:15-103:3).   Mr. Abernathy acknowledged that his actions violated City policy, and that no City policy provided for such a case-by-case determination.   (Id. 103:8-10; 105:2-4).

### d)   Prison Access

When asked about requests from ICE to interview inmates, Mr. Abernathy described the interview form about which he had testified to at length at the preliminary injunction hearing.   He testified that the City had instituted the form, which allows ICE interviews only if an inmate consents in writing, because ICE is the only law enforcement agency investigating primarily civil matters; the City was concerned about the large proportion of individuals who would not be able to

7

afford an immigration lawyer, and wished to inform them of their rights.   (Id. 159:19-160:7).  Mr. Abernathy posited that if another federal civil enforcement agency, such as the IRS or OSHA, were to seek to interview inmates, the City might adopt a similar form.   (Id. 160:9-12). However, if ICE sought an interview with an individual in connection with a criminal matter, Mr. Abernathy testified, the individual might or might not be provided with the form.   In the year prior to the adoption of the form, ICE had requested to interview approximately six inmates, and the interviews had taken place.   (Id. 45:17-19; 116:25).   In the year or so following the adoption of the consent form, ICE had requested to interview six inmates, but no interviews took place because three individuals declined consent, and the remaining three requested to be interviewed in the presence of an attorney.   (Id. 45:3-16).

Throughout his testimony, Mr. Abernathy repeatedly stated that ICE has become more "aggressive" in its tactics in the past year or so.   This has made his job of trying to keep Philadelphians safe and reducing crime, by maintaining law enforcement partnerships while encouraging the community to avail itself of public services of many kinds, including police, "more difficult than it should be."   (Id. 38:14; 148:6-7).

### 2.   Eva Gladstein

Eva Gladstein also testified at the trial.   (See 5/10/18, "Day 4 Tr." 64:6-77:2).   Ms. Gladstein is the deputy managing director of Health and Human Services for the City.   (Id. 64:12-14).   No department that she oversees applied for Byrne JAG grant funding in FY2017. (Id. 66:1-4).

Ms. Gladstein testified that Philadelphia residents can use the City's services without regard to immigration status.   (Id. 65:13-18).   Because some of these services are stigmatized—e.g., substance abuse treatment services—the City has sought to establish trust with

the immigrant communities to ensure that immigrants, like other Philadelphia residents, are able to use the City's services.   (Id. 71:19-72:3).   Ms. Gladstein believes the City's confidentiality policy enables such trust.   (Id. 71:11-18).   Ms. Gladstein credibly testified that immigrants would be less likely to use the City's services if they feared that their immigration status would be readily revealed to ICE as a result, and that City residents do not easily distinguish between departments of the City government.   (Id. 74:4-10).

### 3.    Julie Wertheimer

Julie Wertheimer testified that she is the Chief of Staff for criminal justice in the City's Managing Director's office.   (5/1/18, "Day 2 Tr." 5:3-6).   Her testimony at the trial was in significantly greater detail than at the PI hearing.   As part of her role she oversees all of the City's criminal justice grants, including the JAG grant.   (Id. 5:20-22).   Ms. Wertheimer stated that she works with the Department of Justice's Office of Justice Programs, and in particular with a program officer named Sam Beamon, who serves as the City's point of contact within the DOJ with respect to executing grants.   (Id. 5:25-6:14).   In particular, Ms. Wertheimer consults with Mr. Beamon with respect to budget modifications and extensions, and to ensure the City is meeting the requirements of a particular grant.   She testified that an individual named Corey Randolph is Mr. Beamon's direct supervisor.   (Id. 5:15-17).

Over time working with Mr. Beamon in this capacity, he has assisted Ms. Wertheimer in interpreting JAG grant requirements, including a special condition related to controlled expenditures, and a special condition of a public comment requirement.   (Id. 8:7-15; 10:5-22; 11:4-7, 19-22).

### a)    Section 1373 Issues

Ms. Wertheimer testified that she learned of the DOJ's determination that the City is not in

compliance with Section 1373 in an email from Tracy Troutman in October of 2017.   (5/1/18, "Day 2 Tr." 6:20-7:4).   This was followed by a phone conversation she had in November with Mr. Beamon regarding the October 27th deadline for the City to submit its certification that it is in compliance with Section 1373.   (Id. 7:19-20).   During this conversation Ms. Wertheimer asked Mr. Beamon what the next steps would be with regard to the JAG grant, and Mr. Beamon "indicated that he basically had no idea what was going on with the process."   (Id. 7:21-25).

Ms. Wertheimer testified that she spoke with Mr. Beamon on the phone after the solicitation for the FY 2017 JAG grant was released, and he stated that he was not aware that it had been released and that neither he nor anyone in his chain of command was aware of the new conditions.   (Id. 15:12-17).   Ms. Wertheimer requested assistance from Mr. Beamon in regards to interpreting the condition requiring compliance with Section 1373, and for the first time, he was unable to offer any clarifying guidance related to a special condition.   (Id. 12:1-9; 13:7-13).   She further stated that she assumed that Mr. Randolph did not have any additional clarifying information—though she never spoke with him by phone to confirm this—because in the past when Mr. Beamon has been unable to assist with interpreting conditions he has referred Ms. Wertheimer to Mr. Randolph for this purpose, and he did not do that in this situation.   (Id. 15:12-21; 16:1-4; 17:4-11).

The DOJ sent the City a guidance document regarding compliance with Section 1373 on July 7, 2016, which stated that this condition "does not impose on states and localities the affirmative obligation to collect information from private individuals regarding their immigration status, nor does it require that states and localities take specific action upon obtaining such information."   (Id. 18:2-22).   Ms. Wertheimer also stated that this document, like other guidance documents provided by OJP at the time, did not clarify that citizenship or immigration status

10

information includes addresses, whereabouts, or inmates' release dates.   (Id. 20:3-20; 23:5-15; 25:11-14).

Ms. Wertheimer also asked Mr. Beamon for guidance regarding the jail access and advance notice conditions attached to the City's Fiscal Year 2017 JAG Award.   He told her that these issues would be resolved at a later date and did not offer specific guidance about what was required.   She assumed that he was not clear on how to interpret the conditions.   (Id. 25:15-27:17).   Ms. Wertheimer compared this situation to others, in which new conditions have been attached to federal grants to the City and Mr. Beamon has been able to help the City determine what it needed to do to comply with those conditions.   (Id. 28:11-29:10).

Ms. Wertheimer testified that she first learned that the three new conditions would be attached to the City's Fiscal Year 2017 JAG award when the DOJ posted a notice about it in July, 2017 on their website.   (Id. 30:10-31:4).   The solicitation for applications was posted on August 3rd, 2017, and included reference to the three new conditions.   Ms. Wertheimer stated that she has never seen a condition included in a solicitation that was not then included in the final award document, and that she had no reason to question whether these three new conditions would be include in the final JAG award documents for FY2017.   (Id. 32:11-24).

### b)   City Criminal Justice Details

Ms. Wertheimer is familiar with the City's criminal justice data management systems including CPCMS, or, Common Pleas Case Management System.   She said that it operates by the Office of Judicial Records updating docket information for individual cases typically within three to four hours of the occurrence of new events; at the most she indicated that it is always updated within 24 hours.   (5/1/18, "Day 2 Tr." 33:11-34:18).   Ms. Wertheimer noted this is a public database, and characterized it as a very reliable system that is widely relied upon and used by the

11

public including reporters.   (Id. 34:20-24).   CPCMS includes case status information, confinement information, and bail information.   (Id. 34:25-25:21).

### c)   JAG Details

Ms. Wertheimer testified that she has worked on the JAG grant disbursement for eight years.   Once awarded, the City returns a copy to the DOJ, as well as sending a copy to the City Financial Department, which sets up a grant profile and an "index code," after which the funds for the grant are appropriated.   (5/1/18, "Day 2 Tr." 36:5-18).

Ms. Wertheimer explained that the City uses the term "unobligated" in its financial reporting regarding DOJ grants in order to indicate funds that have not been spent.   (Id. 36:22-37:14).   This term, she clarified, does not mean that the funds are actually unobligated, and the DOJ is aware of that as a result of past practice and communication with the City; Ms. Wertheimer explained, "that's our practice and that's a practice that our program officer, not only our JAG program officer but all our DOJ program officers are aware of."   (Id. 37:13-19).

Ms. Wertheimer stated that the reason all of the City's 2016 JAG funds had been unobligated as of December, 2017, is because the City was concerned about the DOJ's statements that the City may be required to pay back those funds, and the City is not in a position to do that. (Id. 37:20-38:12; 38:18-20).   The City has since moved to obligate all of the funds, she stated. (Id. 378:21-24).   While the OJP provided guidance stating that these funds would not be clawed back, the City remained concerned that they could be as a result of Attorney General Sessions' public statements to the contrary—including a March 27, 2017 press release.   (Id. 75:2-17; 77:2-8).

The City has not funded any of the projects that it intended for Fiscal Year 2017 JAG funds through other funding sources.   (Id. 39:10-12).   Ms. Wertheimer stated that that City needs every

dollar that it has, and the reason it seeks grant money is so that it will not have to cut off funding to competing interests and other important purposes such as public libraries in order to respond to criminal justice and public safety needs.   (Id. 53:4-23).   Philadelphia is the poorest big city and it is stretched thin.   (Id. 86:22-87:8).

Ms. Wertheimer clarified that the JAG grant is structured as a multi-year grant, meaning that the City receives a new allocation each fiscal year, that allocation is backdated one year, and then the City has about a three year additional period for execution; as such the City has not expended the full amount of the 2015 award yet.   (Id. 57:6-58:10; 81:9-19).

### 4.     Matthew Gillespie

Lieutenant Gillespie has been a police officer for fifteen years in Philadelphia, and is currently a Lieutenant in the Philadelphia Police Department as well as the Commanding Officer of the Police Detention Unit—colloquially referred to as the "Roundhouse" or the "PDU." (4/30/18, "Day 1 Tr." 173:6-7; 174:9-10).   The PDU is the largest temporary holding facility in Philadelphia, processing nineteen to twenty thousand arrested people each year.   (Id. 173:9-11). However, it is just one of the five divisional booking centers that process Philadelphia arrestees. (Id. 175:6).

Lt. Gillespie testified that, following an arrest, an arrestee is brought to one of the five divisional booking centers, where the PPD engages in its intake procedure.   (Id. 176:1-3).   After a few hours, the defendant's fingerprints are taken by unsworn civilian corrections officers.   (Id. 176:10-13; 178:13-17).   The delay is due to the fact that the arresting officer or assigned investigator must first fill out a report on the police arrest report system ("PARS"), in which the facts of the case, arresting officer's information, and defendant's biographical information (including "place of birth") are all recorded.   (Id. 176:14-177:13).   The defendant's fingerprints

13

are digitally transmitted to the PPD Records and Identification Unit via the automatic fingerprint information system ("AFIS").   (Id. 179:1-7).   Then, the Records and Identification Unit works with the Pennsylvania Crime Information Center to verify who the person is and determine if the person has any outstanding criminal warrants.   (Id. 179:8-13).   If there is a "hit" for an immigration violator file, but there is no other reason for detaining the defendant, PPD will notify ICE.   (Id. 196:23-197:6).

The District Attorney's Office then reads the facts of the case, and determines if the arrest report will be approved.   (Id. 181:10-12).   If the arrest report is disapproved, the District Attorney's Office calls the PDU and tells them to release the defendant.   (Id. 181:13-15).

Lt. Gillespie testified that, after the arrest report is approved, the PDU coordinates with the bail commissioner to arrange an arraignment for the defendant, which occurs several hours later. (Id. 182:19-22).   Approximately six times per day, a group of arrestees see the bail commissioner through closed circuit television.   (Id. 184:8-11).   If bail is set, the defendant is given two to three hours to have that bail paid.   (Id. 185:14-16).   After the defendant makes bail, he is released, on average, within two hours.   (Id. 188:1-4).   If the bail commissioner does not allow the defendant to post bail, or the defendant fails to post bail, he is transferred to the City's Curran-Fromhold facilities on State Road.   (Id. 186:20-22).   Approximately eleven thousand of the nineteen thousand arrestees who are processed at the PDU are subsequently transferred to the State Road facilities.   (217:22-23).   The average amount of time that someone spends at the PDU is fourteen hours.   (Id. 188:18-25).

In the past two years, Lt. Gillespie stated that he has seen two ICE detainers accompanied by a criminal judicial warrant.   (Id. 189:14-16).   In both cases, the defendants were transferred to federal custody at the State Road facilities after going through the local arrest process.   (Id.

189:20-21).   Anytime ICE calls the PDU and asks if a specific person is in the PDU, PPD will inform them that the person is in custody at the PDU, but will not give advance notice of their release unless there is a judicial warrant.      (Id. 210:12-16).

### a)    Memos – February 7, 2018 and April 23, 2018

Lt. Gillespie was asked about a memorandum that he circulated to the PDU staff on February 7, 2018 (the "Gillespie Memo").   He had sent the memorandum as a result of being notified in late January, 2018, that ICE agents had been stationed in the parking lot outside the PDU requesting to speak with prisoners detained inside.   (Id. 199:3-15).   The memorandum cited Executive Order 5-16, and stated that the City would not comply with detainer requests—including requests for interviews—unless they are supported by a judicial warrant and pertain to an individual being released after conviction for a first or second-degree felony involving violence.   (Id. 200:4-9).   However, Lt. Gillespie stated that the City now honors all detainers supported by judicial warrants, irrespective of the offense for which an individual had been charged or convicted.   (Id. 200:11-23).

Lt. Gillespie was later informed by his supervisor, Deputy Commissioner Coulter, that he should clarify the PDU's policy with a new memorandum, which was issued April 23, 2018. (Id. 201:4-14).   The new memorandum superseded the prior Gillespie Memo, and stated, among other things, that for criminal investigations, ICE is permitted to interview PDU detainees.   (Id. 200:15-21).

Lt. Gillespie stated that changing the PDU's policy to allow ICE agents to conduct civil immigration interviews would hinder the arraignment process and increase the level of tension that the PDU staff would have to endure while at work, as prisoners might express frustration at the prospect of deportation.   (Id. 203:2-204:2).

15

### 5.    Commissioner Ross

Philadelphia Police Commissioner Ross testified that in his role as Police Commissioner he is responsible for training police officers.  He indicated several means used for training, including training at the Police Academy, in-service training, and police teletype, which is the communication of policies by sending them to officers electronically.  (5/10/18, "Day 4 Tr." 38:2-40:7).  He stated that police are trained on all Police Commissioner memoranda and policy directives, and that police are expected to comply with all such memoranda and directives.  (Id. 7:11-17).  Commissioner Ross agreed that when policies and memoranda offer a clear rule, the expectation is that police will follow it completely, but that policies cannot capture every situation.  (Id. 7:18-8:6).

#### a)    Training

Commissioner Ross stated that no police training specifically references Section 1373, other than the Mayor's Executive Order.  (5/10/18, "Day 4 Tr." 9:6-15).  Police are, however, trained on their interactions with federal partners.  (Id. 10:9-12).  With respect to the City Executive Order stating that the police department will not comply with ICE civil immigration detainers unless supported by a judicial warrant, Commissioner Ross clarified that that refers to a criminal warrant and that this policy is consistent with how the police department does business generally.  (Id. 10:19-25; 11:1-17; 12:17-22).  Commissioner Ross explained that Philadelphia police officers across the board have an understanding that they must comply with judicial warrants signed by judges, and that they consistently do comply with such warrants.  (Id. 13:1-18; 14:10-14).  He stated that the police department would respect any federal judicial warrant signed by a judge, however he does not believe that there are any such warrants relating to civil matters.  (Id. 49:17-24; 58:7-59:8).

16

### b)    Smart Policing

Commissioner Ross testified to some extent as he had at the PI hearing, that the City has a big problem with criminality, and that to respond the police must cultivate relationships with residents.   ICE being aggressive over the past year has made this much harder for the City and the police department.   (5/10/18, "Day 4 Tr." 14:17-25; 15:1-9; 25:7-21; 31:11-19).   At the same time, he said cooperation with federal partners absolutely is in line with "smart policing."   (Id. 32:23-33:9).   Commissioner Ross stated that he is aware of the issue of Brian Abernathy violating Executive Order 5-16 by providing advance notice to ICE about the upcoming release of offenders without a warrant.   (Id. 24:17-25:2).   He further stated that there is no policy forbidding communication with ICE when an alien is suspected of a crime or is convicted of a crime.   (Id. 17:1-6).   ICE would be able to discover the facts underlying a crime for which a person was arrested via PARS or NCIC, and there is no policy prohibiting police from sharing this information with ICE, or from sharing the fact that a particular person is in police custody.   (Id. 35:8-36:8).

Commissioner Ross explained that offender-focused policing deals with focusing enforcement efforts on chronic offenders, and agreed that sometimes it is useful to focus on people who have committed crimes in the past in order to promote public safety.   (Id. 20:17-21:8).

### c)    Budget

Commissioner Ross testified that the Philadelphia Police Department's budget was recently increased as a direct and essentially mandated result of an increase in personnel compensation through collective bargaining.   (5/10/18, "Day 4 Tr." 29:14-24).   Technically, he stated, he could have requested a larger budget increase, but he would not have been likely to receive it.   (Id. 53:18-55:2).

17

#### d)   Decrease in Crime

Commissioner Ross testified that the 2016 crime statistics in the City are at a 40-year low, and that he attributes this in large part to smart policing strategies, particularly relationships with the community, including the immigrant community.   (5/10/18, "Day 4 Tr." 40:10-42:5). Commissioner Ross strongly disputed the accuracy of statements made by President Trump and Attorney General Sessions regarding immigrants being a major source of crime in large cities. Those statements do not apply to Philadelphia.   (Id. 42:15-47:18).   The major source of crime in Philadelphia are people who were born and raised here.   (Id.).

#### 6.   David O'Neill

David O'Neill, assistant director at the Philadelphia field office of Immigrations and Customs Enforcement (ICE), testified for Defendant.   The Philadelphia field office oversees ICE operations in Pennsylvania, Delaware, and West Virginia.   (5/1/18, "Day 2 Tr."   126:9-10). The Philadelphia ICE office oversees many programs, including the criminal alien program, the fugitive operations program, the non-detained docket, and the alternatives to detention docket. (Id. 129:1-4).

The criminal alien program is one of the "biggest responsibilities" for the Philadelphia field office, and is "designed to identify, locate, and apprehend aliens that are in a state, local, or federal jail or prison" and ultimately remove them from the country by "taking them into custody upon the completion of their criminal sentence and place them in removal proceedings."   (Id. 129:6-11).   When asked to define the term "criminal alien," Mr. O'Neill testified that he had seen the term used to refer both to non-citizens who had been convicted of crimes, as well as to those who had merely been charged.   (Id. 176:10-13).

The Philadelphia field office apprehended some 3,000-5,000 individuals last year, some of

18

whom had no convictions or convictions for only non-violent offenses.   (5/2/18, "Day 3 Tr." 56:13-57:2).   Mr. O'Neill testified to being familiar with a memo issued in early 2017 by then-Homeland Security secretary John Kelly, which established as a priority executing immigration laws against all removable aliens.   (Id. 47:5-48:20).

Mr. O'Neill testified that ICE primarily learns of persons of interest through the Secure Communities program.   (Day 2 Tr. 131:15-16).   Since the adoption of the Secure Communities program in 2008 or 2009, Mr. O'Neill testified, the FBI checks biometric fingerprint information in its database, NCIC—which includes biometric data sent by local law enforcement agencies such as the Philadelphia Police Department—against the biometric information in the Department of Homeland Security (DHS) database, known as IDENT.   (Id. 131:19; 158:24-159:12).    If there is a match, the FBI informs ICE that an individual was arrested and that there was an IDENT match. (Id. 159:15-18).   Mr. O'Neill testified that ICE receives this information within an hour after fingerprints are sent to the FBI by the arresting agency.   (Day 3 Tr. 81:15-82:2).   The majority of the information in IDENT comes from encounters with various parts of DHS, such as applying for a visa.   (Day 2 Tr. 154:21-155:2; 157:10-14). Thus, someone who crossed the border illegally, and had no prior encounters with law enforcement, would not have biometric information in IDENT.   (Id. 132:14-17).

When asked about the relationship between the Philadelphia ICE office and City government, Mr. O'Neill described a good relationship at the officer level, but "not very good" relations between the respective "management."   (Day 2 Tr. 162:23-25).   Mr. O'Neill testified that relations had been better prior to former Mayor Nutter's original Executive Order.   (Id. 163:5-6).   He testified to being aware of Mayor Kenney's Executive Order 5-16—which, he testified, then-DHS Secretary Jeh Johnson had traveled to Philadelphia to try to persuade Mayor

19

Kenney to change.   (Day 3 Tr. 97:7-18).   Mr. O'Neill testified to being unfamiliar with various other City policies, such as the exception to the police department confidentiality policy for criminal suspects.   (Id. 103:15-104:9).

<b>a)   ICE Access to City Data</b>

Previously, ICE received daily e-mails containing an "automated list of all the intake and…exit" from the City's prison system, which contained individuals' citizenship and place of birth.   (Day 2 Tr. 147:14-148:10).   After receiving the e-mails, Mr. O'Neill testified, ICE would compare the information against "checks" it had already done and individuals it had already encountered through PARS or Secure Communities, and if those individuals had not been encountered, ICE would try to identify them.   (Id. 148:16-22).   ICE stopped receiving the daily e-mails "about a year ago"; Mr. O'Neill assumed that the cessation had to do with Mayor Kenney's Executive Order, but had not reached out to the City about resuming the e-mails.   (Day 2 Tr. 150:14-19; Day 3 Tr. 23:19).

Mr. O'Neill testified that ICE has access to PARS, the City's real-time database, which tracks individuals through the process of the criminal system.   (Day 2 Tr. 133:3-4).   Mr. O'Neill testified that PARS, which does not contain information on City prisons, contains an individual's self-reported country of birth, and did not dispute Plaintiffs' counsel that PARS listed whether someone is "awaiting release."   (Id. 133:24-25; Day 3 Tr. 10:6-14).   A designation of "awaiting release" did not provide an exact time of release, Mr. O'Neill noted.   (Day 3 Tr. 11:12-13).   PARS does not automatically update ICE when someone not born in the United States is entered into PARS or proceeds to the next stage; rather, ICE has to look manually, and Mr. O'Neill testified that ICE checks PARS daily.   (Day 2 Tr. 133:17-21; 146:12).   Mr. O'Neill testified that the most useful piece of information from ICE's point of view, is when ICE can use it to apprehend

20

someone, and the City's failure to provide that information "impair[ed] ICE's mission."   (Id. 216:9-24).   Although ICE has officers at the state prison intake center at Camp Hill, Mr. O'Neill testified that if a detainer does not follow an individual from the City, ICE must regenerate the detainer, resulting in duplicative work.   (Day 3 Tr. 31:4-6; 98:15-17; 111:2-13).

### b) Prisoner Interviews

Mr. O'Neill testified to the importance of being able to interview inmates to determine whether they are removable and whether they might, for example, have medical issues that ICE might need to accommodate during detention.   (Day 2 Tr. 218:3-9; 227:24-25).   He testified that his office seeks to generate a detainer as soon as possible, and to lodge the detainer prior to an individual's release.   (Day 2 Tr. 165:5-11).   Mr. O'Neill testified that, for this reason, ICE liked to interview individuals at the Police Detention Unit (PDU) at the Philadelphia Police Department because it is the first place they are taken after arrest, but estimated that 50% of individuals were released directly from the PDU.   (Day 2 Tr. 165:1-166:1).   In the past, ICE had regularly interviewed individuals at the PDU, but their ability to do so had been impeded by the issuance of the Gillespie Memo.   (Id. 225:19-226:24).   Mr. O'Neill also testified that the consent form instituted at the Department of Prisons had impeded ICE's ability to interview inmates.   (Id. 223:10). By contrast, the Federal Detention Center allows interviews, honors immigration detainers, and provides advance notice of release.   (Day 2 Tr. 228:9-10; 230:16-23).

When posed with a hypothetical about a visa over-stayer who was convicted of rape but sentenced to less than two years, Mr. O'Neill testified that ICE could not get a federal criminal warrant because there would be no crime to charge, and no court issues warrants for deportation proceedings, which are instead initiated by a notice to appear.   (Id. 170:3-171:18).   When ICE seeks a federal criminal warrant—which it most often does for the crime of entry after

deportation—it must first go through the U.S. Attorney's Office and then get the warrant signed by a federal magistrate judge.   (Id. 169:8-23).   Mr. O'Neill provided an example in which ICE did not get a signed warrant for four days after lodging a detainer, but admitted on cross-examination that that had included a weekend.   (Day 3 Tr. 100:11-101:5; 108-21-109:17).

### c)      Custody Transfer

Mr. O'Neill described the process of custody transfer at a jail.   Typically, ICE arranges a time with the local facility to take custody of an individual, sends two officers and a vehicle to a secure part of the facility, receives the individual's belongings and medical records, possibly fills out some paperwork, switches handcuffs, and escorts the individual to a vehicle.   (Day 2 Tr. 186:6-22).   Mr. O'Neill stated that his office prefers to take custody of individuals at jails, because he considers it the safest and most efficient way to make the transfer.   (Id. 186:1-5). Apprehending individuals in the field is a less "smooth operation," such as if someone resists arrest or officers get into foot chases, and Mr. O'Neill was concerned about the risk of injury to officers.   (Id. 213:25-214:8).   ICE also sends more officers for apprehension of individuals in the field; if seeking entry to a house, ICE typically sends at least five officers.   (Id. 211:17-22). Typically, if ICE has done surveillance, it will know when an individual leaves his home, such as to go to work, and will try to arrest individuals as they are leaving their homes.   (Id. 210: 24-211:2).   If ICE encounters other individuals who it has reason to believe may also be removable, it may apprehend those individuals as well.   (Day 3 Tr. 64:6-14).   However, pursuant to ICE's sensitive locations policy, ICE does not apprehend individuals at churches, health facilities, or schools.   (Id. 90:9-20).   Mr. O'Neill testified that ICE might mistakenly have taken custody of U.S. citizens, but was not aware of any such instances.   (Id. 64:24-65:1).

Mr. O'Neill testified that one of his colleagues at the Philadelphia ICE office had received

four or five "late-night" calls from Brian Abernathy that individuals were about to be released from City custody, which ICE regarded as "tips."   (Day 2 Tr. 202:13-21).   On the basis of those tips, and based only on photographs of the individuals, ICE sent four or five officers to wait in cars outside City facilities after midnight to apprehend the individuals.   (Id. 203:12-204:6).

Mr. O'Neill was adamant on direct examination that ICE "de-conflicts" with other law enforcement agencies regarding the addresses where ICE is planning to conduct operations, so as not to intrude on other law enforcement agencies' operations.   (Id. 214:9-11).   However, he admitted on cross-examination that ICE had not informed the Philadelphia Police Department before Operation Cross-Check in early 2017 or major "targeted enforcement operations" in September 2017, which resulted in the apprehension by ICE of 255 and 107 individuals, respectively.   (Day 3 Tr. 61:1-6; 61:16-62:11).

Mr. O'Neill admitted he was not aware of any data showing how the deportation of more immigrants from Philadelphia reduces the crime rate in the City.   (Id. 57:8-11).

**B.     Findings of Fact**

      1.     **City Policies**

1.     On May 17, 2001, Philadelphia Police Commissioner John F. Timoney signed Memorandum 01-06, entitled "Departmental Policy Regarding Immigrants" ("Memorandum 01-06").   (Joint Stipulation of Facts, ¶ 1).

2.     Memoranda in the Philadelphia Police Department ("PPD"), like Memorandum 01-6, are "generated to deal with very specific issues" and "guide the actions or the manner in which" the police conducts themselves.   (J. Stip. Facts, ¶ 2).

3.     All Philadelphia Police Department sworn officers are trained on Police Department memoranda, including by receiving a physical copy of the policy from their local

district and signing it.   (J. Stip. Facts, ¶ 3).

4.      Memorandum 01-06 was adopted, at least in part, to further the "policy" of "encourag[ing]" all immigrants to use "City services without fear of any reprisals." (J. Stip. Facts, ¶ 4).

5.      Memorandum 01-06 provides, in part, that "[t]he Police Department will preserve the confidentiality of all information regarding law abiding immigrants to the maximum extent permitted by law." (directing that officers shall "safeguard the confidentiality of information regarding an immigrant").   (J. Stip. Facts, ¶ 6 (quoting Memorandum 01-06)).

6.      Memorandum 01-06 further provides that "police personnel will transmit such information [regarding immigration status] to federal immigration authorities only" when, among other instances, "[t]he immigrant is suspected of engaging in criminal activity, including attempts to obtain public assistance benefits through the use of fraudulent documents."   (J. Stip. Facts, ¶ 7 (quoting Memorandum 01-06)).

7.      Memorandum 01-06 also states, in part, that "[s]worn members of the Police Department who obtain information on immigrants suspected of criminal activity will comply with normal crime reporting and investigating procedures" and that "[t]he Philadelphia Police Department will continue to cooperate with federal authorities in investigating and apprehending immigrants suspected of criminal activities."   (J. Stip. Facts, ¶ 8 (quoting Memorandum 01-06)).

8.      The routine arrest and prosecution procedures for an undocumented immigrant in Philadelphia are no different from those for a person with legal immigration status.   (J. Stip. Facts, ¶ 9).

9.       On November 10, 2009, Mayor Michael A. Nutter signed Executive Order No. 8-

09, entitled Policy Concerning Access of Immigrants to City Services ("Confidentiality Order").

(J. Stip. Facts, ¶ 10).

10.     The Confidentiality Order instructs that "[n]o City officer or employee shall disclose confidential information" regarding immigration status, except where the subject has authorized the disclosure, where disclosure is required by law, or where "the individual to whom such information pertains is suspected by such officer or employee or such officer's or employee's agency of engaging in criminal activity (other than mere status as an undocumented alien)."   (J. Stip. Facts, ¶ 11 (quoting Confidentiality Order)).

11.     The Confidentiality Order also contains directives for City officers and employees regarding inquiries about immigration status. For police officers, the Confidentiality Order instructs that officers "shall not . . . inquire about a person's immigration status, unless the status itself is a necessary predicate of a crime the officer is investigating or unless the status is relevant to identification of a person who is suspected of committing a crime (other than mere status as an undocumented alien)."   Further, police officers are instructed not to inquire about the immigration status of "crime victims, witnesses, or others who call or approach the police seeking help."   For other City employees, the Confidentiality Order directs that they shall not "inquire about a person's immigration status," unless "immigration status is legally required for the determination of program, service or benefit eligibility or the provision of services," or unless the inquiry is "required by law."   (J. Stip. Facts, ¶ 13 (quoting Confidentiality Order)).

12.     At the same time, the Confidentiality Order does not prohibit City employees from requesting immigration status information from the federal government.   (J. Stip. Facts, ¶ 14).

2.    **City Law Enforcement Practices**

13.    On January 4, 2016, Mayor Jim Kenney signed Executive Order 5-16, titled "Policy Regarding U.S. Immigration and Customs Enforcement Agency Detainer Requests." ("Detainer Order II").   (J. Stip. Facts, ¶ 20).

14.    Detainer Order II states that, for people in the "custody of the City," no "notice of his or her pending release [shall] be provided, unless such person is being released after conviction for a first or second degree felony involving violence and the detainer is supported by a judicial warrant."   (J. Stip. Facts, ¶ 21 (quoting Detainer Order II)).

15.    A March 22, 2017 memorandum sent from First Deputy Managing Director Brian Abernathy to the Philadelphia Prisons Commissioner states that Detainer Order II did not alter the City's past practice of complying with any criminal judicial warrant presented.   (J. Stip. Facts, ¶ 22).

When ICE sends a notification request supported by a judicial criminal warrant of any type, the City provides advance notification of release.   (J. Stip. Facts, ¶ 22, City Submission).

16.    Out of the 164 ICE detainers issued to the City between January 1, 2016 and January 18, 2018, six detainers were accompanied by a criminal arrest warrant signed by a district court or magistrate judge; the remainder were not.   (J. Stip. Facts, ¶ 23).

17.    An immigration detainer, DHS Form I-247A, includes a request to: "Notify DHS as early as practicable (at least 48 hours, if possible) before the alien is released from your custody."   (J. Stip. Facts, ¶ 26 (quoting DHS Form 1-247A, available at: https://www.ice.gov/sites/default/files/documents/Document/2017/I-247A.pdf.)).

18.    An immigration detainer, DHS Form I-247A, is often issued in conjunction with an administrative immigration warrant, as distinct from a judicial warrant.   (J. Stip. Facts, ¶ 27),

see, U.S. Immigrations and Customs Enforcement Policy No. 10074.2 ¶¶ 2.4, 5.2, available at: https://www.ice.gov/sites/default/files/documents/Document/2017/10074-2.pdf.).

However, there is no "data" suggesting any link between "immigrants and crime" in Philadelphia; to the contrary, when it comes to crime statistics overall, the PPD is most "concerned" with "people who were born and raised in Philadelphia."   (J. Stip. Facts, ¶ 28, City Submission).

### 3.      Prison Access

In May 2017, the Philadelphia Department of Prisons implemented a new protocol providing that ICE be given access to interview an inmate in one of the City's detention facilities only after the inmate consents in writing to that interview.   To implement this protocol, the Philadelphia Department of Prisons created a "consent form" to be provided to any inmate whom ICE seeks to interview.   The consent form states that "[ICE] wants to interview you," that "[y]ou have the right to agree or to refuse this interview," and that "[y]ou may request to have an attorney present during any interview."   The consent form also states that "[y]ou have the right to remain silent" and that "[a]nything you say may be used against you in criminal and/or immigration proceedings."   (J. Stip. Facts, ¶ 30).

### 4.      Information Sharing

19.     As a part of routine police practice, the City regularly shares information about the identity of all criminal suspects with the federal government through the use of at least three databases: (1) the National Criminal Information Center ("NCIC") database, managed by the FBI; (2) the Preliminary Arraignment System ("PARS") database, managed by the First Judicial District, the District Attorney's Office, and the PPD; and (3) the Next Generation Identification "NGI," formerly Automated Fingerprint Identification System ("AFIS"), managed by the FBI.

(J. Stip. Facts, ¶ 33).

20.     Philadelphia police officers use the NCIC database in their regular day-to-day criminal law enforcement activities.   PPD officers are trained to run an NCIC "look-up" for all individuals subjected to investigative detention by the police, to determine if they are subject to an outstanding arrest warrant.   If the officer is able to collect the person's date of birth and license plate information, NCIC protocols mandate that that information is to be entered into NCIC as part of a query.   (J. Stip. Facts, ¶ 34).

21.     PARS gives real-time sharing of the identities of all individuals arrested by Philadelphia police directly to the District's attorney's Office.   The database is owned by the First Judicial District of Pennsylvania, the Philadelphia Police Department, and the Philadelphia District Attorney.   (J. Stip. Facts, ¶ 35).

22.     ICE pays for access to PARS under an end-user license agreement.   The licensing fee agreement with ICE excludes the sharing of information on victims and witnesses, but ICE receives information reported to the City by all other arrestees, including their full names, birth countries, locations of arrest, and detention status (i.e., whether they are awaiting bail).   (J. Stip. Facts, ¶ 36).

23.     At the time of a suspect's arrest, his or her fingerprints are inputted into Philadelphia's AFIS platform.   AFIS feeds automatically into Pennsylvania's identification bureau and then to the FBI.   Philadelphia's AFIS fingerprint entries are entered by the FBI into Next Generation Identification ("NGI")—a national fingerprint and criminal history system maintained by the FBI, similar to the Integrated Automated Fingerprint Identification System ("IAFIS")—and then compared to information already contained in the system to look for matches.   These Philadelphia fingerprint entries are also fed into the Automated Biometric

28

Identification System ("IDENT")—a DHS-wide system for storing and processing biometric data for national security and border management purposes.   (J. Stip. Facts, ¶ 37).

24.     ICE has access to all of this information, including information contained in IDENT.   (J. Stip. Facts, ¶ 37, City Submission).

> *a.*     DHS's Automated Biometric Identification System ("IDENT") is the "central DHS- wide system for the storage and processing of biometric and associated biographic information for national security, law enforcement, immigration and border management, intelligence, and background investigation purposes." (Def. Findings of Fact, ¶ 4 (quoting R&R at 9)).

> *b.*     IDENT has relevant information for only a subset of potentially removable aliens.   If someone crosses a United States border illegally, and has not previously had an encounter with the government, there would not be any biometric information for that individual to match against in IDENT.   (Def.'s FF, ¶ 5).

> *c.*     When Philadelphia police officers submit fingerprint information for aliens they arrest and those fingerprints are run through law enforcement databases, there would not be a match in IDENT for individuals who crossed a border illegally and who had not previously had an encounter with the government. Accordingly, ICE would not be made aware via IDENT that the person had been arrested by the City.   (Def.'s FF, ¶ 6).

25.     The City records a prisoner's address in the PARS database upon detention. An

29

address collected upon a prisoner's release may differ from such an address as might earlier have been collected by City police and reported in the PARS database.   (J. Stip. Facts, ¶ 39).

26.   The address a prisoner states is not ordinarily verified.

27.   PARS [Philadelphia's Preliminary Arraignment System] –

   *a.*   PARS contains self-reported information as to an individual's country of birth.   PARS does not show citizenship status.   Individuals do not always accurately report their country of birth.   (Def.'s FF, ¶ 8).

   *b.*   PARS does not automatically alert ICE that the City has arrested someone born in a foreign country; instead, ICE has to manually check PARS.   Nor does PARS send ICE alerts as an individual is moving through the criminal process.   Accordingly, ICE has to manually check the PARS database on a daily basis.   It is resource-intensive for ICE to monitor PARS in this manner. (Def.'s FF, ¶ 9).

   *c.*   PARS does not contain any information about the release of individuals from City prisons.   (Def.'s FF, ¶ 10).

   *d.*   PARS does not provide advance notice identifying when an individual will be released from police custody.   (Def.'s FF, ¶ 11).

28.   NCIC – widely used by federal, state and local law enforcement officers – provides instantaneous internet access to an individual's criminal record, if any, that may or may not include information about whether the individual is a citizen or otherwise an illegal alien:

a.      The NCIC protocol for the Immigration Violator File,
developed by the FBI, states that if an encountering agency gets a
"hit" for a suspected wanted individual, but the agency has "no
other reason for detaining the subject," "appropriate procedures will
depend on whether state or local laws permit detainment and/or
arrest."   The NCIC protocol further provides for notice to ICE if the
whereabouts of the person are known and the "person inquired upon
appears to be identical with the subject of an ICE record."   The City
follows this protocol, and police officers appropriately notify ICE
upon obtaining a hit for an immigration violator file.   (Plaintiff's
Findings of Fact, ¶ 18).

29.   Lock and Track:

a.      The City collects self-reported citizenship information from
inmates upon admission to a PPS facility, as required by
Pennsylvania state law. This information is stored in a PPS database
called Lock and Track.   (Pl.'s FF¶ 14).

b.      From 2004 through 2016, the City provided ICE
with the self-reported citizenship information stored in Lock and
Track in a daily email report.   ICE first reached out to the City by
letter in 2004, asking for this type of information in a data dump.
The City stopped sending the report in 2016 because the City
believed ICE had stopped using the information the City provided.
After the City stopped sending the email report, the City heard no

complaints or requests from ICE.  No one from ICE contacted Brian Abernathy, First Deputy Managing Director of the City's Managing Director's Office, to restart its access until this litigation ensued, nor did ICE otherwise request the emails to resume, Rather, two years after the City stopped sending emails, ICE has now stated that it "was waiting for this hearing to be concluded before we proceeded with anything."  (Pl.'s FF¶ 15).

c.      Without a request from ICE, the City informed the Department of Justice ("DOJ") on May 9, 2018 that it is prepared to provide the ICE Philadelphia Field Office with information in Lock and Track, including self-reported citizenship information.  (Pl.'s FF¶ 16).

d.      When the City receives detainers from ICE, the PPS logs them into Lock and Track, and the detainer is placed in the inmate's "jacket" or file.  ("[T]he form itself would be filed within … the prisoner's file, as well as they would be marked within the prison's computer system so that they would recognize that a detainer had been filed."). If an inmate is transferred to another facility, including a state facility, it is the policy of the City of Philadelphia that the detainer follows the inmate.   ICE's Philadelphia Field Office has separate ways of tracking the individuals who are booked into Pennsylvania's prisons— including individuals transferred from the PPS to state

32

custody—and typically serves subsequent detainers on transferees.

(Pl.'s FF¶ 17).

### 5.     City Supports Cooperation with all Law Enforcement Agencies

30.     The City of Philadelphia has historically, fully cooperated with all federal law enforcement agencies, including ICE.   The Philadelphia policies as shown above have led to the result that Philadelphia agencies, including police, generally don't know whether a person who was arrested, or was a victim, or who seeks help (social help, etc.) is a citizen or, if not a citizen, whether they are lawfully in the United States, or, under federal government statutes or regulations, are considered unlawfully present.   Stated colloquially, in jargon, the City "doesn't have a clue."

31.     In the course of the investigation of a crime, there are no City policies which prevent the City asking or otherwise determining a suspect's citizenship or immigration status, or sharing that information with any other state or federal law enforcement agency, including ICE. However, if the City does not have that information, obviously the City is not in a position to share it with anyone.   A criminal investigation may require the City to seek out informants, conduct surveillance, use electronic means, or, if necessary under the law, secure a search warrant with court approval, and alien status of an individual suspect may be relevant in doing so.   The City does not place any restriction on the nature or extent of the investigation of crime, including with respect to the immigration status of those under investigation for committing crime.   The City itself will determine, in cooperation with other law enforcement agencies, what strategic investigative means and methods are going to be the most useful.   The City will cooperate and assist with all other law enforcement agencies in doing so.

32.     Inconsistencies in practice that occurred from time to time between the police and the managing director's office, or with the police PDU, are not significant.   Philadelphia has over 6,000 police officers.   None of them are perfect and mistakes will be made.   As in all large organizations, communications may be misspoken or misunderstood, and human error is not unusual.   The City supports a logical system that preserves the legitimate functions of ICE, the City's policies, and public safety, along with respect for law enforcement, all recognizing the United States and Pennsylvania Constitution and laws deserve respect.

33.     ICE has presented evidence that at least on one occasion, after the City declined to honor an immigration detainer or notification request and the subject individual was released back into the community, that individual subsequently committed a crime. The City acknowledges that Juan Vasquez, a.k.a. Ramon Aguirre-Ochoa—for whom ICE had lodged a detainer—was released from the custody of the Philadelphia Department of Prisons in 2015 upon entry of a nolle prosequi, and subsequently rearrested and charged in 2016 for an unrelated offense, where he pled guilty to rape of a child and unlawful contact with a minor – sexual offenses.     He was transferred to a state correctional institution in March 2017, where he is serving an eight- to twenty-year sentence.   (J. Stip. Facts, ¶ 28).

34.     There was extensive testimony about City policies with regard to a person who may be considered under federal law a "criminal alien," or who the City knows is not a citizen but has been convicted of a first or second degree felony.

            a.  The vast majority of the detainers the City receives from ICE relate to inmates with no prior felony convictions. Out of the 164 detainers received from ICE between April 2016 and January 2018, only 27 related to individuals with prior felony convictions. Several of those convictions are

34

for non-violent offenses such as criminal trespass and retail theft.   (Pl.'s FF, ¶ 24).

    b.  Approximately 82% of inmates in Philadelphia's prison system are in a pre-trial posture.  Almost all of the inmates against whom ICE lodges detainers are in a pre-trial posture.  Many of these individuals are then released without any advance notice by "court order" because they post bail, or the charges against them are dropped or they are found not guilty. From January 2016 through August 2017, only three detainers that ICE lodged with the City related to inmates actually serving a sentence at the time ICE had lodged the detainer.   (Pl.'s FF, ¶ 25).

35.    After the development of Executive Order 5-16, the City added an additional opportunity for the federal government to effectuate custody of an individual in the custody of City prisons, whether untried, tried but not sentenced, or sentenced, through what the City termed a "judicial warrant."

36.    Public safety, and the safety of law enforcement officers involved in the transfer of an individual who qualifies as a criminal alien, and is subject to detention by ICE, should take place in a controlled environment rather than in a public space or private home.

37.    Ample evidence in the record establishes that the City's policies of community policing and smart policing allow the City to be more effective in reducing crime, and providing social services to Philadelphia citizens, than it could be in the absence of these policies.   (Pl.'s FF, ¶ 54-59, 60, 68).   These policies are well within the City's discretion to implement.

Case 2:17-cv-03894-MMB   Document 224   Filed 06/06/18   Page 40 of 93

38.     The Court finds that the City's description of smart policing is more accurate than the DOJ's suggested findings asserting that smart policing is not an effective law enforcement technique and policy.

### 6.     City Practices Re: ICE Request for Advance Notice of Release

1.     During the testimony of various witnesses, questions were raised about the reach of the City's policies vis-à-vis ICE policies, with regard to individuals who may qualify as "criminal aliens" and are in City custody, and assuming for present discussion purposes, have already been convicted of a felony and have also been sentenced and are serving the sentence.

2.     As to untried prisoners, who are in prison because they are charged with first degree murder and under state law are not entitled to bail, because they are unable to make bail, because of a detainer from another jurisdiction, e.g., because of a probation violation, etc., or because they have been found guilty but have not been sentenced, there is no release date.

Federal judges frequently sign detention orders warranted by the denial of bail under 18 U.S.C. § 3142, and also by signing an order prepared by the probation department which acts as a detainer for a person who is in violation of probation or supervised release, and is already in custody in another prison, whether city, state or federal.

3.     With respect to the definition of "criminal alien,"[3] for present purposes we exclude some of the categories in the federal statute which are questionable, from a constitutional point of view, as considering "criminal" – the principal category being "drug addicts."

---

[3] The Court uses the term "criminal alien" as a "shorthand" for an individual who has been convicted of a felony and who, as established by evidence, is not lawfully in the United States and is subject to removal. The Court notes that the statutory basis of this designation, 8 U.S.C. § 1226(c), is broader, as it includes individuals who have not been convicted of a felony, or who may be "drug addicts."

An amicus brief submitted by a group of "Immigration Law Scholars" provides significant detail about the legislative history of some of the statutes at issue in this case, including Section 1226(c).  This brief

36

4.      The City has no obligation to seek or receive citizenship information from any person in City custody.   When the City does receive citizenship information of a City prisoner, it is self-reported and not verified.

5.      ICE has access to the names of City prisoners, but was vague with regard to how it determines which prisoners are subject to removal as criminal aliens or otherwise.   From evidence in the record, including the forthcoming contents of the Lock and Track data, the Court concludes that there will be some information available to ICE when a City prisoner is not a citizen, and has been convicted of a felony and sentenced, and therefore there is a release date; this person qualifies as a "criminal alien" and is thus subject to removal proceedings.

6.      All Executive Branch administrations in recent decades have made removal of criminal aliens a priority – perhaps with different emphasis, but it has always been the number one priority for removal from the U.S.

### 7.      Conclusory Findings of Fact

1.      The record shows the City of Philadelphia, in general, has no knowledge whether a person is or is not a citizen.   The only major exception applies if these facts have been secured in the context of a criminal investigation.   The City also has no knowledge, as to non-citizens' immigration status.

2.      Even though this Court was tasked with determining whether any evidence justified the JAG conditions, Defendant presented very little evidence showing how ICE knows that a person is subject to removal.   If the person entered the United States illegally "without

---

criticizes use of the term "criminal alien" as not being specifically defined by Congress, and having loose applications throughout the years.   As noted above, this Court uses this phrase as a generic description of individuals who face removal because they have felony convictions.   The Court recognizes that various statutes and Executive Branch promulgations have sought to expand application of the term "criminal alien" beyond the application of that term in this opinion.

inspection," there is no written record of their being in the U.S.   If a person is questioned, and states they were born in the U.S., the record does not show how ICE can prove otherwise.   The only exception in the record is if one of the databases reviewed above discloses facts to allow ICE to infer the person is an alien.   The record contains no facts of how often, in Philadelphia, this occurs.

      a.   One exception where ICE would have knowledge, if a non-citizen had a visa, ICE would have a record and would be able to identify this individual and prove that the visa has expired.   However, removal of visa overstayers has not, for decades, been a priority of ICE to initiate removal proceedings.

3.   ICE has not produced any evidence to dispute Philadelphia's contention that it does not have knowledge of the citizenship of a particular individual or, if not a citizen, what an individual's immigration status is.

      a.   If a person comes in contact with a City office and happens to state he or she was born the United States but this is false, the record does not show how ICE can prove that the person was born outside the United States.

4.   Although ICE has access to the names of City prisoners, which includes a self-reported place of birth, the record does not show how ICE can identify with any kind of certainty, or at least "probable cause," that specific individuals in prison are not citizens, are subject to removal, and therefore may be subject to detention pending removal proceedings.

5.   Since the record establishes that the City generally does not have citizenship or immigration status knowledge, and that ICE often does not have it either, this lack of knowledge undermines the entire utility of the JAG conditions at the heart of this case.   The record also

allows a conclusion that §1373 is not applicable, because the City simply does not have the type of information §1373 encompasses.

6.      The City's policies were adopted in good faith and are a reasonable and lawful exercise of authority by the City.   All City policies have been established by credible and corroborated testimony of City's witnesses and documents.

7.      The City's evidence is not contradicted by the Defendant.

8.      Defendant did not introduce any evidence of any constitutional, or congressionally stated objection, to the wisdom of City policies.

9.      President Trump's and Attorney General Sessions' statements attempting to justify the federal government's policies on so-called "sanctuary cities" and in support of the JAG conditions, are inaccurate and not applicable as to Philadelphia.

10.      ICE official O'Neill testified credibly as to ICE's policies and practices, both nationwide and within the City of Philadelphia.   However, he did not provide any testimony to justify the application of the JAG conditions to Philadelphia.   His testimony, in part, supports the City's contention that it substantially complies with the JAG conditions.

11.      Despite a request by the Court that Defendant call a witness employed by the Philadelphia United States Attorney's Office to testify about Philadelphia practices, vis-à-vis the functioning of the Eastern District of Pennsylvania United States Attorney's Office, Defendant refused to do so.   The Court will not consider this refusal as warranting inferences against the Defendant.   However, the lack of any local testimony by a member of the federal prosecutor's office is a void in the record.

a.   In view of other findings, if Defendant intends to request advance notice of release of a criminal alien, it must involve the United States Attorney's Office in the

39

continued cooperation with the City by processing ICE requests for approval of judicial orders for continued detention of criminal aliens when being transferred from City to ICE custody, in a secured environment.

12.     The Court's findings on irreparable harm in the preliminary injunction opinion, are still valid, and have been updated by trial testimony by Ross, Abernathy and Gladstein on usage of the JAG funds as filling necessary needs of the City that are not provided by current appropriated revenues to the City such as:

    a.   Non-personnel costs of the police department; or

    b.   Narcan needs.

13.     Assuming alternatively that Section 1373 is valid as applied to the City:

    a.   As to the prisoner access, the City's policies are valid in that the City does not completely bar ICE access but only gives inmates the opportunity to refuse to speak to an ICE representative, and also to request representation by counsel at the time of the interview.   These are reasonable.   An individual does not have any obligation to speak to an ICE representative if he/she does not want to do so.   Also, unless knowingly waived, the prisoner may have the right to have counsel present.   A prisoner is under no obligation to speak to an ICE representative, whose intent is to seek removal of the individual, and quite likely to secure incriminating statements from the prisoner.   In this sense, the removal process, although not strictly a criminal process, may result in very severe consequences -- removal from the United States.   This "interview" may result in detention pending removal, along with separation from family, friends, occupation, property, and other human rights.

40

14.     With regard to the advance notice of release condition, the Court concludes new procedures are necessary, see discussion below.

15.     The Court finds that the City complies or substantially applies with the JAG prisoner access and advance notice conditions and also Section 1373, if it applies.   The City policies are designed to ensure individuals' constitutional rights are protected.   The City assumes great risk if it violates individuals' civil rights, which would, inter alia, subject the City to endless litigation and very expensive damage claims for violating civil rights of prisoners.

## IV.   CITY'S MOTION FOR ADOPTION OF JUDGE STRAWBRIDGE'S REPORT AND RECOMMENDATION

Following the issuance of the Preliminary Injunction, on January 18, 2018 the Court appointed Magistrate Judge David R. Strawbridge as a Special Master pursuant to Rule 53 of the Federal Rules of Civil Procedure.   (ECF 88).   The order appointing Judge Strawbridge indicated that he was to meet with the parties to discuss the practices of the City and of the DOJ relating to the three conditions at issue, and particularly as concerning "criminal aliens."   Judge Strawbridge submitted the Special Master's Report and Recommendation on April 13, 2018.   (ECF 154).

Rule 53 states that "[i]n acting on a master's order, report, or recommendations, the court must give the parties notice and an opportunity to be heard; may receive evidence; and may adopt or affirm, modify, wholly or partly reject or reverse, or resubmit to the master with instructions." Fed. R. Civ. P. 53(f)(1).   It further states that "[t]he court must decide de novo all objections to findings of fact made or recommended by a master," and "must decide de novo all objections to conclusions of law made or recommended by a master."   Fed. R. Civ. P. 53(f)(3)-(4).   See, e.g., In re Constar International Inc. Securities Litigation, 585 F.3d 774 (3d Cir. 2009).

Over the course of several months from January to April, 2018, Judge Strawbridge held discussions with the parties, in person, over the phone, and by exchange of letters, for the purpose

of reviewing the details of the complex factual issues central to the case, specifically, the City's criminal justice policies as they relate to the three new conditions imposed on the receipt of JAG funds. This Court viewed these discussions partly as negotiations for a potential settlement or potential for some level of compromise between the parties on particular policies that lie at the heart of the conflict in this case. No such compromise or settlement materialized. These discussions also served the purpose of discovery in this case and enabled the exchange of information between the parties so as to allow more specific evidence to emerge at trial.

The City filed a motion requesting this Court to adopt in substantial part the Special Master's Report and Recommendation on April 20, 2018. (ECF 166, 1). The DOJ filed a Response to the Court's Memorandum regarding the Special Master's Report on April 26, 2016 arguing that the Court should permit a full airing of the facts at trial and objecting to the adoption of the report and recommendation into the trial record. (ECF 183).

This Court has basically adopted, in the above findings, Judge Strawbridge's perceptive analysis of important issues in this case, and has taken testimony on these issues and has made findings. Judge Strawbridge's meeting with the parties and this report and recommendation has been very helpful on the following issues:

1.    Discussion of databases available to the City and ICE (pp. 6-14).

2.    Details regarding ICE detainer forms and practices (pp. 15-18).

3.    ICE practices in federal prisons (pp. 19-20).

4.    Details regarding ICE prison access (pp. 21-23).

5.    Section 1373 issues (pp. 23-25).

Recommendations – Judge Strawbridge made two very important recommendations as follows:

42

1.      The City's Lock and Track database should be made available to ICE.   As the Court reviews above, the testimony showed that the City had previously provided this database to ICE, which apparently did not use it very much; in any event, the City has now agreed to make it fully available and the Court finds that this is further evidence of City "compliance" with the JAG conditions.

2.      Transfer of custody of criminal aliens should be in a controlled environment.   The City has adopted this recommendation with the modification in the City's policies set forth above, that upon receipt of a judicial order, which will be easy for the Defendants to implement if they are serious about wanting to take custody of criminal aliens in a controlled environment, the City will allow ICE access to City prisoners.

The Court reviewed the parties' objections in detail in a prior Memorandum (ECF 170), and that discussion need not be repeated here.   Taking into consideration the full record available to the Court at this point, including the fact that the Preliminary Injunction transcript is fully incorporated into the trial record, the fact that full opportunity was given to both parties to expound upon any of the issues from the report and recommendation at trial, and the fact that all of the topics covered in the report and recommendation were discussed at trial, the Court will adopt the findings made in the report and recommendation because they are consistent with and not directly contradicted by any other record evidence.

The City objected to the adoption of findings regarding David O'Neill's statements during the discussions with Judge Strawbridge as they were not made under oath.   In light of that objection the Court directed the DOJ to present testimony under oath from David O'Neill at trial. As Assistant Director O'Neill did then testify at trial, on virtually all of the same topics that he had discussed with Judge Strawbridge, this objection is moot.   The Court will consider Mr. O'Neill's

statements to Judge Strawbridge in conjunction with Mr. O'Neill's testimony at trial.  As the Court noted in its earlier Memorandum, the DOJ also makes certain objections that are similarly resolved by Mr. O'Neill's trial testimony on all of the topics he discussed with Judge Strawbridge. As to the rest of the DOJ's and the City's objections, they largely reflect the argumentative stances of both parties rather than identifying any actual flaws in Judge Strawbridge's observations and conclusions.  Moreover, many of the points raised by both parties are assuaged by trial testimony that further clarified outstanding questions resulting from the report and recommendation. Adopting the findings from the report and recommendation into the trial record is useful for the context that it provides.  Judge Strawbridge's findings were, across the board, appropriate, well substantiated conclusions from the discussions that he held, and will be adopted for their value in filling out the other record sources in this case.

## V.      CROSS-MOTIONS FOR SUMMARY JUDGMENT AS TO COUNTS I-III

Plaintiff's Motion for Partial Summary Judgment sought entry of a permanent injunction enjoining the DOJ from attaching all three Challenged Conditions to the City's FY 2017 JAG award.  (ECF 157).  Specifically, the motion sought summary judgment as to Counts I, II, and III of the Amended Complaint, while allege violations of the Administrative Procedure Act (APA) on the grounds that the DOJ's decision to impose the Challenged Conditions: (I) constituted *ultra vires* conduct not authorized by Congress in the underlying statute; (II) violated the Constitution's separation-of-powers principles; and, (III) constituted arbitrary and capricious agency action.

Defendant's Motion for Summary Judgment sought a ruling that all six counts of Plaintiff's Amended Complaint failed as a matter of law.   (ECF 155).

On April 27, 2018, just prior to the start of trial, the Court denied Defendant's Motion for Summary Judgment as to Counts I, II, III of the Amended Complaint, and granted Plaintiff's

Motion for Partial Summary Judgment as to the Access and Notice Conditions, finding them invalid as a matter of law.   (ECF 185).   However, the Court reserved any ruling on the issues of irreparable harm and relief until all trial evidence and post-hearing arguments were presented.

### A.   Parties' Contentions

In its Motion for Summary Judgment, Defendant contends that the City has failed to identify any final agency action, because the DOJ has not yet acted on the City's FY 2017 Byrne JAG application and, in any event, there is an administrative reconsideration process to be followed before final disapproval.   Defendant further contends that the City's *ultra vires* and separation of powers claims fails because the Challenged Conditions are authorized by the "capacious delegations of authority" contained in 34 U.S.C. §§ 10102(a)(6) and 10153(a)(5)(D). Finally, the DOJ contends that the Challenged Conditions are not arbitrary and capricious because the purposes of the JAG funds (i.e., crime prevention, control, and reduction) are rationally advanced by facilitating federal access to aliens suspected of violating state or local criminal laws.

In Plaintiff's Motion for Summary Judgment, the City asserts that the DOJ took final agency action when it announced its decision to impose the Challenged Conditions.   Then, the City claims that the DOJ acted *ultra vires* because neither 34 U.S.C. § 10102(a)(6) nor § 10153(a) contains a grant of authority to the DOJ to impose the Challenged Conditions.   Moreover, the City contends that the DOJ violated the separation of powers doctrine by using the unauthorized conditions to deny localities their congressionally appropriated Byrne JAG funds.   Finally, the City argues that the decision to impose the Challenged Conditions was arbitrary and capricious because the administrative record provides no satisfactory explanation for the DOJ's decision to deviate from its prior practice of imposing only non-substantive conditions to Byrne JAG grants.

For reasons stated below, the Court will grant Plaintiff's Motion for Partial Summary

Judgment, but deny Defendant's Motion.

### B. Relevant Standards

#### 1. Rule 56 Standard

A district court should grant a motion for summary judgment if the movant can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it "might affect the outcome of the suit under the governing law." Id.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." Id. at 325. After the moving party has met its initial burden, the adverse party's response must, "by citing to particular parts of materials in the record" set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c)(1)(A). "Speculation and conclusory allegations do not satisfy [the non-moving party's] duty." Ridgewood Bd. of Educ. V. N.E. ex rel. M.E., 172 F.3d 238, 252 (3d Cir. 1999). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." Id. Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party. Anderson, 477 U.S. at 255.

### 2.       Administrative Procedure Act

Under the APA, a district court must hold unlawful and set aside agency action if it is:

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity; or

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right.

5 U.S.C. § 706(2)(A)-(C).

### C.       Violation of the APA through *Ultra Vires* Conduct Not Authorized by Congress in the Underlying Statute (Count I)

This Court has previously detailed six distinct reasons why the Access and Notice Conditions exceed the authority delegated by Congress in 34 U.S.C. § 10102(a)(6), and were therefore *ultra vires*.   See City of Philadelphia, 280 F. Supp. 3d at 616.

In fact, this *ultra vires* argument was the basis for the Seventh Circuit's affirmance of a nationwide injunction against the imposition of the Access and Notice Conditions.

### 1.       City of Chicago v. Sessions – 7th Circuit Decision

Prior to the initiation of the Philadelphia litigation, the City of Chicago, which had enacted a "Welcoming City Ordinance" as part of its municipal code, filed suit challenging the imposition of the Challenged Conditions attached to Byrne JAG funding.   The arguments in the Chicago litigation in many ways parallel those at issue in the Philadelphia case, and Chicago, like Philadelphia, sought preliminary injunctive relief in federal court.   See City of Chicago v. Sessions, 264 F. Supp. 3d 933 (N.D. Ill. 2017).   In this Court's prior opinion, that district court's opinion was summarized in great detail, and a full summary is not warranted here.   Since then, however, the Seventh Circuit has affirmed the preliminary injunction.   City of Chicago v. Sessions, 888 F.3d 272 (7th Cir. 2018).

All three judges on the Seventh Circuit panel agreed that the Chicago was likely to succeed on the merits of its claims that the Attorney General lacked authority under the authorizing statute to impose substantive conditions on Byrne grants, 34 U.S.C. §§ 10151-58, and thus acted *ultra vires* in imposing the Notice and Access conditions.   Id.[4]   In dissent, one Judge objected to the nationwide effect of the District Court's preliminary injunction, but otherwise agreed with the merits of the preliminary injunction.

The majority opinion characterized the "core issue" as "whether Congress granted to the Assistant Attorney General ("AAG") the unbounded authority to impose his or her own conditions on the release of the Byrne JAG funds" pursuant to 34 U.S.C. § 10102(a)(6), which sets forth the "duties and functions" of the AAG, "including placing special conditions on all grants, and determining priority purposes for formula grants."   Id. at 283.   The AAG's interpretation of that "including" clause as a "stand-alone grant of authority . . . to attach any conditions to any grants," was, according to the majority, "obviously belied by [its] plain meaning."   Id. at 285.   Moreover, an interpretation "that would allow the [AAG] to impose any conditions on the grants at will [] is inconsistent with the goal of the statute to support the needs of law enforcement while providing flexibility to state and local governments."   Id.   Therefore, such an interpretation is "at odds with the nature of the Byrne JAG grant, which is a formula grant rather than a discretionary grant."   Id.

Although the Seventh Circuit declined to rest its affirmance on any other grounds, the majority opinion noted that the DOJ's argument "might fail for an additional reason, that the term 'special conditions' is a term of art referring to conditions for high-risk grantees . . . and cannot be

---

[4] The Seventh Circuit's majority opinion also noted that the term "sanctuary city" is a misnomer, because Chicago, like other so-called "sanctuary" jurisdictions, "does not interfere in any way with the federal government's lawful pursuit of its civil immigration activities" and thus no person is "immunize[d] . . . to the reach of the federal government.   City of Chicago v. Sessions, 888 F.3d at 281 (citing City of Philadelphia, 280 F.Supp.3d at 591, 602).

read as an unbounded authority." Id. at 285 n. 2 (citing this Court's holding in City of Philadelphia, 280 F.Supp.3d at 617).

Thus, in affirming the district court, the Seventh Circuit affirmed the nationwide preliminary injunction as to the Access and Notice Conditions, finding, *inter alia*, that the City of Chicago was likely to succeed on the merits of its claim that the Attorney General acted beyond his statutory authority.

### 2.      Prior opinion of this Court: the Challenged Conditions are *Ultra Vires*

Based on a similar approach, this Court had previously reached the same conclusion.  See City of Philadelphia, 280 F. Supp. 3d at 616.  Because the DOJ has presented no argument, beyond those previously considered by the Court at the Preliminary Injunction stage, which dictates a different result, the Court reaches the same result now: the Access and Notice Conditions exceed the authority delegated by Congress in 34 U.S.C. § 10102(a)(6).[5]

### D.      Violation of Constitutional Separation of Powers (Count II)

Similarly, this Court had occasion to consider the parties' contentions with respect to Count II, concluding that the DOJ's imposition of the Challenged Conditions violated the constitutional principle of separation of powers.  Id. at 639-47.

Again, the DOJ has presented no argument, beyond those previously considered by the Court at the Preliminary Injunction stage, which dictates a different result as to Counts I and II at the present stage.  All three Challenged Conditions violate the constitutional principle of separation of powers.

---

[5] As for whether Section 1373 may be considered an "applicable Federal law" within the meaning of 34 U.S.C. § 10153(a)(5)(D), the Court reiterates its opinion that Section 1373 may be authorized by that subsection, but declines to rest its decision to grant relief on this ground because Section 1373 is independently unconstitutional under the Tenth Amendment, and in any event, the City of Philadelphia substantially complies with its requirements.  See City of Philadelphia, 280 F. Supp. 3d at 619.

**E.      Violation of the APA through Arbitrary and Capricious Agency Action (Count III)**

Count III of the Amended Complaint alleges that the Attorney General's imposition of the Challenged Conditions is arbitrary and capricious, and therefore violates the APA, because it deviates from past agency policy without reasoned explanation or justification.   (Am. Compl. ¶¶ 132–35).

The APA requires this Court to "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."   5 U.S.C. § 706(2)(A).

Under Supreme Court precedent, the key issue is whether the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made."   Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983); accord Prometheus Radio Project v. FCC. 373 F.3d 372, 389-90 (3d Cir. 2004).

An agency's departure from prior practice can serve as a basis for finding an agency's interpretation to be arbitrary and capricious, so long as the change in policy constitutes an "unexplained inconsistency."   Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 981 (2005); see also Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 42–43; Encino Motorcars, LLC v. Navarro, 136 S. Ct. 2117 (2016); FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009).   However, where Courts found that an agency's policy shift were found to constitute an "unexplained inconsistency," the agencies had an explicit rule in place, only to later issue the opposite rule with limited or no explanation.   See, e.g., Encino, 136 S. Ct. at 2123 (Department of Labor reversed its rule that service advisors at automobile dealers were exempt from overtime payments under the Fair Labor Standards Act, but

50

"gave little explanation for its decision"); <u>Motor Vehicles</u>, 463 U.S. at 35 ("Briefly summarized, we hold that the agency failed to present an adequate basis and explanation for rescinding the passive restraint requirement and that the agency must either consider the matter further or adhere to or amend [the rule] along lines which its analysis supports.").   Importantly, an agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are better than the reasons for the old one . . . it suffices that the new policy is permissible under the statute . . . ." <u>FCC</u>, 556 U.S. at 515.

Nonetheless, "an agency must give adequate reasons for its decisions."   <u>Encino</u>, 136 S. Ct. at 2125.   An agency's action is not considered the result of "reasoned decision-making" when the agency:

1. "has relied on factors which Congress has not intended it to consider,"
2. "entirely failed to consider an important aspect of the problem,"
3. "offered an explanation for its decision that runs counter to the evidence before the agency, or"
4. Provides a justification that "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."

<u>Id.</u> (emphasis added).

Notably, a claim based on the "arbitrary and capricious" standard is accorded a "narrow standard of review" under which "a court is not to substitute its judgment for that of the agency." <u>FCC v. Fox Television Stations, Inc.</u>, 556 U.S. 502, 513–14 (2009).

At the preliminary injunction stage, the Department pointed to three public explanations to demonstrate that the DOJ provided adequate reasons for its decision to impose the Challenged Conditions.   <u>See</u> <u>City of Philadelphia</u>, 280 F. Supp. 3d at 619-25.   The DOJ's Motion for Summary Judgment highlighted the same exact three items, along with a 2007 Audit Report issued by the Department's Office of the Inspector General (ECF 156-4, "2007 OIG Report").   (<u>See</u> ECF

155-1, at 17-21).

Both parties agree that this Court should consult the Administrative Record (ECF 110) in order to determine whether the DOJ's decision to impose the Challenged Conditions was "arbitrary and capricious."

### 1.    The Administrative Record

Defendant did not make the Administrative Record available to this Court at the time the Preliminary Injunction was issued.  However, this Court has now had the opportunity to fully review the Administrative Record (see ECF 110), which the DOJ presumably relied upon in deciding to add the three Challenged Conditions to the Byrne JAG Grant.  The Administrative Record consists of forty-eight (48) discrete documents, totaling over 1,000 pages of material.   It includes documents from the following categories:

- Correspondence between members of Congress and DOJ leadership regarding, among other things, state and local non-compliance with 8 U.S.C. § 1373;

- Transcripts of congressional hearings at which Attorney General Loretta Lynch testified, including with respect to the topic of so-called "sanctuary jurisdictions";

- Emails to JAG grantees regarding new conditions attached to JAG grants;

- OIG Reports regarding compliance with Section 1373 and criminal alien recidivism;

- City submissions to the DOJ certifying compliance with Section 1373

- DOJ Press Releases and remarks from Attorney General Jeff Sessions

However, it bears emphasis that the DOJ pointed to no other component of the more than 1000-page Administrative Record, other than the 2007 OIG Report, as supporting "a rational connection between the facts found and the choice made" to impose the Challenged Conditions.

State Farm, 463 U.S. at 43.

### 2. The Decision to Impose All Three Challenged Conditions Was Arbitrary and Capricious

Given the nearly perfect overlap between the items considered at the two stages, it should come as no surprise to the litigants that the Court's opinion at the Summary Judgment stage closely aligns with its opinion from the Preliminary Injunction stage, as to the arbitrary and capricious nature of the Challenged Conditions. There is no need to fully reproduce the Court's prior opinion on this point, which is extensively discussed in 280 F. Supp. 3d at 619-625. Nonetheless, it is clear that the 2007 OIG Report does nothing to change the analysis.

First, the OIG Report provides no support whatsoever for the basic premises driving this litigation, one of which is the contention that aliens subject to deportation are leaving local custody without notice to ICE and then later committing crimes. The 2007 OIG Report was issued because Congress passed Public Law 109-162, which required the OIG to audit the DOJ's State Criminal Alien Assistance Program (the "SCAAP") and determine, *inter alia*:

> The number of criminal offenses that have been committed by aliens unlawfully present in the United States after having been apprehended by States or local law enforcement officials for a criminal offense and subsequently being released without being referred to [DHS] for removal from the United States.

(ECF 156-4, at 1).

Rather than putting in the necessary work to reach a firm conclusion, the OIG "reviewed a judgmental sample of 100 criminal histories," (id. at 29)—out of more than 262,000 criminal history files—ultimately concluding that it could not "statistically extrapolate the number of offenses committed by undocumented criminal aliens who were released from local custody without a referral to ICE." (Id. at 30). The Report also stated that the OIG "could not determine if ICE was notified before the criminal aliens in our sample were released from custody." (Id.).

53

In other words, the DOJ cannot point to the 2007 OIG Report as an example of an instance where it "examine[d] the relevant data" to reach a relevant basis for its decision, State Farm, 463 U.S. at 43, because it failed to use the relevant data to form an opinion at all.

Second, insofar as the 2007 OIG Report reviewed recipients of SCAAP funds for Section 1373 compliance, the Report actually observed that "many state, county and local law enforcement agencies . . . have policies that suggest they are willing to cooperate with ICE when they . . . learn that those individuals may be criminal aliens."  (2007 OIG Report, at 22-23).  The DOJ cannot point to a report concluding that localities are willing to cooperate with ICE as the justification for attaching conditions to grants nine years later which require such cooperation.  This makes so little sense that it demonstrates the "arbitrary and capricious" nature of the decision to impose those conditions.

Third, given the nearly ten year gap between the 2007 OIG Report and the decision to add the Challenged Conditions to the Byrne JAG Program, the Report can hardly explain the DOJ's decision.   Under the APA, "an agency must give adequate reasons for its decisions," and the OIG Report issued a decade earlier does not lend support to the DOJ's position.   Encino, 136 S. Ct. at 2125.

The other three sources to which the DOJ points as articulating adequate reasons for its decision to impose the Challenged Conditions are:

> (1) The "Backgrounder on Grant Requirements," issued by the DOJ on July 25, 2017 (first submitted in this litigation as ECF 1, Ex. 1);
>
> (2) DOJ Press Release 17-826, issued by the Attorney General on July 25, 2017; and
>
> (3) A May, 2016 memorandum issued by the OIG.

All three of the above sources were discussed thoroughly in this Court's opinion on the Preliminary Injunction.   (See City of Philadelphia, 280 F. Supp. 3d at 619-25).   The DOJ has not

presented any new argument as to those sources which changes the Court's prior determination that they do not demonstrate any adequate basis for the attachment of the Challenged Conditions. In fact, in some places, the administrative record reinforces that the imposition of the Challenged Conditions was arbitrary and capricious.

For example, Assistant Attorney General Peter Kadzik wrote Senator Richard Shelby a letter stating that "[w]ithhold the funding would have a significant, and unintended, impact on the underserved local populations who benefit from these programs, most of whom have no connection to immigration policy." (Administrative Record ("AR"), Ex. 3). In that same letter, Kadzik acknowledged that "many Department grant funds are formula-based" such that "the Department does not have the discretion to suspend funding at all." (Id.).[6]

Later, at a March, 2017, Senate Oversight Committee hearing, Attorney General Loretta Lynch explained that, with respect to local policies "that prohibit reporting illegal status" of certain individuals, under "the current state of the law, . . . that is a local matter." (AR, Ex. 12).

Thus, if anything, the Administrative Record bolsters this Court's view that the DOJ's decision to tie the Byrne JAG funds to the Challenged Conditions was arbitrary and capricious.[7]

## VI.   SPENDING CLAUSE (COUNT IV)

There was no specific testimony at the trial concerning the City's claim in Count IV that

---

[6] As stated *supra*, the Byrne JAG Program is a formula-based grant.

[7] As noted *supra*, while the City of Philadelphia did not move for summary judgment as to Counts IV through VI, the DOJ moved for summary judgment on all six counts of the Amended Complaint. The Court held under advisement the Defendant's Motion for Summary Judgment as to Counts IV through VI, and denied the motion as to Counts I-III. (See ECF 185). The Court also declined to rule on all six counts insofar as they pertained to the Certification Condition. (See id., at 1 ("Plaintiff's motion for partial summary judgment is **GRANTED** as to Counts I, II, and III of the Amended Complaint, that two of three Challenged Conditions (prison access and advance [notice]) are invalid as a matter of law."). For the sake of clarity, having now heard all evidence at trial and reviewed the parties' briefs throughout this litigation, the Court is now ruling that as a matter of law, the decision to impose all three conditions, including the Certification Condition, was arbitrary and capricious (Count III).

Defendant's actions violated the Spending Clause of the United States Constitution.   This Court incorporates by reference the discussion and holding in the Preliminary Injunction Opinion, 280 F. Supp. 3d at 639-47 which supported granting preliminary relief on this Count in favor of the City. Philadelphia's legal arguments are still persuasive and the Defendant has not made any successful or meritorious legal argument to the contrary.   Therefore, the Court will enter judgment in favor of the City on Count IV.

## VII.   <u>MURPHY V. NCAA</u> AND THE TENTH AMENDMENT – COMMANDEERING

### A.   Review of Preliminary Injunction Opinion

The Court's prior Memorandum in this case (deciding the motion for preliminary injunction) stated the following regarding the City's Tenth Amendment challenge to the DOJ's Certification Condition (requiring a certification of compliance with Section 1373):

> The Tenth Amendment states a "truism" that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."  <u>United States v. Darby</u>, 312 U.S. 100, 124 (1941); U.S. Const. Am. 10.
> . . .
>  [I]n the context of the Spending Clause, the Tenth Amendment represents a prohibition against "impermissible compulsion" or "commandeering," i.e., "when state participation in a federal spending program is coerced."  <u>NFIB</u>, 567 U.S. at 677 (dissent). Among many cases, we review several to guide this Court's Tenth Amendment analysis.

<u>City of Philadelphia</u>, 280 F. Supp. 3d at 647.   The Memorandum went on to discuss four cases:

> In <u>New York v. United States</u>, 505 U.S. 144 (1992), the Supreme Court addressed the constitutionality of three provisions of the Low-Level Radioactive Waste Policy Amendments Act of 1985 ("LLRWPAA"), finding only two of the three provisions consistent with "the Constitution's allocation of power to the Federal Government." <u>Id.</u> at 149.
>
> In <u>Printz v. United States</u>, 521 U.S. 898 (1997), the Supreme Court held that several provisions of the Brady Handgun Violence

Prevention Act were unconstitutional because they "purport[ed] to direct state law enforcement officers to participate, albeit only temporarily, in the administration of a federally enacted regulatory scheme." Id. at 904.

In NFIB v. Sibelius, 567 U.S. 519, the Supreme Court considered a challenge to the constitutionality of the Patient Protection and Affordable Care Act (ACA). As originally drafted, ACA provided substantial federal funds to states to expand their Medicaid programs, but if states chose not to accept the additional funds, they would not only forgo those funds, but lose all existing federal funds as well. The plaintiff States challenged the statute as unduly coercive. Justice Roberts, writing for a plurality of the Court, agreed. The plurality emphasized that decisions of the Court had "repeatedly characterized ... Spending Clause legislation as 'much in the nature of a *contract*.'" Id. at 576-77 (quoting Barnes v. Gorman, 536 U.S. 181, 186 (2002)). As such, states cannot freely accept funds where they are coerced into doing so by the lopsided terms of the grant. Id. at 577.

In City of New York v. United States, 179 F.3d 29 (2d Cir. 1999), New York City lodged a facial challenge against a federal statute which (similar to Section 1373 at issue in the present litigation) "prohibit[ed] state and local governments from limiting their employees in the voluntary provision of information about the immigration status of aliens to [INS]." Id. at 31. New York based its Tenth Amendment challenge on the conflict between those sections and City Executive Order No. 124, which prohibited city employees from transmitting information regarding the immigration status of aliens to federal immigration authorities except under certain situations. The Second Circuit found that the challenged provisions did not violate the Tenth Amendment because the provisions "do not directly compel states or localities to require or prohibit anything. Rather, they prohibit state and local governmental entities or officials only from directly restricting the voluntary exchange of immigration information with the INS." Id. at 35 (emphasis added).

See City of Philadelphia, 280 F. Supp. 3d at 648-51. Finally, the Court concluded:

Philadelphia is likely to succeed on the merits of its Tenth Amendment challenge to the Access, 48-hour Notice, and Certification conditions. As it pertains to the Certification condition, this argument is somewhat distinct from that presented in City of Chicago v. Sessions and City of New York v. U.S., in which

57

> Section 1373 itself was challenged on Tenth Amendment grounds.
> No. CV-17-C-5720, 2017 WL 4081821 (N.D. Ill. Sept. 15, 2017);
> 179 F.3d 29 (2d Cir. 1999).   This Court need not analyze the City's
> Tenth Amendment claim in detail, as the Court will not rely on it in
> considering whether to grant a preliminary injunction.
>
> …
>
> With respect to the Certification condition, this Court agrees with
> the Court in City of Chicago that Section 1373 (and in this case,
> compliance with it), "poses a unique and novel constitutional
> question."   2017 WL 4081821, at *12.   Literal compliance with
> Section 1373 would inherently prevent Philadelphia from, among
> other things, disciplining an employee for choosing to spend her
> free time or work time assisting in the enforcement of federal
> immigration laws.   See id.

City of Philadelphia, 280 F. Supp. 3d at 651.

## B.   Murphy v. NCAA

On May 14, 2018, the Supreme Court of the United States issued its opinion in Murphy v. NCAA, et al., 138 S. Ct. 1461 (2018).   In an opinion delivered by Justice Alito, the Supreme Court struck down provisions of the Professional and Amateur Sports Protection Act (PASPA), which generally made it "unlawful" for any "governmental entity" to "sponsor, operate, advertise, promote, license, or authorize by law or compact . . . a lottery, sweepstakes, or other betting, gambling, or wagering scheme based" on competitive sporting events (the "anti-authorization provision").   28 U.S.C. § 3702(1).[8]

Prior to enacting the law at issue in Murphy, in 2012, New Jersey passed a new law authorizing sports gambling, 2011 N.J. Laws p. 1723 (the "2012 Act"), which prompted the major professional sports leagues and NCAA to bring an action in federal court to enjoin the new law. One of New Jersey's arguments in defense of its new law was that PASPA unconstitutionally infringed on the State's authority under the Tenth Amendment.   For support, New Jersey relied

---

[8] PASPA also contained a "grandfather" provision allowing states such as Nevada to continue all forms of sports gambling that they had at the time PASPA was passed.   See 28 U.S.C. § 3704(a).

principally on <u>New York</u> and <u>Printz</u>, discussed <u>supra</u>.   The plaintiffs' primary argument against the application of <u>New York</u> and <u>Printz</u> was that "PASPA is critically different . . . because it does not command the States to take any affirmative act."   138 S. Ct. at 1471.   Much like the Second Circuit in <u>City of New York</u>, the first two courts to consider PASPA in the context of the 2012 Act (i.e., the district court and the Third Circuit) agreed with the plaintiffs' argument and upheld PASPA, finding it "significant that PASPA does not impose any affirmative command."   <u>Id.</u> New Jersey sought certiorari but the Supreme Court denied review.   <u>Christie v. NCAA</u>, 134 S. Ct. 2866 (2014).

As a result, New Jersey enacted a new law in 2014 (the "2014 Act"), declaring that "it is not to be interpreted as causing the State to authorize, license, sponsor, operate, advertise, or promote sports gambling."   <u>Murphy</u>, 138 S. Ct. at 1472.   The same plaintiffs sued and won in District Court, and the case was eventually heard by the Third Circuit sitting en banc, which affirmed the holding that the 2014 Act violated PASPA by "authorizing" sports gambling. <u>NCAA v. Governor of N. J.</u>, 832 F.3d 389 (2016).   New Jersey against sought a writ of certiorari, and this time, the Supreme Court granted review.   <u>Christie v. NCAA</u>, 137 S. Ct. 2327 (2017).

Justice Alito's majority opinion in <u>Murphy</u> explains that the anticommandeering doctrine "is simply the expression of a fundamental structural decision incorporated into the Constitution, <u>i.e.</u>, the decision to withhold from Congress the power to issue orders directly to the States." <u>Murphy</u>, 138 S. Ct. at 1475.   The opinion goes on to state that the PASPA provision at issue violated the anticommandeering doctrine because it "unequivocally dictate[d] what a state legislature may and may not do. . . . It is as if federal officers . . . were armed with the authority to stop legislators from voting on any offending proposals."   <u>Id.</u> at 1478.   The majority specifically labeled as "empty" the distinction that the plaintiffs sought to draw between "compel[ling] a State

to enact legislation . . . [and] prohibiting a State from enacting new laws." Id.  The majority opinion stresses that reading the Court's prior decisions to suggest that PASPA's "anti-authorization provision is constitutional" is a "misread[ing]" of those cases, because the Court had not, in any of those cases, "uph[eld] the constitutionality of a federal statute that commanded state legislatures to enact or refrain from enacting state law." Id.

The majority opinion also considered the plaintiffs' contention that the anti-authorization prohibition constituted a valid preemption provision, pursuant to the Supremacy Clause. Id. at 1479.  The opinion made clear that, "in order for the PASPA provision to preempt state law," it must: (1) "represent the exercise of a power conferred on Congress by the Constitution; pointing to the Supremacy Clause will not do," and (2) "be best read as [a provision] that regulates private actors," not States. Id.  In other words, "every form of preemption ["express," "conflict," and "field"] is based on federal law that regulates the conduct of private actors, not the States. Id. at 1480.  The pivotal reason that PASPA anti-authorization prohibition could not be construed as a preemption provision is that "there is no way in which this provision can be understood as a regulation of private actors." Id. at 1481.

From here, the majority opinion lost one of its votes, as Justice Breyer joined the dissenting justices' views as to the next topic addressed in Justice Alito's analysis: whether the Court's "decision regarding PASPA's prohibition of the authorization of licensing of sports gambling operations dooms the remainder of the Act." Id. at 1482.  Six justices (Alito, Thomas, Kennedy, Kagan, and Gorsuch, JJ.; and Roberts, C.J.) all agreed "that no provision of PASPA is severable from the provision directly at issue in these cases." Id. at 1484.  Justice Thomas concurred separately to express his "growing discomfort with…modern severability precedents." Id. at 1485 (2018) (Thomas, J., concurring). Justice Breyer wrote separately, concurring in the decision

that PASPA's anti-authorization provision violated the Tenth Amendment but dissenting as to the severability of PASPA as a whole.  Id. at 1488 (2018) (Breyer, J., concurring in part and dissenting in part).   Justice Ginsburg dissented, joined by Justice Sotomayor, disagreeing as to the severability of PASPA as a whole, but declining to express an opinion regarding whether the anti-authorization provision violated the Tenth Amendment.  Id. at 1488 (2018) (Ginsburg, J., dissenting).

Thus, in Murphy, seven Justices held that PASPA's anti-authorization provision violated the Tenth Amendment, and two Justices declined to express an opinion on that issue.

### C.        Effect of Murphy v. NCAA on Constitutionality of Section 1373

In Count VI of the City of Philadelphia's Amended Complaint, the City seeks a declaratory judgment that it complies with 8 U.S.C. § 1373, as constitutionally construed.

Defendant contends that the constitutionality of Section 1373 is not "relevant" to the Court's analysis, and that the Spending Clause provides the appropriate rubric for analyzing Plaintiff's claims.   (See Def. Post-Trial Br., at 5).   Therefore, Defendant claims, "Murphy has no bearing on this case."   (Id. at 6).   If this were correct, then Congress could pass blatantly unconstitutional statutes—including statutes already struck down as unconstitutional by courts—but essentially require states and localities to adhere to those statutes by tying a "certification" of compliance with those conditions to federal grants.   Because the JAG Byrne Program requires compliance with an unconstitutional statute (in this case, Section 1373) in order to receive grant funds, the Certification Condition is itself unconstitutional.

8 U.S.C. §§ 1373(a) and 1373(b) by their plain terms prevent "Federal, State, or local government entit[ies] or official[s] from" engaging in certain activities.   These provisions closely parallel the anti-authorization condition in PASPA which was at issue in Murphy.   Specifically,

the PASPA provision violated the Tenth Amendment because it "unequivocally dictates what a state legislature may and may not do." Murphy, 138 S.Ct. at 1478. Sections 1373(a) and (b) do the same, by prohibiting certain conduct of government entities or officials.

In defense of Sections 1373(a) and (b), Defendant suggests that the Constitution gives sole authorization to the national government to regulate matters of immigration (i.e., preemption). In fact, Defendant asserts, Section 1373 is merely "an information-sharing component of the overall removal scheme, in which the federal government takes full responsibility for regulation of and enforcement against individuals." (See Def. Post-Trial Br., at 6 (citing Arizona v. U.S., 567 U.S. at 409 for the proposition that "state law is pre-empted when it violates 'the principle that the removal process is entrusted to the discretion of the Federal Government.'"). However, the Supreme Court in Murphy made clear that, for a statute to preempt state law, it must not only "represent the exercise of a power conferred on Congress by the Constitution," but also "be best read as [a provision] that regulates private actors," rather than governmental entities or officials. 138 S.Ct. at 1479. Given their plain language, neither Section 1373(a) nor Section 1373(b) can be best read as regulating private actors. On their face, they regulate state and local governmental entities and officials, which is fatal to their constitutionality under the Tenth Amendment.[9]

The third, and only remaining subsection of Section 1373, is Section 1373(c), which does not apply to the City, but rather to ICE, and thus the City cannot be said to be out of compliance with Section 1373(c). Therefore, in light of the unconstitutionality of Sections 1373(a) and (b), (and the inapplicability of Section 1373(c)) the City need not comply with them.

---

[9] Defendant correctly points out that the Murphy majority opinon acknowledged a prior ruling in which it upheld a provision explicitly prohibiting a "State or political subdivision" from "enact[ing] or enforc[ing]" laws relating to air carrier rates. See Morales v. Trans World Airlines, Inc., 504 U.S. 374 (1992). However, Defendant fails to point out that the Court's discussion of Morales related to express preemption, which, for the reasons expressed in the text, does not apply to Section 1373 and did not apply in Murphy.

Defendant cites <u>Reno v. Condon</u>, 528 U.S. 141 (2000) and <u>Printz v. U.S.</u>, 521 U.S. 898 (1997) as support for their contention that Section 1373 is constitutional because it does not "regulate the States in their sovereign capacity to regulation their own citizens" but rather regulates "the States as the owners of data bases," <u>Reno</u>, 528 U.S. at 151, and thus "require[s] only the provision of information to the Federal Government."   <u>Printz</u>, 521 U.S. at 918.

<u>Reno</u> involved a challenge to the Driver's Privacy Protection Act (DPPA), which restricts the ability of states to disclose drivers' personal information, such as their medical information, Social Security number, telephone number, and photograph, without the driver's consent. Defendant has picked out a single sentence from <u>Reno</u>, which removed from context could be seen as supporting the contention that federal statutes may "regulate [] the States as the owners of data bases" without violating the Tenth Amendment.   528 U.S. at 151.   However, when the Supreme Court found that DPPA does not violate the Tenth Amendment, it did not base its holding on the fact that DPPA implicates the provision of information in furtherance of a federal statutory scheme.   Instead, the Supreme Court made clear that DPPA is constitutional because it does not "require [state legislatures] to enact any laws or regulations, and it does not require state officials to assist in the enforcement of federal statutes regulating private individuals."   <u>Id.</u>   In <u>Murphy</u>, the Supreme Court elucidated that restricting state legislatures from enacting certain laws or regulations is akin to requiring state legislatures to enact certain laws or regulations, and therefore struck down PASPA under logic closely aligned with its reasoning in <u>Reno</u>.   In fact, Respondents in <u>Murphy</u> attempted to use <u>Reno</u> in defense of PASPA, but the Supreme Court made clear that <u>Reno</u> did not "uph[o]ld the constitutionality of a federal statute that commanded state legislatures to enact or refrain from enacting state law."   Defendant's reliance on <u>Reno</u> to support the constitutionality of Section 1373 is misplaced.   Because Section 1373 directly tells states and

63

state actors that they must refrain from enacting certain state laws, it is unconstitutional under the Tenth Amendment.

Similarly, Defendant relies on dicta from Printz, stating that statutes "which require only the provision of information to the Federal Government[ ] do not involve . . . the forced participation of the States' executive in the actual administration of a federal program." 521 U.S. at 918. This snippet is actually part of a paragraph in which the Court summarized the Government's (failed) arguments in Printz, which struck down portions of the Brady Act as unconstitutional under the Tenth Amendment:

> The Government points to a number of federal statutes enacted within the past few decades that require the participation of state or local officials in implementing federal regulatory schemes. Some of these are connected to federal funding measures, and can perhaps be more accurately described as conditions upon the grant of federal funding than as mandates to the States; others, which require only the provision of information to the Federal Government, do not involve the precise issue before us here, which is the forced participation of the States' executive in the actual administration of a federal program. We of course do not address these or other currently operative enactments that are not before us; it will be time enough to do so if and when their validity is challenged in a proper case. For deciding the issue before us here, they are of little relevance.

Id. at 917–18.

It suffices to say that Printz's holding, which supports this Court's ruling that Section 1373 is unconstitutional, does not stand for the proposition for which Defendant has cited it.[10]

---

[10] Defendant also seeks to distinguish the statutory scheme at issue in Murphy from that at issue in the present case, speculating that the "analysis in Murphy likely would have been very different" if the law at issue had "merely required States to share information regarding sports betting operations to facilitate federal regulation." (Def. Post-Trial Br., at 7). However, Defendant's best citation in support of this contention is noteworthy because the statute cited (the Organized Crime Control Act of 1970 ("OCCA")) does **not** require states to provide any information to the national government. Among other things, the OCCA, Pub. L. No. 91-452, § 806, created a commission to evaluate the national policy towards gambling. That commission was "authorized to call upon . . . States to furnish, on a reimbursable basis or otherwise,

64

Because Section 1373 violates the Tenth Amendment of the Constitution, the City is entitled to a declaratory judgment on Count VI of its Amended Complaint.

### D.      The First Alternative Conclusion re §1373 – The Text Supports the City's Contentions

#### 1.      The Text of Section 1373 Does Not Require Compliance with the JAG Conditions

The Attorney General argues that 8 U.S.C. § 1373 itself requires the City to provide advance notice of release from City custody; in other words, that the Notice Condition—already preliminarily enjoined by the Seventh Circuit—is subsumed into compliance with the statute, imposing obligations independent of the Byrne awards and precluding the declaratory relief the City seeks.   Relying on the legislative history of the 1996 amendments to the INA, the Attorney General interprets the phrase "information regarding…citizenship or immigration status" in § 1373(a) to assert that "[i]nformation such as an alien's pending release from custody is 'information regarding' immigration status within the contemplation of Section 1373, particularly where the release date implicates the federal authority to take custody pursuant to the removal statute in 8 U.S.C. § 1231."   (Def.'s MSJ at 33).   The Attorney General attempts to buttress this argument with a citation to a passage in a California state case, <u>Bologna v. City & Cty. of San Francisco</u>, 192 Cal. App. 4th 429, 438 (2011), discussing the legislative history of § 1373.

The Attorney General neglects to mention that one federal court has already rejected its proposed reading of § 1373, as the City points out.   (Pl.'s Post-Trial Br. at 3 (citing <u>Steinle v. City & Cty. of San Francisco</u>, 230 F. Supp. 3d 994, 1015 (N.D. Cal. 2017)).   The City is correct that such a reading is simply impossible to square with the statutory text.

---

such statistical data, reports, and other information as the Commission deems necessary."   It is unclear why a statute authorizing a commission "to call upon" States is probative on the question of whether Section 1373, which speaks directly to what states themselves must do, is constitutional.

The City asserts that because the text of §1373 itself says nothing about providing advance notice of release, or about prisoner interviews, the Court cannot impose these requirements on the City.

### 2.     Cases Interpreting Section 1373:   <u>Bologna</u> and <u>Steinle</u>

The parties dispute the significance of two tort actions by the survivors of individuals who had been killed by undocumented immigrants in San Francisco; in both cases, those undocumented immigrants had previous contact with local law enforcement but had not been transferred to ICE custody.   <u>Steinle v. City & Cty. of San Francisco</u>, 230 F. Supp. 3d 994, 1004 (N.D. Cal. 2017); <u>Bologna v. City & Cty. of San Francisco</u>, 121 Cal. Rptr. 3d 406, 408-09 (2011).

#### a)     <u>Bologna</u>

<u>Bologna</u>, a case on which the DOJ relies, centered on an undocumented member of the MS-13 gang who had been arrested many times and spent time in a group home for juveniles. However, ICE was never notified about the MS-13 member's presence in the United States.   The plaintiffs alleged that the tortious harm at issue could have been avoided if ICE had been notified and the MS-13 member had been deported.   <u>Bologna</u>, 121 Cal. Rptr. 3d at 409.   The plaintiffs alleged negligence per se and violation of a mandatory duty imposed by § 1373.   <u>Id.</u>   The California Court of Appeal began with the premise that "[c]entral to claims asserting both negligence per se and violation of a mandatory duty is the requirement that the harm allegedly caused is of the precise nature a statute was designed to prevent."   <u>Id.</u> at 411.   Reviewing § 1373 itself, the court noted that the text "contain[ed] no indication that Congress intended the provision be enacted to protect individuals from violent crime."   <u>Id.</u> at 414.   The court then discussed the legislative history of § 1373 at length, concluding that the statute was intended "to facilitate the enforcement of federal immigration law by eliminating restrictions on the voluntary flow of

66

immigration information between state and local entities and federal immigration officials."   Id.
Thus, because both the text and the legislative history of § 1373 indicated that the statute was not
"designed to protect the public from violent crimes," the plaintiffs' tort claims failed as a matter of
law.   Bologna nowhere addressed whether § 1373 covered an individual's release date from local
custody.

**b)      Steinle**

In Steinle, an undocumented man who had been deported several times committed
homicide after being released from the custody of the San Francisco Sherriff's Department; prior
to his release, ICE had lodged a detainer seeking advance notice of his release, which the city did
not honor pursuant to existing city policy.   230 F. Supp. 3d at 1004.   Steinle's surviving relatives
accused the city of per se negligence, in part because § 1373 required the city to provide advance
notice of release to ICE, and the city's policy was therefore in violation of federal law.   Id. at
1014.

Disagreeing with Bologna's use of legislative history, the Court found that the statutory
language was clear.   Id. at 1014-15.   It continued:

> Nothing in 8 U.S.C. § 1373(a) addresses information concerning an inmate's
> release date. The statute, by its terms, governs only "information regarding the
> citizenship or immigration status, lawful or unlawful, of any individual." … no
> plausible reading of "information regarding ... citizenship or immigration status"
> encompasses the release date of an undocumented inmate. Because the plain
> language of the statute is clear on this point, the Court has no occasion to consult
> legislative history.

Id. at 1015.   The court then found that the plaintiffs' per se negligence claim failed as a matter of
law.   Id. at 1016.

**3.      Statutory Interpretation**

This Court agrees with the conclusion reached in Steinle: Section 1373(a), by its terms,

67

does not require advance notice of an individual's release from custody.

This Court nevertheless offers a few additional thoughts.   The Court is obliged to "assume that 'Congress expresses its intent through the ordinary meaning of its language' and therefore begin[s] 'with an examination of the plain language of the statute.'"   <u>Disabled in Action of Pennsylvania v. Se. Pennsylvania Transp. Auth.</u>, 539 F.3d 199, 210 (3d Cir. 2008) (quoting <u>Rosenberg v. XM Ventures</u>, 274 F.3d 137, 141 (3d Cir. 2001)).   The statute reads as follows, in relevant part:

> Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service <u>information regarding the citizenship or immigration status, lawful or unlawful, of any individual</u>.

8 U.S.C. § 1373(a) (emphasis added).

This language is entirely silent on the obligations of local correctional facilities, and nowhere mentions any requirement to provide advance notice of release for a non-citizen. Instead, § 1373(a) pertains only to "information regarding…citizenship or immigration status." The phrase "citizenship or immigration status," plainly means an individual's category of presence in the United States—e.g., undocumented, refugee, lawful permanent resident, U.S. citizen, etc.—and whether or not an individual is a U.S. citizen, and if not, of what country.   The phrase "information regarding" includes only information relevant to that inquiry.   When an individual will be released from a particular City facility, cannot be considered "information regarding" his immigration status.

### E.   Second Alternative Conclusion re §1373 – The City Complies with the JAG Conditions

The Preliminary Injunction Opinion reviewed in great detail various statutory and regulatory provisions concerning "criminal aliens," a specific category determined by Congress to

have priority for removal purposes.   <u>See</u> 280 F. Supp. 3d at 625-638.   The trial in this case contained significant evidence regarding criminal aliens.   The discussion below focuses on the legal aspects with regard to criminal aliens.

As to criminal aliens in City custody, the City complies (or substantially complies) with the JAG grant conditions.[11]

### 1.   <u>Demore v. Kim</u>, 538 U.S. 510, 513 (2003)

In <u>Demore v. Kim</u>, 538 U.S. 510, 513 (2003) the Supreme Court upheld the constitutionality of Section 1226(c), holding that "Congress, justifiably concerned that deportable criminal aliens who are not detained continue to engage in crime and fail to appear for their removal hearings in large numbers, may require that persons [charged with being deportable from the United States] be detained for the brief period necessary for their removal proceedings."   The Court emphasized the "fundamental premise of immigration law" that "Congress may make rules as to aliens that would be unacceptable if applied to citizens."   <u>Id.</u> at 521-22.   While noting that "[i]t is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings," the Court made clear that its precedent establishes "detention during deportation proceedings as a constitutionally valid aspect of the deportation process."   <u>Id.</u> at 523. The Court was not moved by the fact that other, less burdensome options may have been available as alternative approaches to mandatory detention, noting that "when the Government deals with deportable aliens, the Due Process Clause does not require it to employ the least burdensome means to accomplish its goal."   Id. at 528.

---

[11] Defendant has shown through Mr. O'Neill's testimony that under current ICE policies, ICE does not draw a distinction between criminal aliens and other removable aliens.   The Court considers this topic, if legally relevant to the JAG conditions, as questionable under constitutional standards, as discussed *infra* in greater detail.

The Supreme Court reviewed Congress's reasoning in enacting Section 1226(c), observing that "Congress adopted this provision against a backdrop of wholesale failure by the INS to deal with increasing rates of criminal activity by aliens," and detailing the evidence before Congress that deportable noncitizens failed to appear for removal proceedings at high rates.   Id. at 518-520. In light of Congress's wide discretion to legislate in this area, and the temporary nature of the detention at issue, the Court rejected the contention that Section 1226(c) is constitutionally defective.

2.     **Jennings** and **Dimaya**

In Jennings v. Rodriguez, 138 S. Ct. 830 (2018), the Supreme Court engaged in a statutory analysis of statutory provisions regarding detention pending removal, 8 U.S.C. § 1225(b)(1) and (2), 8 U.S.C. § 1226(a) and (c), ultimately holding that, subject only to explicit statutory exceptions, Sections 1225(b) and 1226(c) "authorize detention [of removable aliens] until the end of applicable [removal] proceedings," regardless of their duration, and that there is no basis for reading any additional entitlement to bond hearings into Section 1226(a), beyond that the statute provides.   Jennings, 138 S. Ct. at 842.

Under Section 1226(c), the Attorney General is required to detain any noncitizen who is inadmissible or deportable on criminal grounds.   An individual detained under Section 1226(c) may only be released pending a removal decision in very narrow circumstances, specifically, when the Attorney General determines that release is necessary to protect a witness, and that the alien does not pose a danger to society or a flight risk.   8 U.S.C. § 1226(c)(2).   The Court in Jennings held that the language of Section 1226(c) authorizes unlimited detention pending removal proceedings of an alien who is deportable on the basis of criminal involvement, and that no implicit restraint on the length of detention can be read into the statute.   Jennings, 138 S. Ct. at

847.

8 U.S.C. § 1225(b)(1) and (2) mandate the detention of certain undocumented aliens who are seeking admission into the United States and are intercepted at the border.   In particular, Section 1225(b)(1)(B)(ii) provides that an alien who is otherwise inadmissible but who intends to seek asylum, and who is determined to have a "credible fear of persecution," "shall be detained" pending review of his or her asylum application.   In Jennings, the Court held that Section 1225(b)(1) authorizes unlimited detention of aliens seeking admission to the United States pending evaluation of asylum applications.   Under Section 1225(b)(2) an alien seeking admission who "is not clearly and beyond a doubt entitled to be admitted…shall be detained" pending removal proceedings.   The Court held in Jennings that the language of Section 1225(b)(2) authorizes unlimited detention pending removal proceedings of aliens seeking admission who are not clearly admissible.   Jennings, 138 S. Ct. at 842-46.

Under 8 U.S.C. § 1226(a) an alien who is subject to removal on non-criminal grounds may be arrested and detained "[o]n a warrant issued by the Attorney General" pending removal proceedings.   The Attorney General may either continue to detain the alien pending removal proceedings, or "may release" her on a bond of $1,500 minimum, or on "conditional parole."   § 1226(a)(1)-(3).   Pursuant to 8 C.F.R. §§ 236.1(d)(1), 1236.1(d)(1), aliens detained under Section 1226(a) will be given a bond hearing at the outset of detention.   The Court in Jennings held that there is no statutory basis for a requirement that an alien held under 1226(a) be entitled to additional bond hearings beyond those explicitly referenced in the statute.   Jennings 138 S. Ct. at 842, 847-48.

In its recent decision in Sessions v. Dimaya, 138 S.Ct. 1204 (2018), a majority of the Court held that the term "crime of violence" in the Immigration and Nationality Act ("INA") is

71

impermissibly vague, for the same reasons the Court so held in <u>Johnson v. United States</u>, in interpreting a similar phrase in the Armed Career Criminal Act, 18 U.S.C. § 924(e).

The plurality opinion by Justice Kagan notes that under the INA, an alien convicted of an "aggravated felony" after entering the United States is deportable.   8 U.S.C. § 1227(a)(2)(A)(iii). Such an alien is also ineligible for cancellation for removal, a form of discretionary relief allowing some deportable aliens to remain in the country.   The opinion thus noted that removal is a virtual certainty for an alien found to have an aggravated felony conviction no matter how long he has previously resided in the United States.

The opinion goes on to note that the term "aggravated felony" contains a list of numerous offenses, often with cross-references to federal criminal statutes, of which "a crime of violence is one such cross-reference, with a definition, for which the term of imprisonment is at least one year."   The specified statute, 18 U.S.C. § 16, provides the Criminal Code's definition of a "crime of violence."   The Court then discusses the "categorical approach," how immigration judges have applied it, and how it was used in the present case to find that respondent was deportable as an aggravated felon.

The majority ultimately concluded that the term, "crime of violence," is ambiguous and thus unconstitutional.

Of particular note is the concurrence by Justice Gorsuch, noting the importance of "fair notice" in considering due process protections for individuals facing removal.   In his lengthy concurrence, Justice Gorsuch similarly notes the close relationship between a number of criminal laws and civil penalties.[12]

Today's decision sweeps narrowly in yet one more way.   By any

---

[12]  This situation arises in the present case, where there is a defined concept of "criminal alien" who is in danger of being on the losing side of a civil procedure, which is removal from the United States.

fair estimate, Congress has largely satisfied the procedural demand of fair notice even in the INA provision before us.   The statute lists a number of specific crimes that can lead to a lawful resident's removal—for example, murder, rape, and sexual abuse of a minor. 8 U.S.C. § 1101(a)(43)(A).   Our ruling today does not touch this list.   We address only the statute's "residual clause" where Congress ended its own list and asked us to begin writing our own. Just as Blackstone's legislature passed a revised statute clarifying that "cattle" covers bulls and oxen, Congress remains free at any time to add more crimes to its list.   It remains free, as well, to write a new residual clause that affords the fair notice lacking here.

138 Sup. Ct. at 1233.

### 3.   City Complies with § 1373

Given Congressional emphasis on removal of criminal aliens, which the Court documented in the preliminary injunction opinion, bolstered by the recent <u>Jennings</u> case, the Court must come to the conclusion that federal law distinguishes in material respects between aliens with criminal convictions, and other aliens, with mandatory detention pending removal applying only to the former.   A criminal alien who is about to be released from a prison, whether federal or state or local, is not necessarily entitled to freedom, because under 8 U.S.C. § 1226, they may be lawfully detained pending removal.

There was substantial testimony about the practical impact of City policies and the ICE policies, as to criminal aliens.

During the trial, the Court asked a number of questions to several witnesses as to the reach of the City's policies with regard to criminal aliens in City jails who have been sentenced and thus presumptively have a release date.   The Court sent counsel a letter with questions (ECF 198), and received responses on May 18, 2018 from the City (ECF 203) and Defendant (ECF 204).

The evidence disclosed a potentially serious consequence from a public safety and law enforcement safety perspective: the City is obliged to release this individual when he has

73

completed his sentence.   ICE is well within its rights to take that person into custody, under §1226, pending removal proceedings.   Jennings held that this person does not have any right to be released pending the outcome of the removal proceedings, although this individual may have certain personal factual reasons that may justify non-removal or release at some point (e.g., cooperation with law enforcement).

Nonetheless, the situation as described by ICE supervisor O'Neill reflects a serious potential for danger to the public and to law enforcement officers.   ICE should not be forced to "hunt down" this person.

The trial testimony went into great detail on this issue.   The City's policy was ambiguous during the last two years, as interpreted by certain police officials.   However, it is now very clear that if ICE secures a a "judicial warrant," with a judicial signature (not including an ICE judge), the City will facilitate the transfer of custody to ICE in a secured environment, and will disclaim any interest or ability to look at the facts behind that signed judicial order.

The Court finds that the City has made a considerable change in its prior approach by the following commitment in its letter of May 18, 2018:

> In sum and as explained below, if the United States Department of Justice changes restrictions on U.S. Attorneys for approval of ICE detainer requests for presentation to a judge, or if the local ICE office and the local U.S. Attorney's Office were to adopt a policy in which the U.S. Attorney will agree to approve and process an ICE request for a detainer as to a criminal alien, for presentation to a U.S. District Court Judge or U.S. Magistrate Judge, who in turn signs this document—whether termed an arrest warrant or a federal judicial court detainer—the City *would be willing* to notify either the U.S. Attorney or ICE before the release of such individuals and to facilitate the transfer of such individuals into ICE custody from the Philadelphia Prison System ("PPS") or Philadelphia Police Department ("PPD") detention facilities.

(ECF 203).

The Defendant stated that it is unwilling to accept this proposal for a number of different reasons.   Fundamentally, the Defendant is unwilling to limit its application of the JAG conditions to criminal aliens.   Defendant insists that, because the current administration will seek removal of any and all undocumented aliens, regardless of how long they have been present in the United States or under what circumstances they arrived, it is not going to adopt any practice that is limited to criminal aliens.

Although this policy may be justified in some localities in the United States, it is not justified in Philadelphia.   Moreover, the Court finds that it is inconsistent with the Spending Clause, which requires a discernible relationship between the JAG Program and the conditions that are attached to JAG grants.   Such a relationship is indiscernible insofar as it is not limited to criminal aliens.   Therefore, the Court concludes that the Defendant's objections to the Court's proposal are unfounded in law.

The Court also rejects all of the other reasons stated in the Defendant's May 18 letter as to why the DOJ cannot change its policies.   These include the inexplicable refusal of the DOJ and the DHS to come together and establish a procedure, with the United States Attorney's Office for the Eastern District of Pennsylvania, to prepare and process a proposed "court order" to be signed by a U.S. District Judge or a Magistrate Judge, based upon facts shown, that an individual in City custody qualifies as a criminal alien and is about to be released from a City prison facility.

The unfortunate, unseemly and unnecessary spectacle of ICE officers hunting down this individual on City streets or within homes of third parties, to avoid detection, is unacceptable. Transfer of jurisdiction from the City to ICE must take place in a safe law enforcement environment, such as the City prison or PDU.

Defendant fails to provide any reason why the Attorney General, or the local U.S. Attorney, and the Secretary of DHS, or a local ICE official, cannot adopt, very quickly, changes in current procedures to show that an individual in City prisons qualifies as a criminal alien under federal law, thereby showing that ICE is entitled to take custody of that person upon their release from City custody.  This procedure could then be used in circumstances in which the United States Attorney's Office seeks a judicial order that the individual be taken into custody by ICE upon release from the City prison.

The reasons why the DOJ rejects this approach are unfounded.

(1) ICE does have access to criminal records and does have access to City prison records and can learn that a person in City custody who qualifies as a criminal alien who is serving a sentence, is about to be released.  ICE can notify the City of its desire and intent to take that person into custody.

(2) When that happens, a government attorney and agent, as is the usual practice in seeking a search warrant or a Title III order, can contact a District or a Magistrate Judge with the facts and the request for a judicial order for detention.  The Judge can then issue an order that this person be turned over to ICE.  The City has now made clear it will recognize this order and allow for the transfer to take place within the City prison or the Philadelphia Police Department.

(3) The Defendant's assertion that this would unduly take the time of judicial officers is unfounded, and in some respects, insulting to the Judges of this Court.  Although the government asserts that there are "substantial burdens," the Court believes that the suggested procedure would actually

76

make this less time consuming and more effective for the public, the
subjects involved, and law enforcement officers, than continuing the
endless debate about ICE immigration detainers, which, as the Third Circuit
held in <u>Galarza</u>, are not binding on state or City officials.   745 F.3d 634 (3d
Cir. 2014).

Given the above exposition of the facts surrounding the Defendant's "advance notice"
condition, the Court finds that the City is in compliance.

The Court has considered whether it should order the Defendant Attorney General to adopt
administrative/procedural practices within the Eastern District of Pennsylvania, whether as a
permanent procedure or on a trial basis, requiring ICE to request a "judicial order" against criminal
aliens known by ICE to be in City custody.   This would provide for security and common sense
protocol for handing over of criminal aliens from City custody to federal custody at the conclusion
of the state-imposed sentence.

The Court has not discussed to any great extent the legal issues surrounding the removal of
non-citizens who do not have any criminal convictions, sometimes referred to as "non-criminal
aliens."   As a general matter, ICE asserts it has authority to arrest and detain these individuals, and
there are some older U.S. Supreme Court cases that have upheld this concept.   <u>See</u> <u>Wong Wing v.</u>
<u>U.S.</u>, 163 U.S. 228 (1896) and <u>Carlson v. Landam</u>, 142 U.S. 524 (1952).   The Court notes,
however, that the facts of those cases are significantly different from the facts concerning a typical
visa over stayer who has been in the United States for decades, with a steady job, family, and no
criminal convictions.   More recent cases have emphasized the requirement for probable cause
before a non-citizen can be arrested or detained.   <u>See</u> <u>Babula v. INS</u>, 663 F.2d 293 (3d Cir. 1981).
In view of the other holdings in this case, this Court need not dwell on these legal issues any further

77

at this time.

## VIII.   STANDARD FOR PERMANENT INJUNCTION AND STANDARD OF REVIEW

### A.      Permanent Injunction Standard

The Third Circuit employs a four-part standard for evaluating a request for a permanent injunction, and must consider whether:

> (1) the moving party has shown actual success on the merits;
>
> (2) the moving party will be irreparably injured by the denial of injunctive relief;
>
> (3) the granting of the permanent injunction will not result in even greater harm to the defendant; and
>
> (4) the injunction would be in the public interest.

Coffelt v. Fawkes, 765 F.3d 197, 201 (3d Cir. 2014) (quoting Shields v. Zuccarini, 254 F.3d 476, 482 (3d Cir. 2001).[13]

The Third Circuit reviews the grant or denial of a permanent injunction for abuse of discretion, but reviews all legal conclusions de novo.   Coffelt, 765 F.3d at 201.   Findings of fact are reviewed for clear error.   Stolt-Nielsen, S.A. v. United States, 442 F.3d 177, 182 (3d Cir. 2006), as amended (May 16, 2006), Ferring Pharm., Inc. v. Watson Pharm., Inc., 765 F.3d 205, 215 n.9 (3d Cir. 2014), held "[t]he standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that [for a preliminary injunction] the plaintiff must [only] show a likelihood of success on the merits rather than actual success."

---

[13] The Supreme Court has announced a slightly different four-factor standard for the grant of permanent injunctions: under that test, a plaintiff "must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."   Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 156–57 (2010) (quoting eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391 (2006)).

B.      **Arguments of the Parties**

The City argues that it has met the standards for declaratory, injunctive and mandamus relief.  The Attorney General disagrees, and asks this Court to decline to enter the requested equitable relief, and remand the matter to the Department of Justice; in particular, the Attorney General asserts that the City has shown no basis for enjoining the Challenged Conditions, as, in its view, the City has not established irreparable harm and the balance of the equities tips in favor of the Attorney General.  With respect to the Notice Condition, the Attorney General argues that there is no impediment to providing advance notice, the City has not established that harm would result to the immigrant community if advance notice were provided, and irreparable harm would result to public safety, including the safety of ICE officers, if individuals in City custody were released without notice.  The Attorney General, which views advance notice as part of Section 1373 compliance, repeats these arguments with respect to the Certification Condition.  As to the Access Condition, the Attorney General asserts that the City's refusal to allow interviews at the PDU and its use of the consent form interfere with ICE's mission and therefore should not be enjoined.  Finally, the Attorney General argues that the City cannot establish irreparable harm from not receiving its Byrne award, and overstates its need for the Byrne funds.

C.      **Injunctions Against Unconstitutional Grant Conditions**

The most factually apposite cases regarding permanent injunctions against enforcement grant conditions are other district court opinions regarding recent attempts to impose immigration enforcement priorities on localities.  In County of Santa Clara v. Trump, 275 F. Supp. 3d 1196 (N.D. Cal. 2017),[14] a later decision in a case discussed in this Court's preliminary injunction memo, the district court permanently enjoined Section 9(a) of the Executive Order issued by

---

[14]  An earlier decision in the same case, City of Santa Clara v. Trump, 250 F. Supp. 3d 497 (N.D. Ca. 2017) was cited and discussed in the Preliminary Injunction Opinion, see 280 F. Supp. 3d at 597-99.

President Trump that ordered the Attorney General and the Secretary of the Department of Homeland Security to "ensure that jurisdictions that willfully refuse to comply with 8 U.S.C. 1373 (sanctuary jurisdictions) are not eligible to receive Federal grants, except as deemed necessary for law enforcement purposes." Id. at 1201 (quoting Enhancing Public Safety in the Interior of the United States, 82 FR 8799).

Similarly, the city of Los Angeles challenged grant conditions identical to the first two Challenged Conditions in this litigation (jail access and advance notice) attached by the Department of Justice to competitive grants to local jurisdictions to hire officers for community-oriented policing ("COPS"). City of Los Angeles v. Sessions, 293 F. Supp. 3d 1087 (C.D. Cal. 2018). Complying with these conditions would entitle applicant jurisdictions for "additional consideration points" beyond the scores their applications would receive. Id. at 1093. The court found that these conditions, under the COPS statute, 34 U.S.C. § 10381, et seq., were ultra vires, in violation of the Spending Clause, and arbitrary and capricious. Id. at 1095-1100. The district court issued a nationwide permanent injunction, finding the city would suffer "irreparable competitive harm" if the conditions were not enjoined, because it would be at a disadvantage in future grant cycles, the city had a strong interest in competing for funds, and the federal government lacked a legitimate interest in unconstitutional distributions of funds. Thus, the Court held that an injunction was necessary in order to prevent the violation of constitutional rights. Id. The district court entered a nationwide injunction to ensure an "even playing field." Id. at 1101.

### D.     Irreparable Harm

The City has established that it will suffer irreparable harm absent an injunction. The Court's finding of irreparable injury from the preliminary injunction stage, see City of

Philadelphia, 280 F. Supp. 3d at 655-57, remains equally applicable at the permanent injunction stage.   This Court found that, under any of the courses of action the City might take given the Attorney General's imposition of the Challenged Conditions—accepting the grant and changing its policies; accepting the grant without changing its policies at risk of sanctions; or foregoing the funds—all caused the City irreparable harm.   Id.

The Third Circuit has not had opportunity to find whether the specific constitutional injuries alleged here, including violations of the Tenth Amendment and the Spending Clause, necessarily constitute irreparable harm.   However, in Printz, the two district courts considering Tenth Amendment challenges to the Brady Act had issued permanent injunctions against enforcement of the provisions at issue, but neither addressed the issue of irreparable injury.   Mack v. United States, 856 F. Supp. 1372, 1374 (D. Ariz. 1994); Printz v. United States, 854 F. Supp. 1503 (D. Mont. 1994).   After the Ninth Circuit found no Tenth Amendment violation and vacated the injunctions, Mack v. United States, 66 F.3d 1025, 1033 (9th Cir. 1995), the Supreme Court reversed the Ninth Circuit, finding that the law commandeered state officers, but did not discuss either the injunction or irreparable injury.   Printz, 521 U.S. 898 (1997).   The Supreme Court's unequivocal anti-commandeering holding strongly suggests that Tenth Amendment violations constitute irreparable harm for purposes of a permanent injunction.

Moreover, since this Court entered its preliminary injunction, the Seventh Circuit affirmed the ruling of the district court in the Seventh Circuit Chicago litigation, where the lower court had held, at the preliminary injunction stage, that "forcing the City either to decline the grant funds based on what it believes to be unconstitutional conditions or accept them and face an irreparable harm, is the type of 'Hobson's choice' that supports irreparable harm."   City of Chicago v. Sessions, 264 F. Supp. 3d 933, 950 (N.D. Ill. 2017), aff'd, 888 F.3d 272 (7th Cir. 2018).   Notably,

the Attorney General did not challenge the finding of irreparable harm on appeal to the Seventh Circuit.   City of Chicago v. Sessions, 888 F.3d 272, 282 (7th Cir. 2018).

The trial testimony also supports a finding of irreparable harm as a factual matter, thereby satisfying the legal standard.   Several witnesses testified to irreparable harm from the consequences of changing City policies to accede to the Challenged Conditions.   Police Commissioner Ross reiterated his earlier testimony that the City's ability to fight crime is impaired when victims and witnesses are afraid to report crimes for fear of immigration consequences.   Eva Gladstein testified that immigrants would be less likely to avail themselves of City services, such as substance abuse and treatment services, if they feared that their immigration status would be revealed to ICE.   Brian Abernathy described other risks to health and safety if immigrants perceive the City to be an "extension of ICE," such as unlicensed construction.   At the preliminary injunction hearing, Dr. Farley testified about the potential risks to public health if immigrants did not feel safe seeking care at City clinics.   See City of Philadelphia, 280 F. Supp. 3d at 609.

At other times, trial witnesses discussed irreparable harm if the City did not receive the Byrne funds.   Julie Wertheimer testified that, as a significant part of its battle against opioid abuse, the City needs JAG funds to purchase adequate amounts of Narcan.   City employees carrying Narcan have saved "numerous lives…during overdoses," but over 1,200 deaths from opioid overdoses nonetheless occurred last year in Philadelphia.   (Day 2 Tr. 40:1-8).   Although Ms. Wertheimer acknowledged that the City has obtained some Narcan from sources besides the Byrne grants, she testified that the City was "constantly trying to distribute more and more Narcan and need all of the supplies of it that we can get."   (Id. 40:11-13).

The Attorney General's arguments against a finding of irreparable injury are unavailing.

The Attorney General, who disputes the City's constitutional claims, cites Adams v. Freedom Forge Corp., 204 F.3d 475 (3d Cir. 2000), an ERISA case involving no constitutional claims, for the proposition that injunctive relief cannot be entered upon speculation alone.   (Def.'s Post-Trial Br. at 14).   Yet the constitutional harms are real, and the harms to public health and safety are real.

The Attorney General also downplays the importance of the Byrne funds to the City.   The Attorney General asserts that the $1.598 million at stake in this litigation represents "less than one third of one percent of the Philadelphia Police Department's budget for FY 2017," see Def.'s Post-Trial Br. at 24, but this number is misleading.   The Court previously found that "between 96–98%" of the Philadelphia Police Department budget is allocated to "personnel costs and benefits," and the $1.598 million in Byrne funds at issue is "significant to crime fighting efforts and represents 10% of non-personnel costs" of the Philadelphia Police Department.   City of Philadelphia, 280 F. Supp. 3d at 601.

The third factor also weighs in favor of granting an injunction—the granting of the permanent injunction would not result in even greater harm to the Attorney General.   The supposed harms to the Attorney General are not realistic.   They would not, in fact, constitute any harm to the Attorney General; he must simply pay money that Congress has already allocated.

Finally, enjoining the Challenged Conditions serves the public interest.   The Court continues to believe, as it stated over six months ago, that "the public interest is better served if the City is not forced to choose between foregoing the JAG Grant funds and losing hard-fought goodwill amongst the immigrant community."   280 F. Supp. 3d at 658.   Enjoining constitutional violations also furthers the public interest.   See Swartzwelder v. McNeilly, 297 F.3d 228, 242 (3d Cir. 2002) ("the public interest is best served by eliminating the unconstitutional restrictions").

## IX.   DECLARATORY JUDGMENT

The City also seeks a declaratory judgment that it complies with 8 U.S.C. § 1373. Although the Court has concluded that this statute is facially unconstitutionally under the Tenth Amendment, and thus need not be complied with, the Court nonetheless wishes to address this issue as an alternative ground for its holding.

The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction… any court of the United States… may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

The Attorney General makes two arguments against granting a declaration, in addition to its position on the merits that the City does not comply with Section 1373.   The first is that even if the City had met its burden of showing compliance with Section 1373, the Court should simply decline to use its discretion to enter a declaratory judgment, an argument to which it devotes all of a paragraph.   Declaratory judgments are indeed "discretionary," see Kelly v. Maxum Specialty Ins. Grp., 868 F.3d 274, 281 (3d Cir. 2017), but the Court believes that, especially after proceedings this prolonged, if the City has met its burden of showing compliance with Section 1373—and it has—it is entitled to the declaration it seeks.

The Attorney General also argues, in a footnote to its post-trial brief, that his "primary contention" regarding the inappropriateness of declaratory relief is that "the City's claim for declaratory relief improperly preempts the administrative process…and that review of any such administrative decision should be subject to the APA's arbitrary and capricious standard." (Def.'s Post-Trial Br. at 8 n.4).   In context, this refers to an earlier discussion in the Attorney General's summary judgment motion of the ripeness of the City's claims, which the City brought

84

while the Attorney General continued to assess whether the City complied with Section 1373. (See Def.'s Mot. for Summ. J. at 32).   Ripe controversies must exist, as the Attorney General correctly asserts, for a court to issue a declaratory judgment.   See, e.g., Lewis v. Alexander, 685 F.3d 325, 341 (3d Cir. 2012) ("[r]ipeness requires a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment") (internal quotation marks omitted).   Because the Court has found, for the reasons discussed in preceding sections, that the City's claims are ripe, this argument is no impediment to the issuance of declaratory relief.[15]

Because the City is in compliance with Section 1373 as to criminal aliens, the Court will issue the requested declaration.

## X.   MANDAMUS

The City also requested that this Court issue a writ of mandamus compelling the Attorney General to immediately disburse Philadelphia's FY 2017 JAG award.   Specifically, the City cites as authorities for such relief the following two statutes:

> (1) The Mandamus Act, 28 U.S.C. § 1361, which authorizes the Court "to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff," and,

> (2) The APA, 5 U.S.C. § 706(1), which authorizes the Court to "compel agency action unlawfully withheld or unreasonably delayed."

However, a claim seeking mandamus under the Mandamus Act is essentially the same as one for relief under the APA, such that only the APA claim warrants discussion below. Independence Mining Co., Inc. v. Babbitt, 105 F.3d 502, 507 (9th Cir. 1997) (quoting Japan Whaling Ass'n v. Am. Cetacean Soc'y, 478 U.S. 221, 230 n.4 (1986) (electing to analyze

---

15 This passage in the Attorney General's summary judgment briefing also suggests that Byrne awards were conditioned not on the certification of compliance—which the City made—but upon compliance with the statute itself.   Especially because of the importance of the interests at stake, it is therefore all the more important that a court have an opportunity to construe and apply this statute.

plaintiff's entitlement to relief under the APA)); accord Ahmed v. Holder, 12 F.Supp.3d 747, 752

n. 3 (E.D. Pa. 2014) (addressing only the APA claim), Han Cao v. Upchurch, 496 F.Supp.2d 569,

575 (E.D. Pa. 2007) (labeling as "coextensive" the scope of the "mandamus statute and the APA").

The relevant factors under Section § 706(1) are:

(1) The length of time that has elapsed since the agency came under a duty to act,

(2) The reasonableness of the delay . . . in the context of the statute authorizing the agency's action,

(3) The consequences of the agency's delay, and

(4) Any plea of administrative error, administrative inconvenience, practical difficulty in carrying out a legislative mandate, or need to prioritize in the face of limited resources.

Prometheus Radio Project v. FCC, 824 F.3d 33, 39-40 (3d Cir. 2016).

As to the first factor, Philadelphia filed its JAG application on September 5, 2017, but has

not received its award.  (ECF 179, Joint Stipulated Facts, ¶ 63).  Typically, the JAG awards are

received by September or August of the relevant grant year.  (Id. ¶ 45).  According to the DOJ,

the DOJ's review of the City's FY 2017 application remains in "continued pendency," purportedly

because the DOJ is still assessing the City's compliance with Section 1373.  (DOJ Post-Trial

Brief, ECF 155-1, at 41).  However, it bears emphasis that Congress specifically set the JAG

Program as an annual award, and the DOJ's delay has precluded the City from receiving the

intended award at such time as the City can make timely use of it.[16]

Thus, as to the second factor, the "reasonableness of the delay . . . in the context of" the

authorizing statute, this factor also favors the City, primarily because the JAG statute is a formula

---

[16] Because this case arises in the context of an annual grant program, a one-year delay represents a far greater delay than might be the case in a different context.  This is not akin to the amount of time delay at issue in cases such as Prometheus, 824 F.3d 33, which considered the failure of an agency to act in a rulemaking capacity.

(rather than discretionary) grant, see Philadelphia v. Sessions, 280 F.Supp.3d at 593-94,[17] but also because the JAG Program enabling statute is couched in mandatory language.   34 U.S.C. §10156(a)(1) specifically states that "[o]f the total amount appropriated for [the JAG Program], the Attorney General shall . . . allocate" money according to the statutory formula.[18]

As for the third factor, "the consequences of the agency's delay," the Court emphasizes the concerns espoused in the Court's discussion, *supra*, of irreparable harm.

With respect to the fourth and final factor, "any plea of administrative error, administrative inconvenience, practical difficulty in carrying out a legislative mandate, or need to prioritize in the face of limited resources," the DOJ has not presented any mitigating evidence on this element, despite Plaintiff seeking *mandamus* relief since filing its Amended Complaint in January (see ECF 84).

Throughout this Court's opinion *supra*, the Court has made clear that the DOJ may not lawfully preclude the City of Philadelphia from receiving JAG Program funds based on alleged noncompliance with the Challenged Conditions.   The DOJ has maintained throughout this litigation that it "has not yet acted on the City's FY 2017 Byrne JAG application."   (See, e.g., ECF 155-1, Def. MSJ, at 10).   Therefore, given this Court's holding that the Challenged Conditions are unconstitutional, are not statutorily authorized, and were imposed in an arbitrary and capricious

---

[17] In fact, in prior cases in which Congress adopted a formula grant, such grants were understood to be mandatory.   See U.S. ex rel. Bauchwitz v. Holloman, 671 F.Supp.2d 674, 680 n. 16 (E.D. Pa. 2009); see also Udall v. State of Wisconsin, 306 F.2d 790, 793 (D.C. Cir. 1962) (holding, in the context of reviewing a writ of mandamus, that grants to the states under a federal wildlife grant program were not discretionary because the amount to be allocated was determined pursuant to a statutory formula).

[18] To support its contention that the JAG statute allows for DOJ discretion, the DOJ points to 34 U.S.C. § 10152(a)(1), which provides that, "[f]rom amounts made available to carry out this part, the Attorney General may, in accordance with the formula established [], make grants to States and units of local government."   However, read in the context of the JAG Program as a non-discretionary formula grant, it is clear that this subsection does not enable the DOJ to withhold funds to which state and local governments are otherwise entitled under the statutory formula, but rather reflects that some eligible grantees may choose not to apply for funding.

manner, see Naporano Metal & Iron Co. v. Sec. of Labor, 529 F.2d 537 (3d Cir. 1976), the Court will grant mandamus relief in favor of Plaintiff, the parameters of which will be determined after opportunity for the parties to suggest the more appropriate specific relief.

## XI.   CONCLUSIONS OF LAW

1.      The City's policies and practices described in the memorandum are reasonable, rational, and an appropriate exercise of municipal authority under the Constitution and laws of the United States and Pennsylvania.

2.      The Attorney General's conditions have been imposed in violation of the Administrative Procedure Act, and are arbitrary and capricious, Counts I-III.

3.      The Attorney General's imposition of the three conditions is invalid because it violates statutory and constitutional law.

4.      The Attorney General's conditions violate the Spending Clause of the United States Constitution, Count IV.

5.      8 U.S.C. § 1373 is unconstitutional under the Supreme Court's decision in Murphy v. NCAA, Counts V.

6.      Plaintiff has proved, pursuant to the applicable burden of proof, that it is entitled to equitable relief, as requested in the Complaint, Count VI.

7.      Defendant's defenses are rejected and do not warrant any diminution in the relief requested by Plaintiff.

8.      Alternatively, if the conditions imposed by the Attorney General are valid, the City is in compliance, or substantial compliance.

9.      The City will suffer irreparable harm if the relief requested is not granted.

## XII.   CONCLUSION

For the foregoing reasons, the Court will grant equitable relief in favor of Plaintiff, the exact terms to be determined by the procedure set forth in the accompanying Order below.[19]

---

[19]  When deciding a case within the broad topic of immigration, a judge may be tempted to cut a wide swath into many issues about which public debate continues.   This opinion purposely sticks to the issues concerning the JAG grants to Philadelphia.   However, assuming the accuracy of current estimates that 11 million undocumented aliens are residing in the United States, most of them living peacefully with families, children and good jobs – in contrast to the small number who would qualify as criminal aliens – the complex issues in this case demonstrate the sheer impossibility, as well as great expense, of relying on a policy of "removal" (deportation) of all undocumented aliens.   The idea that the judicial process, with the necessary procedures and protections and appellate reviews, can accomplish this task is completely unrealistic.   An ICE official in this case testified that many cases take at least several years to resolve, with great expense to the taxpayers and the parties.   From a judge's point of view, Congress needs to act.